# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **GOLDENTREE MASTER FUND, LTD.; GTAM 110 DESIGNATED ACTIVITY COMPANY; GOLDENTREE DISTRESSED MASTER FUND III LTD.; GOLDENTREE DISTRESSED MASTER FUND 2014 LTD.; GOLDENTREE DISTRESSED ONSHORE MASTER FUND III LP; GOLDENTREE STRUCTURED PRODUCTS MASTER FUND VII (2020) LP; GOLDENTREE DISTRESSED FUND 2014 LP; GOLDENTREE STRUCTURED PRODUCTS OPPORTUNITIES OFFSHORE FUND EXTENSION HOLDINGS, LLC; GOLDENTREE MULTI-SECTOR MASTER FUND ICAV - GOLDENTREE MULTI-SECTOR MASTER FUND PORTFOLIO A; GOLDENTREE INSURANCE FUND SERIES INTERESTS OF THE SALI MULTI-SERIES FUND L.P.; GOLDENTREE 2017 K-SC, LTD.; GOLDENTREE STRUCTURED PRODUCTS OPPORTUNITIES DOMESTIC FUND EXTENSION HOLDINGS, LLC; FS CREDIT INCOME FUND; GOLDENVEST LLC; GOLDENTREE MULTI-SECTOR FUND OFFSHORE ERISA, LTD.; GOLDENTREE DISTRESSED MASTER FUND IV LTD.; GOLDENTREE HIGH YIELD VALUE FUND OFFSHORE (STRATEGIC), LTD.; GOLDENTREE DISTRESSED FUND IV LP; GOLDENTREE MULTI SECTOR-C LP; GOLDENTREE STRUCTURED PRODUCTS - C II LP; GOLDENTREE STRUCTURED PRODUCTS - C LP; GOLDENTREE V1 MASTER FUND, L.P.; GT CREDIT FUND LP; GT G DISTRESSED FUND 2020 LP;** and **SYNCORA GUARANTEE INC.,** | **COMPLAINT**<br><br>No. 23-_____<br><br><br>**Civil Action; Violations of Constitutional Rights and Puerto Rico Law** |
| Plaintiffs | |
| v. | |
| **THE COMMONWEALTH OF PUERTO RICO**; **PEDRO PIERLUISI**, in his individual capacity and his official capacity as Governor of Puerto Rico; **OMAR J. MARRERO**, in his individual capacity and his official capacity as executive director of the Puerto Rico Fiscal Agency and Financial Advisory Authority; and the **PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY**, | |
| Defendants. | |

- 1 -

## COMPLAINT

GoldenTree Master Fund, Ltd., GTAM 110 Designated Activity Company, GoldenTree Distressed Master Fund III Ltd., GoldenTree Distressed Master Fund 2014 Ltd., GoldenTree Distressed Onshore Master Fund III LP, GoldenTree Structured Products Master Fund VII (2020) LP, GoldenTree Distressed Fund 2014 LP, GoldenTree Structured Products Opportunities Offshore Fund Extension Holdings, LLC, GoldenTree Multi-Sector Master Fund ICAV - GoldenTree Multi-Sector Master Fund Portfolio A, GoldenTree Insurance Fund Series Interests of the SALI Multi-Series Fund, L.P., GoldenTree 2017 K-SC, Ltd., GoldenTree Structured Products Opportunities Domestic Fund Extension Holdings, LLC, FS Credit Income Fund, GoldenVest LLC, GoldenTree Multi-Sector Fund Offshore ERISA, Ltd., GoldenTree Distressed Master Fund IV Ltd., GoldenTree High Yield Value Fund Offshore (Strategic), Ltd., GoldenTree Distressed Fund IV LP, GoldenTree Multi Sector-C LP, GoldenTree Structured Products - C II LP, GoldenTree Structured Products - C LP, GoldenTree V1 Master Fund, L.P., GT Credit Fund LP, GT G Distressed Fund 2020 LP (together, "GoldenTree Plaintiffs") and Syncora Guarantee Inc. ("Syncora") (together, the "Plaintiffs"), file this Complaint against the Commonwealth of Puerto Rico (the "Commonwealth"), Pedro Pierluisi, in his individual capacity and his official capacity as Governor of the Commonwealth (the "Governor"), Omar J. Marrero, in his individual capacity and his official capacity as executive director of the Puerto Rico Fiscal Agency and Financial Advisory Authority (by its Spanish acronym, "AAFAF"), and AAFAF (together, "Defendants"), and bring this action for damages, just compensation, and equitable relief.  In support thereof, Plaintiffs allege as follows:

AMERICAS 125405039

## NATURE OF ACTION

1.      Plaintiffs are holders and an insurer of approximately 11% of the approximately $8.26 billion in principal amount of outstanding bonds (collectively, the "Bonds")[1] issued by the Puerto Rico Electric Power Authority ("PREPA") pursuant to that certain Trust Agreement, dated as of January 1, 1974 (as amended and supplemented, the "Trust Agreement"), by and between PREPA and a predecessor of U.S. Bank National Association, as trustee (the "Trustee").[2]

2.      This Complaint is an action against Defendants for violation of Puerto Rico law and Plaintiffs' constitutional rights by acts of domination and control over PREPA, including through the creation and submission of the 2022 and 2023 fiscal plans for PREPA.  As explained further below, Defendants' actions in the drafting and submission of those fiscal plans and budgets have caused tremendous damages to Plaintiffs and resulted in a taking of their property interests without just compensation.

3.      To understand how Defendants' actions caused damages to Plaintiffs requires an understanding of the Parties' history.  Although Plaintiffs' claims are based solely on conduct by Defendants occurring after March 16, 2022, a description of Defendants' historical disregard for Plaintiffs' rights, assurances to induce Plaintiffs into delaying remedies, and unexpected about-

---

[1] Funds managed by GoldenTree Asset Management LP hold an aggregate of $889,415,235 of PREPA bonds, including $730,835,526 held by Plaintiffs, and additional $158,579,709 of PREPA bonds that are not held by Plaintiffs.  In addition, funds managed by GoldenTree Asset Management LP own Plaintiff Syncora Guarantee Inc., which owns bonds or claims against PREPA in the amount of approximately $102 million, and also insured PREPA bonds held by third parties in the amount of approximately $76 million, for an aggregate exposure to PREPA of approximately $178 million.  Accordingly, Plaintiffs collectively hold or insure approximately $908,835,526 of PREPA bonds.

[2] The Trust Agreement is attached as **Exhibit 1**.

- 3 -

face shortly after the confirmation of the Commonwealth's plan of adjustment, provides context for the post-March 2022 violations that are the basis of Plaintiffs' claims.

4.       In 1941, the Commonwealth enacted the Puerto Rico Electric Power Authority Act, 22 L.P.R.A. § 191, as amended, reenacted, and supplemented from time to time (the "Authority Act"), which created PREPA and authorized it to build, operate and maintain Puerto Rico's power generation and distribution system.  To fund the foregoing essential activities, the Authority Act authorized PREPA to issue the Bonds, the repayment of which would be secured by the revenues principally generated from the operation of PREPA's power system.  Importantly, the Authority Act requires PREPA to comply with its obligation to repay these Bonds and to take all actions necessary to be able to repay the Bonds. The Authority Act also prohibits the Commonwealth from interfering in PREPA's fulfillment of its obligations with respect to the Bonds.

5.       PREPA exercised the authority granted to it by the Commonwealth to issue the Bonds under the Trust Agreement.  In the Trust Agreement, PREPA promised to collect revenues sufficient to repay the Bonds.  Those revenues must, after providing for Current Expenses,[3] be credited to certain accounts (together, known as the "Sinking Fund") earmarked for the Bonds' repayment.  This provides a dedicated stream of revenues to satisfy PREPA's bond debt.

6.       Despite these statutory and contractual safeguards, mismanagement of PREPA impaired its ability to service its debt with revenue from power generation as the Trust Agreement contemplated.  In the decades following the issuance of the Bonds, years of operating deficits (caused by insufficient rates) were plugged with further bond issuances, which PREPA used to

---

[3] Capitalized terms used but not defined herein shall have the same meaning ascribed to such terms in the Trust Agreement.

AMERICAS 125405039

meet operating revenue shortfalls rather than investing in infrastructure or capital expenditures as intended.[4]

7.      The Commonwealth—and its governors—exacerbated PREPA's mismanagement by saddling it with hundreds of political appointees known as *empleados de confianza*. These "trust employees" frequently occupied positions for which they were unqualified and were replaced every time a new governor took office. The resulting turnover of employees at all levels at PREPA left it with little institutional memory or expertise, and beholden more to political interests than to its stakeholders. PREPA's Board and its managers—predominantly appointees of whatever governor held office at the time—ignored the needs of PREPA's customers by wasting or misdirecting Bond proceeds while the power grid deteriorated for lack of infrastructure investment.

8.      Under the direction of its Commonwealth-appointed management, PREPA repeatedly (and admittedly) breached its duties to holders of the Bonds ("Bondholders")—because the Commonwealth *prevented* PREPA from fulfilling those duties by passing laws and taking other actions to limit or interfere with PREPA's capacity to repay its debt. As explained further below, the Commonwealth took numerous actions to interfere with PREPA's rights and powers, such as (among other things) preventing necessary rate increases, transferring PREPA's power to unilaterally set rates to a new energy board appointed by the governor, disrupting efforts to transition from oil to natural gas, and forcing PREPA to provide enormous subsidies to territory government and municipal agencies by providing free power in lieu of taxes. The

---

4 *See* Final Investigative Report of the Independent Investigator for the Financial Oversight and Management Board for Puerto Rico (Kobre & Kim LLP: August 20, 2018) ("Final Investigative Report"), attached as **Exhibit 2** at 122.

AMERICAS 125405039

Commonwealth's actions, along with its mismanagement of PREPA, pushed Puerto Rico's power generation and distribution systems to the brink of insolvency.

9.    Notwithstanding its financial straits, PREPA certified each year that its revenues were sufficient to satisfy its operating expenses and debt obligations.  But independent investigation has shown that PREPA's certification was based on calculations that included revenues it had failed to collect because of Commonwealth interference.[5]  In truth, PREPA's politically manipulated rates were insufficient to cover even its operating expenses.

10.   The Commonwealth is responsible for PREPA's breaches of the Authority Act because the Commonwealth dominates PREPA.  In fact, as a former member of the Oversight Board put it, "[i]t's farcical to pretend there is a line between PREPA and the Commonwealth, when there clearly is not."[6]

11.   In 2016, the United States enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which permitted the Commonwealth and its entities, including PREPA, to reorganize their financial affairs.  PROMESA created the Financial Management and Oversight Board ("Oversight Board"), empowering it to act on behalf of the Commonwealth in connection with its own financial affairs and, to the extent the Oversight Board deemed it to further the Commonwealth's interest, also those of its instrumentalities, including PREPA.  Title III of PROMESA also empowered the Oversight Board to commence restructuring proceedings for the Commonwealth and its "designated" instrumentalities, including PREPA.[7]

12.   The Oversight Board, acting as an entity of the Commonwealth government, commenced a case under Title III of PROMESA for the Commonwealth to restructure its debt,

---

[5] Final Investigative Report at 136-37.

[6] Justin Peterson, X, @ JPHusker_, April 21, 2023, attached as **Exhibit 3**.

[7] *See* 48 U.S.C. §§ 2121(a), (b), and (d).

AMERICAS 125405039

and designated many of its instrumentalities, including PREPA, to be within its control.  In connection therewith, the Commonwealth, including by and through the Oversight Board, has breached its non-interference obligations under the Authority Act, and has caused PREPA to breach its obligations under the Authority Act with respect to the Bonds. Among other things, the Commonwealth, along with its Governor, its agent, AAFAF, and the Oversight Board as an entity of the Commonwealth government, is causing PREPA to—

- Entirely stop paying the Bonds;

- Misappropriate billions of dollars of revenues PREPA receives on behalf of and for the benefit of the Bonds;

- Prepare fiscal plans and budgets that wrongfully and artificially constrict PREPA's ability to repay the Bonds; and

- Propose and pursue confirmation and consummation of a plan of adjustment for PREPA that would wrongfully and permanently eliminate PREPA's obligations with respect to the Bonds.

13.     Defendants have repeatedly flouted their obligations under the Authority Act not to limit or alter PREPA's rights and powers—specifically, the rights and powers that allow PREPA to collect sufficient revenue for its debts and to pay its Bondholders with those moneys.

14.     Following its own emergence from bankruptcy, the Commonwealth has achieved a new height of disregard for its ongoing statutory covenants in the Authority Act.  As explained further below—and despite a strengthening Commonwealth economy—the Commonwealth has developed and proposed fiscal plans and budgets for PREPA that make no provision whatsoever for the ongoing payment of PREPA's bond debt and threaten permanent losses to Bondholders in the billions of dollars.  Meanwhile, on November 9, 2023, Governor Pierluisi submitted a

AMERICAS 125405039

resolution to the Puerto Rico legislature to amend the FY 2024 budget for the Commonwealth to include a $300 million loan earmarked to fund liabilities under PREPA's pension plan.[8]  By letter dated November 10, 2023, the Oversight Board declared its intention to certify that resolution. The Commonwealth's loan to PREPA stands in contrast to the statement of Defendant Marrero, that providing funds to PREPA from the Commonwealth treasury "is not possible legally, it is not possible financially and it is not possible under the fiscal plans certified by the central government and PREPA, which prohibit cross subsidies."[9]

15.     Governor Pierluisi, acting in his official capacity as governor of the Commonwealth, shares responsibility for the Commonwealth's illegal conduct.  For example, under PROMESA, the Governor is responsible to "submit to the Oversight Board" any fiscal plan developed by him.  48 U.S.C. § 2141(c)(2).  He is also responsible for the development of the Commonwealth's budgets.  *See id.* § 2142(c).  In his individual and official capacities, the Governor has repeatedly and intentionally violated the Authority Act by creating fiscal plans and budgets that limit or alter PREPA's rights and powers, thus preventing PREPA from making its statutorily-obligated payments to Bondholders.

16.     AAFAF, which was created by the Commonwealth and the Governor in 2017, has also taken part in the Commonwealth's illegal actions through its executive director, Defendant Marrero.  By statute, AAFAF is empowered to collaborate with the Governor in the creation, execution, supervision and oversight of fiscal plans and budgets.  *See* Act 2-2017 § 5.  Further,

---

[8] *See* Nov. 10, 2023 Letter from Oversight Board, attached as **Exhibit 4**.

[9] Kumneger, "Omar Marrero warns that Jenniffer Gonzalez's proposal to pay off the principal of PREPA's debt 'is not possible'" (Oct. 2, 2023), available at https://kumnegermedia.com/omar-marrero-warns-that-jenniffer-gonzalezs-proposal-to-pay-off-the-principal-of-prepas-debt-is-not-possible/.

AMERICAS 125405039

AAFAF is empowered to "oversee all matters related to the restructuring, renegotiation or adjustment of any existing or future obligation, and the liability management transactions for any existing or future obligation of the Government of Puerto Rico." *Id*.  The Governor appoints three of the five members of AAFAF's board of directors.  *See id*. § 6.  As an entity and agent of the Commonwealth, AAFAF's participation in the fiscal plan and budget process makes clear the Commonwealth's violations of the Authority Act's duty of non-interference with PREPA's rights and powers with respect to repayment of the Bonds.

17.     Defendants' direct and indirect breaches of their obligations under the Authority Act are currently preventing PREPA from honoring its own obligations under the Authority Act and the Trust Agreement, severely damaging Plaintiffs.  Plaintiffs have been denied payment of millions of dollars in revenues to which they are entitled and are facing permanent losses in the hundreds of millions of dollars.   The actions of Defendants constitute a breach of the Commonwealth's direct covenant and agreement with Bondholders under the Authority Act, are a negligent disregard of the law and tortious interference with PREPA's Bonds under Puerto Rican law, and are a taking of property without just compensation under the Constitutions of the United States and of the Commonwealth.

18.     Accordingly, Plaintiffs seek a judgment that, from and after March 16, 2022 (1) Defendants have violated the Authority Act and they are liable for damages their actions have caused Plaintiffs; (2) Defendants have violated the Authority Act through their fault or negligence and are liable for damages their actions have caused Plaintiffs; (3) Defendants have tortiously interfered with the contractual relationship between Plaintiffs and PREPA, in violation of Puerto Rico law, and are liable for damages their actions have caused Plaintiffs; (4) the actions of Defendants have effected a taking of Plaintiffs' property interests without just compensation in

- 9 -

violation of the United States and Puerto Rico Constitutions; and (5) the *ultra vires* actions of Defendants with respect to PREPA are void because they are in violation of the Authority Act, and Plaintiffs are entitled to damages from Defendants.    Plaintiffs also request equitable relief enjoining Defendants from future violations of the Authority Act and Plaintiffs' constitutional rights.

## PARTIES

19.    Plaintiff GoldenTree Master Fund, Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

20.    Plaintiff GTAM 110 Designated Activity Company is a designated activity company (limited by shares) formed under the laws of Ireland, with its principal place of business at 7-11 Sir John Rogerson's Quay, Dublin 2, Ireland.

21.    Plaintiff GoldenTree Distressed Master Fund III Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at Post Office Box 31527, Grand Cayman KY1-1207, Cayman Islands.

22.    Plaintiff GoldenTree Distressed Master Fund 2014 Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at Post Office Box 31527, Grand Cayman KY1-1207, Cayman Islands.

23.    Plaintiff GoldenTree Distressed Onshore Master Fund III LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York  10022.

AMERICAS 125405039

24.     Plaintiff GoldenTree Structured Products Master Fund VII (2020) LP is an exempted limited partnership formed under the laws of the Cayman Islands, with its principal place of business at 27 Hospital Road, George Town, Grand Cayman KY 1-9008, Cayman Islands.

25.     Plaintiff GoldenTree Distressed Fund 2014 LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York  10022.

26.     Plaintiff GoldenTree Structured Products Opportunities Offshore Fund Extension Holdings, LLC is a limited liability company formed under the laws of the Cayman Islands, with its principal place of business at 27 Hospital Road, George Town, Grand Cayman KY 1-9008, Cayman Islands.

27.     Plaintiff GoldenTree Multi-Sector Master Fund ICAV - GoldenTree Multi-Sector Master Fund Portfolio A is an Irish collective asset-management vehicle formed under the laws of Ireland, with its principal place of business at 7-11 Sir John Rogerson's Quay, Dublin 2, Ireland.

28.     Plaintiff GoldenTree Insurance Fund Series Interests of the SALI Multi-Series Fund, L.P. is a limited partnership formed under the laws of Delaware, with its principal place of business at 6836 Austin Center Boulevard, Suite 320, Austin, Texas  78731.

29.     Plaintiff GoldenTree 2017 K-SC, Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at Post Office Box 31527, Grand Cayman KY1-1207, Cayman Islands.

30.     Plaintiff GoldenTree Structured Products Opportunities Domestic Fund Extension Holdings, LLC is a limited liability company formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York  10022.

AMERICAS 125405039

31.     Plaintiff FS Credit Income Fund is a statutory trust formed under the laws of Delaware, with its principal place of business at 201 Rouse Boulevard, Philadelphia, Pennsylvania 19112.

32.     Plaintiff GoldenVest LLC is a limited liability company formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York 10022.

33.     Plaintiff GoldenTree Multi-Sector Fund Offshore ERISA, Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.

34.     Plaintiff GoldenTree Distressed Master Fund IV Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at Post Office Box 31527, Grand Cayman KY1-1207, Cayman Islands.

35.     Plaintiff GoldenTree High Yield Value Fund Offshore (Strategic), Ltd. is an exempted company formed under the laws of the Cayman Islands, with its principal place of business at 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

36.     Plaintiff GoldenTree Distressed Fund IV LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York, New York 10022.

37.     GoldenTree Multi Sector-C LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York 10022.

AMERICAS 125405039

38.     GoldenTree Structured Products - C II LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York  10022.

39.     GoldenTree Structured Products - C LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York  10022.

40.     GoldenTree V1 Master Fund, L.P. is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York  10022.

41.     GT Credit Fund LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York  10022.

42.     GT G Distressed Fund 2020 LP is a limited partnership formed under the laws of Delaware, with its principal place of business at 300 Park Avenue, 21st Floor, New York New York  10022.

43.     Plaintiff Syncora is a corporation incorporated under the laws of New York, with its principal place of business at 485 Lexington Avenue, 15th Floor, New York, New York  10017.

44.     Plaintiffs together own or insure approximately $866,583,142 in outstanding face amount of PREPA Bonds.

45.     Defendant, the Commonwealth of Puerto Rico, is a territory of the United States of America.  The Commonwealth is distinct from PREPA, which is a "government instrumentality," but also a "corporation having legal existence and personality separate and independent from that of the Government of Puerto Rico."  22. L.P.R.A. § 193.  The Commonwealth acts through its

AMERICAS 125405039

duly authorized agents, including the Oversight Board, its elected officials, and their respective appointees.

46.     Defendant Pedro Pierluisi is the Governor of the Commonwealth of Puerto Rico.

47.     Defendant Omar J. Marrero is the executive director of AAFAAF.

48.     Defendant AAFAF is an agency of the Commonwealth government that represents the Commonwealth's interests and is delegated the power to oversee compliance with the certified budget and fiscal plan process of PROMESA.  *See* Act 2-2017, enacted January 18, 2017.  It is the legal successor of the President of the Government Development Bank.  *See id.*  It can sue and be sued under its own name.  *See id.* § 5(d)(v).

## JURISDICTION AND VENUE

49.     The Court has subject matter jurisdiction over Plaintiffs' constitutional and other Puerto Rico law claims against Defendants under 28 U.S.C § 1331 and 28 U.S.C. § 1367.

50.     Venue is proper under 48 U.S.C. § 2167 and 28 U.S. Code § 1391(b) because this Court is the district court for the territory of Puerto Rico, which is where Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

51.     These claims are submitted pursuant to 22 L.P.R.A. §§ 215, 216; 31 L.P.R.A. § 10801, 31 L.P.R.A. 5335, 28 U.S.C. § 2201, 42 U.S.C. § 1983, and pursuant to the Fifth Amendment to the United States Constitution (as incorporated through the Fourteenth Amendment) and Article II §§ 7, 9 of the Puerto Rico Constitution (the "Takings Clauses").

52.     The Commonwealth does not have immunity from suit under the Eleventh Amendment to the United States Constitution.  Although states and Native American tribes are separate sovereigns, "U.S. territories — including an earlier incarnation of Puerto Rico itself —

- 14 -

are not sovereigns distinct from the United States." *Puerto Rico v. Sánchez Valle*, 579 U.S. 59, 71 (2016) (citing *Grafton v. United States*, 206 U.S. 333, 341 (1907)).

53.    The First Circuit has assumed (without substantial analysis) that the Commonwealth is treated as a state for Eleventh Amendment purposes.  But the Amendment's language, which applies only to cases "commenced or prosecuted against one of the United States," plainly excludes territories such as the Commonwealth.  U.S. Const. Amend. XI.  In short, "it is difficult to see how the same inherent sovereign immunity that the States enjoy in federal court would apply to Puerto Rico." *Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 354 (2023) (Thomas, J. dissenting).  This complaint seeks to clarify this important area of the law by a remedy ruling consistent with latest Supreme Court pronouncements on this issue.

## CONTEXT AND BACKGROUND

### I.    The Commonwealth's Historical Disregard for Bondholders' Rights

54.    The Commonwealth and its governors have a long history of interference in and disregard for the property and contractual rights of Bondholders.  Indeed, the Commonwealth has for years passed laws, implemented regulations and taken other actions that impair the ability of PREPA to pay back its Bonds, despite the Commonwealth's express statutory covenant to the Bondholders not to do so.

#### A.    The Authority Act

55.    The Commonwealth organized PREPA under the Authority Act in 1941.  The Authority Act authorizes PREPA to issue bonds and to enter into binding trust agreements with bondholders that include provisions "as to the manner of collecting the rates, fees, rentals, or other charges for the services, facilities, or commodities of undertaking of [PREPA]." *Id.* § 206(e)(13). Such agreements can include terms "[a]s to the disposition of the entire gross or net revenues and

- 15 -

present or future income of [PREPA], including the pledging of all or any part thereof to secure payment of the bonds." *Id.* § 206(e)(1).[10]

56.    The Authority Act authorizes PREPA to generate revenues by giving it the power to "propose and collect just, reasonable, nondiscriminatory rates and fees, and other charges approved by the [Puerto Rico Energy] Bureau, for the use of the facilities of the Authority, or for electric power services." 22 L.P.R.A. § 196(l).  The Authority Act provides that PREPA has and must exercise the power to collect such revenues "that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of such agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors." *Id.*

57.    As relevant to this Complaint, the Commonwealth agreed directly with Bondholders not to disturb any obligations with respect to Bonds issued by PREPA pursuant to the Authority Act, and committed to continuously comply with that agreement for so long as the Bonds are outstanding:

> The Commonwealth Government does hereby pledge to, and agree with, any person, firm or corporation, or any federal, Commonwealth or state agency, subscribing to or acquiring bonds of the Authority to finance in whole or in part any undertakings or any part thereof, that it will not limit or alter the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged.

25 L.P.R.A. § 215.

---

[10] Plaintiffs assert they have property interests in the form of a lien on PREPA's Revenue, but the court overseeing PREPA's bankruptcy (the "Title III court") has determined the Bondholders do not have a claim secured by a future revenues.  Plaintiffs dispute the Title III court's holdings with respect to their property interests, including the holding that Plaintiffs' security interests are limited to the Sinking Fund and Specified Funds.  Plaintiffs will appeal those determinations at the earliest opportunity.  The correctness of the Title III court's decision is not the subject of this complaint.

AMERICAS 125405039

58.     Defendants have repeatedly violated this covenant throughout PREPA's history, including, as relevant to this Complaint, after the Commonwealth's emergence from bankruptcy, all as set forth below.[11]

**B.      The Commonwealth's Pressure on PREPA to Keep Rates Low**

59.     PREPA's electricity rates are made up of a base rate, which is meant to cover operations, capital expenditures, maintenance, and debt service, and a surcharge to cover fuel costs.   According to the Oversight Board's independent investigator, decades of political mismanagement have kept PREPA from raising its base rate to the level needed to sustain operations and pay its Bonds.[12]

60.     Governors prevented rate increases at PREPA to protect their electoral prospects. When high oil prices increased PREPA rates, the Commonwealth and its governors pressured PREPA to *lower* overall rates despite the negative impact of rate decreases on PREPA's ability to pay its Bonds as Puerto Rico law requires.  Requests by PREPA directors to raise rates (or even to lower them less drastically) were met with resistance or overruled by Commonwealth governors. In one instance, in 2008, a PREPA executive director resigned rather than implement the extreme 20% rate reduction demanded by the Commonwealth's then-governor.[13]

**C.      The Establishment of PREB**

61.     Merely pressuring PREPA to keep rates artificially low was not enough, so the Commonwealth moved to strip PREPA of its unilateral authority to set rates for its services.  In

---

[11] Plaintiffs' claims herein arose after, and are based upon conduct occurring after March 16, 2022 only.  Allegations of facts occurring prior to that date are included in this Complaint for the sole purpose of providing background for the Court and context for the illegal actions and violations of Plaintiffs' rights by Defendants since March 16, 2022.

[12] *See* Exhibit 2, Independent Investigator's Report at 123-24.

[13] *See* Exhibit 2, Independent Investigator's Report at 123.

AMERICAS 125405039

2014, the Commonwealth enacted Act 57-2014 (and later enacted acts that amended Act 57-2014, such as Act 4-2016), which impaired PREPA's ability to meet its contractual obligations to the Trustee and Bondholders by eliminating its power to set rates. Act 57-2014 established the Puerto Rico Energy Bureau (PREB), a new agency of the Commonwealth with control over electricity rates. PREB is an entity of the Commonwealth. Its commissioners are appointed by the Commonwealth's governor, with the advice and consent of the Commonwealth's senate.

62.     Act 57-2014 also limited and impaired PREPA's ability to set rates by amending 22 L.P.R.A. § 196(l). Prior to Act 57-2014, PREPA had the power to "*determine*, *fix*, *alter*, *charge*, and collect reasonable rates, fees, rentals and other charges for the use of the installations of the Authority, or for electric power services." After Act 57-2014, PREPA had the power only to "*propose* and collect just, reasonable, nondiscriminatory rates and fees, and other charges approved by [PREB]." This limitation of PREPA's powers violated both the Trust Agreement and Section 25 of the Authority Act.

63.     In the years since the passage of Act 57-2014, the Commonwealth (through PREB) has repeatedly taken actions that hinder PREPA's ability to charge rates sufficient to service the Bonds. Any rate increase would result in additional revenue to PREPA, and any such revenue not allocated to Current Expenses would flow through and be credited into the applicable accounts comprising the Sinking Fund. PREPA has covenanted to the Bondholders that it will charge rates sufficient to repay the Bonds. To fulfill that covenant, PREPA (or the current operator of the power system) must request rate increases when necessary to meet these obligations.

**D.     The Commonwealth's Use of Net Metering to Weaken PREPA**

64.     In 2007, the Commonwealth enacted Act 114-2007, the Puerto Rico Net Metering Program Act. The Act requires PREPA to compensate customers who produce solar energy by

- 18 -

giving them a billing credit on their monthly bill at the market value of the kilowatt hour.  These customers receive the full market rate for energy they produce, even though they do not have to build or maintain an electrical grid, as PREPA does.  Net metering reduces or even eliminates the amount that customers pay PREPA for access to the power grid, even though solar customers must draw power from the grid when their solar system is insufficient (such as at night).

65.     In 2016, the Commonwealth further weakened PREPA's revenue base by enacting Act 133-2016, authorizing the use of microgrids, such as solar panels for an individual home.  These customers can also participate in net metering, allowing microgrids to benefit from their connection to the power system without contributing to the maintenance or capital needs of its transmission and distribution system.  The Commonwealth then passed Act 3-2018, which prohibits PREPA from billing or collecting for energy not produced by PREPA, even though that energy is still transmitted using PREPA's transmission and distribution system.

66.     In 2019, the Commonwealth enacted Act 17-2019, which ended PREPA's monopoly on energy production and distribution, allowing consumers who generate solar or other energy to sell that energy back into the electric grid without compensating PREPA.  The Act also provided for the privatization of PREPA's generation, transmission, and distribution businesses.

67.     The Commonwealth's actions to expand net metering lowered PREPA's revenue and impaired its ability to repay the Bonds, in violation of the Commonwealth's obligations under the Authority Act not to impair PREPA's rights and powers to repay the Bonds.

**E.      The Commonwealth's "Energy Theft" and Withholding of Funds Due to PREPA**

68.     According to the Oversight Board's independent investigator, PREPA has a "long-lived and well-documented problem with non-payment of receivables by its customers, either as a

result of energy theft, or of government-sanctioned subsidies from PREPA to the municipalities."[14]

For years, the Commonwealth has permitted government corporations not to pay bills to PREPA, resulting in large amounts of revenue owed by the Commonwealth or its entities to PREPA which have gone uncollected.  These are not future revenues of PREPA, but outstanding and unpaid revenues due to PREPA for power it generated and delivered to the Commonwealth.  The amount of PREPA's unpaid accounts receivable has been estimated in the billions, with a significant portion attributable to the Commonwealth and its entities.

69.     The Commonwealth has also forced PREPA to subsidize municipalities with "contributions-in-lieu-of-taxes," or "CILT."  While PREPA is exempted from taxes on certain revenues, the electricity subsidies it must provide in exchange exceed the tax savings.[15]  Moreover, PREPA has for years failed to properly collect revenues from municipal power usage, resulting in hundreds of millions of dollars in outstanding accounts receivable.

70.     Plaintiffs have also been damaged by settlements that the Commonwealth and the Oversight Board have caused PREPA to execute with various government agencies who owed it money for electricity.  For example, on March 7, 2023, the Oversight Board approved a settlement between PREPA and the Puerto Rico Aqueduct and Sewer Authority ("PRASA") that reduced PRASA's debt from $69 million to $42 million, resulting in a $27 million loss of revenues to PREPA that should have been credited to the applicable accounts comprising the Sinking Fund for the benefit of Bondholders, including Plaintiffs.  In another example, on June 23, 2023, the Oversight Board (the Commonwealth's Agent) approved a settlement that the Commonwealth negotiated with PREPA to reduce the debt obligations of 43 government entities for electrical

---

[14] *See* Exhibit 2, Independent Investigator's Report at 129.

[15] *See* Exhibit 2, Independent Investigator's Report at 130.

AMERICAS 125405039

services from $73 million to $50.6 million, a reduction of over 30%.  This resulted in a loss of nearly $23 million that should have been credited to the applicable accounts comprising the Sinking Fund for the benefit of Bondholders, including Plaintiffs.

F.     **The Commonwealth's Use of Fiscal Plans and Budgets to Cause the Diversion of Funds Accrued for the Sinking Fund**

71.     Defendants are preventing PREPA from paying Bondholders even though both they and PREPA both know that PREPA is obligated to credit Net Revenues[16] to the applicable accounts comprising the Sinking Fund under the Authority Act and the Trust Agreement.  The Commonwealth's fiscal plans and budgets for PREPA improperly reallocate those accrued amounts, so that they are not used for the required purposes under the Trust Agreement.  This diversion of PREPA's revenues by Defendants violates Puerto Rico law and the Constitutions of the United States and Puerto Rico.

72.     The pattern of diverting PREPA's Net Revenues is revealed in the required monthly performance reports, which show that billions of dollars have accrued to, but have not been transferred into, applicable accounts comprising the Sinking Fund.  Under Section 710 of the Trust Agreement, PREPA is obligated to produce monthly reports detailing its performance (the "Monthly Reports").  The Monthly Reports must include "a statement for the preceding calendar month and for the fiscal year to date of all deposits and transfers to the credit of and withdrawals from each special fund and account created under the provisions of this Agreement, showing the balance to the credit of each such fund or account[.]" Trust Agreement § 710(b).  These reports reveal that PREPA has often produced sufficient Revenues to generate Net Proceeds to be credited to the applicable accounts comprising the Sinking Fund ("Sinking Fund Accruals"),

---

[16] "Net Revenues" shall mean "the amount of the excess of the Revenues for [any particular] period over Current Expenses for such period."  Trust Agreement at 25.

AMERICAS 125405039

but PREPA failed to place such accruals in the accounts comprising the Sinking Fund, thereby diminishing the Bondholders' collateral.  For example, in the years prior to LUMA Energy, LLC and LUMA Energy ServCo, LLC taking over operating control of PREPA's transmission and distribution services, the Monthly Reports detail as follows:[17]

| Year | Net Revenues | Sinking Fund Accruals |
|------|--------------|-----------------------|
| **FY 2016** | $681,452,000 | $641,562,000 |
| **FY 2017** | $852,901,000 | $652,926,000 |
| **FY 2018** | $679,558,000 | $762,317,000 |
| **FY 2019** | $871,871,000 | $699,037,000 |
| **FY 2020** | $491,071,000 | $572,512,000 |
| **TOTAL** | **$3,576,853,000** | **$3,328,354,000** |

73.     For each year from fiscal year 2016 through fiscal year 2020, PREPA admitted that "[t]he 1974 Sinking Fund Appropriation have [sic] been accrued but not transferred."[18]  From fiscal year 2016 through 2020, PREPA also admitted that the value of such accrued, but not transferred, Sinking Fund Accruals were over $3.3 billion.  PREPA's actions have resulted in a substantial diminution of the Bondholders' collateral according to the Title III court's decision limiting the Bondholders' collateral to the amounts deposited in the Sinking Fund.

**G.     The Commonwealth's Use of PREPA's Restructuring Support Agreement to Dupe Plaintiffs into Forgoing the Exercise of Their Rights to Enforce the Authority Act and Trust Agreement**

74.     On May 3, 2019, the Commonwealth, through AAFAF, the Oversight Board, and certain Bondholders executed a Restructuring Support Agreement with respect to PREPA's Title

---

[17] The numbers in this table are drawn from PREPA's Monthly Reports to the Governing Board, attached as **Exhibit 5**.

[18] *See, e.g.*, Exhibit 5, 2016 Monthly Report at 11 n.4.

AMERICAS 125405039

III case (the "2019 RSA"). Bondholders provided substantial concessions under the 2019 RSA in exchange for a settlement that would pay approximately $7.3 billion on the Bondholders' claims for approximately $8.47 billion in principal and prepetition accrued interest. Final approval of the 2019 RSA required the Commonwealth to pass certain implementing legislation.

75. The Oversight Board described the 2019 RSA as "fair and reasonable," and its then-Executive Director described it as "in the best interests of PREPA." Nevertheless, there were inordinate delays in satisfying the conditions to effectuate the RSA, including the Commonwealth's refusal to pass the required implementing legislation. During these delays, the Commonwealth and the Oversight Board strung the Bondholders along with assurances of continued support. Even after the Commonwealth obtained approval of its own Title III plan on January 18, 2022, it continued to lull Bondholders into believing it would resume compliance with the Authority Act, as modified by the "fair and reasonable" adjustment set forth in the 2019 RSA.

76. More than a month after the Title III court confirmed the Commonwealth's plan of adjustment, on February 25, 2022, a member of the Oversight Board stated that the 2019 RSA "is the right choice" and would result in "annual savings of $375 million for Puerto Rico's taxpayers."[19] Indeed, three days later, on February 28, 2022, the Oversight Board stated it would "move forward with the settlement set forth in the . . . [2019 RSA]."

77. In reliance on its agreement with the Commonwealth (acting through AAFAF and the Oversight Board), Plaintiffs refrained from taking action in furtherance of their rights and remedies under the Authority Act and the Trust Agreement.

---

[19]  *See*  https://oversightboard.pr.gov/op-ed-lawmakers-enabling-prepas-rsa-is-the-right-choice/#:~:text=The%20Restructuring%20Support%20Agreement%20(RSA,million%20for%20Puerto%20Rico's%20ratepayers.

AMERICAS 125405039

78.     Curiously, on March 8, 2022—just one week before the Commonwealth's plan of adjustment went effective—the Governor announced via tweet that the Commonwealth had unilaterally terminated the 2019 RSA.  This announcement came without prior notice to the Bondholders.  To the contrary, by consistently reiterating their support for the 2019 RSA, including more than a month after the Commonwealth's plan of adjustment was approved, Defendants succeeded in duping Bondholders into delaying enforcement of their rights under the Authority Act and Trust Agreement.  In a sudden about-face, literally days before the Commonwealth obtained its discharge, it reneged on its statements of support and terminated the RSA, leading to a subsequent decimation in the value of Plaintiffs' Bonds.

## FACTUAL ALLEGATIONS IN SUPPORT OF PLAINTIFFS' CLAIMS

## II.     Defendants' Intentional and Recurring Violations of the Authority Act That Have Damaged Plaintiffs

79.     As explained further below, Defendants have caused hundreds of millions of dollars in damages to Plaintiffs through conduct occurring from and after March 16, 2022 in violation of the Authority Act.  Specifically, Defendants have taken Plaintiffs' property and caused damages by (1) proposing and adopting fiscal plans for FY 2022 and 2023 based on inaccurate projections of how much debt PREPA can afford in order to minimize Bondholder recoveries; and (2) using fiscal plans and budgets to compel PREPA not to credit Net Revenues to the accounts comprising the Sinking Fund as required by the Authority Act and the Trust Agreement, despite PREPA's accrual of substantial sums for that purpose.   As former Oversight Board member Justin Peterson observed on February 15, 2023, the "approach to dealing with PREPA's bondholders over more

AMERICAS 125405039

than six years has been to constantly move the goalposts on what is 'affordable'.  Puerto Rico continues to pile up record amounts of cash.  There's $ for everything except to pay lawful debt!"[20]

80.    In the Authority Act, the Commonwealth made a continuing promise to Bondholders that it will not disturb PREPA's rights or powers to repay the Bonds.  Specifically, Section 25 of the Authority Act, captioned "Agreement of Commonwealth Government," states that "[t]he Commonwealth Government does hereby pledge to, and agree with, any person, firm or corporation, or any federal, Commonwealth or state agency, subscribing to or acquiring bonds of the Authority to finance in whole or in part any undertaking or any part thereof, that it will not limit or alter the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 22 L.P.R.A. § 215.  Plaintiffs relied on this statutory covenant to the Bondholders in making their investment in the Bonds, and expected that the Commonwealth would honor its covenant.

81.    Notably, the obligations imposed on the Commonwealth under the Authority Act were not preempted or otherwise modified by the Commonwealth's own plan of adjustment.  In fact, the Commonwealth provided—and the Title III court affirmed—a list of statutes affected by the Commonwealth's plan of adjustment.  The Authority Act was not included in that list, and the obligations it imposes on the Commonwealth remain in effect.

82.    Based on the assurances and settled expectations created by the Authority Act and Trust Agreement, Plaintiffs invested hundreds of millions of dollars in the Bonds.  Plaintiffs expected their investment to be repaid through deposits of Net Revenues by PREPA to the applicable accounts comprising the Sinking Fund, because Puerto Rico law and the Trust

---

[20] Justin Peterson, X, @ JPHusker_, Feb 15, 2023, attached as **Exhibit 6**.

AMERICAS 125405039

Agreement ensure that the Commonwealth would never interfere with PREPA's ability to make such deposits.

83.     Despite its express covenant to, agreement with, and pledge to the Bondholders that it would *not* limit or alter PREPA's rights or powers to repay the Bonds, the Commonwealth (along with its agents, the Oversight Board, the Governor, and AAFAF) have done exactly that.   As explained further below, through its Fiscal Plans and Budgets, Defendants disregarded the Authority Act's statutory covenant by (i) causing PREPA not to make deposits of Net Revenues to be credited to the applicable accounts comprising the Sinking Fund; and (ii) artificially deflating its estimate of PREPA's capacity to afford debt sufficient to repay its Bonds.

84.     As a direct result of Defendants' violations of the Authority Act and their agreement and pledge to Bondholders, Plaintiffs have suffered damages.   Those damages include the amounts PREPA was required, from and after March 16, 2022, to deposit as Net Revenues to be credited to the applicable accounts comprising the Sinking Fund but did not because of Defendants' actions.

### A.    Defendants' Violation of the Authority Act Through Fiscal Plans and Budgets

85.     Under PROMESA, the Commonwealth is required to develop fiscal plans for itself and certain of its instrumentalities and deliver those fiscal plans to the Oversight Board for approval and certification.   *See* 48 U.S.C. § 2141.   The Governor, in his official capacity as governor of the territory of the Commonwealth, is responsible for submission of the fiscal plans (*see id*.), while AAFAF collaborates with the Governor in their creation (*see* Act 2-2017 § 5(b)). Since 2017, Defendants have formulated and submitted such fiscal plans for PREPA on an annual basis (from and after March 16, 2022, the "Fiscal Plans").

86.     The Commonwealth is also required to develop budgets for itself and certain of its instrumentalities and deliver those budgets to the Oversight Board for approval and certification.

- 26 -

*See* 48 U.S.C. § 2142.  The Governor is responsible for submission of the budgets (*see id*.), while AAFAF collaborates with the Governor in their creation (*see* Act 2-2017 § 5(b)).  Since 2017, Defendants have formulated and submitted such budgets for PREPA on an annual basis (from and after March 16, 2022, the "Budgets").

87.     PREPA's ability to manage its own affairs is constrained by the Budgets and Fiscal Plans imposed on it by the Commonwealth.  PREPA cannot take any actions—including paying Bondholders by making deposits of Net Revenues to be credited to the applicable accounts comprising the Sinking Fund—unless it is authorized to do so by Defendants in the budgets and fiscal plans.  Indeed, if PREPA does not comply with the Fiscal Plans or Budgets, the Oversight Board (as an entity of the Commonwealth government) is empowered to take corrective action. *See* 48 U.S.C. §§ 2143 – 2144.

88.     Defendants' Fiscal Plans make no provision for PREPA to credit the applicable accounts comprising the Sinking Fund as it is obligated to do.  Indeed, the 2022 Certified Fiscal Plan for PREPA (the "2022 PREPA Fiscal Plan")[21] freely acknowledges that PREPA had not paid cash debt service to Bondholders for more than ***eight years***.  2022 PREPA Fiscal Plan at 34.  The 2022 PREPA Fiscal Plan also acknowledges that PREPA had previously set "electric customer rates that were insufficient to cover operating and maintenance costs and debt service." *Id.* at 21. Despite its acknowledgment that rates were insufficient to service PREPA's debts, the 2022 PREPA Fiscal Plan assumes that the rate structure approved in 2017 and implemented in May 2019 will remain in place for the long-term forecast period.  *Id.* at 157.

89.     Further, the 2022 PREPA Fiscal Plan systematically excludes debt service from all its forecasts.  For example, the forecasted rates used in the 2022 PREPA Fiscal Plan do not include

---

[21] The 2022 PREPA Fiscal Plan is attached as **Exhibit 7**.

AMERICAS 125405039

any rate increases "required for debt service . . . under a Title III plan of adjustment." *Id.* In other words, Defendants promulgated a Fiscal Plan—with which PREPA is required to comply once certified by the Oversight Board—that expressly precludes PREPA from satisfying its obligation under the Authority Act to propose and collect rates sufficient to pay its Bonds. 22 L.P.R.A. § 196(l). Defendants' interference with PREPA's power to satisfy its Bond obligations violates Defendants' own duties under the Authority Act. *See* 22 L.P.R.A. § 215.

90.     Consistent with the approach of the Fiscal Plans, the Budgets drafted by Defendants dictate the allocation of PREPA's revenues and prevent PREPA from making deposits to be credited to the applicable accounts comprising the Sinking Fund. For example, the Fiscal Year 2023 Budget for PREPA (the "FY 2023 PREPA Budget") provides **nothing** for debt service—the final line item in the FY 2023 PREPA Budget, "Surplus/ (Deficit) Before Legacy Pension and Debt Obligations," is set at zero.[22] FY 2023 PREPA Budget at 4. Similarly, the Fiscal Year 2024 PREPA Budget, which the Governor signed on June 29, 2023, shows no funds allocated for payment of Debt Obligations.[23] Defendants' interference with PREPA's power to satisfy its Bond obligations violates Defendants' own duties under the Authority Act. *See* 22 L.P.R.A. § 215.

91.     All the Fiscal Plans and Budgets for PREPA created and submitted to the Oversight Board by Defendants under PROMESA exclude the payment of debt service on the Bonds. Consequently, PREPA has been prohibited by Defendants from making deposits to be credited to the applicable accounts comprising the Sinking Fund as required by the Authority Act and Trust Agreement.

---

[22] The FY 2023 PREPA Budget is attached as **Exhibit 8**.
[23] The FY 2024 PREPA Budget is attached as **Exhibit 9**.

AMERICAS 125405039

92.     PREPA's failure to deposit the Sinking Fund Accruals into the applicable accounts comprising the Sinking Fund is a direct consequence of the Fiscal Plans and Budgets developed by Defendants.  Defendants have misappropriated billions of dollars by requiring PREPA to spend Net Revenues without first fully funding Current Expenses and the Sinking Fund, in violation of the Authority Act and the Trust Agreement.

93.     Upon information and belief, Defendants' actions to prevent PREPA from depositing accrued Net Revenues into the applicable accounts comprising the Sinking Fund will recur.  Each action is a violation of Defendants' duties under the Authority Act that has damaged Plaintiffs.  Each such action is a separate and independent taking of Plaintiffs' property, as well as an interference in Plaintiffs' contractual rights.

**B.     Defendants' Manipulation of PREPA's Debt Service Capacity and Artificial Reduction of Revenues Available to Pay Bondholders**

94.     As required by PROMESA, the final 2022 PREPA Fiscal Plan included a debt sustainability analysis.[24]  But that debt sustainability analysis did not exceed a single page.  The 2022 PREPA Fiscal Plan did not provide any conclusions or estimates of the overall debt sustainability of PREPA, but rather incorporated a sensitivity analysis that illustrated "PREPA's implied debt capacity at varying coupon levels and hypothetical levels of net revenue."  2022 PREPA Fiscal Plan at 170.  The sensitivity analysis assumed a 30-year term and level debt service. *Id.*  Notably, assuming a 6.000% interest rate and 3.000 cents/kWh of net revenue, the sensitivity analysis showed debt capacity of over $5.1 billion. *Id.*

95.     After the certification of the 2022 PREPA Fiscal Plan, the Oversight Board proposed to offer Bondholders a 71.65% recovery on the face amount of their Bond claims.  This

---

[24] *See* Exhibit 7.

AMERICAS 125405039

recovery was to be achieved through the issuance of approximately $6.01 billion in new tax-exempt bonds, bearing an annual interest rate of 6.000% and having a 50-year final maturity with repayment expected within 35 years.

96.     In the absence of Bondholder support for this offer, the Defendants launched a campaign to limit the amount of value available for distribution to Bondholders on their claims by using the debt sustainability analysis as a tool to artificially depress the value of Plaintiffs' Bonds in PREPA's Title III bankruptcy proceeding.  But Defendants' estimates of PREPA's debt capacity cannot pass objective muster.  Rather, by artificially lowering PREPA's debt service capacity, Defendants have impaired and devalued Bondholders' interest in PREPA's future revenues. Indeed, the Governor himself has said that the PREPA Fiscal Plan he drafted and submitted caused the Oversight Board to seek a "significant reduction" in the amount of debt PREPA can afford to pay.  He also called the Title III court's controversial decision to reduce the Bondholders' claims by approximately $6 billion a "vindication" of his government's position.

97.     As shown below, the progression of Defendants' debt sustainability analysis for PREPA is not credible on its face.  In its first analysis in 2022, Defendants' Fiscal Plan calculated $5.1 billion in debt capacity for PREPA (assuming a 6.00% coupon rate).  From that point, Defendants' analysis shifted to suit the Commonwealth's purposes—namely, devaluing Bondholders' claim in the Title III proceeding, so that PREPA could pay its pension obligations in full while keeping electricity rates low.  By the time Defendants submitted the 2023 Fiscal Plan, the debt sustainability analysis estimated PREPA's debt capacity at just $2.36 billion—a *54%* drop in little more than a year.

98.     On December 16, 2022, the Oversight Board filed a Plan of Adjustment for PREPA (the "First PREPA POA").[25]  The First PREPA POA offered distributions to all creditors in the form of approximately $5.4 billion in new exchange bonds.  The Series B Bonds available for distribution to Bondholders were proposed to bear interest at an annual rate between 5.625% and 6.500% and have a final maturity of 50 years with repayment expected within 35 years.  Under the First PREPA POA, the Bondholders had an opportunity to obtain a recovery of no less than 50% of their claims, including the face amount of principal and accrued prepetition interest.  This recovery marked a dramatic decrease compared to the offer previously made.  Rather than receive approximately $6 billion of new bonds, the Bondholders as a group were allocated approximately $4.3 billion in new bonds under the First PREPA POA.

99.     On March 1, 2023, the Oversight Board filed a Modified Second Amended Plan of Adjustment (the "Second PREPA POA").[26]  The Second PREPA POA contemplated a substantially similar overall debt capacity as the First PREPA POA – now $5.68 billion as opposed to $5.4 billion.  However, the Second PREPA POA incorporated several discriminatory provisions that favored a small group of *pari passu* creditors, including certain Bondholders, over the Bondholder class generally, which further eroded potential recoveries to most Bondholders.

100.    On May 12, 2023, Defendants submitted the 2023 PREPA Fiscal Plan ("2023 PREPA Fiscal Plan") to the Oversight Board.  On May 19, 2023, the Oversight Board issued a notice of violation, demanding a number of revisions to the 2023 PREPA Fiscal Plan.  On June 23, 2023, the Oversight Board certified Defendants' revised 2023 PREPA Fiscal Plan.[27]

---

[25] The First PREPA POA is attached as **Exhibit 10**.
[26] The Second PREPA POA is attached as **Exhibit 11**.
[27] The 2023 PREPA Fiscal Plan is attached as **Exhibit 12**.

- 31 -

101.    The 2023 PREPA Fiscal Plan formed the basis for PREPA's Third Amended Title III Plan of Adjustment, filed on August 25, 2023 (the "Third PREPA POA").[28]  Under the Third PREPA POA, approximately $2.36 billion is made available to various creditor classes in the form of debt instruments and the cash proceeds of a proposed exit financing.  In other words, distributions to Bondholders have been reduced by more than half (as compared to the Second PREPA POA) as a result of Defendants' manipulation of PREPA's debt service capacity.

102.    The debt sustainability analysis in the 2023 PREPA Fiscal Plan painted a dramatically different picture than the debt capacity implied by the First PREPA POA and the Second PREPA POA, to say nothing of the Fiscal Plan filed just a year earlier.  Defendants essentially halved their estimate of incremental revenues that would be available to pay debt service and concluded that PREPA had the capacity to support only $2.384 billion of new bonds bearing interest at a rate of 6.000% with repayment expected within 35 years.  *See* 2023 PREPA Fiscal Plan at 146.

103.    With the publication of the 2023 PREPA Fiscal Plan, Defendants eviscerated the value of Plaintiffs' property interest in PREPA's Revenue and destroyed the value of Plaintiffs' claim in PREPA's Title III case.  Taking advantage of PREPA's Title III proceeding, Defendants have used the Fiscal Plan process under PROMESA to reduce the amount available to pay the Bonds in violation of the Commonwealth's obligations under the Authority Act and in interference with the contractual arrangements between PREPA and the Bondholders.

---

[28] The Third PREPA POA is attached as **Exhibit 13**.

AMERICAS 125405039

III.     **The Property Rights of Plaintiffs that Defendants' Violations of the Authority Act Have Damaged and Taken.**

104.     PREPA is failing to pay principal or interest on nearly $8.3 billion of outstanding PREPA Bonds.  Multiple events of default have occurred under the Trust Agreement and multiple breaches of the Authority Act's requirements have also taken place.  PREPA's recurring defaults are due to Defendants' own recurring violations of Puerto Rico and federal law, resulting in damages to Plaintiffs and the taking of their property rights without just compensation.  Those property rights and interests are defined below.

A.     **Plaintiffs' Property Interests in PREPA's Contractual Covenants to Fund the Sinking Fund With its Net Revenues**

105.     The Trust Agreement requires PREPA to "deposit as received" "[a]ll Revenues, other than income from investments made under the provisions of the Trust Agreement," to the credit of a "special fund" called the General Fund (which is a fund created under the Trust Agreement). Trust Agreement § 503.  The Revenues and any other moneys credited to the General Fund are held in trust and must be used first to pay for budgeted Current Expenses,[29] which may "not exceed an amount which is reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner."  *Id.* §§ 505, 601.  Following the payment of Current Expenses, PREPA is afforded the option to reserve a portion of the remaining Revenues for payment of future Current Expenses.

106.     Any amounts remaining after the payment of Current Expenses and provisions for reserves are then deposited to the credit of another special fund called the "Revenue Fund," and then are credited to another special fund called the Sinking Fund (such credited funds, the Sinking

---

[29] "Current Expenses" include PREPA's reasonable and necessary current expenses of maintaining, repairing and operating the System.  Trust Agreement at 20.

- 33 -

Fund Accruals).  *Id.* §§ 506; 507.  The Sinking Fund consists of three different accounts that are each required to be in the Trustee's control for the Bondholders' benefit and together constitute the Bondholders' principal source of repayment in the ordinary course.[30]  *Id.* § 507.  On June 30, 2017, the Trustee-held account holding moneys belonging to the Sinking Fund only had approximately $8.805 million; and the balance totaled approximately $19.8 million as of August 2023.

107.    Numerous contractual covenants and remedies reinforce the Bondholders' security interest and ensure that the Bonds will be fully secured and repaid.  For example, PREPA must "fix, charge and collect" rates and "adjust such rates and charges" as necessary to provide for Revenues sufficient to pay PREPA's Current Expenses and to cover 120% of the Bonds' principal and interest requirements for the next fiscal year.  Trust Agreement §§ 501, 502.  "[I]f at any time the Revenues shall not be sufficient" for these purposes, then PREPA is required to "revise the rates and charges" to customers "so that such deficiency will be made up."  *Id.* § 502.  All moneys received by PREPA under the provisions of the Trust Agreement are to be "held in trust" and applied only as directed by the Trust Agreement.  *Id.* § 601.

108.    Plaintiffs have private property interests in Net Revenues required to be credited to the Sinking Fund, as well as all Revenues of PREPA that the Trust Agreement requires PREPA to deposit to the credit of the accounts comprising Sinking Fund, whether or not PREPA actually fulfills that obligation.  Plaintiffs also have property interests in their rights under the Authority

---

[30] The three accounts are called (a) the Bond Service Account (which is supposed to hold enough Revenues to cover interest and principal accruals through the next month), (b) the Redemption Account (which is supposed to hold enough Revenues to cover the accrual of upcoming bond redemptions through the next month), and (c) the Reserve Account (which is supposed to hold enough Revenues to cover the following 12 months of principal and interest payments).  Trust Agreement § 507.

AMERICAS 125405039

Act and the Trust Agreement, including the right to PREPA's performance of its promises and covenants regarding its revenues. These private property interests are protected by the Takings Clause of the Fifth Amendment to the United States Constitution and the Puerto Rico Constitution. *See Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 611 (D.P.R. 2015).

109.    Upon information and belief, since March 16, 2022, Defendants have caused accruals to the Sinking Fund not to be credited to the applicable accounts comprising the Sinking Fund by use of the Fiscal Plans and Budgets.

**B.    Plaintiffs' Property Interests in Their Claim in PREPA's Title III Case**

110.    When the Oversight Board commenced PREPA's Title III case, Plaintiffs' property interest in PREPA's revenues became a claim in that proceeding.  Their claim is proposed to be resolved in PREPA's "plan of adjustment," a document that provides for the treatment of creditors' claims against PREPA.  The value of Plaintiffs' claim and its treatment under PREPA's plan of adjustment is dependent on the valuation of PREPA's revenues.  As explained above, Defendants have impaired and devalued Plaintiffs' claim, effecting a taking of what remains of Plaintiffs' property interest in PREPA's revenues.

## COUNT I

*Against all Defendants*

**Breach of the Commonwealth's Non-Interference Covenant Under the
Authority Act Resulting in Damage to Plaintiffs**

(22 L.P.R.A. § 215 (1941))

111.    Plaintiffs repeat and incorporate by reference each allegation contained in paragraphs 1-5; 11-53; 55-57; 70; and 79-110.

112.    This is an action for the Defendants' breach of their agreement with and covenant to Plaintiffs under the Authority Act not to limit or alter the rights and powers vested in PREPA, resulting in damages to Plaintiffs.

113.    In the Authority Act, the Commonwealth expressly pledged to, and agreed with, "any person, firm or corporation, or any federal, Commonwealth or state agency, subscribing to or acquiring bonds of the [PREPA] to finance in whole or in part any undertaking or any part thereof, that it will not limit or alter the rights or powers hereby vested in the [PREPA] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  22 L.P.R.A. § 215.  This section of the Authority Act has not been repealed and remains in full force and effect.

114.    Through this provision, the Commonwealth covenanted directly with "any person, firm or corporation" that acquires bonds issued by PREPA not to interfere with PREPA's rights and powers, including its powers to pay such bonds in full, until "all such bonds at any time issued, together with interest thereon, are fully met and discharged."  The Plaintiffs are members of the class expressly intended to benefit from this statutory undertaking by the Commonwealth.

115.    The language of section 215 of the Authority Act, which contains an express agreement between the Commonwealth and holders of PREPA bonds, demonstrates a clear intent that such holders, including the Plaintiffs, shall have the right to enforce this express agreement directly against the Commonwealth.  There is no contrary provision in the Authority Act, and such a right is appropriate and consistent with the statutory scheme, which is intended, among other things, to promote PREPA's access to the capital markets.  *See, e.g*., 22 L.P.R.A § 20.  The Commonwealth legislature clearly understood that subscribers and acquirers of bonds would be reluctant to provide capital to PREPA if there were any risk that the Commonwealth could impair PREPA's rights and powers to satisfy its obligations under the Bonds.

- 36 -

116.    The Commonwealth, its Governor, and its agent AAFAF have breached their express covenant and agreement with the Plaintiffs under the Authority Act not to limit or alter the rights or powers vested in PREPA, including by limiting PREPA's powers to satisfy its obligations under the Bonds.

117.    The actions of Defendants that violate 22 L.P.R.A. § 215 include, but are not limited to:

- Defendants' use of the Fiscal Plans and Budgets to compel PREPA not to make deposits of Net Revenues into the applicable accounts comprising the Sinking fund; and

- Defendants' manipulation of PREPA's debt service capacity to justify multiple drastic reductions in payments to Bondholders.

118.    Plaintiffs have been damaged by Defendants' interference with PREPA's rights and powers, including through the development and submission of Fiscal Plans and Budgets that do not provide for any payment on the Bonds, much less payment in full of such obligations. Specifically, Plaintiffs have been denied payment of billions of dollars that should have been deposited into the applicable accounts comprising the Sinking Fund because the Fiscal Plans and Budgets created by Defendants prevented PREPA from making those deposits as required by Puerto Rico law.  Plaintiffs have also been damaged because their claim in PREPA's Title III proceeding has been devalued by Defendants' inaccurate or negligent calculation of PREPA's debt sustainability analysis.  Defendants' actions directly caused damages to Plaintiffs.

WHEREFORE, Plaintiffs demand compensatory damages from Defendants for all damages resulting from Defendants' violations of the Authority Act occurring from and after March 16, 2022; request an injunction preventing Defendants from violating the Authority Act, including in the development of future fiscal plans and budgets; and request such other relief as the Court deems necessary and proper.

AMERICAS 125405039

## COUNT II

*Against all Defendants*

**Tortious Interference With Plaintiffs' Contractual Rights**

(31 L.P.R.A. § 10801 (2020); 31 L.P.R.A. 5141 (1930))

119.    Plaintiffs repeat and incorporate by reference each allegation contained in paragraphs 1-5; 11-53; 55-57; 70; and 79-110.

120.    The Authority Act authorized PREPA to enter into the Trust Agreement.  The Trust Agreement is a binding contract between PREPA and the Bondholders in which PREPA pledged to repay the Bonds.

121.    Defendants knew of the Trust Agreement.  Defendants knew that it guaranteed the Bondholders repayment of the Bonds and a property interest in revenues of PREPA until the Bonds were repaid.

122.    Defendants acted tortiously, and will engage in additional tortious conduct, by interfering with the rights of the Bondholders and the obligations of PREPA in the Trust Agreement.  For example, Defendants and the Oversight Board (an entity of the Commonwealth government) have caused PREPA not to deposit Net Revenues to the credit of the applicable accounts comprising the Sinking Fund through their formulation and submission of the Fiscal Plans and the Budgets.

123.    Plaintiffs have been damaged by Defendants' acts of tortious interference and will be damaged by future acts of tortious interference because those acts cause PREPA not to deposit moneys to the credit of the applicable accounts comprising the Sinking Fund, despite Plaintiffs' contractual entitlement to those moneys.

124.    The damage to Plaintiffs resulted from the negligent or intentional tortious interference of Defendants.

AMERICAS 125405039

WHEREFORE, Plaintiffs demand compensatory damages from Defendants for all such occasions of interference occurring from and after March 16, 2022, and request such other relief as the Court deems necessary and proper.

## COUNT III

*Against all Defendants*

### Violation of the Authority Act by Fault or Negligence
### Resulting in Damage to Plaintiffs

(31 L.P.R.A. § 10801 (2020); 31 L.P.R.A. 5141 (1930))

125.    Plaintiffs repeat and incorporate by reference each allegation contained in paragraphs 1-5; 11-53; 55-57; 70; and 79-110.

126.    This is an action for Defendants' culpable or negligent violation of the Authority Act, resulting in damages to Plaintiffs.

127.    In the Authority Act, the Commonwealth made a pledge to, and agreed with, "any person, firm or corporation, or any federal, Commonwealth or state agency, subscribing to or acquiring bonds of the Authority to finance in whole or in part any undertaking or any part thereof, that it will not limit or alter the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  22 L.P.R.A. § 215.  This section of the Authority Act has not been repealed and remains in force.

128.    Defendants have an obligation to avoid the occurrence of reasonably foreseeable damages that may result from culpable or negligent violation of the law.

129.    Nevertheless, the Commonwealth, its Governor, and its agent AAFAF—through the Fiscal Plans and Budgets, as certified by the Oversight Board (as an entity of the Commonwealth government)—have disregarded the specific and unambiguous statutory directive

AMERICAS 125405039

not to interfere with PREPA's ability to repay its Bonds.  Defendants have further violated the Authority Act's express command not to limit or alter the rights or powers vested in PREPA.

130.    The actions of Defendants and the Oversight Board that violate 22 L.P.R.A. section 215 include, but are not limited to:

- Defendants' use of the Fiscal Plans and Budgets to compel PREPA not to make deposits of Net Revenues into the applicable accounts comprising the Sinking fund; and

- Defendants' manipulation of PREPA's debt service capacity to justify multiple drastic reductions in payments to Bondholders.

131.    Under Puerto Rico law, Defendants are liable to Plaintiffs for civil damages if their actions were culpable or negligent under the law and those actions caused damages to Plaintiffs. *See* 31 L.P.R.A. § 10801 (2020).

132.    The damages to Plaintiffs from Defendants' actions were reasonably foreseeable. By creating Fiscal Plans and Budgets that prevented PREPA from depositing Net Revenues into the applicable accounts comprising the Sinking Fund, Defendants knew or should have known that Plaintiffs would be damaged.  Similarly, Plaintiffs, knew or should have known that the debt sustainability analysis they created for the Fiscal Plans would damage the value of Plaintiffs' claim in PREPA's Title III case.

133.    Defendants' actions in developing and submitting the Fiscal Plans and Budgets are culpable or negligent under the law because they violate the Authority Act.  Defendants directly violated their covenant in the Authority Act not to limit or alter the ability of PREPA to repay its bonds.

134.    Plaintiffs have been damaged by Defendants' actions in developing and submitting the Fiscal Plans and Budgets.  Specifically, Plaintiffs have not received billions of dollars that should have been deposited into the applicable accounts comprising the Sinking Fund because the

AMERICAS 125405039

Fiscal Plans and Budgets created by Defendants prevented PREPA from making those deposits as required by Puerto Rico law, causing Plaintiffs damages.

135.    Plaintiffs have also been damaged because their claim in PREPA's Title III proceeding has been devalued by Defendants' inaccurate calculation of PREPA's debt sustainability analysis.   Defendants' actions directly caused Plaintiffs' damages, because Defendants' calculation directly reduced the value of Plaintiffs' claim.

WHEREFORE, Plaintiffs demand compensatory damages from Defendants for all damages resulting from the Commonwealth's violations of the Authority Act occurring from and after March 16, 2022, an injunction preventing Defendants from violating the Authority Act, including in the development of future fiscal plans and budgets, and request such other relief as the Court deems necessary and proper.

**COUNT IV**

*Against all Defendants*

**Just Compensation for the Taking of Private Property**

(U.S. Const. amends. V, XIV; P.R. Const. art. II §§ 9, 7; 42 U.S.C. § 1983)

136.    Plaintiffs repeat and incorporate by reference each allegation contained in paragraphs 1-5; 11-53; 55-57; 70; and 79-110.

137.    The Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation."   U.S. Const. amend. V. The Fifth Amendment has been made applicable to Puerto Rico by incorporation through the Fourteenth Amendment.   *See Franklin Cal.*, 85 F. Supp. 3d at 611; *Tenoco Oil Co. v. Dep't of Consumer Affs.*, 876 F.2d 1013, 1017 n.9 (1st Cir. 1989) ("We have no doubt . . . that the takings clause, like the due process and equal protection clauses, applies to the Commonwealth of Puerto Rico.").   The Puerto Rico Constitution provides that "[p]rivate property shall not be taken or

- 41 -

damaged for public use except upon payment of just compensation and in the manner provided by law." P.R. Const. art. II, sec. 9. The Puerto Rico Constitution further provides that "The right to life, liberty and the enjoyment of property is recognized as a fundamental right of man," and "[n]o person shall be deprived of his liberty or property without due process of law." P.R. Const. art. II sec. 7.

138. The Governor, acting in his individual capacity and his official capacity and under color of state law, is responsible under PROMESA for the development and submission of the fiscal plans and budgets on behalf of the Commonwealth. He is assisted by Defendant Marrero and AAFAF, who (acting under color of state law) contribute to the creation and submission of the fiscal plans and budgets in their capacity as an entity and agent of the Commonwealth.

139. By creating and implementing the Fiscal Plans and Budgets for PREPA, Defendants artificially reduced the estimate of Net Revenues available to satisfy the Bonds by billions of dollars.

140. The Governor himself is responsible for the creation and submission of the Fiscal Plans.

141. The Governor himself signed into law the Budgets.

142. Defendants also ensured that the Fiscal Plans and Budgets would prevent PREPA from fulfilling its obligation to deposit Net Revenues to the credit of the applicable accounts comprising the Sinking Fund. For example, Defendants' Fiscal Plans and Budgets allocated no amounts to service the obligations under the Bonds, instead requiring PREPA to spend moneys on other things that are not Current Expenses under the Trust Agreement. PREPA fulfilled obligations imposed by Defendants by spending the moneys it had accrued but did not deposit

- 42 -

those moneys to the credit of the applicable accounts comprising the Sinking Fund to repay the Bonds in accordance with the Authority Act and Trust Agreement.

143.    Defendants' violations of Plaintiffs' rights under the Trust Agreement and the Authority Act, including its actions to artificially deflate PREPA's debt capacity and prevent PREPA from making deposits to the Sinking Fund, have effected a taking of Plaintiffs' private property without just compensation under the Takings Clauses.

144.    Upon information and belief, Defendants will engage in further takings of Plaintiffs' property by passing further fiscal plans and budgets. Plaintiffs seek injunctive relief to prevent Defendants from future actions in violation of Plaintiffs' constitutional rights that result in a taking of their property without just compensation, including actions related to the preparation and submission of future Fiscal Plans and Budgets for PREPA.

145.    The actions of Defendants have defied Plaintiffs' reasonable, investment-backed expectations.  The Trust Agreement uses mandatory language requiring that PREPA credit Net Revenues to the Sinking Fund.  PREPA further covenanted to ensure that it fixed, charged, and collected reasonable rates "so that the Revenues will at all times be sufficient" to pay the principal and interest on the bonds.  *Id.* § 502.  The Commonwealth's own laws, including the Authority Act, required that these obligations be fulfilled.  Plaintiffs reasonably expected that Defendants would not violate Puerto Rico law by causing PREPA not to deposit funds to the credit of the applicable accounts comprising the Sinking Fund to repay the Bonds.

146.    Plaintiffs' property interest in PREPA's contractual covenants to fund the Sinking Fund and Plaintiffs' property interest in their claim in PREPA's Title III proceeding are protected by the Takings Clauses and the Due Process Clause.

- 43 -

147.    Plaintiffs are entitled to just compensation for the actions of Defendants from and after March 16, 2022 that have resulted in a taking of their property by Defendants.

148.    Plaintiffs are entitled to an injunction preventing Defendants from future actions that would violate Plaintiffs' constitutional rights and take the property of Plaintiffs without just compensation.

WHEREFORE, Plaintiffs demand just compensation from Defendants for the actions of Defendants from and after March 16, 2022 that have resulted in a taking of their property without just compensation, an injunction ordering Defendants not to take Plaintiffs' property without just compensation, and such other relief as the Court deems necessary and proper.

## COUNT V

*Against all Defendants*

### Declaratory Action on *Ultra Vires* Acts in Violation of Puerto Rico Law

(28 U.S. Code § 2201; 31 L.P.R.A. 5335 (2020); 31 L.P.R.A. 4 (1930); 22 L.P.R.A. § 215)

149.    Plaintiffs repeat and incorporate by reference each allegation contained in paragraphs 1-5; 11-53; 55-57; 70; and 79-110.

150.    In the Authority Act, the Commonwealth made a pledge to "any person, firm or corporation, or any federal, Commonwealth or state agency, subscribing to or acquiring bonds of the Authority to finance in whole or in part any undertaking or any part thereof, that it will not limit or alter the rights or powers hereby vested in the Authority until all such bonds at any time issued, together with the interest thereon, are fully met and discharged."  22 L.P.R.A. § 215.  This section of the Authority Act has not been repealed and remains in force.

151.    Nevertheless, the Commonwealth, its Governor, and its agent AAFAF—through the Fiscal Plans and Budgets, as certified by the Oversight Board (as an entity of the Commonwealth government)—have disregarded the specific and unambiguous statutory directive

- 44 -

not to interfere with PREPA's ability to repay its Bonds.  Defendants have further violated the Authority Act's express command not to limit or alter the rights or powers vested in PREPA.

152.    The actions of Defendants that violate 22 L.P.R.A. section 215 include, but are not limited to:

- Defendants' artificial deflation of PREPA's capacity to afford debt sufficient to repay its Bondholders.

- Defendants' use of the Fiscal Plans and Budgets to compel PREPA not to make deposits of Net Revenues into the applicable accounts comprising the Sinking fund.

153.    Under Puerto Rico law, acts taken *ultra vires* or contrary to the provisions of law are void except when the law preserves their validity.  31 L.P.R.A. 5335 (2020); 31 L.P.R.A. 4 (1930).  Defendants' actions described above are contrary to the provisions of the Authority Act because it requires the Commonwealth and its agents not to limit or alter the rights and powers of PREPA to repay its Bondholders.  *See* 22 L.P.R.A. § 215.  Accordingly, those acts are void.

154.    Under Puerto Rico law, when an agent exceeds his or her mandate and acts in an *ultra vires* manner, the principal is liable for damages caused as a result.  The Commonwealth is liable for acts or omissions of its officials, employees, and agents if those acts are taken *ultra vires*.

155.    The Governor and Defendant Marrero have acted *ultra vires* in drafting and submitting the Fiscal Plans and Budgets in a manner that violates the Authority Act by interfering with PREPA's ability to repay the Bonds.  In fulfilling their legal obligation to prepare and submit the Fiscal Plans and Budgets, the Governor and Defendant Marrero exercised their discretion by using the Fiscal Plans and Budgets to alter or limit PREPA's rights under the Authority Act.  These actions of the Governor and Defendant Marrero were *ultra vires* because they were taken in violation of the Authority Act.

AMERICAS 125405039

156.    In the Authority Act, the Commonwealth imposed an obligation on itself and covenanted to Plaintiffs and other Bondholders that it would not limit or alter PREPA's rights or powers under the Authority Act.  The Commonwealth's Agents, the Governor and Defendant Marrero, violated that obligation, causing damages to Plaintiffs.

157.    The Court is authorized to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

WHEREFORE, Plaintiffs request that the Court enter an order declaring that any actions taken by Defendants occurring from and after March 16, 2022 in violation of Section 25 of the Authority Act, 22 L.P.R.A. § 215, are null and void to the extent they impair or destroy Plaintiffs' rights under Puerto Rican law, invalidating any actions by Defendants that prevent PREPA from depositing Net Revenues to the credit of the applicable accounts comprising the Sinking Fund as required by Puerto Rico law, ordering Defendants to pay damages to Plaintiffs to compensate for the injuries caused by Defendants' *ultra vires* actions, and enjoining Defendants from any further actions in violation of the Authority Act, including any actions that would prevent PREPA from depositing Net Revenues to the credit of the applicable accounts comprising the Sinking Fund as required by Puerto Rico law.

## PRAYER FOR RELIEF

Plaintiffs therefore request that judgment be entered for them and against Defendants as follows:

A.  Finding that Defendants have violated the Authority Act from and after March 16, 2022 and caused damages to Plaintiffs, and awarding Plaintiffs (for payment and delivery to the PREPA Bond Trustee and distribution in accordance with the Trust Agreement)

AMERICAS 125405039

damages equal to the amount of their resulting losses from and after March 16, 2022;

B.  Finding that Defendants have tortiously interfered from and after March 16, 2022 with Plaintiffs' contractual relationship with PREPA;

C.  Ordering Defendants to pay damages (for payment and delivery to the PREPA Bond Trustee and distribution in accordance with the Trust Agreement) caused by their tortious interference with the contractual relationship between Plaintiffs and PREPA occurring from and after March 16, 2022;

D.  Finding that Defendants tortiously violated the Authority Act from and after March 16, 2022;

E.  Ordering that Defendants pay damages (for payment and delivery to the PREPA Bond Trustee and distribution in accordance with the Trust Agreement) caused by their tortious violations of the Authority Act occurring from and after March 16, 2022;

F.  Finding that Defendants have taken actions from and after March 16, 2022 that effected a taking of Plaintiffs' property interests without just compensation;

G.  Ordering that Defendants pay just compensation (for payment and delivery to the PREPA Bond Trustee and distribution in accordance with the Trust Agreement) for Plaintiffs' property interests that it has taken or destroyed by Defendants' actions taken from and after March 16, 2022;

H.  Enjoining Defendants from any further actions to take Plaintiffs' property without just compensation, including in the preparation and submission of future fiscal plans and budgets;

I.  Declaring that Defendants have acted *ultra vires* in violation of Section 25 of the

Authority Act, and that such actions from and after March 16, 2022 are null and void;

J.  Ordering that Defendants pay damages for their *ultra vires* actions taken from and after March 16, 2022;

K.  Enjoining Defendants from any further actions in violation of the Authority Act, including in the development of future fiscal plans and budgets; and

L.  Granting such other relief as is just and proper for the benefit of all Bondholders.

AMERICAS 125405039

Dated: November 11, 2023
San Juan, Puerto Rico

Respectfully submitted,

**DE GUZMAN LAW OFFICES**

**WHITE & CASE LLP**

*/s/ Guillermo F. DeGuzmán*
Guillermo F. DeGuzmán
USDC No. 201309

DE GUZMAN LAW OFFICES
P.O. Box 362738
San Juan, PR 00936-2738
Tel: (787) 756-2765
Fax: (787) 756-4024
gdeguzman@dgglawpr.com

*/s/ Jaime A. Bianchi*
Jaime A. Bianchi (*pro hac vice* forthcoming)
John K. Cunningham (*pro hac vice* forthcoming)
Keith Wofford (*pro hac vice* forthcoming)
WHITE & CASE LLP
200 S. Biscayne Blvd., Suite 4900
Miami, Florida 33131
Tel.:  (305) 371-2700
Fax:  (305) 358-5744
jbianchi@whitecase.com
jcunningham@whitecase.com
kwofford@whitecase.com

Thomas E Lauria (*pro hac vice* forthcoming)
Glenn M. Kurtz (*pro hac vice* forthcoming)
Thomas E. MacWright (*pro hac vice* forthcoming)
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.:  (212) 819-8200
Fax:  (212) 354-8113
tlauria@whitecase.com
gkurtz@whitecase.com
tmacwright@whitecase.com

*Counsel for GoldenTree Plaintiffs*

**REICHARD & ESCALERA, LLC**

By: */s/  Rafael Escalara*
    Rafael Escalara
    USDC-PR No. 122,609

    */s/  Carlos R. Rivera-Ortiz*
    Carlos R. Rivera-Ortiz
    USDC–PR No. 303,409
    255 Ponce de León Avenue
    MCS Plaza, 10th Floor
    San Juan, PR 00917-1913
    Tel.: (787) 777-8888
    Fax: (787) 765-4225
    escalara@reichardescalera.com
    arizmendis@reichardescalera.com
    riverac@reichardescalera.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/  Susheel Kirpalani*
    Susheel Kirpalani (*pro hac vice* forthcoming)
    Eric Kay (*pro hac vice* forthcoming)
    51 Madison Avenue, 22nd Floor
    New York, New York 10010-1603
    Tel.: (212) 849-7000
    Fax: (212) 849-7100
    susheelkirpalani@quinnemanuel.com
    erickay@quinnemanuel.com

*Counsel for Syncora Guarantee Inc.*

AMERICAS 125405039