# **<u>EXHIBIT 2</u>**



**KOBRE & KIM** | **DISPUTES** AND **INVESTIGATIONS**

**The Financial Oversight & Management Board for Puerto Rico**

Independent Investigator

**FINAL INVESTIGATIVE REPORT**

Kobre & Kim LLP | AUGUST 20, 2018

# THE INDEPENDENT INVESTIGATOR'S

# FINAL INVESTIGATIVE REPORT

# THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO

## SPECIAL INVESTIGATION COMMITTEE

## INDEPENDENT INVESTIGATOR'S

## FINAL INVESTIGATIVE REPORT

\*

### SUBMITTED BY:

**THE FINANCIAL OVERSIGHT & MANAGEMENT BOARD FOR PUERTO RICO**

**SPECIAL INVESTIGATIVE COMMITTEE**

**INDEPENDENT INVESTIGATOR**

**KOBRE & KIM LLP**

Pursuant to The Puerto Rico Oversight, Management and Economic Stability Act of 2016, Sections 101(b), 104(o) and PROMESA Investigative Procedures Sections 1.3(10), 2.1(b)(1), 3.1(a).

# CONTENTS

Financial Oversight & Management Board for Puerto Rico…………………………………iv

Executive Summary……………………………………………................................1

Part I:        Procedural Background…………………………………………………………15
Part II:       Historical Background……………………………………………………………31
Part III:      Bond Issuance Process……………………………………………………………51
Part IV:       GDB………………………………………………………………………………70
Part V:        Puerto Rico's Public Utilities…………………………………………………111
Part VI:       COFINA…………………………………………………………………………156
Part VII:      ERS………………………………………………………………………………195
Part VIII:     Puerto Rico's Budgeting, External Reporting, and Accounting Functions….219
Part IX:       Calculation of the Constitutional Debt Limit…………………………………252
Part X:        Credit Rating Agencies…………………………………………………………268
Part XI:       Selling Practices for Puerto Rico-Related Bonds………………………………334
Part XII:      Puerto Rico's Government Ethics Framework……………………………………394
Part XIII:     Issuers' Use of Interest Rate Swaps ……………………………………………...412
Part XIV:      Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related
               Bonds Before They Issue………………………………………………………446
Part XV:       The Possession Tax Credit………………………………………………………465
Part XVI:      Independent Investigator's Overview of Potential Causes of Action………..475
Part XVII:     Public Comments………………………………………………………………572
Appendix A:    Defined Terms……………………………..…………………………………….A
Appendix B:    PREPA Analysis…………………………………………………………………B



**The Financial Oversight & Management Board for Puerto Rico**

Andrew Biggs
José B. Carrión III
Jaime El Koury
Carlos M. García
Arthur J. González
José R. González
Natalie Jaresko
Ana J. Matosantos
David A. Skeel
Christian Sobrino
Noel Zamot

**Special Investigation Committee**

Arthur J. González
Ana J. Matosantos
David A. Skeel

# EXECUTIVE SUMMARY

# EXECUTIVE SUMMARY

## <u>Findings and Recommendations</u>[1]

As of May 3, 2017, Puerto Rico had approximately $74 billion of bond debt and $49 billion of unfunded pension liabilities.  For an economy of Puerto Rico's size, the burden of this debt has been catastrophic—it has been a financial, and ultimately a humanitarian, catastrophe.  The toll it has taken on the people of Puerto Rico begs a pressing question:  How did it happen?

This Report, like the Independent Investigation upon which it is based, aims to answer that question based on the facts.  On the same basis, it offers recommendations for the people of Puerto Rico, and the policymakers who represent them, to consider in making sure they never have to go through all this again.

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP as the Independent Investigator.  The mandate was to conduct an investigation under PROMESA into the factors contributing to Puerto Rico's fiscal crisis, as well as Puerto Rico's issuance of debt.  Following interviews with over 100 witnesses and review of thousands of documents, as discussed in detail in Part I, we find the following:

---

[1] All capitalized terms in this Executive Summary are used consistently with the definitions set forth in the Defined Terms, attached as Appendix A.

The Independent Investigator's Final Investigative Report

When the Possession Tax Credit's ten-year phase-out period terminated in 2006, Puerto Rico faced a declining population, increasing unemployment, mounting budgetary issues (amplified by a lack of transparency into the spending of the Puerto Rico-Related Entities, as well as delayed disclosure of audited financial reports), and escalating pension liabilities.  Instead of implementing long-term plans to stimulate the Puerto Rico economy, to balance the budget and to fund ERS during the Relevant Period, Puerto Rico's political branches and GDB turned to the debt markets for shorter-term fixes.  The short-term fixes included, among others: (i) the creation of the SUT, a portion of which purportedly secured issuances by COFINA; (ii) the entry into swap arrangements to generate cash to close budget gaps; (iii) an increase in deficit financing; and (iv) the issuance of Puerto Rico-Related Bonds that were purportedly secured by contributions to ERS.

With some of these structures, the Puerto Rico-Related Entities incurred billions of dollars of liability, but did not include those amounts when calculating how close Puerto Rico was to reaching its Constitutional Debt Limit.  At times, in the absence of certain regulations we will discuss, underwriters sold the Puerto Rico-Related Bonds through Local CEFs in which only Puerto Rico investors purchased shares.  Many of those Local CEFs were also managed by affiliates of the same investment banks that underwrote the Puerto Rico-Related Bonds in which the Local CEFs were invested.

GDB, in its dual role as fiscal agent and lender, enabled the Puerto Rico-Related Entities (particularly the Public Utilities and HTA) to subsist on appropriations from the General Fund, short-term cash influxes from GDB, and bond proceeds.  This was done instead of holding the Puerto Rico-Related Entities accountable for their debts, ensuring that Issuers of revenue bonds actually collected sufficient revenues to repay those bonds, or demanding fiscal responsibility and independence.  As the Puerto Rico-Related Entities amassed unsustainable levels of debt, the CRAs became increasingly concerned about the Puerto Rico-Related Entities' perpetual reliance on support from Puerto Rico and GDB, among other factors.  The CRAs ultimately implemented a series of credit rating downgrades for Puerto Rico-Related Bonds at various points between 2012 and 2014, with most of those bonds reaching "junk" status between February and June of 2014.

As each of the Puerto Rico-Related Entities lost access to the capital markets, the short-term fixes strained the liquidity of Puerto Rico and GDB until it simply became untenable.  Eventually, many of the Puerto Rico-Related Entities sought bankruptcy relief in the Title III Proceedings.

Below, we present a summary of our primary findings relating to each aspect of our Independent Investigation.  We also provide an overview of certain recommendations stemming from those findings.  We developed these recommendations on the basis of the evidence we reviewed, with the goals of restoring Puerto Rico's access to the capital markets and reducing the likelihood of another debt crisis.

The Independent Investigator's Final Investigative Report

A.   **Summary of Findings and Recommendations Regarding GDB**

As we explain in detail in Part IV of this Report, the GDB Board members and employees we interviewed were accomplished, diligent, and well-meaning professionals. Notwithstanding their competence and professionalism, the evidence reflects that GDB's dual roles as fiscal agent and lender for the Puerto Rico-Related Entities were in tension, and that this tension became untenable over time.   This was compounded by structural deficiencies that allowed the policy considerations of various gubernatorial administrations to affect the decision-making of GDB in its capacities as both lender and fiscal agent.

The tension between GDB's dual roles manifested itself in multiple ways, including:

- Through decisions to lend money to the Issuers for deficit financing, or as alternatives to fiscally responsible measures that would have upset voters (such as a deeply imperfect substitute for raising water and electricity rates), without applying stricter credit standards or holding the Puerto Rico-Related Entities more accountable for failures to satisfy those obligations when they came due; and

- Through decisions to approve new debt issuances for the purpose of "scooping and tossing" older obligations or, again, as an alternative to forcing the Puerto Rico-Related Entities to implement measures that would have made them less dependent on borrowed liquidity, but that could have increased the costs of living for voters.

When coupled with a lack of resources to enable GDB's practical oversight, these types of decisions undermined GDB's effectiveness as fiscal agent. They also compromised GDB's own liquidity over time.  In light of the foregoing, we recommend that:

- Puerto Rico's political branches consider separating the fiscal agent and lending functions for GDB's successor as fiscal agent;

- GDB's successor as fiscal agent be given access to the joint and integrated accounting systems that we recommend separately in Part VIII of this Report, to improve its oversight of the Puerto Rico-Related Entities it advises; and

- Any successor to GDB as lender regularly evaluate the collectability of its public-sector loan portfolio.

B.   **Summary of Findings and Recommendations Regarding Puerto Rico's Public Utilities**

Part V of this Report presents the findings of our investigation into the Public Utilities. We summarize select aspects here.

With respect to PREPA, we found evidence that politics directly impacted its rates in a way that simultaneously kept the rates high and, yet, insufficient to cover operational expenses

4

and capital improvement projects. To compensate for the suppressed base rate, PREPA became dependent on short-term liquidity injections from GDB, with its principal means of repayment being the issuance of bonds. Based on our review of the evidence, we attribute this to:

- A lack of political will to raise PREPA's base rate;

- Politically-induced obstacles to reducing the power rate by converting PREPA's generation from oil to natural gas; and

- Politically-sanctioned subsidies that reduced PREPA's collected revenues.

In addition, the sheer number of governor-appointed *empleados de confianza* predisposed PREPA to massive turnover, loss of institutional knowledge, and decision-making that was unresponsive to market forces.

Despite a lack of political will to raise rates at PRASA, the market ultimately forced PRASA to do so. In particular, a combination of a reduction in appropriations from Puerto Rico and court-ordered $2 billion in capital improvements forced PRASA to raise its rates in 2008 so that it could reenter the bond market after a twenty-year absence. Bond issuances in 2008 and 2012 were tethered to rate covenants and an FOA that required PRASA to raise its rates in the event that appropriations from Puerto Rico again ceased. When appropriations were eliminated in 2013, the rate covenant and FOA forced PRASA to raise its rates over the objection of GDB management and the Governor.

The evidence also reflects that neither GDB, in its capacity as fiscal agent, nor the underwriters of the Public Utilities' bonds monitored the Public Utilities' actual use of proceeds in relation to the represented uses identified in relevant offering documents. In part for this reason, we worked with a financial advisory firm to analyze PREPA's bond issuances between 2010 and 2013. That analysis identified a difference of several hundred million dollars between proceeds from those issuances earmarked for PREPA's Construction Fund, on the one hand, and reported uses of funds for construction-related projects and changes in restricted cash accounts for such uses, on the other hand.

Based on these findings and others set forth in Part V of this Report, if the political branches in Puerto Rico desire to keep the Public Utilities as Puerto Rico-Related Entities (rather than privatizing them), then we propose the following recommendations for consideration:

- Recomposing the boards of directors for the Public Utilities to include a mix of Governor-appointed and independent members, with longer and staggered terms across administrations;

- Establishing an audit committee comprised of a majority of independent members of the Public Utilities' boards of directors, to verify financials and compliance with rate covenants. The committee should be instructed to exclude uncollected revenues from rate covenant calculations;

- Adopting specific requirements for the Public Utilities to disclose their actual use of bond proceeds;

- Establishing independent rate boards for both of the Public Utilities, which will be tasked with setting and adhering to rate changes on a predictable, market-responsive schedule;

- Empowering an independent fiscal agent to implement the Public Utilities' respective FOAs in a way that requires compliance with rate covenants; and

- Eliminating CILT altogether.

## C.    Summary of Findings and Recommendations Regarding COFINA

As detailed in Part VI of this Report, we found no evidence that the original purpose of COFINA was to evade the Constitutional Debt Limit.  Instead, the evidence reflects that COFINA was originally intended to be a well-rated financing source that would help solve Puerto Rico's deficit issues.  Over time, however, COFINA became a comparatively accessible source of liquidity that staved off the need for Puerto Rico to find a more permanent solution to its financial problems.  And, there were insufficient checks and balances to encourage fiscal discipline or to counterweigh the expansion of uses for COFINA funds.

If Puerto Rico seeks to issue debt in the future through a tax securitization structure, then Puerto Rico's political branches should consider implementing measures that are designed to operate as meaningful checks on the use and accumulation of that debt.  Such measures may include:

- Amending the Puerto Rico Constitution so that this type of debt counts toward the Constitutional Debt Limit calculation, even though tax securitization debt is not backed by the full faith and credit of Puerto Rico;

- Adopting an independent oversight mechanism;

- Developing a plan for ultimately retiring the debt; and

- Adopting a statute that requires that the bonds or the issuer's structure be validated by a court of competent jurisdiction before the debt is issued, as discussed separately in connection with the findings we set out in Part XIV of this Report.

## D.    Summary of Findings and Recommendations Regarding ERS

Part VII of this Report presents the results of our investigation into ERS, and specifically into its decision to issue pension obligation bonds of ERS in 2008 in the aggregate amount of approximately $3 billion.  Payments on the ERS Bonds would reduce the amount of contributions received by ERS for the following 50 years.  ERS intended to invest proceeds from the bonds to offset this reduction and improve its long-term funding position.  But that strategy

The Independent Investigator's Final Investigative Report

failed, triggering extensive criticism by various ERS stakeholders.  We summarize below our key findings based on the evidence:

- ERS struggled perennially with unfunded liabilities, and by June 30, 2005, had actuarial liabilities of $12.284 billion, of which only 19% were funded;

- By 2005, GDB and ERS were considering attempting to solve ERS's unfunded liabilities problem by issuing $2 billion in POBs;

- The POBs that GDB and ERS considered at the time would have taken the form of general obligation debt, which is consistent with most POBs at that time issued by states and municipalities outside of Puerto Rico.  Such an issuance was believed to require authorization from Puerto Rico's Legislative Assembly.  The Puerto Rico Senate proposed legislation and approved it, but the Puerto Rico House of Representatives never voted on it;

- An investment bank proposed a different structure that would not have constituted a general obligation of Puerto Rico—*i.e.*, securitizing the stream of regular payments that Puerto Rico's government employers are required by statute to make to ERS;

- A Puerto Rico law firm reviewed this structure, concluded that it did not require additional approval from Puerto Rico's Legislative Assembly, and concluded that ERS could execute the proposed issuance pursuant to existing law;

- Before ERS issued the bonds, neither the CRAs nor the advisors and professionals of ERS and the underwriters involved raised material concerns about ERS's authority to do so;

- The Puerto Rico law firm acting as bond counsel for ERS opined in a letter appended to the official offering statements for the bonds that ERS had the authority to issue the bonds;

- In the first half of 2008, ERS issued nearly $3 billion of bonds exclusively into the local bond market (*i.e.,* no bonds were made available for purchase by individuals or funds located outside Puerto Rico).  ERS did not issue additional bonds in the second half of 2008 because of unanticipated market behavior.  Starting in 2009, even as credit markets began to re-open, additional ERS Bonds were not issued as a matter of policy set by the incoming administration of Governor Luis Fortuño;

- Decision-makers at ERS and GDB considered, on the advice of professionals, the potential benefits and risks involved with issuing the ERS Bonds;

- The strategy of borrowing against future employer contributions and investing the proceeds may have succeeded in improving both ERS's short-term cash position and long-term underfunding problem if reasonable projections about market behavior and other variables had held true (which they did not); and

7

- The decision to issue the bonds anyway was motivated by the need to meet ERS's immediate cash needs until adjustments to the strategy could be considered and implemented.

E.     **Summary of Findings and Recommendations Regarding Puerto Rico's Budgeting, External Reporting, and Accounting Functions**

We present the results of our investigation into Puerto Rico's budgeting, external reporting, and accounting functions in Part VIII of this Report.  As we explain in that discussion, these functions were deficient during the Relevant Period.  Among other things, Puerto Rico failed to:

- Develop budgets based on accurate growth and revenue estimates, to which it could adhere;

- Develop the infrastructure and resources it needed to support efficient accounting functions; and

- Optimize its use of independent auditors.  This often caused Puerto Rico's external financial reports to be late, which, in turn, interfered with the ability of interested parties to acquire sufficient transparency into matters that concerned, or were otherwise intertwined with, Puerto Rico's fiscal health.

To improve Puerto Rico's budgeting, external reporting, and accounting functions, we recommend that, in addition to the steps that the Oversight Board has already started to implement, Puerto Rico's political branches consider the following measures, which are among the options we present in Part VIII of this Report:

- Adopting a more rigorous process for setting budgets that, among other things: (i) estimates the impact of tax credits on anticipated revenues based on articulable factors; and (ii) includes not only the General Fund, but also the Component Units;

- Continuing to transition to GAAP-compliant budgeting, and also updating financial reporting information throughout the year using the accrual basis method. PROMESA provides for the termination of the Oversight Board only after, among other requirements, Puerto Rico has developed its budgets in accordance with modified accrual accounting standards for at least four consecutive years.  That will help steer Puerto Rico toward the goal of becoming fully GAAP-compliant;

- Studying the viability of creating a dedicated and centralized board that is devoted to: (i) aggregating critical data and financial statements from all relevant Component Units; as well as (ii) preparing and releasing the consolidated external reports;

- Adopting a joint and modernized accounting and budgeting system that: (i) is uniformly implemented across the various Component Units and funds; (ii) is accessible at will by the Department of Treasury, OMB, the Planning Board, and any entity that may be created to manage financial reporting should each be able to access

this system at will; (iii)  incorporates automatic stop-pay controls for exhausted budget categories (including payroll, following a warning as the budget cushion for that category falls below a specified threshold); and (iv) routes all invoices and bills through an online invoice queue before payments may be disbursed;

- Centralizing and streamlining the budgeting, accounting, and financial reporting functions by: (i) requiring OMB and the Planning Board to report to the Department of the Treasury; and (ii) re-drawing the Department of Treasury's responsibilities to focus on fiscal management and accounting;

- Providing online public access to spending data through a comprehensive, user-friendly, and intuitive interface;

- Adopting a mechanism for sanctioning employees and Component Units in the event that they disregard budget limits, develop unreasonable revenue forecasts, or fail promptly to resolve accounts payable.  Puerto Rico's political branches could choose whether to confer such sanctions authority upon OMB or, in the alternative, Puerto Rico's Inspector General;

- Requiring those who lead Puerto Rico's Component Units to undergo skills training at specified intervals, or to possess minimum competency credentials, with respect to fiscal planning and financial management;

- Adopting a formal deadline for publishing external financial reports, to fall within six months of Puerto Rico's fiscal year-end and tying incentives to its attainment for departments and key personnel responsible;

- Prohibiting the political turnover of external auditors without cause until after pending audits have concluded;

- Requiring incoming political administrations to retain legacy accounting employees for a specified period of time before replacing them (with replacement contingent on the new employee completing appropriate training);  and

- Repairing the internal control weaknesses that auditors have previously identified.

## F.    Summary of Findings and Recommendations Regarding Calculation of the Constitutional Debt Limit

In Part IX of this Report, we examine Puerto Rico's interpretation of the Constitutional Debt Limit found in Section 2 of Article VI of the Puerto Rico Constitution and the historical processes and procedures pursuant to which it performed the constitutional Debt Limit Calculation during the Relevant Period.  The evidence we reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations.  And we did not find any evidence that Puerto Rico's government personnel thought Puerto Rico misinterpreted the relevant constitutional provision or calculated the debt inaccurately.

The Independent Investigator's Final Investigative Report

Nevertheless, in light of Puerto Rico's debt crisis, Puerto Rico should consider whether it may be worthwhile for its judiciary to review the meaning of Section 2 of Article VI of the Puerto Rico Constitution, as well as the methods pursuant to which Puerto Rico determines the types of debt servicing payments to be included within the debt limit calculation. Significantly, the Constitutional Debt Limit did not prevent the issuance of legal, but ultimately unsustainable, amounts of public debt.

## G.  Summary of Findings and Recommendations Regarding the CRAs

Part X of this Report examines the ratings that the CRAs assigned to the primary groups of Puerto Rico-related bonds during the Relevant Period, as well as the processes through which those ratings were determined.  Because of the significance of credit ratings to certain types of investors, it is likely that the assignment of investment-grade credit ratings during the Relevant Period made Puerto Rico-Related Bonds appear more attractive to certain investors.  But we cannot conclude that those credit ratings were a significant cause of Puerto Rico's fiscal crisis.

Still, there were vulnerabilities in the processes, procedures, and criteria that the CRAs applied.  In the specific context of Puerto Rico-Related Bonds during the Relevant Period, the Issuers had too much power to frame the CRAs' analysis, and the criteria that the CRAs applied were not sufficiently objective.  Indeed, certain of the Puerto Rico-Related Bonds retained investment-grade ratings for a prolonged period despite mounting levels of debt service, declining Issuer performance, and worsening macroeconomic indicators, with several Issuers ultimately landing in a form of bankruptcy after the CRAs reduced the ratings below investment-grade.

We recommend that the Congress consider whether, in limited circumstances akin to the ones we uncovered with respect to Puerto Rico-Related Bonds during the Relevant Period, the benefits of the existing statutory bar that forecloses SEC from regulating ratings criteria and methodologies no longer justifies certain risks to municipal bond investors in municipal insolvencies.  We also offer certain reform options that could benefit the municipal bond market by making more reliable certain aspects of the CRAs' analysis, even if adopted as self-governing standards.  This includes:

- Developing guidance to help clarify when forward-looking, issuer-supplied information merits heightened skepticism or outright rejection;

- Developing guidance regarding when a credit rating agency should question whether a municipal bond issuer's financial information or budget projections are unreliable or insufficient as support for evaluating the likelihood that an issuer will pay the bond according to its terms;

- Encouraging the uniform consideration of certain credit-relevant variables; and

- Recommending that credit rating agencies have their in-house attorneys or outside counsel analyze the soundness of any legal opinion supplied by or on behalf of an issuer, to the extent that it is a key driver of the ratings analysis.

H.    **Summary of Findings and Recommendations Regarding the Selling Practices for Puerto Rico-Related Bonds**

Part XI of this Report examines the selling practices used to market Puerto Rico-Related Bonds during the Relevant Period.  Among other things, we examined how financial institutions solicited investors to purchase interests in investment funds that held such assets.

As part of that work, we assessed how the triple tax-exempt treatment of Puerto Rico-Related Bonds fueled investor appetite.  Our findings demonstrate that this was a significant driver for overexposure to Puerto Rico-Related Bonds.  For that and other reasons discussed in more detail in Part XI, we encourage lawmakers to consider reserving triple tax-exempt status for only the sub-set of bonds that comply with Section 103 of the Tax Code.

We also examined how the traditional exemption of Puerto Rico from the requirements of the 1940 Act may have contributed to Puerto Rico's broader fiscal crisis—for example, by causing CEFs to incur substantial losses.  The evidence does not permit us to conclude that the 1940 Act exemption was the sole reason for the CEFs' losses.  But it does reflect that, in combination with other market and regulatory factors, the 1940 Act exemption contributed to the losses that the CEFs suffered.

The 1940 Act is a powerful regulatory tool that, if applied to Puerto Rico, could help restore investor confidence.  This is because the 1940 Act and its regulations provide clear and consistent rules that CEFs and affiliated banks must follow regarding disclosures, leverage, and affiliated transactions.  The recent extension of the 1940 Act's requirements to Puerto Rico is therefore a positive development.  We thus recommend that federal regulators and lawmakers critically evaluate any request for a "grandfather clause" that would exempt existing Local CEFs from those requirements.

In addition to the foregoing, we present in Part XI several measures that could strengthen investor protections.  Among other options set forth in that discussion, we encourage Puerto Rico's political branches and relevant regulators to consider:

- Banning affiliated brokers and financial advisors from selling affiliated products or, in the alternative, implementing stronger rules and guidance for safeguarding investors involved in such transactions; and

- Permanently reducing the percentage of Puerto Rico assets in which on-island funds must invest.  The funds do not need to remain entirely tax-free, but they can be structured to better balance their tax advantages against the protections of greater diversification.  Financial analysts and economists should study how to achieve an appropriate balance between the risk of overconcentration and the benefits of incentivizing investments in local assets.

The Independent Investigator's Final Investigative Report

## I.     Summary of Findings and Recommendations Regarding Puerto Rico's Government Ethics Framework

As we explain in Part XII of this Report, we cannot conclude, based on the evidence, that the flow of certain employees and officials between GDB and the private-sector violated any applicable ethics laws during the Relevant Period.  Instead, the evidence we reviewed reflected that the Puerto Rico officials we studied generally either complied with applicable screening and disclosure requirements, or voluntarily sought legal opinions to bless their acceptance of private sector employment opportunities before they accepted them.

We further found that Puerto Rico's government ethics laws are not unlike the frameworks that other US jurisdictions have adopted.  The financial crisis does, however, evidence certain weaknesses in Puerto Rico's enforcement of that framework.  Remedying those weaknesses could help restore public confidence.

To that end, we recommend that Puerto Rico's political branches consider requiring GDB's successor as fiscal agent to establish an agency-level ethics committee that executes and documents the functions that the Government Ethics Act requires, and provides formal confirmation of those functions to OGEPR at regular intervals.  That agency-level ethics committee should:

- Craft its own code of conduct that tailors OGEPR policies, protocols and controls to the specific types of work that its personnel perform;

- Report on the progress of developing its code of conduct to OGEPR; and

- Work with OGEPR to ensure that the resulting guidelines are appropriate.  To the extent that Puerto Rico creates another executive agency to provide inter-agency lending services, this agency should also establish an effective agency-level ethics committee, according to the preceding guidelines.

We also recommend that Puerto Rico's political branches consider increasing OGEPR's resources to enable it to more fully execute the scope of its oversight powers across the approximately 200,000 current and former officials for which it is responsible.  Specifically, we recommend OGEPR undertake targeted reforms, including:

- Implement a whistleblower or bounty program;

- More actively exercise its rule-making authority;

- Aggressively exercise its authority to obtain reports and data from agency-level ethics committees; and

- Increase the frequency of its independent investigations.

**J.**     <u>Summary of Findings and Recommendations Regarding Issuers' Use of Interest Rate Swaps</u>

As we explain in Part XIII of this Report, the regulatory landscape has evolved since the Issuers entered into its Swap transactions during the Relevant Period. Nevertheless, the evidence we reviewed about the Swap transactions indicates that Puerto Rico's political branches should seriously consider amending Act 39 so that:

- It applies to Issuers other than merely Puerto Rico and PBA, including: (i) GDB; (ii) the Public Utilities; (iii) COFINA; and (iv) HTA;

- Potential termination fees, as well as interest, count toward the Constitutional Debt Limit; and

- Swap exposure is reported both internally and externally, including the potential collateral postings and early termination liabilities that may arise from adverse changes in assigned credit ratings.

**K.**     <u>Summary of Findings and Recommendations Regarding Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related Bonds Before They Issue</u>

Part XIV of this Report explains how and why Puerto Rico lacks a clear avenue for stakeholders to obtain judicial answers regarding the validity, enforceability or constitutionality of anticipated bond offerings. The litigation that followed Puerto Rico's debt crisis demonstrates that it would have been beneficial for Puerto Rico to have had such a clear avenue for judicial review, in the form of a bond validation statute that would have required Puerto Rico-Related Entities to obtain judicial validation of their contemplated offerings before going to market. Adopting that type of statute now could help Puerto Rico to regain public confidence going forward, and thus to increase investor demand for future Puerto Rico-Related Bond issuances. We therefore recommend that Puerto Rico's legislative branch consider adopting such a mechanism.

**L.**     <u>Summary of Findings and Recommendations Regarding the Possession Tax Credit</u>

Part XV of this Report examines whether, as some critics of the Possession Tax Credit's repeal have argued, reinstating that federal tax incentive would help Puerto Rico to improve its current economic circumstances. Our analysis does not support any conclusion that the repeal of the Possession Tax Credit "caused" Puerto Rico's recession or its fiscal crisis. And although the Possession Tax Credit is correlated with certain positive economic developments, while its repeal is correlated with certain negative economic developments, we do not find that the Possession Tax Credit stimulated the type of long-term, self-sustaining growth that Puerto Rico needs. This is in part because Puerto Rico lacked sufficient safeguards to ensure that resulting capital inflow was efficiently deployed to further such growth.

At some point, Congress may, as it has in the past, consider adopting new or additional federal tax incentives aimed at stimulating local growth for Puerto Rico. The evidence we analyzed demonstrates that Congress should consider crafting any such policy to more

effectively link the tax benefits to meaningful benchmarks for longer-term, more self-sustaining growth in Puerto Rico.  The policy should also incorporate safeguards to help Puerto Rico effectively deploy any resulting capital inflow for the purpose of such growth.

**M.**    **Summary of Independent Investigator's Overview of Potential Causes of Action**

In Part XVI of this Report, we present certain legal principles and concepts that, when applied to the facts,  various categories of stakeholders may find useful when seeking to make their own determinations about whether they may have a legal right to sue any entity or individual we discuss elsewhere in this Report.[2]  Note, however, that this Report is not evidence; nor should it be relied upon as such.

**N.**    **Summary of Public Comments**

Part XVII, the final section of this Report, provides a concise overview of the types of questions that we received from members of the public during the course of our Independent Investigation.

---

[2] Although we have undertaken to provide a general overview of the law in Puerto Rico and have been assisted by local licensed counsel, as with the other analyses in this Report, our discussion should not be interpreted as providing legal advice with respect to Puerto Rico law.  In addition, the analysis is not for reliance by any specific litigant, but rather, undertaken for the statutory purposes outlined in PROMESA.

# PART I

# PROCEDURAL BACKGROUND

# PART I
# PROCEDURAL BACKGROUND

Kobre & Kim LLP ("Independent Investigator") was retained by the Financial Oversight and Management Board for Puerto Rico ("The Oversight Board"), acting by and through the Special Investigation Committee ("Special Investigation Committee"), to conduct an investigation under the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") into certain matters relating to Puerto Rico's fiscal crisis, as described further below.

Specifically, the Independent Investigator was asked to conduct: (i) a review of the factors contributing to Puerto Rico's fiscal crisis, including changes in the economy, expansion of spending commitments and entitlement programs, changes in the federal funding it receives, and reliance on debt to finance a structural budget deficit; (ii) a review of Puerto Rico's debt, the general use of proceeds, the relationship between the debt and Puerto Rico's structural budget deficit, the range of its debt instruments, and how Puerto Rico's debt practices compare to the debt practices of states and large municipal jurisdictions; and (iii) a review of Puerto Rico's debt issuance, disclosure, and selling practices, including its interpretation of Puerto Rico's constitutional debt limit.  In consultation with the Special Investigation Committee and the Oversight Board's General Counsel, the Independent Investigator focused its inquiry on certain specific areas, as discussed further in Part I.C.1 below.

The Special Investigation Committee's principal goals for the investigation are: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted Puerto Rico and certain of its instrumentalities ("Issuers") to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to

16

assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's reentry to the capital markets.

The Independent Investigator's sole interest in this matter has been to find facts as effectively and efficiently as possible to assist the Oversight Board in achieving its goals, while maintaining the independence of the investigation. To that end, the Independent Investigator reports to the Special Investigation Committee and the Oversight Board's General Counsel.

The Independent Investigator understands its mandate includes maintaining the focus of the investigation on the issues identified by the Special Investigation Committee and statute, and maintaining the independence of the investigation from biases that may arise.

The investigation relied principally upon, and was made possible by, the voluntary cooperation of over 100 witnesses and stakeholders—including former and current senior government officers, underwriters, rating agencies, and outside professionals and advisors. In a few instances, the investigation also relied upon the issuance of subpoenas authorized pursuant to Section 104 of PROMESA.

Having completed the investigation into the matters requested by the Special Investigation Committee, we present this final report ("Report") reflecting our findings.

## A.      Background to the Investigation of the Debt Crisis

The Commonwealth of Puerto Rico ("Puerto Rico") has undergone a fiscal and economic crisis—one that eventually led to the enactment of PROMESA and the creation of the Oversight Board. The Oversight Board, on behalf of Puerto Rico and certain of its instrumentalities, filed several voluntary petitions under Title III of PROMESA (collectively, the "Title III Proceedings"), seeking to restructure their debts.[1]

As of the time of the filings of the Title III petitions, negative economic growth had persisted for nine of the prior ten years, and Puerto Rico and its instrumentalities were burdened by approximately $74 billion in public sector debt and $49 billion in pension liabilities (only

---

[1] *See* Statement of Oversight Board in Connection with PROMESA Title III Petition, *In re   Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2 (describing Puerto Rico's "crisis and fiscal emergency"); *see also* PROMESA § 701, 48 U.S.C. § 2241 (2016) (recognizing Puerto Rico's "fiscal and economic crisis"); PROMESA § 405(m), 48 U.S.C. § 2194(m) (2016) (recognizing Puerto Rico's "fiscal emergency" and "crisis").

"Title III" is a section of PROMESA that provides for judicial restructuring of debts by certain covered territories. The Title III Proceedings docketed with bankruptcy case numbers include: (i) Bankruptcy Case No. 17-BK-3283 (LTS); (ii) Bankruptcy Case No. 17-BK-3284 (LTS); (iii) Bankruptcy Case No. 17-BK-3566 (LTS); (iv) Bankruptcy Case No. 17-BK-3567 (LTS); and (v) Bankruptcy Case No. 17-BK-4780 (LTS). The Title III Proceedings remain pending before the Honorable Judge Taylor Swain.

1.57% of which was funded).[2]  Puerto Rico could no longer fully pay its debt and pay for government services, and it could not refinance its debt, as it also no longer had access to the capital markets.[3]  In short, as stated by the Oversight Board, Puerto Rico's crisis had reached a "breaking point," prompting the filing of the Title III petition for Puerto Rico on May 3, 2017.  Filings of Title III petitions followed shortly thereafter on behalf of several of its instrumentalities.

## B.   PROMESA and the Creation of the Oversight Board

Congress enacted PROMESA in June 2016 in recognition that Puerto Rico faced a "fiscal emergency" created by "[a] combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."[4]  The purpose of PROMESA was, in part, "to provide [Puerto Rico] with the resources and the tools it needs" to restructure its debts and embark on a path to economic recovery.[5]

Through PROMESA, Congress also established the Oversight Board.[6]  The statutory mandate of the Oversight Board is "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets."[7]  The Oversight Board consists of seven members appointed by the President of the United States and one ex-officio member designated by the Governor of Puerto Rico.[8]

PROMESA authorizes the Oversight Board, among other things, to conduct investigations.[9]

On May 26, 2017, the Board adopted certain procedures for conducting investigations titled the "Procedures Adopted by the Financial Oversight and Management Board for Puerto Rico for Conducting Investigations Pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act" (the "PROMESA Investigative Procedures").  The PROMESA Investigative Procedures are discussed further below.

---

[2] Statement of Oversight Board in Connection with PROMESA Title III Petition, *In re  Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2, ¶¶ 1–2.
[3] Statement of Oversight Board in Connection with PROMESA Title III Petition, *In re  Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2, ¶ 2.
[4] PROMESA, § 405(m)(1), 48 U.S.C. § 2194(m)(1) (2016).
[5] PROMESA, § 405(n)(1), 48 U.S.C. § 2194(n)(1) (2016).
[6] PROMESA, § 101(b), 48 U.S.C. § 2121(b)(1) (2016).
[7] PROMESA, § 101(a), 48 U.S.C. § 2121(a) (2016).
[8] PROMESA, § 101(e), 48 U.S.C. § 2121(e) (2016).  The seven appointed members are:  (i) Andrew G. Biggs, (ii) José B. Carrión III, (iii) Carlos M. Garcia, (iv) Arthur J. González, (v) José R. González, (vi) Ana. J. Matosantos, and (vii) David A. Skeel Jr.  The Governor of Puerto Rico was designated an ex-officio member without voting rights.
[9] PROMESA, § 104(o), 48 U.S.C. § 2124(o) (2016); *see also* PROMESA §§ 104(a), (c) & (f), 48 U.S.C. §§ 2124(a), (c) & (f) (2016).

On August 2, 2017, the Oversight Board announced its intention to conduct a comprehensive investigation of Puerto Rico's debt and its relationship to the fiscal crisis and to form a special committee of the Oversight Board for the purpose of appointing an independent investigator to carry out such investigation.

On August 6, 2017, the Oversight Board designated and delegated to the Special Investigation Committee any and all authority to pursue investigations pursuant to the Oversight Board's authority under PROMESA Section 104(o), 48 U.S.C. § 2124(o) (2016), or such other authority invested in the Board to conduct investigations under PROMESA, including PROMESA Sections 104(a), (c), and (f), 48 U.S.C. § 2124(a), (c), and (f) (2016), to make public its findings pursuant to PROMESA Section 104(p), 48 U.S.C. § 2124(p) (2016).  The Oversight Board also appointed the members of the Special Investigation Committee and delegated to it the power to determine the scope of any such investigation and to retain such investigators, agents, advisors, consultants, attorneys or any other professionals, as it in its sole discretion deems appropriate.

## C.    Retention of Kobre & Kim LLP as Independent Investigator

On September 1, 2017, the Oversight Board, acting by and through the Special Investigation Committee, retained Kobre & Kim LLP as the Independent Investigator to carry out a review of Puerto Rico's debt and its connection to the fiscal crisis, and commissioned this Report.  A copy of the engagement letter is available on the Oversight Board's website: https://juntasupervision.pr.gov/index.php/en/documents.

### 1.    Specific Areas of Inquiry

As noted above, in consultation with the Special Investigation Committee and the Oversight Board's General Counsel, we focused on the following areas of inquiry for the investigation.  Except as otherwise specified for a particular analysis in this Report, the relevant period ("Relevant Period") for the investigation was the period between 2006 and 2015.[10]

- *The Government Development Bank of Puerto Rico ("GDB").*  We examined the intersection between politics and bond issuances, including the relationship between Puerto Rico's elected officials, board members and employees of GDB, and the agencies, instrumentalities, public corporations,[11] including the Public Utilities (defined below), and other Issuers (collectively, the "Puerto Rico-Related Entities") for which GDB acted as fiscal agent and financial advisor, or to which GDB loaned

---

[10] During the Relevant Period, Puerto Rico's fiscal year ran from July 1 to June 30.  This Report refers to fiscal years by their ending year (*e.g.* "fiscal year ended 2005" refers to the fiscal year that began July 1, 2004 and ended June 30, 2005).

[11] In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations, which are entities created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions.  Commonwealth of P.R., *Financial Information and Operating Data Report*, 161 (Oct. 30, 2014).

The Independent Investigator's Final Investigative Report

money, during the Relevant Period.  We investigated the extent to which the tension between GDB's dual roles as Puerto Rico's fiscal agent and lender, together with political pressures, undermined fiscally responsible decision-making at GDB in a way that enabled the Puerto Rico-Related Entities to address operational deficits through new bond issuances or by drawing new loan obligations (rather than by raising rates or taking other measures that would have encouraged fiscal discipline and independence).  We present our primary findings relating to GDB in Part IV. Additional GDB-related findings more specific to the Puerto Rico Electric Power Authority ("PREPA") and the Puerto Rico Aqueducts and Sewers Authority ("PRASA" and, together with PREPA, the "Public Utilities") are detailed in Part V.

- *Puerto Rico's Public Utilities*.  In Puerto Rico, power production and distribution, and water sanitation and distribution, are primarily performed, respectively, by the Public Utilities.[12]  By statute, the Public Utilities' operations are supposed to be funded by rate-paying customers.[13]  Nevertheless, during the Relevant Period, the Public Utilities accrued significant debts through bond issuances and also by borrowing from private lenders and GDB.  As of February 2017, combined obligations from the Public Utilities made up nearly 18% of Puerto Rico's total $74 billion in public sector debt.  As part of our investigation, we examined how the Public Utilities' governance structures, degree of dependence on and oversight by Puerto Rico, rate setting and collection of revenues, bond issuances, capital improvement projects, and general operations combined to impact their revenue streams and contribute to Puerto Rico's fiscal crisis.  We present our findings in connection with this area of inquiry in Part V and, to a lesser extent, in Part III.

- *The Puerto Rico Sales Tax Financing Corporation ("COFINA")*.  COFINA is a public corporation created for the purpose of issuing bonds secured by a portion of the sales and use tax authorized under the Taxpayers Justice Act of 2006.  We reviewed why COFINA was created; what evidence exists that it was created or used to circumvent the constitutional debt limit; the constitutional balanced budget requirement, or other legal requirements, and how it eventually became a means to finance operational deficits.  We present our findings in connection with this area of inquiry in Part VI.

- *The Employees Retirement System*. The Retirement System  for Employees of the Government of the Commonwealth of Puerto Rico, formerly known as the Employees Retirement System of the Insular Government of Puerto Rico and its Instrumentalities (*Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico* in Spanish) ("ERS"), is a trust created by legislative act for the purpose of providing pension and other benefits to retired employees of the government of Puerto Rico, with benefits funded by contributions made by Puerto Rico and its

---

[12] PRASA Act, P.R. Laws Ann., tit. 22 § 144 (2018); PREPA Act, P.R. Laws Ann. tit. 22 §193(a) (2018).
[13] PRASA Act (P.R. Laws Ann. tit. 22 § 158 (2018)); PREPA Act (P.R. Laws Ann. tit. 22 § 196(l) (2018)).

The Independent Investigator's Final Investigative Report

employees. In 2008, ERS issued nearly $3 billion of aggregate principal amount bonds ("ERS Bonds") to be secured by future employer contributions, invested the bond proceeds, and used the earnings generated thereon to provide pension benefits. We investigated the circumstances surrounding the issuance of these bonds. We present our findings in connection with this area of inquiry in Part VII.

- *Puerto Rico's Budgeting, External Reporting, and Accounting Functions.* We also investigated Puerto Rico's budgeting, accounting, and external fiscal reporting functions, including the extent to which any weaknesses in those functions contributed to Puerto Rico's fiscal crisis. Although we provide no legal advice on tax or accounting matters in this Report, we further sought to identify reform measures that could help Puerto Rico to repair those weaknesses and, as a result, restore sufficient public confidence to regain access to the capital markets. We present our findings in connection with this area of inquiry in Part VIII.

- *Calculation of the Constitutional Debt Limit.* The Puerto Rico Constitution limits the amount of debt that Puerto Rico may issue in the form of bonds or notes backed by Puerto Rico's "full faith, credit and taxing power." As part of our investigation, we looked into the way that the constitutional debt limit has been interpreted, the process by which it was calculated, and whether there was any evidence to support or refute any suggestion that the constitutional debt limit was deliberately or knowingly exceeded. We present our findings in connection with this area of inquiry in Part IX.

- *The Credit Rating Agencies.* Despite Puerto Rico's prolonged fiscal crisis and the poor performance of certain Issuers, the three major credit rating agencies in the US (Fitch Ratings ("Fitch"), Moody's Investor's Service, Inc. ("Moody's"), and S&P Global Ratings f/k/a S&P Rating Service ("S&P" and, collectively with Fitch and Moody's, the "CRAs") maintained investment-grade credit ratings for most Puerto Rico-Related Bonds until they began downgrading those credit ratings to non-investment-grade across Issuers in February 2014. As part of our independent investigation, we examined (i) what role the credit ratings agencies played with respect to relevant bond issuances; and (ii) the extent to which their assigned credit ratings, or the processes through which they determined those ratings, may have contributed to Puerto Rico's fiscal crisis. We present our findings in connection with this area of inquiry in Part X.

- *Selling Practices for Puerto Rico-Related Bonds.* We investigated the market conditions and the regulatory environment that shaped the industry for Puerto Rico debt securities and affected the underwriting process, primary and secondary market bond sales, and the creation and growth of the Puerto Rico closed-end funds ("CEFs"). CEFs held a substantial amount of Puerto Rico bonds and were exempt from a significant segment of federal regulation that applies to similar funds on the US mainland. However, Puerto Rico-specific rules and regulators governed the CEFs. We examine the effects of this regulatory landscape on CEF-affiliated transactions, leverage, composition and concentration, pricing, disclosures, and related selling practices. We also describe the components of the Puerto Rico debt market, the dynamics of that market, and identify the key participating financial

The Independent Investigator's Final Investigative Report

institutions involved in Puerto Rico sales of retail bonds in CEFs.  We present our findings in connection with this area of inquiry in Part XI.

- *Puerto Rico's Government Ethics Framework*.  We investigated the extent to which there was evidence of any self-dealing or potential conflicts of interest between GDB officials and the financial institutions that underwrote the Puerto Rico-Related Bonds during the Relevant Period having impacted the bond issuances.  We present our findings in connection with this area of inquiry in Part XII.

- *Issuers' Use of Interest Rate Swaps*.  During the Relevant Period, certain Issuers entered into dozens of interest rate exchange agreements, more commonly known as interest rate swaps ("Swaps").  By September 30, 2014, the Issuers had paid over $1.085 billion in net termination fees to the banks that acted as counterparties to these agreements.  The Issuers issued more bonds to raise funds to pay for these termination fees.  As part of our investigation, we examined the circumstances surrounding the Issuers' entry into the Swaps, the management of their financial consequences and, finally, their costly termination.  We present our findings in connection with this area of inquiry in Part XIII.

- *Puerto Rico's Lack of a Clear Mechanism for Validating Puerto Rico-Related Bonds Before They Issue*.  Several US jurisdictions have statutes that clearly empower their courts to rule on the validity, enforceability, or constitutionality of a proposed bond offering.  If properly used, these mechanisms can limit imprudent debt issuances by stopping them before they hit the market.  They can also increase investor demand for, and confidence about, the sub-set of proposed bonds that a court validates prior to issuance, by supplying comfort that the bonds do not have fundamental defects.  Puerto Rico does not have this type of clear mechanism.  Instead, it has two legal procedures that could, in appropriate circumstances, have been adapted to obtain pre-issuance review of certain Puerto Rico-related bond issuances.  But neither avenue for judicial review was sufficiently clear to interested stakeholders during the Relevant Period.  Ultimately, we counsel Puerto Rico's political branches to consider whether to adopt a dedicated bond validation statute.  Such a statute could ease Puerto Rico's return to the capital markets by requiring the Puerto Rico-Related Entities to obtain pre-issuance validation from the judiciary, before bolstering investor confidence in the legality and enforceability of such debt.  We present our findings in connection with this area of inquiry in Part XIV.

- *The Possession Tax Credit*.  Historically, US policymakers have extended tax favored treatment to certain investments in Puerto Rico as a way of encouraging the local economy.  Former Section 936 of the Internal Revenue Code (the "Possession Tax Credit") offered one such incentive.  Some have asserted that the end of the Possession Tax Credit's repeal in 2006 was the trigger for Puerto Rico's fiscal crisis or suggested that reinstating it would help to ameliorate Puerto Rico's current circumstances.  We therefore studied evidence regarding how the Possession Tax Credit, and its repeal, impacted Puerto Rico's fiscal health.  We present our findings in connection with this area of inquiry in Part XV.

## 2.   Investigation Process and Methods

In this section, we describe the process by which the Independent Investigator, on behalf of the Special Investigation Committee, conducted the investigation that culminated in this Report.   The Independent Investigator developed its approach and did its work in regular consultation with the Special Investigation Committee.

### (a)   Procedural Aspects of the Investigation

The PROMESA Investigative Procedures adopted by the Oversight Board in May 2017, pursuant to its investigative powers under PROMESA, established the procedural framework for the investigation.[14]   Those PROMESA Investigative Procedures authorize the Oversight Board to commence an "Informal Investigation" and a "Formal Investigation" to probe activities or conduct for which the Board has authority to investigate under PROMESA (referred to in the PROMESA Investigative Procedures as "Relevant Activities").[15]   The key procedural difference between the two types of investigations is that the Oversight Board is only authorized to issue process to compel testimony and production of investigative materials upon the commencement of a Formal Investigation.[16]   The Independent Investigator used both formal and informal investigative techniques to achieve the mandate set out by the Special Investigation Committee.

---

[14]    The    PROMESA    Investigative    Procedures    are    available    at https://juntasupervision.pr.gov/index.php/en/documents/.

[15] Under the PROMESA Investigative Procedures, an Informal Investigation is an inquiry or review of Relevant Activities undertaken by the Board pursuant to its investigatory powers under PROMESA for which the Board has not adopted an Investigative Resolution authorizing a Formal Investigation. PROMESA Investigative Procedures, § 1.3(10).  The Oversight Board's General Counsel may authorize an Informal Investigation where, from complaints received from members of the public, communications with departments or agencies of the United States, communications with the Puerto Rico Government, examination of publicly available information, or otherwise, it appears that misconduct may have occurred in connection with Relevant Activities.   PROMESA Investigative Procedures, § 3.1(a).   A Formal Investigation under the PROMESA Investigative Procedures is a formal inquiry or review of Relevant Activities undertaken by the Board pursuant to its investigatory powers under PROMESA, for which inquiry or review the Board or its designated agent has adopted an Investigative Resolution authorizing the Formal Investigation.   PROMESA Investigative Procedures, § 1.3(6).  The Board has the authority to adopt an Investigative Resolution initiating a Formal Investigation, upon recommendation of the Board's counsel and General Counsel, following a determination by the Board's General Counsel, in collaboration with the Oversight Board's counsel, that (a) there is evidence that appears to support a finding that misconduct has occurred, is occurring, or is about to occur regarding any Relevant Activities, or (b) an Informal Investigation has been initiated, but the Board's counsel has been unable to conduct the investigation without access to Investigative Subpoenas.   PROMESA Investigative Procedures, § 3.2.

[16] PROMESA Investigative Procedures, §§ 3.1(b), 3.2(b)(2).   Section 104 of PROMESA vests the Oversight Board with the power to issue subpoenas "requiring the attendance and testimony of witnesses and the production of books, records, correspondence, memoranda, papers, documents, electronic files, metadata, tapes, and materials of any nature relating to any matter under investigation by the Oversight Board." 48 U.S.C. § 2124(f)(1) (2016).

The Independent Investigator's Final Investigative Report

Shortly after the Independent Investigator's retention in September 2017, the Oversight Board's General Counsel authorized the Independent Investigator to conduct an Informal Investigation on behalf of the Special Investigation Committee, pursuant to the PROMESA Investigative Procedures.  On October 18, 2017, the Special Investigation Committee, acting on behalf of the Oversight Board, approved a Resolution Initiating Formal Investigation for Purpose of Issuing Investigative Subpoenas (the "Investigative Subpoenas Resolution").[17]  In general terms, under the Investigative Subpoenas Resolution, a Formal Investigation is deemed initiated for the purpose of authorizing the Independent Investigator to issue Investigative Subpoenas[18] in circumstances where a witness has not voluntarily cooperated with the Independent Investigator's requests for documents or an interview, where the witness has communicated that it cannot voluntarily cooperate with the Independent Investigator's requests, or where the witness has provided an interview but the Independent Investigator, in consultation with the Oversight Board's General Counsel, determines that it would be appropriate to have the witness testify under oath.[19]

While the Investigative Subpoenas Resolution authorized the Independent Investigator to issue Investigative Subpoenas in the circumstances described, witnesses, in the main, cooperated with the Independent Investigator, and the Independent Investigator used the tools available through the Informal Investigation.   That cooperation—facilitated by the Independent Investigator's use of its subpoena power only as needed—enabled the Independent Investigator to complete the investigation in an efficient and timely manner, consistent with the objectives of PROMESA and as requested by the Special Investigation Committee.   The Independent Investigator was especially mindful of avoiding the delay and cost of litigating subpoenas.   In

---

[17]   The Investigative Subpoenas Resolution is available at https://juntasupervision.pr.gov/index.php/en/documents/.

[18]  An "Investigative Subpoena" is defined in Section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA Section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution.

[19] More specifically, the Investigative Subpoenas Resolution provides:  "In the event that the Independent Investigator (1) has delivered an informal request for Investigative Materials to a witness and such witness (i) has not responded to the informal request within fourteen (14) days of the date of such delivery, (ii) has responded to the informal request in a manner that the Independent Investigator, in consultation with the General Counsel, determines is insufficient, or (iii) has communicated to the Independent Investigator that he, she or it will not or cannot produce Investigative Materials on a timely and voluntary basis or without the issuance of process; (2) has requested that a witness provide an interview and such witness (i) has not responded to the request within fourteen (14) days of the date the request is communicated, (ii) has communicated to the Independent Investigator that he, she or it will not provide an interview on a timely and voluntary basis, or (iii) has provided an interview but the Independent Investigator, in consultation with the General Counsel, determines that it would be appropriate to have the witness testify under oath; or (3) the Independent Investigator, in consultation with the General Counsel, determines that it would be appropriate to have a witness testify under oath without first interviewing the witness, the requirements for (a) the initiation of a Formal Investigation set forth in Section 3.2(a) of the [PROMESA Investigative] Procedures and (b) the issuance of an Investigative Subpoena set forth in Section 5.1(a) of the [PROMESA Investigative] Procedures . . . , in each case, shall be deemed satisfied."  Investigative Subpoenas Resolution, ¶ A.

addition, as much of the litigation likely could have occurred in the courts of Puerto Rico,[20] the cases would have faced longer-than-usual docket-related delays in the aftermath of Hurricanes Irma and Maria, which closed or delayed the operation of Puerto Rico courts just as the Independent Investigator was soliciting information.

## (b)    Gathering of Information and Materials

Starting in September 2017, in furtherance of the Informal Investigation, the Independent Investigator delivered letters to more than 90 entities (collectively, the "Document Preservation and Request Letters").   The Document Preservation and Request Letters identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients of the letters preserve and produce any responsive documents in their possession, custody, or control.   After the Document Preservation and Request Letters were sent, the Independent Investigator scheduled and conducted conferences with the recipients (most by phone, some in person) to reiterate the requests and discuss a process for identification and delivery of documents to the Independent Investigator.

Over the course of the investigation, the Independent Investigator received a total of approximately 260,800 documents consisting of approximately 2,740,000 pages, from 32 parties. Those parties include, among others, a number of Puerto Rico entities, financial institutions, rating agencies, financial advisors, professionals, and regulators.   The documents that the Independent Investigator received include those that parties voluntarily provided in response to the Document Preservation and Request Letters, as well as documents that certain parties provided in response to supplemental and other informal requests.   In a number of cases, documents were produced based on negotiated search terms and custodian lists.   The Independent Investigator also obtained documents from certain federal governmental agencies by utilizing the Oversight Board's statutory right under PROMESA to secure documents directly from those agencies.[21]   In the case of many entities, we made an investigative choice that they did not need to produce documents because of the large body of investigative material we obtained from other parties, including GDB and the SEC.

Pursuant to the Investigative Subpoenas Resolution, the Independent Investigator issued twelve Investigative Subpoenas (five of which were withdrawn after issuance based on the

---

[20] PROMESA provides that jurisdiction to compel witness testimony and production of materials through a subpoena issued by the Oversight Board is governed by Puerto Rico's "long-arm" statute.   *See* 48 U.S.C. § 2124(f)(1).   PROMESA further provides for the enforcement of such a subpoena in the local courts of Puerto Rico.   *See* 48 U.S.C. § 2124(f)(2) (2016) (providing that if a person refuses to obey a subpoena issued by the Oversight Board in connection with an investigation, "the Oversight Board may apply to the court of first instance of the covered territory").

[21] Specifically, Section 104(c)(1) of PROMESA provides, in relevant part, that the Oversight Board "may secure directly from any department or agency of the United States information necessary to enable it to carry out [PROMESA], with the approval of the head of that department or agency."   48 U.S.C. § 2124(c)(1) (2016).

recipient's subsequent agreement to voluntarily cooperate with the Independent Investigator).[22] Those Investigative Subpoenas were generally issued because certain recipients of Document Preservation and Request Letters were unresponsive to the letters, or because those recipients communicated to the Independent Investigator that they could not comply with the requests voluntarily.   Without exception, the recipients of the Investigative Subpoenas produced documents to the Independent Investigator in response to those subpoenas.

The Independent Investigator also secured direct, read-only access to the email custodial files of dozens of employees and former employees of GDB through its representative, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF").[23]   Over the course of the investigation, the Independent Investigator ran targeted searches through certain of the GDB custodial files and undertook a review of documents responsive to those searches.   While those custodial files were only accessible electronically (through a Relativity database), the Independent Investigator requested periodically throughout the investigation that AAFAF, acting as representative for GDB, produce specifically identified documents contained in the electronic database.   On behalf of GDB, AAFAF produced to the Independent Investigator approximately 36,000 documents from that database.

The materials gathered by the Independent Investigator have been treated with appropriate confidentiality as designated by the people and organizations that produced them pursuant to a confidentiality agreement.   The Independent Investigator took reasonable steps to maintain confidentiality pursuant to Sections 10.1 and 10.3 of the PROMESA Investigative Procedures.   To protect these confidentiality concerns, the Independent Investigator provided two interim reports so that the public and any interested parties could follow the progress of the investigation without compromising confidentiality.

On September 6, 2017, Hurricane Irma hit Puerto Rico, followed by Hurricane Maria on September 20. Both hurricanes caused significant damage to the island, and recovery and rebuilding efforts are ongoing in Puerto Rico. PREPA and PRASA have faced the effects of the debt crisis acutely as Puerto Rico recovers from Hurricane Maria. Furthermore, internet connectivity, access to electronically-stored documents, and the normal attorney-client communications that witnesses require in preparing to respond to investigative requests were made unusually challenging. Accordingly, upon any reasonable request, the Independent Investigator accommodated witnesses' requests for extensions of response deadlines.

---

[22] The recipients of Investigative Subpoenas (apart from those that were withdrawn) were Banco Popular de Puerto Rico, Mesirow Financial Inc., Popular Inc., Popular Securities LLC, Santander Asset Management LLC, Santander Bancorp, and Santander Securities LLC.
[23] That access was obtained through Section 104(c)(2) of PROMESA, which provides as follows: "Notwithstanding any other provision of law, the Oversight Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Oversight Board to carry out its responsibilities under this chapter. At the request of the Oversight Board, the Oversight Board shall be granted direct access to such information systems, records, documents, information, or data as will enable the Oversight Board to carry out its responsibilities under this chapter." 48 U.S.C. § 2124(c)(2) (2016).

(c)    **Witness Interviews**

The Independent Investigator conducted a total of approximately 120 voluntary witness interviews, probing a wide range of topics relevant to the investigation.  The interviews commenced in December 2017 and were taken on a rolling basis, concluding in August 2018. The individuals who provided interviews included former and current senior government officers, underwriters, credit rating agencies, auditors, outside professionals and advisors, as well as former Governors.

In keeping with the structure and spirit of the Investigative Subpoenas Resolution, we attempted first to interview all witnesses voluntarily, with the aim of seeking testimony under oath only if voluntary interviews were refused, or if any specific circumstances warranted testimony under oath. Further, in consultation with the Special Investigation Committee, we determined that it would be sufficient for the specific purposes and goals of the investigation, as outlined in PROMESA, for us to formulate our conclusions and recommendations on statements made by witnesses substantiated, wherever possible, by documentary evidence.  For those reasons, and because the Independent Investigator conducted a voluntary interview with each individual and entity witness for which an interview was sought,[24] we did not take testimony under oath, nor were the interviews transcribed.

Litigants seeking to prove their entitlement to relief on claims specific to their interests will, of course, desire evidence admissible in the forum of their choice.  The Independent Investigator was not retained to, and in any event could not, displace those litigants.  The Independent Investigator is not an advocate.  Rather, with the input of the Special Investigation Committee, the Independent Investigator was retained to gather the evidence on a wide variety of topics, the overwhelming majority of which do not necessarily involve evidence that would be admissible in court proceedings.

A subpoena-driven process would not only have delayed the progress and completion of the investigation, but it would have also imposed substantial additional costs on the investigation, all of which would have been paid with public monies.  In contrast, the Independent Investigator has concluded the investigation and published its Report within the approximately eleven (11) month goal set for completion and in accordance with budgets agreed to by the Special Investigation Committee, which were reflective of the Special Investigation Committee's desire for the investigation to be conducted in as timely and efficiently a manner as possible.

(d)    **Cooperation with Title III Official Committees**

Throughout the investigation, the Independent Investigator engaged in robust cooperation and consultation with the two committees of creditors appointed in the Title III proceedings (the "Title III Committees").  Those committees are the Official Committee of Unsecured Creditors

---

[24] In the case of entity witnesses (such as underwriters, credit rating agencies and auditors), in certain instances the Independent Investigator and the entity conferred on the appropriate representative(s) of that entity who would provide the interview.

(the "<u>Unsecured Creditor Committee</u>") and the Official Committee of Retired Employees (the "<u>Retiree Committee</u>").

On July 21, 2017, the Unsecured Creditor Committee filed a motion (the "<u>UCC Rule 2004 Motion</u>") in the Title III Proceeding, seeking to pursue examinations under Federal Rule of Bankruptcy Procedure 2004 with regard to three groups of entities:  GDB, Banco Santander Puerto Rico and affiliates ("<u>Santander</u>"), and Popular, Inc. and affiliates ("<u>Popular</u>").[25]  At a hearing held on November 15, 2017, the court overseeing the Title III Proceeding (the "<u>Title III Court</u>") denied that motion without prejudice, to avoid a parallel investigation that would duplicate aspects of the investigation being undertaken by the Independent Investigator.  As part of that decision, the Title III Court requested that the Title III Committees and the Independent Investigator develop a protocol to work together to enable the Title III Committees to have meaningful input into the investigation.  To facilitate that process, the Title III Court requested, at the November 15 hearing, that the Unsecured Creditor Committee and Independent Investigator negotiate and enter into a cooperation and non-disclosure agreement ("<u>Cooperation Agreement</u>") in short order.  The Retiree Committee had previously executed a cooperation and non-disclosure agreement on November 3, 2017.  The Unsecured Creditor Committee executed a Cooperation Agreement in the beginning of March 2018.[26]

Beginning shortly after the November 2017 court hearing discussed above (and notwithstanding that the Unsecured Creditor Committee did not execute the Cooperation Agreement until over three months later), the Independent Investigator regularly engaged with both Title III Committees regarding the investigation.  Specifically, in addition to cooperation and communication by calls and e-mails when needed, the Independent Investigator participated in weekly telephone conferences with counsel for each of the Title III Committees.  During those conferences, the Independent Investigator provided information regarding witnesses to be interviewed in the coming week and solicited input from the Title III Committees as to areas to probe during those interviews.  The Independent Investigator took that input into account during the interviews, including by asking questions that counsel to the Title III Committees requested that the Independent Investigator ask.  As the investigation progressed, the Independent Investigator also provided counsel to the Title III Committees with its preliminary observations regarding the results of the investigation in areas in which the Title III Committees had expressed interest.

The Independent Investigator also facilitated the Title III Committees' access to materials that were provided to the Independent Investigator.  In particular, the Independent Investigator provided the Title III Committees with access to a centralized document depository that included materials produced by parties either voluntarily or in response to an Investigative Subpoena.

---

[25] *See* Mot. of Official Committee of Unsecured Creditors for Order, Under Bankruptcy Rule 2004, Authorizing Discovery Program With Respect to Certain Causes of Puerto Rico Financial Crisis, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. 17-3283-LTS (D.P.R. July 21, 2017), ECF No. 706.

[26] Over a period of several months, the Unsecured Creditor Committee sought to negotiate revisions to the same form of agreement previously executed by the Retiree Committee.

Those materials included all documents produced by Popular and Santander, two of the three parties that were the subject of the UCC Rule 2004 Motion, as well as a number of other parties. Those Popular and Santander productions were made in response to subpoenas issued by the Independent Investigator. Those subpoenas incorporated requests for documents that were proposed by the Unsecured Creditor Committee. In the case of GDB, the other party that was the subject of the UCC Rule 2004 Motion, the Title III Committees were provided with access to all non-privileged GDB documents that were produced to the Independent Investigator, along with a privilege log identifying documents that were withheld at the direction of GDB. In sum, the Title III Committees were provided with the same level of access to materials provided to the Independent Investigator that they would been entitled to had they independently sought those materials through an examination in the Title III Proceeding.

The Title III Committees represent the interests of certain creditor constituencies. Naturally, then, the Title III Committees may see fit to further probe specific areas addressed in this Report, in a manner directed to the pursuit of those specific interests. In contrast, the Independent Investigator is not an advocate and does not represent the interest of any creditor or other stakeholder. Should either or both of the Title III Committees choose to request authority from the Title III Court to pursue any further probe, they will have the benefit of the information, facts and findings set forth in this Report, as well as a voluminous body of investigative material already made available to them.

### (e)    The Work Reflected In This Report

As noted in Part I of this Report, the Special Investigation Committee's related goals for the investigation were: (i) to identify any policies (or lack of safeguards) that contributed to the Puerto Rico debt crisis, including factors that permitted the government and its instrumentalities to issue significant amounts of debt without adequate sources of repayment; and (ii) to identify potential value recovery from culpable parties and identify matters for regulatory attention, all to assist the Oversight Board in its mission to restore fiscal balance and economic opportunity and to promote Puerto Rico's reentry to the capital markets.

In furtherance of those goals, the Independent Investigator focused on finding facts in an objective and independent manner based on the information and materials gathered, and then reporting them. The Independent Investigator is also a law firm. As such, this Report reflects the work of lawyers and non-lawyer personnel who worked under the direction and supervision of those lawyers. Again, consistent with the purpose, direction and procedural goals of the investigation described above, the Independent Investigator did not retain economists or experts (financial or otherwise), with the exception of a limited retention of a financial advisory firm for assistance with discrete areas as identified in the Report.[27] Accordingly, this Report does not provide a macroeconomic analysis of the causes of the Puerto Rico debt crisis; nor does it set

---

[27] Specifically, the firm Duff & Phelps ("D&P") provided assistance to the Independent Investigator in analyzing the reported use of the proceeds of certain PREPA bond issuances, as well as calculating the represented uses of the proceeds of certain bond issuances of several Issuers.

forth any expert opinions about those causes. The Report reflects our analysis of the evidence we reviewed, including the weight and assessment we gave to statements made by witnesses.

Additionally, we note that the subject matters covered by this Report are those that were specifically approved by the Special Investigation Committee prior to the drafting of this Report. The Report sets forth the findings of the Independent Investigator related to those subject matters, and also provides recommendations for legislative or policy changes based on those findings that would assist Puerto Rico in regaining access to the capital markets.

The Report also provides a discussion and survey of potential causes of action that the Independent Investigator identified that may arise from the facts learned through the investigation. That discussion is not intended to provide an exhaustive or definitive list and analysis of causes of action that may be available to investors, creditors, debtors, regulators and other parties. Indeed, we do not opine on the likelihood of success of any cause of action. Further analysis and gathering of evidence by other stakeholders, with mandates different or broader than ours, will inform whether any potential causes of action or legal remedies identified in this Report can and should be pursued and, if so, in what manner and against whom. The facts, information and findings set forth in this Report may be a resource for both litigants and courts involved in proceedings related to the subject matters addressed in this Report. At no time does this Report purport to provide legal advice and parties are advised to consult their own counsel in determining the appropriate course and strategy for pursuing causes of action, if any.

# PART II

# HISTORICAL BACKGROUND

# PART II
# HISTORICAL BACKGROUND

The following background discusses certain historical macroeconomic and political factors contributing to Puerto Rico's fiscal crisis.  In providing this background, we do not purport to present a comprehensive account of all factors that contributed to Puerto Rico's fiscal crisis.  Detailed discussions of contributing factors have already been the subject of study and reporting by governmental bodies, the press, and scholars.[1]  In this Part of the Report, we limit our discussion to certain of those factors in an effort to set the stage and provide context to our findings and recommendations.

We proceed in two steps. First, we briefly summarize Puerto Rico's economic and sociopolitical development through the early 2000s, with an emphasis on those features that have contributed to its tendency towards fiscal imbalance.  Second, we provide an account of more recent developments leading up to the present crisis.

---

[1] *See*, *e.g.*, Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook* (2017); James Surowiecki, *The Puerto Rican Problem,* The New Yorker, Apr. 6, 2015; Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at Geo. Mason Univ., *Origins of the Puerto Rico Fiscal Crisis* (2016).

The Independent Investigator's Final Investigative Report

A.   __Historical Factors Contributing to Puerto Rico's Fiscal Imbalance: 1898 – 1996__

1.   __Historical Background and Status in Relation to the United States__

Puerto Rico is an island located between the Caribbean Sea and the North Atlantic Ocean, approximately 1,150 miles southeast of the mainland United States.[2]   It came under United States sovereignty in 1898 pursuant to the Treaty of Paris, which ended the Spanish-American War.[3]   Pursuant to the Territorial Clause of the US Constitution, Congress was authorized "to dispose of and make all needful Rules and Regulations respecting" Puerto Rico.[4] In 1900, after a brief initial period of military governance, Congress enacted the Foraker Act, which established a civilian government on the island, but stopped short of incorporating Puerto Rico as a state or granting US citizenship or the right to vote for representatives to the US government.[5]

In 1917, the Jones Act offered citizenship to those born in Puerto Rico and effected a number of other changes aimed at strengthening Puerto Rico's civil government.[6]   Notably, while the Jones Act placed Puerto Rico under the jurisdiction of most US statutory laws, it exempted it from internal revenue laws.[7]

Puerto Rico's most recent changes in status occurred between 1950 and 1952, with the passage of the Federal Relations Act, the approval of the Federal Relations Act by referendum and adoption of a constitution by the people of Puerto Rico, and the approval of that constitution by the US Congress.[8]

---

[2] Commonwealth of P.R., *Financial Information and Operating Data Report*, 8 (Dec. 18, 2016); CIA World Factbook, *Central America and Caribbean: Puerto Rico*, https://www.cia.gov/library/publications/the-world-factbook/geos/rq.html (last visited Aug. 13, 2018).

[3] Commonwealth of P.R., Financial Information and Operating Data Report, 8 (Dec. 18, 2016); *see also* CIA World Factbook, *Central America and Caribbean: Puerto Rico*, https://www.cia.gov/library/publications/the-world-factbook/geos/rq.html (last visited Aug. 13, 2018); R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 2 (2017).

[4] U.S. Const., art. IV, § 3, cl. 2; see also R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 2 (2017).

[5] *See* The Foraker Act of Apr. 12, 1900, ch. 191, 31 Stat. 77 (1900); *see also* R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 4-5 (2017); Dorian A. Shaw, *The Status of Puerto Rico Revisited: Does the Current U.S.-Puerto Rico Relationship Uphold International Law?,* 17 Fordham Int'l L.J. 1006, 1013 n. 41 (1994).

[6] *See* Jones Act of Mar. 2, 1917, ch. 145, 39 Stat. 951 (1917); *see also* R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 5 (2017).

[7] See 48 U.S.C.A. § 734 (1917); *see also* Dorian A. Shaw, *The Status of Puerto Rico Revisited: Does the Current U.S.-Puerto Rico Relationship Uphold International Law?,* 17 Fordham Int'l L.J. 1006 (1994).

[8] *See* 64 Stat. 319 & 66 Stat. 327; *see also* R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 5 (2017).

2.   <u>**Contemporary Status in Relation to the United States and Related Fiscal Implications**</u>

Today, Puerto Rico is an organized territory of the United States with Commonwealth status.[9]  This Report does take a position with respect to Puerto Rico's relationship with the federal government, but provides a basic background on the history of this relationship.  Although those born in Puerto Rico are US citizens, residents of Puerto Rico lack many of the rights and privileges enjoyed by citizens on the mainland.  As summarized in a 2017 report for the Congressional Research Service, "Puerto Rico is both deeply integrated into American society and insulated from it. . . .  Residents of Puerto Rico lack full voting representation in Congress, typically do not pay federal income taxes on income earned on the island, do not have the same eligibility for some federal programs as those in the states, do not vote in presidential elections (although they may do so in party primaries) . . . ."[10]

Like the federal government, Puerto Rico has three branches of government:  the executive, the legislative, and the judicial.[11]   The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.  The highest Puerto Rico court is the Supreme Court of Puerto Rico.

Two of Puerto Rico's political parties have typically competed for the support of Puerto Rico voters: (i) the New Progressive Party (*Partida Nuevo Progresista* in Spanish, or "<u>PNP</u>"); and (ii) the Popular Democratic Party (*Partido Popular Democrático* in Spanish, or "<u>PPD</u>").  The PNP is typically viewed as the party that advocates for Puerto Rico to become a US state (among other things), whereas the PPD is typically viewed as the party that advocates for Puerto Rico to retain a more autonomous status (among other things). Many surveys of Puerto Rico residents reflect that support is almost evenly shared between these two parties.

As a general matter, Congress has granted Puerto Rico substantial latitude in the management of its internal affairs.  Puerto Rico exercises virtually the same control over its internal affairs as do the 50 states.[12]   Unlike a number of other US territories, Puerto Rico is not required to adopt a "mirror" of the US Internal Revenue Code, and has instead enacted its own income tax system.[13]   The resulting tax code has been described by the Federal Reserve Bank of New York as featuring "low collection rates on major taxes, an income tax code plagued by

---

[9] Commonwealth of P.R., *Financial Information and Operating Data Report*, 4 (May 15, 2009); CIA World   Factbook,   *Central   America   and   Caribbean:   Puerto   Rico*, https://www.cia.gov/library/publications/the-world-factbook/geos/rq.html (last visited Aug. 13, 2018).

[10] R. Sam Garrett, Cong. Research Serv., *Political Status of Puerto Rico: Brief Background and Recent Developments for Congress*, 3 (2017).

[11] Commonwealth of P.R., *Financial Information and Operating Data Report*, 9 (Dec. 18, 2016).

[12] Commonwealth of P.R., *Financial Information and Operating Data Report*, 5 (May 15, 2009).

[13] Sean Lowry, Cong. Research Serv., *Tax Policy and U.S. Territories: Overview and Issues for Congress*, 4 (2016).

The Independent Investigator's Final Investigative Report

many exceptions, deductions, and preferences, and liberal use of tax incentives for favored purposes."[14]

Congress has also historically deferred to Puerto Rico on matters of financial and securities regulation. For instance, the Investment Company Act of 1940 ("1940 Act") regulates the packaging and selling of mutual funds investing in bonds issued by municipalities within the states by, among other things, prohibiting the same financial institutions from playing multiple, potentially conflicting roles with respect to any particular issuance. However, the 1940 Act provided an exemption from these rules and conflict of interest prohibitions for issuances of Puerto Rico municipal bonds. In the wake of that exemption, Puerto Rico did not enact laws of its own to regulate such conduct, giving its issuers a platform to issue municipal debt in a playing field for municipal bond issuances materially distinct from any within the 50 states.[15] We also discuss the importance of this distinction in Part XI.

Puerto Rico is also responsible for its own financial reporting. However, as further discussed below (see Part VIII), its Comprehensive Annual Financial Reports ("CAFRs") have historically often been late compared to similar reports furnished by the 50 states. For example, the 2013 CAFR was issued 365 days after the end of the fiscal year, much later than every state.[16]

Because it is neither a state, nor an independent nation, Puerto Rico lacks access to critical resources for fiscal relief. For instance, Puerto Rico is placed at a severe disadvantage relative to the 50 states in securing federal funding for social programs. The federal government reimburses states between 50 percent and 83 percent of their Medicaid expenses, with the specific percentage indexed to each state's per capita income per Federal Medical Assistance Percentages.[17] Puerto Rico, however, is subject to a federal reimbursement cap of 55 percent of its Medicaid expenses regardless of its poverty levels and other factors which, for states, determine reimbursement rates. In addition, Puerto Rico is subject to a separate dollar cap, which has not scaled with the costs of the program.[18] As a result, in 2016, Puerto Rico spent $2.46 billion on Medicaid against a cap of $335.3 million—an effective reimbursement rate of

---

[14] Fed. Reserve Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy*, 14 (2014).

[15] This situation only changed recently, when a provision in the Economic Growth, Regulatory Relief, and Consumer Protection Act brought Puerto Rico under the Investment Act of 1940. Pub. L. No. 115-174, § 506, 132 Stat. 1296 (2018).

[16] Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at Geo. Mason Univ., *Origins of the Puerto Rico Fiscal Crisis*, 16-18 (2016); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*, 68 (Dec. 18, 2016).

[17] Lara Merling & Jake Johnston, Ctr. for Econ. & Policy Research, *More Trouble Ahead: Puerto Rico's Impending Medicaid Crisis,* 5 (2017).

[18] Lara Merling & Jake Johnston, Ctr. for Econ. & Policy Research, *More Trouble Ahead: Puerto Rico's Impending Medicaid Crisis*, 6 (2017).

The Independent Investigator's Final Investigative Report

under 14 percent.[19]  Were it entitled to the poverty-based formula offered to any state, Puerto Rico would qualify for the maximum 83 percent reimbursement rate.[20]

Puerto Rico is similarly unable to draw upon the various international mechanisms for debt adjustment and assistance typically available to sovereign nations.  In particular, because Puerto Rico is not a member of the International Monetary Fund ("IMF"), it does not qualify for IMF assistance.[21]  Were it a member, Puerto Rico may be eligible for a bailout such as the one received by Greece in 2010, subject, presumably, to policy prescriptions typically required by the IMF under similar circumstances.[22]

### 3.     Federal Legislation Impacting Puerto Rico's Economy

Various federal legislative programs have been enacted throughout Puerto Rico's history with the aim of reinforcing its economy.  These efforts have produced mixed results.

Under the 1917 Jones Act, Puerto Rico bonds were made "exempt from taxation by the Government of the United States…or by any State…or by any county, municipality, or other municipal subdivision of any State."[23]  This so-called "triple-tax-exemption" has historically rendered Puerto Rico bonds uniquely attractive to investors. As a result, as of 2015, over 180 municipal bond funds reportedly held more than 5 percent of their portfolios in Puerto Rico bonds.[24]  This high demand allowed Puerto Rico to raise liquidity on a virtually as-needed basis, contributing to increased debt levels.  A 2014 study by the Federal Reserve Bank found that while Puerto Rico's debt levels are among the highest in a group of advanced and emerging-market economies, "subsidized access to the deep and liquid US municipal bond market has likely allowed it to continue attracting investors and thus to persist in running deficits."[25]

---

[19] Lara Merling & Jake Johnston, Ctr. for Econ. & Policy Research, *More Trouble Ahead: Puerto Rico's Impending Medicaid Crisis,* 6 (2017).

[20] To address the immediate shortfall in funding, in 2012 the ACA offered a one-time grant of $6.4 billion for Puerto Rico to fund its Medicaid program.  Lara Merling and Jake Johnston, Ctr. for Econ. & Policy Research, *More Trouble Ahead: Puerto Rico's Impending Medicaid Crisis,* 3, 6 (2017).

[21] Desmond Lachman, Am. Enter. Inst., *Puerto Rico Needs an IMF-Style Economic Plan* (2017), http://www.aei.org/publication/puerto-rico-needs-an-imf-style-economic-plan/.

[22] Council on Foreign Relations, *Greece's Debt, 1974-2017,* https://www.cfr.org/timeline/greeces-debt-crisis-timeline (last visited Aug. 14, 2018).  In 2018, Argentina has begun to engage in discussions with the IMF about receiving financial assistance.  Int'l Monetary Fund, Press Release No. 18/182: Statement by IMF Managing Director Christine Lagarde at the Conclusion of the Executive Board's Informal Meeting on Argentina (2018), *available at* http://www.imf.org/en/News/Articles/2018/05/18/pr18182-statement-by-imf-managing-director-at-the-conclusion-of-meeting-on-argentina.

[23] *See* 48 U.S.C.A. § 745 (1917).

[24] *See* Scott Greenberg & Gavin Ekins, Tax Found. *Tax Policy Helped Create Puerto Rico's Fiscal Crisis,* (June 30, 2015), https://taxfoundation.org/tax-policy-helped-create-puerto-rico-s-fiscal-crisis/.

[25] Fed. Reserve Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy,* 19 (2014). In addition, in 1961, Congress amended the Puerto Rico Federal Relations Act, removing the federally imposed debt limit on Puerto Rico upon voters' ratification of an amendment to the Puerto Rico Constitution adding debt limitation language.  See Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at Geo. Mason Univ., Origins of the Puerto Rico Fiscal Crisis, 16-18 (2016).   As a result, the Constitution was

The Jones Act further imposed stringent requirements on shipping between Puerto Rico and the US mainland and within Puerto Rico.  Pursuant to the Jones Act, maritime transport of cargo between points in the United States—including from port to port within Puerto Rico— must be carried out by vessels built in the United States and owned by US citizens.[26]  A 2013 report by the US Government Accountability Office ("Government Accountability Office") found that the vast majority of the cargo shipped between the United States and Puerto Rico is carried by just four Jones Act carriers.[27]  The increased costs resulting from this reduced competition are especially acute for Puerto Rico, given its heavy reliance on the transport of goods to and from the mainland United States and the added burden of transporting internally in Puerto Rico on US carriers.  According to one study, Puerto Rico lost $537 million per year as a result of the Jones Act shipping requirements.[28]  There have been some, unsuccessful, efforts to repeal the Jones Act, most notably by US Senator John McCain in 2010 and 2015.[29]

Another US legislative effort that affected Puerto Rico's economy was the 1976 Tax Reform Act, which enacted the Possession Tax Credit.  The Possession Tax Credit allowed certain US corporations with business operations in Puerto Rico to generally eliminate US tax on certain foreign source income related to those operations that would otherwise apply under the US Internal Revenue Code ("Tax Code").[30]  According to one academic researcher, under the Possession Tax Credit, Puerto Rico was "by a wide margin, the most attractive locale in the world for American companies to operate in."[31]

## B.    Lead-Up and Debt Crisis: 1996 - Today

### 1.    Repeal of the Possession Tax Credit and Beginning of Recession

The Small Business Job Protection Act of 1996 repealed the Possession Tax Credit for taxable years beginning after 1995.[32]  While the Small Business Job Protection Act provided for a 10-year grandfather period for existing corporations who claimed the credit, between 1996 and 2002, more than 27,000 industrial jobs were lost in Puerto Rico.  Following the phase out of Section 936 in 2006, and the attendant loss of tax incentives, manufacturers, and jobs, Puerto

---

amended again, so that the debt limit was measured as a percentage of revenue—and allowed for further debt which did not count towards the limit.  *In re: Commonwealth of P.R.,* No. 17--01578-LTS (D.P.R. May 3, 2017), ECF No. 1-2, 10 (internal citations omitted).

[26] Jones Act of Mar. 2, 1917, ch. 145, 39 Stat. 951 (1917); Gov't Accountability Office, GAO-13-260, *Puerto Rico - Characteristics of the Island's Maritime Trade and Potential Effects of Modifying the Jones Act,* 1 (2013).

[27] Gov't Accountability Office, GAO-13-260, *Puerto Rico: Characteristics of the Island's Maritime Trade and Potential Effects of Modifying the Jones Act*, 6 (2013).

[28] Thomas Grennes, Mercatus Ctr. at Geo. Mason Univ., *An Economic Analysis of the Jones Act,* 26 (2017).

[29] Thomas Grennes, Mercatus Ctr. at Geo. Mason Univ., *An Economic Analysis of the Jones Act*, 41 (2017).

[30] Joint Comm. on Taxation, *Overview of the Special Tax Rules Related to Puerto Rico*, 3 (2006).

[31] James Surowiecki, *The Puerto Rican Problem,* The New Yorker, Apr. 6, 2015.

[32] Gov't Accountability Office, GGD-97-101, *Puerto Rican Economic Trends*, 2 (1997).

The Independent Investigator's Final Investigative Report

Rico's recession began.[33]  By many metrics, the sharp decline in economic activity that began in the late 2000s (often referred to as the "Great Recession") still continues in Puerto Rico, with deleterious effects on Puerto Rico's overall fiscal health and ability to generate revenue.

The Great Recession hit Puerto Rico with particular severity when compared to the mainland United States (and slightly earlier).  The US Department of the Treasury notes that, between 2006 and 2016, Puerto Rico's economy contracted by over 10 percent, and employment declined by 14 percent.[34]  In 2016, Puerto Rico's unemployment rate was twice that of the mainland United States, at 11.8 percent.[35]  In that year, only 42.5 percent of Puerto Rico's residents over the age of 15 were employed, compared to well over 60 percent in the mainland US, including during the Great Recession.[36]  In 2017, an estimated 43.5 percent of Puerto Rico's residents lived in poverty.[37]  This is more than triple the rate of the United States overall,[38] and twice the rate of Mississippi, the US state with the highest poverty rate.[39]  The child poverty rate in Puerto Rico in 2017 was similarly three times that of the mainland US.[40]  Puerto Rico also has a lower per capita income than any state ($11,688), half of that in Mississippi (the state with the lowest per capita income) and a third of that in the United States overall.[41]

Over this same period of economic decline, Puerto Rico expanded its spending commitments and entitlement programs – particularly in the areas of healthcare and other social projects – largely funded by bond issuances.  As of 2014, Puerto Rico's health insurance coverage rate (94 percent) was higher than that on the US mainland, but most insurance was provided through publicly funded insurance programs, including Medicaid/CHIP (39 percent), Medicare Advantage (16 percent), Traditional Medicare (6 percent), and Veterans Affairs (3 percent).  Only 36 percent were covered by a commercial provider, contrasted with 59 percent on the mainland United States.[42]

---

[33] *See* Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at Geo. Mason Univ., *Origins of the Puerto Rico Fiscal Crisis*, 15 (2016).

[34] U.S. Dep't of the Treasury, *Puerto Rico's Economic and Fiscal Crisis*, 1, https://www.treasury.gov/connect/blog/Documents/Puerto_Ricos_fiscal_challenges.pdf (last visited Aug. 16, 2018).

[35] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 2 (2017).

[36] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 2 (2017).

[37] U.S. Census Bureau, *QuickFacts: Puerto Rico*, https://www.census.gov/quickfacts/PR (last visited Aug. 14, 2018).

[38] U.S. Census Bureau, *QuickFacts: United States*, https://www.census.gov/quickfacts/fact/table/US/PST045217 (last visited Aug. 14, 2018).

[39] U.S. Census Bureau, *QuickFacts: Mississippi*, https://www.census.gov/quickfacts/ms (last visited Aug. 14, 2018).

[40] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 9 (2017).

[41] U.S. Census Bureau, *QuickFacts: United States*, https://www.census.gov/quickfacts/fact/table/US/PST045217 (last visited Aug. 14, 2018).

[42] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 7 (2017).

The Independent Investigator's Final Investigative Report

As discussed above, Puerto Rico receives considerably less funding than states for these services: federal funds cover only about 23 percent of the cost of Puerto Rico's Medicaid expenditures.[43]   Indeed, according to a report by the Government Accountability Office, a similar pattern holds for a wide range of social programs, including Medicare; Medicaid; Supplemental Nutrition Assistance Program ("SNAP"); Supplemental Security Income ("SSI"); Federal-Aid Highways; Pell Grants; Temporary Assistance for Needy Families ("TANF"); Title I Grants to Local Educational Agencies; Children's Health Insurance Program; Post-911 GI Bill; and the Federal Direct Student Loan Program.[44]   In each case, Puerto Rico's lack of statehood constrains the amount of funding to which it is entitled.   Illustrative examples include:

- **Medicare/Medicaid:** In 2010, Puerto Rico received $4.5 billion in federal government funding for Medicare; had it been a state, this figure likely would have reached $6 billion.[45]   Similarly, actual Medicaid spending from the federal government in 2011 was $685 million, whereas had Puerto Rico been a state, it would have been between $1.0 billion and $2.1 billion.[46]   The federal match rate for Medicaid spending in Puerto Rico is only 55 percent, far lower than states with comparable income (Mississippi receives 76 percent funding).[47]

- **SSI**: Residents of Puerto Rico are not eligible for SSI; instead, the Aid to the Aged, Blind, and Disabled ("AABD") program provides cash benefits for low-income residents.   Under AABD, Puerto Rico received about $24 million in 2011, whereas under SSI, funding would have ranged from $1.5 billion to $1.8 billion.   Moreover, were Puerto Rico a state, a significantly higher portion of its residents would be eligible for SSI. For example, in 2011 between 305,000 and 354,000 Puerto Ricans would have been eligible for SSI, but only 34,401 were eligible for AABD that year.[48]

---

[43] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report,* 8 (2017).

[44] Gov't Accountability Office, GAO-14-31, *Report to Congressional Requesters: Puerto Rico—Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources* (2014).

[45] Gov't Accountability Office, GAO-14-31, *Report to Congressional Requesters: Puerto Rico—Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources*, 65 (2014).

[46] Gov't Accountability Office, GAO-14-31, *Report to Congressional Requesters: Puerto Rico—Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources*, 73 (2014).

[47] Medicaid, *Puerto Rico*, https://www.medicaid.gov/medicaid/by-state/puerto-rico.html (last visited Aug. 14, 2018); Richard V. Reeves & Katherine Guyot, The Brookings Inst., *Keeping Our PROMESA: What the U.S. Can Do about Puerto Rico's Fiscal Crisis* (Sept. 11, 2017), https://www.brookings.edu/research/keeping-our-promesa-what-the-u-s-can-do-about-puerto-ricos-fiscal-crisis/.

[48] Gov't Accountability Office, GAO-14-31, *Report to Congressional Requesters: Puerto Rico—Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources*, 82 (2014).

- **TANF**: A statutory cap limits the federal funds Puerto Rico may receive federal funds to about $107.3 million to operate TANF, AABD, foster care and adoption programs, and Matching Grant, a restriction it would not face were it granted statehood.[49]

In sum, the combination of high rates of unemployment—and therefore substantial need for government support—and low per capita funding means that Puerto Rico's government has been forced to assist more people with less money than states with equivalent rates of poverty and unemployment.

During this same general period, Puerto Rico engaged in large public works projects, paid for by the issuance of bonds.  For example, Puerto Rico's Department of Transportation and Public Works ("DTPW") began work in 1989 on a project to build Puerto Rico's first mass transit system, Tren Urbano (Urban Train), a single-line, 10.7 mile railway system.  Overall, the project cost $2.25 billion, with construction lasting from 1997-2004.  Funding sources included $637.8 million in bonds, $828.8 million from federal grants, $200 million from a Transportation Infrastructure Finance & Innovation Act ("TIFIA") loan and $483.4 million from other sources.[50]  Additional bonds were issued to repay the TIFIA loan, with an interest rate of 4.97 percent (75 basis points lower than the interest rate on the TIFIA loan).[51]  As of 2017, Tren Urbano was selling about one-third of the rides it needed to break even, losing about $50 million a year.[52]

## 2. <u>Population decline</u>

Since 2000, Puerto Rico has faced a mass exodus of its citizens to the mainland United States.  Between 2000 and 2015, Puerto Rico saw a 9 percent decline in population, with 75 percent of this loss occurring after 2010.[53]  In 2016, there was a further 1.8 percent population decline.[54]  With fewer individuals paying local taxes due to outward migration, Puerto Rico increasingly struggled to pay for social benefits programs, which were already underfunded (*see*

---

[49] Gov't Accountability Office, GAO-14-31, *Report to Congressional Requesters: Puerto Rico—Information on How Statehood Would Potentially Affect Selected Federal Programs and Revenue Sources*, 94-95 (2014).

[50] Build Am. Bureau, U.S Dep't of Transp., *Tren Urbano*, https://www.transportation.gov/tifia/financed-projects/tren-urbano (last visited Aug. 14, 2018).

[51] Build Am. Bureau, U.S Dep't of Transp., *Tren Urbano*, https://www.transportation.gov/tifia/financed-projects/tren-urbano (last visited Aug. 14, 2018).

[52] Martin Z. Braun & Jonathan Levin, *Debt Island: How $74 Billion in Bonds Bankrupted Puerto Rico*, Bloomberg, May 15, 2017.

[53] Jens Manuel Krogstad, Pew Research FactTank, *Historic Population Losses Continue Across Puerto Rico* (Mar. 24, 2016), http://www.pewresearch.org/fact-tank/2016/03/24/historic-population-losses-continue-across-puerto-rico/.

[54] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 9 (2017).

above, Part II.B.1).   Many of those departing are young, placing additional strain on the government to care for the elderly and pay pensions.[55]

Enhanced employment prospects on the mainland have also contributed substantially to the mass exodus of people born in Puerto Rico.  People from Puerto Rico on the mainland have labor force participation rates roughly equivalent to overall rates in the mainland United States.  For instance, the labor force participation rate of people from Puerto Rico in the United States in 2016 was 61.5 percent (compared with 62.8 percent overall participation rate in US).  In Puerto Rico, by contrast, the 2016 labor force participation rate was 44.1 percent.[56]  Of people born on the island who had moved to the mainland, at least 40 percent left for job-related reasons, with another 39 percent departing for family-related reasons.[57]

While some studies suggest outward migrants "tend to be somewhat lower-skilled than the population overall,"[58] trained professionals have been departing in large numbers, sparking a notable "brain drain" in several key sectors.  This is particularly true in the case of medical professionals.  According to some reports, between 2011 and 2013, about 12 percent of all physicians moved to the mainland.[59]  According to the College of Physicians and Surgeons of Puerto Rico, in 2016, two doctors left the island per day, and as of 2016 there were only 9,000 doctors on the island, 36 percent lower than a decade before.[60]  Teachers have similarly left.  They struggle to find employment in Puerto Rico but are in high demand in the mainland US given their bilingual abilities.[61]  Due to a combination of departures from the island and an aging population, Puerto Rico's labor force decreased by about 20 percent between 2007 and 2016.[62]

The recent hurricanes have only exacerbated the outward migration, as discussed further below in section II.B.7.

### 3.   Financial Crisis and Related Debt Accumulation

[55] Jaison R. Abel & Richard Deitz, Fed. Reserve Bank of N.Y., *The Causes and Consequences of Puerto Rico's Declining Population*, 1 (2014).

[56] Nashia Roman, Ctr. for P.R. Studies, CUNY Hunter, *Puerto Ricans in the United States: 2010-2016*, 7 (2018).

[57] Jens Manuel Krogstad, Pew Research FactTank, *Historic population losses continue across Puerto Rico*, (Mar. 26, 2016), http://www.pewresearch.org/fact-tank/2016/03/24/historic-population-losses-continue-across-puerto-rico/.

[58] Jaison R. Abel & Richard Deitz, Fed. Reserve Bank of N.Y., *The Causes and Consequences of Puerto Rico's Declining Population*, 5 (2014).

[59] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 14 (2017).

[60] Robin Respaut, *Why people wait more than a year to see a doctor in Puerto Rico*, Reuters, Oct. 11, 2016, https://www.reuters.com/investigates/special-report/usa-puertorico-healthcare/.

[61] Tim Henderson, *Schools Look to Puerto Rico in Search of Bilingual Teachers*, Pew Charitable Trusts, Oct. 13, 2015, http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2015/10/13/schools-look-to-puerto-rico-in-search-of-bilingual-teachers.

[62] Richard V. Reeves & Katherine Guyot, The Brookings Inst., *Keeping Our PROMESA: What the U.S. Can Do about Puerto Rico's Fiscal Crisis* (Sept. 11, 2017), https://www.brookings.edu/research/keeping-our-promesa-what-the-u-s-can-do-about-puerto-ricos-fiscal-crisis/.

The Independent Investigator's Final Investigative Report

As discussed further as part of our investigative findings, amidst the contracting economy, declining population, and growing rates of unemployment, Puerto Rico debt increased through numerous municipal bond issuances by multiple issuers.  Overall, Puerto Rico and related entities issued a total of approximately $23.5 billion in new bonded debt between 2005 and 2014.[63]  IMF data indicates that real Gross Domestic Product ("GDP") has remained negative nearly every year during this period (with the exception of one year of approximately zero growth).[64]  As a result of these debt issuances and Puerto Rico's inability to continually service its debt, the credit rating on Puerto Rico debt was downgraded below investment-grade in 2014.[65]

The majority of Puerto Rico's total public debt was bonded debt outstanding, comprising an average of 86 percent of total public debt between 2005 and 2014.[66]  During that time, the amount of total public debt rose from about $39.2 billion to about $67.8 billion, further rising by 2017 to $74.3 billion.[67]  The bonds were issued by numerous Puerto Rico-Related Entities in order to maintain operations.  As of 2014, the vast majority of the debt was owed by a combination of the primary government (59 percent), PREPA (14 percent), PRASA (7 percent) and the Puerto Rico Highway and Transportation Authority ("HTA") (7 percent).[68]

As discussed in greater detail in our investigative findings, GDB played a significant role in this process of debt accumulation.  GDB was during the Relevant Period the largest bank in the United States that is neither a member of the Federal Reserve System nor overseen by the Federal Deposit Insurance Corporation.[69]  Initially designed to "serve as the foundation for [Puerto Rico's] economic and social development,"[70] GDB historically functioned as a traditional small-enterprise lending bank, extending two-thirds of its loans to local enterprises including laundries, car repair shops, and drugstores in the 1950s.[71]  By the 1970s, GDB had turned towards the public sector and established Puerto Rico's first savings bonds to raise funds for the government amidst an economic downturn.[72]  By 2014, GDB had entirely shifted towards

---

[63] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 12 (2017).

[64] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 4 (2017); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*, 41 (Dec. 18, 2016).

[65] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 16 (2017).

[66] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook,* 12 (2017).

[67] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 13 (2017).

[68] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 14 (2017).

[69] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 3 (2014).

[70] Gov't Dev. Bank of P.R., *The Forties: The Formative Years*, http://www.gdbpr.com/about-gdb/history_02.html                        (*available                        at* https://web.archive.org/web/20160316080323/http:/www.gdbpr.com/about-gdb/history_02.html)        (last visited Aug. 14, 2018).

[71] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 1 (2014).

[72] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 1 (2014).

the public sector, with 99.6 percent of its loan exposure to public institutions.[73]  Observers have noted that GDB's role as "fiscal agent, banker, and 'brain trust' to the Commonwealth" allowed it to raise and allocate borrowed funds for use in covering public-sector deficits.[74]  By various accounts, GDB's image has gradually deteriorated, with some referring to it as Puerto Rico's "piggy bank."[75]

In 2014, S&P downgraded GDB's long-term issuer credit rating to "BB-" and its short-term issuer credit rating to "B."[76]  S&P noted that the passage of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act ("Recovery Act") in 2014 "signal[ed] a potential shift in Puerto Rico's historically strong willingness to continue to meet its obligations to bondholders, particularly in the event of constrained market access."[77]  Moody's declared the same Act to be "a declaration of intent to allow default by highly leveraged public corporations, primarily those providing the island's essential electric, highway and water and sewer services" and downgraded Puerto Rico's general obligation bonds ("GO Bonds") to B2, the lowest rating yet.  Furthermore, Moody's lowered GDB debt rating to one level below that "to indicate the GDB's exposure to the default-eligible authorities (including $2 billion of loans to [HTA]) and potentially higher loss severity in the event of default compared with GO bonds."[78]

In addition to its bonded debt, Puerto Rico's pension funds have been severely unfunded, as discussed further in Part VII.  As of the filing of the Title III petitions, the three major pension systems have approximately $49 billion of pension liabilities, only approximately 1.57 percent of which were funded as of June 30, 2015.[79]  Although the Judiciary Retirement Systems and the Teachers Retirement Systems had funding of about 7.5 percent and 8.05 percent as of June 30, 2015, respectively, ERS yielded a ratio of negative 1.77 percent.[80]  With an aging population moving toward draw-down, the beneficiaries of Puerto Rico's pension continue to grow.[81]

### 4.   Failed Legislative Efforts to Restructure, Followed by Default

---

[73] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 2 (2014).

[74] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 1 (2014).

[75] Arturo C. Porzecanski, Am. Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 3 (2014).

[76] Arturo C. Porzecanski, Am Univ., *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 4 (2014); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*, 97 (Oct. 30, 2014).

[77] Standard & Poor's Ratings Services, *Puerto Rico GO Rating Lowered One Notch to 'BB' Following Debt Legislation; Outlook Negative*, 2 (2014).

[78] Moody's Inv'rs' Serv., *Puerto Rico Restructuring Law Drives Ratings Deeper Into Speculative Territory* (2014).

[79] Commonwealth of P.R., *Financial Information and Operating Data Report*, 222 (Dec. 18, 2016).

[80] Commonwealth of P.R., *Financial Information and Operating Data Report*, 222 (Dec. 18, 2016).

[81] For example, for the Teachers Retirement System, there were approximately seven retirees for every eight active teachers contributing to the pension plan in 2013.  Glenn D. Bowen & Katherine A. Warren, *Puerto Rico Teachers Retirement System: Actuarial Valuation Report*, 2 (2014).

The Independent Investigator's Final Investigative Report

By 2015, Puerto Rico held about $72 billion in debt, representing 66 percent of its GDP, relative to 47 percent in 2005.[82]  As a percentage of Gross National Product ("GNP"), which the US Department of Treasury deems to be a "more representative measure of Puerto Rico's economic activity," total public debt grew from 71 percent in fiscal year ended 2005 to 99 percent in fiscal year ended 2014.[83]

The last time the Puerto Rico-Related Entities issued public debt was Puerto Rico's $3.5 billion issuance of GO Bonds in March 2014.  As discussed in greater detail in Part IV, Puerto Rico had already hired professional restructuring advisors prior to that issuance, to develop a path forward if, as seemed increasingly inevitable, it could not fully repay its indebtedness.  Puerto Rico could not use federal bankruptcy law to restructure its debt, because although the US Bankruptcy Code provides a mechanism for "states" to do so under Chapter 9, Congress amended the Bankruptcy Code's definition of "state" in 1984 to exclude Puerto Rico.  Puerto Rico was thus not considered a US state "for purposes of defining who may be a debtor under [C]hapter 9."[84]   As a result, Puerto Rico was powerless to authorize its own instrumentalities such as PREPA, PRASA and HTA to use Chapter 9 to restructure.[85]

On June 28, 2014, Puerto Rico created its own mechanism for restructuring the debt of its municipal units, similar to Chapter 9.  It did this by enacting the Recovery Act.[86]  Bondholders quickly sued to challenge the Recovery Act's validity.  On February 6, 2015, the US District Court for the District of Puerto Rico ruled the Recovery Act was invalid and enjoined its implementation on the ground that Chapter 9 preempted it.[87]  The US Supreme Court affirmed that ruling on appeal, effectively holding that "the Bankruptcy Code provided no relief for Puerto Rico or its municipalities and at the same time precluded Puerto Rico from enacting an insolvency regime of its own."[88]

In June 2015, after the Recovery Act was invalidated, Governor Alejandro García Padilla declared the approximately $72 billion debt "unpayable."[89]

---

[82] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 12 n.19, 14 (2017).

[83] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 14 (2017).

[84] 11 U.S.C. § 101(52).

[85] Regardless of the 1984 amendment, Puerto Rico could not have authorized itself to be a debtor and restructured its own obligations (such as the GO Bonds) under Chapter 9.  Accordingly, although access to Chapter 9 may have brought significant relief to Puerto Rico, it would not have been a comprehensive restructuring solution.

[86] Act of June 17, 2014, No. 71, 2014 P.R. Laws 273.

[87] *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577 (D.P.R.), *judgment entered*, No. 14-1518 FAB, 2015 WL 574008 (D.P.R. Feb. 10, 2015), *and aff'd*, 805 F.3d 322 (1st Cir. 2015), *aff'd*, 136 S. Ct. 1938 (2016).

[88] Mitu Gulati & Robert K. Rasmussen, Ctr. for Law and Soc. Sci., *Puerto Rico and the Netherworld of Sovereign Debt Restructuring*, 2 (Mar. 20, 2017) (discussing *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938 (2016)).

[89] Lara Merling et al., Ctr. for Econ. & Policy Research, *Life after Debt in Puerto Rico: How Many More Lost Decades?*, 16 (2017).

The Independent Investigator's Final Investigative Report

In early August 2015, the Puerto Rico Public Finance Corporation ("PFC") defaulted on approximately $58 million of due payment.  The default was the first in Puerto Rico's history.[90] Additional defaults occurred in December 2015, including on $35.9 million due on Infrastructure Financing Authority bonds and $1.4 million due on PFC bonds.[91]  The prospect of a disorderly default on Puerto Rico's debts seemed likely.[92]

On April 6, 2016, the Puerto Rico Legislative Assembly enacted the Emergency Moratorium and Financial Rehabilitation Act ("Moratorium Act").  The Moratorium Act recognized that "the Government of Puerto Rico does not have sufficient resources to comply with debt service obligations as originally scheduled and, additionally, to continue providing essential services to the people[.]"[93]

The Moratorium Act authorized the Governor of Puerto Rico ("Governor") to declare (by executive order) a moratorium on debt service payments for a limited period of time for the government, GDB, and other governmental instrumentalities.[94]  The Moratorium Act also created AAFAF.  Under the Moratorium Act, AAFAF assumed the fiscal agency and financial advisory responsibilities previously exercised by GDB.[95]

In 2016, the then-current Governor issued several executive orders that declared payment moratoriums on various debt, implemented a new regulatory framework for GDB operations and liquidity, and related matters.[96]

In April 2016, a bill constituting the first version of PROMESA was introduced in the U.S. House of Representatives.  As discussed, Congress eventually passed PROMESA in June 2016, establishing the Oversight Board.  On May 3, 2017, the Oversight Board, on Puerto Rico's behalf, filed the Title III voluntary petition, seeking to restructure Puerto Rico's debts.  As noted, Puerto Rico and its instrumentalities owe approximately $74 billion in debt and $49 billion in pension liabilities.

As described in the Oversight Board's statement in connection with the Title III filing, by the time of the filing, Puerto Rico's financial situation was "staggeringly grim."  The Oversight Board noted the following statistics:[97]

---

[90] Ctr. for P.R. Studies, CUNY Hunter, *Puerto Rico in Crisis—Timeline* (2017).

[91] Ctr. for P.R. Studies, CUNY Hunter, *Puerto Rico in Crisis—Timeline* (2017).

[92] Ctr. for P.R. Studies, CUNY Hunter, *Puerto Rico in Crisis—Timeline* (2017).

[93] Moratorium Act, Preamble, 2016 P.R. Laws 160; *see also* Statement of Oversight Board In Connection With PROMESA Title III Petition, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2, ¶ 14.

[94] Moratorium Act, Preamble, 2016 P.R. Laws 160; *see also* Statement of Oversight Board In Connection With PROMESA Title III Petition, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2, ¶ 15.

[95] Commonwealth of P.R., *Financial Information and Operating Data Report*, 9 (Dec. 18, 2016).

[96] Commonwealth of P.R., *Financial Information and Operating Data Report*, 37 (Dec. 18, 2016).

[97] *In re: Commonwealth of P.R.,* No. 17-01578-LTS (D.P.R. May 3, 2017), ECF No. 1-2, 3-4 (*internal citations omitted*).

The Independent Investigator's Final Investigative Report

- <u>GNP Decline since 2007</u>: From 2007-2016, Puerto Rico's GNP declined by over 14 percent, while total employment in Puerto Rico fell from 1.25 million to fewer than 1 million;

- <u>Unemployment Rate</u>: In October 2016, Puerto Rico's unemployment rate was 12.1 percent, and only 987,606 persons were employed, down 23 percent from 1,277,559 employed persons in 2006;

- <u>Labor Participation Rate</u>: the labor participation rate has plummeted to 40 percent, two thirds of the level on the US mainland;

- <u>Drop in Economic Activity Index</u>: the Economic Activity Index composed of four factors (payroll employment, electric power generation, cement sales, and gasoline consumption) fell from 160.0 to 124.1 between August 2005 and August 2016;

- <u>Population Decline</u>: since 2007, Puerto Rico's population has declined approximately 10 percent down to less than 3.41 million people in 2016;

- <u>Poverty and Unemployment</u>: according to the US Census Bureau's 2015 community survey, 46.1 percent of Puerto Rico's residents live below the federal poverty level compared to the national average of 14.7 percent, and 36 percent of the residents of Detroit, Michigan (whose financial distress was viewed by many as uniquely devastating).  Puerto Rico's is more so.  For Puerto Rico children under age 5, 63.7 percent live under the federal poverty level, compared to the national average of 22.8 percent.  Median household income in Puerto Rico was $18,626 in 2015, as compared to $56,515 in the states and District of Columbia;[98] and

- <u>Public Debt as a Percentage of Income</u>: Puerto Rico has approximately $74 billion of bond debt and $48 billion of unfunded pension liabilities.  As of 2012, Puerto Rico's public debt as a percentage of aggregate income was 100.7 percent, as compared to 29 percent for New York, which was the highest ratio of public debt to income in the United States (the average is 16.8 percent).

**5.**     **Allocation Among Issuers of $74 Billion Debt Obligation**

A substantial portion of the $74 billion of debt was in the form of bonds, either GO Bonds issued by Puerto Rico or bonds issued by public corporations that provided governmental or quasi-government services, such as PREPA, PRASA and HTA.  Most of the bonds were current interest bonds, but some were capital appreciation bonds ("<u>CABs</u>").  The following chart

---

[98] See also Cong. Task Force on Econ. Growth in P.R., *Report to the House and Senate, 114th Cong.*, 10-11 (2016).

The Independent Investigator's Final Investigative Report

provides a breakdown of the $74 billion (in $MM) in order of indebtedness, based on the Oversight Board's Title III petition.[99]  The primary Issuers are discussed in Part III below.

**Figure II.A: Allocation of Public Sector Debt[100]**

| Issuer | Bond Principal | CAB | Unpaid P&I[a] | Private Loans | Total Bonds & Private Loans |
|---|---|---|---|---|---|
| COFINA | $11,425 | $6,155 | -- | -- | **$17,580** |
| Puerto Rico/GO | $12,013 | $84 | $1,146 | $24 | **$13,267** |
| PREPA | $8,259 | -- | -- | $697 | **$8,956** |
| PRASA[b] | $3,943 | $28 | $13 | $584 | **$4,568** |
| GDB[c], [d] | $3,182 | -- | $742 | $203 | **$4,126** |
| HTA[e] | $3,983 | $135 | $6 | -- | **$4,124** |
| PBA | $3,980 | -- | $117 | -- | **$4,097** |
| ERS | $2,658 | $498 | -- | -- | **$3,156** |
| PRIFA[f] | $1,566 | $409 | $232 | -- | **$2,207** |
| Children's Trust | $847 | $613 | -- | -- | **$1,460** |
| PFC | $1,025 | -- | $172 | -- | **$1,197** |
| HFA | $542 | -- | -- | -- | **$542** |
| UPR[g] | $496 | -- | -- | -- | **$496** |
| PRCCDA | $386 | -- | -- | -- | **$386** |
| PRIDCO | $145 | $11 | -- | -- | **$156** |
| PRIICO | -- | -- | -- | $98 | **$98** |
| AMA | -- | -- | -- | $28 | **$28** |
| Other Central Gov't Entities | $197 | -- | $29 | $413 | **$639** |
| Municipality Related Debt[h] | $556 | -- | -- | $1,140 | **$1,696** |
| SUB TOTAL | $55,203 | $7,933 | $2,457 | $3,188 | $68,781 |
| Less:  GDB Bonds (excl. TDF) | | | | | ($3,766) |
| Plus: Loans from GDB/MFA Entities | | | | | $8,795 |
| **Public Sector Debt** | | | | | **$73,810** |

Notes:

(a) Unpaid principal and interest includes debt service that has been paid by insurers and is owed by the government

(b) PRASA bonds includes Revenue Bonds, Rural Development Bonds, Guaranteed 2008 Ref Bonds

(c) GDB private loans includes Tourism Development Fund guarantees

(d) Includes GDB Senior Guaranteed Notes Series 2013-B1

---

[99] See Statement of Oversight Board In Connection With PROMESA Title III Petition, *In re Fin. Oversight & Mgmt. Bd. for P.R.*, Title III Case No. No. 17-3283-LTS (D.P.R. May 3, 2017), ECF No. 1-2, ¶¶ 1-2; ECF No. 1-3 (Ex. A).

[100] Short-form references in the "Issuer" column conform to the definitions set forth on the List of Defined Terms that is Appendix C to this Report.

The Independent Investigator's Final Investigative Report

(e) HTA includes Teodoro Moscoso bonds
(f) PRIFA includes PRIFA Rum bonds, PRIFA Petroleum Products Excise Tax BANs, PRIFA Port Authority
   bonds and $34.9m of PRIFA ASSMCA bonds
(g) UPR includes $64.2m of AFICA Desarrollos Universitarios University Plaza Project bonds
(h) Municipality Related Debt includes AFICA Guyanabo Municipal Government Center and Guaynabo
   Warehouse for Emergencies bonds

## 6.      **Impact of the Default**

The impact of the fiscal crisis and default has been devastating.  This Report does not purport to catalog or describe all such impacts, but instead, to survey them in sufficient detail to achieve the Report's mandate under PROMESA and instructions of the Special Investigation Committee.

The impact on pensioners has been profound:  By 2017, retirement benefits from the retirement systems for public employees such as ERS had switched to pay-as-you-go, meaning that all benefit payments would come out of tax revenue.[101]

Beyond impact on bondholders, Puerto Rico's ability to fund public services and provide for education, health, and safety of citizens of Puerto Rico has been severely diminished as a result of the fiscal crisis.  The University of Puerto Rico ("UPR"), one of the Puerto Rico-Related Entities that relied on bond issuances, owed $496 million as of 2017.[102]  Declining infrastructure has begun to negatively impact the population's health.[103]  Amidst the economic crisis, Puerto Rico attempted to cut costs across its healthcare system, with the Board's new fiscal plan intending to save $6 billion over 10 years in that area—and likely causing an approximately 6 percent reduction in health care spending.[104]  The Medicaid system, historically funded by the issuance of municipal bonds, has been hit particularly hard.  Following its default, Puerto Rico was no longer able to access capital markets.  As a result, Puerto Rico has been increasingly unable to pay Medicaid providers.[105]  At least one Medicaid Managed Care Organization ("MCO") has pulled out of the market.[106]  Beyond funding issues, the outward migration of physicians and other medical staff has translated into 72 of Puerto Rico's 78

---

[101] Richard V. Reeves & Katherine Guyot, The Brookings Inst., *Keeping Our PROMESA: What the U.S. Can Do about Puerto Rico's Fiscal Crisis* (Sept. 11, 2017), https://www.brookings.edu/research/keeping-our-promesa-what-the-u-s-can-do-about-puerto-ricos-fiscal-crisis/; Nick Brown, *Puerto Rico's other crisis: impoverished pensions*, Reuters, Apr. 7, 2016, https://www.reuters.com/investigates/special-report/usa-puertorico-pensions/.
[102] Martin Z. Braun & Jonathan Levin, *Debt Island: How $74 Billion in Bonds Bankrupted Puerto Rico*, Bloomberg, May 15, 2017.
[103] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 1 (2017).
[104] Richard V. Reeves & Katherine Guyot, The Brookings Inst., *Keeping Our PROMESA: What the U.S. Can Do about Puerto Rico's Fiscal Crisis* (Sept. 11, 2017), https://www.brookings.edu/research/keeping-our-promesa-what-the-u-s-can-do-about-puerto-ricos-fiscal-crisis/.
[105] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 5 (2017)
[106] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 6 (2017).

municipalities being deemed medically underserved areas by the US Health Resources and Services Administration ("HRSA").[107]

### 7.   Hurricanes Irma and Maria

In September 2017, Hurricanes Irma and Maria left many Puerto Rico residents without power, clean water, and communications.  Although still a topic of investigation, the death toll from the hurricanes may be in the several thousands.[108]  The hurricanes also caused major damage to homes, businesses, and water, telecom, transportation, and power infrastructure, and destroyed 80 percent of crops.[109]

For several weeks, most of Puerto Rico saw widespread power and telecommunications outages, fuel shortages, and transportation blockages.  Even months after Hurricane Maria, many parts of Puerto Rico remained without electricity and running water.[110]  According to the US Department of Energy and PREPA, as of April 4, 2018, 62,000 customers—about 4.2 percent—remained without power.[111]  The power outage was "by far the most severe in US history, in terms of total customer-hours lost."[112]  This lack of electricity "limited the availability of potable water, since the filtration systems that create clean running drinking water rely on electricity to treat sewage."[113]  Telecommunications were also hit hard. As of November 16, 2017, AT&T reported that only 80 percent of the population was able to connect to their networks, while in early December, cloud platform Oracle reported only 53% of the usage rates it had immediately before the hurricane.[114]

These conditions increased the demand for public health care, but a lack of power meant that hospitals had to rely on generators to provide basic medical services, and due to damaged roads, even accessing diesel to run these generators was difficult.[115]  A month after the hurricanes, only 40 percent of health centers had access to the internet and electronic health

---

[107] Krista Perreira et al., Urban Inst. Health Policy Ctr., *Puerto Rico Health Care Infrastructure Assessment: Site Visit Report*, 13-14 (2017).

[108] Nishant Kishore et al., *Mortality in Puerto Rico after Hurricane Maria*, 15 N. Engl. J. Med. 162-165 (2018).

[109] Jason Bram, Fed. Reserve Bank of N.Y., *Economic Press Briefing: Puerto Rico and the U.S. Virgin Islands After Hurricanes Irma and Maria*, 7 (2018).

[110] Jason Bram, Fed. Reserve Bank of N.Y., *Economic Press Briefing: Puerto Rico and the U.S. Virgin Islands After Hurricanes Irma and Maria*, 7 (2018).

[111] U.S. Dep't of Energy, *Hurricanes Maria & Irma: April 4 Event Summary (Report #98 – Final)* (2018).

[112] Jason Bram, Fed. Reserve Bank of N.Y., *Economic Press Briefing: Puerto Rico and the U.S. Virgin Islands After Hurricanes Irma and Maria*, 7 (2018).

[113] Geiger Gibson, Milken Inst. Sch. of Pub. Health, Geo. Wash. Univ., *Puerto Rico's Community Health Centers: Struggling to Recover in the Wake of Hurricane Maria*, 4 (2017).

[114] AT&T, Hurricane Maria: *Response & Live Updates: Update on Continued Restoration Efforts* (Nov. 16, 2017), http://about.att.com/inside_connections_blog/hurricane_maria; Doug Madory, Oracle, *Puerto Rico's Slow Internet Recovery* (Dec. 7, 2017), https://blogs.oracle.com/internetintelligence/puerto-ricos-slow-internet-recovery.

[115] Geiger Gibson, Milken Inst. Sch. of Pub. Health, Geo. Wash. Univ., *Puerto Rico's Community Health Centers: Struggling to Recover in the Wake of Hurricane Maria*, 5 (2017).

records.[116]   At the same time, health centers reported an "urgent need" for vaccines (including two-thirds of centers needing tetanus vaccines and one-third needing influenza vaccines) and drugs (including antibiotics, insulin, and anti-inflammatory drugs).[117]   The CDC reported that certain "critical biologic and chemical laboratory testing activities . . . [were rendered] unable to test for infectious diseases or detect environmental hazards" due to the destruction of Puerto Rico's electric power grid.[118]

Irma and Maria only exacerbated Puerto Rico's demographic outflow.  City University of New York's Center for Puerto Rican Studies estimates that in the six months following Maria, approximately 135,000 people born in Puerto Rico relocated to the mainland United States.[119]   In the immediate months following the hurricanes, the net number of domestic air passengers departing Puerto Rico was about 160,000 above normal.[120]

The damage cause by these natural disasters and attendant infrastructure failures have further increased Puerto Rico's need for revenue.  The National Centers for Environmental Information estimated the consumer price index-adjusted cost of Hurricanes Maria and Irma to be $91.8 billion and $51 billion, respectively.[121]   Other estimates suggested potential losses from Hurricane Maria alone cost Puerto Rico $47.5 billion in real gross domestic product, $31.4 billion in real personal income, and about 332,000 person-years of employment.[122]   The damages nearly offset Puerto Rico's entire GDP, which in 2016 was $105 billion, according to World Bank data.[123]

Puerto Rico's fiscal crisis—caused by an aggregate of local, national, and international factors—has shaken Puerto Rico to its core.  It is a humanitarian crisis, too, with substantial and continuing effects on the standards of living of Puerto Rico's residents.

---

[116] Geiger Gibson, Milken Inst. Sch. of Pub. Health, Geo. Wash. Univ., *Puerto Rico's Community Health Centers: Struggling to Recover in the Wake of Hurricane Maria*, 10 (2017).

[117] Geiger Gibson, Milken Inst. Sch. of Pub. Health, Geo. Wash. Univ., *Puerto Rico's Community Health Centers: Struggling to Recover in the Wake of Hurricane Maria*, 10 (2017).

[118] Jeniffer Concepción-Acevedo et al., Ctrs. for Disease Control, *Initial Public Health Laboratory Response After Hurricane Maria—Puerto Rico*, 2017 (2018).

[119] Ctr. for P.R. Studies, CUNY Hunter, *New Estimates: 135,000+ Post-Maria Puerto Ricans Relocated to Stateside* (2018).

[120] Jason Bram, Fed. Reserve Bank of N.Y., *Economic Press Briefing: Puerto Rico and the U.S. Virgin Islands After Hurricanes Irma and Maria*, 8 (2018).

[121] NOAA Nat'l Ctrs. for Envtl. Info., *Billion-Dollar Weather and Climate Disasters: Table of Events*, https://www.ncdc.noaa.gov/billions/events/US/1980-2017 (last visited Aug. 14, 2018).

[122] The Perryman Grp., *Hurricane Maria to cost the economies of Puerto Rico and other US territories nearly $48 billion in output, bringing total losses from Hurricanes Harvey, Irma, and Maria to almost $300 billion in US real gross domestic product*, https://www.perrymangroup.com/with-maria-hurricane-costs-to-us-economy-approach-300-billion/ (last visited Aug. 20, 2018).

[123] The World Bank, *Puerto Rico*, https://data.worldbank.org/country/puerto-rico (last visited Aug. 14, 2018).

# PART III

# BOND ISSUANCE PROCESS

# PART III
# BOND ISSUANCE PROCESS

As discussed above, a substantial portion of the $74 billion of debt was in the form of Puerto Rico-Related Bonds—either GO Bonds issued by Puerto Rico or bonds issued by Puerto Rico-Related Entities that provide governmental and quasi-governmental services, such as the Public Utilities.  In nearly all cases, GDB served a significant advisory role and approved the issuances.  In some cases, GDB also served as interim lender in anticipation of the issuance, purchase and/or guarantee of the bonds.

In this Part, we provide additional background concerning the bond issuance process in order to give further context to the investigative findings we set out in other Parts of this Report. We begin with background concerning GDB (Part III.A, below), followed by background concerning the various Issuers, including Puerto Rico, the Public Utilities and other Puerto Rico-Related Entities (Part III.B, below).  We also briefly discuss other participants in the bond issuance process, including the underwriters and bond counsel (Part III.C, below).

**A.**     **GDB**

**1.**     **GDB's Role, In General**

GDB is a public corporation of Puerto Rico, created by legislative act in 1948.[1]  As provided in its enabling statute, GDB was created to "aid the Commonwealth Government in the

---

[1] Act No. 17 of Sept. 23, 1948, 1948 P.R. Laws 290, 290 (codified as amended at P.R. Laws Ann. tit. 7, § 551 (2018), *et seq.*) (creating GDB as a "governmental instrumentality of the Insular Government"); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report,* 134 (Dec. 18, 2016)

performance of its fiscal duties and more effectively to carry out its governmental responsibility to develop the economy of Puerto Rico, particularly with respect to its industrialization."[2]

GDB's primary functions included: (i) to act as fiscal agent, financial advisor and reporting agent for the government of Puerto Rico and the Puerto Rico-Related Entities; (ii) to lend money to the Puerto Rico-Related Entities; and (iii) to act as depositary of the funds of the Puerto Rico-Related Entities.[3]

In its role as fiscal agent, GDB acted as an advisor to the Puerto Rico-Related Entities in connection with all their borrowings.  All such borrowings and bond issuances were subject to GDB's prior approval.[4]

In its role as lender, GDB also loaned money to the Puerto Rico-Related Entities.[5]  It provided interim financing to these entities in advance of their bond issuances and also provided longer term financing to such entities,[6] including through loans to help the Puerto Rico-Related

---

("GDB is a component unit of the Commonwealth created pursuant to Act No. 17 of September 23, 1948, as amended.").

[2] P.R. Laws Ann. tit. 7, § 551 (2018).

[3] P.R. Laws Ann. tit. 7, § 552 (2018) ("The purposes for which the Bank is formed and the business or objects to be carried on and promoted by it are as follows:  (A) To act as fiscal agent and as paying agent and as a financial advisory and reporting agency of the Commonwealth Government and of the agencies, instrumentalities, commissions, authorities, municipalities and political subdivisions of Puerto Rico, the Governor of Puerto Rico, the Council of Secretaries of Puerto Rico and the Secretary of the Treasury of Puerto Rico.  (B) (1) To act as depositary or trustee of funds for the Commonwealth Government or for the United States and for any agency, instrumentality, commission, authority, municipality or political subdivision of Puerto Rico . . .  (C) To lend money, with or without security, to the Commonwealth government or to any agency, instrumentality, commission, authority, municipality or political subdivision of Puerto Rico."); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*,  134 (Dec. 18, 2016) ("Historically, GDB served as (i) fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities and municipalities (collectively, "Commonwealth Entities"), (ii) an important source of financing for various Commonwealth Entities, and (iii) the principal depositary of the funds of the Commonwealth Entities."); Commonwealth of P.R., *Financial Information and Operating Data Report*, 74 (Oct. 18, 2013) ("The principal functions of GDB are to act as financial advisor to, and fiscal agent for, the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico.").

[4] Commonwealth of P.R., *Financial Information and Operating Data Report*, 60 (Oct. 18, 2013) ("GDB, as fiscal agent of the Commonwealth and its public corporations, must approve the specific terms of each issuance); *see also* Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009) ("In its role as fiscal agent, it acts as advisor to the Commonwealth and its instrumentalities in connection with all their borrowings, and all such borrowings are subject to prior approval by the Bank.").

[5] Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009) ("The Bank lends to, and purchases and guarantees certain obligations of, the Commonwealth and its agencies, public corporations and municipalities.").

[6] Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009) ("It provides interim financing to these entities in anticipation of their refinancing such indebtedness in the bond market and also provides longer term financing to such entities.").

Entities cover operational deficits.[7]  According to GDB, it "generally [did] not provide financing to any government entity of the Commonwealth unless [GDB] reasonably believe[d] that the borrowing governmental entity [would] have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, or has a source of repayment as provided by law, to repay such loan."[8]  GDB has further stated, however, that it did at times provide financing to public entities that did "not have sufficient independent resources to cover operating expenses."[9]

GDB also purchased and guaranteed debt issued by the Puerto Rico-Related Entities.[10]

Starting in 2009, GDB entered into a number of fiscal oversight agreements ("FOAs") with a number of Puerto Rico-Related Entities.[11]  As discussed in Part IV, these were agreements that purported to give GDB access to the Puerto Rico-Related Entities' financial information.  The FOAs also required those public corporations to adopt certain internal controls.  We discuss our findings concerning the FOAs as part of our investigative findings in Part IV of this Report.

As of 2016, GDB no longer acts as fiscal agent, financial advisor and reporting agent for the Puerto Rico-Related Entities.  AAFAF now performs those functions.[12]  GDB is in the process of winding down its operations under Title VI of PROMESA.[13]

---

[7] *See, e.g.*, Commonwealth of P.R., *Financial Information and Operating Data Report*, 74 (Oct. 18, 2013) ("As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities.  This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities.").

[8] Gov't Dev. Bank, *Comprehensive Annual Financial Report: Year Ended June 30, 2013*, 52 (June 30, 2013).

[9] Gov't Dev. Bank, *Comprehensive Annual Financial Report: Year Ended June 30, 2013*, 52 (June 30, 2013).

[10] *See* Commonwealth of P.R., *Financial Information and Operating Data Report*, 74-75 (Oct. 18, 2013) (describing bonds of public corporations held by GBD); Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009) ("The Bank lends to, and purchases and guarantees certain obligations of, the Commonwealth and its agencies, public corporations and municipalities."); *see also* P.R. Laws Ann. tit. 7, § 552 (2018) (authorizing GDB to "invest its funds in…obligations of Puerto Rico, guaranteed as to both principal and interest, by Puerto Rico; or obligations of any agency, instrumentality, commission, authority, municipality or other political subdivisions of Puerto Rico[,]" to "acquire, hold and dispose of . . . securities issued by any corporate entity, organized under the laws of the Commonwealth of Puerto Rico[,]" and to "guarantee, through guarantees or letters of credit, loans and other obligations incurred by public and private entities").

[11] Commonwealth of P.R., *Financial Information and Operating Data Report*, 74 (Oct. 18, 2013) ("As part of its role as fiscal agent, during fiscal years ended 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with PRASA, PREPA, the Highway and Transportation Authority, the PRPA, the Health Insurance Administration and the Medical Services Administration, the Metropolitan Bus Authority and the Maritime Transportation Authority.").

[12] Commonwealth of P.R*., Financial Information and Operating Data Report*, 137 (Dec. 18, 2016).

[13] See Gov't Dev. Bank Website, http://www.gdb.pr.gov/index.html (last visited Aug. 15, 2018) ("The GDB is in the process of winding down its operations in an orderly fashion under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act, Publ. Law 114-187 of June 30, 2016 (PROMESA).").

2.   **GDB Governance and Employees**

Like other public corporations in Puerto Rico, GDB is governed by a Board of Directors ("GDB Board").[14]  Under its enabling act, the members of the GDB Board were appointed by the Governor with the approval of the Council of Secretaries (the group consisting of the heads of the executive departments of Puerto Rico).[15]  The GDB Board was supposed to be staggered with four-year terms, meaning that the members' four-year terms start and end at different times.[16]

The GDB Board appointed the President of GDB, who acted as the chief executive officer of GDB and was responsible for its day-to-day operations.[17]  In addition, GDB had a number of executive vice presidents who oversaw various divisions of the bank.[18]

GDB's personnel included both political appointees ("*empleados de confianza*") and "career" employees ("*empleados de carrera*").[19]  Puerto Rico law distinguishes between these two types of employees.[20]  Political appointees are generally at-will with respect to selection and removal.  In other words, political appointees can be terminated with or without cause.[21]  In our investigation, as discussed below in Part IV and elsewhere, we learned that, in practice, political appointees generally change with each new administration.

By contrast, "career" employees "may only be removed from their positions for just cause and after due filing of charges."[22]  In theory, career employees should transcend changes in political parties.

We discuss our findings concerning GDB in Part IV of this Report.

---

[14] P.R. Laws Ann. tit. 7, § 552 (2018); *see also* Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009).

[15] *See* Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009) ("The Bank is governed by a seven member Board of Directors appointed by the Governor of the Commonwealth with the approval of the Council of Secretaries."); *see also* Act No. 17 of Sept. 23, 1948, 1948 P.R. Laws 290, 298 ("Thereafter, as the terms of office of directors expire, successor directors shall be appointed by the Governor, with the approval of the Executive Council, for terms of four years."); for the amended, *see* P.R. Laws Ann. tit. 7, § 552 (2018) ("After January 1, 2018, all new appointments made by the Governor to the position of member of the Board of Director of the Bank shall require the counsel and consent of the Senate of Puerto Rico.").

[16] P.R. Laws Ann. tit. 7, § 552 (2018).

[17] Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009).

[18] Gov't Dev. Bank, *Official Statement for Senior Notes, 2009 Series A*, 13 (2009).

[19] P.R. Laws Ann. tit. 21, § 4554 (2018).

[20] *See* P.R. Laws Ann. tit. 21, § 4554 (2018); *See also Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 22 n.2 (1st Cir. 2006) ("Puerto Rico law distinguishes between 'career' employees and 'trust' employees.").

[21] *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 22 n.2 (1st Cir. 2006).

[22] *Figueroa-Serrano v. Ramos-Alverio*, 221 F.3d 1, 3 n.1 (1st Cir. 2000) (quoting P.R. Laws Ann. tit. 21, § 4554(b) (2018)).

## B.   Bond Issuers and Issuances

### 1.   Puerto Rico

Of the $74 billion of total public sector debt, approximately $12 billion was in the form of GO Bonds that Puerto Rico issued as of 2017.[23]

GO Bonds are bonds that Puerto Rico issues and secures by a pledge of its good faith, credit and taxing power.[24]  As discussed in more detail below, under Article VI, Section 8 of the Puerto Rico Constitution, GO Bonds purportedly entitle their holders a right of first claim to the government's available revenues/resources.[25]  Based on that interpretation, that means that in the event of a shortfall they get paid first, even ahead of payroll and government overhead.

GO Bonds are issued by Puerto Rico's Secretary of the Treasury, as authorized by the Legislative Assembly.[26]  Specifically, Section 2 of Article VI of the Puerto Rico Constitution gives the government the power to enter contracts and issue debt as determined by the Legislative Assembly.[27]  Based on that power, the Legislative Assembly will from time to time enact a law that authorizes the Secretary of the Treasury to issue bonds pursuant to one or more resolutions to be adopted by the Secretary of the Treasury and approved by the governor.[28]  The law authorizes a maximum amount of the bonds that can be issued and specifies the permissible uses of the proceeds.[29]  It also authorizes the payment of principal and interest on the bonds and provides that the "good faith, credit, and taxing power" of Puerto Rico are irrevocably pledged for the prompt payment.[30]  The act becomes law upon approval by the Governor.  The resolution called by the act

---

[23] Gov't of P.R., P.R. Fiscal Agency and Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 26 (2017).

[24] *See, e.g.*, Commonwealth of P.R., *Financial Information and Operating Data Report*, 6 (Dec. 18, 2016) ("GOs or General Obligations means bonds and notes issued by the Commonwealth and supported by the good faith, credit and taxing power of the Commonwealth."); *see generally General-Obligation Bond*, Black's Law Dictionary (9th ed. 2009) (defining a general obligation bond as a "municipal bond payable from general revenue rather than from a special fund. Such a bond has no collateral to back it other than the issuer's taxing power.").

[25] As discussed in note 33 below, the official translation of the term *recursos disponibles* used in Article VI, Section 8 of the Puerto Rico Constitution is "available revenues," but the term "available resources" is also often used.  This Report takes no position on the appropriate translation of the term or whether the Spanish or English version of the Puerto Rico Constitution controls.

[26] *See, e.g.*, Act No. 153 of July 19, 1999, § 1, 1999 P.R. Laws 448, 449 – 450 (authorizing the Secretary of the Treasury to issue certain general obligation bonds).

[27] P.R. Const., art. VI, § 2 ("The power of the Commonwealth of Puerto Rico to 'contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly . . . .'").

[28] *See, e.g.*, Act No. 153 of July 19, 1999, §§ 1, 2, 1999 P.R. Laws 448, 449 – 451.  Each bond issuance, other than refunding bonds (i.e., bonds used to refund previously issued bonds), is issued pursuant to specific legislation approved in each particular case. Commonwealth of P.R., *Financial Information and Operating Data Report*, 60 (Oct. 18, 2013).

[29] *See, e.g.*, Act No. 153 of July 19, 1999, § 1, 1999 P.R. Laws 448, 449 – 450.

[30] *See, e.g.*, Act No. 153 of July 19, 1999, § 4, 1999 P.R. Laws 448, 451 – 452.

sets forth additional details concerning the bonds, such as the aggregate principal amount, the uses of proceeds, the maturity date, and the interest rate.[31]

As noted above, GDB, as fiscal agent of the Puerto Rico-Related Entities, must approve the specific terms of each issuance.[32]

### (a)    The Constitutional Priority Claims Provision

Holders of GO Bonds are purportedly entitled to a right of first claim to the government's available revenues/resources in the event of a shortfall.  Specifically, Article VI, Section 8 of the Puerto Rico Constitution provides:

> In case the available revenues [*recursos disponibles*] including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.[33]

GO Bonds are considered "public debt" for purposes of Article VI, Section 8 the Puerto Rico constitution,[34] and accordingly, purportedly are paid first from Puerto Rico's available revenues/resources in the event appropriations are insufficient.

---

[31] *See, e.g.*, Sec'y of Treasury, *Bond Resolution Authorizing and Securing $475,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2000*, (2000), (authorizing and securing $475,000,000 Public Improvement Bonds).

[32] Commonwealth of P.R., *Financial Information and Operating Data Report*, 60 (Oct. 18, 2013).

[33] P.R. Const., art. VI, § 8.  The official translation of the term *recursos disponibles* as used in the Puerto Rico Constitution is "available revenues," but the term "available resources" is often used in practice.  *See, e.g.*, Commonwealth of P.R., Official Statement for General Obligation Bonds of 2014, Series A, 28 (2014) ("Section 8 provides that public debt of the Commonwealth constitutes a first claim on 'available resources' of the Commonwealth."); Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2012A*, 13 (2012) ("Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources."); *see also* Mot. Summ. J. of the COFINA Senior Bondholders, *In re: the Fin. And Oversight Mgmt. Bd. For P.R.*, No. 17-00257-LTS, (D.P.R. Feb. 21, 2018), ECF No. 307, 27. ("The official translation of the term *recursos disponibles* is '*available revenues*,' but the more widely accepted translation is 'available *resources*.'"); Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *In re: the Fin. And Oversight Mgmt. Bd. For P.R.*, No. 17-00257-LTS, (D.P.R. Mar. 5, 2018), ECF No. 345-1, 5 n.4 ("Although the official English translation of the Constitution refers to 'available revenues,' the Commonwealth has acknowledged that the Spanish text's use of 'recursos disponibles' is more accurately translated as 'available resources.'").

[34] *See, e.g.*, Commonwealth of P.R., *Official Statement for Public Improvement Bonds, Series 2000*, 11 (2000) ("Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.").

### (b)     The Application of the Constitutional Debt Limit

GO Bonds are subject to the portion of Section 2 of Article VI of the Puerto Rico Constitution that limits the amount of general obligation debt that Puerto Rico can issue ("Constitutional Debt Limit").  The limitation is based on a multi-part calculation of the mathematical relationship between future debt service payments, prior-year guarantee payments and average revenues.  The details and process by which it is calculated are discussed in Part IX of this Report.

### (c)     Authorized Use of GO Bond Proceeds

As noted above, the Legislative Assembly determines and provides, through authorizing acts, the uses for which the bond proceeds may be used.  Authorized uses have historically included such things as:

- Various capital improvement programs authorized by the Legislature, in which case the proceeds are deposited into a special fund established under the authorizing act (typically, an annual "Public Improvements Fund");[35]

- Extraordinary maintenance, in which case the proceeds are deposited into a special fund called the "Extraordinary Maintenance Fund" established under Act No. 66, approved August 14, 1991;[36]

- Refunding (i.e., redeeming debt that had previously been issued), in which case the proceeds are used for the purchase and cancellation of prior bonds or notes and/or deposited into a redemption or escrow account;[37] and

---

[35] *See, e.g.*, Act No. 153 of July 19, 1999, § 7, 1999 P.R. Laws 448, 453 ("The proceeds of the sale of the notes and bonds issued under the provisions of this Act (other than the proceeds of the bonds required for the payment of the principal of such notes) shall be covered into a special fund denominated the "Public Improvements Fund of 2000," and shall be disbursed according to the statutory provisions that regulate the disbursement of public funds, and for the purposes provided herein."); Commonwealth of P.R., *Official Statement for Public Improvement Bonds, Series 2000*, 5-6 (2000).

[36] *See, e.g.*, Act No. 153 of July 19, 1999, § 13, 1999 P.R. Laws 448, 455  ("From the product of the sale of the bonds issued under the provisions of this Act, the sum of twenty-three million, seven hundred and fifty thousand (23,750,000) dollars shall be consigned in its entirety in the appropriation made to the Aqueduct and Sewer Authority, for the financing of the dredging and maintenance of the Carraízo Lake, pursuant to Act No. 66 of August 14, 1991, as amended, which creates the Special Maintenance Fund, which establishes that five (5) percent of the bond issue shall be used in capital improvement projects regarding water resources, among other purposes."); Commonwealth of P.R., *Official Statement for Public Improvement Bonds, Series 2000*, 5-6 (2000).

[37] *See, e.g.*, Act No. 33 of Dec. 7, 1942, §7, 1942 P.R. Laws 174, 186 (codified as amended at P.R. Laws Ann. tit. 13, § 41 (2018)) ("The bonds or certificates of indebtedness that the Secretary of the Treasury of Puerto Rico may issue in accordance with the provisions of §§ 35-43 of this title for the payment, consolidation, conversion, or refinancing of the municipal debt shall constitute obligations of the municipalities and shall be paid with the resources and taxes authorized by the original acts or ordinances

- Repayment of GDB lines of credit.[38]

## 2.    The Public Corporations

As discussed in greater detail in Part V of this Report, the public corporations, including the Public Utilities and HTA, have historically financed a significant portion of their operating budgets and capital expenditures with debt.  As a consequence, approximately $53 billion of the $74 billion in total public sector debt consists of debt issued by the public corporations, primarily in the form of bonds.

Some of the bonds issued by the public corporations, particularly the Public Utilities, are revenue bonds.  Unlike GO Bonds, revenue bonds are obligations of and payable from the net revenues of the public corporation that issued the bonds.  As typically stated on the cover of the official statements used to market the bonds, revenue bonds are "not debts or obligations of the Commonwealth of Puerto Rico . . .  and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions, other than the [public corporation issuing the bonds], shall be liable for the payment of the principal or of interest on the [b]onds."  Revenue bonds were generally not counted toward the Constitutional Debt Limit (unless, as discussed further in Part IX of this Report, Puerto Rico guaranteed and was obligated to make a payment on the bonds).

The authority of the public corporations to issue bonds comes from the enabling acts by which they were created.[39]  Such acts typically empowered the public corporations to issue bonds for a wide variety of purposes.  For example, Act No. 83 of May 2, 1941, which created PREPA, granted it the authority, among other things, "to borrow money, make and issue bonds of the Authority *for any of its corporate purposes*, and to secure payment of its bonds and of any and all other obligations by pledging or placing a lien on all or any of its contracts, revenues, and income only" and, further, to "make and issue bonds *for the purpose of funding, refunding, purchasing, paying, or discharging* any of the outstanding bonds or obligations issued or assumed by it or any bonds or obligations the principal or interest of which is payable in whole or in part from its revenues."[40]  In addition, the bonds are often governed by one or more agreements or resolutions providing additional details concerning the bonds.[41]

---

approved, authorizing the contracting of the loans which are to be the object of payment, consolidation, conversion, or refinancing, or from any funds belonging to said municipalities.").

[38] *See, e.g.*, Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2011 C*, 12 (2011).

[39] Commonwealth of P.R., *Financial Information and Operating Data Report*, 60 (Oct. 18, 2013) ("Debt of public corporations is issued in accordance with their enabling statutes.").

[40] Act No. 83 of May 2, 1941, 1941 P.R. Laws 684 (codified as amended at P.R. Laws Ann. tit. 22, § 196 (2018)) (emphasis added).

[41] PREPA, for example, issued a number of bonds pursuant to the Trust Agreement, dated as of January 1, 1974, as amended, with US Bank National Association as successor trustee.  *See, e.g.*, P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 1 (2013).  PRASA issued a number of bonds pursuant to the Master Agreement of Trust, dated as of March 1, 2008, as amended and restated, with Banco Popular de Puerto Rico as trustee.  *See, e.g.*, P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012A (Senior Lien)*, 2 (2012).  HTA issued a number of bonds pursuant to

### (a)     Authorized Use of Revenue Bond Proceeds

Generally, the authorized uses of the proceeds for the revenue bonds issued by the public corporations have historically included such items as:

- Capital improvement programs;

- Other projects, such as the Via Verde pipeline or Tren Urbano transit system;

- Refunding prior issued bonds and debt;

- Repayment of GDB advances or lines of credit; and

- Repaying certain lines of credit with private banks used to finance the public corporations' working capital.[42]

### (b)     Public Corporations Governance and Employees

The public corporations had varying degrees of financial independence from the Government of Puerto Rico, as discussed further in Part V.  Most of the public corporations are governed by their own boards of directors with a certain number of members appointed by the Governor with the advice and consent of the Puerto Rico Senate.[43]

### (c)     Summary of the Public Corporations and Their Outstanding Debt

Below we provide a brief summary of the public corporations and their outstanding debt.

---

Resolution No. 68-18, adopted by HTA on June 13, 1968, as amended.  *See, e.g.*, P.R. Highway and Transp. Auth., *Official Statement for Highway Revenue Refunding Bonds, Series CC*, 1 (2003).

[42] *See, e.g.*, P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series CCC*, 7 (2010).

[43] Commonwealth of P.R., *Financial Information and Operating Data Report,* 72 (Oct. 18, 2013).

The Independent Investigator's Final Investigative Report

**Figure III.A: Debt of Puerto Rico Public Corporations**

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| PREPA | PREPA owns and operates Puerto Rico's electric power system.[44] It supplies virtually all of the electric power consumed in Puerto Rico.[45]<br><br>PREPA was created by Act No. 83 of May 2, 1941.[46] Under its enabling act, as amended, PREPA is governed by a nine-member Board of Directors. Six of the members are appointed by the Governor, with the advice and consent of the Senate. The other three members are representatives of customers selected in accordance with certain procedure.[47] | $8.95 billion |
| PRASA | PRASA owns and operates Puerto Rico's public water supply and wastewater systems. These systems provide water and waste water services to 97% and 58% of Puerto Rico's population, respectively.[48]<br><br>PRASA was created by Act No. 40 of in 1945.[49] Under its enabling act, as amended, PRASA is governed by a seven-member Board. Four of the seven members are independent directors appointed by the Governor, with the advice and consent of the Senate, based on certain qualification and selection requirements.[50] | $4.56 billion |
| HTA | HTA is responsible for the construction of roads and highways and related transportation facilities in Puerto Rico.[51]<br><br>HTA was created by Act No. 74 of June 23, 1965.[52] Under its enabling act, as amended, HTA is governed by a seven-member Board of Directors. Three of the seven members are appointed by the Governor, with the advice and consent of the Senate, based on certain qualification and selection requirements. The remaining four members consist of the Secretary of the Department of Transportation and Public Works, the Chair of the Puerto Rico Planning Board ("Planning | $4.124 billion |

---

[44] Commonwealth of P.R., *Financial Information and Operating Data Report*, 78 (Oct. 18, 2013).

[45] Commonwealth of P.R., *Financial Information and Operating Data Report*, 137 (Dec. 18, 2016).

[46] Act No. 83 of May 2, 1941, 1941 P.R. Laws 684 (codified as amended at P.R. Laws Ann. tit. 22, § 191 (2018), *et seq.*).

[47] P.R. Laws Ann. tit. 22, § 194 (2018).

[48] Commonwealth of P.R., *Financial Information and Operating Data Report*, 76 (Oct. 18, 2013).

[49] Act No. 40 of May 1, 1945, 1945 P.R. Laws 138 (codified as amended at P.R. Laws Ann. tit. 22, § 141 (2018), *et seq.*).

[50] P.R. Laws Ann. tit. 22, § 143 (2018).

[51] Commonwealth of P.R., *Financial Information and Operating Data Report*, 124 (Dec. 18, 2016).

[52] See Act No. 74 of June 23, 1965, 1965 P.R. Laws 158 (codified as amended at P.R. Laws Ann. tit. 9, § 2001 (2018), *et seq.*).

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| | Board"), the Secretary of the Department of the Treasury, and the President of GDB.[53] | |
| COFINA | COFINA was created for the purpose of issuing bonds and utilizing other financing mechanism for various purposes set forth in its enabling act, as amended.[54]<br><br>COFINA was created by Act No. 56 of July 5, 2007.[55] Under its enabling act, as amended, its Board of Directors is the GDB Board.[56] | $17.6 billion |
| PBA | PBA's purpose is to design, construct, administer and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops, and related facilities leased to the Government of Puerto Rico or any of its departments, agencies, instrumentalities or municipalities.[57]<br><br>PBA was created by Act No. 56 of June 19, 1958.[58] Under its enabling act, as amended, PBA is governed by a seven-member Board of Authority. Four of the members are appointed by the Governor, with the advice and consent of the Senate, based on certain qualification and selection requirements. The other three consist of the Secretary of the Department of Transportation and Public Works, the President of GDB, and the Secretary of the Department of Education.[59] | $4.097 billion |
| GDB | As discussed further above, GDB's role is to aid in economic development of Puerto Rico and its execution of its fiscal duties.[60]<br><br>GDB was created by Act. No. 17 of September 23, 1948.[61] Under its enabling act, as amended, GDB is governed by the seven-member GDB | $4.126 billion |

---

[53] P.R. Laws Ann. tit. 9, § 2020a (2014).

[54] Act No. 56 of July 5, 2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, § 11a (2018), *et seq.*).

[55] P.R. Laws Ann. tit. 13, § 11a (2018).

[56] P.R. Laws Ann. tit. 13, § 11a (2018).

[57] Commonwealth of P.R., *Financial Information and Operating Data Report*, 128 (Dec. 18, 2016); *see also* Act No. 56 of June 19, 1958, 1958 P.R. Laws 120 (codified as amended at P.R. Laws Ann. tit. 22, § 901 (2006), *et seq.*).

[58] P.R. Laws Ann. tit. 22, § 901 (2018), *et seq.*

[59] P.R. Laws Ann. tit. 22, § 904 (2018).

[60] Act No. 17 of Sept. 23, 1948, 1948 P.R. Laws 290, 290 (codified as amended at P.R. Laws Ann. tit. 7, § 552 (2018)).

[61] P.R. Laws Ann. tit. 7 § 551 (2018), *et seq.*

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| | Board. All members are appointed by the Governor. After January 1, 2018, all new appointments require the counsel and consent of the Senate.[62] | |
| ERS | ERS's purpose is to provide pension and other benefits to retired employees of the government of Puerto Rico, with benefits funded by contributions made by Puerto Rico and its employees.[63] <br><br> ERS is a trust created by Act No. 447 of May 15, 1951.[64] Under its enabling act, as amended, ERS is governed by an eleven-member Board of Trustees. Four of the members are ex officio, namely, the Secretary of the Treasury, the Commissioner of Municipal Affairs, the President of GDB, and the Director of the Human Resources Office. Three of the members are appointed by the Governor, two of which must be participants of the system and the other one a participant of the Judiciary Retirement System. Of the remaining four members, two are to be pensioners of each system, appointed by the Governor, other two are to be the Chairs of the Federation of Mayors and the Association of Mayors of Puerto Rico, respectively.[65] | $3.156 billion |
| Children's Trust | Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of Puerto Rico. It exercises its powers independently as owner and administrator of certain funds Puerto Rico transferred to it, which funds proceeded from a tobacco litigation master settlement agreement, and uses the funds under certain statutory provisions.[66] <br><br> Children's Trust was created by Act No. 173 of July 30, 1999.[67] Under its enabling act, as amended, the Children's Trust is governed by a seven-member Board of Directors: Four of the members are to be ex officio members, namely, the Governor, the President of GDB, the Director of the Office of Management and Budget ("OMB"), and the Secretary of Justice. Three members are to be private citizens who serve as representatives of the public interest and are appointed by the Governor with the advice and consent of the Senate of Puerto Rico.[68] | $1.46 billion |

---

[62] P.R. Laws Ann. tit. 7, § 552 (2018).
[63] Act No. 447 of May 15, 1951, 1951 P.R. Laws 1298 (codified as amended at P.R. Laws Ann., tit. 3, § 761 (2018) *et seq.*).
[64] P.R. Laws. Ann., tit. 3, § 761 (2018).
[65] P.R. Laws Ann., tit. 3, § 775 (2018).
[66] Act No. 173 of July 30, 1999, 1999 P.R. Laws 520 (codified as amended at P.R. Laws. Ann. tit. 24, § 3121 (2018) *et seq.*).
[67] P.R. Laws Ann. tit. 24, § 3122 (2018).
[68] P.R. Laws Ann. tit. 24, § 3123 (2018).

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| Puerto Rico Infrastructure Finance Authority ("PRIFA") | PRIFA was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, government instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those facilities.[69] <br><br> PRIFA was created by Act No. 44 of June 21, 1988.[70]  Under its enabling act, as amended, it is governed by a Board of Directors consisting of five members of the GDB Board appointed by the Governor, by the Secretary of the Treasury of Puerto Rico, and by one additional member appointed by the Governor.[71] | $2.207 billion |
| PFC | PFC is a public corporation and government instrumentality created and authorized to issue bonds by legislation in 1984.  PFC's purpose is to provide agencies and instrumentalities of Puerto Rico with alternative means of meeting their financing requirements.[72] <br><br> PFC was created on Dec. 12, 1984 through Resolution 5044 of GDB.[73]  It is a subsidiary of GDB.[74]  According to official statements, it is governed by a Board of Directors consisting of the members of the GDB Board. | $1.197 billion |
| Puerto Rico Housing Finance Authority ("HFA") | HFA provides financing for rental housing units, stimulates the construction industry under federally subsidized programs, and provides interim financing for low-income housing projects and single-family homeownership programs.[75] <br><br> HFA was created in 1977 through a resolution of GDB, which was adopted as amended (with certain exceptions) by Act No. 103 of August 11, 2001.[76]  Under its enabling act, as amended, HFA is governed by a seven-member Board of Directors appointed by the Governor.  Two of the members are ex officio, namely, the Secretary | $542 million |

---

[69] Commonwealth of P.R., *Financial Information and Operating Data Report*, 83 (Oct. 18, 2013).
[70] Act No. 44 of June 21, 1988, 1988 P.R. Laws 180 (codified as amended at P.R. Laws Ann. tit. 3, § 1901 (2018), *et seq.*).
[71] P.R. Laws Ann. tit. 3, § 1903 (2018).
[72] Commonwealth of P.R., *Financial Information and Operating Data Report*, II-70 (Dec. 6, 2011).
[73] P.R. Pub. Fin. Corp., *Official Statement for Commonwealth Appropriation Bonds, Series 2012A*, II-1 (2008).
[74] P.R. Pub. Fin. Corp., *Official Statement for Commonwealth Appropriation Bonds, Series 2012A*, 10 (2008).
[75] Commonwealth of P.R., *Financial Information and Operating Data Report*, 75 (Oct. 18, 2013).
[76] Act No. 103 of Aug. 11, 2001, 2001 P.R. Laws 99 (codified as amended at P.R. Laws. Ann. tit. 7, § 924 (2018), *et seq.*).

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| | of the Department of Housing and the Chairperson of the GDB Board. Three members are to be members of the GDB Board, designated from among its members.  The other two members are from the private sector.[77] | |
| UPR | UPR is an institution of higher education.  Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources.  University capital improvements have been financed mainly by revenue bonds.<br><br>UPR was created in 1903[78] and reorganized by Act No. 1 of January 20, 1966.[79]  Under its enabling act, as amended, UPR is governed by a seventeen-member Board of Trustees.  It is to include ten professionals and four alumni appointed by the Governor with the advice and consent of the Senate.[80] | $496 million |
| Puerto Rico Convention Center District Authority ("PRCCDA") | PRCCDA was created to own, develop, finance, plan, design, build, operate, maintain, administrate, and promote the Dr. Pedro Roselló González Convention Center, and designated private parcels located within the Convention Center District in San Juan.[81]<br><br>PRCCDA was created by Act 351 of September 2, 2000.[82]  Under its enabling act, as amended, PRCCDA is governed by a nine-member Board of Directors.  Three members are ex officio, namely, the Secretary of the Department of Economic Development and Commerce, the Executive Director of the Puerto Rico Tourism Company, and the President of GDB.  Six members are to be appointed by the Governor with the advice and consent of the Senate, based on various qualification requirements.[83] | $386 million |
| Puerto Rico Industrial Development | PRIDCO provides physical facilities, general assistances, and special incentive grants to manufacturers.[84] | $156 million |

[77] P.R. Laws Ann. tit. 7, § 927 (2018).

[78] Act of Mar. 12, 1903, 1903 P.R. Laws 94, *et seq*.

[79] Act No. 1 of Jan. 20, 1966, 1966 P.R. Laws 85 (codified as amended at P.R. Laws Ann. tit. 18, § 601 (2018), *et seq*.).

[80] P.R. Laws tit. 18, § 602 (2018).

[81] Commonwealth of P.R., *Financial Information and Operating Data Report,* 78 (Oct. 18, 2013).

[82] Act No. 351 of Sept. 2, 2000, 2000 P.R. Laws 119 (codified as amended at P.R. Laws Ann. tit. 23, § 6401 (2018), *et seq*.).

[83] P.R. Laws Ann. tit. 23, § 6411 (2018).

[84] Commonwealth of P.R., *Financial Information and Operating Data Report*, 82 (Oct. 18, 2013).

| Public Corporation | Brief Description of Purpose and Corporate Governance | Approx. Debt Outstanding As Of Feb. 2017 |
|---|---|---|
| Company ("PRIDCO") | PRIDCO was created by Act No. 188 of May 11, 1942.[85]  Under its enabling act, as amended, PRIDCO is governed by a seven member Board of Directors.  Four of the members are ex officio, namely, the Secretary of Economic Development and Commerce, the President of GDB, the Secretary of the Treasury, and the President of the Planning Board.  Three are members of the private sector to be appointed by the Governor with the advice and consent of the Senate.[86] | |

## C.     Roles of Underwriters and Other Participants

Other participants in the bond issuance process included: (i) underwriters; (ii) bond counsel; (iii) independent auditors; (iv) swap counterparties; and (iv) broker-dealers.

### 1.     Underwriters

An underwriter is a bank or other financial institution that agrees to buy at a set price a portion of securities to be issued in the event it is unable to sell them to investors.[87]  For each Puerto Rico-Related Bond issuance, the Issuer contracted with a team of underwriters to market and sell the Puerto Rico-Related Bonds into selected capital markets.

As explained in more detail in Part IV of this Report, GDB selected the underwriters for the Puerto Rico-Related Bond issuances in its capacity as fiscal agent.[88]  In connection with each bond issuance, GDB chose one underwriter to act as the "lead manager" that ran the process and as the "book runner" that maintained the official record of all bonds ordered and sold.  Additional underwriters acted as "senior managers" and participated in diligence, pricing and marketing activities.  Together, the underwriters were collectively known as a "syndicate."

---

[85] Act No. 188 of May 11, 1942, 1942 P.R. Laws 934 (codified as amended at P.R. Laws Ann. tit. 23, § 271 (2018), *et seq.*)

[86] P.R. Laws Ann. tit. 23, § 274 (2018).

[87] *See, e.g.*, Commonwealth of P.R., *Bond Resolution Authorizing and Securing $210,250,000 Commonwealth of Puerto Public Improvement Refunding Bonds, Series 2009C* (2009) ("WHEREAS, the underwriters named [in] the Purchase Contract (hereinafter mentioned) have agreed to purchase the Refunding Bonds in an aggregate principal amount of $203,173,597.49, as described below, on the terms and conditions contained in the Purchase Contract, dated December 3, 2009 . . ., by and among the Commonwealth and said underwriters.").

[88] *See, e.g.*, P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2012A, Power Revenue Refunding Bonds, Series 2012B*, 107 (2012) ("As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds.").

The members of a given syndicate each agreed to underwrite the portion of a specific Puerto Rico-Related Bond Issuance. The bonds that each underwriter allocated for sale often corresponded with the portion of the issuance that the specific underwriter was underwriting (referred to as the underwriter's "underwriter risk exposure"). For example, a lead manager may have been allocated 50%, with senior managers receiving 10% each and syndicate members splitting the remaining 30%.

The amount of risk that the underwriters assumed depended on the amount of the issuance that they agreed to underwrite and on the underwriting process itself. Puerto Rico-Related Entities issued bonds using what is known as a "soft underwriting process." In such a process, the underwriters generally take on less risk because they do not commit to underwriting until *after* they have already had an opportunity to gauge what the level of demand for the bond will be among their customers. In contrast, an underwriter for a "hard" underwriting commits to underwriting a portion of the issuance at the beginning of the process, without having the benefit of their customers' input. The hard underwriter therefore has less assurance that all of the bonds will be sold when issued. As a result, the hard underwriter assumes greater risk than a soft underwriter would. Because underwriters are typically compensated based on risk exposure, a soft underwriting results in cheaper underwriting costs for the issuer.

## 2.   Bond Counsel

The role of bond counsel was to advise the Issuer with respect to the legal aspects of the transaction. GDB selected bond counsel for the Puerto Rico-Related Bond issuances. We discuss our findings related to those selections in Part IV of this Report.

Among other things, bond counsel typically drafted or approved the documents needed to implement bond issuances, including any master indentures and disclosure documents. Bond counsel also ensured that all of the legal prerequisites for the bonds to issue had been satisfied. For example, bond counsel received and analyzed certificates that GDB prepared regarding GDB's calculation of the Constitutional Debt Limit, for certain bond issuances. In the course of so doing, bond counsel asked whether the calculations included or excluded certain components, but did not recalculate the figures GDB provided.

Certain bond issuances raised novel or complex legal issues. If the resolution of those issues was unclear based on existing case law or statutes, then bond counsel would prepare a focused written opinion setting forth bond counsel's analysis of that issue. If the same Issuer continued to engage in similar issuances over time, then bond counsel would subsequently update the opinions to incorporate new or additional legal authority.

Bond counsel also participated on public conference calls that provided information to the municipal bond market. Among other market participants, investors and credit rating agency analysts listened in on those calls.

## 3.   Independent Auditors

During the Relevant Period, Puerto Rico hired the accounting firms of Deloitte & Touche LLP ("Deloitte") and KPMG LLP ("KPMG") as its independent auditor. It generally rotated between those two firms. Deloitte served as independent auditor for fiscal years ended 2000 and

2009-2012, and KPMG served as independent auditor for fiscal years ended 2001-2008 and 2013-2015.

As Puerto Rico's independent auditors, KPMG and Deloitte reviewed once per year (during their engagement years) the draft consolidated financial statements that the Department of Treasury prepared for Puerto Rico, as well as financial information concerning certain Puerto Rico-Related Entities that were reported in Puerto Rico's consolidated financial statements. They were also sometimes hired to audit the draft individual financial statements of particular Puerto Rico-Related Entities, such as GDB and COFINA.

A number of Puerto Rico-Related Entities used other independent auditors during the Relevant Period. In particular, Ernst & Young at times served as the independent auditor for PREPA, PRASA, HTA and UPR.

We discuss Puerto Rico's rotation of auditors, as well as relevant circumstances concerning the work that those auditors performed, in more detail in Part VIII of this Report.

### 4.      Bond Trustee

As noted above, bonds issued by the public corporations were often subject to a trust agreement, which is a contract that generally governs the bond issuance process and sets forth the rights and obligations of various parties, including the issuer, the bondholders and the bond trustee.[89]

In general, the bond trustee was responsible for representing the fiduciary interests of the bondholders and enforcing the terms of the trust agreement.[90]   The bond trustee also acted a custodian for the bond proceeds, often holding the accounts into which those proceeds are deposited and then withdrawn from by the issuer for uses covenanted by the trust agreement.

Under the trust agreements, the trustee's responsibilities may include:

- Receiving materials submitted by the issuers in regards to the bonds, including certificates, bond resolutions, and any required letters from third-party consultants like a consulting engineer (in the case of the public utilities);

---

[89] PREPA, for example, issued a number of bonds pursuant to the Trust Agreement, dated as of January 1, 1974, as amended, with US Bank National Association as successor trustee. *See, e.g.*, P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 1 (2013). PRASA issued a number of bonds pursuant to the Master Agreement of Trust, dated as of March 1, 2008, as amended and restated, with Banco Popular de Puerto Rico as trustee. *See, e.g.*, P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012A (Senior Lien)*, 2 (2012).

[90]   *See* Mun. Sec. Rulemaking Board, *Glossary of Municipal Security Terms: Trustee*, http://www.msrb.org/glossary/definition/trustee.aspx (last visited Aug. 16, 2018); *See* Mun. Sec. Rulemaking Board, *Glossary of Municipal Security Terms: Indenture*, http://www.msrb.org/glossary/definition/Indenture.aspx (last visited Aug. 16, 2018).

The Independent Investigator's Final Investigative Report

- Monitoring any debt service requirements on the part of the issuer;

- Authenticating and delivering the bonds;

- Managing the accounts into which bond proceeds are deposited; and

- Paying interest on the bonds to bondholders by the interest payment date.

Banco Popular, Inc. and U.S. Bank Trust National Association have acted as trustee for PRASA and PREPA, respectively, since the early to mid-2000s.[91]  A further discussion of the role of PREPA's trustee in its bond issuances is found in Part V.A.3.(a).(ii)

---

[91] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. (2003, amended and restated Aug. 1, 2011) (on file with author); Trust Agreement from P.R. Aqueducts and Sewer Auth. to Banco Popular de P.R. (Mar. 3, 2008, amended and restated Feb. 12, 2012) (on file with author).

# PART IV

# GDB

---

# PART IV
# GDB

---

Historically and during the Relevant Period, GDB played two key roles that supported Puerto Rico's use of the capital markets: (i) GDB was the designated fiscal agent for the Puerto Rico-Related Entities; and (ii) GDB extended financing to the Puerto Rico-Related Entities. As part of our work, we investigated how GDB's performance in those roles contributed to the financial crisis. The evidence supports the following findings:

1.      During the Relevant Period, GDB had the reputation of a prestigious financial institution. It was perceived as having been comprised of career finance professionals who rivaled private-sector talent, both in terms of sophistication and competency. *See* Part IV.A, below.

2.      In its role as fiscal agent, GDB intermediated all of the Puerto Rico-Related Entities' bond issuances. It essentially acted as a "traffic cop" by deciding which of the Puerto Rico-Related Entities would issue their bonds (or "go to market") over the course of each fiscal year and when. GDB also selected the underwriting and legal professionals who structured and implemented the Puerto Rico-Related Bond deals. *See* Part IV.B.1 and Part IV.B.2, below.

The evidence also reflects that at times, GDB, as fiscal agent, authorized the Puerto Rico-Related Entities to issue certain bonds from which the bond proceeds were intended to be used to re-pay older debt. This includes debt that the Puerto Rico-Related Entities owed to GDB in its separate capacity as lender, as well as debt that rolled forward the repayment of a maturing obligation (commonly referred to as a "scoop and toss"). Unfortunately, the evidence we reviewed demonstrates that "scooping and tossing" was not a sustainable fiscal practice for the Puerto Rico-Related Entities in the long run. *See* Part IV.B.3, below.

Moreover, despite GDB's statutory and contractual oversight powers as fiscal agent, GDB lacked the practical ability to monitor the Puerto Rico-Related Entities' accruing deficits. It similarly lacked the ability to evaluate information that would have helped it to monitor how

71

the Puerto Rico-Related Entities actually used their bond proceeds or loan funds, once those assets were transferred to the control of the Puerto Rico-Related Entities or their trustees.  This was true even after certain Puerto Rico-Related Entities entered into FOAs with GDB in 2009, pursuant to which those Puerto Rico-Related Entities generally provided GDB with certain monthly reports.  *See* Part IV.B.4, below.

3.     In its separate capacity as lender, GDB extended loans to the Puerto Rico-Related Entities.  At times, GDB served as a significant source of funding for some of them.  On certain occasions, when a given Puerto Rico-Related Entity was unable to go to market or it was not yet its turn that year to issue a bond, GDB provided a short-term cash injection, after which some of that Puerto Rico-Related Entity's bond proceeds would be used to repay GDB.  *See* Part IV.C, below.

The evidence further demonstrates that as lender, GDB extended financing for the purpose of helping the Puerto Rico-Related Entities meet their operating deficits.  GDB's lending standards were also, at times, not as rigorous as one would expect given GDB's concurrent responsibilities as fiscal agent.  This was compounded by the fact that GDB did not hold those borrowers strictly accountable when they could not repay their obligations as originally agreed.

These practices undermined GDB's effectiveness in its separate role as fiscal agent.  Indeed, as the evidence we surveyed demonstrates, deficit financing was not, in the long run, a fiscally sustainable practice for the Puerto Rico-Related Entities.  And by continuing to lend to the Puerto Rico-Related Entities without imposing strict accountability, GDB undermined the incentive for those entities to implement more self-sustaining measures that could have improved their long-term fiscal independence and performance.  This includes, among other things, implementing higher consumer rates, and collecting sufficient revenues, to support their own operations without resorting to new bond issuances or GDB loans.  To compound the problem, GDB's provision of short-term cash injections to certain Puerto Rico-Related Entities while they waited to access the capital markets appears to have increased the debt load of certain Puerto Rico-Related Entities, in a way that arguably had the effect of benefitting GDB as creditor relative to others.

4.     Structural vulnerabilities made GDB susceptible to certain policy considerations.  *See* Part IV.D, below.  For example, the Governor appointed all seven members of the GDB Board.  Those officials had the exclusive authority to approve or reject all of GDB's lending, as well as the Puerto Rico-Related Entities' bond issuances.  The Governor also appointed the high-level employees who made recommendations to the GDB Board.  This left not only the GDB Board, but also the upper echelons of GDB's staff, vulnerable to the Governor's will.  In fact, we uncovered numerous instances across administrations when high-level GDB officials resigned from their positions in protest of the fact that fiscally-responsible measures were not implemented due to concerns about voter impact.

Separately (but relatedly), the turnover of so many people with each new political administration resulted in a lack of institutional memory among GDB's upper ranks and on the GDB Board, notwithstanding the expertise of the many competent employees we interviewed.  Continuity and institutional memory were needed to enable GDB to function in a predictable and sustainable way as Puerto Rico's fiscal agent, particularly in light of the increasingly sophisticated financial arrangements that GDB approved or entered into on the Puerto Rico-

Related Entities' behalf (including the swap arrangements discussed in Part XIII of this Report).

5.      Policy considerations ultimately compounded the tension between GDB's role as lender and its role as fiscal agent.  *See* Part IV.E, below.  This includes: (i) the desire to provide essential services to the public at reasonable costs (such as electricity, running water, and public transportation), as well as (ii) a desire to close budget gaps at the central government level.    At times, these policy considerations overcame other more purely financial considerations at GDB, sometimes to the surprise of those who were more fiscally oriented.

For example, as fiscal agent, GDB sometimes did not use its authority to require that the Puerto Rico-Related Entities become self-sustaining by raising their rates and collecting revenues.  GDB instead permitted those entities to subsist on borrowed liquidity–that is, appropriations and bond proceeds.  This sometimes happened as a result of Puerto Rico politicians having policy goals, or having made political promises, that would be difficult to square with rate increases.

6.      Eventually, GDB's prolonged support of the Puerto Rico-Related Entities with limited regard for forcing them to repay their debts overwhelmed GDB's own liquidity.  Restructuring became the only option.  *See* Part IV.F, below.

7.      Certain reforms could help GDB's successor, as fiscal agent, to more effectively oversee the Puerto Rico-Related Entities' finances.  This includes separating the fiscal oversight and public lending functions.  We review these options below in Part IV.G.

## A.     During the Relevant Period, GDB Officials Were Knowledgeable and Well-Credentialed

As explained in more detail below in Parts IV.B and IV.C, GDB had two primary roles with respect to the Puerto Rico-Related Entities:  *first*, GDB was their fiscal agent; and *second*, GDB was a source of loan funds for them.  Our investigation supports the view that although there were structural weaknesses and policy considerations that sometimes undermined GDB's effectiveness, *see* Parts IV.D and IV.E below, GDB's personnel and the members of the GDB Board were, in general, knowledgeable finance professionals.

Our investigation revealed that many finance professionals praised GDB as a prestigious and powerful player within Puerto Rico's finance community during the Relevant Period.  In the words of one witness, GDB was the future of Puerto Rico.  Multiple witnesses told us that they considered GDB's personnel and the members of GDB's Board to rival private-sector talent in terms of sophistication and expertise.

These views are consistent with our impressions of the current and former GDB professionals and GDB Board members with whom we spoke.  Their backgrounds reflect impressive educational pedigrees, with many of them having held high-ranking finance positions not just with GDB, but with top-tier private-sector institutions.  They include, among others:

- A former Chairman of the GDB Board with a Master's in Business Administration from New York University's Stern School of Business.  For more than thirty years, this individual served in various executive capacities with a prominent financial

institution.  This individual has also served on the board of a development fund in Puerto Rico;

- A former Chairman of the GDB Board and Chief Executive Officer of GDB who holds a B.S.E.  and a Bachelor of Arts degree from the University of Pennsylvania. Over the course of more than twenty years of experience in the finance community, this professional has held various high-ranking positions with a prominent financial institution and several of its affiliates.  The individual also founded and respectively serves as the Chief Executive Officer and Managing Partner of a capital management entity and a related investment fund;

- A former Executive Vice President of Financing & Treasury at GDB who received a Master's of Business Administration from Harvard Business School and also holds a Bachelor's Degree with *summa cum laude* distinction from Northeastern University.  This individual has held various positions with prominent financial institutions over the course of a twenty-year career, including the titles of Chief Executive Officer, Vice Chairman and Executive Vice President;

- A former Executive Vice President for Financing & Capital Markets and Aide to the President at GDB who holds a Master's of Business Administration from Northwestern University and a Bachelor's Degree from Boston College.  This individual has served in various capacities with a prominent local financial institution in Puerto Rico; and

- A former President and Executive Vice President of Financing at GDB who, over the course of thirteen years, has held various positions at financial advisory firms and bondholder advocacy groups, as well as high-ranking titles within a prominent mainland financial institution.  This professional holds a Master's of Business Administration from Harvard Business School, as well as a Bachelor of Arts from New York University.

Accordingly, we cannot conclude based on the evidence that GDB officials were inadequately credentialed.

**B.**     **In its Role as Fiscal Agent, GDB Controlled Deal Flow for the Puerto Rico-Related Bonds and Was the Financial Advisor for the Puerto Rico-Related Entities**

Since 2001, GDB was, by statute, authorized to act as the fiscal agent to Puerto Rico's government, its agencies and municipalities, as well as the Secretary of the Treasury.[1]  The scope of that authority was broad.  It essentially allowed GDB to take any action "for the purpose of registering, authenticating or countersigning the bonds, notes or other evidences of indebtedness of" those entities,[2] as well as to oversee creditor and investor relationships on their behalf. [3]  GDB, as fiscal agent, further had the power to perform "such other services . . .  [for those entities and offices], for any purpose not contrary to already existent

---

[1] P.R.  Laws Ann.  tit.  7, § 581 (2018).

[2] P.R.  Laws Ann.  tit.  7, § 581(A) (2018).

[3] *See*, *e.g*., Gov't Dev.  Bank for P.R., P.R.  Elec.  Power Auth, *Fiscal Oversight Agreement*, 1 (July 1, 2009) (on file with author).

The Independent Investigator's Final Investigative Report

legislation," as long as the Secretary of Treasury approved such powers and the agreed-upon terms.[4]  In short, then, GDB had to approve the terms of any Puerto Rico-Related Bond issuance, as well as any indebtedness of the Puerto Rico-Related Entities.[5]

As fiscal agent, GDB was also responsible "for the financial relations of the Commonwealth, its agencies and instrumentalities with financial institutions, and municipal bond investors and credit enhancers."[6]  It is thus not surprising that the Puerto Rico-Related Entities considered GDB to be their "financial advisor."[7]

The evidence reflects that in its capacity as fiscal agent, GDB controlled essentially all aspects of the Puerto Rico-Related Entities' bond issuances.  This includes everything from timing to branding and marketing, to the selection of critical outside professionals like underwriters and counsel.  We discuss the aspects of this control in more detail below.

## 1. Each Year, GDB Decided Which Puerto Rico-Related Entities Would Issue New Bonds, and in What Order

A former GDB official explained to us that, during his tenure, in its role as financial advisor of Puerto Rico, GDB advised on and managed most aspects of the timing for the Puerto Rico-Related Entities' new bond issuances.  Each year, GDB developed and implemented a finance schedule that laid out the bond issuances that GDB planned to take to market.  The purpose was to plan all of the steps that GDB and outside consultants needed to take to ensure that the issuances were ready for market, such as (i) evaluating any capital improvement plans that the bond issuances were expected to fund; (ii) evaluating any liquidity that the Puerto Rico-Related Entities might need to obtain before going to market; (iii) presenting important information about the proposed issuances to various interested parties at "roadshows;" (iv) obtaining credit ratings from the CRAs; and (v) meeting or speaking with the underwriting banks, bond counsel and underwriter counsel about various issues related to structuring, implementing and marketing the transactions.  The schedules also identified the priority of contemplated bond issuances–that is, the order in which GDB planned to take the bonds to market.

To prepare the schedules, GDB used, among other things, a chart that was supposed to reflect all of the outstanding public-sector debt for the relevant Puerto Rico-Related Entity.  There were as many as seventeen Puerto Rico-Related Entities for which GDB, as fiscal agent, developed these bond issuance schedules.  This includes Puerto Rico itself, which GDB generally scheduled to market a new GO Bond issuance once per year.

---

[4] P.R. Laws Ann. tit. 7, § 581(A) (2018).
[5] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series 2005B*, I-23 (2005) (providing that "GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each [debt] issuance.").
[6] *See, e.g.*, Gov't Dev. Bank for P.R., P.R. Elec. Power Auth, *Fiscal Oversight Agreement*, 1 (July 1, 2009) (on file with author).
[7] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2007*, 7 (June 15, 2008) (providing that the principal functions of GDB are to act as "financial advisor to and fiscal agent for" Puerto Rico, its municipalities, and public corporations, in connection with the issuance of bonds and notes).

Based on the foregoing, it is plain that in its capacity as fiscal agent, GDB was the primary director of deal flow for Puerto Rico-Related Bond issuances during the Relevant Period.

### 2. GDB Determined Which Outside Professionals Structured and Implemented the Puerto Rico-Related Bond Issuances

Also in its capacity as fiscal agent, GDB worked closely with the outside professionals who played key roles with respect to the Puerto Rico-Related Bond issuances. GDB also hand-picked many of those professionals through a special committee of the GDB Board. This includes underwriters, as well as bond counsel and underwriter counsel.

### (a) GDB Chose Underwriters From a Pool of Qualified Banks that GDB Considered to be Familiar with Relevant Aspects of Puerto Rico-Related Bond Issuances

With respect to underwriter selections, GDB witnesses told us that GDB maintained a short roster of bank choices during the Relevant Period. Those banks were generally considered the default underwriter options for the Puerto Rico-Related Bonds. For a given issuance, the GDB Board typically chose the underwriter bank that had previously underwritten deals for the relevant Puerto Rico Related-Entity, with two exceptions: (i) sometimes, the GDB Board valued an individual banker more than the underwriting bank itself, so if that individual banker left one underwriter bank on the roster and joined another, then the GDB Board sometimes followed the individual banker to his or her new bank, and selected that bank to underwrite the Issuer's next deal; and (ii) certain underwriting banks were perceived as aligned with particular political parties at various times.

Moreover, between approximately 1993 and 2001, GDB required mainland banks to have a local presence in order to underwrite Puerto Rico-Related Bonds. This meant that the mainland banks had partnership or joint venture arrangements with local banks in Puerto Rico. GDB awarded the underwriting opportunities to those pairings of mainland and local banks, as though they were a package deal.

The Independent Investigator's Final Investigative Report

Notably, the underwriter banks continued to follow the practice of pairing even after GDB stopped formally requiring it in or about 2001. Figure IV.1 below provides examples of frequent underwriter pairings during the Relevant Period.

**Figure IV.1: Mainland and On-Island Bank Pairings**

| Mainland Bank | Local Bank |
|---|---|
| Bank of America | Santander |
| Barclays | CCDA |
| Barclays | Santander |
| Citi Bank | N/A |
| Goldman Sachs | FirstBank |
| Goldman Sachs | UBS |
| Lehman Brothers | Popular |
| JP Morgan | FirstBank |
| JP Morgan | Popular |
| Merrill Lynch | BBVA |
| Merrill Lynch | Popular |
| Morgan Stanley | Popular |
| Wells Fargo | ScotiaBank |

As explained in more detail in Part XIII of this Report, on at least one occasion during the Relevant Period, a mainland bank that had previously served as underwriter fell out of favor with GDB, for reasons unrelated to underwriting. The underwriter bank was a counterparty to a Swap deal involving PREPA that many witnesses viewed as particularly high-risk. One official from the Fortuño Administration told us that an outgoing GDB team had approved this Swap arrangement in order to obtain liquid resources. The witness stressed that, in this witness's view, the Swap could have had catastrophic consequences for PREPA. Ultimately, the GDB Board refrained from hiring the Swap counterparty to underwrite any new Puerto Rico-Related Bond issuances. GDB witnesses described this period to us as the time during which the Swap counterparty had been placed "in the penalty box."

The witnesses we spoke with maintained that the GDB Board did not choose any underwriter to underwrite a Puerto Rico-Related Bond issuance for improper reasons. Instead, witnesses who worked at GDB told us that when GDB chose underwriters, it generally considered a range of relevant factors. Those factors are consistent with normal client service relationships. The factors included, among other things: (i) the degree of the potential underwriter bank's specialized knowledge relevant to the particular issuance; (ii) the amount of time and attention that the potential underwriter bank gave to GDB as client; (iii) the quality of the potential underwriter bank's ideas; (iv) the potential underwriter bank's track record for trading in the secondary market; and (v) the potential underwriter bank's history of loaning money to the Puerto Rico-Related Entities.

Other witnesses similarly indicated that GDB's underwriter selection process was merit-based. In particular, these witnesses told us that the GDB Board rewarded banks that submitted worthwhile ideas. In this vein, numerous witnesses stated that investment banks were often chosen to underwrite the transactions that they had proposed to GDB as ways of meeting specific liquidity goals.

We reviewed dozens of such proposals from numerous investment banks. Although we do not opine on the quality of certain proposals or ideas in relation to others, the evidence confirms that, as many witnesses told us, underwriter banks submitted many more ideas to GDB than GDB ultimately pursued. These unsuccessful pitches included, among others:

- An underwriter bank's proposal for creating a new utility tariff and securitizing it in order to bolster the credit ratings of PREPA bonds (which, in turn, would result in lower coupons, and therefore lower borrowing costs);

- A proposal for bonds that would have been backed by the revenue from lottery ticket sales;

- A proposal for revenue bonds that would have been secured by a municipal property tax-backed loan portfolio held by GDB; and

- A 2004 proposal for pension obligation bonds ("POBs") to provide immediate relief for ERS cash flow concerns.

Accordingly, the selection of underwriters is another way in which GDB, as fiscal agent, controlled deal flow for the Puerto Rico-Related Entities. Based on the evidence, however, we cannot conclude that GDB selected any of those underwriters for improper reasons.

### (b)   GDB Selected Bond Counsel and Underwriter Counsel Based on Personal Relationships With Firms that Were Familiar Choices for Puerto Rico-Related Bond Issuances

The evidence we reviewed reflects that the GDB Board chose the legal professionals for Puerto Rico-Related Bond issuances from a relatively small group of law firms with which GDB was familiar. GDB tended to reuse those law firms across Puerto Rico-related bond issuances during the Relevant Period. As with underwriter selection, however, the evidence does not suggest that GDB's choices were improper.

The firms that GDB selected as bond counsel most often during the Relevant Period included the following: (i) Greenberg Traurig, LLP; (ii) Brown & Wood LLP, as well as its successor law firms (subsequently known as Sidley Austin Brown & Wood LLP, then Sidley Austin LLP (collectively, "Sidley Austin")); (iii) Squire, Sanders & Dempsey LLP ("Squire Sanders"); and (iv) Hawkins, Delafield & Wood LLP ("Hawkins"). Our investigation revealed that GDB did not conduct a formal selection process for bond counsel. Instead, GDB drew upon familiarity with certain lawyers. In general, a GDB official would call a particular law firm and ask it to serve as bond counsel for a specific deal, without the law firm first pitching for the engagement.

For underwriters' counsel during the Relevant Period, the GDB Board tended to rotate selections primarily among the following law firms: (i) Pietrantoni, Méndez & Alvarez LLP ("PMA"); (ii) Squire Sanders; (iii) Fiddler González & Rodríguez PSC ("Fiddler"); and (v) O'Neill & Borges LLC. Although the GDB Board selected underwriter counsel, a witness told us that the underwriters, rather than GDB, would reach out to the chosen law firm and request its services as underwriter counsel for a particular issuance.

By way of illustration, Figure IV.2 below sets forth Puerto Rico-based bond counsel and underwriter counsel selections for certain issuances during the Relevant Period:

**Figure IV.2: Puerto Rico-Based Law Firm Involvement in Bond Issuances during the Relevant Period**

| Issuer | Date | Administration | Local Law Firm | Counsel Type[8] |
|---|---|---|---|---|
| GDB | 5/17/2006 | Acevedo Vilá (PPD) | PMA | Underwriter |
| GDB | 6/1/2006 | Acevedo Vilá (PPD) | PMA | Underwriter |
| GO | 8/2/2006 | Acevedo Vilá (PPD) | PMA | Underwriter |
| GO | 8/8/2006 | Acevedo Vilá (PPD) | PMA | Underwriter |
| GO | 8/17/2006 | Acevedo Vilá (PPD) | PMA | Underwriter |
| HTA | 2/15/2007 | Acevedo Vilá (PPD) | OB | Underwriter |
| COFINA | 12/18/2007 | Acevedo Vilá (PPD) | Fiddler | Bond |
| ERS | 1/29/2008 | Acevedo Vilá (PPD) | Fiddler | Bond |
| ERS | 5/28/2008 | Acevedo Vilá (PPD) | Fiddler | Bond |
| COFINA | 6/25/2008 | Acevedo Vilá (PPD) | Fiddler | Underwriter |
| ERS | 6/26/2008 | Acevedo Vilá (PPD) | Fiddler | Bond |
| GDB | 12/23/2008 | Acevedo Vilá (PPD) | Fiddler | Underwriter |
| COFINA | 1/27/2009 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 1/27/2009 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| COFINA | 6/10/2009 | Fortuño Burset (PNP) | PMA | Underwriter |
| COFINA | 6/19/2009 | Fortuño Burset (PNP) | OB; PMA | Both |
| GO | 9/11/2009 | Fortuño Burset (PNP) | PMG | Underwriter |
| Commonwealth | 11/4/2009 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| Commonwealth | 12/3/2009 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 12/23/2009 | Fortuño Burset (PNP) | OB | Underwriter |
| COFINA | 1/28/2010 | Fortuño Burset (PNP) | PMA | Underwriter |
| PREPA | 3/26/2010 | Fortuño Burset (PNP) | PMA | Underwriter |
| PREPA | 4/22/2010 | Fortuño Burset (PNP) | OB | Underwriter |
| PREPA | 4/22/2010 | Fortuño Burset (PNP) | PMA | Underwriter |
| PREPA | 5/20/2010 | Fortuño Burset (PNP) | OB | Underwriter |
| PREPA | 5/20/2010 | Fortuño Burset (PNP) | PMA | Underwriter |

---

[8] OB: O'Neill & Borges; Ferraiuoli: Ferraiuoli LLC.

The Independent Investigator's Final Investigative Report

| Issuer | Date | Administration | Local Law Firm | Counsel Type |
|---|---|---|---|---|
| HTA | 6/17/2010 | Fortuño Burset (PNP) | OB | Underwriter |
| COFINA | 6/24/2010 | Fortuño Burset (PNP) | PMA | Underwriter |
| GDB | 7/22/2010 | Fortuño Burset (PNP) | OB | Bond |
| GDB | 7/23/2010 | Fortuño Burset (PNP) | OB | Bond |
| GDB | 7/23/2010 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 7/23/2010 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 8/24/2010 | Fortuño Burset (PNP) | OB | Bond |
| GDB | 8/24/2010 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 8/24/2010 | Fortuño Burset (PNP) | Fiddler | Underwriter |
| GDB | 8/25/2010 | Fortuño Burset (PNP) | OB | Bond |
| PREPA | 9/29/2010 | Fortuño Burset (PNP) | PMA | Underwriter |
| PREPA | 12/24/2010 | Fortuño Burset (PNP) | OB | Underwriter |
| GO | 2/10/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| GO | 3/10/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| GO | 6/29/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| COFINA | 11/16/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| COFINA | 12/1/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| PFC | 12/8/2011 | Fortuño Burset (PNP) | PMA | Underwriter |
| PRIFA | 12/16/2011 | Fortuño Burset (PNP) | Ferraiuoli | Underwriter |
| PRASA | 2/15/2012 | Fortuño Burset (PNP) | PMA | Underwriter |
| PRASA | 2/15/2012 | Fortuño Burset (PNP) | PMA | Underwriter |
| GO | 3/7/2012 | Fortuño Burset (PNP) | OB | Underwriter |
| GO | 3/7/2012 | Fortuño Burset (PNP) | PMA | Underwriter |
| PREPA | 4/12/2012 | Fortuño Burset (PNP) | PMA | Underwriter |
| PBA | 6/8/2012 | Fortuño Burset (PNP) | OB | Underwriter |
| PREPA | 8/15/2013 | García Padilla (PPD) | Fiddler | Underwriter |

We cannot conclude, based on the evidence, that GDB selected any of these law firms for improper reasons.

3.      **In Its Capacity as Fiscal Agent, GDB Authorized Bond Issuances to Finance Operational Deficits, Repay GDB Lines of Credit or "Scoop and Toss" Old Debts**

The evidence demonstrates that, in its capacity as fiscal agent, GDB sometimes helped the Puerto Rico-Related Entities to access the municipal bond market to finance operational deficits, or to refinance old debt by (i) authorizing new long-term bond issuances from which the proceeds were authorized to be used to repay maturing bonds, or (ii) refinancing obligations that soon would mature, with the overall effect of delayed repayment (*i.e.*, a "scoop and toss").[9] Correspondence and other evidence reflects that GDB recognized certain Puerto Rico-Related Bond issuances were "scoop and toss" transactions—and referred to them as such—during the Relevant Period.

To assess the potential magnitude of "scooping and tossing" during the Relevant Period, we analyzed the proposed uses of bond proceeds for issuances between 2005 and 2014, with particular emphasis on the Puerto Rico-Related Entities that issued the majority of Puerto Rico-Related Bond debt: (i) Puerto Rico itself (for the GO Bonds); (ii) COFINA; and (iii) the Public Utilities.  To that end, we assessed these Issuers' intended use of proceeds for those bonds, as stated in the relevant offering documents.  Those stated uses generally encompassed five categories: (i) projects and operational expenses (*e.g.*, infrastructure or capital improvement plan projects); (ii) repayment of outstanding bonds; (iii) repayment of GDB lines of credit; (iv) repayment of other lines of credit; and (v) payment of other debts and miscellaneous uses (including, for example, payments of interest and swap termination fees).  Figure IV.3 below reflects the stated use of proceeds for each such category according to the official statements for the bond issuances analyzed:

---

[9] *See* Volcker Alliance Inc., *Truth and Integrity In State Budgeting: What is the Reality?*, 15 (2017).

**Figure IV.3:  Stated Uses of Bond Proceeds for Certain Puerto Rico-Related Issuances Between 2005 and 2014[10]**

| Uses | Amount of Proceeds | Percentage of Proceeds |
|---|---|---|
| Operational   Expenses   &   Capital Projects[11] | $14,154,255,522 | 30.3% |
| Repayment of Bonds[12] | $19,574,266,145 | 41.9% |
| Repayment of GDB Lines of Credit | $5,201,370,070 | 11.1% |
| Repayment of Misc.  Lines of Credit[13] | $1,882,421,194 | 4.0% |
| Other Debts and Miscellaneous[14] | $5,887,267,207 | 12.6% |
| **TOTAL** | $46,699,580,138 | 100% |

As Figure IV.3 reflects, the largest category of stated uses was to repay older bonds. Approximately $19.5 billion (about 42% of relevant bond proceeds) was earmarked for that purpose.  An additional $5 billion (about 11% of relevant bond proceeds) was supposed to be

---

[10] We prepared Figures IV.3 and IV.4 with the assistance of D&P.  The Figures contain information derived from the relevant official statements for the following issuances: COFINA Series 2007A, 2007B, 2007C, 2008A, 2009A, 2009B, 2009C, 2010A, 2010C, 2010D, 2010E, 2011A, 2011B, 2011C, and 2011D; GO Series 2005A, 2005B, 2006A, 2006B, 2006C, 2006D, 2007A, 2007B, 2007A & 2007B (Refunding), 2008A, 2008B, 2008A & 2008B (Refunding) 2008C, 2009A, 2009B, 2009C, 2011A, 2011C, 2011D, 2011E, 2012A, 2012B, and 2014A; HTA Series M, N, and CC; K, L, and BB; PRASA Series 2008A & 2008B (Senior), 2008A & 200B (Refunding), 2012A, and 2012B; and PREPA Series RR, SS, TT, UU, VV, WW, XX, YY, ZZ, AAA, ZZ, BBB, CCC, DDD, EEE, 2012A & 2012B, and 2013A.  These charts do not include uses of the 2010 HTA AA and H Series Bonds, as those bonds were reofferings of the same name issued in 2003, and the official statement for that issuance does not provide information about the stated use of proceeds.  *See, e.g.*, P.R.  Highways and Transp.  Auth., *Official Statement for Highway Revenue Refunding Bonds*, *Series AA* (2010); Official Statement, P.R. Highways and Transp.  Auth., *Official Statement for Transportation Revenue Refunding Bonds*, *Series H* (2010).  In certain cases, the described uses in the official statements required assumptions to be made as to the category of use in the Figures.  The notes accompanying these Figures provide further information as to the described uses that are included in each category.

[11] Includes uses described in the Official Statements as Deposit to the Project Fund, Deposit in Construction Fund and Deposit into Public Improvements Fund(s).

[12] Includes amounts described in the Official Statements as Deposit into Escrow Fund (for Refunded Bonds), Redemption/Refinancing of Refunded Bonds, Repurchase of the Purchased Bonds, Retirement of Outstanding Bonds, Repayment of Extraconstitutional Debt and Payment of 2006 Appropriation Debt.  We assumed that the last two of these categories represent the payment of bond debt in their entirety, although the Official Statements are somewhat ambiguous in that regard.

[13] Some of the Official Statements only generally refer to "Repayment of Lines of Credit" and do not specify the entity that provided the line of credit.  As a result, this category may include, in some instances, repayment of lines of credit provided by GDB.

[14] Includes amounts described in the Official Statements as Payment or Repayment of Bond Anticipation Notes, Repayment of Advances to Pay Interest Expenses, Payment of Interest on the Bonds, Capitalized Interest, Swap Termination/Agreement Payments, Capitalized Interest, Underwriters' Discount and Other Costs of Issuance, and Deposit in Reserve Account/Fund (Budgetary; Debt Service; Bond).

used to repay GDB lines of credit, with $2 billion more (4% of relevant bond proceeds) devoted to repaying other lines of credit.

We stratify on an Issuer-by-Issuer basis below in Figure IV.4 the bond proceeds that were intended to be used to repay GDB and other lines of credit between 2005 and 2014, together with the percentage of total proceeds that those amounts represent.

**Figure IV.4:**
**Line of Credit Uses for Certain Puerto Rico-Related Bonds Between 2005 and 2014**

| Entity | Repayment of GDB Lines of Credit | Repayment of Misc. Lines Of Credit | Total Lines of Credit Repaid | GDB LoC % of Uses[15] | Misc. LoC % of Uses[16] | Total LoC % of Uses[17] |
|---|---|---|---|---|---|---|
| GO | $3,423,815,161 | $289,916,512 | $3,713,731,673 | 26.8% | 2.3% | 29.0% |
| COFINA | - | - | - | - | - | - |
| PREPA | $204,956,622 | $1,592,504,682 | $1,797,461,303 | 2.0% | 15.8% | 17.8% |
| PRASA | $1,119,598,287 | - | $1,119,598,287 | 30.1% | 0% | 30.1% |
| HTA | $453,000,000[18] | - | $453,000,000 | 11.0% | 0% | 11.0% |
| TOTAL | $5,201,370,070 | $1,882,421,194 | $7,083,791,264 | 11.1% | 4.0% | 15.2% |

As Figure IV.4 reflects, repaying lines of credit that GDB extended in its separate capacity as lender comprised a material portion of the stated use of proceeds for relevant bond issuances of three Puerto Rico-Related Entities: (i) Puerto Rico (approximately 27% of the stated use of proceeds for relevant GO Bond issuances); (ii) PRASA (approximately 30% of the stated use of proceeds for relevant issuances); and (iii) HTA (approximately 11% of the stated use of proceeds for relevant issuances). Although only 2% of the stated use of proceeds for relevant PREPA issuances was to repay GDB lines of credit, approximately 16% of the stated use of proceeds was identified as repaying miscellaneous other lines of credit.

---

[15] This reflects the percentage of the represented repayments of each issuer's GDB lines of credit as compared to the total bond proceeds for that issuer.

[16] This reflects the percentage of the represented repayments of each issuer's other lines of credit as compared to the total bond proceeds for that issuer.

[17] This reflects the percentage of the represented repayments of each issuer's total lines of credit as compared to the total bond proceeds for that issuer.

[18] Includes amounts reflected as "Payment of GDB Lines of Credit to Redemption Fund."

A more specific example of a "scoop and toss" bond issuance is the approximately $3.5 billion of GO Bonds that GDB, in its capacity as fiscal agent, authorized to issue in 2014 (the "2014 GO Bond Issuance"). About $1.9 billion of that issuance was to be used to repay loans that Puerto Rico and the Public Buildings Authority had drawn from GDB.[19]  According to a witness who worked first at GDB and subsequently at an underwriter for Puerto Rico-Related Bonds, the very reason for the 2014 GO Bond Issuance was to help "reliquify" GDB so that it could resume its role as bridge loan provider to the government.  We discuss the 2014 GO Bond Issuance and GDB's liquidity problems in more detail below in Part IV.B.3.

The evidence we reviewed during the Relevant Period demonstrates that "scooping and tossing" was not a sustainable fiscal practice for the Puerto Rico-Related Entities.  This stands to reason.  When a government recycles its debt rather than repaying it when it is due, the government has essentially extended the maturity of the original debt.  That enables structural budget problems to persist and be deferred.[20]  Debt recycling also has transaction costs, because each new bond issuance requires the payment of underwriter and professional fees.[21]  It also adds to the Issuer's interest expenses.[22]

**4.      As Fiscal Agent, GDB Was Responsible for Overseeing the Puerto Rico-Related Entities' Finances**

In furtherance of its responsibilities as fiscal agent, GDB also had oversight authority. For that purpose, GDB had the statutory power, since at least 2001, to inspect the "books, records and other documents" of "any instrumentality or public incorporation of the Commonwealth of Puerto Rico."[23]  "Without limitation," these inspection rights included all fiscal planning, spending and liquidity-related documents, such as "budgets, financial statements, certificates, audit reports, notifications, policies, procedures, manuals, plans and

---

[19] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds*, *Series A*, 24 (2014) (reflecting use of $1,896,072,196 in proceeds for "Repayment of GDB lines of credit and deposit to Redemption Fund").

[20] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds*, *Series 2014A*, 24 (2014) (reflecting use of $1,896,072,196 in proceeds for "Repayment of GDB lines of credit and deposit to Redemption Fund").

[21] Mike Cherney, *Borrowing Maneuver Catches Flak*, The Wall Street Journal (Dec.  3, 2013) https://www.wsj.com/articles/borrowing-maneuver-catches-flak-1386034534 (explaining that "scoop and toss" "involves selling new long-term debt to raise funds to pay off maturing bonds, effectively extending the timetable for retiring municipal borrowings").

[22] Certain stakeholders may argue that debt recycling also has constitutional implications, due to the debt maturity clause in Puerto Rico's constitution.  That clause provides, in pertinent part, that "no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date."  *See* P.R.  Const.  Art.  VI § 2.  A Pre-Audit Survey Report by Puerto Rico's Commission for the Comprehensive Audit of Puerto Rico's Public Credit suggests that if Puerto Rico incurred a non-housing-facility debt, then subsequently refinanced that debt before it matured, and the last form of the refinanced debt does not mature until thirty-one years from the date of the original debt, then one could argue that the original debt is, in essence, thirty-one years old, and therefore violates the Puerto Rico constitution.  *See* P.R.  Commission for the Comprehensive Audit of the Public Credit, *Pre-audit Survey Report*, 5-6 (2016).  We expect this issue to be analyzed either by the Commission for the Comprehensive Audit of Puerto Rico's Public Credit, or to be litigated by stakeholders that, unlike the Independent Investigator, have interests to advocate.

[23] P.R.  Laws Ann.  tit.  7, § 581(B) (2018).

any other information related to the finances of such instrumentality or public corporations as the Bank may seem appropriate."[24]

Beginning in 2009, GDB entered into FOAs with nine Puerto Rico-Related Entities including, among others, the Public Utilities and UPR.[25]   Among other things, the FOAs required the relevant Puerto Rico-Related Entities to implement certain fiscal oversight controls.[26]   Those controls included: (i) developing and delivering to GDB a "Fiscal Improvement Plan" that sets forth specific measures that the entity proposes to reduce its operating deficit and improve its financial performance; and (ii) a requirement that the entity obtain GDB's approval before incurring, assuming, or guaranteeing debt.[27]

The FOAs also underscored GDB's authority to inspect and examine the books, records, and accounts of the Puerto Rico-Related Entities.[28]   In particular, they bound the relevant Puerto Rico-Related Entities to furnish GDB with financial statements, fiscal year projections, budgets, audit reports, audited financial statements, operating reports, succession plans for key career employees, lists identifying key career employees and *empleados de confianza*, and other information concerning the entities' business, properties, information systems and operations.  [29]

On paper, then, the FOAs gave GDB full access to all of the information that GDB might need to track deficits, monitor the use of loan funds or verify the use of bond proceeds. As we discuss below, however, our investigation uncovered resource and other limitations that undermined GDB's execution.

## 5.      Deficiencies in Execution Limited GDB's Effectiveness as Fiscal Agent

Despite its responsibility for helping the Puerto Rico-Related Entities to make sound financial decisions, we found no meaningful evidence that GDB had an effective process in place to oversee important aspects of their fiscal health, or to impose accountability for repayment of debts.  For example, we found no meaningful evidence that GDB monitored operational deficits, tracked how the Puerto Rico-Related Entities actually used their loan funds, or oversaw what the Puerto Rico-Related Entities actually did with the proceeds from their bond issuances.  Several GDB officials told us that GDB did have such processes in place,

---

[24] P.R.  Laws Ann.  tit.  7, § 581(B) (2018).

[25] *See* Gov't Dev.  Bank for P.R., *Government Development Bank Consolidates its Financial Strength and Supports Puerto Rico's Economic Development* (Nov.  28,  2012) http://www.gdbpr.com/documents/2012-11-28-ComunicadoBGF-transicion-FINALFINAL-Eng.pdf.

[26] *See*, *e.g.*, Gov't Dev.  Bank for P.R., P.R.  Aqueducts and Sewers Auth., *Fiscal Oversight Agreement* (July 9, 2009); *see also* Gov't Dev.  Bank for P.R., P.R.  Highway and Transp.  Auth.  *Fiscal Oversight Agreement* (Mar.  8, 2012).

[27] *See*, *e.g.*, Gov't Dev.  Bank for P.R., P.R.  Aqueducts and Sewers Auth., *Fiscal Oversight Agreement* (July 9, 2009); *see also* Gov't Dev.  Bank for P.R., P.R.  Highway and Transp.  Auth.  *Fiscal Oversight Agreement* (Mar.  8, 2012).

[28] *See*, *e.g.*, Gov't Dev.  Bank for P.R., P.R.  Highway and Transp.  Auth.  *Fiscal Oversight Agreement*, 6, § 1.5 (July 6, 2009).

[29] *See*, *e.g.*, Gov't Dev.  Bank for P.R., P.R.  Elec.  Power Auth., *Fiscal Oversight Agreement*, 4 § 2.1 (July 1, 2009); *also* Gov't Dev.  Bank for P.R., P.R.  Highway and Transp.  Auth.  *Fiscal Oversight Agreement*, 3 § 1.6 (July 6, 2009).

but we saw no documentary evidence to corroborate those statements (and, in particular, none that pre-dated the adoption of FOAs in 2009).

The lack of corroborating documentary evidence is consistent with what one former high-ranking GDB official told us. That witness stated that GDB was never structured to monitor or address any of the Puerto Rico-Related Entities' deficits. In this witness' understanding, that responsibility was supposed to rest jointly with OMB and the Department of Treasury. According to this witness, GDB did not implement any internal financial controls to monitor operational deficits until 2009, when the FOAs were adopted. This was so notwithstanding that since 2001, GDB had the statutory power to compel any instrumentality or public corporation to deliver or grant access to its books, records and other documents.[30]

In a similar vein, certain witnesses told us that before the FOAs, GDB received certifications from the Puerto Rico-Related Entities as to the intended use of loan proceeds in advance of making distributions in its capacity as lender. But we found no evidence that GDB, in its capacity as fiscal agent, subsequently sought to verify what the Puerto Rico-Related Entities actually did with those loan funds after they received them.

Nor did we find evidence that GDB fully implemented the FOAs after they were adopted in 2009. Just as GDB was never designed to monitor deficits at the Puerto Rico-Related Entities, multiple witnesses told us that GDB was not equipped to monitor the use of proceeds (before or after 2009). They conveyed that GDB's internal controls and resources were too "limited" to accomplish what the FOAs contemplated and that GDB lacked access to any system that would have permitted it to review inter-year financial information for the Puerto Rico-Related Entities. As a practical matter, then, even after 2009, GDB had very little insight into, much less control over, how the Puerto Rico-Related Entities used the bond or loan funds after they received the money. This was particularly so with respect to PREPA, because PREPA received the funds through a designated trustee.[31]

We also learned from several witnesses that GDB implemented the FOAs primarily on a self-reporting basis. Stated otherwise, the primary steps that GDB took to implement the FOAs were to (i) appoint officers who received updates regarding how the Puerto Rico-Related Entities purported to use their lines of credit; and (ii) require that the Puerto Rico-Related Entities submit monthly liquidity reports to GDB. We found no evidence that GDB undertook to independently verify or audit that information.

---

[30] P.R. Laws Ann. tit. 7, § 581 (2018).

[31] The FOAs appear to have helped GDB to extract certain documentation from the Puerto Rico-Related Entities. As just one example, GDB's Fiscal Agent wrote to PREPA's Finance Director in July 2013 to report that PREPA was out-of-compliance with its FOA, because it had not submitted certain materials (including a cash flow statement for the most recent week and monthly progress reports from October 2012 to May 2013). A witness told us that PREPA responded by submitting all of the requested documentation, which resolved the issue. Nevertheless, if GDB lacked the resources or capability to fully analyze those types of materials (as witnesses told us they believed was the case), then GDB's mere possession of the documents would not have helped GDB to track the use of loan funds or bond proceeds, or even to ensure that the relevant entity was complying with the FOA's more substantive requirements. *See* Part IV.E.

As one example of how this impacted GDB's effectiveness as fiscal agent, we reviewed evidence that demonstrates that in July 2011, PREPA approached GDB's Board with a proposal to draw a $260 million line of credit from a private bank. When PREPA did this, it emphasized that any delay in approval would put PREPA at risk of having its oil supply—on which PREPA was dependent—interrupted. This was because PREPA already had an 86-day overdraft with one of its largest suppliers. Just one month earlier, however, PREPA had proposed that it obtain a different line of credit in the amount of $150 million, to be drawn from a different private bank. That earlier proposal did not mention any existing overdraft or potential need for a meaningful amount of additional liquidity in the foreseeable future. Understandably, certain GDB officials expressed surprise at the subsequent request for the $260 million credit line. But GDB nevertheless approved it.[32] We did not find any evidence to demonstrate that the discrepancy was reasonably explained; that GDB exercised its books and records powers to resolve it; or that GDB imposed any consequences on PREPA for what appears, at the very least, to have been a significant error relating to the earlier requests from PREPA.

**C.** **In Its Role as Lender, GDB Extended Substantial Loans to the Puerto Rico-Related Entities, Sometimes in a Way that Undermined its Effectiveness as Fiscal Agent**

The second role that GDB played in relation to the Puerto Rico-Related Entities was that of lender. In that capacity, GDB became, over time, a significant—and, sometimes, the sole—source of liquidity for the Puerto Rico-Related Entities. GDB's support primarily took two forms: (i) GDB provided loans that allowed the Puerto Rico-Related Entities to fill mounting operational deficits; and (ii) GDB extended financing when the Puerto Rico-Related Entities could not access the capital markets or were not slated to do so pursuant to the GDB bond schedule. At times, GDB approved the financing requests very quickly, or despite the presence of circumstances that, if GDB had been a private lender, GDB might not have accepted. As we describe in more detail below, these circumstances at times undermined GDB's effectiveness in its separate role as fiscal agent.

**1.** **Over Time, GDB Shifted from Private Enterprise Lender to Primary Financier of the Puerto Rico-Related Entities**

Historically and throughout the Relevant Period, GDB loaned or advanced money to borrowers for the purpose of "aid[ing] in Puerto Rico's economic development."[33] As we explain in more detail below, the concentration of GDB's loan portfolio evolved over time from loans primarily extended to private actors to loans primarily extended to the Puerto Rico-Related Entities.[34]

---

[32] This line of credit first appears in PREPA's monthly report for July 2011, the same month the request was originally made. *Compare* P.R. Elec. Power Auth., *Monthly Report to the Governing Board*, 10 (July 2011), *with* P.R. Elec. Power Auth., *Monthly Report to the Governing Board*,10 (June 2011).

[33] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2007*, 108 (June 15, 2018) ("Over the years, GDB, as fiscal agent and bank for the Commonwealth, had extended lines of credit, advances, and loans to several agencies and component units in order to finance their capital improvement projects and to cover their operational deficits at times.").

[34] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2007*, 108 (June 15, 2008) ("Over the years, GDB, as fiscal agent and bank for the Commonwealth, had

The Independent Investigator's Final Investigative Report

From the late 1940s through the early 1950s, GDB primarily extended loans to small, highly-targeted programs and to private entities in its role as fiscal agent to Puerto Rico.[35]  For example, GDB participated in a series of housing finance transactions in 1947 that were designed to assist low and moderate-income families.[36]  And throughout much of the 1950s, GDB funded private enterprises with the purpose of furthering Puerto Rico's economic development.[37]  According to an American University report, two-thirds of GDB's total loans in the 1950s were granted to private companies.[38]

This changed over time.  Following a period of rapid economic growth after World War II, GDB increasingly invested in the Puerto Rico-Related Entities.  Between 1951 and 1965, GDB's net disbursements to, and financing for, public endeavors reached more than $1 billion.[39]  This was a significant increase in GDB's total loan portfolio.  It also signaled GDB's arrival as the primary financier for Puerto Rico's government-related investments.

Puerto Rico's economy became distressed in the 1970s.  This was partially due to the energy crisis between 1973 and 1974.[40]  As part of Puerto Rico's overall efforts to rejuvenate its economy, GDB created an affiliated entity, the Puerto Rico Municipal Finance Agency, in

---

extended lines of credit, advances, and loans to several agencies and component units in order to finance their capital improvement projects and to cover their operational deficits at times.").

[35] For example, GDB performed its first major financial transaction in 1943: the purchase of a Water Resources Authority (WRA) bond issue.  *See* Gov't Dev.  Bank for P.R., *The Forties: The Formative Years*, http://web.archive.org/web/20161201025653/http://gdb.pr.gov/about-gdb/history_02.html (last visited on Aug.  7, 2018).

[36]   *See* Gov't   Dev.   Bank   for   P.R.,   *The   Forties:   The   Formative Years*, http://web.archive.org/web/20161201025653/http://gdb.pr.gov/about-gdb/history_02.html   (last visited on Aug.  7, 2018).

[37]   *See* Gov't   Dev.   Bank   for   P.R.   *The   Forties:   The   Formative   Years*, http://web.archive.org/web/20161201025653/http://gdb.pr.gov/about-gdb/history_02.html (last visited on Aug.  7, 2018) (reflecting that the 1947 housing finance transaction lead to the construction of 400 low-cost housing units); *see also* Gov't Dev.  Bank for P.R., *The GDB: Seven Decades of Service to Puerto   Rico   (1942–2012)*,   http://web.archive.org/web/20161201025653/http://gdb.pr.gov/about-gdb/history_02.html (last visited on Aug.  7, 2018).

[38] *See* Arturo C.  Porzecanski, *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 1 (Sept.  18, 2014).

[39] *See* Gov't Dev.  Bank for P.R., *The Fifties: Years of Growth*, https://web.archive.org/web/20170114060721/http://www.gdb.pr.gov/about-gdb/history_03.html  (last visited on Aug.  7, 2018).

[40] *See* Gov't Dev.  Bank for P.R., *The Seventies: The Crisis Years*, http://web.archive.org/web/20170124045355/http://gdb.pr.gov/about-gdb/history_05.html (last visited on Aug.  7, 2018); *see also* Fed.  Reserve Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy*, 16, Fig.  12 (2014).  The slowdown has been attributed by some scholars to an increase in global oil prices.  *See also* U.S.  Department of State, Office of the Historian, *Oil Embargo*, *1973-1974* ¶¶1-2 (2013), https://history.state.gov/milestones/1969-1976/oil-embargo (last visited on Aug.  7, 2018).  Even before the oil embargo started in October 1973, Puerto Rico's power utility was affected by a strike that began on January 4, 1973, signaling the start of a more contentious labor relationship. *See*, *e.g.*, Unión de Trabajadores de la Industria Eléctrica y Riego, *Breve Reseña Histórica de la UTIER*, http://www.utier.org/estructuras/historia.php (last visited on Aug.  7, 2018).

1972.[41]  GDB subsequently established other affiliates, including the Puerto Rico Development Fund, HFA, and the Puerto Rico Tourism Development Fund,[42] as well as PFC.[43]

Successive administrations also set up state-owned enterprises during this time period, with the aim of promoting economic development in Puerto Rico.  This included PREPA, PRASA and HTA, among others.[44]

During the 1980s and 1990s, GDB's role continued to evolve.  In particular, GDB more actively financed certain of the Puerto Rico-Related Entities, including PRASA and HTA.  In that regard, GDB primarily supplied short-term loans.  The loan funds were then used (or intended to be used) to satisfy working capital needs, capital improvement programs, collateral posting requirements under swap and hedging agreements, mandatory prepayments and maturities of financial obligations, and–eventually–to cover operational deficits (discussed in more detail in Part IV.B.3).[45]

GDB's lending to the various public corporations continued and generally increased through approximately late 2012 or early 2013.  In fact, according to one study, more than 99% of GDB's nearly $9 billion in outstanding loans had been made to public-sector obligors, with HTA alone accounting for $2 billion (or nearly one-quarter of GDB's total loans) by mid-2014.[46]

## 2. During the Relevant Period, GDB Often Loaned Money to Help the Puerto Rico-Related Entities Finance Operating Deficits

### (a) The Puerto Rico-Related Entities Expected GDB to Supply Liquidity to Help Them to Balance Their Budgets

In February 2015, Melba Acosta-Febo, who was then the President of GDB, testified before Congress that:

---

[41] Of these entities, HFA is perhaps the largest.  It was created in 1977 to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction. HFA is GDB's largest subsidiary today, and represents approximately 10% of GDB's total assets.  *See e.g.,* Standard & Poor's Ratings Servs., *Government Development Bank for Puerto Rico*, 4 (2012).

[42] *See, e.g.,* Standard & Poor's Ratings Servs., *Government Development Bank for Puerto Rico*, 4-5 (Jan. 31, 2012) (noting that "GDB's affiliates were created by law and can only be dissolved through legislation.  GDB acts primarily in a supervisory capacity, and does not consolidate the assets and liabilities on the balance sheet of its affiliates.").

[43] *See* Gov't Dev.  Bank for P.R., *Puerto Rico Public Finance Corporation* (*PFC*), http://www.gdb.pr.gov/investors_resources/prpfc.html (last visited on Aug.  7, 2018) ("The Puerto Rico Public Finance Corporation (PFC) is a subsidiary corporation of GDB created pursuant to Resolution 5044 of the Board of Directors of GDB.").

[44] *See* Gov't Dev.  Bank for P.R., *The Seventies:  The Crisis Years*, http://web.archive.org/web/20170124045355/http://gdb.pr.gov/about-gdb/history_05.html (last visited on Aug.  7, 2018).

[45] *See* Gov't Dev.  Bank for P.R., *The Nineties:  A Focus on Infrastructure*, http://web.archive.org/web/20170131162544/http://gdb.pr.gov/about-gdb/history_07.html (last visited on Aug.  7, 2018).

[46] *See* Arturo C.  Porzecanski, *The Government Development Bank: At the Heart of Puerto Rico's Financial Crisis*, 2 (2014); *see also* Gov't Dev.  Bank for Puerto Rico, *Update on Fiscal and Economic Progress*, 8–9 (2014).

> Puerto Rico's unprecedented economic difficulties have contributed to rising budget deficits at all levels of government, including at Puerto Rico's municipal or "public" corporations.  To continue providing essential public services, and to close those deficits, these public corporations routinely accessed the market, or relied on interim financing from GDB or private sector banks, to finance their budget deficits.[47]

This is consistent with the Official Statement for the 2014 GO Bond Issuance, which noted that Puerto Rico's "very high level of debt and the resulting required allocation of revenues to service this debt have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has been required to finance, further increasing the amount of its debt."[48]  It is also consistent with what a former Secretary of Treasury told us during an interview.  According to that witness, Puerto Rico had, for decades, used debt to create a "smoke and mirrors show" to demonstrate that its government could continue to function, while accumulating deficits.[49]

Our investigation revealed that GDB was a critical component of Puerto Rico's ongoing ability to function while its publicly-held debt amounted to unsustainable levels.  According to one former high-level government official, GDB backed the public corporations when they had deficits.[50]  Several other government witnesses corroborated this account.  They informed us that GDB historically stepped in whenever Puerto Rico or its public corporations were unable to access the capital markets.  By way of illustration, GDB made over $2 billion in loans to HTA between 2008 and 2013.  Many of those loans were, according to former GDB officials, used to cover HTA's budget deficits.

The consistent stream of GDB funding eventually became an expected method for certain Puerto Rico-Related Entities, like the Public Utilities, to balance their budgets.[51]  For example, according to a former Finance Director for PREPA, PREPA's annual budgets were set with the assumption that PREPA would receive funding from GDB:  the budget would first be decided, and then PREPA would approach GDB with a request for financing.

---

[47] To Amend Title 11 of the United States Code to Treat Puerto Rico as a State for Purposes of Chapter 9 of Such Title Relating to the Adjustment of Debts of Municipalities: *Hearing Before the H. Subcomm. On Regulatory Reform*, *Commercial and Antitrust Law*, 114th Cong.  (2015) (statement of Melba Acosta-Febo on behalf of the Gov't Dev.  Bank for P.R.).

[48] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds*, *Series 2014A*, 8 (2014).

[49] *See*, *e.g.*, Gov't Accountability Office, *Puerto Rico:  Factors Contributing to the Debt Crisis & Potential Fed.  Actions to Address Them* 15, 23 (2018) (concluding that Puerto Rico accumulated debt to finance its deficits).

[50] Part VIII of this Report provides a summary of the net operating deficits for certain public corporations, as well as Puerto Rico's general fund ("General Fund"), during the critical years leading up to Puerto Rico's default.  The General Fund is Puerto Rico's primary accounting fund for operations.  It includes the Department of Treasury's tax revenue collections, as well as all inflows from internal and external sources that are not subsumed within more specific funds.

[51] In addition to stagnant rates, PREPA had difficulty collecting payment from the municipalities and other subsidies.  We discuss the influence of politics on PREPA's revenue collections further in Part V of this Report.

The end result was, as discussed below, unfortunate: an erosion of the Puerto Rico-Related Entities' incentive to become self-sufficient by implementing difficult decisions that may not have been well-received by the voting public, such as raising rates or more aggressively enforcing revenue collection.

### (b) Deficit Financing Proved an Unsustainable Fiscal Practice for the Puerto Rico-Related Entities

Many states and local governments have laws that expressly prohibit deficit financing.[52] Puerto Rico does not. It does, however, have a balanced budget clause in its constitution. Pursuant to that clause, "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."[53] This language suggests that tax revenue, and not debt, should cover spending.

Notwithstanding the foregoing, a 1974 opinion authored by then-Puerto Rico Secretary of Justice Francisco De Jesús Schuck interpreted the balanced budget clause to permit deficit financing. De Jesús Schuck relied on statements made during Puerto Rico's Constitutional Convention of 1952. The statements concerned the interpretation of the phrase "*recursos totales*," which appears in the Spanish version of the Puerto Rico Constitution. Strictly translated, the phrase means "total resources," not "total revenues." After referencing relevant language in the Jones Act and citing to a Spanish-language dictionary, Schuck reasoned that uncollected, but matured, taxes are not a "revenue," but a "resource." As such, they could be used, in his opinion, to finance a balanced budget, without violating the balanced budget clause.[54] De Jesús Schuck cited no case law, no legal treatises, and no other legal authorities in support of this conclusion. Puerto Rico courts never considered the issue, but a GDB witness identified De Jesús Schuck's opinion as what "opened the door" to Puerto Rico obtaining and using debt to help balance its budget.

Whatever GDB's justification for approving deficit financing, one thing is clear: the practice proved unsustainable for Puerto Rico during the Relevant Period. As a former head of the US states' division of a major CRA explained to us, municipal issuers often resort to

---

[52] For example, Article VIII of the Ohio Constitution prohibits the incurrence of certain types of debt for non-capital improvement purposes, in addition to setting a debt limit of $750,000 which can only be exceeded under certain circumstances. *See* Ohio Const. art. 8, §§ 1—3; *see also*, *e.g.*, Gov't Accountability Office, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 33 (2018) (noting that "[a]ccording to ratings agency officials and experts in state and local government, states rarely issue debt to fund operations, and many states prohibit this practice."); Ctr. on Budget and Policy Priorities, *Policy Basics: State and Local Borrowing*, https://www.cbpp.org/research/state-budget-and-tax/policy-basics-state-and-local-borrowing (last updated Jan. 16, 2018) (noting "States typically prohibit the use of bond proceeds to fund operating expenses, although that has occurred in a few instances."); Nat'l Conference of State Legislatures, *State Balanced Budged Requirements*, *Executive Summary*, http://www.ncsl.org/research/fiscal-policy/state-balanced-budget-requirements.aspx (last updated Apr. 12, 1999) (noting, in pertinent part, that "[i]t is extremely rare for a state government to borrow long-term funds to cover operating expenses, although Louisiana did in 1988 and Connecticut did in 1991."); Steven Maguire, Cong. Research Serv., State and Local Government Debt: An Analysis, 3 (2011) ("Nevertheless, the use of capital budgets and balanced budget rules makes it relatively difficult for state and local governments to issue debt to fund current operating expenses.").

[53] P.R. Const., Art. VI, § 7.

[54] P.R. Op. Sec. Just. 1974-15, 1974 WL 326062 (P.R. Atty. Gen.) (English translation).

deficit financing out of desperation, when their fiscal health is declining.  In that witness's experience, deficit financing is a characteristic of municipal issuers that have lower credit ratings (which signal a higher likelihood of default) and constitutes a "red flag" for bond issuers with higher credit ratings.  This was ultimately true of Puerto Rico and the Issuers.

### 3. GDB Sometimes Allowed Certain Puerto Rico-Related Entities to Obtain New Debt With Relative Ease

The evidence reflects that in light of its powers as fiscal agent, GDB could have done more when approached in its separate capacity as lender for the purpose of approving new loans.  GDB's practices for evaluating such loan requests created tension between its duties as fiscal agent and its role as lender.

To begin with—and as a very basic metric—GDB issued its loans to Puerto Rico-Related Entities very quickly after a request was submitted.  This appears to have been the case with respect to HTA in particular.  Indeed, GDB witnesses told us that GDB evaluated and approved HTA loan requests within hours.  According to witnesses, this was to avoid potential adverse consequences stemming from HTA's lack of fiscal health, such as HTA having to shut down the Tren Urbano if its operator had not been paid.

In a more methodical review of this phenomenon, the Office of the Comptroller prepared an audit report dated September 15, 2013, regarding GDB's financing approval process between January 1, 2007 and December 31, 2011.[55]  The audit report mentions the GDB Board's approval on July 3, 2009, of a $600 million revolving line of credit for the Department of Treasury.[56]  The line of credit was extended in connection with the issuance of Series 2010 of Tax and Revenue Anticipation Notes, to finance then-current obligations, budget disbursements and the needs of the cash account.[57]  The Department of Treasury had submitted its formal request letter on July 2, 2009; just one day before GDB approved the loan.[58]

Evidence also demonstrates that GDB regularly extended short-term cash injections to certain Puerto Rico Related-Entities to help them sustain themselves during periods in which those entities were unable to access the capital markets (either because there was no demand, or because it was not the right time according to GDB's bond issuance schedule).  This was done with full knowledge that the bond proceeds from that Puerto Rico-Related Entity's next issuance would then be used to repay GDB.  A witness indicated that even when individuals at GDB felt that certain Puerto Rico-Related Entities did not have enough financial capacity for future bond issuances, there was pressure to present solicited loans (payable from future bond

---

[55] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

[56] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 18 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

[57] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 18 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

[58] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 18 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

issuances) to the GDB Board for its approval. One former high-ranking GDB official remarked that he had read in a book about GDB history that, dating back to the 1950s, GDB would advance funds to public corporations before they went out to market. Another former high-ranking GDB official conveyed that another way a Puerto Rico-Related Entity would pay back the GDB loan was to obtain legislation providing an appropriation from the General Fund.

Finally, there is evidence that, in certain instances, GDB may have approved financing requests notwithstanding circumstances that, if GDB and the recipients had been private actors, might have led to additional due diligence. We summarize examples below:

- A GDB Board Resolution reflects that on August 27, 2010, the GDB Board approved HTA's request for a $45,000,000 emergency line of credit to repay collateral for swap transactions in connection with HTA's 2007 bond issuance. The request stemmed from a private bank having failed to send required notifications for a collateral call during the preceding two-month period. As a result of that failure, HTA had to deposit $21,500,000 without notice. When GDB was considering the request, a GDB official reminded GDB's Board of HTA's poor financial condition and stressed that if HTA could not make the collateral deposit, then HTA would default. GDB approved proceeds from future bond issuances, among other resources attributed to HTA, as the source of repayment for this emergency line of credit;

- A different GDB Board Resolution reflects that on October 24, 2011, GDB granted HTA's request for a $30,000,000 increase to its existing line of credit (bringing the total to $77,000,000). Although $8.2 million remained on the previously-extended line of credit, there was a threat of additional collateral calls due to market volatility. The Board Resolution noted HTA's financial condition and acknowledged that HTA would not be able to cover any more collateral calls. It also noted that the recommendation to approve HTA's request was not based on HTA's borrowing capacity. GDB ultimately granted the request because it believed that so doing would serve its function as fiscal agent by avoiding a default event by HTA and a negative impact on HTA's credit. The intended source of repayment for the increase was identified as HTA's revenue; and

- A GDB Board Resolution reflects that on December 28, 2012, GDB approved another request for an increase to HTA's credit line, bringing the total to a maximum of $107,000,000 (of which the increase comprised $40,000,000). The purpose for the increase was to cover collateral deficiencies relating to swap agreements with a private bank, for bonds issued in 2007 and potential additional collateral calls. HTA's revenue was again the identified source of intended repayment. The Board Resolution noted that because of HTA's existing financial incapacity, the only viable option was for GDB to intervene and effectively pay the obligations on HTA's behalf by increasing the line of credit as HTA requested. It also noted that GDB management believed that repayment risk was mitigated by an increase in the interest rate that would cause the private bank to refund the equivalent to the excess of collateral (or that once the swaps were cancelled or expired, the collateral deposits would be returned).

As with GDB's decisions as fiscal agent to provide Puerto Rico-Related Entities a degree of flexibility that, in retrospect, was inconsistent with long-term sustainability, the types

of decisions that GDB made as lender enabled the Puerto Rico-Related Entities to remain dependent on borrowed liquidity. For that reason, they were arguably in tension with GDB's role as fiscal agent.

## D.   Policy Considerations Further Compounded the Tension Between GDB's Dual Roles as Fiscal Agent and Lender

The evidence reflects that throughout the Relevant Period, Puerto Rico's elected officials were generally unwilling to support measures for the Puerto Rico Related-Entities that could improve operating margins and engender fiscal independence, but were unpopular with voters. For better or worse, the services that the Puerto Rico-Related Entities provided were understood by many to be the responsibility of Puerto Rico's elected politicians. With respect to the Public Utilities in particular, according to witnesses, politically-driven policies influenced GDB's decisions.

In general, Governors between the late 1980s and the 2010s were unwilling or unable to undertake the politically unpopular task of raising utility rates and fees, or of raising taxes associated with transportation.[59] This was so despite the Public Utilities' financial difficulties (detailed in Part V of this Report).

Importantly, public statements by GDB's management during the Relevant Period generally reaffirmed GDB's role as a source of liquidity when rate increases or tax increases were untenable. For example, several witnesses told us that GDB and the public corporations had an implicit understanding that GDB would support the public corporations financially as needed, so that they would not have to raise their rates.

A GDB press release from November 28, 2012, underscores this. In that press release, GDB's President at the time stated that it was important for GDB to remain profitable so that it could "support GDB's subsidiaries and affiliates, the public corporations and the Central Government."[60]   The press release touted GDB's role in the following initiatives, among others: (i) providing support to PREPA for initiatives designed to result in operational and energy cost savings; (ii) providing HTA with financial and fiscal support to address its operational deficits; and (iii) working out a fiscal collaboration agreement with UPR to help maintain its financial health.[61]

For its part, PREPA did not raise rates at all between 1989 and 2016.[62]  Instead, it generally borrowed from GDB to cover operational costs. When appropriations came due,

---

[59] The two major political parties in Puerto Rico are the Partido Popular Democratico (PPD) and the Partido Nuevo Progresista (PNP).   *See Puerto Rico Political Parties* http://www.city-data.com/states/Puerto-Rico-Political-parties.html (last visited Aug 8. 2018).

[60] *See* Gov't Dev. Bank for P.R., *Government Development Bank Consolidates its Financial Strength and Supports Puerto Rico's Economic Development*, 3 (Nov. 28, 2012) http://www.gdbpr.com/documents/2012-11-28-ComunicadoBGF-transicion-FINALFINAL-Eng.pdf.

[61] *See* Gov't Dev. Bank for P.R., *Government Development Bank Consolidates its Financial Strength and Supports Puerto Rico's Economic Development*, 3 (Nov. 28, 2012) http://www.gdbpr.com/documents/2012-11-28-ComunicadoBGF-transicion-FINALFINAL-Eng.pdf. *See also* Carlos Garcia, *Government Development Bank for Puerto Rico*, Puerto Rico Credit Conference (Feb. 25, 2010).

[62] *See* Part V for a full discussion of PREPA rates.

The Independent Investigator's Final Investigative Report

PREPA was unable to re-pay GDB (as were PRASA and HTA).  But GDB did not hold PREPA accountable by declaring an event of default.  In fact, our investigation revealed no evidence that GDB ever declared PREPA in default of a loan obligation.

Gubernatorial will also affected GDB's decision-making with respect to HTA's debt load.  For example, during Governor Fortuño's administration, GDB increased HTA's line of credit to approximately $2 billion.  At the time, the total of GDB's loans receivable was approximately $9 billion.[63]   GDB did this, according to one witness, so that HTA would not have to raise vehicle registration fees, public transportation fees, tolls, or the gasoline tax (known as "la crudita" in Spanish); all of which would have increased costs for ordinary voters.

To be sure, there were some instances prior to 2012 in which GDB declined to provide financial support to the Public Utilities.  For example, a major cause of PRASA's reentrance into the municipal bond market in 2008 was, according to individuals who were involved with the decision, the Governor's unwillingness to provide further subsidies to PRASA's operations, as well as a desire to hold PRASA accountable for its use of funds.

This was more the exception than the rule.  Overall, we found that policy considerations generally continued to influence GDB's lending decisions to Puerto Rico-Related Entities through 2013, when there was a significant shift in gubernatorial policy.  In particular, by early 2013, Governor García Padilla's administration decided that GDB should no longer support the public corporations through appropriations.  At the same time, however, witnesses reported that the Governor remained reluctant to raise Public Utility rates or related taxes—or would not agree to increase them as much as GDB management recommended.

The 2014 GO Bond Issuance illustrates several respects in which policy considerations influenced GDB's decision-making.  Our investigation revealed that GDB first considered the issuance in early 2013.  At that time, the issuance was contemplated as a way to raise capital that HTA could use to satisfy an outstanding debt of about $2 billion.  HTA owed the debt to GDB as a result of loans that HTA had drawn to help bridge its operational deficits.  The loans dated back to 2008.  But to implement the issuance, HTA needed to increase its revenues.  GDB officials encouraged the Governor to increase the gas tax in order to accomplish that.  The Governor declined to do so.  Instead, on June 25, 2013, Puerto Rico increased the portion of the excise tax that HTA received on petroleum products from $3.00 per barrel to $9.25 per barrel, and transferred to HTA the portion of motor vehicle license fee proceeds that was originally due to the Department of Treasury.[64]  The anticipated revenues were insufficient to implement the contemplated HTA offering.  Due to the combined effect of the unwillingness to increase the gas tax, HTA's prior budget overruns, and its shortfalls in anticipated revenues, an HTA offering was out.  GDB prepared instead to go to market with the 2014 GO Bond

---

[63] To put this in perspective, the Commonwealth of Puerto Rico had a projected budget of approximately $9 billion in 2013.  *See* Commonwealth of P.R., *Basic Financial Statements and Required Supplementary Information: Year ended June 30*, *2013*, 246 (June 30, 2014).

[64] *See* Act of Jun 25, 2013, No. 30, P.R.  Laws 170–174; Act of June 25, 2013, No. 31, P.R.  Laws 175–185.  HTA would further receive the first $20 million from an annual cigarette excise tax.  Estimated revenues from these measures totaled around $270 million, with the goal of "allow[ing] . . . [HTA] to begin repaying its outstanding lines of credit with the GDB and provide additional revenues to fund operational expenses." *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds*, *Series 2014A*, II-4 (2014).

The Independent Investigator's Final Investigative Report

Issuance, from which a meaningful portion of the bond proceeds were slated to repay GDB lines of credit (as explained in more detail below in Part IV.B.3).[65]

Policy-driven decision-making also affected PREPA. Faced with reduced appropriations toward the end of 2013, members of GDB's Board and PREPA's executive director approached the Governor to request approval for a rate increase. In particular, former GDB officials, along with a former Executive Director for PREPA, all told us that, in 2013, they requested a short-term rate increase of 1 cent per kilowatt-hour measurement. The purpose of the request was to help PREPA decrease costs over time by paying to improve its system. The Governor rejected the request. He instead told PREPA to cut costs.

The Governor's decision to cut appropriations, coupled with the decision not to raise rates or related taxes, had consequences. Paradoxically, it triggered a mandatory rate increase under PRASA's trust indenture. It also hindered certain contemplated bond issuances (including those of HTA and PREPA) and attracted negative attention from credit rating agencies that considered GDB's financial support to be an important component of most Issuers' creditworthiness. We discuss these issues further in Part V and Part X of this Report.

It is thus plain that during the Relevant Period, gubernatorial will helped shape the decisions of both the Puerto Rico-Related Entities and GDB. In particular, the Puerto Rico-Related Entities dispensed with measures that would have increased the costs of living for voters. That, in turn, incentivized GDB as lender and as fiscal agent to continue permitting the Puerto Rico-Related Entities to rely on new debt, both to operate and to refinance prior debts. And so, the Puerto Rico-Related Entities continued to seek GDB's approval for those additional debts.

## E. Structural Vulnerabilities Sometimes Enabled Policy Considerations to Undermine GDB's Ability to Execute Fiscally Responsible Functions as Fiscal Agent

There is evidence that how GDB Board members and high-level employees were chosen may have helped gubernatorial priorities drive important decisions at GDB. The political turnover that resulted from that structure also, to some degree, deprived GDB of the institutional knowledge that could have empowered GDB to make better decisions in its capacity as fiscal agent. We discuss these circumstances below.

---

[65] We reviewed evidence that in 2014, Citi and Banco Popular prepared a memorandum for David Chafey, the GDB Chairman of the Board, and other high-level GDB officials, suggesting a holistic approach to Puerto Rico's financial situation. The analysis, according to a witness, was that a long-term GO Bond issuance did not make sense. Instead, the proposal envisioned nearly $2 billion in immediate liquidity improvements through securitizing property tax-backed and sales tax-backed municipal loans. The proposal also called for a Balanced Budget Act, a Fiscal Control Act, and the establishment of a five-member oversight body including appointees of the Federal Reserve and US Treasury, as well as a member with well-known bond market credentials. A Citi witness stated that it made more sense to follow some of the suggestions in the memorandum, rather than do another bond offering. The witness also expressed his view that, after having a conversation with GDB about Citi's recommendations in the memorandum, Citi could not in good conscience underwrite another bond while proposing a different path.

1.      <u>**The Governor Appointed the Members of GDB's Board of Directors**</u>

As previously noted in Part IV.B, the Governor nominates GDB's Executive Director, as well as the seven members of the GDB Board.[66]  Before January 1, 2018, the Governor had the power to appoint GDB's board members without first obtaining approval from the Puerto Rico Senate.[67]

The GDB Board had significant control over GDB's operations.  This included the power to approve the issuance of GO Bonds, as well as other Puerto Rico-Related Bonds.[68] As noted above in Part IV.B.2, the GDB Board also, through a committee, selected the key outside professionals needed to structure, market and implement bond issuances.

There were times when the Governor's will influenced the GDB Board's decisions.  A former President of GDB and Chairman of the GDB Board reported that, before his tenure, the GDB Board typically included many government cabinet officials as board members.  At times, that resulted in undue political influence over decisions that should have been made by a majority of independent members.  Still, we cannot conclude based on the evidence that any GDB Board member did not believe that he or she was acting properly with respect to those decisions.

The dynamic was also apparent through several episodes in which disagreements over policy issues also sometimes resulted in tension between or involving GDB Board members.  Some of those members even resigned as a result.  For example:

- A former Governor with whom we spoke recalled a time when two GDB Board members wished to resign after a new administration took office and distributed a plan that would increase spending by 9%.  The plan surprised the GDB Board members because it was a significant reversal from the prior administration's policy of reducing budgets.  The policy change also came at a delicate time because Puerto Rico's economy was only growing tepidly and the credit rating agencies were, by then, skeptical of repeated gubernatorial promises to balance the budget;

- Relatedly, a different witness recalled one of the GDB Board members referenced above lobbying the Governor to reduce the budget deficit, as part of GDB's agreement to implement the 2014 GO Bond Issuance.  This witness stated that the GDB Board member, who had a strong banking background, was concerned that GDB would run out of money if the Governor did not institute a plan to cut spending.  The GDB Board member also worked with an outside advisor to develop a budget proposal.  When the Governor declined to follow that proposal, the GDB Board member resigned;

---

[66] P.R.  Laws Ann.  tit.  7, § 552 (2018).

[67] P.R.  Laws Ann.  tit.  7, § 552 (2018).

[68] *See*, *e.g.*, GDB Board of Directors Resolution 10267 (Mar.  11, 2014) (approving details of 2014 Series A General Obligation bonds) (on file with author); GDB Board of Directors Resolution 10813 (Sept.  9, 2015) (approving Series 2015A PRASA bonds) (on file with author); GDB Board of Directors Executive Committee Resolution EC-2010-18 (June 17, 2010) (approving details of HTA Series AA bonds) (on file with author).

The Independent Investigator's Final Investigative Report

- A former GDB official told us that he resigned for personal, health reasons given the demands of the job. At the time of his resignation, that witness told us that he was strongly disappointed because he felt that more revenue-generating measures were necessary but that leadership was unwilling to do what needed to be done because of political considerations. That same witness noted, however, that they had made headway on structural reforms over his tenure; and

- Another GDB official ultimately resigned his post in part because of the GDB Board's decision to proceed with a basis Swap over his objection. The evidence we reviewed established that there had been public debate about the advisability of the Swap arrangement that the GDB Board approved. It was clear from these public statements that there was a severe and ultimately irreparable break between the official and the rest of the GDB Board.

The evidence therefore reflects instances across administrations when high-level GDB Board members and officials identified policy considerations as having conflicted with what they considered to be fiscally responsible decision-making.

### 2.   The Governor also Appointed GDB's High-Level Staff, Who Changed With Each New Administration

All non-elected public employees in Puerto Rico are divided, by statute, into five groups: (i) *empleados de confianza*, (ii) regular career employees, (iii) probationary career employees, (iv) transitory employees, and (v) irregular employees.[69] The first two categories are most relevant to this discussion.

All of GDB's high-level staff members were *empleados de confianza*, and the Governor appointed each of them. These employees provided support in various capacities to GDB's President. They also handled legislation, public policy, and bond issuances. As such, they were viewed as more powerful within GDB. The titles of *empleados de confianza* included, among others: President; Executive Vice President; Senior Vice President; Assistant to Economic Advisor to the President; First Fiscal Agent; and Head of Information Technology.

*Empleados de confianza* are "at-will" under the law. This means they can be terminated for any reason or for no reason at all.[70] In practice, these employees changed with each new gubernatorial administration. And it was not uncommon during the Relevant Period for *empleados de confianza* to join GDB from—or leave GDB for—positions with private financial institutions. Some of those financial institutions served as underwriting banks for Puerto Rico-Related Bonds during the Relevant Period. This flow of financial professionals between GDB and the private sector sometimes contributed to a perception that there was a "revolving door" between GDB and the private sector.

As we explain separately in Part XII of this Report, our investigation did not uncover sufficient evidence to conclude that the flow of talent between GDB and the private sector resulted in any violations of applicable ethics requirements during the Relevant Period.

---

[69] P.R. Laws Ann. tit. 21, § 4554 (2018).
[70] P.R. Laws Ann. tit. 3, § 1350 (2018); *Aguiar-Carrasquillo v. Agosto-Alicea*, 445 F.3d 19, 23 (1st Cir. 2006).

Instead, the evidence demonstrates that departing and incoming GDB officials implemented appropriate screening measures.

The evidence also suggests that a primary reason for the rotation of talent between GDB and the local banking sector is the fact that Puerto Rico is an island. As multiple witnesses stated, Puerto Rico is geographically isolated and has a relatively small pool of qualified financial professionals. One former Governor told us that, as a result, when this witness sought to select qualified professionals for finance-related positions within the Puerto Rico government, he expected his selectees to have held positions with Puerto Rico institutions at some point.

As previously noted, the *empleados de confianza* we interviewed had impressive resumes and were knowledgeable about the finance principles and functions that concerned their employment. Still, numerous GDB witnesses told us that the political turnover among GDB's *empleados de confianza* resulted, at times, in a recurring loss of institutional knowledge at GDB. One witness who served as an external swap consultant for GDB indicated that certain GDB employees who were responsible for making decisions about Swaps lacked the requisite frame of reference to make those decisions in a fully-informed way because departing GDB officials had made the decision to enter into those Swaps, and GDB did not have sufficient documentation of the transactions' key terms. This is important because, as discussed in Part XIII of this Report, the Swaps were sophisticated financial instruments that exposed certain Puerto Rico-Related Entities to significant financial risk.[71]

It is difficult to reconcile the foregoing with Puerto Rico's robust statutory process for knowledge transitions between political administrations. That statutory process dates back to 2002. It applies to the Puerto Rico government more broadly, and to the individual Puerto Rico-Related Entities. Among other things, the law provides that "the outgoing administration has the responsibility of furnishing to the incoming administration all pertinent information on the status of all public agencies and corporations of the Commonwealth of Puerto Rico, regardless of whether both Government administrations are of the same political party."[72] It further mandates that "[t]he outgoing Governor, all Secretaries or heads of all agencies, and all the directors of all public corporations (in office or acting) . . . have the obligation and ministerial duty of participating in the transition process of the Government."[73]

To that end, the transition process includes an agency- or corporation-level committee that is comprised of certain high-ranking officials within the entity, including the secretary, head, or executive director, as well as the director of finances and director of human resources, among others.[74] The law also requires the Puerto Rico-Related Entities to create transition reports that include, among other things:

- A detailed description and status of personnel;

- Financial status of the agencies with a copy of all audits performed by public or private entities;

---

[71] For a full discussion of swap agreements, *see* Part XIII.
[72] *See* P.R. Laws Ann. tit. 1, § 458 (2018).
[73] *See* P.R. Laws Ann. tit. 1, § 461 (2018).
[74] *See* P.R. Laws Ann. tit. 1, § 464(b) (2018).

- Detailed description and status of the investment portfolios of the public corporations;

- Copy of the inventory of the agency or public corporation;

- Detailed description and status of all judicial actions in which the agency or public corporation is involved;

- All regulations, memoranda, and norms that govern the agency or public corporation; and

- A list and copy of all contracts in effect at the time of transition.[75]

Ultimately, the transition committee must issue a final report summarizing "the most important and significant aspects of the information obtained during the transition process."[76]

It is thus unsurprising that a former GDB official described the transition process as all-consuming. Indeed, the committee members must attend transition meetings within their own Puerto Rico Related-Entities, as well as with OMB, Department of Treasury and others. The same witness reported that these meetings could be very contentious.

Regardless of its comprehensiveness, the legally-mandated knowledge transfer process does not appear to have sufficiently preserved institutional knowledge at GDB, in light of the political turnover among *empleados de confianza*. Based on our conversations with various GDB witnesses, there does not appear to have been sufficient opportunity for incoming employees to observe and learn from outgoing employees. Several witnesses told us that the Governor appointed the President of GDB, after which the President would select replacements for the other *empleados de confianza*. With few exceptions during the Relevant Period, the outgoing *empleados de confianza* did not typically remain at GDB long enough to meaningfully overlap with the incoming ones.

Our review of the relevant knowledge transfer authorities also suggests that the statutory process may not be sufficiently oriented toward equipping incoming *empleados de confianza* with the substantive education and training that they need to immerse themselves in the subject matter that specifically relates to their responsibilities. The formal knowledge transfer requirements instead appear to focus on more high-level issues related to continuity of operations.

In light of the foregoing, a more effective knowledge management and retention process could be helpful, particularly for an entity that is critical to the Puerto Rico-Related Entities' fiscal health (as GDB was during the Relevant Period).

---

[75] *See* P.R. Laws Ann. tit. 1, § 465 (2018).
[76] *See* P.R. Laws Ann. tit. 1, § 473 (2018).

3.      **Retirement Incentives and a Low Government Pay Scale May Have Undermined the Continuity and Expertise that GDB's Career Employees Could Otherwise Have Supplied**

GDB's regular career employees were important to the effective and sustainable functioning of GDB.  This is because the Governor did not appoint GDB's career employees, and the career employees could only be removed "for just cause and after due filing of charges."[77]  As a result, the career employees should have transcended political turnover, thereby supplying the continuity and institutional knowledge that the *empleados de confianza* did not.

GDB's career employees focused principally on carrying out GDB's core functions (like banking) on a day-to-day basis.  They did not handle policy matters.  They were thus generally viewed as lower on the GDB staff hierarchy than the *empleados de confianza*.  According to one GDB witness, "Director" was the highest title for a career employee at GDB.

All of the career employees we interviewed appeared to be competent, experienced and committed employees who were proud to have served Puerto Rico during their time at GDB.  Nevertheless, a GDB witness who served as a high-level *empleado de confianza* told us that, in this witness's view, career employees did not supply GDB with the institutional memory that GDB needed to function effectively.  According to that witness, retirement incentives caused the more senior career employees to step down, which reduced institutional knowledge and expertise.  At least one other witness provided a similar perspective across the Puerto Rico government more broadly, noting that the pay-scale was too low to entice and retain top talent.

The evidence thus demonstrates that there may be a need for Puerto Rico's policy-makers to consider measures that could bolster the desirability of career employee positions at critical entities and encourage those individuals to retain their posts for longer periods.

F.      **Over Time, GDB's Support of the Puerto Rico-Related Entities in its Capacity as Lender Overwhelmed GDB's Own Liquidity**

The evidence demonstrates that by 2013, GDB's failure to hold the Puerto Rico-Related Entities accountable for their debts and critically evaluate requests for new debt resulted in GDB essentially having sacrificed its own liquidity in order to sustain the Public Utilities and other Puerto Rico-Related Entities.  Restructuring eventually became the only option.

1.      **By 2013, GDB's Own Liquidity Had Dwindled**

According to several former GDB officials, GDB harbored concerns about its liquidity as early as 2013.  These witnesses stated that, at the time, GDB's most immediate concerns stemmed from a $2 billion receivable that HTA was unable to repay to GDB.  One witness told us that GDB thus began stressing to the Governor that additional rate increases or new sources of income were required to support HTA.  As noted above, the Governor did not implement such measures.

---

[77] *Figueroa-Serrano v.  Ramos-Alverio*, 221 F.3d 1, 3 n.1 (1st Cir.2000) (quoting P.R.  Laws Ann.  tit. 21, §  4554(b)).

GDB's concerns intensified as 2013 progressed.  By the end of that year, those concerns prompted GDB to halt any deference to traditional policy considerations.  In that regard, certain GDB Board members and high-ranking GDB officials demanded that Governor García Padilla start implementing fiscally responsible, but potentially unpopular, measures.  A letter that they sent to the Governor on December 4, 2013 (the "December 2013 Letter") reflected as much.  It expressed concern for Puerto Rico's fiscal health and for GDB's liquidity.  In particular, the December 2013 Letter listed numerous "recommended measures to save the credit and good name of the free state of Puerto Rico," including:

- Reducing the deficit to no more than $400 million in the fiscal year ending 2015;

- Balancing the budget by the fiscal year ending 2016;

- Reforming the retirement system for teachers;

- Maintaining the sales and use tax at 7% and realizing a 0.5% change in the distribution of the municipal tax through COFINA;

- Finalizing negotiations with a private banking consortium to obtain a line of credit;

- Limiting GDB's financing of the public corporations' operational deficits;

- Refinancing certain GDB loans to assure GDB's financial stability;

- Creating a new integrated transportation authority that should result in operational and budgetary efficiencies;

- Creating a municipal finance corporation to provide municipalities with an efficient financing mechanism (similar to COFINA), and that would permit GDB to refinance its municipal loans and free up liquidity;

- Increasing the amount of debt that GDB could issue with the guarantee of Puerto Rico's good faith and credit, in a manner that would give GDB the greatest flexibility in its role of conceding financing to public agencies and corporations; and

- Conceding additional authority for GDB to oversee the funds of the Puerto Rico-Related Entities, for the purpose of better and more efficiently managing public funds.

We interviewed several of the signatories.  One of them explained to us that, in this witness's view, the priority was to balance the budget by increasing revenues through measures such as increasing the gas tax and PREPA's rates, and simultaneously improving discipline over expenditures.  The hope was that implementing such measures could help Puerto Rico to maintain its credibility and its access to the capital markets, so that Puerto Rico could continue to operate while officials considered implementing other reform measures.  As discussed above in Part IV.D, however, Governor García Padilla ultimately decided not to increase the gas tax or PREPA's rates.  The decision to forego such measures caused GDB serious concern regarding its own liquidity, because GDB viewed those steps as necessary in order to restore

fiscal discipline. GDB's concerns were also compounded by the fact that, as a former GDB official told us, certain CRAs had already begun to signal that they might downgrade the credit ratings for certain Puerto Rico-Related Bonds, expressing as a primary concern the degree of available liquidity.

We also learned that GDB was, according to a different GDB official, in the process of trying to reclaim public deposits from private financial institutions as a means of improving its own liquidity. These deposits included funds that should been deposited in a Treasury Single Account, but were not.

## 2.    At Some Point During the First Quarter of 2014, GDB Began to Realize that it Might Need to Restructure

It is unclear when GDB transitioned from merely being worried about its own liquidity to potentially considering a form of restructuring. For example, a former GDB official told us that, in 2013, GDB management told Governor García Padilla that PREPA had an annual operating deficit of approximately $300 million and that one of the potential solutions was a rate increase. But by mid-2014, the Governor had not requested a rate increase for PREPA. GDB told the Governor there were two options: (i) raise rates at PREPA, or (ii) restructure the Public Utility debt. Another GDB witness denied that restructuring was a consideration until much later, at some point in late 2014.

The evidence reflects that on January 29, 2014, GDB hired two law firms with prominent restructuring practices: (i) Cleary Gottlieb Steen & Hamilton LLP ("Cleary"); and (ii) Proskauer Rose LLP ("Proskauer"). In what many witnesses described as a significant development, GDB hired shortly thereafter on February 5, 2014, a Washington DC-based affiliate of well-known restructuring firm Millstein & Co., L.P. (Millco Advisors, LP ("Millco")). Millco's Founder and CEO, Jim Millstein, is a former Chief Restructuring Officer at the U.S. Department of the Treasury, as well as a former Managing Director and Global Co-Head of Corporate Restructuring at Lazard, and former Head of the Corporate Restructuring practice group at Cleary.[78] According to a contract that is available through a database that the Puerto Rico Office of the Comptroller maintains, the original completion date of the engagement was March 31, 2014.[79] The parties later extended that engagement several times, ultimately through December 31, 2016.

We reviewed evidence regarding the reasons why GDB engaged Millco. A former high-level GDB official told us that, at the time, GDB was not merely seeking a routine liquidity analysis. Instead, this witness stated that GDB was also in search of advice about a potential restructuring. When we asked a different high-ranking GDB official about the reasons for engaging Millco, that witness told us that GDB solicited advice on *all* of its options, including default, even though GDB had decided that defaulting would be the "worst possible scenario."

---

[78] *See* Millstein & Co., *Jim Millstein*, *Founder*, http://www.millsteinandco.com/JimMillstein/ (last visited on Aug. 15, 2018).
[79] *See* P.R. Office of the Comptroller, *Searchable Database*, https://contratos.ocpr.gov.pr (last visited on Aug. 15, 2018).

The Independent Investigator's Final Investigative Report

Nevertheless, multiple other high-level GDB officials, as well as underwriter witnesses, told us that GDB was not contemplating any restructuring when GDB hired Millco.  For example:

- A former high-level GDB official reported that initially, GDB was interested in hiring someone to advise only on liquidity and budget matters and to protect PREPA; not to advise on a potential restructuring.  The witness told us that using an outside expert and having that expert convey its conclusions directly to the Governor could help persuade the Governor to take action to balance the budget, bring in revenues, and be very disciplined about expenses.  These steps were, in this witness's view, important to Puerto Rico maintaining its credibility, retaining its market access, and preserving its ability to keep the government operating;

- A different former high-level GDB official told us that restructuring was not a consideration when GDB hired Mr.  Millstein.  Instead, this witness tied the reason for the engagement to the fact that GDB Board members became concerned that they would be personally liable if GDB were to become insolvent.  Evidence reflects that the GDB Board also became concerned that, under the criminal code, GDB Board members could be held responsible for negligence in the performance of their duties if an action or omission were to cause loss or damage to the public.  The GDB Board members were also concerned with whether they would be indemnified for any actions taken;

- A lead-underwriter witness told us that he met with Mr.  Millstein during the morning of Monday, February 10, 2014, and asked Mr.  Millstein repeatedly why he had been retained and if restructuring was being considered.  According to the witness, Mr.  Millstein explained that his role related solely to conducting a liquidity forecast and denied that he was there in connection with any restructuring.  The witness also stated that he expected Puerto Rico to be able to pay its outstanding debt and did not expect a default;

- A witness who at one point served as underwriter's counsel similarly recalled that Millco's engagement concerned liquidity analysis, although he did not remember the precise boundaries of the representation; and

- An underwriter witness reported that at the time of the issuance, he was not aware of any discussions about potential restructuring of debt and did not have any expectation of restructuring.  The witness stated that he did not like the fact that Millco was hired because he knew of its reputation for restructuring work.  As a result, according to the witness, he asked government personnel why Millco had been hired.  The witness was told that Millco was hired solely to assist with liquidity matters.

According to Mr.  Millstein, at the beginning of Millco's engagement, Millco was simply analyzing cash flows.  He told us that his work included determining how much cash and resources GDB possessed, what the sources were, where GDB was sending the money and for what, and where GDB was getting its funding.  The goal, he said, was to project for how long GDB could remain liquid.  He also told us that, to his knowledge, GDB's chairperson at the time was not considering restructuring when GDB first hired Millco.

The Independent Investigator's Final Investigative Report

These statements are consistent with minutes from the GDB Board meetings.  In particular, the minutes from the February 14, 2014, GDB Board meeting indicate that Mr. Millstein reported on GDB's liquidity status and indicated that he had been retained to explain and conduct a detailed analysis of GDB's cash flow, so that the GDB Board could have a clear idea of the cash needs for the next 12–18 months.  These minutes further demonstrate that Mr. Millstein was to perform a similar analysis of certain Puerto Rico-Related Entities.

### 3.   GDB Informed the Market of Millco's Retention Through a Special Liquidity Update Released in Early March of 2014, But Denied Having Sought Restructuring Advice at that Time

As previously noted, Millco has a strong reputation in the restructuring field.  Accordingly, despite the true reason why GDB hired it, multiple witnesses told us that shortly after GDB signed that contract, the lead underwriter for the 2014 GO Bond Issuance thought it was important to disclose the engagement to the market.  Mr. Millstein told us that he did not object to that disclosure.  He further stated that with the 2014 GO Bond Issuance in March 2014, Millco initially believed that Puerto Rico would have a sufficient "runway" to balance the budget and refinance its way through maturities.

Accordingly, on March 5, 2014, GDB released a Special Liquidity Update.  The purpose of the update was "to provide a brief overview of GDB's liquidity position as of January 31, 2014 and a liquidity projection as of such date based on the assumptions set forth [t]herein."[80]  In pertinent part, the update disclosed that GDB had hired Millco as its "financial advisor" and that Millco would assist GDB:

> . . . in evaluating potential funding sources and financing proposals provided to GDB or the Commonwealth, analyzing cash flow projections and liquidity for the Commonwealth and its component parts, GDB and the public corporations, and analyzing the capital structure of the Commonwealth and its component parts, GDB and the public corporations, including understanding all direct and contingent liabilities, based on information provided by relevant government agencies and/or public corporations.[81]

This disclosure prompted public speculation about a potential debt restructuring.  Indeed, the day after the disclosure, on March 6, 2014, *The Wall Street Journal* reported that the "hiring [of Millco] is a sign that island officials may be laying the groundwork for a potential restructuring of its approximately $70 billion in debt outstanding.  A reorganization could lead to losses for existing bondholders."[82]  Nevertheless, the article quoted a GDB spokesperson as having said:  "We can say clearly, we have not hired anyone to advise on restructuring."[83]  An internal GDB email reflects, however, that a then-high ranking official within GDB suggested that the spokesperson's statement was "false" and should be reframed.  That official wrote:  "I suggest saying, rather than 'have not hired,' . . .  that 'Millco's current engagement is for the purpose of' . . . ."

---

[80] Gov't Dev.  Bank for P.R., *Special Liquidity Update*, 1 (Mar.  5, 2014).

[81] Gov't Dev.  Bank for P.R., *Special Liquidity Update*, 1 (Mar.  5, 2014).

[82] *See* Mike Cherney and Matt Wirz, *Puerto Rico Hires Millstein Affiliate to Study Debt* (Mar.  5, 2014).

[83] *See* Mike Cherney and Matt Wirz, *Puerto Rico Hires Millstein Affiliate to Study Debt* (Mar.  5, 2014).

We also learned from multiple witnesses that by approximately this time in March 2014, the GDB Board had realized that Puerto Rico would not be able to issue its financial statements for the fiscal year ended 2013 before the May 1, 2014, deadline that SEC Rule 15c2-12 and relevant continuing disclosure agreements required—**unless** GDB could first obtain proceeds from the 2014 GO Bond Issuance. In essence, GDB needed those proceeds so that GDB could demonstrate twelve-months of liquidity on its financial statements and, as a result, appear to still be a "going concern" for accounting purposes. This was because HTA could not repay the $2 billion debt it owed to GDB, and GDB did not otherwise have sufficient cash to appear objectively likely to remain solvent for the foreseeable future.[84]

### 4. GDB's Separate Retention of Cleary and Proskauer Broke One Month Later

GDB hired Cleary and Proskauer at the same time in January 2014, and posted both engagement letters on the website at the same time in April 2014. But the press and witnesses reacted to Cleary's engagement before Proskauer's. The Cleary engagement became the subject of press coverage on April 7, 2014.

Mr. Millstein told us that it was not until a few months later, at some point between April and May 2014, when Millco realized that PREPA's expenses (including debt service) exceeded its revenue and without either continuing access to the capital markets to fund its operating deficits or a restructuring of its operations and rate structure, it would eventually have insufficient liquidity to meet all of its obligations in the ordinary course. Among other problems, it had sizeable past due receivables from Puerto Rico of between $200-$300 million. Mr. Millstein also told us that it was then that it became clear to him that PREPA would need to engage in "liability management." According to Mr. Millstein, that term is used on Wall Street to refer to a potential restructuring through refundings, refinancings, or other tools, such as formal proceedings under court supervision. Mr. Millstein's recollection was that Millco's mandate did not include advice for restructuring of Puerto Rico obligations until sometime later, in 2015.[85]

---

[84] The witness was vague and did not explain the specific reason why, in his view, the financial statements "could not" be prepared without obtaining additional liquidity. But financial statements are generally prepared and audited on the assumption that the issuing entity is a "going concern." In auditor language, a "going concern" is an entity that does not face the threat of liquidation in the foreseeable future. Pursuant to International Auditing Standard No. 1 ("Presentation of Financial Statements"), an entity is not considered a "going concern" unless it can demonstrate approximately twelve months of liquidity. Although management makes the "going concern" determination, the auditors subsequently evaluate the financial statements and determine whether they can conclude that the financial statements accurately reflect the financial condition of the entity. *See* Part VIII. If GDB did not have sufficient cash on hand to demonstrate at least twelve months of liquidity when it submitted its financial statements for audit, then GDB's auditors could have concluded that GDB's liquidation was imminent, and it could no longer be assumed a going concern. The auditors may have declined to issue a satisfactory audit opinion as a result. *See* Part VIII. In addition, the lack of demonstrated liquidity could have negatively impacted the credit ratings for Puerto Rico-Related Bonds because, as we discuss separately in Part X of this Report, the CRAs considered GDB's willingness and ability to extend liquidity to Puerto Rico-related issuers to be a key positive when evaluating Puerto Rico-related offerings.

[85] The minutes from GDB Board meetings held on February 14, 2014, February 3, 2015, and June 17, 2015 are consistent with Mr. Millstein's timeline. They reflect that through at least early June of 2015,

### 5. The 2014 GO Bond Issuance Went to Market as a "Junk Bond" Transaction in May 2014, with a Significant Portion of the Proceeds Slated to Repay GDB

The 2014 GO Bond Issuance went to market on March 11, 2014, as a non-investment grade (or "junk bond") transaction.[86] The Official Statement for the offering identified a significant portion of the bond proceeds as having been earmarked for the repayment of GDB lines of credit and other obligations, as well as the refinancing of older bonds. Figure IV.5 sets forth below the categories of stated uses for the proceeds from the 2014 GO Bond Issuance, together with the corresponding amounts for each category, as follows:

**Figure IV.5: Stated Uses of Bond Proceeds for the 2014 GO Bond Issuance[87]**

| Uses | Amount of Proceeds |
|---|---|
| Repayment of GDB lines of credit and deposit to Redemption Fund | $1,896,072,196 |
| Repayment of COFINA BANs | $342,365,760 |
| Refinancing of the Refunded Bonds (including capitalized fees) | $466,574,005 |
| Termination amounts for certain interest rate exchange agreements (including related fees) | $90,417,100 |
| Payment of interest on the Bonds | $422,749,408 |
| Underwriting discount, legal, printing and other financing expenses | $36,821,531 |

The Recovery Act was enacted on June 28, 2014. That law established a restructuring regime for certain Puerto Rico-Related Entities (including the Public Utilities and HTA). Multiple witnesses told us that Cleary and Proskauer helped draft it. Two days later, on June 30, 2014, several signatories of the December 2013 Letter resigned from GDB.

\*     \*     \*

In light of the foregoing, the evidence demonstrates that by continuing to extend liquidity to, and to approve new bond issuances for, the Puerto Rico-Related Entities without more critically evaluating those obligations or holding the Puerto Rico-Related Entities more strictly accountable, GDB enabled the Puerto Rico-Related Entities to avoid implementing the

---

Mr. Millstein or other Millco consultants advised the GDB Board only about GDB's liquidity projections, government cash needs, and cash flow problems.

[86] The SEC conducted an investigation into the 2014 GO Bond Issuance and notified involved parties that it did not intend to recommend enforcement action. The SEC also advised the involved parties that the notice should not be construed to indicate that any party had been exonerated or that no action would ultimately result from the SEC investigation.

[87] The intended use of proceeds was consistent with the authorization set out in the corresponding bond resolution. *Compare* Commonwealth of P.R., *Bond Resolution for General Obligation Bonds, Series 2014A,* 4 § 3(a) (2014), *with* Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series 2014A* (2014).

measures they needed to take in order to become financially self-sufficient. GDB's own liquidity suffered over time, as a result. This combination of circumstances ultimately proved unsustainable and undermined Puerto Rico's broader fiscal health.

## G.   Certain Reforms Could Help GDB's Successor as Fiscal Agent to More Effectively Oversee the Puerto Rico-Related Entities' Finances

As explained above, we uncovered structural and operational deficiencies that contributed to GDB's collapse, as well as the broader fiscal crisis. Those findings inform the recommendations that we set forth below for GDB's successor as fiscal agent (presumed, at this time, in its current form to be AAFAF).[88]

1.   _Puerto Rico's Fiscal Agent Should Not Also Be a Lender._ We reviewed many types of documentary evidence relating to GDB that spanned more than a decade. This includes the minutes from GDB Board meetings, as well as internal communications and other documents. We also spoke with dozens of former GDB officials, as well as the underwriters and attorneys who worked with them; the CRA personnel to whom those officials provided data; current and former officials at the various Puerto Rico Related-Entities to which GDB loaned money; and the democratically-elected political figures to whom the GDB decision-makers ultimately reported. That evidence uniformly underscores that when designing the responsibilities and powers of GDB's successor(s), the political branches of Puerto Rico's government should seriously consider separating the role of fiscal agent from the role of central bank, and dividing those responsibilities between two separate entities.

As our investigation revealed, GDB's performance as fiscal agent was too often hindered by its role as liquidity provider for the same Puerto Rico-Related Entities that GDB was supposed to oversee and advise. That tension manifested throughout the Relevant Period. For example, when rate increases were untenable because the public would have protested or otherwise resisted, GDB felt pressured to look beyond what a private-sector fiscal agent might have proposed in terms of cost controls or other austerity measures, because GDB simultaneously had access to funds that could be disbursed to solve any short-term financial crunch. As a result, the competent and ethical professionals we interviewed who served on the GDB Board or among GDB's senior management were caught between irreconcilable pressures: they were politically accountable for sound fiscal management, but also politically accountable for keeping the lights on.

The tension seems obvious in hindsight. But it was easy to overlook during the Relevant Period. GDB essentially played the roles that politicians and the Puerto Rico-Related Entities expected GDB to play at that time.

Going forward, Puerto Rico's political branches should consider targeted reforms to address the specific ways in which those roles ultimately proved irreconcilable. For example:

---

[88] According to its enabling act, the Puerto Rico Legislature created AAFAF "for the purpose of acting as fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico and to assist such entities in facing the serious fiscal and economic crisis that Puerto Rico is currently undergoing." _See_ Act of Jan. 18, 2017, No. 2, 2017, § 5 P.R. Laws --. Furthermore, AAFAF "assume[d] all fiscal agency, financial advisory, and reporting functions of [GDB]." _See_ Act of Jan. 18, 2017, No. 2, 2017, § 5(c) P.R. Laws --.

The Independent Investigator's Final Investigative Report

- The political branches could provide that individuals be appointed to GDB's successor as fiscal agent for staggered terms, or for terms that span gubernatorial administration changes. In that way, individuals selected for the important duties of fiscal agent can be appropriately accountable to political actors, but not to the exigencies of the moment;

- The political branches could condition disbursements from the Department of Treasury upon the fiscal agent's review and approval, and upon a pre-approved timetable, to the extent that the disbursements exceed a certain threshold. The political branches could also make such sums inaccessible unless the recipients adhere to clear guidelines regarding lending criteria. The experiences of other municipalities and states could inform the development of those criteria; and

- The political branches could recast the fiscal agent as an impartial conduit of information to its clients and to the investing public. This would remove from the entity that is the source of funding the ability, and thus the temptation, to shade or emphasize financial reporting data in order to facilitate the extinguishing of financial brush-fires.

We would expect and encourage the political branches to craft, in ways outside our scope and expertise, solutions appropriate to Puerto Rico in light of these general recommendations.

2.     Oversight of Other Public Corporations. One of GDB's shortcomings was its inability to effectively oversee the Puerto Rico-Related Entities for which it acted as fiscal agent, or to which it extended financing. Numerous witnesses agreed that although the FOAs were a step in the right direction, they were ineffective in practice, due to resource and other limitations that constrained GDB's ability to exercise the full panoply of powers that the FOAs conferred.

To remedy this deficiency, we recommend that GDB's successor as fiscal agent create a separate department or division that is specifically tasked with overseeing all Puerto Rico-Related Entities and monitoring or even auditing their finances. This includes how those entities utilize the proceeds from public loans and bond issuances.

We further recommend that this department be given access to the joint and integrated budgeting and accounting systems that we recommend in Part VIII of this Report. This will permit GDB's successor as fiscal agent to have nearly real-time access to the daily financials and developing deficits of the Puerto Rico-Related Entities that it oversees, thereby helping it to more accurately assess the financial condition of those public-sector borrowers.

3.     Re-Evaluate at Regular Intervals the Collection Risks Associated With Public-Sector Loans. As demonstrated above, GDB's liquidity suffered as a result of its politically-influenced lending decisions concerning the Puerto Rico-Related Entities. In its audit report dated September 15, 2013, the Office of the Comptroller concluded that during the audit period, GDB did not regularly evaluate the risks or collectability of its public-sector loans after they

were extended, notwithstanding that such loans comprised a material portion of its portfolio.[89] It also noted that GDB had not established a sufficient reserve for potential losses on those loans.  This was because GDB believed that it was guaranteed repayment of all obligations backed by General Fund appropriations, based on Law 12 of 1975.[90]   The Office of the Comptroller specifically disagreed with that justification, noting that "[t]he failure to conduct periodic evaluations of the loans granted to the sector public or establish a reserve for losses on such loans may result in an overestimation of the assets in the financial statements.  In addition, no potential risk is recognized for the possible loss that would assume the GDB for the failure to pay the loans granted to that sector."[91]

In light of GDB's own liquidity problems, we recommend that if there is a successor to GDB in its prior capacity as lender of last resort, then that entity should adopt policies and procedures for re-evaluating at quarterly intervals the collectability and other risks associated with existing public-sector financing.  It is appropriate to consider the role of any statutory repayment guarantee, but that should not be the sole, or controlling, factor to inform the collectability analysis.  The framework should also be more closely aligned with the framework that a private bank would apply to evaluate risks to its own loan portfolio.

---

[89] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 11 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

[90] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 11 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

[91] *See* Banco Gubernamental de Fomento para Puerto Rico, Informe de Auditoría CP-14-03, 13 (2013), http://iapconsulta.ocpr.gov.pr/OpenDoc.aspx?id=411dff28-a638-4b36-9470-861811e8b4f2&nombre=CP-14-03.

# PART V

# PUERTO RICO'S PUBLIC UTILITIES

# PART V
# PUERTO RICO'S PUBLIC UTILITIES

In Puerto Rico, power production and distribution, and water sanitation and distribution are primarily performed, respectively, by two public corporations:[1]  PREPA and PRASA.  By statute and under Trust Agreements entered into in connection with issuing bonds, the Public Utilities' operations are supposed to be fully funded by rate-paying customers.[2]  Nevertheless, during the Relevant Period, the Public Utilities accrued significant debts through bond issuances, and also by borrowing from private lenders and GDB.  According to the Fiscal Plan for Puerto Rico released by the Oversight Board, as of February 2017 combined obligations from the Public Utilities made up over 18% of Puerto Rico's total $74 billion in public sector debt.[3]

In September 2017, Hurricanes Irma and Maria affected over 70% of PREPA's transmission and distribution system, damaged 131 out of its total 334 substations, and left the entire island in the dark.[4]  This, in turn, affected critical water infrastructure at PRASA, which relies on PREPA-generated electricity to power its water, sewage, and wastewater collection system.  As a result, over 50% of the population of Puerto Rico was without potable water for much of September and October 2017.[5]  It took the cash-strapped and heavily indebted Public

---

[1] Under Puerto Rico law, the Public Utilities have a "legal existence and personality separate and apart from that of the government."  *See* P.R. Laws Ann. tit. 22, § 193(a) (2018); *See also, e.g.*, P.R. Laws Ann. tit. 22, § 142 (2018); 1957 Op. Sec. Jus. No. 42.

[2] *See* P.R. Laws Ann. tit. 22, § 158 (2018); *see also* P.R. Laws Ann. tit. 22, § 196(l) (2018).

[3] Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

[4] Letter from Fed. Oversight & Mgmt. Bd. to Governor R. Rosselló (Dec. 12, 2017) (on file with author).

[5] Kaiser Family Found., *Public Health in Puerto Rico After Hurricane Maria* (2017); Press Release, Fed. Emergency Mgmt. Administration, *FEMA Approves an Additional $70 Million in Assistance to Puerto Rico*

Utilities months to restore power and water to the island.  The obvious question is:  How could the Public Utilities, having borrowed so much, and having had access to dedicated revenue for so long, have struggled so dramatically?

To answer that question, and to understand the role of the Public Utilities in the financial crisis more broadly, we examined how the Public Utilities' governance structures, degree of dependence on and oversight by Puerto Rico, rate setting and collection of revenues, bond issuances, capital improvement projects, and general operations combined to impact their revenue streams and contribute to Puerto Rico's fiscal crisis.  We interviewed current and former executive directors and chief financial officers for PREPA and PRASA.  We also interviewed GDB officials, underwriters, credit rating agency analysts, and outside professionals such as Consulting Engineers, restructuring officers, lawyers, and auditors, who were involved with the Public Utilities' bond offerings and general operations.  We reviewed thousands of documents on the Public Utilities' finances and operations.  Finally, we engaged the services of financial firm Duff & Phelps to analyze the use of certain bond proceeds, with particular attention to PREPA.  Results from that investigation are discussed in Part V.B.  The evidence supports the following findings:

1.      With regard to PREPA, the sheer number of governor-appointed *empleados de confianza* predisposed PREPA to massive turnover, loss of institutional knowledge, and decision-making that was unresponsive to market forces. During the Relevant Period, six of PREPA's nine Board members turned over every time a new governor took office.  Significantly, those officials had exclusive authority within PREPA to approve or reject all of PREPA's borrowing and rate setting.  They also were responsible for selecting PREPA's Executive Director.  In addition, at PREPA, and unlike at many other Puerto Rico-Related Entities, the governor appointed *empleados de confianza* to not only high-level positions, but also to many operational and technical positions.  Further, we uncovered evidence that just before administrations changed, some *empleados de confianza* would switch to career positions, from which they could not be terminated without cause, and where they would remain employed, often with very light or undefined responsibilities, until their political party came back into power.  Officials who had shifted out of authority were insufficiently consulted by their successors to transfer institutional knowledge and to justify their continued employment.  The prevalence of political appointees within PREPA at all levels meant that, with each new political administration, hundreds of employees turned over at PREPA.  The turnover resulted in a lack of institutional memory among PREPA's upper ranks.  The cycling in and out of *empleados de confianza* and career positions resulted in institutional waste.

2.      With regard to PREPA, our investigation found that politics directly impacted rates in a way that kept them simultaneously high and, yet, still insufficient to cover operational expenses and capital improvement projects.  Based on our review of the evidence, we attribute this to three principal reasons:  (i) a lack of political will to raise PREPA's base rate, revenues from which support PREPA's operations and capital improvements; (ii) politically-induced obstacles to make the system more efficient and cost-effective in the long run by converting PREPA's generation from oil to natural gas; and (iii) politically-sanctioned subsidies to municipalities that reduced PREPA's collection of revenues.  To compensate for the shortcomings in revenue, PREPA

---

(Oct. 11, 2017), https://www.fema.gov/news-release/2017/10/11/fema-approves-additional-70-million-assistance-puerto-rico.

became dependent on short-term liquidity injections from GDB and Puerto Rico,[6] with its principal means of repayment being the issuance of bonds.  As of February 2017, PREPA had almost $9 billion of outstanding debt.[7]

3.　　　Our investigation also found that PREPA systematically included uncollected revenues when it calculated its ability to cover its operations and debt service as required by its Trust Agreement.  The evidence also shows that the Consulting Engineer who approved the debt service calculation in connection with the bond issuances did so without reviewing PREPA's unaudited financials in order to confirm revenue collection or other figures.  We analyze potential claims based on those facts in Part XVI.C.5.

4.　　　With regard to PREPA's bond issuances, the evidence demonstrated that neither GDB nor the underwriters monitored PREPA's *actual* use of bond proceeds as compared to the *represented* use of proceeds.  As one example of this, Duff & Phelps identified a difference of several hundred million dollars between Construction Fund proceeds from PREPA's 2010–2013 issuances, on the one hand, and reported uses of funds for infrastructure and capital improvement projects and changes in restricted cash accounts for such uses, on the other hand.

5.　　　With regard to PRASA, a reduction in appropriations from the Government of Puerto Rico, combined with a court-ordered $2 billion in capital improvements, forced PRASA to raise rates so that it could reenter the bond market in 2008 after a 20-year absence.  Bond issuances in 2008 and 2012 were tethered to rate covenants and a FOA that required PRASA to raise rates in the event Government appropriations again ceased.  When, in 2013, the Government eliminated appropriated funds, the rate covenant and FOA forced PRASA to raise its rates over the objection of GDB management and the Governor.

We present the details of these findings below.

---

[6] As discussed in Part IV.D, GDB, despite its roles as central bank and fiscal agent, enabled this dependence by failing to operate at arms' length (*i.e.*, did not declare events of default) and by overseeing PREPA's bond issuances an alternative to raising rates.

[7] Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

The Independent Investigator's Final Investigative Report

## A.    PREPA

PREPA[8] is the main provider of electricity for the 3.4 million people living on the island,[9] and is also one of the largest public power agencies in the United States.[10]   PREPA controls all aspects of the electrification process in Puerto Rico, from generation, to transmission, to distribution.   As of August 2013 (the publishing date of the last Consulting Engineer Annual Report, which PREPA cites in its online operational profile), PREPA's system included 2,478 miles of transmission lines, 31,485 miles of distribution lines, 279 38 kV substations, 175 transmission centers, and a generating capacity of 6,023 MW across 10 power plants.[11]   Its annual budget during the Relevant Period ranged from $3.60 billion to $4.79 billion.[12]

PREPA is also one of Puerto Rico's largest issuers of debt.   PREPA's debt, standing alone, represents almost $9 billion, or 11%, of Puerto Rico's total public debt.[13]   PREPA is one of the entities that, through the Oversight Board, has declared bankruptcy under PROMESA.[14]

### 1.    PREPA's Management and Employees

One of the areas we have explored in our investigation is the impact of political considerations on employee hiring and retention at PREPA.   As previously discussed in Part IV.E.2, Puerto Rico government employees fall into two primary categories:   *empleados de*

---

[8] PREPA (originally known as the Puerto Rico Water Resources Authority, or "PRWRA") was formed in 1941 "for the purpose of conserving, developing and utilizing, and aiding in the conservation, development and utilization of water and energy resources of Puerto Rico." Act of May 2, 1941, No. 83, 1941 P.R. Laws 682 (Codified in P.R. Laws Ann. tit. 22, § 191–240 (2018)) (hereinafter, "the PREPA Act").   PREPA's original name, the Puerto Rico Water Resources Authority, is a reference to hydroelectric power, which was PREPA's initial primary power source.   By 1979, PREPA's power generation had shifted away from water and to gas, at which point the Authority changed its name to PREPA.   *See* P.R. Elec. Power Auth., *History of PREPA*, https://www.aeepr.com/INVESTORS/History.aspx (last visited Aug. 14, 2018).

[9] The notable exception to PREPA's monopoly are two privately controlled power plants on the southern coast of the island: EcoEléctrica, L.P., located in the Municipality of Peñuelas, and AES-PR, located in the Municipality of Guayama.   Both have cogeneration agreements with PREPA and, as of the Fiscal Year ending 2013, provided over 30% of the power consumed in Puerto Rico and the surrounding islands.   *See* URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 2 (2013).

[10]   U.S. Energy Information Administration, *Puerto Rico Territory Energy Profile* (2017), https://www.eia.gov/state/print.cfm?sid=RQ.

[11] P.R. Elec. Power Auth., *Operational Profile* (Aug. 14, 2013) (citing URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority* (2013)) https://www.aeepr.com/INVESTORS/OperationalProfile.aspx.

[12] P. R. Elec. Power Auth., *Audited Financial Statements*, 9 (2015) (on file with author), P. R. Elec. Power Auth., *Audited Financial Statements*, 19 (2014) (on file with author); P. R. Elec. Power Auth*., Audited Financial Statements*, 9 (2011) (on file with author); P. R. Elec. Power Auth., *Audited Financial Statements*, 8 (2009) (on file with author); P. R. Elec. Power Auth., *Audited Financial Statements*, 6 (2008) (on file with author).

[13] Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

[14] *See generally In re Fin. Oversight and Mgmt. Bd. of P.R. as Representative of P.R. Elec. Power Auth.,* No. 17-04780 (D.P.R. filed July 2, 2017).

*confianza*, who are usually political appointees that can be removed from their positions, and career employees, who can be terminated only for cause.

     **(a)**     **During the Relevant Period, the Governor Had Authority to Appoint PREPA's Board of Directors, Managements, and Other Positions**

PREPA's Governing Board (hereafter, the "<u>PREPA Board</u>") is its main oversight body.[15] For most of the Relevant Period, until 2014, the PREPA Board included nine members.  The governor appointed six members for terms of two to four years.  The remaining three members included the Secretary of Transportation and Public Works, who is an ex-officio member and also appointed by the governor, and two members elected by a consumer referendum to represent consumer interests on the Board.[16]

The PREPA Board's duties and responsibilities include:

- Approving the Annual Budget for the upcoming fiscal year, as proposed by the Executive Director and approved by the Consulting Engineer, on or before the 15th day of May;[17]
- Approving the need for a capital improvement, as defined by the Trust Agreement;[18]
- Issuing resolutions to approve the issuance of bonds by PREPA for the purpose of funding capital improvements;[19] and
- Until 2014, the PREPA Board was also formerly empowered to approve changes in PREPA's rates, following a public hearing.[20]

By statute, the PREPA Board had the authority to appoint PREPA's Executive Director, who is "responsible for the implementation of [PREPA's] policy and the general supervision of the administrative and operational phases of the Authority,"[21] and whose responsibilities included:

- Appointing PREPA's executive officers per the criteria set forth by the Board;[22]

---

[15] Act of May 2, 1941, No. 83, § 4, 1941 P.R. Laws 682.

[16] Consumer representatives may not be PREPA employees or a member of a PREPA union.  Also ineligible are "members of a local or central directing body of a political party, which includes all persons working actively for the party."  Act of May 2, 1941, No. 83, § 4, 1941 P.R. Laws 682.

[17] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 504 (Aug. 1, 2011) (on file with author).

[18] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 208 (Aug. 1, 2011) (on file with author).

[19] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 208, 210 (Aug. 1, 2011) (on file with author).

[20] P.R. Laws Ann. tit. 22, § 196(l) (2018).  The ability to approve rates, discussed in Part V.A.2.(a), was given to the Puerto Rico Energy Commission ("<u>PREC</u>") when it was created by Act 57.  Act of May 27, 2014, No. 57, 2014 P.R. Laws 95.

[21] P.R. Laws Ann. tit. 22, § 194 (b) (2018).

[22] P.R. Laws Ann. tit. 22, § 195(b) (2018).

The Independent Investigator's Final Investigative Report

- Approval of the disbursement and investment of proceeds from bond issuances from certain funds created under the Trust Agreement (discussed in Part V.A.3.(a).(iv));[23] and,

- Signing and submitting, along with the Consulting Engineer, the Certificate of Net Revenues pursuant to Sections 208–210 of the Trust Agreement.[24]

Numerous witnesses told us that in practice, the governor played a role in the selection of PREPA's Executive Directors throughout the Relevant Period.  PREPA's last three Executive Directors were originally proposed as candidates by Fortaleza before being approved by the Board.[25]

Many other important management positions, including executive sub-directors, division managers, and auxiliary division managers, were comprised of *empleados de confianza* appointed by the governor.[26]

In addition to the PREPA Board and management, the governor appointed as *empleados de confianza* many operational and technical employees at PREPA.  Several witnesses found it difficult to explain the logic for why a position would qualify for a political appointment.  For instance, one former PREPA employee told us that when he served in a technical engineering role, depending on in which plant he worked, he sometimes occupied a career position, and, at other times, an *empleado de confianza* position.  Observers estimate that within PREPA's administration at any given time there are around 150 to 300 *empleados de confianza*.[27]

### (b)   During the Relevant Period, There Was Significant Turnover at PREPA

In the last 20 years, PREPA has had at least 12 Executive Directors, including seven within the last decade.  Since 2007, lengths of tenure ranged from 123 days to 993 days, with an average of 493 days (or just over 16 months).  The tenures of PREPA's Executive Directors largely

---

[23] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 402, 507, 602 (Aug. 1, 2011) (on file with author).

[24] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 209 (Aug. 1, 2011) (on file with author).

[25] *See, e.g.*, Caribbean Business, *Governor Recommends New Prepa Chairman,* (Mar. 3, 2017), http://caribbeanbusiness.com/governor-recommends-new-prepa-chairman/;  P. R. Elec. Power Auth., *Audited Financial Statements*, 9 (2015) (on file with author); Oficina Del Gobernador, *Governor Rosselló Announces Appointment of New Executive Director for the Puerto Rico Electric Power Authority* (July 18, 2018),  http://www.fortaleza.pr.gov/content/governor-rossell-announces-appointment-new-executive-director-puerto-rico-electric-power.

[26] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members,  Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 6 (Jan. 11, 2016) (citing the former Chief Restructuring Officer of PREPA, Statement before the Puerto Rican Senate (Apr. 14, 2015)).

[27] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members,  Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 6 (Jan. 11, 2016)  (citing the former Chief Restructuring Officer of PREPA, Statement before the Puerto Rican Senate (Apr. 14, 2015)).

correspond to Puerto Rico's gubernatorial elections and the resulting party changes:  A new Executive Director for PREPA was appointed in 2005, in 2008, in 2013, and in 2017, as each new administration entered office.

There was a consensus among the witnesses with whom we spoke that it was common for an incoming administration to replace the administration of the Public Utilities with individuals who shared the same political party identification or agenda.  Several witnesses told us that it was understood that these individuals were accountable for many operational decisions to political actors.  One former PREPA official told us that he was asked to resign by the Governor after a disagreement over the ability of PREPA to reduce rates during an election cycle.

With respect to other positions, our investigation found a pattern of the same few individuals cycling in and out of the same positions, depending on which political party controlled Fortaleza.  For example, since 2000, there have been three Finance Directors, all of whom served at least twice at different periods of time, with tenures ranging from three to eight years.[28]  Two former PREPA executives told us that they would switch back and forth between being *empleados de confianza* and career positions, depending on which party was in power.  Another PREPA official observed a similar pattern, where *empleados de confianza* at PREPA would transfer back and forth between political and career positions.[29]

The turnover at the executive and management level was mirrored by high levels of turnover throughout the rest of PREPA's work force.  Since 2001, it is estimated that every incoming Fortaleza has replaced around 200 of PREPA's top managers upon taking office, meaning that PREPA's top administrative posts have turned over at least five different times in the last 17 years.[30]

### (c)       The Impact on Operational Expenses

The high turnover of employees and cycling in and out of *confianza* and career positions also affected PREPA's bottom line by increasing employee benefits-related expenses.  For example, according to PREPA's 2018 fiscal plan, PREPA self-funds its employees' medical benefit plans, at a price of approximately $9,600 per year per employee, which is "significantly above the contribution levels at other government agencies."[31]  In addition, PREPA maintained its own Retirement System.  Currently, unfunded portions of PREPA's Retirement System constitute approximately $3.6 billion of PREPA's $9 billion debt.[32]

---

[28] As discussed in Part V.C.1, PRASA has only had four executive directors—with an average tenure of 3.25 years—and one Chief Financial Officer since 2004.

[29] We did not review employment records as part of our investigation.

[30] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members,  Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 6 (Jan. 11, 2016) (citing the former Chief Restructuring Officer of PREPA, Statement before the Puerto Rican Senate (Apr. 14, 2015)).

[31] P.R. Elec. Power Auth., *Fiscal Plan*, 35 (Apr. 5, 2018).

[32] P.R. Elec. Power Auth., *Fiscal Plan*, 26 (Apr. 5, 2018).

### (d)     The Impact on Capital Improvements

Several witnesses told us that the high level of turnover, both on the executive and general administration level, resulted in a lack of institutional knowledge and lack of continuity in capital improvement projects during the Relevant Period.

For example, one former official in PREPA's finance department told us that during the interim period between his tenures as an *empleado de confianza*, he was not privy to management's decisions or consulted by management, even though, during those periods he was still employed by PREPA in a career position.

At times, the turnover in management resulted in the delay or cancellation of maintenance and capital improvement projects initiated by a prior management team.  For instance, PREPA estimates that, between 2009 and 2013, it spent nearly $405 million and $619 million, respectively, on capital improvements to its transmission and distribution facilities,[33] but projects, such as replacing wood poles susceptible to hurricane damage, have yet to be completed.

Other capital improvement projects to convert PREPA's generation from reliance on fuel to natural gas have gone through various iterations across administrations.  We discuss the various uncompleted projects related to the conversation from fuel to natural gas in Part V.A.2.(b).(ii).

### (e)     Political Influence at PREPA

During the Relevant Period, there was widespread criticism of the degree of perceived political influence over PREPA.  For instance, in 2016 the US House Subcommittee on Energy and Mineral Resources stated that PREPA promoted politics and bureaucracy over proper management, asserting that "management and other strategic decisions . . . [had] been based on political considerations rather than best practices or sound business judgment."[34]  More recently, in July 2018, the US House Committee on Natural Resources held a hearing on the politicization of PREPA's Board in the wake of recent resignations, in which both testifying witnesses and committee members agreed that "political calculations" continued to be "injected" into PREPA's management even in 2018.[35]

We encountered little evidence that, during the Relevant Period, the PREPA Act did anything to meaningfully prohibit or monitor the political activity of PREPA management or employees.[36]  Indeed, one former PREPA official told us that, during the Relevant Period, political

---

[33] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 6 (2013).

[34] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members,  Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 4 (Jan. 11, 2016) (citing the former Chief Restructuring Officer of PREPA, Statement before the Puerto Rican Senate (Apr. 14, 2015)).

[35] Memorandum from Majority Committee Staff, Subcomm. on Indian, Insular and Alaska Native Affairs, to All Subcomm. on Indian, Insular and Alaska Native Affairs Members, Oversight Hearing on The Status of the Puerto Rico Electric Power Authority (PREPA) Restructuring Support Agreement, 6 (Mar. 20, 2017).

[36] Act of Feb. 16, 2016, No. 4, 2016 P.R. Laws 8.

activity was permitted as long as the employee was not on the job.  Other witnesses characterized PREPA as one of the largest sources of political fundraising.

Different administrations have paid varying degrees of attention to these critiques, resulting in changes to the composition, regulation, and powers of the PREPA Board over recent years.  In 2016, Governor Alejandro García Padilla signed Act 4 of 2016 ("PREPA Revitalization Act") into law.  The PREPA Revitalization Act provided that a new, non-partisan Governing Board should be created for PREPA, comprised of members identified by a third-party consultant having the relevant qualifications and industry experience to oversee the Power Authority.[37]  The PREPA Revitalization Act also restricted the ability of PREPA Board members and PREPA executives to engage in certain political activities, such as contributing money to political organizations, seeking political office, or seeking to influence others to act towards a specific political interest.  Senator Eduardo Bhatia, former President of the Puerto Rico Senate and a supporter of Act 4, has described these limitations as akin to a Hatch Act for Puerto Rico.[38]

Shortly after entering office in 2017, however, Governor Ricardo Rosselló enacted Act 37 of 2017, which returned the power to appoint PREPA Board members to the Governor.[39]  Under the current law, the governor appoints seven members to the PREPA Board for terms of two to four years.  The public, through an election, also selects two representatives of customers' interests to sit on the PREPA Board.[40]  The current PREPA Board has largely the same scope of powers and responsibilities as before, except that since 2014, the PREPA Board is no longer empowered to change rates.[41]

Once Act 37 of 2017 was enacted, Governor Rosselló promptly fired the previous PREPA Board and nominated their replacements,[42] which included an existing member of his administration and the treasurer of his gubernatorial campaign.[43]  This move was largely opposed by his political opponents and by PREPA's then-Executive Director Javier Quintana Méndez (who resigned soon after the change was implemented).[44]  These critics asserted that the move threatened PREPA's newfound political independence, as well as the then-ongoing negotiations

---

[37] Act of Feb. 16, 2016, No. 4, 2016 P.R. Laws 8.

[38] Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: *Hearing Before the H. Comm. Natural Resources*, 115th Cong., 5 (2018) (written testimony of Eduardo Bhatia) ("Inspired by the federal "Hatch Act", Act 4 prohibits political intervention in appointments, management decisions, contracting, and other internal matters of the utility.").

[39] Act of 2017, No. 37, 2017 P.R. Laws -- ("Act 37 of 2017").

[40] P.R. Laws Ann. tit. 22, § 194(a) (2018). *See also* P.R. Elec. Power Auth., *Amended and Restated Fiscal Plan – Draft Submission*, 12 (2018).

[41] P.R. Laws Ann. tit. 22, § 196(l) (2018). The ability to approve rates, discussed in V.A.2.(a), was given to the PREC when it was created by Act 57.  Act of May 27, 2014, No. 57, 2014 P.R. Laws 95.

[42] With the exception of the consumer representative, who has yet to be chosen, all of the current PREPA Board members were appointed in July 2018 or later by Governor Rosselló.  P.R. Elec. Power Auth., *Amended and Restated Fiscal Plan – Draft Submission* (2018).

[43] *Management Crisis at the Puerto Rico Power Authority and Implications for Recovery: Hearing Before the H. Comm. on Natural Resources*, 115th Cong. (2018) (written testimony of James E. Spiotto).

[44] *See* Leysa Caro González, *Prepa Board in the Cross Hairs*, Endi (Feb. 14, 2017), https://www.elnuevodia.com/english/english/nota/prepaboardinthecrosshairs-2291159/.

between PREPA and its bond holders under the Restructuring Support Agreement ("<u>RSA</u>").[45]
PREPA's entire Board recently resigned again over a dispute with Governor Rosselló regarding
the salary of PREPA's Executive Director.  Their collective resignation letter cited "political forces
in Puerto Rico [that] have sent a definitive statement that they want to continue to control PREPA,"
and thereby threatened the transformation of PREPA into a modern power utility.[46]  The current
Board is PREPA's second in as many years.

### 2.    **PREPA's Rates**

For decades, PREPA's rates, which, per its Trust Agreement,[47] should fund its operations,
have drawn attention from politicians, the press, and the public.[48]  Some lament that PREPA's
rates, which are generally higher than the average mainland rates, but lower than those charged on
other islands, are too high.[49]  Others criticize Puerto Rico's governors and PREPA for not having
raised rates in three decades.[50]  While it is true that prior to 2016 PREPA's base electricity rate
had not been increased since 1989,[51] the full rate charged, which factors in and adjusts for the price

---

[45] A Restructuring Support Agreement is "a standard form of restructuring support agreement, also called
a lock-up or plan support agreement, to be used in transactions between creditors and a Chapter 11 plan
proponent to support a prepackaged or pre-negotiated Chapter 11 plan." Practical Law Practice Note 2-532-
9406, *Restructuring Support Agreement in Bankruptcy* (2018).

[46] Robert Slavin, *Majority of PREPA's Board Resigns Criticizing the Authority's Politicization*, The Bond
Buyer (July 12, 2018), https://www.bondbuyer.com/news/majority-of-prepas-board-resigns-criticizing-
the-authoritys-politicization (citing Board statement).

[47] Under PREPA's Trust Agreement, in order to issue bonds and while any bonds remain outstanding,
PREPA is obligated to "fix, charge, and collect reasonable rates and charges so that revenues [would] be
sufficient to pay [then and future] current expenses and to provide an amount of at least 120% of the
aggregate principal and interest requirements for the [then] next fiscal year." Trust Agreement from P.R.
Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 502 (Aug. 1, 2011) (on file with author). This requirement
is discussed in Part V.A.3.(a).(iii).B.

[48] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and
Minerals Members, Oversight Hearing on "Exploring Energy Challenges and Opportunities Facing Puerto
Rico, 6 (Jan. 11, 2016) (citing the Former Chief Restructuring Officer of PREPA, Statement before the
Puerto Rican Senate (Apr. 14, 2015)); U.S. Energy Info. Admin., *EIA Electricity Sales Data for Puerto
Rico Show Rate of Recovery Since Hurricanes* (Aug. 6, 2018),
https://www.eia.gov/todayinenergy/detail.php?id=36832; Geoffrey Heal, *How to Fix Puerto Rico's Power
System*, Politico (Dec. 12, 2017), https://www.politico.com/agenda/story/2017/12/12/how-to-fix-puerto-
ricos-power-system-000594; Heather Long, *Puerto Rico to Hike Electricity Rates 26%*, CNN Money (June
30, 2016), https://money.cnn.com/2016/06/30/investing/puerto-rico-crisis-electricity-price-
hike/index.html.

[49] *Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on
Natural Resources*, 115th Cong. 2 (2016) (statement of former Chief Restructuring Director of PREPA).

[50] *Management Crisis at the Puerto Rico Power Authority and Implications for Recovery: Hearing Before
the H. Comm. on Natural Resources*, 115th Cong., 2 (2018) (written testimony of James E. Spiotto);
*Management Crisis at the Puerto Rico Power Authority and Implications for Recovery: Hearing Before the
H. Comm. on Natural Resources*, 115th Cong., 3 (2018) (testimony of David Svanda);  *Exploring Energy
Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on Natural Resources*,
115th Cong. 2 (2016) (statement of former Chief Restructuring Officer of PREPA).

[51] *Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on
Natural Resources*, 115th Cong. 2 (2016) (statement of the former Chief Restructuring Officer of PREPA).

The Independent Investigator's Final Investigative Report

of oil, has fluctuated.  Ultimately, three considerations affect PREPA's rates:  (i) the base rate; (ii) the price of oil; and (iii) reallocation of cost to the public to offset government subsidies.  Our investigation revealed that politics influence, if not control, each one of these three considerations.

PREPA's rate is calculated based on a formula that depends on two factors.  The first factor is what is known as the base electricity rate, which funds PREPA's operational costs, and is supposed to be set by PREPA's Board.  As noted above, that rate had not been changed since 1989.  The second factor is called the adjustment charge, and it directly correlates with PREPA's costs to purchase oil and other power, when needed.[52]  The sum of those figures is then adjusted upward by 11% to compensate for revenues that PREPA knows it will not collect because of a type of subsidy that PREPA gives to municipalities, called contributions-in-lieu of taxes, or "CILT."[53]

In April 2017, PREPA acknowledged the rate shortfall in its proposed fiscal plan:  "The current debt crisis was founded in years of rate deficits, during which operating expenses incurred were not recovered in rate revenues. . . . This situation was exacerbated by the practice of meeting operating revenue shortfalls with proceeds from debt issuance, instead of investing these proceeds on infrastructure maintenance or capital investment."[54]  The following figure from the proposed fiscal plan illustrates the shortfall:

### Figure V.A: PREPA's Rates over Time[55]



To deal with the fact that revenues from rates did not cover PREPA's operating expenses, PREPA looked to fund its operations with debt instead of raising rates or cutting costs.  And as we discuss below, our investigation revealed that this debt-funding included use of bond proceeds originally intended for maintenance and capital improvements.[56]  Additionally, the lack of political will to raise rates not only contributed to PREPA's extended issuance of debt—which by 2017,

---

[52] Alvarez & Marsal, Presentation to the Government Development Bank of Puerto Rico, 36 (2012) (on file with author).
[53] We explain CILTs, along with other subsidies and uncollected revenues, in Part V.A.2.(c).
[54] *See* P.R. Elec. Power Auth., *Fiscal Plan*, 15 (2017).
[55] *See* P.R. Elec. Power Auth., *Fiscal Plan*, 15 (2017).
[56] *Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on Natural Resources*, 114th Cong. 2 (2016) (statement of the former Chief Restructuring Officer of PREPA).

had amassed to almost $9 billion—but, at times, prompted PREPA to enter into risky and complicated financial agreements in exchange for up-front cash payments.[57]

(a)    **The Lack of Political Will to Raise PREPA's Base Rate**

Our investigation found that there was a lack of political will to take steps to ensure that PREPA's rates covered its operations, capital improvements, and maintenance. By law, PREPA has had the legal authority to adjust its rates without approval from the governor or the legislature since 1941—first through its Board, and since 2014, through the Puerto Rico Energy Commission ("PREC"). Our investigation found that in practice, however, PREPA would not change its base rate without permission from the governor—permission that was not forthcoming across various administrations for 30 years.

Multiple former PREPA, GDB, and Fortaleza employees told us of instances when governors avoided PREPA rate increases[58] for fear that it would impact their electoral prospects. Likewise, at times when the price of oil went up and threatened to raise PREPA's *overall* rate for customers, governors exerted influence in order to get PREPA to keep the overall rates down. Ironically, even without rate increases, not a single governor has been re-elected in Puerto Rico in over 22 years.[59]

One example of this was seen in 2008. On the eve of a gubernatorial election, PREPA's overall rate increased because of the rising price of oil. The Governor asked the then-executive director of PREPA to reduce the overall rate by 20%. When the executive director responded that he could decrease the overall rate by 10% without compromising PREPA's operations, the Governor asked him to resign. And in fact, he did resign in November 2008.

The subsequent administration then considered a PREPA rate increase, but it never materialized. Instead, as discussed further in Part V.A.2.(b).(ii).B, that administration focused on the conversion from oil to natural gas as a means to reduce long-term costs and thereby eventually reduce PREPA rates. That conversion never occurred.

In another instance, one Executive Director of PREPA expressed interest in raising rates slightly, but the Governor rejected it. Former GDB management and Board members, along with a former Executive Director for PREPA, all told us that, in 2013, the Governor refused to approve a requested short-term rate increase of 1 cent per kilowatt-hour (¢ per kWh) measurement proposed

---

[57] In March 2008, PREPA entered into an agreement, called a Basis Swap, with Goldman. In the most basic terms, PREPA agreed to pay Goldman a then-unknown sum equivalent to the difference in two fluctuating interest rates, called LIBOR and SIFMA, over a period of 29 years. In exchange for PREPA making essentially a bet on interest rates, Goldman paid PREPA a lump sum of $80 million. Witnesses within PREPA told us that PREPA entered into the PREPA Basis Swap to generate cash. One of GDB's swap advisors opined that PREPA may have wanted the Swap to generate cash because PREPA did not want to raise the rates it charged its customers for electricity. We provide a broader analysis and discussion of interest rate swaps, including this one, in Part XII.

[58] Other witnesses told us that there was a lack of initiative to decrease PREPA's expensive employee benefits.

[59] Pedro Rosselló was the last sitting Governor to be reelected to a second term, in 1996. He is also the father of the current Governor, Ricardo Rosselló.

The Independent Investigator's Final Investigative Report

to help decrease costs in the long run by paying to improve PREPA's system. According to one former GDB official, in 2013 the Governor rejected a 1-cent increase proposal by PREPA and demanded that other initiatives be undertaken to address a cash flow deficiency projected at the time. Another former GDB official told us that, in 2013, GDB management advised Governor García Padilla that PREPA had an annual operating deficit of approximately $300 million that could be fixed with a rate increase.

This focus on rates continued into 2014, when Puerto Rico's lead debt restructuring adviser, Millstein & Co., was retained by GDB.[60] Specifically, according to various members of the management team at GDB and GDB's outside advisors, it was obvious by April or May of that year that PREPA would have serious liquidity problems and would have to restructure unless it was able to raise its rates to repay its bonds and bank debt. One former GDB official told us that because, by mid-2014, the Governor had not requested a rate increase for PREPA, GDB presented the Governor with two options to address the debt: raise rates at PREPA or restructure the Public Utility debt.

PREPA did not raise rates. Instead, on June 28, 2014, the 2014 Recovery Act was enacted, which established a path for PREPA to pursue restructuring. In August 2014, PREPA entered into Forbearance Agreements with the banks, its bondholders, and GDB, and began the debt restructuring process. On September 4, 2014, PREPA appointed a Chief Restructuring Officer, whose responsibilities included negotiating with PREPA's creditors, developing a comprehensive business plan for PREPA, and working with PREPA's management to reduce costs and management liquidity.[61]

That same year, in 2014, the Puerto Rico Energy Transportation and RELIEF Act created the PREC as an oversight body for PREPA, and transferred the ultimate power to approve rates from PREPA's Board to the Commission.[62] Under the new guidelines, all proposed rate changes are reviewed by Board and then by the PREC before being implemented. A public hearing is required before changes to the rate structure can be implemented.[63] On June 28, 2016, the PREC approved a provisional rate increase of 1.299 ¢ per kWh (on top of the existing base rate for all customers).[64]

---

[60] Mark Tannenbaum & Martin Z. Braun, *Puerto Rico GDB Hires Millstein Unit as Financial Adviser*, Bloomberg (Mar. 6, 2014) http://www.bloomberg.com/news/articles/2014-03-05/puerto-rico-gdb-hires-millstein-affiliate-asfinancial-adviser. *See also* Emily Glazer & Mike Cherney, *Puerto Rico Finance Arm Hires Restructuring Lawyers: Government Development Bank for Puerto Rico Hires Cleary Gottlieb Steen & Hamilton*, Wall St. J. (Apr. 7, 2014), https://www.wsj.com/articles/puerto-rico-finance-arm-hires-restructuring-lawyers-1396897399.

[61] Professional Services Agreement between P.R. Elec. Power Auth. & AlixPartners Int'l, Inc. (Sept. 12, 2014).

[62] Act of May 27, 2014, No. 57, 2014 P.R. Laws 95.

[63] P.R. Laws Ann. tit. 22, § 196a (2018).

[64] Order Establishing Provisional Rates, 7, *In re Review of Rates of the P.R. Power Auth.*, No. CEPR-AP-2015-0001 (P.R. Energy Comm. June 24, 2016).

The Independent Investigator's Final Investigative Report

    (b)    **Politics Have Prolonged PREPA's Reliance on Oil Instead of Gas, Resulting in Higher Rates and Increased Borrowing**

        Political influence also extended to PREPA's capital improvement projects, in particular those related to the conversion from oil to natural gas.  While both political parties agree that the conversion should happen, they have disagreed about how.  This disagreement has resulted in Puerto Rico remaining dependent on oil, despite initiatives over the last 15 years from both political parties to covert to natural gas.  This is significant because PREPA's reliance on oil has resulted in higher costs,[65] which in turn have been passed on to consumers and compelled increased borrowing.[66]  If PREPA could reduce its reliance on oil, then it could increase its base rate to a level sufficient to cover operational expenses, without increasing the overall rates paid by the consumers.  In addition, the series of built and unbuilt gas pipelines proposed by each administration in the last fifteen years exacerbated PREPA's indebtedness, because much of the funding for these projects was raised by issuing bonds.

    (i)    **PREPA's Reliance on Oil Leads to Higher Rates and Increased Borrowing**

        As of 2016, PREPA relied on petroleum for 47% of its generating capacity.[67]  PREPA's dependence on petroleum versus renewable or other power sources distinguishes it from many of its mainland counterparts,[68] but not from other islands, like the Hawaiian Islands, which face challenges in transporting other forms of fuel, such as natural gas, to their shores.[69]  Like Puerto

---

[65] In June 2018, oil prices averaged over $74 per gallon, while natural gas only averaged around $10.56 per thousand cubic feet (the equivalent unit of measurement).  *See* U.S. Energy Info. Admin., *Short-Term Energy Outlook* (Aug. 7, 2018), https://www.eia.gov/outlooks/steo/report/prices.php.  Additionally, the Jones Act has made the price for shipping goods from the US to Puerto Rico to be higher than shipping from a foreign country to Puerto Rico, which has a concurrent effect on the cost PREPA pays to bring oil to the island.  *See* U.S. Gov't Accountability Office, GAO-13-260, *Puerto Rico: Characteristics of the Island's Maritime Trade and Possible Effects of Modifying the Jones Act*, Highlights (Mar. 2013).

[66] PREPA agrees that its reliance on oil increases consumer rates.  *See, e.g.*, P.R. Electric Power Auth., 2010 AAA Offering Statement, Dependence on Fuel Oil; Fuel Cost Volatility, 26 (Apr. 22, 2010). ("Since the cost of fuel is passed on to the Authority's clients on a current basis through a fuel adjustment charge, the Authority's dependence on fuel oil has resulted in overall increases and significant volatility in the cost of energy to the Authority's customers during the last five fiscal years.").

[67] U.S. Energy Info. Admin., *Puerto Rico Territory Energy Profile* (Sept. 21, 2017), https://www.eia.gov/state/print.cfm?sid=RQ.

[68] As a comparison, the US Energy Sector as a whole relies primarily on natural gas as its power source and for which petroleum only accounted for 0.5%, or 200.75 billion kWh of the 4,015 billion kWh total electricity produced in 2017.  *See* U.S. Energy Info. Admin., *Age of Electric Power Generators Varies Widely* (June 16, 2011), https://www.eia.gov/todayinenergy/detail.php?id=1830.

[69] For example, Hawaiian Electric Industries (which provides electricity to 95% of Hawaii's residents) relies on petroleum fuel to generate 66.3% of its total production capacity, or approximately 1150 MW.  Hawaiian Elec. Cos., Power Facts (2018), https://www.hawaiianelectric.com/Documents/about_us/company_facts/power_facts.pdf.

The Independent Investigator's Final Investigative Report

Rico, Hawaii derives provide nearly 95% of the islands' power from a single distributor, Hawaiian Electric Industries, and 68.8% of the electricity produced in 2017 came from petroleum oil.[70]

As a result of the reliance on oil,[71] PREPA's residential customers paid, on average, 24.40 cents per kWh as of March 2018,[72] which is higher than the national average of 12.99 cents per kWh.[73] As a point of comparison, residents of Los Angeles buy electricity from the Los Angeles Department of Power and Water, which serves a comparable number of customers to PREPA, and, according to the latest data available, relied on natural gas for 34% of its electricity in 2016.[74] Today, LA households pay an average of 17.8 ¢ per kWh for their electricity.[75] PREPA's rates, however, are still less than those of other islands,[76] like Hawaii, which averaged 31.21 cents per kWh for residential customers in April 2018.[77]

---

[70] As of March 2018, residential consumers in Hawaii paid an estimated 32.05 cents per kilowatt-hour of energy. *See* U.S. Energy Info. Admin., *Electric Power Monthly,* Table 5.6.A. (May 30, 2018).

[71] The high rates caused by petroleum fuel purchase have been the subject of corruption allegations against PREPA, and have precipitated rumors about the existence of a fuel cartel that supplies PREPA with fuel at prohibitive costs. The Fortuño administration, reacting to these allegations, transferred PREPA's fuel purchasing prerogative to a fuel control board at GDB (the move was subsequently reversed by the García-Padilla administration). In 2015, a class action lawsuit was filed, alleging that PREPA knowingly participated in a kickbacks scheme in which PREPA overpaid its suppliers for "fuel oil that did not meet contractual or EPA specifications . . . and passed through the entire cost of the Non-Compliant Fuel Oil to [its clients] on their regular monthly electricity bills." Complaint, 1, *Marrero v. Autoridad De Energía Eléctrica*, No. 3:15-cv-01167-JAG (D.P.R. Feb. 24, 2015). A 2016 Puerto Rico Senate investigation, led by Senator Eduardo Bhatia, recommended that prosecution be pursued against PREPA and its fuel providers. Nevertheless, no criminal proceedings has been brought to date. While we do not draw a conclusion as to the veracity of fraud claims in this report, we believe that the allegations themselves are important indicators for the lack of transparency in PREPA's fuel purchasing process, especially in regards to how it interacts with the rates charged to PREPA's customers, and therefore worthy of mention.

[72] P.R. Elec. Power Auth., *Amended & Restated Fiscal Plan*, 35 (2018).

[73] *See* U.S. Energy Info. Admin., *Electric Power Monthly,* Table 5.6.A, Table 8.4 (May 30, 2018).

[74] As of July 2018. *See* Bureau of Labor Statistics, *Average Energy Prices, Los Angeles-Long Beach-Anaheim – July 2018*, 2 (2018), https://www.bls.gov/regions/west/news-release/averageenergyprices_losangeles.htm.

[75] *See* U.S. Energy Info. Admin., *Electric Power Monthly,* Table 5.6.A. (May 30, 2018).

[76] Alvarez & Marsal, Presentation to the Government Development Bank of Puerto Rico, 23 (2012) (on file with author).

[77] *See* U.S. Energy Info. Admin., *Electric Power Monthly,* Table 5.6.A. (May 30, 2018). Although both are islands, it must be noted that Hawaii's Median Household Income (In 2016 Inflation-Adjusted Dollars) is $74,511 per year compared with Puerto Rico's $20,078 per year. U.S. Census Bureau, Fact Finder, *Median Household Income (In 2016 Inflation-Adjusted Dollars): U.S States and Puerto Rico Households* (last visited Aug. 19, 2018)). Consequently, while residents of the Hawaiian Islands pay more per kilowatt-hour for their electricity than residents of Puerto Rico, residents of Puerto Rico are spending a larger portion of their income on electricity than their Hawaiian brethren. Additionally, in Hawaii, costs of electricity are largely passed on to tourists, as tourism is Hawaii's largest industry. *Compare* Dave Graham & Robin Respaut & Hilary Russ, *Puerto Rico's Fragile Economy Dealt New Blow by Maria*, Reuters (Sept. 25, 2017), https://www.reuters.com/article/legal-us-storm-maria-puertorico/puerto-ricos-fragile-economy-dealt-new-blow-by-maria-idUSKCN1C01FT, *with* Haw. Dept. of Bus., Econ. Dev. & Tourism, *2017 State*

PREPA's reliance on oil also deepened PREPA's debt by making it reliant on lines of credit obtained from GDB and private banks to finance fuel purchases, at rates that fluctuated with global oil prices.  During the Relevant Period, PREPA had lines of credit with Banco Popular, Citi, and Scotiabank equaling upwards of $800 million.[78]  As is discussed in Part IV.D, these lines of credit represent one area in which GDB frequently acceded to PREPA's requests for credit extensions in order to ensure PREPA's continued operations in the short term.  It was these lines of credit—specifically, PREPA's inability to repay a $700 million fuel purchase facility that matured in July 2014, combined with the banks' refusal to waive such inability as a designated event of default or to extend the maturity of the facility—that eventually forced PREPA, in August of the same year, to enter into Forbearance Agreements with the banks, its bondholders, and GDB, and begin the debt restructuring process.

### (ii)    Politics Have Prolonged PREPA's Reliance on Petroleum Gas by Stymying Efforts to Covert to Natural Gas

Since the 1990s, there have been at least three proposals by consecutive administrations to construct pipelines in order to provide natural gas to the island and, by doing so, diversify its fuel sources and lower energy costs.[79]

According to the former Project Manager of PREPA's Consulting Engineer, capital improvement projects in the electric utility industry generally span 8 to 10 years.  In PREPA's case, however, none of these pipeline projects survived for more than about four years, the bookends of which generally lined up with election cycles.

### A.    Gasoducto del Sur

The *Gasoducto del Sur* pipeline was proposed by Governor Acevedo Vilá's administration in 2005.  It was to be a 49-mile-long natural gas pipeline from the private EcoEléctrica facility in Peñuelas to the Aguirre Combined Cycle Plant in Salinas.[80]  It was estimated to cost $74 million, with a completion date before June 30, 2009.[81]  The project was cancelled by Governor Fortuño shortly after his defeat of Governor Acevedo Vilá and entrance into office in 2009.  At the time of its cancellation, *Gasoducto del Sur* is estimated to have been around 25% completed.  The cancellation left PREPA/Puerto Rico $59 million in debt to the pipeline's contractor, Skanska

---

*of Hawaii Data Book*, tbl. 13.01 (2017)).  By comparison, in Puerto Rico, the largest economic sector is manufacturing, and higher electrical rates may prove to be a deterrent to growth in that sector.

[78] P.R. Elec. Power Auth., *Monthly Report to the Governing Board*, 10 (Dec. 2013).

[79] *See, e.g.,* P.R. Electric Power Auth., 2010 AAA Offering Statement, Dependence on Fuel Oil; Fuel Cost Volatility, 26 (Apr. 22, 2010). ("In order to achieve this [rate] reduction, the Authority plans to convert existing oil-fired facilities to allow them to use natural gas and to review the option of developing new coal-burning facilities.").

[80] P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplementary Schedules for Years Ended June 30, 2008 and 2007*, 9 (Dec. 23, 2008).

[81] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series VV*, 33 (2007).

The Independent Investigator's Final Investigative Report

Energy Services LLC.[82] PREPA later used portions of its bond issuances to pay down this debt.[83] Later, although it was proposed that the existing pipeline be transformed into a water pipeline, Gasoducto el Sur was substantively "unbuilt" after its cancellation—despite PREPA having already spent $55 million to build it.[84]

## B.   Vía Verde

The *Vía Verde* project (also known as *Gasoducto del Norte*) was a 92-mile-long underground natural gas pipeline from northern to southern Puerto Rico proposed by the Fortuño administration in 2009 (after the cancellation of the *Gasoducto del Sur* project). A similar project had previously been proposed by Miguel Cordero Lopez, Executive Director for PREPA from 1993 to 2000, under the administration of Governor Pedro Rosselló.[85]  PREPA estimated the overall cost of the project—which included the conversion of the Costa Sur, San Juan, Palo Seco, and Arecibo (Cambalache) power generating plants from oil to natural gas[86]—at $450 million, $74 million of which would be used to build the pipeline itself.  The project anticipated savings of more than $1 billion annually in energy costs for Puerto Rico.[87]  Funding for the project was to come from a $50 million term loan facility from FirstBank Puerto Rico,[88] and from a portion of the $255,730,000 PREPA Series EEE (Issuer Subsidy Build America Bonds), issued December 24, 2010.[89]  The pipeline was initially estimated to be completed by the end of 2011, although this estimate was repeatedly pushed back due to delays in the permitting process.[90]

The pipeline faced opposition from the PPD (then the opposition party), the EPA, the US Fish and Wildlife Service, members of Congress, and from various environmentalist groups.

---

[82] P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplementary Schedules for Years Ended June 30, 2009 and 2008*, 66 (Dec. 30, 2009).

[83] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 45 (2010).

[84] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2012 A*, 59 (2012).

[85] P.R. Elec. Power. Auth., *Financial Statements, Required Supplementary Information and Supplementary Schedules for Years Ended June 30, 2010 and 2009*, 6 (Jan. 31, 2011).

[86] Of those generation plants, only Costa Sur's units 5 and 6 had been converted to full natural gas firing as of 2013.  *See* URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 14 (2013).

[87] P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplementary Schedules for Years Ended June 30, 2010 and 2009*, 6 (Jan. 31, 2011); P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 35 (2010).

[88] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 67 (2010).

[89] The estimated sources and use of funds in the Official Statement for the Series EEE bonds earmarks $284,466,001.56 of the bond proceeds for "deposit to construction fund." We believe that funding for *Vía Verde*'s construction (a stated use) would have come from this allocation.  *See* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 8 (2010).

[90] *See* P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplementary Schedules for Years Ended June 30, 2010 and 2009*, 6 (2011).  *See also* Lizette Alvarez, *Puerto Rico's Plan for Gas Pipeline Has Many Critics*, N.Y. Times (Oct. 21, 2011), https://www.nytimes.com/2011/10/22/us/puerto-ricos-plan-for-gas-pipeline-has-many-critics.html.  PREPA was required to get USACE approval before beginning construction.  As of October 2011, construction had not yet started.

These groups variously asserted that the pipeline posed potential environmental dangers, as well as safety and financial concerns.[91]  On October 11, 2012, PREPA withdrew *Vía Verde's* complete permit application from consideration by the U.S. Army Corps of Engineers.[92]  By that time, PREPA had raised $355,730,000 in proceeds from bond issuances for a project that never broke ground.  A discussion of the use of these proceeds can be found in Part V.B.

Ultimately, the influence of Puerto Rico's political system on PREPA not only crippled the conversion efforts and prolonged reliance on oil, but also resulted in wasted time, effort, and funds, exacerbating PREPA's already significant debts.

### (c)      Energy Theft and Politically Sanctioned Subsidies Reduced PREPA's Collected Revenues

PREPA also has a long-lived and well-documented problem with non-payment of receivables by its customers, either as a result of energy theft, or of government-sanctioned subsidies from PREPA to the municipalities, as explained in more detail below.  In its most recent audited financial statements for the fiscal year ending June 30, 2015, PREPA's total accounts receivable were estimated at $2.14 billion, of $3.87 billion in total operating revenues.[93]  Of that $2.14 billion, accounts receivable from residential, industrial, and commercial customers totaled approximately $852 million.[94]  In 2014, FTI estimated that over half of PREPA's accounts receivable were more than 120 days past due, a number that has risen steadily since 2012.[95]

The evidence we reviewed, including many publicly-available reports from during the Relevant Period, demonstrates that PREPA's failure to adequately collect its fees eroded the Authority's ability to operate on what it charged for electricity, making it increasingly dependent on bond issuances to fund its operations and long term capital improvements.  Additionally, as discussed in Part V.A.3.(a).(iii).B, which addresses PREPA's Debt Coverage Requirement, PREPA's non-collection of revenues not only affects its bottom line, but also its ability to issue debt.

---

[91] Greg Allen & Marisa Peñaloza, *Puerto Rican Governor Faces Opposition to Pipeline*, NPR (Aug. 25, 2011), https://www.npr.org/2011/08/25/139801215/puerto-rican-governor-faces-opposition-to-pipeline; Lizette Alvarez, *Puerto Rico's Plan for Gas Pipeline Has Many Critics*, N.Y. Times (Oct. 21, 2011), https://www.nytimes.com/2011/10/22/us/puerto-ricos-plan-for-gas-pipeline-has-many-critics.html;   Nat'l Geographic, *How Green Is Puerto Rico's Vía Verde?* (Nov. 21, 2011), https://www.nationalgeographic.com/environment/great-energy-challenge/2011/how-green-is-puerto-ricos-via-verde/.

[92] Nancy J. Sticht, *Busy Year for Nation's Largest Regulatory Permitting Program*, U.S. Army Corps of Eng'rs (Jan. 10, 2013), http://www.saj.usace.army.mil/Media/News-Stories/Article/479590/busy-year-for-nations-largest-regulatory-permitting-program/.

[93] P. R. Elec. Power Auth., *Audited Financial Statements for Year Ending June 30, 2015*, 22 (April 20, 2018) (on file with author).

[94] P. R. Elec. Power Auth., *Audited Financial Statements for Year Ending June 30, 2015*, 40 (April 20, 2018) (on file with author).

[95] FTI Capital Advisors, *Accounts Receivable and CILT Report*, 19 (2014).

The Independent Investigator's Final Investigative Report

### (i)   <u>Energy Theft and Related Concerns</u>

Much of PREPA's outstanding account receivables amongst its residential, industrial, and commercial customers can be attributed to energy theft, as well as errors in billing emanating from an estimation-based invoicing system. In the past, PREPA often estimated customers' power consumption because it did not have sufficient meters across its entire system to accurately measure each customer's actual usage.[96] According to PREPA witnesses, this may have resulted in customers paying for less than their actual usage—sometimes on purpose, and sometimes because of faulty or absent equipment.

In addition, PREPA has suffered from electricity theft through meter tampering, which, in 2013, the Consulting Engineer described as "occurring across client classes, throughout the Commonwealth and ha[ving] been identified as having a material impact on the Authority's operations."[97]

The Authority has implemented various theft prevention programs in recent years, including using anti-tampering meters, installing "smart-grid" remote meters that allow for remote connection and disconnection of electric service and prevent reliance on estimates for charge-purposes, and creating a data map comparing historical electricity usage to a client's present usage.[98] In 2013, PREPA projected that it would recover $30 million in lost revenue every year from 2014 through 2018, as a result of these programs.[99] That, unfortunately, was a gross overestimate of the programs' effectiveness. During FY 2013, only $5 million of the $19.1 million in theft-related billings identified were successfully collected.[100] Nonetheless, in its 2013 bond offering documents, PREPA included the $30 million estimate in its net revenues and debt coverage calculations.[101]

### (ii)   <u>Mandated Subsidies and Contribution-In-Lieu-Of-Taxes</u>

While PREPA receives tax exemptions, these are exceeded by statutorily-required pay-outs to municipalities, ranging between 11 and 20%. This deficit is compounded both by PREPA's failure to collect tax revenues and willingness to pay inflated fuel costs.

PREPA enjoys a tax exemption as to certain revenues, but it comes with conditions. . . Specifically, by statute, PREPA is exempt from paying "taxes or assessments on any property acquired by it or under its jurisdiction, control, possession, or supervision, or on its activities in the operation and maintenance of any undertaking; or on the income derived from any of its

---

[96] Motion to Allow Compliance, Attachment B, J Schedules: Electric Service Rates, 43, *In re Review of Rates of the P.R. Power Auth.*, No. CEPR-AP-2015-0001 (P.R. Energy Comm. May 27, 2016).

[97] URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 95 (2013).

[98] URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 48 (2013).

[99] *See* URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 95 (2013).

[100] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 10 (2013).

[101] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 64 (2013).

undertakings or activities."[102]  In exchange, the Authority is required to "devote a sum equal to eleven percent (11%) of its gross income, derived from the sale of electric power to consumers as a contribution from the current fiscal year,"[103] to cover the costs of price subsidies to its consumers, including the current residential subsidy.[104]  From what remains of that total 11%, after deducting subsidies and grants, and in order to offset the tax revenues lost by municipalities through PREPA's exemption, PREPA is required to "distribute twenty percent (20%)… or a sum equal to the actual electric power consumption of each municipality or the average paid by the Authority as contribution in lieu of taxes to the municipalities, in the five fiscal years preceding the fiscal year in which the corresponding payment of the contribution in lieu of taxes is made, whichever of the three (3) sums is higher."[105]  This admittedly complicated framework results in municipalities receiving contributions in lieu of taxes, or "CILT."

The total CILT is apportioned amongst the municipalities "in proportion to the electric power billing for public lighting and public facilities of each municipality during said fiscal year."[106]  In short, in lieu of receiving revenue from property taxes paid by PREPA for its properties in a given municipality, that municipality's total power costs (i.e., for the electricity needed to power municipal buildings) are lowered by what the total amount of property tax would have been, plus an even larger amount being received the more energy the municipalities use.

However, PREPA has for years failed to properly collect the revenues stemming from municipal power usage, resulting in nearly $420 million in outstanding accounts receivable from municipalities.[107]  In a privileged and confidential 2011 presentation to GDB, professional services firm Alvarez & Marsal found that instead of collecting the revenues from power consumed by municipalities and then paying back the CILT, as is required by law,[108] PREPA "offsets accounts receivables with the amount of the CILT and never collects on invoices sent,"[109] resulting in uncollected revenues that amount to "17-20% of PREPA's total produced electricity."[110]  There is also evidence that many municipalities applied the CILT provision to provide power to municipally owned, for-profit businesses located in municipal buildings that, as a result, provided revenues to the municipalities without having to pay power expenses.[111]  A 2016 *New York Times*

---

[102] P.R. Laws Ann. tit. 22, § 212 (2018).

[103] P.R. Laws Ann. tit. 22, § 212(b) (2018).

[104] P.R. Laws Ann. tit. 22, § 212(b)(2) (2018).

[105] P.R. Laws Ann. tit. 22, § 212(b)(2) (2018).

[106] P.R. Laws Ann. tit. 22, § 212(b)(2) (2018).

[107] As of June 30, 2014. *See* FTI Capital Advisors, *Accounts Receivable and CILT Report*, 19 (2014).

[108] P.R. Laws Ann. tit. 22 § 212(b)(2) (2018).

[109] Alvarez & Marsal, *Presentation to the Government Development Bank of Puerto Rico*, 38 (2012) (on file with author).

[110] Memorandum from Subcomm. on Energy and Minerals Staff (x5-9297) to Subcomm. on Energy and Minerals Members,  Oversight Hearing on Exploring Energy Challenges and Opportunities Facing Puerto Rico, 4 (Jan. 11, 2016) (quoting Alvarez & Marsal, Presentation to the Government Development Bank of Puerto Rico, 39 (2012) (on file with author)). The Alvarez & Marsal report became public at least as early as 2014. *See*  Luciana Lopez, *RPT-INSIGHT-Puerto Rico Keeps the Lights On, But Debt Crisis Far From Over*, Reuters (Aug. 15, 2014).

[111] FTI Capital Advisors, *Accounts Receivable and CILT Report*, 20 (2014).

article cited an ice-skating rink and a water park in Aguadilla as examples of municipal-owned, for-profit businesses that received free electricity from PREPA during the Relevant Period.[112]

As previously mentioned, PREPA's rates include a built-in 11% markup on fuel and purchased power revenue that is meant to, at least in part, recover CILT revenues.  However, this markup adds to PREPA's reliance on higher fuel costs as a main manner of increasing its revenues. According to the Alvarez & Marsal report, as actual CILT charges have typically been less than the 11% markup, "PREPA benefits financially when fuel costs increase and fares worse when those costs decline" and "is even further disincentivized to invest in projects that would reduce fuel costs (such as the natural gas plan) as it incurs additional operating and capital costs with no compensation in base rates and loses 11% for every dollar fuel or purchased power costs are reduced."[113]

In addition to the CILTs, in 2014 FTI Capital Advisors estimated that PREPA had an additional $200 million in outstanding accounts receivable from other Puerto Rico-Related Entities, like PRASA.[114]  The consultant estimated that this failure to collect cost PREPA an additional $2.5 million in accounts receivable every month.[115]

### 3.　　PREPA's Bond Issuances

#### (a)　　PREPA's Bond Issuance Process

PREPA's bond issuance process is governed by and must comply with the requirements of both the PREPA Act and a Trust Agreement, dated January 1, 1974 (the "<u>PREPA Trust Agreement</u>").  The PREPA Trust Agreement sets forth the types of bonds PREPA can issue, the role of the trustee, the role of the Consulting Engineer, and PREPA's debt coverage requirements. Pursuant to the PREPA Act, PREPA's Board has authority to approve the bond issuances.  As discussed in Part V.B, in practice, GDB, in its capacity as fiscal agent, oversees the entire bond issuance process, and the GDB Board must approve each issuance, including the selection of underwriters.

##### (i)　　Types of Bonds

Section 6 of the PREPA Act broadly permits PREPA to "make and issue bonds . . . for any of its corporate purposes" and "for the purpose of funding, refunding, purchasing, paying, or discharging any of the outstanding bonds or obligations issued or assumed by it or any bonds or obligations the principal or interest of which is payable in whole or in part from its revenues."[116]

---

[112] Mary Williams Walsh, *How Free Electricity Helped Dig $9 Billion Hole in Puerto Rico,* N.Y. Times (Feb. 1, 2016), https://www.nytimes.com/2016/02/02/business/dealbook/puerto-rico-power-authoritys-debt-is-rooted-in-free-electricity.html?login=email&auth=login-email.

[113] Alvarez & Marsal, *Presentation to the Government Development Bank of Puerto Rico*, 40 (2012) (on file with author).

[114] PRASA, which by law is subject to a preferential rate of 22 cents per kWh for all of its accounts at PREPA, owed $29 million in accounts receivables as of September 2014.  *See* FTI Capital Advisors, *Accounts Receivable and CILT Report*, 16 (2014).

[115] FTI Capital Advisors, *Accounts Receivable and CILT Report*, 16 (2014).

[116] P.R. Laws Ann. tit. 22, §§ 196(o)-(p) (2018).

The Independent Investigator's Final Investigative Report

The PREPA Act neither defines nor limits what activities fall under those designed to advance "corporate purposes."  Nor are any bond issuance purposes expressly prohibited by the Act. Section 16 of the PREPA Act further details the procedures PREPA should follow to issue bonds and the calculation for the maximum amount of bonds permitted to be issued at a time.  It also explicitly establishes that the debts of PREPA are not to be considered debts of Puerto Rico (a source of controversy addressed in Part IX.B.1 of this Report).[117]

Figure V.B shows the steps that must be taken in order for PREPA to issue bonds.

**Figure V.B: PREPA's Bond Issuance Process**



(ii)     **The Trustee**

PREPA's Bond Trustee is responsible for representing the interests of the bondholders and enforcing the terms of the Trust Agreement.[118]  The Trustee also acts a custodian for the bond

---

[117] P.R. Laws Ann. tit. 22, § 193(b) (2018).
[118] *See* Mun. Sec. Rulemaking Board, *Glossary of Municipal Security Terms: Trustee*, http://www.msrb.org/glossary/definition/trustee.aspx (last visited Aug. 16, 2018).

proceeds and is responsible to confirm sources of revenues for the bonds, debt service requirements, and the flow of funds of bond proceeds.

The Trustee's responsibilities generally include:

- Paying interest on the bonds to bondholders by the interest payment date;[119]
- Authenticating and delivering the bonds;[120]
- Receiving materials submitted by PREPA in regards to the bonds, including certificates, bond resolutions, and Consulting Engineer letters;[121]
- Approving the Consulting Engineer firm chosen by Executive Director;[122]
- Approving the CPA firm chosen for yearly audit by Executive Director;[123] and
- Managing the accounts into which bond proceeds are deposited.[124]

The various trust accounts are discussed later in Part V.A.3.(a).(iv).

### (iii)    The Consulting Engineer

PREPA's Trust Agreement requires PREPA to employ a Consulting Engineer to serve as an independent, technical advisor, to approve certain bond proceeds uses and budgetary outcomes.[125]   In other words, the Consulting Engineer was responsible for representing to the Trustee and to the public two primary points: (i) the condition of PREPA's systems; and (ii) whether PREPA's rates and revenue would be sufficient to satisfy the rate covenant under the Trust Agreement.  The Consulting Engineer made these representations in Annual Reports to the Trustee, which were then incorporated by reference into PREPA's Official Statements, as well as in certifications and letters made in connection with specific PREPA bond issuances.

Notably, during the Relevant Period, the same team of engineers acted as PREPA's Consulting Engineer for these purposes.  As part of our investigation, we reviewed the Consulting Engineer's Annual Reports from 2009 to 2013 and various certifications, as well as sat down with two witnesses from the Consulting Engineer.

---

[119] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 203 (Aug. 1, 2011) (on file with author).

[120] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 204 (Aug. 1, 2011) (on file with author).

[121] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 208(a)–(e), 209(a)–(e), 210(a)–(d) (Aug. 1, 2011) (on file with author).

[122] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 706 (Aug. 1, 2011) (on file with author).

[123] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 710 (Aug. 1, 2011) (on file with author).

[124] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 208–10, 506–10 (Aug. 1, 2011) (on file with author).

[125] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 706 (Aug. 1, 2011) (on file with author).

The Independent Investigator's Final Investigative Report

From 2009 to 2013, the Consulting Engineer's Annual Reports, which are incorporated by reference into PREPA's Official Statements, each contained the following unequivocal statements:

- "In the opinion of the Consulting Engineers, the properties of the System are in good repair and sound operating condition."[126]

- "The Consulting Engineers believes the Authority will receive sufficient revenues in [this] fiscal year [] with the existing rates to cover current expenses, to make all required deposits in accordance with the 1974 Agreement's dictates and to exceed its 120% debt service coverage requirement."[127]

## A.    Condition of the Systems

To assess the condition of the system, a witness from the Consulting Engineer told us that the team would inspect, randomly and unannounced, a third of PREPA's transmission and distribution facilities each year, with the goal of having inspected all of the transmission and distribution facilities every three years.  The team inspected the generation plants three to seven times per year, depending on the type of facility.  The team also met with the directors of each facility.  When equipment needed repair, the Consulting Engineer reviewed vendor reports of repairs when they could not visit the facility.  Before issuing the Annual Report, the Consulting Engineer would present its findings to PREPA's directors to verify its accuracy before publication.

When asked about the state of PREPA's system, the Consulting Engineer witness told us that when it opined on the condition of PREPA's system was "in good repair and sound operating condition," it was always in the context of considering the system's age.  The Annual Reports, however, never included qualifying language to that effect.  Also, the witness also noted that PREPA simply did not have the funds to retire old facilities and build new ones.

## B.    Sufficiency of PREPA's Rates and Revenues

Under the PREPA Trust Agreement, in order to issue bonds and while any bonds remain outstanding, PREPA is obligated to "fix, charge, and collect reasonable rates and charges so that revenues [would] be sufficient to pay [then and future] current expenses and to provide an amount of at least 120% of the aggregate principal and interest requirements for the [then] next fiscal year."[128]  This is what is known as the "debt coverage requirement."  The calculation is supposed

---

[126] *See, e.g.*, P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplemental Schedules*, 50 (2011).

[127] URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 3 (2013); URS Corp., *Thirty-Ninth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 3 (2012); URS Corp., *Thirty-Eighth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 3 (2011); URS Corp., *Thirty-Seventh Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 2 (2010);  URS Corp., *Thirty-Sixth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 3 (2009).

[128] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 13 (2013); Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 208(e), 502(A)(b) (Aug. 1, 2011) (on file with author).

to give comfort to the Trustee and bondholders that PREPA's revenues are sufficient to cover its operating expenses, as well as upcoming payments on its debt service.

During the Relevant Period, whenever PREPA issued a bond, PREPA's Executive Director and Consulting Engineer had to calculate whether PREPA's net revenues satisfied its debt coverage requirement, and to submit a certificate along with the Official Statement attesting to the fact that PREPA was able to meet the debt service requirement.[129]

As noted, year after year, the Consulting Engineer signed such debt service certifications. The evidence we have gathered demonstrates that these certifications, however, were based on calculations that included, as discussed in Parts V.A.2.(c), revenues PREPA never collected.  For instance, in its 2013 Annual Report, the Consulting Engineer stated that the debt service calculation used a particular revenue formula, despite knowing that 25% of it was comprised of CILTs PREPA did not collect.[130]  There is evidence that GDB knew by 2012, at the very latest, that if PREPA had used a revenue figure that accurately reflected the amount of revenues it expected to, and did, collect, then PREPA would not be able to satisfy the required debt coverage needed to issue the Series 2013A Power Revenue Bonds.[131]  Despite this, both PREPA and PREPA's Consulting Engineer signed off on the debt coverage calculations with the arguably inflated revenue figures and represented, albeit with qualifications, that the debt coverage met the requirements under the PREPA Trust Agreement.

Additionally, as discussed in Part XVI.C.5.(a).(ii), there also is evidence that PREPA overestimated its revenues in connection with the Series 2013A Power Revenue Bonds by an additional $25 million when it was overly optimistic in the success of its theft prevention programs. Specifically, for fiscal years 2014 through 2018, PREPA projected that, through these theft prevention programs, it would recover $30 million in lost revenue every year.[132]  In the Official Statement for the Series 2013A Power Revenue Bonds, PREPA included the estimated $30 million per year in additional revenues due to theft prevention in its debt coverage calculation.[133]  During FY 2013, however, only $5 million of theft-related accounts receivable were successfully collected.[134]

---

[129] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 209(1.2) (Aug. 1, 2011) (on file with author).

[130] *See* URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 80 (2013). *See also* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 4 (2013) ("For purposes of the Trust Agreement, the Authority includes in its calculation of Revenues and Net Revenues . . . amounts billed to the municipalities for electric energy sales that the Authority is legally entitled to collect but historically has not collected because it instead offsets such billings against the CILT hat the Authority is requirement by law to pay the municipalities . . .").

[131] Specially, according to a June 2012 presentation commission by GDB, if CILT had not been included in PREPA's revenues, then PREPA's debt coverage ratio for 2013 would have been only 1.06—below the amount required to issue the Series 2013A Power Revenue Bonds.  Alvarez & Marsal, *Presentation to the Government Development Bank of Puerto Rico*, 49 (2012) (on file with author).

[132] *See* URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority*, 95 (2013).

[133] *See* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 64 n.3 (2013).

[134] *See* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 10 (2013).

Specifically, in connection with the issuance of the debt service certificate, the former Project Manager from PREPA's Consulting Engineer told us that the Consulting Engineer based its certificate on figures provided to it by PREPA.  This witness also stated, however, that the Consulting Engineer relied upon these figures without reviewing any of PREPA's unaudited financials to confirm the veracity of the figures underlying the calculations.  According to the witness, the certification letters were meant to certify that the revenue figure provided by PREPA was sufficient based on PREPA's anticipated expenses, but not that the revenue figure itself was accurate.[135]  The Consulting Engineer's written Annual Reports and certifications made in connection with the bonds issuances did not contain a disclosure to that effect.

Today, there is a consensus among PREPA's outside professionals—and PREPA, itself—that PREPA's rates were insufficient to cover its operating expenses.[136]  Indeed, in April 2017, PREPA admitted that, from 2011 to 2016, its rates were insufficient to cover overhead and operational costs:  "The current debt crisis was founded in years of rate deficits, during which operating expenses incurred were not recovered in rate Revenues."[137]

### (iv)    The Trust Accounts and Flow of Bond Proceeds

The Trust Agreement established about a dozen different accounts to be held in trust by either PREPA or the Trustee, and it dictates the order and size of the deposit of any bond funds and Authority revenues into them.[138]  Figure V.C depicts these funds and the allocation of bond proceeds into each.  For the purposes of our investigation, we focused on five accounts that hold bond proceeds, funds for interest payments, and other funds earmarked for maintenance and capital improvements: the Construction Fund, the Sinking Fund, the Reserve Maintenance Fund, Self-insurance Fund, and Capital Improvement Fund.

---

[135] Similarly, witnesses from GDB and various investment banks that underwrote PREPA bonds told us that the underwriters accepted PREPA's debt service calculations without conducting any of their own due diligence into the veracity of those figures.

[136] *See Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on Natural Resources,* 114th Cong., 2 (2016) (statement of former Chief Restructuring Officer of PREPA); P.R. Elec. Power Auth., *Fiscal Plan*, 15 (2017).

[137] *See* P.R. Elec. Power Auth., *Fiscal Plan*, 15 (2017).

[138] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc., Articles 4–5 (Aug. 1, 2011) (on file with author).

**Figure V.C: Disposition of Bond Proceeds for PREPA**



- The Construction Fund (the "<u>Construction Fund</u>") holds "the proceeds of any bonds issued for the purpose of paying the cost of Improvements" to PREPA's system.[139] This would include, for example, proceeds from PREPA's Power Revenue Bonds Series EEE (issued December 24, 2010), which were issued in part to fund the construction of the *Vía Verde* pipeline (discussed further in Part V.A.2.(b).(ii).B) and which included a deposit of almost $284.5 million into the Construction Fund as a stated use of proceeds in its official statement.[140]  In the case of *Vía Verde*, under the Trust Agreement the proceeds deposited in the Construction Fund could then be used to pay any costs related to the pipeline's construction, including labor, purchasing materials and land on which to build the pipeline, and paying for an architect or engineer, as well as general administration costs related to the project and paying interest on the original bonds.  As discussed in Part V.B.2, Duff & Phelps' analysis of PREPA's use of proceeds found that amount of bond proceeds in 2010–2013 earmarked for the Construction Fund exceed, by approximately $430 million, PREPA's reported uses of funds for infrastructure and capital improvement projects and changes in restricted cash accounts for such uses.

---

[139] *See* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2012A, Power Revenue Refunding Bonds, Series 2012B*, I-14 (2012).

[140] *See* P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 8 (2010).

The Independent Investigator's Final Investigative Report

- The Sinking Fund (the "Sinking Fund") holds all funds necessary for paying the interest on the Authority's bonds[141] and, as such, is one of the first places bond proceeds are deposited under the Authority's disposition of revenues (see Figure V.C).[142] Composed of three sub-accounts—the Bond Service Account, the Redemption Account, and the Reserve Account[143]—it is entirely under the control of the Trustee, who holds its revenues in trust and disburses them for their proper uses.[144] It is these accounts which are directly beholden to PREPA's 120% net revenues debt service covenant, [145] and the Trustee's control of these accounts means that it is in the best position to: (1) act as a check against any potential fraud or misuse of funds resulting from the bond issuances; and (2) ensure that PREPA has enough cash on hand to pay down its debt. Nevertheless, as we will discuss, PREPA not only chronically failed to ensure that it met its required debt coverage ratio, but also, through the (technically permissible) inclusion of uncollected revenues as part of its net revenues in its debt coverage calculations, inflated its debt coverage ratio, gave the appearance that it had the financial liquidity to support further bond issuances when almost certainly, as the ultimate insolvency of the Authority shows, it did not.

- The Reserve Maintenance Fund (the "Reserve Maintenance Fund") and Self-Insurance Fund (the "Self-Insurance Fund") are entirely dedicated to paying the costs of any repairs, maintenance, or other extraordinary expenses incurred as a result of unexpected events, such as hurricanes, mudslides, or other natural disasters, which are not covered by insurance.[146] Recommendations as to the size of deposits into the funds are made by the Consulting Engineer[147] and, in the case of the Self-Insurance Fund, money cannot be removed by the Authority without the Consulting Engineer's direct approval.[148] According to a witness from the former Consulting Engineer, there was tension between the Consulting Engineer and PREPA over the amount of funds that should be kept in the Self-Insurance Fund. The Consulting Engineer witness told us

---

[141] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 507 (Aug. 1, 2011) (on file with author).

[142] See P.R. Elec. Power. Auth., Official Statement for Power Revenue Bonds, Series 2013A, I-8–I-9 (2013).

[143] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 507 (Aug. 1, 2011) (on file with author).

[144] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 513 (Aug. 1, 2011) (on file with author).

[145] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 502 (Aug. 1, 2011) (on file with author) ("the Authority further covenants that it will at all times find, charge and collect reasonable rates and charges […] [and] will adjust such rates and charges so that Revenues will at all times be sufficient […] to provide an amount at least equal to one hundred twenty per centum (120%) of the aggregate Principal and Interest Requirements for the next fiscal year on account of all the bonds then outstanding under this Agreement, reduced by any amount deposited to the credit of the Bond Service Account from the proceeds of bonds to pay interest to accrue thereon in such fiscal year.").

[146] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 507(f)–(e) (Aug. 1, 2011) (on file with author).

[147] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 507(f)–(e) (Aug. 1, 2011) (on file with author).

[148] Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 512(A) (Aug. 1, 2011) (on file with author).

that it always recommended there be at least $100 million in both funds in order to provide a dedicated source of funds in the event of a natural disaster, but that PREPA frequently sought to reduce that amount.

- The Capital Improvement Fund (the "Capital Improvement Fund") is a fund used to "pay the cost of anticipated extensions and Improvements of the System the cost of which has not otherwise been provided for from the proceeds of bonds."[149]   The Consulting Engineer witness told us that the Capital Improvement Fund was chronically underfunded, with PREPA, at times, contributing only 1 to 2 percent of its net revenues into the Capital Improvement Fund.  Instead, PREPA relied on bond proceeds to fund capital improvements.

### (b)   From 1994 to 2013, PREPA Issued $13.5 Billion in Bonds

From 1994 to 2013, PREPA issued nearly $13.5 billion in debt in the form of Revenue Bonds and Revenue Refunding Bonds (the "PREPA Bonds").  As previously mentioned, as of February 2017, PREPA still had nearly $9 billion in outstanding debt (including total bonds and lines of credit).[150]

During the Relevant Period, PREPA typically issued two types of bonds each year—one for revenue, and one for refunding.  In 2010 alone, however, the Authority issued nearly $3.7 billion in debt over seven issuances, including six Revenue Bonds and one Revenue Refunding Bond.  Only two of those bond issuances (the Power Revenue Bonds Series YY and Power Revenue Bonds Series EEE Issuer Subsidy Build America Bonds) were dedicated toward PREPA's capital improvement program.  The rest of the bond proceeds from the 2010 issuances were largely used to pay down existing lines of credit to GDB and private entities.  As a result, the Authority's bonds proceeds have gone toward financing the maintenance, improvement, and expansion of the power grid (See Figure V.D for a breakdown of uses of bond proceeds for 2010–2013).

---

[149] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2012A*, 35 (2012).

[150] Gov't of P.R., P.R. Fiscal Agency and Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

The Independent Investigator's Final Investigative Report

**Figure V.D: Stated Use of Bond Proceeds for Bonds Issued 2010–2013, in %**



*Note sum of components may not equal 100% due to independent rounding

By February 2018, PREPA had almost $9 billion of outstanding debt,[151] or 230% of its revenue in 2015, the most recent year for which data was available.[152]

## B.   PREPA Use of Proceeds Analysis

As previously discussed in this Part, Puerto Rico's Public Utilities, despite having dedicated revenue sources for the funding of operations, amassed significant debt through bond issuances, private loans, and GDB loans. The Public Utilities told the market in their Official Statements they would use proceeds from issuing that debt for capital improvement projects, the refinancing of prior debt, operational costs (like buying fuel), and payment of pension fund obligations.[153]

---

[151] Gov't of P.R., P.R. Fiscal Agency and Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

[152] P.R. Elec. Power Auth., *Financial Statements, Required Supplementary Information and Supplemental Schedules for Year Ending June 30, 2015*, 9 (Apr. 20, 2018).

[153] P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds)*, 8 (2010); P.R. Aqueduct and Sewer Auth*., Official Statement for Revenue Bonds, Series*

The Independent Investigator's Final Investigative Report

PREPA, in particular, has come under scrutiny from both US and Puerto Rico governments, as well as the public at-large, because of the large amount it borrowed, the long-standing high cost of energy on the island, and the poor operational state of Puerto Rico's electrical grid, as evidenced by the aftermath of Hurricanes Irma and Maria.[154]  We also gathered evidence from witnesses at GDB[155] and the underwriters that, once PREPA issued its bonds, neither GDB nor the underwriters monitored PREPA's actual use of proceeds.  Under these circumstances, and given that PREPA's outstanding debt is approximately $9 billion,[156] it is natural to question how PREPA used the proceeds of bond issuances.

Against this backdrop and in consultation with the Special Investigation Committee, we determined that it would further the goals of the investigation to pursue an independent analysis of PREPA's use of bond proceeds.  We engaged the financial advisory firm Duff & Phelps to perform an analysis of PREPA's use of proceeds, under our direction, using information we obtained during our investigation.  This analysis focused on PREPA's use of the proceeds of bonds issued between March 2010 and August 2013 (when PREPA made its last public debt issuance), and examined the use of those proceeds in the period from fiscal years 2010 through 2015 (the "Subject Period").

During the Subject Period, as reflected in Appendix B.1, PREPA raised debt through ten different public bond issuances (including eight in 2010 alone) in the aggregate principal amount of approximately $4.43 billion.  That, coupled with additional bond-related sources of funds, resulted in available proceeds of approximately $4.72 billion.  Of that amount, and as reflected in Figure V.D, approximately $1.31 billion (about 28% of the total) was earmarked for deposit to the "Construction Fund," which is the fund designated for use to build and improve infrastructure and capital projects—such as new pipeline projects or repairs to existing pipelines.  The offering documents reflect that, of the remaining $3.41 billion, PREPA designated approximately $1.24 billion of proceeds to repay lines of credit, $1.33 billion for repayment of other debt (including bonds, bond anticipation notes, and payments into an escrow fund for refunded bonds), and $841 million for miscellaneous purposes.

---

*2012B (Senior Lien)*, 13 (2012); P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B (Guaranteed by the Commonwealth of Puerto Rico)*, 43 (2008).

[154] The US House Committee on Natural Resources, in particular, has held several oversight hearings regarding the management and operations of PREPA.  *See Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on Natural Resources,* 114th Cong., 2 (2016) (statement of former Chief Restructuring Officer of PREPA); *Management Crisis at the Puerto Rico Electric Power Authority and Implications for Recovery: Hearing Before the H. Comm. on Natural Resources*, 115th Cong. (2018) (Hearing Memorandum of the Majority Committee Staff); *see also* Commonwealth of P.R. House of Representatives, H.R. Res. 1049, 17th Legis. Assemb. 5th Sess., 1–2 (2015) (an investigation into the operational energy expense of various industries, small and medium business on the island, energy alternatives, the decision making and financial management of PREPA, and analysis of the liquidity and financial claims of bondholders); P.R. Commission for the Comprehensive Audit of the Public Credit, *Pre-audit Survey Report*, 35 (2016) (investigating PREPA's Series 2013A Power Revenue Bonds).

[155] For further discussion of this topic as it relates to GDB, *see* Part IV.B.5.

[156] *See* Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 26 (2017).

The Independent Investigator's Final Investigative Report

## 1.    Overview of D&P Analysis and Methodology

We sought to understand whether it could be determined how much of the $1.3 billion in bond proceeds allocated to the Construction Fund during the Subject Period were reportedly used for investment in infrastructure and capital improvement projects.  To assist us with that inquiry, D&P performed an analysis focused on reconciling the proposed sources and uses of PREPA bond proceeds with funds allocated to construction activity for infrastructure and capital improvements ("Construction Use") as well as changes in restricted cash balances (described further below).

To facilitate that analysis, we provided to D&P information we obtained through GDB, PREPA, PREPA's external auditors and PREPA's banking institutions.  That information included certain bond transaction documents, bank records, internal accounting files, external audit work product, and other sources of information.

In reviewing this information, D&P observed that PREPA held certain cash receipts as "restricted cash."  In this context, restricted cash means certain cash accounts that PREPA's accounting records identified as designated for limited use, specifically costs associated with Construction Use.  Consequently, bond proceeds that PREPA earmarked for Construction Use should remain segregated from PREPA's general operating funds until construction costs were funded.  If restricted cash balances decreased and no "Additions" (defined below) were funded, then it is possible that PREPA expended restricted cash held for Construction Use for a different purpose.

D&P then assessed whether the bond proceeds in the Subject Period earmarked for the Construction Fund matched the books and records provided by PREPA and its auditor regarding "Additions" to infrastructure and changes in restricted cash account balances.  "Additions" are the annual increases in the general ledger category[157]—referred to as "Utility Plant in Service"—that PREPA uses to describe its generation, transmission and distribution resources and other charges.[158]  In principle, funds allocated for infrastructure and capital improvements should be traceable to Construction Use and the changes in any restricted cash account holding such funds. If there is a discrepancy between those numbers, it may suggest that proceeds earmarked for the Construction Fund were instead expended for non-Construction Use.

D&P reviewed the Additions to Utility Plant in Service (the accounting term used by PREPA for utility generation, transmission and generation resources) over the fiscal period 2010 to 2015 ("Utility Plant Additions").  D&P further assessed the net change in restricted cash balances over each fiscal year in the Subject Period.  D&P sourced PREPA's restricted cash

---

[157] General ledger category refers to that part of PREPA's permanent record keeping system where PREPA maintains business and transactional information about its assets, liabilities, equity, revenues and expenses.
[158] In reviewing certain information about Additions, D&P did not question PREPA's decisions about the type or validity of costs capitalized as Additions.  Ordinarily, according to D&P, on-site and direct labor costs are capitalized as a component of infrastructure and construction activities.  D&P reports that nothing came to its attention, based on the information reviewed, to suggest that on-site labor costs were not capitalized as Additions.

information from Puerto Rico's CAFRs.[159]  Historically, PREPA has not published a standalone financial statement.

D&P then compared the Utility Plant Additions and Adjustments to Changes in Utility Plant in Service (as discussed below) and net changes in the restricted cash balances to the funds designated by PREPA's bond offerings as earmarked for Construction Use in the Subject Period. This methodology is illustrated below:[160]

(Utility Plant Additions — Adjustments to Change in Utility Plant in Service)

+                          Net Change in Restricted Cash

─────────────────────────────────────────────────────────

=           Bond Proceeds transferred into Construction or Restricted Accounts

As further described below, D&P's analysis led it to make a preliminary finding, based on certain assumptions described below and as supported in the attached appendices, that in the five-year period from June 30, 2010 through June 30, 2015, the amount of bond proceeds earmarked for the Construction Fund exceeded the value of Utility Plant Additions after Adjustments and the net change in the reported value of PREPA's restricted cash by approximately $430 million.[161]  To contextualize this figure, we note the difference represents approximately 86% of the $500 million in funds from PREPA's 2013A Power Revenue bond offering that PREPA represented would be allocated to the Construction Fund.[162]  We chose to publish this finding, noting that further analysis by other stakeholders, with mandates different from or broader than ours, could lead to additional, more definitive findings on the subject.

### (a)  Explanation of D&P Analysis

The steps D&P followed to perform the analysis, in accordance with the methodology described above, are as follows:

### (i)  Step One:  Schedule of Sources and Uses of Bond Proceeds

D&P first constructed a schedule of sources and uses of PREPA bond proceeds from March 2010 to August 2013.  D&P also examined uses in fiscal years 2014 and 2015.  As of the date of this report, PREPA has not issued financial statements for periods after June 30, 2015.  The schedule is reflected in Appendix B.1, which summarizes the amount of bond proceeds by issuance and the stated purpose of the proceeds (as described in the relevant official statements) of a "deposit to construction fund" for PREPA.  As shown in Appendix B.1, approximately $1.3 billion

---

[159] Fiscal year 2012 is the last one for which Puerto Rico published a full CAFR.  In later years, Puerto Rico published Basic Financial Statements.  For purposes of this discussion, CAFRs refers to Puerto Rico's annual financial reporting both before and after fiscal year 2012.

[160] An intended infrastructure use is marked as "Deposit to Construction Fund" and other related line items.

[161] D&P reports that its analysis is subject to various factors that may make the specific values cited subject to correction, while still directionally correct.  Those factors could include, but are not limited to, timing issues, informational integrity and data reliability, inaccurate assumptions, and lack of specific relevant information.

[162] See P.R. Elec. Power. Auth., *Official Statement for Power Revenue Bonds, Series 2013A*, 11 (2013).

was earmarked for deposit to the Construction Fund which, as noted previously, is a fund designated under PREPA's Trust Agreement for use to build and improve infrastructure and capital projects.[163]

### (ii)      Step Two:  Prepare a Roll Forward of Capital Expenditures

As a second step, D&P examined certain PREPA financial records and auditor work papers to prepare a "roll forward" of PREPA's capital expenditures (PREPA internally designates capital expenditures as "<u>Additions</u>") in connection with its generation, transmission and distribution assets (referred to as "<u>Utility Plant in Service</u>") for the fiscal years ending June 30, 2010 through 2015. Generally, a roll-forward analysis brings forward prior period information together with current year information seeking both to reconcile changes in relationships and to provide data for comparative and analytical purposes.  D&P used this method to assess, in part, how much in bond proceeds earmarked for the Construction Fund was reported by PREPA as having been expended for Construction Use purposes (reflected as Additions).

According to D&P, Utility Plant in Service represents the primary operating asset class in PREPA's books and records.  D&P did not identify any other significant asset class of a similar nature.  Therefore, D&P proceeded with the assumption that the funds allocated to Utility Plant in Service are a reliable proxy for funds used for capital and project improvements, i.e., Construction Use.  D&P relied on two sources to analyze Utility Plant in Service: the PREPA balance sheets, where those assets were classified as Capital Assets, and the work papers of PREPA's auditor, where those assets were classified as Utility Plant in Service.  A detailed analysis of the roll forward and related calculations including information from both sources is presented at <u>Appendix B.2</u>.[164]

### (iii)      Step Three:  Analyze Adjustments to Change in Utility Plant in Service and "Construction Work on Progress"

As a third step, D&P analyzed the major components comprising Utility Plant Additions. PREPA's books and records include an account titled Construction Work in Progress ("<u>CWIP</u>"), which is a subset of Utility Plant in Service.  The major components of CWIP include accounting entries for undistributed (capitalized) interest expense and overhead costs, reclassifications, and

---

[163] We note that under PREPA's Trust Agreement, funds in the "Construction Fund" are authorized to be used for "Improvements," defined to include "such improvements, renewals and replacements of the System or any part thereof and such extensions and additions thereto as may be necessary or desirable, in the judgment of the Board, to keep the same in proper condition for the safe, efficient and economic operation thereof and to integrate into the System any unit or part thereof."  The Trust Agreement further provides that the cost of Improvements "shall embrace the cost of acquisition or construction and equipment and all other items of cost incident to such acquisition and construction and equipment and the financing thereof."  Trust Agreement P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. §§ 101, 401, 403 (Aug. 1, 2011) (on file with author).  Permitted uses of the Construction Fund under the Trust Agreement may encompass uses beyond Construction Use.  D&P's analysis does not consider whether funds allocated to the Construction Fund were used in accordance with the Trust Agreement.

[164] D&P made estimates for PREPA accumulated depreciation in fiscal year 2010 of $5 billion utilizing a "trend analysis" for years 2011–2015.  D&P has considered this estimate not to be a material factor in the development of information in the Appendices.

contributed capital-plant.  Based on information provided by PREPA's auditor, D&P determined that these type of Additions to CWIP, while appropriate for PREPA's use in maintaining its books and records, did not represent the type of fiscal activities relevant to this analysis.  Specifically, D&P made a determination that fiscal activities related to operating cost allocations, capitalized expenses and third party transaction costs are not activities that fall within Construction Use.

In this manner, D&P sought to isolate and quantify Utility Plant Additions (as adjusted by D&P) representing the expenditure of bond proceeds for each fiscal year specifically earmarked for Construction Use.  The Utility Plant Additions, as adjusted by D&P, are referred to as "Net Additions".  The results of D&P's analysis and the adjustments to Utility Plant Additions are presented at Appendix B.3.[165]

### (iv)    Step Four: Analyze Changes in Restricted Cash

Lastly, D&P analyzed PREPA's restricted cash information as set forth in the CAFRs to determine the balances in and changes to PREPA's restricted cash accounts.  This information is set forth in Appendix B.4.  D&P observed that bond proceeds earmarked for the Construction Fund were deposited in PREPA's restricted cash bank accounts and that the changes in restricted cash accounts on the balance sheet from year to year serve as a proxy for the expenditure of cash by PREPA for Construction Use.[166]

D&P also observed that PREPA's auditor work papers regarding restricted cash account balances relating to the Construction Fund and other special funds for fiscal years ending June 30, 2011 to June 30, 2015 reflect significantly lower balances than PREPA's restricted cash account information set forth in the CAFRs (as shown in Appendix B.4).  Further analysis would be required to reconcile these differences.  D&P determined that the changes in restricted cash balances during the Subject Period were the important figures in measuring PREPA's use of Construction Funds.  Because the overall changes in restricted cash balances measured from both the CAFRs and auditor workpapers were similar (as reflected in Appendix B.4), D&P determined that the differences in restricted cash balances between the CAFR and auditor workpaper balances did not impact the analysis.

### 2.    Summary Results of D&P's Analysis

The summary results of D&P's analysis, subject to the limiting conditions described herein, are that the amount of bond proceeds in the Subject Period earmarked for the Construction Fund exceed, by approximately $430 million, what PREPA reported as Net Additions and changes in ending restricted cash account balances.  The analysis undergirding these findings can be found in Appendix B.5, which reflects, by fiscal year, the amount of proceeds of bond issuances during the Subject Period that PREPA designated for the Construction Fund, contrasted with what D&P

---

[165]   These adjustments were made for the periods June 30, 2012 to 2015, as information regarding fiscal years 2010 and 2011 was not available.

[166]   D&P reported that it did not have access to sufficient information to make a definitive determination that all funds in PREPA's restricted cash bank accounts were, in fact, funds raised from bond offerings that were earmarked for the Construction Fund.  As such, D&P assumed that changes in restricted cash balances relate to the Construction Fund, although additional facts may prove that assumption to be inaccurate.

calculated were Utility Plant Additions (Net Additions), and the changes in ending restricted cash account balances.

Notably, as shown in Appendix B.5, for fiscal years 2010 through 2014, D&P's analysis reflects that bond proceeds earmarked for the Construction Fund appear to be generally consistent with PREPA's actual deployment of those funds for Construction Use over that same period.

During fiscal year 2015, however, there was a significant decrease in the amount of restricted cash held at PREPA based on the information sourced from the CAFRs.[167]  PREPA's fiscal year 2015 records do not reflect a corresponding increase in Utility Plant Additions (or Net Additions as determined by D&P).  D&P observed that, during this period of time, PREPA self-reported experiencing severe liquidity challenges.[168]

We believe this analysis will be of assistance to parties whose particular interests may lead them to pursue further inquiry on the subject of PREPA's use of bond proceeds earmarked for infrastructure and construction projects.  The analysis underscores the importance of transparency in how Puerto Rico and its entities account for and report on the use of bond proceeds.  Transparency gives investors the confidence that money they lend will in fact be used as represented by Puerto Rico debt issuers.  That confidence, in turn, is essential to a borrower's access to the capital markets.  We include recommendations on how to carry forward this sort of transparency in the conclusion of this Part.

## C.   PRASA

PRASA was incorporated on May 1, 1945 from the various water systems that then served the island.  Act 40 of 1945 ("The PRASA Act") transferred "ownership, possession, operation, and development thereby, of all the public aqueduct and sewer systems in Puerto Rico" to this new agency.[169]  It estimates a customer base of over 1.2 million, and, similarly to PREPA, holds an effective monopoly over all water quality, water management, and water supply services in Puerto Rico.[170]  Unlike PREPA, however, PRASA is one of the only Puerto Rico-Related Entities that has yet, as of the date of this report, to default and is still paying the interest on its bonds, having issued over $3.7 billion in debt since 2008 (the "PRASA Bonds").  As of February 2017, PRASA had $4.568 billion in outstanding debt (including private loans).[171]

PRASA's system covers over 3,535 square miles, with 51 wastewater treatment plants, 116 water treatment plants, eight dams, and more than 20,000 miles of water and sewer pipes island

---

[167] D&P relied on the CAFRs as the principal measurement tool for the changes in restricted cash balances as these reports are public records published by the Puerto Rico government.

[168] We note that, in August 2014, PREPA entered into forbearance agreements with its credit agreement lenders that required PREPA to, among other things, report each month on disbursements from the Construction Fund.  *See* Forbearance Agreement by and among P.R. Electric Power Auth. and Citibank, § 4(a)(viii) (Aug. 14, 2014). *See* Forbearance and Amendment Agreement by and among P.R. Electric Power Auth., Scotia Bank De Puerto Rico *et al.*, § 4(a)(viii) (Aug. 14, 2014).

[169] Act of May 1, 1945, No. 40. P.R. Laws Ann. tit. 22, § 140 (2018).

[170] *See* P.R. Aqueducts & Sewer Auth., *Investor's and Financial Information: PRASA, at a glance* (2018), http://www.acueductospr.com/INVESTORS/Investors_ataglance.html.

[171] Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

wide.[172]   The system is split into five regions: North, South, East, West, and the San Juan Metropolitan Area ("Metro" in Figure V.E).

## Figure V.E: Map of PRASA Regions



1. **Prohibitions on Political Behavior for PRASA's Board and Executives Reduced Political Influence on PRASA's Operations, and Allowed for Consistency in Management and Vision**

PRASA's current administrative hierarchy, described in Figure V.F, is largely a result of the reorganization that occurred in 2004 when PRASA returned to government control after quasi-privatization from 1994 to 2004.[173]   When PRASA reorganized, Act 92 of 2004 established a "decentralized managerial structure" with a nine-member Governing Board, an Executive Director, an Infrastructure Executive Director responsible for the capital improvement program, and five regional directorates in control of day-to-day operations in their regions.[174]   Each region is administered by its own Regional Executive Director, who is responsible for the "administering and supervising of all the assets and employees of [PRASA] within his/her region" and reports to the Executive Director of the Authority.[175]

---

[172] P.R. Aqueducts & Sewer Auth., *Investor's and Financial Information: PRASA, at a glance* (2018), http://www.acueductospr.com/INVESTORS/Investors_ataglance.html.

[173] By law, PRASA can enter into temporary contracts with private entities for them to take over its operations.   From 1995 to 2004, PRASA entered into two such agreements in succession: from 1995 to 2001, French conglomerate Vivendi operated PRASA, but the contract ended after Vivendi increased PRASA's operational deficit to $685m; from 2002 to 2004, PRASA was operated by Ondeo de Puerto Rico (a subsidiary of the water division of Suez S.A.) through and Operations and Maintenance contract. According to individuals familiar with PRASA, the contract was mutually terminated for economic reasons.

[174] P.R. Laws Ann. tit. 22, § 143(f) (2018).

[175] P.R. Laws Ann. tit. 22, § 143(g) (2018).

The Independent Investigator's Final Investigative Report

**Figure V.F: PRASA's Administrative Hierarchy**



As with other public corporations, the Governor appoints many of PRASA's Board members. The PRASA Act, however, also prohibits certain political behaviors for PRASA's Board members and top-level executives, including:

- "Contribut[ing] money directly or indirectly to any political parties, candidates, or organizations;
- Perform[ing] or campaign[ing] to hold any office in the direction or organization of a political party, nor run[ning] for an elective public office;
- Participat[ing] or collaborat[ing] directly or indirectly in a political campaign of any kind, or in events of a political-partisan nature."[176]

In addition, members of PRASA's Board are precluded from being Authority employees or related to any of the Authority's unions. In comparison, PREPA's governing laws did not preclude similar types of political behavior until 2016.[177]

The evidence we reviewed, including the statements of several witnesses, supports the conclusion that these measures allowed PRASA a relative degree of political independence that has benefitted their fiscal management. For example, even though by law the governor has the same level of involvement with PRASA's hiring as with PREPA's (*e.g.*, the ability to appoint four of its seven board members, who then appoint the Authority's executives[178]), during our investigation, we found fewer instances in which PRASA officials and management turned over

---

[176] P.R. Laws Ann. tit. 22, § 143(m) (2018).
[177] Act of Feb. 16, 2016, No. 4, 2016 P.R. Laws 8.  *See* Part V.A.1.(d) for a further discussion.
[178] P.R. Laws Ann. tit. 22, § 143 (2018).

The Independent Investigator's Final Investigative Report

with changes in administration.  To the contrary, PRASA's administration has been relatively stable over the last 15 years.[179]  For example, PRASA has only had four Executive Directors and one CFO since 2004.  PREPA, in comparison, has had more than that number of Executive Directors and Finance Directors in the last eighteen months.  Similarly, since February 2017, only two of PRASA's board members have changed,[180] as compared to PREPA, whose entire Board has been replaced twice in the same period, both times due to political circumstances.[181]

Nevertheless, despite the relatively stable management structure and prohibitions on political activity, as is discussed in Part V.C.2, during the Relevant Period, PRASA was subjected to political pressures with respect to its rate-setting and historically relied on GDB and central government funding for its operations in lieu of raising those rates—just as PREPA did, but with dramatically different outcomes.

### 2.   Reduced Government Subsidies and a $2 billion EPA Consent Decree Forced PRASA to Raise Rates so It Could Reenter the Bond Market

In 2008, after a 20-year hiatus, PRASA reentered the municipal bond market to raise funds to pay for almost $2 billion in capital improvements and remediation required by the EPA.  Before it could do so, PRASA had to raise in its rates—something it, much like PREPA, had not done in 20 years.

### (a)   PRASA's Historical Reliance on Government Subsidies

During the Relevant Period, PRASA's Governing Board was responsible for setting PRASA's rates[182] and approving any modifications to ensure that they were sufficient "(a) to pay the cost of maintaining, repairing and operating the Commonwealth Water System and the Commonwealth Sewer System, including reserves for such purposes, and for replacement and depreciation; (b) to pay the principal of and the interest on revenue bonds issued… as the same shall become due, and reserves therefor, and (c) to provide a margin of safety for making such payments."[183]  By law, changes in rates are subject to a formal approval process, including public

---

[179] This is not to say that PRASA's management has been devoid of controversy.  In 2008 and 2015, various PRASA union leaders and PRASA officials were indicted for federal bribery, fraud, and corruption charges.  *See United States v. Hernández-Pérez*, No. 15-739 (D.P.R. 2015).

[180] *Compare* P.R. Aqueduct and Sewer Auth., *Board and Meeting Minutes* (Feb. 22, 2017), *with* P.R. Aqueduct and Sewer Auth., *Government Board Members*, http://www.acueductospr.com/JUNTA/index.html (last visited Aug. 16, 2018).

[181] *See* Part V.A.1.(d) for further discussion on this topic.

[182] PRASA has two types of water rates, depending on whether the usage is metered or not.  Water usage charges for metered customers are calculated using a combination of a base rate and a supplementary charge for each cubic meter of use in excess of 10 cubic meters.  The amount of the supplementary charge is dependent on the diameter of pipes serving the customer as well as on customer class (e.g. a commercial, industrial, or governmental customer, or a residential customer).  Unmetered rates are determined by customer class and type of use.  Wastewater charges, which are charged alongside normal water charges, are calculated in the same manner, although the base rates and adjustment rates are slightly lower.  P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*, 46 (2012).

[182] *See* P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*.

[183] P.R. Laws Ann. tit. 22, § 158 (2018).

hearings, before they can be implemented.[184]   Although PRASA's Board has had the legal authority to adjust its rates without approval from the governor or the legislature, our investigation found that in practice—just like PREPA—PRASA also appeared to be obligated to obtain permission from the governor in order to raise its rates.

PRASA rates, like PREPA's, failed to cover PRASA's operational expenses for decades. According to witnesses from PRASA and the executive branch, PRASA historically relied on GDB and general fund appropriations to subsidize a significant portion of its operational costs. According to PRASA's own Consulting Engineer, these subsidies gave PRASA "few incentives … to provide cost-effective services."[185]

**(b)      PRASA's Subsidies Were Reduced as a New EPA Consent Decree Increased Its Capital Improvement Costs**

In 2005, PRASA's dependence on government subsidies began to change, when the Acevedo Vilá administration instructed PRASA that it was reducing appropriations by $400 million.[186]   According to Governor Acevedo Vilá, PRASA had been surviving on subsidies, funded by tax dollars, instead of being independent.   In order to reallocate those tax dollars, Governor Acevedo Vilá decided to reduce subsidies to PRASA in favor of PRASA reentering the bond market to cover its capital improvement needs.

---

[184] Act of May 31, 1985, No. 21. *See also P.R. Aqueduct and Sewer Auth., Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*, 45 (2012) ("The Authority, under the Act, may change its rates and charges upon the holding of a public hearing after publication of reasonable notice, except for a temporary period or in cases of emergency when changes in rates and charges may be imposed without a public hearing.").

[185] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B (Guaranteed by the Commonwealth of Puerto Rico)*, ES-2 (2008).  PRASA's liquidity issues are exacerbated by PRASA's high levels of water loss.  In Fiscal Year ending 2016, non-revenue water (which is the difference between total water produced and total water sales) accounted for 58.7% of the water produced by the Authority (a decrease of nearly 15% from 2012's 72.9%). *See* P.R. Aqueduct and Sewer Auth*., 2016 Consulting Engineer's Report*, 4–27 (2016).  According to the Authority, these losses can be attributed to a combination of theft, water delivered but not billed for, and hydrant use, with the vast majority (82.96%) of physical water losses stemming from main breaks and other pipe leaks (a fact that only serves to underline the sorry state of PRASA's infrastructure). *See* P.R. Aqueduct and Sewer Auth*., 2016 Consulting Engineer's Report*, 5–26 (2016).  In recent years, PRASA has attempted to reduce non-revenue water through comprehensive billing campaigns and metering overhauls.  *See* P.R. Aqueduct and Sewer Auth*., 2016 Consulting Engineer's Report*, 5–26 (2016). Nevertheless, although there have been improvements over the last five years, PRASA's percentage of water loss is still extremely high compared to that experienced by other water utilities in the US and Canada. *See* P.R. Aqueduct and Sewer Auth*., 2016 Consulting Engineer's Report*, 4–28 (2016).

[186] KPMG, *Puerto Rico Aqueduct and Sewer Authority, Basic Financial Statements*, I-2 (2007) (as included in P.R. Aqueduct and Sewer Auth*., Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B (Guaranteed by the Commonwealth of Puerto Rico)*, 44 (2008) ("The Commonwealth has indicated that it no longer intends to provide these subsidies to the Authority")).

The Independent Investigator's Final Investigative Report

Around the same time, PRASA was negotiating its eighth consent decree with the EPA.[187] In 2006, PRASA pled guilty to 15 felony counts of violating the Clean Water Act, which resulted in a record-breaking $9 million criminal penalty, $1 million in fines, and a comprehensive civil settlement with the US Government (the "2006 Consent Decree").[188]   As part of the settlement, PRASA agreed to make certain capital improvements and remediation estimated to cost $1.7 billion.[189]

### (c)    **PRASA Raised Its Rates**

In 2005 and 2006, PRASA raised its rates by 128% in two phases.[190]   As part of the rate increase, however, PRASA's Board included, as part of the rate resolution, limits on PRASA's ability to raise rates in the future.[191]   These limits prevented PRASA from raising rates for a period of five years, after which it could not independently raise rates more than 4.5% in a year, or 25% cumulatively across a series of years.[192]

### (d)    **Strict Enforcement of The Bond Rate Covenants Forced PRASA to Raise Rates Again**

As noted earlier, in 2008, PRASA returned to the bond market after a 20-year absence. Pursuant to the PRASA Act, PRASA's Board has authority to approve the bond issuances.  As discussed in Part V.B, in practice, GDB, in its capacity as fiscal agent, oversaw the entire bond issuance process as to PRASA during the Relevant Period, and the GDB Board had to approve the issuance, including selection of underwriters.

According to the Official Statements from the 2008 PRASA offerings, the proceeds from the $1.6 billion in 2008 Senior Revenue Bonds went, in part, to help fund PRASA's $1.98 billion capital improvement program, with a specific emphasis on the projects required by the 2006 Consent Decree.[193]   In connection with the 2008 bond issuances, PRASA entered into a Trust

---

[187] Since 1995, the EPA, through the U.S. Department of Justice, has entered into eight Consent Decrees with PRASA relating to violations of the Clean Water Act ("CWA"), the Clean Air Act ("CAA"), and the Safe Drinking Water Act ("SDWA").  *See* Press Release, Department of Justice, *Puerto Rico Aqueduct and Sewer Authority Indicted for Environmental Crimes; Will Pay $10 Million in Criminal and Civil Fines and Spend $1.7 Billion Improving Wastewater Treatment* (June 22, 2006) https://www.justice.gov/archive/opa/pr/2006/June/06_enrd_382.html.

[188] *See* Press Release, Department of Justice*, Puerto Rico Aqueduct and Sewer Authority Indicted for Environmental Crimes; Will Pay $10 Million in Criminal and Civil Fines and Spend $1.7 Billion Improving Wastewater Treatment* (June 22, 2006) https://www.justice.gov/archive/opa/pr/2006/June/06_enrd_382.html.

[189] *See Notice of Lodging of Modification of Consent Decree Under the Clean Water Act*, Notice No. 06-6048, 71 Fed. Reg. 38,660 (July 7, 2006).

[190] *See* P.R. Aqueduct and Sewer Auth.*, Investor Presentation*, 28 (Mar. 3, 2008)*.*

[191] *See* P.R. Aqueduct and Sewer Auth.*, 2012 Consulting Engineer's Report*, 5–2 (2012).

[192] *See* P.R. Aqueduct and Sewer Auth.*, 2012 Consulting Engineer's Report*, 5–2 (2012).

[193] *See* P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series B (Guaranteed by the Commonwealth of Puerto Rico)*, 1 (2008).

Agreement (the "PRASA Trust Agreement"), which contained a rate covenant requiring PRASA to set rates sufficient to cover operations, as well as 120% of principal and interest due.[194]

After the 2008 bonds, PRASA did not raise rates again for another four years.  From 2008 to 2012, according to PRASA's Chief Financial Officer, PRASA avoided another rate increase through Central Government appropriations of approximately $250 million.[195]  Specifically, in 2011, appropriations were made "in order to permit [PRASA] to meet is debt service and operating expense requirements without having to increase its rates."[196]

In 2012, PRASA issued the Series 2012A and Series 2012B (Senior Lien) Revenue Bonds for a combined $2.1 billion.  According to the Official Statement, the Series 2012A bond was issued to "(i) repay certain lines of credit provided by the Government Development Bank to the Authority as interim financing for a portion of its capital improvement program, (ii) finance a portion of the Five-Year [Capital Improvement Program], (iii) make a deposit to the newly created Budgetary Reserve Fund, (iv) pay capitalized interest on the Series A Bonds through July 1, 2013, and (v) pay the costs of issuance."[197]  The Series 2012B bonds were issued to "(i) provide funds to repay a bond anticipation note issued by the Authority in the aggregate principal amount of $241 million, the proceeds of which were used to repay certain of the Authority's outstanding indebtedness, (ii) provide funds to repay certain lines of credit provided by Government Development Bank to the Authority to finance operative expenses and as interim financing for a portion of its capital improvement plan, (iii) pay capitalized interest on the Series B Bonds through July 1, 2013, and (iv) pay the costs of issuance."[198]

The 2012 bonds were issued under an amended and restated Trust Agreement (the "Amended PRASA Trust Agreement").  The Amended PRASA Trust Agreement "provides for, among other things, (i) a gross lien on Authority Revenues… to secure the payment of debt service on Bonds and Other System Indebtedness and (ii) a revised rate covenant and revised additional bonds test."[199]  As such, PRASA's operating revenues would first go to paying its debt obligations before paying current expenses.[200]

---

[194] Trust Agreement from P.R. Aqueducts and Sewer Auth. to Banco Popular de P.R. § 7.01 (Feb. 12, 2012) (on file with author).

[195] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*, 7 (2012).

[196] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*, 7 (2012).

[197] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012A (Senior Lien)*, 13 (2012).

[198] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012B (Senior Lien)*, 13 (2012)

[199] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012A (Senior Lien)*, 3 (2012).

[200] P.R. Aqueduct and Sewer Auth., *Official Statement for Revenue Bonds, Series 2012A (Senior Lien)*, 3 (2012).

Also in connection with the 2012 bonds, PRASA entered into a revised Fiscal Oversight Agreement with GDB.  The revised FOA, in order to keep PRASA compliant with the amended Trust Agreement, required PRASA to raise rates in the event appropriations ceased:

> To the extent that the Commonwealth determines not to request an appropriation or otherwise fails to provide an additional funding source in an amount equal to at least the Budgetary Reserve Requirement for a fiscal year, the Authority shall be obligated to either promptly revise its rates fees and charges or to otherwise increase Operating Revenues or decrease expenses to ensure that it will be in compliance with the Rate Covenant under the Trust Agreement.[201]

As discussed in Part IV.D, in 2013, Governor García Padilla's administration decided to cease appropriations to the Public Utilities.  As a result, in 2013, PRASA raised rates again, this time by 60%.[202]

According to a former GDB President, Governor García Padilla was forced to raise water rates as a result of the terms and conditions of PRASA's 2012 bond deal, which acted as a poison pill.  The rate increase implemented in 2013, according to the same GDB President, was only undertaken because GDB and the Government lacked sufficient funds to provide PRASA with the subsidy required to avoid a rate increase in connection with the 2012 bond deal. To meet the terms of that deal, PRASA commenced the rate increase process.

As of the publication of this report, PRASA has not filed for relief under PROMESA.

## D.  <u>Conclusions and Recommendations</u>

Before the Public Utilities can regain access to the capital markets, they have to regain the trust of investors and the market.  To do so, the public must have comfort that the Public Utilities' collected revenues are sufficient to cover operational expenses and debt service as required by the debt covenants in their respective Trust Agreements, as well as necessary capital improvements. In other words, they have to show that they are more self-sustaining than they have been in the past.

---

[201] *Compare* Gov't of P.R., P.R. Aqueduct and Sewer Auth., *Revised Fiscal Oversight Agreement*, § 1.1 (2012) *with* Gov't of P.R., P.R. Elec. and Power Auth., *Fiscal Oversight Agreement*, (2009) (does not contain an analogous provision).

[202] *See* Moody's Inv. Serv., *Puerto Rico Aqueduct and Sewer Authority Approves 60% Rate Increase, a Credit Positive* (July 11, 2013) (available from Moody's Inv. Serv.).  PRASA's return to reliance on appropriations instead of raising rates sufficient to cover expenses did not go unnoticed by investors:  In 2013, when Standard & Poor's lowered the credit rating for the Authority's senior lien revenue bonds to a non-investment grade 'BB+' in 2013, it cited PRASA's "Historically poor financial performance, stemming from unwillingness to raise rates, deficient billing and collection systems, and low liquidity, all of which historically constrained the utility from generating consistent operating surpluses," as one of the main areas of concern.  A more in depth analysis of the relationship between the Credit Rating Agencies and the Public Corporations, including PRASA, can be found in Part X.

The Independent Investigator's Final Investigative Report

To the extent the Public Utilities remain public corporations, as opposed to being privatized, we make the following recommendations for consideration by the elected officials of Puerto Rico:

1.      <u>Create Boards of Directors with a Mix of Independent and Governor-Appointed Members</u>. Recompose the Boards of Directors for the Public Utilities to include a greater mix of Governor-appointed and independent members, with longer and staggered terms across administrations.

2.      <u>Establish an Audit Committee Comprised of a Majority of Independent Board Members</u>. The role of the csommittee would be to verify financials and compliance with rate covenants.  The committee should be instructed to exclude uncollected revenues from rate covenant calculations, including CILT (to the extent it still exists).

3.      <u>Adopt Specific Requirements for the Public Utilities to Disclose Their Actual Use of Bond Proceeds</u>.  Such measures might include, for example, legislation requiring Puerto Rico's Public Utility issuers to provide and make public a report, issued on a periodic basis (e.g., quarterly or bi-annually) and certified by a senior-level officer, itemizing how the proceeds of public bond issuances have been used within the period covered by the report.  Another measure that might be considered is a requirement that an independent engineer or general contractor certify, on an annual basis, that bond proceeds earmarked for infrastructure have been expended according to plan and/or publicly represented uses.  Auditing firms can also be retained to express an opinion on whether or not the Public Utilities' books and records accurately report on how the proceeds of bonds issuances are used.

4.      <u>Establish Independent Rate Boards for Both PREPA and PRASA</u>. These rate boards will be tasked with setting and adhering to rate changes on a predictable, market-responsive schedule.

5.      <u>Empower an Independent Fiscal Agent to Implement FOAs With the Public Utilities That Require Compliance With Rate Covenants, Consistent With our Recommendations in Part IV.G</u>. To promote fiscal responsibility, the FOAs should address reduction of unnecessary or bloated expenses, in addition to considerations of rate increases.

6.      <u>Do Away With CILT</u>. On the basis of the evidence we reviewed about the Relevant Period, we conclude that the elected officials of Puerto Rico consider doing away with CILT altogether, as they have resulted in costs being passed along to the consumers, as well as significant uncollected revenues at PREPA.

# PART VI

# COFINA

# PART VI
# COFINA

As part of our investigation, we examined the creation and use of COFINA, a public corporation created in 2007 for the purpose of issuing bonds payable from and secured by Puerto Rico's sales and use tax ("<u>SUT</u>," also known in Spanish as the *impuesto sobre ventas y uso*, or "<u>IVU</u>").

Representing $17.6 billion in outstanding debt, the bonds that COFINA issued ("<u>COFINA Bonds</u>") constitute nearly 25% of Puerto Rico's total public sector debt.[1]  Accordingly, to understand the nature of the Puerto Rico debt crisis, it is useful to trace the history of COFINA. That history exemplifies the extent to which Puerto Rico turned to debt to address difficult times without solving the underlying persistent operating deficits.  This approach may have prolonged the day of reckoning but, unchecked by constitutional limitations, it added several billions more to Puerto Rico's debt problem.

On Saturday, May 13, 2006—as a partial resolution to political gridlock between Puerto Rico's Executive Branch and Legislative Assembly concerning proposed tax reform and the budget for fiscal year ended 2006—then-Governor Aníbal Acevedo Vilá signed several new laws designed to address Puerto Rico's ongoing "structural imbalance."  "<u>Structural imbalance</u>" here

---

[1] Gov't of P.R., P.R. Fiscal Agency and Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

The Independent Investigator's Final Investigative Report

refers to the extent to which Puerto Rico's operating expenses exceeded its recurring revenues.[2] Among the new laws was Act No. 91 of May 13, 2006 ("Act 91-2006").[3]

As described further below, Act 91-2006 created a mechanism to pay or refinance Puerto Rico's so-called "extraconstitutional debt" in existence as of June 30, 2006, which, according to the Act's "Statement of Motives," had substantially affected Puerto Rico's credit.[4] "Extraconstitutional debt" (also called "appropriation debt") means Puerto Rico debt payable solely from legislative appropriations with no identified source of repayment and not backed by Puerto Rico's full faith, credit and taxing power.[5] According to GDB witness accounts, as discussed below, by 2006 the amount of extraconstitutional debt had become a burden to the General Fund.

To that end, Act 91-2006 created a special fund called the "Urgent Interest Fund" ("UIF") and required a portion of future tax revenues from an anticipated new consumption tax (the details of which were at the time still being negotiated) to be deposited into the fund. Act 91-2006 also required that the moneys deposited in the fund be used to pay or refinance the extraconstitutional debt.[6]

A year later, COFINA was created through Act No. 56 of July 5, 2007 ("Act 56-2007").[7] Act 56-2007 further amended Act 91-2006, after it had already been amended once through Act 291 of December 26, 2006 ("Act 291-2006").[8] By the time of Act 56-2007's enactment, the anticipated SUT had been created under the Taxpayers Justice Act of 2006.[9] Act 56-2007 created a special fund called the "*Fondo de Interés Apremiante*" (the "FIA Fund" or the "Dedicated Sales Tax Fund") and required that a portion of the revenues collected from the SUT be transferred to the FIA Fund. Under Act 56-2007, the FIA Fund was transferred to COFINA, and COFINA was authorized to issue bonds, pledge the moneys deposited into the FIA Fund to secure payment on the bonds, and use the proceeds of the bond sales to pay or refinance the extraconstitutional debt in existence as of June 30, 2006. According to statements by GDB, such extraconstitutional debt totaled approximately $6.847 billion at that time.[10] Through 2008, COFINA issued several series

---

[2] *See, e.g.*, Commonwealth of P.R., *Financial Information and Operating Data Report*, 55 (June 1, 2006) ("During fiscal year 2005, the amount by which the Commonwealth's operating expenditures exceeded its recurring revenues (the so-called structural imbalance) was approximately $1 billion.").

[3] Act of May 13, 2006, No. 91, 2006 P.R. Laws 246.

[4] Act of May 13, 2006, No. 91, Statement of Motives, 2006 P.R. Laws 246, 247.

[5] Gov't Dev. Bank for P.R., *Public Debt Report: Fiscal Year 2006 and First Six Months of Fiscal Year 2007*, 1 (May 3, 2007) ("The main challenge that the Government of Puerto Rico had with our public debt was the appropriations debt (or as we call it in Puerto Rico, the 'extraconstitutional debt.')"); *id.*, 4 ("This debt was issued throughout the years and is mostly debt authorized by legislations but with no identified sources of repayment[.]").

[6] Act of May 13, 2006, No. 91, §§ 2–3, 2006 P.R. Laws 246, 247–248.

[7] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173.

[8] Act of Dec. 26, 2006, No. 291, 2006 P.R. Laws 1110.

[9] Act of July 4, 2006, No. 117, 2006 P.R. Laws 1231.

[10] Gov't Dev. Bank for P.R., *Public Debt Report: Fiscal Year 2006 and First Six Months of Fiscal Year 2007*, 4 (May 3, 2007) ("[W]e still need to comment on the appropriation debt that as of June 30, 2006 totaled $6,847 million and to which no further obligations will be added.").

The Independent Investigator's Final Investigative Report

of bonds totaling approximately $5.23 billion, the net proceeds of which were to pay or refinance the extraconstitutional debt.

In January 2009, a new administration led by Governor Luis Fortuño calculated Puerto Rico's fiscal imbalance to be in excess of $3 billion.[11]  On January 8, 2009, the Governor declared a fiscal emergency[12] and shortly thereafter, on January 14, 2009, signed Act No. 1 into law ("Act 1-2009").[13]  Act 1-2009 further amended Act 91-2006 to increase the portion of the SUT revenues allocated to COFINA and to expand the permitted uses of COFINA bond proceeds.  Under Act 1-2009, COFINA bond proceeds were now permitted to be used for a number of purposes beyond paying or refinancing extraconstitutional debt, including to fund Puerto Rico's general operating expenses.  In 2009 through 2011, COFINA continued to issue bonds, and the outstanding principal amount of COFINA bond issuances increased to approximately $16.3 billion.

Since then, certain of Puerto Rico's creditors, including holders of Puerto Rico's GO Bonds ("GO Bondholders"), have challenged the transfer of ownership to COFINA of its allocated portion of the SUT revenues.  They seek to undo the transfer of the SUT revenues so that those revenues are available to satisfy amounts owed on their GO Bonds.  Among other things, they assert that COFINA was created to circumvent Article VI of Puerto Rico's Constitution, which they claim gives them a priority claim to Puerto Rico's "available resources." [14]  This priority claim under Article VI of the Puerto Rico Constitution is often referred to as a "Clawback Right."[15]  The GO Bondholders' challenges have been the subject of litigation in the Title III Proceedings.[16]

---

[11] P.R. Exec. Order No. OE-2009-001, 1 (Jan. 8, 2009).

[12] P.R. Exec. Order No. OE-2009-001, 1 (Jan. 8, 2009).

[13] Act of Jan. 14, 2009, No. 1, 2009 P.R. Laws 1.

[14] *See, e.g.*, Commonwealth Agent's Mot. for Summ. J. and Mem. of Law, 29–30, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, No. 17-00257-LTS (D. P.R. Mar. 6, 2018), ECF No. 347-2 ("In its twelfth cause of action, the Commonwealth Agent seeks a declaration that the purported transfer of SUT revenues to COFINA is unconstitutional and void because, on its face, Act 91 (as amended to create the COFINA structure) constitutes an impermissible evasion of Puerto Rico's . . . constitutional debt priority.").

[15] The term "clawback" as used in this Report refers to rights arising under Article VI of the Puerto Rico Constitution.  It is not meant to refer to other types of clawback rights that may arise under statute or contract.

[16] On June 5, 2018, it was announced that the COFINA and Puerto Rico agents had reached a settlement in principle to resolve the COFINA-related litigation in the Title III Proceedings.  The parties moved for a 60-day stay of such proceedings.  *See* Joint Urgent Mot. of Commonwealth Agent and COFINA Agent Req. That Ct. Hold Decision on Mots. for Summ. J. in Abeyance for 60-Day Period, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D.P.R. Jun. 5, 2018), ECF No. 484.  The Court has since granted a renewed motion to extend the stay of such proceedings through September 13, 2018.  *See* Order Granting Joint Urgent Mot. of Commonwealth Agent and COFINA Agent Req. an Extension of the Date through which a Dec. on the Mots. For Summ. J. Will Be Held in Abeyance, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin.Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D.P.R. Aug. 3, 2018), ECF No. 539.

The Independent Investigator's Final Investigative Report

Our investigation focused on several questions, including:

- Why was COFINA created?  Where did the idea come from and how did it come about?

- Is there any evidence that COFINA was designed to evade Article VI of the Puerto Rico Constitution, including the Clawback Rights of GO Bondholders?

- To what extent did GDB consult with legal counsel concerning the viability of the COFINA structure, particularly concerning the Clawback Right issues?  What was counsel's views and to what extent were those views disclosed to purchasers of COFINA Bonds?

- How were COFINA Bonds marketed?  Does anything about their manner of sale raise concerns for evaluation by potential claimants or policymakers?  How were they received in the marketplace?

- Why was the COFINA program expanded from a means to pay or refinance existing extraconstitutional debt to a means to finance Puerto Rico's ongoing operations and fund budget deficits?  Relatedly, how did the outstanding amount of debt on COFINA bond issuances grow to over $17.6 billion ($16.3 billion in principal amount issued, plus accreted interest), totaling nearly 25% of Puerto Rico's total public sector debt?

- How have other states or municipalities used a tax securitization strategy like COFINA, and what lessons can be learned from that use?

A summary of our key findings is as follows:

- Although COFINA was created in 2007 to pay or refinance Puerto Rico's existing extraconstitutional debt, GDB began to consider sales tax securitization strategies in early 2005 as a potential well-rated financing source in order to help solve Puerto Rico's structural imbalance.  GDB consulted with third party financial institutions about such strategies.  At that time, the contemplated use was not specifically tied to extraconstitutional debt;

- GDB also consulted with several law firms concerning the dedicated sales tax and COFINA structure, as well as the potential Clawback Right issues arising from the same;

- As reflected in emails that have been made public in the Title III Proceedings, an attorney from a mainland US firm expressed doubts to GDB as to whether the sales tax revenue, even if transferred and assigned to a public corporation, could be carved out from GO Bondholders' Clawback Rights.  That view was not shared with investors;

- COFINA obtained and received a favorable opinion from a different mainland US law firm, as well as from a Puerto Rico law firm and the Secretary of Justice of Puerto Rico, each of which opined that the sales tax revenues would not be subject to GO Bondholders' Clawback Rights;

The Independent Investigator's Final Investigative Report

- COFINA Bonds were marketed based on the strength of the legal opinions that held that the SUT revenues would not be subject to GO Bondholders' Clawback Rights;

- COFINA Bonds received strong ratings based in part on the strength of these legal opinions and were rated higher than Puerto Rico's GO Bonds;

- Notwithstanding the issuance of approximately $5.23 billion in COFINA Bonds in 2007 and 2008, Puerto Rico continued to struggle with its structural imbalance;

- In 2009, the permitted use of COFINA Bond proceeds was expanded in response to what was viewed as a fiscal emergency and the belief that there were no better options to address a $3.2 billion budget deficit;

- COFINA Bonds were understood to not be subject to the Constitutional Debt Limit. Accordingly, COFINA issued them unconstrained by that limitation; and

- Notwithstanding the absence of political consensus in Puerto Rico concerning raising rates for power and water, raising taxes, or cutting benefits, there was relatively little political opposition to the broadening of permissible uses for COFINA funds. COFINA became a relatively easy source of liquidity that staved off the need to find a more permanent solution to Puerto Rico's financial problems.

A.   **COFINA Was Created To Pay or Refinance Extraconstitutional Debt, Although There Is Evidence That GDB Initially Considered A Broader Use**

1.   **GDB Began To Consider A Sales Tax Securitization Strategy in 2005**

Through our investigation, we learned that officials at GDB considered the potential use of a COFINA-like sales tax securitization as early as 2005.[17] Generally speaking, a "securitization" is the process through which revenue-generating assets are packaged into securities that are then sold to investors.[18] The cash flows generated by the underlying assets are used to pay principal and interest on the securities.[19] The securities themselves are "backed" or supported by the assets.[20] In the case of a sales tax securitization like COFINA, a portion of the tax revenue collected from the sales tax constitutes the asset backing the securities. For reasons discussed

---

[17] *See, e.g.*, Ex. 3 at 2, Decl. of Donald Burke in support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 5, 2018), ECF No. 345-5 ("As you may or may not know, at the request of GDB in early 2005, Hawkins prepared a memorandum evaluating the strategies to accomplish securitization and concluded that securitization is achievable under the Constitution.").

[18] Moody's Investors Service Special Comment, *Demystifying Securitization for Unsecured Investors*, 1 (Jan. 2003) (available through Moody's Investors Service).

[19] Moody's Investors Service Special Comment, *Demystifying Securitization for Unsecured Investors*, 1 (Jan. 2003) (available through Moody's Investors Service).

[20] Moody's Investors Service Special Comment, *Demystifying Securitization for Unsecured Investors*, 1 (Jan. 2003) (available through Moody's Investors Service).

The Independent Investigator's Final Investigative Report

further below, sales tax-backed bonds generally receive good credit ratings, due in part to their dedicated source of cash flows from tax revenues that do not flow through a government's general fund.

According to various witness accounts, in early 2005, then-President of GDB William Lockwood expressed concern about the government's declining credit quality and a desire to find a stable, higher-rated financing source. Mr. Lockwood expressed an interest in the possibility of Puerto Rico employing a sales tax-supported new debt issuer. By some accounts, the concept of a sales tax securitization may have originally been proposed by Lehman Brothers ("Lehman").

By early 2005, Puerto Rico had experienced several consecutive years in which its recurring revenues were insufficient to cover its operating expenditures,[21] reflecting a structural imbalance.[22] As explained in Part IV of this Report, in order to balance its budget each year, Puerto Rico had relied on various non-recurring, stop-gap measures, including borrowing substantial amounts from GDB. In fiscal year ended 2003, for example, Puerto Rico balanced its budget with a GDB loan of $250 million.[23] In fiscal year ended 2004, it balanced its budget with a GDB loan of $233 million.[24] And its budget for fiscal year ended 2005 included an additional GDB loan of $550 million.[25]

The CRAs noticed both Puerto Rico's annual operating deficits and its use of stop-gap measures (particularly the GDB loans), and they lowered Puerto Rico's GO Bond credit ratings. For example, in September 2004, Moody's announced that it was changing its ratings outlook on Puerto Rico's outstanding GO Bond debt from "stable" to "negative."[26] As noted in the corresponding Moody's report, the outlook change reflected Moody's concern over Puerto Rico's

---

[21] *See, e.g.*, Commonwealth of P.R., *Financial Information and Operating Data Report*, 51 (Dec. 1, 2005) ("The Commonwealth is currently experiencing a budget imbalance in fiscal year 2006 which comes in the wake of several recent fiscal years during which the Commonwealth had insufficient recurring revenues to cover its expenditures.").

[22] Commonwealth of P.R., *Financial Information and Operating Data Report*, 55 (June 1, 2006).

[23] Commonwealth of P.R., *Financial Information and Operating Data Report*, 44 (Aug. 1, 2004) ("General Fund total net revenues for fiscal year 2003 were $7.592 billion . . . . This amount excludes proceeds of a loan of $250 million obtained from GDB[.]").

[24] Commonwealth of P.R., *Financial Information and Operating Data Report*, 50 (Dec. 1, 2005) ("General Fund total net revenues for fiscal year 2004 were $7.985 billion . . . . This amount excludes proceeds of a loan of $233 million obtained from GDB[.]").

[25] Commonwealth of P.R., *Financial Information and Operating Data Report*, 43 (Aug. 1, 2004) ("Budgeted revenues also include the proceeds of a $550 million loan from GDB[.]").

[26] Moody's Investors Service, *Moody's Assigns Baa1 Rating and Negative Outlook to Puerto Rico's G.O. Bonds*, 1–3 (Sept. 21, 2004) (available through Moody's Investors Service) ("The assignment of a negative rating outlook at this time reflects Moody's growing concerns regarding the Commonwealth's financial performance, particularly the failure to balance General Fund operations in the past two fiscal years without resorting to GDB loans late in the year, the increased structural imbalance programmed into the adopted fiscal 2005 budget, and the possibility of further growth in the Commonwealth's already very large unfunded pension liabilities . . . . The unexpected resort to GDB loans to balance the budget in 2003 and 2004, large structural imbalance in 2005, and potential for increased pension funding costs and/or growth in already very large unfunded liabilities are the primary causes for concern.").

The Independent Investigator's Final Investigative Report

financial performance and that it was balancing the budget in part through loans from GDB.[27]  In May 2005, Moody's and S&P each announced downgrades to Puerto Rico's GO Bond debt ratings: from "Baa1" to "Baa2" and from "A-" to "BBB," respectively.[28]  These CRAs cited a concern over Puerto Rico's financial performance, including the structural imbalance in its budget, the lack of availability of additional recurring revenue sources, as well as uncertainty surrounding the approval of a budget for fiscal year ended 2006.[29]

It was under these circumstances that, according to witness accounts, Mr. Lockwood expressed an interest in a sales tax-supported financing structure.  Although Puerto Rico did not have a sales tax at this time, Puerto Rico was considering one as part of the general evaluation of tax reform that it was then undertaking.[30]  Witnesses told us that Mr. Lockwood viewed a sales tax

---

[27] Moody's Investors Service, Inc., *Moody's Assigns Baa1 Rating and Negative Outlook to Puerto Rico's G.O. Bonds*, 2 (Sept. 21, 2004) (available through Moody's Investors Service) ("Similar to the experience in fiscal 2003, the Commonwealth was forced to borrow from the GDB late in the fiscal year in order to balance the budget and ensure repayment of outstanding tax and revenue anticipation notes (TRANs).  The $233 million loan is similar in size to the $250 million loan in 2003, and both loans reportedly have an expected repayment term of five years . . . .  The Commonwealth's adopted budget for 2005 is similar to the Governor's proposal earlier in the year, and includes an approximate 6.5% increase in General Fund spending to $8.9 billion (including debt service transfers). The budget is not structurally balanced, with expenditures exceeding ongoing revenues by a wide margin.  As previously reported, the gap will be funded largely via a $550 million loan from the GDB."); *see also* Moody's Investors Services, *Moody's Assigns Baa1 Rating and Stable Outlook to $732 Million Commonwealth of Puerto Rico General Obligation Bonds*, 2 (Apr. 29, 2004) (available through Moody's Investors Service) ("Despite efforts early in the year to identify revenue variances, spending pressures, and remediation plans, the Commonwealth was again forced to rely on various non-recurring measures, including $70 million of federal stimulus aid and a $250 million GDB loan, in order to balance its budget in fiscal 2003.  This represented the third consecutive year of deficit operating results and reliance on non-recurring budget fixes.").

[28] Moody's Investors Service, *Moody's Downgrades Commonwealth of Puerto Rico's G.O. Bonds to Baa2* (May 23, 2005) (available through Moody's Investors Service); *see* Gov't Dev. Bank for P.R., Commonwealth of Puerto Rico Standard & Poor's Historical Ratings, http://www.gdb.pr.gov/investors_resources/credit_ratings/RatingSP-PR.pdf.

[29] Moody's Investors Service, *Moody's Downgrades Commonwealth of Puerto Rico's G.O. Bonds to Baa2*, 1 (May 23, 2005) (available through Moody's Investors Service) ("The May 19 downgrade reflects: the Commonwealth's deteriorating General Fund financial condition[,] . . . a greater-than-expected decline in the Commonwealth-owned Government Development Bank's net liquidity position during 2005[,] . . . [and] a significant increase in the Commonwealth's outstanding tax-supported debt, now approaching 60% of personal income[.]"); *id.*, 2 ("The plan is to cover the new cash needs with . . . proceeds from an upcoming $520 million PRIFA bond sale . . . and other one-time sources"); *id.*, 3 ("The Governor has outlined a budget plan that attempts to balance revenues and expenditures without the need for deficit borrowing. . . . [T]he legislature is expected to present its alternative budget proposals by mid June."); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*, 27 (Dec. 1, 2005).

[30] *See, e.g.*, Official Statement, Commonwealth of P.R., *Public Improvement Bonds of 2005, Series A (General Obligation Bonds)*, 3 (Sept. 24, 2004) ("The Commonwealth is evaluating a revenue-positive tax restructuring which includes the imposition of a consumption tax and a lowering of the current income tax rates applicable to middle income taxpayers."); *see also* Moody's Investors Service, *Moody's Assigns Baa1 Rating and Negative Outlook to Puerto Rico's G.O. Bonds*, 2 (Sept. 21, 2004) (available through Moody's Investors Service) ("The administration refers to the 2005 plan as a 'transitional budget,' noting the possibility of a significant tax restructuring that will be revenue-positive in 2006. The restructuring, if

as a practical measure to capture the revenues of the portion of the economy that was not paying taxes, and he favored a sales tax-supported debt issuer as a potential stable revenue stream. According to witness accounts, GDB was looking to find a well-rated financing source to fund deficits with lower borrowing costs, and other states had some success with bonds backed by sales taxes.

In addition to consulting with Lehman about a potential sales tax securitization, GDB officials also worked with bankers at Goldman, Sachs & Co. ("Goldman") on the structure.  GDB later selected Lehman and Goldman as lead underwriters for the inaugural COFINA Series 2007A issuance (discussed below).[31]

## 2.    GDB Obtained The Views of Counsel Regarding Constitutional Issues

During this time, GDB also discussed a sales tax securitization strategy with lawyers at Sidley Austin LLP ("Sidley") and Hawkins.  Sidley (through Brown & Wood LLP, with which Sidley merged in 2001) had served as Puerto Rico's bond counsel for decades.  Hawkins was also a prominent firm in the municipal bond space and had at times served as counsel for GDB.

One of the key issues counsel considered was whether, under Article VI of the Puerto Rico Constitution, the sales tax revenue could effectively be "diverted" from the General Fund so as not to be subject to priority claims by GO Bondholders.  As discussed in Part III of this Report, Article VI, Section 8 of the Puerto Rico Constitution provides that holders of public debt (i.e., GO Bond debt) have priority rights to be paid from "available resources," ahead of all other debts, in the event of a revenue shortfall.[32]  In such a case, Article VI, Section 2 of the Puerto Rico Constitution authorizes the Secretary of Treasury to apply "available resources" to payment of public debt upon the suit of any bondholder.[33]  If the portion of the SUT allocated to COFINA were determined to constitute "available resources" under the Puerto Rico Constitution, then the holders of public debt would have a priority claim to those funds.

Publicly available evidence reflects that sometime prior to mid-March 2006, at least one attorney had advised GDB that, under the Puerto Rico Constitution, the SUT could not be diverted away from the General Fund.  In a March 10, 2006 email, which has since been publicly filed in

---

adopted by the legislature, would involve a lowering of income taxes and imposition of a new 'consumption tax'").

[31] See Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007A*, 2 (July 13, 2007).

[32] P.R. Const. art. VI, § 8 ("In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.").  The Spanish version of the Puerto Rico Constitution refers to "available resources," whereas the English version refers to "available revenues."  This is discussed further in Part III.B.1.

[33] P.R. Const. art. VI, § 2 ("The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by § 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.").

the Title III Proceedings, GDB's Acting President, Alfredo Salazar Conde, wrote to a Lehman banker with whom GDB consulted, stating:

> I was somewhat surprised at the rec of in-house counsel that according to the PR const, the Sales tax cannot be diverted away from the General Fund.[34]

It is unknown to whom the reference to "in-house counsel" in the email refers. One witness informed us that while he always received GDB's in-house counsel's opinions, he had not seen any in-house opinions on constitutional issues. In any case, the position communicated is consistent with the views expressed by an attorney and partner at Sidley ("Sidley Counsel"), who had long served as Puerto Rico bond counsel. In a May 2007 email, which also has since been publicly filed, Sidley Counsel wrote to GDB's Executive Vice President for Financing, stating:

> I think a court would have a hard time concluding just on the basis of the legislature saying so that the sales tax revenues are not "available" to the Commonwealth should it need the money to pay G.O. debt. [35]

That email is discussed further below. Several witnesses informed us that, consistent with the email, Sidley Counsel had expressed doubts about whether a portion of the sales tax revenue could effectively be segregated from the General Fund so as not to be subject to the GO Bondholders' Clawback Rights under Article VI of the Puerto Rico Constitution, and suggested that a ruling by the Puerto Rico Supreme Court would resolve the issue.

By contrast, an email that has been made public in the Title III Proceedings reflects that lawyers at Hawkins advised that the strategy was viable. To the March 2006 email from Mr. Salazar Conde quoted above, the Lehman banker replied by noting that the issue had also been considered by Hawkins, who had advised that the strategy was viable under Puerto Rico's Constitution:

> We have been working on the Sales Tax Securitization for more than a year and presented the concept to GDB only after getting a clear and unambiguous legal analysis as to its constitutionality. We worked with local counsel in Puerto Rico and with Hawkins, Delafield and Wood. As you may or may not know, at the request of GDB in early 2005, Hawkins prepared a memorandum evaluating the strategies to accomplish securitization and concluded that securitization is achievable under the Constitution. Hawkins was further comforted in their conclusion based on the existing precedent of the Children's Trust, Tobacco Securitization.

---

[34] Ex. 3, Decl. of Donald Burke in support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 5, 2018), ECF No. 345-5.

[35] Ex. 4, Decl. of Donald Burke in Support of Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. May 27, 2018), ECF No. 345-6.

The Independent Investigator's Final Investigative Report

> We have extensive experience working with Hawkins on similar transactions elsewhere and also know that they are well versed in Puerto Rico Constitutional law and we find their analysis of this securitization fully satisfactory. [An attorney] at Hawkins has confirmed to us today that they fully stand by their prior analysis and stand ready to support the efforts in whatever way would be most helpful.[36]

As discussed further below, both Sidley and Hawkins advised on these constitutional Clawback Right issues again in 2007 in anticipation of the first COFINA Bond issuances—Hawkins in its capacity as bond counsel to COFINA, and Sidley in the course of advising GDB on certain disclosure language.

### 3.    **The Sales Tax Securitization Was Perceived As Advantageous**

One of the perceived advantages of the sales tax securitization structure was the belief that, notwithstanding any Clawback Right risk, the COFINA Bonds would receive a higher credit rating due to the pledge of a dedicated revenue stream, which would in turn result in a lower cost of borrowing.  For example, in the March 2006 email from the Lehman banker to Mr. Salazar Conde, the banker stated:

> I am very willing to speak to whomever you feel is appropriate, to explain the mechanics and benefits of creating a new, highly rated sales tax credit for the Commonwealth.  My belief that this effort would attain great rating results and broad market acceptance was only bolstered today by S&P's decision to rate the Convention Center bonds at BBB+ (stable).  S&P's rating shows that even with the constitutional GO clawback they recognized the strength of a separate revenue pledge, and we know that the sales tax bonds, as envisioned, will be a far stronger credit.  At this point it would be very helpful to work with counsel to develop the draft language necessary to include in the sale tax legislation in order to assure that a new highly rated credit can be properly created.[37]

According to some witnesses, during these early discussions, the sales tax securitization was viewed as a good potential borrowing vehicle.  At that time, it was not specifically tied to refinancing the existing extraconstitutional debt.  The relation between the sales tax securitization and extraconstitutional debt did not come until later.

---

[36] Ex. 3, Decl. of Donald Burke in Support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 5, 2018), ECF No. 345-5.

[37] Ex. 3, Decl. of Donald Burke in Support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 5, 2018), ECF No. 345-5.

4.  **Act 91-2006 Emerged From the Debate Concerning the Budget for Fiscal Year Ended 2006 and Potential Sales Tax Reform**

Throughout much of 2005 through May 2006, a debate existed between the Executive Branch and the Legislative Assembly concerning both the budget for fiscal year ended 2006 and general tax reform.[38]  In March 2005, Governor Acevedo Vilá submitted for approval a budget for fiscal year ended 2006.[39]  The Legislative Assembly did not approve the Governor's proposal and instead approved a budget resolution for fiscal year 2006, which the Governor subsequently vetoed.[40]  As a result, by law, the budget for fiscal year ended 2005 (with certain adjustments) carried over into fiscal year ended 2006 as the budget debate continued.[41]

At the same time, the Government of Puerto Rico was evaluating tax reform and considering the imposition of a consumption tax.  On November 21, 2005, the Legislative Assembly approved, and the Governor signed, Joint Resolution No. 321,[42] a statement of the basic principles that would govern the reform of Puerto Rico's tax system.[43]  The proposed tax reform was aimed at increasing revenues by expanding the tax base through the implementation of the consumption tax.[44]  This proposed consumption tax ultimately became the SUT.

In late 2005 and early 2006, competing proposals were put forward by the Governor and various members of the Legislative Assembly concerning the consumption tax, with disagreement concerning the aggregate amount of the rate (5.5% versus 7%).[45]

Meanwhile, Puerto Rico's GO Bond credit rating continued to deteriorate, as agencies focused on the anticipated budget deficit for fiscal year ended 2006, slow progress on tax and fiscal reform, and the apparent political impasse regarding these measures.  On February 24, 2006, Moody's placed Puerto Rico's GO Bond rating of "Baa2" on its Watchlist for review and possible downgrade.[46]  On March 22, 2006, S&P placed Puerto Rico's GO Bond rating on CreditWatch and indicated it may take further rating action on or prior to June 30, 2006.[47]

---

[38] *See* Commonwealth of P.R., *Financial Information and Operating Data Report*, 65–67 (June 1, 2006).
[39] Commonwealth of P.R., *Financial Information and Operating Data Report*, 65 (June 1, 2006).
[40] Commonwealth of P.R., *Financial Information and Operating Data Report*, 65 (June 1, 2006).
[41] Commonwealth of P.R., *Financial Information and Operating Data Report*, 65 (June 1, 2006).
[42] Commonwealth of P.R., *Financial Information and Operating Data Report*, 56 (June 1, 2006).
[43] Commonwealth of P.R., *Financial Information and Operating Data Report*, 56 (June 1, 2006).
[44] Commonwealth of P.R., *Financial Information and Operating Data Report*, 56 (June 1, 2006).
[45] Commonwealth of P.R., *Financial Information and Operating Data Report*, 56 (June 1, 2006).
[46] Moody's Investors Service, *Moody's Places Commonwealth of Puerto Rico's Baa2 Rating on Watchlist for Possible Downgrade* (Feb. 24, 2006) (available through Moody's Investors Service).
[47] Standard & Poor's Ratings Services, *Puerto Rico Debt Ratings Placed on CreditWatch Negative; Persistent Structural Imbalance Cited* (Mar. 22, 2006) (available through Standard & Poor's Ratings Services).

5. **GDB Began to Target the Extraconstitutional Debt That Had Become a Burden**

In looking for ways to close the budget gap, one of the issues GDB focused on was the cost of debt servicing on the "extraconstitutional debt."  As noted, extraconstitutional debt refers to debt that is payable solely from legislative appropriations with no identified source of repayment. It had accumulated over several years and included loans from GDB to fund operational deficits.[48] The extraconstitutional debt was often refinanced through PFC in the form of appropriation bonds.

By May 2006, PFC had outstanding approximately $4.3 billion in appropriation bonds.[49] In addition, according to statements at the time, Puerto Rico had approximately $2.2 billion of extraconstitutional debt outstanding in the form of loans from GDB.[50]   According to a senior-level GDB official, by 2006, the extraconstitutional debt had become a burden to the General Fund. The debt service on appropriation debt was approximately $532 million per year.[51]  The amount of the debt was substantially affecting Puerto Rico's credit, and Puerto Rico was struggling to identify methods for repayment.[52]

6. **The Government Partially Shut Down**

On April 25, 2006, Governor Acevedo Vilá warned in a televised address that "[b]eginning next Monday, May 1, the majority of agencies of the central government will not be able to operate."[53]  The next day, he signed an executive order allocating Puerto Rico's remaining revenues to those agencies that offer essential services.[54]  On May 1, the order took effect and, as a result, certain non-essential services by Puerto Rico agencies and departments, including public schools, were suspended.[55]  Approximately 95,000 public employees were granted unpaid leave

---

[48] *See* Gov't Dev. Bank for P.R., *Public Debt Report: Fiscal Year 2006 and First Six Months of Fiscal Year 2007*, 4 (May 3, 2007) ("This debt was issued throughout the years and is mostly debt authorized by legislations but with no identified sources of repayment, until the approval of the Fiscal Reform Act of 2006.").

[49] Commonwealth of P.R., *Financial Information and Operating Data Report*, 66 (June 1, 2006).

[50] *See* Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 38 (May 16, 2006) ("'Bill Cunningham: To continue with that 6.5 billion that you are talking about, consists of (4.3) billion in appropriation debt?  And what's the rest of it?  Is it the 2.2 billion that is on the GDB balance sheet?' 'Jorge:  That is correct.'").

[51] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 19 (May 16, 2006) ("What we call the extra constitutional debt meaning PFC and the loans of [GDB] . . . the debt service on that is about 532 million[.]").

[52] Act of May 13, 2006, No. 91, Statement of Motives, 2006 P.R. Laws 246, 246–247.

[53] *See* Miranda Leitsinger, *Puerto Rico days away from government shutdown, leader warns*, Bos. Globe, Apr. 27, 2006, http://web.archive.org/web/20121006162222/http://www.boston.com/news/nation/articles/2006/04/27/puerto_rico_days_away_from_government_shutdown_leader_warns/.

[54] P.R. Exec. Order No. OE-2006-10, 2 (Apr. 26, 2006).

[55] Commonwealth of P.R., *Financial Information and Operating Data Report*, 66 (June 1, 2006).

of absence until such time as Puerto Rico was provided with sufficient resources to cover remaining expenditures for fiscal year ended 2006.[56]

What followed was an impasse and period of negotiation between the Executive Branch and the Legislative Assembly with respect to ending the partial government shutdown and addressing the budget deficit for fiscal year ended 2006.  During this time, Puerto Rico-related credit ratings further deteriorated.[57]  On May 8, 2006, Moody's downgraded the GO Bond ratings from "Baa2" to "Baa3," the agency's lowest grade above junk status.[58]  It downgraded Puerto Rico's appropriation bond ratings from "Baa3" to "Ba1."[59]  The Moody's report also noted Puerto Rico's strained financial condition, ongoing political conflict and lack of agreement regarding the measures necessary to end the government's multi-year trend of financial deterioration as reason for its ratings action.

### 7.  <u>End to the Impasse</u>

Ultimately, with the assistance of an appointed special four-member committee, a compromise was reached that involved several parts.  Act 91-2006, by which a portion of the anticipated sales tax would be diverted to a special fund (then the Urgent Interest Fund) for purposes of paying or refinancing extraconstitutional debt, was part of the solution.

Specifically, according to remarks by Mr. Salazar Conde at a May 16, 2006 investor conference call, as part of the compromise, it was agreed that GDB would provide to Puerto Rico a loan of $741 million to finance the budget deficit for fiscal year ended 2006.[60]  The loan would be repaid through a combination of: (a) approximately $200 million from one-time tax measures; and (b) the remaining $500 million through the sales tax mechanism set up by Act 91-2006, which would also be used to pay or refinance various appropriation bonds.[61]  According to the

---

[56] Commonwealth of P.R., *Financial Information and Operating Data Report*, 66 (June 1, 2006).

[57] *See* Moody's Investors Service, *Moody's Comments on Puerto Rico Government Shut-Down*, 1 (May 2, 2006) (available through Moody's Investors Service) (preceding the downgrade, explaining their view that the shutdown was a "high-stakes effort to force a resolution of the Commonwealth's longer term budget issues" and warning that "[i]f this is not productive, or if the political stalemate continues beyond a relatively short period of time, the rating implications will be negative.").

[58] Moody's Investors Service, *Moody's Downgrades Commonwealth of Puerto Rico's G.O. Bonds to Baa3 and Appropriation Bonds to Ba1* (May 8, 2006) (available through Moody's Investors Service).

[59] Press Release, Gov't Dev. Bank for P.R., Moody's Downgrades Puerto Rico's Credit and Keeps It on Its Watchlist (May 8, 2006); *see also* David McFadden, *Agency Downgrades Puerto Rico Bond Rating*, Wash. Post, May 8, 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/05/08/AR2006050801112.html.

[60] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 15 (May 16, 2006) (". . . . And I just want to point out that—I mean it is coincidental that you know the legislature approved the GDB loan to the government of 741 million.").

[61] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 3 (May 16, 2006) ("The first is the collection of specific (tax) measures that were approved by the legislature one time—measures one time (tax) measures that can generate approximately $200 million.  And number two, taking the remaining balance of the $500 million and refinancing it together with approximately $6 billion of appropriation bonds and notes that the

The Independent Investigator's Final Investigative Report

Commonwealth Financial Information and Operating Data Report of June 2006, the $741 million GDB loan allowed Puerto Rico to resume full government operations on May 15, 2006.[62]  In addition, there was a commitment to work out the details behind a sales tax, including the aggregate rate.[63]

Accordingly, on May 12, 2006 the Legislative Assembly approved, and on May 13, 2006 the Governor signed Act No. 90, authorizing GDB to lend up to $741 million to finance Puerto Rico's budget deficit for fiscal year ended 2006.[64]  They also enacted Act 91-2006, as discussed below.

### 8.    The Legislative Assembly Approved and the Governor Signed Act 91-2006, Creating the UIF

As discussed, through Act 91-2006, the Legislative Assembly created the UIF and called for a portion of the impending SUT revenues to be transferred to it.[65]  Act 91-2006 directed that the UIF be used, among other purposes, to pay or refinance the extraconstitutional debt in existence as of June 30, 2006.[66]

Act 91-2006's Statement of Motives states that the purpose of Act 91-2006 was to address Puerto Rico's growing extraconstitutional debt resulting from ongoing budget deficits:

> During the past decades, the Government of Puerto Rico has been contracting debts to finance its operations without succeeding in identifying methods for their repayment.  The current amounts of this extraconstitutional debt have substantially affected government credit.  This situation turned more severe during fiscal year 2005-2006, when

---

[62] Commonwealth has outstanding.  So the idea is that the refinancing of the $6.5 billion would be paid with one percentage point of the sales tax.").

[62] Commonwealth of P.R., *Financial Information and Operating Data Report*, 67 (June 1, 2006).

[63] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 3 (May 16, 2006) ("And so that being the case, we have by law—we have set aside one percentage point of whatever that sales tax is going to be.  And the discussion right now is whether it is going to be 5.5 percent or 7 percent.  That is the discussion that is going on.  What keeps us apart is just that 1.5 percent.  And it will be settled within the next weeks.").

[64] Act of May 13, No. 90, 2006, 2006 P.R. Laws 244, 244.

[65] At the time Act 91-2006 was passed, the sales and use tax was contemplated as part of Joint Resolution 321 of November 21, 2005 ("Resolution to Establish the Objectives, Principles and Parameters that shall Frame and Govern the Evaluation and Approval of a Tax Reform and a Fiscal Reform of 2006").  Legis. Assemb. J. Res. 321, 15th Legis., 1st–2d Reg. Sess., (P.R. 2005).  The IVU was subsequently imposed as part of the Taxpayers Justice Act of 2006, Act of July 4, 2006, No. 117, 2006 P.R. Laws 1231.

[66] Specifically, Act 91-2006 called for the moneys to be used: (a) to pay or refinance the extraconstitutional debt in existence as of June 30, 2006; (b) to pay the advances to be made by the Government Development Bank pursuant to the Act to Impose the Supertax of 2006; (c) to cover the costs of early retirement plans of the Retirement Systems of the Employees of the Commonwealth; and (d) to service the debt in existence as of June 30, 2006, with the Teachers' Retirement System and the Retirement System of the Employees of the Commonwealth and the Judiciary.  Act of May 13, 2006, No. 91, Statement of Motives, 2006 P.R. Laws 246, 248.

government expenses once again surpassed revenues, thus creating the government crisis that afflicts the Island at present and which led to layoffs for over 95,000 government employees. [67]

GDB witnesses we interviewed confirmed the language and the intent of Act 91-2006 was to pay or refinance the extraconstitutional debt and that the language of the statute did not contemplate using the COFINA structure as a means to fund general operational expenses.  As noted, a high-level GDB official described the extraconstitutional debt as having become a burden to the General Fund.  According to this witness, his belief was that the government could refinance that debt through a structure that would have a "very high [credit] rating."

We found no evidence that the purpose of the UIF or the sales tax securitization structure that eventually became COFINA was to evade the Constitutional Debt Limit, and witnesses denied that that was its purpose.

During an investor conference call hosted by GDB on May 16, 2006, a question was asked whether there was a plan to do more than just refinance the extraconstitutional debt.  According to a transcript of the conference call, the questioner observed:

> [B]ecause these are long-term bonds that you are talking about.  Is there anything that would prevent you from segregating the sales tax revenue and issuing more debt that was backed by the sales tax revenue, even if the deficits were declining for just a short period of time?  Is that sales tax revenue really going to be able to back these bonds for 30 to 40 years, or is there some way that it could be segregated out and bonded out as a sales tax revenue bond?

In response, GDB's Executive Vice President for Financing stated:  "Well in terms of the—I think you are referring to the structure. Yes. We may in our restructuring of this debt create a sales tax bond so to speak, as other jurisdictions have done.  But we don't—you know we don't see this— *it would only be used to substitute existing debt.  Not to increase it.*" (emphasis added).[68]

### 9.   GDB Continued To Consider A Securitization Structure and Look Into Constitutional Questions

Act 91-2006 segregated a portion of the anticipated sales tax revenue by transferring it to a special fund, but it did not itself establish the securitization structure, whereby an entity issues bonds payable from and secured by the moneys deposited into the special fund.  That came later (first through Act 291-2006, then through Act 56-2007, which created COFINA).

The evidence shows that, as of this time, GDB was still working out the details behind the securitization structure.  Moreover, GDB was continuing to analyze the legal issues, including those related to a potential Clawback Right.  For example, during the May 16 investor conference call previously mentioned, a question was asked concerning the timing of any refinancing and

---

[67] Act of May 13, 2006, No. 91, Statement of Motives, 2006 P.R. Laws 246, 246–247.

[68] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 26 (May 16, 2006).

whether "this new sales tax, the one percent that is dedicated to these appropriation bonds, would that be still subordinate to the (GO) bonds constitutionally, or be somehow dedicated solely to the new sales tax bonds?"  In response, GDB's Executive Vice President for Financing stated:

> Whether we can create a sales tax bond is still—you know your question about the constitution.  Whether this would be subject to the GO you know [Claw]back [Right] or what is called available resources for the GO under the constitution is something that we are studying very carefully.  And you know, we are sensitive to the, you know, the requirements.

> There can be no impairment regarding GO bonds and certainly they are backed by the full taxing power of the commonwealth regardless of whether this one percent of the sales tax is available to the GO or not.  And currently you know the debt services, [$]516 million more or less, and the available revenues are you know projected to be in the magnitude of [$]9.5 billion.

> So you know, we will be studying this carefully . . . .  So a lot of work remains to be done.  And I think your questions are exactly the ones that we are asking ourselves.  And we'll be studying all this you know in the very near future and trying to conclude what the best way to do this is.[69]

Thus, not only was GDB considering the Clawback Right issues of the sales tax securitization, but so, too, were at least some investors.

### 10.  The Taxpayers Justice Act of 2006 Was Enacted

On July 4, 2006, after remaining differences over tax reform and the sales tax were resolved, the Taxpayers Justice Act of 2006 was enacted.[70]  Among other changes to the tax code, the Taxpayers Justice Act imposed a 5.5% sales and use tax for the benefit of Puerto Rico and also authorized the municipalities to impose a 1.5% retail sales and use tax.[71]

### 11.  Act 291-2006 Was Enacted, Creating COFINA's Precursor, the Urgent Interest Fund Corporation

Later that year, on December 26, 2006, the Legislative Assembly amended Act 91-2006 through Act 291-2006.  Act 291-2006's Statement of Motives reiterated that the portion of the SUT to be transferred to the UIF was "to be used to pay the extraconstitutional debt of the

---

[69] Transcript, Goldman Sachs & Co., *Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call*, 33 (May 16, 2006).

[70] Act of July 4, 2006, No. 117, 2006 P.R. Laws 1231 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16, et seq.).

[71] Act of July 4, 2006, No. 117, 2006 P.R. Laws 1231 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16, et seq.).

government of the Commonwealth, including the sums advanced by the Government Development Bank for Puerto Rico."[72]

Act 291-2006 also authorized the creation of the Puerto Rico Urgent Interest Fund Corporation (the "UIFC") as a subsidiary of GDB, and the transfer of the UIF to the UIFC.  The UIFC was to be created "for the purpose of issuing bonds or using other financing mechanisms to pay or refinance the extraconstitutional debt of the Commonwealth of Puerto Rico in existence as of June 30, 2006," and was authorized to pledge or otherwise encumber moneys in the UIF to repay those bonds.[73]

Importantly, Act 291-2006 expressly provided that UIFC debt "shall not constitute an obligation or debt of the Commonwealth of Puerto Rico or of its other instrumentalities" and that "neither the Commonwealth of Puerto Rico nor its other instrumentalities shall be responsible for the payment of such bonds or obligations, which shall not enjoy neither [sic] the full faith and credit nor the power of the Government to levy taxes."[74]

Act 291-2006 also increased the amount of SUT revenues transferred to the UIF, by setting that amount as the greater of (i) a specified percentage of all SUT collections during the fiscal year; or (ii) a minimum base amount that increases by 4% each fiscal year (starting with approximately $170 million in fiscal year ending 2008).[75]

Act 291-2006 authorized the same uses for the proceeds as authorized under Act 91-2006, described above.[76]

### 12.    As GDB Prepared to Go to Market With the First COFINA Bond Issuance, GDB Obtained Legal Opinions and Sidley Continued to Express Doubts About Viability

In spring and summer 2007, GDB prepared for the first COFINA Bond issuances.  The evidence reflects that, by this time, it was anticipated that Act 91-2006 would again be amended (as it ultimately was in Act 56-2007 of July 5, 2007) to establish COFINA as a new corporation and to rename the UIF as the "FIA Fund" (or, as it was later called in English, the "Dedicated Sales Tax Fund").  The anticipated amendment would state that the moneys deposited in the FIA Fund belong to COFINA and do not constitute available resources of Puerto Rico for any purpose "including for the purposes set forth in Section 8 of Article VI of the Constitution," as the amendment (*i.e.*, Act 56-2006) eventually does.[77]

---

[72] Act of Dec. 26, 2006, No. 291, Statement of Motives, 2006 P.R. Laws 1110, 1111.

[73] Act of Dec. 26, 2006, No. 291, sec. 2, § 1, 2006 P.R. Laws 1110, 1112–1113 (amending sec. 2 of Act 91-2006).

[74] Act of Dec. 26, 2006, No. 291, sec. 3, § 2, 2006 P.R. Laws 1110, 1114–1115 (amending sec. 3 of Act 91-2006).

[75] Act of Dec. 26, 2006, No. 291, sec. 2, § 1, 2006 P.R. Laws 1110, 1112–1113 (amending and adding to sec. 2 of Act 91-2006).

[76] Act of Dec. 26, 2006, No. 291, sec. 3, § 2, 2006 P.R. Laws 1110, 1113–1115 (amending sec. 3 of Act 91-2006).

[77] Act of July 5, 2007, No. 56, Statement of Motives, 2007 P.R. Laws 173, 174.

The Independent Investigator's Final Investigative Report

As discussed in Part XIV of this Report, unlike some states, Puerto Rico did not have a debt validation statute authorizing pre-issuance judicial review. Such a procedure permits a state's judiciary to issue a decision concerning a bond's validity and associated rights of bondholders prior to the bond's issuance.

According to one witness, Sidley Counsel, consistent with the views he expressed in a May 2007 email that has been publicly filed in the Title III Proceedings (discussed below), raised the question around this time whether a judicial validation procedure could effectively be replicated through an action seeking what is known as a "writ of mandamus" from the Supreme Court of Puerto Rico. We discuss the availability of a writ of mandamus in detail in Part XIV of the Report, but in general, if issued, a writ of mandamus in this context would have ordered an agency official to perform a legally-required act to issue certain bonds, thereby validating the legality of the issuance. According to the witness, however, lawyers from several Puerto Rico law firms informed Sidley Counsel that they believed such a mandamus action would not be possible in Puerto Rico.

In any case, in the absence of a clear mechanism for pre-issuance judicial review, the COFINA bond underwriters required that COFINA obtain a legal opinion from counsel concluding, among other things, that if the issue were to come before the Puerto Rico Supreme Court, the sales tax securitization structure would be held constitutional and not be found to violate the GO Bondholders' priority rights under the Puerto Rico Constitution. A witness for one of the COFINA underwriters explained that, for special revenue issuances in jurisdictions that do not have a bond validation statute (such as Puerto Rico), those legal opinions are a required condition to closing.

The evidence reflects that Sidley declined to provide such an opinion.

Sometime thereafter, GDB asked Sidley Counsel to review draft language to be included in the "Legal Considerations" section of an anticipated official statement (even though Sidley Counsel had not been engaged with respect to the contemplated issuance). Sidley Counsel responded to this request by email dated May 9, 2007. The email has since been publicly filed in the Title III Case.[78] It quotes draft language that reflects an expectation that the Puerto Rico Secretary of Justice would opine that Act 91-2006 was a valid enactment and that, although the question had not previously been decided, "pursuant to the provisions of Act 91, the Dedicated Sales Tax [would] not constitute 'available resources' of the Commonwealth for any purpose . . . ."

In the email, Sidley Counsel recommended, among other things, that language be added to the investor disclosure reflecting the lack of judicial approval of the proposed securitization structure. He wrote: "I would then add: 'no assurance can be given that the Puerto Rico Supreme Court will agree with the opinion of the Secretary of Justice should the issue by properly presented before the Court.'"[79]

---

[78] Ex. 4, Decl. of Donald Burke in support of Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. May 27, 2018), ECF No. 345-6.

[79] Ex. 4, Decl. of Donald Burke in support of Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. May 27, 2018), ECF No. 345-6.

He then added his own "view of where the above logic breaks down," stating:

> I think a court would have a hard time concluding just on the basis of the legislature saying so that the sales tax revenues are not "available" to the Commonwealth should it need the money to pay G.O. debt. Ultimately, the legislation may be upheld . . . but the mere fact that I'm having this discussion with you about its validity is reason you have to disclose that this conclusion isn't a slam dunk.[80]

As discussed further below, Sidley Counsel's recommended "no assurance" language was not included in the official statements that were ultimately issued.

Evidence reflects that, by May 2007, the Secretary of Justice had prepared a favorable opinion letter in support of the issuance. The opinion letter was a so-called "clean" opinion, meaning that the opinion was given without reservation. Witnesses told us that the practice of GDB was to transmit drafts of opinion letters to the Secretaries of Justice along with a request for the opinion.

In addition, Hawkins, which acted as bond counsel, also prepared and provided an opinion letter—addressed to COFINA, the CRAs and the COFINA Bond underwriters—in support of the anticipated issuance. Evidence suggests that Hawkins was asked to provide such an opinion after Sidley Counsel declined and, further, that Lehman played a role in involving Hawkins in the opinion process. The Hawkins opinion letter was a so-called "reasoned" opinion, meaning that it opined how it anticipated the Supreme Court of Puerto Rico would rule, in light of an ambiguity and absence of case law, and provided the support and legal analysis behind that opinion. The letter (ultimately dated July 31, 2007) concluded:

> Based upon and subject to the foregoing, as of the date hereof, we are of the opinion that a court, applying existing legal principles to the facts as properly found after appropriate briefing and argument, would find that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that said asset and right of the Corporation shall not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

The Hawkins opinion letter relied, in turn, upon an opinion letter of the separate law firm Fiddler, which served as underwriters' counsel.[81] The Fiddler letter provided an opinion as to matters of Puerto Rico law. While the issues addressed in the Hawkins opinion were, at their core, matters

---

[80] Ex. 4, Decl. of Donald Burke in support of Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. May 27, 2018), ECF No. 345-6.

[81] The Hawkins opinion also considered "applicable precedent in other jurisdictions, including especially the State of New York."

of Puerto Rico law, an underwriter witness told us that having a reputable stateside firm such as Hawkins provide the opinion helped with the marketability of the COFINA Bonds.

We understand that, although these legal opinions were shared with one or more of the CRAs in advance of the issuances, the opinions were not made publicly available in connection with the issuances. The subsequent release of the legal opinions for the 2011 COFINA issuances, in 2013, is discussed below.

We found no evidence that the views of Sidley Counsel were disclosed at this time.

### 13.    In Anticipation of First Issuances, GDB Presented to the CRAs and Obtained Positive Credit Ratings

In anticipation of the first issuance of the COFINA Bonds, GDB gave presentations to various ratings agencies. The presentation outlined the advantages of the financing structure, including statements that the structure:

- "Creates a strong new dedicated Credit that is independent of the General Fund[;]"

- "Efficiently refunds or services as much of the Commonwealth's appropriation-support ('Extra-Constitutional') debt as possible[;]"

- "Improves the Commonwealth's structural budget situation by eliminating, as a claim on the budget, over $500 million in annual debt service requirements[;]" and

- "Further strengthens the liquidity position of the GDB by repaying up to $2.8 billion in loans (plus $266.2 million in accrued interest) payable from General Fund appropriations."[82]

The presentation also highlighted the anticipated legal opinions that supported the issuance. A slide entitled "Legal Opinions Reinforce the Separation of the Dedicated Sales Tax from the Commonwealth Budget" stated as follows:

- "The Commonwealth Secretary of Justice has provided an unqualified opinion to the effect that, among other things:"

    - "COFINA has valid title to the collections of the Dedicated Sales Tax and the right to receive the Dedicated Sales Tax[;]"

    - "The Dedicated Sales Tax and all future collections are not 'available resources' of Puerto Rico (*i.e.*, not subject to prior claim for Puerto Rico's GO Bondholders)[;]" and

---

[82] Ex. 39 at 5, Decl. of Antonio Yanez, Jr. in Support of COFINA Agent Mot. for Summ. J., *Official Comm. Of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 7, 2018), ECF No. 348-3.

- "Subject to the right of the Legislature to modify or repeal the Dedicated Sales Tax, any attempt to redirect the Dedicated Sales Tax would violate the provisions of Puerto Rico law prohibiting the impairment of contracts."

- "Bond counsel (Hawkins) and underwriter counsel (Fiddler) will also provide opinions that conform to the Secretary of Justice's opinion on the above points."

- "The opinions are based on the explicit language transferring the sales tax property to the Corporation in consideration of payment of the extraconstitutional debt."[83]

In late June 2007, the ratings agencies gave the COFINA Bonds relatively strong credit ratings, noting in particular the strength of the revenue pledge and the legal opinions from bond counsel and underwriters' counsel.

Specifically, Moody's assigned an "A1" credit rating to the COFINA Series 2007A and 2007B Bonds. The Moody's report stated that the assignment of the "high quality rating" reflects, among other things, a "[a] strong legal structure, including a pledge of the larger of 1% of the Commonwealth's 5.5% sales tax revenues or a base amount, that does not flow through the General Fund and may only be used for repayment of the appropriation-supported debt."[84] The report noted that: "The Commonwealth's Secretary of Justice and outside bond counsel are expected to provide clean validity opinions for the sales tax bonds. These will include specific opinions that the pledged sales tax revenues are not available to the Treasury or the General Fund. That is, the revenues are not subject to the 'clawback' provision that affects many Commonwealth revenues. The Commonwealth has also covenanted not to impair bondholder's rights."[85]

Similarly, S&P assigned an "A+" credit rating to the COFINA Series 2007A and 2007B Bonds and stated that its rating reflected "a strong legal structure that separates the revenue stream supporting the bonds from the Commonwealth of Puerto Rico along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal." The report noted that S&P had "received an opinion from bond counsel stating that Act 91 successfully transfers property of the sales and use tax collections to COFINA. This transfer of property effectively excludes the pledged sales and use tax revenues from Puerto Rico's constitutional provision regarding the Commonwealth GO debt's first-lien claim on all available revenues (also known as the 'claw-back' constitutional provision)."[86]

---

[83] Ex. 39 at 32, Decl. of Antonio Yanez, Jr. in support of COFINA Agent Mot. for Summ. J., *Official Comm. Of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 7, 2018), ECF No. 348-3.

[84] Moody's Investors Service, *New Issue: Moody's Assigns A1 Rating and Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds*, 1 (June 27, 2007) (available through Moody's Investors Service).

[85] Moody's Investors Service, *New Issue: Moody's Assigns A1 Rating and Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds*, 2 (June 27, 2007) (available through Moody's Investors Service).

[86] Standard & Poor's Ratings Services, *Puerto Rico Sales Tax Financing Corp.; Sales Tax*, 2 (June 28, 2007) (available through Standard & Poor's Ratings Services).

Fitch also assigned an "A+" credit rating to the COFINA Bonds, noting in its report that the rating "reflects a structure and revenue pledge that results in a much stronger credit than the commonwealth of Puerto Rico's currently strained general obligation (GO) credit." The Fitch report went on to state: "Strong legal opinions have found that neither the commonwealth general fund nor commonwealth GO Bondholders have a claim on pledged sales tax revenues." The report acknowledged that "[t]he determination that the pledged sales tax revenues are not available to GO Bondholders is critical to the analysis of the sales tax bond credit and the strong 'A+' rating."[87]

By contrast, the CRAs had given, and were still giving, GO Bonds substantially lower ratings during the same time period. In 2007, Moody's rated the GO Bonds "Baa3," five notches below its "A1" COFINA Bond rating,[88] while S&P rated the GO Bonds "BBB-," four notches below its "A+" COFINA Bond rating.[89] As explained in Part X.C.4 of this Report, the CRAs rated the COFINA Bonds higher than other Puerto Rico-Related Bond issuances, and maintained their investment-grade ratings for the COFINA Bonds until as late as July 2014 (Fitch and Moody's) and February 2015 (S&P).

### 14.    The Legislative Assembly Enacted Act 56-2007, Creating COFINA

On July 5, 2007, the Legislature further amended Act 91-2006 through Act 56-2007. As anticipated in the draft official statement language discussed above, Act 56-2007 created COFINA in place of the UIFC as the entity authorized to issue the sales tax bonds. Act 56-2007 also changed the name of the UIF to the "*Fondo de Interés Apremiante*" (FIA Fund) or the "Dedicated Sales Tax Fund."[90]

Act 56-2007 provided that COFINA is "a corporate and political entity independent and separate from the Commonwealth of Puerto Rico." It also provided that COFINA was to be "attached" to GDB, have the same Board of Directors as GDB, and have the same powers and rights granted to GDB under its Constitutional Charter.[91]

The Statement of Motives for Act 56-2007 states that the purpose of the adjustment was to avoid negative financial consequences that would have resulted if the bonds were issued by a subsidiary of GDB. Its Statement of Motives explains that Act 291-2006 had "authorized the creation, by means of a resolution of the Board of Directors of the Government Development Bank for Puerto Rico (GDB), of the Puerto Rico Sales Tax Financing Corporation (COFINA, Spanish

---

[87] Fitch Ratings, *Tax Supported New Issue: Puerto Rico Sales Tax Financing Corporation* (July 5, 2007) (available through Fitch Ratings).

[88] Moody's Investors Service, *New Issue: Moody's Assigns Baa3 Rating to Approximately $1.5 Billion of Commonwealth of Puerto Rico Public Improvement Refunding Bonds; Outlook is Negative* (May 22, 2007) (available through Moody's Investors Service).

[89] Standard & Poor's Ratings Services, *Puerto Rico's GO Debt Rating Lowered to 'BBB-' Due To Structural Imbalance* (May 22, 2007) (available through Standard & Poor's Ratings Services).

[90] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 176.

[91] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 175.

acronym) as a subsidiary of GDB" but notes that "COFINA was never created by GDB."[92]  It further explains:

> If COFINA had been created as a subsidiary of GDB, there would have been adverse financial results for GDB due to the consolidation of the financial statements . . . . Therefore, it is necessary to amend Act No. 91 so that COFINA is created by law as an independent corporation attached to GDB, rather than as one of its subsidiaries.[93]

Act 56-2007 authorized the same uses for the bond proceeds as authorized under Act 91 as set forth above, including to pay or refinance extraconstitutional debt.[94]

Act 56-2007 also increased the minimum base amount of funds to be deposited into the Dedicated Sales Tax Fund (from $170 million to $185 million in fiscal year ending 2008).[95]

### 15.   COFINA Issued Series 2007A and Series 2007B, Followed by Series 2007C and Series 2008A

In late July 2007, COFINA issued its first two series of bonds: (i) Series 2007A, with a principal amount of approximately $2.6 billion; and (ii) Series 2007B, with a principal amount of approximately $1.3 billion.  In December 2007, COFINA issued Series 2007C bonds in the principal amount of approximately $500 million.  The next year, in 2008, COFINA issued Series 2008A bonds in the principal amount of approximately $730 million.

Consistent with COFINA's authorized purposes under its enabling legislation, the official statements for the 2007 and 2008 issuances reflect that the proceeds for those issuances were principally to be used to repay extraconstitutional debt.[96]

A portion of the bonds in each of the series were issued as CABs.  CABs are types of municipal securities for which principal and interest are paid in one lump sum on the maturity date in in lieu of payments over time.[97]  Because interest on CABs accrues and compounds, the amounts

---

[92] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 174.  As noted above, in the English version of Act 291-2006, COFINA is referred to as "Urgent Interest Fund Corporation."

[93] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 174.

[94] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 175.

[95] Act of July 5, 2007, No. 56, 2007 P.R. Laws 173, 177.

[96] See Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), Sales Tax Revenue Bonds, Series 2007A, 2 (July 13, 2007) ("The Corporation is . . . created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006.  Act 91 vested the Corporation with . . . the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created.").  See also Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), Sales Tax Revenue Bonds, Series 2008A, 2 (June 25, 2008).

[97] See, e.g., Glossary of Municipal Securities Terms, Municipal Securities Rulemaking Board, Capital Appreciation Bond (CAB), http://www.msrb.org/Glossary/Definition/CAPITAL-APPRECIATION-BOND-_CAB_.aspx (CAB: "A municipal security on which the investment return on an initial principal amount is reinvested at a stated compounded rate until maturity.  At maturity the investor receives a single payment (the 'maturity value') representing both the initial principal amount and the total investment return.

due at maturity can be many times the principal amount originally advanced. For example, as described in the official statement for the COFINA Series 2007A bonds, CABs with an original principal amount of $87,036,390 that matured August 2056 would require payment of approximately $1,151,275,000 at maturity—over **thirteen** times the original principal amount—as a result of the accumulation of compounding interest that is due at maturity.[98] While CABs are a costly form of financing in the long run, a GDB witness justified their use on the basis that the SUT was new and the collections projections were untested, and therefore the CABs avoided the risk of there not being sufficient SUT revenues collected from which to pay current interest.

For the 2007 and 2008 COFINA issuances, approximately $2.1 billion in initial principal amount of COFINA Bonds were issued as CABs, with additional COFINA CABs issued in subsequent years. The COFINA CABs were issued with maturity dates of up to forty-nine years after issuance.[99] Even though the Puerto Rico Constitution generally precludes Puerto Rico debt from maturing later than thirty years,[100] COFINA debt was not considered to be Puerto Rico-issued debt, and therefore not considered subject to the constitutional limitations.

In addition, in August 2007, COFINA entered into two forward starting interest rate swap transactions associated with a then-future COFINA issuance. As explained in Part XIII, a swap is a type of complex financial transaction that transfers the risk of interest rate fluctuations between a bond issuer and its counterparty. The COFINA swaps were structured such that COFINA could fix interest payments on floating rate notes issued five years later, in 2012. Those swap transactions suggest that, in 2007, GDB contemplated potential COFINA issuances in as late as 2012.

### 16.   Official Statements for 2007 and 2008 Issuances

The COFINA Bonds were marketed through official statements describing COFINA, the COFINA Bonds, and the pledged SUT, among other things. The cover of the official statements state in capitalized text:

> THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER

---

CABs typically are sold a deeply discounted price with maturity values in multiples of $5,000 . . . . [O]nly the initial principal amount of a CAB would be counted against a municipal issuer's statutory debt limit, rather than the total par value . . . .").

[98] *See* Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007A*, 14 (July 13, 2007).

[99] *See* Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007A*, cover page 2 (July 13, 2007) ("$175,057,848.00 Capital Appreciation Bonds due August 1, 2056").

[100] P.R. Const., art. VI, § 2.

THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.[101]

The official statements also contain a section titled "Legal Considerations" that discusses the validity of the COFINA Bonds and the legal opinions supporting their issuances. After describing Section 8 of Article VI of the Puerto Rico Constitution and Act 91-2006 as amended, the official statements for the COFINA Series 2007A and 2007B issuances state:

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.[102]

The official statements for the COFINA Series 2007C and 2008A issuances contain substantially identical language.[103]

The official statements for the COFINA Bonds issued in 2007 through 2008 did not include additional language that Sidley Counsel had recommended in 2007 for inclusion in the official statements concerning the uncertainty on the Clawback Right issue, as discussed above in Part VI.A.12. As discussed below, this additional language was later included in the official statements accompanying later COFINA Bond issuances, from 2009 onward.

---

[101] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007A* (July 13, 2007).

[102] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007A*, 21–22 (July 13, 2007); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007B*, 12 (July 17, 2007).

[103] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2007C*, 12 (Dec. 18, 2007); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2008A*, 11 (June 25, 2008).

The Independent Investigator's Final Investigative Report

**B.** **COFINA Was Expanded in 2009 to Authorize Issuance of Bonds to Cover Budget Deficits**

    **1.** **Through 2008, Puerto Rico Continued to Struggle**

        Through 2007 and 2008, as the general economy deteriorated, Puerto Rico continued to experience a general recession.[104]  The CRAs continued to comment about Puerto Rico's high debt levels and structural imbalance.[105]  For example, in July 2008, Moody's observed:

> The commonwealth has a long history of structural deficits, with deficit financing and one-time revenues being used to balance recurring expenditures. In recent years, however, the structural deficit has been reduced significantly. The structural deficit went from almost $1.5 billion in fiscal year 2006 to $700 million in fiscal year 2007. After narrowing in

---

[104] Commonwealth of P.R., *Financial Information and Operating Data Report* 1 (May 15, 2008) ("Puerto Rico's economy has been in a recession, which commenced in the fourth quarter of fiscal year 2006."); Act of Mar. 9, 2009, No. 7, Statement of Motives, 2009 P.R. Laws 30, 47.

[105] Moody's Investors Service, *Moody's Assigns Baa3 Rating $101.695 Million Commonwealth of Puerto Rico Public Improvement Refunding Bonds; Outlook is Negative*, 1 (Dec. 29, 2006) (available through Moody's Investors Service) ("Multi-year trend of large General Fund operating deficits, primarily due to overspending, and financed by deficit borrowing. Deficits are expected to continue in the next two years, though smaller than the imbalance of over 18% of revenues in 2006."); *id.* ("Very high government debt level relative to the economy, due in part to financing budget deficits, although growth in debt is expected to decline in coming years."); *id.*, 2 ("Although the Commonwealth has enacted legislation on several fronts to improve its finances, the scope of the measures is nonetheless moderate compared to the size of the structural budget imbalance experienced in 2006 and otherwise projected for 2007."); Standard & Poor's Ratings Service, *Puerto Rico's GO Debt Rating Lowered to 'BBB-' Due to Structural Imbalance*, 1 (May 22, 2007) (available through Standard & Poor's Ratings Service) ("Standard & Poor's Ratings Services lowered its long-term rating on the Commonwealth of Puerto Rico's GO debt one notch to 'BBB-' from 'BBB,' reflecting a long history of structural imbalance and the ongoing difficulties anticipated with further efforts to reduce the accrued deficit."); Moody's Investors Service, *Moody's Affirms Baa3 Rating on $500 Million Commonwealth of Puerto Rico Public Improvement Bonds and $1 Billion Refunding Bonds; Outlook is Negative*, 1 (Sept. 17, 2007) (available through Moody's Investors Service) ("Multi-year trend of large General Fund operating deficits, primarily due to overspending, and financed by deficit borrowing. Deficits are expected to continue in the next two years, though smaller than the imbalance of over 18% of revenues in 2006."); Moody's Investors Service, *High Profile Rating Update, Puerto Rico*, 3 (Nov. 26, 2007) (available through Moody's Investors Service) ("Multi-year trend of General Fund operating deficits, primarily due to overspending, and financed by deficit borrowing.  Deficits are expected to continue in the next two years, though smaller than the imbalance of over 18% of revenues in 2006."); Moody's Investors Service, *Moody's Assigns Baa3 Rating to Puerto Rico's $272.4M Public Improvement Refunding Bonds, Sub-Series 2003C-6 (General Obligation), in Conjunction with Conversion from Put Bonds to Indexed Floaters*, 1 (July 2, 2008) (available through Moody's Investors Service) ("Puerto Rico's Baa3 debt rating reflects . . . uncertainty surrounding the future of the sales tax given a reduction proposed by the Governor, a proposed 2009 budget which shows a return to increased structural imbalance, and the recessionary environment the commonwealth is operating within.").

The Independent Investigator's Final Investigative Report

2007, however, the structural imbalance is widening again, with a $1 billion imbalance in the fiscal 2009 proposed budget.[106]

On May 22, 2007, S&P lowered its credit rating for GO Bond debt to "BBB-" due to the continuing structural imbalance.[107]  Moody's assigned a "Baa1" rating to GO Bonds, noting the multi-year trend of General Fund operating deficits.[108]  And on September 3, 2008, Moody's observed: "General Fund revenue projections for fiscal year 2009 total $8.484 billion, a decrease of $183 million, or 2.1%, from estimated net revenues for fiscal year 2008 of $8.671 billion.  This leaves a shortfall of $1 billion."[109]

## 2.   Newly-Elected Governor Fortuño Declared a "Fiscal Emergency" in January 2009

On January 2, 2009, Luis Fortuño was sworn in as Governor.  At that time, according to his administration, Puerto Rico faced an estimated budget deficit of $3.2 billion for fiscal year ended 2009[110] and projected budget deficits of $3 billion per year for the following three fiscal years.[111]  According to a government witness certain CRAs had indicated that a further downgrade

---

[106] Moody's Investors Service, *Moody's Assigns Baa3 Rating to Puerto Rico's $272.4 M Public Improvement Refunding Bonds, Sub-Series 2003C-6 (General Obligation), in Conjunction with Conversion from Put Bonds to Indexed Floaters*, 2 (July 2, 2008) (available through Moody's Investors Service).

[107] Standard & Poor's Ratings Service, *Puerto Rico's GO Debt Rating Lowered to 'BBB-' Due to Structural Imbalance* (May 22, 2007) (available through Standard & Poor's Ratings Service) ("Standard & Poor's Ratings Services lowered its long-term rating on the Commonwealth of Puerto Rico's GO debt one notch to 'BBB-' from 'BBB,' reflecting a long history of structural imbalance and the ongoing difficulties anticipated with further efforts to reduce the accrued deficit.").

[108] Moody's Investors Service, *Moody's Affirms Baa3 Rating on $500 Million Commonwealth of Puerto Rico Public Improvement Bonds and $1 Billion Refunding Bonds; Outlook is Negative* (Sept. 27, 2007) (available through Moody's Investors Service) ("Multi-year trend of large General Fund operating deficits, primarily due to overspending, and financed by deficit borrowing.  Deficits are expected to continue in the next two years, though smaller than the imbalance of over 18% of revenues in 2006.").

[109] Moody's Investors Service, *Moody's Assigns Baa3 Rating to $250 Million Puerto Rico General Obligation Bonds; Outlook is Stable* (Sept. 3, 2008) (available through Moody's Investors Service).

[110] Commonwealth of P.R., *Financial Information and Operating Data Report*, 2 (May 15, 2009) ("As discussed below, the estimated structural deficit for fiscal year 2009 is projected to be $3.2 billion.").

[111] Act of Jan. 14, 2009, No.1, Statement of Motives, 2009 P.R. Laws 1; Act of Mar. 9, 2009, No.7, Statement of Motives, 2009 P.R. Laws 30, 39 ("The net result of these practices is a severe imbalance between recurring expenditures and income of the Government, coupled with a structural deficit nearing $3.2 billion for the current fiscal year, and which is projected to continue over $3 billion per year for upcoming fiscal years if no measures are immediately taken to stabilize our fiscal situation and to develop our economy.").

of Puerto Rico debt to junk status was imminent.[112]  On January 8, 2009, Governor Fortuño signed an executive order declaring a fiscal emergency.[113]

### 3.    Act 1-2009 Was Enacted

According to a high-level government witness who was involved, issuing more COFINA Bonds was viewed as the only viable option to close the budgetary gap.  The witness stated that senior government personnel understood there was limited capacity to issue GO Bonds due to the Constitutional Debt Limit, and COFINA Bonds were believed to be significantly less expensive because of their stronger credit rating.  According to that witness, GDB made the recommendation to issue additional COFINA Bonds and informed the new Governor of the legal opinions supporting such issuance.  Governor Fortuño ultimately agreed.  The plan was to issue the bonds and then balance the budget within four years.

Accordingly, on January 14, 2009, the Legislature enacted Act 1-2009, which broadened the COFINA program to issue more COFINA Bonds for an expanded list of permitted purposes.

Act 1-2009 increased the percentage of SUT revenues to be deposited into the Dedicated Sales Tax Fund from 1% to 2%, for the purpose of enabling COFINA to issue additional bonds backed by those SUT revenues.[114]  Moreover, it expanded significantly the authorized uses of COFINA Bond proceeds.  The authorized uses under Act 1-2009 included, among others: (i) to pay down Treasury debt with GDB in the amount of $1 billion, that had been used to finance the budget deficit for fiscal year ended 2009; (ii) to pay or finance Puerto Rico's operating expenses for the next three fiscal years (those ending 2010, 2011 and 2012); and (iii) to pay the accounts payable to suppliers of Puerto Rico.[115]

Consistent with witness accounts, the Statement of Motives accompanying Act 1-2009 underscored the expanded reliance of the Puerto Rico government on the COFINA program as a source of financing.  The Statement attributes Puerto Rico's poor financial condition to "the aftermath of eight years during which the Executive Branch failed to take the necessary measures to establish a balanced budget."[116]  It declares COFINA Bonds to be "the most cost-effective financing source" of the government "since the payment thereof is backed by the collections of the sales and use tax—a consistent and reliable revenue source."[117]  It further notes that COFINA Bonds "enjoy a credit rating higher than that of the general obligation bonds of the Commonwealth."[118]

---

[112] Act of Mar. 9, 2009, No. 7, Statement of Motives, 2009 P.R. Laws 30, 40–41 ("At present, our rating is at Baa3/BBB-, one step away from falling into the 'junk' credit rating and from losing its investment grade. . . .  While the 50 states have a A1 or higher rating, Puerto Rico is five levels below, on the edge of the precipice.  The degradation of our credit into 'junk' would be catastrophic for Puerto Rico.").

[113] Act of Jan. 14, 2009, No. 1, Statement of Motives, 2009 P.R. Laws 1; P.R. Exec. Order No. OE-2009-001 (Jan. 8, 2009).

[114] See Act of Jan. 14, 2009, No. 1, sec. 3(a), § 2, 2009 P.R. Laws 1, 7 (amending § 2 of Act 91-2006).

[115] See Act of Jan. 14, 2009, No. 1, sec. 2(b), § 1, 2009 P.R. Laws 1, 4 (amending § 1 of Act 91-2006).

[116] Act of Jan. 14, 2009, No. 1, 2009 P.R. Laws 1, 1–2.

[117] Act of Jan. 14, 2009, No. 1, 2009 P.R. Laws 1, 3.

[118] Act of Jan. 14, 2009, No. 1, 2009 P.R. Laws 1, 3.

The Independent Investigator's Final Investigative Report

By its express terms, Act 1-2009 authorized COFINA to issue debt to cover budget deficits. As explained in Part IV.C.2 and Part XI.D, although Puerto Rico's Constitution includes a balanced budget clause, a 1974 Puerto Rico Secretary of Justice opinion concluded, in essence, that it would be constitutional to issue bonds to fund budget deficits. It does not appear that, in connection with the passage of Act 1-2009 or subsequent COFINA Bond issuances, fresh opinions on the subject were requested of or provided by the Secretary of Justice or outside bond counsel.

## 4. The Legislature Enacted Act 7-2009, Declaring a Fiscal Emergency

Less than two months later, on March 9, 2009, the Legislature approved Act No. 7 ("Act 7-2009"), which declared a state of fiscal emergency and established a "Comprehensive Fiscal Stabilization Plan." As described in the Statements of Motives for Act 7-2009, the Fiscal Stabilization Plan involved "a combination of (a) new revenue and better oversight measures (Chapter II); (b) control and spending cutback measures (Chapter III); and (c) financing measures (Chapter IV) to help cover budgetary shortfalls while the revenue and the spending cutback measures begin to yield effect, to finance costs associated with the implementation of spending cutback measures, and to prevent adverse impacts to affect the General Fund in view of the precarious fiscal situation of some corporations and municipalities."[119]

The financing measures in Act 7-2009 included expansion of the COFINA program by increasing the percentage of SUT revenues to be deposited into the Dedicated Sales Tax Fund from 2% to 2.75%.[120] Underscoring the key role contemplated for COFINA in the Fiscal Stabilization Plan, a March 2009 GDB investor presentation stated that COFINA "is the financial 'anchor' of the Fiscal Reconstruction Plan and the Commonwealth's main financing tool for the next few years."[121] And a GDB witness characterized COFINA as "one of the legs of the stool" supporting Governor Fortuño's fiscal plan.

## 5. GDB Campaigned to Obtain a Credit Rating Increase for COFINA Bonds

In spring 2009, GDB worked with bankers at Citi[122] to present to the CRAs in an effort to increase the credit ratings on the outstanding COFINA Bonds as well as obtain favorable ratings on contemplated future issuances of subordinate COFINA Bonds.

Among the various arguments presented to support higher ratings was that, per the legal opinions of the Puerto Rico Secretary of Justice and bond counsel, the sales tax revenue transferred to COFINA would not be subject to the Clawback Right due to the separation of the dedicated sales tax from Puerto Rico's General Fund.

---

[119] Act of Mar. 9, 2009, No. 7, Statement of Motives, 2009 P.R. Laws 30, 47.

[120] Act of Mar. 9, 2009, No. 7, sec. 50, § 3, 2009 P.R. Laws 30, 112 (amending § 3 of Act 91-2006).

[121] Gov't Dev. Bank for P.R., *Economic and Fiscal Reconstruction Plan: Government Development Bank for Puerto Rico Investor Presentation*, 33 (March 12, 2009).

[122] Citi served as a lead underwriter for two of the three 2009 COFINA issuances. *See* Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2009A* (June 10, 2009); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2009B* (June 19, 2009).

The Independent Investigator's Final Investigative Report

In May 2009, Moody's and S&P increased their ratings (from "A1" to "Aa3," and from "A+" to "AA-," respectively) on the outstanding senior COFINA Bonds.  Fitch affirmed its "A+" ratings on the outstanding senior bonds and removed them from "Ratings Watch Negative."[123]  In addition, the agencies assigned strong ratings to the forthcoming first subordinated series of COFINA Bonds:  Moody's assigned the forthcoming subordinated bonds an "A2," S&P assigned them an "A+," and Fitch assigned them an "A." [124]

Among other considerations, the three CRAs noted the perceived strength of the legal structure that separates the tax revenue stream from the General Fund.  Moody's and Fitch specifically noted in their reports the strength of the legal opinions supporting that conclusion.[125]

## 6.   COFINA Issued Three Series of COFINA Bonds in 2009

In 2009, COFINA issued three series of COFINA Bonds (Series 2009A, Series 2009B and Series 2009C) in the aggregate principal amount of approximately $5.6 billion.  Offering documents for the 2009 issuances reflect that the proceeds for those issuances were, consistent with Act 1-2009, principally to be used to pay outstanding obligations of Puerto Rico and provide funds for operating expenses.  According to the official statements, none of those issuances were to be used to repay extraconstitutional debt.[126]  In addition, beginning in 2009, COFINA began to

---

[123] *See* Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $7.5B Subordinate Lien Sales Tax Revs 'A'* (May 20, 2009) (available through Fitch Ratings).  A new issue report regarding COFINA 2009A and 2009B first subordinate Lien Series was published on June 5, 2009.  Press Release, Fitch Ratings, *Tax Supported New Issue: Puerto Rico Sales Tax Financing Corporation* (June 5, 2009) (available through Fitch Ratings).

[124] *See* Standard & Poor's Ratings Services, *Puerto Rico Sales Tax Financing Corp. Sales Tax Revenue Bonds Rated 'A+'; On CreditWatch Negative* (June 24, 2008) (available through Standard & Poor's Rating Service).  *See also* Moody's Investors Service, *Moody's Assigns A2 To Puerto Rico Subordinate Lien Sales Tax Revenue Bonds; Upgrades Senior Lien Sales Tax Bonds To Aa3* (May 18, 2009) (available through Moody's Investors Service); Moody's Investors Service, *Moody's Assigns Aa3 To $238 Million Sales Tax Revenue Refunding Bonds, Senior Series 2009 C, Issued By The Puerto Rico Sales Tax Financing Corporation* (June 16, 2009) (available through Moody's Investors Service).

[125] Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $7.5B Subordinate Lien Sales Tax Revs 'A*,' 1 (May 20, 2009) (available through Fitch Ratings) ("The legal opinions are strong, finding that neither the commonwealth general fund nor commonwealth GO bondholders have a claim on pledged sales tax revenues."); Moody's Investors Service, *Moody's Assigns A2 To Puerto Rico Subordinate Lien Sales Tax Revenue Bonds; Upgrades Senior Lien Sales Tax Bonds To Aa3*, 3 (May 18, 2009) (available through Moody's Investors Service) ("We note that the rating on the senior and subordinate Sales Tax Revenue Bonds is significantly higher than our current Baa3/stable rating on the commonwealth's general obligation bonds, primarily reflecting . . . the fact that the sales tax revenues are not subject to the commonwealth's 'clawback' provisions (according to opinions issued by the commonwealth's Secretary of Justice and outside bond counsel).").

[126] For one of those issuances—the COFINA Series 2010A bonds, in the amount of approximately $1.8 billion—about $500 million of proceeds appear to have been used to repay previously issued bond anticipation notes.  *See* Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010 A*, A-8 (Jan. 28, 2010).  Bond anticipation notes are short-term interest-bearing securities used in advance of a larger, future bond issuance.  *See* Glossary of Municipal Securities Terms, Municipal Securities Rulemaking Board, Note, http://www.msrb.org/glossary/definition/note.aspx ("*Bond*

issue bonds that were subordinated in right of payment to other COFINA Bonds.  In other words, in the case of insolvency, investors who purchased subordinated COFINA Bonds would be paid back after those who purchased senior COFINA Bonds.  COFINA ultimately issued (through the last COFINA issuances in 2011) approximately $9.7 billion in principal amount of subordinated bonds.

### 7.        COFINA Made Certain Risk Disclosures for its 2009 Issuances

The "Risk Factors" section of the official statement for the COFINA Series 2009A bonds, under the heading "Certain Constitutional Considerations Relating to Act 91," stated that the Puerto Rico Supreme Court "could reach a different conclusion" than that reached by the prior opinions, and that if that happened, "it would not necessarily constitute reversible error."  The official statement went on to state that "the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court . . . that reached the issue on the merits would hold and . . . are not a guarantee, warranty or representation."[127]

### 8.        COFINA Issued Additional Bonds in 2010 and 2011

In 2010, the law firm of Nixon Peabody replaced Hawkins as bond counsel for COFINA issuances.  Nixon Peabody issued its own reasoned opinion in support of the constitutionality of the COFINA structure for the 2010 and 2011 issuances.[128]  The legal opinions in support of the 2011 COFINA issuances, including the Nixon Peabody opinion, were publicly released by GDB in October 2013, in response to specific investor requests, as discussed further below.[129]

In 2010, COFINA issued another $3.6 billion in principal amount of bonds (Series 2010A, 2010C, 2010D and 2010E).[130]  Like the 2009 issuances, the 2010 issuances—based on the offering documents—were principally to be used to pay outstanding government obligations and provide funds for operating expenses.[131]

In 2011, COFINA issued four series of bonds (Series 2011A through Series 2011D) in the aggregate principal amount of approximately $1.9 billion.  Those were the last COFINA Bond

---

*Anticipation Notes (BANs)* – Notes issued by a governmental unit, usually for capital projects, that are repaid from the proceeds of the issuance of long-term bonds.").

[127] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds*, *Series 2009A*,  31–32 (June 10, 2009).

[128] The Nixon Peabody opinions relied on the Puerto Rico law firm PMA for certain Puerto Rico law matters. PMA served as underwriters' counsel for the 2009–2011 COFINA issuances.

[129] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 1 (Oct. 31, 2013).

[130] There was also a COFINA Series 2010B issuance, structured as a bond anticipation note.  *See* Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010C*, 2–3 (June 24, 2010).

[131] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010A*, 38 (Jan. 28, 2010); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010C*, 37 (June 24, 2010); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010D and 2010E*, 36 (June 24, 2010).

issuances.  According to the offering documents, the proceeds of those bonds were to be used for various purposes, including to repay extraconstitutional debt, refinance existing COFINA subordinated debt and provide funding for Puerto Rico.[132]

Notably, for the $1 billion Series 2011C issuance, the deal documents reflect that about $400 million of proceeds were to be used to pay termination fees under COFINA swap agreements.[133]  The use of COFINA bond proceeds to pay swap termination fees appears to have been permitted under Act 56-2007 (discussed above), which allowed COFINA to pay "obligations incurred under any type of financing or guaranty agreement or interest rate swap agreement executed with respect to [COFINA] bonds."[134]  The use of COFINA Bond proceeds to pay swap termination fees is discussed in Part XIII.E.2.

### 9.    **The Investor Call**

The legal opinions in support of the 2011 COFINA issuances, including the Nixon Peabody opinion, were publicly released by GDB in October 2013, in response to specific investor requests.[135]  On a public investor conference call hosted by GDB on October 31, 2013 (the "Investor Call") to discuss the opinions, shortly after their issuance, GDB's General Counsel explained that the release of the opinions reflected "a renewed commitment to observe best disclosure practices and improve our relationship with our investor base."[136]  According to witness accounts, GDB was considering a new COFINA Bond issuance at the time, and investors were looking at the risks of the COFINA structure afresh.  Indeed, in an email sent by a member of GDB's public relations firm to GDB's General Counsel recounting a discussion with a large bond investor shortly before the Investor Call, it was noted that the investor "believes that available revenues and the potential for a clawback have not been confirmed, and if we can't say speak [sic] definitively and positively about this on the webcast he expects a very negative reaction from the markets."[137]  Reflecting the perceived importance of disclosing the opinions to the market at that time, an outside COFINA advisor stated the following in an email to the GDB Interim President after the Investor Call:  "Posting the opinions that support COFINA's 'non-clawbackable' status

---

[132] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2011A*, 42 (Nov. 16, 2011); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2011B*, 40 (Nov. 16, 2011); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2011C*, 37 (Dec. 1, 2011); Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2010A*, 38 (Dec. 1, 2011).

[133] Official Statement, P.R. Sales Tax Fin. Corp. (COFINA), *Sales Tax Revenue Bonds, Series 2011C*, 39 (Dec. 1, 2011).

[134] Act of July 5, 2007, No. 56, sec. 3, § 4, 2007 P.R. Laws 173, 178 (amending § 4 of Act 91-2006).

[135] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 1 (Oct. 31, 2013).

[136] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 9 (Oct. 31, 2013).

[137] Ex. 10, Decl. of Donald Burke in Support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D. P.R. Mar. 5, 2018), ECF No. 345-12.

is a positive and its impact on the market for added COFINA debt will depend on the perceived strength of those opinions."

Lawyers with Nixon Peabody and PMA who prepared the opinions participated on the Investor Call and addressed pre-selected questions from investors regarding the opinions.  Several investors asked questions as to why the Puerto Rico courts had not, by that time, addressed issues surrounding the Clawback Right and whether there was a plan to seek a ruling from the Puerto Rico courts on that issue.  According to the transcript of the Investor Call, an attorney with PMA responded to these inquiries as follows: "The short answer for this question is that under Puerto Rico's jurisdictional requirement, parties cannot bring a test case or seek an advisory opinion from the courts."[138]  That same attorney went on to explain that "COFINA has not sought a ruling of this nature because unless there was a real case or controversy, the court would not have jurisdiction to rule on this matter."[139]  An attorney with Nixon Peabody then directed the following question to the PMA lawyer:

> Several of the questions that we received cited what other jurisdictions have done in terms of seeking declaratory judgment or having a court provide an advisory opinion with respect to certain legislative acts, but Puerto Rico law doesn't provide for that procedure, right?  So no such request can be made.  Is that fair to say?[140]

The response from that attorney was: "That's fair to say."[141]  This matter is discussed further in Part XIV.C.1.(d) of the Report.

Ultimately, the planned COFINA Bond issuance did not go forward, as it was decided that GO Bonds would be issued instead.

## 10.     The CRAs Downgraded COFINA Bonds in 2014

In 2014, as Puerto Rico's economy worsened, the CRAs downgraded COFINA Bonds. After the enactment of the Recovery Act on June 28, 2014,[142] Moody's and Fitch downgraded COFINA Bonds to junk status.[143]  While the CRAs still considered the legal structure and separation of tax revenues to be strong, they generally noted that "the willingness to adjust the

---

[138] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 5 (Oct. 31, 2013).

[139] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 5 (Oct. 31, 2013).

[140] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 5 (Oct. 31, 2013).

[141] Investor Call Transcript, Gov't Dev. Bank for P.R., *Conference Call about COFINA Legal Opinions*, 5 (Oct. 31, 2013).

[142] Act of June 28, 2014, No. 71, 2014 P.R. Laws 371.

[143] Fitch Ratings, *Fitch Downgrades Puerto Rico GO, Sales Tax, Retirement System & Water Revenue Bonds* (July 9, 2014) (available through Fitch Ratings); Moody's Investors Service, *Moody's Downgrades Puerto Rico GO and Related Bonds to Ba2, Notched Bonds to Ba3 and COFINA bonds to Baa1, Baa2; Outlook Negative* (Feb. 7, 2014) (available through Moody's Investors Service).

statutory debt structure the risk that COFINA's sales tax security pledge may not be separated from the commonwealth's finances in the future."[144]

For example, on July 1, 2014, Moody's downgraded senior COFINA Bonds to "BA3" from "Baa1" and the COFINA subordinated bonds to "B1" from "Baa2," with a negative outlook. The report noted a concern that Puerto Rico may act to impair the rights of COFINA Bondholders: "The COFINA ratings have now been positioned closer to the GO [Bond ratings], reflecting their increased susceptibility to any action that impairs bondholders' claims on sales tax revenues if the commonwealth invokes its police powers and acts to protect the health and safety of the general public ahead of bondholders. The new GO and COFINA bond ratings face heightened risk of default, given the commonwealth's stagnant economic conditions and disproportionately large debt burden."[145]

Similarly, on July 9, 2014, Fitch Ratings downgraded the senior COFINA Bonds to "BB-" from "AA-" and subordinate COFINA Bonds to "BB-" from "A+."  The report noted concern with actions Puerto Rico may take:  "Pursuant to Fitch criteria, the amount of credit given to a special tax security is tempered by the risk that the state, faced with extreme financial stress, could exercise its sovereign powers to the detriment of bondholders."[146]

And on July 11, 2014, S&P downgraded its ratings on senior COFINA Bonds to "BBB" from "AA-" and on subordinate COFINA Bonds to "BBB-" from "A+."  S&P noted:  "We have also lowered the rating on COFINA multiple notches, bringing the COFINA sales tax rating closer to that of the commonwealth's GO, as a result of our view that the Act raises the risk that the commonwealth may seek additional changes in statutory law that could potentially reduce the separation in credit quality of COFINA's sales tax pledge from the commonwealth's finances should financial stress on the general fund increase significantly."[147]

COFINA has not issued any additional bonds since 2011.[148]

## C.     Use of Tax Securitization Structures in Other Jurisdictions

Puerto Rico was neither the first, nor the last, government to raise financing through a sales tax securitization structure.  The use of such a structure to address New York City's fiscal crisis in

---

[144] Standard & Poor's Ratings Services, *Puerto Rico And Related Entity Ratings Placed On CreditWatch Negative Following Legislation Approval*, 2 (June 27, 2014) (available through Standard & Poor's Rating Service).

[145] Moody's Investors Service, *Moody's Downgrades Puerto Rico GOs to B2 from Ba2, COFINA Senior-Sub to Ba3-B1; Outlooks Negative*, 1 (July 1, 2014) (available through Moody's Investor Service).

[146] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO, Sales Tax, Retirement System & Water Revenue Bonds*, 2 (July 9, 2014) (available through Fitch Ratings).

[147] Standard & Poor's Ratings Services, *Puerto Rico GO Rating Lowered One Notch To 'BB' Following Debt Legislation; Outlook Negative*, 2 (July 11, 2014) (available through Standard & Poor's Rating Service).

[148] In April 2013, COFINA issued approximately $333 million in principal amount of bond anticipation notes, the proceeds of which were used to fund Puerto Rico's operating budget for the fiscal year ended 2013.  *See* P.R. Sales Tax Fin. Corp, *Basic Financial Statements: Year Ended June 30, 2013*, 3 (Apr. 14, 2014).  Those notes were repaid from the proceeds of the 2014 GO Bond Issuance.  *See* Part IV.F.5.

the mid-1970s is a notable example of how such a structure has been used as a form of "rescue financing."  In 1975, the State of New York created the Municipal Assistance Corporation ("MAC") as one measure to stabilize New York City's finances.[149]  MAC was initially authorized to issue up to $3 billion in long-term debt, secured by and repaid from a sales tax levied only in New York City. The proceeds of the MAC bonds were used to repay New York City's maturing short-term debt and to cover some of the City's operating expenses.[150]  Over the years, MAC ultimately issued almost $10 billion in bonds, and provided New York City with the breathing room to address its budget deficit problems without defaulting on its debt.  MAC finally dissolved itself in 2008, after retiring all of its debt.[151]

A key driver to the success of the MAC program appears to be that it was accompanied by measures to improve fiscal discipline.  Specifically, shortly after the creation of MAC, New York State enacted legislation that, among other things: (i) created the Emergency Financial Control Board, which was authorized to take control of New York City's finances; and (ii) required New York City to balance its budget within three years and to follow generally accepted accounting practices.[152]  New York City also received federal assurances under the federal New York City Seasonal Financing Act of 1975[153] and had the direct backing, financial support, and oversight of the New York State government.  These measures are credited with giving New York City much needed fiscal discipline, a balanced budget, and good accounting practices.[154]

In the early 1990s, Pennsylvania employed a similar structure when it passed legislation creating the Pennsylvania Intergovernmental Cooperation Authority ("PICA") to address Philadelphia's fiscal problems in existence at that time.[155]  PICA acts as a state-level fiscal responsibility and oversight board, and also provided financial assistance to Philadelphia, including through the issuance of bonds.[156]  PICA is vested with authority to review and approve

---

[149] See Donna E. Shalala and Carol Bellamy, "A State Saves a City:  The New York Case," 1976 Duke L.J. 1119 (1976).

[150] See Donna E. Shalala and Carol Bellamy, "A State Saves a City:  The New York Case," 1976 Duke L.J. 1119, 1128 (1976).

[151] See Dall Forsythe, *Debt Management in New York City, 1978–2008* (Oct. 2008) (working paper prepared for delivery at the Annual Conference, Association for Budgeting and Financial Management) (on file with the New York University Robert F. Wagner School of Public Service).

[152] N.Y. State Fin. Emergency Act for the City of N.Y., 1975 N.Y. Laws 1405, 1442, 1444, and 1569 (McKinney) (codified as N.Y. Unconsol. Laws §§ 5401–5420 (McKinney), terminated by N.Y. Unconsol. Law § 5418 (McKinney)).

[153] 31 U.S.C. § 1501 *et seq.* (1975). *See Ropico, Inc. v. City of New York*, 425 F. Supp. 970, 975 (S.D.N.Y. 1976) (explaining the Act's provision of $2.3 billion of seasonal loans to New York City); *see also Withers v. Teacher's Ret. Sys. of City of New York*, 447 F. Supp. 1248, 1261 (S.D.N.Y. 1978), *aff'd* 595 F.2d 1210 (2d Cir. 1979) (noting federal efforts to insure the fiscal preservation of the City of New York).

[154] *See* Dall Forsythe, *Debt Management in New York City, 1978–2008*, 4 (Oct. 2008) (working paper prepared for delivery at the Annual Conference, Association for Budgeting and Financial Management) (on file with the New York University Robert F. Wagner School of Public Service).

[155] Pa. Intergovernmental Cooperation Authority Act for Cities of the First Class, 53 Pa. Stat. Ann. § 12720.101, *et seq.* (West).

[156] *See* Official Statement, Pa. Intergovernmental Cooperative Auth., *Sales Tax Revenue Refunding Bonds, Series of 2009*, B-7–B-9 (June 10, 2009) (showing that the last Special Tax Revenue Bonds were issued on December 15, 1994).

The Independent Investigator's Final Investigative Report

Philadelphia's five-year financial plans, and also has the power to certify the city's non-compliance with its financial plans, in which case PICA can direct the Pennsylvania Secretary of Budget to withhold state funding for the city.[157]  Starting in 1992, PICA issued special tax revenue bonds backed by a 1.5% tax on salaries and other compensation earned by Philadelphia residents, which were used to fund the city's operating deficit.[158]

Tax revenue bonds have also been used to fund operational deficits at the state level.  In 2004, California passed legislation authorizing the issuance of up to $15 billion in so-called Economic Recovery Bonds supported by a portion of a new statewide 0.25% state-wide sales and use tax.[159]  The bond proceeds were used to help fund a state budget deficit of $35 billion incurred in fiscal year 2003.  California ultimately issued over $14 billion of principal on Economic Recovery Bonds, with issuances in 2004 and 2008.[160]  As of August 2015, California had paid off principal and interest on the bonds, one year ahead of schedule.[161]

And as recently as 2017, Chicago tapped into the tax securitization bond market to address a structural budget deficit of over $100 million[162] and $30 billion of unfunded pension liabilities.[163]  In October 2017, Chicago's City Council established the Sales Tax Securitization Corporation ("STSC"), a non-profit public corporation and instrumentality of the City of Chicago authorized to issue sales and use tax securitization bonds.[164]  Debt issued by the STSC has been principally earmarked to reduce the City's debt service burden by refinancing existing debt, including general obligation debt, with higher rated bonds carrying lower debt service costs.[165]

---

[157] Pa. Intergovernmental Cooperation Auth. Act for Cities of the First Class, 53 Pa. Stat. Ann. § 12720.210 (West).

[158] Pa. Intergovernmental Cooperation Auth. Act for Cities of the First Class, 53 Pa. Stat. Ann. § 12720.601, *et seq.* (West).  *See also* Official Statement, Pa. Intergovernmental Cooperative Auth., *Sales Tax Revenue Refunding Bonds*, *Series of 2009*, 5 (June 10, 2009) ("The 2009 Bonds are . . . payable . . . solely from (i) the revenues pledges and assigned by the Authority for such payment under the Indenture, including revenues received by the Authority from a one and one-half percent (1.5%) tax (the "Authority Tax Ordinance"), exclusively for the purposes of the Authority, on the salaries, wages, commissions and other compensation earned by residents of the City[.]").

[159] Economic Recovery Bond Act, Cal. Gov't Code § 99050 *et seq.* (West 2004).

[160] Official Statement, State of Cal., *Economic Recovery Bonds, Series 2004A and 2004B* (May 4, 2004); Official Statement, State of Cal., *Economic Recovery Bonds, Series 2004C* (June 8, 2004); Official Statement, State of Cal., *Economic Recovery Bonds, Series 2008A and 2008B* (Feb. 7, 2008).

[161] Press Release, California State Treasurer's Office, Treasurer Chiang, Finance Director Cohen Act to Make Final Payment on 2004 Economic Recovery Bonds (Aug. 5, 2015), https://www.treasurer.ca.gov/news/releases/2015/20150805.asp ("The payment closes the books on the Proposition 57 [Economic Recovery Bonds], approved by voters in March 2004 to refinance accumulated budgetary debt.  Overall, bond payments made since 2004 total $14.2 billion in principal and $4.8 billion in interest, with additional administrative costs of $153 million.").

[162] City of Chi., *Annual Financial Analysis 2017*, 19 (July 19, 2017).

[163] City of Chi., *Comprehensive Annual Financial Report for the Year Ended December 31, 2017*, 21 (June 29, 2018).

[164] Sales Tax Securitization Corp., *Sales Tax Securitization Bonds: Authorizing Resolution* (Nov. 2, 2017).

[165] Press Release, Office of the Mayor, City of Chicago, City Council Approves Revenue Securitization Structure Paving the Way for the City to Save Millions in Debt Service Costs Each Year (Oct. 11, 2017)

The Independent Investigator's Final Investigative Report

All of this underscores that COFINA was not invented from scratch as a desperate ploy.  It drew upon an existing framework that other US governments have used (and continue to use) in periods of fiscal distress.

Distinctions can be drawn, however, in comparing the COFINA Bond program with tax securitization structures instituted elsewhere.  For example, unlike the New York MAC and Pennsylvania PICA programs, COFINA was not accompanied by measures directed towards imposing fiscal discipline within the Puerto Rico government.  As an additional distinction, the MAC and PICA programs relied on a *state* control board to impose fiscal discipline by a *city*.  That hierarchical structure involving state oversight did not apply in the case of Puerto Rico.

If Puerto Rico seeks to use a tax securitization structure in the future to issue debt, we recommend that the political branches of the Puerto Rico government consider implementing measures aimed at establishing meaningful checks on the incurrence and use of that debt, appropriate independent oversight over the program, and a plan for ultimate retirement of the debt.  One such measure might be a constitutional amendment that counts such debt towards the constitutional debt limit, notwithstanding that tax securitization debt is not backed by the full faith and credit of Puerto Rico.  In addition, as discussed in Part XIV.C, Puerto Rico's adoption of a debt validation statute may avoid future disputes over the validity of a tax securitization structure, like the one that has been litigated in the Title III Proceedings.[166]

## D.   Conclusion

To summarize, we found no evidence that COFINA's purpose was to evade the Constitutional Debt Limit.  The original purpose of the sales tax securitization was to obtain a well-rated financing source in order to help solve Puerto Rico's structural imbalance.  It was eventually deployed successfully to help relieve Puerto Rico from a $532 million annual drain on the General Fund for debt services on appropriation debt.

---

("City Council today approved an ordinance to create a securitization structure for the City of Chicago, which is expected to achieve higher credit ratings and reduce debt service costs for taxpayers. . . . [T]he Corporation plans to refund the City's existing Sales Tax Revenue Bonds . . . . This refinancing is expected to save the City millions of dollars per year in debt service costs and help alleviate the City's GO debt burden.").  The STSC bonds received strong ratings notwithstanding the pendency of the Clawback Right dispute in the Puerto Rico Title III Proceedings.  For example, in November 2017, those bonds received ratings of "AAA" from Fitch, in comparison with Fitch's "BBB-" rating for Chicago's general obligation debt.  A Fitch report regarding the STSC bonds explains that the Illinois legislation creating the STSC is apparently different than the COFINA legislation in that "[t]he Illinois legislation does not benefit the state and is not an attempt to avoid a limit imposed on the state in dealing with its own debt and tax revenues.  Moreover, it is not an attempt to work around any limit imposed on the city by the constitution."  Press Release, Fitch Ratings, *What Investors Want to Know: Chicago Sales Tax Securitization*, 7 (Nov. 28, 2017) (available through Fitch Ratings).

[166] *See generally Official Comm. of Unsecured Creditors of P.R. v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-00257-LTS (D.P.R.).

The Independent Investigator's Final Investigative Report

As Puerto Rico's financial troubles worsened, however, and Puerto Rico faced an estimated $3.2 billion budget gap, COFINA became a crutch that Puerto Rico leaned upon to close operational deficits, eventually allowing COFINA debt to grow, ultimately to over $17 billion.

Within this history, legal counsel had different views as to the potential rights of GO Bondholders with respect to the sales tax revenues.  The existence of those different views was not disclosed.  While we express no views as to whether that should have been disclosed, we discuss potential claims that may arise from this fact in Part XVI.C.1(a).

Ultimately, COFINA's history exemplifies the extent to which Puerto Rico turned to debt to address difficult times without solving the underlying persistent structural imbalance. Unchecked by the Constitutional Debt Limit, it added billions more to Puerto Rico's debt problem.

# PART VII

# ERS

# PART VII
# ERS

As part of our investigation, we also investigated the circumstances surrounding ERS's issuance of the ERS Bonds.  ERS is a trust created by legislative act to provide pensions and other retirement benefits to retired government employees of Puerto Rico.  Until recently, ERS paid for these benefits with funds contributed monthly or twice a month to ERS by certain of Puerto Rico's public corporations, agencies and instrumentalities in their capacities as employers ("Government Employers"), as well as their employees.  Funds for benefit payments also came from ERS's investment earnings and from Puerto Rico through statutory appropriations approved from time to time.  Government Employers were required by law to make contributions to ERS of a statutory set percentage of their covered payroll ("Employer Contributions").

Between January and June of 2008, ERS issued the three series of ERS Bonds, which totaled nearly $3 billion.  The purpose of the issuances was to increase the funds available for ERS to pay near-term pension obligations and, over the long-term, reduce its unfunded liabilities.  "Unfunded liabilities" refers to the extent to which ERS lacks the funds it is projected to need at any given time in order to meet all of its obligations to pay pension benefits as they become due in the future.

As explained further below, the ERS Bonds were payable from and purportedly secured by the stream of Employer Contributions that Government Employers were required by statute to make to ERS.  Basically, the plan was to take a portion of the proceeds of the ERS Bond sales and invest it, with the expectation that the investment would grow and give the pension an additional return after it paid debt service (*i.e.*, principal and interest) on the ERS Bonds.  This investment strategy is called "arbitrage."

196

The Independent Investigator's Final Investigative Report

The risk of an arbitrage strategy is the possibility that the investments do not grow at a rate sufficient to cover the debt service obligations on the bonds, which can have the effect of making a pension's underfunding problem worse.  As discussed further below, that is essentially what happened in the case of ERS Bonds.  After they were issued, ERS invested an insufficient portion of the proceeds at a materially lower rate of return than ERS's advisors and professionals had projected. As a result, although some of the proceeds from the ERS Bonds provided cash to allow ERS to continue paying its obligations in the short term, the returns on the invested portion of the proceeds will not offset the long-term cost of issuing the bonds.

As discussed further below, the original expectation was to issue approximately $7 billion in bonds.  However, ERS ended up issuing slightly less than $3 billion in bonds, and investing less than half the proceeds therefrom into the intended arbitrage strategy, due in part to the market plunge accompanying the onset of the US's fiscal crisis in the second half of 2008.

In January 2009, a newly-elected administration appointed a new president of GDB, put an end to the ERS Bond program and subjected the strategy to scrutiny.

In 2010, GDB and ERS retained Conway MacKenzie, Inc. ("Conway"), a management consulting and financial advisory firm, to "identify, analyze, and summarize the key events and decisions that have created the current financial crisis of the ERS."[1]  In October 2010, Conway released a report ("Conway Report") concluding that ERS management, the ERS Board of Trustees ("ERS Board") and the GDB Board "may have failed to meet the standard of due care and other important fiduciary duties in approving" the issuance of the ERS Bonds.[2]  In early 2011, the Puerto Rico legislature passed legislation that, among other things, foreclosed ERS from issuing any new bonds, and limited its ability to issue other debt unless the legislature pre-approved it.[3]  The "Statement of Motives" accompanying that legislation characterized the ERS Bonds as "illegally made" and described them as "so badly structured that, rather than yielding profits . . . [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System."[4]

In the Title III Proceedings and other pending litigation, several litigants have likewise challenged the ERS Bonds, contending that they lacked appropriate authorization and are not backed by an enforceable security interest.

Although our investigation does not address or take any position with respect to the litigation related to the ERS Bonds, it did focus on several questions, including:

---

[1] *See* Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 2 (2010).

[2] *See* Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 5 (2010).

[3] *See* Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431, 1436 (codified at P.R. Laws Ann. tit. 3, § 779(d)) (2018) ("Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System.  For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary.").

[4] P.R. Laws Ann. tit. 3, § 779(d) (2018)

The Independent Investigator's Final Investigative Report

- How did the idea for the ERS Bonds and their structure come about?

- What were the primary objectives of their issuance?

- In the lead up to the ERS Bond issuance, what were the main legal and financial issues considered by the relevant parties, including ERS, GDB, underwriters, counsel, and CRAs?

- To what extent did directors and officers of ERS and GDB rely on the advice of professionals in pursuing and approving the ERS Bond issuances?

- Why did ERS stop issuing bonds after issuing Series A through Series C, and what effect might that have had on the arbitrage strategy?

- Do Conway's findings comport with the evidence we reviewed?

A summary of our key findings is as follows:

- ERS had long struggled with unfunded liabilities. By June 30, 2005, ERS had actuarial liabilities of $12.284 billion, only 19% of which were funded;

- By 2005, GDB and ERS considered attempting to solve ERS's unfunded liabilities problem through the issuance of $2 billion in POBs;

- In other states and municipalities, POBs often involve an arbitrage strategy, whereby the proceeds from the bond sales are invested in the hope of earning a greater return than the cost of debt services;

- The POBs that GDB and ERS were considering were in the form of general obligation debt, which is consistent with most POBs at that time that had been issued by states and municipalities outside of Puerto Rico. Such an issuance was believed to require authorization from the Legislative Assembly. Legislation was proposed and approved by the Puerto Rico Senate but was never voted on by the Puerto Rico House of Representatives;

- An investment bank Merrill Lynch first proposed the idea of securitizing the stream of Employer Contributions. The proposed issuance would not be a general obligation of Puerto Rico. This structure was reviewed by a Puerto Rico law firm (Fiddler), which believed that the proposed structure did not require additional approval by Puerto Rico's Legislative Assembly, and that the proposed issuance could be executed by ERS pursuant to existing law. Therefore, ERS and GDB believed the transaction could be executed without prior approval by the Legislative Assembly;

- Merrill Lynch recommended that ERS "issue at least $7 billion" in bonds, an amount Merrill Lynch believed would be sufficient to accomplish two objectives. First, ERS could use a portion of the proceeds to improve its cash-position and ability to make near term benefit payments. Second, ERS could invest the remaining proceeds in an

arbitrage strategy that Merrill Lynch projected would keep ERS solvent for the next twenty-five years or more;

- In the lead up to the ERS Bond issuance in January 2008, ERS, GDB, Merrill Lynch and the CRAs were most concerned about understanding the Legislative Assembly's ability (or lack thereof) to reduce future Employer Contributions and the credit rating the contemplated bonds would receive.  The evidence we reviewed indicates that neither the CRAs nor the advisors and professionals of ERS and the underwriters involved raised material concerns about whether the ERS had authority to issue the bonds prior to them being issued.  The evidence also shows that Fiddler, as bond counsel, opined that ERS had the authority to issue the bonds in a letter included with the Official Statement for each issued series of ERS Bonds;

- In the first half of 2008, ERS issued nearly $3 billion of bonds exclusively into the local bond market (*i.e.*, no bonds were made available for purchase by individuals or funds located outside of Puerto Rico).  Evidence indicates additional ERS Bonds were not issued in the second half of 2008 because of unanticipated market behavior.  Starting in 2009, even as credit markets began to re-open, additional ERS Bonds were not issued as a matter of policy set by the incoming administration of Governor Luis Fortuño.  As we explain below, an arbitrage strategy can fail if an insufficient portion of the bond proceeds is invested, even if the rate of return on that investment exceeds the return rate being paid on the bonds.  According to the Conway Report, only $937 million out of $2.73 billion in aggregate net proceeds from all three series of ERS Bonds was invested by ERS.  If that was the case, the arbitrage strategy had little chance of succeeding without additional proceeds being invested; and

- Finally, the Conway Report did not provide the legal standards against which it evaluated underlying circumstances and the conduct of ERS and GDB decision-makers to reach its conclusions that the ERS Bonds were "inherently flawed, misconceived and speculative," and that ERS and GDB decision-makers "did not exercise due care."[5]  The evidence we reviewed demonstrated that: (i) ERS and GDB decision-makers considered, on the advice of professionals, the potential benefits and risks involved with issuing the ERS Bonds;  (ii) the strategy of borrowing against future Employer Contributions and investing the proceeds may have succeeded in improving both ERS's short-term cash position and long-term underfunding problem if reasonable projections about market behavior and other variables had held true (which they did not); and (iii) the decision to issue the bonds anyway was motivated by the need to meet ERS's immediate cash needs until adjustments to the strategy could be considered and implemented.

The potential legal significance of our factual findings is discussed further in Part XVI.C.3.a.

---

[5] *See* Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 12, 21 (2010).

The Independent Investigator's Final Investigative Report

## A.  Background

### 1.  ERS

ERS is a trust created by Act No. 447 of May 15, 1951 (as amended, "Act 447") for the purpose of providing pension and other retirement benefits to retired employees of Government Employers.[6]  As an example of such benefits, pursuant to 1973 amendments to Act 447 that remained in effect until benefit cut-backs were implemented in 1990, workers who retired at age fifty-five or older after completing thirty years of employment by a Government Employer were guaranteed to receive from ERS a yearly pension for the rest of their lives equal to 75% of the average salary from their three highest earning years.[7]  Other benefits included disability annuities, death benefits, and loans to Puerto Rico's public employees.[8]

In order to provide the necessary funds to pay for these retirement benefits, Government Employers and their employees were required by statute to make regular contributions to ERS. From February 1990 through the issuance of the ERS Bonds in 2008 and for several years thereafter, Government Employers were required to make Employer Contributions of at least 9.275% of their payroll for employees covered by ERS.  Any excess funds left from Employer Contributions, employee contributions and statutory appropriations from Puerto Rico after current benefits were paid then were invested with the expectation they would grow and be available to pay for future benefits.

As of June 30, 2007, a total of 210 Government Employers made Employer Contributions to ERS.  At that time, ERS had approximately 175,000 participating employees and provided retirement benefits to 99,851 beneficiaries, which include retirees and spouses of deceased retirees. ERS's net assets held in trust for pension plan benefits were approximately $2.891 billion.

### 2.  History of Underfunding

As noted, the obligation of a retirement system to provide retirement benefits creates a liability that must be paid for (or "funded").  To the extent the liability exceeds the assets of the retirement system, the liability is said to be unfunded.  Unfunded liabilities were calculated on what is called an "actuarial" basis.  As a hypothetical example, imagine that ERS seeks to determine how much in funds it needs to be able to cover its ongoing obligation to pay retirement benefits in the future.  To do so, it would try to determine future payment requirements by using various assumptions and statistical modelling that take into account a number of factors, including the anticipated number of future retirees, the timing of their retirement and the cost of benefits.

---

[6] Act of May 15, 1951, No. 447, 1951 P.R. Laws 1298 (codified as amended at P.R. Laws Ann. tit. 3, § 761, et seq.).  ERS is the largest of several retirement systems that provide retirement benefits for the public employees of Puerto Rico and its instrumentalities.  Other retirement systems for public employees include the Puerto Rico System of Annuities and Pensions for Teachers, the Commonwealth Judiciary Retirement System, and the Employees Retirement System of Puerto Rico Electric Power Authority.

[7] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, III-3 (2008).

[8] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 7 (2008).

The Independent Investigator's Final Investigative Report

Based on this information, let's assume it predicts that it will be obligated to pay a total of $100 million in retirement benefits the following year (Year 1), followed by $110 million in Year 2, $120 million in Year 3, $125 million in Year 4, and so forth.  ERS may then use an assumed discount rate to calculate the net present value of such future payments.  This would result in what is called an "accrued actuarial liability."  Imagine that number is $10 billion.  If at the time ERS only had $4 billion in assets, it would have $6 billion in unfunded accrued actuarial liabilities.  And it would have a corresponding "funding ratio" of 40% ($4 billion divided by $10 billion).

The greater the amount of unfunded liability (or, correspondingly, the lower the funding ratio) the bigger the problem.  For a pension, slight underfunding indicates potential difficulty paying benefits years, if not decades, into the future.  By contrast, a severely underfunded pension with very low funding ratios may run out of assets to pay benefits to its retirees in a matter of months.  Thus, a funding level signals how far into the future a pension can provide the benefits it has promised to retirees.

The amount of its unfunded liabilities has always been a problem for ERS.  ERS was created in 1951 by the merging of several pre-existing retirement systems which were themselves underfunded.  ERS absorbed this underfunding.  Moreover, ERS, by its own admission in audited financial statements filed in early 2018, "since its inception, lacked proper planning.  The levels of contributions were relatively low and still remain low in comparison to the level of benefits."[9]  Statutory rates for Employer Contributions and employee contributions remained the same from 1990 until 2011.[10]  Nevertheless, according to the Official Statement for the ERS Series A Bonds, from fiscal year 1991 to fiscal year 2005, the unfunded accrued actuarial liability of ERS increased from $3.568 billion to $9.956 billion.[11]   As of June 30, 2005, according to the Financial Information and Operating Data Report dated May 15, 2009, ERS's total pension benefit obligation was $12.284 billion, and the unfunded pension benefit obligation for the same period was $9.956 billion, representing a funding ratio of 19%.[12]

By this time, the unfunded liabilities of the retirement systems, and particularly ERS, were negatively impacting Puerto Rico-related credit ratings.  For example, when Moody's downgraded the credit ratings for Puerto Rico's GO Bonds in May 2005, the report stated: "The rating change also reflects a continuing problem of very large and growing unfunded government pension

---

[9] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2015*, 13 (Feb. 19, 2018).

[10] In 2011 and again in 2013, Puerto Rico enacted legislation aimed at addressing ERS's severe underfunding problem, but by then it appears to have been too late.  In its 2015 CAFR released earlier this year, Puerto Rico reported owing more than $1.3 billion to ERS in "deferred" payments it agreed to make under this recent legislation.  *See* Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2015,* 292 (June 29, 2018).  As discussed below, in 2017, Puerto Rico effectively took-over ERS, converting it to a pay-as-you-go system whose obligations are supported by the General Fund.

[11] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 6 (2008).

[12] *See* Commonwealth of P.R., Financial Information and Operating Data Report, 60 (May 15, 2009).

liabilities, despite steps taken to increase the retirement age and close the system to new participants a few years ago."[13]

### 3.      Governance/Management of ERS

Control of the governance and operation of ERS is vested in the ERS Board, which sets policy and oversees the operations consistent with applicable laws. [14]   The ERS Board is responsible for appointing the Administrator of ERS ("ERS Administrator").  The members of the Board include a number of political appointees; among others, it is comprised of the Puerto Rico Secretary of the Treasury and the President of GDB, each as non-voting members, plus three voting members appointed for three year terms by the Governor.[15]

## B.      Background on Pension Obligation Bonds and Arbitrage Strategy

The ERS Bonds are a form of POB.  The standard POB is issued by a state or municipality as general obligations in order to fund its obligation to the pension fund or system in which its employees are members.[16]  POBs have been around since 1985 when they were first issued by the City of Oakland, California.[17]

POBs employ an arbitrage strategy.  Arbitrage, as previously noted, refers in this context to a strategy whereby the issuer borrows money in order to invest the proceeds on the expectation that its return on those investments will exceed the costs of the borrowing.  For example, assume a pension system issues $100 of bonds for a one year term at 10%, and strategically invests the bond proceeds in assets that return 15% in that same period.  In theory, if the pension system invests 100% of the proceeds—or $100 here, if the costs of borrowing are zero and no proceeds are used to make other required payments—then at the end of the year it will have the original $100 bond proceeds plus a $15 return on its investment.  In turn, the system can use that $115 to repay the $110 of principal and accrued interest to satisfy the bonds, and be left $5 richer than before it issued the bonds (*i.e.,* the arbitrage produced a net yield of $5).  If the pension system was underfunded on an actuarial basis, the additional $5 will reduce its unfunded accrued actuarial pension liability.

In reality, it is always possible that an arbitrage strategy fails to produce more money investing the bond proceeds than it costs to issue the bonds in the first place.  The most obvious way this can happen is if the return on invested bond proceeds is insufficient.  In the example above, if the pension system invests $100 of proceeds in assets that return only 5%, then it will

---

[13] Moody's Inv'rs. Serv., *Rating Update: Moody's Downgrades Puerto Rico G.O. Rating to Baa2* (May 19, 2005).

[14]  Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 8 (2008).

[15]  Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 8 (2008).

[16]  Gov't Fin. Officers Ass'n, Pension Obligation Bonds (last visited Aug. 16, 2018), http://www.gfoa.org/pension-obligation-bonds; Alicia H. Munnell, Jean-Pierre Aubry, & Mark Cafarelli, Ctr. for Ret. Research of B.C., *An Update on Pension Obligation Bonds*, 1 (2014).

[17]  Alicia H. Munnell, Jean-Pierre Aubry, & Mark Cafarelli, Ctr. for Ret. Research of B.C., *An Update on Pension Obligation Bonds*, 2 (2014).

The Independent Investigator's Final Investigative Report

have $105 at the end of the year. When it comes time to repay the full $110 of principal and interest on the bonds, it will use that $105 plus it will have to use an additional $5 from the pension's assets, leaving the pension system $5 worse off than if it had never issued the bonds.

Another way arbitrage can result in a negative net yield is if an insufficient amount of the proceeds are invested. For example, assume a pension system can borrow by issuing bonds paying 10% interest, can invest the bond proceeds at a 15% rate of return and has $40 in pension obligations coming due in the upcoming year, which it needs cash to pay. The pension system issues $100 worth of bonds, sets aside $40 of the cash proceeds to satisfy the $40 of obligations coming due and invests the remaining $60 of proceeds at a 15% rate of return. At the end of the year, the system will have $69 (consisting of $60 invested and a return of $60 x 15% = $9) and will owe $40 less than it did at the beginning of the year. In other words, the system will have generated $109 of value as a result of issuing the bonds. However, it will require $110 of value from the system to repay the full principal and interest on the bonds. To do so, the system can use the $69 of invested bond proceeds plus an additional $41 from other pension assets. In other words, the pension system will be left $1 worse off than if it had never issued the bonds and satisfied $40 of obligations that came due using $40 of that same $41 of other pension assets.

With one more example, we demonstrate how an arbitrage strategy can go from unsuccessful to successful if the amount of bonds issued is increased. Assume, just like the example in the prior paragraph, that a pension system can borrow by issuing bonds paying 10% interest, can invest the bond proceeds at a 15% rate of return, and has $40 in pension obligations coming due in the upcoming year, for which it needs cash to pay. This time, instead of issuing $100 of bonds—which we know will result in a net $1 loss to the pension system—the system issues $200 in bonds, sets aside $40 to satisfy its near-term obligations, and invests the remaining $160 at a 15% rate of return. At the end of the year, the system will have $184 (consisting of the $160 invested and a return of $160 x 15% = $24) and will owe $40 less than it did at the beginning of the year. In other words, the system will have generated $224 of value as a result of issuing the bonds. It will require $220 of value from the system to repay the full $200 of principal and $20 of interest on the bonds. To do so, the system can use the $184 of invested bond proceeds plus an additional $36 from other pension assets. In other words, the pension system will be left $4 richer than if it had never issued the bonds and satisfied the $40 of obligations that came due using $40 of other pension assets.

These last two examples demonstrate a fundamental risk of issuing POBs and using an arbitrage investment strategy to try and fix pension underfunding. That is, a pension system may end up decreasing its overall funding level if it fails to commit a sufficient portion of bond proceeds to be invested. By issuing $200 of bonds instead of $100 of bonds, the pension system in the examples above increased the percentage of bond proceeds it then invested from 60% ($60/$100) to 80% ($160/$200) as a result of the amount of required short-term payment in each scenario being the same ($40). For this reason, before POBs are issued, underwriters, financial advisors and actuaries typically run detailed calculations based on a pension's short-term cash needs, level of underfunding and prevailing market conditions (among other factors) and provide recommendations for the amount of bonds that should be issued and the amount and manner in which the bond proceeds should be invested in order to achieve desired improvements to the long-term funding of the pension system.

The Independent Investigator's Final Investigative Report

When POBs are issued but a pension's long-term funding does not improve, understanding what happened requires investigation of several potential factors, including whether the issuer understood the risks involved or followed the advice of its advisors and experts, and whether reasonable projections at the time of the issuance ultimately were not met because of unforeseen events. We investigated those issues and others in connection with the issuance of the ERS Bonds. Our findings are discussed below.

## C.   Events Leading Up to the Issuance of the ERS Bonds in 2008

### 1.   A 2004 POB Proposal Stalled in the Legislature

In the early 2000s, a number of investment banks had pitched the idea of POBs to address the chronic underfunding of ERS. According to several witnesses, following the election of Governor Acevedo Vilá in 2004, decision-makers at GDB were interested in pursuing POBs, and selected Citibank as lead underwriter to put a proposal together. The proposal was structured like a typical POB: Puerto Rico would issue $2 billion in bonds payable from the General Fund and secured by a pledge of Puerto Rico's full faith, credit and taxing power as well as ERS's pension fund assets. ERS would receive the net proceeds from the bond sale and invest them to create arbitrage.[18]

Like other general obligation bonds, Citibank's proposed POBs would require legislative authorization.[19] Ultimately, that authorization was never provided. Acevedo Vilá's term in office was a divided government, with his administration and the majority of the Legislative Assembly hailing from rival political parties. Legislation was proposed that would authorize the POB issuance and also increase the statutory levels of public employer and employee contributions to ERS. It was projected that the legislation, had it been approved, would have improved ERS's funding ratio from 19% to 35% and covered its obligations through 2021. The legislation was approved by the Senate, but it ultimately stalled when the House of Representatives never brought it to a vote.[20]

### 2.   Merrill Lynch's November 2006 and Revised August 2007 POB Proposals Avoided the Need for Legislative Approval

In November 2006, another investment bank, Merrill Lynch, made a proposal to GDB for a POB issuance that was structured so as not to require the Legislative Assembly's approval.

---

[18] Commonwealth of P.R., *Official Statement for Tax Revenue Anticipation Notes, Series 2006,* I-40 (2005) (Commonwealth of P.R., *Financial Information and Operating Data Report for Year Ending June 30, 2005* (Dec. 1, 2005)) ("In addition, legislation has been submitted that, if enacted, will authorize the issuance of pension obligation bonds ("POBs"). The POBs will contribute approximately $2 billion in assets to the Employees Retirement System and will be payable solely from the Commonwealth's General Fund.").

[19] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A,* IV-27 (2008); (Commonwealth of P.R., *Financial Information and Operating Data Report* (Jan. 1, 2008)) ("Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case.").

[20] Goldman Sachs & Co. Investor Conference Call (May 16, 2006) ("The pension bonds have been approved by one of the houses and not the other. The House of Representatives is still thinking about it.").

Merrill Lynch's initial proposal shared similarities to the COFINA structure that Puerto Rico had created earlier that year to issue bonds secured by a dedicated stream of SUT revenue. The proposal would have ERS assign its right to statutorily mandated Employer Contributions to a grantor trust. The trust would then issue POBs secured by its incoming stream of Employer Contributions and transmit the bond proceeds back to ERS.

The initial proposal contemplated the trust would issue an amount of POBs sufficient to provide $6.5 billion in net proceeds at an average interest cost of 6% with a final maturity of 2057. Merrill Lynch estimated this would keep ERS solvent for another ten to eighteen years.

An important feature of the structure Merrill Lynch proposed is that the POBs would only have recourse to the incoming stream of Employer Contributions, and not to ERS's assets. In other words, bondholders would not be able to seek payment from any of ERS's current assets or out of any funds payable to ERS in the future from employee contributions, government funding, and Employer Contributions in excess of the amount needed to make monthly payments on the bonds.

Perhaps most importantly under the circumstances, because the financing would be initiated by ERS and not Puerto Rico, the expectation was that the debt of the trust would not be consolidated with Puerto Rico's financial statements. As a result, Merrill Lynch believed ERS would not need to obtain legislative approval before proceeding. In fact, prior to delivering the proposal, a Puerto Rico law firm, Fiddler, reviewed the structure. Fiddler believed that the proposed structure did not require additional approval by the Legislative Assembly and that the transaction could be executed by ERS pursuant to existing law.

### (a)  ERS Authorized Merrill Lynch's Initial Proposal to Move Forward

Merrill Lynch's initial proposal was attractive to GDB decision-makers, who presented it to the ERS Board for preliminary authorization on February 27, 2007. The ERS Board considered, among other things, that: (i) ERS's payment obligations were exceeding its incoming contributions by an increasing amount each year with a projected 2007 deficit of $167 million; (ii) continued deficits would deplete its existing assets by 2015; and (iii) the Citibank proposal remained stalled in the Legislative Assembly. The Board also evaluated the size and structure of the Merrill Lynch proposal and its impact on ERS's funding ratio. Specifically, because bondholders would have no recourse to ERS assets, the view of Merrill Lynch's underwriting team—to which ERS and GDB agreed—was that the addition of $6.5 billion or more of bond proceeds to ERS's existing $2.3 billion of assets would raise the funding ratio from 19% to 72%. Finally, municipalities outside of Puerto Rico were using POBs, with reportedly more than $47 billion of POBs issued in the prior two decades. Members of the ERS Board considered the risks of the proposal, including the risk that, like all POBs, the market does not behave as expected resulting in an inability to invest the proceeds to make sufficient returns to cover the cost of the bonds. The ERS Board then authorized Merrill Lynch to go forward with preparing the transaction.[21]

---

[21] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, II-22 (2008) (Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Basic Financial Statements for the Years Ended June 30, 2007 and 2006* (Dec. 28, 2007)).

### (b)   Merrill Lynch Revised the Proposal and Worked Toward a Global Issuance of POBs in 2007

Merrill Lynch worked throughout 2007 with Sidley Austin and O'Neill & Borges, as underwriter's counsel, as well as Fiddler, as ERS's bond counsel, to prepare a POB offering.  An economic forecasting firm, Global Insight, was also retained to run model projections using certain variables and assumptions about ERS's future obligations, expected Employer Contributions and ability to invest bond proceeds at rates that would grow ERS.  Given the size of the anticipated issuance, Merrill Lynch proposed a global issuance of the bonds, including both the US mainland and European bond markets.  Accordingly, DEPFA bank, a Dublin based, German-Irish bank was also retained to advise on POB issues in the European marketplace.  GDB also retained Mesirow Financial, Inc. ("Mesirow") as its financial advisor for the transaction.

By mid-2007, in consultation with these parties and advisors, Merrill Lynch revised its proposed bond structure.  Instead of creating a grantor trust to issue the bonds and take assignment of Employer Contributions, ERS – itself a trust – could issue the bonds directly and pledge its own rights to receive the Employer Contributions as the payment source for bondholders.  The revision was premised on language in Act 447, which provided ERS authority to "seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of ERS."[22]  As bond counsel, Fiddler opined that this language authorized ERS to issue POBs without obtaining further permission from the Legislative Assembly.[23]  The evidence we reviewed does not indicate that any material concerns about this authorization were raised prior to issuance.

On August 7, 2007, Merrill Lynch provided ERS with a formal revised proposal.  In addition to the change in structure, this proposal incorporated detailed analysis by Merrill Lynch and others, based on actuarial projections by Global Insight across several different issuance scenarios.  For example, the proposal indicated the most likely year in which ERS would run out of money to be:

- 2016, if no bonds were issued;

- 2025, if only $4 billion of bonds were issued;

- 2032 if $7 billion of bonds were issued all at once, or in two issuances of $3 million and $4 million separated by a short period of time (a few months); and

---

[22] Act of May 15, No. 447, 1951 P.R. Laws 1298 (codified as amended at P.R. Laws Ann. tit. 3, § 761, et seq.).
[23] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, VIII- 2 (2008) (Emps. Ret. Sys, of the Gov't of the Commonwealth of P.R., *Basic Financial Statements for the Years Ended June 30, 2007 and 2006* (Dec. 28, 2007)).

- *Never*, if $7 billion of bonds were issued in several smaller issuances over a longer period of time (several months or longer).[24]

Further, Merrill Lynch recommended in the proposal that ERS "issue at least $7 billion either upfront or through short-term phasing," noting there is "sizeable market demand" for the bonds. Referring to the potential for successful arbitrage, Merrill Lynch observed that "even with recent volatility, long-term market rates and credit spreads are still favorable," and assumed for purposes of its projections that ERS was able to achieve a rate of return on investments of 8.3% and to issue bonds at an all-in cost of 6.7%.

### (c)    Negotiations With CRAs Highlighted Concerns Regarding the Structure and Creditworthiness of the ERS Bonds

By the time it provided ERS with its revised proposal in August 2007, Merrill Lynch had already been speaking about the bonds for several months with the CRAs. It would take several more months of discussion before ratings ultimately were issued.

The evidence we reviewed indicates discussions during this period focused on addressing at least two concerns raised. First, the CRAs questioned whether the Legislative Assembly could reduce the required Employer Contributions after bonds were issued. Because the bonds were structured so that bondholders had no recourse to ERS assets, the bonds might not be repaid if Employer Contributions were reduced or eliminated. To address this concern, ERS requested that its bond counsel, Fiddler, analyze the issue. On September 27, 2007, Fiddler provided ERS with an opinion letter setting forth its analysis. According to the letter, the Legislative Assembly was prohibited from altering public employees' pension rights unless the proposed amendments are reasonable and promote the actuarial solvency of the underlying retirement system.[25] Applying that standard, Fiddler concluded that a reduction in Employer Contributions after ERS bonds were issued would be impermissible, unless a court or actuary somehow found such reduction would improve the solvency of ERS rather than adversely affect it. Ultimately, the CRAs reached a level of comfort on the issue, with one explaining that its "stable outlook" on the ERS Bonds "reflects our expectation that employer contributions will … consistently flow into the ERS with historic levels."

Second, the CRAs were concerned with what they viewed as ERS's level of dependency on Puerto Rico and on Employer Contributions made from its General Fund. On that basis, the CRAs ultimately rejected attempts by Merrill Lynch and GDB to obtain a better rating for the ERS Bonds than the rating of Puerto Rico's outstanding GO Bonds. Merrill Lynch likened the anticipated ERS Bonds to the COFINA Bonds issued in July 2007. In fact, several of the underwriters took the position that the 210 Government Employers required by law to remit Employer Contributions to ERS each payment period were a more diversified resource than the tax base generating the stream of SUT payments into COFINA. They also argued the Employer Contributions had less of a Clawback Right risk than COFINA Bonds because not all of the 210

---

[24] The proposal indicated that issuing several smaller series of POBs over a longer period of time would reduce the risk that an unexpected downturn in the market could negatively impact the full $7 billion of invested proceeds.

[25] *See Bayron Toro v. Serra*, 119 D.P.R. 605 (1987).

Government Employers were a part of Puerto Rico's central government, and those that were received less than 58% of their budgetary resources from the General Fund. Therefore, in a scenario in which Puerto Rico had to use its General Fund to pay debt service on GO Bonds instead of funding Employer Contributions, ERS would still receive some payments from other sources. Merrill Lynch and GDB argued that for these reasons, the Employer Contributions were less subject to volatility and worthy of a rating at or near the rating of COFINA Bonds.

Ultimately, however, the CRAs determined that ERS's dependency upon the General Fund as the source for a substantial portion of its incoming Employer Contributions warranted rating the ERS Bonds the same as GO Bonds. Accordingly, in mid-January 2008, the ERS Bonds received a rating of "Baa3" by Moody's and a rating of "BBB-" from both S&P and Fitch.

### 3. In the Meantime, ERS Worked With UBS as Investment Consultant to Prepare For the Strategic Investment of Bond Proceeds

When it authorized Merrill Lynch to move forward with its initial proposal in February 2007, ERS had only general investment guidelines by which it directed its asset managers. On March 14, 2007, the ERS Board was given a presentation and proposed work plan from its investment consultant, UBS Consulting Services of Puerto Rico ("UBS Consulting"). UBS Consulting proposed to evaluate ERS's existing investment policies and asset managers and develop an investment program specifically to govern the significant amount of bond proceeds that the ERS Board anticipated receiving as soon as May 2007. As part of its presentation, UBS Consulting discussed certain market risks and its policies for evaluating investment strategies to address them. The ERS Board authorized UBS Consulting to proceed.

Over the next several months, UBS Consulting advised the ERS Board of investment strategies for the anticipated bond proceeds. On April 25, 2007, UBS Consulting and the ERS Board discussed the actuarial goal of pensions like ERS achieving an 8.5% rate of return and the challenges to doing so in the market at that time. On June 29, 2007, UBS Consulting identified certain investments for the ERS Board's consideration, including in international markets, which were returning greater than 8.5%.

On August 3, 2007, UBS Consulting explained to the ERS Board its historical analysis of the best asset distributions for pensions like ERS to achieve desired returns even in times of significant market disruption such as the bursting of the "tech bubble" and following events like 9/11 and the Enron scandal. In particular, UBS Consulting recommended a strategy of splitting anticipated bond proceeds across two investment portfolios: 35% of the proceeds would be committed to more conservative investments that produced greater cash flow to fund ERS's current obligations, while 65% would be committed to less conservative and less liquid investments that produced greater rates of return.

On August 29, 2007, the ERS Board discussed its understanding that UBS Consulting's two-portfolio strategy, once applied to anticipated bond proceeds, would provide ERS with both: (i) sufficient cash from the 35% portfolio to fund its pension obligations even after accounting for the loss of Employer Contributions that will be used to pay bondholders; and (ii) sufficient yield from investments in the 65% portfolio to improve its long-term funding levels.

The Independent Investigator's Final Investigative Report

4.    <u>The Start Date for the Global Issuance of Bonds by Merrill Lynch was Postponed Multiple Times During the Summer and Fall of 2007</u>

When ERS authorized Merrill Lynch to move forward with its initial proposal in February 2007, it expected to begin issuing bonds by May or June 2007.  Throughout the summer and fall of 2007, however, ERS delayed issuing the bonds.  In early August, the first issuance was expected to be in September.  By the end of August, that timeframe had been extended to middle or late October, in part because of recent indications of a lack of liquidity and instability in the markets.  In October, the anticipated timing was an initial issuance in November followed by a second issuance in May 2008.  One cause of delay during this period generally was the ongoing effort to convince the CRAs to assign higher ratings to the bonds.

5.    <u>In Late 2007, GDB Began to Work in Parallel With UBS PR on a Potential Issuance of Bonds Exclusively in Puerto Rico</u>

Merrill Lynch's proposal had been to offer the ERS Bonds globally, which Merrill Lynch thought would result in more favorable pricing.  A Merrill witness we interviewed believed at the time that there was a substantial appetite for the bonds, assuming they were priced correctly.

The evidence we reviewed suggests that by late September 2007, however, GDB had begun to consider issuing an initial tranche of bonds exclusively in the Puerto Rico market.  POBs did not qualify for tax-free status in the United States like other municipal bonds.  However, because residents of Puerto Rico were not required to pay federal taxes on income generated by the bonds, GDB believed a local issuance could be done at materially lower interest costs compared to the price that would be required to issue in US and European markets at the time.

To explore this alternative, GDB worked with UBS Financial Services Incorporated of Puerto Rico ("<u>UBS PR</u>") as lead underwriter.  A former GDB official told us that UBS PR confirmed to GDB that an offering in the local Puerto Rico market could be done for a lower interest rate than the likely global issuance price that GDB was hearing from Merrill Lynch.  Ultimately, GDB and ERS determined to proceed with a local issuance through UBS PR.  The same former GDB official confirmed  that the plan was not to issue the entire $ 7 billion of bonds exclusively in Puerto Rico, but rather to begin with a smaller local issuance followed by the global issuance Merrill Lynch was continuing to pursue.

D.    <u>The ERS Board Decided to Proceed With a January 2008 Issuance of ERS Bonds</u>

On January 10, 2008, the ERS Board was informed that ERS was ready to move forward with an issuance of between $700 million and $1 billion of bonds in the local Puerto Rico market.  The overall plan remained to issue $7 billion total within the first nine months of 2008, inclusive of this first issuance, followed by a second issuance of up to $3 billion of bonds in US and European markets, and a third issuance a few months after that once again in the local market of up to $3 billion, depending upon demand.  The CRAs had determined to give the bonds the same ratings as Puerto Rico's outstanding GO Bonds.  ERS anticipated investing bond proceeds at a yield of 7.84% until it could issue additional series of bonds.  By comparison, the actuary analysis suggested ERS would still "break even" so long as a 7.8% yield was obtained.  Moreover, a bill to

209

increase Employer Contribution levels was pending before the Legislative Assembly and, if passed into law, would provide further relief and require less debt to be issued.

On January 24, 2008, the ERS Board met again, this time to consider and approve the issuance of the first series of bonds. The issuance had been oversubscribed and the amount to be issued now was $1.5 billion. The ERS Board discussed, among other things, that

- ERS was running an annual deficit of $125 million and if no bonds were issued, the fund was expected to be depleted by 2014;

- ERS had achieved an 11% rate of return over the previous three years;

- ERS Bonds had been structured without recourse to ERS or its assets, and as a result, the anticipated receipt of $7 billion of bond proceeds was expected to significantly reduce underfunding;

- ERS Bonds' structure and strategy had been based on analysis by Merrill Lynch and Global Insight, which ran multiple scenarios;

- ERS Bonds had been priced close to, but slightly more expensive than, COFINA Bonds due to a lesser credit rating;

- ERS Bonds were being sold first in the local market in an effort to maximize the advantages of that market; and

- ERS was prepared to receive and invest bond proceeds.

Following this discussion, the ERS Board adopted the bond resolution approving the issuance of the ERS Bonds.[26]

## E.      The Issuance of ERS Series A Bonds and the Use of Proceeds

On January 29, 2008, ERS issued its first series of POBs totaling approximately $1.6 billion in face amount at a total interest cost of 6.39% (the "ERS Series A Bonds"). The purpose of the issuance, as stated on the cover of the Official Statement, was to "increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability."[27] The ERS Series A Bonds were sold to the local Puerto Rico market through UBS PR as lead underwriter.

The Official Statement evidences that, as of that time, the ERS Board anticipated additional issuances outside Puerto Rico and in the full net $7 billion amount of the strategy recommended by Merrill Lynch. Specifically, the cover of the Official Statement stated that ERS intended to

---

[26] See Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, VI (2008) (Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Pension Funding Bond Resolution* (Jan. 24, 2008)).

[27] See Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, cover page (2008).

issue additional issuances "in other jurisdictions."[28]   Likewise, a section of the Official Statement titled "Projected Debt Service Coverage" stated that ERS "anticipates issuing additional Senior Bonds in an amount sufficient to produce net proceeds of $7.0 billion (after taking into consideration the net proceeds generated by the Series A Bonds) in one or more phases during calendar year 2008."[29]

The Official Statement also contained a section titled "Investment Considerations," which further evidences that the ERS Board was aware of and considered the possibility that the yield on the investments of the ERS Series A Bond proceeds may not be sufficient to cover the interest rates on the bonds.  Specifically, the Official Statement states: "The net yield of the System's assets may increase or decrease over time regardless of this transaction, but could decrease as a result of the issuance of Bonds in the event that the System is unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the Bonds."[30]   This statement is consistent with the discussions reflected in the ERS Board minutes discussed above.

According to the ERS Series A Closing Memorandum, and consistent with the Official Statement, net proceeds of $1.426 billion from ERS Series A Bonds was transferred to ERS to fund retirement benefits.

## F.  The Global Issuance Was Further Delayed by Tax Issues and Market Disruption During the First Half of 2008

ERS hoped to make a second issuance of notes following closely after the issuance of the ERS Series A Bonds.  Evidence indicates that by early February, Merrill Lynch was actively trying to place $4.5 billion issuance into the global market.

Ultimately, however, Merrill Lynch did not find a market outside of Puerto Rico in which to sell the bonds at a price (*i.e.,* interest rate) acceptable to ERS and GDB.  In its August 2007 proposal, Merrill Lynch had predicted ERS would be able to issue bonds outside of Puerto Rico at 6.7% interest.  When it attempted to issue the bonds in 2008, however, Merrill Lynch indicated to GDB the bonds would have to carry 7-8% interest or more if issued outside of Puerto Rico.

Several witnesses told us taxes were a contributing factor.  Investors residing in most jurisdictions pay taxes on interest income earned on their bond holdings, but not investors in Puerto Rico who do not pay federal income taxes.[31]   As a result, in the global bond market, the same "taxable" bond (*i.e.*, one for which payments of interest constitute taxable income to its holder) may be less valuable to an investor outside of Puerto Rico who, after paying taxes, will take home less interest income than a Puerto Rico investor.  In turn, demand for that bond among Puerto Rico

---

[28] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, cover page (2008).

[29] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 17 (2008).

[30] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 6-7 (2008).

[31] Puerto Rico generally imposes an income tax on its own residents.  Interest income on the ERS Bonds, however, is excluded from a resident's taxable income.  *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 45 (2008).

investors may be greater than the demand for the same bond among investors outside of Puerto Rico.  The price of bonds issued only in Puerto Rico, like the ERS Bonds, will reflect market demand among Puerto Rico investors only.  Thus, an issuer may have to increase the bond's issue price to generate that same level of demand in the global market where the vast majority of investors may value the bond less than Puerto Rico investors because of their obligation to pay taxes on its interest income.

Changing market conditions also may have been a factor.  In March 2008, investment bank Bear Stearns collapsed unexpectedly, and market instability was generally on the rise.  In May 2008 the ERS Board understood that the market for the bonds had deteriorated around 35 basis points (or 0.35%).  Despite this, one Merrill Lynch witness informed us that, as late as June 2008, he believed there was still a market for an additional offering of $1 billion in ERS Bonds, assuming they were priced correctly.  Correspondence between that witness and GDB confirm this stated belief.

Accordingly, the resulting difference between the prices that ERS could issue in and outside of Puerto Rico had the potential to be substantial.  The total interest cost of ERS Series A Bonds was 6.39%.  If ERS could obtain that price for a second issuance in Puerto Rico but instead decided to issue globally at 8%, the added interest expense over the thirty- to fifty-year term of the bond may have been cost-prohibitive.

Moreover, for ERS's arbitrage strategy to work, it needed to invest bond proceeds at a higher rate than it had to pay on the bond.  Merrill Lynch projected ERS to realize a rate of return around 8.3%.  If the proceeds being invested came from 8% bonds, the small difference between these rates would have minimized ERS's ability to realize positive net yield through investment arbitrage.

According to a UBS witness, GDB kept delaying the taxable issue.  GDB kept saying that they needed to wait for things to settle down in the market.  Eventually, in May 2008, GDB came back and asked UBS to do another portion of issuances.

## G.   The Issuance of ERS Series B and Series C Bonds

### 1.   ERS Series B Bonds

In late May 2008, ERS issued its second series of bonds in approximately $1 billion total face amount at a total interest cost of 6.58% ("ERS Series B Bonds").  UBS PR was again the underwriter.  Like the ERS Series A Bonds, the ERS Series B Bonds were sold only to Puerto Rico purchasers.  As discussed in Part XI.D.3.d of this Report, the issuance was largely purchased by UBS managed funds.  Specifically, UBS managed funds purchased $885 million of series.

We note that, for this issuance, a change was made to language in the Official Statement, potentially signaling uncertainty as to whether the full $7 billion would ever be issued.  Specifically, where the ERS Series A Offering Statement had stated that the ERS anticipated issuing additional bonds in an amount sufficient to generate net proceeds of $7 billion, the ERS

Series B Offering Statement stated: "If market conditions are favorable, the System anticipates issuing additional Senior Bonds during calendar year 2008."[32]

### 2. ERS Series C Bonds

In late June 2008, ERS issued its second series of bonds in approximately $300 million total face amount at a total interest cost of 6.49% ("ERS Series C Bonds"). UBS PR was again the underwriter. Like both Series A and Series B issuances, Series C bonds were sold only to Puerto Rico purchasers.

### 3. Use of Proceeds From Series B and Series C

The ERS Series B and ERS Series C issuances combined to produce approximately $1.3 billion in net proceeds. Unlike the Closing Memorandum for ERS Series A, the Closing Memoranda for ERS Series B and ERS Series C does not indicate that the net proceeds of those issuances were transferred to ERS. Instead, both indicate net proceeds were transferred "to GDB for further credit to [ERS]." The evidence we reviewed corroborates that these proceeds were transferred to GDB where they remained in a restricted cash account that ERS used to pay pension obligations for several years thereafter. For reasons discussed further below, no part of these proceeds was invested in the long-term arbitrage strategy.

### H. Consideration of Liability-Driven Investment Strategies and Additional Bond Issuances

Throughout the first half of 2008, the ERS Board and GDB continued to work with UBS Consulting to design and implement an optimal investment strategy for ERS assets, including the bond proceeds. By early June, UBS Consulting had developed a proposed liability-driven investment ("LDI") strategy that was specifically tailored to the dual needs of ERS to maintain sufficient cash-flow to cover its short-term obligations and to also realize the greatest yield possible on its long-term investments to improve its underfunding problem.

In June 2008, UBS Consulting presented the proposed LDI strategy to the ERS Board, including its analysis that indicated anticipated yields of more than 11% on ERS investments. The strategy contemplated the reallocation and reinvestment of existing ERS assets as well as the investment of $1 billion of ERS Series B Bond proceeds and anticipated bond proceeds from ERS Series C Bonds. The ERS Board ultimately approved the LDI strategy and asked UBS Consulting to continue its ongoing process to identify asset managers to participate in the strategy while the ERS Board considered its approval.

Later that month, UBS Consulting presented the ERS Board with its selection of asset managers to implement the strategy, including a private investment fund that has achieved yields of up to 20%. The President of GDB (a non-voting member of the ERS Board) suggested the ERS Board consider an investment of $25 million into that fund from proceeds of the recent ERS Bond issuance. In doing so, the President of GDB noted that the market had fallen 17% in the prior six

---

[32] *Compare* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 17 (2008), *with* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series B*, 17 (2008).

months and therefore would be a good time for ERS to seek investments that may be undervalued at current market prices.

At the same time, the President of GDB informed the ERS Board of the issuance of $300 million of ERS Bond Series C and affirmed the intention that the combined proceeds from ERS Series B and ERS Series C be placed into the LDI strategy once it was implemented.  The President of GDB informed the ERS Board that the goal remained to issue a total of $7 billion of ERS Bonds, and that further issuances were expected to continue in September and October of 2008.

## I.      The Onset of the US's Fiscal Crisis and Puerto Rico's Gubernatorial Election

On September 15, 2008, global markets collapsed when Lehman filed for bankruptcy in New York.  The stock markets plunged and the credit markets froze.  Notwithstanding the market collapse, however, ERS continued to pursue an arbitrage strategy with existing bond proceeds while waiting for global markets to re-open to issue additional ERS Bonds.  This intention was corroborated by at least one UBS witness with knowledge of the situation.

In October 2008, the ERS Board discussed the crisis occurring in the financial markets and its impact on ERS.  The overall market was down 35%, and that was having the same negative affect on ERS as it was on other pension funds broadly.  ERS investments were down 29%, but the $1.3 billion proceeds from ERS Series B and ERS Series C were not impacted because they remained in an account at GDB.  Therefore, considering all ERS assets, the value of ERS was down only 14%.  Similarly, the President noted that an evaluation by UBS Consulting of other pension funds utilizing an LDI strategy indicated those funds also fell in value by less than the overall market due to the portfolio diversification called for by the strategy.

On November 4, 2008, Luis Fortuño was elected Governor, defeating the re-election effort of current Governor Acevedo Vilá.  Thereafter, he constituted a transition team, including his appointee to become the new President of GDB once in office.  At some point, the incoming President indicated his desire to the outgoing President to not issue further ERS Bonds or invest any more cash proceeds into the market.

In December 2008, the ERS Board decided, in view of position of the incoming gubernatorial administration and new President of GDB, that there was insufficient time to continue to develop the LDI strategy and that that $1.3 billion bond proceeds from ERS Series B and ERS Series C would be left in the cash account at GDB.

## J.      The New Administration

On January 2, 2009, Governor Fortuño was sworn in as Governor.  As discussed in Part VI. B.2 of this Report concerning COFINA, almost immediately upon taking office, Governor Fortuño announced that Puerto Rico's fiscal burden was $3.2 billion and declared a fiscal emergency.

The first pieces of legislation enacted under the Governor's administration were highly critical of the prior administrations.  For example, the Statement of Motives of Act 1-2009, which expanded COFINA, states:   "This situation is the aftermath of eight years during which the Executive Branch failed to take the necessary measures to establish a balanced budget."

Consistent with prior administration practice, Governor Fortuño appointed a new President of GDB.  According to a GBD senior official, the ERS strategy, as well as the perceived risks of not issuing the additional bonds, were explained to the new GDB President.  But the new GDB President was opposed to the strategy and against layering additional debt on ERS given its substantial underfunding.

No further ERS Bonds were issued.  Consequently, less than $3 billion was borrowed out of the $7 billion Merrill Lynch had recommended to improve ERS's long-term funding issues.  By comparison, the smallest potential transaction Merrill Lynch had analyzed in its August 2007 proposal was a $4 billion issuance – an amount Merrill Lynch found unlikely to generate sufficient investment returns to improve ERS's underfunding problem.  Two senior GDB officials from the prior administration analogized the situation to "building half a bridge."

## K.   ERS and GDB Retained Conway  in 2010

In June 2010, ERS and GDB retained Conway to "identify, analyze, and summarize the key events and decisions that [had] created the current financial crisis of the ERS."[33]  As part of the engagement, Conway was instructed to "review the analyses supporting the issuance and utilization of funds related to the issuance of" the ERS Bonds.  Conway's engagement culminated in the publication of the Conway Report in October 2010.

According to the Conway Report, Conway's review focused on three questions:

1. "Was the Pension Obligation Bond strategy reasonable?"

2. "Was it prudent to issue the Pension Obligation Bonds?"

3. "Were Pension Obligation Bond proceeds utilized appropriately?"

As to the first question ("Was the Pension Obligation Bond strategy reasonable?"), Conway concluded as follows:

> Based upon Merrill Lynch's analyses, the ERS had the capacity to issue $7.0 billion of pension obligation bonds. While it was a reasonable strategy to help address near term liquidity requirements, it was not likely to significantly improve the System's funding status when calculated consistently with prior methodologies. In addition, the transaction was subject to significant risks among others, the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the POB proceeds. Based upon our review of supporting documents, it appears that these risks were not fully understood or vetted by the decision-makers prior to undertaking the bond issuance strategy and several of these risks actually materialized. Given the importance, magnitude and potential risks associated with a failed strategy, by not understanding or vetting the risks associated with the POB transaction, it

---

[33] Conway Mackenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 2 (2010).

appears the ERS management, the Board of Trustees and GDB Board of Directors did not exercise due care.

As to the second question ("Was it prudent to issue the Pension Obligation Bonds?"), Conway concluded as follows:

> Based upon advice and analysis from Merrill Lynch, the ERS believed that at least a $7.0 billion POB issuance was required to resolve the System's liquidity needs. Although POB proceeds of less than $7.0 billion would assist the System by improving liquidity in the short term and extending the date by which it would deplete its assets, they did not provide a permanent solution to the System's problems and actually harmed the System because negative arbitrage was realized. The parties responsible for the oversight and administration of the ERS had a fiduciary responsibility to ensure market conditions were supportive of issuing at least the full $7.0 billion transaction required to solve the System's financial crisis before proceeding with the transaction.

> It is Conway MacKenzie's opinion that several warning signs existed concerning market conditions, principally Merrill Lynch's inability to issue the POBs in the global market, that should have given ERS management, Board of Trustees and GDB Board of Directors probable cause to either postpone the bond transaction or request additional due diligence be performed.

> Additionally, we believe that by June 2008 it should have been apparent to the decision-makers and their advisors, that it was very unlikely that the incremental $5.5 billion in POB issuances required to reach the full $7.0 billion could be raised given deteriorating market conditions.

> For these reasons, it is our opinion that the decisions made by the governing boards of the ERS and GDB to pursue and enter into Series A, Series B and Series C transactions were not prudent given the risks inherent in the transactions, several of which risks appear to have increased significantly in probability prior to the issuance of these bonds.

As to the third question ("Were the Pension Obligation Bond proceeds utilized appropriately?"), Conway concluded as follows:

> The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed based on the current liquidity needs of the System. In fact, the POB transaction has and will continue to cost the System money, as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually

> earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees.

The Conway Report contains additional findings purporting to support these conclusions, but does not provide the legal standards against which it evaluated those findings. The Conway Report is publicly available and can be accessed by visiting http://www.slcg.com/pdf/blog/13409.pdf. The Conway Report is discussed further in Part XVI.C.3, where we analyze investigative findings as they relate to the additional conclusion of Conway that ERS and GDB decision-makers "may have failed to meet the standard of due case and other important fiduciary duties in approving" the ERS bonds.

## L.     The Passage of Act 116 in 2011

Less than a year after the Conway Report, on July 6, 2011, the Legislative Assembly approved and Governor Fortuño signed into law Act No. 116-2011 ("Act 116"). Act 116 amends Act No. 447 of May 15, 1951 to increase the minimum rate of Employer Contributions, prohibit ERS from issuing any more ERS bonds, and requiring any other borrowing by ERS to be pre-approved by the Legislative Assembly.[34] The "Statement of Motives" included in Act 116 characterized the ERS Bonds as (i) "illegally made by the [ERS decision-makers in 2008] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to the System" and (ii) "so badly structured that, rather than yielding profits . . . [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System."[35]

## M.     Recent Events Impacting ERS

Following the events discussed above, ERS continued to be underfunded, critically so in more recent years. On November 14, 2016, ERS projected that it will deplete its remaining liquid assets (which amounted to $655.3 million as of that date) by the end of 2017, if not sooner. On May 3, 2017, a Title III Petition was filed on behalf of ERS by the Oversight Board.

On June 23, 2017, the Legislative Assembly passed a budget resolution providing that Employer Contributions to ERS "shall be eliminated."[36] The purpose of the resolution was to fund "the pay-as-you-go system as a new method for safeguarding pensions for Government retirees."[37] This was to be accomplished by eliminating Employer Contributions, requiring ERS to transfer all of its assets to the General Fund, and requiring the General Fund to assume responsibility for all payments owed by ERS to its beneficiaries.[38] Subsequently, Puerto Rico enacted Act 106-2017,

---

[34] Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431.
[35] Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431, 1436.
[36] *See* Legis. Assemb. J. Res. 188, 18th Leg., 1st Sess. § 4(3) (P.R. 2017).
[37] *See* Legis. Assemb. J. Res. 188, 18th Leg., 1st Sess. (P.R. 2017).
[38] *See* Legis. Assemb. J. Res. 188, 18th Leg., 1st Sess. § 4(3) (P.R. 2017).

establishing the "PayGo" system.[39]   Under this system, current pensions are paid by the Commonwealth, funded in part by the transfer of available funds and assets of the retirement systems.[40]

On July 19, 2017, holders of ERS bonds commenced litigation against the federal government challenging the elimination of the Employer Contributions on the basis that it was an unconstitutional "taking."[41]   On July 13, 2018, the government's motion to dismiss the action was denied.  That litigation remains pending.[42]

On July 21, 2017, the Oversight Board, on behalf of ERS, commenced litigation seeking a determination that holders of ERS bonds did not have valid, enforceable liens in the Employer Contributions or any other ERS assets.[43]  On August 17, 2018, the Title III Court granted judgment in favor of the Oversight Board.[44]  That judgment remains subject to appeal, and therefore is not final as of publication of this Report.  If upheld, the judgment, in effect, would render the right to payment of holders of ERS bonds unsecured, meaning they would be entitled to share equally with other unsecured creditors of ERS in any distributions made by ERS in the Title III proceedings. That litigation remains pending.

---

[39] Act of 2017, No. 106, 2017 P.R. Laws --.

[40] Act of 2017, No. 106, 2017 P.R. Laws --.

[41] *See Altair Global Credit Opportunities Fund (AL) LLC v. United States*, 17-cv-00970-SGB (Fed. Cl. July 19, 2017).  *See also In re Fin. Oversight and Mgmt. Bd. for P.R. as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A) LLC v. The Commonwealth of Puerto Rico),* No. 17-219 (D.P.R. July 2, 2017) (allegations, among others, that diversion of employer contributions violated US and Puerto Rico Constitutions).

[42] *See Altair Glob. Credit Opportunities Fund (A), LLC v. United States*, No. 17-970C, 26 (Fed. Cl. July 13, 2018).

[43] *See In re Fin. Oversight and Mgmt. Bd. for P.R. as Representative of The Commonwealth of Puerto Rico* (*Fin. Oversight and Mgmt. Bd. for P.R. as Representative of The Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A) LLC),* No. 17-213 (D.P.R. July 21, 2017).

[44] *See Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* Tit. III Case No. 17-BK-3283-LTS, Adv. No. 17-213-LTS, 20 (D.P.R. Aug. 17, 2018).

# PART VIII

# PUERTO RICO'S BUDGETING, EXTERNAL REPORTING, AND ACCOUNTING FUNCTIONS

# PART VIII
# PUERTO RICO'S BUDGETING, EXTERNAL REPORTING, and ACCOUNTING FUNCTIONS

As part of our investigation, we examined whether the evidence demonstrates any weaknesses in Puerto Rico's budgeting, accounting, or fiscal reporting functions and, if so, then whether those weaknesses contributed to Puerto Rico's debt crisis. The evidence supports five conclusions:

1.     Puerto Rico failed to develop and execute prudent budgets. *See* Part VIII.A. The budgets rested on erroneous assumptions of economic growth and unreasonable revenue projections. Puerto Rico also did not sufficiently curtail spending. These failures yielded substantial deficits.

2.     Puerto Rico's external financial reports were often stale. *See* Part VIII.B. This likely interfered with the ability of interested parties to acquire sufficient transparency regarding matters that concerned, or were otherwise intertwined with, Puerto Rico's fiscal health. That, in turn, likely contributed to a loss of investor confidence.

3.     Puerto Rico did not prioritize the efficiency of its accounting mechanism. *See* Part VIII.C. In particular, Puerto Rico failed to develop the necessary infrastructure and resources to support that function.

The Independent Investigator's Final Investigative Report

4.      Puerto Rico did not optimize its use of independent audits, particularly in light of the complexity of its accounting structure.  *See* Part VIII.D.  This led to protracted audits that necessarily delayed the completion and release of Puerto Rico's external reports.  For more recent delayed audits, evolving current events also played a role.  This includes, among other things, changes in Puerto Rico's reduced market access, liquidity concerns, worsening economic conditions, and deteriorating fiscal health.

5.      Certain reforms could help Puerto Rico to improve its budgeting, reporting and accounting functions, and thus to eventually restore public confidence.   We present our recommendations below in Part VIII.E.

## A.      Puerto Rico Did Not Prudently Develop or Execute Its Budgets

We found that Puerto Rico divided its budgeting and accounting functions between two separate agencies: (i) OMB, which developed the yearly budget and related expenditure amounts that the Governor would then submit to the Legislative Assembly for approval;[1] and (ii) the Department of Treasury, which handled comprehensive financial reporting, related aggregation of accounting information, and the collection of revenues.  The functions of both entities, in turn, were dependent upon the estimates of economic growth that a third government body prepared: the Planning Board.  This is because the Planning Board developed annual economic reports that forecasted economic growth for the upcoming year,[2] on which the Department of Treasury then relied to produce its own revenue estimates.  OMB, in turn, used the Department of Treasury's revenue estimates to develop the yearly budget and allocate permissible expenditures.

As others have previously reported, the Planning Board's economic growth estimates were too optimistic.[3]   The Department of Treasury's resulting revenue estimates were also unreasonable, as were the budgets that OMB based on those estimates.  *See* Part VIII.A.1, below.  In addition, Puerto Rico and many of the agencies, instrumentalities or other entities that affect its consolidated year-end accounting ("Component Units") failed to cabin expenditures that exceeded OMB's overly generous budget thresholds.  *See* Part VIII.A.2, below.

Different witnesses offered different opinions regarding the reasons why the Planning Board overestimated economic growth, Department of Treasury overestimated revenues, and no one curtailed expenditures.  We summarize these opinions below.  Whatever the reasons for the errors, one thing is clear:  there was no meaningful consequence for the unreasonable projections and no true incentive to curtail spending, in part because funds were traditionally available from GDB or new Puerto Rico-Related Bond issuances.  *See* Part IV of this Report.

---

[1] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2010*, 94 (Apr. 27, 2011).

[2] *See, e.g.,* Gobierno de Puerto Rico, Oficina del Gobernador, Junta de Planificación, *Proyecciones Económicas a Corto Plazo: Años Fiscales 2017 y 2018* (2017).

[3] *See, e.g.,* Gov't Accountability Office, GAO-18-387, Puerto Rico, *Factors Contributing to the Debt Crisis & Potential Federal Actions to Address Them*, 18-19 (2018).

The Independent Investigator's Final Investigative Report

1.  **The Planning Board Developed Unreasonable Assumptions of Economic Growth that Fueled Inflated Revenue Estimates and Imprudent Budgets**

Figure VIII.A below compares the Planning Board's estimate of growth or contraction against actual growth or contraction, as measured by real GNP, for the period between 2003 and 2012.  As it reflects, the Planning Board overestimated growth and underestimated contraction in most of those years.

**Figure VIII.A: Planning Board Estimates of Growth vs. Actual Economic Change by Year (2003-2012)[4]**



As Figure VIII.A demonstrates, the Planning Board's estimates were inaccurate.  A former President of the Planning Board told us that the issues with the Planning Board's estimates were, at least in part, traceable to its lack of resources.  The Planning Board was materially underfunded and its economists used outdated computer systems, as well as modeling programs that did not conform to generally-accepted standards for US municipal issuers.  In this witness's view, the resulting forecasts would have been different if the Planning Board had access to modern systems.  The witness further recalled the Planning Board having asked for increased funding to upgrade its computer systems in either 2011 or 2012, and the Puerto Rico government having declined that request.[5]

---

[4] The data in this Figure spans the ten-year period between 2003 and 2012, for which the Planning Board's projections of economic growth have been sourced from the relevant Puerto Rico CAFR filings.  As noted in Part VIII.B.1, Puerto Rico stopped filing full CAFRs as of fiscal year-end 2013 and started releasing only basic financial statements.  The basic financial statements do not contain Planning Board projections.

[5] A 2011 report prepared by the U.S. Department of Commerce's Bureau of Economic Analysis noted a 2009 study reflecting that the Planning Board used certain variables for calculating estimated growth based on information from the 1950s.  *See* U.S. Bureau of Econ. Analysis, U.S. Dep't of Commerce, *Evaluation and Improvement of Puerto Rico's National Economic Accounts*, 3-4 (2011).

The Independent Investigator's Final Investigative Report

A former GDB President expressed a different view. He conveyed that in or about 2001, Puerto Rico decided to reduce taxes for new projects in the biopharmaceutical industry so that the new tax rate was essentially 0%. The Planning Board and the Department of Treasury did not, in his view, adequately model how this reduction of taxes would impact subsequent economic growth. Our factual investigation did not verify this witness's viewpoint.[6]

Regardless of why the Planning Board repeatedly overestimated growth, those errors necessarily contributed to unreliable estimates of revenue by the Department of Treasury.[7] As noted above, the Department of Treasury relied on Planning Board estimates to develop its own revenue projections. It is therefore unsurprising that, as Figure VIII.B reflects below, the revenues originally budgeted for the General Fund exceeded the actual revenue collections for six of the years between 2005 and 2014:[8]

---

[6] This witness may have been referring to the implementation of a 2001 Puerto Rico law that allowed certain businesses to claim a tax deduction for expenses incurred in connection with their purchase, acquisition or construction of property. *See* Tax Incentives Act of 1998—Amendment, 2001 P.R. Laws 113-6 (amending Tax Incentives Act of 1998, 1997 P.R. Laws 733-806). Others have also reported that, to entice investment, the Department of Treasury made agreements with specific companies to reduce their tax rates, that Puerto Rico did not properly account for those agreements and, as a result, that the Department of Treasury was unable to take those agreements into account when estimating revenues. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 19 (2018).

[7] *See* Anne O. Krueger, Ranjit Teja, & Andrew Wolfe, *Gov't Development Bank for P.R., Puerto Rico – A Way Forward*, 9 (2015).

[8] Disbursements from the General Fund are generally approved through Puerto Rico's annual budgeting process and included in the annual appropriated budget. *See, e.g.*, Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2010*, 17 (Apr. 27, 2011).

The Independent Investigator's Final Investigative Report

**Figure VIII.B: General Fund Budgeted vs. Actual Revenues by Year, 2005-2014[9]**

| Fiscal Year | General Fund Originally Budgeted Revenues | General Fund Actual Revenues | Difference Between Originally Budgeted and Actual Revenues |
|---|---|---|---|
| 2005 | $8.1 bn | $8.6 bn | +0.5 bn |
| 2006 | $8.7 bn | $8.4 bn | -0.3 bn |
| 2007 | $9.1 bn | $8.7 bn | -0.4 bn |
| 2008 | $9.1 bn | $8.2 bn | -0.9 bn |
| 2009 | $9.3 bn | $7.6 bn | -1.7 bn |
| 2010 | $7.5 bn | $7.6 bn | +0.1 bn |
| 2011 | $7.9 bn | $8.0 bn | +0.1 bn |
| 2012 | $8.5 bn | $8.6 bn | +0.1 bn |
| 2013 | $8.6 bn | $8.1 bn | -0.5 bn |
| 2014 | $9.4 bn | $8.7 bn | -0.7 bn |

Some have attributed the revenue shortfalls to circumstances other than the Planning Board's growth estimates.[10] For example, certain researchers contend that the Department of Treasury simply overestimated how much was owed in taxes or could be collected in prior years, and that those shortfalls affected the figures for subsequent years.[11] To some degree, the shortfalls also persisted during—and may be linked to Puerto Rico's inability to accurately measure the severity of—a prolonged period of economic stagnation and contraction.[12]

At least one witness with whom we spoke blamed politics. This witness told us that politicians inflated revenue estimates in order to circumvent election-year budget limits. He described a law pursuant to which spending during the first six months (beginning July 1) could not exceed 50% of annual budget line items.[13] He observed that it was typical in election years

---

[9] All figures taken from Puerto Rico's relevant yearly CAFR for years 2005 through 2012 or the audited Basic Financial Statement for years 2013 and 2014. *See, e.g.*, Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2005*, 30 (Mar. 30, 2006).

[10] *See* Commonwealth of P.R., *Commonwealth of Puerto Rico Financial Information & Operating Data Report*, 66 (Dec. 18, 2016); Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis & Potential Federal Actions to Address Them*, 18-19 (2018).

[11] Commonwealth of P.R., *Commonwealth of Puerto Rico Financial Information & Operating Data Report*, 66 (Dec. 18, 2016); Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis & Potential Fed. Actions to Address Them*, 18-19 (2018).

[12] *See, e.g.*, The White House, *Addressing Puerto Rico's Economic and Fiscal Crisis and Creating a Path to Recovery*; Anne O. Krueger, Ranjit Teja, & Andrew Wolfe, *Gov't Dev. Bank for P.R., Puerto Rico – A Way Forward*, 9-10 (2015) (describing optimistic revenue projections and systematic understatement of tax refunds).

[13] *See* P.R. Laws Ann. tit. 23, § 108 (2018) ("During the period from July 1 of the year when general elections and the date of the inauguration of the newly elected officials in these general elections it will be illegal to incur expenses or obligations that exceed fifty (50) percent of the budget allocation for each item . . . . Provided, however, that this limitation shall not apply to the Judicial Branch, the Legislative Branch, allocations for matching federal funds requiring advance of the capital improvement programs, payment of

224

for politicians to increase their revenue projections so that the dollar amount they could devote to campaigning without exceeding that limit was higher than it otherwise would have been. This witness also stated that Puerto Rico did not have any mechanism for building into its revenue forecasts the sizeable tax credits that functioned as expenses. And because public budget approval meetings were, in his recollection, little more than a rubber-stamp exercise that focused almost entirely on the General Fund (to the exclusion of the Component Units), the inflated revenue forecasts were typically adopted even if they did not track macroeconomic growth trends or deficit data. We found no documentary evidence to corroborate this allegation.

In all events, however, the budgets that OMB predicated upon the Department of Treasury's estimates would have allowed for more spending than circumstances warranted. They therefore could not have served as useful tools for fiscal planning or management.

### 2.   <u>Puerto Rico Did Not Sufficiently Curtail Spending</u>

We agree with prior findings that, in addition to developing imprudent budgets, Puerto Rico failed adequately to cabin expenditures[14] and instead continued to incur liabilities for which it could not pay.[15] This appears to have resulted in significant part from poor internal controls, integrated systems and coordination among relevant entities. Witnesses conveyed that:

- The Component Units' various accounting systems were not equipped to track budgeted figures against actual expenditures;

- Internal payroll systems did not shut down the release of additional paychecks if the budgeted limit had been exhausted. This is significant because a former high-ranking Treasury official identified payroll as the largest category of expenditure;

- Certain Component Units, like the Department of Education, were given substantial autonomy over their expenditures in an attempt to expedite certain functions and to unburden the Department of Treasury. The Department of Treasury essentially functioned as a cashier, while the agencies had the freedom to enter into contracts, receive invoices, and even approve certain payments;

- The Department of Treasury lacked insight into the uses to which lump-sum grants and conveyances to certain Puerto Rico-Related Entities, like UPR, were ultimately put. The Department of Treasury had no control or oversight over those large sums after they were transferred;

---

the public debt, allocations to the University of Puerto Rico and assignments with specific legal purposes and does not constitute ongoing operating costs.").

[14] Gov't Dev. Bank for Puerto Rico, *Commonwealth of Puerto Rico Fiscal Plan,* 6 (Oct. 14, 2016) (noting that "Puerto Rico has experienced persistent deficits, routinely overestimating revenue and failing to control spending").

[15] *See* Anne O. Krueger, Ranjit Teja, & Andrew Wolfe, *Gov't Dev. Bank for P.R., Puerto Rico – A Way Forward,* 14-15 (2015).

The Independent Investigator's Final Investigative Report

- OMB—the very department that was supposed to manage the budget—did not have the ability to timely see what the Component Units were spending, much less the authority to impose consequences for any overruns;

- A former Department of Treasury official conveyed that when he took office, the Department of Treasury's system automatically issued checks within five days of having received an invoice that the agency submitted and the system approved.  The checks were issued regardless of whether sufficient funds were available.  If funds were insufficient, then the checks would simply be held.  They often expired and were re-issued.  As a result, there was no way to reliably track how many invoices remained outstanding at any given point in time; and

- The internal use of cash basis accounting (discussed in more detail below in Part VIII.C.2) may have incentivized certain employees to manufacture the appearance of budget compliance by delaying invoice payments.  This is because cash basis accounting does not debit invoices against revenues until the invoices are actually paid.  In many instances, there were no ramifications for engaging in this practice.[16]

In light of the foregoing, it is not surprising that Puerto Rico and its Component Units continued to spend more than was prudent during the relevant period.

### 3.    Puerto Rico's Weak Budgeting Functions Likely Yielded Operational Deficits

The weaknesses we identify above had consequence.  Figure VIII.C reflects below the net deficit of Puerto Rico and the deficit of the General Fund for fiscal years 2005 through 2014, as set forth in Puerto Rico's CAFRs.  As it demonstrates, Puerto Rico's fiscal deficits accumulated significantly:[17]

---

[16] This tracks the findings of certain scholars, as well as the Government Accountability Office.  *See* Anne O. Krueger, Ranjit Teja, & Andrew Wolfe, *Gov't Dev. Bank for P.R., Puerto Rico – A Way Forward*, 10 (2015); *see also* Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis & Potential Federal Actions to Address Them*, 20-22 (2018).

[17] *See, e.g.,* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2006*, 29 (Aug. 6, 2007).

The Independent Investigator's Final Investigative Report

**Figure VIII.C: Puerto Rico and General Fund Deficits by Year, 2005-2014[18]**

| Fiscal Year | Puerto Rico Net Deficit[19] | General Fund Deficit[20] |
|---|---|---|
| 2005 | $15.2 bn | $511.0 mm |
| 2006 | $16.4 bn | $384.0 mm |
| 2007 | $17.7 bn | $511.0 mm |
| 2008 | $17.1 bn | $1.8 mm |
| 2009 | $26.4 bn | $3.3 mm |
| 2010 | $30.4 bn | $2.0 mm |
| 2011 | $33.7 bn | $1.1 mm |
| 2012 | $39.0 bn | $1.3 mm |
| 2013 | $47.2 bn | $807.0 mm |
| 2014 | $66.6 bn | $440.0 mm |

The failure to both develop and execute prudent budgets contributed to greater deficits than anticipated because those budgets assumed revenue amounts that, as Puerto Rico has acknowledged, were overestimated and allowed for spending limits that were also too high.[21] As Figure VIII.C demonstrates, Puerto Rico's net deficit increased almost every year, sometimes by a substantial amount. The General Fund also operated with a significant deficit each year, although the size of that deficit generally decreased after 2009. Consistent with the analysis presented above in Part VIII.A.1, a government witness tied these deficits to the beginning of the Planning Board's overly optimistic estimates of economic growth, which pre-dated the 1990s.

---

[18] All figures are drawn from the relevant CAFR for fiscal years between 2005 and 2012 or from the relevant audited Basic Financial Statements for years between 2013 and 2014.

[19] This figure is reported as "Statement of Net Assets (Deficit)" in Puerto Rico's financial statements. It reflects, for Puerto Rico's primary government (which includes certain Component Units), the difference between the reported government's assets and liabilities for governmental and business-type activities (which is defined in the CAFRs as "total net assets (deficit)"). *See, e.g.*, Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2012*, 21 (Sept. 16, 2013). The CAFRs indicate that "[o]ver time, increases or decreases in the Commonwealth's net assets (deficit) may serve as a useful indicator of whether the financial position of the Commonwealth is improving or deteriorating." *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2012*, 21 (Sept. 16, 2013).

[20] The General Fund deficit consists of the difference between total recurring revenues and total expenditures for a fiscal year. *See, e.g.*, Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2011*, 35 (Apr. 27, 2012).

[21] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2009*, 19 (Oct. 22, 2010) (stating that one of the main reasons for Puerto Rico's structural imbalance between revenues and expenditures was "the overestimation of economic growth by the Puerto Rico Planning Board, which led to the overestimation of revenues by the Department of Treasury and the corresponding increase in budgeted expenditures by [OMB]").

Many Component Units have likewise tended to exceed their budgeted limits.[22]   As Figure VIII.D reflects, the Public Utilities and HTA, as well as UPR (each of which is a significant Component Unit), each had net deficits for the years between 2005 and 2014:

**Figure VIII.D: Net Deficits by Year for Certain Public Corporations, 2005-2014**[23]

| Fiscal Year | PREPA Net Deficit | PRASA Net Deficit | HTA Net Deficit | University of Puerto Rico Net Deficit |
|---|---|---|---|---|
| 2005 | $50.6 mm | $431.4 mm | $90.3 mm | $820.4 mm |
| 2006 | $64.5 mm | $362.6 mm | $576.1 mm | $833.0 mm |
| 2007 | $117.9 mm | $43.0 mm | $522.2 mm | $1.0 bn |
| 2008 | $349.6 mm | $303.6 mm | $598.2 mm | $1.1 bn |
| 2009 | $188.4 mm | $168.6 mm | $598.4 mm | $1.2 bn |
| 2010 | $154.0 mm | $168.4 mm | $626.0 mm | $1.2 bn |
| 2011 | $276.5 mm | $249.8 mm | $704.1 mm | $1.0 bn |
| 2012 | $370.5 mm | $340.5 mm | $729.4 mm | $973.4 mm |
| 2013 | $316.1 mm | $478.3 mm | $508.2 mm | $1.1 bn |
| 2014 | $441.0 mm | $55.4 mm | $668.0 mm | $1.1 bn |

As we explain separately in Part IV.C.2 of this Report, these entities drew various loans from GDB for the purpose of bridging these deficits.  Certain Puerto Rico-Related Bonds were also issued either for the same purpose or to re-pay GDB.  Because GDB was a reliable and sometimes uncritical source of cash, there was no significant incentive for the Planning Board to align its economic growth estimates with reality; for the Department of Treasury to pursue more effective methods of developing revenue estimates; for OMB to ensure that budgets were reasonable and allotted limits would not be exceeded; or for the Component Units to curtail their spending.[24]

---

[22] *See, e.g.,* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2005*, 38 (Mar. 30, 2006); *see also* Commonwealth of P.R, *Financial Information and Operating Data Report*, 155 (Dec. 18, 2016).

[23] All figures are drawn from the relevant CAFR for fiscal years between 2005 and 2012 or from the relevant audited Basic Financial Statements for years between 2013 and 2014.

[24] One former Treasury official also conveyed that, by the summer of 2015, and as a result of a report prepared by an economist, deficits were found to be greater than reported because of how Puerto Rico had been measuring them.  According to that official, the deficit of Puerto Rico was always reported to be the deficit of the General Fund.  The problem was that this measure did not incorporate the deficits or debt of certain Puerto Rico-Related Entities that Puerto Rico considered independent, but that certain economists believed should nevertheless have been included in calculating Puerto Rico's deficits.  GDB covered portions of the deficits of these Puerto Rico-Related Entities by making loans to them.  *See* Part IV.C.  This witness indicated that Puerto Rico created many Puerto Rico-Related Entities that were believed to be independent, and some of them were authorized to issue debt.  Ultimately, many of these entities required the financial assistance of Puerto Rico or GDB to operate (for example, HTA).  Given this need, in some instances, the debt and deficits of those entities were ultimately subsumed within Puerto Rico's overall figures.

The Independent Investigator's Final Investigative Report

**B.**     **Puerto Rico's External Reporting Deviated from Recognized Best Practices**

    **1.**     **The Government Accounting Standards Board Establishes Best Financial Reporting Practices for Local Governments**

    The Government Accounting Standards Board ("GASB") develops best practices for financial reporting and accounting standards among local US governments.[25] Those best practices provide guidance for local governments to follow when preparing and publishing their respective CAFRs for each fiscal year.[26] The CAFR is supposed to be a standardized reporting mechanism through which US localities provide detailed public disclosures concerning their respective financial conditions.[27] To that end, each CAFR is supposed to include, among other things, the reporting entity's basic financial statements for the relevant fiscal year, any fund-specific financial statements, the notes to the financial statements, an independent auditor's report concerning the financial statements, and related analysis.[28] In this way, the CAFRs can provide interested parties with consistent disclosure about the fiscal health of each reporting entity.

    GASB also provides guidance on how the reporting entities should compile their CAFRs. In particular, GASB-promulgated standards for best practices in government finance encourage the use of accrual basis accounting[29] and compliance with Generally Accepted Accounting Principles ("GAAP").[30] These uniform standards enable interested parties to use the reports to put

---

[25] *See About the GASB*, Governmental Accounting Standards Bd., http://www.gasb.org/jsp/GASB/Page/GASBSectionPage&cid=1176168081485 (last visited May 24, 2018).

[26] *See* GASB Cod. § 2200.101 ("Every governmental entity should prepare and publish, as a matter of public record, a Comprehensive Annual Financial Report (CAFR) that encompasses all funds of the primary government (including its blended component units). The CAFR should also encompass all discretely presented component units of the reporting entity.").

[27] *See Guide to Understanding Comprehensive Annual Financial Reports*, Texas Comptroller's Office, https://comptroller.texas.gov/transparency/budget/cafr-faq.php (last visited Jul. 31, 2018) ("A CAFR is a set of financial statements for a state, municipality or other governmental entity that comply with the accounting requirements established by the Governmental Accounting Standards Board (GASB)" and reports on "financial trends that may better inform the reader about the government's activities.").

[28] *See* GASB Cod. § 2200 ("The basic financial statements should include: (a) Government-wide financial statements. (b) Fund financial statements. (c) Notes to the financial statements."). As previously noted, fiscal year 2012 is the last one for which Puerto Rico published a full CAFR. *See* Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2013*, (June 30, 2014) (reflecting Puerto Rico downgraded its financial reporting as of fiscal year 2013, after which it agreed to submit only basic financial statements rather than a full CAFR); *see also* GASB Cod. § 2200(c)(2) ("Basic financial statements essentially consist of the entity's balance sheet (or statement of financial condition), income statement, and cash flow statement."). For ease of reference, however, we use the term "CAFR" in this Part of the Report to describe Puerto Rico's annual financial reporting both before and after fiscal year 2012.

[29] *See Summary of Statement No. 34*, Governmental Accounting Standards Bd., https://www.gasb.org/st/summary/gstsm34.html (last visited Aug. 7, 2018) (noting that pursuant to GASB Pronouncement No. 34, basic financial statements, including the government-wide financial statements and the fund-specific financial statements, are to be prepared using "the accrual basis of accounting").

[30] *See* GASB Cod. § 1200 ("Adherence to GAAP is essential to assuring a reasonable degree of comparability among the financial reports of state and local governmental units. Governmental accounting

The Independent Investigator's Final Investigative Report

in context a particular entity's financial condition – for example, by enabling comparisons across reporting governments.[31]

Relevant GASB pronouncements provide that among other things, a government's financial reports are supposed to be "timely" and "useful."[32]  Although there is no law or regulation that imposes a deadline by which each reporting entity must publish its CAFR, GASB Concept Statement 1 recognizes that "[i]f financial reports are to be useful, they must be issued soon enough after the reported events to affect decisions. . . . Sometimes a timely estimate is more useful than precise information that takes a long time to produce."[33]  GASB research suggests that to satisfy this requirement, a reporting entity must generally issue its financial reports within six months of the corresponding fiscal year-end.[34]  In GASB's view, usefulness quickly diminishes after as few as forty-five days.[35]  The Government Finance Officers Association ("GFOA") takes a similar view, generally conditioning eligibility for its award of a Certificate of Achievement for Excellence in Financial Reporting ("GFOA Certificate") on whether a reporting entity has issued its CAFR by the six-month anniversary of the relevant fiscal year-end.[36]

### 2.   Puerto Rico's External Reports Were Not Timely Enough to Be Useful, as GASB's Best Practices Contemplate

Localities with better fiscal health tend to publish their CAFRs more quickly.[37]  Puerto Rico's publication times, however, have typically lagged behind those of most US states.  In fact, we are unaware of any fiscal year between 2005 and the present in which Puerto Rico released its CAFR in as timely a fashion as most US states, much less within six months of its fiscal year-

---

[31] Governmental Accounting Standards Bd., *Concepts Statement No. 1: Objectives of Financial Reporting*, 20-21 (1987).

[32] Governmental Accounting Standards Bd., *Concepts Statement No. 1: Objectives of Financial Reporting*, 20 (1987).

[33] Governmental Accounting Standards Bd., *Concepts Statement No. 1: Objectives of Financial Reporting*, 20 (1987).

[34] Governmental Accounting Standards Bd., *Research Brief: The Timeliness of Financial Reporting by State and Local Governments Compared with the Needs of Users*, 2 (2011).

[35] Governmental Accounting Standards Bd., *Research Brief: The Timeliness of Financial Reporting by State and Local Governments Compared with the Needs of Users*, 2 (2011).

[36] *See, e.g.*, *Certificate of Achievement for Excellence in Financial Reporting (CAFR Program)*, Gov't Fin. Officers Ass'n, http://www.gfoa.org/certificate-achievement-excellence-financial-reporting-cafr-program (last visited Aug. 7, 2018).  According to Puerto Rico's 2003 CAFR, Puerto Rico received the GFOA Certificate for its 1996 through 2002 CAFRs.  *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2003*, 12 (June 9, 2004).  Those CAFRs, however, were not issued within six months of the relevant fiscal year ends.  This was prior to when GFOA began indicating in 2010 that a government should complete its audited financials within 180 days.  *See* Government Fin. Officers Ass'n, *Understanding Your Continuing Disclosure Responsibilities* (2010).

[37] *See* Corey S. Cagle et al., *Compilation Report Timeliness in Local Governments: An Investigation of Entities Exceeding State Deadlines*, 17 J. Acct. & Fin., 43, 55 (2017) (indicating a higher amount of indebtedness is associated with an increase in the time it takes for governments to issue financial statements).

The Independent Investigator's Final Investigative Report

end.[38]  And as this Report went to print, Puerto Rico was approximately two years behind on its financial reporting, having failed to release CAFRs or even audited financial statements for the fiscal years ended 2016 and 2017.  Scholars have cited Puerto Rico's persistent lack of timely CAFRs as one symptom of its financial dysfunction.[39]

As noted earlier, GASB recognizes that "[s]ometimes a timely estimate is more useful than precise information that takes a long time to produce."[40]  Year after year, however, Puerto Rico let the imperfect be the enemy of the good.  And, its tardy reporting history began before the fiscal crisis intensified:  Puerto Rico's average CAFR publication time for the fiscal years between 2005 and 2014 was 406 days,[41] which is meaningfully higher than the fifty-state average of approximately 200 days for the same period.[42]  Similarly, as shown in Figure VIII.E, Puerto Rico had not typically released its financial statements in a timely fashion for fiscal years 2002 through 2015, for which period the publication times ranged from a low of 273 days to a high of 1095.

---

[38] This is based on an analysis of multiple reporting sources for fiscal years between 2005 and 2014.  *See* State of South Carolina Office of Comptroller General, Accountability Report – Fiscal Year 2007-2008, at 41 (2008) (reporting CAFR preparation times for all fifty states for fiscal years 2002-2007); *see also* Nat'l Ass'n of State Auditors, Comptrollers and Treasurers, *CAFR Completion Dates for Fiscal Years 2008-2012*, https://www.nasact.org/files/Resources/CAFR_Completion_Dates/2013_09_CAFR_FY_08-12.pdf (last visited Jul. 29, 2018); Nat'l Ass'n of State Auditors, Comptrollers and Treasurers, *CAFR Completion Dates for Fiscal Years 2012-2016*, https://www.nasact.org/files/Resources/CAFR_Completion_Dates/2018_03_CAFR_FY_12-16.pdf (last visited Jul. 29, 2018); *Estados Financieros del Gobierno de Puerto Rico*, Departamento de Hacienda, http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico (last visited Jul. 29, 2018).

[39] Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at George Mason Univ., *Origins of the Puerto Rico Fiscal Crisis*, 16-19 (2016).

[40] Governmental Accounting Standards Bd., *Concepts Statement No. 1: Objectives of Financial Reporting* (1987).

[41] This is based on an analysis of financial reports provided by the Puerto Rico Department of the Treasury.  *See Estados Financieros del Gobierno de Puerto Rico*, Departamento de Hacienda, http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico (last visited Jul. 29, 2018); Commonwealth of P.R., *Basic Financial Statement: Year Ended June 30, 2015*, 13 (June 29, 2018).  We calculated the publication times by subtracting the date of Puerto Rico's transmittal letter in the financial reports from the date of the last day of the reporting period.  To the extent that Puerto Rico's transmittal letters were not available, we used the date of the independent auditor report.

[42] We reached this conclusion by analyzing multiple reporting sources for fiscal years 2005 through 2014.  *See* State of S.C. Office of Comptroller Gen., *Accountability Report: Fiscal Year 2007-2008*, 41 (2008) (reporting CAFR preparation times for all fifty states for FYs 2002-2007); *see also* Nat'l Ass'n of State Auditors, Comptrollers and Treasurers, *CAFR Completion Dates for Fiscal Years 2008-2012*, https://www.nasact.org/files/Resources/CAFR_Completion_Dates/2013_09_CAFR_FY_08-12.pdf (last visited Jul. 29, 2018); Nat'l Ass'n of State Auditors, Comptrollers and Treasurers, *CAFR Completion Dates for Fiscal Years 2012-2016*, https://www.nasact.org/files/Resources/CAFR_Completion_Dates/2018_03_CAFR_FY_12-16.pdf (last visited Jul. 29, 2018); *Estados Financieros del Gobierno de Puerto Rico*, Departamento de Hacienda, http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico (last visited Jul. 29, 2018).

**Figure VIII.E: Days to Issuance of Puerto Rico Annual Financial Statements[43]**



As with Puerto Rico's CAFRs, these publication times far exceed the six-month "usefulness" window that research supports.

In certain instances, the materials were also not filed with relevant authorities, including the Municipal Securities Regulation Board ("MSRB"), until after the applicable filing deadline pursuant to Rule 15c2-12 and applicable continuing disclosure agreements. For example, the combination of that rule and the relevant agreements requires Puerto Rico, as an issuer of GO Bonds and a party to certain related undertakings, to file with MSRB no later than 305 days from the close of Puerto Rico's fiscal year-end certain core financial information and operating data.[44] This includes audited, GAAP-compliant financial statements. Puerto Rico has failed to meet that deadline many times, including in 2004, 2006, 2007, 2008, 2009 and 2012, among other

---

[43] This is based on an analysis of financial reports provided by the Puerto Rico Department of the Treasury. *See Estados Financieros del Gobierno de Puerto Rico,* Departamento de Hacienda, http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-rico (last visited Jul. 29, 2018). The number of days to issuance was calculated by subtracting the date of Puerto Rico's transmittal letter in the financial reports from the date of the last day of the reporting period. To the extent that Puerto Rico's transmittal letters were not available, we relied on the date of the independent auditor report.

[44] *See* SEC Rule, 17 C.F.R. § 240.15c2-12(b)(5)(ii)(C) (2013) ("The written agreement or contract for the benefit of holders of such securities also shall identify each person for whom annual financial information and notices of material events will be provided, either by name or by the objective criteria used to select such persons, and, for each such person shall . . . [s]pecify the date on which the annual financial information for the preceding fiscal year will be provided."); *see also* Commonwealth of P.R., *Offering Statement for General Obligation Bonds of 2014, Series A*, 3 (2014) (reflecting that then-current continuing disclosure requirements for GO Bonds required Puerto Rico to file within 305 days of its fiscal year-end); Commonwealth of P.R., *Remarketing Circular for Public Improvement Refunding Bonds, Series 2007 A-4*, 2 (2009) (confirming that Puerto Rico's continuing disclosure agreements required it to file its CAFR by May 1 of the following fiscal year, which amounts to 305 days from Puerto Rico's fiscal year-end).

years.[45]  Certain Puerto Rico-Related Entities have also failed to satisfy their applicable filing deadlines, including the PBA, COFINA, the Puerto Rico Municipal Finance Agency ("MFA"), the UPR and the Convention Center District Authority.[46]

### 3.   **Puerto Rico's External Reporting Failures Have Likely Eroded Investor Confidence**

External reporting is not a formality.  For municipal bonds, investor confidence depends largely upon the perceived financial condition of the issuer.  Better fiscal health is generally viewed as the natural result of fiscal discipline and transparency.  And if an issuer has good fiscal discipline and transparency, then transforming its financial data into an external report should not be too onerous.

It is thus not surprising that the market considers timely external reporting to be a marker of better fiscal health.[47]  After all, the reports are typically the most detailed insight that interested parties will have into a government issuer's financial condition.  Many investors and, to some degree, credit rating agencies, use the reports to help assess a government issuer's creditworthiness, and thus the relative balance of risk and reward for an investment in, or concerning, that issuer.  *See* Part X.B.1 of the Report.  Other types of interested parties similarly rely on external reports to inform themselves about the issuer's management of public funds, as well as its potential need for fiscal relief.  If the external reports are too stale to foster meaningful analysis, then the consequences may therefore be significant.  Investors may choose to put their money elsewhere and policymakers may miss opportunities to mitigate a developing crisis.[48]

---

[45] *See* Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2011 A*, 35 (2011)*; see also* Commonwealth of Puerto Rico, *Official Statement for General Obligation Bonds of 2014, Series A*, 42 (2014).

[46] These Issuers have continuing disclosure requirements similar to those of Puerto Rico.  *See* P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 44 (2012); P.R. Sales Tax Fin. Corp., *Supplement to Certain Official Statements of Puerto Rico Sales Tax Financing Corporation, First Subordinate Series 2011A-D*, 46 (2011); P.R. Mun. Fin. Agency, *Official Statement for Series A Bonds, Series B Refunding Bonds, Series C Refunding Bonds*, 38 (2005); Univ. of P.R., *Official Statement for University System Revenue Refunding Bonds, Series P-Q*, 55 (2006); P.R. Convention Ctr. Dist. Auth., *Official Statement for Hotel Occupancy Tax Revenue Bonds, Series A*, 35 (2006).  Recently, these Issuers have been tardy in their filings.  *See Puerto Rico Entities Miss Deadlines as Commonwealth Falls Nearly 2 Years Behind on Financial Reporting*, Reorg Research (Apr. 28, 2016), https://platform.beta.reorg-research.com/v3/#/items/intel/1869?item_id=21155.

[47] *See* Trent S. Henke & John J. Maher, *Government Reporting Timeliness and Municipal Credit Market Implications*, 5 J. Governmental & Nonprofit Acct. 1, 3 (2016) ("Our results indicate a significant negative association between the bond rating the government entity is assigned by bond rating analysts and the number of days it takes for a municipality to file its financial statements after the close of its fiscal year."); Fitch Ratings, Tax-Supported Rating Criteria, 7 (2012) (in rating general obligation bonds of municipal governments for the period Aug. 13, 2012 to Apr. 18, 2016,  "[w]here established accounting practices exist, Fitch expects the issuer will be in compliance," and "[a]dditional financial reporting, such as interim revenue reporting throughout the year, is viewed positively.").

[48] *See* Robert Attmore, *The Importance of Timely Government Financial Reporting*, 60 J. Gov't Fin. Mgmt. 8, 9 (2011) ("Municipal financial analysts deciding whether to buy a government's bonds, city council members allocating limited resources in the budget, or taxpayer associations assessing the efficiency and

Puerto Rico's failure to produce timely external reports likely contributed to its loss of public confidence.  Crucially, Puerto Rico did not supply interested parties with sufficiently useful substitute data while its external reports remained unavailable.  Puerto Rico does produce certain interim reports, but those materials are not audited, include preliminary figures and are subject to adjustment.[49]  They also concern a fraction of relevant information because they focus solely on the General Fund, thereby excluding the Component Units (many of which run substantial deficits).[50]

Nor did Puerto Rico effectively manage public expectations regarding the timing of its financial reports or the reasons for their tardiness.  In 2015, for example, Puerto Rico did not announce that its CAFR filing for the fiscal year ending June 30, 2014 would be delayed until April 21, just ten days prior to the initial SEC Rule 15c2-12 filing deadline of May 1.[51]  Puerto Rico subsequently extended the anticipated release date twice more, after which it ultimately offered no new estimate.[52]  Puerto Rico did not release these audited financial statements until June 30, 2016—two years after the corresponding fiscal year end.[53]

## C.    Puerto Rico Did Not Develop the Infrastructure to Support Its Accounting and External Reporting Functions

The evidence demonstrates that Puerto Rico failed to cultivate the infrastructure it needed to support prudent accounting and timely financial reporting.  This includes fragmented internal accounting and record-keeping systems, the use of a different accounting method (or "basis") during the year than the one that the consolidated year-end audits required, the conferral of too much discretion upon Component Units over which the Department of Treasury and OMB had virtually no control, and the failure to maintain adequate human resources.  We discuss each failure in turn below.

---

effectiveness with which a government has used its tax revenues are greatly challenged to do so with financial information that, in some cases, can be more than nine months old.").

[49] Commonwealth of P.R., *Financial Information and Operating Data Report*, 72 (May 15, 2009); *see also* Commonwealth of P.R., *Financial Information and Operating Data Report*, 99 (Apr. 30, 2011) (presenting "the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2006, 2007, 2008, 2009 and the preliminary revenues and expenditures for fiscal year 2010.  Once the audited financial statements have been completed, the Commonwealth will provide the actual General Fund revenue and expenditure data for fiscal year 2010.  The numbers for fiscal year 2010 have not been audited and are subject to audit related adjustments.").

[50] *See* Anne O. Krueger, Ranjit Teja, & Andrew Wolfe, *Gov't Dev. Bank for P.R., Puerto Rico – A Way Forward*, 11 (2015).

[51] *See* Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at George Mason Univ., *Origins of the Puerto Rico Fiscal Crisis*, 17 (2016).

[52] *See* Marc D. Joffe & Jesse Martinez, Mercatus Ctr. at George Mason Univ., *Origins of the Puerto Rico Fiscal Crisis*, 17 (2016).

[53] *See* Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2014*, 7 (June 30, 2016).

1.   **Puerto Rico Lacked Sufficient Internal Transparency With Respect to Component Units**

As discussed in Part VIII.A.3, several of the Component Units ran sizeable deficits that together comprised a material portion of the fiscal crisis.  Yet we uncovered no uniform accounting or reporting function across the Component Units during the relevant period.  In fact, several witnesses stated that the Component Units utilized many different accounting and record-keeping systems, and that those systems were often incompatible with the Department of Treasury's system or inaccessible to OMB.  We further learned that not only were these systems outdated and incapable of efficiently communicating key data from one to another, but they were sometimes discordant within a single Component Unit (with different employees using different versions).[54]

These circumstances plainly deviate from generally accepted principles, which recommend that localities use and maintain systems that can effectively provide all data needed to permit the timely preparation of financial statements for the locality as a whole, in accordance with GAAP.[55]

2.   **Puerto Rico's Internal Accounting Method Differed from the One that Applied to Year-End Reporting**

Puerto Rico's internal accounting method was different from the one that year-end audits and external reports required.  In particular, Puerto Rico and its Component Units generally used a form of cash basis accounting throughout the fiscal year, notwithstanding that year-end audits and external reports employed a form of accrual basis accounting.  The two methods differ materially, as can the resulting calculations for revenues and liabilities.

Cash basis accounting records transactions at the time that they are completed.  In pertinent part, this means that: (i) a liability does not reduce the revenue figure until the corresponding invoice is paid; and (ii) only cash that has actually been received is included in the revenue figure.[56]  The opposite is true for accrual basis accounting.  It focuses on ***available*** revenue.  Of particular

---

[54] Puerto Rico's disclosure in December 2017 that it had identified more than 800 bank accounts with a total of almost $6.9 billion in Puerto Rico government funds illustrates the potential effects of fragmented accounting systems and a lack of internal transparency.  *See* P.R. Fiscal Agency & Fin. Advisory Auth., *Summary of Bank Account Balances for Puerto Rico Governmental Instrumentalities: As of November 30, 2017*, 6 (Dec. 18, 2017).  The Oversight Board held a public hearing on the matter in January 2018, at which government witnesses testified.  In February 2018, the Oversight Board retained D&P to undertake an independent forensic investigation regarding the disclosed accounts.  *See* Press Release, Fin. Oversight & Mgmt. Bd. for P.R., Oversight Board Announces Details on Liquidity Hearing (Jan. 17, 2018); Press Release, Fin. Oversight & Mgmt. Bd. for P.R., Oversight Board Retains Independent Forensics Team to Investigate Puerto Rico Bank Accounts (Feb. 6, 2018).  As this Report went to print, that investigation remained ongoing.
[55] *See GAAP Financial Reporting as the Base Line for State and Local Governments*, Gov't Fin. Officers Ass'n, http://www.gfoa.org/gaap-financial-reporting-base-line-state-and-local-governments (last visited Feb. 14, 2018) (specifically recommending that reporting entities "maint[ain] accounting system[s] adequate to provide all of the data needed to allow for the timely preparation of financial statements . . . in conformity with GAAP").
[56] *See* Raj Gnanarajah, Congressional Research Service, *Cash Versus Accrual Basis of Accounting: An Introduction*, 2 (2014).

relevance to this discussion, accrual basis accounting reduces the revenue figure by invoiced amounts as soon as the invoices have been received, regardless of payment status.[57]

To illustrate the concept and its potential effect, we can use the example of a hypothetical government official who receives a $10,000 invoice for services completed by an outside contractor.  Further assume that the relevant budget category has $12,000 remaining.  Under the cash basis accounting method, the $10,000 invoice is not applied against the $12,000 budget until it is actually paid.  If the official does not submit the invoice for payment right away, but a different government official submits and releases payment for a different expenditure of $9,000 within the same budget category, then the $9,000 payment will be debited from the $12,000 remainder.  This reduces the remaining budget cushion to just $3,000.  When the first official submits the $10,000 invoice for payment, there will be insufficient funds to actually complete it unless payment is deferred to the following fiscal year.

The result would be different pursuant to accrual basis accounting, if all other things remain equal.  Using that method, the $10,000 invoice would be deducted from the $12,000 budget cushion when the first official receives the invoice (assuming, of course, that the government official timely logs the obligation).  Regardless of when payment is actually released, the available balance in the budget cushion would therefore be reflected as $2,000.  If acting prudently, the second official would know that there are insufficient funds to cover a subsequent expenditure of $9,000 and should decline to contract for any such obligation.

### 3.　　Puerto Rico Permitted its Component Units to Exercise Unfettered Discretion

Puerto Rico allowed the various Component Units to have too much discretion and too little coordination regarding individual accounting and reporting standards.  Among other things, Puerto Rico did not mandate that the Component Units transmit their respective financial information to the Department of Treasury by a specified date in advance of Puerto Rico's consolidated year-end audit or the release of its external financial reports.  Nor did Puerto Rico develop uniform standards regarding, for example, how promptly an invoice must be recorded once received or what the consequences were if any such rule was disregarded.

### 4.　　Puerto Rico Did Not Maintain Adequate Human Resources

Puerto Rico also failed to maintain sufficient human resources to support efficient accounting and reporting functions.  Among other things, Puerto Rico did not prioritize institutional memory.  As discussed elsewhere in this Report, multiple witnesses conveyed that incoming political administrations tended to replace all non-career personnel without regard for ongoing projects.  This included accounting personnel.  In the opinion of one witness, the career employees who remained could not bridge the talent gap because the government pay scale was too low to entice professionals with appropriate credentials.

We further find that the Department of Treasury was understaffed in light of the complexity of Puerto Rico's accounting and financial reporting structure.  Puerto Rico has dozens of

---

[57] *See* Raj Gnanarajah, Congressional Research Service, *Cash Versus Accrual Basis of Accounting: An Introduction*, 2 (2014).

Component Units and funds, many of which engaged in numerous complex transactions.[58] Each of those Component Units performs its own reconciliations, gathers its own information, prepares its own draft financial statements, and then undergoes its own audit before transmitting the results to the Department of Treasury.  Even the determination of which Puerto Rico-Related Entities qualified as Component Units that would be reflected on Puerto Rico's financial statements, and how, was a complicated assessment.  It was essentially made anew each year and further complicated whenever Puerto Rico created new entities.  Despite the magnitude and complexity of Puerto Rico's consolidated accounting, however, one auditor recalled the Secretary of Treasury being the sole point of contact for outside auditors, with just two-to-three accounting employees assigned to liaise.  Although Puerto Rico attempted to augment its accounting staff with external consultants, this auditor characterized those consultants as insufficiently skilled.  He also indicated that the consultants confronted similar systems- and staffing-related challenges as the Department of Treasury's internal staff.  Puerto Rico ultimately allowed internal training and education to lapse as it increased its reliance on these outside consultants.

**D.     Prolonged and Complicated Audits Contributed to Puerto Rico's Delayed External Reports**

**1.     Puerto Rico Did Not Optimize its Use of Independent Audits**

Independent audits are, as previously noted, one component of strong fiscal discipline.[59] An auditor's role will vary by engagement, but it typically includes reviewing a reporting entity's financial statements and certain underlying information to render an unbiased opinion as to whether the financial statements fairly depict the reporting entity's financial condition.[60]  The auditor may also opine on whether relevant internal controls have any material weaknesses.[61]  If effectively performed, independent audits can therefore provide opportunities to identify risks to fiscal integrity and to correct potential errors and omissions.[62]

---

[58] *See, e.g.,* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2012*, 2-4 (Sept. 16, 2013) (reflecting fifty-six Component Units and five major funds).

[59] *See* Robert J. Kueppers & Kristen B. Sullivan, *How and Why an Independent Audit Matters* 7; Int'l J. *Disclosure & Governance* 286, 291 (2010); *GAAP Financial Reporting as the Base Line for State and Local Governments*, Gov't Fin. Officers Ass'n, http://www.gfoa.org/gaap-financial-reporting-base-line-state-and-local-governments (last visited Aug. 1, 2018) (recommending that, as a best practice, reporting entities have their financial statements independently audited in accordance with Generally Accepted Auditing Standards ("GAAS") or Government Auditing Standards ("GAS"), as appropriate).

[60] *See, e.g., All About Auditors: What Investors Need to Know,* Securities and Exchange Commission, https://www.sec.gov/reportspubs/investor-publications/investorpubsaboutauditorshtm.html (last modified Jun. 24, 2002) (explaining that independent auditors of companies examine financial statements in order to provide a report on their fairness).

[61] *See* Ass'n of Int'l Certified Pub. Accountants, *Statement on Auditing Standards No. 130*, 1 (2015) (stating that an auditor will be required to opine on effectiveness of internal controls instead of having an option, effective for audits of periods ending on or after December 15, 2016).

[62] *See* Robert J. Kueppers & Kristen B. Sullivan, *How and Why an Independent Audit Matters,* 7 Int'l J. Disclosure & Governance 286, 291 (2010) (discussing how an auditor's critical viewpoint can lead to fewer errors).

The evidence demonstrates that Puerto Rico did not optimize its use of independent audits during the relevant period. This often resulted in protracted audits and, as a result, delayed external reports. There are several reasons why.

*First*, politics sometimes derailed efficient audits. Just as incoming officials released legacy accounting personnel without regard for ongoing projects, so, too, would they replace existing auditors, regardless of pending engagements. Figure VIII.F below demonstrates how the auditors who were engaged to prepare Puerto Rico's consolidated financial statements changed together with the Governor's political affiliation between fiscal years 1999 and 2015:

**Figure VIII.F: Independent Auditors and Political Affiliation of Governor**[63]

| CAFR | Independent Auditor | Political Affiliation Of Governor |
|---|---|---|
| **1999** | Deloitte & Touche LLP | PNP |
| **2000** | Deloitte & Touche LLP | PNP |
| **2001** | KPMG LLP | PPD |
| **2002** | KPMG LLP | PPD |
| **2003** | KPMG LLP | PPD |
| **2004** | KPMG LLP | PPD |
| **2005** | KPMG LLP | PPD |
| **2006** | KPMG LLP | PPD |
| **2007** | KPMG LLP | PPD |
| **2008** | KPMG LLP | PPD |
| **2009** | Deloitte & Touche LLP | PNP |
| **2010** | Deloitte & Touche LLP | PNP |
| **2011** | Deloitte & Touche LLP | PNP |
| **2012** | Deloitte & Touche LLP | PNP |
| **Basic Financial Statement** | **Independent Auditor** | **Political Affiliation Of Governor** |
| **2013** | KPMG LLP | PPD |
| **2014** | KPMG LLP | PPD |
| **2015** | KPMG LLP | PPD |

This corroborates what several witnesses conveyed. They told us that Deloitte was historically affiliated with the PNP and KPMG was traditionally affiliated with the PPD.

Although it may be prudent for an issuer to vary its outside auditors from time to time,[64] the way that Puerto Rico rotated auditors, and executed those rotations, proved inefficient.

---

[63] *See Estados Financieros del Gobierno de Puerto Rico*, Departamento de Hacienda, http://www.hacienda.gobierno.pr/inversionistas/estados-financieros-del-gobierno-de-puerto-rico-financial-statements-goverment-puerto-ric (last visited Aug. 1, 2018).

[64] *See* Randal J. Elder, Suzzanne Lowensohn & Jacqueline L. Reck, *Audit Firm Rotation, Auditor Specialization, and Audit Quality in the Municipal Audit Context*, 4 J. Gov't & Nonprofit Acct. 73, 75

The Independent Investigator's Final Investigative Report

Incoming auditors and employees necessarily needed time to familiarize themselves with the current state-of-play, as well as other relevant issues and materials. Often, the incoming auditors needed to coordinate with the outgoing auditors in order to discuss and resolve certain legacy issues. This sometimes required that the outgoing audit firm transfer its internal work product (known as "work-papers") to the incoming audit firm. Auditors perceive their work-papers to be sensitive materials because the work-papers reflect in detail the work that the auditors have done and the judgment calls that they have made. Accordingly, it is not uncommon for auditors to attempt to claim some form of privilege over those materials in the context of litigation.[65] Given that the incoming and outgoing auditors are technically competitors, it is unsurprising that the transfer of such materials from one to the other at times introduced complications of its own and was not timely.

Puerto Rico's retention of KPMG to audit the consolidated financial statements for the fiscal year ended 2013 (the "2013 Audit") illustrates this point well. To complete the 2013 Audit, KPMG needed Deloitte's work-papers from the prior fiscal year (2012). To release the work papers, Deloitte needed two things: (i) consent from Puerto Rico; and (ii) signed agreements with Puerto Rico and KPMG regarding the terms pursuant to which Deloitte would provide KPMG with access to the work papers. That took months to accomplish. This was in part because the default agreement that Puerto Rico prepared appears to have been modeled on an audit contract. As such, it contained many provisions that, in the views of some, needed to be removed. The contract was also prepared in Spanish and needed to be translated into English. Beyond this, the Puerto Rico government required various certifications from different agencies and Component Units, after which OMB performed its own review of the contract. KPMG ultimately did not receive Deloitte's 2012 work-papers until KPMG was half-way through the 2013 Audit.

Differences in audit philosophy between incoming and outgoing auditors also complicated certain engagements. In particular, differing views between Deloitte and KPMG regarding the treatment of a particular COFINA transaction contributed to delayed completion of the 2013 Audit. Witnesses recalled that COFINA did not reflect a certain receivable from Puerto Rico in the audited financial statements for the prior fiscal year, while KPMG concluded that COFINA's financial statements should reflect that receivable.[66] The relevant financial statements and balances for COFINA were ultimately corrected (or "restated"). This required additional time and resources that, in the recollection of these witnesses, delayed the 2013 Audit.[67]

---

(2015) (noting the view that rotation of audit firms may improve audit quality by reducing the potential influence of clients over auditors or auditor complacency).

[65] *See, e.g., S.E.C. v. Fuhlendorf*, No. 10-CV-01691-MSK-KLM, 2010 WL 3547951, *1 (D. Colo. Sept. 7, 2010) (accountant challenged subpoena on the ground that certain work-papers that he prepared as independent auditor were confidential and subject to protection from disclosure pursuant to a purported "accountant-client privilege").

[66] *See, e.g.,* P.R. Sales Tax Fin. Corp, *Basic Financial Statements: Year Ended June 30, 2013*, 12 (Apr. 14, 2014).

[67] There is some doubt regarding the reliability of one of the witnesses who discussed this transaction. That witness claimed that the COFINA restatement had to be reflected on the GDB financials, which therefore triggered a chain of delays. This witness was not a member of the GDB or COFINA audit teams, and we found no mention of COFINA in the relevant financial statements for GDB. A review of the relevant financial statements instead reflects that any restatement was isolated to the COFINA financial statements.

The Independent Investigator's Final Investigative Report

*Second*, we uncovered evidence that Puerto Rico did not provide its auditors with all of the information they requested in a timely enough fashion.  For example, we obtained and analyzed e-mail correspondence indicating that KPMG estimated that completing Puerto Rico's audits typically required eight weeks from the date on which KPMG received the draft financial statements from Puerto Rico.  As of March 2, 2014, however, KPMG was still waiting for Puerto Rico to supply critical items for the 2013 Audit.  This included, among other things, the draft financial statements, the final trial balance, and cash reconciliations.  Related correspondence from the next two days demonstrates that Puerto Rico deemed itself unlikely to satisfy the original Rule 15c2-12 filing deadline of May 1, 2014.[68]   And when Puerto Rico finally transmitted its draft financial statements to KPMG in the middle of March (leaving KPMG with only six weeks to complete the audit by May 1), the draft statements were incomplete.  They omitted necessary cash flow statements as well as a reconciliation of fund financial statements to the government-wide financial statement, and had several other unresolved issues.  Puerto Rico's 2013 financial statements were ultimately not published or filed with the MSRB until approximately 60 days after the Rule 15c2-12 deadline, which was 182 days after the six-month deadline that GASB and GFOA encouraged.

*Third,* several of the accounting deficiencies identified above in Parts VIII.A through VIII.C complicated Puerto Rico's year-end audits and, accordingly, delayed its external reports.  This is particularly so in light of Puerto Rico's complex accounting structure and its preference to only release financial statements with a "<u>clean</u>" audit opinion.[69]  A clean (or "<u>unqualified</u>") audit opinion is one that conveys that the auditor is entirely satisfied with the degree of transparency provided by management and, on the basis of that information, can confidently conclude that the financial statements fairly represent the reporting entity's financial condition.  Simply stated, the audits were often prolonged, and the external reports delayed, because the auditors were unable to gain the requisite degree of comfort to support that "clean" opinion any sooner.  This was sometimes due to Component Units not having completed their own audits on time, sometimes due to incomplete or inaccurate entries, and sometimes because of the degree of manual reconciliation that Puerto Rico's audits required.  For example:

- Multiple witnesses reported that external auditors often identified accounting inconsistencies affecting relevant funds or Component Units, in part because the Component Units used different accounting systems and practices.  Commonly, the

---

[68] The May 1, 2014 deadline is the 305-day deadline that applied pursuant to the continuing disclosure agreements for the GO Bonds and SEC Rule 15c2-12.  *See* Part VIII.D.1, above.  This is, as previously noted, a more generous deadline than the six-month deadline that GASB and GFOA recommended.

[69] *See* Pub. Co. Accounting Oversight Bd., *AS 3101: The Auditor's Report on an Audit of Financial Statements When the Auditor Expresses an Unqualified Opinion* (2017); Pub. Co. Accounting Oversight Bd., *AS 3105: Departures from Unqualified Opinions and Other Reporting Circumstances* (2017) (reflecting that an audit opinion may take one of several forms, depending upon the independent auditor's degree of comfort: (i) a "clean" and unqualified opinion (as when the auditor is entirely satisfied with the degree of transparency received, and can conclude that the financial statements fairly represent the reporting entity's financial condition); (ii) a "qualified" opinion (as when the engagement has been limited in a non-pervasive or non-material way); (iii) a "disclaimer" opinion (as when the auditor has been limited by circumstances beyond his or her control); or (iv) an "adverse" opinion (as when the auditor has concluded that the financial statements do not fairly represent the reporting entity's financial condition)).

inconsistency would involve one agency recognizing that it owed a debt to another, where the receiving entity had not recorded it. The auditors would then request additional information in order to resolve the inconsistency. Unfortunately, the same challenges that yielded the inconsistencies typically complicated the resolution of those requests. They also sometimes spurred additional rounds of auditor follow-up work or the involvement of a national referee. The process was not streamlined because the Component Units had their own audit engagement teams and sometimes used different auditing firms;

- Relatedly, several of the accounting deficiencies identified above in Parts VIII.A through VIII.C necessitated a great deal of human intervention in order to prepare certain metrics for the consolidated year-end audits. For example, multiple Department of Treasury witnesses stated that because of deficient accounting systems and fragmented practices, individual transactions had to be manually investigated and figures double- or triple-confirmed before they could be submitted to the auditors, after which they still had to be converted from the cash basis accounting method to the accrual basis accounting method and then presented in the consolidated financial statement or external report. Although simple entities might have been able to perform these tasks in time to satisfy GASB's best practices and the requirements of SEC Rule 15c2-12, Puerto Rico's structure is complex. At least one high-ranking Treasury official told us that it simply became too burdensome for Puerto Rico to handle its internal accounting functions on the desired timeline. Auditors echoed this sentiment, flagging the number of Component Units and related complications, combined with understaffing at the Department of Treasury, as consistent causes of Puerto Rico's protracted audits and late financial reports; and

- Certain witnesses also described protracted audits at the Component Unit level. Because the figures for many Component Units had to be incorporated into (or "codified within") Puerto Rico's financial statements, the delays by Component Units and/or their individual audit teams often contributed to delays of Puerto Rico's audits and its subsequent release of financial statements.

*Fourth,* Puerto Rico's internal control failures sometimes caused auditors to disagree with Puerto Rico's own classification of particular transactions. The audit for the fiscal year ending June 30, 2014 ("2014 Audit") is one example. During that audit, KPMG disagreed with how a specific COFINA transaction had been recorded. Specifically, PRIFA had recorded at fair market value on its own 2013 financial statements an investment that it made in COFINA bonds. The transaction was significant, totaling approximately $225 million. PRIFA became a blended Component Unit of Puerto Rico in fiscal year 2013, with the passage of GASB Statement No. 61. This meant that PRIFA's financial information would be reflected in Puerto Rico's financial statements (or "blended") going forward, as non-major governmental funds of Puerto Rico. For accounting purposes, KPMG considered PRIFA's investment in COFINA bonds to be the equivalent of an investment in Puerto Rico's debt, because COFINA was itself a blended Component Unit of Puerto Rico. But Puerto Rico's blended financial statements for 2013 did not

reflect PRIFA's investment in the COFINA bonds. Certain balances had been misstated as a result. Puerto Rico corrected and restated those balances as of June 30, 2013, after which it finally released its audited financial statements for the fiscal year ended June 30, 2014, on June 30, 2016.[70] In a letter relating to that audit report and KPMG's review of relevant internal controls, KPMG specifically recommended, as a result of this issue, that Puerto Rico revise certain controls to ensure that its financial statements and the process through which they are consolidated would be "accurate, complete, and reasonable."

## 2.  For More Recent Fiscal Years, the Uncertain Impact of Evolving Events Also Helped to Prolong Audits and Delay External Reports

For some time now, Puerto Rico's financial and accounting troubles have been in the news and in the courts. Relevant events have continued to unfold on a near-daily basis. The uncertain impact of those evolving events has protracted the audits for more recent fiscal years and, accordingly, delayed the release of external reports. This is because, as noted above, auditors cannot produce their reports without first gaining the requisite degree of comfort based on audit evidence.

One official recounted his experience with a Puerto Rico-related audit for the fiscal year ending 2014. In connection with that engagement, KPMG auditors sought to acquire the comfort they needed to ascertain the collectability of a large receivable owed to GDB. The receivable concerned loans that GDB had extended to Puerto Rico-Related Entities. The analysis of whether the receivable could be deemed reasonably collectable thus needed to account for the evolving impact of current events on those debtors' liquidity and their abilities to access the capital markets. In this witness's view, the auditors (i.e., KPMG) were conservative and involved their national office due to the sensitivity of the situation. This resulted in a lengthy audit, with the auditors not issuing their reports until July 5, 2016, for GDB, and June 30, 2016, for Puerto Rico.[71] This was the first fiscal year in which GDB recognized losses on the relevant loans.

A different witness similarly identified subsequent events as having played a role in the delayed 2013 Audit. According to that witness, the Puerto Rico Supreme Court's decision to invalidate a restructuring of the Teachers' Retirement System, as well as the passage of the Recovery Act, extended the audit and related external reports.

Finally, there is evidence that when preparing Puerto Rico's draft accounting and financial statements for its auditors to review, the Department of Treasury may not have fully appreciated the accounting impact of evolving events. For example, KPMG disagreed with the Department of Treasury regarding the extent to which the receivable that resulted from the PRIFA-COFINA transaction that we discuss above would be collectable, once the transaction was properly recorded. The transaction was ultimately reflected as an inter-fund loan between COFINA and Puerto Rico, in the COFINA debt service fund. As one witness succinctly framed the issue, KPMG considered the COFINA bonds receivable to have had an impaired value, while management (i.e., Puerto Rico) did not. In particular, KPMG did not believe that Puerto Rico considered all relevant factors

---

[70] See Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2014*, 7 (June 30, 2016).
[71] See Gov't Dev. Bank for P.R., *Basic Financial Statements: Year Ended June 30, 2014*, 2 (July 5, 2016); Commonwealth of P.R., *Basic Financial Statements: Year Ended June 30, 2014*, 7 (June 30, 2016).

that could affect the receivable balance as of the relevant fiscal year-end. This included many of the same factors that the CRAs considered when evaluating Puerto Rico-Related Bonds during that time period, such as Puerto Rico's reduced ability to access the capital markets; its recurring deficits; its poor financial condition; and worsening economic factors. *See* Part X.C of the Report. KPMG considered the receivable that Puerto Rico calculated to have been too high as a result, and thus inconsistent with the "net realizable loss value" that GAAP required. Ultimately, KPMG recommended that Puerto Rico reconsider its internal controls relating to collectability determinations in order to ensure that all relevant circumstances would be analyzed in the future.

\* \* \*

In combination, these circumstances demonstrate that Puerto Rico's inefficient use of external auditors and its deficient accounting infrastructure materially contributed to protracted year-end audits, which delayed the completion and release of its external reports. So, too, has the unsettled impact of events that continue to affect liquidity and market access assessments on a near-daily basis.

## E.     Recommendations to Improve Puerto Rico's Budgeting, External Reporting and Accounting Functions, and to Optimize Independent Audits

The improvement of Puerto Rico's external reporting and internal accounting controls is a central aspect of PROMESA. For example, PROMESA requires that any fiscal plan developed by Puerto Rico "provide a method to achieve fiscal responsibility and access to the capital markets" and, among other things, "improve fiscal governance, accountability, and internal controls."[72]

To that end, the Oversight Board has taken certain steps to improve Puerto Rico's budgeting and reporting practices. In fiscal year 2018, for example, the Oversight Board expanded the role of the Office of the Chief Financial Officer for Puerto Rico ("OCFO") to implement financial management best practices from other states and centralize all financial management functions of Puerto Rico in order to "empower the OCFO to improve fiscal governance and forecasting, increase transparency, substantiate accountability, heighten internal controls, and improve stakeholder confidence in Puerto Rico's financial management" and "enable the Government to achieve fiscal responsibility and restore access to the capital markets."[73]

The Oversight Board has also established a series of reporting requirements to provide more transparency into Puerto Rico's financial management. This includes a requirement that Puerto Rico publish periodic reports that provide a snapshot of its liquidity situation as compared to its projected annual liquidity plan.[74]

We have identified a number of options that, in combination with the steps that the Oversight Board has already taken, should help Puerto Rico to improve the identified weaknesses in its budgeting, external reporting and accounting mechanisms. We present our proposals below.

---

[72] 48 U.S.C. §§ 2141(b)(1), (b)(1)(F) (2016).
[73] *See* Fin. Oversight & Mgmt. Bd. for P.R., *Annual Report: Fiscal Year 2018*, 11-12 (2018).
[74] *See* Fin. Oversight & Mgmt. Bd. for P.R., *Annual Report: Fiscal Year 2018*, 12 (2018).

The Independent Investigator's Final Investigative Report

1.    <u>**Recommendations for Improving Budget Discipline**</u>

    There are several steps that Puerto Rico can take to help improve its budgeting and auditing functions.  As an initial matter, OMB must have a stronger role with respect to the approval, implementation and enforcement of comprehensive and reasonable budgets.  Those budgets should include not only the General Fund, but also the Component Units.  At a minimum, this will require:

- <u>Adoption of a More Rigorous Process for Setting Budgets</u>.  The budget approval process should be more probing, with less opportunity for manipulation or deviation from actual macro-economic indicators. At a minimum, all revenue projections should be tethered to timely and useful data and analysis and their relationship to existing macro-economic conditions and trends should be explored.  Budget approval meetings should also incorporate a discussion of category estimates in light of the prior fiscal year's actual figures, as well as relevant data for any interim period.  As part of that process, tax credits should be estimated based on articulable factors and incorporated into the approved revenue projection;

- <u>Rescission of Payroll or Spending Authority Previously Granted to the Component Units</u>.  The political branches of Puerto Rico's government should evaluate ways to feed all of the Component Unit's finances through centralized processes and procedures, including the mandatory use of a joint and integrated system (which we discuss below in connection with our accounting recommendations).  The system should incorporate warnings for budgeted items that are about to be exhausted, followed by automatic stop-pay controls once those items have been exhausted (including for payrolls).  OMB should also have the ability to use the system to access at will—and, ideally, in real-time—all financial and accounting data for the various funds and Component Units.  In addition, the joint systems should require the online submission of invoices directly from vendors, contractors and others who provide services to the Component Units and further incorporate a mechanism that queues those invoices for payment according to: (i) priority, (ii) the existence of sufficient resources to cover the payment, and (iii) the existence of a sufficient cushion in the relevant budget category.  Invoices received directly from the Component Units, rather than the service providers, should be rejected;

- <u>Incorporation of Enforcement Authority</u>.  Puerto Rico should adopt a mechanism for sanctioning relevant employees and Component Units in the event that they disregard budget limits, develop unreasonable revenue forecasts or fail promptly to resolve accounts payable.  This could be accomplished in one of two ways:  (i) sanctions authority could be conferred on OMB.  This would not only incentivize compliance, but also help to legitimize a regulator that Component Units do not previously appear to have taken seriously; or (ii) the role of the Puerto Rico's Inspector General could be strengthened to include sanctions authority.  One witness who served as Inspector General described the existing form of the office as purely administrative.  A review of Puerto Rico law reflects that the Inspector General may investigate and summon witnesses or compel production, but only through Puerto Rico's Court of First

Instance.[75]  Similarly, the Inspector General does not have the power to pursue charges, but must instead refer violations to other agencies or offices, and only after first receiving the approval of the Governor's Committee on Government Integrity and Efficiency (which is comprised of the Secretary of Treasury, the President of GDB, the Director of OMB and two gubernatorial appointees);[76]

- Imposition of Conditions on the Receipt of Lump Sum Amounts.  A witness from the Department of Treasury indicated that certain entities received large lump sum amounts from the Puerto Rico government, over which the Department of Treasury lost all control once the transfer is completed.  If Puerto Rico placed conditions on the receipt of such sums, then that could help to ensure that the recipient entities put the funds to prudent, intended and budgeted uses;

- Alignment of Budgeting, Accounting and External Reporting Methods.  To improve budget execution, Puerto Rico should require that all budgeting for the General Fund and Component Units comply with GAAP and that financial reporting information be updated throughout the year using the accrual basis method.  This will make it easier to compare annual budgets to year-end financial statements and to learn from any differences.  Indeed, the evidence reflects that if Puerto Rico had used the accrual basis method for its internal reporting (as opposed to cash basis), that would have improved the efficacy of Puerto Rico's external, year-end reporting.  If our recommendations regarding joint and improved systems are adopted as set forth below, then this item would be addressed as part of that initiative.  PROMESA provides for the termination of the Oversight Board only after, among other requirements, Puerto Rico has developed its budgets in accordance with "modified accrual accounting standards" for at least four consecutive years.[77]  That will help steer Puerto Rico towards the goal of becoming fully GAAP-compliant;

- Strengthened Fiscal Planning and Management Credentials or Skills for Heads of Component Units.  A Department of Treasury witness conveyed that, in his recollection, the leaders of various agencies and Component Units have little experience with fiscal planning and management.  As a result, they are not savings-minded.  Instead, they tend to make decisions without regard for the corresponding economic effects.  We therefore recommend that those who lead Puerto Rico's Component Units be required to possess a minimum degree of competency with respect to fiscal planning and financial management, or to undergo skills training in those areas at regular intervals; and

---

[75] See P.R. Laws Ann. tit. 3, § 8854(27).

[76] See P.R. Laws Ann. tit. 3, § 8854(25); P.R. Laws Ann. tit. 3, § 8858.

[77] 48 U.S.C. § 2149(2)(A) (2016).  PROMESA defines "modified accrual accounting standards" as "recognizing revenues as they become available and measurable and recognizing expenditures when liabilities are incurred, in each case as defined by the Governmental Accounting Standards Board, in accordance with generally accepted accounting principles."  48 U.S.C. § 2104(16) (2016).

- <u>Provision of Online Access to Spending Data</u>.  Research demonstrates that when government spending data has been made publicly available, the public has paid attention.[78]  Accordingly, if Puerto Rico provided online access to such data, then the increased transparency into how budgeted funds are used could yield accountability for relevant Component Units and elected officials.  That, in turn, should help to create a stronger incentive for officials to respect budget limits.  To maximize effectiveness, the online spending data should be comprehensive, user friendly, and intuitive, as the US Public Interest Research Group recommends.[79]

If implemented, these reforms should support Puerto Rico's development and execution of prudent budgets.  Consistent enforcement over time should signal better fiscal discipline to the market, eventually helping to rehabilitate public confidence.

## 2.   Recommendations for Improving External Reporting and Accounting

### (a)   Puerto Rico Could Benefit from Establishing an Efficient Framework for Centralized Oversight

One of the primary challenges that Puerto Rico has faced is its lack of a truly centralized Treasury function.  Puerto Rico does not have a central authority with sufficient visibility into the information needed to develop and execute prudent budgets, to complete audits in an efficient manner, and to compile timely external reports.  At least one former Department of Treasury official suggested that the Department of Treasury's responsibilities are too diffuse to allow the entity to function as an effective central authority.  For example, according to that witness, the Secretary of Treasury is forced to participate on the boards of more than twenty-five Component Units, acting as Chairman of more than ten of them.

Re-setting the Department of Treasury's responsibilities to focus on fiscal management and accounting, while requiring the entities that are responsible for budgeting and critical economic projections to report to the Department of Treasury, would be helpful.  At a minimum, this means that OMB and the Planning Board would be subsumed under the Department of Treasury's oversight. [80]  To help the Department of Treasury remain efficiently focused, OMB should have a stronger and clearer role, as recommended above in Part VIII.E.1. We recommend

---

[78] *See, e.g.,* Michelle Surka and Elizabeth Ridlington, *Following the Money 2016 – How the 50 States Rate in Providing Online Access to Government Spending Data*, U.S. PIRG Educ. Fund (Apr. 13, 2016), https://uspirg.org/news/usf/following-money-2016-new-report-ranks-all-fifty-states-government-spending-transparency.

[79] *See, e.g.,* Michelle Surka and Elizabeth Ridlington, *Following the Money 2016 – How the 50 States Rate in Providing Online Access to Government Spending Data*, U.S. PIRG Educ. Fund (Apr. 13, 2016), https://uspirg.org/news/usf/following-money-2016-new-report-ranks-all-fifty-states-government-spending-transparency.

[80] Puerto Rico's October 2016 Revised Fiscal Plan similarly recommends a form of single treasury function. P.R. Fiscal Agency and Fin. Advisory Auth., *Commonwealth of Puerto Rico Fiscal Plan*, 31 (Oct. 14, 2016).

that the political branches of Puerto Rico's democratically-elected government evaluate proposals for achieving these goals.

We further recommend that Puerto Rico study the viability of a dedicated and centralized board that is devoted to aggregating critical data and financial statements from all relevant Component Units, as well as preparing and releasing the consolidated external reports ("Reporting Board"). Like OMB and the Planning Board, the Reporting Board should work closely with and report to the Department of Treasury. The Reporting Board should also have the power to enforce the reporting deadlines we recommend below in Part VIII.E.2(c), and to set additional internal deadlines as needed.

To be effective, the recommendation for a centralized Treasury function would also need to be implemented together with our recommendations for improved internal accounting systems and methods.

### (b)   Puerto Rico Should Implement a Joint and Integrated Accounting System Across Component Units

As discussed in Parts VIII.C and VIII.D, systems-related issues have had particular significance for Puerto Rico, because they helped occlude internal transparency and complicated external audits. That, in turn, magnified many of Puerto Rico's other accounting, budgeting, and reporting weaknesses. Systems-related issues were clearly part of the problem and they must be part of any effective solution.

To maximize effectiveness, the improved system should, if at all possible, be a single, joint system that is uniformly implemented across the various Component Units and funds. If a joint system is cost prohibitive or otherwise not feasible, then the various individual systems should at least be standardized, upgraded, and harmonized. At a minimum, they must enable the maintenance of up-to-date ledgers, payroll records and balance sheets, and should be implemented in tandem with our recommendations for improved budgeting and centralized oversight.[81]  *See* Parts VIII.E.1 and VIII.E.2.(a). The new system(s) should integrate budgeting, payroll and expense functions, thereby allowing for near real-time tracking of remaining budget cushions in light of actual expenditures. They should also incorporate a firm enforcement mechanism for existing budgets, as previewed above in Part VIII.E.1.

To the extent that it would be helpful from a financial management perspective for Puerto Rico to continue tracking throughout the year the amount of actual (rather than available) revenues, as well as paid (rather than accrued) invoices, a separate cash basis financial management system

---

[81] Notably, both California and Michigan employ uniform accounting practices across internal components. Michigan uses GAAP, while California has developed its own standards manual in which the State Controller details for counties certain uniform accounting procedures that conform to GAAP. *See, e.g.,* State of Michigan, *Comprehensive Annual Financial Report: Year Ended September 30, 2017*, 6 (Jan. 5, 2018) (indicating that, as required by state statute, Michigan prepares their CAFR in accordance with GAAP); Cal. State Controller's Office, *Accounting Standards and Procedures for Counties*, 1 (2018) (noting California Government Code § 30200 requires the State Controller to prescribe uniform accounting procedures for counties that conform to GAAP).

could be linked to the accrual basis financial reporting system that we recommend above in Part VIII.E.1.  Puerto Rico would only have one set of accounting books, but its systems would essentially provide two different functionalities throughout the year, to make it easier to comply with both financial reporting and accounting requirements.  The end result should be less need for manual conversion from cash basis to accrual basis at year-end and, accordingly, fewer reporting delays.  It should also help minimize the delayed presentation of invoices for payment.

In isolation, new internal systems are unlikely to prove a silver bullet.  To be sure, although some US jurisdictions have improved their perceived fiscal health after implementing large-scale improvements of their accounting systems (including Hawaii, North Carolina and Oregon, each of which has climbed the Mercatus Center state fiscal rankings in recent years[82]), other US jurisdictions have consistently been able to release timely and useful external reports notwithstanding their continued use of antiquated and fragmented accounting systems (including Michigan and California,[83] each of which reported using accounting software and/or information technology systems that are older than Puerto Rico's and scheduled to be replaced).[84]  For this reason, improved internal systems are a critical component of a broader reform plan for Puerto Rico, but would not make a material difference standing alone.

### (c)      Puerto Rico Should Adopt and Enforce Statutory Deadlines for External Reporting

Some states have adopted statutory deadlines for publishing their CAFRs, or at least for releasing their audited financial statements.[85]  Research suggests that these statutory deadlines are effective.

Michigan is one of more than twenty states that has adopted a statutory deadline for publishing its CAFR.[86]  In 1985, Michigan enacted a law that requires it to publish its CAFR by

---

[82] *See* Eileen Norcross & Olivia Gonzalez, Mercatus Ctr. at George Mason Univ., *Ranking the States by Fiscal Condition 2017 Edition* (2017), https://www.mercatus.org/statefiscalrankings.

[83] *See* Governor's Comm. on Information Systems, Gov't of P.R., *Information Systems Progress Report,* (Jan. 31, 2000), http://www.presupuesto.gobierno.pr/PresupuestosAnteriores/af2001/ingles/Inforefe/infcogssi.htm (showing that Puerto Rico's accounting system was in development in 2000, six years after Michigan's accounting system was implemented and almost twenty years after California's accounting system was implemented).

[84] *See* Perry Zielak, Mi. House Fiscal Agency, *Information Technology Investment Fund Projects* 3 (2015) (reporting that Michigan's primary accounting and financial system developed in 1994 is "outdated" and that department systems "cannot directly interact" with the primary system; CALSTARS (California State Accounting & Reporting System) Resources, http://www.dof.ca.gov/Accounting/CALSTARS/ (last visited Jun. 18, 2018) (reporting that California's primary accounting system was developed in 1981); Fiscal FAQs, http://www.fiscal.ca.gov/faqs/fiscalfaqs.html (last visited Jun. 18, 2018) (explaining that California's new accounting systems would replace over 2,500 unstandardized legacy systems).

[85] *See, e.g.,* N.J. Rev. Stat. § 52:27B-46 (2013).

[86] Mich. Comp. Laws Ann. § 18.1494(1) (West 2018). Other states with deadlines for reporting financial statements (and, in some instances, full CAFRs) include Alaska, Colorado, Florida, Idaho, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, New Hampshire, New Jersey, North Carolina, Oregon, Virginia, Washington and Wyoming.

no later than six months after the fiscal year-end on September 30.[87]  This has helped Michigan to safeguard the timeliness and usefulness of its CAFRs.  It is no accident then that since 2005, Michigan has typically ranked among the fastest CAFR publishers in the US.  For example, as of the date on which Michigan issued its CAFR for the fiscal year ended September 20, 2017, Michigan had received the GFOA Certificate for thirty consecutive years.[88]  And according to our calculations, between 2000 and 2014, Michigan published its CAFRs within an average of just 123 days from the close of its fiscal year.[89]  The US PIRG Education Fund also ranked Michigan at No. 2 in a different measure of financial transparency in 2016:  the provision of online access to government spending data.[90]

At least one state has followed Michigan's lead in recent years.  Specifically, Illinois passed a law in 2011 that established a deadline for its agencies and other instrumentalities to submit their financial statements to the state controller.[91]  There is limited data regarding the impact of the Illinois provision, and, as a practical matter, its implementation may be less pure than that of Michigan's corollary.[92]  It does appear, however, that Illinois has more quickly published its financial reports in the time that has elapsed since.   Indeed, our review of Illinois CAFRs shows that between 2013 and 2017, Illinois issued its CAFR within less than 270 days from its fiscal year-end, compared to an average of 346 days for fiscal years 2010 through 2012.[93]

As previously noted, Puerto Rico did not have a formal deadline for publishing its external reports.  But based on our discussion with a former high-ranking Department of Treasury official, it appears that Puerto Rico internally used a "soft" deadline of nine months from the fiscal year-end.  This is three months longer than the six-month publication deadline that GASB and GFOA

---

[87] Mich. Comp. Laws Ann. § 18.1494(1) (West 2018) ("Within 6 months after the end of the fiscal year, the director shall publish a comprehensive annual financial report which shall conform as nearly as practicable to established governmental reporting standards. The financial statements shall be prepared in accordance with generally accepted accounting principals [sic] and shall contain certificates of examination by the auditor general and any other independent auditor the auditor general may assign. The comprehensive annual financial report and the 120-day report shall contain disclosures of the budgetary basis if different from statements prepared under generally accepted accounting principles.").

[88] *See* State of Mich., *Comprehensive Annual Financial Report:  Year Ended Sept. 3, 2017*, 10 (Jan. 5, 2018).

[89] To calculate this average, we analyzed the dates of the transmittal letters for Michigan's CAFRs for 2005 through 2014, in comparison to the corresponding fiscal year ends for the relevant period, and averaged them.

[90] Michelle Surka and Elizabeth Ridlington, *Following the Money 2016 – How the 50 States Rate in Providing Online Access to Government Spending Data*, U.S. PIRG Educ. Fund (Apr. 13, 2016), https://uspirg.org/news/usf/following-money-2016-new-report-ranks-all-fifty-states-government-spending-transparency.

[91] 15 Ill. Comp. Stat. Ann. 405/19.5 (West 2018).

[92] We note, however, that Illinois has since passed other legislation that may hinder its ability to meet the statutory deadline for publishing CAFRs.  *See, e.g*., State of Illinois, *Official Statement for General Obligation Bonds, Series of November 2017*, 15 (2017) (explaining that Public Act 97-691 allows the State to pay for expenses months after the end of the fiscal year and may pose problems in publishing at least unaudited financial statements).

[93] *See Comprehensive Annual Financial Report (CAFR)*, State of Ill. Comptroller, https://illinoiscomptroller.gov/financial-data/find-a-report/comprehensive-reporting/comprehensive-annual-financial-report-cafr/ (last visited Jul. 30, 2018).

recommend.  But even with that extra flexibility, Puerto Rico often failed to release its external reports in a timely fashion.  *See* Part VIII.B.2.  We thus believe that although the experiences of Michigan and Illinois indicate that Puerto Rico could benefit from adopting a formal deadline for publishing its external reports, that deadline is but one aspect of a broader reform plan that must address the underlying causes of Puerto Rico's tardy reporting.   For reasons already explained in Part VIII.B.2, the formal deadline will be most helpful to investors and policymakers if it falls within six months of Puerto Rico's fiscal year-end, as Michigan's does.[94]

### 3. <u>Recommendations for Improving Institutional Knowledge and Audit Efficiency</u>

Several of the recommendations set forth above will help Puerto Rico to optimize its use of independent auditors by streamlining the year-end audit process, minimizing errors, and reducing the need for manual intervention.  But in addition to those recommendations, Puerto Rico should limit, or at least maximize the efficiency of, political turnover for accounting-related personnel and external auditors.  Multiple witnesses identified the wholesale replacement of external auditors and non-career accounting personnel each time a new administration assumed office as disruptive.  Puerto Rico should thus set reasonable limits that balance respect for the incoming administration's discretion with the need for efficiency.

One solution may be to foreclose incoming politicians from replacing external auditors without cause until after pending audits have concluded, or to require that incoming administrations retain legacy employees for a specified period of time before replacing them (with replacement contingent on the new employee having completed appropriate training). These types of measures could encourage the continuity needed to more efficiently harvest and reconcile crucial financial data in light of Puerto Rico's complex accounting structure.

---

[94] Certain funds or reporting units in Michigan also appear to use earlier fiscal year ends of June 30, rather than the state's fiscal year-end of September 30.  *See* State of Mich., *Comprehensive Annual Financial Report: Year Ended September 30, 2014*, 63 (Dec. 29, 2014).  This includes the ten state universities, the Farm Produce Insurance Authority and the Venture Michigan Fund. *See* State of Mich*., Comprehensive Annual Financial Report: Year Ended September 30, 2014*, 63 (Dec. 29, 2014).  Although the reason for that is unclear, staggering fiscal years for certain component units would seem, in theory, to make it easier for a reporting jurisdiction to ensure there is sufficient time to collect financial statements from all of the relevant entities and incorporate that data into its CAFR before the publication deadline.  *See* Dylan McLeod Bartlett, *Government Financial Disclosures: The Timeliness of State Comprehensive Annual Financial Reports*, 26 (2016).   In practice, however, the value of staggered deadlines appears to turn on the circumstances.  GASB has recommended against it, instead encouraging "a common fiscal year-end for the primary government and all component units," unless a "common fiscal year-end is impractical" and "timely and accurate presentation of the financial statements of the reporting entity is not adversely affected" by the use of staggered deadlines.  *See* Gov't Accounting Standards Bd. of the Fin. Accounting Found., *Governmental Accounting Standards Series Publication No. 078-B Regarding GASB Statement No. 14, Reporting Periods*, 25 ¶ 59 (June 1991)*.*  With respect to Puerto Rico, available evidence demonstrates that aggregating, confirming and publishing all of the requisite financial data across the various Component Units has proven impractical when using a common deadline, in light of the government's size and its various systems- and standards-related challenges.  *See* Part VIII.B.1, above.  Puerto Rico should thus revisit the relative "advantages and disadvantages of [retaining] a common fiscal year-end" across all Component Units.

The Independent Investigator's Final Investigative Report

   We further recommend that Puerto Rico devote resources to repairing the internal control weaknesses that its auditors have previously identified.  This includes, among other things, the controls concerning how to account for inter-fund obligations, as well as the controls concerning how to assess the accounting impact of ongoing events.

# PART IX

# CALCULATION OF THE CONSTITUTIONAL DEBT LIMIT

# PART IX
# CALCULATION OF THE CONSTITUTIONAL DEBT LIMIT

The Constitutional Debt Limit found in Section 2 of Article VI of the Puerto Rico Constitution limits the amount of debt that Puerto Rico may issue directly in the form of bonds or notes for which it has pledged its "full faith credit and taxing power," as well as how much debt it may guarantee. The provision limits the amount of debt that Puerto Rico may issue or guarantee based on a multi-part calculation of the mathematical relationship between future debt service payments, prior-year guarantee payments and average revenues (the "Debt Limit Calculation"), as discussed in Part IX.A below.

As part of our investigation, we explored Puerto Rico's interpretation of the Constitutional Debt Limit and its historical practices to ensure compliance with it. We sought to determine the extent to which Puerto Rico's interpretation or application of the Debt Limit Calculation may have contributed to the debt crisis.

Based on our investigation, and as discussed further below, we find as follows:

- Puerto Rico has historically interpreted the Constitutional Debt Limit to require that only the following be included in the Debt Limit Calculation: (i) direct obligations for which it is has pledged its full faith, credit and taxing power; and (ii) certain debt servicing payments on bonds or notes it has guaranteed. In other words, debt issued by the public corporations (unless that debt is guaranteed by Puerto Rico) is not included in the Debt Limit Calculation and is not limited by the Constitutional Debt Limit;

- Based on the plain text of the provision, Puerto Rico's interpretation that non-guaranteed debt of public corporations is not included in the Debt Limit Calculation appears uncontroversial and, based on our research, is not the subject of litigation;

- However, the fact that Puerto Rico's Constitutional Debt Limit does not limit debt issued by its public corporations (unless guaranteed)—although not unusual in US states and territories—means that a significant portion of debt that is ultimately attributable to Puerto Rico's public sector, and that substantially contributed to the financial crisis, was not subject to the limit. A substantial portion of the $74 billion in public sector debt constitutes non-guaranteed debt of the public corporations;

- Puerto Rico has interpreted the Constitutional Debt Limit as a debt service limit. That is, the limit is tied to future annual debt service payments and prior-year guarantee payments, not based on the absolute amount of debt issued. That interpretation appears uncontroversial and, based on our research, is not the subject of litigation;

- Multiple witnesses informed us that, as a consequence of the future debt service feature of the limit, GDB worked with the underwriters to structure the future debt service payments to avoid a Constitutional Debt Limit violation;

- Puerto Rico has also interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to the extent that: (i) the issuer (a public corporation, for example) is unable to make debt service payments; and (ii) Puerto Rico is required to do so under its guaranty;

- Puerto Rico's interpretation concerning guaranteed debt is the subject of ongoing litigation about debt service payments on the bonds that PBA issued ("PBA Bonds"), and we express no view as to that interpretation. We did, however, investigate Puerto Rico's understanding of its compliance with the Constitutional Debt Limit. Based on our investigation, we did not find evidence that any Puerto Rico official believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violated the Constitutional Debt Limit; and

- We also investigated the practices Puerto Rico employed to confirm compliance with the Constitutional Debt Limit. Based on our investigation, we conclude that Puerto Rico employed a reasonably robust process involving a number of players, as well as consultation with counsel. The players included the Secretary of the Treasury, career officials at GDB, bond counsel, the underwriters and, to a limited extent, the PRDOJ.

## A.     The Constitutional Debt Limit Provision and Debt Limit Calculation

The Constitutional Debt Limit is set forth in Section 2 of Article VI of the Puerto Rico Constitution. The relevant portion of that section reads as follows:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith credit and taxing power of the Commonwealth shall be

pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; . . . and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.[1]

Put more simply, under this provision, Puerto Rico may not issue general obligation debt (*i.e.*, bonds or notes to which it has pledged its full faith and credit and taxing power) or guarantee debt if it will cause a certain calculation to exceed 15%.  That calculation is as follows:

As to any issuance or guaranty of debt,

- (A) the sum of

  - (i) the maximum future annual debt service (principal and interest "payable in any fiscal year") on all of its outstanding general obligation debt (including the issuance in question),

    plus

  - (ii) any amounts Puerto Rico has paid in the previous fiscal year on account of any bonds or notes it guaranteed,

  cannot exceed 15% of

- (B) Puerto Rico's average annual "internal revenues" based on averaging the prior two fiscal years.

---

[1] P.R. Const. art. VI, § 2.

"Internal revenues" consists principally of income taxes, property taxes, sales and use taxes (excluding the portion allocated by law to COFINA) and excise taxes.[2]  And so, in short, item (A)(i), plus item (A)(ii), cannot be greater than 15% of item (B).

The following example, taken from the Official Statement for the 2014 GO Bond Issuance, illustrates the calculation.  In this example, according to the Official Statement:

- The maximum future annual debt service for Puerto Rico's outstanding general obligation debt (including the bonds in question) (*i.e.*, item (A)(i) in the previous paragraph) was $1,161,777,697;

- The amounts paid by Puerto Rico in the previous fiscal year on account of bonds or notes it guaranteed (*i.e.*, item (A)(ii) in the previous paragraph) was $17,315,000;

- The sum of $1,161,777,697 and $17,315,000 equals $1,179,092,697;

- The average of Puerto Rico's annual internal revenues in the previous two fiscal years (*i.e.*, item (B) in the previous paragraph) was $8,307,097,000; and

- Dividing $1,197,092,697 by $8,307,000 yields 14.2%, which is less than 15%.[3]

To determine the maximum future annual debt service, Puerto Rico determines the debt service requirements on its outstanding GO Bonds for future years.  For variable rate bonds (where the interest rates fluctuate), Puerto Rico uses the maximum legal rate (12%).  It then determines the maximum annual requirement.  In this example, it is shown to be $1,161,777.697 for fiscal year ended 2016.[4]

In Section C below, we discuss where the numbers that fed into the above calculation came from.  But first, we discuss how the scope of the Constitutional Debt Limit was historically interpreted by Puerto Rico.

**B.    Puerto Rico's Interpretation of the Constitutional Debt Limit and Debt Limit Calculation**

As part of our investigation, we examined how Puerto Rico interpreted and applied the Constitutional Debt Limit and Debt Limit Calculation during the Relevant Period.

### 1.    Public Corporation Debt Is Generally Not Included

First, Puerto Rico interpreted the Constitutional Debt Limit to require the Debt Limit Calculation to include: (i) direct general obligations of Puerto Rico; and (ii) as discussed further below in subsection (3), certain payments on debt obligations that Puerto Rico may guarantee.  In

---

[2] *See, e.g.*, Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 31 (2014).

[3] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

[4] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 34 (2014).

other words, as interpreted by Puerto Rico, the Debt Limit Calculation does not include debt issued by the public corporations if that debt is not guaranteed by Puerto Rico (such as non-guaranteed revenue bonds issued by PREPA, for instance). This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Our investigation included interviews of a number of former Secretaries of Justice, whose role in GO Bond issuances included issuing an opinion that the bonds constitute valid and binding general obligations of Puerto Rico. One former Secretary of Justice we interviewed commented that the provisions of the Constitutional Debt Limit clearly refer to "direct obligations" of Puerto Rico and that the public corporations, even though instrumentalities of Puerto Rico (like the Issuers) are separate and distinct entities from Puerto Rico. The senior official commented that this explains why there are many instrumentalities in Title III Proceedings.

This interpretation helps explain how public sector debt (which includes debt of the public corporations) could reach $74 billion notwithstanding the Constitutional Debt Limitation. In short, a substantial portion of that $74 billion was in the form of non-guaranteed public corporation debt, to which the Constitutional Debt Limit was understood not to apply.

We note that it is not unusual for US states and territories to apply debt limitations solely to general obligation debt. Nor is it unusual that this specifically defined nature of the debt limitation coincides with a growth in nonguaranteed debt. Indeed, a 1961 report by the Advisory Commission on Intergovernmental Relations ("ACIR"), titled "State Constitutional and Statutory Restrictions on Local Government Debt," notes the prevalence of debt limitations that only cover general obligation debt:

> One feature of these State-imposed restrictions [concerning debt limits] deserves emphasis—the fact that they do not encompass all types of local bond issues, but commonly apply only to local governments' issuance of full faith and credit debt. Various legal doctrines and devices by which local governments can issue nonguaranteed or "revenue" debt, usually exempt from such state restrictions, have developed widely. In recent years, there has been an extremely rapid growth of "unrestricted" local debt.[5]

The ACIR also observed the resulting rapid growth of nonguaranteed debt to finance projects traditionally financed through general obligation debt:

> Nonguaranteed debt originally developed to finance utility-type operations of local governments, such as water supply. It was later broadened (with Federal backing) to provide for local public housing projects. As recently as 1957, the bulk of all local nonguaranteed debt outstanding had been incurred for these two kinds of purposes. But the past few years have witnessed a rapid

_____

[5] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt,* 2 (1961).

> extension of the so-called "revenue bond" device to finance types of projects traditionally financed by full faith and credit borrowing . . . .[6]

It is for Puerto Rico's political branches to consider and decide whether the Constitutional Debt Limit should be broadened or legislation enacted to restrict debt issued by any of the public corporations. Alternatively, other constitutional or legislative positions directed specifically to the debt of the public corporations could be considered as a way to address debt that is outside Article VI, Section 2, but should nonetheless by limited or maintained.

### 2.   The Constitutional Debt Limit Is Based On Debt Service, Not the Absolute Amount of Debt

Second, Puerto Rico has interpreted the Constitutional Debt Limit to be based on future debt service and prior-year guarantee payments (and their relationship to prior-year revenues), not based on total amount of debt issued or guaranteed. This interpretation appears consistent with the plain text of the provision and, based on our research, does not appear to be the subject of litigation.

Because the Debt Limit Calculation includes future annual debt service payments, Puerto Rico could attempt to avoid a violation by structuring the servicing payments in a certain way. For example, a longer maturity on a bond being issued could result in lower annual payments so as to fit the issuance within the 15% limit. According to multiple witnesses, GDB historically worked with the underwriters to manage the debt and structure the service payments to avoid a violation. Based on our investigation, it appears this interpretation was shared among the participants responsible for ensuring compliance with the Constitutional Debt Limit and that the practice of managing debt to avoid a violation was understood to be permissible.

We also note that Puerto Rico is not alone in tying its debt limitations to debt service payments. A number of US states have debt limits that, like Puerto Rico, are calculated based on annual debt service. In Tennessee and Hawaii, for example, debt service on public debt cannot exceed 10% and 18.5% of annual revenues, respectively.[7]

### 3.   Guaranteed Debt and PBA Bonds

Third, Puerto Rico has interpreted the Constitutional Debt Limit to require that the Debt Limit Calculation include debt that it has guaranteed, but only to an extent. Specifically, under Puerto Rico's interpretation, debt service payments on guaranteed debt are not included in the Debt Limit Calculation unless the issuer of the debt is unable to make payment and Puerto Rico is required to make payment under its guarantee. In other words, while debt service payments that Puerto Rico is required to make under its guaranty *are* included in the Debt Limit Calculation (as item (A)(ii) of the calculation discussed above), debt service payments either that the issuer makes or that Puerto Rico is not required under its guaranty to make *are not* included.

---

[6] U.S. Advisory Comm'n on Intergovernmental Relations, *State Constitutional and Statutory Restrictions on Local Government Debt,* 25–26 (1961).
[7] *See* Tenn. Code Ann. § 9-9-105(c)(1) (West 2018); Haw. Const. Art. 7, § 13.

Puerto Rico's interpretation may be relevant to a dispute concerning Puerto Rico's guaranty of PBA Bonds, which we discuss below.  In light of this ongoing litigation, we express no view about whether this interpretation is consistent with the plain text of the provision.

### (a)  Puerto Rico's Treatment of Guaranteed Debt, In General

We learned that Puerto Rico has had a longstanding practice of only including in the Debt Limit Calculation debt servicing payments that Puerto Rico was required to pay.  In addition, we found that Puerto Rico's practice and interpretation concerning guaranteed debt has been disclosed repeatedly, at least as far back as 2007.  For example, Puerto Rico's *Financial Information and Operating Data Report* dated July 1, 2007 (appended to the official statement for Public Improvement Bonds of 2007, Series A) described this interpretation in relation to certain guaranteed PRASA bonds, as follows:

> Annual debt service payments on the PRASA guaranteed bonds have been paid by PRASA since fiscal year 2006 and, thus, such payments are not now included now [sic] in the calculation of the 15% debt limitation.  In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[8]

Later reports made this point even more clearly:

> Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% debt limitation.[9]

Similarly, official statements for the PBA Bonds state as follows:

> As provided above, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the issuers of such guaranteed bonds are unable to make such payments and the Commonwealth is therefore required to make such payments under

---

[8] Commonwealth of P.R., *Official Statement for Public Improvement Bonds of 2007, Series A*, I-27 (2007).
[9] Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2009 A*, I-38 (2009).

its guarantee, in which case such debt service would be included in the calculation of the 15% constitutional debt limitation.[10]

Although witnesses confirmed that Puerto Rico's interpretation was part of a longstanding practice, no witness we asked was able to identify specific legal authority or a Secretary of Justice opinion upon which Puerto Rico relied for this particular point. And we did not find any, either.

We are aware of various opinions by former Secretaries of Justice that address a similar, but not identical, issue. Those opinions were provided in connection with the issuance of various guaranteed bonds and concluded that amounts "required to be paid" by Puerto Rico under a guaranty constitute "public debt" within the meaning of Section 8 of Article VI of the Puerto Rico Constitution.[11] But this speaks to the rights of holders in the event that Puerto Rico has insufficient resources to satisfy its obligations. It does not specifically address the extent to which debt service payments should be included in the Debt Limit Calculation.

**(b)** **PBA Bonds**

PBA is a public corporation. The PBA Bonds add an additional layer of complexity to the question of how the Debt Limit Calculation should be applied because, as discussed further below, Puerto Rico has not only guaranteed the PBA Bonds with a pledge of its full faith, credit and taxing power, but the PBA Bonds themselves are payable from rental payments on facilities rented to governmental entities and Puerto Rico has guaranteed those rental payments with a pledge of its full faith, credit and taxing power. As discussed below, certain creditors maintain that debt service payments on PBA Bonds should be included in the Debt Limit Calculation.

PBA owns a number of buildings—including office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops and related facilities—that it leases to various governmental entities, such as departments, agencies, instrumentalities and municipalities of the Government. It has issued PBA Bonds, approximately $ 4.1 billion of which are were outstanding as of February 2017.[12]

---

[10] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Bonds, Series R, 24* (2011); *see also* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 10 (2014) ("The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if (a) the sum of (i) the total amount payable in any fiscal year on account of principal of and interest on all the Direct Obligations already issued and (ii) the amount paid by the Commonwealth in the next preceding fiscal year on account of Guaranteed Obligations exceeds (b) 15% of the average of the total annual internal resources of the Commonwealth for the two preceding fiscal years. Accordingly, debt service payable on Guaranteed Obligations is ***not*** taken into consideration for purposes of the debt limit ***unless*** the Commonwealth is required to pay such debt service pursuant to its guarantee and the Commonwealth may continue to guarantee bonds and notes issued by its instrumentalities as long as the 15% limitation is not exceeded.") (emphasis added).

[11] *See, e.g.*, P.R. Aqueduct & Sewer Auth., *Official Statement for Revenue Refunding Bonds, 2008 Series A, 2008 Series B*, 7–8 (2008).

[12] P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

The Independent Investigator's Final Investigative Report

PBA Bonds are payable from and secured by a pledge of the rental payments owed by the governmental entity that leased the building.[13]  In other words, Puerto Rico has guaranteed the rental payments owed by the governmental entity, and the PBA Bonds are secured by that guaranty.[14]  In addition, Puerto Rico has guaranteed payment of the principal of and interest on the PBA Bonds themselves.[15]  For both the guaranty of rental payments and the guaranty of payment on PBA Bonds, Puerto Rico has pledged its full faith, credit and taxing power.[16]

According to the official statements for the PBA Bonds, under a 2001 agreement designed to reduce the frequency and length of delays in rent payments, each month the Treasury Department forwarded to GDB funds for PBA rental payments, which were deposited into a PBA account at GDB.  Portions of the rental payments were used to cover debt service on PBA Bonds.

As noted, Puerto Rico has not included either the rental payments or debt service payments on the PBA Bonds in the Debt Limit Calculation because it understood that no payments under its guaranty were required.[17]

In one of the Title III adversary proceedings, holders of senior bonds issued by COFINA ("COFINA Senior Bondholders") have argued that, due to the nature of Puerto Rico's guarantees, the "rental obligations and payments" by Puerto Rico should have been included as future debt service payments in the Debt Limit Calculation.[18]  They argue that, due to the nature of the arrangements, it is an "illusion" that Puerto Rico does not have a "direct full faith and credit obligation to PBA bond investors" and that "the Court must look to the substance of the transaction in determining that the PBA debt should be counted against the constitutional debt limit."[19]

The COFINA Senior Bondholders contend that the effect of not including the future debt service on PBA Bonds in the Debt Limit Calculation was to increase the total permissible debt. They claim that properly including the future payments on PBA Bonds in the calculation would

---

[13] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1 (2012).

[14] P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 17 (2012).

[15] *See* Act of July 2, 2012, No. 131, 2012 P.R. Laws 380, 380 ("Act No. 17 of April 11, 1968, as amended . . . provided that the Government of Puerto Rico would guarantee the payment of the principal of and interest on bonds issued by the PBA and specified by the latter for any of the purposes authorized by law.").

[16] *See, e.g.*, Act of July 2, 2012, No. 131, § 1, 2012 P.R. Laws 380, 381–82; P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 1, 17 (2012).

[17] *See, e.g.*, P.R. Pub. Buildings Auth., *Official Statement for Government Facilities Revenue Refunding Bonds, Series U*, 22 (2012) ("No payments under the Commonwealth guaranty have been required to date for any of the Authority's bonds.").

[18] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

[19] Mot. and Incorporated Mem. of Law at 32, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

result in the Constitutional Debt Limit having been exceeded by March 2011 and that by March 2014 the debt level would have been approximately 17.5%, in excess of the 15% limit.[20]

We are aware of no ruling by Puerto Rico courts on the constitutionality of the practice and take no position as to the merits of the COFINA Senior Bondholders' argument.

As part of our investigation, we sought to determine whether there was any evidence that Puerto Rico understood its practice of not including debt service payments on PBA Bonds to violate the Constitutional Debt Limit. Based on our investigation, we found no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violates the Constitutional Debt Limit. As noted, according to witnesses, Puerto Rico had a longstanding practice of treating direct debt and guaranteed debt differently for purposes of the Debt Limit Calculation. And several witnesses stated that they were not aware of anyone expressing the view that PBA Bonds should be included in the Debt Limit Calculation. In addition, we note that the Puerto Rico Commission for the Comprehensive Audit of the Public Credit reported that "[t]he computational methods used by GDB appeared to be arithmetically correct, performed in a manner consistent with protocol employed in years past, and supported by the opinion of outside bond counsel."[21] Moreover, through at least the 2013 fiscal year, independent auditors opined that the debt limit had not been exceeded.[22]

### 4.     <u>Swap Termination Fee Payments</u>

Puerto Rico has also interpreted the Constitutional Debt Limit not to require that the Debt Limit Calculation include certain Swap termination fee payments. As discussed in Part XIII, a Swap is a type of complex financial transaction into which certain Issuers entered, that transfers the risk of interest rate fluctuations between the Issuer and its counterpart. Swap agreements often provide for the payment of certain "termination fees" triggered by certain credit events.

Through Act No. 39 of August 1, 2005 ("<u>Act 39-2005</u>"), Puerto Rico pledged the "good faith, the credit and the power to impose taxes of the Commonwealth" for amounts payable— interest, specifically—under Swap agreements entered into by Puerto Rico as well as by the PBA.[23] Act 39 expressly excludes, however, any amount payable or to be paid by Puerto Rico in termination fees for Puerto Rico Basis Swaps and PBA Swaps from the Debt Limit Calculation. Specifically, with regard to Puerto Rico Basis Swaps, Act 39 provides:

> In the case of a qualified basis swaps agreement, the amount paid to the other party by the Commonwealth as payment for terminating the agreement shall constitute neither interest nor principal nor shall it be deemed as a component of the service of the debt of the

---

[20] Mot. and Incorporated Mem. of Law at 32-33, *Lex Claims, LLC v. Alejandro García-Padilla*, 204 F. Supp. 3d 424 (D.P.R. 2016) (No. 16-2374), ECF No. 219.

[21] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report,* 20 (2016).

[22] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report,* 20 (2016).

[23] Art. 3 § 5 & Art. 4 § 2(b), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

Commonwealth for purpose of Section 2 of Article VI of the Constitution of Puerto Rico.[24]

Additionally, with regard to PBA, Act 39 provides:

> For the purpose of the calculation of the constitutional limit of the public debt under Section 2 of Article VI of the Constitution of Puerto Rico, any amount payable or to be paid by the Commonwealth under the Guarantee with respect to any payment for the termination of a Qualified Interest Rate Exchange Agreement of [PBA] shall neither constitute the principal, nor the interest, nor shall it be deemed to be a component of the service of the debt of the Authority or of the Commonwealth.[25]

There is no provision in Act 39 that states specifically whether or not termination fees in connection with non-basis Puerto Rico swaps should be counted toward to the Constitutional Debt Limit.

As discussed further in Parts XIII and XVI, Puerto Rico has taken the position that Swap termination payments payable by Puerto Rico, even though a "good faith" and credit obligation, are not to be included in the Debt Limit Calculation.  According to the official statement for the 2014 GO Bond Issuance, the payment does not need to be included because "it is not a payment of principal of or interest on general obligation debt of the Commonwealth."[26]    The official statement acknowledges, however, that "the exclusion of such amounts from the debt limit has to this point never been ruled upon by any court."[27]

Based on our investigation, we found no evidence that Puerto Rico personnel believed the interpretation was incorrect, although we note that witnesses we asked had little recollection of any discussions concerning this issue.

From 2008 to 2014, annual net and gross amounts paid net swap termination fees paid were as follows.  As discussed further in Part XVI, an argument could be made that these payments should have been included in the Debt Limit Calculation, which may have had the effect of decreasing the amount Puerto Rico could borrow within the Constitutional Debt Limit.

---

[24] Art. 3 § 3(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).
[25] Art. 4 § 4(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).
[26] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).
[27] Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 32 (2014).

**Figure IX.A: Puerto Rico and PBA Swap Termination Fees by Fiscal Year**

| Fiscal year ended | Net termination payments | Gross termination payments |
|---|---|---|
| 2008 | (9,536,750.00) | (9,536,750.00) |
| 2009 | (24,640,000.00) | (36,770,000.00) |
| 2010 | 246,000.00 | (12,454,000.00) |
| 2011 | (58,552,030.00) | (58,552,030.00) |
| 2012 | (125,386,600.00) | (125,386,600.00) |
| 2013 | - | - |
| 2014 | (101,234,600.00) | (101,234,600.00) |

## C. Puerto Rico's Process For Ensuring Compliance With The Constitutional Debt Limit

We also investigated the practices Puerto Rico employed to confirm compliance with the Constitutional Debt Limit. Based on our investigation, we conclude that Puerto Rico employed a reasonably robust process involving a number of players and advice of counsel. The players included the Secretary of the Treasury, GDB, bond counsel, the underwriters, and, to a limited extent, the PRDOJ.

### 1. The Secretary of the Treasury's Certificate

In connection with any GO Bond offering, the Secretary of the Treasury issued a certificate, titled the "Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico under Section 2 of Article VI of the Commonwealth Constitution" ("Certificate of Borrowing Power"), which sets out the figures for the debt limit calculation described in Part IX.A.[28] The Certificate of Borrowing Power is included in the closing binder. It forms part of the basis for bond counsel's opinion that the bonds constitute valid and binding general obligations of Puerto Rico, and the figures are consistent with those provided in the official statement.

For example, consistent with the figures set forth above in Part IX.A, the Certificate of Borrowing Power for the 2014 GO Bond Issuance states that:

---

[28] *See, e.g.*, Treasury of Commonwealth of P.R., *Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico under Section 2 of Article VI of the Commonwealth Constitution* (Mar. 17, 2014) (on file with P.R. Dep't of Treasury).

- The annual revenues transferred into the Treasury for each of the previous two fiscal years with certain exceptions ($8,357,838,000 for fiscal year ended 2012 and $8,256,356,000 for fiscal year ended 2013) as well as the average of those two numbers: $8,307,097,000 (*i.e.*, item (B) above);

- The total principal amount of the bonds or notes issued by Puerto Rico for which the full faith, credit and taxing power are pledged;

- The maximum future annual debt service on the bonds and notes identified in the previous bullet payable in any fiscal year (in this case being fiscal year ended 2016): $1,161,777.697 (*i.e.*, item (A)(i) above); and

- The total amounts paid by Puerto Rico in fiscal year ended 2013 on account of bonds or notes guaranteed by Puerto Rico: $17,315,000 (*i.e.*, item (A)(ii) above).

Finally, the Certificate of Borrowing Power also provided a calculation of the estimated "borrowing margin," or the difference between the figure of item (A) above and the 15% of item (B) above. In the case of the 2014 GO Bond Issuance, that figure was 0.806% (15.000% minus 14.194%), reflecting a near maximum debt level.

## 2.    <u>GDB</u>

Based on the statements of multiple witnesses, we learned that the numbers set forth in the Certificate of Borrowing Power were provided by the finance department at GDB. Individuals primarily responsible for these numbers were career employees, and the person largely responsible for general obligation debt calculations for much of the Relevant Period had many years of experience. A former high-level GDB official explained that the GDB finance department maintained an Excel spreadsheet of internal revenues and bond issuances that was used to perform the calculation. The GDB official explained that the finance department would confirm the internal revenues based on information the Department of Treasury maintained online.

In performing any necessary calculations (such as the maximum future annual debt service, which assumes an interest rate of 12%), GDB finance would confer with and rely upon bond counsel and in-house counsel at GDB.

As noted, the calculation was also included in the official statements, which, like the Certificate of Borrowing Power, were signed by the Secretary of the Treasury. We learned that, before the official statements were signed, there were meetings among the Secretary of the Treasury and members of GDB management, including the GDB President and in-house counsel, at which the calculation was discussed.

## 3.    <u>Bond Counsel</u>

Multiple former high-ranking GDB and PRDOJ officials stated that the Debt Limit Calculation, including what was to be included and not included, was reviewed and approved by bond counsel. One former high-ranking GDB witness reported that on local issuances, Puerto Rico counsel advised regarding the Constitutional Debt Limit. As noted, a former high-ranking GDB witness told us GDB relied on counsel's advice.

A former bond counsel witness conveyed that counsel reviewed the calculations and made sure the calculation process was consistent with counsel's understanding of how the calculation was supposed to be performed.  Another former bond counsel also stated that counsel would ask questions to confirm whether certain debt issuances were accounted for, although they would ultimately rely upon the accuracy of the numbers.

As part of the issuance, bond counsel would issue an opinion stating that the bonds constitute valid and binding general obligations of Puerto Rico.[29]

### 4.      Underwriters' Counsel

We learned that underwriters and their counsel provided an additional check on Puerto Rico's compliance with the Constitutional Debt Limit.  This is because underwriters had strong interest during the Relevant Period to avoid underwriting and marketing debt securities that might later be found to have been unlawfully issued.

One underwriters' counsel witness stated that the underwriters relied on the calculations provided by GDB and bond counsel's opinion that the Constitutional Debt Limit had been respected for a given issuance.  A bond counsel witness reported that underwriters' counsel would also check to make sure the calculation was consistent with underwriters' understanding of how the calculation should be performed and would ask questions about what items were included and excluded from the calculation.  The witness stated that underwriters' counsel would review the calculations but not look behind the numbers.

A former high-ranking GDB official, as well as underwriter witnesses, stated that underwriters' counsel independently performed the constitutionally required calculations. The underwriter witness conveyed that the underwriter received advice from counsel about how to perform the calculations.  Significantly, our investigation revealed no evidence that, at any point during the Relevant Period, underwriters' counsel reached a conclusion that any constitutional calculation by GDB resulted in an unlawful offering.

Multiple witnesses explained that the underwriters worked with GDB to structure the debt service to ensure compliance with the Constitutional Debt Limit provision. This was possible because the Puerto Rico Constitution, as discussed above, did not limit the total debt.  Rather, it limited future annual direct debt service payments (and payments in the more recent fiscal year on guaranteed debt) to no more than 15% of the average revenue for the prior two fiscal years.

### 5.      PRDOJ

Finally, The Secretary of Justice issued an opinion concluding that "the Bonds constitute valid obligations of the Commonwealth . . . ."[30]   Multiple PRDOJ witnesses stated, however, that

---

[29] See, e.g., Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, II-1–II-2 (2014).

[30] Inquiry No. 14-142-A, Op. Sec. Just. César R. Miranda Rodríguez, 2 (Mar. 17, 2014) (on file with P.R. Dep't of Justice).

PRDOJ did not perform or check the Debt Limit Calculation figures that appeared in official statements, instead deferring to GDB's calculations.

**D.      The Balanced Budget Provision and the Maximum Debt Maturity Provision**

We also note two other provisions in the Puerto Rico Constitution that may be implicated by the Government's issuance of debt: the balanced budget provision and the maximum debt maturity provision.

The balanced budget provision is located at Section 7 of Article VI of the Puerto Rico Constitution.  Based on the English version of the Constitution, the text reads:  "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  This may lead a reader to conclude that debt may not be issued in order to finance budgetary shortfalls, because appropriations (*i.e.*, expenditures) may not exceed total revenues.  However, as discussed in Part IV of this Report, a 1974 opinion issued by a Puerto Rico Secretary of Justice has been interpreted to mean that Puerto Rico is permitted to use proceeds of debt issuances as an available resource to prepare a balanced budget.  We are not aware of any contrary Secretary of Justice legal opinion, and no court appears to have interpreted this provision of the Puerto Rico Constitution.

The maximum debt maturity provision is located in Section 2 of Article VI.  It provides that no general obligation bonds or notes "for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date."  As noted in Part IV of this Report, Puerto Rico regularly refinanced debt by "scooping and tossing"—that is, issuing new Puerto Rico-Related Bonds and using at least a portion of the proceeds to pay off old Puerto Rico-Related Bonds.  We briefly discuss potential arguments that could be made as to the "scoop and toss" practice and compliance with the maximum debt maturity provision in Part IV.

**E.      Conclusion**

In summary, the evidence we reviewed supports the conclusion that Puerto Rico employed a reasonably robust process for these Debt Limit Calculations.  In addition, we did not find any evidence that Puerto Rico's government personnel believed that Puerto Rico's interpretation of the Constitutional Debt Limit was wrong or that Puerto Rico performed the Debt Limit Calculation incorrectly.

Nevertheless, in light of Puerto Rico's debt crisis, Puerto Rico should consider whether it may be worthwhile for its judiciary to review the meaning of Section 2 of Article VI of the Puerto Rico Constitution, as well as the methods pursuant to which Puerto Rico determines the types of debt servicing payments to be included within the Debt Limit Calculation. Significantly, the Constitutional Debt Limit did not prevent the issuance of legal, but ultimately unsustainable, amounts of public debt.

# PART X
# CREDIT RATING AGENCIES

# PART X
# CREDIT RATING AGENCIES

In the wake of the Great Recession, the Permanent Subcommittee on Investigations of the US Senate's Committee on Homeland Security & Governmental Affairs, the Financial Crisis Inquiry Commission, and others criticized US credit rating agencies for having assigned higher-than-merited credit ratings to certain institutions that ultimately went bankrupt, as well as to securities collateralized by residential mortgages with higher risks of default than the assigned credit ratings indicated.[1]  Certain lawmakers and analysts concluded that the favorable credit ratings lent credence to weak issuances of residential mortgage-backed securities ("RMBS") and bolstered perceptions of creditworthiness for failing institutions.[2]  In particular, they argued that

---

[1] *See*, *e.g.*, The Fin. Crisis Inquiry Comm'n, *Conclusions of the Financial Crisis Inquiry Commission*, xxiv-xxv (2011); U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis:  Anatomy of a Financial Collapse*, 244 (Apr. 13, 2011) ("Inaccurate AAA credit ratings introduced systemic risk into the U.S. financial system and constituted a key cause of the financial crisis."); *see generally also* U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 5-7, 26-32, 243-317  (Apr. 13, 2011) (setting forth relevant findings).
[2] *See*, *e.g.*, U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 244 (Apr. 13, 2011) (finding, in relevant part, that "[i]f the credit rating agencies had issued ratings that accurately exposed the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, slowed the pace of securitizations. . . .").

The Independent Investigator's Final Investigative Report

credit rating agencies, including certain of the three CRAs that rated Puerto Rico-Related Bonds, had inherent conflicts of interest and were incentivized to prioritize their own profits above the quality of their ratings analyses because of the "issuer-pay" model – that is, the fact that the issuers hired the credit rating agencies and paid them to rate the RMBS deals.[3]  The US Department of Justice even accused one of the largest CRAs of civil fraud.[4]  These critics further identified the credit rating agencies' subsequent downgrades of large numbers of the high credit ratings they assigned to RMBS deals as "the immediate trigger for the [US] financial crisis."[5]

Reforms were ultimately enacted in August 2014 as a result of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act").  These reforms augmented a prior round of reforms that stemmed from the Credit Rating Agency Reform Act of 2006 ("Reform Act").  Together, these sets of reforms focused on strengthening the training, experience and competency of credit rating agency employees; dislocating the credit ratings analysis from issuers' influence; increasing transparency relating to process criteria, the meanings of rating symbols, and methods; developing registration requirements; and implementing loose oversight through the establishment of the SEC's Office of Credit Ratings.[6]  Neither set of reforms prohibited the issuer-

---

[3] See, e.g., U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, Wall Street & the Financial Crisis: Anatomy of a Financial Collapse, 244 (Apr. 13, 2011) (finding, in relevant part, that "[i]f the credit rating agencies had issued ratings that accurately exposed the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have . . . slowed the pace of securitizations, and as a result reduced their own profits").

[4] See, e.g., Press Release, U.S. Department of Justice, Department of Justice Sues Standard & Poor's for Fraud in Rating Mortgage-Backed Securities in the Years Leading Up to the Financial Crisis (Feb. 5, 2013),       https://www.justice.gov/opa/pr/department-justice-sues-standard-poor-s-fraud-rating-mortgage-backed-securities-years-leading ("Many investors, financial analysts and the general public expected S&P to be a fair and impartial umpire in issuing credit ratings, but the evidence we have uncovered tells a different story. . . . "); Our investigation revealed that, despite their representations to the contrary, S&P's concerns about market share, revenues and profits drove them to issue inflated ratings, thereby misleading the public and defrauding investors. In so doing, we believe that S&P played an important role in helping to bring our economy to the brink of collapse.

[5] See, e.g., U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, Wall Street & the Financial Crisis: Anatomy of a Financial Collapse, 259 (Apr. 13, 2011) ("Perhaps more than any other single event, the sudden mass downgrades of RMBS and CDO ratings were the immediate trigger for the financial crisis.").

[6] See Pub. L. No. 109-291, 120 Stat. 1327 (reflecting intent of Reform Act as "improv[ing] ratings quality for the protection of investors and in the public interest by fostering accountability, transparency, and competition in the credit rating agency industry."); 17 C.F.R. § 240.17g-8 (codifying new rule as a result of Dodd-Frank Act reforms requiring, among other things, limited standardization of meanings assigned to credit rating symbols across NRSROs, establishing requirement of "look-back reviews" to ascertain whether any conflict of interest affected a previously assigned rating, requiring internet publication of procedures and methodologies applied to yield assigned credit ratings, requiring disclosure of any significant errors in previously-assigned ratings, and mandating disclosure of version of procedure or methodology applied); 17 C.F.R. § 240.17g-9 (imposing certain requirements as a result of Dodd-Frank Act reforms relating to training, education and credentials for NRSRO employees involved in assigning ratings); see also Press Release, U.S. Sec. & Exchange Comm'n, SEC Adopts Credit Rating Agency Reform

pay model or standardized analytical criteria or methodologies within the credit ratings industry. Nor did the reforms provide guidance to the credit rating agencies regarding what to consider, or how to consider it, when determining a credit rating. *See* Part X.I, below.

We examined the fact that, despite Puerto Rico's worsening fiscal crisis and the poor performance of certain Issuers, the three CRAs rated the majority of Puerto Rico-Related Bonds[7] as "investment-grade" until certain CRAs downgraded the GO Bonds and several other issuances to non-investment-grade starting in February 2014.[8] In certain instances, the downgrades were the first step in a series of events that led to the swap terminations and related payments discussed in Part XIII of this Report.

In light of the foregoing, we examined: (i) what role the CRAs may have played with respect to Puerto Rico-Related Bond issuances; and (ii) the extent to which their assigned credit ratings, or the processes through which they arrived at those ratings, may have contributed to Puerto Rico's fiscal crisis. The evidence supports the following findings:

1.      The CRAs and the credit ratings that they assign serve an important function in the municipal bond market. *See* Part X.A.

2.      We are unaware of any evidence to suggest that the CRAs departed from their general processes and procedures. We summarize our understanding of those processes and procedures below in Part X.B.

3.      Based on the evidence available to us, the CRAs' rating analyses during the Relevant Period appear to have tracked their respective evaluation criteria. *See* Part X.C. Those criteria were generally similar from one CRA to the next, despite differences in how the CRAs' analysts ("CRA Analysts") may have considered those criteria, or what they may have deemed most persuasive.

4.      There were vulnerabilities in the CRAs' processes and procedures. In particular, their analyses remained largely issuer-driven and were not sufficiently objective in the context of Puerto Rico-Related Bonds. This is because the CRAs and the CRA Analysts had complete

---

*Rules*, www.sec.gov/news/pressrelease/2014-178.html (Aug. 27, 2014) (summarizing newly-enacted amendments to Exchange Act and existing rules, as well as new rules, including 17 C.F.R. § 240.17g-8 and 17 C.F.R. § 240.17g-9); U.S. Sec. & Exchange Comm'n, *Amendments to Rules for Nationally Recognized Statistical Rating Organizations*, Release No. 34-59342, 2-3, 5 (Feb. 2, 2009) (summarizing final rules adopted as a result of Reform Act and following investigation into three major credit rating agencies, pursuant to which rating agencies must apply for NRSRO status, SEC oversees those registrations, and NRSROs became subject to broader requirements regarding rating history disclosures, transparency, avoidance of conflicts of interest and handling of material non-public information).

[7] As we discuss further below, Moody's dropped its rating for the senior-lien PRASA Bonds below investment-grade in December 2012. S&P followed suit in March 2013.

[8] Our investigation has primarily focused on the credit ratings assigned between 2006 and July 2014 (which is the "Relevant Period," as that term is used in this Part X of the Report).

discretion to determine whether and to what extent to continue relying upon issuer-supplied information, regardless of indicia that such reliance may not, in the specific context of the Puerto Rico-Related Bonds, have been entirely prudent.  Nor were the CRAs or the CRA Analysts uniformly required to consider certain variables that, in the context of the Puerto Rico-Related Bonds, were credit-relevant. *See* Part X.D. [9]

5.     Factors specific to Puerto Rico complicated the CRAs' analyses, particularly in combination with the vulnerabilities referenced above.  *See* Part X.E.  Some of those difficulties concerned the accounting and financial reporting challenges that we separately discuss in Part VIII of this Report, while others related to the difficulty of finding a body of comparable credits to reference when evaluating Puerto Rico-Related Bonds.

6.     There is evidence that, in hindsight, there may have been a basis to take earlier or more aggressive action to change the positive ratings of certain Puerto Rico-Related Bond ratings.  At least some of the CRA Analysts with whom we spoke identified long-standing concerns, and a review of CRA reports from the Relevant Period demonstrates that similar factors surfaced multiple times.  There is also evidence that certain CRA Analysts were skeptical of prospective issuer-supplied information.  *See* Part X.F.

7.     Notwithstanding the foregoing, we have not seen any evidence to establish that the CRAs did not genuinely believe that contemporaneous circumstances justified their assigned ratings.  To the contrary, the evidence reflects that for most of the Puerto Rico-Related Bonds, the CRA Analysts did not begin to deem more severe ratings actions to be justified until GDB signaled a lack of willingness to continue supporting certain entities and it became clearer that Puerto Rico would default.  *See* Part X.G.

8.     Given the significance of credit ratings to certain types of investors, it is likely that the CRAs' assignment of investment-grade credit ratings during the Relevant Period made Puerto Rico-Related Bonds appear more attractive to certain investors.  We do not, however, believe that those ratings were a significant cause of the broader fiscal crisis.  *See* Part X.H.

9.     The significance that some investors assign to credit ratings is arguably not justified by the scope of specific ratings decision-making that we reviewed.  This is particularly so where, as in the case of Puerto Rico, certain municipal bonds retained investment-grade ratings for a prolonged period despite mounting levels of debt service, declining Issuer performance, and worsening macroeconomic indicators, with several Issuers ultimately landing in a form of bankruptcy.  Congress should consider whether there may be a point at which, in limited sets of circumstances akin to the ones we uncovered with respect to Puerto Rico-Related Bonds during the Relevant Period, the benefits of the existing statutory bar that forecloses the SEC from regulating the CRAs' criteria or methodologies no longer justifies the risks to municipal bond investors.  We also offer certain reforms that could benefit the municipal bond market by making

---

[9] We do not opine on the general sufficiency of the CRAs' processes, procedures, or ratings criteria.  Instead, we identify inherent vulnerabilities that, in the specific context of Puerto Rico-Related Bonds, appear to have been magnified.

The Independent Investigator's Final Investigative Report

more reliable certain aspects of the CRAs' analyses, even if adopted as self-governing standards. *See* Part X.I.

We present our findings in turn below.

## A.    The CRAs and Their Rating Determinations Served an Important Function With Respect to Puerto Rico-Related Bonds During the Relevant Period

### 1.    The CRAs Provided Opinions of Creditworthiness and Default Risk for Puerto Rico-Related Bonds

The CRAs are companies that, in essence, perform privatized risk assessments for the capital markets.  The risk assessments are supposed to result in a credit rating that reflects the assigning CRA's opinion of how likely a particular bond offering or financial institution is to repay the bond-holders' principal, plus interest, as agreed.[10]

Each of the three CRAs is a nationally recognized statistical rating organization ("NRSRO"), registered pursuant to Section 15E of the Securities Exchange Act of 1934.[11]  As

---

[10] *See*, *e.g.*, U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 247 (Apr. 13, 2011) ("Essentially, credit ratings predict the likelihood that a debt will be repaid"); U.S. Senate, Comm. on Homeland Sec. & Governmental Affairs, *Wall Street & the Financial Crisis:  Anatomy of a Financial Collapse*, 255 (Apr. 13, 2011) ("The purpose of a credit rating, whether stated at first issuance or after surveillance, is to forecast a security's probability of default (S&P) or expected loss (Moody's)."); *see also* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 5 (June 2018) (available through Moody's Inv'rs Serv.) ("Ratings assigned on Moody's global long-term and short-term rating scales are forward-looking opinions of the relative credit risks of financial obligations issued by non-financial corporates, financial institutions, structured finance vehicles, project finance vehicles, and public sector entities."); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 3 (2018) (available through Standard & Poor's Ratings Servs.) ("Credit ratings are opinions about credit risk. Our ratings express the agency's opinion about the ability and willingness of an [I]ssuer, such as a corporation or state or city government, to meet its financial obligations in full and on time."); Fitch Ratings, *Rating Definitions*, 4 (2018) (available through Fitch Ratings) ("Ratings, including Rating Watches and Outlooks, assigned by Fitch are opinions based on established criteria."); Moody's Inv'rs Serv., *Index of Credit Rating Methodologies*, *Cross Sector Methodologies*, *and Other Permissible Service Methodologies*, http://www.moodys.com/research/Index-of-Rating-Methodologies--PBC_127479 (last visited July 14, 2018) (database with links to hundreds of specific rating methodologies for particular debt securities and industries).

[11] A list of registered NRSROs is available on the SEC website. *See* U.S. Sec. & Exchange Comm'n, *Current NRSRO's*, https://www.sec.gov/ocr/ocr-current-nrsros.html (last modified July 10, 2018); *see also* U.S. Sec. & Exchange Comm'n, *Credit Rating Agencies—NRSROs*, http://www.sec.gov/answers/nrsro.htm (last modified May 31, 2013). Each CRA also makes its Form NRSRO filings available on its website. *See* Moody's Inv'rs Serv., *Annual Certification of Form NRSRO 2013* (Mar. 28, 2014); Fitch Ratings, *United States Regulation*, https://www.fitchratings.com/site/regulatory (last visited July 14, 2018); Standard & Poor's Ratings Servs., *Application for Registration as a Nationally Recognized Statistical Rating Organization* (*NRSRO*) (May 31, 2018).

The Independent Investigator's Final Investigative Report

such, they are loosely regulated by the SEC.[12]  The scope of that regulation primarily concerns disclosure and registration requirements, as well as safeguards intended to ensure that the CRAs' business relationships do not compromise the integrity of their analyses.[13]

As a result of the CRAs' NRSRO designations (and assuming that they comply with related regulations), each CRA's credit ratings were eligible at one point to be used to set regulatory standards for other types of financial participants.[14]  Such standards concerned, among other things, investment restrictions, lending limitations, diligence requirements, and minimum capital requirements.[15]

There are two broad categories of credit ratings: (i) one for investment-grade assets; and (ii) one for non-investment-grade assets.[16]  The former is comprised of the highest-rated bond investments, which are supposed to have the lowest risk of default.[17]  The latter includes investments with a higher likelihood of default or nonpayment, like junk (also called

---

[12] *See*, *e.g.*, U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 249 (Apr. 13, 2011) (providing an overview of "uneven or limited regulatory oversight" of credit rating agencies prior to the Reform Act and noting that despite its reforms, even that statute limited the scope of SEC oversight).

[13] *See*, *e.g.*, 17 C.F.R. § 240.17g-8; 17 C.F.R. § 240.17g-9; *see also* Press Release, U.S. Sec. & Exchange Comm'n, *SEC Adopts Credit Rating Agency Reform Rules* (Aug. 27, 2014), https://www.sec.gov/news/pressrelease/2014-178.html (summarizing Dodd-Frank Act amendments to Exchange Act, and rules amended or enacted in 2014, as establishing "new requirements for NRSROs [to] address internal controls, conflicts of interest, disclosure of credit rating performance statistics, procedures to protect the integrity and transparency of rating methodologies, disclosures to promote the transparency of credit ratings, and standards for training, experience, and competence of credit analysts," including related certifications).

[14] *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 6-7 (Jan. 2003) (summarizing certain ways in which NRSRO credit ratings have been used to regulate the capital markets over time).

[15] *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 7 (Jan. 2003).

[16] *See*, *e.g.*, U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 247-248 (Apr. 13, 2011); *see also* Schroder Investment Management, *Credit Ratings and Risk*, https://www.schroders.com/en/archive/legacy/au2/investor/about-schroders/schroders-overview/ (last visited July 14, 2018).

[17] *See*, *e.g.*, U.S. Senate Comm. On Homeland Sec. & Governmental Affairs, Permanent Subcomm. On Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 247 (Apr. 13, 2011); *see also* Moody's Inv'rs Serv., *Moody's Rating Scale and Definitions*, 1-2 (last visited July 14, 2018) (available through Moody's Inv'rs Serv.) (including a clear definition of what investment grade denotes for Moody's); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 14 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, *Rating Definitions*, 3 (2018) (available through Fitch Ratings).

The Independent Investigator's Final Investigative Report

"speculative") bonds.[18]  There are markets for both investment-grade and non-investment grade bonds, and different investors favor each for different reasons.

Each CRA determines its own rating conventions for investment-grade and non-investment-grade assets.  Figure X.A, below, reflects the ordinal rating scale that each CRA used during the Relevant Period.  We present the ratings in declining order of creditworthiness:

**Figure X.A: Credit Ratings Scales for Moody's, Fitch, and S&P[19]**

|  | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| **Investment Grade** | Aaa | AAA | AAA |
|  | Aa1 | AA+ |  |
|  | Aa2 | AA | AA |
|  | Aa3 | AA- |  |
|  | A1 | A+ |  |
|  | A2 | A | A |
|  | A3 | A- |  |
|  | Baa1 | BBB+ |  |
|  | Baa2 | BBB | BBB |
|  | Baa3 | BBB- |  |
| **Non-Investment Grade** | Ba1 | BB+ |  |
|  | Ba2 | BB | BB |
|  | Ba3 | BB- |  |
|  | B1 | B+ |  |
|  | B2 | B | B |
|  | B3 | B- |  |
|  | Caa1 | CCC+ | CCC |
|  | Caa2 | CCC | C |
|  | Caa3 | CCC- | C |
|  |  |  | DDD |
|  | C | D | DD |
|  |  |  | D |

---

[18] *See, e.g.*, U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis:  Anatomy of a Financial Collapse*, 247 (Apr. 13, 2011).
[19] *See* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 6 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 9, 13 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, *Rating Definitions*, 4 (2018) (available through Fitch Ratings); *see also* UBS Financial Services Inc., *Municipal Brief: Puerto Rico Credit & Market Update*, 6 (Nov. 7, 2013).

The Independent Investigator's Final Investigative Report

In addition to assigning credit ratings, the CRAs released credit rating "outlooks."[20] Outlooks indicate how, if at all, a CRA expects an assigned credit rating to change within a specified time period.[21]   Depending upon the CRA, the outlook period may be anywhere from six to twenty-four months.[22]   The CRAs assign outlooks based on their analyses of fundamental business or economic circumstances that, in their view, have the potential to affect creditworthiness.   Outlooks are typically expressed as "positive," "negative," "stable," or "evolving."[23]

The CRAs also assign credit rating "watches" or, in the case of Moody's, credit rating "reviews" (collectively and for ease of reference, "watches").   Much like outlooks, the CRAs express their watches as "positive," "negative," or "evolving."[24]   Unlike outlooks, however, watches are probabilistic.[25]   They indicate an increased likelihood that the existing credit rating

---

[20] *See* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 19 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, *Rating Definitions*, 11 (2018) (available through Fitch Ratings).

[21] *See* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 19 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, *Rating Definitions*, 11-12 (2018) (available through Fitch Ratings).

[22] *See*, *e.g.*, Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *S&P Global Ratings Definitions* (Apr. 19, 2018) (available through Standard & Poor's Ratings Servs.) (". . . Ratings outlook assesses the potential direction of a long-term credit rating over the intermediate term (typically six months to two years) . . . In determining a rating outlook, consideration is given to any changes in economic and/or fundamental business conditions. An outlook is not necessarily a precursor of a rating change or future CreditWatch action."); Fitch Ratings, *Rating Definitions*, 11 (2018) (available through Fitch Ratings).

[23] *See* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 19 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, Rating Definitions, 11 (2018) (available through Fitch Ratings).

[24] Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 19 (2018) (available through Standard & Poor's Ratings Servs.); Fitch Ratings, *Rating Definitions*, 11 (2018) (available through Fitch Ratings).

[25]*See* Moody's Inv'rs Serv., *Rating Symbols and Definitions*, 26 (June 2018) (available through Moody's Inv'rs Serv.) ("Ratings are placed on review when a rating action may be warranted in the near term but further information or analysis is needed to reach a decision on the need for a rating change or the magnitude of the potential change."); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 19 (2018) (available through Standard & Poor's Ratings Servs.) ("Or, if events or circumstances occur that may affect a credit rating in the near term, usually within 90 days, S&P Global Ratings may place the rating on CreditWatch. Typically, an updated outlook or CreditWatch . . . includes a rationale for the potential change and the extent of the change, up or down, that may occur. However, updating a ratings outlook or placing a rating on CreditWatch does not mean a ratings change is inevitable."); Fitch Ratings, *Rating Definitions*,

will be modified in the near-term (generally, within a 60-90 day period) and express the direction of that potential modification.[26]  Most often, watches stem from specific events.[27]  The triggers may be anticipated, contingent, or things that have already occurred but for which the implications remain unclear.[28]  The watch period flags the existing rating pending the CRA's observation of developing circumstances and its analysis of related implications.[29]

### 2.  Certain Types of Municipal Bond Investors Use Credit Ratings to Inform Their Decision Making

Investors use various factors to determine whether to invest in a municipal bond offering, when to do so, and at what price.  Some factors carry more weight than others.  The analysis will vary from investor to investor depending upon specific goals, risk tolerance, and broader portfolios, but two such factors are the perceived safety of a municipal bond offering and its price.

The perceived safety of a bond investment largely derives from its degree of credit risk— that is, the likelihood that the Issuer will fail to return the bond-holder's principal, plus anticipated yield, on the expected timeline.[30]  As noted above, credit ratings are supposed to depict the

---

12 (2018) (available through Fitch Ratings) ("Rating Watches indicate that there is a heightened probability of a rating change and the likely direction of such a change . . .").

[26] See, e.g., Fitch Ratings, Rating Definitions, 12 (2018) (available through Fitch Ratings) ("Rating Watches indicate that there is a heightened probability of a rating change and the likely direction of such a change."); Standard & Poor's Ratings Servs., Guide to Credit Rating Essentials, 19 (2018), (available through Standard & Poor's Ratings Servs.) ("[I]f events or circumstances occur that may affect a credit rating in the near term, usually within 90 days, S&P Global Ratings may place the rating on CreditWatch."); Moody's Inv'rs Serv., Rating Symbols and Definitions, 26 (June 2018) (available through Moody's Inv'rs Serv.) ("For the majority of reviews, however, where the conclusion of the review is not dependent on an event whose timing Moody's cannot control, reviews are typically concluded within 30 to 90 days.").

[27] See, e.g., Fitch Ratings, Rating Definitions, 12 (2018) (available through Fitch Ratings) ("A Rating Watch is typically event-driven, and as such, it is generally resolved over a relatively short period."); see also Standard & Poor's Ratings Servs., General Criteria: Use of CreditWatch And Outlooks, 3 (Sept. 14, 2009) (available through Standard & Poor's Ratings Servs.); Moody's Inv'rs Serv., Rating Symbols and Definitions, 26 (June 2018) (available through Moody's Inv'rs Serv.).

[28] See, e.g., Fitch Ratings, Rating Definitions, 12 (2018) (available through Fitch Ratings) ("The event driving the Watch may be either anticipated or have already occurred, but in both cases, the exact rating implications remain undetermined."); see also Standard & Poor's Ratings Servs., General Criteria: Use of CreditWatch And Outlooks, 3 (2009) (available through Standard & Poor's Ratings Servs.); Moody's Inv'rs Serv., Rating Symbols and Definitions, 26 (June 2018) (available through Moody's Inv'rs Serv.).

[29] See Standard & Poor's Ratings Servs., General Criteria: Use of CreditWatch and Outlooks, 3 (Sept. 14, 2009) (available through Standard & Poor's Ratings Servs.); Moody's Inv'rs Serv., Rating Symbols and Definitions, 26 (June 2018) (available through Moody's Inv'rs Serv.).

[30] See U.S. Sec. & Exchange Comm'n, Investor Bulletin Municipal Bonds: Understanding Credit Risk (Dec. 26, 2012), https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-municipal-bonds-understanding ("A key concern is whether the [I]ssuer or other obligor will be able to pay interest and principal in full"); U.S. Sec. & Exchange Comm'n, Investor Bulletin: Municipal Bonds – Asset Allocation, Diversification and Risk, https://www.sec.gov/oiea/investor-alerts-and-

The Independent Investigator's Final Investigative Report

assigning CRA's opinion of that credit risk.  The better the credit rating, the safer the investment.[31]  In a basic sense, then, credit ratings are to municipal bond offerings what Fair Isaac Corporation credit scores ("FICO") are to consumer credit card applications.[32]

On the whole, there has traditionally been greater investor demand for investments that have a lower risk of default and receive better credit ratings.[33]  The natural demand for such investments causes them to be priced more expensively relative to riskier, lower-rated alternatives.[34]  They also have lower degrees of anticipated return.[35]  In essence, the discounted pricing of a lower-rated investment serves as a form of enticement that helps boost investor demand, while the higher anticipated return on that investment rewards the bond-holder for having assumed a greater risk of poor performance.[36]

---

bulletins/ib_munibondsrisk (last modified Feb. 2, 2018) (encouraging investors to consider various risk factors when making decisions to invest in municipal bonds, including credit/default risk, followed by call risk, inflation risk, interest rate risk and liquidity risk).

[31] See, e.g., U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 255 (Apr. 13, 2011) ("If the security has an extremely low likelihood of default, credit rating agencies grant it AAA status. For securities with a higher probability of default, they provide lower credit ratings."); U.S. Sec. & Exchange Comm'n, *Updated Investor Bulletin: The ABCs of Credit Ratings*, https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings (last modified Oct. 12, 2017) ("Credit ratings generally reflect a relative ranking of credit risk.  For example, an obligor or debt security with a high credit rating is assessed by the credit rating agency to have a lower likelihood of default (that is, not paying back its debt) than an [I]ssuer or debt security with a lower credit rating.").

[32] A FICO score is a type of proprietary borrower credit score that the Fair Isaac Corporation generates. Lenders use FICO scores, along with other details on borrowers' credit reports, to assess individual borrowers' credit risk and determine whether to extend credit.  See Fair Isaac Corporation, *FICO Score Overview*, http://www.fico.com/en/products/fico-score#overview (last visited July 14, 2018).

[33] See, e.g., U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Market*, 27 (Jan. 2003) ("Credit ratings can play a significant role in the investment decisions of investors, and the value investors place on such ratings is evident from, among other things, the impact ratings have on an [I]ssuer's ability to access capital."); *see also* Piper Jaffray & Co., *Credit Ratings Play an Important Role for Municipal Bond Investors*, 1 (last visited July 14, 2018) ("The lower the rating, the greater the indication of risk of a payment default").

[34] See, e.g., Am. Assoc. of Individual Inv'rs, *How Credit Ratings Affect Bond Valuations* (Nov. 2001), http://www.aaii.com/journal/article/how-credit-ratings-affect-bond-valuations.touch ("In fact, bond prices sometimes change if there is even a strong possibility of an upgrade or a downgrade. This is because anxious investors sell bonds whose credit quality is declining and buy bonds whose credit quality is improving."); Doron Kliger & Oded Sarig, *The Information Value of Bond Ratings*, 6 J. Fin. 2879, 2901 (2000) (stating that "bondholders . . . benefit from such reductions in risk assessments.").

[35] See Stoyan Bojinov, *Understanding Bond Ratings* (Aug 20, 2011), http://www.municipalbonds.com/education/read/67/understanding-bond-ratings/ ("Generally speaking, the higher the bond's rating, the lower the yield you are likely to receive.").

[36] See, e.g., Piper Jaffray & Co., *Credit Ratings Play an Important Role for Municipal Bond Investors*, 1 (last visited July 14, 2018) ("Because ratings are a reflection of credit risk, they have an important effect

The Independent Investigator's Final Investigative Report

As short-hand representations of risk, credit ratings often serve as the basis for guidelines regarding what types of assets certain kinds of investors will consider.[37]  For that purpose, the distinction between investment-grade ratings and non-investment-grade ratings is important.[38]  It is not uncommon for funds with traditional investment-grade preferences (including municipal mutual funds and pension funds), certain types of institutions, and other investors to be subject to investment guidelines that limit the amount of non-investment-grade assets that they may hold in their portfolios (or even forbid such investments entirely).[39]  In general, the market for non-investment-grade assets is comprised of very specific investors, including certain hedge-funds and others who prefer the cheaper costs, higher risks, and greater potential yields associated with distressed debt. [40]

In addition to motivating certain investor decisions, credit ratings often play a role in private financial contracts.[41]  This includes lines of credit, swap agreements, and warehouse liquidity arrangements.  Many contracts even specify that the downgrade of a credit rating below

---

on a bond's price and yield in the market. Securities with higher credit risk have higher yields to compensate investors for the additional financial risk.").

[37] *See*, *e.g*., Piper Jaffray & Co., *Credit Ratings Play an Important Role for Municipal Bond Investors*, 1 (last visited July 14, 2018) ("Rating trends of upgrades and downgrades for individual issuers and/or sectors in the municipal bond market can help investors identify improving and declining risk profiles over time. Municipal market participants rely heavily on these indicators of risk when they determine the relative value of municipal investments."); Piper Jaffray & Co., *Credit Ratings Play an Important Role for Municipal Bond Investors*, 2 (last visited July 14, 2018) ("Bond ratings play an important role in the municipal bond market by helping investors interpret the relative credit risk of their investment holdings and opportunities.").

[38] *See*, *e.g*., U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 247 (Apr. 13, 2011).

[39] *See*, *e.g*., U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 28 (Jan. 2003) ("Buy-side firms also may use credit ratings to comply with internal by-law restrictions or investment policies that require certain minimum credit ratings for investments, or to identify acceptable counterparties. Finally, buy-side firms use credit ratings to ensure compliance with various regulatory requirements . . . . To a large extent, sell-side firms use credit ratings in a fashion similar to buy-side firms. . . . [In addition], sell-side firms often act as dealers in markets that place significant importance on credit ratings. For example, in the over-the-counter derivatives market, broker-dealers tend to use credit ratings (when available) to determine acceptable counterparties, as well as collateral levels for outstanding credit exposures"; "Credit ratings are used for regulatory purposes around the world, primarily in the context of financial regulations. The regulatory use of credit ratings increases their importance to certain market participants.").

[40] To underscore this point, at least one CRA Analyst with whom we spoke conveyed that after the February 2014 adjustments to non-investment-grade, the investor base for certain Puerto Rico-Related Bonds switched from investors with traditional fixed-income preferences to non-traditional-investors like hedge funds.  This analyst interpreted that switch as reflecting a loss of market access.

[41] *See*, *e.g*., U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 29 (Jan. 2003) (acknowledging that "[t]he extensive use of credit ratings in private contracts also has enhanced the importance of credit ratings to the marketplace").

279

an identified threshold acts as a trigger for adverse consequences.[42]  Such consequences can restrict liquidity, impose additional liabilities, or otherwise compound existing hardships.[43]  Examples include the premature termination of an existing swap arrangement that triggers associated fees, a moratorium on further lending, or the acceleration of outstanding debt obligations.[44]

**B.      Available Evidence Indicates That Each CRA Adhered to Its Own Processes and Procedures**

Various CRA employees described to us their procedures and criteria for rating Puerto Rico-Related Bonds during the Relevant Period.  The procedures were similar from one CRA to the next.  Our witness interviews, key correspondence, the CRAs' rating reports and the criteria that we reviewed do not suggest that any CRA meaningfully departed from what we understand their processes and procedures to have been.  We summarize those procedures below.

**1.      The CRAs Largely Relied Upon Materials Supplied By or On Behalf of the Issuers, as Well as Publicly-Available Information**

Typically, each CRA assigned two CRA Analysts to each ratings analysis.[45]  The primary CRA Analyst served as the point of contact for the Issuer or its agent and was responsible for most of the analysis, while the secondary CRA Analyst supported the primary analyst as needed.

The CRAs needed sufficient information and documents in order to provide a credit rating.  The bulk of that information came from the Issuer or from an entity acting on the Issuer's behalf.  GDB appears to have been the primary conduit for such information, particularly with respect to the GO and COFINA Bonds.  Some CRA Analysts described GDB as having been less involved

---

[42] *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 29 (Jan. 2003) (explaining use of credit rating "triggers" in private financial contracts).

[43] *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 29-30 (Jan. 2003) (explaining how adverse trigger events impact issuers and why this more broadly affects the capital markets).

[44] *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Report on the Role and Function of Credit Rating Agencies in the Operation of the Securities Markets*, 30 (Jan. 2003) (explaining typical consequences of credit rating "triggers" in private financial contracts).

[45] *See* Moody's Inv'rs Serv., *Municipal Debt Issuers' Guide To Moody's Ratings and Ratings Process*, 9 (available through Moody's Inv'rs Serv.) (last visited on July 14, 2018) ("The rating process starts with the assignment of a lead analyst, who will be the primary contact with the [I]ssuer…. [a] backup analyst with knowledge of the sector may also be assigned.");  Fitch Ratings, *2016 Annual Certification to Form NRSRO*, *Exhibit 2. Procedures and Methodologies for Determining Credit Ratings*, 2 (Mar. 30, 2015) ("The manager leading the relevant product group will assign a primary and secondary analyst to lead the analysis, formulate a rating recommendation and, outside of the Structured Finance and select U.S. Public Finance groups, continue surveillance of the rating."); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 10 (2018) (available through Standard & Poor's Ratings Servs.) (noting that S&P selects a lead CRA Analyst and then the CRA Analyst has a team of specialists assigned to assist with developing the rating and evaluating information).

with the flow of information for other Puerto Rico-Related bond issuances like PREPA (although GDB was still viewed as its legitimate agent) and PRASA.  The CRA Analysts did, however, identify GDB as the typical source of liquidity information across Issuers.

To varying degrees, the underwriters for certain offerings also acted as intermediaries. Underwriters were described as particularly involved in the flow of information for the ERS and COFINA issuances, as well as PREPA's 2012 issuance.

The materials on which the CRAs relied varied depending on the issuance.  They included documents, as well as presentations and/or oral discussions with the Issuers or their intermediaries. The CRA Analysts described the following materials as commonly considered: (i) financial statements; (ii) financial projections; (iii) operating reports; (iv) capital improvement plans; (v) publicly available information (*e.g.*, historic budget performance metrics, information available on Issuer websites and information about relevant current events); (vi) deal documents and offering statements; (vii) indentures; (viii) relevant legislation; (ix) flipbooks and presentation materials received from or on behalf of the Issuer relating to, among other things, the Issuer's view of applicable ratings criteria; (x) cash flow and liquidity information; and (xi) written policies.

The CRAs received additional or more specific information for certain issuances.  For example, PRASA and PREPA allowed several CRA Analysts who rated their issuances to visit and observe certain plant sites.  And when analyzing COFINA Bonds, the CRAs received legal opinions regarding the degree of separateness between the bond funds and the portions of the Puerto Rico Constitution that could be interpreted to confer a Clawback Right ("Clawback Provision").  One Fitch analyst who rated the COFINA Bonds described these materials as sufficiently robust for assignment of a rating.  As we explain in more detail in Part X.C.4.(a) through Part X.C.4.(c) below, the CRAs considered the perceived legal separation between the COFINA Bond funds and the Puerto Rico government to be a core strength when analyzing COFINA-Related Bonds.

The CRA Analysts for PRASA in particular appear to have received a range of additional information.  One PRASA CRA Analyst recalled considering information about the breakdown of funding sources, the percentage of waste water treated, the number of customers, consent decree analyses, the master PRASA Trust Agreement with GDB, information about proposed changes to the trust indenture (received from bond counsel), amortization schedules, PRASA's master plan, information about capital improvement programs, and information regarding historic or outstanding debt.  Another PRASA CRA Analyst reported having met with PRASA's engineering consultants, reviewed engineering reports, and even having been invited to attend telephone conferences with bond counsel concerning the amendments to the PRASA Trust Agreement.  This CRA Analyst considered PRASA's management team to be responsive and transparent.[46]

---

[46] The PREPA CRA Analyst never asked to speak with PREPA's auditors or engineering consultant and did not know that PREPA had a trust agreement that, in part, established segregated accounts for certain funds.  It is thus not possible to compare PREPA's transparency to PRASA's transparency in those respects.

The Independent Investigator's Final Investigative Report

Ultimately, the primary CRA Analyst reviewed all of the available information to assess whether, in his or her view, it was sufficient to support the applicable ratings analysis. If the CRA Analyst had questions about the information, then he or she typically communicated with the Issuer or its agent.[47] CRA Analysts also recalled gathering publicly-available information and assessing the issuer-supplied information in light of that.

### 2.     The CRAs Evaluated the Puerto Rico-Related Bonds Pursuant to Internally-Developed Criteria and Stress-Modeling

The credit ratings largely resulted from each CRA's internally-developed criteria. The criteria provided the framework for analyzing the factors that, in the CRA's view, bore upon creditworthiness for the relevant bond. Those factors incorporated what witnesses referred to as qualitative and quantitative circumstances. Accordingly, some considerations were more objective, but others required subjective judgment. As described in more detail below, the CRAs appear to have assigned significant weight to GDB's role as a liquidity provider, especially with respect to the Public Utility-related issuances.

The CRAs each maintained several sets of criteria and determined which set(s) to apply for a given issuance. Neither the criteria nor the methodology pursuant to which they were considered were standardized from one CRA to the next. The CRAs generally determined which set of criteria to apply based on considerations like the type of Issuer, the nature and strength of its ties to the Puerto Rico government, the nature of its anticipated revenue stream, and whether the bonds were backed by the full faith and credit of Puerto Rico. At least one CRA Analyst told us that the assessment of which factors within the criteria are most important for a given analysis is essentially a matter of discretion.

Each CRA representative with whom we spoke conveyed that their CRA's ratings criteria were publicly available. Our review of the evidence supports that conclusion. The CRA Analysts further stated that they did not consider—and, in fact, avoided learning about—the rating determinations of any other CRA when performing their own analyses. The CRA Analysts described this as an effort to insulate their results from bias. The limited exception to this rule appears to have been when another CRA's downgrade of a particular bond could result in reduced liquidity or market access, at which point the other CRA's rating action becomes credit relevant.

The CRAs also applied proprietary models to the available information in order to assess the ability of a particular Issuer to perform its bond obligations while subject to varying degrees of economic stress—for example, hypothetical changes in operating conditions or macro-

---

[47] *See*, *e.g.*, Fitch Ratings, *The Ratings Process under Fitch Criteria*, 1 (Mar. 31, 2016) (available through Fitch Ratings); Standard & Poor's Ratings Servs., *Guide to Credit Rating Essentials*, 10 (2018) (available through Standard & Poor's Ratings Servs.); Moody's Inv'rs Serv., *Municipal Debt Issuers' Guide To Moody's Ratings and Ratings Process*, 9 (available through Moody's Inv'rs Serv.) (last visited July 14, 2018).

economic factors.[48]  The higher the credit rating of the Issuer, the higher the degree of stress the CRAs believed the Issuer could withstand.[49]

### 3. The CRAs Assigned Their Ratings Following a Committee Vote

If, in an individual CRA Analyst's judgment, the information available to the CRA Analyst was sufficient, then he or she would prepare a ratings assessment and make a presentation to an assembly of colleagues ("Ratings Committee").  At that meeting, the primary CRA Analyst would walk through the rating analysis, including the results of any stress-modeling, and identify the proposed assigned rating.  The Ratings Committee members could ask questions of the primary CRA Analyst and engage in a discussion about the ratings rationale. The Ratings Committee would then decide on an assigned rating, as long as the members agreed that the information presented was well-rounded enough to support it.

The CRAs typically conveyed their assigned ratings to the Issuers or to GDB in the form of a draft rating opinion.  The rationale was to permit the Issuer to correct any factual errors and flag any confidentiality issues.  The CRAs also allowed the Issuers to appeal ratings determinations based upon "new" or "material" information that the CRAs had not previously considered. Appeals generally resulted in a designated committee of CRA employees considering the additional information and then determining whether it altered the original calculus.

Various CRA Analysts recalled several instances in which Puerto Rico, GDB or specific Issuers disagreed with the CRAs' ratings determinations, as well as occasions on which they appealed certain decisions.  This includes some of the adjustments toward, or below, junk status. The CRA Analysts we asked did not recall any instance during the Relevant Period in which their CRAs changed a rating in favor of an Issuer following such an appeal.

### 4. The CRAs Separated Their Business Departments From Their Analytical Functions

The Issuers or their agents generally solicited—and paid for—their credit ratings. CRA Analysts from each of the CRAs stressed that their business units handled all such interactions and related fee arrangements.  When asked for details regarding the business relationships or fee arrangements, the CRA Analysts were unable to provide additional information.

The CRA Analysts further conveyed that their CRAs separated the business departments entirely from the credit analysis functions.  Accordingly, the CRA Analysts did not manage any aspect of the CRAs' relationships with the Issuers, except for the collection of information needed to support the credit analysis.

---

[48] *See* U.S. Sec. & Exchange Comm'n, *Report to Congress: Credit Rating Standardization Study*, 25-26 (Sept. 2012) (summarizing stress testing used by S&P and Moody's).

[49] *See* U.S. Sec. & Exchange Comm'n, *Report to Congress: Credit Rating Standardization Study*, 25-26 (Sept. 2012) (summarizing stress testing used by S&P and Moody's).

The Independent Investigator's Final Investigative Report

None of the witness interviews or documentary evidence suggests that these safeguards were disregarded.

## C.   The Evidence Indicates That the CRAs' Rating Analyses for Puerto Rico-Related Bonds Tracked Their Respective Criteria During the Relevant Period

In large part, our investigation focused on the credit ratings assigned to the following bond groups, rather than the stand-alone credit rating for any Puerto Rico-Related Entity: (i) GO Bonds; (ii) PREPA Bonds; (iii) PRASA Bonds; (iv) COFINA Bonds; and (v) ERS Bonds. As we detail below:

- Each CRA assigned investment-grade ratings to Puerto Rico-Related Bonds as of 2006, as of the CRA's inaugural rating for the issuance (for issuances that post-dated 2006), or as of the earliest ratings report we analyzed;

- In general, the ratings for most of the Puerto Rico-Related Bonds declined over time, but maintained investment-grade status until Moody's and S&P dropped their ratings for the senior-lien series of PRASA Bonds to non-investment-grade in December 2012 and March 2013, respectively;

- All three CRAs subsequently dropped their ratings for the GO Bonds to non-investment-grade in early February 2014;[50]

- The CRAs generally rated the COFINA Bonds higher than the other four bond groups discussed in this Part of the Report. The CRAs also maintained their investment-grade ratings for the COFINA Bonds until as late as July 2014 (Fitch and Moody's) or February 2015 (S&P);[51] and

- S&P maintained its investment-grade rating for the PREPA Bonds until late June of 2014.

---

[50] There was an upgrade of many Puerto Rico-Related Bond ratings in 2010-2011. Available evidence reflects that this resulted from a broader recalibration of rating scales. We did not uncover any evidence that it was based on a more favorable credit analysis or improved performance for a given issuance. *See*, *e.g.*, Moody's Inv'rs Serv., *Moody's US Municipal Ratings to Move to Global Scale Beginning April* (May 16, 2010) (available through Moody's Inv'rs Serv.) (detailing the global rating recalibration conducted by Moody's in early 2010); Press Release, Government Development Bank for Puerto Rico, *Moody's Reaffirms A3 Rating For Puerto Rico's Credit*, http://www.gdb.pr.gov/documents/MoodysreaffirmsA3ratingforPuertoRicoscredit.pdf (Aug. 10, 2010); Fitch Ratings, *Recalibration of U.S. Public Finance Ratings Special Report* (Mar. 25, 2010) (available through Fitch Ratings) (announcing Fitch Ratings' recalibration of its US public finance ratings).

[51] As noted below in Part X.C.4.(a) through Part X.C.4.(c), the senior-lien COFINA Bond series also enjoyed a merit-based upgrade in 2009, as a result of the strengthened bond resolution that positively impacted certain factors that bore upon the relevant ratings criteria.

The Independent Investigator's Final Investigative Report

We summarize by Issuer below the principal rating methodologies that we understand the CRAs applied when evaluating the five primary Puerto Rico-Related Bond groups during the Relevant Period, together with some of the CRAs' significant rating actions and the types of factors that they cited in support of those actions.

As demonstrated below, there is parity between the CRAs' respective criteria and the factors that they cited for significant ratings-related decisions during the Relevant Period. We therefore cannot conclude that any CRA Analyst or CRA misapplied its criteria when evaluating the offerings.

### 1.   GO Bonds

Each of the CRAs rated the GO Bonds as investment-grade during the Relevant Period, until the CRAs downgraded the GO Bonds within a week of each other in February 2014. Figure X.B depicts the CRAs' rating changes for the GO Bonds graphically:

**Figure X.B: Puerto Rico General Obligation (GO) Bond Ratings**



We discuss the individual CRAs' analyses in more detail below. Based on available evidence, the CRAs appear to have considered the potential for liquidity support from GDB, Puerto Rico's broader fiscal health (*e.g.*, deficits, revenue overestimation and deficit financing), its degree of market access, and macro-economic factors to have been key components of evaluating GO Bonds during the Relevant Period.

The Independent Investigator's Final Investigative Report

### (a)      Notable Fitch Actions

Fitch rated GO Bonds at 'BBB+; Outlook Stable' as of January 19, 2011.[52]  Fitch revised its ratings and GO-related credit outlooks several times thereafter before downgrading the GO Bonds to non-investment-grade on February 11, 2014.[53]

For GO Bonds, Fitch applied its Tax-Supported Rating Criteria and its US State Government Tax-Supported Rating Criteria.[54]  These methodologies were materially similar and focused on four primary factors: (i) debt and other long-term liabilities; (ii) Puerto Rico's economy; (iii) finances; and (iv) management and administration:[55]

- The "debt" factor assessed debt ratios and trends, future capital and debt needs, the debt structure, pension funding, indirect risks and contingent liabilities;

- The "economy" factor considered major economic drivers, employment trends, indenture requirements and relevant statutes;

- The "finances" factor centered on revenue, expenditures, operating margins, fund balance and reserve levels, and liquidity; and

- The "management and administration" factor analyzed institutional policies, budgeting practices, financial reporting and accounting, and revenue and spending limitations.  It also considered the labor, political, and taxpayer environments.

Fitch cited the following factors, among other things, in connection with some of its major GO Bond-related actions during the Relevant Period:  macro-economic factors; the degree of liquidity support from GDB; Puerto Rico's historically weak financial operations, budget deficits, and the degree of operating imbalances; Puerto Rico's overestimation of revenues; its unfunded overspending; the existence of high debt levels that increased as a result of deficit financing; low levels of pension funding; the potential fiscal stabilization plan; revenue performance (or underperformance); whether Puerto Rico's financial management had made progress toward goals relating to key issues (like budgetary deficits and revenue overestimation); the strength of the GO

---

[52] Press Release, Fitch Ratings, *Fitch Assigns 'BBB+' Rating to Outstanding Puerto Rico GO Bonds; Outlook Stable* (Jan. 19, 2011) (available through Fitch Ratings).  This is the earliest Fitch ratings report available to us for the GO Bonds.

[53] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO and Related Debt Ratings to 'BB'; Outlook Negative* (Feb. 11, 2014) (available through Fitch Ratings).

[54] *See, e.g.*, Press Release, Fitch Ratings, *Fitch Assigns 'BBB+' Rating to Outstanding Puerto Rico GO Bonds; Outlook Stable*, 3 (Jan. 19, 2011) (available through Fitch Ratings) (citing the Tax-Supported Rating Criteria and the U.S. State Government Tax-Supported Rating Criteria).

[55] *See* Fitch Ratings, *Tax-Supported Rating Criteria*, 1 (Sept. 24, 2009) (available through Fitch Ratings); Fitch Ratings, *U.S. State Government Tax-Supported Rating Criteria*, 1 (Aug. 14, 2012) (available through Fitch Ratings) (updating the U.S. State Government Tax-Supported Rating Criteria dated April 25, 2008).

The Independent Investigator's Final Investigative Report

Bond-related pledge; and Puerto Rico's reduced financial flexibility in light of deterioration in capital market access.

### (b)   Notable S&P Actions

S&P rated GO Bonds at 'BBB-; Outlook Stable' as of May 22, 2007.[56]  It upgraded the GO Bonds on March 7, 2011,[57] then downgraded them to non-investment-grade on February 4, 2014.[58]

S&P evaluated the GO Bonds using its State Ratings Methodology.[59]  S&P used this methodology for all US state governments and territories.[60]  The methodology considered five primary criteria: (i) government framework; (ii) financial management; (iii) economy; (iv) budget performance; and (v) debt and liability profile.[61]  The methodology also provided for several overriding factors that could modify the rating that would otherwise have resulted.[62]  They included system support from the federal government, capital market access, and willingness to support debt.[63]  In appropriate circumstances, high levels of anticipated debt, weak financial management, and a high level of risk regarding variable rate debt or derivatives could negatively impact the rating.[64]

---

[56] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BBB-' Due To Structural Imbalance* (May 22, 2007) (available through Standard & Poor's Ratings Servs.).  This is the earliest S&P rating report made available to us for the GO Bonds.

[57] *See* Press Release, Gov't Dev. Bank for P.R., *Puerto Rico gets good marks from S&P for fiscal and economic progress*, 1 (Mar. 7, 2011) ("…credit rating agency Standard & Poor's just upped its rating for Puerto Rico's general obligation debt improving it from BBB- to BBB…"); *see also* Standard & Poor's Ratings Servs., *Puerto Rico*; *Puerto Rico GO Rating Raised TO 'BBB' From 'BBB-' On Improved Revenue Performance* (Mar. 7, 2011) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *Puerto Rico*; *Appropriations*; *General Obligations* (Mar. 8, 2011) (available through Standard & Poor's Ratings Servs.).

[58] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'*; *Remains On Watch Negative* (May 22, 2007) (available through Standard & Poor's Ratings Servs.).

[59] *See*, *e.g.*, Standard & Poor's Ratings Servs., *Commonwealth of Puerto Rico's GO 2012 A&B Public Improvement Bonds Rated 'BBB'*; *Existing Ratings Affirmed*, 3 (Mar. 8, 2012) (available through Standard & Poor's Ratings Servs.) (citing the State Ratings Methodology dated January 3, 2011); *see also* Standard & Poor's Ratings Servs., *State Ratings Methodology* (Jan. 3, 2011) (available through Standard & Poor's Ratings Service).

[60] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology*, 3 (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.).

[61] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology*, 3-5 (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.).

[62] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology*, 5-7 (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.).

[63] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology*, 6-7 (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.).

[64] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology*, 6 (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.).

The Independent Investigator's Final Investigative Report

The factors that S&P cited for notable GO Bond-related actions during the Relevant Period included, among others: the commonwealth's full faith and credit pledge; legal authority to adjust revenue and expenditures; government policy and related measures regarding economic and fiscal issues (*e.g.*, deficit reduction); the degree of liquidity support from GDB; GDB's degree of financial and management influence; the size and trajectory of Puerto Rico's budget gaps and structural balance challenges; high debt levels (including unfunded ERS liabilities); and macroeconomic factors (including recession and strong ties to the US economy).

### (c)    Notable Moody's Actions

Moody's rated GO Bonds at 'A3; Outlook Negative' as of February 4, 2011.[65]  It downgraded the GO Bonds to non-investment-grade on February 7, 2014.[66]

Moody's applied its State Rating Methodology to the GO Bonds.[67]  That methodology focused on four overarching factors in varying proportions: (i) economy; (ii) governance; (iii) finances; and (iv) debt:[68]

- The "economy" factor considered per-capita income in comparison to that of the US, as well as employment and economic diversity;[69]

- The "governance" factor focused on budget development and management practices, as well as financial best practices, flexibility and constitutional constraints (*e.g.*, caps on revenue raising);[70]

- The "financial strength" factor analyzed revenue diversity, volatility, and growth using

---

[65] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A3 Rating to Commonwealth of Puerto Rico Public Improvement Refunding Bonds*, *Series 2011A* (Feb. 4, 2011) (available through Moody's Inv'rs Serv.).  This is the earliest Moody's report made available to us for the GO Bonds.

[66] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA Bonds to Baa1, Baa2; outlook negative* (Feb. 7, 2014) (available through Moody's Inv'rs Serv.).

[67] *See*, *e.g.*, Moody's Inv'rs Serv., *Rating Action: Moody's Assigns Baa1 Rating to Up to $3.1 Billion Commonwealth of Puerto Rico Public Improvement Refunding Bonds*, *Series 2012 A and B* (*General Obligation Bonds*, 3 (Mar. 6, 2012) (referencing the use of the Moody's State Rating Methodology, first published in November 2004 and subsequently replaced by the version published and dated April 17, 2013, in the formulation of the ratings determination).

[68] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 5-13 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[69] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 5-6 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[70] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 7-8 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

the preceding ten years of revenue collections.  It also considered fund balances, the health of the "Rainy Day Fund,"[71] cash management, and liquidity;[72] and

- The "debt" factor focused on the percentage of revenues comprised of debt, as well as unfunded pension liabilities.[73]

Each of these primary factors had sub-factors.[74]  Examples of those sub-factors include a narrow economy that carries little expected growth; a lack of congressional representation or the existence of political polarization that impacts budgeting; a lack of market access; and extremely high debt ratios.[75]

Moody's cited the following factors, among other things, in connection with its notable GO Bond-related actions during the Relevant Period:  Puerto Rico's economic recession; its high unemployment rates; its poverty levels; its high and growing debt levels; its chronic budget deficits; multi-year trends regarding large operating deficits in the General Fund and related deficit financing; reduced liquidity and increased refinancing risk; Puerto Rico's increased reliance on external short-term debt; its constrained market access; the large size of Puerto Rico's government relative to its economy; high unfunded pension ratios; the Puerto Rico government's actions (*e.g.*, steps taken or not taken to increase revenue, control spending, reform the retirement system, reduce debt issuances and promote economic development); and Puerto Rico's political and economic links to the US.

## 2.   **PREPA Bonds**

Fitch and Moody's each downgraded the PREPA Bonds to below investment-grade in early February 2014, in close proximity to the key downgrades of the GO Bonds.  In contrast, S&P elected to maintain an investment-grade rating for PREPA until June 2014.  Figure X.C depicts the CRAs' notable ratings actions for PREPA Bonds graphically:

---

[71] Most US states maintain "Rainy Day Funds."  In general, they consist of the subset of reserve funds that would be available outside the General Fund.  Moody's considers the Rainy Day Fund when assessing whether a state or territory has available fund balances that can be used to cover unforeseen events.  *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 10-11 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[72] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 12 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[73] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 13 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[74] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 15 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[75] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology*, 15 (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

The Independent Investigator's Final Investigative Report

**Figure X.C: Puerto Rico Electric Power Authority (PREPA) Bond Ratings**



We discuss each CRA's analysis of PREPA Bonds in more detail below.  Based on available evidence, the CRAs appear to have considered the potential for liquidity support from GDB, PREPA's reluctance to raise its consumer base rates, business- and operations-related risk factors (including capital improvement plans), and macro-economic factors to have been key components of evaluating PREPA Bonds during the Relevant Period.

      (a)     <u>Notable Fitch Actions</u>

Fitch rated PREPA at 'A-; Outlook Stable' on March 30, 2007. [76]  Fitch revised its ratings and credit outlooks several times thereafter before downgrading PREPA Bonds to non-investment-grade on February 18, 2014. [77]

Fitch applied three sets of criteria to the PREPA Bonds during the Relevant Period: (i) Revenue-Supported Rating Criteria; (ii) Public Power Rating Guidelines; and (iii) US Public

---

[76] Press Release, Fitch Ratings, *Fitch Assigns 'A-' to Puerto Rico Electric Power Auth $2B Series TT & UU* (Mar. 30, 2007) (available through Fitch Ratings).  This is the earliest Fitch Ratings report made available to us for the PREPA Bonds.

[77] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico Electric Power Auth's Revs to 'BB+'; Outlook to Negative* (Feb. 18, 2014) (available through Fitch Ratings).

The Independent Investigator's Final Investigative Report

Power Rating Criteria.[78]  The latter two methodologies were substantially similar.  We provide a brief overview below:

- *Revenue-Supported Rating Criteria*.  This methodology considered four primary factors: (i) governance and management; (ii) operational profile; (iii) debt profile; and (iv) financial profile.[79]  The first of these factors considered the effectiveness of the governing body, senior management's history of adhering to policies and meeting stated goals, the Issuer's operational profile, its business strategy, its operational effectiveness, its environmental profile, the current and expected regulatory climate, the Issuer's adherence to regulatory expectations, and its capital planning.[80]  The debt profile analysis assessed general creditworthiness, including the purpose, magnitude, structure, and legal provisions involving the debt.  The analysis further incorporated the Issuer's performance metrics and peer comparisons;[81] and

- *Public Power Rating Guidelines/US Public Power Rating Criteria*. These methodologies were similar and primarily focused on five areas of inquiry: (i) management, government and business strategy; (ii) service area; (iii) asset operations; (iv) cost structure; and (v) financial performance and legal considerations.[82] The management, governance and business strategy factor analyzed the quality of senior management, the utility's governing body, management's ability to formulate and execute a strategic plan (including past performance with respect to attaining stated goals), its ability to understand the system risk profile, and the Issuer's capital improvement needs.[83]  The service area analysis considered the quality of the Issuer's revenue sources, the utility's customer mix, its growth factors, and income and

---

[78] *See*, *e.g.*, Fitch Ratings, *Revenue-Supported Rating Criteria – Effective June 20, 2011 to June 12, 2012* (June 20, 2011) (available through Fitch Ratings);  Fitch Ratings, *Public Power Rating Guidelines* (June 11, 2009) (available through Fitch Ratings); Fitch Ratings, *U.S. Public Power Rating Criteria – Effective Mar. 28, 2011 to Jan. 11, 2012* (Mar. 28, 2011) (available through Fitch Ratings).

[79] *See* Fitch Ratings, *Revenue-Supported Ratings Criteria – Effective June 20, 2011 to June 12, 2012*, 1 (June 20, 2011) (available through Fitch Ratings).

[80] *See* Fitch Ratings, *Revenue-Supported Ratings Criteria – Effective June 20, 2011 to June 12, 2012*, 1-3 (June 20, 2011) (available through Fitch Ratings).

[81] *See* Fitch Ratings, *Revenue-Supported Ratings Criteria – Effective June 20, 2011 to June 12, 2012*, 6-7 (June 20, 2011) (available through Fitch Ratings) (discussing how Fitch's analysis also considers how a borrower's financial profile matches up with the profiles of other entities with similar market, operational, financial and credit characteristics).

[82] *See* Fitch Ratings, *Public Power Rating Guidelines*, 1 (June 11, 2009) (available through Fitch Ratings); *see also* Fitch Ratings, *U.S. Public Power Rating Criteria – Effective Mar. 28, 2011 to Jan. 11, 2012*, 1 (Mar. 28, 2011) (available through Fitch Ratings).

[83] *See* Fitch Ratings, *Public Power Rating Guidelines*, 1 (June 11, 2009) (available through Fitch Ratings) (discussing the risk profile for an Issuer); *see also* Fitch Ratings, *U.S. Public Power Rating Criteria – Effective Mar. 28, 2011 to Jan. 11, 2012*, 1-2 (Mar. 28, 2011) (available through Fitch Ratings).

unemployment levels.[84]   The asset operations assessment evaluated the utility's generation facilities as well as their operations, fuel source mix, fuel supply, performance, environmental standards compliance, and new power resources (or the development of them).[85]

Fitch cited the following factors, among others, in connection with notable rating determinations for PREPA Bonds during the Relevant Period:  PREPA's governance structure; its role as Puerto Rico's only electricity provider; the characteristics of its customer base; its high dependence on oil-fired generation; its fuel adjustment surcharges; its strategy for diversifying power supplies and upgrading systems (*e.g.*, the Via Verde project); PREPA's mounting accounts receivable from the Puerto Rico government; its large capital improvement plan (*e.g.*, the amount of capital investment required); the degree of liquidity support from GDB and access to lines of credit from other banks; its above-average debt-service and increasing debt-service schedule; management's efforts to improve PREPA's financial performance; Puerto Rico's broader recession; increased fuel costs; declining electricity usage; and PREPA's persistent reluctance to increase its consumer base rates.

**(b)**     **Notable S&P Actions**

S&P assigned a rating of BBB+ to the PREPA Bonds, with a "stable" outlook, as of April 9, 2007,[86] until June 21, 2013, at which time S&P downgraded PREPA Bonds to BBB.[87]  S&P further downgraded them to non-investment-grade on June 27, 2014.[88]  This was more than four months after Fitch and Moody's did so.

---

[84] *See*, *e.g.*, Fitch Ratings, *Public Power Rating Guidelines*, 2-3 (June 11, 2009) (available through Fitch Ratings) (mentioning growth factors, income levels, and customer composition); *see also* Fitch Ratings, *U.S. Public Power Rating Criteria – Effective Mar. 28*, *2011 to Jan. 11*, *2012*, 10 (Mar. 28, 2011) (available through Fitch Ratings) (stating "customer composition and concentration, population trends, and economic base, give an indication of a constituency's load (stable or not) and ability to pay electric bills . . . ").

[85] *See* Fitch Ratings, *Public Power Rating Guidelines*, 2-3 (June 11, 2009) (available through Fitch Ratings); *see also* Fitch Ratings, *U.S. Public Power Rating Criteria – Effective Mar. 28*, *2011 to Jan. 11*, *2012*, 3 (Mar. 28, 2011).

[86] Standard & Poor's Ratings Servs., *Research: Puerto Rico Electric Power Authority*; *Retail Electric* (Apr. 9, 2007) (available through Standard & Poor's Ratings Servs.).  This is the earliest (incomplete) report made available to us for S&P's ratings of PREPA Bonds.

[87] Standard & Poor's Ratings Servs., *Puerto Rico Electric Power Authority's Bonds Downgraded To 'BBB' On Week Economy And Continuing Challenges* (June 21, 2013) (available through Standard & Poor's Ratings Servs.).

[88] Standard & Poor's Ratings Servs., *Puerto Rico Electric Power Authority Revenue Bonds Downgraded To 'BB' On Legislative Passage Of Debt Law* (June 27, 2014) (available through Standard & Poor's Ratings Servs.).

The Independent Investigator's Final Investigative Report

In general, S&P rated PREPA Bonds using its Electric Utility Ratings Criteria.[89] This ratings methodology assessed variables like management and operations (including efficiency, reliability, power and fuel mix, capacity/demand and capital needs), as well as the utility's competitive position in the market, its customer base, the demographics of the service area, the impact of applicable regulations, and the utility's compliance with such regulations.[90] A traditional financial analysis also factored into the assessment, as did rate covenants, the flow of funds and the existence of reserves.[91]

The factors that S&P cited when taking notable actions relating to the PREPA Bonds during the Relevant Period included, among others, PREPA's nature as an isolated electric system; its large capital needs (*e.g.*, for plant conversion and system upgrades); fuel oil dependency; PREPA's ability to pass through fuel costs; PREPA's high rates; its unchanged base rates; its debt service coverage; PREPA's liquidity issues (including increasing government accounts receivable); the efforts of PREPA's management (*e.g.*, extent to which management tried to lower costs of electricity, reduce operating costs, reduce energy theft, increase collections, and strengthen transmissions); PREPA's market access challenges; the degree of liquidity support from GDB; the persistent weakness of Puerto Rico's economy; and the profile of GO Bonds, as well as the stand-alone profile of GDB.

Importantly, S&P stressed in its reports that it viewed PREPA's credit profile as "strongly linked" to the island economy it serves (as reflected in the GO Bond ratings).[92] In a July 31, 2009 report, S&P further recognized that the administration of then-Governor Fortuño had prioritized fiscal stability and noted that, as part of the fiscal reconstruction plan, GDB would guarantee bank loans for debts that Puerto Rico and the Puerto Rico-Related Entities owed to PREPA.[93]

---

[89] *See*, *e.g.*, Standard & Poor's Ratings Servs., *Puerto Rico Electric Power Authority*; *Retail Electric*, 4 (Apr. 9, 2007) (available through Standard & Poor's Ratings Servs.); *see also* Standard & Poor's Ratings Servs., *USPF Criteria: Electric & Gas Utility Ratings*, (June 15, 2007) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *USPF Criteria: Electric & Gas Utility Ratings*, (Dec. 16, 2014) (available through Standard & Poor's Ratings Servs.).

[90] *See* Standard & Poor's Ratings Servs., *USPF Criteria: Electric & Gas Utility Ratings*, 1, 5-6 (June 15, 2007) (available through Standard & Poor's Ratings Servs.).

[91] Certain CRAs applied different or additional criteria once the ratings dropped below investment-grade. We do not canvass those criteria in this Report.

[92] *See*, *e.g.*, Standard & Poor's Ratings Servs., *Summary: Puerto Rico Electric Power Authority*; *Retail Electric*, 2 (July 31, 2009) (available through Standard & Poor's Ratings Servs.) ("In our opinion, PREPA's credit profile is strongly linked to the island economy it serves (Puerto Rico's general obligation bond rating is BBB-/Stable), although the utility has maintained fairly stable financial metrics in the island's past economic cycles."); *see also* Standard & Poor's Ratings Servs., *Summary: Puerto Rico Electric Power Authority*; *Retail Electric*, 3 (Dec. 20, 2010) (available through Standard & Poor's Ratings Servs.).

[93] Standard & Poor's Ratings Servs., *Summary: Puerto Rico Electric Power Authority*; *Retail Electric*, 3 (July 31, 2009) (available through Standard & Poor's Ratings Servs.).

### (c)     **Notable Moody's Actions**

Moody's rated PREPA Bonds at 'A3; Outlook Stable' as of March 11, 2010. [94]   It downgraded the PREPA Bonds to non-investment-grade on February 7, 2014.[95]

Prior to 2011, Moody's applied its US Public Power Electric Utilities with Generation Ownership Exposure Criteria to the PREPA Bonds.[96]   After 2011, Moody's began using its US Public Power Utilities Methodology.   The two methodologies were substantially similar from a substantive standpoint.   Pursuant to that analysis, Moody's considered five principal factors and assigned a relative weight to each:   (i) cost recovery framework within service territory; (ii) willingness and ability to recover costs with sound financial metrics; (iii) generations and power procurement risk exposure; (iv) competitiveness in the market; and (v) financial strength and liquidity:[97]

- The "cost recovery framework" factor considered the strength of the utility's monopoly control over a service area, whether it could raise rates without restriction, the strength of the utility's customer base, and the strength of the economy in its service area;

- The "willingness and ability to recover costs" factor considered how long the utility took to implement new rates and collect any additional revenue that resulted, the utility's relationship with and support received from the Puerto Rico government, and general fund transfer policies;

- The "generations and power procurement risk factor" evaluated power supply costs, generation sources and strategy, and system reliability;

- The "competitiveness" factor looked at how the utility compares to others in its region; and

- The "financial strength and liquidity" factor analyzed various debt ratios that Moody's specified.

---

[94] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A3 Rating to Puerto Rico Electric Power Authority*; *Outlook Stable* (Mar. 11, 2010) (available through Moody's Inv'rs Serv.).   This is the earliest Moody's report made available to us for the PREPA Bonds.

[95] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades PREPA's ratings to Ba2 from Baa3*; *outlook negative* (Feb. 7, 2014) (available through Moody's Inv'rs Serv.).

[96] *See*, *e.g.*, Moody's Inv'rs Serv., *Rating Action: Moody's Assigns A3 Rating to Puerto Rico Electric Power Authority*; *Outlook Stable*, 3 (Mar. 11, 2010); *see also* Moody's Inv'rs Serv., *US Public Power Electric Utilities with Generation Ownership Exposure* (Apr. 2008) (available through Moody's Inv'rs Serv.).

[97] *See* Moody's Inv'rs Serv., *US Public Power Electric Utilities with Generation Ownership Exposure*, 5 (Nov. 9, 2011) (available through Moody's Inv'rs Serv.).

The Independent Investigator's Final Investigative Report

Moody's also considered certain other factors, such as operational considerations, debt structure and reserves, as well as revenue stability and diversity.[98]  When merited, these factors could override the credit rating that would otherwise have resulted from the principal criteria.[99]

For notable PREPA Bond-related actions during the Relevant Period, Moody's cited the following factors, among others:  PRASA's role as the sole provider of an essential service with full rate-setting control (and automatic fuel cost pass-through); PREPA's management team and its subsequent turnover; Puerto Rico's deteriorating economic and demographic situations (as well as the impact of those conditions on PREPA's revenue); fuel oil dependency and rising fuel costs; the existence of a sound debt covenant; debt leverage above median levels; accounts receivable and collections issues (particularly with respect to amounts owed by the Puerto Rico government); PREPA's independence from the finances of Puerto Rico; PREPA's liquidity support from GDB; its debt service coverage; the strategy of PREPA's management to diversify power resources and to improve reliability; project-related risks and uncertainty; PREPA's limited internal liquidity and its augmentation via external lines of credit; PREPA's basis swap (which added additional risk to its debt structure); the trajectory of GO Bond credit ratings and GDB's stand-alone credit profile ratings; and PREPA's sizeable capital improvement program.

### 3.    **PRASA Bonds**

Unlike the PREPA Bonds, a series of PRASA Bonds (*i.e.*, the Puerto Rico-guaranteed series) was backed by the full faith and credit of Puerto Rico.  PRASA also drew a greater amount of liquidity support from GDB.  Accordingly, the CRAs tended to rate PRASA Bonds using methodologies that accounted for PRASA's stronger links to Puerto Rico and greater likelihood of financial support.  We depict the key rating changes for the PRASA Puerto Rico-guaranteed series and the PRASA senior-lien series graphically in Figure X.D.

---

[98] *See* Moody's Inv'rs Serv., *US Public Power Electric Utilities with Generation Ownership Exposure*, 7-10 (Nov. 9, 2011) (available through Moody's Inv'rs Serv.).

[99] *See* Moody's Inv'rs Serv., *US Public Power Electric Utilities with Generation Ownership Exposure*, 19 (Nov. 28, 2017) (available through Moody's Inv'rs Serv.) ("The scorecard in this rating methodology represents a decision to favor simplicity that enhances transparency and to avoid greater complexity that would enable the scorecard to map more closely to actual ratings.  Accordingly, the eight rating factors in the scorecard do not constitute an exhaustive treatment of all of the considerations that are important for ratings of entities in this sector.").

The Independent Investigator's Final Investigative Report

### Figure X.D: Puerto Rico Aqueducts and Sewers Authority (PRASA) Bond Ratings



As Figure X.D reflects, Fitch downgraded the Puerto Rico-guaranteed and senior-lien PRASA Bonds to non-investment-grade in February 2014.  Moody's and S&P downgraded the senior-lien series to non-investment-grade in December 2012 and March 2013, respectively, but waited until February 2014 to do so for the Puerto Rico-guaranteed series.

We discuss each CRA's analysis of PRASA Bonds in more detail below.  Based on available evidence, the CRAs appear to have considered PRASA's very close relationship to Puerto Rico, the potential for liquidity support from GDB, PRASA's rate history and its autonomy to raise consumer base rates without legislative approval, business-related risk factors (like capital improvement needs), and macro-economic factors to have been key components of evaluating PRASA Bonds during the Relevant Period.

### (a) Notable Fitch Actions

Fitch rated PRASA senior-lien bonds and Puerto Rico-guaranteed bonds both at 'BBB; Outlook Stable' as of January 16, 2008.[100]  Fitch downgraded the PRASA Puerto Rico-guaranteed

---

[100] Press Release, Fitch Ratings, *Fitch Rates Puerto Rico Aqueduct & Sewer Authority $1.5B Revenue Bonds 'BBB-'; Outlook Stable* (Jan. 16, 2008) (available through Fitch Ratings).  This is the earliest Fitch Ratings report made available to us for the PRASA Bonds.

296

bonds to non-investment-grade on February 11, 2014,[101] with the senior-lien PRASA Bonds following shortly thereafter on February 18, 2014.[102]

During the Relevant Period, Fitch applied three sets of criteria to PRASA Bonds: (i) the Revenue-Supported Rating Criteria; (ii) US Water and Sewer Revenue Bond Rating Criteria; and (iii) Water and Sewer Revenue Bond Rating Guidelines.[103]   We summarize the first of these methods above in Part X.C.2.(a).

The latter two methodologies were materially the same.  In essence, for municipal water and sewer utilities in the US, Fitch examined ten factors that it collectively called the "10 Cs."[104] The factors covered four areas, comprised of (i) governance and management; (ii) financial profile; (iii) debt profile; and (iv) operating profile.[105]   The governance and management analysis considered the quality of the management team (or crew) and its practices.[106] Better stability, transparency, and experience generally garnered higher grades within this category.[107] The financial assessment considered debt coverage and financial performance; cash and balance sheet considerations; and charges and rate affordability.  For the debt profile, Fitch considered capital demands and burden, as well as covenants.[108]   The operating profile evaluation accounted for customer growth and concentration; capacity; community characteristics like employment, wealth, and poverty levels; and compliance with environmental laws and regulations.[109]

Available evidence reflects that in support of its major PRASA Bond-related actions during the Relevant Period, Fitch emphasized different sets of factors when analyzing the senior-lien bonds and the Puerto Rico-guaranteed bonds:

---

[101] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO and Related Debt Ratings to 'BB'; Outlook Negative*, 1 (Feb. 11, 2014) (available through Fitch Ratings).

[102] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico Aqueduct & Sewer Auth Senior Revs to 'BB+'; Outlook Remains Negative* (Feb. 18, 2014) (available through Fitch Ratings).

[103] *See* Fitch Ratings, *Revenue-Supported Rating Criteria* (Dec. 29, 2009) (available through Fitch Ratings); Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria* (Aug. 10, 2011) (available through Fitch Ratings); Fitch Ratings, *Water and Sewer Revenue Bond Rating Guidelines* (Aug. 6, 2008) (available through Fitch Ratings).

[104] *See* Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 1 (Aug. 10, 2011) (available through Fitch Ratings); Fitch Ratings, *Water and Sewer Revenue Bond Rating Guidelines*, 1 (Aug. 6, 2008) (available through Fitch Ratings).

[105] *See* Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 1 (Aug. 10, 2011) (available through Fitch Ratings).

[106] *See* Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 1-2 (Aug. 10, 2011) (available through Fitch Ratings).

[107] *See*, *e.g.*, Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 13 (Aug. 10, 2011) (available through Fitch Ratings).

[108] *See*, *e.g.*, Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 8 (Aug. 10, 2011) (available through Fitch Ratings).

[109] *See*, *e.g.*, Fitch Ratings, *U.S. Water and Sewer Revenue Bond Rating Criteria*, 11 (Aug. 10, 2011) (available through Fitch Ratings).

The Independent Investigator's Final Investigative Report

- For the senior-lien bonds, Fitch cited, among other things, PRASA's need for a rate increase during certain periods; its settlements of regulatory lawsuits; its capital improvement plan (which had extensive capital needs); PRASA's weakened financial performance; its debt profile; its perceived solid management; the degree of support from Puerto Rico (including GDB's advisory capacity and interim funding sources); PRASA's weak but extensive service area; and PRASA's role as an essential service provider; and

- For the Puerto Rico-guaranteed bonds, Fitch more typically cited factors that were similar to the rating factors used for GO Bonds.  This included, among other things, Puerto Rico's historically weak financial operations; its increased operating imbalances; its high debt levels; its low degree of pension funding (with pension reform recognized as necessary); its efforts to restructure fiscal operations (*i.e.*, the fiscal stabilization plan); its efforts to stimulate the economy; its improved financial management; the broader Puerto Rico recession; Puerto Rico's ties to the US economy; and its reduced financial flexibility.

### (b)　　Notable S&P Actions

S&P's ratings sometimes differed for the Puerto Rico-guaranteed series and senior-lien series of PRASA Bonds.  This was due to the perceived stronger likelihood of repayment with respect to the Puerto Rico-guaranteed series, as a result of it being backed by Puerto Rico's full faith and credit:

- S&P rated PRASA's Puerto Rico-guaranteed bonds at 'BBB-; Outlook Stable' as of January 16, 2008.[110] It upgraded the guaranteed bonds to 'BBB; Outlook Stable' on March 31, 2011,[111] following its upgrade of the GO Bonds earlier in March.  S&P downgraded PRASA's Puerto Rico-guaranteed bonds below investment-grade on February 4, 2014;[112] and

- S&P rated the senior-lien PRASA Bonds at 'BBB-; Outlook Stable' as of January 16,

---

[110] Standard & Poor's Ratings Servs., *Research: Puerto Rico Aqueduct & Sewer Authority*; *Water/ Sewer* (Jan. 16, 2008) (available through Standard & Poor's Ratings Servs.).

[111] Standard & Poor's Ratings Servs., *Rating On Puerto Rico Aqueduct & Sewer Authority's 2008A And B Refunding Bonds Raised To 'BBB' From 'BBB-'* (Mar. 31, 2011) (available through Standard & Poor's Ratings Servs.).

[112] Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority Commonwealth-Backed Debt Rating Lowered To 'BB+'; Remains On Watch Neg* (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.).

The Independent Investigator's Final Investigative Report

2008.[113]  It downgraded those bonds below investment-grade on March 26, 2013.[114]

Unlike PREPA, S&P viewed PRASA as a government-related entity ("GRE").  Under S&P's criteria, a GRE was an entity that either was controlled by a government, or relied upon one for support in times of stress.[115]  S&P therefore approached the PRASA Bond ratings differently than it approached the PREPA Bond ratings.

In essence, S&P applied two tiers of analysis for PRASA:  (i) a stand-alone credit profile rating for PRASA; and then (ii) an adjustment after considering the likelihood of support from Puerto Rico.  For PRASA, this was usually reflected as a "lift," due to the perception that Puerto Rico's support of PRASA was strong.[116]

During the Relevant Period, S&P applied the following methodologies to PRASA Bond ratings:  (i) Revised Criteria for Rating Water, Sewer, and Drainage Utility Revenue Bonds; and (ii) General Criteria: Rating Government-Related Entities: Methodology and Assumptions.[117]  We summarize these methods briefly below:

- *Revised Criteria for Rating Water, Sewer and Drainage Utility Revenue Bonds*.  This methodology considered a range of factors, including economic considerations; financial data; capital improvement plans; rate-setting philosophy and practices; operational characteristics; management; and legal provisions.[118]  It also accounted for the GO Bond debt ratings, wealth, and income levels, as well as debt service coverage, liquidity, and a comparison of total debt to PRASA's net property ownership.  S&P further considered

---

[113]  Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority*; *Water/ Sewer*, 1 (Jan. 16, 2008) (available through Standard & Poor's Ratings Servs.).

[113]  Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority Senior-Lien Bond Rating Lowered To 'BB+' After Puerto Rico Downgrade* (Mar. 26, 2013) (available through Standard & Poor's Ratings Servs.).

[114]  Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority Senior-Lien Bond Rating Lowered To 'BB+' After Puerto Rico Downgrade* (Mar. 26, 2013) (available through Standard & Poor's Ratings Servs.).

[115]  *See, e.g.*, Standard & Poor's Ratings Servs., *General Criteria Rating Government – Related Entities: Methodology and Assumptions*, 4 (Dec. 9, 2010) (available through Standard & Poor's Ratings Servs.).

[116]  Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority*; *General Obligation Equivalent Security*; *Water/Sewer*, 2 (Feb. 7, 2012) (available through Standard & Poor's Ratings Servs.).

[117]  *See* Standard & Poor's Ratings Servs., *USPF Criteria: Standard & Poor's Revises Criteria For Rating Water, Sewer, And Drainage Utility Revenue Bonds* (Sept. 15, 2008) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *General Criteria Rating Government – Related Entities: Methodology and Assumptions* (Dec. 9, 2010) (available through Standard & Poor's Ratings Servs.).

[118]  *See* Standard & Poor's Ratings Servs., *USPF Criteria: Standard & Poor's Revises Criteria For Rating Water, Sewer, And Drainage Utility Revenue Bonds*, 3 (Sept. 15, 2008) (available through Standard & Poor's Ratings Servs.).

consumer diversity and fixed-charge coverage calculations;[119] and

- *General Criteria: Rating Government-Related Entities: Methodology and Assumptions.* These criteria applied only if, like PRASA, an entity was considered a GRE.  The criteria thus examined the negative or positive impact of the interrelationship between the GRE (PRASA) and the relevant government (Puerto Rico).[120] As previewed above, under this criteria, Puerto Rico's general credit rating served as a baseline for PRASA's credit rating, and PRASA's credit rating could either go above or below Puerto Rico's general rating, depending on the assessment of three factors: (i) the likelihood of PRASA receiving extraordinary support from Puerto Rico; (ii) an evaluation of PRASA's role with respect to Puerto Rico; and (iii) an evaluation of PRASA's link to Puerto Rico.[121]

To illustrate S&P's unique rating approach for PRASA Bonds, S&P assigned a 'BBB; outlook stable' rating to the senior-lien PRASA Bonds (Series 2012A and Series 2012B) on February 7, 2012.  This rating included a lift from PRASA's stand-alone credit profile of BB+, as a result of having applied S&P's GRE criteria.[122]  Pursuant to those criteria, S&P considered the likelihood that PRASA would receive financial support from Puerto Rico and deemed it to be high.[123]  S&P downgraded PRASA Bonds in close proximity to its March 2013 downgrade of the GO Bonds, by which point Puerto Rico had a larger-than-anticipated budget gap and the potential for fiscal stability was uncertain.[124]

S&P typically discussed its rating actions for the two types of PRASA Bonds in a combined press release, and covered the relevant factors that contributed to rating actions together (discussed in more detail below).  The trajectory of GO Bond ratings, together with its related factors, appears to have directly affected S&P's rating of the Puerto Rico-guaranteed PRASA Bonds, but appears to have only indirectly affected the rating of the senior-lien PRASA Bonds.  For instance, in a press release dated February 4, 2014, S&P explained that although the downgrade of GO Bonds

---

[119] *See* Standard & Poor's Ratings Servs., *USPF Criteria: Standard & Poor's Revises Criteria For Rating Water, Sewer, And Drainage Utility Revenue Bonds*, 3-4 (Sept. 15, 2008) (available through Standard & Poor's Ratings Servs.).

[120] *See* Standard & Poor's Ratings Servs., *General Criteria Rating Government – Related Entities: Methodology and Assumptions*, 3 (Dec. 9, 2010) (available through Standard & Poor's Ratings Servs.).

[121] *See* Standard & Poor's Ratings Servs., *General Criteria Rating Government – Related Entities: Methodology and Assumptions*, 4, 10 (Dec. 9, 2010) (available through Standard & Poor's Ratings Servs.).

[122] Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority's 2012A&B Revenue Bonds Rated 'BBB-'; Existing Ratings Affirmed*, 1 (Feb. 7, 2012) (available through Standard & Poor's Ratings Servs.).

[123] Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority's 2012A&B Revenue Bonds Rated 'BBB-'; Existing Ratings Affirmed*, 1 (Feb. 7, 2012) (available through Standard & Poor's Ratings Servs.).

[124] Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority Senior-Lien Bond Rating Lowered to 'BB+' After Puerto Rico Downgrade*, 1 (Mar. 26, 2013) (available through Standard & Poor's Ratings Servs.).

did not immediately affect the senior-lien PRASA Bond rating, S&P decided to assign a negative watch to the senior-lien PRASA Bonds, due to PRASA's status as a GRE and its relationship with Puerto Rico.[125]

Consistent with the relevant criteria, S&P cited the following factors, among other things, when evaluating PRASA Bonds during the Relevant Period: PRASA's relatively fragmented system; its significant deferred capital needs; its high operational deficiencies; its historically poor financial performance (including an unwillingness to raise rates despite the ability to do so without legislative approval, its deficient billing and collection systems, and its low liquidity, all of which constrained operating surplus); PRASA's large capital needs relating to capital improvement programs; the efforts of PRASA's management (*e.g.*, to increase the combined rates, to adopt an annual rate adjustment, and to adopt aggressive initiatives to improve billing and collection methods); the supportive regulatory environment (*e.g.*, PRASA's authority to increase rates and to cut off services); the legal provisions of PRASA Bonds that provided protection to the bondholders (*e.g.*, revenue pledges); and its high likelihood of extraordinary support from Puerto Rico (as a function of PRASA's very strong links to the Puerto Rico government, its role as the sole water and sewer service provider, the history of support from GDB, and GDB's stated intention to continue providing such support).

(c) **Notable Moody's Actions**

Moody's rated the Puerto Rico-guaranteed PRASA Bonds at 'Baa3; Outlook Stable' as of January 16, 2008.[126] It rated the senior-lien PRASA Bonds at 'Baa1; Outlook Negative' as of November 9, 2010.[127] It downgraded the senior-lien PRASA Bonds to non-investment grade on December 13, 2012,[128] and downgraded the Puerto Rico-guaranteed PRASA Bonds to non-investment grade on February 7, 2014.[129]

---

[125] Standard & Poor's Ratings Servs., *Puerto Rico Aqueduct & Sewer Authority Commonwealth-Backed Debt Rating Lowered To 'BB+'; Remains On Watch Neg*, 1 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.).

[126] Moody's Inv'rs Serv., *New Issue: Moody's Assigns Baa3 to $277 M PRASA Revenue Refunding Bonds with Commonwealth Guarantee*; *Outlook Stable* (Jan. 16, 2008) (available through Moody's Inv'rs Serv.). This is the earliest Moody's report made available to us for the Puerto Rico-guaranteed PRASA Bonds.

[127] Moody's Inv'rs Serv., *Rating Update: Moody's Affirms Baa1 Rating on Puerto Rico Aqueduct and Sewer Authority's Senior Lien Revenue Bonds* (Nov. 9, 2010) (available through Moody's Inv'rs Serv.). This is the earliest Moody's report made available to us for the senior-lien PRASA Bonds.

[128] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico general obligation and related bonds to Baa3 from Baa1 and certain notched bonds to Ba1*, 4 (Dec. 13, 2012) (available through Moody's Inv'rs Serv.).

[129] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA Bonds to Baa1, Baa2*; *outlook negative*, 1-2 (Feb. 7, 2014) (available through Moody's Inv'rs Serv.).

The Independent Investigator's Final Investigative Report

As with the GO Bonds, Moody's evaluated the PRASA Bonds for most of the Relevant Period using the State Ratings Methodology described above in Part X.C.1.(c).[130]   At some point in 2012, Moody's began applying its Water and Sewer analysis to the PRASA Bonds.[131]   That methodology was later updated in or about 2014 to the US Municipal Utility Revenue Debt methodology.[132]

The Water and Sewer methodology was substantially similar to the US Municipal Utility Revenue Debt methodology.  Substantively, these criteria focused on four broad rating factors, at varying weights: (i) system characteristics; (ii) financial strength; (iii) management; and (iv) legal provisions.[133]   The analysis considered the condition of the utility's assets, including their remaining useful life; the wealth of the service area; the size of the system; the annual debt service coverage, including collection rates and revenue and expense projections; cash on hand; and the ratio of debt-to-operating-revenues.[134]   It also assessed the utility's compliance with regulations like the Safe Drinking Water and Clean Water Acts, capital planning, and the utility's rate covenants and debt service reserve requirements.[135]

Similar to Fitch, available evidence shows that Moody's emphasized different considerations when analyzing the senior-lien PRASA Bonds and the Puerto Rico-guaranteed PRASA Bonds:

- For the senior-lien PRASA Bonds, Moody's emphasized, among other things, the following:  PRASA's role as the sole provider of an essential service; its nature as a large and complex system; PRASA's ability to adjust rates (as well as the prolonged lack of actually exercising that power); its experienced management team; its compliance with environmental agreements with regulators; the large needs of its capital improvement program; its debt service coverage; its large amount of undetermined water losses; its bond pledge; its FOA with GDB; its reliance on liquidity support from GDB and Puerto Rico; and the trajectory of GO Bond ratings and GDB's stand-alone credit rating; and

---

[130] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology* (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

[131] *See*, *e.g.*, Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico GO Bonds to Caa1 from B2, COFINA to B3/Caa1 from Ba3/B1* (Feb. 18, 2015) (available through Moody's Inv'rs Serv.).

[132] *See*, *e.g.*, Moody's Inv'rs Serv., *Moody's downgrades Puerto Rico general obligation and related bonds to Baa3 from Baa1and certain notched bonds to Ba1*, 4 (Dec. 13, 2012) (available through Moody's Inv'rs Serv.).

[133] *See*, *e.g.*, Moody's Inv'rs Serv., *US Municipal Utility Revenue Debt*, 9 (July 30, 2014) (available through Moody's Inv'rs Serv.).

[134] *See*, *e.g.*, Moody's Inv'rs Serv., *US Municipal Utility Revenue Debt*, 9 (July 30, 2014) (available through Moody's Inv'rs Serv.).

[135] *See*, *e.g.*, Moody's Inv'rs Serv., *US Municipal Utility Revenue Debt*, 16-18 (July 30, 2014) (available through Moody's Inv'rs Serv.).

- For the Puerto Rico-guaranteed PRASA Bonds, Moody's noted that Puerto Rico's Attorney General had opined that its full faith and credit guarantee conferred on the PRASA refunding bonds the same priority of payment as Puerto Rico's direct bond debts.[136]  Moody's therefore tended to cite factors that were more aligned with the factors it used to determine GO Bond ratings.  Such factors included, among others, Puerto Rico's weak economy; its political and economic links to the US; its high unemployment rates and poverty levels; Puerto Rico's broad legal powers (*e.g.*, to raise revenue, to adjust spending and to borrow); Puerto Rico's perceived strong dedication to tax and fiscal reform (although Moody's noted the existence of what was, in Moody's view, a deeply polarized political system that impedes consensus regarding economic development and fiscal issues); multi-year trends regarding large General Fund operating deficits and related deficit financing; very high debt levels for Puerto Rico; debt service coverage ratios; and a seriously underfunded pension system.

### 4.    COFINA Bonds

As previewed earlier, the CRAs generally assigned higher ratings to the COFINA Bonds than to the other Puerto Rico-Related Bonds discussed in this Part X of our Report.  This was primarily because the CRAs assigned significant weight to COFINA's structure and the perceived strength of the separation between the COFINA Bonds' revenue stream and the assets that might become available to GO Bondholders.[137]  In large part, the CRAs based this perception on the legal opinions that the Puerto Rico Secretary of Justice supplied.[138] CRA Analysts told us that they viewed those legal opinions as reliable, accepted them at face value, and did not ask in-house attorneys or outside counsel to evaluate their soundness.

The CRAs also continued to rate the COFINA Bonds more favorably than the GO Bonds even as the GO Bond ratings fell toward, and below, junk status.[139]  In fact, the CRAs did not

---

[136] Moody's Inv'rs Serv., *New Issue: Moody's Assigns Baa3 to $277 M PRASA Revenue Refunding Bonds with Commonwealth Guarantee*; *Outlook Stable*, 1 (Jan. 16, 2008) (available through Moody's Inv'rs Serv.).

[137] *See*, *e.g.*, Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (June 28, 2007) (available through Standard & Poor's Ratings Servs.); *see also* Fitch Ratings, *Fitch Rates Puerto Rico's $3.6B Sales Tax Bonds 'A+'*, 1 (June 27, 2007) (available through Fitch Ratings); Moody's Inv'rs Serv., *New Issue: Moody's Assigns A1 Rating and Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds*, 2 (June 27, 2007) (available through Moody's Inv'rs Serv.).

[138] *See*, *e.g.*, Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $3.6B Sales Tax Bonds 'A+'*, 1 (June 27, 2007) (available through Fitch Ratings); *see also, e.g.,* Moody's Inv'rs Serv., *New Issue: Moody's Assigns A1 to $500 M Puerto Rico Sales Tax Revenue Bonds*, *Series 2007C*, 2 (June 27, 2007) (available through Moody's Inv'rs Serv.).

[139] *See*, *e.g.*, Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO and Related Debt Ratings to 'BB'*; *Outlook Negative*, 1 (Feb. 11, 2014) (available through Fitch Ratings) ("The current action does not affect the ratings that Fitch assigns to bonds issued by the Puerto Rico Sales Tax Financing Corporation (COFINA). Those bonds are secured by the commonwealth's sales and use tax and insulated from the

adjust the COFINA ratings to junk status until as late as July 2014 (for Fitch and Moody's) and February 2015 (for S&P). By the time the CRAs began moving the COFINA Bond ratings closer to the GO Bond ratings, it had become clearer that Puerto Rico might not be willing and able to repay its debt. Both the COFINA Bond ratings and the GO Bond ratings steadily declined thereafter. At least one CRA Analyst explained that the CRA Analyst initially did not believe the COFINA Bond ratings would be affected much by a decline in the GO Bond ratings, but later changed that view given the reduction in Puerto Rico's willingness to pay.

We depict the key rating changes for the senior-lien COFINA Bonds and the first-subordinate-lien COFINA Bonds graphically in Figure X.E   As the Figure reflects, the CRAs sometimes assigned different ratings to the senior-lien COFINA Bonds and first subordinate-lien COFINA Bonds. Priority of payment differed between the two categories of COFINA Bonds, and the CRAs considered that important before the adjustments to junk status.

**Figure X.E: Puerto Rico Sales Tax Financing Corporation (COFINA) Bond Ratings**



Because of the nature of the COFINA Bonds and their revenue stream, the CRAs considered various factors that could affect the payment and collection of SUT to be important

---

commonwealth's general credit strain. Their ratings are driven by economic and revenue performance."); *see also, e.g.,* Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'; Remains On Watch Negative,* 2 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.) ("We have not taken a rating action on sales tax-secured debt of Puerto Rico Sales Tax Financing Corp. (COFINA), but have retained our negative outlook on our COFINA ratings reflecting our view of the economic outlook and that COFINA sales tax is not subject to the prior diversion of revenue for GO debt service payments.").

components of evaluating the COFINA Bonds.  They also considered the 2009 strengthening of the non-impairment clause in the COFINA Bond resolution to be important because the amendment made it more difficult for Puerto Rico to adversely alter the SUT that backed the COFINA Bonds.  We summarize the CRAs' respective analyses in turn below.

### (a)     Notable Fitch Actions

Fitch rated the senior-lien COFINA Bonds at 'A+; Outlook Stable' as of June 27, 2007.[140] Fitch rated the first subordinate-lien COFINA Bonds at 'A; Outlook Stable' as of May 20, 2009.[141] Fitch downgraded both sets of COFINA Bonds to non-investment-grade status on July 9, 2014.[142] The downgrade post-dated the February 2014 adjustment of the GO Bond rating by approximately five months, and coincided with further downgrades of GO, PRASA, and ERS Bonds.

Fitch applied two methodologies to rating the COFINA Bonds:  (i) its Tax-Supported Rating Criteria; and (ii) its US State Government Tax-Supported Rating Criteria.[143]  We describe these methodologies above in Part X.C.1.(a).[144]  As described by one CRA Analyst, these analyses emphasized special factors like lien status, indenture requirements, and flow of funds, as well as the sales tax environment.

Fitch repeatedly relied on COFINA's structure and its revenue pledge when evaluating COFINA Bonds during the Relevant Period, which it considered to be a stronger credit source than the GO Bond credit.  Among other things, Fitch cited the COFINA Bondholders' priority right to SUT revenues; the existence of a perceived strong legal opinion regarding the separation of the pledged SUT revenues from the General Fund and potential Clawback Right claims by the GO Bondholders; and the 2009 enhancement of the non-impairment clause in COFINA's bond resolution.  Fitch further cited factors like the Puerto Rico sales tax base; Puerto Rico's retail environment; its revenue growth; its SUT collection rate; the lengthy maturity periods of the COFINA Bonds; the limited operating history of Puerto Rico's SUT; the debt service coverage

---

[140] Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $3.6B Sales Tax Bonds* 'A+' (June 27, 2007) (available through Fitch Ratings).

[141] Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $7.5B Subordinate Lien Sales Tax Revs* 'A' (May 20, 2009) (available through Fitch Ratings).

[142] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO, Sales Tax, Retirement System & Water Revenue Bonds*, 1 (July 9, 2014) (available through Fitch Ratings) ("Fitch Ratings has downgraded the ratings of various Commonwealth of Puerto Rico Bonds as follows . . . $6.7 billion Puerto Rico Sales Tax Financing Corporation (COFINA) senior lien sales tax revenue bonds to 'BB-' from 'AA-' . . . $8.5 billion COFINA first subordinate lien sales tax revenue bonds to 'BB-' from 'A+'.").

[143] *See*, *e.g.*, Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $2.2B Subordinate Lien Sales Tax Revs* 'A', 2 (Jan. 8, 2010) (available through Fitch Ratings); Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $441MM Subordinate Lien Sales Tax Revs* 'A+'; *Outlook Stable*, 2 (Nov. 8, 2011) (available through Fitch Ratings).

[144] *See*, *e.g.*, Fitch Ratings, *Tax-Supported Rating Criteria* (Sept. 24, 2009) (available through Fitch Ratings); *see also* Fitch Ratings, *U.S. State Government Tax-Supported Rating Criteria – Effective Aug. 15, 2011 to Aug. 14, 2012* (Aug. 15, 2011) (available through Fitch Ratings).

The Independent Investigator's Final Investigative Report

level; Puerto Rico's strained fiscal and economic environment; and, eventually, the passage of the Recovery Act.

(b)     **Notable S&P Actions**

As of June 28, 2007, S&P rated the senior-lien COFINA Bonds at 'A+; Outlook Stable.'[145] S&P upgraded the senior-lien COFINA Bonds to 'AA-; Outlook Stable' on May 18, 2009, based on its view that the expansion of assigned SUT and strict limits on the issuance of additional senior-lien debt provided a "significantly higher" coverage of senior annual debt service.[146]   In conjunction with this upgrade, S&P rated the first subordinate-lien COFINA Bonds for the first time, assigning a rating of 'A+; Outlook Stable' on the same day.[147]

S&P downgraded both series of COFINA Bonds to non-investment-grade on February 12, 2015, assigning a rating of 'B.'[148]   This was about one-year later than S&P's critical downgrade of the GO Bonds and six months later than Fitch's key downgrade of the senior-lien COFINA's Bonds.   Unlike the other CRAs, the report that S&P issued in connection with its COFINA downgrades did not rely on the Recovery Act as a key driver for the downgrades, but instead focused on the potential switch to a value added tax ("VAT") structure. In particular, S&P foresaw that the introduction of the new VAT "will create increased uncertainty as to the timing of receipts of pledged revenue and whether bond covenants separating the tax revenue from that of the commonwealth may be maintained."

For both sets of COFINA Bonds, S&P applied its Special Tax Bonds criteria.[149]   That methodology considered the local economy to be central to the ratings-assignment process.   It thus considered a range of cyclical economic factors, such as tourism, diversity and size of the employment base, as well as Puerto Rico's geographic jurisdiction.   The applicable version of this methodology emphasized fundamental economic factors above the legal features associated with the debt issuance and relevant reserve funds.   It also looked to growth trends, the implications of

---

[145] Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax* (June 28, 2007) (available through Standard & Poor's Ratings Servs.).

[146]  Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Bonds Rating Raised To 'AA-'*, 1 (May 18, 2009) (available through Standard & Poor's Ratings Servs.).

[147]  Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Bonds Rating Raised To 'AA-'*, 1 (May 18, 2009) (available through Standard & Poor's Ratings Servs.).

[148] Standard & Poor's Ratings Servs., *Puerto Rico General Obligation Debt Rating Lowered To 'B' From 'BB' On Potential Inability To Meet Debt Commitments*, 1 (Feb. 12, 2015) (available through Standard & Poor's Ratings Servs.) ("In addition, Standard & Poor's has lowered its ratings on . . . Puerto Rico Sales Tax Financing Corp.'s (COFINA) first-lien sales tax bonds to 'B' from 'BBB'. . . COFINA's second-lien sales tax bonds to 'B' from 'BBB-'.").

[149] *See* Standard & Poor's Ratings Servs., *Special Tax Bonds Ratings Criteria* (June 13, 2007) (available through Standard & Poor's Ratings Servs.).

such trends (while still remaining focused principally on historical revenues), debt service coverage, and legal protections for the debt.[150]

The factors that S&P cited when analyzing COFINA Bonds during the Relevant Period included, among other things, COFINA's legal structure and the separation of its revenue stream; the priority access to SUT; the limited history of SUT collection; COFINA's status as a corporate and political entity independent and separate from Puerto Rico; the performance of pledged revenue; annual debt service coverage; the limit on new issuances of senior-lien COFINA Bonds; debt-service coverage amounts; economic and population-related trends; the subsequent expansion of the sales tax base; market access challenges; the amount and timing of pledged revenue receipts; and, eventually, the passage of the Recovery Act.

In multiple reports, S&P noted that although it viewed COFINA's legal structure as important and the separation of its revenue stream as strong, its ratings of COFINA Bonds were nevertheless constrained because: (i) "the [COFINA] structure cannot completely isolate COFINA's bondholders from [the] commonwealth's financial condition;[151] and (ii) the ability to level and collect SUTs depended directly on underlying economic activity in Puerto Rico and was thus sensitive to Puerto Rico's financial condition.[152] S&P further noted that COFINA's bond structure did not entirely eliminate this dependency.[153] Accordingly, even though S&P assigned higher ratings to the COFINA Bonds than to the GO bonds, S&P still viewed broader Puerto Rico-related considerations as limiting the assigned COFINA Bond ratings to some degree.

Nevertheless, the "constraining" effect of S&P's broader Puerto Rico-related considerations does not appear to have caused S&P to reduce the COFINA Bond ratings together with the GO Bond ratings as the GO Bond ratings moved toward, and below, junk status. In fact, when S&P assigned a negative credit watch to the GO Bonds and ERS Bonds on January 24, 2014, S&P made clear that it had not taken any adverse rating action with respect to the COFINA

---

[150] *See* Standard & Poor's Ratings Servs., *Special Tax Bonds Ratings Criteria*, 4-5 (June 13, 2007) (available through Standard & Poor's Ratings Servs.).

[151] *See*, *e.g.*, Standard & Poor's Ratings Servs., *Summary: Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 1 (Nov. 15, 2011) (available through Standard & Poor's Ratings Servs.); *see also, e.g.,* Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (Jan. 14, 2010) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Bond Rating Raised To 'AA-'*, 2 (May 18, 2009) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (June 28, 2007) (available through Standard & Poor's Ratings Servs.).

[152] *See*, *e.g*., Standard & Poor's Ratings Servs., *Summary: Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 1 (Nov. 15, 2011) (available through Standard & Poor's Ratings Servs.); *see also, e.g.,* Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (Jan. 14, 2010) (available through Standard & Poor's Ratings Servs.); Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (June 28, 2007) (available through Standard & Poor's Ratings Servs.).

[153] Standard & Poor's Ratings Servs., *Puerto Rico Sales Tax Financing Corp.*; *Sales Tax*, 2 (Jan. 14, 2010) (available through Standard & Poor's Ratings Servs.).

Bonds.[154]   Shortly thereafter, when S&P downgraded the GO Bonds and ERS Bonds to non-investment-grade on February 4, 2014, S&P again took no new adverse action with respect to the COFINA Bond ratings. [155]   It simply maintained the existing negative outlook. [156]   When explaining that negative outlook, S&P stated that "the COFINA sales tax is not subject to the prior diversion of revenue for GO debt service payment."[157]

### (c)   Notable Moody's Actions

Moody's rated the senior-lien series of COFINA Bonds at 'A1; Outlook Stable' as of June 27, 2007.[158] Like S&P, Moody's upgraded the senior-lien COFINA Bonds to 'Aa3; Outlook Stable' on May 18, 2009, based on structural changes to the bond resolution that reflected the increased pledge of SUT, among other reasons.[159] In conjunction with the upgrade, Moody's rated the first subordinate-lien series COFINA Bonds for the first time at 'A2; Outlook Stable.'[160] It downgraded both senior-lien COFINA Bonds and first subordinate-lien COFINA Bonds to non-investment-grade on July 1, 2014.[161]

Through 2009, Moody's applied a methodology to the senior-lien and first subordinate-lien COFINA Bonds that consisted of a series of factors, including the following:

> [T]he business risk and competitive position of the [I]ssuer versus others within its industry or sector, ii) the capital structure and financial risk of the [I]ssuer, iii) the projected performance of the [I]ssuer over the near to intermediate term, iv) the [I]ssuer's history of achieving consistent operating performance and meeting budget or financial plan goals, v) the

---

[154] Standard & Poor's Ratings Servs., *Puerto Rico GO*, *Appropriation Debt Ratings On Watch Negative On Government Development Bank of Puerto Rico CreditWatch*, 1 (Jan. 24, 2014) (available through Standard & Poor's Ratings Servs.).

[155] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'*; *Remains On Watch Negative*, 1 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.).

[156] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'*; *Remains On Watch Negative*, 1 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.).

[157] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'*; *Remains On Watch Negative*, 2 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.).

[158] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A1 Rating And Stable Outlook to Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds* (June 27, 2007) (available through Moody's Inv'rs Serv.).

[159] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A2 to Puerto Rico Subordinate Lien Sales Tax Revenue Bonds*; *Upgrades Senior Lien Sales Tax Bonds to Aa3*, 1 (May 18, 2009) (available through Moody's Inv'rs Serv.).

[160] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A2 to Puerto Rico Subordinate Lien Sales Tax Revenue Bonds*; *Upgrades Senior Lien Sales Tax Bonds to Aa3*, 1 (May 18, 2009) (available through Moody's Inv'rs Serv.).

[161] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico GOs to B2 from Ba2, COFINA Senior-Sub to Ba3-B1*; *outlooks negative* (July 1, 2014) (available through Moody's Inv'rs Serv.).

nature of the dedicated revenue stream pledged to the [COFINA B]onds, vi) the debt service coverage provided by such revenue stream, vii) the legal structure that documents the revenue stream and the source of payment, and viii) and the [I]ssuer's management and governance structure related to payment.[162]

For the 2011 issuance, Moody's used its Piercing the GO Rating Ceiling criteria.[163] Pursuant to that methodology, a special tax bond could surpass the credit rating that Moody's separately assigned to the parent government's general obligation bond rating, if: (i) the underlying tax base and economy of the municipality was stronger than the general obligation bond rating; and (ii) the special tax bonds were legally separate from the general fund revenues.

By 2012, Moody's applied its US Public Finance Special Tax Methodology to the COFINA Bonds.[164] This methodology considered three principal factors, in varying proportions: (i) taxable base and the pledge; (ii) legal structure; and (iii) financial metrics. Various sub-factors informed each of the principal factors. Sometimes, the sub-factors were allotted varying sub-percentages that totaled the overall weight for the corresponding principal factor.[165] For example, the legal structure factor was comprised of an additional bonds test that accounted for 20% of the overall allotment for the legal structure factor, and a debt service fund requirement for the remainder.[166] The taxable base and pledge factor evenly considered the economic strength of the tax base as well

---

[162] *See* Moody's Inv'rs Serv., *Moody's Assigns Aa3 to $238 Million Sales Tax Revenue Refunding Bonds, Senior Series 2009C, Issued by the PRSTFC*, 4 (June 16, 2009) (available through Moody's Inv'rs Serv.) (noting that "[t]hese attributes were compared against other Issuers both within and outside of the Puerto Rico Sales Tax Financing Corporation's core peer group, and Puerto Rico Sales Tax Financing Corporation ratings are believed to be comparable to ratings assigned to other Issuers of similar credit risk."); *see also, e.g.,* Moody's Inv'rs Serv., *US Public Finance Special Tax Methodology* (July 19, 2017) (available through Moody's Inv'rs Serv.).

[163] *See* Moody's Inv'rs Serv., *Piercing the G.O. Rating Ceiling Criteria – Conditions for "Special Tax" Debt Achieving a higher Rating than the G.O. Debt of the Same Governmental Unit* (Aug. 2007) (available through Moody's Inv'rs Serv.) ;  *see also, e.g.,* Moody's Inv'rs Serv., *Moody's Assigns A1 Rating On $443 Million Puerto Rico Sales Tax Revenue Bonds, First Subordinate Series 2011A and 2011 B* (Nov. 4, 2011) (available through Moody's Inv'rs Serv.).

[164] *See, e.g.,* Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 2 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.); *see also, e.g.,* Moody's Inv'rs Serv., *U.S. Public Finance Special Tax Methodology* (July 19, 2017) (available through Moody's Inv'rs Serv.) (employed primarily in a number of COFINA press releases from Moody's).

[165] *See* Moody's Inv'rs Serv., *U.S. Public Finance Special Tax Methodology*, 1 (July 19, 2017) (available through Moody's Inv'rs Serv.) (employed primarily in a number of COFINA press releases from Moody's).

[166] The "additional bonds test" was a formula for assessing the Issuer's ability to pay.  The separate "debt service reserve fund requirement" examined, on a sliding scale, how much of a reserve fund was needed. If the reserve fund equaled a year or more of the maximum annual debt service, then it was considered the strongest. *See* Moody's Inv'rs Serv., *U.S. Public Finance Special Tax Methodology*, 15 (July 19, 2017) (available through Moody's Inv'rs Serv.).

as the nature of the special tax, while the financial metrics factor accounted for maximum annual debt service coverage, revenue trends, and revenue volatility.

Although Moody's evaluated the senior-lien COFINA Bonds using the same criteria as the subordinate-lien COFINA Bonds, the application of those criteria sometimes yielded different assigned ratings.  For example, when Moody's upgraded the senior-lien COFINA Bonds to 'Aa3' in March 2009, it assigned a lower rating of 'A2' for the subordinate-lien COFINA Bonds based on what Moody's called an "additional bonds test," as well as the degree of potential coverage if both liens were fully leveraged.[167]  Moody's explained that pursuant to the new structure as of 2009, the senior bonds had greater coverage than the senior and subordinate bonds combined.[168]

Moody's cited the following factors, among others, when taking notable COFINA Bond-related actions during the Relevant Period:  COFINA's "strong" legal structure and the perceived separation of SUT revenues from the Clawback Right; the enhancement of the non-impairment clause in COFINA's bond resolution in 2009; the possibility of a legislative change to decrease available revenue; the existence of a broad and diversified economic base; the subsequent expansion of the sales tax base; debt service coverage; SUT revenues and the lack of a history of steady performance; economic recession factors and the recession's impact on SUT revenues; lax SUT collection and enforcement; the existence of a long period until the bonds were set to mature; and, eventually, the enactment of the Recovery Act.

Notably, in October 2013, Moody's reassessed the prior six-notch differential between its assigned ratings for the senior-lien COFINA Bonds and the GO Bonds.  In so doing, Moody's noted that it perceived a "close and enduring linkage" between Puerto Rico's credit position and that of the SUT Bonds, ultimately concluding that the prior difference of six notches on the ratings scale was too great.[169]  Although Moody's still viewed the SUT pledge to be insulated from Puerto Rico's broader budget and financial problems, it believed there was a greater risk of a challenge to that insulation as Puerto Rico's economic and fiscal stress intensified.[170]  Moody's ultimately

---

[167] Moody's Inv'rs Serv., *New Issue: Moody's Assigns A2 to Puerto Rico Subordinate Lien Sales Tax Revenue Bonds*; *Upgrades Senior Lien Sales Tax Bonds to Aa3*, 1 (May 18, 2009) (available through Moody's Inv'rs Serv.).

[168] *See* Moody's Inv'rs Serv., *New Issue: Moody's Assigns A2 to Puerto Rico Subordinate Lien Sales Tax Revenue Bonds*; *Upgrades Senior Lien Sales Tax Bonds to Aa3*, 2 (May 18, 2009) (available through Moody's Inv'rs Serv.).

[169] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 1 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.).

[170] *See* Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 1 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.) ("Strengths . . .  * A strong legal structure, including a pledge of the larger of either 2.75% of the first dollars collected of the commonwealth's 7% sales tax or a minimum, fixed Base Amount, and a collection mechanism that segregates those monies from the General Fund . . . * Non-impairment covenant by the commonwealth; legal opinions that the pledged sales tax revenues are

narrowed the ratings spread between the senior-lien COFINA Bonds and the GO Bonds to four notches, based on persistent and cumulative effects of the weak economy in Puerto Rico, as well as Moody's reassessment of the link between Puerto Rico's credit profile and that of the COFINA Bonds. [171]  In so doing, Moody's noted that it was rare for a special tax bond to exceed the credit rating for its parent government's general obligation bond, especially by more than two notches.[172] Accordingly, despite Moody's reduction of the ratings spread, Moody's assignment of a four-notch difference between the GO Bond rating and the senior-lien COFINA Bond rating still reflected that Moody's perceived the legal separation between the two credits to be strong.[173]

### 5.   **ERS Bonds**

Overall, the ERS Bond ratings typically followed those of GO Bonds during the Relevant Period.  All three CRAs downgraded the ERS Bonds to non-investment-grade in early February 2014.  We depict the key rating changes for the ERS Bonds graphically in Figure X.F:

---

not available to its General Fund . . . Challenges . . . * Increasing pressure on the insularity of sales and use tax revenues due to ongoing weakness in the Commonwealth's economy and finances.").

[171] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 1 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.).

[172] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 1 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.).

[173] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades $6.8 billion Puerto Rico Senior Sales Tax Revenue Bonds to A2 from Aa3 and affirms $9.2 billion subordinate bonds at A3*, 1 (Oct. 3, 2013) (available through Moody's Inv'rs Serv.).

**Figure X.F: Puerto Rico Employee Retirement System (ERS) Bond Ratings**



We detail the CRAs' respective evaluations of the ERS Bonds in turn below.  In general, the CRAs considered the trajectory of GO Bond ratings to be important when evaluating the ERS Bonds, as well as: the possibility of pension reform (or lack thereof); the elevated degree of unfunded pension liabilities; the degree of debt service coverage; and the history of employer contributions.

      (a)      <u>Notable Fitch Actions</u>

Fitch rated ERS Bonds at 'BBB-; Outlook Stable' as of January 11, 2008.[174]  Fitch revised its ratings and outlooks several times thereafter before downgrading ERS Bonds to non-investment-grade on February 11, 2014.[175]

Fitch applied its Tax-Supported Rating Criteria and US State Government Tax-Supported Rating Criteria to the ERS Bonds.[176]  We describe each of those criteria above in Part X.C.1.(a).

---

[174] Press Release, Fitch Ratings, *Fitch Rates Puerto Rico's $4.3B Pension Funding Bonds 'BBB-'* (Jan. 11, 2008) (available through Fitch Ratings).

[175] Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO and Related Debt Ratings to 'BB'; Outlook Negative*, 1 (Feb. 11, 2014) (available through Fitch Ratings) ("Fitch Ratings has downgraded the ratings for the following Commonwealth of Puerto Rico debt to 'BB' from 'BBB-' . . . Employee Retirement System of the Commonwealth of Puerto Rico pension funding bonds.").

[176] *See* Fitch Ratings, *Tax-Supported Rating Criteria* (Sept. 24, 2009) (available through Fitch Ratings); *see also* Fitch Ratings, *U.S. State Government Tax-Supported Rating Criteria* (Aug. 14, 2012) (available through Fitch Ratings).

When evaluating ERS Bonds during the Relevant Period, Fitch cited, among other things, the following factors:  whether there was a strong legal obligation for employers to make contributions to the system; whether there was a lengthy history of timely payment; whether there was a strong revenue pledge; the extent of legal protections against the legislature lowering statutory contribution rates; the length of time until final maturity; the rising debt-service profile; the degree of high unfunded pension liabilities; the potential for pension reform; and the trajectory of GO Bond ratings (with their related factors).

### (b) <u>Notable S&P Actions</u>

S&P rated ERS Bonds at 'BBB-; Outlook Stable' as of January 14, 2008.[177]  It downgraded the ERS Bonds below investment-grade on February 4, 2014.[178]

S&P applied two sets of its criteria to the ERS Bonds:  (i) the State Ratings Methodology; and (ii) the Appropriation-Backed Obligations Criteria.[179]  We summarize the State Ratings Methodology above in Part X.C.1.(b).

In general, the Appropriation-Backed Obligations Criteria methodology assessed the general creditworthiness of the government obligor, as well as relevant appropriations and term features thereof.[180]  The test for the government's general creditworthiness was a traditional GO Bond-type analysis that considered several sub-factors, including debt burden and structure; economic and tax-base factors; financial flexibility, performance, and position; and administrative and management factors. The administrative and management portion of the analysis considered different elements depending upon which sector the appropriation concerned.  For the appropriations analysis, S&P considered the useful life of the financed property; the terms of the contracts that match the bond issue; whether the appropriation was factored into the general obligor's budget; whether there was an unconditional agreement by the obligor to make payments; whether there was underlying revenue support; debt-service reserve funds; and the bankruptcy risk of any relevant lessor.

The factors that S&P cited for its major actions relating to ERS Bonds during the Relevant

---

[177] Standard & Poor's Ratings Servs., *Puerto Rico Employees Retirement System*; *Appropriations* (Jan. 14, 2008) (available through Standard & Poor's Ratings Servs.).

[178] Standard & Poor's Ratings Servs., *Puerto Rico GO Rating Lowered To 'BB+'; Remain On Watch Negative*, 1 (Feb. 4, 2014) (available through Standard & Poor's Ratings Servs.) ("At the same time, we have downgraded…Employee Retirement System (ERS) debt to 'BB'.").

[179] *See* Standard & Poor's Ratings Servs., *State Ratings Methodology* (Jan. 3, 2011) (available through Standard & Poor's Ratings Servs.); *see also* Standard & Poor's Ratings Servs., *Appropriation-Backed Obligations Criteria* (June 13, 2007) (available through Standard & Poor's Ratings Servs.).

[180] The methodology also considers non-tax-supported leases, but only in the context of higher education, healthcare, and transportation lease bonds.  The non-tax-supported lease factor was not applied to Puerto Rico's ERS Bonds.

The Independent Investigator's Final Investigative Report

Period included, among others, the existence of a large pool of participating employers; the long track record of contributions at a stable rate; the legal protections of the contribution rate; the degree of debt service coverage; Puerto Rico's credit quality (as reflected in the GO Bond rating); Puerto Rico's fiscal and budgetary challenges; Puerto Rico's liquidity and related concerns about its ability to make timely contributions; the subordinate nature of the Employer Contributions (with a portion of pledged revenues effectively subject to the Clawback Provision); extended bond maturity; concerns about the adoption of pension reform; and reduced access to external liquidity from GDB as well as other sources.

### (c)      Notable Moody's Actions

Moody's rated ERS Bonds at 'Baa3; Outlook Stable' as of January 4, 2008.[181]  It downgraded the ERS Bonds to non-investment-grade on February 7, 2014.[182]

Much like the GO Bonds, Moody's applied its State Ratings Methodology to the ERS Bonds.[183]  This method is summarized above in Part X.C.1.(c).

For notable ERS Bond-related actions during the Relevant Period, Moody's cited the following factors, among others:  the long history of Puerto Rico employers regarding contribution payments; the large and diverse retirement system; debt service coverage levels; legal protections concerning contributions and appropriations; the lack of complete legal separation from Puerto Rico; the fact that Employer Contributions were partially subject to the Clawback Provision; the length of time until bond maturity; and the trajectory of GO Bond ratings (as well as their related factors).

*      *      *

Based on the foregoing, we found no basis on which to conclude that the CRAs meaningfully deviated from the analytical frameworks that they reportedly applied.  Instead, the CRAs' notable ratings decisions during the Relevant Period appear largely to have stemmed from the contemporaneous views of individual CRA Analysts regarding relevant circumstances and developments, as guided by their CRAs' respective criteria, filtered through each CRA's Ratings Committee review process.  The overarching principles of the CRAs' respective criteria for each Puerto Rico-Related Bond group appear to have been similar from one CRA to the next, notwithstanding potential differences in how each CRA considered those criteria or what they deemed to be most persuasive.

---

[181] Moody's Inv'rs Serv., *New Issue: Puerto Rico Employees Retirement System*, *Moody's Assigns Baa3 to approximately $4 B Puerto Pension Funding Bonds*, *Series A* (Jan. 4, 2008) (available through Moody's Inv'rs Serv.).

[182] Moody's Inv'rs Serv., *Rating Action: Moody's downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA Bonds to Baa1, Baa2*; *outlook negative*, 1-2 (Feb. 7, 2014) (available through Moody's Inv'rs Serv.) ("Downgraded to Ba2 from Baa3 . . . Pension funding bonds").

[183] *See* Moody's Inv'rs Serv., *Moody's State Rating Methodology* (Apr. 17, 2013) (available through Moody's Inv'rs Serv.).

The Independent Investigator's Final Investigative Report

**D.**    **There is Evidence of Vulnerabilities in the Ratings Assignment Process**

Our investigation revealed two primary weaknesses in how the CRAs developed their rating actions during the Relevant Period: *first*, the Issuers had the power to frame the ratings analysis; and *second*, the ratings largely resulted from discretion and individual perception as to what weight, if any, to give certain information that, in the context of Puerto Rico-Related Bond, should have had heightened significance. This includes, among other things, forward-looking projections, Puerto Rico's vulnerability to and the economic impact of hurricanes, the actual use of bond proceeds, and the impact of a CRA's own ratings downgrade.

**1.**    **The Assigned Credit Ratings Largely Turned on Issuer-Supplied Information**

The CRA Analysts we interviewed conveyed that when S&P and Moody's performed their analyses, the CRAs accepted as true the information supplied by, or on behalf of, the Issuers. As one CRA Analyst explained, the Analyst's CRA generally did not test the issuer-supplied information unless it had independent knowledge that it was wrong. Other CRA Analysts also conveyed that the CRAs lack the vantage point of auditors and thus rely upon what the Issuers (or their agents) provide. In addition, the CRAs could not verify certain types of information through third parties even if they wanted to, because of its nature. This includes forward-facing performance and financial projections, which are estimates and, as such, not verifiable.

The CRA Analysts did sometimes explore beyond the surface of the information they received when, in their individual judgment, there was a reason to do so. If additional clarity was needed with respect to issuer-supplied information, for example, then CRA Analysts communicated with the Issuer or its agent to ask questions and potentially obtain additional materials. But in general, the CRA Analysts did not seek third-party confirmations or perform independent due diligence of issuer-supplied information. Many reported that it was not their role to do so.

Fitch likewise relied primarily on the raw information supplied by or on behalf of the Issuers, but appears to have had a more nuanced process than the other two CRAs.[184] This was particularly so with respect to financial data. For example, one CRA Analyst conveyed that although Fitch relied on the underlying issuer-supplied financial data, it did not always rely on the Issuer's calculations. This Analyst recalled Fitch maintaining a database and running its own financial analysis of the PREPA-supplied documents. Similarly, Fitch's Analyst for PRASA told us that Fitch Analysts would check the financial information received from the Issuer for factual consistency, to determine whether the numbers tied out, and would seek to contextualize the numbers within the Issuers' historically-provided financials. Another Fitch Analyst told us that

---

[184] *See* Fitch Ratings, *Rating Definitions*, 5 (2018) (available through Fitch Ratings) (noting that although "Fitch relies on factual information it receives from issuers, underwriters and other sources Fitch believes to be credible" and "[u]ltimately, the [I]ssuer and its advisers are responsible for the accuracy of the information they provide to Fitch and to the market[,]" Fitch "conducts a reasonable investigation of the factual information it relies on in accordance with its rating criteria and obtains reasonable verification of that information from independent sources, to the extent such sources are available for a given security or in a given jurisdiction.").

the Fitch Analyst's colleagues were free to reach out to third-parties for follow-up if they felt that the issuer-supplied information was incomplete, if they needed guidance, or if they had questions. The example this Fitch Analyst provided was that of an adverse audit opinion.  The CRA Analyst told us that if an Issuer supplied one with respect to its financial statements, then the CRA Analyst may have sought to directly discuss it with the auditors.  Other CRA Analysts stated that if publicly-available information cast doubt upon the issuer-supplied information, then they would reach back to the Issuer or its agent to ask questions about the divergence.

The Issuers knew that they had the power to frame the CRAs' analyses.  Indeed, each CRA stressed in public materials, as well as communications with the Issuers (including rating assignment letters that attached terms and conditions of the ratings) that the CRA's analysis depended largely upon the information supplied by or on behalf of the Issuer, as to which the CRAs disclaimed any duty of due diligence, validation, or audit.[185]

### 2. <u>The CRA Analysts Performed Only Limited Post-Ratings Monitoring and Were Not Required to Consider All Relevant Risk Factors</u>

Each of the CRAs monitored their assigned ratings to varying degrees.  In general, they reported that they monitored investment-grade credit ratings once every twelve months or even less frequently, with the review window sometimes dependent on where the ratings fell on the relevant scale.[186]  Certain CRAs reported through witnesses that they reviewed ratings more often based on developing events.  Credit ratings attached to negative watches were typically monitored

---

[185] *See*, *e.g*., Fitch Ratings, *Rating Definitions*, 5 (2018) (available through Fitch Ratings) ("In issuing and maintaining its ratings, Fitch relies on factual information it receives from issuers, underwriters and other sources Fitch believes to be credible."; "Ultimately, the [I]ssuer and its advisers are responsible for the accuracy of the information they provide to Fitch and to the market in offering documents and other reports."); Standard & Poor's Ratings Servs., *Sufficient Information* (*Quality of Information*), 1 (May 23, 2016) (available through Standard & Poor's Ratings Servs.) (" . . . S&P Global Ratings' use of such information is not a guarantee of its accuracy."); Moody's Inv'rs Serv., *Code of Professional Conduct*, 7 (March 2018) (available through Moody's Inv'rs Serv.) ("[I]n assigning a Credit Rating, MIS is in no way providing a guarantee with regard to the accuracy, timeliness, or completeness of factual information reflected, or contained, in the Credit Rating or any related MIS publication."); Standard & Poor's Ratings Servs., *General Description of the Credit Rating Process*, 2 (July 2017) (available through Standard & Poor's Ratings Servs.) ("S&P Global Ratings does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives."); Moody's Inv'rs Serv., *Code of Professional Conduct*, 7 (March 2018) (available through Moody's Inv'rs Serv.) ("However, MIS is not an auditor and cannot in every instance independently verify or validate information received in the rating process.").

[186] *See* Moody's Inv'rs Serv., *Code of Professional Conduct*, 9 (March 2018) (available through Moody's Inv'rs Serv.) ("[Moody's] at least once in any twelve month period, review[s] the creditworthiness of the Issuer or other relevant entity or obligation."); Standard & Poor's Ratings Servs., *Surveillance Policy* (2017), (available through Standard & Poor's Ratings Servs.) ("S&P Global Ratings maintains surveillance of its outstanding Credit Ratings on an ongoing basis and at least every 12 months."); Fitch Ratings, *The Ratings Process*, 5 (March 2015) (available through Fitch Ratings) ("Fitch's ratings are typically monitored on an ongoing basis and the review process is a continuous one.").

on a shorter-term basis that varied by CRA. A report was typically issued to address or resolve the watch.

We further learned that CRA Analysts were not uniformly required to consider certain factors that could affect investor interests. Indeed, we did not find evidence to establish that CRAs factored natural disasters into their analysis for most Puerto Rico-Related Bonds. Given Puerto Rico's susceptibility to major hurricanes, as well as the potential for such storms to disrupt utilities and imports, to complicate the distribution of aid, to destroy utility plants and transmission channels, and to drain other resources, these factors could have affected the ability to repay Puerto Rico-Related Bonds. With the exception of S&P's analysis of the GO Bonds and COFINA Bonds, however, they did not. One of the CRA Analysts with whom we spoke conveyed that the reason why this CRA Analyst did not typically consider natural disasters was because of the potential for support from the US Federal Emergency Management Agency ("<u>FEMA</u>"), particularly with respect to PREPA. This CRA Analyst viewed this very positively. Another CRA Analyst conveyed that although event risk was a factor, the CRA assumed that Puerto Rico would have access to FEMA funds, which was a positive.

The evidence similarly does not reflect that the CRAs required the CRA Analysts to uniformly consider an Issuer's use of bond proceeds. Arguably, the use of bond proceeds to bridge operational deficits signals that the Issuer is in some degree of financial distress, or has a weak budgeting function. This is particularly so if it is a repeated occurrence. And, the use of proceeds in a manner that is inconsistent with an issuance's stated purpose would seem to cast doubt upon the credibility of forward-looking issuer-supplied information (like projections). In general, however, the CRAs did not require that CRA Analysts obtain certifications or other information regarding the actual use to which proceeds had been put, that they compare those uses against the ones disclosed when the issuance was offered, or that they contact relevant auditors to test the information or obtain confirmations. Instead, the CRA Analysts often had discretion to determine the extent to which use of proceeds should be considered (if at all). Some CRA Analysts even told us that the distinction between external and internal liquidity was irrelevant to them, as long as the Issuer was somehow able to finance its operations using an investment-grade source. For example:

- For PRASA and PREPA Bonds, the CRA Analysts we interviewed did not typically consider actual use of proceeds in making ratings determinations. One CRA Analyst who rated PRASA Bonds noted, however, that if the CRA Analyst caught a discrepancy between the use of proceeds reflected by the financials and the use of proceeds disclosed in the bond documents, then the CRA Analyst would have inquired further;

- The CRA Analysts who rated GO Bonds told us that, in general, the intended use of proceeds would have been more important for evaluating that type of bond. Nevertheless, when we asked one CRA Analyst who rated GO Bonds whether a GO Bond analysis reflected that proceeds in fact had been used to refinance debt, the Analyst responded in the negative; and

- Multiple CRA Analysts who rated COFINA Bonds and one CRA Analyst who rated ERS Bonds told us that the use of proceeds would not, in their view, have been a

material consideration, because COFINA's structure and sales tax risks were more critical than general operations risk. One CRA Analyst for COFINA further conveyed that whether proceeds were used to finance swap termination fees would not, in this analyst's view, have been a material consideration for the COFINA Bonds. A different CRA Analyst who rated COFINA and ERS Bonds, however, confirmed that if the bond proceeds were intended to pay existing deficits, then that would have factored into the analyst's analysis.

Nor are we aware of the CRAs having considered the full impact of their own credit rating assignments on the continued creditworthiness of relevant Issuers. One CRA Analyst conveyed that the Analyst's CRA assigned ratings without regard for how the ratings would impact the Issuers' interests. This CRA Analyst therefore did not consider the extent to which the assigned ratings might trigger contingent liabilities that reduced that Issuer's liquidity – for example, through an acceleration clause, a forced termination clause or related fees under a swap agreement. But the extent to which a contemplated rating would itself reduce an Issuer's liquidity is arguably relevant to developing a more accurate assessment of that Issuer's near-term creditworthiness. Presumably for this reason, several CRA Analysts confirmed that they considered the impact that *other* CRAs' credit rating downgrades might have on certain aspects of an Issuer's creditworthiness, if the downgrade would have converted a contingency like a swap termination payment into a liability that threatened liquidity, or if the downgrade would have threatened market access.[187]

## E.  Other Factors Unique to Puerto Rico May Have Complicated the CRAs' Evaluation of Puerto Rico-Related Bonds

Certain Puerto Rico-specific factors may have complicated the CRAs' analyses, particularly in combination with the process weaknesses discussed above. In particular, CRA Analysts told us that they typically received outdated and/or unaudited financial statements for Puerto Rico and related Issuers. Some of them also reported having no useful frame of reference when evaluating the Issuers' creditworthiness or analyzing certain Puerto Rico-Related Bonds. We explain these findings in more detail below.

### 1.  Puerto Rico's Internal Accounting and Financial Reporting Challenges May Have Tempered the Reliability of the CRAs' Analysis

Financial statements were, as noted above, one type of issuer-supplied material on which the CRAs relied. For many of the same reasons discussed separately in Part VIII of this report, the financials were supposed to be timely and audited. As one CRA Analyst confirmed, an Issuer's

---

[187] Considering how a CRA Analyst's own ratings assignment would affect the Issuer's creditworthiness would also be more consistent with how multiple CRA Analysts described their approaches for incorporating the existence of certain swap arrangements into their analysis. In particular, the CRA Analysts reported considering specific swap arrangements that could adversely impact the Issuer's debt or financial performance, either because they were speculative swaps rather than hedges, or because the agreements included adverse consequence clauses.

true financial position could be substantially different from what is reflected on the financial information, if the financial information is stale.

Yet, analysts from each of the CRAs told us that they typically received late financials from Puerto Rico and certain other Issuers.  In fact, multiple CRA Analysts identified Puerto Rico as abnormal among municipal Issuers, particularly with respect to releasing audited versions.  One CRA Analyst recalled other US jurisdictions typically completing their audits within six-to-eight months from the close of their fiscal years, with Puerto Rico often a year or more late (and borderline stale).  When asked why Puerto Rico's audits were late, one CRA Analyst who rated several groups of Puerto Rico-Related Bonds pointed to Puerto Rico's fragmented internal accounting systems (discussed separately in Part VIII of this Report).

PREPA was similarly tardy.  Indeed, one of the PREPA CRA Analysts noted that it was not unusual for PREPA to release audited financials that were a year late.  In at least one CRA Analyst's opinion, this practice was atypical for electric authorities and not ideal.  The CRA Analyst also attributed some of the delays to disagreements between PREPA and its auditors concerning the reconciliation of certain internal entries.  The CRA Analyst could not provide us with more color in that regard, but commented that the tardy financials were also linked to auditor turnover and changes in the employees who acted as points of contact for the auditors.

The CRAs did not have a similar view of PRASA.  In fact, one CRA Analyst described PRASA as having provided everything requested, and mostly on time, except for the 2015 audited financial statements.

Despite the general lack of timely audited financials, we are not aware of any instance in which a CRA declined to rate, or took negative actions regarding, a Puerto Rico-Related Bond due to missing or stale financial data.  In fact, the available evidence is inconclusive regarding how delayed or unaudited financials may have impacted the assigned ratings.  This is because the CRA Analysts with whom we spoke gave differing accounts of the potential implications of those materials.  Like most other things, reliance upon outdated or unaudited financial information appears to have been a matter of discretion even where, as here, the financials were habitually late and certain Issuers demonstrated declining performance.

For example, multiple CRA Analysts from Fitch told us that Fitch's analytical process expects, but does not necessarily need, audited financials.  Still, one Fitch Analyst identified a lack of timely, GAAP-compliant information as symptomatic of an Issuer's challenging financial situation.  Another Fitch Analyst also confirmed that Fitch assigned substantial weight to the validation of audited financials.  This was not because of the numbers, but more because of the context that the audit process supplies.  For example, if auditors attributed trends in certain figures to a declining customer base, then that would have been important for purposes of analyzing the creditworthiness of PREPA Bonds.

The Fitch Analysts also conveyed that it was not uncommon for Issuers to supply late materials.  Those who rated PREPA, GO, COFINA and/or ERS Bonds each stated that they were comfortable proceeding without audited financials from the Issuers, as long as they had current figures.  In the absence of current audited financials, these CRA Analysts would rely on the most

recent audited financials or use unaudited versions, assessing the financials for reasonableness and analyzing them based on the CRA Analyst's experience and familiarity with entities in the sector. Obviously, these circumstances are not ideal.

Similarly, another CRA Analyst who worked on PRASA Bonds suggested that if the Issuer was unable to provide audited snapshots and the financial information was outdated by two years or more, then the analyst would consider a suspension of ratings until more information was available.  This CRA Analyst also stressed the importance of independent auditing – again, because of the context that such a process provides regarding trends in the financial data from one year to the next, particularly with respect to critical revenue and performance variables.  This CRA Analyst indicated that without the context that audits provide, numbers are not particularly helpful to the ratings analysis.

Finally, a third CRA Analyst echoed the sentiment that audited figures are important for context.  But this CRA Analyst appeared to view audited financial data as secondary to budget projections, because the former is retrospective and the latter is prospective.  This CRA Analyst suggested that although access to timely financial information is important, the issuer-supplied budget projections were, in the CRA Analyst's view, more important, because the budget projections provided a more current view of the Issuer's fiscal health.  In the absence of audited financials, this CRA Analyst recalled using the issuer-supplied budget projections, monthly revenue figures and publicly available information for the analysis.

2.     **The CRAs May Have Lacked an Adequate Comparator for Puerto Rico-Related Bonds**

Several CRA Analysts reported general difficulty categorizing Puerto Rico-related offerings and locating suitable precedent to guide their analyses.  They attempted to draw upon relevant experience with island municipalities like Guam, the Bahamas, and the US Virgin Islands, but did not consider any of those localities to be sufficiently comparable to Puerto Rico in all relevant respects.

For example, at least one CRA Analyst considered the complexities of Puerto Rico's legal status as a commonwealth to be relevant for purposes of determining which analytical framework to apply.  This CRA Analyst found it challenging to rate Puerto Rico-Related Bonds as a result. The analyst's CRA had developed criteria for local governments, for US states, and for individual sovereigns, but not for US commonwealths.  The CRA Analyst considered Puerto Rico to be not only unique from the other categories of Issuers with developed criteria, such as states and municipal governments, but also even within the Caribbean.  When assigning a rating, the CRA Analyst considered using Guam as precedent, but ultimately viewed Guam as too small.  The CRA Analyst recalled that in order to analyze Puerto Rico Issuers, the CRA essentially aggregated input from colleagues who typically rated states, territories, and Caribbean island sovereigns.

Puerto Rico's financial condition was another distinguishing factor, as was the underlying weakness of the economy.  For example, the CRA Analysts conveyed that they would otherwise have viewed the US Virgin Islands as a helpful comparator with respect to water and power utility issuances, but Puerto Rico's degree of debt distinguished it.  In addition, a CRA Analyst told us

The Independent Investigator's Final Investigative Report

that the Public Utility Issuers did not manage their systems with the same commitment to reducing customer costs and reluctance to raise rates. Guam could have been an alternative, because it was viewed as similar to Puerto Rico in certain respects. It was smaller than Puerto Rico, but closest in size and, like Puerto Rico, was a US territory and an island. Guam had also issued debt. But ultimately, even Guam was not on all fours with Puerto Rico due to, among other things, having experienced less shock after losing the synthetic support that the Possession Tax Credit supplied.

Several CRA Analysts also pointed to Puerto Rico's unique geography, the size of its consumer base, and its population distribution as distinguishing factors. These considerations were particularly relevant to assessing the creditworthiness of the utility Issuers and the risk of default for related issuances. This is because the utilities provided services that could be complicated or made more expensive as a result of Puerto Rico's island status, its population distribution, and the age of its systems. Among other things:

- Puerto Rico and its utilities were dependent on fuel oil imports. That dependency carried additional cost, as well as supply risk. And although the CRA Analysts who analyzed PREPA Bonds noted that some degree of fuel oil reliance is common for island jurisdictions, they identified Puerto Rico's near-total dependency as unusual;

- In relation to typical municipalities with water utilities, PRASA's geographic coverage was ten to twelve times greater, yet supported by a mere eighth of the usual consumer base. This distinguished PRASA Bonds, leaving no true comparators;

- Puerto Rico residents are densely concentrated in metropolitan areas, but also reside in remote rural locations. The metropolitan concentrations can tax aging systems and deplete resources, while the rural channels can be difficult to service or even to supply; and

- The age of Puerto Rico's utility systems also mandates expensive maintenance and upgrades (like plant conversions) to keep pace with increasing needs, evolving technology and changing regulatory requirements.

All of this made it difficult for the CRAs to align Puerto Rico and other Issuers with analogues when assessing credit risk.

Finally, some of the Puerto Rico-Related Bonds were, by their nature and structure, novel for CRA Analysts in the US. This includes the ERS Bonds. The CRA Analysts viewed those offerings as atypical because, as one CRA Analyst explained, the system did not contribute money up front so that savings and investments could accumulate throughout the employees' working lives. Another CRA Analyst considered ERS to be distinct from typical pension funds because this CRA Analyst had never rated any other such funds that were backed by contributions into the retirement system. The CRA Analysts thus considered the ERS Bonds to be unique and lacking a body of comparable peers for reference.

Certain CRA Analysts also identified the COFINA Bonds as unique, at least in the later years. According to one CRA Analyst, COFINA's 2016 switch from a SUT-based revenue stream

to a VAT-based revenue stream erected an additional hurdle, because CRA Analysts had not previously dealt with VAT-backed bonds in the US. Although such taxes and bonds were common in Europe, this CRA Analyst had no barometer for how stable a VAT tax or offering would be in the US or Puerto Rico. The CRA Analyst recalled internal debate within his CRA regarding the potential instability of any VAT-backed issuance.

**F.      The Evidence Suggests that there May Have Been a Basis for the CRAs to Take More Aggressive Actions Sooner**

In light of the evidence the evidence we reviewed, reasonable minds can differ regarding the point at which the CRAs should have stopped relying on prospective information supplied by or on behalf of the Issuers, anticipated an increased likelihood of default, or taken more aggressive actions like downgrading Puerto Rico-Related Bonds below investment-grade status. Indeed, our investigation uncovered evidence that the CRAs had persistent concerns with respect to certain Issuers and their issuer-supplied information prior to the 2014 downgrades.

**1.      The CRAs Harbored Long-Standing Concerns Regarding Persistent Credit-Relevant Conditions**

Many of the CRAs' adverse rating adjustments, watch assignments, and outlook revisions during the Relevant Period appear to have been based, at least in part, on conditions that had persisted for some time. On this point, S&P's downgrade of PREPA Bonds to a lower investment-grade rating in June 2013 is illustrative. Available evidence makes plain that many of the factors that S&P cited for the downgrade were not new in 2013. For example, among S&P's cited concerns were the persistent weakness of Puerto Rico's economy, as well as dependence on fuel oil, large capital requirements needed for conversions, and limited liquidity.[188] But as early as 2007, S&P publicly identified as relevant factors PREPA's large capital requirements, its dependence on oil and gas, Puerto Rico's weak economy, and limited liquidity.[189] And by 2009, S&P acknowledged that PREPA's liquidity had been weak.[190] Specifically, S&P observed that

---

[188] Standard & Poor's Ratings Servs., *Puerto Rico Electric Power Authority's Bonds Downgraded to 'BBB' on Weak Economy And Continuing Challenges*, 1 (June 21, 2013) (available through Standard & Poor's Ratings Servs.) ("The lower rating better reflects our opinion of both the continuing weakness of the island's economy and the utility's own challenges . . . includ[ing]: [h]igh rates due to dependence on fuel oil for 61% of energy production; [l]arge capital requirements to convert generating plants to gas, bury distribution wires, and upgrade and extend the transmission system . . . [l]imited liquidity, exacerbated by delinquency of public corporation receivables.").

[189] Standard & Poor's Ratings Servs., *Research: Puerto Rico Electric Power Authority*; *Retail Electric*, 1 (Apr. 9, 2007) (available through Standard & Poor's Ratings Servs.) ("The ratings reflect: . . . [l]arge capital requirements, [d]ependence on oil and gas, [a] weak economy . . . and [l]imited liquidity.").

[190] Standard & Poor's Ratings Servs., *Summary: Puerto Rico Electric Power Authority*; *Retail Electric*, 4 (July 31, 2009) (available through Standard & Poor's Ratings Servs.) ("For these reasons, we believe PREPA's liquidity has always been weak.").

The Independent Investigator's Final Investigative Report

"cash and investments normally on hand are equal to just a few days of operation costs."[191] Despite the foregoing, S&P chose to keep PREPA Bonds at investment-grade until June 2014.

CRA Analysts also told us that by the time of the adjustments to non-investment-grade, they had held long-standing concerns about certain Issuers or Puerto Rico-Related Bonds. These include, among others:

- Concerns that ERS was too generous a system and lacked adequate funding from its inception. One ERS analyst in particular acknowledged that Puerto Rico tried to make the plan more self-sustaining, but noted that the system was too expensive;

- The fact that Puerto Rico's economy had been lagging and never fully recovered from the financial downturn that began in 2006;

- Views that Puerto Rico's high poverty level had persisted throughout recent memory;

- Concerns regarding the Public Utilities' persistent reluctance to raise rates. In fact, certain CRA Analysts conveyed that by 2012-2013, it was common knowledge that despite having a monopoly on services and a high degree of control over its own performance, PREPA could not fund its operations due to long-standing issues, including the refusal to raise rates;

- Long-standing revenue shortfalls, particularly with respect to the Public Utilities (dating as far back as 2011 for PREPA);

- Recurring missed budget targets and resulting deficits. One CRA Analyst specifically noted that as far back as 2000, Puerto Rico would promise to have a balanced budget the next year, but never did;

- For PREPA in particular, CRA Analysts viewed Puerto Rico's near-complete dependency on fuel oil as a persistent contributor to liquidity problems. They also noted that none of the multiple attempts to convert plants to other fuel alternatives or to optimize the efficiency of fuel transport had been successful. Many of those projects were started and later abandoned; and

---

[191] Standard & Poor's Ratings Servs., *Summary: Puerto Rico Electric Power Authority*; *Retail Electric*, 4 (July 31, 2009) (available through Standard & Poor's Ratings Servs.) ("Cash and investments normally on hand are equal to just a few days of operation costs. However, a $275 million line of credit provides financing for fuel purchases, and a $200 million credit facility provides operating liquidity, although this facility is fully used. GDB has provided lines of credit in the interim and is willing to provide guarantees to banks to back the delinquent receivable repayment plan by the Puerto Rico government and governmental agencies.").

- CRA Analysts also described PREPA as having persistent issues related to broken meters and substantial percentages of energy theft.

Notwithstanding these long-standing concerns, the CRAs elected to maintain investment-grade ratings for all Puerto Rico-Related Bonds other than the senior-lien PRASA Bonds until at least February 2014.

### 2.    Some CRA Analysts Were Skeptical of Certain Prospective Information Received From, or on Behalf of, Certain Issuers

In the course of our investigation, we uncovered evidence that well before the 2014 downgrades, some CRA Analysts did not appear to be entirely comfortable with certain information that they received from, or on behalf of, certain Issuers.  This includes prospective information about stated policy goals and projected performance.

The CRA Analysts' skepticism appears to have been strong with respect to one of the Public Utilities in particular.  A CRA Analyst described to us how, at some point in 2013, the Analyst began to notice that the Public Utility's projections were out-of-step with what the CRA would have expected, and the Public Utility's financial information did not appear to be supported by its audited figures.  The same CRA Analyst conveyed that as the Public Utility's performance declined in 2013, the Public Utility's internal financial documents began to diverge in certain respects from the audited versions that the CRA received approximately one year later. Moreover, when that CRA analyzed the utility's actual performance against its own projections based on trends in the audited figures, it determined that the Public Utility's projections were unlikely. Despite all of this, the CRA chose to maintain the Public Utility's investment-grade ratings until February 2014.

This CRA Analyst also described multiple instances between 2012 and 2013 in which the Public Utility's actions cast doubt upon the reliability of its projections, including the Public Utility's strategy for improving revenue and margins.  In this CRA Analyst's assessment, the Public Utility was aware in 2010 and 2011 that it needed to increase its revenues over the subsequent four-year period, to reduce energy theft, and to lower its operating costs.  Nevertheless, the Public Utility chose in 2012 to issue a rebate to its retail customers, rather than to build itself a financial cushion.  The CRA Analyst recalled not having seen any indication by 2012 that the Public Utility's strategies were improving its revenue figures as needed, and conveyed that the CRA interpreted the rebate as the Public Utility having prioritized the interests of its retail customers ahead of those of its bondholders.  By March 2013, the CRA had lost confidence in the Public Utility's ability to execute its own strategies.  It viewed the Public Utility's declining performance as a reflection of its lack of commitment to stated goals, and its lack of execution as impairing management's credibility.  This was primarily because despite having autonomy over its own performance due to a sanctioned monopoly on services, the autonomy to raise rates without legislative approval, and a measure of control over its fuel costs, the Public Utility had demonstrated an unwillingness to increase customer costs.  Nevertheless, the CRA chose only to

place the Public Utility's Bonds on negative credit watch. [192]  The CRA Analyst linked that decision to the continued effects of the economic recession.

In a similar vein, another CRA Analyst described having doubts as early as 2010 regarding the same Public Utility's ability to implement its capital improvement plans.  The CRA Analyst eventually lost confidence at some point between 2012 and 2014.  The CRA Analyst conveyed that the Analyst initially viewed the plan as credible based on the reports and other information that the Public Utility supplied, but that progress had not been made despite the passage of a year-and-a-half from the program's announcement.  The CRA did not immediately lower the Public Utility's Bonds to non-investment-grade, but instead reduced them gradually over approximately eighteen months.

This is also consistent with what a third Public Utility CRA Analyst told us.  That Analyst explained that although the Analyst initially felt that the Public Utility was making some progress in its capital improvement plans, particularly relating to facility conversions that would reduce fuel oil dependence, the CRA Rating Committee viewed those plans as less persuasive over time.  The CRA Analyst specifically pointed to the fact that the promised date of completion for an important project was a moving target.  The Public Utility's projects also failed repeatedly, and it was not uncommon for them to be abandoned without completion following the expense of significant resources.  Nevertheless, the CRA maintained its investment-grade rating for the utility until June 2014.

**G.    Available Evidence Does Not Suggest that Any CRA Analyst or CRA Contemporaneously Believed that More Severe Adverse Rating Actions Should Have Been Taken Earlier**

Notwithstanding the foregoing, none of the CRA Analysts with whom we spoke suggested that he or she contemporaneously viewed the CRAs' rating actions as unjustified in light of the relevant circumstances.  This was true even of the one CRA Analyst who disclosed that the Analyst's CRA contemplated the 2014 downgrades at some point in 2013.  At bottom, witness after witness said, credit ratings are opinions, and the evidence reflects that in general, the CRAs' adverse actions coincided with changed conditions in 2013 and 2014.  These conditions included reduced liquidity and market access (*e.g.*, the decline in GDB's willingness to continue support), as well as relevant current events (*e.g.*, the passage of the Recovery Act and worsening macro-economic conditions for Puerto Rico).  In some instances, there is also evidence to suggest that mitigating information or assurances supplied by or on behalf of the Issuers had helped quell the CRA Analysts' concerns about certain issues.

---

[192] *See* Press Release, Fitch Ratings, *Fitch Places Puerto Rico Electric Power Authority's Revenue Bonds on Rating Watch Negative*, 1 (Mar. 14, 2013) (available through Fitch Ratings) (noting that the Watch Negative is based on review of "PREPA's operating and unaudited financial highlights" and the "continuing effects of the economic recession.").

The Independent Investigator's Final Investigative Report

1. **Until the Recovery Act, the CRA Analysts Assigned Great Weight to the Issuers' Perceived Ability to Access Financial Support from GDB**

Crucially, the CRAs appear to have assigned great weight to the ability of relevant Issuers to draw liquidity from GDB or Puerto Rico, and those entities' prior willingness and ability to supply it. Notwithstanding the persistent conditions and concerns the CRA Analysts identified, they thus did not consider more severe adverse actions to be warranted until it became clear that, in their view, that assistance would no longer be available to certain Issuers. For example, Fitch downgraded PRASA when Puerto Rico ceased its willingness to issue appropriations to PRASA to cover revenue shortfalls.[193] The downgrades of the GO Bonds and others in early 2014 were similarly linked to liquidity and market access concerns.

Consistent with the foregoing, CRA Analysts who rated each of the Puerto Rico-Related Bond groups identified the mid-2014 passage of the Recovery Act as a turning point. In their view, that statute brought a degree of clarity that, despite ongoing economic difficulties, was previously lacking regarding such matters as the Issuers' lack of critical legislative support, the likelihood that Puerto Rico would not repay its bonds as anticipated, and the possibility that COFINA bondholders would not be prioritized as previously assured. At Fitch, for example, the Recovery Act triggered almost immediate and universal downgrades for Puerto Rico-Related Bonds.[194]

There is less agreement regarding the degree to which each CRA Analyst reported having been surprised by the Recovery Act's introduction. The Fitch Analysts reported more surprise, while one S&P Analyst reported only slight surprise. A COFINA Analyst for Moody's recalled learning of the possibility of a restructuring law months in advance to the law's enactment in June 2014—possibly as early as late 2013. The Analyst recalled being aware that the law would theoretically exempt COFINA Bonds. The Analyst also recalled that the possibility that a restructuring law would be enacted began to call into question Puerto Rico's willingness to pay outstanding debt. Ultimately, we are unaware of any evidence to suggest that any CRA Analyst or CRA had advanced-notice that the Recovery Act would be passed.

2. **Information Supplied by, or on Behalf of, the Issuers Appears to Have Mitigated Some of the CRA Analysts' Skepticism About Certain Issues Prior to the Recovery Act**

---

[193] *See* Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico Aqueduct and Sewer Auth. Sr. Revs to 'BBB-'; Outlook to Negative*, 2 (Apr. 18, 2013) (available through Fitch Ratings) ("While PRASA has received both direct and indirect commonwealth support in prior years to balance operations, the commonwealth determined not to provide an appropriation for PRASA for fiscal 2014.").

[194] *See* Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO, Sales Tax, Retirement System & Water Revenue Bonds*, 1 (July 9, 2014) (available through Fitch Ratings) (Fitch downgraded GO, COFINA, ERS, and PRASA on the same day to BB or below and noted that "[t]he rating actions follow passage of the Puerto Rico Public Corporation Debt Enforcement and Recovery Act."); *see also* Press Release, Fitch Ratings, *Fitch Downgrades Puerto Rico GO, Sales Tax, Retirement System & Water Revenue Bonds*, 1 (July 9, 2014) (available through Fitch Ratings) (reflecting that Fitch downgraded PREPA to 'CC' from 'BB' due to the Recovery Act).

The Independent Investigator's Final Investigative Report

A couple of the CRA Analysts with whom we spoke suggested that in certain instances, information or assurances supplied by or on behalf of an Issuer had helped to assuage their concerns in the period leading up to the critical downgrades. Some of those concerns proved well-founded, while the assurances did not.

Fitch's analysis of PREPA between 2012 and 2014 illustrates this point well. The Analyst who worked on PREPA explained to us that Fitch maintained the prevailing rating in March 2012, but revised the outlook on the rating to "negative" from "stable," after PREPA management reported that following better-than-expected performance in the first two quarters of that fiscal year, PREPA would be issuing customer rebates rather than building its cash reserves. As previously noted, Fitch interpreted this as management having chosen to prioritize the interests of PREPA's customers ahead of those of its bondholders, at the expense of PREPA's creditworthiness. The CRA Analyst suggested that although Fitch had been focused on PREPA's tightening margins before then, PREPA always supplied an explanation regarding why the actual figures deviated from the projections. Fitch apparently considered those explanations to be satisfactory at the time.

The same CRA Analyst also recalled having liquidity concerns relating to PREPA in or about 2013, and having calculated by 2014 that PREPA would not have sufficient cash to pay its debtors. But the CRA Analyst also recalled attending a meeting in May 2014 at which GDB discussed PREPA's liquidity. The analyst left that meeting with a clear understanding that PREPA had insufficient funds, but that GDB would step in to provide liquidity. The Recovery Act passed the following month, after which GDB told Fitch in writing that contrary to what it previously indicated, GDB would not back PREPA. This was significant because although PREPA had not typically borrowed much from GDB, Fitch had previously considered GDB to be a source of support for PREPA, if PREPA ever needed it, and liquidity risk was a material factor for the ratings analysis.

Another CRA Analyst provided a more concise example. This Analyst recalled that leading up to the critical downgrades, the Analyst was under the impression based on meetings with the then-Governor that Puerto Rico would not default on its bond obligations. The Analyst recalled the Governor later suggesting the opposite during a public address.

Overall, our analysis of available evidence leads us to conclude that it was not until some point in 2013 or 2014 when the CRAs may have begun to deem issuer-supplied or GDB-supplied assurances to be less persuasive. Indeed:

- A CRA Analyst recalled viewing the forward-looking statements of PREPA as less persuasive beginning in the first or second quarter of 2013, when it became clearer that PREPA was unlikely to make meaningful progress toward instituting the changes that could have improved its performance;

- After the downgrades in early 2014, GDB made various efforts to try to persuade S&P about anticipated liquidity improvements and the ability of Puerto Rico and GDB to preserve their access to the capital markets. S&P did not ultimately restore the ratings to higher notches as a result of those efforts;

- A CRA Analyst told us that by 2014, the Analyst's CRA was wary of implementation risk with respect to purported policy goals.  As a result, the CRA Analyst needed more comfort than before regarding the likelihood that things would improve.  This CRA Analyst conveyed that his skepticism could have been tempered if the Analyst had seen progress toward certain steps that, although politically unpopular, could have improved Puerto Rico's budget deficit (such as pension reform).  But there was no such progress, and the Analyst no longer found persuasive GDB's repetition of the same types of purported goals it had previously identified;

- A Moody's CRA Analyst conveyed that in early December 2013, GDB appealed Moody's decision to place the GO Bonds on watch for a downgrade.[195]  Moody's granted the appeal to the extent that Moody's considered the information that GDB provided in support of its position—but ultimately did not change its decision to put the GO Bonds on negative watch.  Moody's subsequently downgraded the GO Bonds on February 7, 2014;[196] and

- COFINA likewise appealed Fitch's downgrade of the COFINA Bonds after the Recovery Act passed.  Fitch did not reverse its decision.

Accordingly, based on the evidence, we cannot conclude that any CRA or CRA Analyst contemporaneously believed that different or more severe ratings-related actions were merited sooner, notwithstanding the objective circumstances.

**H.     The Investment-Grade Credit Ratings May Have Helped Maintain Investor Demand During the Relevant Period, but Available Evidence Does Not Indicate That They Were a Significant Cause of the Broader Fiscal Crisis**

Because credit ratings often motivate investor decisions, it is likely that, at least for some investors, the CRAs' decisions to keep the investment-grade ratings for Puerto Rico-Related Bonds was a consideration in buying or holding such assets. It is also possible that if the weaknesses had been more publicly aired and analyzed, those investors might have attempted to sell such assets or opted to purchase different ones. This is most likely to be true with respect to individual

---

[195] *See e.g.*, Moody's Inv'rs Serv., *Moody's places Puerto Rico general obligation and related bonds on review for downgrade* (Dec. 11, 2013) (available through Moody's Inv'rs Serv.).  This ratings report also covers rating actions on COFINA Bonds.

[196] *See* Moody's Inv'rs Serv., *Moody's downgrades Puerto Rico GO and related bonds to Ba2, notched bonds to Ba3 and COFINA Bonds to Baa1, Baa2; outlook negative* (Feb. 7, 2014) (available through Moody's Inv'rs Serv.).  This ratings report also covers rating actions on COFINA Bonds and PRASA Bonds.

bondholders who, in contrast to distressed-debt hedge-funds and other sophisticated investors, are less likely to fully appreciate the limitations of the CRAs' analysis.

It may also be true with respect to the subset of sophisticated investors that had investment-grade preferences. Moody's rated the 2013 PREPA Bond issuance as 'Baa3' with a negative outlook, which is just one notch above junk status.[197] The Moody's Analyst did not, at the time, think that the issuance should necessarily have been rated below investment-grade, but the Analyst signaled that it was a judgment call. Moody's placed the issuance on a negative outlook, which, the witness described, reflected downward pressure on the credit rating and provided notice to investors (including investors who were barred from investing in non-investment-grade debt) that the rating could move below investment grade. The issuance was later placed on review for downgrade in December 2013 and downgraded to below investment-grade on February 7, 2014.[198] Given the suitability implications of non-investment-grade status for certain investors, the discretion to issue a negative outlook or watch rather than a downgrade may have contributed to at least some investors purchasing bonds during the watch period that they would not otherwise have considered.

Notwithstanding the foregoing, we conclude that the overall impact of the continued investment-grade ratings on Puerto Rico's fiscal crisis was relatively minor when considered in light of other factors.[199] This is, in part, because even if the CRAs could fairly be characterized as having maintained investment-grade credit ratings for Puerto Rico-Related Bonds past the point at which some contend that those credit ratings made sense, we do not believe that those ratings played as significant a role as others have concluded the sub-prime RMBS credit ratings did in connection with the Great Recession. Unlike the coveted 'AAA' (or equivalent) ratings that the CRAs assigned to those RMBS assets, most of the investment-grade ratings that the CRAs assigned to Puerto Rico-Related Bonds were relatively moderate. In fact, CRA Analysts recalled Puerto Rico and its Public Utilities typically having the lowest investment-grade ratings among peer subjects in their portfolios. And despite the sharp division between investment-grade and non-investment-grade assets, most investors do not rely *solely* on whether a credit rating is investment-grade in order to assess suitability.[200]

---

[197] *See*, *e.g.*, Moody's Inv'rs Serv., *Moody's downgrades PREPA to Baa3 from Baa2*; *Outlook is Negative* (June 19, 2013) (available through Moody's Inv'rs Serv.); *see also* Moody's Inv'rs Serv., *Moody's Assigns Baa3 rating to PREPA Power Revenue Bonds*, *Series 2013a*; *outlook is negative* (July 25, 2013) (available through Moody's Inv'rs Serv.).

[198] *See* Moody's Inv'rs Serv., *Rating Action: Moody's downgrades PREPA's ratings to Ba2 from Baa3*; *outlook negative* (Feb. 7, 2014) (available through Moody's Inv'rs Serv.).

[199] The evidence available to us does not support the quantification of any impact of a particular credit rating on demand for, or pricing of, any specific Puerto Rico-Related Bond.

[200] In fact, regulators discourage them from doing so. *See*, *e.g.*, U.S. Sec. & Exchange Comm'n, *Updated Investor Bulletin: The ABCs of Credit Ratings*, https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings (last modified Oct. 12, 2017); U.S. Sec. & Exchange Comm'n, *Investor Bulletin Municipal Bonds: Understanding Credit Risk* (Dec. 26, 2012), https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-bulletin-municipal-bonds-understanding; Fin. Indus. Regulatory Auth., *Municipal Bonds: Important Considerations for Individual Investors*,

The Independent Investigator's Final Investigative Report

Investors also had other compelling incentives to purchase Puerto Rico-Related Bonds, aside from their investment-grade ratings.  This includes the unique tax-favored treatment discussed elsewhere in this Report.  Similar incentives did not exist for the 'AAA'-rated sub-prime RMBS deals to which some have attributed the Great Recession.

We acknowledge that reasonable minds can differ about whether and, if so, to what degree, Puerto Rico would be in a better position today if the CRAs had downgraded the Puerto Rico-Related Bonds at an earlier point in time.  According to some estimates, up to 20% of the investor base for Puerto Rico-Related Bonds was comprised of municipal mutual funds that had traditional investment-grade preferences, and thus were subject to limits on non-investment-grade assets.[201] For reasons already explained, Puerto Rico-Related Bonds would have been less attractive to such investors after the date on which the credit ratings for those bonds were adjusted to non-investment-grade.[202]  Accordingly, if the junk status ratings had materialized sooner, then investor demand would likely have been suppressed at an earlier date, and there may have been a stronger counterweight to the debt culture that contributed to uncontrolled liabilities.  Earlier downgrades may also have triggered termination events under certain contracts, forcing an earlier reckoning.[203] For reasons explained above in Part X.F.2, however, the CRAs do not appear to have believed that they had a sufficient basis to reject certain issuer-supplied information, to refuse to rate certain Issuers or Puerto Rico-Related Bond offerings, or to issue significant downgrades for most of the Puerto Rico-Related Bonds until some point in 2013 or 2014.  By then, the bulk of such Bonds had already issued.

---

http://www.finra.org/investors/alerts/municipal-bonds_important-considerations-individual-investors (last updated Apr. 24, 2013) (encouraging investors to use credit ratings as but one of many factors when evaluating a potential investment in municipal bonds and stressing that credit ratings should not be interpreted as assurances of liquidity or performance).

[201] *See* Fed. Res. Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy*, 20 (2014) (available through Fed. Res. Bank of N.Y.) (providing estimate as of December 2013).

[202] *See* Fed. Res. Bank of N.Y., *An Update on the Competitiveness of Puerto Rico's Economy*, 20 (2014) (available through Fed. Res. Bank of N.Y.).

[203] *See, e.g.*, U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 14-15 (May 2018) (identifying Puerto Rico's practice of issuing debt to finance operations as a factor that contributed to Puerto Rico's persistent deficits and noting that the growth of Puerto Rico's total debt resulted in greater annual debt servicing obligations); *cf.* U.S. Senate Comm. on Homeland Sec. & Governmental Affairs, Permanent Subcomm. on Investigations, *Wall Street & the Financial Crisis: Anatomy of a Financial Collapse*, 244 (Apr. 13, 2011) (concluding, with respect to the role of RMBS credit ratings in the US fiscal crisis, that "[i]f the credit rating agencies had issued ratings that accurately exposed the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, slowed the pace of securitizations, and as a result reduced their own profits.").

The Independent Investigator's Final Investigative Report

## I.    <u>There is Room to Improve Inherent Vulnerabilities in the Credit Rating Process</u>

The CRA representatives we interviewed told us that they viewed their roles as providing independent, objective opinions about credit quality.  There is some tension between that and the evidence we analyzed.  As discussed above, the Issuers or their agents have power to frame the ratings analyses and the assigned credit ratings are not sufficiently objective.  The municipal bond market could benefit from reforms that reduce the CRAs' dependency on Issuers and help guide CRA Analyst discretion, at least where, as here, an Issuer shows indicia that greater due diligence would be prudent (for example, due to habitual tardiness in delivering audited financial statements, recurrent deviation from purported goals or projected performance, and elevated political influence).

We recognize the concerns that the CRAs and others have raised when process reforms were considered in other contexts.  The primary objection appears to have been that a one-size-fits-all approach to ratings analysis could erode competition and degrade their products.[204]  But credit rating agencies are important market actors, and we do not believe that healthy competition and high-quality results are mutually exclusive of reasonable guidance.

Nevertheless, we are mindful that the Reform Act erected a statutory bar that prohibits the SEC and certain other authorities from regulating the substance of the CRAs' criteria or methodologies.[205]  For this reason, among others, the Dodd-Frank and Reform Act measures focused on softer concepts, such as establishing the SEC's Office of Credit Ratings, increasing disclosure and implementing procedures designed to cabin conflicts of interest.[206]

---

[204] *See*, *e.g*., U.S. Sec. & Exchange Comm'n, *Report to Congress: Credit Rating Standardization Study*, 2-4, 9-11, 23-24, 26-27 (Sept. 2012) (summarizing objections submitted by NRSROs regarding potential standardization of credit ratings).

[205] *See* 15 U.S.C § 78o-7(c)(2) ("Notwithstanding any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings.").

[206] *See*, *e.g*., 15 U.S.C. § 78o-7(h)(3); 15 U.S.C. § 78o-7(h)(2); U.S. Sec. & Exchange Comm'n, *Report to Congress: Credit Rating Standardization Study*, 2 (Sept. 2012) (summarizing objections submitted by NRSROs regarding potential standardization of credit ratings, including lack of authority for SEC to implement due to statutory bar set out in 15 USC 78o-7(c)(2), and ultimately recommending no action regarding standardization of symbols or criteria); *see also, e.g.,* 17 C.F.R. § 240.17g-8; 17 C.F.R. § 240.17g-9; Press Release, U.S. Sec. & Exchange Comm'n, *SEC Adopts Credit Rating Agency Reform Rules*, www.sec.gov/news/pressrelease/2014-178.html (Aug. 27, 2014) (summarizing amendments to Exchange Act, amendments to existing rules and enactment of new rules regarding NRSROs pursuant to Dodd-Frank, including 17 C.F.R. § 240.17g-8 and 17 C.F.R. § 240.17g9); U.S. Sec. & Exchange Comm'n, *Amendments to Rules for Nationally Recognized Statistical Rating Organizations*, Release No. 34-59342, 2-3, 5 (Feb. 2, 2009) (summarizing reforms adopted after Reform Act passed and following investigation into the CRAs, pursuant to which rating agencies must apply for NRSRO status, SEC oversees those registrations, and NRSROs became subject to broader requirements regarding rating history disclosures, transparency, avoidance of conflicts of interest and handling of material non-public information).

The Independent Investigator's Final Investigative Report

As noted above, we found no evidence that the CRAs circumvented or deviated from existing conflict-separation or other protections with respect to Puerto Rico-related offerings. But what we did find are process weaknesses that existing rules and regulations do not resolve. We thus propose for consideration the following categories of potential reforms. In our view, these options could help to more closely align credit rating products with their perceived significance to the market. This is so even if some of them may only be voluntarily implemented as self-governing best practices, due to the existing statutory bar:

1.     <u>Reconsideration of Benefits and Drawbacks of Existing Statutory Bar in Relation to Certain Sets of Circumstances Affecting Municipal Bond Issuers.</u> Credit ratings serve an important function in the municipal bond market and, in some ways, are a gateway to investors. Yet, the existing framework incorporates no obligation that any credit rating agency consider certain factors that appear to be highly credit-relevant for municipal bond issuers (such as the overall amount and pace of an issuer's debt load or the underlying and persistent weakness of its economy); to weight those factors a particular way; or even to ensure that the factors are objectively reasonable in light of contemporaneous circumstances. This is because, as previously noted, the Reform Act erected a statutory bar that forecloses the SEC from regulating the ratings criteria or methodologies that credit rating agencies use. The provision appears to have been inserted in the Reform Act immediately before it passed and, as a result, the intended purpose and justification for the bar remain unclear.

It is difficult to identify any meaningful benefit that the Reform Act's bar on criteria regulation offered to Puerto Rico's municipal bondholders during the Relevant Period. Instead, our investigation reflects that although the CRAs appear to have genuinely believed that their ratings were justified at the time, the wide latitude that the CRAs and their Analysts had with respect to ratings criteria resulted in Puerto Rico-Related Bonds having been rated above investment-grade, and new issuances continuing to proceed to market, during the Relevant Period even as: (i) certain Issuers provided late or stale financials, performed poorly, or deviated from stated goals; (ii) Puerto Rico's economy remained weak; (iii) Puerto Rico's debt load increased; and (iv) certain Issuers approached insolvency. In this particular context, the CRAs' perception of the creditworthiness of certain Issuers appears to have been out-of-step with reality, and to have persisted for some time as the CRA Analysts sought to rate through any potential economic cycle. The Recovery Act was passed, and certain Issuers ultimately landed in a form of insolvency proceedings, after their municipal bonds were downgraded below investment-grade.

Puerto Rico's debt crisis thus demonstrates that certain objective criteria requirements could, at least in the factual context we investigated with respect to Puerto Rico-Related Bonds, have been helpful to municipal bond investors. It may therefore make sense for Congress to consider, or the SEC to evaluate in its rulemaking, whether it should reserve for federal regulators some degree of authority to regulate limited aspects of the process through which credit ratings are assigned for the municipal bond asset class, at least when a similar mix of circumstances is present.

2.     <u>The Development of Guidance to Help Clarify When Forward-Looking Issuer-Supplied Information Merits Heightened Skepticism or Outright Rejection.</u> At least one CRA Analyst conveyed that if there were questions about the accuracy of issuer-supplied information, then those questions would be disclosed publicly and the Analyst would recommend withdrawing

the assigned rating.  Despite the concerns outlined above with respect to issuer-supplied information for Puerto Rico-Related Bonds, however, we are not aware of any CRA having pursued that course of action.  This may be a symptom of the inherent difficulty of evaluating information that, like a forward-looking statement, is not purely factual and thus seldom identifiable as true or false when supplied.  The development of guidelines regarding how often an Issuer's actual performance may lag or remain stagnant in light of stated goals before a rating agency should not use that Issuer's forward-looking information in the ratings analysis could help address this type of difficulty.

3.      The Development of Guidance Regarding When a Credit Rating Agency Should Question Whether a Municipal Bond Issuer's Financial Information or Budget Projections Are Unreliable or Insufficient.  At least one CRA Analyst identified instances in which an Issuer's audited financial information appeared to deviate from the CRAs own projections, as well as the Issuer's internal estimates.  Guidance regarding the point at which such deviations become too frequent for the Issuer's financial information to be considered reliable could help address that situation.  We would also recommend that the CRAs adopt guidance regarding how late is "too late" with respect to an Issuer's provision of audited financial statements, in order to protect the integrity of the CRAs' assessments of liquidity risk and financial condition.  Benchmarks regarding how many fiscal years or quarters the Issuer's performance may deviate from anticipated figures before the CRA Analyst should reject it could also be helpful.

4.      The Development of Guidance Encouraging the Uniform Consideration of Certain Credit-Relevant Variables.  This would include, among other things, a recommendation that the CRAs' methodologies consider event risks for issuers engaged in a line of business that may be sensitive to such risks, if also situated in a geographic location that is vulnerable to those risks.  It may also include a recommendation that the CRAs  (i) require, as part of their rating terms and conditions, that the issuers certify (either directly or through their auditors) the actual use of bond proceeds in regular, specified intervals; (ii) require their CRA Analysts to evaluate those certifications against the intended uses of the bond proceeds; (iii) encourage the CRA Analysts to consider any departure between the two to either be reasonably explained, or to merit that any forward-looking information subsequently provided be viewed with enhanced skepticism; and (iv) encourage the CRA Analyst to consider the use of proceeds to bridge operational deficits or to refinance existing debt as a credit negative.

5.      Recommendation that CRAs Have Their In-House Attorneys or Outside Counsel Analyze the Soundness of Any Legal Opinion Supplied by or on Behalf of an Issuer, to the Extent That it is a Key Driver of the Ratings Analysis.  As demonstrated above, the CRAs assigned great weight to the legal opinions that Puerto Rico supplied regarding the purported separation between the COFINA revenue stream and the Clawback Provision.  In material part, the CRAs' belief in the strength of that separation boosted the COFINA Bond ratings above the GO Bond ratings (and others).  Yet, none of the CRA Analysts we asked recalled asking a CRA lawyer to read the opinions, much less to test the soundness of the analysis.  We think it would have been more prudent for them to have done so.  And because many credit rating agencies have their own in-house legal departments or continuing relationships with outside counsel, this would be a relatively easy safeguard to incorporate.

# PART XI

# SELLING PRACTICES FOR PUERTO RICO-RELATED BONDS

# PART XI
# SELLING PRACTICES FOR PUERTO RICO-RELATED BONDS

### A.   <u>Introduction</u>

Under PROMESA, Congress granted the Oversight Board the authority to investigate the "disclosure and selling practices in connection with the purchase of bonds issued by the Government of Puerto Rico," particularly as those practices relate to retail investors.[1]  Following this mandate, we investigated the selling practices of key players in the underwriting, issuance, and primary and secondary market sales of Puerto Rico-Related Bonds and Puerto Rico funds heavily invested in those bonds.[2]  We also investigated disclosures made to investors by the key players, the impact of potential conflicts of interest, and compliance with applicable laws and regulations.

Our investigation revealed a broad market for Puerto Rico-Related Bonds, both within Puerto Rico and throughout the US mainland.  Puerto Rico issued a vast amount of debt into both markets—$72 billion in total remained outstanding as of 2015.[3]  The debt was issued primarily in the form of bonds placed directly into specific, targeted markets.

---

[1] PROMESA § 104(o).

[2] As described below, the "<u>primary market</u>" is the sale of bonds at the time of the initial issuance of the bond.  The "<u>secondary market</u>" is the over-the-counter sales of bonds and other securities after the initial primary market allocation.

[3] Analysis provided by UBS counsel based on data from Bloomberg, L.P.  Outstanding public debt includes both short and long term debt but not refunded debt and derivatives.  In this section of the report, we focus on the selling practices for the roughly $72 billion in debt that Puerto Rico had outstanding as of 2015.  As

At the time of issuance, Puerto Rico-Related Bonds were assigned for sale in either Puerto Rico or the US mainland, and designated for either institutional or retail markets.  The placement of the bonds into either the Puerto Rico or US mainland market ("mainland market"), and assignment for sale into either the "institutional bond market" or "retail bond market," was based on market conditions and the anticipated tax treatment under US and Puerto Rico laws, among other factors.  For example, of four series of COFINA Bonds issued in 2010, two were issued in the US mainland and two were issued within Puerto Rico.

Banks marketed and sold Puerto Rico-Related Bonds to diverse investors across the US mainland and in the Puerto Rico market ("local market"), both retail and institutional, with a variety of investment goals and levels of sophistication.  Through this process, approximately $56 billion of Puerto Rico's debt was issued into the mainland market, while a significant amount—approximately $16 billion as of 2015, which comprised more than 20% of total Puerto Rico debt—remained within Puerto Rico.

1.    **Puerto Rico-Related Bonds were Issued and Sold through the Soft Underwriting Process**

As discussed in Part III.C.1 of this Report, Puerto Rico-Related Bonds were sold through what is called a soft underwriting process, through which underwriters minimize risk in advance of an issuance by assessing the potential market and allocating the forthcoming bonds to buyers.  A soft underwriting is an integrative process, where the specific characteristics of an issuance are matched to demand for bonds by first gauging the interest of potential investors.

As a general matter, the soft underwriting process is fluid.  Its component steps and the order in which they are implemented varies by issuance.  In Puerto Rico, the process typically began when GDB decided that a Puerto Rico-Related Entity would issue new bonds.  GDB first asked members of its underwriting panel about their interest and desired level of underwriting commitment.  GDB then selected the lead managers, senior managers, and remaining syndicate members from those underwriting firms that demonstrated interest.  Sometimes, GDB considered proposals from two or more interested underwriting firms before making these decisions.  Other times, GDB would set roles at the outset based on its experience with the chosen underwriters and a desire to spread underwriting assignments among its panel of potential underwriters.  Typically, if the issuance was designated for the local market, the lead manager and book runner were Puerto Rico banks or at least had a large Puerto Rico presence.

Once assigned, the lead manager worked with its capital markets desk to price the issuance.  The capital markets desk came to a pricing level for the issuance, meaning an interest rate for each bond to be issued, based on the desk's understanding of market demand, which was shaped by many factors including the financial condition of the issuer, the duration of the bonds, and total amount and structure of the proposed issuance.  A single issuance was typically comprised of several bonds, each with different maturities and payment terms, and priced individually.  At this

---

discussed in Part II.B.3 of this Report, by 2017, this figure had risen to roughly $74 billion.  The vast majority of the debt is in the form of bonds issued by Puerto Rico or by Puerto Rico-Related Entities, like the Public Utilities.  Gov't of P.R., P.R. Fiscal Agency and Fin. Advisory Auth., Fiscal Plan for Puerto Rico, 27 (2017).

point in the process, the bankers were prohibited from providing information about the proposed terms of the issuance (or other material inside information) to the sales force or customers.

After GDB agreed in principle to a pricing proposal and the general structure of the issuance, each participating underwriter would then be permitted to ask their wealth management teams to gauge potential demand for the bonds among the underwriters' retail customers. The capital markets team would do the same for institutional clients. This process is called building the order book. If the issuance was designated for the local market, salespeople and traders based in Puerto Rico sought out their Puerto Rico institutional and retail clients for expression of intent to buy specific numbers of bonds in the primary market sale. The same process would occur in the US for underwritings of issuances destined for sale on the mainland.

Each underwriter would then aggregate these results and return to GDB with a percentage of the planned issuance that it was willing to underwrite, based on the commitments received from customers. GDB then (usually in consultation with the lead manager) would assign the portion of the issuance that each underwriter was allocated to sell in the primary market. GDB would sometimes be so involved as to specifically direct allocations of certain bonds to certain banks and their respective institutional customers. GDB would also determine the split of bonds to be sold to retail and institutional investors, with the largest allocations typically designated for the institutional markets. At this point in the process, the volume of the issuance would be set, based on the commitments the underwriters had received from their customers.

Once the issuance was finalized and completed, and the bonds transferred to customers in exchange for payment to the issuer, the underwriters were compensated for their role through a combination of an underwriting discount (the difference between what the underwriters pays for the bonds and the price it sells the bonds), management fees, risk fees, and sales credits.

## 2.     Bond Issuances in the Mainland Market

As of 2015, the primary holders of US municipal bond debt included large mainland mutual funds, small-scale institutions, and individual mainland investors looking to integrate high-yielding, tax-exempt products into their portfolios. As discussed in more detail below, unlike issuances from a US state, certain Puerto Rico-Related Bonds could be sold on a tax-exempt basis to residents of *any* US state, not just to residents of Puerto Rico.[4] These bonds were triple tax-exempt because, as previewed above in Part II of this Report, the interest income was not subject to federal, state, or local income tax. Changes to the Tax Code in the 1980s limited the amount of municipal debt issued in the US mainland that was exempt from taxation, which made Puerto Rico-Related Bonds an attractive alternative.

Witnesses who worked with various underwriters said that GDB typically pursued bond issuances in the mainland due to Puerto Rico's unique access to the entire mainland market and the lower costs and interest rates available there. They told us that if bonds could be issued in the mainland market on a tax-exempt basis, they would be issued there. As one witness involved in

---

[4] 48 U.S.C. § 745 (2016).

the bond issuance process said, the mainland market was thought to be "bigger, deeper, and more institutional."

As of 2015, approximately 20% of all US bond mutual funds held some quantity of Puerto Rico-Related Bonds—especially COFINA Bonds—and cumulatively owned approximately $11.3 billion of the total debt.[5]  Some US funds would include Puerto Rico-Related Bonds in municipal bond funds that were otherwise concentrated in the issuances of a single US state, due in part to the generally higher yields for Puerto Rico-Related bonds in comparison to US state bond yields.[6]

These US funds likely held an even larger portion of Puerto Rico-Related Bonds before the Puerto Rico financial crisis.  In 2013, US bond mutual funds rapidly reduced exposure to Puerto Rico-Related Bonds due to uncertainty over Puerto Rico's fiscal situation.[7]  The remainder of Puerto Rico debt that was sold on the mainland went to retail investors and smaller US-based institutions.

### 3.    <u>Bond Issuances in Puerto Rico</u>

Although most of Puerto Rico's debt was issued in the US mainland, Puerto Rico residents also held a substantial amount of the island's debt.  If an issuance did not qualify for tax exemption in the US mainland, Puerto Rico had a unique alternative: it could, and did, issue these bonds on a triple tax-exempt basis (and largely free of estate taxes) to Puerto Rico residents.  For example, ERS Bonds that did not qualify for tax exemption in the US mainland were instead issued in the local market.[8]  These tax incentives and other market features spurred the growth of the Puerto Rico debt market beginning in the 1990s.  By 2015, approximately 22%, or $16 billion, of Puerto Rico's outstanding debt was held in the local market, having been sold either directly to investors as retail bonds or through institutional sales primarily to Puerto Rico mutual funds that, in turn, were sold to Puerto Rico retail investors.[9]

These Puerto Rico mutual funds were predominantly Closed-End Funds ("CEFs").  CEFs are a type of mutual fund that issues a fixed number of shares in an initial public offering, which then trade in the secondary market.[10]  These shares are typically not redeemable, meaning that the CEFs are not obligated to repurchase the shares upon investor request.  Investors were particularly

---

[5] Lara Merling, *et al*., *Life After Debt in Puerto Rico: How Many More Lost Decades?*, 16 (2017).

[6] *See, e.g*., Gov't Accountability Office, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 43-44 (2018) ("Some of the demand for Puerto Rico municipal securities came from certain US municipal bond funds.  These funds concentrated their investments in one state to sell to investors within that state, but also included Puerto Rico bonds in their portfolios.  Puerto Rico bond yields generally were higher than state bond yields, according to industry experts.  When added to a fund, the higher yields from Puerto Rico bonds would increase the overall return on investment yield of a fund.")

[7] Lara Merling et al., *Life After Debt in Puerto Rico: How Many More Lost Decades?*, 16-17 (2017).

[8] Conway MacKenzie, Inc., *Review of the Events and Decisions That Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 13 (2010).

[9] Analysis provided by UBS counsel that is based on data from Bloomberg, L.P.  Local market debt is approximated as Puerto Rico debt that is federally taxable.

[10] *Closed-End Fund Information*, U.S. Sec. & Exch. Comm'n (Jan. 16, 2013), https://www.sec.gov/fast-answers/answersmfclosehtm.html.

attracted to CEFs issued in Puerto Rico because they were tax-exempt if the funds complied with certain investment requirements, including that two-thirds of the fund assets be invested in Puerto Rico.

As discussed below, these CEFs were exempt from the 1940 Act.  This is crucial, because the 1940 Act subjects most mutual funds in the US to a variety of regulations governing disclosure requirements, leverage limitations, transactions with affiliates, and other features.  However, it provides an exemption for US territories, including Puerto Rico.  That exemption, combined with the favorable tax environment, fueled the popularity of Local CEFs (defined below).  The CEFs, in turn, enabled Puerto Rico to issue Puerto Rico-Related Bonds at more favorable rates and to a wider pool of investors than the Issuers could have done without the CEFs.

The local market differed from the mainland market not only because of its regulatory and tax features, but also because of its composition.  The local market was particularly retail-driven, whereas the mainland market had a significant institutional investor component.  Puerto Rico bank witnesses stated—and documents we reviewed confirmed—that retail Puerto Rico investors preferred fixed income, tax-exempt investments.  The investor base for on-island debt was comprised of individuals and Puerto Rico-based corporations.

Our investigative findings focus on the emergence and growth of the debt market within Puerto Rico under these unique circumstances—and, in particular, on the creation and growth of CEFs.  That growth, beginning in the 1990s and lasting through 2013, helped set the stage for the debt crisis, the losses that stemmed from the debt crisis, and the debt crisis' impact on Puerto Rico residents.

We first analyze the dynamics that fueled the growth of investment in Puerto Rico municipal debt on the US mainland as well as in Puerto Rico, including the rise of the Local CEFs. We then take a closer look at the Local CEFs.

Puerto Rico banks and their affiliates created and managed thirty-five CEFs in total ("Local CEFs"), beginning in 1995.[11]  UBS Financial Services Incorporated of Puerto Rico ("UBS PR"[12]) sponsored twenty-three of them, nine of which it co-sponsored with Popular Securities LLC

_____

[11] *See Puerto Rico Funds*, UBS Wealth Management USA (July 25, 2018, 4:42 PM), https://www.ubs.com/us/en/wealth/misc/puertoricofunds.html; *First Puerto Rico Family of Funds*, Santander                                                                                                  Securities http://puertorico.santandersecurities.com/SecuritiesFamFunds/sec_family_funds.aspx (last visited Aug. 6, 2018);   *Popular   Family   of   Funds*,   Popular   One   Products   and   Services, http://popularone.com/services/investments/products-and-services/popular-family-of-funds/  (last  visited Aug. 6, 2018).

[12] This Report uses the term "UBS PR" to encompass UBS Financial Services Incorporated of Puerto Rico and/or its affiliate UBS Asset Managers of Puerto Rico ("UBS AM"), which manages and acts as investment advisor to the UBS Funds.

The Independent Investigator's Final Investigative Report

("Popular Securities") (collectively, "UBS Funds").   In addition, Santander Securities LLC ("Santander Securities")[13] independently sponsored twelve CEFs ("Santander Funds").[14]

The Local CEF market has been the subject of extensive press reporting,[15] regulatory proceedings (before SEC[16] and Financial Industry Regulatory Authority ("FINRA")), [17] and federal class action lawsuits.[18]  This is because prior to 2013, the Local CEFs produced up to 12% in annual returns to investors,[19] but after 2013, the Local CEFs declined in value, causing huge losses to the Puerto Rico residents who had invested in them.  The UBS Funds reportedly declined by up to 60% in share price, resulting in nearly $3 billion in losses to Local CEF investors.[20]  UBS PR provided documents that confirm that the share prices for twenty-one of the UBS Funds declined an average of 50% between July and December 2013.[21]  Some Local CEF prices declined 60% while others fell by 30%.[22]

## 4.     Overview of Conclusions

The evidence we developed through our investigation supports the following conclusions:

1.     Consistent with a report that the Government Accountability Office recently released,[23] the triple tax-exempt status of Puerto Rico-Related Bonds to all US states made them attractive to mainland investors.  This tax benefit was a key reason for the sale of approximately $56 billion (of the $72 billion total Puerto Rico debt outstanding as of 2015) into the mainland market.[24]  *See* Part XI.A.2.

---

[13] This Report uses the term "Santander Securities" to encompass Santander Securities LLC and/or its subsidiary Santander Asset Management, L.L.C. ("SAM"), which serves as investment advisor to the Santander Funds.

[14] These entities also created and maintained fifteen open-end funds. UBS PR, Popular Securities, and Santander Securities sponsored four, five, and six open-end funds, respectively.

[15] *See, e.g.,* Dawn Giel, *The 77-Year-Old Loophole That Created Puerto Rico's Unique Market and Led to Its Ultimate Meltdown*, CNBC (Dec. 18, 2017), https://www.cnbc.com/2017/12/18/the-77-year-old-loophole-that-created-puerto-ricos-unique-market.html.

[16] *In the Matter of Miguel A. Ferrer and Carlos J. Ortiz*, 107 S.E.C. Docket 3047 (Oct. 29, 2013).

[17] FINRA, No. 14-02464, *De Jesus v. UBS Financial Services* (Dec. 5, 2016).

[18] *Fernandez v. UBS AG, No.* 15-02859 (S.D.N.Y. Apr. 2015).

[19] Dawn Giel, *The 77-year-old loophole that created Puerto Rico's unique market and led to its ultimate meltdown*, CNBC (Dec. 18, 2017), https://www.cnbc.com/2017/12/18/the-77-year-old-loophole-that-created-puerto-ricos-unique-market.html.

[20] Craig McCann and Edward O'Neal, *UBS Puerto Rico's Bond Fund Debacle: What We Know so Far*, SLCG (Feb. 12, 2015), http://blog.slcg.com/2015/02/ubs-puerto-ricos-bond-fund-debacle-what.html.

[21] UBS excluded from its calculation the data for two of the UBS Funds with principal distributions during this period.

[22] UBS documents also show that as measured by fund performance, the UBS Funds lost 43.1% between July and December 2013.

[23] U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* (2018).

[24] Analysis provided by UBS PR counsel that is based on data from Bloomberg, L.P.  103 market debt is approximated as Puerto Rico debt that is federally tax-exempt according to Bloomberg, L.P. 103 market

2.      Changes in the late 1980s to Section 103 of the Tax Code ("Section 103") regarding the tax status of state and local bonds that are exempt from federal taxation ("103 bonds") re-directed bonds that did not comply with Section 103 ("non-103 bonds") to the local market.  This is because Puerto Rico non-103 bonds were still tax-exempt when sold in Puerto Rico.  *See* Part XI.B.1.

3.      The tax-exempt status of the non-103 bonds in Puerto Rico sparked the creation and fueled the growth of the Local CEF industry, which was further encouraged by market dynamics, including low competition from other products due to low interest rates; the fixed income, tax-exempt preferences of Puerto Rico investors; and favorable tax incentives for these bonds and Local CEFs.  Under these conditions, Local CEFs became a major conduit for the sale of non-103 Puerto Rico debt to Puerto Rico investors.  *See* Part XI.B.2.

4.      The local market is retail-driven, meaning that individual investors, as opposed to institutions, make up the bulk of the investor base.  Our investigation determined that the $16 billion non-103 component of the Puerto Rico debt outstanding as of 2015 was designated for and sold to two primary buyers: (i) CEFs, which dominated the Puerto Rico institutional market; and (ii) individual investors in the Puerto Rico retail market.  Roughly $8 billion (approximately 11% of Puerto Rico's total municipal debt as of 2015) was held by approximately 60,000 Puerto Rico residents[25] (along with a small number of entities investing in the retail market, such as local insurance companies and cooperatives).[26]  The remaining roughly $8 billion was sold to the Local CEFs, which were then securitized into shares that banks sold to Puerto Rico individual investors.  Because the Local CEFs were composed primarily of Puerto Rico-Related Bonds, the Local CEFs functioned as a pass through for the sale of those Puerto Rico-Related Bonds to individual retail investors in Puerto Rico.  *See* Part XI.B.3.

5.      The regulatory environment for CEF selling practices, specifically the exemption of Local CEFs from the provisions of the 1940 Act and its related regulations, also played a key role in the growth of the Local CEFs.  While on the US mainland most mutual funds are regulated under the 1940 Act, until recently, investment companies located in Puerto Rico and other US territories were exempt from those regulations.  Mainland CEFs registered under the 1940 Act are subject to a variety of trading restrictions, borrowing limits, and reporting requirements enforced by SEC.  However, we found that Puerto Rico imposed its own rules and regulations on the Local CEFs.  The absence of the 1940 Act, coupled with the Puerto Rico rules and regulations, was critical to the growth of the Local CEFs.  Specifically:

- Affiliated Transactions: The evidence shows that the absence of the "affiliated transactions" prohibition—defined by the 1940 Act to prohibit transactions between underwriting banks and their sponsored funds—was not a major cause of the Local

---

debt includes approximately $2.9 billion of debt that is federally tax-exempt and Puerto Rico taxable according to Bloomberg, L.P.

[25] Bonistas del Patio, Inc., *Proposals to reactivate economic growth in Puerto Rico*, US Senate Committee on Finance, 4–5 (Oct. 14, 2016).

[26] Typically, in financial markets, "retail investors" refer to individual investors, whereas "institutional investors" refer to institutions such as banks, mutual funds, and insurance companies. The issuer defines the criteria for retail or institutional investors in any given issuance. UBS PR witnesses noted that in Puerto Rico, smaller institutions sometimes qualified for the retail market, depending on the size of the trade.

CEF losses. However, by virtue of the size of the banking industry in Puerto Rico, several on-island banks (especially UBS PR) derived revenue from its various roles—underwriting, fund management, and sales to individual retail clients—which raises the question of whether these profits incentivized the local banks to seek out more opportunities to underwrite bonds. *See* Part XI.D.1;

- Leverage: Leverage—in this context, an investment strategy of using borrowed money to increase the potential return in an investment—was a significant component of the local market, with nearly one-third (over $5 billion) of municipal bonds in the local market sold through leveraged transactions. The absence of 1940 Act rules made it relatively cheap for the Local CEFs to leverage at 50%, which significantly increased yields (but also risks) to investors. However, we found that what really fueled the precipitous crash of the Local CEFs was the combination of: (i) high leverage; (ii) Puerto Rico's requirement to invest two-thirds of a CEF's assets in Puerto Rico securities; and (iii) high levels of concentration in a single issuer. Finally, UBS PR was for many years a leverage provider to both the Local CEFs and retail clients. However, in 2011 and 2012, UBS PR took steps to dramatically reduce its leverage exposure to the local market and yet continued to sell the Puerto Rico debt products to its customers. *See* Part XI.D.2;

- Composition and Diversification: Puerto Rico regulations required: (i) a concentration limit of 25% in a single issuer (in other words, a CEF cannot hold more than 25% of, for example, COFINA Bonds or GO Bonds ("25% Concentration Rule")); and (ii) imposed regulations on the Local CEFs to invest up to 67% of aggregate Local CEF assets in qualifying Puerto Rico assets to be sold on a tax-exempt basis to Puerto Rico residents ("67% Investment Requirement").[27] These rules were ultimately incompatible. Due to the small number of Puerto Rico issuers, Local CEFs could not meet both the 67% Investment Requirement and diversify enough to meet the 25% Concentration Rule. Accordingly, *Oficina del Comisionado de Instituciones Financieras* ("OCIF"), the Puerto Rico regulator, routinely waived the concentration limitations. The 67% Investment Requirement also left the Local CEFs highly exposed to interrelated Puerto Rico-Related Bonds (aside from any single issuer concentration). However, although OCIF waived the 67% Investment Requirement at times, when Puerto Rico needed buyers for a bond issuance, Puerto Rico appears to have orchestrated its rules to all but require CEF participation. *See* Part XI.D.3;

- Pricing and Inventory of CEFs: Because Local CEFs are not traded on an exchange, but traded over the counter almost exclusively through the affiliated banks' trading desks, the banks—UBS PR and Santander Securities—set the price for Local CEF shares each day. Our investigation found that although this practice is not in itself improper, UBS PR's and Santander Securities' pricing usually resulted in the shares selling at a premium to the underlying net asset value. The SEC proceeding against two UBS PR bankers who were responsible for pricing the Local CEF shares did not find a violation of the federal securities laws related to the way these individuals represented pricing practices to investors. In 2012, UBS PR settled these allegations

---

[27] P.R. Laws Ann. tit. 10, § 666 (2018).

with SEC for $26.6 million without admitting guilt. The evidence we reviewed, however, suggests that UBS PR's pricing practices—on the one hand, setting prices above net asset value and on the other hand, making demand appear higher than it was by buying Local CEF shares to hold in inventory—made the liquidity and value of the Local CEFs appear different than they actually were. *See* Part XI.D.4; and

- <u>Disclosure Requirements</u>: Even though the Local CEFs were not subject to the 1940 Act disclosure requirements, they typically sought to proactively disclose risk-related features arising from the 1940 Act exemption, as well as the Local CEFs' concentration in Puerto Rico issuers. In addition, the Local CEFs were still subject to the usual array of US federal laws and regulations governing bond and CEF transactions with retail investors. Ultimately, given (i) the nature of the local market as a retail market of individual investors; (ii) the long years of sustained profitability of these products; (iii) the lack of transparency arising from both Puerto Rico's delayed financials and the banks' pricing of the Local CEF shares; and (iv) the pervasive and inescapable affiliated transactions at every level, the standard disclosure requirements in the absence of the 1940 Act were likely not enough to protect Puerto Rico investors. *See* Part XI.D.5.

In light of the above findings, we make the following recommendations in Part XI.E. of the Report:

1.     Only 103 bonds should be triple tax-exempt in Puerto Rico.

2.     Specific measures tailored to Puerto Rico, although not contained in the 1940 Act, are needed to protect Puerto Rico investors, specifically in these areas:

- Affiliated transactions in the local market—especially sales of affiliated products by brokers or financial advisors of a firm—should face greater regulation or be curtailed;

- After additional analysis by economists, the composition requirements for tax-exempt Puerto Rico CEFs should be lowered;

- Leverage limits should be lowered to be more in line with the reality of a current lack of diversified investments; and

- Disclosure standards should be maintained at the highest level.

3.     While Puerto Rico's exemption from the 1940 Act did not itself contribute significantly to investor losses, the 1940 Act provides important regulatory tools. For this reason, we recommend that SEC reject any requests to "grandfather" in the current CEFs.

**B.**     **The Local Municipal Debt Market Grew as a Result of Changes to Section 103 of the Tax Code, Corresponding Tax Exemptions in Puerto Rico, Other Global and Local Market Dynamics, and the Rise of the Local CEFs**

      **1.**     **Changes to Section 103 of the Tax Code, Coupled with Puerto Rico's Tax Exemption for Municipal Bonds, was a Key Reason for the Approximately $56 billion in Mainland Issuances**

            **(a)**     **The Tax Reform Act of 1986 Altered the Municipal Bond Tax Structure, Reducing the Availability of Tax-Exempt Bonds on the Mainland**

A lot of investors buy municipal bonds for their tax exemption benefits. While the tax structure for municipal issuances is complex, Section 103 generally exempts from federal taxation all interest income from most bonds issued by states (as well as the District of Columbia and US possessions), or political subdivisions thereof.[28] States are typically exempt from state income tax bonds held by a resident of the issuing state. For example, bonds issued by a New York municipality or the State of New York (as well as New York investment funds holding these bonds as assets) offer triple tax exemption for New York residents and institutions.[29] However, Puerto Rico-Related Bonds (along with those issued by other US territories) are tax-exempt not only to investors within Puerto Rico (as the issuing municipality), but across the United States—that is, residents of any state can enjoy tax-free interest income from Puerto Rico-Related Bonds.[30] This characteristic, combined with changes to the Tax Code, helped fuel the growth of the local market.

Changes made between 1968 and 1986 to federal regulations governing the taxability of municipal bonds significantly impacted the market for Puerto Rico municipal issuances. In the late 1960s, Congress narrowed the tax exemptions on the income generated by municipal bonds. Under the Revenue and Expenditure Control Act of 1968, issuances that did not serve a predominantly public purpose were no longer exempt and instead subjected to new taxation.[31] The effort to limit the quantity of tax-exempt municipal debt[32] continued through the 1980s in the form

---

[28] 26 U.S.C. § 103(a) (2016); *see also* 26 C.F.R. § 1.103-1(a) (2018) ("Interest upon obligations of a State, territory, a possession of the United States, the District of Columbia, or any political subdivision thereof … is not includable in gross income, except as provided under section 103(c) and (d) and the regulations thereunder.").

[29] *See* Daniela Pylypczak-Wasylyszyn, *Are Municipal Bonds Exempt From State Taxes?*, Taxation for Municipal Bonds (June 24, 2015), http://www.municipalbonds.com/tax-education/tax-exemption-from-state-income-taxes; *see also* Marc D. Joffe and Jesse Martinez, *Origins of the Puerto Rico Fiscal Crisis*, Mercatus Research, 6 n.13 (Apr. 2016). Generally, interest earned from state municipal bonds or obligations are free of state (laws vary per state) and federal income tax. *See* 26 U.S.C. § 103(a) (2016).

[30] 48 U.S.C. § 745 (2016).

[31] Pub. L. No. 90-364, 82 Stat. 251 (1968).

[32] Historically high interest rates in the 1970s motivated these policies. Starting in the 1970s, rising interest rates spurred "demand for financing at the relatively lower rates available from borrowing on a tax-exempt basis," expanding the size of the tax-exempt market. Congress likely sought to control this market's growth to protect tax revenues. Letter from William H. Caudill, Chair, Section of Taxation to Hon. John A. Koskinen, Comm'r, I.R.S. (May 10, 2017).

of further revisions to Section 103, including the Tax Reform Act of 1986 ("1986 Act").[33] Witnesses who worked at Puerto Rico banks during the evolution of Section 103 recalled that the 1986 Act dramatically affected the US municipal bond market, and the tax-exempt status of certain categories of municipal bond issuances, including:

- Private activity bonds (*i.e.,* municipal bonds issued on behalf of state and local governments to finance certain projects);

- Arbitrage bonds (*i.e.*, bond proceeds used to acquire higher yielding investments, or when proceeds are used to replace funds that acquired higher yielding investments); and

- Bonds that are federally guaranteed.[34]

Following the changes, mainland municipalities could issue bonds in these taxable categories, but the income generated would no longer be tax-exempt.[35]  To remain competitive in the bond market, non-103 issuances compensated for the loss of tax exemption by offering higher yields than tax-exempt, 103-conforming bonds.[36]  Consequently, non-103 bonds usually are more expensive to the issuing municipality and, by comparison, 103 bonds pay lower yields and therefore net more revenue for issuers.  The 1986 Act reduced incentives to issue bonds that no longer qualified for the 103 exemption (such as issuances designed to finance certain private transactions), because they became expensive for government issuers to finance.

    **(b)**    **Puerto Rico Capitalized on Two Advantages: (i) Puerto Rico 103 Bonds Were Tax-Exempt in All Fifty States and (ii) Non-103 Bonds Were Tax-Exempt in Puerto Rico**

The 1986 Act's amendments to Section 103 reduced the supply of tax-exempt bonds across the entire US municipal market.  However, as a result of these changes, Puerto Rico developed and capitalized on two advantages in selling Puerto Rico-Related Bonds, namely:

- Puerto Rico 103 Sales Across the Mainland:  As discussed, Puerto Rico 103 bonds could be sold on a tax-exempt basis to residents of ***any*** US state, not just residents of Puerto Rico.[37]  Because income from Puerto Rico 103 bonds is tax-free to investors nationwide, Puerto Rico 103 bonds were positioned to fill the supply gap in tax-exempt bonds created by the 1986 Act's amendments to Section 103 and the consequent reduction in tax-exempt issuances.[38]  For example, as the supply of qualifying, tax-exempt New York 103 bonds shrank following the 1986 Act's amendments, New York retail and institutional investors could turn to tax-exempt Puerto Rico 103 bonds.

---

[33] Pub. L. No. 99-514, 100 Stat. 2085 (1986).

[34] Pub. L. No. 99-514, 100 Stat. 2085 (1986); 26 U.S.C. § 103 (2016); 26 U.S.C § 148(a) (2016); 26 U.S.C § 149 (2016).

[35] 26 U.S.C. § 103 (2016).

[36] Andrew Kalotay, *The Interest Rate Sensitivity of Tax-Exempt Bonds Under Tax-Neutral Valuation,* J. of Inv. Mgmt., 62 (2014).

[37] 48 U.S.C. § 745 (2016).

[38] 48 U.S.C. § 745 (2016).

Further, Puerto Rico 103 bonds often offered higher yields on average than similar US state 103 issuances.[39]  Several witnesses cited the 1986 Act's amendments to Section 103 and the resulting increased demand for Puerto Rico 103 bonds as significant factors in the increase of Puerto Rico-Related Bond issuances that began in the late 1980s; and

- Puerto Rico Non-103 Sales in Puerto Rico Were Still Tax-Exempt:  Puerto Rico could issue non-103 bonds that would be subject to taxation if issued on the US mainland, but that were tax-exempt for Puerto Rico residents (both institutional and retail investors).[40]  This gave Puerto Rico a second advantage over mainland municipal issuers:  in particular, income from **all** Puerto Rico-Related Bonds held by Puerto Rico investment companies, corporations, and residents is triple tax-exempt, including the non-103 bonds.  For example, arbitrage bonds or bonds used to finance certain private activities that would not qualify for 103 tax exemption if sold in the mainland market, would be fully tax-exempt when issued by any Puerto Rico-Related entity and sold in the local market.[41]  Because of the tax exemption, Puerto Rico non-103 bonds could pay lower yields than their non-103 counterparts issued on the mainland, and therefore generate more revenue for Puerto Rico.

Witnesses who worked with various underwriters said that GDB typically pursued bond issuances in the ("103 Market") due to Puerto Rico's unique access to the entire mainland market and the lower costs and interest rates available there.  However, if a Puerto Rico issuance could not be structured to meet 103 qualifying tax-exempt standards, then GDB could instead issue the non-103 debt in the local market on a tax-exempt basis at yields close to the 103 issuance. Accordingly, the non-103 status did not limit the Puerto Rico-Related Entities from issuing their bonds in the same way as it limited mainland municipal issuers.  Rather, the changes in 103 tax exemption standards simply split the local market.  Puerto Rico 103 qualifying bonds were sold almost exclusively in the mainland market, and Puerto Rico non-103 bonds were sold predominantly in the local market; the only place where they could continue to be sold on a tax-exempt basis.

For example, according to one Local CEF manager, because ERS Bonds did not qualify for the 103 market, UBS PR as underwriter presented GDB with a plan for a structured deal to place a portion of the issuance for sale in the local market (as opposed to the mainland market, where the non-103 bonds would be taxable) to improve the terms for GDB.  This Local CEF manager noted that GDB stood to save between 50 and 100 basis points[42] by issuing in the local, rather than mainland, market.

---

[39] US tax-exempt bond mutual funds could place Puerto Rico-Related Bonds in their portfolios to "boost the overall yield without jeopardizing the tax exemption." *See* Mary Williams Walsh, *Puerto Rico: A Debt Problem That Kept Boiling Over,* N.Y. Times (May 5, 2017), https://www.nytimes.com/2017/05/05/business/dealbook/puerto-rico-debt.html; *see also* Initial Decision, 16, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz,* SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[40] 48 U.S.C. § 745 (2016).

[41] 48 U.S.C. § 745 (2016).

[42] Basis points are a unit of measurement for interest rates and other percentages in finance. One basis point is equal to 0.01%.  *See* Simon Constable, *What Is a Basis Point and Why Is It So Important?*, The Wall

By contrast, the bonds that public corporations (like PRASA) issued generally were sold in the mainland market because they almost always qualified for the 103 tax exemption, even under the revised 103 parameters.[43]

### 2. Other Market Dynamics Encouraged the Growth of Local Municipal Bond Issuances and Sales

#### (a) Puerto Rico Investors Focused on Income Over Growth

Multiple bank witnesses stated that Puerto Rico retail investors demonstrated a long-standing preference for fixed income, tax-exempt investment products, such as Puerto Rico municipal bonds and Local CEFs. Puerto Rico-based bankers we interviewed characterized the Puerto Rico investment market as strongly inclined towards new capital investments, generally represented by conservative investors more focused on income than growth. Documents we reviewed suggest that as many as 90% of UBS PR customers[44] and 70% of Santander Securities customers owned fixed income securities. Bank witnesses told us these investment patterns set a strong foundation for demand both for municipal debt generally, and Local CEFs specifically.

#### (b) Interest Income and Estate Tax Exemptions Motivated Buying Decisions

Local CEFs and retail municipal bonds offered Puerto Rico investors, particularly retirees,[45] a long-term investment option with high rates of return combined with exemption from Puerto Rico income tax. This was especially attractive to retirees and other investors who qualified by residing within Puerto Rico for at least 181 days per year.[46]

Puerto Rico's estate tax structure benefited Puerto Rico residents invested in Puerto Rico-Related Bonds and Local CEFs. Prior to 2017, Puerto Rico residents, like mainland residents, were required to pay the relevant federal estate tax rate—normally between 18% and 40%, depending on the size of the estate—for any US-based property valued over $60,000.[47] However, Puerto Rico municipal bonds and Local CEF shares were both treated as Puerto Rico-based property for estate tax purposes, and were taxed at only 10%. This significantly lowered estate tax

---

Street Journal (Sept. 3, 2013), https://www.wsj.com/articles/what-is-a-basis-point-and-why-is-it-so-important-1378324917.

[43] *Puerto Rico Bonds Decline Following Recovery Act*, Fitch Ratings (July 11, 2014), https://www.fitchratings.com/gws/en/fitchwire/fitchwirearticle/Puerto-Rico-Bonds?pr_id=839103. ("[P]ublic corporations issued debt mostly into the US tax designated '103' market . . . .").

[44] Initial Decision, 8, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[45] *See* Initial Decision, 8, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[46] Initial Decision, 7, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[47] *See* U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* 36 (2018).

rate, together with the income tax exemption, created financial incentives for Puerto Rico residents to concentrate their investments in Puerto Rico municipal bonds and Local CEFs.[48]

### (c)    Low Interest Rates Reduced Competition From Other Products

Sales of Puerto Rico municipal debt products and Local CEFs also benefited from diminished competition from other potential investments in the local market.  During the course of our investigation, the most often cited reason for this low-competition environment was the prevalence of historically-low interest rates, beginning in the early 1990s and continuing all the way through the peak of Puerto Rico's fiscal crisis.  As described above, Puerto Rico fixed income investors were searching for high-yield investments with high-income returns—Puerto Rico municipal debt and Local CEFs fit that bill perfectly.

### 3.    The Rise of Local CEFs was a Significant Factor in the Growth of the Local Puerto Rico Debt Market

#### (a)    Uncertain at First, Local CEFs Grew to Dominate the Retail Market

##### (i)    UBS PR and Popular Securities Created the First Local CEFs but Were Uncertain About Whether They Would Succeed

Between 1995 and 1999, PaineWebber Puerto Rico[49] ("PaineWebber") and Popular Securities created and co-managed the first nine Local CEFs ("Puerto Rico Family of Funds").

According to bankers we interviewed, it was not clear that the first Local CEFs would attract so many investors at the time they were created.  Because the bankers were uncertain about whether Puerto Rico residents would invest in the Local CEFs, the first Local CEFs were structured on a small scale, relative to their successors.  For example, UBS PR initiated the Puerto Rico Tax-Free Funds I-VI (co-managed with Popular Securities) at only approximately $150 million to $200 million in equity, before leverage.  For comparison, on November 30, 2011, the UBS Funds held roughly $5.8 billion in equity, before leverage.[50]  The UBS Fund Manager stated that had UBS PR bankers known the Local CEFs would be as successful as they eventually were, UBS PR might have initially created one large Local CEF, rather than multiple smaller funds within the same family.[51]

Several bankers involved in structuring the first Local CEFs said that PaineWebber initially partnered with Popular Securities because of the two banks' comparative strengths: PaineWebber's large on-island retail broker-dealer network would lead the on-the-ground marketing and sales of the Local CEFs' shares, while Popular Securities had the resources and infrastructure to act as the Local CEFs' administrator—handling, for example, fund asset value

---

[48] *See* U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them* 36 (2018).

[49] UBS AG acquired PaineWebber in 2000.  In 2003, UBS PaineWebber rebranded as UBS.

[50] *See* Initial Decision, 7, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[51] For example, according to this witness, UBS PR may have created a single "Tax-Free Fund" instead of six separate CEFs within that family.

and other accounting calculations.  In 2000, Popular Securities created new products—specifically index funds and open-end funds—while retaining its position as co-manager of the Puerto Rico Family of Funds.  According to a former Popular Securities banker, Popular Securities exited the CEF business in 2000.  Popular Securities was concerned that at some point, when investors wanted to sell their shares, they would be illiquid (because only certain investors within Puerto Rico could own and trade these shares).  These concerns motivated Popular Securities to focus on open-end funds.  UBS PR, in turn, chose to expand its CEF business and independently developed fourteen solely managed Local CEFs between 2001 and 2008.[52]

### (ii)    Local CEFs Became a Significant Investor in Puerto Rico Municipal Bonds

The solely managed UBS and Santander Funds and co-managed Puerto Rico Family of Funds were the dominant "institutional" purchasers of non-103 Puerto Rico issuances.  UBS PR bankers explained that, outside the CEFs, the institutional market had only a small number of additional participants, including open-end funds, local insurance companies, and cooperatives.

As a result, UBS AM became the leading force in the Local CEF industry.  UBS AM ultimately managed 23 Funds, which formed the largest institutional purchaser of Puerto Rico municipal debt, holding approximately 38% of the total non-103 Puerto Rico debt outstanding as of 2015—or $6 billion.  In 2008, when the UBS Funds reached over $10 billion in total assets under management, Puerto Rico-Related Bonds represented roughly 40% of those assets, or approximately $4 billion.[53]

While UBS PR established and managed the substantial majority of Local CEFs, Santander Securities also managed twelve CEFs beginning in 2001, ultimately totaling $2.4 billion in value as of 2013.[54]

Below in Part XI.B.3.(b), we discuss the effects of the significant place Local CEFs held in the Puerto Rico bond market.  In summary, this market environment affected the incentives of the GDB to issue debt to be purchased by the Local CEFs, and the practices related to the sale of this debt to investors in the Local CEFs.

---

[52] *See Puerto Rico Funds*, UBS Wealth Management USA (July 25, 2018, 4:42 PM), https://www.ubs.com/us/en/wealth/misc/puertoricofunds.html.

[53] This finding is based on a review of documents and analysis provided by witness Dr. Craig McCann, including holding reports for the UBS Funds for various dates in 2008.  Dr. Craig McCann is a testifying expert and founder of the Securities Litigation Consulting Group ("SLCG"), who has testified in numerous FINRA arbitrations against UBS PR.  We did not retain Dr. Craig McCann or SLCG as part of our investigation.

[54] *See* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Total Assets of Investment Companies Registered in Puerto Rico as of March 31, 2018*, 2 (Mar. 31, 2018); *see also* Craig McCann et al*., Santander's First Puerto Rico Family of Funds: Same Defects, Similar Losses as UBS Puerto Rico and Popular Funds* (Mar. 16, 2017), http://blog.slcg.com/2017/03/santanders-first-puerto-rico-family-of.html.

### (iii)    More Diversified Products Were Not As Popular with Puerto Rico Investors

According to UBS PR witnesses, Puerto Rico retail investors gravitated toward fixed income, high-yield, tax-exempt products like CEFs and retail bonds even when presented with more diversified alternatives.  UBS PR sold two open-end funds into the local market that were permitted to invest up to 80% in US securities.[55]  One UBS PR witness said that although these funds offered local investors higher exposure to mainland assets than most of UBS's Local CEFs, they did not sell as well because they only held partial tax-exempt status and offered lowered yields.

Other potential market substitutes for retail bonds and CEFs also fell short of Puerto Rico investors' expectations because they did not qualify for complete tax exemption.  One UBS PR witness who formerly advised broker-dealers recalled developing customized investment strategies for individual retail investors in cooperation with the bank's mainland research team. The witness noted that bank clients routinely sidestepped tailored investment strategies in order to weigh their portfolios heavily with fully tax-exempt investments, namely Puerto Rico-Related Bonds and Local CEFs.  Santander Securities' witnesses did not recall the same wide disparity between the popularity of Santander Securities' Local CEFs and Santander Securities' offerings in open-end funds.  However, Santander Securities witnesses did acknowledge that the Local CEFs' exceptionally high yields made it hard for other products to compete in the local market.  It is unclear whether bonds and CEFs out-competed rival products in Puerto Rico because they suited investor preferences or because banks marketed them more aggressively over other potential investments.

### (b)    As Local CEFs Were Sold to Retail Investors, the Municipal Market Remained Retail-Driven, but Local CEFs Provided Market Efficiencies

### (i)    The Local CEFs Provided Market Efficiencies Allowing for Easier Allocations of Bonds to the Local Market

Before the Local CEFs, there was effectively no on-island institutional market.  As noted above, the soft underwriting process involved gauging the market's appetite for a potential issuance.  It was a lengthy process that required bank wealth management divisions to survey their customers on an investor-by-investor basis in order to assess demand. In contrast, after the banks created CEFs, underwriters could more quickly and accurately seek and confirm substantial allocations by simply speaking to the UBS, Popular, and Santander Local CEF managers to determine whether and how much the Local CEFs would invest in a particular issuance.  In this way, Local CEFs served as a channel for the retail sale of Puerto Rico-Related Bonds, allowing for efficient placement of those bonds into the Local CEFs, followed by the sale of CEF shares to retail investors, effectively putting the Puerto Rico-Related Bonds into individual retail customer accounts.

---

[55] *See* UBS, *Multi-Select Securities Puerto Rico Fund Prospectus* (Dec. 2017); *see also* UBS, *UBS US Municipal & Income Fund, Inc. Offering Memorandum* (June 2017).

Local CEFs accelerated the Puerto Rico government's financing program by enabling GDB and underwriters to issue debt more efficiently, to a small number of sizeable institutional participants—the Local CEFs—on shorter time frames, and with a more definite picture of market demand. As described below in Part XI.D.3.(d), the ERS and COFINA Bond issuances in 2007 and 2008 illustrate this point: the UBS Funds were allocated between 40% and 100%[56] of four issuances, totaling nearly $3 billion. Without the Local CEFs as an aggregate institutional bond purchaser, and conduit to the retail investor market through the subsequent sales of Local CEFs shares, it is unlikely these issuances would have gone to market.

### (ii)     While Local CEFs Offered Investors Benefits Over Bonds, Opinions Differ as to Whether Retail Investors Would have Bought Bonds in the Same Quantities as Local CEFs

On one hand, UBS PR witnesses stated that without Local CEFs, there would have been lower overall demand for Puerto Rico-Related Bonds. On the other hand, other witnesses from UBS contended that, prior to CEFs, Puerto Rico retail investors searching for tax-free, fixed income, high return products bought Puerto Rico-Related Bonds and would have continued to do so in the absence of CEFs, and the overall demand for issued bonds and the size of the local market would have remained generally the same.

Witnesses from Santander Securities aligned more closely with the former view, and expressed that 1995 marked a pivotal moment in the development of the local non-103 retail bond market. One Santander Securities banker said that retail bonds issued before 1995 did *not* draw significant investment from Puerto Rico residents, who at the time filled their desire for tax-exempt, fixed income investments through other means. This primarily included US Government-backed RMBS products, which had high credit ratings and high taxable equivalent yields (meaning that the yields were high when taken into account with the tax-exempt benefits). As a result, said this witness, early bond issuances flowed almost entirely off the island and into the hands of US mutual funds and other sophisticated mainland investors. Another bank witness told us that this dynamic changed in 1995, with the dwindling availability of RMBS products and the birth of the debt-based CEFs that together drove local demand for Puerto Rico-Related Bonds.

In addition, Puerto Rico-Related Bonds were not consistently available in the market for purchase by retail investors. According to one UBS PR witness, prior to the availability of Local CEFs, residents may have had to wait three to six months for a new bond issuance to provide an investment opportunity, and then risk being out-bid by large institutional buyers when demand for the deal exceeded supply. By contrast, Local CEFs offered investors an immediate, convenient way to put capital to work. Further, because the Local CEFs were securitized investment products—meaning that large investments in bonds were packaged into smaller investment tranches that individuals could purchase—they allowed retail investors with lower investment thresholds to participate in the bond market on a smaller scale than institutional investors.

---

[56] Documents we reviewed show that UBS Funds purchased 99.8% of the COFINA Series 2008 A Bond issuance. The remaining 0.2% was bought by a UBS open-end fund.

High leverage ratios (described further below) also enabled Local CEFs to provide high yields and a reliable source of income for investors, even during periods of market imbalance.[57] For example, by 2008, UBS Funds regularly paid dividends between 6% and 7%, and total returns as high as 15.6%.[58]   In contrast, the municipal bonds themselves paid 2% to 2.5% lower in annualized returns, and were more volatile.

## C.   Until Recently, Local CEFs Were Exempt Under the 1940 Act, But Still Subject to Puerto Rico Law and Regulations

### 1.   The 1940 Act's Territorial Exemption Was in Place at the Time

As noted above, the 1940 Act typically regulates both open-end funds and CEFs.[59]  The 1940 Act and its associated regulations define the responsibilities and requirements of investment companies and publicly traded investment product offerings, including CEFs, with the aim of protecting retail investors.  But, until recently, investment companies located in US territories, including Puerto Rico, were exempt from the 1940 Act.[60]  Congress originally enacted this exemption due to the high costs and logistical complications of sending SEC staff to travel to the territories to examine the companies based there—barriers that no longer exist in today's world.[61]

Banks created the first Local CEFs with the understanding that the 1940 Act would not apply to those CEFs.  Instead, the Local CEFs would be (i) established and managed by banks (namely, PaineWebber and eventually UBS PR, as well as Santander Securities and Popular Securities) with a principal place of business in Puerto Rico, (ii) sold to Puerto Rico residents only, (iii) primarily composed of Puerto Rico assets, and (iv) organized under the laws of Puerto Rico.[62]

### 2.   The Local CEFs Also Received an SEC "No Action" Letter Confirming That the 1940 Act Did Not Apply

The Puerto Rico Investors Tax-Free Fund, managed by both PaineWebber and Popular Securities, was the first co-managed Local CEF in Puerto Rico.  In August 1994, as part of its plans to organize the Fund, PaineWebber sought an opinion from SEC (a "no-action" letter) that SEC staff would not recommend enforcement actions if the Local CEF did not register under the 1940 Act.[63]

---

[57] Initial Decision, 83, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[58] Initial Decision, 83, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[59] 15 U.S.C. § 80a (2016).

[60] *See* 15 U.S.C. § 80a-6(a)(1) (2016) ("The following investment companies are exempt from the provisions of [the 1940 Act]: (1) Any company organized or otherwise created under the laws of and having its principal office and place of business in Puerto Rico, the Philippine Islands, or any other possession of the United States . . . . ").

[61] *See* 163 Cong. Rec. H2981-2983 (daily ed. May 1, 2017).

[62] Letter from Alison E. Baur, Senior Counsel, S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. to Brown & Wood (Oct. 5, 1994) (on file with author).

[63] Letter from Brown & Wood to S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. (Aug. 30, 1994) (on file with author).

On October 5, 1994, SEC issued a responsive no-action letter exempting the original Local CEF (and subsequent CEFs) from the 1940 Act on the basis that the CEF was organized in Puerto Rico, and planned to sell its securities only to residents of Puerto Rico, the Virgin Islands, or other possessions of the US.[64]

As a result, in January 1995, PaineWebber and Popular Securities released the Puerto Rico Investors Tax-Free Fund as the first Local CEF.  SEC further clarified its position in an April 29, 1997 no-action letter to PaineWebber, stating that the 1940 Act did not apply to Local CEFs because the banks requesting the letter and the CEF were both based in Puerto Rico.[65]  SEC confirmed in this 1997 letter that it would not consider the jurisdiction in which the fund *invests* its assets as a factor for application of the 1940 Act.[66]

### 3. <u>The Territorial Exemption of the 1940 Act Has Recently Been Repealed</u>

Some Puerto Rico observers believe these gaps in regulatory oversight contributed to the Puerto Rico fiscal crisis or otherwise exacerbated its impact.[67]  US Congressional Representative Nydia Velázquez (D-NY 12th) introduced a bill in 2015, proposing to strike the first paragraph of Section 6(a) of the 1940 Act, eliminating the exemption for US territories.[68]  The goal of the bill, according to Representative Velázquez, was to ensure that residents of Puerto Rico had access to "the same transparency requirements and consumer protections other American investors benefit from."[69]  Representative Velázquez introduced various iterations of the repeal between 2015 and 2017.  A 2016 version added a safe harbor provision giving existing financial institutions currently

---

[64] Letter from Alison E. Baur, Senior Counsel, S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. to Brown & Wood (Oct. 5, 1994) (on file with author); *see* Merrill Lynch Puerto Rico Tax–Exempt Fund, Inc., SEC No-Action Letter, 1995 WL 32962811 (May 26, 1994).  A Merrill Lynch Fund that Santander Securities came to own likewise received an exemption on the basis that its tax-exempt shares would solely be offered to residents of Puerto Rico and to companies that benefitted from the Possession Tax Credit ("<u>936 companies</u>").  Santander Securities acquired the Puerto Rico Tax-Exempt Fund from Merrill Lynch in 2000 as part of its acquisition of Merrill Lynch's retail brokerage operations in Puerto Rico. *See* Santander Bancorp, Annual Report 2001 (Form 10-K) (Apr. 1, 2002), https://www.sec.gov/Archives/edgar/data/1099958/000109995802000002/anualrpt.htm).

[65] Letter from Edward J. Rubenstein, Senior Counsel, S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. to Brown & Wood, 4 (Apr. 29, 1997) (on file with author).  In the letter, SEC states that "[i]n determining whether a fund has its "principal office and place of business in Puerto Rico" for purposes of Section 6(a)(1), the staff considers the totality of the fund's contacts with Puerto Rico, and does not consider any one factor to be controlling."  SEC further states that "the jurisdiction in which a fund invests its assets should not be a factor in determining the location of its principal place of business for purposes of Section 6(a)(1)."

[66] Letter from Edward J. Rubenstein, Senior Counsel, S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. to Brown & Wood, 4 (Apr. 29, 1997) (on file with author).

[67] *See e.g., Dawn Giel, The 77-Year-Old Loophole That Created Puerto Rico's Unique Market and Led to Its Ultimate Meltdown*, CNBC (Dec. 18, 2017), https://www.cnbc.com/2017/12/18/the-77-year-old-loophole-that-created-puerto-ricos-unique-market.html.

[68] U.S. Territories Investor Protection Act of 2015, H.R. 3610, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/house-bill/3610.

[69] Press Release, Congresswoman Nydia Velazquez, *Committee Approves Velazquez Bill Protecting Investors in Puerto Rico, U.S. Territories* (June 16, 2016), https://velazquez.house.gov/media-center/press-releases/committee-approves-velazquez-bill-protecting-investors-puerto-rico-us.

exempt from the 1940 Act up to three years from the repeal's effective date to come into compliance, and giving SEC the authority to provide an additional three-year extension for any company requesting one.[70] Opponents of the repeal argued that: (i) financial institutions would need to move off-island, leading to a massive loss of jobs in Puerto Rico; (ii) the need to change leverage requirements would require financial institutions to unwind their deals to become 1940 Act-compliant; and (iii) given the difference in debt service ratio calculations on the mainland and in Puerto Rico, measuring compliance with the leverage requirements under the 1940 Act would be difficult and costly.[71]

The third and final version introduced by Representative Velázquez in January 2017 passed in the US House of Representatives, but remained dormant for months in the US Senate.  Then, on May 24, 2018, President Trump signed the Economic Growth, Regulatory Relief and Consumer Protection Act.[72]  While the focus of this legislation was to reverse various Dodd-Frank provisions, Section 506 of this statute repealed the exemption in the 1940 Act for US territories.  This ended the dichotomy between on-island and mainland regulations.[73]

## 4.    **Puerto Rico Laws and OCIF Regulations Applied to the Local CEFs**

Although the 1940 Act did not apply, other regulations did.  These regulations addressed many of the areas that the 1940 Act would have otherwise regulated, as well as other aspects of CEF operations (including affiliated transaction processes, leverage limits, concentration limits, and disclosure requirements).[74]

---

[70] U.S. Territories Investor Protection Act of 2016, H.R. 5322, 114th Cong. (2016), https://www.congress.gov/bill/114th-congress/house-bill/5322/all-actions.

[71] Letter from Frank J. Serra, Javier Rubio, Carlos V. Ubiñas, Puerto Rico Mutual Funds to Congressional Task Force on Economic Growth in Puerto Rico (Sept. 2, 2016).

[72] Pub. L. 115—174, S.2155 (2018).

[73] It is unclear how the 1940 Act territorial-exemption repeal became part of the Dodd-Frank repeal, but given the difficulty in passing the initial three iterations of Representative Velázquez's bill, it likely only passed because it was a rider attached to an unrelated bill with bipartisan support.  Because of the safe harbor provisions, the effects of this repeal will not be seen until 2021 at the earliest, and potentially until 2024 if SEC grants the additional three-year delay to many companies.  Despite spearheading efforts to repeal the 1940 Act exemption, Representative Velázquez voted against S. 2155, because of the rollback of the Dodd-Frank regulations on banking and financial institutions.  She told the press: "It is a somewhat ironic, but positive, silver lining that S.2155, which I cannot support, contains provisions I personally authored to prevent the residents of Puerto Rico from being preyed on by unscrupulous actors."  Press Release, Congresswoman Nydia M. Velázquez, *Velázquez on Dodd-Frank Bill, Puerto Rico Protections,* https://velazquez.house.gov/media-center/press-releases/vel-zquez-dodd-frank-bill-puerto-rico-protections (last visited Aug. 3, 2018).

[74] In 2013, the Investment Companies Act of Puerto Rico of 2013 (Act 93-2013), as initially passed, included certain requirements for investment companies operating in Puerto Rico under the 1954 Act (such as regulations related to affiliated transactions), which mirrored the 1940 Act.  According to our interviews with Puerto Rico regulator witnesses, Local CEF Managers complained that the regulations in the original Act 93-2013 would negatively affect both bank operations and the rights of local investors.  As a result of these complaints, three months after its enactment, the legislature passed amendments to Act 93-2013 that eliminated many of the regulatory provisions for the investment companies.

OCIF enforced those regulations (and still does today).[75] Indeed, before establishing a CEF based in Puerto Rico, a CEF management company is required to register the CEF with OCIF, under the Puerto Rico Investment Companies Act No. 6 of October 19, 1954 (10 L.P.R.A. § 666) ("Section 666"), as amended.  For a management company to qualify for registration under Section 666, it must maintain its principal office in Puerto Rico; hold an annual shareholder meeting in Puerto Rico; and have a chairman, president or vice-president, secretary or assistant secretary, and at least two directors as residents of Puerto Rico.[76] All thirty-five of the CEFs managed by UBS PR, Santander Securities, and Popular Securities registered with OCIF. "OCIF Rulings" set out the regulatory parameters of the Local CEFs.  OCIF also conducted examinations of broker-dealers to ensure they complied with both local and federal regulations.[77]  OCIF generally follows FDIC standards for its own financial exams, and regulates municipal securities under the rules and standards of the MSRB, SEC, and FINRA.

**D.** **The Absence of the 1940 Act Rules, Coupled with Application of Certain Puerto Rico Requirements on Fund Composition, Were Critical Factors in the Growth and Losses of the Local CEFs**

The 1940 Act exemption freed Local CEFs to operate in ways that registered CEFs on the US mainland could not, including:

- The ability to conduct "affiliated transactions," which in this context are sales of the underlying securities from the underwriting division of a bank into the managed funds of an affiliated entity of the bank;

- Higher limits on the amount of leverage (borrowing against the CEFs' equity), which allowed the funds to increase yields to investors but also increased risk; and

- No requirement to register with SEC, report to it, or trade on SEC authorized exchanges.

The debate over whether 1940 Act oversight will render positive results largely mirrors the debate over whether there is a link between the gaps in regulation and the crisis in the first place. As discussed below, our investigation found that the 1940 Act exemption was not the sole reason for the growth or losses of the Local CEFs.  Instead, Puerto Rico's relaxed concentration limits

---

[75] Puerto Rico's Act No. 4 of October 11, 1985 created OCIF.  As previously noted, OCIF is responsible for regulating Puerto Rico's financial industry.  Its responsibilities include supervising the industry by registering financial entities, monitoring and enforcing applicable regulations, and, as necessary, responding to requests for waivers for specific regulatory requirements or limits.  *See* Act No. 4 of October 11, 1985 (codified as amended at P.R. Laws Ann. tit. 7, § 2003-2020) (2018); P.R. Laws Ann. tit. 7, § 2007 (2018).  Accordingly, OCIF oversees all functions, powers, and duties regarding the oversight of investment companies.

[76] P.R. Laws Ann. tit. 10, § 666 (2018).

[77] Additionally, OCIF conducted examinations of trust companies (including UBS Trust Company of Puerto Rico).  OCIF's trust examinations include a review of policies, procedures and practices; board meeting minutes; latest internal and external audits; selected accounts; common and collective funds; proprietary mutual funds; compliance with applicable laws and regulations; and a review of matters recommended in the previous examination.

(setting the amount a Local CEF could invest in one issuer) and 67% Investment Requirement (requiring a two-thirds investment in local assets) also played significant roles in distinguishing mainland CEFs from Local CEFs.  Because of the overlap between the CEF market and the retail bond market, we also investigated and discuss below certain conduct affecting the retail bond market, specifically UBS PR providing leverage to retail clients to purchase bonds and the effect of the disclosure requirements on retail bond purchasers.

### 1. The Absence of the Affiliated Transaction Prohibition of the 1940 Act was Not Itself a Cause of the Local CEF Losses, But the Benefits to the Banks from Their Affiliated Roles Raises Questions Concerning Their Underwriting Incentives

#### (a) The 1940 Act Prohibits Affiliated Transactions

The 1940 Act seeks to prevent investment companies from acting in the interests of directors, officers, advisors, brokers, underwriters, dealers, or specific classes of investors, at the expense of the broader range of other investors in the company's securities.  To that end, certain transactions are prohibited amongst individuals or corporations defined as "affiliates."[78]

Most relevant to the issues here, under the 1940 Act, affiliated investment banks are prohibited from selling securities into or buying securities from an affiliated CEF, and from borrowing money from or lending money to an affiliated CEF,[79] including borrowing or lending on securities underwritten by the investment bank.[80]  Simply put, a regulated bank cannot trade in securities with its affiliated CEFs because those transactions could result in self-dealing that advantages the banks to the detriment of bank customers.

Notably, much of the effort to repeal the 1940 Act exemption focuses on the need to regulate or prohibit affiliated transactions (along with leverage limits discussed below).  In this section, we discuss the local market's absence of a prohibition on affiliated transactions, as well as its effects.

#### (b) The Prohibition Against Affiliated Transactions Did Not Apply to Local CEFs

Because Puerto Rico was exempt from the 1940 Act, Local CEFs could operate without restrictions on affiliated transactions.  Thus, unlike the mainland CEFs, in Puerto Rico, an affiliated

---

[78] 15 U.S.C. § 80a-1(b)(2) (2016); 15 U.S.C. §§ 80a–2(a)(2)-2(a)(3) (2016). The Investment Company Act prohibits certain transactions between investment companies and their affiliated persons (referred to as "first-tier affiliates") and affiliated persons of their affiliated persons (referred to as "second-tier affiliates"). Affiliated persons of a fund include, among others:  (i) its investment adviser and any sub-advisers; (ii) companies the fund controls or 5% (or more) of whose securities are held by the fund; (iii) persons who control the fund; and (iv) persons who are under common control with the fund.

[79] 15 U.S.C. § 80-17(a) (2016).

[80] SEC can grant statutory exemptions for these affiliated transactions if the transactions are reasonable, fair, in the public's interest, and consistent with the policy of each CEF and the 1940 Act, providing limited exceptions including, for example, sales of securities of which the buyer is the issuer.  *See* 15 U.S.C. § 80-a(17)(b) (2016).

entity could serve as underwriter or broker of bonds and sell those bonds to Local CEFs managed by an affiliated entity.[81]

According to a UBS PR banking witness, relief from the prohibition on affiliated transactions was the primary motivation for UBS PR seeking SEC no-action letters that confirmed the Local CEFs' exemption from 1940 Act coverage.  Because of this exemption, banks routinely sold bonds they had underwritten or brokered to Local CEFs of affiliated banks.[82]

In addition to engaging in affiliated transactions, banks were able to act in multiple roles. Altogether, the on-island banks like UBS PR, Santander Securities, and Popular Securities served and collected fees as:

- Underwriters of bonds collecting the underwriting spread and sales credits from sales to the Local CEFs;

- Managers of the Local CEFs collecting management fees;

- Investment advisors to the Local CEFs, collecting advisor fees; and

- Financial advisors to the individual clients who bought the Local CEFs and bonds, collecting sales commissions.[83]

### (c)   OCIF Monitored But Did Not Prohibit Affiliated Transactions

The 1954 PR Act is silent on the issue of affiliated transactions.  However, OCIF provided oversight and a legal framework governing affiliated transactions involving Local CEFs through the registration documents for each Local CEF ("OCIF registration documents").[84]  The OCIF registration documents stated that affiliated transactions were permitted if the value of the

---

[81] *See* 15 U.S.C. 80-17(a) (2016); *see also* 15 U.S.C. § 80a-6(a)(1) (2016).

[82] *See* Hedge Clippers & The Committee for Better Banks, *How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, 3 (Dec. 2016); *see also* Am. Compl., 28, *Fernandez v. UBS AG,* No. 15-02859 (S.D.N.Y. May 8, 2015), ECF No. 68.

[83] *See* Dawn Giel, *The 77-Year-Old Loophole That Created Puerto Rico's Unique Market and Led to Its Ultimate Meltdown*, CNBC (Dec. 18, 2017), https://www.cnbc.com/2017/12/18/the-77-year-old-loophole-that-created-puerto-ricos-unique-market.html; *see also* David Evans, *Public retirement funds across the U.S. are ignoring a looming crisis, one fed by underfunding and poor investments—and papered over by accounting gimmicks. Future generations of taxpayers will foot the bill*, Bloomberg Markets, 74 (Apr. 2009).

[84] OCIF Rulings contain a section discussing transactions involving affiliates, including limitations on affiliate ownership of securities and authorization of affiliated investment advisers by the Local CEFs' independent directors. Language is generally standard across OCIF's rulings regarding the organization of Local CEFs within Puerto Rico.  *See, e.g.*, Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.*, 10 (July 11, 2002) (on file with author).

securities sold to an affiliate did not exceed 5% of the market value of the Local CEF's assets and the purchase was approved by a majority of the independent directors of the Local CEF.[85]

Although OCIF did not prescribe specific rules governing affiliated transactions, the OCIF registration documents stated that "affiliated transactions will be executed pursuant to terms and conditions comparable to those under which the Fund would execute portfolio transactions with unrelated third parties."[86]

And, in the course of its oversight and reviews of the Local CEFs, OCIF analyzed whether Local CEFs were complying with the regulations set out in the registration letters, including the 5% of Local CEF value rule for the purchases and sales of securities to affiliated entities.  OCIF also monitored risk management practices over the selection, retention, and monitoring of third-party service providers, including affiliated entities.

However, OCIF delegated the implementation of these rules to the Local CEFs' Independent Directors with the caveat that the procedures must "ensure the transactions are in the best interest of the Fund shareholders."

### (d) UBS PR and Santander Securities Generated Revenue from their Roles in Every Aspect of the Bond and Local CEF Transaction Process

Both UBS PR and Santander Securities had affiliates that managed the majority of the Local CEFs and also served as lead or co-underwriter in a large percentage of the local bond deals.[87]  Our investigation revealed that Santander Securities and UBS PR reaped financial benefits at all stages in the process—from underwriting the bonds, to managing the Local CEFs containing the bonds, to selling the Local CEF shares and bonds to local retail investors.  At all steps in this process, UBS PR's on-island role and size dwarfed all other on-island banks.

UBS Financial (including the mainland and Puerto Rico divisions) was lead underwriter on 19.5% of the outstanding Puerto Rico public debt as of 2015, making it the second largest underwriter of Puerto Rico debt.  For comparison, Santander Securities was the lead underwriter on 4.4% of all outstanding Puerto Rico debt.[88]

UBS PR also had the advantage of being the first to structure and bring to market a Local CEF.  This allowed the bank to corner the Local CEF market until the creation of the Santander Funds in 2001.  Indeed, in 2011, the UBS Funds had approximately $10.8 billion in assets under management compared to the Santander Funds at approximately $2.3 billion in assets under

---

[85] *See, e.g.*, Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.*, 12 (July 11, 2002) (on file with author).

[86] *See, e.g.*, Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.*, 12 (July 11, 2002) (on file with author).

[87] *See* Hedge Clippers & The Committee for Better Banks, *How Santander's Revolving Door with Puerto Rico's Development Bank Exacerbated a Fiscal Catastrophe for the Puerto Rican People*, 3 (Dec. 2016); *see also* Am. Compl., 28, *Fernandez v. UBS AG*, No. 15-02859 (S.D.N.Y. May 8, 2015), ECF No. 68.

[88] Analysis provided by UBS counsel that is based on data from Bloomberg, L.P. The largest underwriter of Puerto Rico debt was Citigroup Global Markets, Inc., at 20.2%.

management.[89]  Between 2004 and 2008, the UBS Funds generated half of the annual revenues for UBS PR and UBS Trust Company of Puerto Rico[90] combined, which included Local CEF advisory and administration fees, as well as primary and secondary market sales commissions.[91] During 2008 alone, UBS PR's Local CEF business earned the firm $94.5 million in revenue.[92]

UBS PR was also the largest broker-dealer and had the largest wealth management business in Puerto Rico, with 35,000 customers.  In 2012, it held almost triple the assets under management ($16.3 billion) compared to Santander Securities, which was the next largest player in the local market ($5.7 billion).

> **(e)**    **Effects and Perspectives: Although Bankers Assert that Affiliated Transactions Were Necessary and Did Not Harm Investors, Benefits to the Banks from Their Affiliated Roles Raise Questions Concerning Their Underwriting Incentives**

In discussing the impact of affiliated transactions, Puerto Rico bankers and representatives acknowledged that the banks profited over the years through their various roles in the transactions. However, they stated the affiliated transaction exemption was necessary and did not harm the Local CEF shareholders.  Below we set out and evaluate these arguments.

*First*, one UBS PR witness opined that the Local CEFs would not have been created or effectively managed if the 1940 Act affiliated transactions rules applied.  The witness suggested this is because only a small number of capable financial entities had: (i) adequate on-the-ground presence in the local market, able to both underwrite Puerto Rico-Related Bonds or other Puerto Rico securities and maintain the active secondary market trading necessary for a robust municipal bond market; and (ii) sufficient underlying capital and infrastructure to create, maintain, and manage a Local CEF.  In other words, this witness said that in the small local market, the only entities with the capital and infrastructure to create and maintain the Local CEFs were the same entities who had the capacity and infrastructure to underwrite the Puerto Rico-Related Bonds.  Thus, if UBS affiliates had not been allowed to play multiple roles, then the Local CEFs likely would never have gotten off the ground in the first place.  Other UBS PR witnesses disagreed with these assertions, suggesting that application of the affiliated transactions rules would merely have reduced returns for Local CEF investors, or would have had no effect at all.

It is difficult to prove the negative—that is, that the Local CEFs or some similar investment vehicle would ***not*** have been created without the affiliated transaction exemption.  However, as

---

[89] *See* Initial Decision, 7, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[90] UBS Trust Company of Puerto Rico manages the UBS Funds through its division UBS AM.

[91] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, and Section 9(b) of the Investment Company Act of 1940, 4, *In the Matter of Miguel A. Ferrer and Carlos J. Ortiz,* Securities Act Release No. 9371, Securities Exchange Act Release No. 6892, 2013 WL 5800586 (May 1, 2012).

[92] *See* Initial Decision, 8, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

discussed above, the market dynamics were ripe for the creation and growth of the Local CEF market and global financial markets typically find a way to meet and fulfill market inefficiencies.

*Second*, UBS PR bankers noted that, without the 1940 Act exemption, the UBS Funds would have been forced to seek leverage transactions from other banks, rather than internally. The bankers say these would have come at higher costs, and would have meant lower returns to shareholders.

However, in comparison, the Santander Funds could have chosen to engage in leverage transactions with their affiliate, Santander Securities, but did not do so because Santander Securities did not engage in repurchase agreement transactions (defined below in Part XI.D.2.(b)) like UBS PR did. This illustrates that, at least for Santander Securities, the 1940 Act prohibition would have had no effect on the Santander Funds' ability to leverage transactions.

*Third,* UBS PR witnesses explained that both the banks and OCIF took steps to manage any potential conflicts of interest. The measures taken included erecting barriers around relevant groups of people to ensure that material information was properly used. All UBS PR witnesses we spoke with told us that the informational barriers set in place were not breached and we did not see any evidence to show otherwise.

*Fourth*, UBS PR bankers told us that affiliated transactions did not benefit the bank to the detriment of the Local CEFs' shareholders. This is because the price of the bonds sold from the affiliated banks to the Local CEFs were either set market prices in the primary market, or were prescribed by stringent rules ensuring best price in the secondary market.

Primary market transactions are defined as allocations and sales of bonds at the time of the initial issuance. Puerto Rico bankers stated that it is undisputed that banks completed affiliated transactions in the primary market at the same market price as deals with unaffiliated entities. This is because in the primary market, the offering price is standard across all buyers[93] (*i.e.*, all primary market buyers pay the same amount for securities that bear the same identifier assigned by the Committee on Uniform Securities Identification Procedures ("CUSIP"[94]). Thus, when UBS PR negotiated for discounts on the CUSIPs—which it often did—UBS PR could pass the discounts on uniformly to all primary market buyers, but not exclusively to its affiliated UBS Funds.

There are some instances, as described below, where the UBS Funds purchased 100% of an issuance. UBS PR underwrote some, but not all, of these issuances. In those circumstances, it was not possible to obtain a comparative market price (*i.e.*, a price of a bond sold to another entity) in the primary market, because the entire issuance was sold to the UBS Funds. In those situations, the UBS PR Fund Manager would effectively negotiate the transaction for placement into the

---

[93] *See* Municipal Securities Rulemaking Board, MSRB Rule Book 234 (last updated April 1, 2018) ("No broker, dealer or municipal securities dealer shall purchase municipal securities for its own account from a customer, or sell municipal securities for its own account to a customer, except at an aggregate price (including any mark-up or mark-down) that is fair and reasonable.").

[94] Bonds are generally broken into components known by their classification under the CUSIP identifier system. Certain CUSIPs may be designated for institutional sale and others for retail sale at the time of issuance. U.S. Securities and Exchange Commission, *Fast Answers CUSIP Number* (Apr. 27, 2015), https://www.sec.gov/answers/cusip.htm.

Local CEFs, with the UBS PR investment banking division reaping significant underwriting fees. For those transactions, the Local CEF Managers said that they had significant buying power and thus received meaningful price and maturity concessions from GDB. These assertions have not been verified.

One final issue is worth noting with respect to primary market deals when affiliated transactions are permitted. Affiliated transactions related to Puerto Rico-Related Bonds started with the underwriting process, where UBS PR charged significant fees. The market dynamics described above could have incentivized UBS PR to seek out more opportunities to underwrite bonds, thereby encouraging it to underwrite and place riskier bonds. We found no evidence, however, that these incentives ultimately resulted in the violation of any of UBS PR's internal policies regarding its various affiliates' interactions with each other.

With respect to secondary market transactions, Puerto Rico bankers told us that the Funds received fair market pricing on those transactions as well. Secondary market transactions are defined as any over-the-counter ("OTC") sales of bonds and other securities after the initial primary market allocation. As noted above, the OCIF registration documents required the Local CEFs to create internal policies setting out rules for pricing transactions with affiliates in the secondary market. According to one UBS PR Fund Manager, UBS PR was required to receive market quotations from two independent dealers for all affiliated transactions. These comparative prices had to be documented and retained. The secondary market affiliated transactions were then reviewed periodically by the Board of Directors and Independent Board of Directors. We learned from one Santander Fund Manager that the Santander Funds enforced similar internal procedures that required at least three quotes from outside parties before buying affiliate Santander-underwritten bonds.

An additional check on secondary market pricing came from the UBS Funds' auditors, PriceWaterhouseCoopers ("PwC"), who monitored affiliated transactions in the secondary market as part of an annual audit. We reviewed a number of PwC audits of the UBS Funds for various quarters in 2007, 2008, and 2012, all of which reported no violation of affiliated transaction procedures as identified by PwC.

There was also a low volume of affiliated transactions of Puerto Rico assets in the secondary market. Indeed, bankers told us that the UBS Funds typically had a "buy and hold" strategy, and thus did not engage in a significant volume of secondary market trading, including trades of Puerto Rico-Related Bonds. Because these Local CEFs did not regularly trade in the Puerto Rico-Related Bonds on the secondary market, very few bonds were traded by banks to affiliated Local CEFs. The Santander Funds similarly employed a buy and hold strategy and thus did not engage in much secondary market trading on Puerto Rico assets.

The Independent Investigator's Final Investigative Report

2.   **Leverage was a Significant Component of the Bond Sales and Local CEF Growth and, Coupled with the Composition Requirements, Fueled the Precipitous Crash of the Local CEFs**

Leverage refers to the investment strategy of using borrowed money to increase the potential return in an investment.[95]   Leverage is usually expressed as a ratio between the amount borrowed to purchase assets as related to the total assets held: a "leverage ratio."[96]   Our investigation shows that the high leverage ratios employed by the Local CEFs magnified both the gains investors experienced before 2013 and the significant losses incurred during the Puerto Rico fiscal crisis.  Therefore, in this section we will address: (i) the leverage limits for the Local CEFs ("fund leverage" or "structural leverage"); as well as (ii) various mechanisms that individual investors used to leverage their positions in both the Local CEFs and in retail bonds, for example, through the use of repurchase agreements, traditional margin accounts, or lines of credit.

(a)   **In the Absence of 1940 Regulations, Local CEFs Could Leverage on a 2:1 Basis Through Repurchase Transactions**

Fund leverage, or structural leverage, refers to borrowing and issuing debt and preferred shares to increase a fund's portfolio assets.[97]   Because CEFs are not impacted by redemptions in the same way as open-end funds, CEFs are permitted to invest in a greater amount of illiquid securities, meaning securities that cannot be sold or disposed of in the ordinary course of business at approximately the value ascribed to it by the fund.[98]   Therefore, CEFs typically have greater leverage limits than open-end funds.[99]

The 1940 Act sets leverage limits for CEFs in an effort to mitigate potential risks from declining values in the CEF that are created by excessive borrowing, which in turn increases the speculative nature of the investments.[100]   Put simply, too much structural leverage jeopardizes a fund's stability because the leverage multiplies losses resulting from any decline in the value of fund assets.  The 1940 Act requires registered CEFs to maintain asset coverage of at least 300%

---

[95] *Frequently Asked Questions About Closed-End Funds and Their Use of Leverage,* Investment Company Institute, https://www.ici.org/cef/background/faqs_closed_end.

[96] Leverage can be expressed as a "leverage ratio" (debt divided by total assets) or an "asset coverage ratio" (assets divided by total debt).  An asset coverage ratio is the inverse of the leverage ratio.  For purposes of this Report, we will refer to "asset coverage ratios."  *See Frequently Asked Questions About Closed-End Funds and Their Use of Leverage,* Investment Company Institute, https://www.ici.org/cef/background/faqs_closed_end.

[97] *Frequently Asked Questions About Closed-End Funds and Their Use of Leverage,* Investment Company Institute, https://www.ici.org/cef/background/faqs_closed_end.

[98] *See* 17 C.F.R. § 270-2a-7 (2018) ("Illiquid security means a security that cannot be sold or disposed of in the ordinary course of business within seven calendar days at approximately the value ascribed to it by the fund.").

[99] Section 18 of the 1940 Act requires CEFs to maintain a 300% asset coverage level for issued debt to pay common stock dividends, or a 200% asset coverage level to pay preferred stock dividends on issued senior debt.   *See Closed-End Fund Information*, U.S. Sec. & Exch. Comm'n (Jan. 16, 2013), https://www.sec.gov/fast-answers/answersmfclosehtm.html.

[100] 15 U.S.C. § 80-a(1)(b)(7) (2016).

for all borrowing, or a 33% leverage limit.[101]   Any regulated CEF therefore must maintain $300 in assets for every $100 borrowed.  Because the Local CEFs were not registered under the 1940 Act, they were not subject to these leverage limits.

Under Puerto Rico law, the Local CEFs were permitted to maintain only $200 in assets for every $100 borrowed, a leverage limit of 50%.[102]   Some evidence suggests that OCIF was willing to raise the leverage limit for Local CEFs in the face of certain market circumstances to 55%.[103]   The permissible forms of leverage for Local CEFs were set under Puerto Rico law, and usually prescribed by OCIF during the registration process for a particular Local CEF.[104]   In practice, as described below, the leverage took many forms, ranging from direct borrowing from financial institutions to security repurchase agreements.

> **(b)**   **Effects and Perspectives: Leverage Limits Fueled the Growth of the Local CEFs and, Combined with No Limits on Issuer-Concentration and the 67% Investor Requirement, Leverage Also Drove Customer Losses**

There is ample evidence to support the conclusion that high leverage thresholds fueled the growth of the Local CEF market.[105]   The Local CEFs were able to capitalize on the combination of high leverage limits and a period of historically low interest rates, using short-term financing to maintain the most crucial selling feature of the Local CEFs: their high yields.  The Local CEFs are considered a "pass-through entity" because approximately 90% of Local CEF income is distributed back to investors as dividends.[106]   The difference between the return on assets (primarily, the underlying Puerto Rico-Related Bonds) and the low cost of funding supported consistently high

---

[101] 15 U.S.C. § 80a-18(1)(A) (2016) ("It shall be unlawful for any registered closed-end company to issue any class of senior security, or to sell any such security of which it is the issuer, unless—if such class of senior security represents an indebtedness—immediately after such issuance or sale, it will have an asset coverage of at least 300 per centum . . . .").

[102] The basis for the 2:1 leverage limit in Puerto Rico law is not clear.  However, the limit appears to be set at 50% by OCIF Regulation 5105, though witnesses at OCIF said that the agency had no role in setting or monitoring leverage limits.

[103] *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Request for Waiver from Certain Leverage Requirements for Certain First Puerto Rico Funds* 12 (Oct. 18, 2013).

[104] *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.*, 12 (July 11, 2002) ("The Funds may engage in transactions such as repurchase agreements, reverse repurchase agreements, futures, options, swaps, and other derivative instruments with Puerto Rico or non-Puerto Rico counterparts. The Fund intends to use these transactions primarily to hedge its portfolio securities as part of its leverage program, but not as a speculative investment.").

[105] Leveraged funds such as the Local CEFs typically generate higher yields than non-leveraged funds because they can own and earn interest on a greater volume of assets.  As described above, the Local CEFs' 2:1 asset coverage ratio enabled them to consistently deliver high yields.  The value of the high leverage limits was magnified by the historically low interest rate environment, which reduced the cost of leverage and increased yields.  Increased yields raised the value of CEFs and contributed to their popularity amongst Puerto Rico investors.

[106] Initial Decision, 6, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

yields in the form of dividend payments for shareholders (who were mostly individual retail investors).

As these conditions made the Local CEFs more attractive through higher dividends, low interest rates simultaneously reduced competition with the Local CEFs and increased their capacity to invest by purchasing relatively inexpensive assets at lower prices with higher yields. As one banker involved in Local CEFs commented, the average short-term interest rate was around 2%, bringing the cost of leverage down and allowing the Local CEFs to pay dividends at 8%.

The evidence demonstrates that the Local CEFs were consistently as highly leveraged as regulation would allow. For example, on November 30, 2011, the UBS Funds held approximately $5.8 billion in capital and $5 billion in leverage.[107] By mid-2013, these Local CEFs were uniformly leveraged at between 45% and 50%, with most approaching the 50% limit.[108] In 2013, according to the New York Times, the UBS Tax-Free Puerto Rico Fund II reached a leverage ratio of approximately 53%.[109]

The Local CEFs also employed as leverage various forms of repurchase agreements (known as "repos," "internal repos," and "reverse repos"). The terms "repo" and "reverse repo" refer, respectively, to transactions in which securities are sold pursuant to an agreement that the same securities will be repurchased either (i) at a later date; or (ii) on demand.[110] Through repos and reverse repos, UBS PR could buy back, or repurchase, bonds at a reduced price. Witnesses expressed diverging opinions as to what portion of the Local CEFs' leverage secured through repos would have been considered leverage under the definitions used for CEFs regulated under the 1940 Act. Several bankers, for example, stated that mainland CEFs were able to remain below the 33% leverage limit because leverage secured through repos and reverse repos is not calculated as leverage under the 1940 Act. That type of leverage would, however, be included in the calculation pursuant to OCIF regulations that govern Local CEFs. Some bankers therefore concluded that the 1940 Act would have had little or no effect on the actual volume of leverage employed by the Local CEFs, because although the Local CEFs had a higher leverage limit, OCIF defined leverage more broadly than SEC did. Thus, leverage that SEC would not have counted toward the 33% leverage limit would have counted toward OCIF's limit of 50%.

Further, multiple UBS PR witnesses refuted the narrative that application of the 1940 Act leverage limits would have mitigated risks or lessened losses for Puerto Rico investors. They stated that the Local CEFs would have been managed in substantially the same way under 1940 Act regulations, except that any reduction in leverage ratios, or changes to the Local CEFs' leverage

---

[107] Initial Decision, 7, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[108] *See* Edward S. O'Neal, *The Use of Leverage in the UBS Puerto Rico Closed-End Funds Magnified Losses*, SLCG (Jan. 23, 2014), http://blog.slcg.com/2014/01/the-use-of-leverage-in-ubs-puerto-rico.html. For a discussion regarding leverage ratios towards the end of 2013, see Am. Compl., 25, *Fernandez v. UBS AG*, No. 15-02859 (S.D.N.Y. May 8, 2015), ECF No. 68.

[109] Susanne Craig, UBS Brokers in Puerto Rico Create Headache for the Bank, N.Y. Times (Oct. 2, 2013), https://dealbook.nytimes.com/2013/10/02/ubs-brokers-in-puerto-rico-create-headache-for-the-bank/.

[110] *See 2018 Investment Company Fact Book*, Investment Company Institute 314 (last visited Aug. 6, 2018).

strategy that might have increased the cost of borrowing, would have caused Local CEF investors to receive lower yields over the years prior to the onset of the fiscal crisis.

But Dr. McCann and his team at SLCG disputed UBS's position.[111]  Specifically, SLCG focused on the UBS Funds' high concentration, which refers to the percentage of investment in a single bond issuance or issuer, as well as the high leverage in the Local CEFs.  SLCG pointed to this combination of high concentration and high leverage as a significant factor in contributing to the losses suffered by Puerto Rico investors.[112]  For example, the SLCG analysis shows that the UBS Funds suffering the greatest losses were more heavily concentrated in the ERS and COFINA Bonds than other Local CEFs were.  As described more fully below, UBS counsel rejects SLCG's analysis.

SLCG's analysis also found that the portfolio for one Local CEF, the Puerto Rico Fixed Income Fund I, had net assets of $361 million as of June 2013, but through leverage, the Fund held total investments valued at $748 million, of which $338 million was comprised of ERS and COFINA Bonds.[113]  Although the ERS and COFINA Bonds represented 45% of the total equity investments in this Local CEF, the risk to the investors was magnified by the fact that 93% of the Local CEF's net assets were composed of only those two bond issuers.  In other words, the destiny of this Local CEF was almost wholly dictated by the rise and fall in value of bonds issued by two Issuers.  Tracking the performance of the bonds, the result was predictable.  Between July and September 2013, ERS and COFINA Bonds lost approximately 36% in value and caused a 34% decline in the net assets of the Puerto Rico Fixed Income Fund I, reflecting a nearly 1-to-1 impact on that particular Local CEF.[114]

### (c)   UBS PR Provided Leverage to Individual Retail Clients and the UBS Funds through 2011 when it Reduced its Leverage Exposure

In addition to the risks from the leverage ratios within the Local CEFs themselves, investors borrowed to leverage their own investments in both Puerto Rico retail bonds and the Local CEFs ("individual leverage" or "portfolio leverage").  As with all leveraged positions, this added greater risk to investor portfolios and further escalated the eventual investor losses.

The aggregate impact of both fund leverage and individual leverage was significant.  By the end of 2010, total securities-backed lending exposure for UBS PR was roughly $3.5 billion, with roughly $2.2 billion in individual retail leverage exposure and the remaining roughly $1.3 billion in institutional borrower exposure (including lending to UBS Funds).  However, in around

---

[111] SLCG reportedly made $4 million in fees for its role as a testifying witness in litigations against UBS PR.  UBS counsel believes that Dr. McCann had an enormous financial stake in fomenting litigation against UBS PR, which biased his analysis.

[112] Edward O'Neal, *The Use of Leverage in the UBS Puerto Rico Closed-End Funds Magnified Loss,* SLCG (Jan. 23, 2014), http://blog.slcg.com/2014/01/the-use-of-leverage-in-ubs-puerto-rico.html.

[113] Edward O'Neal, *The Use of Leverage in the UBS Puerto Rico Closed-End Funds Magnified Loss,* SLCG (Jan. 23, 2014), http://blog.slcg.com/2014/01/the-use-of-leverage-in-ubs-puerto-rico.html.  These figures from SLCG have not been verified by our investigation and may reflect the bias of the source.  In addition, these findings cover a limited timeframe and cannot be used for extrapolation.

[114] Edward O'Neal, *The Use of Leverage in the UBS Puerto Rico Closed-End Funds Magnified Loss,* SLCG (Jan. 23, 2014), http://blog.slcg.com/2014/01/the-use-of-leverage-in-ubs-puerto-rico.html.

2011, UBS PR made the decision to reduce leverage across its institutional and individual retail lines of business, resulting in a substantial reduction in its own leverage exposure and that of its retail customers.

Leverage was a significant component of the local bond market. Setting aside margin accounts, according to UBS PR, 10% of the total bonds issued to the local market—$1.6 billion of the total $16 billion—was leveraged through $400,000 in equity investments. The leveraged purchase of Puerto Rico-Related Bonds within the Local CEFs themselves was even greater at roughly $3.5 billion (assuming a 50% leverage rate on roughly $7 billion of Puerto Rico municipal bonds across all the Local CEFs). Thus, together, a total of roughly $5 billion of the municipal bonds sold in the local market were sold as a consequence of leverage. This leverage volume would be even greater if investors' margin accounts were included in the calculation. These leverage ratios suggest there was not a sustainable, deep local market for these local bonds and easy access to leverage by retail investors, together with the absence of the 1940 Act's restraints, fueled demand for the Local CEFs.

> ### (i)      Unlike Other Banks, UBS PR Provided Leverage to Retail Clients Through Reverse Repurchase Agreements That Amounted to 10% of the Non-103 Bond Market

In the retail bond market, UBS PR investors used reverse repos with UBS PR to leverage their bond positions. Repo loans are only collateralized by the single security subject to the repo, in this case often Puerto Rico-Related Bonds. UBS PR referred to its retail repurchase exposure as its "retail repo book."

UBS's lawyers told us that the reverse repo transactions were typically used by institutional investors and were not generally used in the industry outside of Puerto Rico for individual retail accounts. As such, there was no UBS policy that set retail repo limits. Instead, a UBS PR credit officer had the primary responsibility for setting the limit and the amount of equity needed for each repo transaction on an account-by-account basis, allowing investors to purchase up to five times the amount of their equity investment.

At its height, the UBS PR retail reverse repo book had $1.6 billion in total retail investor exposure at the end of 2010, which was about 10% of the total bonds issued in Puerto Rico. Citing the fact that as of December 1, 2010, there were approximately 900 repo accounts out of 35,000 accounts at UBS PR, UBS's counsel stated that repos were not a significant part of the UBS PR business.[115] While the number of clients using repo was relatively small, retail repo transactions permitted Puerto Rico investors to put a relatively small amount of money down to purchase a significant sum of Puerto Rico debt. UBS PR representatives were unable to determine what percentage of the $1.6 billion was leverage as opposed to the underlying collateral (given the lack of internal rules). However, UBS PR stated that while required equity could be as little as 10% for some high net-worth clients, the average was closer to 25%. Thus, assuming $1.6 billion in leverage plus 25% equity, the securities purchased through repo total about $2 billion. In other words, by investing $400 million, collectively Puerto Rico investors were able to multiply their

---

[115] Santander Securities, by contrast, allowed for margin lending but did not employ repurchase agreements as a means of leverage for their customers.

investment through leverage and purchase $2 billion in debt. Without the ability to leverage, these clients' exposure to Puerto Rico debt would have been significantly lower.

<b>(ii)  UBS PR's Traditional Margin Leverage Was Smaller and Capped by UBS Internal Policies</b>

Traditional margin loans were used for investors in both the retail bond market and the CEFs. Margin lending involves credit that is extended for the purpose of purchasing additional CEF shares or retail bonds. In traditional margin lending, the loans are secured by the customer's account that serves as collateral.[116]

Puerto Rico investors employed margin accounts to purchase both retail bonds and CEF shares. The use of leverage increases the risk of an investment in Puerto Rico-Related Bonds and an account on margin was vulnerable to a margin call should the price of Puerto Rico-Related Bonds decline and the account value drop below a minimum value set by the broker or financial advisor. However, unlike the repo book, the margin book was subject to strict UBS internal policies on lending. Margin balances in UBS PR customer accounts as of April 2011 were approximately $221 million—roughly 14% of the retail repo book.

<b>(iii)  Along with Repos and Margin, SEC Found that UBS PR Improperly Permitted Non-Purpose Lines of Credit to Buy Local CEF Shares</b>

A broker-dealer may extend a line of credit that is secured by the customer's marketable securities for purposes *other* than buying or carrying securities, often referred to as good-faith or non-purpose loans.[117] However, in Puerto Rico, UBS PR extended low interest, non-purpose lines of credit from a Utah-based affiliate, UBS Bank USA ("UBS-USA"), to UBS customers in Puerto Rico, and expressly encouraged client investors to use the credit to invest more heavily in UBS Funds.[118]

This practice occurred despite the fact that UBS-USA loan agreements, UBS PR internal policies, and applicable federal securities regulations did not allow customers to use non-purpose lines of credit proceeds to purchase securities.[119] SEC enforces this prohibition because the use of non-purpose lines of credit could otherwise provide incentives that were potentially detrimental to

---

[116] Peter Fortune, *Margin Requirements, Margin Loans, and Margin Rates: Practice and Principles*, New Eng. Economic Review, 22 (2000).

[117] *See* FINRA Rule 4210, *Margin Requirements* (last visited Aug. 7, 2018) ("In a nonsecurities credit account, a member may extend and maintain nonpurpose credit to or for any customer without collateral or on any collateral whatever;" "The term 'nonpurpose credit' means an extension of credit other than 'purpose credit' as defined in Section 220.2 of Regulation T."); *see also* Federal Reserve Board Good Faith Account Rule, 12 C.F.R. § 220.6 (1998).

[118] *See* Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions, *In the Matter of UBS Financial Services Incorporated of Puerto Rico,* Securities Exchange Act Release No. 76013, 2015 WL 5693101 (Sept. 29, 2015).

[119] Opinion and Order, 3, *Securities and Exchange Comm'n v. Ramírez*, No. 15-2365 (D.P.R. April 30, 2018).

investors: UBS PR brokers received the normal 3% commission paid to them on the sales of Local CEF shares, but also were compensated based on amounts drawn from the customers' lines of credit.[120]  Customers who purchased Local CEF shares with the proceeds from lines of credit that were collateralized by brokerage accounts suffered significant losses following the 2013 bond market collapse.[121]  Many of those customers eventually received "maintenance calls" from UBS PR.[122]

       In 2015, SEC brought an enforcement action against UBS PR branch officer Ramiro Colon, UBS PR broker Jose Ramirez, and UBS PR.  The SEC action focused on UBS PR's misuse of non-purpose lines of credit for customers.[123]  UBS PR settled with SEC for $15 million and with FINRA for a total of $18.5 million.  Mr. Colon paid a $25,000 penalty (both UBS PR and Colon neither admitted nor denied SEC's findings), and SEC recently won summary judgement on the issue of liability regarding Jose Ramirez.[124]  During the litigation before SEC, SEC's testifying expert witness identified 414 instances in which UBS Funds were purchased with proceeds of customers' lines of credit between January 2011 and September 2013, though the majority of these (approximately 230) appeared to involve the customers of Mr. Ramirez.[125]  FINRA permanently barred Mr. Ramirez from acting as a broker or associating with a broker-dealer firm.[126]  OCIF reached a $5.2 million settlement with UBS on October 9, 2014, over UBS's use of lines of credit

---

[120] *See* Notice of Filing Plaintiff's Statement of Material Uncontested Facts in support of Plaintiff's Partial Motion for Summary Judgment on the Issue of Liability, 9, *Securities and Exchange Comm'n v. Ramírez*, No. 15-2365 (D.P.R. Mar. 1, 2017), ECF No. 22.

[121] *See* Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions, *In the Matter of UBS Financial Services Incorporated of Puerto Rico*, Securities Exchange Act Release No. 76013, 2015 WL 5693101 (Sept. 29, 2015).  UBS PR made efforts to reduce its non-purpose loan book to little or no avail.  By the end of 2010, UBS PR stated that it had accumulated $640 million in leverage exposure through non-purpose loans.  From 2011 to the eve of the fiscal crisis in 2013, this amount grew to approximately $850 million.   UBS PR described various steps in the first part of 2013 to reduce this exposure: cancelling credit lines not used in the prior 15 months; eliminating several hundred non-purpose loans; reducing credits in accounts with insufficient collateral; and adjusting collateral maintenance requirements in new accounts from 30% to 40%.  By June 2013, UBS PR clients could only loan against 50% (as opposed to the previous 60% limit) of the value of the Local CEFs in their account.   These efforts appear to have had minimal impact on line of credit exposure—by late 2013, that number had been reduced to $706 million, some of which may have been due to the advent of the fiscal crisis and resulting collateral calls.

[122] A maintenance call refers to an order for an investor to deposit additional funds into his or her margin account when the value of securities in the account falls below a certain minimum.

[123] *See* Compl., *Securities and Exchange Comm'n v. Ramírez*, No. 15-2365 (D.P.R. Sept. 29, 2015), ECF No. 1.

[124] *See* Opinion and Order, 5, *Securities and Exchange Comm'n v. Ramírez*, No. 15-2365 (D.P.R. Apr. 30, 2018), ECF No. 39.

[125] *See* Opinion and Order, 5, *Securities and Exchange Comm'n v. Ramírez*, No. 15-2365 (D.P.R. Apr. 30, 2018), ECF No. 39.

[126] *See* Financial Industry Regulatory Authority, Inc., Broker Check Report for Jose Gabriel Ramirez Jr. (2018).

and its effects on a small selection of low net worth UBS customers with conservative investment profiles and sizeable investments in Local CEFs compared to total liquid assets.[127]

### (iv)   UBS PR Reduced its Exposure to Puerto Rico Assets through its Deleveraging Process

Between 2010 and early 2011, UBS PR decided to sharply reduce its exposure to Puerto Rico debt by completely eliminating its retail repos through migration to its clients' margin accounts, followed by an effort to reduce the client margin exposure.  In addition, at around the same time, UBS PR also reduced its institutional reverse-repo portfolio, reducing the banks' exposure to the UBS Funds.

In the ensuing deleveraging process, between May 2011 and September 2011, UBS PR migrated all retail repos, approximately $1.6 billion, into its clients' margin accounts, effectively closing the UBS PR retail repo book and significantly reducing UBS PR's exposure to Puerto Rico debt.  UBS PR determined that it was in the best interest of retail customers to cease offering them repo lending and transition the customers with existing repo balances to margin.  According to UBS, the transition would result in reduced leverage levels and greater collateral diversification.

In a second phase of the deleveraging process, UBS PR took steps to reduce the overall exposure of its retail clients in the margin accounts.  By September 2012, retail client margin leverage was reduced to below $1 billion.  By July 2013, Puerto Rico margin balances totaled approximately $860 million, amounting to an almost 50% reduction in retail client margin exposure.

According to UBS's counsel, UBS PR sought to reduce its exposure to Puerto Rico debt by eliminating its exposure to the retail repurchase agreements.  The deleveraging effort also reduced the exposure of UBS PR clients to Puerto Rico debt.  In addition, the margin accounts were controlled by UBS's internal margin requirements, which imposed collateral requirements on customers.  UBS PR witnesses asserted that efforts to deleverage both the repo book and the margin accounts of individual clients significantly reduced the volume of margin calls for UBS PR retail customers in the wake of the fiscal crisis.

UBS PR's efforts to reduce the size of the individual repo book took place at the same time UBS PR reduced its repo exposure to UBS Funds.  UBS PR's institutional repo book was $1.3 billion at its height in December 31, 2010.  According to UBS, it reduced the approved size of the institutional repo book for UBS Funds to $827 million on December 31, 2010, and to $650 million by February 28, 2013.  UBS was not able to tell us the exact size of the institutional repo portfolio after December 31, 2010.  Instead, UBS framed the information in terms of "limits" because the UBS Funds effectively had a line of credit with UBS PR and at times borrowed up to the available limit on the credit line (through repo transactions), though during other periods, it did not reach the credit limit.

---

[127] See Press Release, Commissioner of Financial Institutions of Puerto Rico (OCIF), *UBS Agrees to Settlement with OCFI on Offering and Sale of Puerto Rico Closed-End Mutual Funds; Will Pay $3.5 Million Contribution Imposed by the OCFI and $1.7 Million Restitution on Client Losses* (Oct. 9, 2014).

On the basis of our investigation, we conclude that a reasonable bondholder claimant or regulator could question whether UBS PR should have reevaluated its decision to continue to underwrite and sell Puerto Rico-Related Bonds including to related Local CEFs at the same time UBS PR decided to reduce its exposure to the local market through reduction of its leverage portfolios prior to the crisis.  UBS representatives stated that the deleveraging effort was initiated in the context of a firm global effort to reduce risk across UBS's different businesses following the global financial crisis.  At the time, Puerto Rico GO Bonds were rated 'BBB+,' three notches above investment grade.[128]  The impetus of this effort was UBS PR's desire to reduce both firm and Puerto Rico client reverse repo exposure to collateral positions concentrated in the bonds of a single geographic region and not a perceived deterioration of Puerto Rico's credit.  However, the fact remains that through its actions, UBS PR was significantly less exposed to the local market by 2013, whereas UBS PR clients had not reduced their exposure to the same degree and suffered substantial losses as a result.

3. **Puerto Rico's 25% Concentration Rule and 67% Puerto Rico Investment Requirement Were Incompatible and the 67% Puerto Rico Investment Requirement Required the Local CEFs to be Over-Concentrated in Correlated Products**

As described above, class action plaintiffs[129] and expert witnesses like SLCG[130] have criticized Local CEFs—in particular, UBS Funds—for concentrating in ERS and COFINA Bonds despite an already concentrated local bond market.  For example, at least fifteen UBS Funds had more than 37% of their holdings invested in ERS and COFINA Bonds.[131]  Although UBS refuted any correlation, the leverage ratios in the UBS Funds (as discussed above) together with the concentration of ERS and COFINA Bonds in certain UBS Funds does appear to correlate with the losses that the UBS Funds incurred after the collapse of the local bond market.

While these critics have asserted that the UBS Funds were over-concentrated in ERS and COFINA Bonds, our investigation found that there was tension between the requirements that the Local CEFs be invested in a majority of Puerto Rico assets while remaining sufficiently diversified.  Indeed, OCIF routinely waived its concentration rules, while choosing to enforce the requirement that the Local CEFs invest in local Puerto Rico assets when an issue was coming to market, effectively forcing the Local CEFs to invest heavily in certain local issuances.

---

[128] Fitch rated the GO Bonds 'BBB+' on January 19, 2011.  *See* Press Release, Fitch Ratings, *Fitch Assigns 'BBB+' Rating to Outstanding Puerto Rico GO Bonds; Outlook Stable* (Jan. 19, 2011) (available through Fitch Ratings). S&P rated the GO Bonds as 'BBB' on March 7, 2011.  *See* Standard & Poor's Ratings Services, *Puerto Rico; Puerto Rico GO Rating Raised To 'BBB' From 'BBB-' On Improved Revenue Performance* (Mar. 7, 2011). Moody's rated the GO Bonds 'Baa1' on August 8, 2011. *See* Moody's Investors Service, *Moody's downgrades Puerto Rico General Obligation Bonds to Baa1 from A3; outlook is negative* (Aug. 8, 2011) (available through Moody's Investors Service).

[129] Compl., 21, *Fernandez v. UBS AG*, No. 15-02829 (D.P.R. May 30, 2014), ECF No. 1.

[130] *See* Craig McCann & Edward O'Neal, *UBS Stuffed $2.5 Billion of ERS and COFINA Bonds it Underwrote in Its Puerto Rican Funds in 2007 and 2008* (Nov. 04, 2014), http://blog.slcg.com/2014/11/ubs-stuffed-25-billion-of-ers-and.html.

[131] Compl., 21, *Fernandez v. UBS AG*, No. 15-02829 (D.P.R. May 30, 2014), ECF No. 1.

### (a)   Composition

The 1940 Act does not address the type of assets that must be held by CEFs in order to be exempt from its regulations.  Indeed, as discussed above, SEC no-action letters made it clear that the exemption of the Local CEFs from the 1940 Act was not based on the type or location of assets held by the Local CEFs.[132]

Section 666 sets the composition requirements of funds necessary to qualify for triple tax exemption.[133]  Section 666 historically required investment companies to invest at least 20% of their assets in Puerto Rico securities to be eligible for the tax exemption.[134]  In 1995, at or around the time the Local CEFs were created, Section 666 was amended to incorporate the 67% Investment Requirement, thereby raising the concentration requirement from 20% to 67%.[135]  Stated otherwise, Local CEFs were, as of this change, required to invest 67% of their assets in Puerto Rico securities.[136]  According to the amendment's Statement of Motives, the legislature's aim was to both increase investor participation in Puerto Rico while still limiting investment risk by maintaining a diversification requirement.[137]

Based on the evidence we reviewed, the 67% Investment Requirement offered Puerto Rico investors an advantage over retail bonds by giving investors the opportunity to diversify holdings and invest, on a tax-exempt basis, in US-based securities, thus differentiating the Local CEFs in the marketplace from retail bonds.

### (b)   Concentration

While the 1940 Act closely regulates *disclosures* related to a fund's concentration in specific issuers or specific markets, it does not set limits on the actual levels of concentration.[138]  Under the 1940 Act, if a registered investment company does not meet diversification

---

[132] Letter from Edward J. Rubenstein, Senior Counsel, S.E.C. Office of Chief Counsel, Div. of Inv. Mgmt. to Brown & Wood 4 (Apr. 29, 1997) (on file with author).

[133] P.R. Laws Ann. tit. 10, § 666 (2018).

[134] P.R. Laws Ann. tit. 10, § 666 (2018).

[135] Act. No. 18 of Jan. 20, 1995, subsec. (e), 1995 part 1 (amending subsec. (e) of Act 6-1954).

[136] "Total Assets" is defined as the total market value of the CEF's portfolio securities, including but not limited to portfolio securities purchased with the proceeds of leverage, cash, and cash equivalents. *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.,* 12 (July 11, 2002).

[137] Act No. 18 of Jan. 20, 1995, Statement of Motives, 1995 part 1, 155.

[138] Section 5(b)(1) of the 1940 Act requires companies which are registered as "diversified" companies to satisfy certain requirements.  In particular, at least 75% of the fund's total assets must be represented by: (i) cash and cash items (including receivables); (ii) government securities; (iii) securities of other investment companies; and (iv) securities of other issuers, provided that the investment represented by securities of other issuers does not exceed 5% of the total assets of a fund or 10% of the voting stock of the issuer.  *See* 15 U.S.C.  § 80a-5(b)(1) (2016).

requirements, it is categorized as a "<u>non-diversified</u>" company and must describe itself as such through its disclosures, noting its "non-diverse" status and the associated risks.[139]

However, while SEC generally takes no position about concentration requirements for mutual funds, the IRS incentivizes mutual funds to be less concentrated through favorable pass-through tax treatment for those funds electing to be treated as a regulated investment company (or "<u>RIC</u>," as opposed to a registered investment company) under Subchapter M of the Tax Code.[140] To qualify as a RIC, a fund cannot hold more than 25% of its total assets in the securities of any one issuer.[141]  CEFs that fail to qualify as a RIC are taxed at a much higher rate of an ordinary corporation.[142]

Because of this incentive, RIC treatment is extremely attractive to CEFs.  Thus, while the 1940 Act does not impose concentration requirements, there are strong incentives under the Tax Code for mainland CEFs to remain within a 25% concentration limit.

The 1954 Puerto Rico Act also imposed the 25% Concentration Rule, limiting the Local CEFs from investing more than 25% of their assets in the securities of a single issuer.[143]  Our investigation found, however, that OCIF waived the concentration limit, without exception, in the OCIF registration documents.[144]  In other words, although federal tax regulations incentivized a 25% concentration limit for mainland funds, Puerto Rico never enforced its parallel 25% Concentration Rule.  This led to over-concentration for Local CEFs, in an already limited securities market.  Overall, the Local CEFs were more exposed to the volatility of those securities.

### (c)   Concentration and Composition in Practice: Routinely Waived by OCIF

OCIF representatives explained that OCIF waived the 25% Concentration Rule without exception because the Local CEFs would not have been able to both meet this requirement and hold a minimum 67% of Puerto Rico assets.  This is because there were limited qualifying Puerto

---

[139] The IRS also incentivizes CEFs to be less concentrated through favorable tax treatment for 1940 Act companies with concentration limits.  To qualify, an investment company must meet certain eligibility requirements set forth in Section 851 of the Internal Revenue Code.  *See* 26 U.S.C. § 851 (2016).

[140] *See* Regulated Investment Companies and Real Estate Investment Trusts, 26 U.S.C. Subchapter M §§ 851-860 (2016).

[141] 26 U.S.C. § 851(b)(3)(B) (2016).

[142] *Compare* 26 U.S.C. § 852 (2016) (taxation of regulated investment companies), *with* 26 U.S.C. § 11 (2016) (taxation of corporations).

[143] P.R. Laws Ann. tit. 10, § 662(b) (2018) ("An investment company is diversified, and shall be so designated when it invests in securities of another issuer not more than 5 per centum of the value of its total assets and owns not more than 20 per centum of the outstanding voting securities of such other issuer.  An investment company which does not meet the requirements shall be classified as nondiversified but it shall not invest more than 25 per centum of the value of its total assets in securities of any other issuer . . . .").

[144] Based on the rulings we received from OCIF for the sole and co-managed UBS Funds and the Santander Funds, the specific rules regarding concentration and affiliated transactions, among others, were consistent with the requirements set forth by the 1954 Act.

Rico securities available to meet the 67% Investment Requirement.[145]  In fact, all bank witnesses we interviewed on this topic agreed that most of the qualifying securities were Puerto Rico-Related Bonds.

There were fewer types of municipal issuers in Puerto Rico as compared to mainland states, where county divisions as well as many more project specific issuing entities, like hospitals and airports, create greater opportunity for diverse holdings.

OCIF, however, also routinely waived the 67% Investment Requirement due to the scarcity of available assets.[146]  Thus, OCIF could have permanently reduced the 67% Investment Requirement in favor of diversification if it chose to do so.  Indeed, the UBS Funds requested— and OCIF granted—temporary waivers due to the periodic scarcity of Puerto Rico non-103 bonds.[147]  Our analysis of the UBS Funds shows that between 2005 and 2007, some UBS Funds held as little as 60% Puerto Rico-qualifying securities.[148]  UBS PR witnesses explained that this was because in 2005, the local bond market stagnated, leaving the Local CEFs with increasingly limited local Puerto Rico investment options to meet the 67% Investment Requirement.  In other words, because the Local CEFs relied so heavily on the Puerto Rico-Related Bond issuances to meet the investment requirement, the scarcity of such bonds ensured they would fall short.[149]

---

[145] *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Waiver to the 67% Investment Requirement for the Puerto Rico Tax-Free Target Maturity Funds I and II,* 3 (Aug. 31, 2006).

[146] *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Waiver to the 67% Investment Requirement for the Puerto Rico Tax-Free Target Maturity Funds I and II,* 3 (Aug. 31, 2006).

[147] In November 2005, UBS AM sought an exemption from OCIF to the 67% Investment Requirement to 60-64%, citing the "scarcity" of "acceptable" Puerto Rico assets available to the Funds, as well as the postponement of Puerto Rico government securities and the delayed credit rating of Puerto Rico debt amid "the recent downgrade of senior unsecured debt of some [Puerto Rico] financial institutions to below investment grade."  Within one week of UBS PR's request, OCIF granted the Funds a temporary, one-month waiver, permitting the Funds to hold only 60% Puerto Rico-qualifying assets and still retain their tax-exempt status, with additional one-month extensions available at OCIF's discretion.  UBS PR witnesses stated that the Local CEF then continued to seek and obtain monthly extensions each month.  This pattern— of seeking and receiving exemptions—continued through 2007.

[148] This finding is based on a review of UBS Fund annual reports for various dates between May 30, 2005 and March 31, 2007.

[149] The exemption request letter refers to the reduced number of issuances of "Puerto Rico government securities" in the "local market."  UBS PR witnesses stated that the 103 bonds that otherwise could have been used to meet the 67% Investment Requirement were not purchased by the UBS Funds in large part because the bonds were intended for—and allocated to—institutional investors on the mainland market, and the demand for those bonds was met with mainland institutional and retail investors.  As such, the UBS Funds could not obtain a large enough allocation of 103 bonds to increase the percentages of Puerto Rico investments in the UBS Funds. UBS PR witnesses also stated that even if 103 bonds were available in quantities large enough to bring all the UBS Funds up to compliance with the 67% Investment Requirement, the UBS Funds may not have been able to purchase these bonds due to credit quality parameters.  Moreover, bonds issued in the 103 market generally had lower yields than comparable local bonds and so would have been undesirable given the investment parameters and expected returns of the UBS Funds.

Santander Securities took a different approach.  According to a Santander Fund witness, in 2008, the Santander Funds requested a permanent waiver of the 67% Investment Requirement, based on the risks associated with the over-concentration in Puerto Rico assets.  OCIF denied this request.  OCIF witnesses explained that OCIF considered the 67% Investment Requirement an essential requirement that Local CEFs had to comply with, so the waivers could only be given if there was a true scarcity of available assets.

Once the market began to decline in 2013, it was increasingly challenging for Local CEFs to meet the 67% Investment Requirement, given that Puerto Rico-Related Bonds were worth less and less as the market dropped.  In response to the crisis, OCIF granted an exception to the 67% Investment Requirement, this time lowering it to 50%, where it remains to this day.  According to OCIF witnesses, these waivers were granted based on Puerto Rico's critical financial situation. The only way to reach the 67% ratio would be to have the Local CEFs divest their US assets.  To avoid this, and to prevent further investor losses through these sales, OCIF granted the waivers down to 50%.

### (d)  OCIF's Enforcement of the 67% Investment Requirement and GDB Calls Compelled the UBS Funds to Concentrate in ERS and COFINA

On May 15, 2007, OCIF reversed its years of prior exemptions and informed the UBS Funds that they were required to re-achieve compliance with the 67% Investment Requirement by no later than January 1, 2008.  It is unclear why this occurred.  UBS PR witnesses speculated that the timing likely coincided with the fact that GDB was bringing two local non-103 issuances to market—COFINA Bonds and ERS Bonds—and wanted the UBS Funds to participate in these local issuances.

One UBS PR Fund Manager described how, after the May 2007 OCIF letter withdrawing the 67% Investment Requirement waiver, as the year progressed, the UBS Funds were in the market purchasing qualifying securities trying to meet the impending deadline.  As of November 30, 2008, UBS Funds purchased 66% (around $880 million) of the COFINA Series 2007 B (local) issuance issued on July 17, 2007, and approximately 40% (over $600 million) of the ERS Series 2008 A (local) issuance issued on January 29, 2008.[150]  UBS PR was the lead underwriter on both of these deals, and made over $14 million in sales credits and underwriting fees.  Witnesses state that these transactions brought the UBS Funds into compliance with the 67% Investment Requirement.

With respect to both the COFINA Series 2007 B and ERS Series 2008 A offerings, UBS Fund witnesses explained that these deals provided an opportunity to reach compliance with the 67% Investment Requirement through the purchase of bonds with very attractive characteristics. UBS PR Fund Managers described how they believed COFINA had a strong structure, as

---

[150] This finding is based on a review of documents and analysis provided by Dr. McCann and SLCG, including UBS Fund holding reports dated between January and November 2008.  *See also* Craig McCann and Edward O'Neal, *UBS Succumbed to Conflicts and Purchased $1.7 Billion of Employee Retirement System Bonds into its Puerto Rican Municipal bond Funds in 2008,* SLCG (Nov. 6, 2014), http://blog.slcg.com/2014/11/ubs-succumbed-to-conflicts-and.html.

compared with GO Bonds or public corporation notes.[151]   Similarly, UBS PR Fund Managers stated that they believed that the ERS Bonds were attractive from a structural standpoint because the sources of payment into ERS were from diverse entities, including Puerto Rico and federal funding.  The COFINA Series 2007 B Bonds also generated a relatively higher yield than other local issuances.[152]   Likewise, UBS PR witnesses stated that the ERS Series 2008 A Bonds offered favorable coupons (and an assurance that the bonds could not be called for 10 years), giving investors assurance in the bonds even if market were to go down in the future.[153]

However, although the UBS Funds had met the 67% Investment Requirement after the purchase of the COFINA Series 2007 B and ERS Series 2008 A Bonds, correspondence and evidence show that GDB called or cancelled notes held by the UBS Funds in the amount of $1.5 billion, ultimately leading the UBS Funds to purchase additional ERS and COFINA Bonds to replace these called and cancelled notes:

- GDB Note for ERS Series 2008 B: In 2006, the UBS Funds, along with the Santander Funds, purchased approximately $800 million of GDB's $885 million notes through private placement transactions.  One UBS PR witness described these notes as "short call" notes, meaning that GDB had the option to redeem them prior to their maturity date.  As part of the 2007 issuance, GDB had taken out a swap—with UBS PR as one of the swap counterparties—on the note.  As discussed above, in Part VII.C.5 of the Report, once the global ERS issuance was halted, GDB and UBS PR wanted to issue additional ERS Bonds locally.  It was understood, however, that the UBS Funds had no more room for these new ERS Bonds and the ERS issuance could only be purchased by the UBS Funds if the swap was cancelled by the counterparties (including UBS PR) and GDB then called the GDB note.[154]   In April 2008, the swap was cancelled and the GDB note was called.  The UBS Funds then purchased $752 million of the ERS Series 2008 B.

- PFC Bonds for COFINA Series 2008 A: Similarly, the COFINA Series 2008 A Bonds were issued to replace certain PFC Bonds that the UBS Funds held.  According to

---

[151] Notes refer to short-term obligations that generally mature in one year or less. *See* Municipal Securities Rulemaking Board, MSRB Glossary of Municipal Securities Terms, 66-67 (last updated Aug. 2013)*; see also* P.R. Sales Tax Fin. Corp., Official Statement for Sales Tax Revenue Bonds, Series 2007 A (2007).

[152] Typically a local issuance yielded 1% more than the 103 issuance, but the COFINA Series 2007 B issuance yielded 1.35% more than the COFINA Series 2007 A 103 mainland issuance.  As the UBS PR witness explained, thirty-five additional basis points "meant $8 million more to fund shareholders on a yearly basis."

[153] *See* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Official Statement for Senior Pension Funding Bonds, Series A, 29 (2008); *see also* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Official Statement for Senior Pension Funding Bonds, Series B, 30 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Official Statement for Senior Pension Funding Bonds, Series C, 31 (2008).

[154] In fact, in one correspondence from GDB to UBS PR regarding the terms for the ERS Series 2008 B Bonds, GDB stated that the ERS Series 2008 B would only move forward if the "market is at the right level for us to tear up the swap related to the GBD notes."  Other correspondence noted the overlapping and (at times) conflicting positons of UBS PR in this deal: "UBS is in an awkward position here. Not only did they prove to be bad a[t] pricing the swap, they are also the lead manager on the bonds, and they are the dominant investor in the local market in PR."

UBS PR witnesses, the UBS Funds collectively held a large fraction ($730 million) of PFC Bonds. As discussed in Part VI of the Report, PFC Bonds were considered extraconstitutional moral obligation bonds and, as one witness explained, as a preventative measure, Puerto Rico was looking to eliminate this type of debt from the market.[155] In and around the spring of 2008, GDB asked the UBS Funds to sell the PFC Bonds in furtherance of Puerto Rico's policy of reducing of this type of debt. After extensive negotiations, GDB proposed to exchange COFINA Bonds for the UBS Funds' PFC Bonds.[156] This witness said that in the end, the UBS Funds benefited from this deal because they received a better bond with very favorable terms and pricing.[157]

GDB's actions—*i.e.*, calling notes and seeking to exchange bonds—initiated both transactions. First, a UBS PR witness agreed that GDB's decision to call its notes freed up substantial capital around the time of the ERS Series 2008 B Bond offering. However, calling the notes also removed Puerto Rico qualifying assets at a time when the UBS Funds had recently come into compliance with the 67% Investment Requirement. Second, absent GDB's decision to seek to negotiate the exchange of PFC Bonds for COFINA bonds, the UBS Funds would not have had the opportunity to replace the PFC Bonds with the COFINA Series 2008 bonds. As UBS representatives acknowledged, the UBS Funds could have rejected GDB's offer to exchange the PFC Bonds for COFINA Bonds and had a variety of other choices when the GDB notes were called (including rolling over their existing GDB position or using the call proceeds to purchase other issuances or bonds in the secondary market). While these ERS and COFINA deals increased the UBS Funds' holdings in these Issuers' bonds (replacing GDB and PFC Bonds for more ERS and COFINA Bonds), the UBS PR Fund Managers judged these bonds to be better investment opportunities for the UBS Funds (relative to other options) while maintaining compliance with the 67% Investment Requirement.

UBS PR benefited from these deals: it was the lead underwriter or placement agent on all of the COFINA and ERS Bond issuances. UBS PR received approximately $20.8 million in revenue for its role as lead underwriter in the ERS Series 2008 A Bond and COFINA Series 2007 B Bond deals, and as placement agent in the ERS Series 2008 B Bond and COFINA Series 2008 A Bond deals. This included $3.6 million in total management fees and $3.7 million in institutional sales credit for sales to the UBS Funds and other institutional customers. UBS PR also earned close to $10 million in retail sales credits as part of their participation in the ERS Series 2008 A Bond and COFINA Series 2007 B Bond deals.

---

[155] We note that the Santander funds still held PFC Bonds as of 2009. *See* Santander Securities, *First Puerto Rico Target Maturity Income Opportunities Fund I, Inc. Statement of Assets and Liabilities* (September 2009) (on file with author).

[156] One Fund Manager recalled that the UBS Funds had successfully negotiated to do the exchange "part for part" and receive bonds with the same maturities and coupons as the PFCs.

[157] UBS counsel noted that from December 31, 2012 to December 1, 2017, the ERS Bonds and senior COFINA Bonds (representing 80% of the UBS Funds' COFINA holdings) outperformed all other Puerto Rico-Related Bonds except for PRASA Bonds (and performed at the same level as PREPA Bonds).

**(e)**      **Effects and Perspectives: High Concentration in Puerto Rico Assets Coupled with Leverage Caused Investor Losses**

SLCG's analysis shows that many Local CEFs remained highly concentrated in ERS and COFINA Bonds in the years preceding the crisis. These Local CEFs appear to have experienced increased losses after 2013 (when the local market collapsed) as compared with Local CEFs that were not as concentrated in those types of Puerto Rico-Related Bonds. For example, SLCG found that Local CEFs that held over 20% combined COFINA and ERS Bonds showed an approximately 50% decrease in net asset value ("NAV") between December 2012 and December 2013. In contrast, Local CEFs that held less than 10% of the two issues during this timeframe showed an approximately 15% to 25% decrease in NAV.[158] The NAV is the value of the fund's underlying assets (less liabilities) divided by the number of shares outstanding.

Based on analysis performed by economic consultants retained by UBS PR, UBS rejects SLCG's analysis and conclusions. The UBS PR economists looked at the same question concerning correlation between concentration and losses, but used different data points. In particular, the analysis excluded certain types of UBS Funds (Target Maturity and AAA Funds) to control for differences in credit quality and other investment parameters and used different date ranges.[159] Based on those parameters, UBS PR consultants found that there is no evidence of correlation of losses to high concentration of the UBS Funds in ERS and COFINA Bonds. Instead, UBS states that SLCG's analysis shows, at most, that a portfolio consisting of only Puerto Rico-Related Bonds performed worse in the 2013 crash than a portfolio containing both Puerto Rico-Related Bonds and US bonds that carry a 'AAA' credit rating.[160]

We do not opine on the competing economic analyses, but we do agree that due to the general decline in Puerto Rico securities, the scarcity of Puerto Rico-Related Bond offerings, and the requirements that the Local CEFs be primarily invested in Puerto Rico securities, limiting concentration to 25% per single issuer likely would not have prevented all the losses to the Local CEFs in 2013, but concentration in the ERS and COFINA Bonds likely magnified some of those losses. In addition, while the UBS PR Fund Managers believed that ERS and COFINA were favorable bonds to own, GDB and OCIF appear to have orchestrated the 67% Investment Requirement waivers, new issuances, and calls and cancelations in such a way as to all but compel the UBS Funds to purchase these ERS and COFINA Bonds.

---

[158] We received this analysis from Dr. McCann at SLCG. It is based on UBS Fund annual reports, holdings reports, and quarterly reviews from August 2012 to May 2013.

[159] UBS counsel did not disclose the amount of fees it paid this consultant.

[160] According to the analysis by UBS's consultant, a comparison of UBS PR's sixteen perpetual investment-grade funds (primary invested in Puerto Rico-Related Bonds) over a variety of post-crash time periods (beginning just before the crash and extending to end points ranging from October 31, 2013 to May 21, 2016) found no statistically distinguishable difference in average monthly total return performance between the eight funds with the greatest concentration in these bonds and the eight funds with the lower concentration in these bonds. Another analysis showed no statistically significant correlation between a CEF's concentration in ERS and COFINA Bonds, and the CEF's NAV performance from Q2 2008 through Q4 2013.

4.    **The Evidence Shows that the CEF Share Price Setting Practices of UBS PR and Santander Securities Sometimes Inflated the Prices of Local CEF Shares**

Sponsors of Local CEFs such as UBS PR and Santander Securities were responsible for pricing Local CEF shares.[161]  While open-end funds are bought and sold on demand, Local CEFs have a fixed number of shares, and as previously noted, the Local CEFs have no obligation to buy shares back from investors upon request.

Local CEFs are also typically traded on the OTC market and, as such, are not registered with a stock exchange.  Like all OTC securities, they therefore trade via dealer networks and not on any centralized exchange.  Mainland CEFs, in contrast, are typically traded on exchanges in the secondary market[162] where the price is determined by the market and thus may be greater or less than the shares' NAV.[163]  Mainland CEFs have historically traded at a market price lower than the CEF's NAV.[164]

The UBS PR trading desk had the discretion to determine daily bid and ask prices for the UBS Funds.[165]  Based on the evidence we reviewed, including SEC findings on the subject, we conclude that, by using a variety of pricing mechanisms, UBS PR exercised a meaningful degree of control over the trading price of UBS Fund shares.

(a)    **The 1940 Act Is Silent on CEF Share Price Setting, But Other Federal Laws and Regulations Applied**

The 1940 Act offers little guidance on the regulation of a registered investment company's efforts to price CEF shares in an OTC market.  Section 2(a)(41)(B) of the Act does generally require registered funds to use market values to value portfolio securities for which market quotations are readily available.[166]  When market quotations are not readily available, funds must

---

[161] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, 2, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[162] P.R. Laws Ann. tit., 10 § 5(a)(2) (2018); *Closed-End Fund Information*, U.S. Sec. & Exch. Comm'n (Jan. 16, 2013), https://www.sec.gov/fast-answers/answersmfclosehtm.html.

[163] *See* Financial Industry Regulatory Authority, *Closed-End Fund Distributions: Where is the Money Coming From?*,    http://www.finra.org/investors/alerts/closed-end-fund-distributions-where-money-coming.

[164] *See* Financial Industry Regulatory Authority, *Closed-End Fund Distributions: Where is the Money Coming From?*,    http://www.finra.org/investors/alerts/closed-end-fund-distributions-where-money-coming.

[165] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, 2, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[166] 15 U.S.C. § 80a-2(a)(41)(B) (2016).

value portfolio securities and all other assets by using their fair value as determined in good faith by the CEFs' boards of directors.[167]

The 1940 Act also prohibits a firm from acquiring more than 10% of a CEF,[168] a limitation that generally reduces a firm's ability to exercise undue influence over price. The 1940 Act also requires certain disclosures, such as semi-annual shareholder reports and quarterly schedules of portfolio holdings that may reveal when CEF shares are trading at a particularly large discount or premium.[169] There are few other requirements imposed by the 1940 Act related to OTC pricing of CEFs. Disclosure or reporting obligations related to pricing CEF shares are largely governed by provisions against securities fraud and manipulation, such as Securities Act Section 17(a)(1)-(3) and Exchange Act Section 10(b) (both acts defined below). For example, liquidity providers who seek to improperly control the price of CEF shares may violate the Exchange Act's antifraud provision.[170]

### (b)   While Banks Complied With Federal Laws for CEF Pricing, Certain Pricing Practices Obscured Actual Market Value

Pricing of CEFs differed dramatically from both pricing in the retail bond market and pricing in open-end funds. In the retail bond market, prices are set by the market forces of supply and demand. An open-end fund offers and redeems fund shares at NAV.[171] For Local CEFs trading on the OTC market, however, the Trading Desk set bids and offers, and no set formula applied.[172] Carlos J. Ortiz was in charge of UBS PR's Capital Markets Trading Desk from 2003 to 2014, and was responsible for daily Local CEF pricing and trading decisions at UBS PR, utilizing an array of factors to set the price including supply and demand, order flow, inventory, yields, dividends, market conditions, and the condition of Puerto Rico credit.[173]

Similarly, Santander Securities bankers told us that an "Administrator" and Investment Advisors for the Santander Funds and Santander Securities set the price of Santander Fund shares daily, and was at least in part based on market quotations and pricing information provided by dealers.[174]

---

[167] 15 U.S.C. § 80a-2(a)(41)(B) (2016).

[168] 15 U.S.C. § 80a–12(d)(1)(C) (2016).

[169] *See* 17 C.F.R § 210 (2018); *see also* 17 C.F.R 270 (2018); *see also* 17 C.F.R § 274 (2018).

[170] *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1469 (2d Cir. 1996) (noting that market makers who charge customers retail prices that include an undisclosed, excessive markup violate 17(a) and 10(b) of the securities laws); *see also* Rule 10b-5 and Section 10(b) of the Exchange Act.

[171] Initial Decision, 14, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[172] Initial Decision, 15, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[173] Initial Decision, 5, 15, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[174] Santander Securities, *First Puerto Rico Tax-Exempt Fund II Prospectus*, 57 (February 2013) ("The Fund's assets will be valued by the Administrator, with the assistance of the Investment Adviser and Santander Securities, in good faith and under the supervision of the Fund's Board of Directors or based upon market quotations when such quotations are available.")

The Independent Investigator's Final Investigative Report

In 2013, after investigating and holding a hearing to evaluate claims of misrepresentations allegedly made by UBS PR bankers Miguel A. Ferrer and Carlos J. Ortiz related to pricing Local CEFs, SEC issued an opinion dismissing the proceedings.[175]  UBS PR separately settled with SEC regarding substantially similar allegations.   According to SEC opinion in the Ferrer and Ortiz matter, in 2008, UBS PR observed a decrease in customer demand for Local CEF shares and an increase in the number of customer sell orders.[176]  Because of, at least in part, a desire to maintain high premiums, UBS PR began purchasing shares to augment its inventory, thereby increasing demand and boosting share prices.[177]  To reduce risk and limit the impact of this pricing mechanism, UBS Financial Services' Risk Committee set an overall inventory limit of $30 million.[178]  But Ortiz, as UBS PR's Head of Capital Markets, routinely requested increases to that limit so that UBS PR could purchase additional Local CEF shares to maintain high premiums.[179]  The inventory limit increased from $30 million to $40 million in April 2008; to $45 million in June 2008; and to $50 million in December 2008.  By December 16, 2008, the inventory stood at $50.1 million.[180]

According to one UBS PR witness, the fundamental purpose of holding inventory was to enable the Trading Desk to temporarily bridge gaps in supply and demand, or in other words to provide liquidity to facilitate customer trades, a practice UBS PR described as both routine and appropriate.  Further, UBS PR employees described that UBS PR did not shift inventory levels dramatically—at its highest point, the value of inventory was less than 1% of the value of the UBS Funds' total capitalization.[181]

As UBS's Local CEF inventory grew during the second half of 2008 (and after the initial public offering of the final UBS Funds in 2008), UBS PR attempted to generate customer demand by promoting the Local CEFs through an investor conference and other efforts to make the Local CEFs look more attractive.[182]  When these proved ineffective, UBS PR requested another increase in the inventory limit to $55 million in March 2009.[183]  At this point, the Risk Committee refused, and the Chief Risk Officer instead instructed a reversal of approach, ordering an inventory

---

[175] Initial Decision, 95, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[176] Initial Decision, 10-11, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[177] Initial Decision, 24-25, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[178] Initial Decision, 23-24, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[179] Initial Decision, 24, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[180] Initial Decision, 25, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[181] Initial Decision, 18, 27, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[182] Initial Decision, 40, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[183] Initial Decision, 27, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

reduction to the original $30 million limit.[184]  In May 2009, the Chief Risk Officer ordered a further reduction in inventory to $12 million, even though UBS PR warned that such a substantial reduction would cause customers to "panic" and would lead to "major market disruptions . . . causing major losses to both fund investors and holders of other local securities."[185]

After UBS PR received the instruction to reduce inventory to $30 million, it stopped purchasing shares and instead implemented a plan internally referred to as "Objective: Soft Landing," which called for UBS PR to allow the share prices to fall by selling off the significant majority of its inventory of Local CEF shares.[186]  In the process, UBS PR routinely undercut existing sell orders from customers.[187]  UBS PR maintained an order book called the GTC ("good-til-cancelled") book containing marketable sell orders (i.e., orders at or lower than the existing bid price).[188]  Although UBS PR's trading policy directed the firm to immediately execute marketable orders, as part of Objective: Soft Landing, UBS PR instead held those orders, priced its own sell orders just below the lowest marketable order, and then executed its own orders instead of those of the customers.[189]  In so doing, UBS PR was able to sell its own inventory before—and obtain better prices than—its customers.[190]  As anticipated, Objective: Soft Landing resulted in significant price declines for the Local CEF shares.[191]

Santander Securities had a similar experience with its own inventory of Local CEF shares. At its peak in approximately 2009-2011, Santander Securities held $25 million in Local CEF shares inventory, but by 2013, that was reduced to only $8 million in inventory.  By October 2013, Santander Securities had decided not to take on additional inventory because it believed there was ample supply of shares available in the market and demand had decreased significantly.

These pricing mechanisms raise concerns under the Exchange Act and FINRA Rule 5310. The SEC examined whether, under the Exchange Act's requirements, UBS PR may have misled customers related to facts that:  (i) the Local CEF  share prices were set and maintained by UBS PR's trading desk; (ii) the secondary market lacked liquidity absent UBS PR's inventory purchasing practices; (iii) the Local CEF  share prices were dependent on UBS PR's efforts to attract and maintain customer demand; (iv) UBS PR reduced the use of its inventory to support the Local CEF market through Objective: Soft Landing; and (v) UBS PR undercut its customers'

---

[184] Initial Decision, 28, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[185] Initial Decision, 33, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[186] Initial Decision, 27, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[187] Initial Decision, 30, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[188] Initial Decision, 9, 27, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[189] Initial Decision, 27, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[190] Initial Decision, 30, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[191] Initial Decision, 30, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

marketable orders to sell its own inventory first.[192]  UBS PR settled with SEC without admitting any of the factual allegations for approximately $27 million in disgorgement, penalties, and interest.[193]  In 2013, an Administrative Law Judge rejected SEC's claims against Ortiz and Ferrer.[194]

SEC proceedings and other litigants have questioned whether UBS PR's pricing mechanisms (and the manner in which they were described to the public) violated the Exchange Act's antifraud and market manipulation provisions.  To determine whether a party engaged in manipulative or deceptive conduct giving rise to liability under SEC Rule 10b-5, "courts generally ask whether a transaction sends a false pricing signal to the market."[195]  UBS PR has been accused in ongoing litigation of violating SEC Rule 10b-5 by sending false pricing signals and artificially propping up the price of the Local CEF shares through its inventory purchasing practices.  Similarly, UBS PR has been accused of fraud and breach of fiduciary duty as a result of misrepresenting the manner in which it priced Local CEFs and executed trades on behalf of its customers.[196]

Regardless of whether UBS PR is ultimately liable for violating the federal securities laws,[197] the evidence we reviewed suggests that UBS PR's pricing efforts resulted in Local CEF share prices that traded at a premium to NAV and obscured the liquidity and value of the Local CEFs.  While it is typical for CEF shares anywhere, including on the US mainland, to trade at a discount or premium compared to NAV, UBS PR was able to maintain an unusually large premium—more than 40% over NAV—for an extended period of time.[198]  In addition, although UBS PR never owned more than 1% of outstanding Local CEF shares, the evidence indicates that it nonetheless held enough shares in its inventory to influence the market through its control of the order book.[199]  Accordingly, through its pricing practices and by affecting supply and demand in

---

[192] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[193] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, 14, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[194] Initial Decision, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[195] *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007).

[196] *See e.g., Fernandez v. UBS AG*, No. 15-02859 (S.D.N.Y. Apr. 2015); *Román v. UBS Financial Services, Inc. of Puerto Rico,* No. 12-01663 (D.P.R. Aug. 2012).

[197] *See* Part XVI for a discussion of these federal securities laws.

[198] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, 4-7, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[199] *See* Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making

the secondary market through inventory accumulation, UBS PR was able to make its Local CEFs appear more liquid and more valuable. UBS PR then took advantage of the perception of demand—to the detriment of its customers—when it decided to switch from buyer to seller and dramatically reduced its inventory. As the bank sold off its inventory, and reduced its own exposure to the Puerto Rico bond market by 2009, one expert testifying on behalf of SEC opined that the resulting price drop had cost investors $604.8 million between March 1, 2009, and September 30, 2009, and that losses due to expired, unexecuted sell orders amounted to approximately $16.6 million.[200] A UBS PR expert witness strongly disputed both of these figures, criticizing the estimate of $604.8 million in investor losses in part because it assumed all investors wanted to sell their holdings on March 1, 2009, and were precluded from doing so until September 30, 2009. And the UBS PR expert argued that UBS PR did not over-saturate sell orders through their inventory reduction, asserting that the reduction was only 20% of total customer sell volume, and therefore did not crowd out other sellers.[201]

### 5. Multiple Factors Raised the Importance of Adequate Risk Disclosures to Customers, But Standard Disclosure Requirements May Have Not Have Adequately Protected Investors from Risks Regarding the Investments, Liquidity, and Potential Market Volatility

#### (a) Several Factors Reduced the Quantum of Publically Available Information about the Local CEFs

As previewed above, CEFs can be traded either on an exchange or in the OTC market. The ones listed on a national securities exchange, such as the NYSE, must follow the exchange's listing rules, which typically include prompt disclosure of material information to the public.[202] By contrast, CEFs in an OTC market, including all Local CEFs,[203] are traded outside a central location between any two market participants and at a price that is not necessarily known to others.[204] For this reason, OTC markets are typically less transparent than exchanges and subject to fewer regulations.[205] As a result, securities traded on OTC markets generally are riskier than exchange

---

Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order, 2, *In the Matter of UBS Financial Services Inc. of Puerto Rico,* Securities Act Release No. 9318, Securities Exchange Act Release No. 6893, 2012 WL 1514678 (May 1, 2012).

[200] Initial Decision, 68, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[201] Initial Decision, 70-73, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

[202] Misrepresentations and omissions are material "if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). For a more detailed discussion regarding security claims, *see* Part XVI.A.2.

[203] *See* Order Instituting Administrative Proceedings Pursuant to Section 15(b) of the Securities Exchange Act of 1934, Making Findings, and Imposing Remedial Sanctions, 3, *In the Matter of UBS Financial Services Incorporated of Puerto Rico,* Securities Exchange Act Release No. 76013, 2015 WL 5693101 (Sept. 29, 2015).

[204] *Over-The-Counter – OTC*, Investopedia (2018), https://www.investopedia.com/terms/o/otc.asp.

[205] *Over-The-Counter – OTC*, Investopedia (2018), https://www.investopedia.com/terms/o/otc.asp.

traded securities due to less information about the issuer and the investment, potential illiquidity and higher volatility, and an increased risk of market manipulation.[206]

In addition, the 1940 Act imposes registration, disclosure, and reporting requirements on CEFs.[207] These requirements increase the volume of fund-related information available to shareholders and the public, but these provisions did not apply to Local CEFs, which were exempt from the 1940 Act and therefore were not required to register with SEC. Nevertheless, the 1940 Act disclosure requirements provide a useful point of comparison for what can and should be done to protect investors.

A third factor contributing to the comparatively lower volume of information about the Local CEFs available to the public were Puerto Rico's routine delays in issuing its financial statements. *See* Parts VIII and X.E.1. As Puerto Rico retail bonds were the major underlying asset for Puerto Rico Funds, these delays reduced the amount of information normally available to the investing public.

       **(b)**    **<u>Despite the 1940 Act Exemption, Other Regulations Governing Disclosure Still Applied</u>**

The three factors referenced above reduced the volume of information that might have become publically available through SEC disclosures, exchange disclosures or through timely disclosures by Puerto Rico. However, a variety of laws and regulations affect the information about the Puerto Rico municipal securities that must be disclosed to regulators and to customers purchasing those securities, namely the Securities Act of 1933 ("<u>Securities Act</u>"), the Securities Exchange Act of 1934 ("<u>Exchange Act</u>"), Puerto Rico laws, and FINRA regulations, all apply to the disclosures to individual clients and customers purchasing debt securities in Puerto Rico. This array of US federal laws and regulations prohibits misrepresentations and omissions in connection with offering and selling both Puerto Rico municipal bonds in the retail market, as well as Local CEF shares to retail investors, and includes:

---

[206] Robert W. Baird & Co., *Important Information about Non-Exchange Traded Equity Securities,* 1 (2017).

[207] CEFs must file: (i) a prospectus designed to provide shareholders with basic information about the fund in clear, concise language; (ii) a "statement of additional information" describing in detail the fund's management team, service providers, policies, and other characteristics; and (iii) other documents and information, such as corporate formation documents, compliance policies, and active contracts. They must disclose their investment objectives, principal investment strategies, restrictions on the types of investments they can make, and whether they will maintain "diversified" or "non-diversified" portfolios; hold annual shareholder meetings and provide proxy statements; file notice with SEC if they intend to repurchase any outstanding shares, and file certified reports on a semi-annual basis. *See* 15 U.S.C. § 80a-24(a)(2) (2016); *see also* 15 U.S.C. § 80-8(a) (2016). Registered CEF's file the material information via SEC Registration Form N-2.

- Securities Act Section 17(a) prohibiting fraudulent conduct in the offer or sale of securities;[208] Exchange Act Section 15(c);[209] Exchange Act Section 10(b);[210] and SEC Rule 10b-5, all prohibiting fraudulent conduct in connection with the purchase or sale of securities;[211]

- The Investment Advisers Act of 1940 Registered Investment Advisor provisions. A "Registered Investment Advisor" is a "person or firm that, for compensation, is engaged in the act of providing advice, making recommendations, issuing reports or furnishing analyses on securities, either directly or through publications."[212] Under the Investment Advisers Act, Registered Investment Advisors (whether with SEC or a state securities regulator) act as fiduciaries, and are subject to the duty of loyalty and due care with their clients;[213]

- FINRA Rule 2111, which went into effect in July 2012 and requires that a broker-dealer or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [firm] or associated person to ascertain the customer's investment profile;"[214]

---

[208] *See* 15 U.S.C. § 77q(a) (2016) ("It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:  (1) To employ any device, scheme, or artifice to defraud; or (2) To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.").

[209] Section 10(c) of the Exchange Act prohibits any broker or dealer from using the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security by means of any manipulative, deceptive, or other fraudulent device or contrivance.  *See* 15 U.S.C. § 78o(a)(1) (2016).

[210] Section 10(b) of the Exchange Act makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.  *See* 15 U.S.C. § 78j (2016).

[211] SEC Rule 10b-5 makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange: (i) To employ any device, scheme, or artifice to defraud; (ii) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (iii) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.  *See* 17 C.F.R § 240.10b-5 (2018).

[212] 15 U.S.C. § 80b-6 (2016).

[213] 15 U.S.C. § 80b-6(11) (2016).

[214] A customer investment profile would include the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs and risk tolerance.  "The rule also explicitly covers recommended investment strategies involving

- MSRB Rule G-27, which requires broker-dealers to supervise the conduct of their municipal securities activities to ensure compliance with both federal securities laws and MSRB rules;[215] and

- Puerto Rico law, which requires that "[e]very broker-dealer, issuer, investment adviser, investment adviser representative, federal covered adviser, investment adviser representative of a federal covered adviser, agent or any other person subject to the provisions of the Act, must observe the highest standard of fiduciary duty toward their customers and investors."[216]

### (c)   Effects and Perspectives: The Unique Nature of the Local Market Demanded a Heightened Duty of Disclosure

Our investigation first examined the Local CEFs' disclosure of information and risks, despite their exemption from the 1940 Act.  We found that institutions proactively sought to disclose these risks, even when not strictly required to do so.  For example, in Puerto Rico, UBS PR and Santander Securities included in the prospectus for each of their Local CEFs a "Risk Factors and Special Considerations" section explaining that the Local CEFs would likely engage in affiliated transactions involving securities and repo agreements with affiliates that might present a conflict of interest.[217]  The prospectuses also note that the Local CEFs carry certain risks arising from their concentration in Puerto Rico-Related Bonds and from the use of leverage—two CEF characteristics specifically related to the 1940 Act exemption.[218]  The Local CEFs' public quarterly reports served as another means through which UBS PR conveyed these risks.[219]

In addition, UBS PR's central compliance office sent a disclosure brochure to every client who invested in a Local CEF in 2009.  As a condition of their rulings, OCIF also required the Local CEFs to disclose a similar set of CEF features that were unique to Puerto Rico due to the 1940 Act exemption.  For example, OCIF required Local CEFs to disclose risks related to non-diversification, conflicts of interest, and leverage utilization.[220]

We also investigated the effect of the limitations on publicly available information created by the three factors described above—lack of SEC or exchange registration, exemption from the 1940 Act, and Puerto Rico's delays in releasing its financial statements.  Some observers noted that a significant volume of information regarding the risks of holding Puerto Rico debt could be

---

securities, including recommendations to 'hold' securities.  The rule, moreover, identifies the three main suitability obligations: reasonable-basis, customer-specific, and quantitative suitability.  Finally, the rule provides a modified institutional-customer exemption."  *See* FINRA Rule 2111, *Suitability* (May 2014), http://finra.complinet.com/en/display/display_main.html?rbid=2403&element_id=9859.

[215] *See* Municipal Securities Rulemaking Board, MSRB Rule Book, 220 (last updated Apr. 1, 2018).

[216] *See* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Regulation No. 6078*, *Regulation Under the Uniform Securities Act of Puerto Rico*, 26-27 (Jan. 18, 2000).

[217] *See* UBS PR, *Puerto Rico Fixed Income Fund, Inc. Prospectus Supplement* (Dec. 2003); Santander Securities, *Tax-Exempt Target Maturity Fund II Prospectus* (Sept. 2001).

[218] UBS PR, *Puerto Rico Fixed Income Fund, Inc. Prospectus Supplement* (Dec. 2003).

[219] UBS PR, *UBS Asset Managers of Puerto Rico Funds Quarterly Review First Quarter 2012* (2012).

[220] *See, e.g.,* Commissioner of Financial Institutions of Puerto Rico (OCIF), *Letter Regarding Organization of the Target Maturity Puerto Rico Fund, Inc.,* 3 (July 11, 2002) (on file with author).

gathered through other means.  For example, one banker noted that purchases of bonds in the primary market by affiliated Local CEFs were the subject of significant oversight, beginning during the underwriting process, and that due diligence, credit rating agency oversight, documentation, accountant comfort letters, and legal review provided scrutiny over these affiliated transactions.  This banker also noted that media coverage about Puerto Rico's fiscal health supplemented the quantity of information available to investors, and that local investors in fact were more likely to receive information from open source media than from Puerto Rico's audited financials, even if they had been timely-published.  On the other hand, class action plaintiffs have claimed that the banks utilized the press to publicly minimize risks and tout the gains of Local CEFs and underlying bonds.[221]

It is difficult to assess the quantum of information regarding the overall condition of the local municipal bond market generally available to investors, and whether it was adequate to enable investors to weigh the risks and potential benefits of investing in Puerto Rico-Related Bonds and Local CEFs.  In this uncertain environment, the volume and content of always-crucial communications between broker-dealers and financial advisors and their customers assumes an even more vital role.  This is especially true in the local retail market, which is comprised of individual investors (buying both retail bonds and Local CEF shares) rather than the typically more sophisticated and larger institutional investors that predominate in the mainland bond market.

Additional aspects of the local market further heightened the importance of adequate risk disclosures to investors for both Local CEFs and retail bonds.  First, bankers frequently pointed to the long period during which both bond and Local CEF investors enjoyed high yields and significant profits, dating from the inception of the Local CEFs through 2013.  However, following such a long period of steady profitability, timely and specific risk disclosures became ever more crucial in the face of changing circumstances and indications of growing instability in the local market.

Another consideration is that, because affiliated transactions were allowed in the local market (given its exemption from the 1940 Act), underwriters for Puerto Rico-Related Bonds were uniquely positioned to gather and assess market information related to the bonds that were then sold to affiliated Local CEFs or into the retail bond market.  This is particularly important where those same features—the ability to permissibly conduct affiliated transactions, to collect fees from the underwriting process, to sell the issued bonds to affiliated Local CEFs in the primary market, to purchase and sell bonds between affiliated entities in the secondary market, and to sell both Local CEF shares and retail market bonds via affiliated broker-dealers—contributed to the profits that local banks, Local CEFs, and local broker-dealers made across that series of transactions.  Given this environment, it may be appropriate to impose a heightened duty to apprise client investors of risk when the broker or advisor is part of a group of affiliated entities that dominate every stage of the municipal market from issuance through retail sale.

Indeed, much of the litigation against the banks since the 2013 collapse of the bond market predictably centers on the alleged failure to disclose risks that were created by high levels of

---

[221] *See e.g.,* Am. Compl., 46, *Fernandez v. UBS AG,* No. 15-02859 (S.D.N.Y. May 8, 2015), ECF No. 68.; Miguel A. Ferrer & Carlos J. Ortiz, Securities and Exchange Commission Initial Decision Release No. 513, File No. 3-14862, 82-83 (October 29, 2013).

leverage within the Local CEFs, high levels of leverage in client accounts, and Local CEF pricing practices that did not accurately reflect liquidity and market price. In addition, many of these lawsuits allege that banks acted in ways that reflected a sense of the growing instability in the Puerto Rico bond market and a commensurate rise in risk (like the deleveraging process and sales of inventory undertaken by UBS PR in 2009 and 2011), but did not act or adequately disclose risk to protect their customers.

Allegations related to misrepresentations, omissions and failure to convey adequately risks or material information related to risk (as well as selling Local CEFs and bonds that exceeded clients' risk profiles) have arisen in proceedings before SEC, FINRA, and OCIF as well as civil class action lawsuits. Commensurate with its dominant position in the Local CEF market, UBS PR has been the most frequent target of these claims.[222] As of February 2018, approximately $377 million in settlements and awards had been paid to clients as a result of these actions.[223]

Another frequently cited episode[224] relates to serious concerns raised in April 2011 by UBS PR financial advisors about selling UBS Funds. In explaining declining Local CEF sales, the advisors cited low liquidity, high levels of concentration, a lack of information, excessive leverage, oversupply and underlying instability in the bond market, and their own reluctance to aggressively sell the Local CEFs under these conditions.[225] In June 2011, UBS PR leadership seemed to dismiss the reservations of the UBS PR advisors, instead pressuring them to maintain the course of aggressive Local CEF sales and to discourage customers from offloading their Local CEF holdings.[226] UBS PR and the individual leaders involved in responding to the concerns have vigorously defended the decision to press for increased sales at this juncture, based on the UBS PR view that the bond market remained viable and the strong historical performance of the Local CEFs would endure.[227]

Whether a particular sale of a Local CEF share or Puerto Rico retail bond was accompanied by an adequate disclosure of risk (or whether the sale was properly matched to the investor's risk profile) requires a particularized, fact-specific analysis. Our investigation revealed different views as to the governing standard of conduct to be used in that analysis. For example, no witness, including bankers who were interviewed, could provide a breakdown of the volume of sales of

---

[222] Dawn Giel, Leslie Picker, Scott Zamost, *Broken bonds: the role Wall Street played in wiping out Puerto Ricans savings*, CNBC (Dec. 18, 2017), https://www.cnbc.com/2017/12/18/broken-bonds-wall-streets-role-in-wiping-out-puerto-ricans-savings.html.

[223] Craig McCann, Chuan Qin, Mike Yan, *Puerto Rico Securities Arbitrations: 2,469 Filings, $377 million in Settlements and Awards so far (updated February, 2018)* (Oct. 10, 2017).

[224] *See e.g.*, Am. Compl., 34, *Fernandez v. UBS AG*, No. 15-02859 (S.D.N.Y. May 8, 2015), ECF No. 68.

[225] Suzanne Barlin, *Exclusive: Recording Shows how UBS Drove Reluctant Brokers to Sell High-risk Puerto Rico Funds, Reuters*, (Feb. 6, 2015), https://www.reuters.com/article/us-ubs-puertorico-tactics/exclusive-recording-shows-how-ubs-drove-reluctant-brokers-to-sell-high-risk-puerto-rico-funds-idUSKBN0LA0FN20150206.

[226] Suzanne Barlin, *Exclusive: Recording Shows how UBS Drove Reluctant Brokers to Sell High-risk Puerto Rico Funds, Reuters*, (Feb. 6, 2015), https://www.reuters.com/article/us-ubs-puertorico-tactics/exclusive-recording-shows-how-ubs-drove-reluctant-brokers-to-sell-high-risk-puerto-rico-funds-idUSKBN0LA0FN20150206.

[227] Initial Decision, 42-52, *In The Matter of Miguel A. Ferrer, and Carlos J. Ortiz*, SEC Release No. 513, 107 S.E.C. Docket 3047, 2013 WL 5800586 (Oct. 29, 2013).

either bonds or Local CEFs executed by financial advisors who were required to operate under a fiduciary standard, or by broker-dealers who acted under a mere suitability standard. "<u>Suitability</u>" typically refers to the assessment of whether an investment is appropriate for a particular investor's needs at a particular time, given various considerations such as price, rate of return, length of investment, and degree of perceived risk.

For broker-dealer sales, bank witnesses acknowledged that FINRA does not clearly define "suitability."  In-house counsel for one bank described the standard as "I'll know it when I see it."[228]  Adding to the confusion were the variety of titles of those involved in sales, such as "wealth managers," who do not obviously fall under one standard or the other.[229]  This is in spite of the fact that Puerto Rico law, unlike the mainland, imposes "the highest standard of fiduciary duty" on financial advisors and brokers alike in dealings with their customers and investors.[230]

At bottom, the local market was dominated by retail sales to individuals.  Local CEFs had unique features related to high levels of leverage and concentration, and selling practices that employed lines of credit, margin purchases and (for retail bond sales) repurchase agreements. Local CEF pricing practices made it difficult to discern actual value and liquidity for Local CEF shares.  Several factors also reduced the overall volume of publicly available information about Local CEFs.  These circumstances called for clear standards of conduct and disclosure that would influence brokers and advisors alike to convey risk adequately, and especially changes in the level of risk, to their customers.  It is far from clear that a sufficiently protective standard was in place and applied across the board for Puerto Rico investors at the emergence of the Puerto Rico fiscal crisis.

## E.   <u>Recommendations</u>

Based on the above findings of our investigation, we make the following recommendations:

### 1.   <u>Only 103 Bonds Should Be Triple Tax-Exempt in the Local Market</u>

The evidence suggests that the triple tax-exempt status of those Puerto Rico-Related Bonds that would not have qualified as tax-exempt on the mainland drove both the supply of and demand for Puerto Rico-Related Bonds issued for sale on the island.  We recommend that, upon its eventual return to the municipal bond markets, Puerto Rico consider adopting the categories of issuances described in Section 103 of the tax code that fall outside the tax exemption.  In other words, for any Puerto Rico bondholder to receive tax-exempt interest income, the issuance should first conform to Section 103.  The evidence we reviewed shows that had the restrictions of Section 103 applied to Puerto Rico issuances prior to 2013, Puerto Rico would have had to pay significantly higher yields on non-103 bonds. This disincentive would have substantially reduced the $16 billion

---

[228] UBS lawyers stated that the relevant FINRA provision governing suitability (FINRA Rule 2111) does not establish a well-defined rule as to what constitutes a suitable transaction, but requires that financial advisors have a reasonable basis for believing their recommendations are suitable, and FINRA does set forth some criteria to be considered in giving investment advice.

[229] UBS PR described its wealth managers as falling under the broker-dealer standard of suitability, not the financial advisor fiduciary standard.

[230] *See* Commissioner of Financial Institutions of Puerto Rico (OCIF), Regulation No. 6078, Regulation Under the Uniform Securities Act of Puerto Rico, 26 (Jan. 18, 2000).

of Puerto Rico issuances that were sold as tax-exempt, non-103 bonds to Puerto Rico investors. In addition, the reduced availability of high yielding, tax-free investments may begin to wean the Local CEF and retail market off these investments.

> ## 2. Specific Measures Tailored to the Local Market, Although Not Contained in the 1940 Act, are Needed to Protect Local Investors

Below we suggest recommendations beyond the 1940 Act implementation that we believe will protect Puerto Rico investors and reduce the risk of future catastrophic losses:

> ### (a) Affiliated Transactions Should Be More Heavily Regulated or Curtailed

Our investigation found that a few market players controlled the local investments at every level in Puerto Rico. From the first stage in underwriting the bonds to the last stage of sales to retail investors directly or through the Local CEFs, affiliated transactions abounded. In addition, as there are only a few products that were sold to local retail investors, namely the Puerto Rico-Related Bonds (underwritten by UBS PR, Santander Securities, and Popular Securities) and the Local CEFs (created and packaged by UBS PR, Santander Securities, and Popular Securities), these few banks were selling their own proprietary products to their customers.

In particular, we recommend that the Puerto Rico legislature, OCIF, and SEC continue to scrutinize affiliated CEF transactions between financial advisors and broker-dealers and their affiliated parent entity. UBS PR financial advisors were selling primarily UBS Funds to their retail customers, which benefits not only the financial advisor (through commissions), but also the UBS Funds (through management fees) and thus has double the benefit to UBS PR as parent bank. The same is true of the Santander Funds and Popular Funds. Indeed, these sales of affiliated CEF shares have been the subject of at least 2,640 FINRA arbitrations to date.[231]

While on the mainland, broker-dealers can sell their own bank's proprietary products—as long as they are not incentivized to push these products over others[232]—the mainland markets are deep and robust, with thousands of available products for retail investors. If some version of the 67% Investment Requirement remains along with the triple tax incentives for other Puerto Rico investments, there will remain only a few financial products available to meet the retail market's needs for tax-free, high-yield products. We recommend that SEC and Puerto Rico's political branches or regulatory authorities (including OCIF) consider implementing stronger limitations and guidance for affiliated brokers and financial advisors selling affiliated products, if not ban the practice outright.

---

[231] See Craig McCann, Chuan Qin, Mike Yan, *Puerto Rico Securities Arbitrations: 2,469 Filings, $377 million in Settlements and Awards so far (updated February, 2018)* (Oct. 10, 2017).

[232] NASD Rule 2830(k) prohibits NASD members from favoring the sale of mutual fund shares based on the receipt of brokerage commissions. *See, e.g., SEC Charges Morgan Stanley With Inadequate Disclosure in Mutual Fund Sales; Morgan Stanley Pays $50 Million To Settle SEC Action,* US Securities and Exchange Commission Newsroom (Nov. 17, 2003), https://www.sec.gov/news/press/2003-159.htm.

The Independent Investigator's Final Investigative Report

### (b)   The Composition Requirements for Tax-Exempt Puerto Rico Funds Should Be Lowered

The combination of the 67% Investment Requirement and the lack of available qualifying assets beyond the highly correlated Puerto Rico municipal bonds led to the over-concentration of Local CEFs in Puerto Rico-Related Bonds. Certainly, the 25% Concentration Rule should have been enforced, as the Local CEFs could have simply purchased the slightly lower yielding 103 bonds from other Issuers (beyond COFINA and ERS). Because the entire local bond market was integrated, however, single issuer diversification probably would not have eliminated the huge losses.

We recommend that Puerto Rico permanently reduce the investment requirement in Puerto Rico assets for Local CEFs. We are not suggesting that the Local CEFs need to remain entirely tax-free, but they can be structured to give investors some tax advantages while also protecting investors through greater diversification. Although the current 50% requirement appears suitable, we recommend further study by financial analysts and economists to determine the appropriate balance between risks from over concentrating versus incentivizing local investment in Puerto Rico.

### (c)   Leverage Limits Cannot Be Maintained with the Current Lack of Diversified Investments

Bank witnesses described divergent interpretations of the leverage limits that SEC and OCIF imposed. These differences centered on the definition of reverse repo agreements as leverage (SEC does not count repo transactions as leverage, but OCIF does). The bankers stated that the Local CEFs technically met the leverage requirements of the 1940 Act, once the volume of repo transactions was subtracted from the Local CEFs' overall leverage amount. UBS PR and Santander Securities bankers noted that application of the 1940 Act will make it much more expensive to maintain the previous high levels of leverage as the banks can no longer turn to affiliated transactions for repo transactions, and only a small number of mainland market participants engage in repo transactions with funds. UBS will be greatly affected in light of the high volume of leverage transactions previously conducted with UBS PR, but no longer permitted under the 1940 Act prohibition on affiliated transactions. We understand that these costs will translate to lower returns to investors.

Our investigation found that leverage was not the cause of the fiscal collapse, but the Local CEFs' high levels of leverage, their single issuer concentration, their high Puerto Rico exposure under the 67% Investment Requirement, and their high volume of individual leverage (via lines of credit and repo agreements, for example) combined to significantly magnify the losses for local investors. Thus, as discussed above, we recommend that OCIF and Puerto Rico's legislative branch consider risk exposure more broadly, and the aggregate risk created by high leverage limits and high concentration requirements and, for example, consider whether it makes sense to reduce the composition requirements below the current 67% Investment Requirement. Puerto Rico's legislative branch and OCIF may also consider requiring lower leverage ratios, in conjunction with the concentration and composition reductions to account for the over-concentration risks.

### (d)      Disclosure Standards Should Be Maintained at the Highest Level

A combination of regulatory and market conditions in Puerto Rico called for a clarified, exacting level of required disclosures to client investors.

*First*, through a combination of factors, the Puerto Rico investor was exposed to high levels of risk. The high leverage ratios allowed within the Local CEFs (and in individual investor portfolios) and the high levels of concentration in the Local CEFs significantly magnified the risk exposure of local investors, a group dominated by individuals purchasing retail bonds or Local CEF shares. In addition, consistently high returns from Puerto Rico-Related Bonds (and Local CEFs that held those bonds as underlying assets) over a period of many years created a danger that individual Puerto Rico investors would be slow to look for, recognize, and react to indications of instability or elevated risk in the local market.

*Second*, there was a shortage of information available to investors. The Local CEFs were not registered either with SEC (because of the 1940 Act exemption) or with an exchange (because they are traded OTC), reducing the volume of publicly available information, a shortage exacerbated by Puerto Rico's failure to issue timely audited financial statements. In addition, Local CEF prices were set by trading desks rather than by market forces and at certain intervals were influenced by inventory transactions. This practice usually resulted in shares priced at a premium to NAV, and deprived the investing public of an accurate indicator of Local CEF value and liquidity.

*Third*, in the absence of the 1940 Act, affiliated entities were able to perform multiple roles in the bond market in relation to a single issuance. A bank could perform as underwriter, then sell the issued bonds in the primary market to affiliated Local CEFs, and affiliated brokers and advisors could in turn sell Local CEF shares (and retail bonds) in the secondary market. Though we determined that many of the perceived dangers of affiliated transactions were largely mitigated by oversight and audit procedures, a family of affiliated entities involved in, and profiting from, transactions at every stage from issuance through retail sale is incentivized to use its prevalent position in the market to gather and assess information about stability and risk in the underlying asset, in this case Puerto Rico-Related Bonds. That information should be shared with retail investors.

Under these three conditions—high risk, information shortage, and the prevalent position of affiliated entities—financial advisers and broker-dealers who recommend investments in Puerto Rico debt, including through Local CEFs, should continue to be held to the highest standards of fiduciary duty, as prescribed under Puerto Rico law, including all associated risk disclosure requirements and the ongoing responsibility to assess the risk allocations against the risk profiles of client investors. Further, with the recent extension of the 1940 Act to Local CEFs (from which we recommend there be no "grandfather" treatment), the information shortage component will be partly cured by the disclosures that SEC now requires and the increased visibility that this will afford both regulators and the public.

### 3. The SEC Should Not "Grandfather" Existing Local CEFs From the Recent Extension of the 1940 Act

We understand that certain banks have asked SEC to consider a "grandfather" exemption that would exclude existing Local CEFs from regulation under the 1940 Act's recent extension to the local market (even after the three year grace period that the amendment provides). There is a low likelihood of new Puerto Rico issuances or the creation of new Local CEFs anytime soon. So, if SEC agrees to a grandfather provision, the newly amended 1940 Act will not be relevant to Local CEFs for quite some time. We recommend that SEC not exempt existing Local CEFs.

Bank witnesses repeatedly told us that, contrary to press reporting, exemption from regulations under the 1940 Act did not significantly contribute to the volume of losses suffered by investors in Local CEFs. We agree that the 1940 Act exemption was not the sole cause of the losses suffered by the Local CEFs. However, as discussed above, it played a role in contributing to the losses, along with other market and regulatory factors.

The 1940 Act is an important regulatory tool, and its application to both current and future Local CEFs would have three primary benefits.

*First*, compliance would add necessary restraints and a defined set of regulations that would benefit the Local CEFs and their shareholders. One of those requirements for 1940 Act registered funds will be disclosures to SEC, which will improve oversight of the Local CEFs and provide additional important information for investors that has been lacking in the past.

*Second*, witnesses from the banks stated that if the 1940 Act applied, they would be forced to lower leverage ratios and that would in turn hurt investors. We do not find this compelling. The banks themselves suggested that at least some of the leverage used in Puerto Rico would not be counted under the definitions applied by SEC under the 1940 Act. The leverage limits also protect investors from high levels of risk—there seems to be no justification for a disparate standard for leverage between the mainland and local markets.

*Third*, as to affiliated transactions, even if the Local CEFs could not have been created in the 1990s (in their current form) absent the 1940 Act exemption, bankers agree that today, the local banks are able to create and manage CEFs—if required—with unaffiliated entities. Further, elimination of affiliated transactions in the local market would help counter any perception of self-dealing, conflicts of interest, and the idea of a regulatory double standard (*i.e.*, that there are more protections for mainland investors, and thus a higher standard for that market, in comparison to fewer protections for local investors, and a lower standard for the local market). This alignment may serve to restore the public trust in the local market and in Puerto Rico financial institutions, thereby helping Puerto Rico to regain access to the capital markets at some point.

In short, the 1940 Act and its regulations would provide clear and consistent rules to the Local CEFs and affiliated banks regarding disclosures, leverage, and affiliated transactions and should apply to the Local CEFs as soon as permitted under the law.

# PART XII

# PUERTO RICO'S GOVERNMENT ETHICS FRAMEWORK

# PART XII
# PUERTO RICO'S GOVERNMENT ETHICS FRAMEWORK

Because Puerto Rico is geographically isolated, its finance community is somewhat insular.  In comparison to large financial capitals like New York, for example, Puerto Rico has a smaller pool of individuals with the appropriate credentials for positions that involve complex financial transactions.[1]   There is thus an increased likelihood that such individuals will have the opportunity to pursue similar public- and private-sector employment on the island at different points in their careers.

As part of our independent investigation, we were charged with investigating how, if at all, personal relationships or potential self-dealing between certain public servants and stakeholders in the private sector, may have impacted Puerto Rico's negotiations with the financial institutions that were involved in relevant transactions.  Among other things, we analyzed: (i) whether Puerto Rico had an adequate framework for regulating conflicts of interest involving GDB officials; (ii) whether the evidence demonstrates any weaknesses in Puerto Rico's implementation of that framework; (iii) whether the evidence we examined demonstrates that former GDB officials violated applicable ethics requirements in connection with any relevant transactions involving the Puerto Rico government; and (iv) how any identified weaknesses in the existing framework may be reformed.  We reach the following conclusions:

1.      On paper, the ethics framework that the Government Ethics Act of 2011 (the "Government Ethics Act") and its predecessor, the Puerto Rico Ethics in Government Act of 1985 ("Ethics in Government Act"), established is well-designed, and in general, completely administered by the Office of Government Ethics of Puerto Rico ("OGEPR").  *See* Part

---

[1] The entire island has 590 FINRA-registered brokers and investment advisers with at least ten years of experience whereas New York City has 39,293 FINRA-registered brokers and investment advisers with the same amount of experience, as of August 2, 2018.  *See* Database of Brokers and Investment Advisers, Fin. Indus. Regulatory Auth., https://brokercheck.finra.org/search/genericsearch/grid.

The Independent Investigator's Final Investigative Report

XII.A.1, below.  Its contours are comparable to—and, in some instances, more comprehensive than—the ones that other US jurisdictions have adopted.  *See* Part XII.A.2, below.

2.      We nevertheless conclude that this anti-conflict framework was not optimized during the relevant period.  In fact, we identified several implementation-related weaknesses that threatened its effectiveness.  *See* Part XII.B, below.

3.      The evidence we examined does not support the conclusion that current or former GDB officials violated any applicable ethics restriction in connection with relevant Puerto Rico-related transactions.  Among other things, we found no instances of bribery, kickbacks, improper use of information obtained through official channels, deficiencies in mandatory financial disclosures, or improper awards of government contracts to family members of a public servant.  *See* Part XII.C, below.  Beyond this, the rotation of certain individuals between positions at GDB and positions with private financial institutions either complied with applicable screening requirements or was pre-approved.

4.      Puerto Rico's anti-conflicts framework can benefit from reforms that strengthen its vulnerabilities. We offer a series of recommendations for that purpose in Part XII.D, below.

A.      **In Concept, Puerto Rico's Anti-Conflicts Framework is Comprehensive**

The Government Ethics Act (the "Code of Ethics") provides the foundation for ethics compliance by government employees in Puerto Rico.[2]   The statute passed in late 2011 and became effective in early 2012.  In pertinent part, it streamlined and updated, but did not materially depart from, the pre-existing ethics framework that the Ethics in Government Act established.[3]  The framework has four pillars:

- *First*, the Code of Ethics defines specific ethical violations and prohibits active and former public servants from engaging in conduct that may yield a real or perceived conflict of interest.[4]  Among other things, the Code of Ethics imposes minimum screening periods on incoming and outgoing public servants;

- *Second*, there is a regulatory enforcement mechanism with two layers of oversight available through: (i) OGEPR; and (ii) individual ethics committees situated within each executive branch agency;[5]

- *Third*, public servants and candidates for public office must disclose certain information so that potential conflicts of interest can timely be detected and remediated;[6] and

---

[2] P.R. Laws Ann. tit. 3, §§ 1854-1860b (2018).

[3] The differences between these two ethics regimes are not substantively important for purposes of our analysis.  For efficiency, we thus present our analysis in terms of the Government Ethics Act (which currently governs).

[4] P.R. Laws Ann. tit. 3, §§ 1857-1857g (2018).

[5] P.R. Laws Ann. tit. 3, §§ 1855-1855d (2018).

[6] P.R. Laws Ann. tit. 3, §§ 1858-1858i (2018); P.R. Laws Ann. tit. 3, §§ 1859-1859a (2018).

The Independent Investigator's Final Investigative Report

- *Fourth*, the Code of Ethics provides sanctions power and corrective authority to deter violations and promote compliance with other provisions of the Government Ethics Act. [7]

We discuss these attributes in Part XII.A.1 below. For the reasons we explain separately in Part XII.A.2: (i) this framework is similar to the ones that other US jurisdictions have implemented; and (ii) it is, in important respects, more comprehensive than the frameworks that exist in certain US states that have recently experienced municipal bankruptcies.

1. **Puerto Rico Has a Multi-Faceted Structure for Preventing and Remediating Conflicts of Interest**

    (a) **The Code of Ethics Prohibits Current and Former Executive Branch Servants from Having Real or Perceived Conflicts of Interest**

    The Code of Ethics applies to public servants who serve, or have served, in Puerto Rico's Executive Branch, including public corporations like PREPA and PRASA.[8] It prohibits overt acts of corruption, such as bribery, kickbacks, and other self-dealing.[9] It also prohibits servants from taking on a second job that may impair their work on behalf of the government[10] and from improperly awarding a contract to a business that a family member owns.[11] In addition, the Code of Ethics prohibits servants from using public property to promote a political party or candidate[12] or from destroying public property under the servant's custody.[13]

    To achieve these objectives, the Code of Ethics incorporates a number of features that are designed to prevent and timely address conflicts. One such feature is the screening period requirement. That provision is intended to reduce the likelihood that conflicts of interest will arise from the flow of individuals between Puerto Rico's public and private sectors (often referred to as a perceived "revolving door"), thereby tempering appearances of impropriety. For this purpose, the screening period requirement generally mandates that incoming and outgoing servants wait until a specified period of time has passed between their periods of public service and private sector employment, if they intend to engage in certain covered conduct. Accordingly, an incoming servant may generally not work on substantially the same matters with which he or she was involved while employed in the private sector, until after the applicable screening period. [14] A departing public servant must similarly refrain from representing any business on a matter in which the servant participated during his or her

---

[7] P.R. Laws Ann. tit. 3, §§ 1860-1860b (2018).

[8] P.R. Laws Ann. tit. 3, § 1857 (2018) ("This code regulates the conduct of public servants and former public servants in the Executive Branch.").

[9] *See, e.g.,* P.R. Laws Ann. tit. 3, § 1857a(a) (2018); P.R. Laws Ann. tit. 3, § 1857a(c) (2018). Through its separate Code of Conduct for Contractors, Puerto Rico further prohibits any current or former public servant of a relevant executive branch agency from accepting a benefit from a person who wishes to establish a contractual, commercial, or financial relationship with Puerto Rico. *See* P.R. Ann. tit. 3, § 1756(e) (2018).

[10] P.R. Laws Ann. tit. 3, § 1857b(a) (2018).

[11] P.R. Laws Ann. tit. 3, § 1857b(c) (2018).

[12] P.R. Laws Ann. tit. 3, § 1857a(i) (2018).

[13] P.R. Laws Ann. tit. 3, § 1857a(p) (2018).

[14] P.R. Laws Ann. tit. 3, § 1857a(g) (2018).

The Independent Investigator's Final Investigative Report

employment with the government until after the applicable screening period has expired.[15]  The applicable screening period may is either one or two years, depending on the circumstances.[16]

Notably, the screening period requirement does not apply if an incoming or outgoing servant obtains an opinion in advance from OGEPR that either confirms that the screening period is inapplicable or, provides instructions for implementing a course of screening conduct that would eliminate the need for it (such as a recusal).  We discuss OGEPR opinions in more detail below in Parts XII.A.1.b.i and XII.C.

Finally, the Code of Ethics requires public servants to report to OGEPR any conflicts or potentially unethical actions.[17]  It also permanently forbids former public servants from using confidential or privileged information obtained in their capacity as a public servant for their own purposes or sharing it with third parties.[18]

### (b)      Puerto Rico Has Two Tiers of Enforcement for Ethics Violations

There are two ways to address ethics violations in Puerto Rico:  (i) through OGEPR; and (ii) through individual agency-level committees. We discuss each layer of oversight below.

### (i)      Oversight by OGEPR

OGEPR is an agency of the Puerto Rico government that is devoted to the ethics goals and policies that govern Puerto Rico's Executive Branch overall.  OGEPR thus focuses on: (i) "educat[ing] public servants . . . to carry out their duties observing values such as caring, trustworthiness, fairness, responsibility, respect, and citizenship;" (ii) "oversee[ing] the conduct of public servants;" and (iii) "penaliz[ing] all those who infringe the code of ethics[.]"[19]

The Government Ethics Act confers broad authority on OGEPR in pursuit of these objectives.  Among other things, OGEPR has the power to formulate ethical and moral conduct policies and programs for public servants; to promulgate regulations; to issue orders; to conduct audits; to designate administrative judges;[20] to establish procedures for identifying violations of the Code of Ethics and preventing conflicts of interest; and to take any other action that may be necessary to carry out its purpose.[21]  There are thus few measures that OGEPR may not lawfully pursue.[22]

---

[15] P.R. Laws Ann. tit. 3, § 1857e(b) (2018).

[16] P.R. Laws Ann. tit. 3, § 1857e(c) (2018); P.R. Laws Ann. tit. 3, §1857e(d) (2018).

[17] P.R. Laws Ann. tit. 3, § 1857d (2018).

[18] P.R. Laws Ann. tit. 3, § 1857e(e) (2018).

[19] P.R. Laws Ann. tit. 3, § 1855(a) (2018).

[20] In practice, OGEPR seldom designates an administrative law judge to preside over an administrative proceeding.  The majority of enforcement actions brought by OGEPR are conducted before Official Examiners, who are employees of OGEPR but have total autonomy to handle the adjudicative process, execute orders, and file Reports with the Executive Director recommending how their cases should be resolved.

[21] P.R. Laws Ann. tit. 3, § 1855b (2018) (describing the powers and authorities of the Office and the Executive Director).

[22] P.R. Laws Ann. tit. 3, § 1855b(x) (2018) ("The Office and Executive Director shall have the following powers and authorities . . . [t]o take any other action or measure that may be necessary and convenient to achieve the purposes of this chapter.").

The Independent Investigator's Final Investigative Report

One important function of OGEPR is "to issue opinions on the provisions" of the Government Ethics Act.[23] In this regard, OGEPR may, at the request of any active or former public servant, investigate and perform its own legal analysis to determine whether that individual's prior or anticipated course of conduct complies with applicable ethics laws. OGEPR employs four attorneys who specialize in performing such analysis under the supervision of one Auxiliary Director. OGEPR's Executive Director individually reviews and approves every resulting opinion letter, after which OGEPR makes them available to the public.[24]  OGEPR does not issue opinion letters in response to hypothetical scenarios, but rather only prepares opinions in response to questions arising from specific sets of facts.

The Executive Director leads OGEPR and has ultimate responsibility for the implementation and oversight of the Government Ethics Act.  A panel of former justices of the Supreme Court of Puerto Rico selects the Executive Director, who the Governor then appoints. The Executive Director serves a ten-year term and cannot be removed from office absent gross negligence, immoral conduct or illegal activity.[25]  The Executive Director cannot have been a candidate in a general or special election during the four years prior to appointment, and is not allowed to engage in any political activity during the ten-year term.[26] At least one Executive Director with whom we spoke stated that these procedures and restrictions foster independence by enabling Executive Directors to make decisions without having to consider how others may view those decisions, and with little fear of reprisal.

### (ii)    Oversight by Agency-Level Committees

Each Executive Branch agency must appoint and maintain its own ethics committee for the purpose of preventing agency personnel from violating applicable ethics laws.[27]  The agency-level committees are thus supposed to augment OGEPR by implementing and enforcing its goals and policies on a day-to-day basis.

Every agency-level committee includes five public servants.  Two of those are the head of the relevant agency's Office of Human Resources, and the head of its Office of Finance. Agency personnel elects the remaining three members.[28]

OGEPR is supposed to oversee the agency-level committees.  To enable that oversight, the agency-level committees are required to verify compliance with OGEPR's directives, inform OGEPR of their work, and maintain and update records for OGEPR's review on an annual basis.[29]  If an agency-level committee observes a violation of the Code of Ethics, it must report the perceived violation to OGEPR for further action.  In addition, OGEPR has the

---

[23] P.R. Laws Ann. tit. 3, § 1855b(e) (2018).

[24] *Autorizaciones Ex Servididores*, Oficina de Ética Gubernamental de P.R., https://ethica-pr.data.socrata.com/Government/-AUTORIZACIONES-EX-SERVIDORES/icqb-bx9y/data        (last visited July 17, 2018).

[25] P.R. Laws Ann. tit. 3, § 1855a(f) (2018).

[26] P.R. Laws Ann. tit. 3, § 1855a(c) (2018).

[27] P.R. Laws Ann. tit. 3, § 1855d (2018) (describing the composition, duties and function, and sanctions and penalties related to Government Ethics Committees).

[28] P.R. Laws Ann. tit. 3, § 1855d(a) (2018).

[29] P.R. Laws Ann. tit. 3, § 1855d(b) (2018) (describing duties and functions of the Government Ethics Committees).

authority to impose administrative sanctions on agency-level committee members if the committee fails to execute its duties.[30]

### (c)   Puerto Rico Requires Public Servants To Disclose Personal Financial Information

Public servants from the executive and legislative branches must disclose information about their finances when they assume or leave public office, as well as annually while serving.[31]  Public servants submit their mandatory financial disclosures through an electronic system known as the Sistema de Presentación de Informes Financieros ("PEIF"), using a standardized form.[32] Candidates and nominees for public office must also make certain disclosures.  In particular, they must file sworn statements attesting to their personal financial solvency and absence of conflicts of interest.[33]  This is in addition to the disclosures they must make after they begin their service.  Each year, public servants file approximately 7,000 to 8,000 financial disclosure reports with OGEPR.

The disclosures encompass a range of information that is relevant to assessing compliance with the Government Ethics Act.  This includes details about the individual's income, wages, business interests, assets held by financial institutions, investments in securities and other financial instruments, real estate holdings, personal property, various types of debts and obligations, and any other transactions or interests that may be relevant to evaluating a potential conflict of interest.[34]  The public can view this information using the searchable database that OGEPR maintains.[35]

OGEPR uses the mandatory financial disclosures in two primary ways:

1.     *For Prevention*.  OGEPR uses the disclosures to identify and remedy potential conflicts before they arise.[36]  This process typically includes conversations between OGEPR and the individual who submitted the disclosures, with the goal of working toward a cooperative solution that does not require a formal proceeding (such as an investigation) or sanctions.  These conversations often begin when a public servant approaches OGEPR to request advice about a potential conflict of interest.  OGEPR may ultimately recommend one or more courses of action, such as requiring the public servant to place certain assets in a blind trust or recuse himself or herself from decision-making with respect to the underlying subject matter of the potential conflict.   If the disclosures are thorough and honest, then this process enables OGEPR to effectively promote compliance with the Government Ethics Act.

---

[30] P.R. Laws Ann. tit. 3, § 1855d(c) (2018).

[31] P.R. Laws Ann. tit. 3, §§ 1858-1858a (2018) (describing financial disclosure requirements for public servants).

[32] *See Sistema de Presentación Electrónica de Informes* Financieros, Oficina de Etica Gubernamental de P.R., https://reif.oeg.gobierno.pr/OEGPEIF/main.aspx (last visited July 19, 2018).

[33] P.R. Laws Ann. tit. 3, §§ 1859(a)-(b) (2018).

[34] P.R. Laws Ann. tit. 3, § 1858c (2018) (mandating the contents of financial disclosures).

[35] *See Resumen Financiero de Servidores Públicos*, Oficina de Etica Gubernamental de P.R., http://rfsp.eticapr.com (last visited July 19, 2018); P.R. Laws Ann. tit. 3, § 1858g(a) (2018) ("The Office shall make available to the public a summary of on the contents of financial reports filed by the members of the Executive Branch through its webpage.").

[36] P.R. Laws Ann. tit. 3, § 1858d(a) (2018).

2.      *For Enforcement.*   OGEPR uses the disclosures as evidence for investigations and proceedings. When OGEPR receives a third-party tip or complaint about an alleged ethics violation, it reviews the subject's disclosures to determine whether the complaint has merit.[37] And because falsifying a disclosure is itself a violation of the Government Ethics Act,[38] OGEPR typically investigates disparities between the information in a complaint and the relevant disclosures.[39]  In some cases, OGEPR may investigate omissions from the disclosures where it has evidence that a public servant is attempting to conceal relevant information. Accordingly, investigations that begin with a suspicious disclosure sometimes unveil more substantial ethics violations concerning improper payments or conflicts of interest.   For example, a person who has served as OGEPR's Executive Director told us that, after discovering that a local judge had omitted relevant information from his disclosure, , OGEPR uncovered a scheme in which that judge accepted payments in exchange for rendering a particular judicial opinion.   We are not aware of any connection between that judge and any Puerto Rico-related bond issuance during the relevant period.

### (d)      Puerto Rico's Anti-Conflict Framework Incorporates Mechanisms for Imposing Liability on Public Servants Who Violate Applicable Requirements

The Government Ethics Act provides criminal, civil, and administrative penalties for individuals who violate either the Code of Ethics or the Government Ethics Act's provisions regarding financial disclosures, continuing education requirements, and the duties of government ethics committees.[40] The agencies with authority to enforce these provisions include the OGEPR, the Puerto Rico Department of Justice and, in certain cases, appropriate federal law enforcement agencies (including the Federal Bureau of Investigation).  The OGEPR has the power to impose fines and administrative sanctions for ethics infractions, as well as to order the payment of restitution.[41] The Puerto Rico Department of Justice prosecutes intentional violations of the Code of Ethics, such as a public servant's exploitation of the duties and powers of office for financial gain.[42]  OGEPR is also required to refer to the Puerto Rico Department of Justice or an appropriate federal authority any findings that may result in civil or criminal liability.[43]

Since OGEPR was created in 1985, it has received approximately 3,249 formal complaints and has enforced approximately $4.3 million in fines.  OGEPR has also ordered public servants to pay restitution directly to agencies and municipalities from which the servants have illegally misappropriated funds.  To carry out that enforcement function, OGEPR employs a staff of approximately 10 attorneys who are each responsible for investigating and managing approximately 80 to 100 cases.   These attorneys are not *empleados de confianza*,

---

[37] P.R. Laws Ann. tit. 3, § 1858d(b)(2) (2018).

[38] P.R. Laws Ann. tit. 3, § 1858f(a)(1) (2018).

[39] P.R. Laws Ann. tit. 3, § 1858d(a) (2018).

[40] P.R. Laws Ann. tit. 3, § 1855d(c) (2018) (describing administrative sanctions and penalties related to duties of government ethics committees); P.R. Laws Ann. tit. 3, § 1856c (2018) (describing administrative sanctions related to continuing education requirements); P.R. Laws Ann. tit. 3, § 1857f (2018) (describing criminal, civil, and administrative sanctions and penalties related to the Code of Ethics); P.R. Laws Ann. tit. 3, § 1858f (2018) (describing criminal, civil, and administrative sanctions and penalties related to financial disclosures for public servants in the executive branch).

[41] P.R. Laws Ann. tit. 3, § 1857f(c) (2018).

[42] P.R. Laws Ann. tit. 3, § 1855b(p) (2018); P.R. Laws Ann. tit. 3, § 1858e (2018).

[43] P.R. Laws Ann. tit. 3, § 1855b(p) (2018); P.R. Laws Ann. tit. 3, § 1858e (2018).

but are initially selected by political appointment.  They are subject to strict oversight by the Executive Director and may be removed on the basis of poor performance.  Among other things, these attorneys are responsible for reviewing financial disclosures and pursuing complaints submitted to OGEPR.  If they detect a potential conflict of interest, they typically begin an informal investigation by asking individuals of interest to produce information voluntarily.  If necessary, the attorneys have the power to request that a court issue a subpoena.[44]  They are also responsible for determining whether OGEPR has jurisdiction to investigate a potential ethics violation or should refer it to another authority.

The Government Ethics Act identifies the consequences for violating the Code of Ethics.  Those consequences generally turn on the nature of the violation:

- *Criminal Liability.*  Those who intentionally violate the Code of Ethics may be imprisoned for a fixed term of three to eight years, forced to pay fines of up to $10,000, and required to make restitution.[45]

- *Civil Liability.* Those who realize financial gain as a result of having violated the Code of Ethics may be required to pay up to three times the value of that gain.[46]

- *Administrative Sanctions.*  The Executive Director of OGEPR has the authority to impose fines of up to $20,000 on anyone who is found to have violated the Government Ethics Act or related regulations, orders, or norms.[47]

The Government Ethics Act separately specifies the consequences for those who violate its financial disclosure requirements.  In most instances, these consequences are similar to the ones that apply to violations of the Code of Ethics:

- *Criminal Liability.*  If the violation is a knowing and willing falsification or failure to supply information, then the violator may be imprisoned for a fixed term of three years.  The violator may also have to pay a fine of $5,000.[48]

- *Civil Liability.*  Anyone who gains financially by violating the financial disclosure requirements may be forced to pay three times the value of that financial gain.[49]

- *Administrative Sanctions.*  OGEPR's Executive Director may sanction anyone who violates any other provisions concerning mandatory financial disclosures and related regulations, orders, or norms, and may impose a fine of up to $20,000.[50]

---

[44] P.R. Laws Ann. tit. 3, §§ 1855b(f)-(g) (2018).
[45] P.R. Laws Ann. tit. 3, § 1857f(a)(1) (2018).
[46] P.R. Laws Ann. tit. 3, § 1857f(b)(3) (2018).
[47] P.R. Laws Ann. tit. 3, § 1857f (c) (2018).
[48] P.R. Laws Ann. tit. 3, § 18578f(a)(1) (2018).
[49] P.R. Laws Ann. tit. 3, § 1858f(b)(3) (2018).
[50] P.R. Laws Ann. tit. 3, § 1858f(c) (2018).

### 2.   Puerto Rico's Anti-Conflict Framework is Comparable to Those of Other US Jurisdictions

Puerto Rico's anti-conflict framework is similar to those that other US jurisdictions have adopted.  For example, much like OGEPR, the US Office of Government Ethics ("OGE") is a dedicated agency that is centrally responsible for identifying and resolving conflicts of interest involving executive branch employees in the US federal government. [51]  OGE has a staff of approximately seventy-five and is responsible for establishing an ethics program that designated ethics officials who work for the various executive branch agencies then implement. To that end, OGE issues ethics opinions, conducts reviews of financial disclosures, administers a public education program, and monitors the compliance of agency ethics programs and leadership. [52]  OGE thus has a similarly broad range of authority as OGEPR.

There are some differences between OGEPR and OGE.  Most notably, OGE does not handle complaints and lacks the authority to conduct investigations (unlike OGEPR). [53] OGE is also an active rulemaking authority that has instituted a range of prohibitions and requirements, many of which are codified in the Code of Federal Regulations.  OGEPR, in contrast, primarily relies on the Code of Ethics and has not adopted many of its own regulations. [54]

The State of New York's ethics regime is similar to Puerto Rico's.  The New York State Joint Commission on Public Ethics ("JCOPE") is New York's version of OGEPR. [55]  Like OGEPR, JCOPE handles complaints and investigates potential violations of the code of ethics contained within New York's Public Officers Law. [56] The JCOPE and Public Officers Law are largely similar to OGEPR and the Government Ethics Act, respectively.  Much like Puerto Rico, for example, New York restricts public servants from providing preferential treatment to previous employers or those with whom the servant has had business relationships within the prior two-year period. [57]

---

[51] The Ethics in Government Act of 1978 established OGE.  *See* 5 C.F.R. § 2600.101(a) (2018) ("OGE exercises leadership in the executive branch of the Federal Government to prevent conflicts of interest on the part of executive branch employees and to resolve those conflicts of interest that do occur.").

[52] *See Mission and Responsibilities*, U.S. Office of Government Ethics, https://www.oge.gov/web/oge.nsf/Mission%20and%20Responsibilities (last visited June 5, 2018); *see also* 5 U.S.C. 402(b)(4) & (8) (2016).

[53] *See Mission and Responsibilities*, U.S. Office of Government Ethics, https://www.oge.gov/web/oge.nsf/Mission%20and%20Responsibilities (last visited June 5, 2018).

[54] Some of the regulations that OGE has established differ from the corresponding rules set forth in the Government Ethics Act. For example, the OGE has imposed a permanent restriction on former federal employees influencing matters in which they were involved during their term of public service. *See* 5 C.F.R. § 2641.201(a) (2018). The Government Ethics Act only imposes such a restriction for a two-year period. P.R. Laws Ann. tit. 3, § 1857e(b) (2018).

[55] N.Y. Exec. Law § 94.1 (Consol. 2018).

[56] N.Y. Exec. Law § 94.13(a) (Consol. 2018).

[57] *See* N.Y. State Ethics Comm'n, Advisory Opinion No. 98-09, 7 (1998). The Government Ethics Act imposes a similar restriction. *See* P.R. Laws Ann. tit. 3, § 1857b(c).

The Independent Investigator's Final Investigative Report

Puerto Rico's ethics framework also appears to be more comprehensive than those of at least two US states with municipalities that have declared bankruptcy in recent years.[58] Specifically, our review of the ethics frameworks in Michigan and Alabama suggest that those states: (i) have not incorporated some of the more important restrictions that the Government Ethics Act imposes; and/or (ii) that their dedicated oversight bodies lack some of the more significant enforcement powers that OGEPR enjoys.  For example:

- The Michigan Compiled Laws restrict state-level public servants and employees of the state's executive branch from working on matters that could inure to their own personal benefit.  They do not, however, impose any standards for ethical conduct relating to prior relationships with private or public entities. [59]

- The Board of Ethics that is responsible for enforcing the provisions of the Michigan Compiled Laws has the power to conduct investigations and provide advisory opinions, but lacks any authority to establish its own rules, compel compliance, or prosecute violations.[60]

- Alabama imposes a two-year restriction on former public employees representing private parties in government matters.[61]  Nevertheless, Alabama does not confer on its State Ethics Commission any authority to establish internal controls or monitor government agencies in order to identify and prevent violations of this, or any other, restriction.  Instead, the Alabama Code only confers on the State Ethics Commission the powers to educate, investigate, and gather financial reports.[62]

On paper, then, Puerto Rico's ethics framework appears to be comparable to, and in some ways better than, those of other US jurisdictions.

---

[58] In 2011 and 2013, respectively, Jefferson County, Alabama and Detroit, Michigan declared two of the largest municipal bankruptcies in US history.  *See generally In re City of Detroit, Mich*., 504 B.R. 97 (Bankr. E. D. Mich. 2013); Voluntary Petition, *In re Jefferson, Cty. Ala*., No. 11-05736-TBB9 (Bankr. N. D. Ala. Nov. 9, 2011).   Some have questioned whether ethics violations or conflicts of interest may have contributed to those events.  *See* Tresa Baldas, How Corruption Deepened Detroit's Crisis, USA Today, Oct. 6, 2013, https://www.usatoday.com/story/news/nation/2013/10/06/how-corruption-deepened-detroits-crisis/2929137/; *United States v. Langford, et al*., No. 7:08-CR-00245 (N.D.Ala. filed Jun. 12, 2008) (reflecting that the President of the Jefferson County Commission (which is the governing body of Jefferson County, and is responsible for allocating financial resources), was tried and convicted for bribery after he accepted $241,000 in cash and gifts in exchange for involving a particular investment bank in the County's bond offerings).  And according to the Center for Public Integrity, Michigan ranks as one of the worst states in terms of powers given to ethics enforcement agencies to regulate conflicts of interest.  *See* Yue Qiu, Chris Zubak-Skeese & Erik Lincoln, *How does your state rank for integrity?*, Center for Public Integrity, https://www.publicintegrity.org/2015/11/09/18822/how-does-your-state-rank-integrity  (last updated Feb. 2, 2018).

[59] *See* Mich. Comp. Laws Serv. § 15.342 (LexisNexis 2018).

[60] *See* Mich. Comp. Laws Serv. § 15.345 (LexisNexis 2018).

[61] *See* Ala. Code § 36-25-13(a) (2018).

[62] *See* Ala. Code § 36-25-4 (2018) (omitting, among other things, powers to ensure compliance of financial and conflict of interest reporting processes at state agencies).

## B.   Puerto Rico Did Not Fully Implement its Ethics Framework During the Relevant Period

Despite its adequacy in principle, Puerto Rico's ethics framework requires more robust implementation in light of factors specific to Puerto Rico. Available evidence indicates that Puerto Rico did not fully execute the dual-tiered oversight system that the Government Ethics Act requires.  This is primarily a function of OGEPR not having exercised the full scope of its authority, as well as GDB having failed to maintain an adequate agency-level ethics committee.

### 1.   The Evidence Reviewed Indicates that OGEPR Did Not Exercise Its Full Authority Under the Government Ethics Act

As noted above, the Government Ethics Act confers on OGEPR wide latitude to take various measures in pursuit of its mandate. In practice, however, the OGEPR's work appears to have focused on the following initiatives:

- Providing education and training for public servants, including the developing seminars, publishing reference materials, and advising public servants on specific issues and scenarios;

- Investigating clear conflicts of interest and obvious violations of the Code of Ethics; and

- Performing conflicts screens for certain government employees based on their financial disclosures.[63]

These functions indicate that, in general, OGEPR relies upon the cooperation of others to implement its mandate.  In particular, OGEPR's work largely depends upon (i) the provision by individual public servants of timely, complete and accurate financial disclosures; (ii) the ability of those individuals to understand applicable ethics restrictions and to self-screen as appropriate; and (iii) the efficiency of the agency-level committees.[64]  A breakdown in any of these dependencies would necessarily curtail OGEPR's effectiveness. To a certain extent, that is unavoidable.  It is also not inconsistent with the way other similarly-situated ethics enforcement agencies operate. But in light of Puerto Rico's unique need to restore transparency and credibility in order to regain capital markets access, we conclude that more rigorous efforts will now be required.

The opinion letter process illustrates how inherent vulnerabilities can limit the effectiveness of an ethics compliance program.  This is because OGEPR only prepares opinion letters on request, and the Government Ethics Act does not require that incoming or outgoing public servants certify their review of new opinion letters at regular intervals, as a form of continuing ethics education.  Accordingly, even though the opinion letters we reviewed were well-supported and well-reasoned, they served a limited audience:  those who affirmatively sought to comply with the law and recognized their need for guidance regarding how best to

---

[63] P.R. Laws Ann. tit. 3, § 1855b(h) (2018) (empowering OGEPR "to conduct audits and forensic audits on financial reports and recommend the action to be taken to correct, process or refer any detected violations").

[64] *See* Oficina de Etica Gubernamental de Puerto Rico, *El Mecanismo de Inhibición* (2016).

do so.  The opinion letter process is inherently less useful with respect to individuals who are unaware of their potential conflicts, prefer to remain blind to them, or seek to evade detection.

OGEPR also appears to prioritize only the most egregious ethics violations. This includes actual conflicts of interest involving internal corruption or abuses of power (like bribery and embezzlement).  OGEPR does not devote a similar degree of resources to conflict prevention.  In fact, OGEPR appears to lack any mechanism for independently monitoring and evaluating *potential* ethics issues at the agency level, other than by receiving direct requests for advice or third-party tips and complaints.  Nor does OGEPR investigate or pursue outside actors, even if they contract with, or engage in transactions with, the Puerto Rico government. Of particular relevance here, OGEPR does not appear to have examined the financial institutions that were involved in the events that contributed to Puerto Rico's fiscal crisis.

## 2. The Evidence Suggests that GDB Did Not Maintain an Adequate Agency-Level Ethics Committee

As noted above, the Government Ethics Act contemplates that the agency-level ethics committees will implement compliance measures on a day-to-day basis. Agency-level ethics committees are closer to individual public servants and thus better-positioned to identify earlier on the circumstances that present actual or potential conflicts.  Arguably, the importance of agency-level committees is heightened with respect to agencies that, like GDB, regularly interface with the private sector (and thus more frequently encounter opportunities for potential conflicts), or are responsible for managing a large portion of Puerto Rico's wealth.

Our investigation indicates that GDB may not have maintained the type of agency-level ethics committee that the Government Ethics Act required.  In fact, several of the current and former GDB employees with whom we spoke conveyed that they had no interactions with any members of the GDB ethics committee.  Several were unaware that the committee even existed. One witness told us that GDB's Human Resources department was responsible for ethics issues.

Our assessment of the evidence leads us to conclude that GDB's ethics committee gathered principally for three purposes: (i) to confirm that GDB employees had submitted their annual financial disclosures properly; (ii) to check compliance with GDB's continuing education requirements (including ethics training that employees were required to complete once every two years); and (iii) to manage conflicts of interest that had been raised via self-reporting or anonymous tips. Further, our review of the available evidence revealed few, if any, instances in which the GDB ethics committee itself investigated alleged conflicts of interest. Instead, on the basis of our review of GDB records and our analysis of OGEPR and its operations, a potential conflict would only be raised with GDB's ethics committee if the employee who left the bank voluntarily self-reported it.  This falls well short of the proactive day-to-day enforcement that the Government Ethics Act contemplates.

Nor are we aware of any evidence that establishes that the GDB ethics committee regularly "verif[ied] the establishment of and compliance with administrative controls to prevent and discourage their personnel from incurring violations," as the Government Ethics Act directs.[65]  To the contrary, available evidence suggests that GDB failed to establish any administrative controls whatsoever, instead relying on an informal, volunteer-based system. As we note above in connection with our review of OGEPR's weaknesses, a volunteer-based

---

[65] P.R. Ann. Laws tit. 3, § 1855d(b)(3) (2018).

system is inherently vulnerable because it does not effectively address conflicts that impact public servants who fail to self-report (whether because they do not understand applicable rules and regulations, are unaware of them, or wish to evade them).

In a similar vein, we did not find sufficient evidence to demonstrate that GDB's ethics committee regularly communicated with OGEPR about its work, as the Government Ethics Act contemplates. [66]

## C.    Notwithstanding the Foregoing, Our Investigation Did Not Reveal Any Violations of the Government Ethics Act

Despite the weaknesses identified above, we did not find evidence to demonstrate that relevant officials committed any ethics violations in connection with relevant transactions. Specifically:

- We did not find evidence to establish bribery, kickbacks, or pay-to-play violations in connection with any Puerto Rico-related bond issuance.

- We did not find evidence to establish that information obtained through official channels was subsequently disclosed or used for any individual's benefit in connection with relevant transactions.

- We did not find evidence to establish that any of the relevant transactions involved the Puerto Rico government improperly hiring or otherwise engaging in business with a public servant's family member.  That was the case even with respect to one political official who, to our knowledge, had a family member who worked for one of the financial institutions that was a swap counterparty concerning certain Puerto Rico-related bonds.  It was also true with respect to a GDB official who worked on Puerto Rico-related bond issuances during the same period whose family member worked for a financial institution that historically underwrote Puerto Rico-related debt.  The official told us that he disclosed the relationship to OGEPR and implemented the screening recommendations that OGEPR recommended in its opinion letter.

- We found no evidence that any relevant official failed to comply with applicable financial disclosure requirements.

Consistent with the insular nature of Puerto Rico's financial services community, however, we identified a number of witnesses who served both in the Puerto Rico government and with private sector financial institutions at various points during the relevant period. Some of those officials left high-ranking positions at GDB and accepted employment with financial institutions that underwrote certain Puerto Rico-related bonds.  Other individuals did the opposite:  they started in the private sector, then moved into high-ranking positions at GDB before returning to their private employer.  We did not find that these individuals violated the screening period requirements in the Code of Ethics.  In fact, each of the fifteen individuals with respect to whom we had sufficient evidence to perform the analysis satisfied the applicable screening period requirements in one of two ways: (i) by implementing screening procedures

---

[66] P.R. Ann. Laws tit. 3, § 1855d(b)(1) (2018).

to avoid prohibited conduct; or (ii) by accepting employment that avoided the need for screening periods altogether.

By way of example, seven of the fifteen individuals referenced above worked for GDB and, within the applicable screening period, held positions with financial institutions that underwrote Puerto Rico-related bonds.  Each of those seven individuals consulted with OGEPR or undertook self-screening measures that OGEPR recommended in order to avoid engaging in prohibited conduct (like participating in the same bond issuance while working for both a private financial institution and GDB) during their applicable screening periods. This includes an official who, at various times, worked as a Senior Executive Vice President, Chief Operating Officer, and President of a financial institution that underwrote certain Puerto Rico-related bonds.  Within one month of terminating his private sector employment, this individual accepted an appointment as Chairman and President of GDB.  At the time, the applicable screening period was four years.[67]  The individual told us that, to avoid the perception of any conflict of interest with his former employer, he requested the OGEPR to review and evaluate a proposed process related to the issuance of securities and the provision of advisory services at GDB.  The individual obtained an ethics opinion letter from OGEPR before starting the position with GDB.  Like other opinion letters we reviewed, this letter was soundly reasoned and well-supported.  The letter approved the individual's proposed process, which called for him to recuse himself from any activity relating to the issuance of securities or the provision of advisory services by his former employer.  Under the Code of Ethics, such a recusal rendered the screening period requirement inapplicable.  We are not aware of any evidence to suggest that this individual did not recuse himself.  The GDB secretary confirmed, the individual said, that the individual had formally recused himself.[68]

The remaining eight of the fifteen individuals referenced above worked for GDB, but did not hold during the applicable screening period any private sector positions that implicated the work they performed in government service.  One example concerns an official who served as a Senior Vice President of GDB but, while working in the private sector during the applicable screening period, was only employed in unrelated fields.  This official met personally with OGEPR's Executive Director, who advised that the contemplated private sector employment did not violate the Government Ethics Act.  To further illustrate, we examined the circumstances surrounding an official who served as Executive Vice President of Financing and President of GDB before accepting employment with a private financial institution that underwrote a GO bond offering.  The applicable screening period at the time was two years.[69]  Because five years elapsed between this official's term of service at GDB and the term of private sector employment, this official satisfied the screening period.

---

[67] *See* P.R. Laws Ann. tit. 3, § 1823(c) (2006).

[68] The evidence made available to us is not sufficient to enable a fair assessment of whether any financial institution that engaged in relevant transactions with the Puerto Rico government failed to maintain a sufficient compliance program regarding conflicts of interest.  For example, although we uncovered evidence that one such financial institution maintained a written compliance policy and did not have a formal ethics training procedure to convey that policy to new employees, we were not given sufficient evidence to enable any conclusion regarding the extent to which the financial institution enforced that policy, or whether existing employees understood it.

[69] P.R. Laws Ann. Tit. 3, §1857e(d) (2018).

D. **There is Room to Strengthen Puerto Rico's Implementation of its Anti-Conflicts Framework**

As demonstrated above, we did not find any ethics violations concerning relevant transactions. We did, however, identify several weaknesses that leave Puerto Rico vulnerable to perceived conflicts of interest. Addressing those weaknesses would help strengthen confidence in the integrity of Puerto Rico's financial sector. We provide certain recommendations below.

1. **GDB's Successor as Fiscal Agent Should Establish an Effective Agency-Level Ethics Committee**

We recommend that GDB's successor as fiscal agent establish an agency-level ethics committee that executes and documents the functions that the Government Ethics Act requires. At the very least, this ethics committee should:

- Ensure that employees know that it exists and are aware of what it does.

- Ensure that employees are trained at regular intervals about the Code of Ethics' requirements and any new or clarified pronouncements in OGEPR opinion letters.

- Provide formal confirmation of the entity's functions and objectives to OGEPR at regular intervals. At a minimum, this should include details of: (i) the preparation and maintenance of relevant records; (ii) analysis of financial disclosure forms; (iii) summaries of tips and self-reported events; (iv) documentation regarding investigations or cooperative work-outs of the foregoing; and (v) implementation of OGEPR policies, protocols and controls.

To more effectively augment OGEPR, we also recommend that the agency-level ethics committee craft its own tailored code of conduct that adapts OGEPR policies, protocols and controls to the specific types of work that its personnel perform. [70] It would be most effective for employees to understand the types of ethics-related challenges that they are more likely to encounter while serving at a specific entity. The agency-level ethics committee should report on the progress of developing its code of conduct to OGEPR, and liaise with OGEPR to ensure that the resulting guidelines are appropriate. To the extent that Puerto Rico creates another executive agency to provide inter-agency lending services, this agency should also establish an effective agency-level ethics committee, according to the guidelines described above.

2. **Puerto Rico Should Provide OGEPR with the Resources it Needs to Fully Execute its Duties**

In theory, Puerto Rico's statutory framework supplies OGEPR with all of the tools it needs to proactively identify, prevent and remediate conflicts of interest. Available evidence suggests that OGEPR's partial implementation of that authority may stem from a lack of resources. According to one witness who served as an Executive Director of OGEPR, the agency's funding has been meaningfully reduced over the years and so, too, has OGEPR's capacity to effectively comply with its preventative mission and proactively pursue potential violations of the Code of Ethics. Indeed, multiple witnesses conveyed that the primary reason

---

[70] P.R. Ann. Laws tit. 3, § 1855d(b)(3) (2018).

The Independent Investigator's Final Investigative Report

why OGEPR only prepares ethics opinions on request is because of the time and expense that this work requires – the OGEPR has a staff of only four attorneys who prepare ethics opinion letters, but oversees nearly 200,000 current and former public servants.

Some witnesses have suggested that OGEPR's lack of resources may have hindered its ability to determine whether GDB's ethics committee was operating effectively. OGEPR is responsible for overseeing ethics issues concerning *every* executive branch agency; not just Puerto Rico's fiscal agent. As a result, OGEPR allocates the majority of its resources to identifying violations of the Code of Ethics that are very clear or easy to prove, rather than affirmatively identifying or preventing more subtle violations (by, for example, ensuring the proper functioning of agency ethics committees). To the extent that OGEPR's funding was reduced and OGEPR needed to prioritize remaining resources, this may help explain why OGEPR did not take a more active role in monitoring GDB's ethics committee.

It is therefore possible that, with additional resources, OGEPR could deploy more fulsome prevention and enforcement efforts. We recommend that Puerto Rico consider allocating additional resources to OGEPR for the purpose of enabling it to more proactively detect, prevent, and investigate conflicts of interest.

### 3.  OGEPR Should Consider Implementing a Whistleblower or Bounty Program

Given OGEPR's reliance on tips and complaints, a whistleblower program may have value. Other enforcement agencies have realized meaningful success through such programs, including the US SEC and US Commodity Futures Trading Commission ("CFTC"). The programs tend to be more effective if the reporting party receives a bounty in the form of a portion of whatever funds the agency recovers through a resulting enforcement action.[71] Because OGEPR appears to have had success with respect to the recovery of fees resulting from third-party complaints,[72] a bounty program may well be viable.

There is, however, a significant drawback. Just as bounty programs can incentivize some people to submit helpful tips, they can incentivize others to submit meritless ones. Meritless tips and complaints drain resources and would undermine OGEPR's mission. For this reason, we recommend that any whistle-blower or bounty program incorporate a feature for deterring frivolous tips and complaints. One option to consider may be for Puerto Rico to impose civil or criminal liability on any person who submits a tip or complaint to OGEPR in the absence of any good-faith basis for so doing. To avoid encumbering OGEPR with the responsibility for undertaking fact-intensive determinations relating to the motivation of the tipster, the authority to pursue such liability should rest with Puerto Rico's government lawyers, rather than with OGEPR.

### 4.  OGEPR Should More Actively Exercise its Rule-Making Authority

---

[71] *See* Press Release, Sec. & Exch. Comm'n, *SEC Announces its Largest-Ever Whistleblower Awards* (Mar. 18, 2018), https://www.sec.gov/news/press-release/2018-44; Press Release, Commodity Futures Trading Comm'n, *CFTC Announces its Largest Ever Whistleblower Award of Approximately $30 Million* (Jul. 12, 2018), https://www.cftc.gov/PressRoom/PressReleases/7753-18.

[72] *See Querellas y Resoluciones*, Oficina de Ética Gubernamental de Puerto Rico, http://tmp.oegpr.net/fiscalizacion/querellas-y-resoluciones (last visited Jul. 19, 2018).

The Independent Investigator's Final Investigative Report

As previously noted, one of the ways in which OGEPR differs from OGE concerns the latter's focus on active rule-making and regulation-setting. OGEPR's efforts may be more effective in practice if it augments the Code of Ethics with specific rules and regulations that supply more granular guidance to agency-level committees. Among other things, OGEPR could establish a uniform conflict-screen procedure for incoming executive branch employees. We found little to no evidence that any such procedure currently exists. If developed by OGEPR, the agency-level ethics committees could implement this procedure in tandem with their corresponding Offices of Human Resources, and then certify compliance to OGEPR. Additional resources could help OGEPR to more effectively exercise its rule-making authority under the Government Ethics Act.

### 5.   OGEPR Should Exercise Its Authority to Obtain Reports and Data from Agency-Level Committees

One of OGEPR's powers under the Government Ethics Act enables it to "request from agencies any reports or data deemed necessary."[73] Given the importance of agency-level ethics committees for purposes of detecting and preventing conflicts of interest, OGEPR should in the future request compliance reports from GDB's successor as fiscal agent on a routine basis. OGEPR in the past could have "impose[d] administrative sanctions on the members of the Committee" for any failure to comply with this, or any other, requirement under the Government Ethics Act.[74] Such actions would have been consistent with the portion of OGEPR's mandate that requires OGEPR to "assume an active role within the amplest venues of public discussion, in order to stimulate active collaboration so as to encourage the joining of efforts of all agencies, nonprofit entities, businesses, and citizens."[75]

### 6.   OGEPR Should Increase the Frequency of Independent Investigations

We conclude that OGEPR could be more effective if it were better able to independently identify and pursue potential conflicts. One way to achieve this may be to increase the frequency with which OGEPR conducts independent investigations. Among other things, OGEPR could perform some form of due diligence on the public servants' mandatory financial disclosures. At present, OGEPR only reviews those disclosures for patent inconsistencies and apparent conflicts of interest. It does not routinely test or verify the information if the disclosure forms appear on their face to comply with the Government Ethics Act. Because OGEPR often relies on information derived from financial disclosures for evidence in ongoing investigations, it is possible that OGEPR could detect and prevent additional ethics violations if it more closely scrutinized the financial disclosures. This would not only serve to better position OGEPR to detect and remediate conflicts without relying on third-party submissions, but also create a stronger disincentive for public servants to engage in questionable activity, due to an increased likelihood that OGEPR may proactively discover it.

---

[73] P.R. Ann. Laws tit. 3, § 1855b(k) (2018).
[74] P.R. Ann. Laws tit. 3, § 1855d(c) (2018).
[75] P.R. Ann. Laws tit. 3, § 1855(a) (2018).

# PART XIII

# ISSUERS' USE OF INTEREST RATE SWAPS

# PART XIII
# ISSUERS' USE OF INTEREST RATE SWAPS

From 2004 to 2008, the Issuers entered into at least 77 Swaps.  As noted in prior Parts of this Report, Swaps are interest rate exchange agreements that transfer the risk of interest rate fluctuations between an issuer and its counterparty bank or banks.  In this Part XIII of the Report, we explore how, often for sensible and financially sound reasons, the Issuers made extensive use of Swaps during the Relevant Period.  Overall, on the basis of the evidence we reviewed, these agreements worked to the Issuers' detriment during the Relevant Period.  By September 30, 2014, the Issuers had paid over $1.085 billion in net termination fees to the banks that acted as counterparties to these agreements.[1]

While the ultimate net amount of termination fees may appear relatively modest as compared to the Issuers' overall debt of $74 billion,[2] it is significant that, at one time in 2009, the Issuers were collectively potentially liable for $1.32 billion—or over 14%[3] of Puerto Rico's

---

[1] In some instances, the Issuers received termination fees from counterparty banks.  The Issuers received a total of approximately $29 million from counterparty banks in connection with the termination of the Issuers' Swaps.  The net total cost is the difference between the termination fees received by the Issuers and the termination fees paid by the Issuers to counterparty banks.

[2] Gov't of P.R., P.R. Fiscal Agency & Fin. Advisory Auth., *Fiscal Plan for Puerto Rico*, 27 (2017).

[3] Puerto Rico General Fund budgeted revenues for fiscal year 2009 were $9.3 billion.  *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2009*, 21 (Oct. 22, 2010).

annual budget and 17%[4] of its actual revenues—in Swap termination fees.  Moreover, as addressed fully in Part XIII.C.1, because Puerto Rico law does not include swap termination fees toward the Constitutional Debt Limit, this $1.32 billion of potential liability was not factored into the Debt Limit Calculation nor was it treated as a bar to Puerto Rico issuing more debt.  To understand why the Issuers entered into the Swaps, and to help prepare for Puerto Rico's return to the capital markets, we investigated GBD's and the Issuers' handling of the Swap portfolio.

Some details concerning the Issuers' use of the Swaps, like the payment of substantial sums by the Issuers to end these contracts, have been publicly reported over the years.[5]  Other terms, like collateral posting requirements, have not been reported.  This is because the Swap agreements are generally bilateral contracts entered into privately,[6] and, therefore, are not required to be published or incorporated by reference in the official statements.  Before reporting requirements were implemented by GASB Statement No. 53, Swaps were reported, if at all, only in a footnote in financial statements.[7]  Further, neither the SEC nor CFTC regulated municipal swaps until the Dodd-Frank Act in 2010.  In addition, there was no MSRB regulation that specifically regulated fair dealing and duties of disclosure applicable to municipal security dealers (including underwriters of municipal securities) and municipal advisors until MSRB Rule G-17 was amended on August 2, 2012 to extend those duties to municipal security dealers. This was well after the Issuers had entered into Swaps with exposure of over one billion dollars.

In our investigation into this matter, we interviewed more than a dozen witnesses involved in structuring, executing, monitoring, and terminating the Swaps, including Puerto Rico officials, management at the Issuers, bankers at the financial institutions serving as counterparties, and the financial and legal advisors engaged by GDB.  We also analyzed thousands of documents and communications related to the Swaps.

Based on our investigation, and as discussed further below, we find as follows:

- GDB, in its role as fiscal agent, oversaw and approved the Issuers' entry into the Swaps.  After speaking with many former members of GDB management and GDB's Board, the general consensus is that at numerous critical times during the Relevant Period, those individuals did not have a thorough comprehension of the mechanics of the Swaps or an appreciation of the financial risks they ultimately posed to the Issuers.  One symptom of this was that GDB did not maintain complete records of the legal documentation for Swaps, including those with terms for collateral posting;

- Instead, GDB management and its board relied on outside advisors to evaluate the Swap proposals.  The outside advisors, however, told us that they were asked to consult generally only after GDB had decided to do a Swap;

---

[4] Puerto Rico General Fund actual revenues for fiscal year 2009 were $7.6 billion.  *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2009*, 21 (Oct. 22, 2010).
[5] *See e.g.*, Michael Corkery and Mike Cherney, *Banks Rack Up Big Fees From Puerto Rico Bond Deals*, The Wall Street Journal (Oct. 22, 2013), https://www.wsj.com/articles/banks-rack-up-big-fees-from-puerto-rico-bond-deals-1382491664.
[6] SEC, *Report on the Municipal Securities Market*, 91 (July 31, 2012).
[7] SEC, *Report on the Municipal Securities Market*, 99 (July 31, 2012).

The Independent Investigator's Final Investigative Report

- When Puerto Rico faced budgetary issues, it was inclined to enter into riskier Swaps in exchange for influxes of cash. The banks that covered Puerto Rico knew about the budgetary issues and encouraged, if not orchestrated, Puerto Rico's entry into the swap market. In 2005, one investment bank offered an upfront cash payment of about $100 million to entice Puerto Rico, which was on the brink of a government shutdown, to enter into a particularly risky type of swap, called a "Basis Swap," which we describe below. Former GDB officials told us that the investment bank went around GDB and pitched a Basis Swap and proposed legislation directly to the Puerto Rico legislature;

- From 2004 to 2008, with the trend of issuing variable rate bonds, the Issuers entered into dozens more Swaps. The majority of these Swaps were "Synthetic Fixed Swaps," which are structured so that the banks who acted as counterparties in the transactions would owe money to the Issuers if interest rates increased and the Issuers would owe money to the banks if interest rates dropped;[8]

- In the fall of 2008, following the collapse of Lehman Brothers and the onset of the Great Recession, interest rates continued to drop and remained lower than they had been pre-2008, which meant that the Issuers now owed money to the banks. By January 1, 2009, the base amount on which the interest was to be paid (called the "notional amount") on the outstanding Swaps was $9 billion, and by February 2009 the Issuers were potentially liable to their counterparties for $1.32 billion. For perspective, Puerto Rico's anticipated revenue for that same fiscal year was $9.3 billion.[9] The evidence shows that potential liability, despite being equal to 14% of Puerto Rico's budget for that year, did not deter the issuance of more debt, nor was it counted toward the Constitutional Debt Limit;

- In some instances, because of the declining credit ratings for the Puerto Rico-Related Bonds, the banks could terminate the Swaps early and collect payment at that time. This left the Issuers with two options: (i) if they had available funds they could post collateral, sometimes in the hundreds of millions of dollars, to the banks to postpone an early termination and hope that interest rates would increase in the Issuers' favor; or (ii) cut losses by terminating the Swaps early and paying the banks the difference in interest at that time. Initially, the Issuers took steps to ride out changes in the interest rate environment by posting collateral;

- By 2009, the Issuers began to systematically terminate the Swaps. GDB, under the Fortuño Administration, viewed the Swap portfolio as too risky and penalized at least one investment bank it viewed as taking advantage of PREPA with a Basis Swap. Before the Issuers could terminate the Swaps, they had to come up with funds to pay the termination fees. From 2008 to 2014, the Issuers raised funds to pay off termination fees by issuing over $965 million in debt through COFINA, GO, PREPA,

---

[8] There are various other ways to hedge, make bets, or speculate on the movement of interest rates with a swap, which we will explain below.

[9] *See* Commonwealth of P.R., *Comprehensive Annual Financial Report: Year Ended June 30, 2009*, 21 (Oct. 20, 2010).

The Independent Investigator's Final Investigative Report

PRASA, PRIFA, and PBA Bonds. While unwinding some of the Swaps resulted in payouts to some of the Issuers, the vast majority resulted in payments to the counterparty banks. By September 30, 2014, the Issuers had paid over $1.085 billion in net termination fees to investment banks, including to Morgan Stanley, FMS Wertmanagement, UBS and Citibank;

- When compared to other jurisdictions like Detroit, Michigan and Jefferson County, Alabama, we found that the Issuers' Swap portfolio was larger and more complex. We did not, however, find any evidence to suggest illegal conduct like the conduct that the SEC pursued and was criminally prosecuted in connection with the Jefferson County, Alabama swaps. We also compare the requirements and protections of Michigan's and Puerto Rico's respective swaps statutes; and

- During the Relevant Period, there was a general absence of federal regulations about municipal use of swaps. Regulations enacted after the Issuers' execution of the Swaps would have regulated some of the practices relating to those transactions, such as the access investment bankers used to market Swaps directly to GDB and the Issuers. In addition, reporting obligations enacted in 2012 now require municipal issuers to report swap exposure on their financial statements.

To support and provide context for our findings, we provide an overview of how swaps can be structured and valued, as well as the benefits and risks to the Issuers that used Swaps during the Relevant Period.

## A.   <u>Interest Rate Swaps</u>

Swaps are a form of a derivative contract[10] that can be can be structured in various ways to protect against, or "hedge," risk, or benefit from opportunities. In an interest rate swap, what is being "hedged" are fluctuations in the underlying variable interest rate of the bond, typically based on benchmark interest rates, such as the London Interbank Offered Rate ("<u>LIBOR</u>")[11] and the Securities Industry and Financial Markets Association ("<u>SIFMA</u>") Municipal Swap Index.[12]

---

[10] A derivative contract is a form of "financial contracts whose prices are determined by, or 'derived' from, the value of some underlying asset, rate, index, or event. They are not used for capital formation of investment, as are securities; rather they are instruments for hedging business risk or for speculating on changes in prices, interest rates and the like." Fin. Crisis Inquiry Comm., *The Financial Crisis Inquiry Report*, 45 (Jan. 2011).

[11] LIBOR is a benchmark interest rate, calculated and published daily, that is based on the interest rates a group of large financial institutions would charge each other to borrow funds for a given amount of time and in a given currency. Like many other derivatives contracts, many of the Issuers' Swaps were tied to LIBOR. In those cases, LIBOR was used as the base for calculating at least one of the variable interest rate cash flows in the relevant Swap. *See* Intercontinental Exch., *ICE Libor*, The ICE, https://www.theice.com/iba/libor (last visited Aug. 18, 2018).

[12] The SIFMA Municipal Swap Index is an index calculated using the interest rates of certain variable interest rate municipal securities. Some Swaps used the SIFMA Municipal Swap Index as the base for calculating at least one of the variable interest cash flows in the Swap. *See* Sec. Indus. & Fin. Markets Ass'n, *About The Municipal Swap Index* (Aug. 18, 2014), https://www.sifma.org/resources/research/about-the-municipal-swap-index/.

The Independent Investigator's Final Investigative Report

While there are many ways to structure a swap, our investigation focuses on the Issuers' use of two types of swaps: (i) Synthetic Fixed Swaps; and (ii) Basis Swaps (both described below).

### 1. <u>Synthetic Fixed Swaps</u>

The most common Swap structure used by the Issuers during the Relevant Period was a Synthetic Fixed Swap. Typically, a bond issuer enters into a Synthetic Fixed Swap in connection with issuing a bond that has a variable interest rate. With a Synthetic Fixed Swap, a bond issuer agrees to pay a counterparty—often, but not always—an underwriter of the underlying bond, an amount determined by a fixed interest rate in exchange for receiving a payment based on a variable (or "floating") interest rate.[13]  This allows an issuer of a variable interest rate bond to effectively pay a fixed borrowing cost without altering its underlying obligation to pay its bondholders a variable interest rate. Put another way, issuers using Synthetic Fixed Swaps pay a fixed interest rate to the swap counterparty, receive variable interest rate payments from the swap counterparty, and still pay their bondholders a variable interest rate payment.

With a Synthetic Fixed Swap, if interest rates increase, then the bank that acts as a counterparty in the transaction would owe money to the issuer. If interest rates drop, then the issuer would owe money to the counterparty bank.[14]  The principal amount of the underlying bond (*i.e.*, the notional amount) is not actually exchanged between the issuer and the counterparties.[15]

A Synthetic Fixed Swap's value at a particular time is based on the difference between the amount owed by the counterparty to the issuer based on the variable interest rate and the amount owed by the issuer to the counterparty based on the fixed interest rate.[16]  This is called the "<u>mark-to-market value</u>." The mark-to-market value also approximates the amount of money an issuer would owe or be owed if the swap were terminated at that time.[17]

---

[13] At other times, and less often, the Issuers entered into different types of Swaps that were not connected to a particular bond issuance, which are described later in Part XIII.A.2.

[14] There are various other ways to make bets or speculate on the movement of interest rates with a swap. We explain some of them below in Part XIII.A.2.

[15] *See* Douglas Skarr, C.A. Debt and Inv. Advisory Comm., *Issue Brief: The Fundamentals of Interest Rate Swaps*, 1 (Oct. 2004).

[16] *See* Douglas Skarr and Kristen Szakaly-Moore, C.A. Debt and Inv. Advisory Comm., *Understanding Interest Rate Swap Math & Pricing*, 1–2 (Jan. 2007).

[17] The mark-to-market value is not the same as the termination value because there are multiple ways to calculate the final termination value. Also, swap dealers may charge a markup. *See* Douglas Skarr, C.A. Debt and Inv. Advisory Comm., *Issue Brief: The Fundamentals of Interest Rate Swaps*, 3-4 (2004).

The diagram below illustrates the flow of payments in a Synthetic Fixed Swap.

**Figure XIII.A: Exchange of Cash Flows in a Synthetic Fixed Swap**



One potential benefit of a Synthetic Fixed Swap is that it mitigates some of the risk of unknown future fluctuations in interest rates.  When interest rates fluctuate, however, the issuer could end up paying more to the counterparty than it is receiving or vice versa.  Typically, a swap sets out predetermined payment dates for this exchange.

> 2.      **Basis Swaps**

Unlike Synthetic Fixed Swaps, Basis Swaps are not tethered to a particular bond issuance.  Instead, a Basis Swap is essentially a bet between an issuer and its counterparty or counterparties based on the movements of two different interest rates, usually, a taxable rate such as LIBOR, and a tax-exempt rate, such as the SIFMA Municipal Swap Index.  With a Basis Swap, there is a risk that a change in tax laws will adversely affect the relationship between the taxable and tax-exempt rates in a way that will cause the issuer to pay more than it receives from its counterparty.  In exchange for taking on that risk, the issuer may receive an upfront payment, which can be in the tens of millions of dollars.  When an issuer receives an upfront payment, that amount is set off against whatever gains the issuers would receive over the course of the Basis Swap.

> 3.      **Risks Associated with Swaps**

Both Synthetic Fixed Swaps and Basis Swaps come with their share of risks to the issuer.  Some of those risks were particularly relevant to the Issuers during the Relevant Period.[18]  The most obvious risk, of course, is that interest rates will fluctuate in a way that results in the issuer

---

[18] For a general discussion of risks inherent in swaps, please see GASB Statement No. 53, *Accounting and Financial Reporting for Derivative Instruments*, 33 (June 2008).

owing money to the counterparty. Other risks include that the counterparty will not be able to pay the issuer in the event interest rates fluctuate in the issuer's favor, which is called, "Counterparty Risk." Additionally, there is "Termination Risk" which, as the name suggests, is the risk that any number of early termination triggering events could occur, at which point the counterparty could insist on terminating the swap early. Depending on what the parties negotiate, early termination events can include a Puerto Rico-Related Bond's rating falling below an agreed-upon threshold. If, at the time of an early termination triggering event, the interest rates are in the counterparty's favor, the counterparty can demand payment, sometimes in a substantial amount, from the issuer. In the event of an early termination where the interest rates are in favor of the counterparty, the payment from the issuer to the counterparty is called a "Termination Fee."

There are steps an issuer can take to mitigate some of the risks. For example, where there is a large notional amount, an issuer can decrease Counterparty Risk by having multiple banks as counterparties on multiple swaps associated with a given bond.

As a means to defer an early termination event, an issuer and the counterparty can also negotiate the option to post collateral equal to the amount one party owes to the other at a given time over a defined threshold.[19] Most, if not all, of the Issuers' Swaps contained collateral provisions.

The universal terms of collateral posting in the swap world are set forth in the Credit Support Annex ("CSA") to the form swap agreement issued by the International Swaps and Derivatives Association ("ISDA Agreement"). According to the CSA, the amount of collateral to be posted by the issuer depends on two factors. The first is the cumulative value of all the swaps held with one counterparty, the value of which is not tethered to a single swap, but to the total mark-to-market value across all swaps between that bank and the issuer.

The second factor is a Puerto Rico-Related Bond's credit rating. In general, the lower a Puerto Rico-Related Bond's credit rating falls, the higher the collateral amount the Puerto Rico-Related Bond's Issuer is required to post, up to the mark-to-market value of the swap. So, imagine an issuer with one swap with one counterparty and an obligation to post collateral. If that issuer's swap has a mark-to-market value of negative $10 million, the issuer would be required to post somewhere between $0 and $10 million in collateral, with the exact point on the range determined by the Puerto Rico-Related Bond's credit rating at that time.

**B.    GDB's Role with Respect to Swap Decision-Making**

As financial advisor and fiscal agent to the Issuers, GDB played a crucial role in every aspect of Issuers' Swaps, from fielding and evaluating proposals, to its board approving each Swap, to later terminating the Swaps. As was common with other functions it performed, GDB hired outside consultants to provide advice on Swaps.

---

[19] For the purposes of our discussion, we address these factors from the perspective that it is the issuer who is facing an early termination event and has the option to post collateral. Generally speaking, a counterparty with a downgraded credit rating could find itself in the same position of electing to post collateral.

1.    **Evaluation of Proposals**

From 2004 to 2008, GDB worked with a swap advisor to help GDB evaluate the Swaps pitched by investment banks.   According to witnesses from both GDB and from the swap advisor, the role of the swap advisor was not to advise GDB whether it should or should not enter into a Swap.   Rather, once GDB made the decision to go forward with a Swap, it turned to its swap advisor to evaluate a Swap proposal and assist with pricing and execution.   At times, GDB would decide to approve an Issuer's issuance of a variable rate bond, then decide to hedge the risk that the variable interest rate could increase in the future, thereby requiring the Issuer to pay more interest to the bondholders, by entering into a Synthetic Fixed Swap. At other times, GDB received proposals that, at its discretion, it later passed on to its swap advisor to evaluate.

Both GDB management and the swap advisor told us that the role of the swap advisor was to evaluate the proposed terms of the Swap; "de-engineer" the figures provided by the proposing bank(s); advise GDB on the technical details like pricing, risks, and execution; negotiate those terms; at times, bid out the Swap; and review the transaction documents.   At times, in the swap advisor's opinion, the swap advisor policed potential counterparties' proposals and called out pricing unfavorable to the Issuer—a role one of GDB's swap advisors told us, in its opinion, the counterparties often resented.

The swap advisor worked directly with GDB management and staff, who one knowledgeable witness described as generally professional, organized, and smart, with an "above-average" understanding of swaps.   However, many of the GDB Board members we interviewed who were the ultimate decision makers in approving Swaps, told us they viewed Swaps as technical financial instruments, and that they were not familiar with the mechanics and risks associated with swaps.   Many told us outright they could not describe how a swap worked. Instead, the GDB Board members told us they relied on the advice presented to them by the swap advisor.

As part of the swap proposal evaluations and negotiations, GDB had to select the counterparties.   When selecting counterparties, the swap advisor told us that sometimes the swaps were bid out on a competitive basis to the cheapest bidder, and at other times, GDB selected counterparties on a negotiated, rather than competitive, basis.

The swap advisor also played a role in negotiating collateral terms with counterparties. Various witnesses, including two different swap advisors to GDB, told us that historically general obligation municipal issuers are able to agree not to post collateral because either their bonds had higher credit ratings than the Puerto Rico-Related Bonds, or applicable law prohibited them from doing so, or both.   However, in Puerto Rico all Issuers agreed to some form of collateral posting.

As discussed in Part XIII.E, when both interest rates and the Puerto Rico-Related Bond's credit ratings dropped, the counterparties could have terminated the Swaps.   To avoid early termination, the Issuers had the option to post collateral.   One swap advisor told us that it viewed the option to post collateral as a protection against involuntary termination by acting as a stopgap measure to forestall termination that would occur only on further credit downgrade.   Of course,

The Independent Investigator's Final Investigative Report

to take advantage of that protection, the Issuers needed to have enough available funds to post collateral in the first place.

2.        **Monitoring of the Swap Portfolio**

During the Relevant Period, as a legal matter, GDB hired its first swap advisor on a transaction-by-transaction basis and not on retainer to monitor the Issuers' Swap portfolio.  One witness told us that although the swap advisor was not engaged to monitor the portfolio, the swap advisor analyzed counterparty concentration risks across the Issuers' Swap portfolio in connection with evaluating new proposals.  The witness also told us that the swap advisor, in between transactions and at GDB's request, furnished information to GDB in between transactions.

Monitoring the growing portfolio of Swaps and associated liabilities therefore fell to GDB.  As discussed in more detail below in Part XIII.C.1, a former GDB manager called upon the GDB Board in 2005 to audit the Swaps and put a monitoring system in place.  When asked if GDB monitored the Swaps in 2005 to 2008, another former GDB manager told us that the Asset Liability Management Committee of GDB monitored the Swap portfolio.

By early 2009, the incoming GDB administration hired a new swap advisor to monitor the Swap portfolio for changes in the portfolio's mark-to-market values, as well as the implications of changes in credit ratings.  Although a former GDB manager told us that the Asset Liability Management Committee of GDB monitored the Swap portfolio, the new swap advisor said GDB provided a single spreadsheet with "one-liners" describing the Issuers' Swaps.  It was the advisor's view that GDB did not "really know what they had" in terms of the Swap portfolio because the previous administration's recordkeeping had been inadequate.  Indeed, GDB was unable to provide the documentation associated with the Swaps, in particular those that set out the legal and business terms, including collateral posting terms, of the Swap agreements.  The swap advisor then spent months tracking down the relevant documentation, in part by calling swap dealers and asking them if they had trades with Issuers.  Once the information was compiled, the swap advisor provided quarterly reports to GDB detailing each Issuer's Swap mark-to-market values, collateral posting requirements, and sensitivity analyses demonstrating the effects of potential credit rating downgrades and interest rates.

C.        **Puerto Rico and PREPA Used Basis Swaps to Generate Upfront Cash**

In 2006 and 2008, Puerto Rico and PREPA, respectively, entered into Basis Swaps with Goldman.  As part of our investigation, we explored how these Basis Swaps were pitched and the decision-making underlying the deals.  We concluded that the investment bank pitched the deals to GDB and at times, to the Legislative and Executive Branches.  We also concluded that the Issuers agreed the deals because each viewed the upfront cash payments, about $100 million to Puerto Rico and about $80 million to PREPA, as much-needed budgetary relief.

1.        **With Active Input from an Investment Bank, Puerto Rico Enacted Legislation to Enable It to Enter into Basis Swaps to Generate Cash**

According to numerous witnesses, in 2005, Goldman was aggressively marketing a Basis Swap not only to the GDB Board, but directly to members of the Puerto Rico legislature.  As part

of the deal, Goldman offered Puerto Rico approximately $100 million in cash up front.  As discussed in Part XIII.C.2, in 2006, Puerto Rico would later execute similar Basis Swaps with Goldman, and to lesser extent Morgan Stanley, as counterparties ("GO Basis Swaps").  When it became apparent that Puerto Rico did not have a legislative structure in place that would permit the issuances of Swaps, Goldman engaged various political actors.[20]

Through interviews of multiple former GDB high-level managers and review of contemporaneous correspondence, we uncovered evidence that Goldman, in pitching to GDB, also went directly to the Legislative and Executive Branches to convince them to motivate GDB to approve the proposed Basis Swap.  We reviewed contemporaneous electronic correspondence between two former GDB managers at that time, which referenced continued pressure on GDB to help close Puerto Rico's deficit gap, including speculation that Puerto Rico would ask GDB for a $100 million line of credit if the proposed Basis Swap did not proceed.

In another contemporaneous email exchange between two other high-ranking members of GDB's management in 2005, one expresses frustration at Goldman directly marketing Swaps to the Executive and Legislative Branches, and characterizes Goldman as going behind GDB's back to convince the Secretary of Treasury and the legislature that the proposed Basis Swap could be a means of providing budget relief.

We spoke with the recipient of that email, a former high-level manager at GDB, who told us that Goldman's proposed Basis Swap generated disagreement among GDB management, the GDB Board, and Puerto Rico about whether to proceed.  This former manager told us that the GDB Board, Secretary of Treasury, OMB, and the Governor were all in favor of entering into the proposed Basis Swap.  A member of the GDB Board at that time also told us that Goldman went around GDB and approached the Puerto Rico legislature directly with the proposed legislation. Some members of GDB management, however, opposed the proposed Basis Swap.  As discussed, below, one member of GDB management resigned when the GDB Board indicated its intention to proceed with the proposed Basis Swap.

On August 1, 2005, the Puerto Rico legislature enacted legislation to permit Swaps, called "Act 39."[21]  Act 39's "Statement of Motives" emphasizes the need for legislation that expressly authorizes Puerto Rico to enter into swaps and states that Puerto Rico has not been able to take advantage of swaps to manage interest rate fluctuations.

Act 39 authorizes the Secretary of Treasury and the Executive Director of PBA to execute "qualified interest rate exchange agreements" on behalf of Puerto Rico and PBA if certain requirements are met.  Significantly, Act 39 applies only to Puerto Rico and PBA, and not to other Puerto Rico-Related Entities or Issuers like GDB, the Public Utilities, COFINA, and HTA, the obligations of which are not, per statute, considered obligations or debts of Puerto

---

[20] Once adopted, Act 39 (discussed below) provided the legal basis for Puerto Rico to enter into Swaps as part of a proposed transaction.  Act 39 was based on a similar Michigan law and laws from other jurisdictions and, according to one witness, was meant to ensure that swaps could not be used for speculation.
[21] Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

Rico.[22]  As relevant to our investigation, Act 39 contains the following provisions:

- Act 39 prohibits the Secretary of Treasury from negotiating and executing qualified interest exchange agreements that would lead to financial speculation and expressly states that counterparties must have and maintain a "high credit classification of not less than investment grade."[23]  The Act also demands that the actions of the Secretary of Treasury be consistent with the Rate Risk Management Policy Statement adopted by GDB;[24]

- Act 39 defines "qualified interest rate exchange agreements" specifically to include interest rate option agreements, Basis Swaps, and other similar agreements and limits the possibility of cash generation through the use of these instruments to up to one hundred and sixty million dollars ($160,000,000);

- Act 39 expressly excludes termination fee payments made in connection with Puerto Rico Basis Swaps and PBA qualified interest rate agreements from the calculation of the Constitutional Debt Limit.[25]  The practical effect of this exclusion, analyzed in Part XVI, is that a foreseeable liability under Puerto Rico Basis Swaps and PBA qualified interest rate agreements will not be computed for purposes of the Constitutional Debt Limit, whereas the principal fixed interest payment under the same agreement will.  The Constitutional Debt Limit therefore excludes a relevant portion of an obligation that is part of the main swap agreement;

- Section 3 of Act 39 allows Puerto Rico to use the fixed rate payable under qualified interest rate agreements when calculating exposure for purposes of the Constitutional Debt Limit, instead of using: (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by Puerto Rico; and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds;[26]

- The Secretary of Treasury is also authorized to pledge the "good faith," credit and taxing power of Puerto Rico for the payment of the obligations incurred under such interest rate exchange agreements;[27]

---

[22] *See, e.g.*, P.R. Laws Ann. tit. 22 §§ 152(a) and 158(c) (PRASA); P.R. Laws Ann. tit. 22 § 210 (PREPA); P.R. Laws Ann. tit. 9 § 2012(h) (HTA).

[23] Statement of Motives, Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[24] Statement of Motives, Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).  GDB's policy is discussed below.

[25] Statement of Motives Article 3 § 3(g), Article 4 § 4(g), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[26] *See* Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico.

[27] Statement of Motives, Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005)  ("For such a purpose the obligations of the Commonwealth of Puerto Rico under these agreements are supported by the good faith, the credit and the power to levy taxes of the Commonwealth of Puerto Rico.").

- Act 39 permits the swap agreements to be guaranteed by some designated collateral (either property or a sources of income or revenue of Puerto Rico), and relinquishes the sovereign immunity of Puerto Rico regarding any civil cause that may arise under a swap agreement.[28]  This allows the swap counterparties to assert their rights under the swap agreements in a court of competent jurisdiction; and

- Although fixed interest payments and interest paid under qualified interest rate exchange agreements are computed towards the calculation of the Constitutional Debt Limit,[29] termination fee payments to exit Puerto Rico Basis Swaps and PBA qualified interest rate agreements are not.[30]  Act 39 does not state specifically whether or not termination fees in connection with non-basis Puerto Rico swaps should be counted toward to the Constitutional Debt Limit.  We discuss the implications of this in Part IX.

When it looked like the GDB Board intended to proceed with the proposed Basis Swap, despite the objection of members of GDB management, one former high-level manager drafted and provided to the GDB Board a memorandum outlining, among other issues, his opposition to the proposed Basis Swap.  The memorandum dated August 18, 2005, raised, among others, the following concerns:

- Swaps are risky, in general.  By that time, the former high-level manager told us, GDB had hired a swap advisor to present guidelines on derivatives and had already a submitted a report to the GDB Board;

- GDB lacked a formal monitoring procedure for its existing Swaps.  He encouraged the GDB Board to conduct an audit of Swaps to date; and

- Based on conversations between a GDB staffer and a CRA Analyst, entering into the proposed Basis Swap would cause at least one CRA to downgrade the credit ratings for the GO Bonds.  Specifically, the former high-level manager told us that Goldman had—without GDB's permission—called S&P to discuss the proposed Basis Swap.  S&P then immediately called GDB's New York office to alert GDB that there potentially would be a credit rating downgrade in the event GDB moved forward with the proposed Basis Swap.  At that time, the credit ratings for the GO Bonds had already been reduced.

The former high-level manager told us that he was increasingly concerned about further potential tension between the Legislative Branch and the Executive Branch regarding Puerto Rico's expenditures because, to close fiscal year 2005, GDB had to provide more deficit financing resources than what had been initially required by OMB and Treasury.  This made the former high-level manager concerned about GDB as fiscal agent, particularly with regard to what

---

[28] Article 3 § 6, Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[29] Article 3 § 5, Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

[30] Article 3 § 3(g) (regarding Puerto Rico Basis Swaps), Article 4 § 4(g) (regarding PBA swaps), Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005).

The Independent Investigator's Final Investigative Report

he viewed as weaknesses in cash management, budgeting, and financial information systems and controls.

The former high-level manager then resigned from GDB, in part, because of the GDB Board's decision to go forward with the proposed Basis Swap over his objections. *See* Part IV.

In September 2005, following the enactment of Act 39, GDB issued a "Master Swap Policy"[31] with the purpose of providing guidance for the use of derivative financial products in conjunction with the management of the debt obligations of the Issuers. GDB's Master Swap Policy provides guidelines for the Issuers, and requires GDB's permission for to enter into swap transactions. The Master Swap Policy regulates:

- Authority. Swaps and other derivative instruments shall be approved by the boards of directors for the Issuers and GDB. The legal authority for the Issuers is based on the enactments of Puerto Rico's Legislature;[32]

- Procedure. GDB, based on analysis performed by its staff and legal and financial advisors, issues the final recommendation for the Puerto Rico-Related Entities to enter into swap agreements. GDB's analysis will take into consideration the following factors, among others: the appropriateness of the transaction; sensitivity analysis; alternatives for funding termination payments; the legal framework for the transaction based on Puerto Rico statutes; potential availability on the cost of bond issuance; impact on the total amount of debt exposure; and the ability of the Puerto Rico-Related Entities to handle any administrative burden imposed by the transaction;[33]

- Permitted Uses. GDB permits swaps and other derivative transactions for the purposes of, among other things: managing exposure to floating and fixed interest rates; locking in fixed rates in current markets for use at a later date; reducing the cost of fixed or floating rate debt; managing the exposure to the risks of changes in the legal and regulatory treatment of tax exempt bonds; and managing the credit exposure to financial institutions;[34]

- Counterparty Credit Standards. GDB requires swap and derivatives counterparties to have and to maintain a "high credit classification of not less than investment grade." GDB further requires, among other things, that the Puerto Rico-Related Entities avoid excessive concentration of exposure to a single counterparty;[35]

- Method of Procurement. GDB chooses counterparties for entering into swaps and derivative transactions on either a negotiated or competitive basis;[36]

---

[31] Gov't Dev. Bank for P.R., *Master Swap Policy* (Sept. 2005) (on file with author).
[32] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 1 (Sept. 2005) (on file with author).
[33] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 2 (Sept. 2005) (on file with author).
[34] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 3–4 (Sept. 2005) (on file with author).
[35] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 4–5 (Sept. 2005) (on file with author).
[36] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 5 (Sept. 2005) (on file with author).

- Risk Management. In order to mitigate the risks associated with swaps, GDB will perform a detailed evaluation and analysis of each swap agreement (entered into by GDB and the Puerto Rico-Related Entities) within a larger context of impact at both the entity level and at Puerto Rico's level. The following risks are among those that GDB is required to evaluate: termination risk; collateral posting risk (i.e., the risk that the Puerto Rico-Related Entity will have to post collateral in the event of a credit downgrade or a market change); and basis risk (i.e., the risk that, in a synthetic fixed rate structure, the floating rate of the swap fails to offset the floating rate of the underlying liability);[37] and

- Reporting. GDB holds itself responsible for tracking and regularly reporting the financial implications of the Swaps that each Puerto Rico-Related Entity executed, issuing an annual report to be prepared by each entity's board of directors. These reports must include: a summary of the key terms of the agreements; the market-to-market value of the swap; the amount of exposure that each Puerto Rico-Related Entity had to each counterparty; any collateral postings; the status of any liquidity support used in connection with a swap agreement; and an updated contingency plan to replace a termination swap, or fund a termination payment in the event an outstanding swap is terminated. GDB also performs any monitoring and reporting as required by the CRAs to ensure compliance with the requirements of GASB and the Financial Accounting Standards Board.[38]

## 2. The 2006 GO Basis Swaps

By April 2006, it was public knowledge that Puerto Rico was facing a budget crisis. On April 25, 2006, Governor Acevedo Vilá announced that Puerto Rico did not have sufficient funds to pay its operating expenses for May and June 2006.[39] Governor Acevedo Vilá asked GDB for a $500 million loan. GDB only agreed to provide it if the legislature approved a sales tax.[40] On April 26, 2006, with the sales tax not yet approved, Governor Acevedo Vilá announced that non-essential Puerto Rico agencies would be shutting down May 1, 2006. They remained closed

---

[37] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 6 (Sept. 2005) (on file with author).

[38] Gov't Dev. Bank for P.R., *Master Swap Policy*, page no. 7 (Sept. 2005) (on file with author).

[39] *See* Miranda Leitsinger, *Puerto Rico days away from government shutdown, leader warns*, Associated Press (Apr. 27, 2006) https://web.archive.org/web/20060509103516/http://www.boston.com/news/nation/articles/2006/04/27/puerto_rico_days_away_from_government_shutdown_leader_warns/.

[40] Declaration of Antonio Yanes, Jr., Ex. 34, 4, *In re The Financial Oversight and Management Board for Puerto Rico*, *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Bettina Whyte*, Adv. Proc. No. 17-00257, (Bankr. D. P.R. Mar. 7, 2018), ECF No 348–50 ("The first is the collection of specific (tax) measures that were approved by the legislature one time—measures one time (tax) measures that can generate approximately $200 million. And number two, taking the remaining balance of the $500 million and refinancing it together with approximately $6 billion of appropriation bonds and notes that the Commonwealth has outstanding. So the idea is that the refinancing of the $6.5 billion would be paid with one percentage point of the sales tax.").

The Independent Investigator's Final Investigative Report

until May 14, 2006.[41]

On July 1, 2006, the GO Basis Swaps with Goldman and Morgan Stanley as another counterparty, became effective. Puerto Rico received an upfront cash benefit of approximately $100 million.

We interviewed the lead banker on Goldman's Puerto Rico team in 2005, who was identified by GDB management and in contemporaneous documents, as having proposed the legislation or advocated for the Swaps. When we asked this senior Goldman investment banker if he was involved in drafting or commenting on the 2005 legislation, he told us he did not recall.[42] We also asked him if someone on his team would have been designated to comment on or draft the legislation. He told us he did not recall. When we asked the senior Goldman investment banker about the GO Basis Swaps specifically, he told us he did not recall the specifics of any Swap transaction, including where an Issuer received upfront money as part of a Swap, and did not recall any pitches Goldman made in connection with a Swap.

We asked Governor Acevedo Vilá about the decision to enter into the GO Basis Swaps in 2006. He told us that there was a concern that Puerto Rico would run out of money when it paid off the GO Bonds in May, and by that time, the legislature had not approved an adjustment of the SUT. To raise funds to pay for certain of its essential operations, Puerto Rico entered into the GO Basis Swaps.

The GO Basis Swaps later exposed Puerto Rico to collateral calls from that Goldman, putting pressure on Puerto Rico's finances. Ultimately, in 2014, Puerto Rico terminated the remaining portions of GO Basis Swaps for about $26.2 million, which was far less than the $100 million Puerto Rico received up front.

### 3. The Proposed 2008 PBA Basis Swap

In February 2008, Goldman proposed another Basis Swap with an upfront payment, but this time for PBA ("PBA Basis Swap"). Goldman offered GDB a $70 to $75 million upfront payment in connection with the Basis Swap. At that time, according to GDB's swap advisor, Puerto Rico's existing GO Basis Swap with Goldman "was now at risk of forcing a collateral call for the Commonwealth." In exchange for doing the PBA Basis Swap, Goldman offered more lenient credit terms on the existing GO Basis Swap with Goldman.

Having previously received pressure from political actors to enter into prior Basis Swaps, some documentary evidence we reviewed suggests that GDB management expected to receive pressure from the Governor and Secretary of Treasury to do the PBA Basis Swap to close the budget gap.[43] The PBA Basis Swap was never executed, but remains another example of GDB's

---

[41] Commonwealth of P.R., *Financial Information and Operating Data Report*, 66 (June 6, 2006).

[42] This senior investment banker retired in 2008.

[43] We spoke with a former officer at the Department of Treasury who expressed suspicion after, in 2008, being approached directly by a banker who told him he could get the Department of Treasury $100 million in two weeks. He thought the banker should be approaching GDB, instead of the Department of Treasury.

view that the Executive Branch was willing to enter into these types of agreements when it was eager for cash to address budgetary issues.

### 4.     The 2008 PREPA Basis Swap

The following month, however, PREPA entered into its own Basis Swap with Goldman ("PREPA Basis Swap"), which came with an upfront cash payment of approximately $80 million. As discussed as part of our investigation into the political will to raise PREPA's rates in Part V.A.2.(a), witnesses within PREPA told us that PREPA entered into the PREPA Basis Swap to generate about $80 million cash. One of GDB's swap advisors opined that PREPA may have wanted the Swap to generate cash because PREPA did not want to raise the rates it charged its customers for electricity. In November 2008, however, just four months after having entered into the PREPA Basis Swap, PREPA had to post $108.3 million in collateral to Goldman.[44]

Several witnesses, both within GDB and at an outside advisor, criticized the PREPA Basis Swap's large size and concentrated counterparty exposure.

We spoke with at least six witnesses—including investment bankers, GDB officials, and advisors—who told us that GDB, as discussed above in Part IV, put Goldman in a "penalty box" during the Fortuño Administration, effectively barring Goldman from doing business with GDB because of the PREPA Basis Swap. One official from the Fortuño Administration told us that a prior GDB team had approved the PREPA Basis Swap in order to obtain liquid resources. The witness stressed that, in this witness's view, this particular transaction could have had catastrophic consequences for PREPA.

We asked two senior Goldman investment bankers about their relationship with GDB. They told us they were not aware of GDB's decision to withhold business from the investment bank as a result of the PREPA Basis Swap.

Ultimately, PREPA was able to unwind portions of the PREPA Basis Swap between 2012 and 2014 for $15.89 million—substantially less than the approximately $80 million that PREPA received upfront.

### D.     The Issuers Used Synthetic Fixed Swaps to Hedge Risk Arising from Variable Rate Bonds

From 2004 to 2008, the Issuers issued over a dozen variable interest rate bonds.[45] With variable interest rate bonds comes uncertainty with respect to Issuers' borrowing costs. According to GDB witnesses, the Issuers began to use Synthetic Fixed Swaps to protect against potential future rising interest rates on their variable rate bonds. A former member of GDB's management and Board told us that investment bankers told GDB that there was demand in the municipal bond market for the Issuers to issue variable rate debt and that the risk of rising interest rates would be mitigated by entering into swaps to fix the rate. This begged the question: if variable rate bonds created the risk of uncertainty in borrowing costs, why did Issuers start issuing variable rate bonds in the first place?

---

[44] See P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series YY*, 45 (2010).

[45] Prior to 2004, Issuers, such as Puerto Rico, PBA, and PREPA, tended to issue fixed-rate bonds.

The Independent Investigator's Final Investigative Report

We spoke to witnesses from GDB and underwriters about why the Issuers transitioned to variable rate bonds. Those witnesses offered various, and at times conflicting, motives for issuing variable rate bonds.

Several witnesses highlighted the importance of market forces in shaping the decision to issue variable rate debt that would be hedged with Synthetic Fixed Swaps. One former executive vice president of GDB told us that the monetary tightening initiatives that the US Federal Reserve began implementing in June 2004 increased rates and suppressed investor appetite for long-term fixed-rate debt, which led to a "general trend" in municipal finance for issuers to issue variable rate debt. A former member of GDB's management and the GDB Board told us that the investment banks sold the Synthetic Fixed Swaps to GDB as a market requirement because if the potential risk of rising interest rates was not hedged, it could affect the Issuer's credit and, accordingly, the credit rating of the bonds.

Some witnesses said that, historically, the Issuers could obtain a lower cost of borrowing by issuing a variable rate bond with a Synthetic Fixed Swap than they could by issuing fixed rate bonds. To that end, one former officer of GDB told us that the Issuers used Synthetic Fixed Swaps as risk management so they could take advantage of "very attractive floating rate deals" being offered by the banks.

Still other witnesses told us that the Issuers issued variable rate debt to diversify their investor bases. Two investment bankers who participated in offerings and pitched swaps to the Issuers explained to us that there were different groups of investors who invested in fixed versus variable rate bonds, and that it made strategic sense for the Issuers to diversify the investor base.

All of the Synthetic Fixed Swaps were structured with maturities consistent with the decades-long maturities of their underlying variable rate bonds. The structure should have allowed the Issuers to pay a fixed interest rate over the life of their hedged bonds.

By 2009, however, interest rates were lower than they had been in years, and the Issuers faced over $1.32 billion in Swaps exposure.

## E.   Issuers' Exit From the Swap Market Was Costly

The dramatic fall in interest rates during and after the Great Recession had significant consequences for Issuers' Swaps, liquidity, and financing needs. The majority of Issuers' Swaps were Synthetic Fixed Swaps, which had been structured to protect the Issuers from rising interest rates. But with interest rates dropping, the Issuers owed money to the counterparties on the Synthetic Fixed Swaps.

Simultaneously, as discussed in Part X.C, the CRAs were downgrading the credit ratings for Puerto Rico-Related Bonds. In some instances, the combination of the credit rating and low interest rates triggered an early termination event under the Synthetic Fixed Swap agreements. This meant that the counterparties could choose to terminate the Swap and demand payment. If the Issuer had available funds, the Issuer had the option under the Swaps to post collateral equal to an amount over a pre-determined threshold of the amount that would be owed if the Swap was terminated at that time.

The Independent Investigator's Final Investigative Report

Starting with the Great Recession, the Issuers' exposure remained significant, even as GDB took steps to reduce its overall exposure by unwinding the Swaps. The chart below tracks the Issuers' Swap portfolio's mark-to-market value over time, using data from the swap advisors.

**Figure XIII.B: Mark-to-Market Value of Issuers' Swap Portfolio**



Ultimately, between 2008 and 2014, the Issuers paid a net total of nearly $1.085 billion to their counterparties in exchange for exiting their Swaps early. The vast majority of this amount was generated through the issuance of additional Puerto Rico-Related Bonds.

### 1.   **Collateral Postings**

In general, to avoid early termination, the Swap agreements required an Issuer to be able to meet collateral requirements. Those, in turn, depended on relevant credit ratings and the mark-to-market value of the Swaps. Collateral postings were typically calculated daily and were dependent on mark-to-market values. In addition, collateral postings were calculated across all Swaps between two parties. This meant that the amount of collateral an Issuer would owe to a particular bank was not based on a single Swap, but on all existing Swaps between that Issuer and the counterparty bank. If the Issuer had multiple Swaps with one counterparty bank, then the Issuer could find itself in a position where it was required to post a large sum to a single bank.

Initially, Puerto Rico took steps to ride out changes in the interest rate environment by posting collateral. When it did not have available cash, Puerto Rico issued bonds to generate it. For example, a portion of the bond proceeds from Series 2008 of Puerto Rico's Tax and Revenue Anticipation Notes went to collateral postings for Puerto Rico's Swaps.

By December 31, 2008, Puerto Rico had posted over $241.4 million[46] to counterparties to satisfy collateral requirements of Puerto Rico's GO Basis Swaps.

---

[46] *See* Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2009 B*, I-42 (2009).

The Independent Investigator's Final Investigative Report

2.    <u>**In 2009, Puerto Rico Began to Systematically Terminate the Swaps and Had to Issue More Puerto Rico-Related Bonds to Pay for the Termination Fees**</u>

In 2009, GDB, under the incoming Fortuño Administration, hired a new swap advisor. As mentioned earlier in Part XIII.B.2, GDB was unable to provide the new swap advisor with documentation related to its Swaps. After the swap advisor compiled the documentation from the counterparties and reviewed the documents, the swap advisor found 57 relatively simple "plain vanilla" Swap agreements, which carried a notional amount of $9 billion. That swap advisor described itself as being astonished and shocked that a municipal issuer had a swap portfolio with such a high notional amount. The swap advisor also determined that nearly one third of that exposure was with just one counterparty: Goldman.

Once the portfolio was compiled, former GDB managers told us that the Fortuño Administration decided to systematically terminate the Swaps. The bulk of the portfolio was comprised of Synthetic Fixed Swaps. There were also two outstanding Swaps, called Forward-Starting Swaps that were designed to lock in interest rates for five years for bonds that COFINA might issue in the future.

By February 2009, the Issuers were potentially liable to their counterparties for $1.32 billion in interest on all existing Swaps if they were immediately terminated. GDB management and the swap advisor told us that GDB viewed the Swap portfolio as a liquidity risk. They also told us that GDB's Financing Department wanted to refund and refinance existing variable rate bonds at the now lower fixed interest rates. An underwriter witness explained that once GDB decided to refund a variable rate bond, the Swaps associated with that bond had to be terminated.

The cost to terminate a swap before its agreed maturity and the determination of which party bears the termination cost depends on where the interest rates are at a given time. In the case of Synthetic Fixed Swaps, the termination cost depends on the difference between current interest rates at the time of termination and interest rates at the time of the original agreement.

In Puerto Rico's case, the bulk of the Issuers' terminations occurred between 2009 and 2012, when interest rates remained at historic lows. As a result, the terminations came at a ten-figure total cost to the Issuers.[47]

However, before Issuers could terminate the Swaps, it had to come up with funds to pay the termination fees. From 2008 to 2014, Issuers raised funds to pay off these termination fees by issuing over $965 million in bond debt through COFINA, GO, PREPA, PRASA, PRIFA and PBA. The table below summarizes the total funds raised by Issuers for the purpose of terminating Swaps.

---

[47] Prior to the Great Recession, there were some cases when Issuers were able to terminate Swaps early when interest rates were in their favor and receive cash payments from their counterparties. For example, in December 2005, the MFA terminated three Swaps executed just three months prior with Goldman, realizing a gain of $9.3 million. Later, in May 2006, UPR received $18.6 million from its counterparties—fewer than six months after executing the trade. MFA and UPR's swaps benefited from a rise in 1-Month LIBOR, the benchmark interest rate tied to the variable legs of their Swaps.

The Independent Investigator's Final Investigative Report

**Figure XIII.C: Bond Proceeds Used to Pay Termination Fees by Issuer**

| Issuer | Funds Raised |
|---|---|
| COFINA[48] | $469,072,346.00 |
| GO | $286,905,346.00 |
| PRASA | $75,274,680.00 |
| PRIFA | $61,837,000.00 |
| PREPA | $44,500,000.00 |
| PBA | $28,395,000.00 |
| Grand Total | $965,984,372.00 |

By September 30, 2014, Issuers had paid a net total of over $1.085 billion in termination fees to financial institutions and investment banks, including Morgan Stanley, FMS Wertmanagement, UBS, and Citibank. The table below summarizes the total net termination payments received by each counterparty to a Swap from 2006 to 2014.[49]

---

[48] As discussed in more detail in Part VI.B.8, in 2011, COFINA earmarked about $400 million from the Senior Series 2011C COFINA Sales Tax Revenue Bonds, underwritten by Morgan Stanley, to pay termination fees for the Forward-Starting Swaps to Morgan Stanley and FMS Wertmanagement. This amounts to almost half of the total termination fees across all Issuers.

[49] Some of the Issuers' counterparties are no longer in business and have merged with or have been acquired by other Swap counterparties. In these cases, the amounts in the table reflect amounts received directly by the counterparty and any of its predecessor entities.

The Independent Investigator's Final Investigative Report

**Figure XIII.D: Net Total Termination Fees Paid by Issuers to Each Counterparty**

| Counterparty | Net Total Termination Paid by Issuers |
|---|---|
| **Morgan Stanley** | $299,409,992.00 |
| **FMS Wertmanagement**[50] | $220,578,000.00 |
| **UBS** | $93,132,840.00 |
| **Citibank** | $81,750,000.00 |
| **Bank of New York Mellon** | $72,316,000.00 |
| **JPMorgan**[51] | $62,397,388.00) |
| **Wells Fargo**[52] | $61,837,000.00 |
| **Deutsche Bank** | $61,553,000.00 |
| **Goldman** | $55,836,346.00 |
| **Royal Bank of Canada** | $50,167,750.00 |
| **Barclays**[53] | $24,830,250.00 |
| **Merrill Lynch** | $1,807,880.00 |
| **Grand Net Total Cost** | $1,085,616,446.00 |

    In some instances, Swap counterparties that received termination payments from bond proceeds also served as underwriters of the same bonds. For example, in 2009, Barclays received $21 million of the proceeds of Senior Series 2009C COFINA Sales Tax Revenue Bonds in addition to the fees that it received as an underwriter of the same bond. Similarly, COFINA used $194.8 million in proceeds from Senior Series 2011C COFINA Sales Tax Revenue Bonds

---

[50] Includes termination payments received by DEPFA Bank. *See* FMS Wertmanagement, *FMS-WM continues buying debt instruments of the DEPFA group*, https://www.fms-wm.de/en/mobile/en/press/308-fms-wm-continues-buying-debt-instruments-of-the-depfa-group ("The German state owned wind down agency, FMS Wertmanagement AöR ("FMS-WM"), was instructed in May 2014 to wind down DEPFA BANK plc ("DEPFA") and [its] wholly owned subsidiaries (the "DEPFA group")).

[51] Includes termination payments received by Bear Stearns Capital Markets Inc.

[52] Includes termination payments received by Wachovia Bank NA.

[53] Includes termination payments received by Lehman Brothers Derivative Products Inc. and Lehman Brothers Special Financing Inc.

The Independent Investigator's Final Investigative Report

to terminate a Swap with Morgan Stanley, which also served as an underwriter of those bonds. A discussion of the use of COFINA funds to pay termination fees is at Part VI.B.8.

From 2006 to 2014, the total net cost of the Swap terminations to the Issuers was $1,085,616,446.00.

**Figure XIII.E: Total Net Cost to Terminate Swaps by Issuer**

| Issuer | Net Total Termination Cost |
|---|---|
| COFINA | -$449,072,346.00 |
| Puerto Rico | -$282,333,980.00 |
| MFA | $9,315,000.00 |
| PBA | -$36,770,000.00 |
| PRPA | -$61,837,000.00 |
| HTA | -$112,967,440.00 |
| PRASA[54] | -$75,274,680.00 |
| PREPA | -$95,293,000.00 |
| UPR | $18,617,000.00 |
| **Total Cost Across Issuers** | -$1,085,616,446.00 |

## F.    Other Municipal Issuers' Use of Swaps

During the Relevant Period, Puerto Rico was not the only government Issuer to find itself with billions of dollars of Swap exposure and without sufficient liquidity to see the Swaps through to maturity. By 2009, Jefferson County, Alabama had a swap portfolio with an exposure of $650 million in potential termination fees. In 2013, Detroit, Michigan had a swap portfolio with an exposure of $228 million in potential termination fees. Both of those pale in comparison

---

[54] In 2007, both Public Utilities entered into Rate Lock Swaps designed to secure prevailing interest rates in anticipation of future bond issuances a few months later. PREPA entered into a rate lock in September 2007 it would later exit at a cost of $13.56 million in June 2008. PRASA's June 2007 rate lock would prove even costlier, requiring PRASA to pay $75.27 million to unwind in February 2008. PRASA's CFO later told us that PRASA entered into the rate lock at the insistence of GDB and the upcoming transaction's underwriters. Although PRASA's management was not entirely comfortable with this transaction, PRASA's CFO told us that GDB was the fiscal agent and a recognized expert in this field, and when GDB presented the transaction to PRASA's Board, PRASA's Board approved it.

The Independent Investigator's Final Investigative Report

with Issuers, which, as discussed in detail above, paid over $1.085 billion in net Swap termination fees. We examined each of these bankruptcies in an effort to determine why Jefferson County and Detroit, like Puerto Rico, entered into swaps, how each municipality addressed its swaps liabilities compared to Puerto Rico, and how it is that each had substantially lower liabilities than the Issuers.

### 1. Jefferson County, Alabama

On November 9, 2011, Jefferson County commenced Chapter 9 bankruptcy as a result of liabilities exceeding $5 billion, largely as a result of the issuance of approximately $3 billion in revenue bonds to raise funds to pay for improvements to its sewer system required by consent decrees with the EPA and the US Department of Justice.[55] At that time, it was the largest municipal bankruptcy in US history.[56]

Prior to filing, between 2002 and 2003, Jefferson County had entered into 18 swaps, with a notional amount of $5.6 billion.[57] Some of the swaps were in connection with the revenue bonds to pay for the sewer work but others were not, which is apparent from the fact that the notional amount exceeded the revenue generated from the bonds. JPMorgan was the lead underwriter on a majority of the bonds and a counterparty to a majority of the swaps.[58]

While there are a few similarities between Jefferson County and Puerto Rico, there are also important differences. There are three similarities: (i) both Jefferson County and Puerto Rico entered into swaps with their underwriters; (ii) there is evidence that in both cases, the underwriter banks approached government officials directly to promote the swaps; and (iii) like Puerto Rico, despite Jefferson County being able to shed the bulk of its swap liability prior to commencing bankruptcy, it still ended up in bankruptcy.

The key difference is that, unlike Puerto Rico, Jefferson County did not pay a single dollar in termination fees to JPMorgan to exit the swaps. This is because prior to Jefferson County's bankruptcy in 2011, over twenty individuals, including Jefferson County officials and bankers, were convicted on charges of bribery and fraud in connection with over $5 billion in various municipal financings, including entry into the swaps. Specifically, in 2009, the SEC accused JPMorgan, Jefferson County's lead bankers, and other individuals of bribing Jefferson County officials to agree to the swaps.[59] The SEC also accused JPMorgan of using a portion of the fees paid to JPMorgan by Jefferson County to pay kickbacks to Goldman so that Goldman would not complete with JPMorgan for the swap business.[60] When JPMorgan settled with the

---

[55] *See generally*, *In Re Jefferson County, Alabama*, No. 11-05736 (Bankr. N.D. Ala.).
[56] See Melinda Dickinson, *Alabama county files biggest municipal bankruptcy*, Reuters (Nov. 10, 2011), https://www.reuters.com/article/us-usa-alabama-jeffersoncounty-idUSTRE7A94CP20111110.
[57] *See* Complaint, ¶ 26, *SEC v. Charles E. Lecroy and Douglas W. Macfaddin*, No. 09-2238 (N.D. Ala. Nov. 4, 2009), ECF No. 1.
[58] *See* Complaint, ¶¶ 25–26, *SEC v. Charles E. Lecroy and Douglas W. Macfaddin*, No. 09-2238 (N.D. Ala. Nov. 4, 2009), ECF No. 1.
[59] *See* Final Judgment, *SEC v. Charles E. Lecroy and Douglas W. Macfaddin*, No. 09-2238 (N.D. Ala. Dec. 4, 2015), ECF No. 245.
[60] *See* Final Judgment, *SEC v. Charles E. Lecroy and Douglas W. Macfaddin*, No. 09-2238 (N.D. Ala. Dec. 4, 2015), ECF No. 245.

SEC, it agreed to forfeit almost $650 million in termination fees that Jefferson County owed to it and also paid $50 million to Jefferson County.[61]   As a result, Jefferson County did not pay termination fees to JPMorgan to exit the swaps.

We spoke with one witness who had particular knowledge of the regulatory and criminal conduct surrounding the Jefferson County swaps, and who also served as a swap advisor for GDB.  The witness told us that, while advising GDB about entry into Swaps during the Relevant Period, he did not observe in Puerto Rico any of the kinds of conduct others have observed in connection with the Jefferson County bankruptcy, such as thinly-veiled kickbacks and bribes. Furthermore, through the course of our investigation, we did not uncover any evidence to suggest bribery or fraud in connection with Issuers' Swaps during the Relevant Period.

## 2.    City of Detroit, Michigan

The City of Detroit serves as a point of comparison for the Puerto Rico swap analysis. Detroit is useful precedent not only in the context of swaps, but also with respect to broader issues, such as the issuance of voidable municipal debt and investor protection discussed in other Parts of this report.

In this Part, we identify differences and similarities between the two municipal issuers that opted to use swaps as a financial tool to minimize interest rate risks in connection with the issuance of municipal bonds.  In summary, we have looked at Detroit and examined what the Issuers could have done differently with its Swap portfolio if there are lessons learned that could still be applicable to Puerto Rico.

We have divided this subsection in three parts: *first*, we compare the statutory regimes in Michigan and Puerto Rico regarding entry into swaps; *second,* we set out a brief narrative of Detroit's swap transactions as described in the municipality's Chapter 9 filings; and *third*, we use those filings as the factual basis for a comparison between the swap portfolios of Detroit and the Issuers.

### (a)    The Detroit Example

On July 18, 2013, Detroit filed for Chapter 9 bankruptcy as a result of liabilities exceeding $18 billion, a proceeding described by the United States Bankruptcy Court for the Eastern District of Michigan as "the largest [C]hapter 9 case in history."[62]  The debt consisted of, among other things, swap payments owed to banks, pension liabilities and post-employment benefits for Detroit's retired workers.[63]   The most controversial obligation among the city's

---

[61] *See* Final Judgment, *SEC v. Charles E. Lecroy and Douglas W. Macfaddin*, No. 09-2238 (N.D. Ala. Dec. 4, 2015), ECF No. 245; *see also* Press Release, Sec & Exch. Comm'n, *J.P. Morgan Settles SEC Charges in Jefferson County, Ala. Illegal Payments Scheme,* (Nov. 4, 2009), https://www.sec.gov/news/press/2009/2009-232.htm. Many of the individuals involved were later criminally convicted and enjoined under the Exchange Act.

[62] *See* Motion of Debtor, 5, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846, (Bankr. E.D. Mich.) ECF No. 2806.

[63] *See* Motion of Debtor, 5 *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846, (Bankr. E.D. Mich.), ECF No. 2806.

massive liabilities was its $1.4 billion in pension-related Certificates of Participation ("COPs"),[64] which was also the cause of the swap transaction controversies.  Between 2005 and 2006, Detroit issued COPs through complex trust vehicles associated with non-profit corporations created by the city as financial intermediaries.  Detroit issued this debt to assist with the financial hardship it was experiencing as a result of its underfunded pensions.[65]

Detroit maintains two pension funds: (i) the General Retirement Plan of the City of Detroit; and (ii) the Police and Fire Retirement Plan of the City of Detroit.  Both pension funds were under-funded and in 2005, they were in severe need of cash to fund the actuarially accrued liability of each pension fund,[66] which totaled $1.4 billion.  The unsecured COPs were the most attractive choice at Detroit's disposal, allowing Detroit to apparently fully fund both pension funds, while sidestepping Detroit's borrowing limit and the need for voter approval[67] under Michigan's Act 34.[68]

Detroit's municipal issuance of the COPs attracted investors because of the special purpose vehicles that were created: non-profit service corporations for each of the two pension funds and funding trusts.  In general terms, the structure Detroit used consisted of: (i) creating the non-profit service corporations and funding trusts for each of the two pension funds; (ii) entering into service contracts with each of the service corporations; (iii) having the non-profit service corporations assign any payment rights owed by Detroit as a result of the service contracts to the funding trusts; and (iv) using the funding trusts as the issuers of the COPs, which represented an undivided proportionate interest in the payments that Detroit would make to the service corporations under the service contracts.  Detroit used this to attract investors, especially the insurance protection against payment defaults by the funding trusts and hedges against the floating interest rates that the interest rate swap arrangements provided.[69]

### (b)      Michigan's Act 34 Provided More Protections than Act 39

As descried above, Act 39 regulates qualified interest rate agreements executed by Puerto Rico and by PBA.  As a point of comparison, we reviewed the requirements and protections of Michigan's Act 34, which, among others, regulates swap and hedge agreements executed by any municipality within the State of Michigan.

One significant similarity is that both statutes generally exclude termination fees from being counted toward the respective constitutional debt limits.  Michigan's Act 34 does this by excluding interest rate exchange agreements all together from its calculation of Michigan's

---

[64] *See* Joshua C.  Showalter, *The Consequences from Issuing Invalid Municipal Debt: Examining the Voidable Debt Issues in the Detroit Bankruptcy and Puerto Rican Debt Crisis*, North Carolina  Banking Institute, Vol. No. 21 Issue No. 1, 195, 201 (Mar. 2017).

[65] *See In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF 1945, 11.

[66] *See Pension Plan of the General Retirement System of the City of Detroit*, 36 (June 30, 2014).

[67] *See* David Skeel, *The Education of Detroit's Pension and Bond Creditors*, University of Pennsylvania Public Policy Initiative Vol. 2 No. 1 (Jan. 2014).

[68] Michigan's Revised Municipal Finance Act, Act 34 (2001), 41.2317 – Sec 317.(3) and (4)

[69] *See In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 11–12.

constitutional debt limit.[70]   As discussed above, Act 39 expressly carves out Puerto Rico's payment of termination fees for Puerto Rico Basis Swaps and PBA Swaps.

Michigan's Act 34 includes a number of requirements absent from Act 39 that may have contributed to Detroit having less swap liability than the Issuers.  Michigan's Act 34 requires both a debt management plan and swap management plan before a municipality can enter into swaps.[71]  These debt management plan requires the municipality to analyze the risks of its total debt, and its variable rate debt.  The swap management plan requires the municipality to analyze: (i) "the benefits and costs of entering into swap agreements;" (ii) "the risk associated with entering into swap agreements;" and (iii) "early termination, involuntary termination, default, and cost considerations associated with swap agreements;" as well as have a "[s]ystem in place to monitor the status of all outstanding swap agreements."

In addition to the required monitoring and analysis, Michigan's Act 34 imposes two important limits on the extent to which Michigan pledges its full faith and credit to payments of interest or termination fees for interest rate exchange agreements.  First, Michigan pledges its full faith and credit to payments of interest or termination fees *only* in the event the underlying bond was approved by the voters.[72]  If the underlying bond was not approved by the voters, then there is only a limited pledge of full faith and credit.[73]  Second, Michigan also limits the extent to which its pledges its full faith and credit by capping the amount of termination fees that qualify as "interest" at the statutory cap on interest rates for underlying debt.[74]

### (c)   Detroit's Swap Instruments Were Used in a Different Context Than Puerto Rico's Swaps

Detroit's interest rate swap agreements, also described by Judge Steven W.  Rhodes as hedge agreements, were entered into between the non-profit service corporations and two swap counterparties: (i) UBS; and (ii) SBS Financial[75] (together, the "Detroit Swap Counterparties") to synthetically convert the floating interest rates paid by the COPs into a fixed payment.[76]  As of June 12, 2006, Detroit, via the non-profit service corporations, had eight pay-fixed, receive-

---

[70] Act of Mar 1, 2002, No. 34, 2001 § 141.2317, § 317(3) (codified at Mich. Comp. Laws Ann. §§ 141.2101–141.2821 (2018).

[71] Act 34 § 7.

[72] Mich. Comp. Laws Ann. § 141.2317 § 317(5) (2018).

[73] Mich. Comp. Laws Ann. § 141.2317 § 317(4) (2018).

[74] Mich. Comp. Laws Ann. § 141.2317 § 317(6) (2018).

[75] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 12.

[76] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 12 ("Under the swaps, if the floating interest rates exceeded a certain rate, the Swap Counterparties would make payments to the Service Corporations.  But if the floating interest rates sank below a certain rate, the Service Corporations would make payments to the Swap Counterparties.").

[76] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 12.

The Independent Investigator's Final Investigative Report

variable interest rate swap contracts with a total notional amount of $800,000,000,[77] which were also insured by the same insurance companies underwriting protection against a default under the COPs.

However due to the Great Recession, Detroit, together with many other municipalities,[78] including Puerto Rico, faced steep financial consequences from declining interest rates, which dramatically impacted the price of both Detroit's COPs and swap instruments. A default on Detroit's COP was characterized as an "event of default" or a "termination event"[79] under the swap agreements that could be called anytime by the swap counterparties. But, despite such contract power, the Detroit Swap Counterparties opted to negotiate an alternative arrangement with Detroit before taking any further action. In June 2009, Detroit and the Detroit Swap Counterparties signed a new agreement, called a "collateral agreement."[80]

The collateral agreement changed some major provisions of the original swap agreements, such as eliminating the "additional termination event" and the potential for an immediate demand for a termination payment; two factors that could immediately and negatively affect Detroit's ability to comply with its financial obligations in the event that any macroeconomic changes occurred that could result in a downgrade of Detroit's credit rating. However, Detroit agreed to increase the interest rate applicable to the swap agreements and to new termination events that could result in any downgrade of the COP credit rating. Furthermore, the collateral agreement also set up a payment structure that would provide an additional payment assurance to the swap counterparties, given that the revenues to fund the swap payments were to come from the gaming tax payments owed to Detroit.[81]

The new swap payment structure created by the collateral agreement consisted of two separate accounts, which would operate as a guarantee to the Detroit Swap Counterparties for any event of default. Events of default occurred in March 2012, when Detroit's COPs were downgraded, and in March 2013, when an emergency manager was appointed for Detroit.[82]

The Detroit Swap Counterparties opted not to terminate the swaps and require that payment be made in full. But because this coincided with Detroit filing its Chapter 9 proceeding, Detroit was able to exert pressure on the Detroit Swap Counterparties to reach a better settlement concerning payment of swap termination fees. This was for two reasons that we set out in more

---

[77] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 12.

[78] Municipal bond default rates spiked in 2008 as 162 issuers defaulted on $8.2 billion in municipal bonds. *See also,* U.S. Gov't Accountability Office, GAO-12-698, *Municipal Securities: Options for Improving Continuing Disclosure*, 19 (July 31, 2012).

[79] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 12.

[80] *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 13.

[81] *See In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 13 ("The City agreed to make the swap payments through a 'lockbox' arrangement and to pledge certain gaming tax revenues as collateral.").

[82] *See In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945, 14.

detail below: *first,* the city was able to argue that the debt incurred by the swap agreements was not authorized pursuant to Michigan's Act 34; and *second*, it was able to obtain the support of the bankruptcy judge in relation to this argument.

Detroit's main argument in the Chapter 9 proceedings, which was supported by the insurance companies involved in the swap agreements, relied on the fact that the service contracts entered into by the service corporations in connection with the issuance of COPs for the pension funds bonds, were not future service contracts, but rather a means for Detroit to issue debt not authorized under Detroit's regulation and Michigan's Act 34.  This is because the service corporations, even though they were parties to the service and swap agreements, were special purpose vehicles created solely for the sham purpose of entering into such instruments so that Detroit could characterize its payments as payments for future services by the service corporations rather than for debt actually incurred.[83]  Also, the swap agreements contained a provision by which, Detroit pledged funds from its casino tax as collateral for these obligations, which could potentially violate Michigan's Gaming Control and Revenue Act.[84]  In light of these arguments, Detroit sought to have the swap obligations declared void if no settlement was reached under favorable conditions for Detroit and its taxpayers.

But, another important factor to consider is the context in which Detroit was able to achieve the settlement it did, with the Detroit Swap Counterparties. The Detroit Swap Counterparties and Detroit managed to reach a settlement that was denied by the bankruptcy judge due to concerns that the terms of settlement were not fair to Detroit.  The judge played an active role in the settlement negotiations by indicating that, if no favorable settlement was reached between the parties, then Detroit's argument that the swaps were invalidated (for the reasons set out above) had "substantial merit," and its claim thus had a "reasonable likelihood of success."[85]

Detroit made it clear to the Detroit Swap Counterparties that it was prepared to and would pursue litigation immediately if a favorable settlement was not reached.  Detroit was further armed with the court's statements that Detroit "is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act and the Bankruptcy Code" as well as that Detroit "is reasonably likely to succeed on its challenge to the swap agreements under PA 34."[86]  As a result of its demonstrated willingness and ability to pursue every option available against the Detroit Swap Counterparties, Detroit was able to secure a materially better deal from the Detroit Swap Counterparties than it had been at any time before or after its bankruptcy filing.[87]

---

[83] *See In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846, Adv. Pro. No. 14-04112 (Bankr. E.D. Mich.), ECF No. 73, 4.

[84] Michigan Gaming Control and Revenue Act (1996).

[85] *See* Motion of Debtor, 16, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 2806.

[86] *See* Motion of Debtor, 16, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 2806.

[87] *See* Motion of Debtor, 27-30, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 2806.

### (d)    Comparison with Puerto Rico

There are some similarities between the swap exposures of Detroit and Puerto Rico. Both Detroit and Puerto Rico are municipal issuers that experienced significant financial hardship during the Relevant Period. Both financed municipal operations by issuing municipal bonds that paid variable interest rates to investors, and used swap agreements to hedge interest rate risks.

As stated above, when Detroit filed its Chapter 9 petition, its total liabilities exceeded $18 billion, which consisted of $11.9 billion in unsecured debt and $6.4 billion in secured debt.[88] Detroit's unsecured debt at the time the city filed for its Chapter 9 proceeding was $3.5 billion in unfunded pension obligations, $651 million in general obligation bonds, $1.4 billion for COPs related to pensions, and $346.6 million for swap contract liabilities related to these COPs.[89] The swap termination fees for these swap contracts were estimated at approximately $228 million.

The Issuers' Swap exposure was much higher than Detroit's, as was the Issuers' total debt. In fact, as of January 1, 2009, the Issuers' Swap portfolio (with a notional amount of approximately $9 billion) was roughly half of Detroit's entire indebtedness. As of the filing of the Title III Proceedings, the three major pension systems had approximately $49 billion of pension liabilities.[90] In addition, the majority of the Issuers' total public debt was outstanding bonded debt, comprising an average of 86% of total public debt between 2005 and 2014.[91] During that time, the amount of total public debt rose from about $39.2 billion to about $67.8 billion, further escalating to $74.3 billion by 2017.[92]

With such a large portfolio (and total debt), it is reasonable to expect that Puerto Rico would contract with different and additional counterparties than Detroit. Detroit's swap agreements were only executed with two counterparties (UBS and Merrill Lynch Capital Services), whereas Issuers executed 77 Swaps with seventeen different counterparties.

Since the Detroit Swap Counterparties were the only parties to the swap transactions that were subject to default when Detroit was close to filing for bankruptcy, it was in their interest to work with Detroit to find a viable solution that would continue to guarantee payment under the agreements. In the case of the Issuers, due to the large numbers of Swap agreements in place and the effects of the Great Recession, Swap counterparties were in a position to call for termination of the agreements for any event of default, such as the downgrade of the credit ratings assigned to Puerto Rico-Related Bonds. The continued debt issuances by the Issuers, backed by the statutory authorization for COFINA proceeds to pay termination fees and any obligations under

---

[88] *See* Opinion Regarding Eligibility, 7–8, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846 (Bankr. E.D. Mich.), ECF No. 1945 for detailed description of Detroit's debt.

[89] *See* Opinion Regarding Eligibility, 7–8, *In Re City of Detroit v. Detroit General Retirement System Service Corporation*, No. 13-53846, ECF No. 1945 (Bankr. E.D. Mich.).

[90] Commonwealth of P.R., *Financial Information and Operating Data Report*, 222 (Dec. 18, 2016).

[91] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 13 (2017).

[92] Gov't Accountability Office, GAO-18-160, *U.S. Territories: Public Debt Outlook*, 13 (2017).

Swap agreements, and Puerto Rico's inability to keep posting collateral in order to maintain Swap obligations, left the counterparties with little incentive to negotiate termination fees.

Unlike the counterparties to the Issuers' Swaps, the Detroit Swap Counterparties were amenable to negotiation, and in fact were creative in setting a different structure that would permit Detroit to continue making its payments, instead of incurring extraordinary termination fees.

In this sense, the fact that Detroit filed for Chapter 9 bankruptcy and was able to discuss the collateral agreements within Detroit's bankruptcy proceeding, and with the support of the bankruptcy judge, resulted in a significant advantage to the municipality. Judge Rhodes did not hide his opinion on the termination fee amounts and clearly stated that if Detroit were to bring a claim against the Detroit Swap Counterparties to challenge the terms of the swap agreements and the collateral agreements, it would have a high probability of voiding those contracts under Michigan Gaming Control and Revenue Act and Michigan's Act 34.[93]

## G.   **Subsequent Federal Laws and Regulations**

Before the Great Recession, the CFTC, MSRB and SEC did not regulate swap transactions in general. As raised by SEC in a specific report on the municipal securities market, most of the problematic practices that market participants identified with respect to municipal issuers and derivative products pre-dated the Dodd-Frank Act.[94] In fact, until the passage of that statute in 2010, municipal advisors were generally not required to register with SEC or any other federal, state, or self-regulatory entity with respect to their municipal advisory activities.[95] Additionally, municipal advisors did not have to adhere to standards for training, qualification, or conduct, including the treatment of conflicts of interest.[96] According to CFTC, regulators were not able to assess and quantify the counterparty credit risk of large banks and swap dealers.[97]

In the absence of federal oversight, the GASB attempted to address this gap when it issued its Statement No. 53, which sought to address the recognition, measurement, and disclosure of information regarding derivative instruments entered into by state and local governments. The requirements of Statement No. 53 were effective for financial statements for periods beginning after June 15, 2009. Statement No. 53 requires that the fair value of derivatives be reported in a separate description in the financial statements, and not only in footnotes. The fact that Statement No. 53 creates an accounting obligation for Puerto Rico to disclose and explain its swap transactions reflects, from an accounting perspective, a need of additional information regarding derivative transactions, which have a high impact on any municipal issuer's liabilities.

---

[93] Michigan's Revised Municipal Finance Act, Act 34 (2001).

[94] *See also,* U.S. Gov't Accountability Office, GAO-12-698, *Municipal Securities: Options for Improving Continuing Disclosure*, 96 (2012).

[95] *See* Sec. & Exch. Comm'n, *Registration of Municipal Advisors, Final Rule*, SEC Release No. 34-70462, File No. S7-45-10, 16 (Jan. 2014).

[96] *See* Press Release, Sec. & Exc. Comm'n, *SEC Approves Registration Rules for Municipal Advisors* (Sept. 18, 2013).

[97] *See* Commodity Futures Trading Comm., *Swaps Regulation Version 2.0: An Assessment of the Current Implementation of Reform and Proposals for Next Steps*, *White Paper*, iii (2018).

The Independent Investigator's Final Investigative Report

The first step toward federal regulation occurred in April 2009, when the MSRB issued a detailed report on unregulated market participants, including financial advisory firms, calling special attention to the need for an expansion of its regulatory powers,[98] especially in light of the complex derivatives products and intricate investment strategies in practice in the municipal securities marketplace.[99]

> And yet, despite a thin patchwork of state and local laws, ***the majority of financial advisors is unregulated and operates in the public sphere without any legal standards or regulatory accountability.*** The MSRB does not have authority to regulate activities of any non-dealer professionals in the municipal finance market. These include independent financial advisors and swap advisors (collectively, "financial advisors"), and brokers of guaranteed investment contracts and other investment products purchased with proceeds from municipal bond offerings ("investment brokers").[100]

According to MSRB data, in 2008, approximately 70% of the total volume of municipal debt was issued with the assistance of financial advisors. While only 27% of those financial advisors were registered with MSRB as dealers,[101] they were nevertheless subject to MSRB Rules as broker-dealers or municipal securities dealers. This includes Rule G-23, specifically, which seeks to minimize the actual or apparent conflict of interest when a municipal securities professional acts both as an advisor and as an underwriter in these types of issuances by requiring disclosure of the same. This rule would have impacted certain bond issuances for Issuers, in which banks were leading the underwriting process and also paying for Swap termination fees.

The MSRB report also explains the role of the swap advisors in the municipal securities derivatives market, taking into consideration the complexity of derivatives products and the relative lack of knowledge on the municipal issuers' side with respect to these transactions,

---

[98] A dual regulatory structure to be employed between the SEC and the MSRB was the alternative suggested on the report. *See Unregulated Municipal Market Participants: A Case for Reform*, MSRB, 1 (2009)                    http://www.msrb.org/~/media/Files/Special-Publications/MSRBReportonUnregulatedMarketParticipants_April09.ashx?la=en.

[99] *See Unregulated Municipal Market Participants: A Case for Reform*, MSRB, 1 (2009) http://www.msrb.org/~/media/Files/Special-Publications/MSRBReportonUnregulatedMarketParticipants_April09.ashx?la=en. ("The municipal securities marketplace has evolved from one in which states and municipalities offered plain-vanilla, fixed rate bonds to finance specific projects into a market that involves the use of complex derivative products and intricate investment strategies.").

[100] *See Unregulated Municipal Market Participants: A Case for Reform*, MSRB (2009) http://www.msrb.org/~/media/Files/Special-Publications/MSRBReportonUnregulatedMarketParticipants_April09.ashx?la=en (emphasis added).

[101] According to MSRB data, in 2008, approximately 50% of the total financial advisory business was conducted by the top ten firms in terms of offering volume, only three of which were registered dealers. *See Unregulated Municipal Market Participants: A Case for Reform*, MSRB, 9 (2009) http://www.msrb.org/~/media/Files/Special-Publications/MSRBReportonUnregulatedMarketParticipants_April09.ashx?la=en.

including about interest rate risk and termination risk.[102]  With respect to this concern, based on the interviews we conducted, when GDB first started executing Swaps, its staff requested special training from the first swap advisor hired on Swap transactions, and also received pitch books from large banks, such as UBS and Morgan Stanley.

In response to concerns raised by the MSRB report, on September 18, 2013, SEC unanimously voted to adopt Section 975 of Title IX of the Dodd-Frank Act, which amended Section 15B of the Exchange Act[103] by characterizing municipal advisors as a new class of regulated persons.  Section 975 of the Dodd-Frank Act protects municipalities, taxpayers, and investors from conflicted advice and unregulated advisors, requiring SEC to establish a registration regime for municipal advisors, by imposing certain record-keeping requirements on such advisors,[104] and by recognizing that a fiduciary duty exists between a municipal advisor and a municipal issuer.[105]  The goal was to mitigate the main concerns raised in the MSRB report, including undisclosed conflicts of interest, advice rendered by financial advisors without adequate training or qualification, and failure to place the duty of loyalty to municipal issuers ahead of the advisors' own interests.

With respect to CFTC rules, they establish business conduct standards and reporting and recordkeeping requirements for swap dealers governing communications, dealing activities and, in some cases, advisory activities.  These regulatory requirements tend to be more stringent for swap dealers dealing with "special entities" like municipal issuers.  Specifically, when acting as counterparties to special entities, swap dealers and major swap participants must have a reasonable basis to believe that a special entity is represented during transactions by qualified independent representative or fiduciary.[106]

---

[102] *See Unregulated Municipal Market Participants: A Case for Reform*, MSRB, 10 (2009) http://www.msrb.org/~/media/Files/Special-Publications/MSRBReportonUnregulatedMarketParticipants_April09.ashx?la=en. ("To assist issuers in understanding the characteristics, risks, and potential benefits of these products, many firms developed expertise as swap advisors.").

[103] Under Rule 15 U.S.C. § 78o-4(a)(1)(B), it is unlawful for any municipal advisor to provide certain advice to or on behalf of, or to solicit, municipal entities or certain other persons without registering with the SEC.  In addition, as part of the category of "regulated persons" under the Exchange Act, a person is deemed to have a statutory fiduciary duty to any municipal entity for whom such person acts as a municipal advisor. *See* Press Release, Sec. & Exch. Comm., *Registration of Municipal Advisors, Final Rule*, SEC Release No.  34-70462, File No.  S7-45-10, 6 (Jan. 2014).

[104] The new set of rules that SEC approved became effective as of October 1, 2010, and consisted of interim temporary rules and forms that enabled municipal advisors to register under a temporary registration regime until the applicable compliance date for permanent registration.  *See Registration of Municipal Advisors, Final Rule*, SEC Release No.  34-70462, File No.  S7-45-10, 1 (Jan. 2014).

[105] *See* 15 U.S.C. § 78o-4(c), § 15B(c)(1) ("A municipal advisor and any person associated with such municipal advisor shall be deemed to have a fiduciary duty to any municipal entity for whom such municipal advisor acts as a municipal advisor, and no municipal advisor may engage in any act, practice, or course of business which is not consistent with a municipal advisor's fiduciary duty or that is in contravention of any rule of the Board.").

[106] *See Regulatory Framework for Municipal Market Derivatives*, MSRB, 2 (2018), http://www.msrb.org/~/media/Files/Resources/MSRB-Brief-Regulatory-Framework-for-Municipal-Market-Derivatives.ashx?la=en.

In addition, a swap dealer who is acting as an advisor to a municipal entity must act in the best interest of the municipal entity and tailor to its needs or characteristics.[107]  Alternatively, the swap dealer must disclose to the municipal entity that it is not undertaking to act in municipal entity's best interests and refrain from providing opinions as to whether the special entity should enter into the recommended swap or strategy.

As an example, the ISDA, as part of an initiative to implement best practices in the swap industries as a result of the changes implemented by the Dodd-Frank Act, issued the ISDA August 2012 D-F Protocol ("ISDA Protocol") to amend any existing master agreements and to allow end-users to make representations that enable a swap dealer to trade with them.  The ISDA Protocol is not required by law, but swap dealers commonly request its use when negotiating with special entities because it provides specific representations to establish the existence of a qualified independent representative or fiduciary, and additional swap dealer protections in the form of permissible end-user safe harbor representations.

The relative lack of federal regulatory supervision about municipal use of swaps until 2010 is relevant in the context of the Swaps that the Issuers entered into, given that some of the earliest Swaps we identified were executed in 2004 and Act 39, the first legislation[108] enacted by Puerto Rico to regulate swaps,[109] was dated 2005, with a limited scope to govern derivatives agreements solely negotiated and executed by Puerto Rico and PBA.

## H.     Conclusions and Recommendations

Although the regulatory landscape has evolved since the Issuers entered into their Swaps during the Relevant Period, the evidence we reviewed about the Issuers' structuring, executing, monitoring, and terminating of the Swaps indicates that Puerto Rico's political branches should consider amending Act 39:

1.     To apply to Issuers beyond merely Puerto Rico and PBA, such as GDB, the Public Utilities, COFINA, and HTA;

2.     To count potential termination fees, in addition to interest, for all Issuers' Swaps toward the Constitutional Debt Limit; and

3.     To require internal and external reporting on swap exposure, including potential collateral postings and early termination liabilities arising from changes in credit ratings.

---

[107] See 17 C.F.R. § 23.450(b)(1).
[108] Puerto Rico approved a resolution, Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, on September 30 2004, specifically to authorize Puerto Rico to enter into Swaps with respect to the Puerto Rico's $447,875,000 Public Improvement Refunding Bonds, Series 2004B.
[109] A total of nine swap agreements were executed in 2004.

# PART XIV

# PUERTO RICO'S LACK OF A CLEAR MECHANISM FOR VALIDATING PUERTO RICO-RELATED BONDS BEFORE THEY ISSUE

# PART XIV
# PUERTO RICO'S LACK OF A CLEAR MECHANISM FOR VALIDATING PUERTO RICO-RELATED BONDS BEFORE THEY ISSUE

Several US jurisdictions have statutes, rules or regulations that clearly empower their courts to rule on the validity, enforceability or constitutionality of a proposed bond offering ("Pre-Issuance Validation Mechanisms").   If properly used, Pre-Issuance Validation Mechanisms can limit imprudent debt issuances by stopping them before they hit the market. Pre-Issuance Validation Mechanisms can also increase investor demand for, and confidence about, the sub-set of proposed bonds that a legal court validates prior to issuance, by supplying comfort that the bonds do not have fundamental defects.[1]

Pre-Issuance Validation Mechanisms are court procedures.   As such, they require litigants to expend some degree of resources to obtain a ruling.   But if used wisely, they also dispense with the need for stakeholders to expend potentially greater resources litigating core

---

[1] *See, e.g.*, *State ex rel. Pension Obligation Bond Comm. v. All Persons Interested in Matter of Validity of California Pension Obligation Bonds to Be Issued*, 152 Cal. App. 4th 1386, 1397, 62 Cal. Rptr. 3d 364, 370 (2007) ("Within their proper scope . . . validation actions serve an important function in eliminating legal uncertainty that could impair a public agency's ability to operate, market bonds, or the like."); *Friedland v. City of Long Beach*, 62 Cal. App. 4th 835, 843, 73 Cal. Rptr. 2d 427 (1998) ("[A] key objective of a validation action is to limit the extent to which delay due to litigation may impair a public agency's ability to operate financially. A validation action fulfills a second important objective, which is to facilitate a public agency's financial transactions with third parties by quickly affirming their legality. . . . The fact that litigation may be pending or forthcoming drastically affects the marketability of public bonds.") (internal citations and quotation marks omitted).

The Independent Investigator's Final Investigative Report

questions about bonds that could ultimately be deemed void or valueless after having been sold to investors.[2]

California's pre-issuance review of a $960 million pension obligation bond offering that was proposed in 2004, but ultimately invalidated ("CA Pension Obligation Bonds"), demonstrates these principles. California's Pre-Issuance Validation Mechanism was not explicitly designed for municipal bond issuances, but had developed a body of precedent that applied it to such cases. Stakeholders used that Pre-Issuance Validation Mechanism to test the CA Pension Obligation Bonds before they issued. California avoided issuing nearly $1 billion of invalid debt instruments as a result.

Unlike California, Puerto Rico does not have a formal Pre-Issuance Validation Mechanism. Instead, Puerto Rico has two types of judicial review mechanisms that, under the right circumstances and at the right time, could have been adapted to obtain a measure of early certainty regarding the validity, enforceability or constitutionality of certain Puerto Rico-Related Bonds before they issued. This would have been so if, and *only* if, the party requesting that review could have convinced the court that there was a true dispute to resolve (a requirement that legal professionals refer to as an "actual case or controversy"). Puerto Rico's declaratory judgment rule is one such mechanism. Puerto Rico's writ of mandamus procedure is the other.

As we explain below in Part XIV.B.3, neither of those two options would have been a silver bullet. The ability to use either procedure would have turned on the precise factual circumstances that the litigants would have presented to the Puerto Rico courts. Indeed, reasonable minds can differ regarding the extent to which a litigant could have demonstrated an actual case or controversy, and by what time. Ultimately, all of the Puerto Rico-Related Bonds remained untested until after Puerto Rico's fiscal crisis.[3]

We conclude that if Puerto Rico had a Pre-Issuance Validation Mechanism during the Relevant Period that clearly applied to proposed issuances of municipal bonds, then Puerto Rico could either have: (i) avoided issuing at least some of the bonds that litigants have since argued are invalid, unenforceable, or unconstitutional (specifically, the ERS Bonds, which are, in material respects, similar to the CA Pension Obligation Bonds); or (ii) confirmed the validity of those bonds, and thus prevented at least some of the post-crisis litigation. For that to be the case, however, the Pre-Issuance Validation Mechanism would have needed to incorporate certain elements. In particular, it would have needed to: (i) be mandatory, such that the relevant Issuer would have been required to proceed through the Pre-Issuance Validation Mechanism before it could go to market; or (ii) if discretionary, then available for non-government actors to institute. We recommend that Puerto Rico's legislature consider adopting this type of clear Pre-Issuance Validation Mechanism. *See* Part XIV.C, below.

---

[2] *See, e.g., Friedland*, 62 Cal. App. 4th at 838 (1998); *King Cty. v. Taxpayers of King Cty.*, 133 Wash. 2d 584, 593, 949 P.2d 1260, 1265 (1997); M. David Gelfand, State & Local Government Debt Financing § 14:05, 14–17 (1994).

[3] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico* (*The Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC et. al.*), No. 17-00213 (D.P.R. July 21, 2017) (Complaint allegation of ERS); *see also* Part VII.

The Independent Investigator's Final Investigative Report

A.     **The Pre-Issuance Invalidation of the CA Pension Obligation Bonds Demonstrates the Value of Early Certainty for Municipal Bond Issuances**

California is one of several states with a statutory Pre-Issuance Validation Mechanism.[4] Examples of issues that arise in such proceedings include whether the proposed issuance would violate any constitutional debt limits, whether it must be routed through a referendum, whether it resulted from authority that was properly delegated to the municipality, whether the bond issuance actually serves a public purpose (as it must), and whether the proposed issuance resulted from a statute that was somehow defective.[5]

Procedurally, the Pre-Issuance Validation Mechanisms vary by jurisdiction, but the statutes typically incorporate several components:

- The creation of a right to initiate the proceeding, and the conferral of that right upon specified stakeholders (a concept known as "standing");[6]

- The identification of the court in which the proceeding must be filed, as well as the form of initiating document (typically, a complaint);[7]

- A description of the types of questions that the court is empowered to resolve;[8]

---

[4] *See, e.g.,* Ala. Code § 11–81–220, *et seq.* (2018); Cal. Civ. Proc. Code §§ 860–871 (2018); Fla. Stat. Ann . § 75.01, *et seq.* (2018); Ga. Code § 50–17–25 (2018); Ky. Rev. Stat. § 66.191 (2018); La. Rev. Stat. § 13:5121, *et seq.* (2018); Miss. Code § 31–15–5, *et seq.* (2018); Ohio Rev. Code § 133.07, *et seq.* (2018); Wash. Rev. Code § 7.25.020, *et seq.* (2018); W. Va. Code § 13–1–25, *et seq.* (2018).

[5] *See, e.g.*, *City of Bakersfield v. W. Park Home Owners Ass'n & Friends*, 4 Cal. App. 5th 1199, 1204, 209 Cal. Rptr. 3d 346, 350 (Ct. App. 2016) (determining that bonds would not violate constitutional debt limit); *Redevelopment Agency v. Shepard*, 75 Cal. App. 3d 453, 456, 142 Cal. Rptr. 212, 213 (Ct. App. 1977) (finding that a redevelopment plan involving a proposed revenue bond issuance involved a substantial public purpose, did not constitute an unconstitutional delegation of legislative power, and did not require a referendum); *see also King Cty. v. Taxpayers of King Cty*., 133 Wash. 2d 584, 593, 949 P.2d 1260, 1265 (1997) (adopting a three-issue formulation for "validity" of municipal bonds that permits courts to consider whether: (i) there is a proper delegation of authority to the municipality to issue the bonds for the particular purpose; (ii) the statute authorizing the bonds was constitutionally enacted; and (iii) whether the bonds serve a public and corporate purpose, and not a private purpose).

[6] *See, e.g.*, Cal. Civ. Proc. Code § 863 (2018).  Most jurisdictions empower the issuer's representatives, as well as other government officials, to seek pre-issuance validation.  Other jurisdictions, such as California, more broadly empower any member of the general public to do so.

[7] *See, e.g.*, Fla. Stat. Ann. § 75.01, *et seq.* (2018) ("[A] complaint shall be filed in the circuit court in the county or in the county where the municipality or district, or any part thereof, is located…."); Ga. Code § 50–17–25 (2018) (requiring the district attorney to commence an action in the name of the state in the Superior Court of Fulton County).

[8] Depending upon the jurisdiction, the statute may make pre-issuance review available simply to ascertain the validity of the issuance overall, rather than restricting the procedure to specific types of validity questions.  *Compare* Fla. Stat. Ann. § 75.01 (2018) ("Circuit courts have jurisdiction to determine the validation of bonds and certificates of indebtedness and all matters connected therewith"), *with*  Ala. Code § 11-81-221 (2018) ("[The governing body of the issuer may] determine its authority to issue such obligations and the legality of all proceedings had or taken in connection therewith, the validity of the tax or other revenues or means provided for the payment thereof and the validity of all pledges of revenues and of all covenants and provisions contained in any such resolution by filing a complaint . . . .").

The Independent Investigator's Final Investigative Report

- A requirement that the general public be properly notified of both the proposed bond issuance and the pending validation proceeding,[9] typically via publication in a newspaper of general circulation;[10]

- An identification of the period of time during which interested parties may object to the proposed debt issuance and potentially be heard;[11]

- The empowerment of the designated court to adjudicate the merits of the respective positions offered; and

- Permission to appeal, pending satisfaction of applicable temporal and procedural requirements.[12]

If the notice period outlined in the steps above closes without any objections, then certain jurisdictions (like California) empower their designated court to enter a judgment that validates the proposed offering by default, without any litigation or contested hearing.[13] The California statute further forecloses any subsequent challenge to, or reconsideration of, that outcome.[14]

Municipal issuers in California generally do not seek to use the Pre-Issuance Validation Mechanism unless a bond offering is novel or atypical.[15] This is primarily because California's procedure is voluntary, rather than compulsory. That is, the statute does not require any type of bond to be validated before it issues.[16]

A unique offering arose in 2004, when California's state legislature authorized the proposed CA Pension Obligation Bonds with the disclosed purpose of helping to fund employee pensions.[17] As direct obligations of the state, the CA Pension Obligation Bonds were arguably subject to the state's constitutional debt limit provision that applied to obligations created by the state legislature.[18] That provision prohibits the state legislature from "creating any indebtedness greater than $300,000 unless that indebtedness has been approved

---

[9] *See, e.g.*, Fla. Stat. Ann. § 75.06 (2018).

[10] *See, e.g.*, Fla. Stat. Ann. § 75.06 (2018); Wash. Rev. Code § 7.25.020 (2018); Ga. Code § 50-17-25 (2018).

[11] *See, e.g.*, Wash. Rev. Code Ann. § 7.25.020 (2018); Cal. Civ. Proc. Code § 862 (2018).

[12] *See, e.g.*, Fla. Stat. § 75.08 (2018); Ky. Rev. Stat. § 66.191 (2018).

[13] According to a report from the law firm Orrick, Herrington & Sutcliffe LLP, as of 2006, default judgments had been obtained for every city and county pension obligation bond issuance for which a debt validation action had been brought. *See* Roger L. Davis, *An Introduction to Pension Obligation Bonds and Other Post-Employment Benefits* 52 (2006).

[14] *See* Cal. Civ. Proc. Code § 870(a) (2018); *accord, e.g.,* Miss. Code. Ann. § 31-13-5 (2018) ("If no written objection is filed to the validation . . . by any taxpayer to the issuance of same, then the validation decree shall be final and forever conclusive from its date, and no appeal whatever shall lie therefrom.").

[15] *See* Mark Campbell, *Validation Actions and Public Finance*, 1-2 (2000).

[16] *See generally* Cal. Civ. Proc. Code §§ 860–871 (2018).

[17] *See State ex rel. Pension Obligation Bond Comm. v. All Persons Interested in Matter of Validity of California Pension Obligation Bonds to Be Issued*, 152 Cal. App. 4th 1386, 1390, 62 Cal. Rptr. 3d 364, 365 (2007).

[18] *See* Cal. Const. Art. XVI, § 1

The Independent Investigator's Final Investigative Report

by a two-thirds vote of the legislature and a majority vote of the people."[19]

The state did not authorize the CA Pension Obligation Bonds with a two-thirds vote or a public referendum. Instead, on October 22, 2004, the state's Pension Obligation Bond Committee ("CA Committee") filed an action seeking a judicial determination that the CA Pension Obligation Bonds were exempt from the two-thirds vote and referendum requirement. Specifically, the CA Committee argued that the court should rule that where, as was the case, the state legislature incurred debt to fund "obligations imposed by law," such debt should be exempt from the constitutional debt limit that applies to direct obligations of the state (just as courts had ruled that debt that California municipalities incurred to fund "obligations imposed by law" were exempt from the constitutional debt limit that applied to municipalities).[20]

The CA Committee published its notice, after which the Fullerton Association of Concerned Taxpayers ("FACT") objected to the proposed issuance. FACT argued that the CA Pension Obligation Bonds would violate California's Constitution because, even if the "obligations imposed by law" exception applied to debt authorized by the state legislature, it would not apply given the particular facts of the case.[21] Following a contested hearing, the trial court agreed.[22] It entered a judgment that invalidated the proposed issuance on November 30, 2005.[23] The matter was finally resolved nearly three years after the complaint was filed, when an appellate court affirmed the judgment.[24]

The CA Pension Obligation Bond proceedings illustrate the benefits of Pre-Issuance Validation Mechanisms. Using its own mechanism, California avoided issuing nearly $1 billion of bonds that would have violated the state's constitutional debt limit. If issued and subsequently challenged, then the CA Pension Obligation Bonds would essentially have been deemed worthless; the investors who purchased them would have suffered losses; and the state would have incurred the expenses associated with the issuances, as well as subsequent litigation.

**B.      Puerto Rico Law Does Not Clearly Provide a Means of Obtaining Pre-Issuance Judicial Review for Municipal Bonds**

Puerto Rico does not have a Pre-Issuance Validation Mechanism. It does, however, recognize two types of court procedures through which early judicial review of certain Puerto Rico-Related Bonds could arguably have been obtained during the Relevant Period: (i) the declaratory judgment action; and (ii) the writ of mandamus proceeding. These are, however, potential solutions that would have required risk and creativity, and whether a Puerto Rico court would ultimately have decided to entertain either form of review would have turned on the precise circumstances presented, as well as the timing of the court filing. There are no published cases in Puerto Rico reflecting that either mechanism has ever been used to test the validity, constitutionality, or enforceability of a proposed municipal bond issuance, and reasonable minds can differ regarding whether a Puerto Rico court might ultimately have chosen to hear any such dispute. It is thus plain that neither a declaratory judgment action nor a writ of mandamus is a sufficiently clear substitute for a formal Pre-Issuance Validation

---

[19] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1390.

[20] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1390.

[21] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1390 (internal quotation marks omitted).

[22] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1390.

[23] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1390.

[24] *See Pension Obligation Bond Comm.*, 152 Cal. App. 4th, 1408.

The Independent Investigator's Final Investigative Report

Mechanism.

    **1.**    **At Least Some GO Bondholders Arguably Had Standing to Obtain a Declaratory Judgment Regarding Certain COFINA-Related Issues As Soon As COFINA Began Issuing the COFINA Bonds in July 2007**

    Like most US jurisdictions, Puerto Rico permits an interested party to obtain in appropriate circumstances a court judgment that adjudicates the relative rights and obligations of certain parties, without awarding damages.[25]   This relief is known as a "<u>declaratory judgment</u>," and Rule 59.2 of the Puerto Rico Rules of Civil Procedure establishes the standard for obtaining it.  Pursuant to that rule, every person "whose rights, status or other legal relations are affected by any statute … may apply for a decision on any difference in the validity of said statutes … and also a declaration of rights, status or other legal relations derived therefrom."[26]

    The focus on "rights, status, or other legal relations [that] *are* affected" is key.  Puerto Rico courts do not have the power to render advisory opinions and Rule 59.2 does not abrogate that limitation.[27] Above all else, there must be an ***actual*** dispute between the parties; not a theoretical one.  An actual dispute exists only if: (i) the allegations establish a substantial case or controversy between parties with adverse legal interests; and (ii) that dispute is sufficiently real and timely to justify the entry of a declaratory judgment.[28]   At a bare minimum, then, a

---

[25] *See* P.R. Rules of Civ. Proc. 59.1 (conferring on "[t]he Court of First Instance" in Puerto Rico the power to "authority to declare rights, status and other legal relationship"); *see also* P.R. Rules of Civ. Proc. 59.2 (setting the standard for so doing).  Puerto Rico courts may issue declaratory judgments despite the availability of alternative remedies.  *See* P.R. Rules of Civ. Proc. 59.1 (providing that declaratory judgments may be pursued "even though another remedy is or may be instigated.").

[26] P.R. Rules of Civ. Proc. 59.2(a); *see, e.g., P.P.D. v. Gobernador*, No. O-81-150 R-81-118, 1981 WL 176503 (P.R. May 8, 1981) (interpreting electoral statute and declaring procedure for filling vacant position where representative had passed away); *Comision Asuntos de la Mujer v. Srio. de Justicia*, No. O-79-213, 1980 WL 138549, * 3 (P.R. Apr. 29, 1980) (declaring criminal procedure rule unconstitutional).

[27] *San Gerónimo Caribe Project v. A.R.Pe.*, 174 D.P.R. 640, 652 (2008); *see also P.P.D. v. Gobernador I*, 139 D.P.R. 643, 675 (1995); *Santiago Ortiz v. Administración de Corrección*, No. BBD2007G0017, 2008 WL 2130450, 2 (P.R. Cir. Mar. 31, 2008) (declining to enter declaratory judgment where prisoner was seeking advisory opinion as to his eligibility for participating in a program); *Rodriguez v. Ramirez*, No. KLAN0400384, 2005 WL 808096, 7 (P.R. Cir. Jan. 21, 2005) (reiterating that declaratory judgments should not be utilized to resolve abstract controversies); *Cardona Alvarez v. Banco Popular de Puerto Rico*, No. I3CI201400458, 2016 WL 886608, * 4 (P.R. Cir. Jan. 29, 2016) (declining to enter declaratory judgment where there was no case or controversy between mortgagor and mortgagee who was seeking to renegotiate agreement); *P.I.P. v. E.L.A.*, 2012 TSPR 111 (P.R. July 6, 2012) (stating that courts can only exercise their judicial function in the presence of actual cases and controversies).

[28] *See, e.g., Rodriguez*, 2005 WL 808096, 7; *see also Sanchez et al. v. Srio. de Justicia et al.*, 2002 TSPR 98 (P.R. June 28, 2002) (holding that citizen-litigants did not have standing to challenge constitutionality of criminal statute pursuant to which they had never been arrested, processed, or charged); *Hernandez Torres v. Hernandez Colon*, No. AC-90-707, 1996 WL 1089977 (P.R. Sept. 16, 1992) (holding that legislator who sought declaratory judgment that law was unconstitutional lacked standing absent allegations of personal harm); *Laboratorio Clinico Irizarry Guasch, Inc. v. Estado Libre Asociado de Puerto Rico*, No. K AC2011-0991, 2013 WL 4037012, * 7 (P.R. Cir. May 31, 2013) (underscoring that declaratory judgment is not available if a dispute is not firmly anchored in specific acts).

stakeholder who seeks a declaratory judgment must incur some harm that is real, imminent, and precise.[29]  This is, as previously noted, the "case or controversy" requirement.

The analysis is fact-intensive and the difference between an actual dispute and a theoretical one is often a matter of degree.[30] If there is an actual dispute, then Puerto Rico's courts recognize a declaratory judgment as the appropriate vehicle through which to, among other things, determine whether an official act or law violates the Puerto Rico Constitution.[31] But this is tempered by Puerto Rico's refusal to allow taxpayers at large to challenge laws or official acts merely because their tax money is used to support them (a concept known as "taxpayer standing").[32]  Puerto Rico's courts view this type of general harm to the citizenry as insufficiently personal to support an actual dispute.[33]  They do, however, recognize an individual taxpayer's right to challenge the application of a taxing statute to that taxpayer.  This includes the taxpayer's right to dispute a specific obligation that has been assessed against that taxpayer in a certain amount, or to pay a particular type of tax that the taxpayer contends is unlawful.[34]

A 2006 challenge to Puerto Rico's interpretation of its SUT underscores the distinction. There, the Puerto Rico Supreme Court recognized the right of certain taxpayer plaintiffs to seek a declaratory judgment determining the appropriate amount of SUT, precisely because the action focused on the specific tax obligations of those plaintiffs.[35]  Puerto Rico had also taken steps to implement its interpretation of the SUT statute, thereby rendering the dispute sufficiently immediate.[36]

These principles, coupled with the evidence considered to date, lead us to conclude that if COFINA had sought a declaratory judgment regarding the constitutionality of its structure, or the validity of its contemplated bond issuances, when COFINA was created on July 5, 2006,

---

[29] *P.I.P. v. E.L.A.*, 2012 TSPR 111.

[30] *See Rodriguez*, 2005 WL 808096, 7; *see also, e.g., Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972) (interpreting analogous statute and finding threat of enforcement of state pollution control act to be sufficiently immediate and real to justify standing for association of car vessel owners as soon as related vessel service facilities opened, notwithstanding state's assurances that it would not yet prosecute any vessel owners); *Laboratorio Clinico Irizarry Guasch*, 2013 WL 4037012, * 7 (finding no case or controversy in clinical laboratories' lawsuit against Puerto Rico regarding constitutionality of law requiring clinical reports to bear specific seals, absent allegation that Puerto Rico had denied plaintiffs their certifications or made efforts to apply the law against their individual interests).

[31] *Cruz Cortes v. Estado Libre Asociado de Puerto Rico*, No. ISCI201600427, 2016 WL 8452670, * 5 (P.R. Cir. Nov. 30, 2016) (reiterating that declaratory judgment is the appropriate remedy for the courts to interpret laws and the Puerto Rico Constitution, so long as there exists a case or controversy).

[32] *Compare* P.R. Laws Ann. tit. 32, §3075 (2018) (providing that no court in Puerto Rico has jurisdiction over a case challenging the validity or constitutionality of any law where plaintiff's only interest is that of a taxpayer), *with, e.g.,* Fla. Stats., § 75.01, *et seq*. (2018) (enabling  public entities to seek judicial validation of a proposed bond prior to issuance, and empowering property owners, taxpayers, citizens, and other generally interested persons to intervene and challenge validity); Cal. Code of Civ. Proc. § 860, *et seq*. (2018) (enabling interested persons to initiate proceeding to ascertain validity of proposed bonds, and empowering public agencies to obtain judgments affirming the validity, legality and binding nature of agency financing commitments).

[33] *Romero Barcelo v. E.L.A.*, 2006 TSPR 163 (P.R. Nov. 10, 2006).

[34] *Romero Barcelo*, 2006 TSPR 163.

[35] *Romero Barcelo*, 2006 TSPR 163.

[36] *Romero Barcelo*, 2006 TSPR 163.

then it is unlikely that a Puerto Rico court would have found that dispute to be justiciable.[37] We similarly conclude that, although taxpayers may have been able to challenge the imminent impact of the SUT on them individually at some point after it was authorized on July 4, 2006,[38] investors at large would not have been able to challenge the mere use of the SUT to secure the COFINA bonds (nor could they currently do so). Finally, the GO Bondholders would not likely have had a cognizable dispute regarding any of the foregoing issues at any time prior to July 2007. Each of those challenges would have been insufficiently concrete or immediate to support an actual case or controversy.

The analysis arguably changes as of July 2007, when COFINA issued its Amended and Restated Sales Tax Revenue Bond Resolution. At that point, the interests of at least some GO Bondholders were adversely affected in a real and articulable way. This is because the resolution included a pledge that Puerto Rico would not interfere with the transfer to COFINA of dedicated SUT revenues for distribution to COFINA bondholders. By exempting the SUT revenues from the body of funds that might otherwise have been available to repay the GO bonds, the resolution arguably eroded the rights of the GO Bondholders. The dispute was also sufficiently immediate, because steps had already been taken to authorize the SUT, to create COFINA, and to make the bonds available to the market.[39] The GO Bondholders thus appear to have had an actual dispute regarding the constitutionality of the COFINA Bonds, the relative priority of the GO Bondholders with respect to SUT revenues, or any other harm to their individualized interests.

## 2. A Form of Mandamus Action Could Also Have Served as a Method for Early Judicial Input

One witness who routinely acted as Puerto Rico bond or underwriter counsel over a period of twenty-five years recalled discussing the possibility of pursuing a court remedy known as a "writ of mandamus" (defined below) with lawyers from several Puerto Rico law firms. This witness believes that such a court procedure could have served as a vehicle for testing whether the SUT revenues that backed certain COFINA bonds could be considered available resources under Puerto Rico's Constitution, and thus subject to Puerto Rico's Clawback Provision. In particular, the witness told us that if an obligated actor had refused to perform the act of certifying the COFINA bonds, as he believed that Act 91 of 2006 and relevant COFINA resolutions required, then COFINA could have petitioned the Supreme Court of Puerto Rico for a writ of mandamus to resolve the issue.

Based on the facts uncovered during our investigation, as well as relevant Puerto Rico legal authorities, we agree that Puerto Rico recognized the remedy of a writ of mandamus at the time COFINA issued its first series of COFINA Bonds (Series 2007A). We further

---

[37] P.R. Laws Ann. tit. § 173 (2007).

[38] P.R. Laws Ann. tit. § 1231 (2006).

[39] *Compare, e.g., Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972) (finding that threat of enforcement of state pollution control act justified standing for association of car vessel owners, in part because related vessel service facilities had already opened), *and Romero Barcelo*, 2006 TSPR 163 (finding that plaintiff-taxpayers had standing to challenge SUT as applied to them, in part because the legislature had already taken certain steps to implement the challenged interpretation of the SUT statute), *with, e.g., Laboratorio Clinico Irizarry Guasch*, 2013 WL 4037012, * 7 (finding no case or controversy in clinical laboratories' lawsuit against Puerto Rico regarding constitutionality of law requiring clinical reports to bear specific seals, absent allegation that Commonwealth made any effort to apply the law against plaintiffs' interests).

conclude that interested parties could likely have pursued a writ of mandamus to determine the constitutionality of the COFINA structure.  *See* Part XIV.B.2.b, below.

We also analyzed the separate option of a prohibitory mandamus action.  In particular, we considered whether a GO Bondholder could have petitioned the Supreme Court of Puerto Rico to stop COFINA's Executive Director from performing the requisite certifications for COFINA Bonds to issue, on the basis that the issuances would have violated the constitutional debt limit.  As set forth below in Part XIV.B.2.c, Puerto Rico case law suggests that such an action would have been a colorable means of obtaining early judicial guidance from the Supreme Court of Puerto Rico.

### (a)     Contours of the Writ in Puerto Rico

A writ of mandamus is a court remedy that, if obtained, compels a government official or government agency either to perform,[40] or to refrain from performing, an act that would violate[41] a "ministerial" duty imposed by law.[42]  A Puerto Rico court may also issue the writ to interpret or otherwise clarify the contours of such a duty.[43]  In general, an act will qualify as ministerial if the official is mandated to perform it without judgment or discretion.[44]  Compulsory actions that are procedural or administrative often qualify.[45]

As a remedy of last resort, the writ is only available if the party that seeks it has the legal right to do so (*i.e.*, standing)[46] and there is no other avenue to obtain the requested relief.[47]  The decision to issue the writ also rests within the court's discretion.[48]  Because the writ is often sought in politically-charged situations—for example, by one government official against another, when their respective branches of government have different views about a course of

---

[40] *AMPR v. Srio. Educacion, E.L.A.*, 178 D.P.R. 253, 265 (P.R. Feb. 16, 2010); *see, e.g., Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 444-45 (2006); P.R. Laws Ann. tit. 32 § 3421 (2018) (mandamus may be directed to any natural person, persons, corporation, or lower court).

[41] *Baez Galib y Otros*, 152 D.P.R., 393 (*quoting Baily v. McDougall*, 320 N.Y. Sup.2d 271, 274 (1970); *Matter of New York Post Corporation*, 163 N.Y. Sup. 2d 409, 414 (1957)).

[42] *Badillo Martinez v. Comision Apelativa del Sistema de Administración de Recursos Humanos del Estado Libre y Asociado de Puerto Rico*, 2009 WL 5872869, No. HE-96-09-0614, 2009 WL 5872869, 2 (P.R. Cir. Sept. 24, 2009).  Courts may also recognize a bond resolution authorized by law as imposing a ministerial duty enforceable by a writ of mandamus. *See, e.g., Southtrust Bank of Alabama, Nat'l Ass'n v. Palms of Terra Ceia Bay Cmty. Dev. Dist.*, 560 So. 2d 1205, 1206 (Fla. 2d DCA 1990).

[43] *Acevedo Vila*, 168 D.P.R. at 475 (*quoting Rosati v. Haran*, 459 F. Supp. 1148, 1151 (D.N.Y. 1977)).

[44] *AMPR*, 178 D.P.R., 264.
 *Cordova y Otros v. Camara Representantes*, 171 D.P.R. 789, 812 (P.R. June 29, 2007).

[45] *See, e.g., Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 444-45 (2006) (finding ministerial the administrative act of certifying and forwarding a tax bill to the Governor of Puerto Rico).  Many of the relevant legal authorities focus on distinguishing ministerial acts from non-ministerial ones. *See, e.g., Cordova y Otros v. Camara Representantes*, 2007 TSPR 133 (P.R. June 29, 2007).  The analysis is fact-specific.

[46] *See, e.g., Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 452 (2006).  Relevant aspects of the concept of standing under Puerto Rico law are discussed in more detail above in Part XIV.B.1.

[47] P.R. Laws Ann. tit. 4 § 24s (2018); P.R. Laws Ann. tit. 32 § 3421 (2018); *Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 444-45 (2006);  *Baez Galib y Otros v. Comision Estatal de Elecciones*, 152 D.P.R. 382, 392 (2000) (*citing* D. Rivé Rivera, *El Mandamus en Puerto Rico*, 46 Rev. C. Abo. P.R. 15, 19 (1985)).

[48] *Baez Galib y Otros*, 152 D.P.R., 391.

action[49]—the court must consider the potential impact of the writ on public interests, which must be proportional to the purported ministerial duty.[50] The court must also consider whether the writ would unduly invade the province of the executive or prejudice a third party.[51]

> **(b)** **A Mandamus Action Would Have Been a Plausible Vehicle for COFINA to Test Whether the SUT Revenues that Backed the COFINA Bonds Were Available Resources that Could Be Clawed Back to Benefit the GO Bondholders**

A review of published case law in Puerto Rico suggests that Puerto Rico courts have not previously considered writ petitions that seek to determine the constitutionality of a municipal bond issuance. Nevertheless, it is arguable that, if COFINA's Executive Director had refused to certify the COFINA Series 2007A Bonds as reflected on Exhibit A to the COFINA Series 2007A First Supplemental Resolution (which was authorized by Act 91)[52] due to alleged concerns about the validity of the pledge that purported to exempt the SUT revenues from the body of available resources that could repay the GO Bonds, then COFINA could have obtained such a writ from the Supreme Court of Puerto Rico.

In this regard, *Acevedo Vilá v. Aponte Hernández*, 168 D.P.R. 443, 444-45 (2006), is instructive. There, Governor Acevedo Vilá asked the Puerto Rico Supreme Court to issue a writ of mandamus ordering the President of the Puerto Rico House of Representatives to submit a tax bill to him for his consideration.[53] In the Governor's view, the President of the House had a ministerial duty to certify and forward the bill, so that he could exercise his constitutional power to approve or veto it.[54] He contended that this ministerial duty was triggered as soon as both chambers of the Puerto Rico legislature passed the bill, due to Section 19 of Article III of the Puerto Rico Constitution.[55] In pertinent part, that Section provided that any bill that is approved by a majority of each chamber "will be submitted to the Governor" and become law if the Governor signs it, or if he does not return it with his objections to the originating chamber within ten days of receipt.[56]

The President of the House disagreed. He contended that the purported duty was not ministerial, but discretionary.[57] In his view, the Governor had no legal right to certification and submission, which were instead functions of the legislature's power to manage its own

---

[49] *Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 444-45 (2006).

[50] *Acevedo Vila*, 168 D.P.R., 444-45.

[51] *Baez Galib y Otros*, 152 D.P.R., 393.

[52] *See* Section 1.4 of the Series 2007A Supplemental Resolution (providing that supplemental resolution is adopted pursuant to authority conferred on COFINA by Act 91 and Series 2007A General Resolution); Section 102 of General Resolution (providing that General Resolution is adopted pursuant to authority conferred on COFINA by Act 91); Act 91 (explicitly authorizing COFINA to issue bonds and thus implicitly to adopt resolutions to implement such issuances).

[53] *Acevedo Vila*, 168 D.P.R. 443. The Court confirmed that the Governor of Puerto Rico had the legal right to vindicate his constitutional prerogatives, and that legislators similarly have the right to question any rule or process that restricts their constitutional powers, as long as the relevant circumstances satisfy the elements discussed above in Part XIV.A. *See Acevedo Vila*, 168 D.P.R. 453-56.

[54] *Acevedo Vila*, 168 D.P.R., 450.

[55] *Acevedo Vila*, 168 D.P.R., 450.

[56] *Acevedo Vila*, 168 D.P.R., 460.

[57] *Acevedo Vila*, 168 D.P.R., 451.

The Independent Investigator's Final Investigative Report

inner processes.[58]

The Court agreed with the Governor and issued the writ.  In so doing, it stressed the plain language of Section 19 of Article III of the Puerto Rico Constitution, noting that it "clearly" provides that a law that has been approved by both legislative chambers ***must*** be submitted to the Governor.[59]  The Court further noted that because the bill was a tax bill, the failure to perform this ministerial duty could threaten the economic stability of Puerto Rico, as well as its fiscal health and creditworthiness.[60]

This precedent supports two avenues through which a Puerto Rico court could have entertained a mandamus petition regarding COFINA's structure.  Both options would have required that certain COFINA officers first refuse to perform specified tasks, after which COFINA could itself have filed a petition seeking the writ as a means of compelling those officers' compliance:

- *First,* Section 303 of COFINA's general resolution requires that the COFINA Bonds reflect a corporate seal to which the Secretary of COFINA has attested.[61]  It provides that COFINA's "corporate seal (or a facsimile thereof) shall be . . . affixed [onto the bonds], imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary." Like the constitutional provision at issue in *Acevedo*, this language is clear, unambiguous and compulsory.  It leaves no room for the exercise of judgment, but instead requires the performance of the discrete and mechanical task of attestation prior to issuance.[62]  Nor does the COFINA general resolution identify any other actor who may perform the requisite attestation if the Secretary refuses to do so, suggesting that there would not have been an alternative means of judicial enforcement;[63] and

---

[58] *Acevedo Vila*, 168 D.P.R., 451.

[59] *Acevedo Vila*, 168 DPR, 451-52.

[60] *Acevedo Vila*, 168 DPR, 451-52; *cf. also Cordova y Otros*, 2007 TSPR 133 (declining to issue writ of mandamus based on citizens' contention that legislature had legal duty to amend Puerto Rico Constitution to provide for one legislative chamber rather than two following public referendum expressing preference for same, because the legislature's power to approve constitutional amendments were discretionary rather than ministerial and therefore not judicially enforceable).

[61] Amended and Restated Sales Tax Revenue Bond Resolution, 30, § 303 (2018) (on file with author).

[62] We found no published precedent reflecting that a Puerto Rico court has considered whether a ministerial duty imposed by a bond resolution qualifies as an obligation imposed by law. There is, however, positive precedent in at least one other US jurisdiction.   *See Southtrust Bank of Alabama, Nat'l Ass'n v. Palms of Terra Ceia Bay Cmty. Dev. Dist.*, 560 So. 2d 1205, 1206 (Fla. 2d DCA 1990).

[63] Bond Resolution, P.R. Sales Tax Revenue Bond Resolution, *First Supplemental Sales Tax Revenue Bond Resolution*, Series 2007A (2007), 10, A-1 (on file with author).  Although Section 2.6 permits the Series 2007A bonds to deviate from Exhibit A with "necessary and appropriate variations, omissions and insertions," any such deviations must be "as permitted by the General Resolution [*i.e.*, the Sales Tax Revenue Bond Resolution] and this Supplemental Resolution." Bond Resolution, P.R. Sales Tax Revenue Bond Resolution, *First Supplemental Sales Tax Revenue Bond Resolution*, Series 2007A (2007), 10 (on file with author).  Because Section 303 of COFINA's general resolution requires the bonds to be executed by "an Authorized Officer," which includes both the Executive Director and Assistant Executive Director, it is possible that the Assistant Executive Director's signature would have sufficed as an "appropriate variation" under Section 2.6 of the First Supplemental Tax Resolution. Importantly, however, neither of those documents contains any provision that permits the Series 2007A

- *Second,* in combination, Section 2.6 of the COFINA Series 2007A First Supplemental Resolution and Exhibit A to that Resolution are similar to the constitutional provision at issue in *Acevedo.* This is because Section 2.6 of the COFINA Series 2007A First Supplemental Resolution requires, in pertinent part, that "the Series 2007A Bonds *shall be* in substantially the form of Exhibit A," and Exhibit A is a specimen COFINA Bond that reflects a certification by COFINA's Executive Director.[64]  Here, too, the relevant officer has no discretion regarding whether to perform this mechanical function.  And although Section 303 of COFINA's general resolution arguably permits an Assistant Executive Director to provide the requisite signature if the Executive Director does not,[65] neither that document nor the COFINA Series 2007A First Supplemental Resolution identifies a third actor who may perform the function if both of these "Authorized Officers" refuse.[66]

We conclude that COFINA would have had the legal right to seek the writ, because the Executive Director's refusal to perform the certification would have prevented COFINA from issuing its Series 2007A bonds, thereby depriving it of the opportunity to obtain necessary capital.  It is therefore at least arguable that a Puerto Rico court would have concluded that there was an actual dispute and thus exercised its discretion to preside over such a mandamus action.  In the context of so doing, the Puerto Rico court could have considered, and resolved, certain issues concerning the constitutionality of COFINA Bonds.  And in the process, COFINA might have been forced to overcome a legal hurdle to accessing the capital markets.  In retrospect, that hurdle may have served as a healthy check and balance on certain Puerto Rico-Related Bond issuances during the Relevant Period.

   (c)    **A Mandamus Action Might Have Been a Plausible Vehicle for the GO Bondholders to Test Whether Certain COFINA Bonds Violated the Constitutional Debt Limit**

As noted above, Puerto Rico case law indicates that the writ is appropriate to prevent a public official from doing something that would violate an existing ministerial duty.  As discussed below, it also confirms that every public official has a ministerial duty *not* to violate the Puerto Rico Constitution.  We thus conclude that the Supreme Court of Puerto Rico may

---

Bonds to issue without the signature of either officer, or confers any discretion on those officers to withhold such signatures.

[64] Bond Resolution, P.R. Sales Tax Revenue Bond Resolution, *First Supplemental Sales Tax Revenue Bond Resolution*, Series 2007A (2007), 10 (on file with author).

[65] Section 2.6 permits the Series 2007A COFINA Bonds to deviate from Exhibit A with "necessary and appropriate variations, omissions and insertions," if any such deviations are "as permitted by the General Resolution [*i.e.*, the Sales Tax Revenue Bond Resolution] and this Supplemental Resolution." Bond Resolution, P.R. Sales Tax Revenue Bond Resolution, *First Supplemental Sales Tax Revenue Bond Resolution*, Series 2007A (2007), 10 (on file with author).  Because Section 303 of COFINA's general resolution requires the bonds to be executed by "an Authorized Officer," which includes both the Executive Director and Assistant Executive Director, it is possible that the Assistant Executive Director's signature would have sufficed as an "appropriate variation" under Section 2.6 of the First Supplemental Tax Resolution.

[66] Bond Resolution, P.R. Sales Tax Revenue Bond Resolution, *First Supplemental Sales Tax Revenue Bond Resolution*, Series 2007A (2007), 10, A-1 (on file with author).

well have entertained a mandamus petition seeking to prohibit COFINA from certifying any bond issuance that allegedly would have enabled the COFINA Bonds to unlawfully bypass constitutional limitations on the amount of public debt that Puerto Rico could legally issue. *See* Part VI; *see also* Part IX.

We base this conclusion on *Baez Galib y Otros*, 152 D.P.R. at 392. That dispute involved a petition for mandamus that a Senator, political party official, and certain employees of the Puerto Rico Commission on Elections filed against the Puerto Rico Commissioner on Elections ("Commissioner on Elections"). In particular, the petitioners sought to foreclose the Commissioner on Elections from complying with a new Puerto Rico law that required him to organize, administer, and carry out an election in Puerto Rico to select delegates who would eventually vote for the US President and Vice-President.[67] The new law also allocated $900,000 for expenses related to the election of delegates and directed the Commissioner on Elections to use resources, equipment, property, and employees for that purpose.[68] It thus conflicted with federal law, which does not permit Puerto Ricans who live in Puerto Rico to vote in presidential elections.[69]

Among other things, the petitioners argued that the law violated the Puerto Rico Constitution. This was primarily because the Puerto Rico Constitution required that public funds only be used for legitimate public purposes, but the new law purported to allow them to be used in furtherance of a non-existent legal right.[70] The Court agreed. It explained that the Commissioner on Elections was a public employee who had a ministerial duty to act according to law,[71] and thus not to violate the Puerto Rico Constitution. In addition, the Court considered the writ to be the only judicial remedy that could prevent an illegal election.[72]

*Baez Galib y Otros* thus teaches that the writ may be used to prevent imminent constitutional harm. Arguably, the GO Bondholders would not have been able to pursue this type of challenge until the specific time when Puerto Rico had, in their view, reached its Constitutional Debt Limit. To that end, they would likely have argued that any bond issuances that COFINA's Executive Director was scheduled to certify would have threatened an imminent constitutional violation. The writ would have been the only means of judicial enforcement because, as stated above in Part XIV.B.2.b, neither Exhibit A nor the 2007A First Supplemental Resolution permits anyone other than COFINA's Executive Director to certify the COFINA Bonds.

It is also likely that the Supreme Court of Puerto Rico would have deemed the imminent constitutional violation to have concretely eroded the GO Bondholders' interests, regardless of whether Puerto Rico had yet defaulted on the GO Bonds or become insolvent. This is because the Constitutional Debt Limit and its calculation were integral to Puerto Rico's fiscal health and its continued solvency, without which the GO Bonds might not have been repaid.[73]

The writ would also have served the public interest, as the case law requires. Indeed,

---

[67] *Baez Galib y Otros v. Comision Estatal de Elecciones*, 152 D.P.R. 382, 390-91 (P.R. Nov. 2, 2000).
[68] *Baez Galib y Otros*, 152 D.P.R., 387.
[69] *Baez Galib y Otros*, 152 D.P.R., 388-89.
[70] *Baez Galib y Otros*, 152 D.P.R., 389-90.
[71] *Baez Galib y Otros*, 152 D.P.R., 392.
[72] *Baez Galib y Otros*, 152 D.P.R., 394-95.
[73] Our review of public case law in Puerto Rico reflects that Puerto Rico's courts often issue written decisions that provide the rationale for denying a mandamus petition.

the dispute would have concerned how to implement a constitutionally-mandated aspect of fiscal discipline. The disregard of that requirement could arguably compromise Puerto Rico's fiscal stability. That public interest is at least as great as the ones considered in *Baez Galib y Otros* and *Acevedo*.

In light of the foregoing, we conclude that a Puerto Rico court may well have found an actual dispute in the context of a prohibitory mandamus action like the one we describe above. It is therefore possible that such a court would have chosen to exercise its discretion to hear that dispute and, in that context, disposed of certain issues concerning the constitutionality of the COFINA Bonds.

### 3. The Ability to Use Either a Declaratory Judgment Action or a Mandamus Action as a Substitute for a Pre-Issuance Validation Mechanism Was Not Sufficiently Clear to Interested Parties

As demonstrated above, if carefully designed, either a declaratory judgment action or a mandamus action could have been used as a form of Pre-Issuance Validation Mechanism. Nevertheless, we conclude that neither of those options was so clearly available to stakeholders during the Relevant Period as to serve as an effective substitute in practice.

To begin with, reasonable minds can differ regarding whether a declaratory judgment action or a mandamus action would have presented an actual dispute, even under the scenarios we present above. Not only are the relevant court decisions difficult to reconcile,[74] but neither mechanism has ever, according to our review of published case law, been used in Puerto Rico as a means of deciding the validity, constitutionality or enforceability of a municipal bond issuance. Any issues concerning the constitutionality of COFINA Bonds or the relative priority of the GO Bondholders with respect to SUT revenues would thus have been ones of first impression. It is therefore difficult to predict how a Puerto Rico court would ultimately have ruled.[75]

Moreover, to manufacture the conditions to support any mandamus action, a government official would have had to disobey the orders of COFINA and/or of the Puerto Rico governor by refusing to perform an act that the government official was required to perform. There is no evidence to suggest that any government official would have done so during the Relevant Period.

Finally, declaratory judgment actions and mandamus actions are creative—and, in the case of mandamus, extraordinary—procedural devices. Even able counsel can sometimes overlook them as options. It is therefore unlikely that individual stakeholders (or even their sophisticated counsel) would have understood that either device could have been used as a substitute for a Pre-Issuance Validation Mechanism, or that they would have understood at what point a Puerto Rico court might have considered such a dispute to qualify as an actual

---

[74] *Compare, e.g., Lake Carriers' Ass'n*, 406 U.S. 498 (finding threat of enforcement sufficient to justify declaratory judgment under federal statute analogous to Puerto Rico's, despite state's assurance that it would not yet prosecute anyone under the challenged law), *with, e.g., Laboratorio Clinico Irizarry Guasch*, 2013 WL 4037012, * 7 (finding lack of sufficient dispute to support declaratory judgment absent allegation that Puerto Rico tried to apply challenged law against plaintiff's interests).

[75] The statements that certain bond counsel and underwriter counsel made on the October 2013 Investor Call discussed in more detail in Part VII of this Report underscore these points.

case or controversy.

For each of these reasons, we conclude that neither Puerto Rico's declaratory judgment statute nor its writ of mandamus procedure currently functions as an effective substitute for the more explicit Pre-Issuance Validation Mechanisms that other US jurisdictions have adopted. As currently interpreted by Puerto Rico's courts, then, Puerto Rico's declaratory judgment statute and writ of mandamus procedure do not offer a meaningful hurdle for potential debt issuances to overcome going forward.

**C.    Puerto Rico Should Adopt a Pre-Issuance Validation Mechanism that Clearly Provides for Judicial Review of Proposed Municipal Bonds**

Puerto Rico could benefit from adopting a Pre-Issuance Validation Mechanism that clearly applies to proposed issuances of municipal bonds, as other US jurisdictions have done. To be effective, however, any such mechanism should: (i) be a mandatory step in the bond-issuance process; or (ii) if discretionary, then be available for non-government actors to pursue.

**1.    Puerto Rico Could Have Benefitted from a Clear Pre-Issuance Validation Mechanism During the Relevant Period**

Comparing Puerto Rico's experience with its ERS Bonds to California's experience with its CA Pension Obligation Bonds is instructive.  Both sets of bonds were supposed to help bolster pension obligations and reduce unfunded liabilities.[76]  Yet they fared very differently, potentially because stakeholders in California had access to a Pre-Issuance Validation Mechanism, while stakeholders in Puerto Rico did not.

ERS purported to authorize the ERS Bonds pursuant to a resolution that it adopted in 2008.[77]  A recital to the resolution stated that, by virtue of Act 447 of May 15, 1951,[78] ERS has "the duties and powers . . . to incur debt secured by the assets of [ERS]."[79]  Certain ERS bondholders have attributed this power "to incur debt" to the ERS Enabling Act, which permitted ERS to "seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the [ERS]."[80]

---

[76] *See* Official Statement of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Senior Pension Funding Bonds, Series A, B and C ("The System has authorized the issuance of one or more series of bonds in order to increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability.").

[77] *In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 17, 2017), [ECF # 41].

[78] *See* Official Statement of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, Senior Pension Funding Bonds, Series A, B and C.

[79] *See* Pension Funding Bond Resolution of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico adopted on January 24, 2008.

[80] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 8, 2017), [ECF # 39]), [ECF # 39] (citing P.R. Laws Ann. tit. 3 § 779(d) (2018)).

The Independent Investigator's Final Investigative Report

The ERS Bonds were issued in 2008.  Approximately three years later, in early 2011, Puerto Rico's legislature sought to amend the ERS Enabling Act to, among other things, foreclose ERS from issuing any new debt intended to be secured by ERS assets, unless the legislature pre-approved it.[81]  As part of that process, the legislature authored a "Statement of Motives" in which it characterized the ERS Bonds as "illegally made"[82] and described them as "so badly structured that, rather than yielding profits . . . [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System."[83]

The enforceability of the ERS Bonds is now contested.  In the pending Title III proceedings,[84] for example, each of the Puerto Rico Fiscal Agency and Financial Authority, Governor Ricardo Rosselló Nevares, and Treasury Secretary Raúl Maldonado have asked the Court to conclude that the ERS Bonds are invalid because they lacked the requisite statutory authorization.[85]  ERS and the Oversight Board have challenged the ERS Bonds in a slightly different way, contending that there is no enforceable security interest.[86]  The investors who purchased the ERS Bonds disagree with both positions.[87]  The timeline for resolving these issues remains unclear.  As this Report went to print, a federal court had invalidated the investors' security interests, but the appeal window for that decision had not yet elapsed.[88]  Other issues surrounding the ERS Bonds, such as whether they were statutorily authorized, had

---

[81] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 8, 2017), [ECF # 39] (citing P.R. Laws Ann. tit. 3 § 779(d) (2018)).

[82] Act 116-2011, Statement of Motives (July 6, 2011) (available at http://www.oslpr.org/download/en/2011/A-0116-2011.pdf.).

[83] Act 116-2011, Statement of Motives (July 6, 2011) (available at http://www.oslpr.org/download/en/2011/A-0116-2011.pdf.).

[84] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 17, 2017), [ECF # 44].

[85] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 17, 2017), [ECF # 44], 4, 10-16.

[86] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*The Financial Oversight and Management Board of Puerto Rico as Representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC*), Adv. Case No. 17-213 (D.P.R. July 21, 2017), [ECF # 1]; *see also In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Nov. 17, 2017), [ECF # 41], 9-13.

[87] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*Altair Global Credit Opportunities Fund (A), LLC v. The Commonwealth of Puerto Rico*), Adv. Case No. 17-219 (D.P.R. Dec. 20, 2017), [ECF #50].

[88] *See In re The Financial Oversight and Management Board of Puerto Rico as Representative of The Commonwealth of Puerto Rico* (*The Financial Oversight and Management Board of Puerto Rico as Representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Altair Global Credit Opportunities Fund (A), LLC*), Adv. Case No. 17-213 (D.P.R. Aug. 17, 2018), [ECF # 65].

The Independent Investigator's Final Investigative Report

been submitted to a federal court and were awaiting decision on a motion to dismiss.[89]

We thus conclude that a Pre-Issuance Validation Mechanism could have been helpful to Puerto Rico, at least with respect to the controversy surrounding the ERS Bonds. If Puerto Rico had such a mechanism in 2008, then interested parties would have had a clear path to seek certainty about core validity issues at that time. In this way, public confidence in, and investor demand for, Puerto Rico-Related Bonds could have been bolstered. In addition, some of the costs associated with allegedly invalid ERS Bonds, or post-issuance litigation regarding those bonds, might have been avoided. In retrospect, then, both Puerto Rico and ERS bondholders could have benefitted from the type of early certainty that the CA Pension Obligation Bond proceedings supplied.

Pre-issuance review could also have spared Puerto Rico from public infighting between two entities that are, at bottom, intertwined. ERS serves hundreds of thousands of employees and retirees, and senior government officials sat on its board when the ERS Bonds issued.[90] This includes the President of GDB and the Acting Secretary of the Treasury.[91] The strongly-worded criticism in the legislature's "Statement of Motives" may never have been lodged if fundamental issues had been anticipated, and judicial guidance sought, in 2008. This would not only have avoided embarrassing public disagreement, but also the making by political actors of a public statement that certain stakeholders might attempt to use to their benefit in subsequent litigation regarding the bonds' enforceability or validity.

We are, however, mindful of context. Civil servants retire every day in Puerto Rico, having planned to sustain themselves in significant part based on their pensions. When the ERS Bonds issued, ERS was already underfunded.[92] And as the CA Pension Obligation Bond proceedings make plain, pre-issuance validation procedures generate expenses of their own. They also take time. It may be years before all interventions and objections are resolved, ensuing appeals are decided, and decisions become final. In the interim, the issuer will have been deprived of the contemplated funds. The consequences of that delay will depend on the intended use of that money, but for emergent or time-sensitive needs, the costs may be substantial.

Moreover, as we discuss elsewhere in this Report, the Puerto Rico-Related Entities and other government actors generally preferred during the Relevant Period to obtain new debt (either through loans or new municipal bond issuances), rather than to pursue fiscally responsible, but politically unpopular, alternatives. *See Part IV*. Accordingly, we cannot conclude that if Puerto Rico had a Pre-Issuance Validation Mechanism in 2008 that clearly applied to municipal bonds, then any Puerto Rico-Related Entity or government actor would have chosen to use it.

---

[89] As discussed elsewhere in this Report, Puerto Rico has also faced actual or threatened litigation concerning the constitutionality of certain COFINA Bonds, GO Bonds, and PBA Bonds. *See* Parts VI and IX.

[90] Official Statement. P.R. Employee Retirement System, Senior Pension Funding Bonds, Series A 8 (2008).

[91] Official Statement. P.R. Employee Retirement System, Senior Pension Funding Bonds, Series A 8 (2008).

[92] Official Statement. P.R. Employee Retirement System, Senior Pension Funding Bonds, Series A 6 (2008).

We therefore conclude that to have had any benefit in Puerto Rico during the Relevant Period, a Pre-Issuance Validation Mechanism would either have had to: (i) be written into law as a compulsory component of the bond issuance process; or (ii) if discretionary (as in California), then designed to permit non-issuers and non-government actors to institute the proceedings. In either case, the result would have been a greater likelihood of creditworthy issuances having been validated and of non-creditworthy issuances having been stopped before they occurred. This could have bolstered investor confidence and potentially helped to contain some portion of Puerto Rico's debt crisis.

## 2. Puerto Rico Should Adopt a Clear Pre-Issuance Validation Mechanism to Govern Future Municipal Bond Issuances

Whether crafted as a compulsory component of the bond issuance process, or designed as a discretionary measure of which non-government actors may avail themselves, the Puerto Rico legislature should consider adopting a formal Pre-Issuance Validation Mechanism for municipal bond issuances. For reasons already stated, this type of clear path to early certainty can only benefit the Puerto Rico-Related Entities and their bondholders.

To the extent that the Legislative Assembly is inclined to adopt a form of discretionary Pre-Issuance Validation Mechanism rather than a compulsory one, there is always a risk that certain non-government stakeholders may use the proceedings to file meritless challenges for the purpose of stopping certain bond issuances. To temper that risk, the Puerto Rico legislature could incorporate some form of fee- or cost-shifting mechanism. We caution, however, that any such feature must be designed to deter the meritless challenges, while leaving intact the incentive to pursue the meritorious ones.

# PART XV
# THE POSSESSION TAX CREDIT

# PART XV
# POSSESSION TAX CREDIT

Historically, US policymakers have extended tax favored treatment to certain investments in Puerto Rico as a way of encouraging such investment.[1]  The Possession Tax Credit offered one such incentive.  Congress enacted the Possession Tax Credit as Section 936 of the Tax Code in 1976 to replace prior measures dating back to 1921 that had been repealed amidst a then-developing fiscal crisis for the US.[2]  The Possession Tax Credit was supposed to incentivize businesses to move their operations to US territories like Puerto Rico and, with that, spur local growth.[3]  To the extent that the success or failure of the Possession Tax Credit is relevant to understanding Puerto Rico's financial crisis, we studied the impact it, and its termination, had on

---

[1] *See* César J. Ayala & Rafael Bernabe, *Puerto Rico in the American Century: A History since 1898*, 179 (Univ. of N.C., 2009).  Section 931 of the Internal Revenue Code (adopted in 1921) was the immediate precursor to the Possession Tax Credit.  Section 931 was less generous than the Possession Tax Credit, because it was an exemption rather than a dollar-for-dollar reduction of tax liability.  *See* Revenue Act of 1921, Pub. L. No. 67-98, § 262, 42 Stat. 227, 271 (1921); 26 U.S.C. § 931 (1954).  It also exempted overseas earnings from federal taxes only until the subsidiary in Puerto Rico sent those amounts to stateside parent companies.  *See* Revenue Act of 1921, Pub. L. No. 67-98, § 262, 42 Stat. 227, 271 (1921); 26 U.S.C. § 931 (1954).

[2] *See* 26 U.S.C. § 936 (1976).

[3] *See*, *e.g*., U.S. Gov't Accountability Office, GAO 18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 5 (2018) (describing original intent of measure as spurring "employment-producing investments"); U.S. Gov't Accountability Office, GGD-92-72BR, *Pharmaceutical Industry: Tax Benefits of Operating in Puerto Rico*, 1 (1992); *see also*, *e.g*., U.S. Gov't Accountability Office, GAO-06-541, *Puerto Rico: Fiscal Relations with the Federal Government and Economic Trends during  the Phaseout of the Possessions Tax Credit*, 2 (2006) ("For the past 30 years, the U.S. Tax Code has provided a possessions tax  credit specifically designed to encourage U.S. corporations to invest  in Puerto Rico and the other U.S. insular areas and create  jobs.").

The Independent Investigator's Final Investigative Report

Puerto Rico's need and ability to access the capital markets.  Our investigation revealed mixed evidence about its effectiveness.

The Possession Tax Credit essentially sheltered from federal taxes the corporate income that subsidiaries of US companies earned in Puerto Rico[4] if certain limited conditions were satisfied.[5]   The companies could benefit from this treatment regardless of whether they subsequently passed those profits back to their stateside parent entities.[6]  Many companies only paid a minor Puerto Rico tax on such income.[7]

The measure was repealed, after a ten-year phase-out that began in 1996, as part of an initiative to reduce the federal deficit.[8]  The adoption of the repeal also coincided with a period of Congressional discontent regarding the magnitude of lost revenue for the federal treasury,[9] as well as the degree to which certain industries (like pharmaceuticals) disproportionately benefitted from Puerto Rico-related tax incentives.[10]   Some proponents of the repeal also characterized the Possession Tax Credit as corporate welfare and expressed persistent concerns that it did not

---

[4] *See* 26 U.S.C. § 936(a) (1976); *see also* U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 5 (2018) ("In general, the credit equaled the full amount of federal tax liability related to an eligible corporation's income from its operations in a possession-including Puerto Rico-effectively making such income tax free").

[5] *See* 26 U.S.C. § 936(a)(1)(A) (1976) (requiring, pursuant to an amended version of Possession Tax Credit provision, that specified minimum percentage of gross income of relevant domestic corporation be derived from sources within a US possession for three-year period immediately preceding the close of the relevant taxable year); *see also* 26 U.S.C. § 936(a)(1)(B) (1976) (requiring, pursuant to an amended version of Possession Tax Credit provision, that specified minimum percentage of gross income of domestic corporation for relevant period have been derived from active conduct of trade or business within a US possession).

[6] *See generally* 26 U.S.C. § 936 (1976).

[7] *See* U.S. General Accounting Office, GGD-93-109, *Tax Policy Puerto Rico and the Section 936 Tax Credit*, 2–3 (1993).

[8] *See* Small Business Protection Act, Pub. L. No. 104–188 (1996); Sandra L. Suarez, *Does Business Learn?: Tax Breaks, Uncertainty and Political Strategies*, 115 (Univ. of Mich., 2000) (explaining that the repeal coincided with President Clinton's efforts to address a $290 million gap in the federal budget, as well as tax cuts for small businesses and a minimum wage hike); *see also* Congressional Budget Office, *The Economic and Budget Outlook: Fiscal Years 1996-2000*, xvi (1995); U.S. Dep't. of Labor Wage and House Division, *History of Changes to Minimum Wage Law*, https://www.dol.gov/whd/minwage/coverage.htm.

[9] A 1992 estimate prepared by the Government Accountability Office anticipated that the corresponding revenue loss to the US government for just the four-year period between 1993 and 1997 would be $15 billion.  *See* U.S. General Accounting Office, GGD-92-72BR, *Pharmaceutical Industry: Tax Benefits of Operating in Puerto Rico*, 1 (1992).

[10] *See*, *e.g.*, U.S. General Accounting Office, GGD-92-72BR, *Pharmaceutical Industry: Tax Benefits of Operating in Puerto Rico*, 3, 13 (1992) (reflecting that the pharmaceutical industry was the largest beneficiary of the Possession Tax Credit); Sandra L. Suarez, *Does Business Learn?: Tax Breaks, Uncertainty and Political Strategies*, 38 (Univ. of Mich., 2000) ("U.S. Treasury data support the conclusion that pharmaceuticals were the biggest beneficiaries of Section 931. Treasury estimates show that between 1973 and 1975, approximately 50 percent of the total federal tax savings associated with 931 were concentrated in the pharmaceutical industry.").

sufficiently benefit Puerto Rico.[11]

After the repeal, many large companies shuttered their operations in Puerto Rico.[12]  The last year of the phase-out (2006) was also the last time that some have said that Puerto Rico had a sound economy.[13]  Some opponents of the repeal have even blamed it for Puerto Rico's recession.[14]

In light of the foregoing, we examined whether reviving the Possession Tax Credit or a comparable tax incentive would help Puerto Rico to restore its fiscal health.  For that purpose, we gathered the input of certain witnesses and analyzed their views in light of other available evidence.

Ultimately, we did not find sufficient support for any conclusion that reintroducing the Possession Tax Credit would substantially improve Puerto Rico's current circumstances.[15]  This is in part due to the lack of reliable evidence demonstrating that the Possession Tax Credit caused Puerto Rico's local economy to experience any meaningful degree of permanent or self-sustaining growth, as we explain further below.[16]

---

[11] *See*, *e.g.*, 142 Cong. Rec. 12186 (1996) (statement of Rep. Burton); *see also*, *e.g.*, U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 6 (2018) ("The possessions tax credit was criticized . . . because a large share of the benefits of the credit was not reaped by Puerto Rico residents.").

[12] *See*, *e.g.*, U.S. Gov't Accountability Office, GAO-06-541, *Puerto Rico: Fiscal Relations with the Federal Government and Economic Trends during  the Phaseout of the Possessions Tax Credit*, "What GAO Found" (2006) ("U.S. corporations claiming the possessions tax credit dominated Puerto  Rico's manufacturing sector into the late 1990s. After the tax credit was repealed in 1996 beginning a 10-year phaseout period, the activity of these corporations decreased significantly.").

[13] U.S. Dep't of the Treasury, *Puerto Rico's Economic and Fiscal Crisis*, 1 (Undated).

[14] *See*, *e.g.*, Edwin Melendez, *Statement for the Record at the Congressional Round Table Discussion on Puerto Rico* (July 18, 2017) ("It was Congress and the ruling political party in Puerto Rico at the time that decided to phase out Section 936 of the Internal Revenue Code, a decision that provoked the loss of 75,000 manufacturing jobs over the ensuing decade. The phase-out ended in 2006 — the very year the recession started in Puerto Rico. The inability to foster alternative economic strategies to mitigate the loss of federal tax incentives — as well as ill-advised spending decisions by the island's politicians — aggravated the situation."); *see also*, *e.g.*, Gov't of the Commonwealth of P.R., *Submission to the Senate Finance Committee and House Ways & Means Committee Regarding Proposed Tax Reform Options for Puerto Rico* ("In repealing [S]ection 936, Congress essentially experimented with the removal of the most critical feature of the code affecting Puerto Rico. It is now apparent from Puerto Rico's economic conditions that this experiment has been a critical failure – especially since close to 200,000 jobs have been lost to the Commonwealth since the repeal"); Gov't of the Commonwealth of P.R., *Submission to the Senate Finance Committee and House Ways & Means Committee Regarding Proposed Tax Reform Options for Puerto Rico* ("It is hardly coincidental that the last year that Puerto Rico enjoyed a healthy economy was 2006, the last year of effectiveness of [S]ection 936.").

[15] *See*, *e.g.*, Joaquin Villamil, *Statement for the Record at the Congressional Round Table Discussion on Puerto Rico* (July 18, 2017) (stating, in relevant part, that "[s]ince the mid-seventies, public spending and debt, federal transfers, a growing underground economy and the impact of Section 936 gave the impression that the economy was performing adequately.").

[16] As the Government Accountability Office has previously acknowledged, it is difficult to reliably measure how effective various tax incentives may be in practice, even for jurisdictions to which those incentives have applied for some time.  Among other things, this is due to data limitations, as well as the programs'

Accordingly, if Congress considers federal tax benefits relating to Puerto Rico in the future, then Congress should consider crafting a policy that incorporates elements that help link those federal tax benefits to long-term, local growth more effectively than the Possession Tax Credit did, including incorporating safeguards to help ensure that Puerto Rico is able to direct any resulting capital inflow toward measurable improvements in long-term economic growth.

\* \* \*

The Possession Tax Credit has been correlated with several positive effects for Puerto Rico. Following its implementation:

- Corporate presence in Puerto Rico increased, primarily across five industries: (i) pharmaceuticals; (ii) food and related products; (iii) chemicals; (iv) machinery; and (v) electronics;[17]

- New local industries formed, in large part to service the companies that the Possession Tax Credit enticed;

- Unemployment declined for most years between 1982 and 1996;[18]

- Income grew for most years during that same period, as measured by both GNP and GDP (notwithstanding the disparity between the two);[19] and

- According to several witnesses, banks in Puerto Rico had more liquidity, and that liquidity financed certain local economic activity (whether directly or indirectly). At least some of this liquidity appears to have consisted of capital that might otherwise

---

complexity, occluded oversight, the layering of incentives that taxpayers may simultaneously claim, and the difficulty of isolating an individual program's effects from concurrent macro-economic factors.  *See*, *e.g.*, U.S. Gov't Accountability Office, GAO-14-500, *The New Markets Tax Credit:  Better Controls And Data are Needed to Ensure Effectiveness*, "What GAO Found" (2014); U.S. Gov't Accountability Office, GAO-12-262, *Community Development: Limited Information on the Use and Effectiveness of Tax Expenditures Could Be Mitigated through Congressional Attention*, 26 (2012); U.S. Gov't Accountability Office, GAO-04-306, *Community Development: Federal Revitalization Programs Are Being Implemented*, *but Data on the Use of Tax Benefits are Limited*, 20 (2004); U.S. Gov't Accountability Office, GAO-08-731, *Tax Expenditures: Available Data Are Insufficient to Determine the Use and Impact of Indian Reservation Depreciation*, 2 (2008).

[17] Dep't of the Treasury, *The Operation and Effect of the Possessions Corporation System of Taxation First Annual Report*, 36, 38, 41 (1978).  Together, these industries are believed to have reaped 90% of the Possession Tax Credit benefits in tax years 1985, 1987, and 1989.  *See* U.S. Gov't Accountability Office, GGD-92-72BR, *Pharmaceutical Industry: Tax Benefits of Operating in Puerto Rico*, 4 (1992).

[18]  *Databases*, *Tables & Calculators by Subject: Puerto Rico*, *1982-1996*, Bureau of Labor Statistics, https://www.bls.gov/eag/eag.pr.htm.

[19] U.S. General Accounting Office, *Tax Policy Puerto Rican Economic Trends*, 4 (1997).

The Independent Investigator's Final Investigative Report

have been routed to the Eurodollar market.[20]

We also recognize that the repeal of the Possession Tax Credit coincides with the onset of Puerto Rico's fiscal crisis.[21]  Puerto Rico's economy began contracting in 2006; the same year that marked the end of the Possession Tax Credit's phase-out.[22]  It has yet to recover.  In addition, certain witnesses suggested that the repeal may have contributed to Puerto Rico's debt culture. They observed that bond endeavors became more important after the repeal, as liquidity and incentives for external corporate investment dwindled.  Puerto Rico was forced to find new sources of capital and debt issuances were natural options because of investor appetite stemming from the triple tax-exempt status that we discuss separately in Part II and Part XI of this Report.  Finally, local corporate taxes gleaned from certain companies that claimed the Possession Tax Credit were a source of some revenue for the Puerto Rico Treasury, which likely decreased as corporate presence dropped.[23]

On balance, however, the Possession Tax Credit failed to remedy deeper problems in a manner that might have led to long-term prosperity.[24]  There are several reasons why.

*First*, until certain amendments in 1993, the Possession Tax Credit essentially tied its benefits to the mere generation of income that could be attributed to Puerto Rico (if only on paper).[25] Among other things, the Possession Tax Credit did not originally mandate that companies create a certain number of jobs for local residents, that they pass a percentage of their tax-exempt profits along to local employees in the form of better pay, or that they invest a certain amount per year in local plants or equipment.[26]  As a result, the measure disproportionately attracted businesses that could glean substantial income from non-labor-intensive endeavors, such as profit-

---

[20] Joint Committee on Taxation, *An Overview of the Special Tax Rules Related to Puerto Rico and an Analysis of the Tax and Economic Policy Implications of Recent Legislative Options*, 52 (2006).

[21] This is consistent, in our view, with findings that the Government Accountability Office recently released. In particular, the Government Accountability Office found that although the repeal of the Possession Tax Credit likely contributed to the Puerto Rico fiscal crisis, the evidence was mixed regarding whether the phase-out, rather than co-occurring factors like globalization, actually caused the Puerto Rico economy to contract and, as such, the magnitude of any impact on the fiscal crisis cannot be quantified.  *See* U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico: Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 27, 32 (2018).  Similarly, a Congressional staffer with whom we spoke conveyed that the true impact on Puerto Rico of the Possession Tax Credit and its repeal are difficult to assess, in part due to the lack of adequate accounting services in Puerto Rico.

[22] U.S. Dep't of the Treasury, *Puerto Rico's Economic and Fiscal Crisis*, 1 (Undated).

[23] *See* U.S. General Accounting Office, GAO-/GGD-93-109, *Tax Policy Puerto Rico and the Section 936 Tax Credit*, 61 (1993).

[24] *See*, *e.g.*, Joaquin Villamil, *Statement for the Record at the Congressional Round Table Discussion on Puerto Rico* (2017) (stating, in relevant part, that "[s]ince the mid-seventies, public spending and debt, federal transfers, a growing underground economy and the impact of Section 936 gave the impression that the economy was performing adequately.").

[25] U.S. General Accounting Office, GGD-93-109, *Tax Policy Puerto Rico and the Section 936 Tax Credit*, 5 (1993).

[26] *See* 26 U.S.C. § 936 (1976).

The Independent Investigator's Final Investigative Report

generating intangibles like trademarks and patents.[27]  These companies used their subsidiaries in Puerto Rico to hold such assets, which enabled them to reap significant amounts of income that was technically generated in Puerto Rico, but required comparatively little investment in Puerto Rico's economy.[28]

It is thus not surprising that although the Possession Tax Credit conferred enormous tax savings on certain companies, researchers have identified few clear benefits for local residents. For example:

- The Government Accountability Office concluded as early as 1992 that the pharmaceutical industry alone gleaned an estimated $1.3 billion per year as a result of the Possession Tax Credit;[29]

- A US Department of Treasury study found that despite receiving approximately half of the benefits of the Possession Tax Credit, pharmaceutical companies employed less than 20% of workers in Puerto Rico;[30]

- A report prepared by Congress's Joint Committee on Taxation concluded that for every dollar that a local employee received, pharmaceutical companies received $2.67 in tax benefits;[31]

- A 1997 report prepared by the Government Accountability Office observed that under the Possession Tax Credit, Puerto Rico's GNP grew at a slower rate than its GDP.[32] This suggests that much of the increase in income generated within Puerto Rico ultimately benefitted non-residents;[33] and

- A study published by the National Bureau of Economic Research concluded, using regression analysis, that there was no clear relationship between the value of the tax

---

[27] U.S. General Accounting Office, *Tax Policy Puerto Rico and the Section 936 Tax Credit*, 5 (1993).

[28] *See*, *e.g.*, U.S. Gov't Accountability Office, GAO- No. 18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 6 (2018) ("The possessions tax credit was criticized on the grounds that the associated revenue cost was high compared to the employment it generated . . . ."); *see also*, *e.g.*, U.S. General Accounting Office, GAO-/GGD-93-109, *Tax Policy: Puerto Rico and the Section 936 Tax Credit*, 5 (1993).

[29] *See* U.S. Gov't Accountability Office, *Pharmaceutical Industry Tax Benefits of Operating in Puerto Rico*, 12 (1992).

[30] *See* Dep't of the Treasury, *The Operation and Effect of the Possessions Corporation System of Taxation First Annual Report*, 39, 43 (1978); *see also* U.S. Gov't Accountability Office, *Pharmaceutical Industry Tax Benefits of Operating in Puerto Rico*, 12 (1992).

[31]  Joint Committee on Taxation, *An Overview of the Special Tax Rules Related to Puerto Rico and an Analysis of the Tax and Economic Policy Implications of Recent Legislative Options*, 52 (2006).

[32] U.S. General Accounting Office, GAO/GGD-97-101, *Tax Policy Puerto Rican Economic Trends*, 4, 6 (1997).

[33] *See* U.S. General Accounting Office, GAO/GGD-97-101, *Tax Policy Puerto Rican Economic Trends*, 4 (1997).

The Independent Investigator's Final Investigative Report

credits that US corporations received and how much they spent on local pay.[34]

*Second*, it is debatable whether the Possession Tax Credit even caused the positive economic developments with which it coincided.  To be sure, the Government Accountability Office has previously noted that the influx of companies to Puerto Rico following the enactment of the Possession Tax Credit also correlated with improvements in Puerto Rico's utility facilities, the skills of its labor-force and its transportation capabilities.[35]  Despite anecdotal observations to the contrary from certain witnesses with whom we spoke, the US Treasury has also concluded on at least one occasion that capital inflow to Puerto Rico resulting from the Possession Tax Credit was minimal and had a "virtually imperceptible" impact due to offsetting capital outflows.[36]

Nor does the evidence demonstrate a clear cause-and-effect relationship between the phase-out of the Possession Tax Credit and the contraction of Puerto Rico's economy in 2006.  As the Government Accountability Office recently noted, the phase-out began in 1996 and Puerto Rico's economy continued to grow through 2005.[37]

*Third*, the Possession Tax Credit failed to encourage the locally-centered economic improvement that many believe is necessary for sustainable long-term growth.  Far from equipping Puerto Rico residents with the tools for self-sufficiency, the measure maintained Puerto Rico's dependency on external investment.[38]  By definition, any local jobs created under the Possession Tax Credit were tied to employers that were rooted elsewhere.  Those jobs and industries were thus dependent upon the decision-making of external actors.  Many of those decision-makers lacked true ties to Puerto Rico and were thus not committed to keeping their business in Puerto Rico after the repeal.  In addition, much of the local industry that developed existed solely to service the companies that claimed the Possession Tax Credit, and therefore collapsed when companies left Puerto Rico after the repeal.

*Fourth* (and relatedly), the Possession Tax Credit was a political solution.  As such, it was vulnerable to political whim.  The positive impacts of the Possession Tax Credit largely evaporated together with the tax incentive, when lawmakers phased it out in furtherance of President Clinton's desire to reduce the federal deficit and the anti-pharma preferences of certain members of

---

[34] Zadia M. Feliciano & Andrew Green, National Bureau of Economic Research, *MNE's in Puerto Rico and the Repeal of Tax Credits for U.S. Corporations*, 10 (2016).

[35] U.S. Gov't Accountability Office, *Pharmaceutical Industry Tax Benefits of Operating in Puerto Rico*, 12 (1992).

[36] *See* U.S. Dep't of the Treasury, *The Operation and Effect of the Possessions Corporation System of Taxation* (1980); *see also* Joint Committee on Taxation, *An Overview of the Special Tax Rules Related to Puerto Rico and an Analysis of the Tax and Economic Policy Implications of Recent Legislative Options* (2006) (concluding that capital inflow from corporations that received the Possession Tax Credit's benefits was minimal and had a "virtually imperceptible" local impact because of other offsetting outflows).

[37] *See* U.S. Gov't Accountability Office, GAO 18-387, *Puerto Rico Debt:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 32 (2018).

[38] Lawrence A. Hunter, Institute for Policy Innovation, *Leave No State or Territory Behind: Formulating A Pro-Growth Economic Strategy For Puerto Rico*, 6 (2003).

The Independent Investigator's Final Investigative Report

Congress.[39]  Since lawmakers had not instituted more permanent, self-sustaining solutions, it was natural for Puerto Rico to experience some degree of economic shock beginning in 2006 as corporate presence diminished. It was not necessarily the phase-out of Section 936 that "caused" that shock, so much as the loss of an established industry without a meaningful replacement.

*Finally*, Puerto Rico's broader fiscal inefficiency may have tempered the Possession Tax Credit's long-term effectiveness.  For example, one GDB official conveyed that although he considered Puerto Rico's banks to have plenty of liquidity after the measure was implemented,[40] Puerto Rico never developed efficient uses for that money. A private banking official echoed this sentiment.  These witnesses commented that instead of implementing a principled investment strategy, Puerto Rico simply let the capital inflow rest in local banks that, in turn, primarily used it to finance local lending, often pursuant to degraded standards.  In that regard, one witness recalled the banks using the funds to originate and securitize local mortgages.

Ultimately, because of the lack of clarity regarding the positive net effect of the Possession Tax Credit, we cannot conclude that reviving the Possession Tax Credit would significantly improve Puerto Rico's current circumstances.

* * *

 Several witnesses with whom we spoke, including former elected officials, initially identified the repeal of the Possession Tax Credit as a critical component of Puerto Rico's current circumstances. But when we explored further, we found that most of these witnesses actually meant that Puerto Rico needs a policy incentive for more self-sustaining local growth. This is consistent with views expressed by many commentators, as well as former governors from both sides of the aisle.[41]

The evidence we have reviewed suggests that, to engender more self-sustaining growth, tax policy should focus on addressing structural challenges like outmigration, human capital development and local investment.  There is even less capacity now for home-grown investment in Puerto Rico than there was before.[42] Too many residents have lost their savings, and many who

---

[39] Sandra L. Suarez, *Does Business Learn?: Tax Breaks*, *Uncertainty and Political Strategies* (Univ. of Mich., 2000).

[40] As previously noted, these types of observations arguably stand in tension with the US Treasury's conclusion that capital inflow from corporations that received the Possession Tax Credit's benefits had a "virtually imperceptible" local impact.  *See generally* Joint Committee on Taxation, *An Overview of the Special Tax Rules Related to Puerto Rico and an Analysis of the Tax and Economic Policy Implications of Recent Legislative Options* (2006).

[41] *See generally* Office of Congresswoman Nydia Velazquez, *A Discussion on the Future of Puerto Rico's Economy* (2017).

[42] *See also*, *e.g.*, U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 32–33  (2018) (explaining that "Puerto Rico is undercapitalized, which makes it difficult for businesses to develop," identifying impact of recent hurricanes as having "caused significant damage to physical capital in Puerto Rico," and noting that difficulties in Puerto Rico's banking and housing sectors have resulted in Puerto Rico having "less capital, which may inhibit economic growth, according to some experts on Puerto Rico's economy.").

might have had the resources to reinvest locally have chosen to relocate (which US citizenship facilitates).[43] To the extent that remaining residents are physically able to earn disposable income, there are simply not enough opportunities for them to do so.[44]

A federal tax reform policy that more effectively ties local growth to the receipt of tax benefits could help stimulate the type of interim investment that Puerto Rico needs.  If Congress considers any such policies in the future, then we respectfully suggest that such policies should be crafted with an eye toward: (i) helping Puerto Rico to address the underlying weaknesses in its economy; and (ii) incorporating safeguards to ensure that any capital inflow that may result from those policies is efficiently deployed for the development of sustainable, long-term growth in Puerto Rico.

---

[43] *See, e.g.*, U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 7–8 (2018) (documenting Puerto Rico's outmigration in wake of fiscal crisis and "small and declining labor force"); *see also* U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 27–29 (2018) (explaining reasons for outmigration, and how outmigration and demographic trends like aging have diminished Puerto Rico's available labor force).

[44] U.S. Gov't Accountability Office, GAO-18-387, *Puerto Rico:  Factors Contributing to the Debt Crisis and Potential Federal Actions to Address Them*, 27–29 (2018).

# PART XVI

# INDEPENDENT INVESTIGATOR'S OVERVIEW OF POTENTIAL CAUSES OF ACTION

# PART XVI
# INDEPENDENT INVESTIGATOR'S OVERVIEW OF
# POTENTIAL CAUSES OF ACTION

As part of our independent investigation, we evaluated whether the facts support the view that any of the parties involved in Puerto Rico's fiscal crisis committed conduct that is actionable under certain US federal, state, and local laws.  Below, we discuss the consideration of potential claims available to debtors, investors, and government regulators under applicable bodies of law that arise from the facts we found.  *First*, in Part XVI.A, we provide a legal background regarding the types of claims that may be available under certain applicable securities laws, state and federal common law, and insolvency-related laws.  *Second*, in Part XVI.B, we summarize certain prior and pending investigations and litigations related to our work.  *Third*, in Part XVI.C, we apply the law to the facts and circumstances uncovered during our investigation to address the viability of prospective litigation.

Although we seek to address a broad range of potentially actionable conduct and a wide variety of potential plaintiffs and defendants, we do not purport to identify and analyze all possible claims that may be brought based on the facts uncovered by our investigation.  The purpose of this section is not to evaluate or advocate for the legal sufficiency of any particular claim on behalf of any particular group or individual.  Rather, our task is merely to identify possible claims arising out of the factual observations that we have made over the course of these approximately ten months.  As a result, our analysis of a potential claim should not be interpreted as legal advice regarding the propriety of asserting such a claim under any particular body of law, nor should our omission of a claim be interpreted as an opinion that such a claim is not viable.  Any parties considering litigation arising out of the facts described in this Report should consult counsel to determine an appropriate strategy for them in possibly pursuing their rights.

The Independent Investigator's Final Investigative Report

A.   **Legal Framework for Claims Available to Debtors, Investors, and Government Actors**

This Part provides a description of some of the legal bases for the types of claims that may be available to debtors and investors, as well as potential avenues for government enforcement actions that may arise from the evidence discovered in our investigation.  This section walks through the legal framework of the types of claims without reference to the underlying facts.  The purpose of this section is to provide the legal framework from which the facts can subsequently be analyzed.

These potential claims fall into three categories based on the source of law from which the claims derive: (i) claims arising under the securities laws of the US federal government and of Puerto Rico;[1] (ii) claims arising under the common law of Puerto Rico or other US jurisdictions; and (iii) claims arising under the US Bankruptcy Code, as incorporated under PROMESA, and applicable state law.  We address these categories in turn after we briefly explain how jurisdictions choose which law to apply to a given dispute.[2]

1.   **Choice of Law**

When a plaintiff asserts a state law cause of action in a particular case, the court must first determine which body of law to apply to the facts raised by the cause of action.  To make this determination, courts follow a two-step process known as a "choice of law" analysis.  First, the court identifies which jurisdiction's choice of law rules should apply.  Because different jurisdictions vary in how they choose which body of law should govern a case, courts must begin by determining which jurisdiction's rules to use in choosing the right law.  Second, using those rules, the court determines which jurisdiction's substantive body of law should control the causes of action at issue in the case.  Based on the below analysis, we have concluded that either Puerto Rico or New York substantive law will likely apply to the common law claims addressed below.  However, it is possible that a court could reach a different conclusion–and apply a different jurisdiction's substantive law–after completing the choice of law analysis described below.

In general, courts apply the choice of law rules of the forum state.[3]  The few exceptions to this general rule include: (i) when the forum state has enacted a law directing the court to apply different choice of law rules; (ii) when the policy objective of the forum state's choice of law rules direct the court to reach the same result as a court in another state would reach on the same facts; or (iii) when the forum state has no substantial relationship to the particular issue or the parties, and the courts of all interested states would concur in selecting a particular state's choice of law rules.[4]

---

[1] Although we have undertaken to provide a general overview of the law in Puerto Rico and have been assisted by local licensed counsel as with the other analyses in this Report, our discussion should not be interpreted as providing legal advice with respect to Puerto Rico law.

[2] This analysis is not for reliance by any specific litigant, but rather, undertaken for the statutory purposes outlined in PROMESA.

[3] *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941) (district courts sitting in diversity must follow state substantive law in the jurisdiction where the district court sits, including applicable choice of law rules); Restatement (Second) of Conflict of Laws: Applicability of Choice-of-Law Rules of Another State (Renvoi) § 8 (Am. Law. Inst. 1971).

[4] Restatement (Second) of Conflict of Laws: Applicability of Choice-of-Law Rules of Another State (Renvoi) § 8 (Am. Law. Inst. 1971).

Most states' choice of law rules apply one of two predominant tests to determine which jurisdiction's substantive law to apply in a case.  First, under the "traditional" test, the law that applies depends on the characteristics of each cause of action.  Tort claims[5] are generally governed by the law of the place where the tortious conduct occurred, while contract claims are generally governed by the place where the contract was formed or the laws that the parties have selected at the time of contracting.[6]  Second, under the "significant relationship" or "modern" test, courts combine specific rules for particular types of claims with consideration of several factors to determine which state has the most significant relationship to the case, and thus which state's law should control, including:

- The needs of the interstate and international systems;

- The relevant policies of the forum;

- The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue;

- The protection of justified expectations;

- The basic policies underlying the particular field of law;

- Certainty, predictability and uniformity of result; and

- Ease in the determination and application of the law to be applied.[7]

Both Puerto Rico and New York use the significant relationship test, under which the state with the most significant contacts to the disputed issues will apply.[8]  Assuming a lawsuit asserting the claims described below is filed in a Puerto Rico or New York court, the court will begin by analyzing a specific set of factors to determine which jurisdiction's law to apply.  For tort cases, factors that courts will consider include:

- The place where the injury occurred;

- The place where the conduct causing the injury occurred;

- The domicile, residence, place of incorporation/place of business of the parties; and

---

[5] A "tort" is a civil wrong for which a remedy may be obtained through a lawsuit by the injured party against the wrongdoer.  Tort claims typically involve intentional conduct resulting in harm or unintentional, negligent conduct that creates an unreasonable risk of harm. *See Tort,* Black's Law Dictionary (10th ed. 2014).

[6] Restatement (First) of Conflict of Laws: The Place of Wrong § 377 (Am. Law. Inst. 1934).

[7] Restatement (Second) of Conflict of Laws: Choice-of-Law Principles § 6(2) (Am. Law. Inst. 1971).

[8] *Wojciechowicz v. United States*, 474 F. Supp. 2d 291, 295 (D.P.R. 2007) (citing *New Ponce Shopping Ctr. S.E. v. Integrand Assur. Co.*, 86 F.3d 265, 267 (1st Cir. 1996)); *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 21 (1st Dep't 2006).

The Independent Investigator's Final Investigative Report

- The place where any relationship between the parties is centered.[9]

In contract cases, courts will consider the following factors:

- The place of contracting;

- The place of negotiation;

- The place of performance;

- The location of the subject matter; and

- The contracting parties' domiciles.[10]

The choice of law analysis will determine the substantive elements and standards governing the claims asserted in a given case.

On the basis of our investigation, a substantial part of the potentially tortious conduct that we have observed occurred within Puerto Rico or New York. In addition, the overwhelming majority of the relevant contracts were entered in Puerto Rico or New York, and many of these contracts contained a choice of law provision[11] specifying that any litigation arising from the contract must be governed by the substantive law of one of these jurisdictions. Accordingly, for the purpose of our analysis below, we assume that either Puerto Rico or New York substantive law will apply to the claims that we have identified, in addition to federal statutory and common law. We recognize, however, that a lawsuit asserting claims related to Puerto Rico's fiscal crisis could be filed in any jurisdiction, and a state or federal court could decide to apply a different body of law in that case.

Also, in cases arising in New York, even if New York law were to govern, it is still possible that another state's limitations period could apply. Under New York's "borrowing statute," when a cause of action accrues outside New York (*i.e.*, comes into existence as a legally enforceable claim outside of New York), the complaint must be timely filed under the statute of limitations of both New York and the jurisdiction where the cause of action accrued.[12]

## 2. Securities Claims

When disputes arise from the offer, sale and purchase of municipal bonds, buyers may have recourse against issuers, sellers, and other professionals under federal or state securities law. Below is a summary of the primary provisions that could be applicable to the facts uncovered in our investigation.

---

[9] *See, e.g.*, *Leslie v. Construcciones Aeronauticas, S.A. (CASA)*, 896 F. Supp. 243, 247 (D.P.R. 1995); Restatement (Second) of Conflict of Laws: The General Principle § 145 (Am. Law. Inst. 1971).

[10] *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 21 (1st Dep't 2006); Restatement (Second) of Conflict of Laws: Law Governing in Absence of Effective Choice by the Parties § 188 (Am. Law. Inst. 1971).

[11] Contractual choice of law provisions are generally enforceable unless procured by fraud or overreaching, even if, under a traditional choice of law analysis, the application of the chosen law would violate a fundamental public policy of another, more interested jurisdiction. *See Tosapratt, LLC v. Sunset Props., Inc.*, 86 A.D.3d 768, 770 (3d Dep't 2011).

[12] N.Y. C.P.L.R. § 202.

The Independent Investigator's Final Investigative Report

### (a)    Regulating Agencies

As set out in greater detail below, municipal securities, more commonly known as municipal bonds, are primarily regulated by SEC and MSRB.  In Puerto Rico, OCIF also regulates municipal securities.[13]

SEC is a federal government agency with the mission "to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation."[14]  SEC enforces the federal laws that govern municipal securities and is authorized to bring enforcement actions against municipal bond issuers who violate those provisions.[15]  SEC also requires certain parties involved in the municipal bond issuance process—including brokers, dealers, and advisors—to register with SEC and comply with its rules.[16]

MSRB, on the other hand, is a self-regulatory organization subject to oversight by SEC.[17]  Congress established MSRB to protect municipal bond investors, municipalities, and the public interest by regulating the activities of broker-dealers and banks that buy, sell, and underwrite municipal bonds.[18]  MSRB also regulates municipal advisors that consult municipal entities about the issuance of bonds and other financial products.  To achieve its mission, MSRB has established a number of rules and regulations governing the conduct of players in the municipal bond market.[19]  MSRB also maintains a database called the Electronic Municipal Market Access system ("EMMA"), a tool for municipal bond investors to obtain information about the suitability and pricing of bond offerings.[20]

### (b)    Relevant Securities Laws and Implementing Regulations

Even though municipal bonds are exempt from the federal securities registration and reporting requirements that apply to other securities offered to the public,[21] municipal bonds are subject to the antifraud provisions of the federal securities laws.

To protect investors, federal securities laws and regulations require issuers and underwriters to timely disclose material information about municipal bond offerings.  The purpose of securities laws is to "provide investors with full disclosure of material information

---

[13] P.R. Laws Ann. Tit. 10, § 881 (2018).

[14] *See* Securities and Exchange Comm'n, *What We Do*, https://www.sec.gov/Article/whatwedo.html.

[15] *See Statement of the Commission Regarding Disclosure Obligations of Municipal Securities Issuers and Others*, Exchange Act Release No. 33741, 1994 WL 73628 (Mar. 9, 1994) (analyzing SEC jurisdiction).

[16] *See* 15 U.S.C. §§ 78o-4(c)(1)–(2). (2016).

[17] *See* 15 U.S.C. § 78o-4(b) (2016) (establishing MSRB).

[18] *See* 15 U.S.C. § 78o-4(b) (2016).

[19] *See* Mun. Sec. Rulemaking Bd., *MSRB Rules and Guidance*, http://www.msrb.org/Rules-and-Interpretations/MSRB-Rules.aspx (last visited Aug. 19, 2018).

[20] *See* Mun. Sec. Rulemaking Bd., *Electronic Municipal Market Access System*, http://emma.msrb.org; *see also* U.S. Securities and Exchange Comm'n, *Order Granting Approval of Proposed Rule Change Relating to the Establishment of a Primary Market Disclosure Service and Trade Price Transparency Service of the Electronic Municipal Market Access System and Amendments to MSRB Rules G-32 and G-36*, Exchange Act Release No. 59966, 74 Fed. Reg. 25790 (May 29, 2009) (establishing rules for the maintenance of EMMA).

[21] *See* 15 U.S.C. §§ 77c(a)(2), 77r(b)(4)(E) (2016).

concerning public offerings of securities in commerce, to protect investors against fraud and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing."[22]   These laws and regulations prohibit issuers and dealers who buy, sell and underwrite municipal securities, from making any false or misleading statement of material fact, and from omitting any material facts in connection with the offer, purchase, or sale of any municipal security.[23]   More specifically, they impose requirements designed, among other things, to prohibit fraud, require certain disclosures, and prevent conflicts of interests as follows:

- Section 17(a) of the Securities Act of 1933 ("Section 17(a)") prohibits fraud and misrepresentations in the offer and sale of securities;

- Section 10(b) of the Exchange Act ("Section 10(b)") and SEC Rule 10(b)(5) prohibit intentional misrepresentations and omissions of material fact;

- Section 15B(a)(5) of the Exchange Act ("Section 15B(a)(5)") prohibits municipal advisors from fraudulent, deceptive, or manipulative acts in connection with the issuance of municipal securities;

- Section 15B(c)(1) of the Exchange Act ("Section 15B(c)(1)") prohibits municipal advisors from breaching their fiduciary duties to municipal entity clients;

- SEC Rule 15c2-12 requires timely delivery of official statements to investors and continuing disclosures, including the timely filing of audited financial statements;

- MSRB Rule G-47 requires the disclosure of material information but applies only to broker-dealers;[24]

- MSRB Rule G-17 prohibits brokers, dealers, and municipal advisors from engaging in any deceptive, dishonest, or unfair practice; and

- MSRB Rule G-23 prohibits brokers, dealers, and municipal securities dealers who are acting as financial advisors on a bond issuance from underwriting the issuance.

### (c)      Due Diligence and Disclosures

As context for our discussion on the federal and local securities laws that prohibit material misrepresentations and omissions of material facts, we briefly discuss the context in which material misrepresentations and omissions may arise.

Required disclosures for each municipal bond offering are typically made in an official

---

[22] *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).
[23] *See* 15 U.S.C. § 77q(a) (2016) (prohibiting fraud and misrepresentations in the offer and sale of securities); 15 U.S.C. § 78j-2 (2016); 17 CFR 240.10b-5 (2018) (prohibiting intentional misrepresentations and omissions of material fact); MSRB Rule G-47 (applying only to broker-dealers and requiring the disclosure of material information); *see also* MSRB Rule G-32 (governing customer disclosure requirements); MSRB Rule G-17 (prohibiting brokers, dealers, and municipal advisors from engaging in any deceptive, dishonest, or unfair practice).
[24] *See also* MSRB Rule G-32 (governing customer disclosure requirements).

statement that provides potential investors with information about the issuer, the bonds, and the project to be financed with bond proceeds.  Issuers generally have a duty to provide complete and truthful disclosures, and "[b]y participating in an offering, an underwriter makes an implied recommendation about the securities [and that it] . . . has a reasonable basis for belief in the truthfulness and completeness of the key representations made in any disclosure documents used in the offerings."

The underwriters' investigation is commonly known as "due diligence."  By underwriting bonds, and as a result of the due diligence process, banks imply "a reasonable basis for belief in the truthfulness and completeness of the key representations" contained in any disclosure documents used in the offering.[25] In fact, "an underwriter may violate the antifraud provisions of the federal securities laws if it does not have a reasonable basis for believing the truthfulness of material statements in the offer or sale of securities as a result of inadequate due diligence."[26]  Generally known as gatekeepers, "underwriters have a 'heightened obligation' to ensure adequate disclosure."[27]

Due diligence varies according to the type of bond being offered, the complexity of the transaction, and the type of issuer.  Generally, due diligence can include meetings with the issuer and its governing board, on-site visits to the facility or project that will be financed by the bond proceeds, and a comprehensive review of the issuer's finances.  Underwriters are required to consider information that could affect the issuer's future ability to repay bonds when due, including pending litigation, environmental factors, adverse trends in the issuer's tax base or revenue streams, and the status of unfunded pension liabilities.[28]

We turn next to the federal laws and rules that govern disclosures, due diligence, and municipal bond issuances.

### (d)    Section 17(a) of the Securities Act of 1933

In relation to the offer or sale of any security, or security-based swap agreement, Section 17(a) includes three categories of prohibitions for **all persons**, including issuers, underwriters, broker-dealers, and all other professionals involved in the offer and sale of bonds. The first category is set out in Section 17(a)(1), which prohibits the use of any device, scheme, or artifice to commit fraud.   Section 17(a)(2) prohibits obtaining money or property by means of any untrue statement of material fact, or omission of any material fact, that is necessary so that the statements that are made are not misleading.[29]  Misrepresentations and omissions are

---

[25] Mun. Sec. Disclosure, SEC Release No. 34-26100, 53 Fed. Reg. 37778 (Sept. 22, 1988); Proposed Amendments to SEC Rule 15c2-12, SEC Release No. 34-80130, 2017 WL 839491 (Mar. 1, 2017); SEC Office of Compliance Inspections and Examinations, *National Examination Risk Alert: Strengthening Practices for the Underwriting of Municipal Securities* (Mar. 19, 2012),

[26] Lawson Fin. Corp., *Securities Act Release No. 10334,* 2017 WL 1245083, 11 (Apr. 5, 2017).

[27] *See* Lawson Fin. Corp., *Securities Act Release No. 10334,* 2017 WL 1245083, 11 (Apr. 5, 2017) (quoting *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008) (internal citations omitted)); *see also* Press Release, U.S. Sec. & Exch. Comm'n, SEC Charges Muni Bond Underwriter With Gatekeeper Failures (Apr. 5, 2017)  ("[u]nderwriters are critical gatekeepers relied upon by investors to ensure that accurate information is being provided in municipal bond offering documents").

[28] *See* Mun. Sec. Rulemaking Bd., *Overview of Disclosure Obligations for Primary Offering of Municipal Securities* (2018).

[29] Some courts have found that this prohibition includes money obtained legally through bonuses or increased pay. *See SEC v. Norton*, 21 F. Supp. 2d 361, 365 (S.D.N.Y. 1998).

material "if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision."[30]  Section 17(a)(3) prohibits engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a buyer of securities.

Individuals may violate Sections 17(a)(2) and (3) through negligent acts.[31]  In one case, for example, the court instructed the jury that it could "consider any evidence of industry practice, custom, or standards, as they pertained to a reasonably prudent person in [defendant's] position at the time."[32]  In other words, the jury could judge defendant's negligence by comparing his actions to those of his peers and the expected practices within the securities industry.  In its administrative complaints, SEC similarly defines negligence as "a failure by an actor to conform conduct to the standard of 'a reasonable [person] under like circumstances.'"[33]  SEC has also concluded that a person acts negligently if he "knew or should have known" that his actions violated federal securities laws.[34]

### (e)　Section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5

Section 10(b) prohibits all persons from using "any manipulative or deceptive device or contrivance" that contravenes any SEC rules designed to protect investors and the public interest.[35]  To implement Section 10(b), SEC promulgated SEC Rule 10b-5 in 1942.[36]  This long-standing rule is a widely known prohibition on fraud in the securities market.  More specifically, the rule makes it illegal for any person, in connection with the purchase or sale of any security, to use any device, scheme, or artifice to commit fraud, or to make any untrue statement of material fact, or to omit any material fact that is necessary so that the statements that are made are not misleading.[37]

Facts are "material" for purposes of SEC Rule 10b-5 if there is a substantial likelihood that a reasonable investor would consider it important in making his investment decision.  Courts do not assess materiality in a vacuum, but instead consider the "total mix" of information that is available to investors.  In 2011, the Supreme Court of the United States made an important ruling relating to false and misleading statements under SEC Rule 10b-5, holding that only "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it" may be held liable for a false or misleading statement.[38]

In addition to being material, a misrepresentation must be untrue.  An untrue statement

---

[30] *See Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).
[31] *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980).
[32] *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980).
[33] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 8 (Jan. 10, 2017) (citing Restatement (Second) of Torts §§ 282-83 (Am. Law Inst. 1977)).
[34] *See KPMG, LLP v. SEC*, 289 F.3d 109, 120 (D.C. Cir. 2002) (denying petition for review of Commission decision).
[35] 15 U.S.C. § 78j (2016).
[36] *See* 17 C.F.R. 240.10b-5 (2018).
[37] 17 C.F.R. § 240.10b-5 (2018).
[38] *Janus Capital Grp., Inc. v. First Derivative Trader*, 131 S. Ct. 2296, 2302 (2011).

of fact is one that was false "***at the time it was made***."[39] An untrue statement of opinion or belief is false if (i) the opinion or belief "constitutes a factual ***misstatement***" in itself; or (ii) the opinion or belief is "rendered misleading by the ***omission*** of discrete factual representations."[40]

Although SEC Rule 10b-5 is similar to Section 17(a), discussed above, there are two important differences between the two.  Unlike Section 17(a) which encompasses negligent conduct, SEC Rule 10b-5 requires intent.[41]  The two are also different because Section 17(a) does not permit individuals to bring their own lawsuits to enforce the law, while SEC Rule 10b-5 does.[42]

While SEC generally has five years to seek civil penalties and other relief that seeks to punish defendants who violate federal securities laws,[43] some courts have held that this time limitation does not apply to enforcement actions that seek to remedy a past wrong or protect the public from future harm.[44]  For private actions under Section 10(b) and SEC Rule 10b-5 the limitations period is the earlier of two years after "discovery of the facts constituting the violation" or five years after such violation.[45]  The two-year period is known as the statute of limitations, while the five-year period is known as a statute of repose. Statutes of limitations generally begin to run "when the plaintiff did in fact discover, or . . . when a reasonably diligent plaintiff would have discovered," the facts constituting the securities fraud violation.[46]  Statutes of repose generally begin to run when the violation occurred, without regard to when it was discovered.[47]

### (f)      Section 15B(a)(5) and Section 15B(c)(1)

Section 15B(a)(5) prohibits municipal advisors from engaging "in any fraudulent, deceptive, or manipulative act or practice" in connection with the issuance of any municipal security.  A municipal advisor is a person or entity (other than a municipal entity and its staff) that "provides advice to or on behalf of a municipal entity or obligated person with respect to municipal financial products or the issuance of municipal securities, including advice with respect to the structure, timing, terms, and other similar matters concerning such financial products or issues."[48]  The term explicitly includes financial advisors, guaranteed investment contract brokers, third-party marketers, placement agents, solicitors, finders, and swap advisors, but excludes brokers, dealers, underwriters, registered investment advisers, registered commodity trading advisors (and persons associated with a commodity trading advisor who

---

[39] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 67 (S.D.N.Y. 2015) (quoting *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y 2014) (emphasis in original)).
[40] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69 (S.D.N.Y. 2015) (*quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015) (emphasis in original)).
[41] *Aaron v. SEC*, 446 U.S. 680, 696–97 (1980).
[42] *Touche & Ross Co. v. Redington*, 442 U.S. 560, 568–71 (1979).
[43] 28 U.S.C. § 2462 (2004).
[44] *See SEC v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007).
[45] 28 U.S.C. § 2462 (2016).
[46] *See Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010).
[47] *See Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010).
[48] 15 U.S.C. § 78o-4 (2016).

are providing advice related to swaps), attorneys offering legal advice or services, and engineers providing engineering advice.[49]

Section 15B(c)(1) further provides that municipal advisors owe their municipal entity clients a fiduciary duty and prohibits municipal advisors from engaging in any act, practice, or course of business that is inconsistent with this fiduciary duty. As the SEC explains in its administrative proceedings, "[i]t is well settled that fiduciaries must act in utmost good faith, use reasonable care to avoid misleading clients, and fully and fairly disclose conflicts of interest."[50]   To avoid violating this fiduciary duty, municipal advisors must disclose any conflicts of interest caused by issues that affect the advisor's economic interest.[51]

### (g)   SEC Rule 15c2-12

SEC Rule 15c2-12, known as the continuing disclosure rule, requires underwriters who participate in bond issuances with an aggregate principal amount of $1,000,000 or more to ensure that the issuer agrees to provide financial information to MSRB about the bonds on an ongoing basis.[52]   These continuing disclosure requirements include:

- The timely filing of audited financial statements;

- Event notices for principal and interest payment delinquencies;

- Non-payment related defaults;

- Unscheduled draws on debt service reserves reflecting financial difficulties;

- Unscheduled draws on credit enhancements reflecting financial difficulties;

- Substitution of credit or liquidity providers, or their failure to perform;

- Adverse tax opinions or events affecting the tax-exempt status of the security;

- Modifications to rights of security holders, bond calls and tender offers;

- Defeasances, release, substitution or sale of property securing repayment of the securities;

- Rating changes, bankruptcy, insolvency or receivership;

- Merger, acquisition or sale of all issuer assets; and

---

[49] 15 U.S.C. § 78o-4(e)(4) (2016).
[50] Barcelona Strategies, LLC, *Exchange Act Release No. 83191,* 2018 WL 2128677, 4 (May 9, 2018) (citing *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963)).
[51] Barcelona Strategies, LLC, *Exchange Act Release No. 83191,* 2018 WL 2128677, 4 (May 9, 2018) (citing *SEC v. Wall Street Publ'g Inst., Inc.*, 591 F. Supp. 1070, 1084 (D.D.C. 1984)); *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir. 2003); *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013).
[52] 17 C.F.R. § 240.15c2-12(b)(5)(i) (2018).

- Appointment of successor trustee.[53]

Underwriters generally comply with their obligations under SEC Rule 15c2-12 by ensuring that the issuer enters into a written Continuing Disclosure Agreement ("CDA") under which the issuer agrees to provide information and event notices to the MSRB, as required by SEC Rule 15c2-12.[54] The purpose of the CDA is to help municipal securities dealers satisfy their obligation (among others) to have a reasonable basis to recommend securities in the secondary markets.[55]

As set out by the SEC, "[o]ne of the purposes of [SEC] Rule 15c2-12 is to encourage dissemination of secondary market disclosure so that investors can better protect themselves from misrepresentation or other fraudulent activities."[56] Furthermore, "[a] lack of consistent secondary market disclosure impairs investors' ability to acquire information necessary to make intelligent, informed investment decisions, and thus, to protect themselves from fraud."[57] SEC also emphasizes that "the timeliness of financial information is a major factor in its usefulness."[58]

### (h)     MSRB Rule G-17

MSRB Rule G-17 provides that brokers, dealers, and municipal advisors must deal fairly with all persons involved in a municipal bond transaction and must not engage in any deceptive, dishonest, or unfair practice.  According to MSRB guidance, the rule's prohibition against fraud is similar to the standard set forth in SEC Rule 10b-5.  Thus brokers, dealers, and municipal advisors "must refrain from engaging in certain conduct and must not misrepresent or omit the facts, or other material information about municipal advisory activities. . . . " Moreover, even in the absence of fraud, these professionals "must deal fairly with all persons." As with violations of Section 17(a) of the Securities Exchange Act, negligence is sufficient to establish a violation of Rule G-17.[59]

### (i)     MSRB Rule G-23

MSRB Rule G-23 prohibits brokers, dealers, and municipal securities dealers who are acting as financial advisors on a bond issuance from underwriting the issuance.  A person or entity is a financial advisor under this rule when the person or entity agrees to provide advice with respect to structure, timing, terms, or other similar matters.[60]

---

[53] 17 C.F.R. § 240.15c2-12(b)(5)(i) (2018).

[54] Mun. Fin. Servs., Inc., *Exchange Act Release No. 81475,* 2017 WL 3634288, 2 (Aug. 24, 2017).

[55] *See* Municipal Securities Disclosure, *Exchange Act Release No. 34961,* 59 (Nov. 10, 1994); Fed. Reg. 59590,59591 (Nov. 17, 1994).

[56] Mun. Fin. Servs., Inc., *Exchange Act Release No. 81475,* 2017 WL 3634288, 2 (Aug. 24, 2017).

[57] Mun. Fin. Servs., Inc., *Exchange Act Release No. 81475,* 2017 WL 3634288, 2 (Aug. 24, 2017)..

[58] Mun. Fin. Servs., Inc., *Exchange Act Release No. 81475,* 2017 WL 3634288, 2 (Aug. 24, 2017) (citing U.S. Sec. & Exch. Comm'n, *Report on the Municipal Securities Market* 74 (July 31, 2012)); Statement of the Commission Regarding Disclosure Obligations of Municipal Securities Issuers and Others, *Exchange Act Release No. 33741,* 60 (Mar. 9, 1994).

[59] Merrill Lynch, Pierce, Fenner & Smith, Inc., *Exchange Act Release No. 40352,* 1998 WL 518489, 13 (Aug. 24, 1998).  Rule G-17 applies to municipal advisors and associated persons as of December 22, 2010.

[60] *See* Mun. Sec. Rulemaking Bd., *MSRB Notice 2011-65* (2011).

### (j)   MSRB Rule G-47

In 2014, SEC approved MSRB Rule G-47, which provides that dealers cannot sell or purchase municipal bonds without disclosing to the customer, at or before the time-of-trade, all material information known about the transaction and material information about the bond that is reasonably accessible to the market.[61]  Information is "material" under this rule if there is a substantial likelihood that the information would be considered important or significant by a reasonable investor in making an investment decision.  Material information includes a complete description of the bond and the features that a reasonable investor would likely consider significant, as well as facts that are material to assessing potential risks.

"Reasonably accessible to the market" means that information is available publicly through "established industry sources," including the EMMA system, rating agency reports, and other sources of information generally used by dealers in similar transactions.  Notably, dealers are not relieved of their disclosure obligations by the fact that material information may be availability through EMMA or other public sources.

### (k)   SEC Enforcement Actions

SEC enforces federal securities laws, its own rules, and MSRB rules through administrative proceedings and civil lawsuits.  SEC's administrative proceedings differ from civil lawsuits in several respects.  The greatest difference is that an administrative law judge presides over administrative proceedings, while SEC's civil lawsuits are heard in federal courts by judges who are appointed by the President of the United States and confirmed by the Senate.

Administrative law judges issue recommended findings of fact and conclusions of law, which SEC can affirm or reverse.  As administrative sanctions, SEC may issue cease and desist orders, suspend or revoke broker-dealer and investment advisor registration, bar individuals from working in the securities industry, order civil monetary penalties, and order disgorgement.

In a federal civil lawsuit, SEC may seek injunctions, or court orders that prohibit further violations of securities laws and SEC rules.[62]  SEC may also seek disgorgement, civil monetary penalties, and orders barring individuals from serving as corporate officers or directors.[63]

### (i)   Municipal Securities Enforcement Actions

In the past decade, SEC's enforcement actions in the municipal securities market have targeted material misrepresentations and omissions, conflicts of interest, breaches of fiduciary duty, pay-to-play schemes, the failure to make continuing disclosures, the failure to conduct reasonable due diligence, and fraudulent use of proceeds from bond issuances.  We discuss particular cases in each area in greater detail below.

---

[61] *See* Mun. Sec. Rulemaking Bd., *MSRB Rule Book 345–46* (Apr. 1, 2018).

[62] *See* 15 U.S.C. §§ 77t(b), 78u(d)(1) (2012).

[63] *See SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474–77 (2d Cir. 1995) (disgorgement); 15 U.S.C. §§ 77t(d), 78u(d)(3) (2012) (civil monetary penalties); 15 U.S.C. § 78u(d)(2) (2012) (bar from service).

### (ii)      Material Misrepresentations And Omissions

SEC's enforcement actions in the municipal securities market have focused in large part on material misrepresentations and omissions.  In one particularly instructive case, SEC initiated administrative proceedings against the Port Authority of New York and New Jersey (referred to in this Part XVI as the "Port Authority"), alleging that the Port Authority approved $1.8 billion in non-revenue generating projects without disclosing to investors known material risks arising from "the potential lack of legal authority to fund these projects."[64]  SEC alleged that the Port Authority's lawyers "explicitly identified" the risk of a legal challenge and cautioned the Port Authority on multiple occasions that the projects could fall outside the scope of the Port Authority's mandate.[65]  Internally, staff stated "there is no clear path to legislative authority to undertake such projects," but the Port Authority failed to publicly disclose any risk of a legal challenge.[66]  Instead, the official statements provide that the Port Authority issued bonds "only for purposes for which the Port Authority is authorized by law to issue bonds."[67]  Finding that the Port Authority omitted material facts, SEC charged the Port Authority with violating Sections 17(a)(2) and 17(a)(3) of the Securities Act.[68]  The Port Authority admitted wrongdoing and paid a $400,000 penalty to settle charges.[69]

Other material misstatement or omission cases have arisen from the failure to disclose an issuer's deteriorating financial condition.  In *SEC v. Town of Ramapo*, SEC alleged that town officials failed to disclose a strain on the town's finances which was caused by a $60,000,000 baseball stadium and declining sales and property tax revenues.[70]  To hide the strain, according to SEC, city officials "cooked the books" of the city's operating fund and disclosed fraudulently inflated balances.  SEC reasoned that investors "consider the condition of a municipality's general fund when making investment decisions," and that city officials made material misrepresentations in violation of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act, and SEC Rule 10b-5.  SEC sought financial penalties, a court order appointing an independent consultant for Ramapo, and an order prohibiting the city officials from participating in future municipal bond offerings.  Three officials ultimately consented to lifetime bars prohibiting them from participating in municipal bond offerings and to the payment of civil penalties.

Also relating to the failure to disclose an issuer's deteriorating financial condition, in a case involving the City of Harrisburg, Pennsylvania, SEC found that Harrisburg failed to comply with requirements that it provide ongoing financial information and audited financial statements.[71]  Because of this failure, investors were forced to seek information about Harrisburg's financial condition from other public statements, including the city's budget, State of the City address, and mid-year fiscal report.[72]  SEC found that the City was nearly bankrupt and that it did not timely submit annual financial information, audited financial statements, or material event notices about its failure to submit financial information or its credit rating

---

[64] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 1 (Jan. 10, 2017).

[65] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 1 (Jan. 10, 2017).

[66] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 6 (Jan. 10, 2017).

[67] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 7 (Jan. 10, 2017).

[68] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 1–2 (Jan. 10, 2017).

[69] Port Auth. of N.Y. and N.J., *Securities Act Release No. 10278,* 2017 WL 83465, 3 (Jan. 10, 2017).

[70] *See generally SEC v. Town of Ramapo*, No. 16-cv-2779 (S.D.N.Y. Apr. 14, 2016).

[71] *See* City of Harrisburg, *Exchange Act Release No. 69515*, 2013 WL 1869030 (May 6, 2013).

[72] City of Harrisburg, *Exchange Act Release No. 69515*, 2013 WL 1869030, 2 (May 6, 2013).

downgrades.[73]  Since the publicly available information, including the City's budget and the State of the City address, failed to disclose the City's deteriorating financial condition, the City violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.[74]

SEC has also brought numerous cases relating to pension fund bonds, where issuers allegedly failed to properly disclose material pension liabilities and other risks to investors.  In one case, SEC sanctioned New Jersey because it failed to disclose to investors that it was underfunding the state's two largest pension plans.[75]  SEC found that New Jersey sold more than $26 billion of municipal bonds spread across 79 offerings, and that the official statements for the bonds created the false impression that the pension systems were adequately funded.[76]

SEC filed similar charges against Kansas and Illinois for misleading pension disclosures. In the Kansas case, SEC found that even though the Kansas Public Employees Retirement System was the second-most underfunded statewide public pension system in the nation, the official statements for the bonds did not disclose the system's significant unfunded liability.[77]  SEC noted that the official statements also failed to disclose the effect of the unfunded liability on the risk of the legislature's non-appropriation of debt service payments.[78]

SEC found that the state of Illinois also failed to disclose to investors that its statutory plan significantly underfunded the state's pension obligations and increased the risk to its overall financial condition.[79]  According to SEC's Order, Illinois disclosed legislative amendments to the pension plan, but did not disclose the effect of the changes on the state's ability to meet its pension obligations.[80]  Illinois agreed to settle SEC's charges.

### (iii)  Continuing Disclosures

In August 2017, SEC initiated administrative proceedings against an issuer for failing to disclose that it had regularly failed to timely file continuing disclosures.[81]  From 2003 to 2013, the Beaumont Financing Authority had issued approximately $260 million in municipal bonds in 24 separate offerings for the development of public infrastructure.  For each offering, Beaumont agreed to provide investors with annual continuing disclosures, including important financial information and operating data.

From at least 2004 to April 2013, Beaumont regularly failed to provide investors with the promised information. It also failed to disclose this poor record of compliance in the relevant official statements for 2012 and 2013.  SEC found that "[a]s a result, the bonds appeared more attractive and investors were misled about the likelihood that the district would comply with its continuing disclosure obligations in the future." Although SEC prosecuted this case for material misrepresentations under Sections 17(a)(2) and 17(a)(3) of the Securities Act, SEC relied on the fact that Beaumont had entered into a CDA pursuant to SEC Rule 15c2-12,

---

[73] City of Harrisburg, *Exchange Act Release No. 69515*, 2013 WL 1869030, 1 (May 6, 2013).

[74] City of Harrisburg, *Exchange Act Release No. 69515*, 2013 WL 1869030, 1 (May 6, 2013).

[75] *See* New Jersey, *Securities Act Release No. 9135*, 2010 WL 3260860 (Aug. 18, 2010).

[76] New Jersey, *Securities Act Release No. 9135*, 2010 WL 3260860, 8 (Aug. 18, 2010).

[77] *See* Kansas, *Securities Act Release No. 9629*, 2014 WL 3896055 (Aug. 11, 2014).

[78] Kansas, *Securities Act Release No. 9629*, 2014 WL 3896055, 1 (Aug. 11, 2014).

[79] *See* Illinois, *Securities Act Release No. 9389*, 2013 WL 873208 (Mar. 11, 2013).

[80] Illinois, *Securities Act Release No. 9389*, 2013 WL 873208, 1 (Mar. 11, 2013).

[81] *See* Beaumont Fin. Auth., *Securities Act Release No. 10406*, 2017 WL 3614281 (Aug. 23, 2017).

The Independent Investigator's Final Investigative Report

which requires underwriters to take measures to ensure timely continuing disclosures, including the timely filing of audited financial statements.[82]

SEC also filed civil complaints against the underwriter and against an individual who was both Beaumont's City Manager and the Executive Director of the Beaumont Financing Authority. The City Manager agreed to pay a civil penalty and to be barred from participating in any future municipal bond offerings, and the underwriter agreed to civil penalties.

### (iv)    Conflicts Of Interest

Several SEC municipal securities enforcement cases have involved alleged conflicts of interests among municipal advisors. In one case, SEC charged a municipal advisor with defrauding a south Texas school district because he overstated and misrepresented his municipal finance experience, and failed to disclose that he was employed by the same attorneys who served as bond counsel for the three offerings for which he served as an advisor to the school district.[83] The municipal advisor agreed to disgorgement, a civil penalty, and a bar prohibiting him from associating with municipal advisors and other regulated entities. In another recent case, SEC filed a civil action against a municipal advisor who allegedly defrauded the City of Rolling Fork, Mississippi by overcharging the municipality for its services. The advisor also failed to disclose to the city that he accepted $2,500 from a municipal underwriter shortly before the advisor recommended to the city that it hire the underwriter for a bond offering.[84] SEC alleges that the municipal advisor violated Sections 15B(a)(5) and 15B(c)(1) of the Exchange Act and MSRB Rule G-17 and is seeking injunctions, civil penalties, and disgorgement.

In a separate case, SEC charged a Kansas-based municipal advisor with breach of its fiduciary duty for failing to disclose to its municipal client that two of the advisor's employees arranged for the offerings to be underwritten by a broker-dealer where the advisor and the two employees also worked.

### (v)    Pay-to-Play Schemes

"Pay-to-Play" is a phrase that is used in many contexts and generally means that money is exchanged illegally for the privilege of taking part in a particular business activity. In one recent case, SEC filed a civil action against a public official, alleging that he solicited and received a $75,000 bribe from a contractor who stood to benefit from a multi-million dollar construction project that would be funded with bond proceeds.[85] SEC alleges that this conduct violates Section 10(b) of the Exchange Act, SEC Rule 10b-5, and Section 17(a)(1) of the Securities Act of 1933 because reasonable investors and the City Council would have considered information regarding this bribe, or pay-to-play scheme, as important to their decision-making process. SEC noted that an investor told SEC that "the existence of corruption would have been an important fact for it to know prior to its purchase" of bonds.[86] To resolve

---

[82] Beaumont Fin. Auth., *Securities Act Release No. 10406*, 2017 WL 3614281, 2 (Aug. 23, 2017).

[83] *See* Barcelona Strategies, LLC, *Exchange Act Release No. 83191*, 2018 WL 2128677 (May 9, 2018).

[84] *See generally SEC v. Malachi Fin. Prods., Inc.*, No. 3:18-cv-1 (S.D. Miss. Jan. 2, 2018).

[85] *See generally SEC v. Webb*, No. 17-8685 (N.D. Ill. Dec. 1, 2017).

[86] Complaint ¶ 19, *SEC v. Webb*, No. 17-8685, (N.D. Ill. Dec. 1, 2017).

the case, the official agreed to a permanent injunction barring him from participating in future municipal bond offerings.[87]   The judge will determine disgorgement and penalties, if any.[88]

### (vi)   <u>Due Diligence</u>

In 2017, SEC settled charges against an underwriter and underwriter's counsel relating to due diligence obligations arising from conduit[89] municipal bond offerings.[90]  SEC found that the underwriter failed to be a "gatekeeper" by failing to conduct reasonable due diligence.  As gatekeepers, underwriters "have a 'heightened obligation' to ensure adequate disclosure."[91] *See* Part XVI.A.2(c), for a discussion on the gatekeeper function.

As we explained in Part XVI.A.2, federal securities laws require municipal securities issuers and borrowers (among others) to periodically update financial information through an official document that is filed with the MSRB.  In this recent enforcement action, SEC concluded that the underwriter conducted "inadequate due diligence."[92]  More specifically, the underwriter failed to ensure that the conduit borrowers (who were private businessmen renovating nursing homes and senior living facilities) complied with continuing disclosure obligations under SEC Rule 15c2-12.  SEC noted that the underwriter failed to independently determine if continuing disclosures were timely filed and instead "relied solely" on the conduit borrowers' representations.[93]  Since the underwriter failed to conduct its own investigation, it "failed to form a reasonable basis for believing the truthfulness of material statements in the official statements for the offerings, including statements regarding the [conduit] borrowers' compliance with prior continuing disclosure undertakings."[94]

SEC found that as a result of this conduct, the underwriter willfully violated Sections 17(a)(2) and (3) of the Securities Act, Section 15(c)(2) of the Exchange Act, and SEC Rule 15c2-12.[95]  SEC also found that underwriters' counsel willfully violated Sections 17(a)(2) and (3) of the Securities Act, Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder, and aided and abetted and caused the underwriters' violation of Section 15(c) of the Exchange Act and SEC Rule 15c2-12.[96]

---

[87] Judgement as to Defendant David Webb, Jr. ¶ 19, *SEC v. Webb*, No. 17-8685, (N.D. Ill. Dec. 12, 2017).

[88] Judgement as to Defendant David Webb, Jr. ¶ 19, *SEC v. Webb*, No. 17-8685, (N.D. Ill. Dec. 12, 2017).

[89] A conduit municipal bond offering is one in which "a municipal entity technically serves as the issuer but issues the bonds on behalf of a 'conduit' borrower such as a private college, hospital, or nursing home." *See* Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 4 (Apr. 5, 2017).

[90] *See* Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083 (Apr. 5, 2017); Lynch, *Securities Act Release No. 10335*, 2017 WL 1245084 (Apr. 5, 2017).

[91] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 11 (Apr. 5, 2017) (quoting *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 641 (D.C. Cir. 2008) (internal citations omitted)); *see also* Press Release, U.S. Sec. & Exch. Comm'n, *SEC Charges Muni Bond Underwriter With Gatekeeper Failures* (Apr. 5, 2017) (on file with author) ("[u]nderwriters are critical gatekeepers relied upon by investors to ensure that accurate information is being provided in municipal bond offering documents").

[92] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 2 (Apr. 5, 2017).

[93] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 8 (Apr. 5, 2017).

[94] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 1 (Apr. 5, 2017).

[95] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 12 (Apr. 5, 2017).

[96] Lawson Fin. Corp., *Securities Act Release No. 10334*, 2017 WL 1245083, 9 (Apr. 5, 2017).

The Independent Investigator's Final Investigative Report

The underwriters agreed to pay disgorgement and civil penalties.  Underwriter's counsel also agreed to pay civil penalties and faces other sanctions arising from his failure to disclose that he was not authorized to practice law when he served as underwriter's counsel.

### (vii)   Misuse Of Bond Proceeds

In 2014, SEC filed an enforcement action in Illinois, in which it alleged that the comptroller of several municipalities participated in a scheme to divert bond proceeds for improper purposes.  These municipalities issued bonds in 2008, 2009, and 2010 to finance a full-service hotel and conference center.  SEC alleged that the comptroller diverted the bond proceeds for payroll, other purposes unrelated to the hotel, and to make payments to himself beyond what was disclosed in the official statements.  The court issued an order barring the comptroller from participating in any municipal securities and directing him to pay disgorgement and civil penalties.

### (l)   Puerto Rico's Uniform Securities Law

Puerto Rico's Uniform Securities Law prohibits all individuals from using any ruse, scheme, or artifice with the purpose of committing fraud in connection with the offer, sale, or purchase of any security.[97]  The law also generally prohibits all individuals, again in relation to an offer, sale, or purchase of any security, from making false statements of material facts or omitting material facts that are necessary so that public information, in light of the circumstances under which it was made public, does not lead to error.[98]  To enforce these prohibitions, OCIF has the power to conduct investigations, take evidence, and subpoena witnesses.[99]  OCIF may also issue orders requiring parties to stop engaging in illegal activities, sanction individuals who are licensed as broker-dealers, agents, or investments advisers, or prohibit other individuals from associating with broker-dealers, agents, and investment advisors.[100]  In addition, OCIF may seek a Court order prohibiting specific individuals or entities from engaging in illegal practices or otherwise failing to comply with the law governing securities.[101]  Finally, OCIF may impose administrative fines and refer evidence of violations to Puerto Rico's Secretary of Justice.[102]

Puerto Rico's Secretary of Justice may also initiate criminal proceedings against anyone who violates Puerto Rico's Uniform Securities Law.  Criminal penalties may range from $500 to $10,000 in fines and six months to five years of incarceration.[103]

Enforcement proceedings under the Puerto Rico Uniform Securities Law must commence within five years of the alleged violation.[104]

---

[97] P.R. Laws Ann. tit. 10, § 851 (2018). Like many states, Puerto Rico also has its own "Blue Sky" law, which provides for a civil cause of action on behalf of buyers against individuals and entities brokering, offering or selling securities. P.R. Laws Ann. tit. 10, § 890 (2011).

[98] P.R. Laws Ann. tit. 10, § 851 (2018).

[99] P.R. Laws Ann. tit. 10, § 887 (2018).

[100] P.R. Laws Ann. tit. 10, § 888(b)(1)–(3) (2018).

[101] P.R. Laws Ann. tit. 10, § 888 (2018).

[102] P.R. Laws Ann. tit. 10, § 889 (2018).

[103] P.R. Laws Ann. tit. 10, § 889 (2018).

[104] P.R. Laws Ann. tit. 10, § 889 (2018).

The Independent Investigator's Final Investigative Report

### (m)     Preemption

It is possible that the federal securities laws may preempt one or more of the common law claims described below, meaning that the state claims would no longer be available because of the federal law that governs.  Because of the "magnitude of the federal interest in protecting the integrity of efficient operation of the market for nationally traded securities," Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA") and the Securities Litigation Standards Act of 1998 ("SLUSA") to regulate the purchase and sale of securities and the securities industry.[105]   SLUSA preempts any securities action where four conditions are satisfied: (i) the action is a "covered class action;"[106] (ii) the claims are based on state law; (iii) the action involves a "covered security;" and (iv) the claims allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of the security.[107] Importantly, SLUSA does not preempt all state enforcement or private causes of action in securities fraud cases.[108]   Accordingly, the likelihood that any of the common law claims described below will be preempted must be considered on a case-by-case basis.

### 3.     Common Law Claims[109]

Below is a discussion of potential common law claims and applicable legal standards.

### (a)     Fraud And Misrepresentation

In general, fraud is defined as a gain of advantage to another's detriment by deceitful or unfair means.[110]   Although courts in various jurisdictions have articulated different combinations of elements of the common law claim for such misrepresentations, courts generally agree that plaintiff must prove the following elements:

- An intentional misrepresentation (or omission in certain instances);

- Of fact;

- That proximately causes harm;

- Where the misrepresentation or omission is material;

- Intended to induce reliance by a plaintiff;

- Does induce reliance by plaintiff; and

---

[105] *Zweiman v. AXA Equitable Life Ins. Co.*, 146 F. Supp. 3d 536, 544 (S.D.N.Y. 2015).

[106] SLUSA broadly defines a "covered class action" to include several types of litigation, including those that do not implicate formal class action procedures in state or federal court.  *See* 15 U.S.C. § 78bb(f)(5)(b) (2016).

[107] *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236, 243 (S.D.N.Y. 2004)

[108]  *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 123 (2d Cir. 2003).

[109] For the reasons discussed above, when assessing state law claims, we have generally considered Puerto Rico and New York law.

[110] *Keywell Corp. v. Weinstein*, 33 F.3d 159 (2d Cir. 1994).

The Independent Investigator's Final Investigative Report

- That reliance is reasonable or "justifiable."[111]

Fraud and misrepresentation cannot be defined easily because they can be accomplished in so many different ways. However, in each case, they present issues of fact. In addition to circumstantial evidence, motive, past conduct, and related wrongful acts are factors to be considered by the trial court in examining whether a claim for fraud exists. The term "fraud" itself embraces all the means that an individual may use to gain advantage over another by false suggestions or by suppression of the truth.[112]

Under Puerto Rico law, an action for common law fraud requires plaintiff to establish four elements: (i) a false representation was made; (ii) plaintiff reasonably and foreseeably relied thereon; (iii) plaintiff was injured by his reliance; and (iv) defendant intended to defraud plaintiff.[113] Under New York law, a plaintiff must prove five elements: (i) a misrepresentation or a material omission of fact; (ii) which breach was false and known to be false by defendant; (iii) made for the purpose of inducing the other party to rely upon it; (iv) justifiable reliance of the other party on the misrepresentation or material omission; and (v) injury.[114] For fraud involving concealment (*e.g.*, material omissions), plaintiff must additionally set forth that defendant had a duty to disclose material information.

New York law distinguishes between actual and constructive fraud. Actual fraud involves an intentional deception, meaning the purposeful use of a scheme or artifice to circumvent, cheat, or deceive another person. Constructive fraud, on the other hand, arises from a rule of public policy or from the existence of a confidential or fiduciary relationship between the parties. While actual fraud requires an intent to deceive, no intentional dishonesty is required to show constructive fraud.[115] Instead, constructive fraud may result from reckless or negligent representations, even if they were not made with a deliberate intent to deceive. The tort of fraud also encompasses the theory of fraudulent inducement. A claim of fraudulent inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation; there, the fraud relates not to the nature of the contract, but to the facts inducing its execution.[116]

Both Puerto Rico and New York impose statutes of limitation on intentional fraud and misrepresentation claims. In Puerto Rico, the applicable statute of limitations is one year from when the plaintiff becomes aware of the injury and the party that caused it.[117] In New York, the statute of limitations is the greater of six years from the date the cause of action accrued

---

[111] 14 Lee S. Kreindler et al., N.Y.Prac., New York Law of Torts § 1:68 (2017).

[112] 37 Am. Jur. 2d *Fraud and Deceit* § 1.

[113] *Valle-Ortiz v. R.J. Reynolds Tobacco Co.*, 385 F. Supp. 2d 126, 133 (D.P.R. 2005); *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 323 (D.P.R. 1996).

[114] *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 827, 59 N.E.3d 485, 491 (2016)*; see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559, 910 N.E.2d 976, 979 (2009) ("The elements of a cause of action for fraud require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.").

[115] *See Levin v. Kitsis*, 82 A.D.3d 1051, 1054 (2011).

[116] *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524 (8th Cir. 1999).

[117] *Ocaso, S.A., Compania De Seguros Y Reaseguros v. Puerto Rico Mar. Shipping Auth.*, 915 F. Supp. 1244, 1258 (D.P.R. 1996) (statute of limitations for fraudulent misrepresentation same as tort—one year).

and two years from the time plaintiff discovered the fraud, or could with reasonable diligence have discovered it.[118]

### (b)  Negligent Misrepresentation

Both Puerto Rico and New York recognize claims for negligent misrepresentation. Puerto Rico law requires a plaintiff to establish three elements to assert a valid claim for negligent misrepresentation: (i) negligent conduct on part of defendant; (ii) plaintiff suffered damages; and (iii) negligent conduct was the cause of damages.[119]  Under New York law, plaintiff must establish five elements: (i) defendant had a duty, as a result of a special relationship, to give correct information; (ii) defendant made a false representation that he or she should have known was incorrect; (iii) the information supplied in the representation was known by defendant to be desired by plaintiff for a serious purpose; (iv) plaintiff intended to rely and act upon it; and (v) plaintiff reasonably relied on it to his or her detriment.[120]  The same statutes of limitations apply for negligent misrepresentation claims as for intentional fraud and misrepresentation claims.

In the securities context, some plaintiffs have struggled to demonstrate the existence of a "special relationship of trust or confidence" sufficient to create an actionable duty for the purpose of a negligent misrepresentation claim.  For example, in *Crigger v. Fahnestock and Co., Inc.*, investors brought suit against an investment bank and their account executives alleging, in addition to other claims, that defendants negligently misrepresented the degree of risk involved in a particular securities offering.  The court granted summary judgment in defendants' favor and dismissed the investors' negligent misrepresentation claim, explaining that the mere existence of "a broker-client relationship does not in and of itself create a special or fiduciary relationship" giving rise to liability.[121]

### (c)  Professional Negligence

Professional negligence is a tort that applies when professionals breach their duty of care with respect to their clients.  Duties giving rise to professional negligence claims typically include a responsibility on the part of the professional to keep his or her client from physical, emotional, or financial harm.  For example, professionals who may be subject to such claims include attorneys, doctors, and financial advisors.

Under Puerto Rico law, the elements of a claim for professional negligence are: (i) the existence of a relationship giving rise to a professional duty; (ii) a violation of that duty by the professional, through action or omission; (iii) damages; and (iv) proximate causation of plaintiff's damages by the violation (*i.e.*, that the violation caused the plaintiff's damages).[122]  Under New York law, a plaintiff must demonstrate that defendant failed to exercise the ordinary and reasonable skill and knowledge commonly possessed by a member of defendant's

---

[118] N.Y. C.P.L.R. § 213(8) (McKinney 2018).
[119] *MMB Dev. Grp., Ltd. v. Westernbank P.R.*, 762 F. Supp. 2d 356, 369 (D.P.R. 2010).
[120] *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012).
[121] *See Crigger v. Fahnestock & Co.*, No. 01 Civ. 0781 (JFK), 2003 WL 22170607, 10 (S.D.N.Y. 2003).
[122] *Santana Baez v. Cardona Estelritz*, No. K DP2014-0002, 2015 WL 2202700, 4 (P.R. Cir. Mar. 12, 2015).

profession, and that defendant's breach of this professional duty caused plaintiff's actual damages.[123]

Puerto Rico imposes different statutes of limitations for professional negligence claims depending on the nature of the professional relationship at issue. If plaintiff and defendant had a non-contractual relationship, the statute of limitations extends only one year from the date of the conduct giving rise to the claim; however, if the relationship was based in contract, the statute of limitations extends for fifteen years.[124] In New York, the statute of limitations for professional negligence claims extends three years from the wrongful conduct.[125]

### (d)   Breach of Fiduciary Duty

A fiduciary duty is an obligation that a fiduciary, such as an agent or corporate director, owes to a beneficiary, such as a principal or shareholder, to act in good faith and in the beneficiary's best interests.[126] Under Puerto Rico law, to recover for a breach of fiduciary duty, plaintiff must prove three elements: (i) a breach of a duty; (ii) proof of damages; and (iii) a causal relationship between such damages and the breach.[127] Puerto Rico law provides that "an omission gives rise to a cause of action [for breach of fiduciary duty] only in cases where there is a legal duty to act."[128] A duty to act arises either: (i) by a statute, regulation, ordinance, law or contract; (ii) as the result of a "special relationship between the parties that has arisen through custom;" or (iii) by a "traditionally recognized duty of care particular to the situation."[129]

Breach of fiduciary duty claims (and, derivatively, aiding and abetting claims) are likely subject to the business judgment rule, which shields fiduciaries from liability for their reasonable, good faith business decisions.[130] In practice, the business judgment rule creates a strong presumption that officers and directors have complied with their duty of care with respect to any business decisions they make on an informed basis and with an honest, subjective belief that the decision is in the best interests of the entity for whom they act.[131]

Puerto Rico law also provides some protections and limitations on liability for corporate officers and directors subject to claims for breach of fiduciary duty.[132] In general, officers and

---

[123] *Health Acquisition Corp. v. Program Risk Mgmt., Inc.*, 105 A.D.3d 1001, 1004, 964 N.Y.S.2d 554, 557 (2013) (citing *Ofman v. Katz*, 89 A.D.3d 909, 910, 933 N.Y.S.2d 101).

[124] *Rosas Gonzalez v. Acosta Pagan*, No. RE-89-140, 1993 WL 840047 (P.R. Dec. 3, 1993).

[125] *See* N.Y. C.P.L.R. § 214(6); *New York State Workers' Comp. Bd. v. Fuller & LaFiura, CPAs, P.C.*, 146 A.D.3d 1110, 1114, (N.Y. App. Div. 2017).

[126] *See* Black's Law Dictionary (10th ed. 2014).

[127] *See CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 68 (D.P.R. 2006) (finding no duty existed for GDB under the facts).

[128] *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 69 (D.P.R. 2006) (citations omitted).

[129] *CMI Capital Mkt. Inv., LLC v. Municipality of Bayamon*, 410 F. Supp. 2d 61, 69 (D.P.R. 2006) (citations omitted).

[130] *See* P.R. Laws Ann. tit. 14, § 2723 (2018); *see also First Bancorp Derivative Litig.*, 465 F. Supp. 2d 112, 118 (D.P.R. 2006) (same).

[131] *See Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 807 F.3d 502, 505 (2d Cir. 2015).

[132] Puerto Rico law explicitly grants corporate shareholders standing to file a derivative suit for fiduciary duty violations. *See* P.R. Laws Ann. tit. 14, §§ 3563, 3786 (2018); *Segarra-Miranda v. Perez-Padro*, 482 B.R. 59, 69–70 (D.P.R. 2012). These provisions may not, however, provide standing for plaintiffs to maintain derivative actions against public corporations such as those at issue in the analysis below.

directors accused of failing to exercise an appropriate level of attention and care may only be held personally liable for a breach of this fiduciary duty if they act with "<u>gross negligence</u>."[133] Some courts have defined that term to mean conduct that "smacks of intentional wrongdoing" or "evinces a reckless indifference to the rights of others."[134]  In addition, officers and directors can seek indemnification from liability under Puerto Rico law.  Former government officials are entitled to indemnification for acts or omissions made in good faith and within the scope of their job functions.[135]  Puerto Rico also generally indemnifies current public officials in suits against them in their personal capacities.[136]

Under New York law, the elements of a breach of fiduciary duty claim are: (i) the existence of a fiduciary relationship; (ii) misconduct by the defendant; and (iii) damages directly caused by the defendant's misconduct.[137]  These elements must be pleaded with particularity to overcome a motion to dismiss, meaning the plaintiff must assert specific facts in the complaint that prove each element of the claim, rather than alleging generalities.[138]  New York law provides that a fiduciary duty arises when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship.[139]  In the context of a broker-client relationship, the scope of the fiduciary obligation is limited to affairs entrusted to the broker.[140]

The statute of limitations for a breach of fiduciary duty claim under Puerto Rico law extends three years from when plaintiff discovers "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[141]  Under New York law, the statute of limitations for breach of fiduciary duty depends on the substantive remedy that plaintiff seeks.  If the remedy sought is monetary in nature, a three-year statute of limitations applies, but if the remedy sought is

---

A derivative suit is an action brought by a shareholder on a corporation's behalf against a third party, such as the individuals in control of the corporation.  *See* Black's Law Dictionary (10th ed. 2014). Under Puerto Rico law, corporate officers and directors are required to provide the same level of attention and care that a responsible and competent officer or director who applies his or her business judgment in good faith would provide under the same circumstances.  Officers and directors can also be held liable under Puerto Rico law for knowingly making false written statements with respect to any important matter regarding the condition or business of a corporation, even if they do not act with gross negligence.  In addition, the law imposes specific fiduciary duties on GDB, requiring it to "aid the Commonwealth of Puerto Rico in the performance of its fiscal duties" and "to develop the economy of Puerto Rico." P.R. Laws Ann. tit. 7, § 551 (2018) (discussing creation and purpose behind Government Development Bank of Puerto Rico); *see also* P.R. Laws Ann. tit. 3, § 779(c)(5) (2018) (establishing statutory duty for investments under provisions creating the ERS).  However, it is unclear whether bondholders would be able to invoke these laws in order to maintain a derivative suit against officers and directors of a public corporation in Puerto Rico.

[133] P.R. Laws Ann. tit. 14, § 3563 (2018).

[134] *Ryan v. IM Kapco, Inc.*, 88 A.D.3d 682, 683 (N.Y. App. Div. 2011).

[135] *See* P.R. Laws Ann. tit. 32, § 3085 (current through 2010 Legis. Sess. and various acts from 2011 to the present).

[136] *See, e.g., Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza.,* 484 F.3d 1, 26 n.28 (1st Cir. 2007).

[137] *Stinner v. Epstein*, 162 A.D.3d 819 (N.Y. App. Div. 2018).

[138] *Stinner v. Epstein*, 162 A.D.3d 819 (N.Y. App. Div. 2018).

[139] *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 534 (S.D.N.Y. 2009).

[140] *Bissell v. Merrill Lynch & Co.*, 937 F. Supp. 237, 246 (S.D.N.Y.1996)

[141] *Segarra-Miranda v. Perez-Padro*, 482 B.R. 59, 69 (D.P.R. 2012) (citing P.R. Law Ann. tit. 32, § 261 (2018)).

equitable in nature, a six-year statute of limitations applies.[142]  Moreover, a plaintiff may be regarded as being on notice of an injury based on public proceedings and news sources regardless of her subjective awareness thereof.[143]

### (e)   Unjust Enrichment

The term "unjust enrichment" does not signify a single well-defined cause of action but is, rather, a general principle, underlying various legal doctrines and remedies.[144]  It is used in law to characterize the result or effect of a failure to make restitution of or for property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account for the property or benefits.  Unjust enrichment occurs when defendant enjoys a benefit bestowed by plaintiff, who was not adequately compensated.[145]  Because unjust enrichment is a quasi-contractual remedy, it is generally not available when a valid and enforceable written contract governs the same subject matter as the alleged unjust enrichment claim.[146]

An action to recover on the theory of unjust enrichment is based on the equitable principle that a person must not be enriched unjustly at the expense of another.[147]  In order to recover, defendant must actually be enriched, and possessed of the property or assets of plaintiff.[148]  However, the claim does not require that the party enriched take an active role in obtaining the benefit, and plaintiffs are not required to plead that they performed services for defendants, in order to sufficiently plead a cause of action sounding in unjust enrichment.[149]

In Puerto Rico, to prove unjust enrichment, plaintiff must show: (i) existence of enrichment; (ii) a corresponding impoverishment; (iii) a connection between the enrichment and the impoverishment; (iv) lack of justification for enrichment; and (v) non-existence of legal principal which would prohibit application of unjust enrichment.[150] In New York, plaintiff must show: (i) defendant was enriched; (ii) at plaintiff's expense; and (iii) that it is against equity and good conscience to permit defendant to retain what is sought to be recovered.[151]  In Puerto Rico, claims for unjust enrichment are "subsidiary in nature and will only be available in situations where there is no available action to seek relief."[152]

---

[142] *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139, 907 N.E.2d 268, 272 (2009)
[143] *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 379-84 (S.D.N.Y. 2016) (holding investors in Puerto Rico closed-end funds were on notice of claims against funds' managers based from date of public reports of prior lawsuits administrative proceeds arising out of similar operative facts).
[144] *Evans v. City of Johnstown*, 96 Misc. 2d 755, 410 N.Y.S.2d 199 (N.Y. Sup. Ct. 1978).
[145] *Swain v. Brown*, 135 A.D.3d 629, 24 N.Y.S.3d 598 (N.Y. App. Div. 2016).
[146] *See Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 361 (S.D.N.Y. 1998); *see also P.R. Telephone Co., Inc. v. SprintCom, Inc.*, 662 F.3d 74 (1st Cir.2011) (explaining that unjust enrichment "does not apply where . . . there is a valid and binding agreement between the parties that governs the dispute at issue").
[147] *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 879 N.Y.S.2d 355, 907 N.E.2d 268 (2009).
[148] *Swartz v. Swartz*, 145 A.D.3d 818, 44 N.Y.S.3d 452 (N.Y. App. Div. 2016).
[149] *Monex Fin. Servs., Ltd. v. Dynamic Currency Conversion, Inc.*, 62 A.D.3d 675, 878 N.Y.S.2d 432 (N.Y. App. Div. 2009).
[150] *See* Quasi contracts defined, P.R. Laws Ann. tit. 31, § 5091 (2018) (citing *Roberto Hatton v. Ponce*, 134 D.P.R. 1001 (1994)).
[151] *See GFRE, Inc. v. U.S. Bank, N.A.*, 130 A.D.3d 569, 570 (N.Y. App. Div. 2015).
[152] *Ocaso, S.A., Compania De Seguros Y Reaseguros v. P.R. Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 (D.P.R. 1996) (citing *Medina & Medina v. Country Pride Foods Ltd.*, 631 F. Supp. 293, 302

The applicable statute of limitations differs between the two jurisdictions. Under Puerto Rico law, unjust enrichment carries a fifteen-year statute of limitations.[153]  New York, on the other hand, imposes a six-year statute of limitations on unjust enrichment claims.[154]  New York law provides that an unjust enrichment claim accrues "upon the occurrence of the wrongful act giving rise to a duty of restitution."[155]

### (f)      Conspiracy and Aiding and Abetting

Conspiracy and aiding and abetting are each theories of liability under which defendant may be held responsible for the tortious conduct of another party.  Because a conspiracy requires an agreement, it must involve at least two persons.  A claim for civil conspiracy also requires malice and intent to injure plaintiff, an overt act in furtherance of the conspiracy, and resulting damage to plaintiff.[156]

Aiding and abetting, on the other hand, applies when a party provides assistance to a wrongdoer in the absence of a conspiratorial agreement to achieve a malicious goal.  In New York, defendant can be held liable for aiding and abetting another party's tortious conduct if plaintiff proves three elements: (i) the existence of wrongful conduct by the primary wrongdoer; (ii) knowledge of the wrongful conduct on the part of defendant; and (iii) substantial assistance of defendant in achieving the wrongdoing.[157]  Puerto Rico law does not expressly recognize or reject aiding and abetting claims and thus it is an open question whether a plaintiff could assert a viable aiding and abetting claim in a Puerto Rico court.  We have therefore analyzed aiding and abetting claims under Puerto Rico law assuming that such claims, if viable, would be governed by the same legal standards as set forth by New York law.

Aiding and abetting liability may apply where a party has been retained by corporate decision-makers who breach their fiduciary duties.  For example, one court found a financial institution—specifically, an investment bank—liable under this theory after finding the banker's failure to fully inform a board of directors about a transaction caused the board to breach its fiduciary duties.  In that case, the investment banker for the board of a company that agreed to sell itself also acted as an advisor to parties on the buy-side of the sale.  The court found that the investment banker "knew that the Board was uninformed about these critical matters, but failed to disclose the relevant information to further its own opportunity to close a

---

(D.P.R.1986), *aff'd*. 901 F.2d 181 (1st Cir. 1990) and *El Toro Elec. Corp. v. Zayas*, 106 D.P.R. 98, 6 P.R. Offic. Trans. 133 (1977)).

[153] *Wells Fargo Bank, N.A. v. Burke*, 155 A.D.3d 668, 671, 64 N.Y.S.3d 228, 232 (N.Y. App. Div. 2017) ("[T]he unjust enrichment cause of action to recover money allegedly paid by the plaintiff for real property taxes and hazard insurance was time-barred with respect to any payment made by the plaintiff on or before December 2, 2008, six years prior to the commencement of this action.") (citations omitted).

[154] *Cook, Stratton & Co. v. Universal Ins. Grp., Inc.*, 241 F.R.D. 411, 419 (D.P.R. 2007); *Antonio Rios v. Rios Jordan*, 2017 WL 1832472, *2 (P.R. Cir. Mar. 30, 2017); *Municipio de Hormigueros v. Municipio de Mayaguez*, 2010 WL 3200394,*6 (P.R. Cir. May 25, 2010).

[155] *Elliott v. Qwest Commc'ns Corp.*, 25 A.D.3d 897, 898 (N.Y. App. Div. 2006).

[156] *Bereswill v. Yablon*, 6 N.Y.2d 301, 189 N.Y.S.2d 661, 160, N.E.2d 531 (1959).

[157] *Rizer v. Breen*, No. 601676/05, 2007 WL 4378149 (N.Y. Sup. Ct. Jan. 29, 2007).

deal, get paid its contingent fee [by the Board], and receive additional and far greater fees for buy-side financing work."[158]

In holding the investment bank liable for aiding and abetting a breach of fiduciary duty, the court reasoned that "[a] disinterested board that benefitted from disinterested advice and actually obtained an analysis of potential alternatives likely would have concluded that [the company] should wait before conducting a sale process" but did not wait because of the urging of the conflicted investment banker.[159]   As the court explained, "[b]ecause of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the investment banker's compensation structure, relationships, and potential conflicts."[160]

### 4.   Insolvency-Related Claims

Below is a discussion of claims and remedies that may be available (collectively, "Insolvency Claims") as a result of the application of the Bankruptcy Code[161] in the Title III Proceedings, in which each of Puerto Rico, COFINA, HTA, ERS, and PREPA is a "Debtor"). Generally speaking, the outcome from a successful pursuit of any Insolvency Claim would benefit all creditors of a Debtor by increasing that Debtor's assets or reducing the total amount of claims that will determine each creditor's share in any bankruptcy distributions.   As indicated below, however, only certain of the Insolvency Claims could be pursued by individual stakeholders.

Applicable legal standards generally increase the chances of success if the party targeted by an Insolvency Claim is (or was at the relevant time) an "insider" of the Debtor.  By statute, the Bankruptcy Code defines an insider to include: (i) if the debtor is a municipality, an elected official of the debtor or relative of an elected official of the debtor; (ii) a managing agent of the debtor; (iii) an "affiliate" of the debtor; and (iv) any insider of an affiliate.[162]   The Bankruptcy Code defines an "affiliate" to be essentially any person or entity that owns or shares common ownership with the debtor.[163]   PROMESA adopts this definition, but also adds that an affiliate in the Title III case of Puerto Rico includes any of Puerto Rico's territorial instrumentalities, and that an affiliate in the Title III case of a territorial instrumentality such as COFINA, HTA, ERS, or PREPA includes Puerto Rico and any of its other territorial instrumentalities.[164]   Notably, a territorial instrumentality is an affiliate under the PROMESA definition even if not subject to its own Title III case (e.g., PRASA).

Moreover, the "insider" designation is not limited by the statutory definition under the Bankruptcy Code.  "Courts have devised tests for identifying other, so-called 'non-statutory'

---

[158] *In re Rural Metro Corp.,* 88 A.3d 54, 100 (Del. Ch.), *decision clarified on denial of reargument sub nom; In re Rural Metro Corp. Stockholders Litig.,* No. 6350-VCL, 2014 WL 1094173 (Del. Ch. 2014).
[159] *In re Rural Metro Corp.,* 88 A.3d 54, 101 (Del. Ch.), *decision clarified on denial of reargument sub nom; In re Rural Metro Corp. Stockholders Litig.,* No. 6350-VCL, 2014 WL 1094173 (Del. Ch. 2014).
[160] *In re Rural Metro Corp.,* 88 A.3d 54, 90 (Del. Ch.), *decision clarified on denial of reargument sub nom; In re Rural Metro Corp. Stockholders Litig.,* No. 6350-VCL, 2014 WL 1094173 (Del. Ch. 2014).
[161] The Bankruptcy Code is codified in 11 U.S.C. § 101, *et seq.*
[162] The term "insider" is defined in section 101(31) of the Bankruptcy Code, as incorporated under section 2161(a) of PROMESA.
[163] *See* 11 U.S.C. § 101(2) (2016).
[164] *See* 48 U.S.C. § 1261(c)(1) (2016).

insiders."[165]  A non-statutory insider (meaning an insider not specifically described as one in the Bankruptcy Code) has a "sufficiently close relationship with the debtor that [their] conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."[166]  To find a party is a non-statutory insider, courts usually require not just a close relationship with the debtor but also something "other than closeness to suggest" that its transactions with the debtor were not at arm's length.[167]  For example, one court has refused to dismiss an action accusing a debtor's banks of being non-statutory insiders based on allegations that the banks had a "long-standing multifaceted relationship" with the debtors as their underwriters, financial advisors, and lead lenders, and had used that relationship to "dominate and control" the debtors.[168]  Keep this in mind as we discuss the claims below.

### (a)   Potential Avoidance and Recovery Actions and Disallowance Claims

A primary goal of bankruptcy law is "to secure equality among the creditors of a bankrupt."[169]  To achieve that goal, the Bankruptcy Code gives a bankruptcy trustee authority to: (i) undo (*i.e.*, "avoid") certain pre-bankruptcy transfers by a debtor; (ii) repossess (*i.e.,* "recover") the property that had been transferred; and (iii) refuse to recognize (*i.e.,* "disallow") any claim to share in bankruptcy distributions asserted by the recipient of the transfer until the property is returned to the trustee.  The first step is accomplished by filing an action to avoid the transfer in question on the basis that it is either a "preference" or a "fraudulent transfer".  Each of these types of transfers is explained below.

Under PROMESA, Congress granted the Oversight Board certain powers of a bankruptcy trustee under the Bankruptcy Code,[170] including the ability to seek: (i) to avoid both preferential and fraudulent transfers as well as to "step into the shoes" of any creditor of the Debtor to undo transfers that creditor could have avoided under applicable non-bankruptcy law if the Title III Proceedings had not been commenced; (ii) to recover the property involved in those transfers for the benefit of all creditors of the Debtor; and (iii) to disallow any claim asserted by the recipient(s) of that property.[171]  As a result, and as further discussed below, any recipients of the Debtors' preferences and fraudulent transfers before the filing of the Title III Proceedings—including, for example, certain financial institutions, underwriters, investment bankers, financial and legal advisors, accountants, auditors, and other third-party professionals

---

[165] *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 962, 965 (2018).

[166] S. Rep. No. 95-989, *as reprinted in* 1978 U.S.C. Cong. & Admin. News 1978, 5787, 5810.

[167] *Capmark Fin. Grp., Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 351 (Bankr. S.D.N.Y. 2013).

[168] *In re Oakwood Homes Corp.*, 340 B.R. 510, 524 (Bankr. D. Del. 2006).

[169] *Boese v. King*, 108 U.S. 379, 385–86 (1883).  The US Bankruptcy Court for the District of Puerto Rico has acknowledged the US Supreme Court's precedent addressing the primary goal of equality of distribution and described it as the "central policy" of the Bankruptcy Code and described avoidance powers as a way to further that policy.  *See In re Roldan*, No. 10-10792 ESL, 2012 WL 2221410,*6 (Bankr. D.P.R. June 13, 2012).

[170] Under section 2161(c)(7) of PROMESA, the term "trustee", when used in a section of the Bankruptcy Code made applicable in a case under PROMESA, means the Oversight Board.

[171] Sections 502, 544, 545, 546, 547, 548, 549(a), 549(c), 549(d), 550 of the Bankruptcy Code, among others, are applicable under section 2161(a) of PROMESA.  Section 2161(c)(5) of PROMESA provides that the term "property of the estate" used in these Bankruptcy Code section is to be interpreted as property of the relevant Debtor in the Title III case.

who provided services to the Debtors and received transfers from the Debtors before the bankruptcy filing—are potential targets of avoidance, recovery and disallowance actions.

As we discuss the details of these potential actions, keep in mind that except in certain cases involving intentional fraud, avoidance actions generally require proof that a Debtor was insolvent at the time it made the payment or transfer it issue. Within the context of a municipal bankruptcy, the term "insolvent" means that the municipality is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due."[172]  As the Bankruptcy Court explained in Detroit's bankruptcy, the test under the first prong of this definition is met if a municipal debtor was unable to pay debts that it presently owed at that the time in question, whereas the second prong is met if at that same point in time, the debtor's budget imbalance and lack of resources indicate it was unable to pay debt that became due thereafter.[173]

In connection with the investigation, we were not tasked with identifying or analyzing every payment or transfer made by each of the Debtors before commencement of the Title III Proceedings.  Further, we did not have the benefit of a solvency analysis for any of the Debtors or comprehensive discovery pertaining to discrete prepetition transactions between the Debtors and third parties (*e.g.*, lists of payments to creditors, which is typically contained in a chapter 11 debtor's Statement of Financial Affairs).  We take no position on whether any Debtor is or has ever been insolvent, under any definition, and nothing herein should be read to suggest otherwise.

### (i)    Preferences Under Section 547(b) of the Bankruptcy Code

It would be unfair to allow a creditor to keep a payment received shortly before a debtor enters bankruptcy if that payment is more than other similarly situated creditors of the debtor will receive through the bankruptcy case.  To prevent debtors from "preferring" certain creditors over others in this way (intentionally or otherwise), the Bankruptcy Code allows a trustee to unwind such payments.[174]  Specifically, section 547(b) of the Bankruptcy Code ("Section 547(b)") empowers a trustee to avoid:[175]

---

[172] *See* 11 U.S.C. §101(32) (2016) (made applicable in Title III Proceedings pursuant to section 2161(a) of PROMESA).

[173] *In re City of Detroit, Mich.*, 504 B.R. 97, 168 (Bankr. E.D. Mich. 2013).

[174] *See In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 313 (Bankr. D.P.R. 2016) ("There are two purposes behind the avoidance of preferential transfers; namely: (i) to discourage creditors from racing to the courthouse and dismember the debtor's assets and (ii) most importantly to further the bankruptcy policy of equality of distribution amongst the debtor's creditors.") (citing Alan N. Resnick & Henry J. Sommer, 5 *Collier on Bankruptcy* ¶ 547.01 (16th ed. 2016)).

[175] *See* 11 U.S.C. § 547(b) (2016); *see also BBVA v. Wiscovitch–Rentas (In re Net–Velazquez)*, 625 F.3d 34, 38 (1st Cir. 2010) ("Under section 547(b) of the Bankruptcy Code, the trustee of an estate in bankruptcy may avoid any transfer of an interest of the debtor in property made (1) to a creditor, (2) on account of an antecedent debt, (3) while the debtor was insolvent, (4) during the 90–day period preceding the filing of the petition, which (5) allowed such creditor to receive more than it would have under Chapter 7.").

- a transfer of an interest of the debtor in property;[176]

- to or for the benefit of a creditor;[177]

- for or on account of an antecedent debt[178] owed by the debtor before such transfer was made;

- made while the debtor was insolvent;

- made on or within 90 days before the date of the filing of the petition, or within one year before the petition date if the creditor was an insider of the debtor at the time of the transfer;[179] and

- that enables such creditor to receive more than such creditor would receive if it shared equally with other similarly situation creditors in a liquidation of the debtor's assets under chapter 7 of the Bankruptcy Code.[180]

The trustee generally bears the burden of proving each of these elements by a preponderance of the evidence.[181]   However, the Bankruptcy Code presumes a debtor was insolvent during the relevant pre-bankruptcy period instead of requiring the trustee to prove that element.[182]   Moreover, the trustee need not prove the debtor or creditor intended the targeted payment to be preferential.   Nor need a trustee prove that a targeted creditor actually received the money or property transferred if it can show the payment or transfer in question

---

[176] The Bankruptcy Code does not define "an interest of the debtor in property," but the U.S. Supreme Court has interpreted the phrase to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Mahern v. Merchants Grain, Inc. (In re Merchants Grain, Inc.)*, 93 F.3d 1347, 1352 (7th Cir. 1996) (quoting *Begier v. U.S.*, 496 U.S. 53, 58 (1990)).

[177] The Bankruptcy Code defines a "<u>creditor</u>" as, inter alia, an entity holding "a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A) (2016).

[178] A "debt" is defined by the Bankruptcy Code as a "liability on a claim." *See* 11 U.S.C. § 101(12) (2016).

[179] *In re Oakwood Homes Corp.*, 340 B.R. 510, 524 (Bankr. D. Del. 2006) (refusing to dismiss an action to avoid transfers made more than 90 days but less than one year before bankruptcy to underwriters, financial advisors, and lead lenders who were allegedly non-statutory "insiders" of the debtor).

[180] *See In re Roco Corp.*, 701 F.2d 978, 984–85 (1st Cir. 1983) (stating that "payments clearly fall within section 547(b) because they enabled [defendant] to receive more than he would have otherwise received under chapter 7.").   It should be noted that a municipality cannot be liquidated and therefore, this element of preference may have limited application to the Debtors' Title III Proceedings.

[181] *See* 11 U.S.C. § 547(g) (2016) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . . .").   *See also In re Crawford*, 454 B.R. 262, 274 (Bankr. D. Mass. 2011) ("In an action seeking to avoid a preferential transfer, 'the trustee has the burden of proving by a preponderance of the evidence each of the elements prescribed in § 547(b).'") (quoting *In re First Software Corp.*, 107 B.R. 417, 420–21 (D. Mass. 1989) (citing *In re Utility Stationery Stores, Inc.*, 12 B.R. 170 (Bankr. N.D. Ill. 1981); *Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir. 1980))).

[182] A debtor "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." *See* 11 U.S.C. § 547(f) (2016).

was made "to or for the benefit of" that creditor.[183]  Thus, for example, if during the relevant period a debtor repaid a loan that had been guaranteed by a third party, a trustee could assert a preference claim under section 547(b) against that third-party guarantor in addition to, or instead of, asserting a preference claim against the creditor that was owed and actually received the payment.[184]

There are key exceptions and defenses to preference claims that could prevent a payment or transfer from being avoided even if all of the elements above are proven.  The Bankruptcy Code generally gives targeted creditors the chance to keep a preference payment if they can prove by a preponderance of the evidence that the payment was made in the ordinary course of the debtor's business or that the creditor gave new value to the debtor in exchange for the payment.[185]  Also, as discussed in more detail below, section 546(e) of the Bankruptcy Code ("Section 546(e)") protects certain payments made in connection with securities transactions from being undone by a trustee in bankruptcy.  Further, in the specific context of municipal bankruptcy, section 926(b) of the Bankruptcy Code provides that transfers made by a municipal debtor "to or for the benefit of any holder of a bond or note, on account of such bond or note, may not be avoided under section 547."[186]  PROMESA expressly applies this exception here.

Finally, the particular circumstances of the Title III Proceedings may make identifying and asserting viable preference claims difficult.  The last debt issued by any of the Debtors was in March of 2014.  As a result, by May 3, 2016—the earliest date on which a transfer subject to a preference claim could have been made—the Debtors may not have had available funds to make payments outside the ordinary course of business or subject to other defenses.  In a typical bankruptcy, a trustee uses expansive disclosures the Bankruptcy Code requires debtors to make to determine what transfers may have been preferential.  Here, however, the Debtors were not required to and have not provided such disclosures in the Title III Proceedings, and to our knowledge and have not disclosed any payments made to creditors within the preference lookback period.

We have not been tasked with identifying or analyzing any preference payments or transfers made by the Debtors before the commencement of the Title III Proceedings.  Nonetheless, if any payments were made by the Debtors within the 90-day (or within one-year, for insiders) preference lookback period to any financial institutions, underwriters, investment bankers, financial and legal advisors, accountants, auditors, and other third-party professionals who provided services to the Debtors, such payments potentially may be avoided by the

---

[183] *See In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 314 (Bankr. D.P.R. 2016) ("As the explicit language of the Bankruptcy Code makes clear, however, the transfer need not be made directly by the debtor; indirect transfers made by third parties to a creditor on behalf of the debtor may also be voidable under the Code.").

[184] *See In re Imageset, Inc.*, 299 B.R. 709, 718 (Bankr. D. Me. 2003) ("As explained in Bonded Financial, the paradigmatic "entity for whose benefit the transfer was made" is the debtor or guarantor, whose own liability is reduced or extinguished by the payment made, as a result of the payment itself. The benefit must derive directly from the transfer, not from the use to which it is put by the transferee. 'Someone who receives the money later on is not an 'entity for whose benefit such transfer was made.''") (citing and quoting *Bonded Fin. Servs., Inc. v. European Am. Bank (In re Bonded Fin. Servs., Inc.)*, 838 F.2d 890, 895 (7th Cir. 1988)).

[185] *See* 11 U.S.C. § 547(c)(1), (c)(2), (c)(4) (2016).

[186] *See* 11 U.S.C. § 926(b) (2016) (incorporated by PROMESA § 301(a)).

The Independent Investigator's Final Investigative Report

Oversight Board, or another party in interest with requisite standing, subject to these affirmative defenses.

**(ii)**     **Fraudulent Transfers Under Section 548(a)(1) of the Bankruptcy Code**

In addition to preferences, the Bankruptcy Code empowers a trustee to avoid a second category of pre-bankruptcy transfers called fraudulent transfers. Transfers made, or obligations incurred, by a debtor may be avoided if they were either actually or constructively fraudulent under the Bankruptcy Code. Section 548(a)(1)(A) of the Bankruptcy Code ("Section 548(a)(1)(A)") and Section 548(a)(1)(B) of the Bankruptcy Code ("Section 548(a)(1)(B)") respectively authorize the trustee—here, the Oversight Board[187]—to avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor within the two years before a bankruptcy filing if it was: (i) "actually fraudulent" ("with actual intent to hinder, delay, or defraud" any creditor), or (ii) "constructively fraudulent" (because the debtor received "less than a reasonably equivalent value," **and** was, among other things, insolvent, left with "unreasonably small capital," or unable to pay its debts as such debts matured, when or immediately after the transfer was made or the obligation was incurred).[188]

**(iii)**     **Actual Fraudulent Transfer Under Section 548(a)(1)(A) of the Bankruptcy Code**

A transfer of the debtor's property, or the incurrence of an obligation by the debtor, that is made with the intent to hinder, delay, or defraud creditors may be avoided as an actual fraudulent transfer under section 548(a)(1)(A).[189] To state an actual fraudulent transfer claim under section 548(a)(1)(A), the Oversight Board must show that there was:

- a transfer of an interest in property of the debtor;

- made by the debtor;

-  with intent to hinder, delay or defraud present or future creditors (*i.e.*, creditors at the time of the transfer or thereafter);[190] and

- within two years before the Petition Date.

Direct evidence of fraudulent intent is rarely available. Therefore, courts usually rely on circumstantial evidence, and have developed certain "badges of fraud" to establish actual intent to hinder, delay, or defraud creditors under section 548.[191] In the First Circuit, courts

---

[187] Under section 2161(c)(7), the term "trustee," when used in a section of Title 11, made applicable in a case under PROMESA, means the Oversight Board.

[188] *See* 11 U.S.C. § 548(a) (2016). Within the context of a municipal bankruptcy, the term "insolvent" means that the municipality is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due." *See* 11 U.S.C. §101(32)(C) (2016).

[189] *See* 11 U.S.C. § 548(a)(1)(A) (2016).

[190] *See In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) ("Fraudulent intent does not requirement an intent to run the company aground; it requires merely an intent to hinder or defraud creditors.").

[191] *See Max Sugarman Funeral Home*, 926 F.2d 1248, 1254–55 (1st Cir. 1991); *In re Roco Corp.*, 701 F.2d 978, 981, 984 (1st Cir. 1983).

505

have set out the following five factors to assess fraudulent intent:

- actual or threatened litigation against the debtor;

- a purported transfer of all or substantially all of the debtor's property;

- insolvency or other unmanageable indebtedness on the part of the debtor;

- a special relationship between the debtor and the transferee; and,

- retention by the debtor of the property involved in the putative transfer.[192]

The trustee bears the burden of proving the elements of section 548(a)(1)(A) by a preponderance of the evidence.[193]

### (iv) Constructive Fraudulent Transfer Under Section 548(a)(1)(B) of the Bankruptcy Code

Another type of pre-petition transfer that may be avoided is a constructively fraudulent transfer under section 548(a)(1)(B).[194]  To state a constructive fraudulent transfer claim under section 548(a)(1)(B), the Oversight Board must show that there was:

- a transfer of an interest in property of the debtor;

- made by the debtor;

- Within two years before the Petition Date;

- the debtor received less than a reasonably equivalent value in exchange for the transfer made or obligation incurred, *plus one of the following*:[195]

- the debtor was insolvent at the time the transfer was made or obligation incurred, *or* became insolvent as a result thereof; [196]

---

[192] *See In re Comprehensive Power, Inc.*, 578 B.R. 14, 31 (Bankr. D. Mass. 2017).

[193] *See In re Crawford*, 454 B.R. 262, 271 (Bankr. D. Mass. 2011) ("[T]he Trustee, as the party seeking to avoid the transfer at issue, 'bears the burden of proof on each element of entitlement to avoidance' and must discharge that burden 'by a preponderance of the evidence.'") (citations omitted).

[194] Claims under Section 548(a)(1)(B) and under Section 544 of the Bankruptcy Code (discussed below) would be subject to a 'safe harbor' defense under section 546(e) of the Bankruptcy Code.

[195] In addition, subsection 548(a)(1)(B)(ii)(IV) provides for an alternative avoidance theory if the Debtors' employees are transferees. There, the trustee must demonstrate that: "(1) the transfer was made, or the obligation was incurred, within two years before the bankruptcy petition was filed; (2) the beneficiary of the transfer or obligation was an insider under an employment contract; (3) the debtor received less than reasonably equivalent value in exchange for the transfer or obligation; and (4) the transfer was made or obligation was incurred out of the ordinary course of the debtor's business." *In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 319 (Bankr. D.P.R. 2016) (citations omitted).

[196] *See In re Roco Corp.*, 701 F.2d 978, 981 (1st Cir. 1983) (in determining whether debtor was solvent, the appellate court approved bankruptcy court's reliance on unaudited financial statements, stating: "We have held, however, that unaudited financial statements may be admissible as the best available evidence and that it is for the trier of fact to access the accuracy of such statements.").

The Independent Investigator's Final Investigative Report

- the debtor was engaged in, or about to engage in, a business or a transaction for which any property remaining with the debtor was an unreasonably small capital; *or*

- the debtor intended to incur, or believed the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.[197]

The trustee bears the burden of proving the elements of section 548(a)(1)(B) by a preponderance of the evidence.[198]

### (v)   Affirmative Defenses to Fraudulent Transfers

Section 548(c) of the Bankruptcy Code provides an affirmative defense for "good faith transferees," protecting innocent transferees from liability where the debtor made a transfer found to be a fraudulent transfer.[199]  In order to establish such a defense, the transferee must show that it was "in good faith" and that the transferee gave value to the debtor for the transfer received.[200]  If a court determines that the transferee asserting this defense received a transfer from the debtor for value and in good faith, the transferee may retain the otherwise avoidable transfer.[201]

The transferee, and not the debtor, has the burden of proof for this type of defense, and must make a showing of both value and good faith.[202]  The term "value" is defined in this context as "property, or satisfaction or securing of a present or antecedent debt of the debtor," but does not include "an unperformed promise to furnish support to the debtor or to a relative of the debtor."[203]  The term "good faith" is not defined in the Bankruptcy Code, but courts "have applied an 'objective' or 'reasonable person standard'" in determining whether a transferee should have been on notice of a debtor's fraudulent intent or possible insolvency.[204]

Additionally, section 546(e) sets out an additional defense to potential fraudulent transfer claims.  This "safe harbor defense" is discussed in more detail below in Part XVI.A.4(a)(x).

---

[197] *See In re Roco Corp.*, 701 F.2d 978, 981 (1st Cir. 1983); *see also In re Comprehensive Power, Inc.*, 578 B.R. 14, 32 (Bankr. D. Mass. 2017).

[198] *See In re Feeley*, 429 B.R. 56, 62 (Bankr. D. Mass. 2010) ("[T]he trustee must prove each element by a preponderance of the evidence.") (citations omitted).

[199] 11 U.S.C. § 548(c) (2016); *see also Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").

[200] 11 U.S.C. § 548(c) (2016) ("Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.").

[201] *In re Adler Coleman Clearing Corp.*, 263 B.R. 406, 471 (S.D.N.Y. 2001).

[202] *See In re Bayou Grp., LLC*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.") (citations omitted).

[203] 11 U.S.C. § 548(d)(2)(A) (2016).

[204] *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 447 (Bankr. S.D.N.Y. 2011) (citations omitted); *see also In re Dreier LLP*, 462 B.R. 474, 491 (Bankr. S.D.N.Y. 2011).

In the Title III Proceedings, the last debt issued by any of the Debtors was in 2014, which is outside the two-year lookback period from the Title III filing date under section 548(a) of the Bankruptcy Code. If the Debtors made any fraudulent transfers within the two-year fraudulent transfer lookback period to any financial institutions, underwriters, investment bankers, financial and legal advisors, accountants, auditors, or other third-party professionals who provided services to the Debtors, such transfers potentially may be avoided by the Oversight Board, or another party in interest with requisite standing, subject to these affirmative defenses.

#### (vi)    Avoidance Actions Under Applicable Law Pursuant to Section 544(b) of the Bankruptcy Code

In addition to the powers to avoid preferences and fraudulent transfers, Congress provided the Oversight Board with the power to avoid any transfer of the Debtors' property, or obligation incurred, that is voidable under "applicable law" by a creditor holding an unsecured claim under section 544(b) of the Bankruptcy Code ("Section 544(b)").[205]

Section 544 of the Bankruptcy Code ("Section 544") is the jurisdictional hook that gives the trustee the power to avoid any transfer that creditors would be able to seek to avoid under applicable non-bankruptcy law.   It invokes state law to determine the trustee's rights.[206] Under that section, the trustee—here, the Oversight Board[207]—steps into the shoes of an unsecured creditor[208] to pursue the avoidance of fraudulent transfers using the substantive state or federal law applicable to that particular creditor. Transfers avoided by the trustee become property of the bankruptcy estate and are distributed to all creditors on a pro rata basis.[209]

---

[205] *See* 11 U.S.C. § 544(b) (2016). *See also In re Comprehensive Power, Inc.*, 578 B.R. 14, 32 (Bankr. D. Mass. 2017) ("The 'applicable state law' pursuant to which the Trustee brings his § 544(b) claim to avoid the Transfers is the UFTA as adopted in Massachusetts[.] The UFTA is similar to § 548 of the Bankruptcy Code, and it applies to transfers that are fraudulent as to present and future creditors.") (internal citation omitted).

[206] *See In re Garrido Jimenez*, 370 B.R. 878, 881 (B.A.P. 1st Cir. 2007) ("The United States Court of Appeals for the First Circuit has previously stated that 11 U.S.C. § 544 invokes state law to determine the rights of the trustee under this section.") (citing *Abboud v. The Ground Round, Inc. (In re the Ground Round, Inc.)*, 482 F.3d 15, 20 (1st Cir. 2007) (holding Pennsylvania law determined the rights of a hypothetical lien creditor under section 544(a)(1))).

[207] Under section 2161(c)(7), the term "trustee", when used in a section of Title 11, made applicable in a case under PROMESA, means the Oversight Board.

[208] *See In re Malavet*, 552 B.R. 24, 36 (Bankr. D.P.R. 2016) ("[W]hen the trustee initiates a cause of action pursuant to 11 U.S.C. § 544(a), he or she is standing in the shoes of a hypothetical lien creditor . . . ."). The US District Court for the District of Puerto Rico has found that the Oversight Board was authorized under PROMESA to pursue remedies available to a trustee under section 544 of the Bankruptcy Code, including the avoidance of unperfected security interests granted prior to PROMESA's enactment. *See Altair Glob. Credit Opportunities Fund (A), LLC v. United States*, No. 17-970 (Fed. Cl. July 13, 2018).

[209] *See Moore v. Bay*, 284 U.S. 4, 5 (1931).

State fraudulent transfer laws differ on issues ranging from the statute of limitations[210] (which may be longer than those provided for under the Bankruptcy Code[211]) to the evidentiary burden regarding insolvency.[212]  Thus, the outcome of an avoidance action may depend on the state law governing it.  This makes a choice of law analysis particularly important, because the outcome of a section 544 claim may hinge on which state's law is applied.  Also, under section 108 of the Bankruptcy Code, the bankruptcy filing tolls certain non-bankruptcy statutes of limitations, including the claims asserted under applicable fraudulent conveyance law (such as state fraudulent transfer statutes), by two years.[213]  Therefore, assuming claims are brought within two years of the bankruptcy filing, the relevant time that has elapsed before bringing the claim is the amount of time between when the cause of action arose and when the bankruptcy was filed.

### (vii)  Increased Look-Back Period to Pursue Fraudulent Transfers under Section 544(b)(1) of the Bankruptcy Code

Section 544(b)(1) provides the trustee with a potentially powerful tool, that is to use the Internal Revenue Service ("IRS") as the "triggering creditor"[214] for bringing fraudulent transfer

---

[210] *See* Del. Code Ann. tit. 6, § 1309(2) (West 2018) (providing a four-year statute of limitations for constructive fraudulent transfer claims); N.Y. C.P.L.R. § 213(8) (McKinney 2018) (providing a six-year statute of limitations for constructive fraudulent transfer claims under New York Uniform Fraudulent Conveyance Act).

[211] Under section 546(a), "an action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of—
    (1) the later of—
    (A) 2 years after the entry of the order for relief; or
    (B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or
    (2) the time the case is closed or dismissed."

[212] *Compare Walker v. Anderson*, 232 S.W.3d 899, 913 (Tex. App. 2007) (noting that the burden is on the creditor to prove every element of an alleged fraudulent transfer, including the insolvency of the debtor), *with Sullivan v. Messer (In re Messer Corcoran)*, 246 B.R. 152, 163 (E.D.N.Y. 2001) (noting that once it has been shown that a debtor transferred property without receiving reasonably equivalent value in return, the burden shifts to the debtor to prove that it was solvent after the transfer).

[213] *See* 11 U.S.C. § 108 (2016); *Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.,* 975 F.2d 1022, 1025 (4th Cir. 1992) (agents of both trustees and debtors-in-possession can invoke § 108(a)); *Natco Indus., Inc. v. Fed. Ins. Co.,* 69 B.R. 418, 419 (S.D.N.Y. 1987) ("The purpose of the two year extension granted by section 108 is to preserve the interests of the debtor's estate."); *Diamond v. Friedman (In re Century City Doctors Hospital, LLC)*, 466 B.R. 1, 7–8 (Bankr. C.D. Cal. 2012) (citing 11 U.S.C § 108(a)); *Alberts v. Tuft (In re Greater Southeast Cmty. Hosp. Corp.)*, 333 B.R. 506, 534 (Bankr. D.D.C. 2005) (citing section 108(a) and stating that a "bankruptcy trustee is granted an additional two years from the filing of the bankruptcy petition in which to raise a claim on behalf of the estate assuming that the statute of limitations did not expire prior to the petition."); *see also* 11 U.S.C. § 546(a) (2106) ("An action or proceeding under section 544, 545, 547, 548, or 553 of this title may not be commenced after the earlier of--- (1) the later of--- (A) 2 years after the entry of the order for relief").

[214] *See In re CVAH, Inc.*, 570 B.R. 816, 825 (Bankr. D. Idaho 2017) ("'Applicable law', as used in § 544(b)(1), should be construed to be a broad term, as the Code contains no language limiting its meaning, save that the 'triggering' creditor into whose shoes the trustee steps must be able to avoid a transfer under the selected law."); *see also In re Tronox Inc.*, 503 B.R. 239, 275 (Bankr. S.D.N.Y. 2013) ("§ 544(b) of the Bankruptcy Code requires a 'triggering creditor' whose allowable, unsecured claim dates from the time of the challenged conveyance.").

claims, providing an increased lookback period of ten or more years in the pursuit of fraudulent transfers that may otherwise be outside the applicable state law statutes of limitation.[215]

Section 544(b)(1) is derivative and "enables the trustee to do in a bankruptcy proceeding what a creditor would have been able to do outside of bankruptcy, except the trustee will recover the property for the benefit of the estate."[216] The trustee's rights depend on the rights of an actual unsecured creditor under applicable law, allowing the trustee to avoid fraudulent transfers that would be "voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502."[217]

The IRS can collect tax liability from a transferee of property of the taxpayer under section 6901(a)(1) of the Tax Code[218] and can use state fraudulent transfer, fraudulent conveyance laws, or the Federal Debt Collections Procedure Act ("FDCPA")[219] to collect debts owed to the US government. When proceeding under a state's fraudulent transfer law, substantive rights of the IRS are those of a creditor, as applicable under state law.[220] Statutes of limitations for fraudulent transfers under state law vary but are typically within four to six years of the transfer date.[221]

The IRS "must prove that a transfer is avoidance under the applicable state law, [but] the limitations period for [the IRS'] filing the avoidance action is governed by federal law."[222] In this regard, "the IRS generally has three years from the filing of a tax return to assess tax liability against a taxpayer and one year thereafter to assess tax liability against a transferee."[223] The IRS's collection period is limited to a ten-year period under section 6502(a) of the Tax Code.[224]

The majority of bankruptcy courts have interpreted section 6502(a) of the Tax Code as providing the IRS, and therefore the trustee using section 544(b), with a ten-year lookback

---

[215] *See* 11 U.S.C. § 544(b)(1) (2016).

[216] *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014).

[217] 11 U.S.C. § 544(b)(1) (2016).

[218] *See Frank Sawyer Trusts of May 1992 v. Comm'r*, 712 F.3d 597, 602–03 (1st Cir. 2013) ("[T]he federal statute authorizing the collection of taxes from transferees, 26 U.S.C. § 6901(a)(1), provides only a procedural remedy against an alleged transferee; substantive state law controls whether a transferee is liable for a transferor's tax liabilities.").

[219] *See* 28 U.S.C. § 3001, *et seq*., which was enacted to establish "a comprehensive framework for the collection of debts owed to the United States government." Notably, under section 3304 of the FDCPA provides a six-year lookback period for avoidance of potential fraudulent transfers.

[220] *See Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 185 (2d Cir. 2013) ("Having determined that the two prongs of § 6901 are 'independent requirements, one procedural and governed by federal law, the other substantive and governed by state law,' we now turn to the Tax Court's assessment of liability under New York state law.") (quotation omitted).

[221] *See, e.g.*, Del. Code Ann. tit. 6, § 1309(2) (West 2018). (providing a four-year statute of limitations for constructive fraudulent transfer claims); N.Y. C.P.L.R. § 213(8) (McKinney 2018) (providing a six-year statute of limitations for constructive fraudulent transfer claims under New York Uniform Fraudulent Conveyance Act).

[222] *In re Kipnis*, 555 B.R. 877, 881 (Bankr. S.D. Fla. 2016).

[223] *In re Kaiser*, 525 B.R. 697, 710 (Bankr. N.D. Ill. 2014) (citing 26 U.S.C. § 6501(a) (providing three (3) years from the date of filing of a tax return, as to taxpayer) and 6501 (providing one year after assessment to taxpayer/transferor, as to transferee)).

[224] 26 U.S.C. § 6502(a).

The Independent Investigator's Final Investigative Report

period to pursue fraudulent transfers.[225]  Therefore, the Oversight Board, standing in the shoes of the IRS or the US government—a creditor in the Title III Proceedings[226]—arguably, could seek to avoid fraudulent transfers using the ten-year lookback period under section 6502(a) or the six-year lookback period under the FDCPA.

In the Title III Proceedings, if the IRS has filed a claim and is a creditor, as of the filing date of the Debtors' Title III Proceedings, the Oversight Board may be able to use the IRS' ten-year lookback period to use the avoidance powers under section 544(b).  Any fraudulent transfers made by the Debtors within the six-year lookback period under the FDCPA or ten-year lookback period under the Tax Code to any third party (including any financial institutions, underwriters, investment bankers, financial and legal advisors, accountants, auditors, and other third-party professionals who provided services to the Debtors) potentially may be avoided by the Oversight Board, or another party in interest with requisite standing.

A trustee may seek to avoid prepetition transfers of the Debtors' property, or obligation incurred, that is voidable under "applicable law" by a creditor holding an unsecured claim under section 544(b).  A court evaluating potential fraudulent transfer claims under Section 554(b) would likely look to either New York law or Puerto Rico law, applying the choice of law analysis discussed above.  For purposes of our analysis, we have evaluated claims under both laws.

### (viii)   Avoidance Actions Under Puerto Rico Law, as Applicable Under Section 544(b) of the Bankruptcy Code

Puerto Rico's fraudulent transfer law focuses specifically on "contracts" rather than the broader category of conveyances.[227]  Under this law, courts may rescind contracts which are executed in fraud of creditors when the creditor cannot recover what is due them in any other

---

[225] *See, e.g.*, *In re Kaiser*, 525 B.R. 697, 711, 713 (Bankr. N.D. Ill. 2014) (finding that the plain meaning of Section 544(b) imposed no limitation on the use of the IRS as a triggering creditor, or the "applicable law" that the IRS (and therefore, the trustee) could use in pursuing avoidance actions).  *But see In re Kipnis*, 555 B.R. 877, 881–83 (Bankr. S.D. Fla. 2016) (explaining a split of authority on whether a trustee can step into the shoes of the IRS under section 544(b) and ultimately "agree[ing] with *Kaiser* court and the majority of decisions that the language in § 544(b) is clear and allows the Trustee in this case to step into the shoes of the IRS to take advantage of the ten-year collection period in 26 U.S.C. § 6502.").

[226] *See* Claim Nos. 17836 and 19064 filed by the Dept. of Treasury; Internal Revenue Serv. against P.R. Highways and Trans. Auth. and P.R. Elec. Power Auth., respectively.; *See also* Claim No. 42668 filed by the Internal Revenue Serv. against P.R. Elec. Power Auth.; Claim No. 21703 filed by the U.S. Dep't of Agric. against Commonwealth of P.R.; Claim Nos. 21481, 30276, 31949 and 34365, among others, filed by the U.S. Dep't of Housing and Urban Dev. against Commonwealth of P.R.; Claim Nos. 36062, 36095, 40262, 41138 and 42189 filed by U.S. against Commonwealth of P.R.

[227] While the majority of states have adopted the Uniform Fraudulent Transfer Act ("UFTA") and apply similar laws, Puerto Rico has not adopted the UFTA.  Generally, the UFTA makes it possible for creditors to reach assets, even if they were transferred fraudulently to third parties.  In states where the legislature has adopted some version of the UFTA, a fraudulent transfer is generally any conveyance that is made with an actual intent to delay, hinder, or defraud present or future creditors. *See, e.g.*, N.Y. Debt. & Cred. Law § 276 (McKinney 2018).

manner.[228]  Contracts in which a debtor alienates property without consideration are presumed to be executed in fraud of creditors.[229]

In assessing whether a debtor transferred assets fraudulently, courts look for "the most obvious signs of fraud," including "the haste with which the alienation is effected, the insolvency of the debtor, the relations of family, intimacy or confidence with the acquirer, the state of the business affairs of the transferor and judicial claims pending against him."[230]

To bring a lawsuit to rescind a contract for being in fraud of creditors, plaintiffs must allege and prove that: (i) the plaintiffs are creditors; (ii) defendant alienated their property in fraud of them; (iii) the plaintiffs were injured by such alienation; and (iv) plaintiffs have no other remedy to recover their credit.[231]  A defrauded creditor must be bring this lawsuit within four years.[232] Although the Puerto Rico statute is silent as to when the four years begin, some courts have held that it begins when the contract is executed.[233]

We have found no published court decisions in Puerto Rico in which a court explicitly applied Puerto Rico law under section 544(b)(1).  In at least one case under Chapter 7 of the Bankruptcy Code, however, the United States Bankruptcy Court for the District of Puerto Rico rescinded a contract through which two debtors donated their residence to their daughters, finding a fraudulent transfer under Puerto Rico law.[234]  Without discussion, the court stated that "the validity of the contract and the determination of whether the transfer [of] property was executed with the intent to defraud is based upon the laws of Puerto Rico."[235]  To support its holding, the court explained that the transfer occurred for no consideration and that it was executed after the creditors filed a lawsuit for damages, which ultimately resulted in a judgment against the debtors.[236]

---

[228] *See* P.R. Laws Ann. tit. 3, §§ 3491-3492 (2018).

[229] P.R. Laws Ann. tit. 3, § 3498 (2018); *In re Sepulveda Figueras*, 193 B.R. 118, 120 (Bankr. D.P.R. 1996). Transfers for "valuable consideration" are also presumed in fraud of creditors if: (i) a condemnatory judgment has been rendered against the transferor or a writ of attachment has been issued against his property; (ii) the transferor sells his property to another who is cognizant of the judgment or of the attachment; and (iii) a creditor is prejudiced by the conveyance and has no other legal remedy to obtain reparation for the injury. P.R. Laws Ann. tit. 31, § 3498. As these circumstances did not exist with respect to GDB or any of the Puerto Rico-Related Entities before Congress enacted PROMESA, this presumption is not relevant to our analysis.

[230] *Fed. Deposit Ins. Corp. v. Martinez Almodovar*, 671 F. Supp. 851, 879 (D.P.R. 1987) (citing *De Jesús v. Carrero*, 112 D.P.R. 631, 1982 WL 210626, *2-3 (1982)); *see also Union de Periodistas, Artes Graficas y Ramas Anexas v. Irving Paper Ltd. (In re El Mundo Corp.)*, 208 B.R. 781, 783 (D.P.R. 1997); *see In re Sepulveda Figueras*, 193 B.R. 118 (Bankr. D.P.R. 1996) (discussing factors a trier should weigh in determining whether a contract was executed in fraud of creditors).

[231] *See Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 441 (1st Cir. 1985) (superseded by statute on other grounds); *Jose Nine v. Los Esposos Jose Aviles*, 53 D.P.R. 471, 1938 WL 7237 (1938).

[232] P.R. Laws Ann. tit. 31, § 3500 (current through 2010 Legis. Sess. and various acts from 2011 to the present).

[233] *Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 441 (1st Cir. 1985) (superseded by statute on other grounds); *Jose Nine v. Los Esposos Jose Aviles*, 53 D.P.R. 471, 1938 WL 7237 (1938).

[234] *In re Sepulveda Figueras*, 193 B.R. 118, 120 (Bankr. D.P.R. 1996); *see also, F.D.I.C. v. Martinez Almodovar*, 671 F. Supp. 851 (D.P.R. 1987) (holding that a transfer of shares of a corporation for no consideration gives rise to a presumption that the transfer was in fraud of creditors).

[235] *In re Sepulveda Figueras*, 193 B.R. 118, 120 (Bankr. D.P.R. 1996).

[236] *In re Sepulveda Figueras*, 193 B.R. 118, 120 (Bankr. D.P.R. 1996).

The Independent Investigator's Final Investigative Report

The United States Bankruptcy court for the District of Puerto Rico also relied on Puerto Rico's law governing rescission of contracts to decline appointment of a Chapter 11 trustee.[237] The appellate court noted that "the bankruptcy court offered no explanation for its reference to the Puerto Rican contract rescission provision to define 'fraud' under" Chapter 11, thereby suggesting that the lower court possibly erred in doing so.[238] The court explained that exclusive reliance on this contract rescission provision is "misplaced" because the "constrained definition of fraud [in the Puerto Rico law] is at odds with the broader scope of" Chapter 11.[239] Nevertheless, the court found no prejudice to the debtor and thus did not further discuss any dissonance between Puerto Rico's law on fraudulent transfers and Chapter 11.[240]

In sum, Puerto Rico's jurisprudence on fraudulent transfers in the bankruptcy context, particularly with respect to section 544(b), is not sufficiently developed to provide a clear conclusion regarding the applicability of Puerto Rico law to potential avoidance actions against third parties. However, there is case law to support an argument to that effect.

### (ix) Avoidance Actions Under New York Law, as Applicable Under 544(b)

Based on the New York's connections to the events at issue, it is possible that a court could conclude that New York law would apply for avoidance actions that could be brought by the Oversight Board applicable under section 544(b). In that case, New York's substantive fraudulent transfer law (*e.g.*, New York Debtor & Creditor Law §§ 273 and 274) may govern potential state law avoidance actions that could be brought by the Oversight Board, as representatives of the Debtors' estates, under section 544(b).[241] Importantly, New York applies a six-year statute of limitations to fraudulent transfer actions.[242]

Section 273 of the New York Debtor & Creditor Law provides:

---

[237] *Lopez-Munoz*, 553 B.R. 179, 192 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Lopez-Munoz*, 866 F.3d 487 (1st Cir. 2017).

[238] *Lopez-Munoz*, 553 B.R. 179, 192 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Lopez-Munoz*, 866 F.3d 487 (1st Cir. 2017).

[239] *Lopez-Munoz*, 553 B.R. 179, 192 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Lopez-Munoz*, 866 F.3d 487 (1st Cir. 2017).

[240] *Lopez-Munoz*, 553 B.R. 179, 192 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Lopez-Munoz*, 866 F.3d 487 (1st Cir. 2017).

[241] *See* Commonwealth of P.R., *Official Statement for General Obligation Bonds of 2014, Series A*, 17, 30 (2014) ("In accordance with the Act, the Secretary of the Treasury has provided in the Bond Resolution, and the Secretary of Justice has approved, that the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or the Bond Resolution, and that any such actions shall be brought only in New York courts or U.S. federal courts sitting, in either case, in the Borough of Manhattan, The City of New York, New York, or Commonwealth courts or U.S. federal courts sitting in San Juan, Puerto Rico.") (emphasis added). *See also* Act of Mar. 4, 2014, No. 34, 2014 P.R. Laws 76, 87 § 4 (providing: "[t]he Secretary of the Treasury is hereby authorized to include in the Authorizing Resolution or Resolutions any terms and conditions that he/she may deem necessary and convenient for the sale of bonds and notes authorized under this Act, including to consent on behalf of the Commonwealth of Puerto Rico, with the consent of the Secretary of Justice, to be subject to the laws of New York, and the jurisdiction of any state or federal court located in the Manhattan county, New York, New York City, New York, in the event that a lawsuit may arise in connection with such bonds and notes.").

[242] N.Y. C.P.L.R. § 213(8) (McKinney 2018) (providing a six-year statute of limitations for constructive fraudulent transfer claims under New York Uniform Fraudulent Conveyance Act).

> Every conveyance made and every obligation incurred by a person who is
> or will be thereby rendered insolvent is fraudulent as to creditors without
> regard to his actual intent if the conveyance is made or the obligation is
> incurred without a fair consideration.

Section 274 of the New York Debtor & Creditor Law provides:

> Every conveyance made without fair consideration when the person making
> it is engaged or is about to engage in a business or transaction for which the
> property remaining in his hands after the conveyance is an unreasonably
> small capital, is fraudulent as to creditors and as to other persons who
> become creditors during the continuance of such business or transaction
> without regard to his actual intent.

To state a claim under the New York Debtor & Creditor Law, the trustee must allege
that a transfer was made without fair consideration **and** that either: (i) the debtor was insolvent
at the time of the transfer or was rendered insolvent by the transfer in question, under section
273; or (ii) that as a result of the transfer in question, the debtor was left with unreasonably
small capital to conduct its business, under section 274.[243]

The trustee has the burden of proving that the transfer at issue was "without fair
consideration," which could be established by proving that the value of what the debtor actually
received was disproportionately small compared to the value of what it gave.[244]   When
determining whether reasonably equivalent value was given in exchange for a transfer, courts
consider first whether any value was given and, if so, whether that value was reasonably
equivalent.[245]

"Once it is established that a debtor transferred property without fair consideration,
however, the law presumes that the transfer rendered the debtor insolvent."[246]   To evaluate the
sufficiency of a complaint's insolvency allegations, the court may look for a "balance sheet"
test or other information provided, which the court may use "to infer that the corporation's
liabilities exceeded their assets at the time the transfers took place."[247]

---

[243] *See* N.Y. Debt. & Cred. Law §§ 273–274 (McKinney 2018); *see also Eclaire Advisor as Trustee to
Daewoo Int'l (Am.) Corp. Creditor Trust v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 257, 268
(S.D.N.Y. 2005).

[244] *See In re Vivaro Corp.*, 524 B.R. 536, 557–58 (Bankr. S.D.N.Y. 2015).

[245] *See In re Garcia*, 494 B.R. 799, 815 (Bankr. E.D.N.Y. 2013) *reconsideration denied*, 507 B.R. 434
(Bankr. E.D.N.Y. 2014) (citing *Devon Mobile Commc'ns Liquidating Trust v. Adelphia Commcns
Corp. (In re Adelphia Commc'ns Corp.)*, No. 02–41729, 2006 WL 687153,*11 (Bankr. S.D.N.Y. Mar.
6, 2006)).

[246] *See In re Vivaro Corp.*, 524 B.R. 536, 557–58 (Bankr. S.D.N.Y. 2015) ("If the absence of fair
consideration is properly alleged, then the court may presume insolvency, and the burden shifts to the
defendants to rebut it") (citing, among other cases, *Tese–Milner v. Edidin & Assocs. (In re Operations
N.Y. LLC)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013)).   *See also First Keystone Consultants, Inc. v.
Schlesinger Elec. Contractors, Inc.*, 871 F. Supp. 2d 103, 120 (E.D.N.Y. 2012); *Liberty Mut. Ins. Co.
v. Horizon Bus Co.*, No. 10-0449, 2011 WL 1131098, *4 (E.D.N.Y. Feb. 22, 2011) ("While the plaintiff
has the burden of establishing the lack of fair consideration, where it is shown that a transfer is made
without consideration, there exists 'a presumption of insolvency that shifts the burden to the defendant
to rebut by showing continued solvency after the transaction.'").

[247] *In re Vivaro Corp.*, 524 B.R. 536, 557–58 (Bankr. S.D.N.Y. 2015).

### (x)   Safe Harbor Under the Bankruptcy Code

The Bankruptcy Code contains several safe harbor provisions[248] that grant significant benefits to certain participants in financial markets.[249]  The purpose of those provisions, as has generally been recognized by the courts, is to minimize systemic risks in certain markets.[250]  Among the safe harbor provisions is section 546(e) ( "Safe Harbor"), which limits the power of a trustee to avoid certain types of transfers made by or to enumerated financial market participants ("Financial Institution(s)")[251] unless these transfers were made with "actual intent" to hinder, delay, or defraud creditors.[252]  The two types of transfers that are exempt under the Safe Harbor are "margin payments" and "settlement payments."[253]

Section 546(e) provides an exemption for transfers that, among other things, exempts a transfer that is a "settlement payment . . . made by or to (or for the benefit of) . . . a financial institution [or] financial participant . . .  or that is a transfer made by or to (or for the benefit of) . . . a financial institution [or] financial institution . . . in connection with a securities contract."[254]  The Safe Harbor provides defense to constructive fraudulent transfer claims under section 548(a)(1)(B) and applicable state law claims under section 544.

The Safe Harbor limitations expressly do **not** apply to intentional fraudulent transfer claims under section 548(a)(1)(A) of the Bankruptcy Code.[255]  In *Merit Management Group, LP v. FTI Consulting, Inc.*, the US Supreme Court limited the scope of the Safe Harbor by refusing to extend its protection to financial institutions which were acting simply as conduits for the transaction.[256]  As a result, using a conduit financial institution does **not** preclude the trustee from avoiding a constructively fraudulent transfer under section 548(a)(1)(B), or applicable non-bankruptcy law, when the trustee is suing the ultimate recipient of the fraudulent transfer (not the intermediary).

In the Title III Proceedings, there do not appear to be any transactions or transfers made by the Debtors in connection with the public debt issuances within the two-year lookback period prepetition that may be avoided under section 548(a)(1)(A).  In connection with the

---

[248] For example, safe harbor of transfers that are margin or settlement payments made in connection with securities, commodity, or forward contracts under 11 U.S.C. § 546(e) and safe harbor of transfers made by, to, or for the benefit of a swap participant or financial participant under or in connection with a prepetition swap agreement under 11 U.S.C. § 546(g).

[249] *See* Mark D. Sherrill, *Limitations of Market Participants' Protections Against Fraudulent-Conveyance Actions*, 28 Am. Bankr. Inst. J. 28, 28 (2009) (citing 11 U.S.C. §§ 362(b)(6), (7), (17), (27); 546(e), (f), (g), and (j); 555-56; 559-61).

[250] *See, e.g., In re Quebecor World (USA)*, 453 B.R. 201, 204 (Bankr. S.D.N.Y. 2001) ("The 'safe harbor' sections of the [Bankruptcy] Code were enacted to exempt certain specified financial contracts from the reach of the automatic stay and the avoidance powers of the Code. These immunities are intended to contain the spread of economic contagion and protect the markets from systemic risk.")

[251] Financial Institutions include commodities brokers, forward contract merchants, stockbrokers, financial participants, or securities clearing agencies. *See* 11 U.S.C. § 546(e) (2016).

[252] 11 U.S.C. § 546(e) (2016).

[253] 11 U.S.C. § 546(e) (2016).

[254] 11 U.S.C. § 546(e) (2016).

[255] 11 U.S.C. § 546(e).  *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (concluding that the safe harbor "operates as an exception to the avoiding powers afforded to the trustee under the substantive avoidance provisions" except for "an actually fraudulent transfer under § 548(a)(1)(A).").

[256] *See Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018).

investigation, we were not tasked with identifying or analyzing payments or transfers made by each of the Debtors before the Title III Proceedings' filing date.

### (xi)   Recovery Actions Under Section 550

Under Section 550 of the Bankruptcy Code ("Section 550"), if a transfer is avoided, the trustee may recover the property transferred, or its value, for the benefit of the estate, from the initial transferee or any immediate transferee of such initial transferee.  The trustee is not required to recover the property if avoidance alone (including avoidance under Section 544[257]) provides an adequate remedy because avoidance and recovery are independent remedies.[258]  This means that even where an avoidance action is successful, a trustee may separately need to utilize Section 550 in order to recover the property transferred, or its value.

A transferee may have good defenses to a recovery action that would protect it from having to turnover any property to the trustee.[259]  The Bankruptcy Code prevents a trustee from recovering property from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided."[260]  Whether the transferee party has given value is looked at from the perspective of the transferee, and not whether the transferor received value.[261]  The transferee has acted in good faith if the transferee had neither actual knowledge nor willful blindness.[262]

The good-faith defense available under Section 550(b)(1) is not a defense to claim disallowance with respect to holders of assigned claims/claim purchasers.[263]

---

[257] *See In re Colon Vidal*, 578 B.R. 481, 492–94 (Bankr. D.P.R. 2017) (citing *In re Priest*, 268 B.R. 135, 139 (Bankr. N.D. Ohio 2000) ("Because §§ 544 and 550 provide independent remedies, the trustee need not pursue recovery of property from the transferee if avoidance alone is an adequate remedy") and *In re Burns*, 269 B.R. 20 (B.A.P. 6th Cir. 2001)).

[258] *See In re Colon Vidal*, 578 B.R. 481, 493 (Bankr. D.P.R. 2017); *In re Congress Credit Corporation v. AJC International*, 186 B.R. 555, 558 (D.P.R. 1995).

[259] *See* 11 U.S.C. § 550 (1978); *see also In re Colon Vidal*, 578 B.R. 481, 492 (Bankr. D.P.R. 2017) ("The good faith transferee defense applies only to actions for recovery of property, not to actions where the trustee seeks only to avoid the transfer.").

[260] 11 U.S.C. § 550(b) (1978); *see also In re VJ Int'l, Inc.*, 359 B.R. 401, 409 (Bankr. D.P.R. 2006).

[261] *See, e.g.*, *Bonded Fin. Svs., Inc. v. European Am. Bank.*, 838 F.2d 890, 897 (7th Cir. 1988) (discussing the difference between "value" under 550(b)(1) and "value to the debtor" in other sections of the Bankruptcy Code).

[262] *See, e.g.*, *Securities Inv. Protection Corp. v. Bernard L. Madoff Inv. Securities LLC*, 516 B.R. 18, 23 (S.D.N.Y. 2014).

[263] *In re Enron Corp.*, 379 B.R. 425, 448–49 (S.D.N.Y. 2007) (equitable subordination under section 510(c) and disallowance under section 502(d) are personal disabilities that are not fixed as of the petition date and do not inhere in the claim. Nevertheless, [claimant] may be subject to equitable subordination and disallowance based solely on the conduct of the transferor if the claims were transferred to [claimant] by way of an assignment")*; seealso In re KB Toys Inc.*, 736 F.3d 247, 255 (3d Cir. 2013) ("Section 550(b) protects a good faith transferee who purchases ***property of the estate*** that is avoidable under the various avoidance sections. . . . ASM did not purchase property of the estate. ASM purchased *claims* against the Debtors' estates. A claim against an estate is not property of that estate. . . . Thus, on its face, § 550(b) is inapplicable to ASM.") (citations omitted) (emphasis added).

#### (xii)    Disallowance of Claims under 11 U.S.C. § 502(d)

Section 502 of the Bankruptcy Code ("Section 502") governs the allowance and disallowance of claims and interests in bankruptcy.[264]  A claim is "allowed" when it has been deemed approved for payment.  Generally, any properly filed claim is deemed to be an allowed claim, unless a party-in-interest objects.[265]  However, Section 502(d) disallows claims from creditors who have not repaid avoidable transfers like preferences and fraudulent transfers.[266]

A party-in-interest may file a complaint and commence an adversary proceeding in the bankruptcy court over an objection to a claim under Section 502(d).  Alternatively, an objection to the claim under Section 502(d) may be filed as part of the claims reconciliation process to determine the amount of a creditor's allowed claim, which, in turn, would determine the amount of the creditor's recovery in the Debtors' Title III Proceedings.  Limitations periods do not apply to objections to the allowance of a claim "unless voidable preferences are first surrendered . . . ."[267]

In the Title III Proceedings, the Oversight Board may seek to disallow, under Section 502(d), any claim of any the creditors (including claims of any financial institutions, underwriters, investment bankers, financial and legal advisors, accountants, auditors, or other third-party professionals who provided services to the Debtors) who have received an avoidable transfer, unless the creditors either pay an amount equal to the transfer or return the property that was the subject of the transfer.  As a result, Section 502(d) may preclude any creditor that received an avoidable transfer from sharing in the distribution of the Debtors' assets unless that creditor has returned the avoidable transfer or otherwise made the Debtors whole.

#### (b)    Equitable Subordination

A bankruptcy court may reorder claims as a result of a creditor's inequitable conduct, in order to prevent unjust or unfair results among creditors in a bankruptcy.  A creditor who has engaged in inequitable conduct may have its claim moved down in the order in which claims are paid, resulting in a reduction—or elimination—of that creditor's recovery.  The bankruptcy court's power to subordinate claims on equitable grounds is codified in section 510(c) of the Bankruptcy Code, which applies to the Title III Proceedings through Section 301 of PROMESA.  Section 510(c) of the Bankruptcy Code provides, in relevant part, that "after notice and a hearing, the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ."  11 U.S.C. § 510(c).  Here, the doctrine of equitable subordination may be relevant to claims filed in the Title III estate by creditors whose claims could potentially be subordinated, impacting the recovery of other creditors who are not alleged to have engaged in inequitable conduct.

---

[264] 11 U.S.C. § 502(d) (1978); *see also Petitioning Creditors of Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1237 (1st Cir. 1997) ("A proof of claim must be disallowed unless the preference recipient pays the amount for which he is "liable" under 11 U.S.C. § 550.").

[265] 11 U.S.C. § 502(a) (1978).

[266] 11 U.S.C. § 502(d) (1978).

[267] *In re Cushman Bakery*, 526 F.2d 23, 34 (1st Cir. 1975).

The common law standard for equitable subordination was set forth by the Fifth Circuit in its *Mobile Steel* decision, which outlines three requisite conditions for a court to exercise the power of equitable subordination:

- The claimant must have engaged in some type of inequitable conduct;

- The misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and

- Equitable subordination of the claim must not be inconsistent with [other Bankruptcy Code provisions].[268]

Most district courts and courts of appeal—including the First Circuit—generally follow the *Mobile Steel* standard and apply its three-pronged test for the determination of whether to subordinate claims pursuant to Section 510(c).[269]

Bankruptcy courts have generally recognized equitable subordination to be an extraordinary remedy that should be applied sparingly.[270]  Even where all of the *Mobile Steel* elements are satisfied, some courts have still found that subordination is not required.[271]  This is because equitable subordination is a remedial measure.  It is not intended to be punitive, so a bankruptcy court will only subordinate a creditor's claims to the extent necessary to repair injuries to other creditors.[272]  Because bankruptcy courts are courts of equity, they can use their equitable powers to grant remedies—like equitable subordination—that are appropriate to the circumstances of each particular case.[273]  If the *Mobile Steel* elements are satisfied, a bankruptcy court may subordinate a claimant's claims that are ***not directly related to the claimant's inequitable conduct***—but only to the extent necessary to redress the injury to other creditors caused by that inequitable conduct.[274]  We walk through the *Mobile Steel* factors below, because they provide a clear roadmap for the types of conduct that could impact creditor recoveries in the Title III Proceedings.

---

[268] *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977) (internal citation omitted) (hereinafter "*Mobile Steel*").

[269] *United States v. Noland*, 517 U.S. 535, 538-39 (1996) (noting that most district courts and courts of appeal have generally followed *Mobile Steel* test in absence of explicit statutory criteria); *see Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 59 (1st Cir. 2005) (utilizing three-pronged *Mobile Steel* standard); *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1 (Bankr. D. Mass 2011) (same).

[270] *See Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008).

[271] *See In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 744 (6th Cir. 2001) ("Satisfaction of this three-part standard [from *Mobile Steel*] does not mean that a court is ***required*** to equitably subordinate a claim, but rather that the court is ***permitted*** to take such action.") (emphasis in original); *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 n.9 (5th Cir. 1991).

[272] *See In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008).

[273] *See, e.g., Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 212 (2d Cir. 1978); In re Aéropostale, Inc., 555 B.R. 369, 397 (Bankr. S.D.N.Y. 2016).

[274] *See In re Mobile Steel Co.,* 563 F.2d 692, 701 (5th Cir. 1977) ("[I]nequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim."); *Enron-Bankruptcy Court Decision*, 2005 WL 3832053, *8 ("However, a bankruptcy court can subordinate a claim only to the extent necessary to offset the harm suffered by the bankrupt and its creditors on account of [claimant's inequitable] conduct.") (citing *In re Mobile Steel Co.,* 563 F.2d 692, 701 (5th Cir. 1977)).

## (i)     First Prong of *Mobile Steel*: Inequitable Conduct

According to one bankruptcy court in the First Circuit, misconduct is a "prerequisite" for equitable subordination."[275]   It is "determined on a case-by-case basis, and conduct that shocks the conscience of the court is required."[276]   Traditionally, circumstances in which courts have found equitable subordination to be warranted have been limited to situations involving:

- Fraud, illegality or breach of fiduciary duty;

- Undercapitalization; and

- Control or use of the debtor as an alter ego for the benefit of the claimant.[277]

Generalized allegations of "inequitable conduct," without more, are insufficient – plaintiff must allege that the claimant's conduct falls into one of these three categories.[278] Courts have also found equitable subordination where a creditor breached the implied duty of good faith and fair dealing.[279]   The proponent of equitable subordination must demonstrate, for example, "a substantial breach of contract and advantage-taking by the creditor," or, absent a contractual breach, "fraud, misrepresentation, estoppel or similar conduct that justifies the intervention of equity."[280]

A key issue is whether or not the claimant alleged to have acted inequitably was an "insider" of the debtor.  Where the claimant is an insider, its dealings with the debtor "are subjected to rigorous scrutiny."[281]   The party seeking subordination must produce material evidence of inequitable conduct by an insider.  The burden is then on the insider claimant, who must "demonstrate the good faith and inherent fairness of his conduct toward the debtor and the other creditors."[282]   Conversely, in circumstances where the claimant is not found to be an insider, the burden of proof remains with the party seeking subordination.  In that case, there are fewer traditional grounds for finding inequitable conduct available (because, for example, claims of undercapitalization and breach of fiduciary duty cannot be sustained against non-

---

[275] *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 44 (Bankr. D. Mass. 2011) (emphasis added).

[276] *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 44 (Bankr. D. Mass. 2011) (emphasis added).

[277] *See In re 80 Nassau Assocs.*, 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994); *In re Ticketplanet.com*, 313 B.R. 46, 65-66 (Bankr. S.D.N.Y. 2004); *In re Lois/USA, Inc.*, 264 B.R. 69, 133 (Bankr. S.D.N.Y. 2001).

[278] *See ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997).

[279] *See In re Lightsquared*, 511 B.R. 348 (Bankr. S.D.N.Y. 2014).

[280] *See In re Lightsquared*, 511 B.R. 348 (Bankr. S.D.N.Y. 2014).

[281] *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 564 (Bankr. S.D.N.Y. 2002) (quoting *In re Mobile Steel Co.,* 563 F.2d 692, 701 (5th Cir. 1977) (quoting *Pepper v. Litton*, 308 U.S. 295, 306)).

[282] *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994); *Allied Eastern States Maintenance Corp. v. Miller (In re Lemco Gypsum, Inc.)*, 911 F.2d 1553, 1557 (5th Cir. 1990).

insiders).[283]  As a result, courts have rarely found a <u>non-insider</u> claimant's conduct sufficiently inequitable to warrant subordination.[284]

>        (ii)      **Second Prong of *Mobile Steel*:  Inequitable Conduct Must Result in Injury to Other Creditors or Unfair Advantage to Claimant**

Actual harm to creditors is necessary in order for the court to equitably subordinate a creditor's claim.[285]  Actual harm occurs when a claimant's conduct directly injures other creditors (*e.g.*, by reducing recoveries to them) or indirectly injures them by giving the claimant an unfair advantage.  Where the first prong of the *Mobile Steel* standard is sufficiently plead, general allegations of harm (for example, allegations that other creditors are less likely to collect the full amount of their claims as a result of the claimant's inequitable conduct) may satisfy the second prong and support a plausible claim.[286]

To satisfy the second prong of the *Mobile Steel* standard, however, proof of a particularized injury is ultimately required.[287]  However, evidence about an exact *measure* of the injury is not required.[288]  Courts have recognized that quantification of the harm to general creditors resulting from a claimant's inequitable conduct may not always be feasible and if it is not feasible, the wrongdoer should not benefit.[289]  Accordingly, even if an injury is difficult to quantify, plaintiff may establish the second prong of *Mobile Steel* if it identifies the nature of the harm suffered sufficiently so that a court can determine whether and to what extent subordination may be a proportional remedy.[290]

>        (iii)     **Potential Defenses**

The doctrine of unclean hands prohibits equitable relief for a wrongdoer who also engaged in alleged inequitable conduct.  It is a defense available in many jurisdictions, to a wide variety of allegations.  Puerto Rico recognizes the doctrine of unclean hands.[291]  The Puerto Rico Supreme Court has also "adopted the rationales and theories underlying equitable

---

[283] *See, e.g.*, *In re Granite Partners, L.P.*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) (noting courts have described degree of wrongful conduct warranting equitable subordination of non-insider claims as "gross and egregious," "tantamount to fraud, misrepresentation, overreaching or spoliation" or "involving moral turpitude"); *In re 80 Nassau Assocs.*, 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994) ("[A]verage general creditor does not owe a fiduciary duty to the debtor or the creditors of the debtor in the collection of its claim.").

[284] *See generally In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 566 (Bankr. S.D.N.Y. 2002).

[285] *See In re Kalisch*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008) (citing *In re SI Restructuring Inc.*, 532 F.3d 355, 361 (5th Cir. 2008); *In re Multiponics, Inc.*, 622 F.2d 709, 721 (5th Cir. 1980).

[286] *See In re 80 Nassau Assocs.*, 169 B.R. 832,840 (Bankr. S.D.N.Y. 1994); *In re Ticketplanet.com*, 313 B.R. 46, 65-66 (Bankr. S.D.N.Y. 2004).

[287] *In re Mobile Steel Co.*, 563 F.2d 692, 702-06 (5th Cir. 1977).

[288] *See, e.g.*, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009) ("Moreover, although this court has indicated that a creditor's claim should only be subordinated to the extent necessary to remedy the harm caused by that creditor's misconduct, ***we have never required the bankruptcy estate to quantify specific harms to the estate or other creditors.***") (emphasis added).

[289] *See, e.g.*, *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 413 (3d Cir. 2009) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 (3d Cir. 1998)).

[290] *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 413 (3d. Cir. 2009).

[291] *Cabot LNG Corp. v. Puerto Rico Elec. Power Auth.*, 922 F. Supp. 707, 711 n. 5 (D.P.R. 1996).

remedy defenses."[292]   The doctrine of unclean hands is analogous to the common-law defense of *in pari delicto*, which "bars claims of a plaintiff who is 'an active, voluntary participant in the unlawful activity that is the subject of the suit.'"[293]   For purposes of this analysis, we will use the terms interchangeably.[294]

There is little case law directly addressing the issue of whether the doctrine of unclean hands may be invoked in defense of an equitable subordination claim, and the results are inconsistent.  The First Circuit does not appear to have directly addressed the issue.  In *Granite Partners*, the District Court for the Southern District of New York dismissed a claim for equitable subordination against the debtors' broker-dealers, holding such claim was barred under the defenses of *in pari delicto* and unclean hands.[295]  In that case, the court held that the conduct of the insiders—which the court imputed to the debtors—demonstrated substantially equal fault between the debtors and the insiders.  Therefore, claims against the broker-dealers, including equitable subordination, were barred under the defenses of *in pari delicto* and unclean hands.  *Id.* at 290, 310-11.

Since the *Granite Partners* decision, however, at least two courts have held that the doctrine of unclean hands cannot be raised by a claimant in defense against an equitable subordination claim (at least when such claim is brought by a bankruptcy trustee or a creditors' committee).  In *Student Finance Corp.*, the District Court for the District of Delaware rejected an unclean hands defense against a trustee brought by the debtor's prepetition attorneys, who contended that: (i) the debtor participated in alleged inequitable conduct; and (ii) the trustee stood in the shoes of the debtor.  The court found that "imputing [the debtor's] wrongful conduct to the Trustee, who is not himself accused of any wrongdoing, would lead to an inequitable result."[296]

Similarly, the Bankruptcy Court for the Northern District of Illinois in *Automotive Professionals* held that "unclean hands is not a viable defense to an action for equitable subordination as a matter of law."  In that case, a Chapter 11 trustee sought equitable subordination of a secured claim, alleging the claimant had engaged in inequitable conduct harming other creditors.  In granting the trustee's motion to strike the claimant's affirmative defense of unclean hands, the bankruptcy court found that: (i) unclean hands is inconsistent with the focus of equitable subordination, which looks only at the conduct of a creditor and its resulting injury on others; (ii) courts have consistently subordinated claims even where the debtor was "integrally involved in giving the creditor an unfair advantage;" and (iii) barring subordination when the debtor was involved in the inequitable conduct would "defeat the purpose of section 510(c)."[297]

It is also possible that claimants who are insiders of a debtor may be precluded from raising the doctrine of unclean hands as a defense to equitable subordination.  The *in pari*

---

[292] *Cabot LNG Corp. v. Puerto Rico Elec. Power Auth.*, 922 F. Supp. 707, 711 n. 5 (D.P.R. 1996) (citing *Colon v. San Patricio Corp.*, 81 D.P.R. 242, 262 (1959)).

[293] *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998) (quoting *Pinter v. Dahl*, 486 U.S. 622, 635-36 (1988)).

[294] *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 365 B.R. 24. 47 n.75 ("[T]he Court regards references to 'clean hands,' 'unclean hands' and '*in pari delicto*' as alternative ways of saying the same thing.").

[295] *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 310-11 (S.D.N.Y. 1998).

[296] *Stanziale v. Pepper Hamilton LLP (In re Student Finance Corp.)*, 335 B.R. 539, 546 (D. Del. 2005).

[297] *Gecker v. Goldman Sachs & Co. (In re Automotive Professionals, Inc.)*, 398 B.R. 256, 263 (Bankr. N.D. Ill. 2008).

*delicto* defense does not bar claims by a bankruptcy trustee (or a committee) against a debtor's insiders.[298]   In a decision addressing this issue in the context of a claim for equitable subordination, the Bankruptcy Court for the Southern District of New York precluded defendants from raising the defense of *in pari delicto* because sufficient facts were alleged to establish that defendants were insiders and, therefore, such defense was "inapplicable in this case."[299]

However, a claimant may argue that, in the context of *in pari delicto*, the term "insider" does not include every statutory insider, but only those who exercise actual domination and control over, or otherwise breach fiduciary duties to, the debtor.[300]  As a result, and based on the relevant case law, it is difficult to know whether a claimant would be prevented from invoking the doctrine of unclean hands in defense against an equitable subordination claim by the Oversight Board or Committee on this basis.

In the event that a claimant *is* permitted to invoke the doctrine of unclean hands, the Bankruptcy Court would look to the relative fault between the claimant and the relevant debtor(s) to determine whether subordination is equitable.[301]  "Courts apply the [*in pari delicto*] defense where the plaintiff has participated in some of 'the same sort of wrongdoing' as the defendant . . . and should not allow the defense 'unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater.'"[302]

In summary, there is no controlling case law on the availability of the defenses of unclean hands or *in pari delicto* against an equitable subordination claim.  While arguments can be made that such defenses are not available to claimants here as a matter of law or because of their status as ta Debtor's insider, claimants can raise such defenses.  Accordingly, any potential benefits of asserting such a claim should be appropriately weighed against this possible defense.

## B.   Prior and Pending Enforcement Actions and Private Litigation

To provide appropriate context for our discussion of potential claims, below is a summary of some of the various government enforcement actions and private suits in Puerto Rico and New York related to the facts that are within the scope of our investigation. This

---

[298] *See Goldin v. Primavera Familienstiftung, Tag Assocs., Ltd. (In re Granite Partners, L.P.)*, 194 B.R. 318, 332 (Bankr. S.D.N.Y. 1996) ("*In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners.").

[299] *In re KDI Holdings, Inc.*, 277 B.R. 493, 517-19 (Bankr. S.D.N.Y. 1999) (denying motion to dismiss and holding unsecured creditors' committee asserted colorable claim for equitable subordination).

[300] *See, e.g.*, *OHC Liquidation Trust v. Credit Suisse (In re Oakwood Homes Corp.)*, 356 F. App'x 622, 628 (3d Cir. 2009) ("[Claimant] was not an 'insider' for purposes of *in pari delicto* because [debtor] retained total control over its decisions. . . . The justification for [New York's *in pari delicto*] doctrine here . . . relates to the control that others exert over a corporation that does not act on its own.") (citations omitted); *In re KDI Holdings, Inc.*, 277 B.R. 493, 511 (Bankr. S.D.N.Y. 1999) ("In cases involving non-management creditors, a creditor will be held to an insider standard where it is found that it dominated and controlled the debtor.").

[301] *See, e.g.*, *BrandAid Marketing Corp. v. Biss*, 462 F.3d 216, 218 (2d Cir. 2006) ("[R]equirement for invocation of the doctrine of *in pari delicto* is that the plaintiff's wrongdoing be at least substantially equal to that of the defendant.").

[302] *Peltz v. SHB Commodities, Inc*., 115 F.3d 1082, 1090 (2d Cir. 1997) (quoting *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 307 (1985) and *Pinter v. Dahl*, 486 U.S. 622, 636 (1988)).

overview, which is a survey and necessarily a high-level summary of complex matters, is no substitute for a careful review of each matter, and interested readers should use our citations to obtain more detailed and updated information.

1.   **FINRA Proceedings**

In September 2015, FINRA announced the conclusion of its investigation into UBS PR's customer account monitoring practices.  FINRA found that UBS PR failed to properly monitor customer accounts for risks related to leverage and concentration levels and lacked a system for flagging risky transactions associated with Local CEFs.[303]  FINRA found that UBS PR violated Rule 3010 of the National Association of Securities Dealers ("NASD") and FINRA Rule 2010.[304]  FINRA fined and censured UBS PR for $7.5 million and ordered UBS PR to pay approximately $11 million in restitution to 165 customers who were forced to realize losses on their CEF positions.  In concluding these settlements, UBS PR neither admitted nor denied the charges, but consented to the entry of FINRA's findings.[305]

According to FINRA, for more than four years, UBS PR did not implement a reasonably designed system to identify and prevent unsuitable transactions "in light of the unique Puerto Rican economy," in which retail customers typically maintained high levels of concentration in Puerto Rican assets and often used those highly concentrated accounts as collateral for cash loans. According to Brad Bennett, FINRA's Executive Vice President of Enforcement, UBS PR " operated in a unique economy and ultimately failed to tailor its supervisory systems to its specific business needs."

In this case, UBS PR solicited certain customers to open lines of credit ("LOCs") collateralized by their by highly concentrated accounts.  Due to the "unique benefits of Puerto Rican assets for Puerto Rican residents," UBS PR customer accounts were typically highly concentrated in CEF shares. As the local markets in August 2013 were strained, caused in part by downgrades of Puerto Rico-related credit ratings, this caused the value of many CEF shares to plummet, and customers were forced to realize substantial losses in order to meet them their collateral calls on the LOC's.[306]

---

[303] Michelle Ong & Nancy Condon, *FINRA Sanctions UBS Puerto Rico $18.5 Million for Supervisory Failures Regarding Sales of Puerto Rican Closed-End Funds and Related Loans*, Financial Industry Regulatory Authority (Sept. 29, 2015), http://www.finra.org/newsroom/2015/finra-sanctions-ubs-puerto-rico-185-million-supervisory-failures.

[304] Letter from Carlos V. Ubinas Taylor, President & CEO, UBS Financial Services Incorporated of Puerto Rico to the Department of Enforcement, Financial Industry Regulatory Authority (Sept. 15, 2015) (on file with author).

[305] Michelle Ong & Nancy Condon, *FINRA Sanctions UBS Puerto Rico $18.5 Million for Supervisory Failures Regarding Sales of Puerto Rican Closed-End Funds and Related* Loans, Financial Industry Regulatory Authority (Sept. 29, 2015), http://www.finra.org/newsroom/2015/finra-sanctions-ubs-puerto-rico-185-million-supervisory-failures.

[306] Michelle Ong & Nancy Condon, *FINRA Sanctions UBS Puerto Rico $18.5 Million for Supervisory Failures Regarding Sales of Puerto Rican Closed-End Funds and Related Loans*, Financial Industry Regulatory Authority (Oct. 13, 2015), http://www.finra.org/newsroom/2015/finra-sanctions-ubs-puerto-rico-185-million-supervisory-failures.  On the same day, SEC brought an action against UBS PR for the firm's failure to supervise a former broker who had customers invest in Local CEFs using money borrowed pursuant to lines of credit. As discussed below, that matter was settled as UBS PR paid $15 million in disgorgement, interest, and penalties, which was placed into a fund for harmed investors.

In October 2015, FINRA fined Santander Securities $2.0 million after an investigation into its supervision of selling practices for Puerto Rico-Related Bonds. FINRA found that, between December 2012 and December 2013, Santander Securities failed to ensure the accuracy of its product risk-classification tool with respect to "market risks of investing in Puerto Rico municipal bonds," failed to establish a system for monitoring customer accounts for excess concentration in Puerto Rico-Related Bonds and Local CEFs, and failed to "supervise its Puerto Rico employees' trading for certain potential conflicts of interest." In addition, and as part of its settlement, Santander Securities paid $4.4 million in restitution to certain customers. FINRA found that Santander Securities violated NASD Conduct Rules 3010(a) and 3010(b), FINRA Rule 2010, and MSRB Rule G-27. In concluding this settlement, Santander Securities neither admitted nor denied the charges, but consented to the entry of FINRA's findings.[307]

In November 2014, FINRA censured and fined Popular Securities $125,000 for its failure to have in place adequate systems for monitoring customer account purchases for excess concentration of, among other securities, Puerto Rico-Related Bonds. FINRA found that Popular Securities violated NASD Rules 3010(a) and 3010(b) as well as FINRA Rule 2010. Popular Securities neither admitted nor denied the charges, but consented to the entry of FINRA's findings.[308]

In addition to the foregoing proceedings, there have been thousands of FINRA arbitration cases filed against Puerto Rico financial institutions related to claimants' investments in Local CEFs concentrated in Puerto Rico-Related Bonds. These claimants alleged that the financial institutions held poorly diversified securities accounts overly concentrated in Puerto Rico municipal bonds or Local CEFs holding leveraged portfolios of such bonds. Claimants argue that the financial institutions also improperly leveraged these accounts using margin debt, lines of credit, and proceeds from non-purpose loans recycled through third-party banks. Between October 1, 2013 and December 31, 2017, at least 2,420 arbitrations were filed against UBS PR, Santander Securities, Popular Securities, Oriental Financial Services Corp., and Merrill Lynch, Pierce, Fenner & Smith Inc.[309] At least 220 more arbitration complaints have been filed in 2018.

## 2.    SEC Proceedings

As Puerto Rico's fiscal crisis emerged and risks to its municipal debt mounted in the years after the Great Recession,[310] SEC began investigating and prosecuting entities that had violated federal securities laws. In May 2012, SEC brought charges against UBS PR and two of its executives, Miguel A. Ferrer and Carlos J. Ortiz, for defrauding closed end fund customers. Specifically, SEC alleged that UBR PR misled investors by concealing information

---

[307] Michelle Ong & Nancy Condon, *FINRA Sanctions Santander Securities LLC $6.4 Million for Supervisory Failures Related to Sales of Puerto Rican Bonds* (Oct. 13, 2015), http://www.finra.org/newsroom/2015/finra-sanctions-santander-64-million-pr-bond-supervisory-failures.

[308] Letter from Carlos V. Ubinas Taylor, President & CEO, UBS Financial Services Incorporated of Puerto Rico to the Department of Enforcement, Financial Industry Regulatory Authority (Sept. 15, 2015) (on file with author).

[309] Craig McCann, *et al*., Puerto Rico Securities Arbitrations: 2,640 Filings, $408 million in Settlements and Awards so far 1 (2018).

[310] Statement of Oversight Bd. In Connection With PROMESA Tit. III Pet., ¶¶ 1, 2 & 12, *In re: Fin. Oversight & Mgmt. Bd. for P.R.*, No. 17-3283-LTS (D.P.R. May 3, 2017).

about its "control of the secondary market for 23 proprietary closed-end mutual funds" and "advantage[ing]" its own trades "over those of its customers."  As SEC explained:

> UBS Puerto Rico agreed to settle SEC's charges, without admitting or denying the findings, that it violated Section 17(a), Sections 10(b) and 15(c) of the Exchange Act and SEC Rule 10b-5 thereunder. The order requires UBS Puerto Rico to pay $11.5 million in disgorgement, $1.1 million in prejudgment interest, and a penalty of $14 million. In addition to the monetary relief, SEC's order censures UBS Puerto Rico, directs it to cease-and-desist from committing or causing any further violations of the provisions charged, and orders the firm to comply with its undertaking to retain an independent consultant at UBS Puerto Rico's expense."[311]

On September 29, 2015, SEC instituted and simultaneously settled two related administrative proceedings against UBS PR and its former branch office manager, Ramiro L. Colon, III, for the same conduct that led to FINRA sanctions as described above. SEC asserted that, from at least 2011 through 2013, UBS PR, through Colon, violated the federal securities laws by failing to supervise Jose Ramirez, Jr., a registered representative and associated person of UBS PR, who engaged in conduct that violated the anti-fraud provisions of the securities laws. SEC ordered UBS PR to pay a total of $15,000,000.00 in disgorgement, prejudgment interest, and civil money penalties and Colon to pay a $25,000.00 civil money penalty.  SEC created a Fair Fund, pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 for UBS PR's payments, so that the penalties, along with the disgorgement and interest, could be distributed to harmed investors. Colon's penalty was ordered to be held by SEC, pending a decision whether SEC, in its discretion, would seek to distribute such funds or transfer them to the U.S. Treasury.[312]

SEC also asserted that Ramirez violated Section 17(a), which prohibits fraudulent conduct in the offer and sale of securities, as well as Section 10(b) and SEC Rule 10b-5 thereunder, which prohibit fraudulent conduct in connection with the purchase or sale of securities. According to SEC, UBS PR failed reasonably to supervise Ramirez.[313]

### 3.    Investor Litigation

The following class actions have been brought against entities alleging claims triggered by the fiscal crisis in Puerto Rico.[314]

- *Fernandez v. UBS*, Case No. 15-cv-2859 (S.D.N.Y. 2015)

---

[311] *See* Press Release, U.S. Sec. & Exch. Comm'n, SEC Charges UBS Puerto Rico and Two Executives with Defrauding Fund Customers (May 1, 2012), https://www.sec.gov/news/press-release/2012-2012-81htm.

[312] U.S. Sec. & Exch. Comm'n, In the Matter of Ramiro L. Colon, III Admin. Proc. File No. 3-16847 (2017), https://www.sec.gov/divisions/enforce/claims/ubs-colon.htm.

[313] *UBS Fin. Servs. Inc. of P.R.*, Exchange Act Release No. 76013, 2015 WL 5693101, *6 (Sept. 29, 2015).

[314] Note that this is not a comprehensive list, and is limited to the main local Puerto Banks involved in our investigation regarding the selling practices concerning Puerto Rico-Related Bonds during the Relevant Period (Part XI).

A class that invested in one or more of twenty-three Local CEFs sponsored or co-sponsored by UBS PR and Popular brought a suit against various UBS entities and individuals, as well as Popular entities for alleged breach of fiduciary duty and breach of contract claims. The plaintiffs alleged the defendants created a scheme relating to the marketing and sale of hundreds of millions of dollars of non-exchange-traded closed-end funds.  This case is currently ongoing.  The deadline for summary judgment and other dispositive motions set forth in the Scheduling Order are due on August 28, 2018.

- *Román v. UBS*, Case No. 12-cv-1663 (D.P.R. 2012)

The plaintiffs brought a class action suit against UBS PR and several individual defendants related to their investments in one or more of six closed-end funds sponsored or co-sponsored by UBS PR from 2008 through May 2012.  The plaintiffs alleged securities violations, fraudulent inducement, negligent and/or fraudulent misrepresentation, rescission, and breach of implied duty to act in good faith. According to the plaintiffs, UBS PR and the individual defendants made false statements in connection with the sale of hundreds of millions of dollars of CEF shares. The plaintiffs alleged that the defendants had failed to disclose in offering documents and related communications that CEF prices were not based on market forces such as supply and demand, in violations of the Exchange Act and the Puerto Rico Securities Act.[315]

UBS PR and the individual defendants moved to compel arbitration according to a mandatory arbitration provision in UBS PR's Client Relationship Agreement, and to dismiss the plaintiff's claims without prejudice pending the outcome of arbitration proceedings.  The court entered a partial judgment and dismissed the complaint without prejudice on August 21, 2017, but held the case open pending arbitration. The court ordered the parties to file a status report addressing the progress of arbitration on December 4, 2018. [316]

- *Wilbush v. Ambac Financial Group, Inc.*, Case No. 16-cv-5076 (S.D.N.Y. 2016)

On June 28, 2016, the plaintiffs filed a class action suit against Ambac Financial Group, a financial services company that provided insurance for debt issued by Puerto Rico.  Ambac insured approximately $2.5 billion dollars of Puerto Rico debt, guaranteeing the timely repayment of bond principal and interest in case of default.  The plaintiffs' proposed class was a group of investors who purchased Ambac common stock between November 2013 and June 2015, and alleged that Ambac had made false and misleading statements regarding its financial stability and the active management of its assets and liabilities. Specifically, the class alleged that Ambac misrepresented that its financial condition was improving even though it was losing billions of dollars on its public finance bond portfolio.[317]

Ambac moved to dismiss the case, arguing that the plaintiffs had failed to allege actionable fraud because the complaint did not specify any facts showing that Ambac had made any material misstatement or omissions. Ambac also argued that the plaintiffs had failed to adequately allege that Ambac recklessly or intentionally falsified statements or was responsible

---

[315] Compl., *Román v. UBS*, No. 12-1663 (D.P.R. Aug. 13, 2012).
[316] Partial J., *Román v. UBS*, No. 12-1663 (D.P.R. Aug. 21, 2017); Order, *Román v. UBS*, No. 12-1663 (D.P.R. July 11, 2018).
[317] Compl., *Wilbush v. Ambac Fin. Grp., Inc.*, No. 16-cv-5076 (S.D.N.Y. June 28, 2016).

for causing the plaintiff's harm.  The court agreed with Ambac, granting its motion and dismissing the case on September 5, 2017.[318]

- *Ponsa-Rabell et al. v. Santander Securities LLC*, Case No. 17-cv-02243 (D.P.R. 2017)

Class members who together purchased over $180 million worth of Puerto Rico-Related Bonds and $101 million worth of Local CEFs from Santander Securities between December 2012 and October 2013 brought a suit against Santander Securities for allegedly concealing the poor credit worthiness of its financial instruments and other material facts about the company's commercial operations in order to induce plaintiffs and the class members to purchase $180 million worth of Puerto Rico-Related Bonds and $101 million worth of Local CEFs.

On March 20, 2018, the court granted a joint stipulated motion requesting clarification and medication of case management deadlines. The plaintiffs filed a second amended complaint. The case remains ongoing.

- *UBS v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, Case No. 16-cv-2017 (D.P.R. 2016)

On June 3, 2016, UBS PR brought suit against the defendant, the *Asociación de Empleados del Estado Libre Asociado de Puerto Rico* ("AEELA"), seeking to confirm an arbitration award entered on May 23, 2016.  For several years before the collapse of the Puerto Rico-Related Bond market, AEELA had engaged UBS PR to provide consulting and brokerage services related to its investments in Puerto Rico municipal bonds. On April 22, 2014, AEELA filed a claim against UBS PR with FINRA, alleging violations of Section 10(b) and SEC Rule 10b-5 thereunder. The claim went to arbitration before a FINRA arbitral panel and culminated in a ten-day evidentiary hearing in San Juan in May 2016.[319]

After considering the evidence, the FINRA arbitral panel unanimously rejected AEELA's claim, finding that UBS PR had not violated the federal securities laws. The District Court granted UBS PR's request to confirm the arbitration award on March 28, 2017.[320]  Three weeks later, AEELA filed a motion to set aside the arbitration award, arguing that the arbitration was tainted because two of three arbitrators should have been disqualified due to their personal relationships with UBS PR. The motion has been fully briefed but remains pending before the District Court.[321]

---

[318] Decision and Order, *Wilbush v. Ambac Fin. Grp., Inc.*, No. 16-cv-5076 (S.D.N.Y. Sept. 5, 2017).

[319] Compl., *UBS v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, No. 16-cv-2017 (D.P.R. June 3, 2016).

[320] Order, *UBS v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, No. 16-cv-02017 (D.P.R. Mar. 28, 2017).

[321] Mot. to Set Aside J., *UBS v. Asociación de Empleados del Estado Libre Asociado de Puerto Rico*, No. 16-cv-02017 (D.P.R. Apr. 21, 2017).

- *Dionisio Trigo Gonzalez v. Banco Santander, S.A.*, Case No. 16-cv-857 (D.P.R. 2016)

This lawsuit arose out of alleged misconduct by several Santander entities, including directors, executives, and senior management who owed Puerto Rico-based investors the highest standard of fiduciary and contractual duties. The plaintiffs allege that the defendants wrongfully loaded the investment funds with high-risk bonds and improperly concentrated the Funds' assets in bonds in order to allow them to reap substantial profits while the plaintiff and the putative class of investors suffer from losses.  The case is currently ongoing.

## C.  Application of Potential Claims to Fact Patterns Subject to the Investigation

### 1.  Potential Government Enforcement Actions and Potential Civil Claims and Avoidance Actions Arising from COFINA Bond Issuances

As fully set out in Part VI, the COFINA issuances created significant controversy after Puerto Rico became unable to pay its debts and became the subject of litigation in the Title III proceedings.  More specifically, certain of Puerto Rico's creditors, including holders of Puerto Rico's general obligation bonds, challenged the transfer of ownership to COFINA of sales and use tax revenues.  The creditors sought to undo the transfer of the sales and use tax revenues so that those revenues are available to satisfy amounts owed on their general obligation bonds. Among other things, the creditors asserted that COFINA was created to circumvent Article VI of Puerto Rico's Constitution, which they claim gives them a Clawback Right.  As discussed in Part VI, Article VI, Section 8 of the Puerto Rico Constitution arguably provides that holders of public debt (*i.e.*, general obligation debt) have priority rights to be paid from "available resources," ahead of all other debts, in the event of a revenue shortfall.

On June 5, 2018, the parties to this litigation announced that the COFINA and Puerto Rico agents had reached a settlement in principle to resolve the COFINA-related litigation in the Title III Proceedings.  *See* Part VI.  To date, SEC has not initiated any enforcement proceedings relating to the COFINA issuances.

Section 10(b) and SEC Rule 10b-5 prohibit material misstatements and omissions in the issuance of securities.[322] As previously noted, facts are "material" if there is a substantial likelihood that a reasonable investor would consider it important in making his investment decision.  Given the broad scope of what is considered "material," we cannot exclude the possibility that SEC or a court could have found that certain information was unlawfully withheld.

Any new private action seeking to impose liability on COFINA or its underwriters, however, may be subject to the limitations period requiring private actions under US securities law to be commenced within two years after discovery of the facts constituting a violation of securities laws or within five years of the issuance of securities regardless of when violations are discovered.[323]  Similarly, any SEC enforcement action may be subject to the five-year limitations period that is applicable to punitive actions. [324] In the event any action can be maintained notwithstanding these limitations, we would expect it to focus on one or more of

---

[322] 17 C.F.R. § 240.10b-5 (2018).
[323] 28 U.S.C. § 1658(b) (2018).
[324] 28 U.S.C. § 2462 (2018).

the following possible misstatements or omissions that we discovered in the course of our investigation.

(a)    <strong><u>Series 2007 & 2008 COFINA Bonds</u></strong>

As fully set out in Part VI, COFINA was created in 2007 with the idea of using a dedicated revenue stream from a new sales and use tax to back bonds that would, because of the source of that revenue, be a safe investment. In other words, the COFINA structure appealed to investors because it was supposed to isolate the sales and use tax proceeds from Puerto Rico's general revenue fund, which backs general obligation debt and other debt that would take priority over COFINA bonds.

COFINA ultimately issued bonds in 2007, 2008, 2009, 2010, and 2011. Before the first issuance of COFINA Bonds, there were questions about the legality of the COFINA structure. At GDB, there were internal discussions about the "clawback risk," or the risk that under the Puerto Rico Constitution, the sales and use tax revenue could be subject to the Clawback Right of GO Bondholders because the proceeds from this revenue stream could not be diverted from General Fund. On this issue, GDB discussed the strategy with lawyers at Sidley and Hawkins.

COFINA's underwriters ultimately required an opinion from bond counsel, concluding that if the issue were to come before the Puerto Rico Supreme Court, the sales tax securitization structure would be found to be constitutional and not to violate the GO Bondholders' priority rights under the Puerto Rico Constitution.

Publicly available evidence reflects that sometime prior to mid-March 2006, at least one attorney had advised GDB that, under the Puerto Rico Constitution, the SUT could not be diverted away from the General Fund. In a March 2006 email, which has since been publicly filed in the Title III Proceedings, Alfredo Salazar (who became GDB President and Chairman of the Board in August 2006) wrote to a Lehman banker with whom GDB consulted, stating:

> I was somewhat surprised at the rec of in-house counsel that according to the PR const, the Sales tax cannot be diverted away from the General Fund.[325]

It is unknown to whom the reference to "in-house counsel" in the email refers. One witness informed us, however, that while he always received GDB's in-house counsel's opinions, he had not seen any in-house opinions on constitutional issues. In any case, we do note that the view expressed is consistent with those expressed by Sidley Counsel, who had long served as bond counsel for Puerto Rico-related Bond offerings. In a May 2007 email, which also has since been publicly filed, Sidley Counsel wrote to Jorge Irizarry of GDB (then Executive Vice President for Financing), stating:

> I think a court would have a hard time concluding just on the basis of the legislature saying so that the sales tax revenues are not

---

[325] Ex. 3, Decl. of Donald Burke in support of Mot. for Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-257-LTS (D.P.R. Mar. 5, 2018).

"available" to the Commonwealth should it need the money to pay G.O. debt.[326]

Several witnesses informed us that, consistent with the email, Sidley Counsel had expressed doubts about whether a portion of the SUT revenue could effectively be segregated from the General Fund so as not to be subject to the GO Bondholders' Clawback Rights under Article VI of the Puerto Rico Constitution, and suggested that a ruling by the Puerto Rico Supreme Court would resolve the issue.

GDB subsequently sought to obtain legal opinions from counsel concluding, among other things, that if the issue were to come before the Puerto Rico Supreme Court, the sales tax securitization structure would be held constitutional and not be found to violate the GO Bondholders' priority rights under the Puerto Rico Constitution.  Sidley declined to provide such an opinion.

Sometime thereafter, GDB asked Sidley Counsel to review draft language to be included in the "Legal Considerations" section of an anticipated official statement (even though Sidley Counsel had not been engaged with respect to the contemplated issuance).  Sidley Counsel responded to this request by email dated May 9, 2007.  The email has since been publicly filed in the Title III Proceedings.[327]  It quotes draft language that reflects an expectation that the Secretary of Justice would opine that Act 91 was a valid enactment and that, although the question has not previously been decided, "pursuant to the provisions of Act 91, the Dedicated Sales Tax will not constitute 'available resources' of the Commonwealth for any purpose . . . ."

In the email, Sidley Counsel recommended, among other things, that language be added to the investor disclosure reflecting the lack of judicial approval of the proposed securitization structure.  He wrote:  "I would then add: 'no assurance can be given that the Puerto Rico Supreme Court will agree with the opinion of the Secretary of Justice should the issue by properly presented before the Court.'"

Ultimately, COFINA retained Hawkins as bond counsel to provide an opinion that the sales and use tax pledged to COFINA did not constitute "available resources" of Puerto Rico.  The Hawkins opinion letter relied, in part, on an opinion letter of underwriter's counsel at Fiddler, as to matters of Puerto Rico law.[328]  The Puerto Rico Secretary of Justice also issued a written legal opinion in support of the same conclusions.

The Official Statements of the COFINA Series 2007A and 2007B bonds discuss the validity of the bonds and the legal opinions supporting their issuances, as follows:

---

[326] Ex. 4, Decl. of Donald Burke in support of Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders, *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-257-LTS (D.P.R. May 27, 2018).

[327] Exhibit 4, Decl. of Donald Burke Supp. Mot. Summ. J. of the Ad Hoc Group of General Obligation Bondholders (Email from L. Bauer to J. Irizarry (May 9, 2007)), *Official Comm. of Unsecured Creditors v. Whyte (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-257-LTS (D.P.R. Mar. 3, 2018).

[328] The Hawkins opinion letter also considered "applicable precedent in other jurisdictions, including especially the State of New York."

> *Legal Considerations*. . . . .
> Act 91 has not been challenged in any court of law and the Supreme
> Court of Puerto Rico has not expressed itself as to (i) the
> constitutionality of the transfer of the Pledged Sales Tax to the
> Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax
> constitutes available resources of the Commonwealth for purposes of
> Section 8 of Article VI of the Constitution.
> Upon issuance of the Bonds, the Secretary of Justice of the
> Commonwealth of Puerto Rico (who acts as attorney general for the
> Commonwealth) will opine that (i) Act 91 is a valid enactment of law
> by the Commonwealth, (ii) the Pledged Sales Tax will not constitute
> "available resources" of the Commonwealth for any purpose, including
> for purposes of Section 8 of Article VI of the Constitution, and (iii) the
> Pledged Sales Tax cannot be applied to cover debt services of the
> Commonwealth's general obligation bonds or guaranteed debt under the
> circumstances contemplated by Section 8 of Article VI of the
> Constitution.[329]

None of the Official Statements for the 2007 through 2008 issuances includes the additional language that Sidley Counsel had recommended concerning the uncertainty in this area.

### (b)   Series 2009 COFINA Bonds

For the first time in 2009, the COFINA Official Statement included a separate "Risk Factors" section, which disclosed that the Puerto Rico Supreme Court "could reach a different conclusion" than that reached by bond counsel and underwriters' counsel, who opined that a court would hold that the sales and use tax pledged to COFINA does not constitute "available resources" of Puerto Rico. The Risk Factors also stated that if a lower court reached a different conclusion than bond counsel and underwriters' counsel, "it would not necessarily constitute reversible error." Moreover, the disclosure provided that "the opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court . . . that reached the issue on the merits would hold and . . . are not a guarantee, warranty or representation."

### (c)   Potential Actions Arising from COFINA Bonds Issued in 2007, 2008, and 2009

The earlier COFINA issuances in 2007, 2008, and 2009 raised questions about potential material misrepresentations and omissions relating to the failure to disclose discussions about the constitutionality of the COFINA structure and Puerto Rico's existing long-term bond counsel's refusal to issue an opinion concerning COFINA. To determine the materiality of omitted disclosures relating to COFINA, *In the Matter of Port Authority of New York and New Jersey* is particularly instructive. In its administrative order instituting cease and desist proceedings, making findings, and imposing a cease-and-desist order, SEC found that the failure to disclose discussions raising doubt about the legality of a bond issuance constituted a material misrepresentation or omission of material fact.

---

[329] Commonwealth of P.R., *Official Statement for Puerto Rico Sales Tax Financing Corporation, Series A and B* (2007).

Based on the evidence reviewed during our investigation, it is possible that a fact finder could reach conclusions similar to those that SEC reached in *In the Matter of Port Authority of New York and New Jersey*, as there are several indications that a reasonable investor would consider a dispute as to the legality of pledging the sales and use tax to COFINA important in deciding to buy COFINA bonds.  For example, during the Investor Call in October 2013, several investors expressed concern about the legality of the COFINA structure and asked whether judicial review would be available to determine its legality.  It was suggested in response that such a mechanism was not available.  For a full discussion of the disclosures in the COFINA Official Statements, *see* Part VI.

Even assuming that there were valid claims related to these COFINA issuances, the applicable five-year limitations period for SEC enforcement actions that seek to punish defendants for violating federal securities laws would pose a challenge to any such claims.[330]  SEC may not be restricted by this five-year period, however, in bringing an action that seeks to undo damage (rather than punish defendants) and protect the public from future harm.[331]

We also cannot exclude the possibility that investors may have had private claims for violations of Section 10(b) and SEC Rule 10b-5.  These claims would also have to overcome limitations periods: in the case of investors, two years from discovery of alleged violations of securities laws or five years from the issuance.  These limitations may pose a particular challenge for these earlier issuances, the latest of which occurred nine years ago.

### (d)    The Investor Call

In 2010, Nixon Peabody replaced Hawkins as bond counsel for COFINA and prepared its own opinion in support of the constitutionality of the COFINA structure for the issuances between 2010 and 2011.[332]  The legal opinions in support of the 2011 COFINA issuances, including the Nixon Peabody opinion, were publicly released by GDB in October 2013, in response to specific investor requests.  On the Investor Call—a public conference call hosted by GDB to discuss the opinions shortly after their issuance—GDB's General Counsel explained that the release of the opinions reflects "a renewed commitment to observe best disclosure practices and improve our relationship with our investor base."[333]

Lawyers with Nixon Peabody and PMA (Puerto Rico-based underwriters' counsel) who prepared the opinions participated on that investor call and addressed pre-selected questions from investors regarding the opinions and the possibility of the Puerto Rico Supreme Court addressing and resolving the Clawback Right issue, which is whether GO Bondholders have priority rights to be paid from "available resources," including the SUT pledged to COFINA, in the event of a revenue shortfall.  During that call, underwriters' counsel suggested that COFINA could not seek judicial review of the constitutionality of its structure because no case or controversy existed for the court to review.  These statements may not have provided all

---

[330] 28 U.S.C. § 2462 (1948).

[331] *See S.E.C. v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007).

[332] The Nixon Peabody opinions relied on the Puerto Rico law firm Pietrantoni Mendez & Alvarez LLP ("Pietrantoni") for certain Puerto Rico law matters.  Pietrantoni served as underwriters' counsel for the 2009–2011 COFINA issuances.

[333] Government Development Bank for Puerto Rico, *Conference Call About COFINA Legal Opinions* (2013).

potentially relevant information, because a declaratory judgment action or petition for writ of mandamus to determine the constitutionality of COFINA may have been viable.

In fact, Puerto Rico has had a declaratory judgment mechanism since 1979.[334] We acknowledge that underwriters' counsel and bond counsel for the COFINA issuances likely believed that judicial review was not available to determine the constitutionality of the bond issuance. We cannot, however, exclude the possibility that certain options for judicial review might have been available to interested parties, like the GO Bondholders by the time of the Investor Call.[335] It is possible that either COFINA or the GO Bondholders could have identified an actual dispute or controversy that was sufficiently real and ripe to support a declaratory or mandamus action.[336] In any case, underwriter's counsel and bond counsel gave the impression, perhaps incorrectly, that judicial review was unavailable as a means of gaining certainty as to the legality of the COFINA bond offering.

### (e)   Potential Actions Arising from the Investor Call

Questions abound as to whether the statements of bond and underwriter's counsel were in fact inaccurate, and even if inaccurate, could support a misrepresentation claim. We are unaware of an SEC enforcement action arising from similar facts as described above. Here, the first question that arises is whether the statements of counsel were sufficiently imprecise to support such a claim. Bond and underwriters' counsel were responding to questions about the availability of judicial review to determine the legality of a specific bond issuance and gave the impression that judicial relief was not available at that time. It is unclear, however, whether counsel's statements were sufficiently imprecise to rise to the level of a misrepresentation, or an untrue statement.[337] An untrue statement of fact is one that was false "*at the time it was made.*"[338] An untrue statement of opinion or belief is false if: (i) the opinion or belief "constitutes a factual *misstatement*" in itself; or (ii) the opinion or belief is "rendered misleading by the *omission* of discrete factual representations."[339]

As set out in Part XIV, we believe that there may have been opportunities available to test the legality of the COFINA structure. However, as those opportunities were never tested and indeed, some of the litigation-related ideas may be creative with the benefit of hindsight, they likely would not rise to the level of making the statements on the investor call misleading or untrue. For these reasons, while we cannot exclude the possibility of a government

---

[334] *See* P.R. Rules of Civ. P. 59.1 (conferring on "[t]he Court of First Instance" in Puerto Rico the power to "authority to declare rights, status and other legal relationship"); *see also* P.R. Rules of Civ. P. 59.2 (setting the standard for so doing). Puerto Rico courts may issue declaratory judgments despite the availability of alternative remedies. *See* P.R. Rules of Civ. P. 59.1 (providing that declaratory judgments may be pursued "even though another remedy is or may be instigated.").

[335] *See, e.g.*, *Cruz Cortes v. Estado Libre Asociado de Puerto Rico*, No. ISCI201600427, 2016 WL 8452670, *5 (P.R. Cir. 2016) (reiterating that declaratory judgment is the appropriate remedy for the courts to interpret laws and the Constitution, so long as there exists a case or controversy).

[336] *See, e.g.*, *Acevedo Vila v. Aponte Hernandez*, 168 D.P.R. 443, 444-45 (2006) (writ ordering public official to fulfill ministerial duty); *Baez Galib y Otros v. Comision Estatal de Elecciones*, 152 D.P.R. 382, 390-91 (2000) (granting writ of mandamus where statute would require public officials to violate the constitution).

[337] *See* 17 C.F.R. § 240.10b-5 (2018) (prohibiting untrue statement of material fact).

[338] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 67 (S.D.N.Y. 2015).

[339] *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 69 (S.D.N.Y. 2015) (*quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318 (2015)).

enforcement action or private claims arising from counsel's statements during the Investor Call, we believe it is unlikely that these statements would, on the basis of the evidence we have seen, rise to the level of a material misrepresentation.

The second question that needs to be resolved in order for the statements of counsel to support a fraud claim is whether the comments were material to an investor's decision to invest. Here, the statement at issue goes to the question of the view of counsel as to the availability of judicial review, rather than the legality of the COFINA structure. It is an open question as to whether the view of counsel regarding judicial mechanisms were sufficiently material in this case.

Finally, even assuming the viability of misrepresentation claims, any such claims would have to overcome the applicable statute of limitations and statute of repose periods for material misrepresentations and omissions as set out above.

### (f)    Potential Avoidance Actions Arising from COFINA Issuances

COFINA issued bonds, and the outstanding amount of COFINA's Bond debt was approximately $17.6 billion. With respect to the last debt issuances, in 2011, COFINA issued four (4) series of COFINA Bonds (Series 2011A-D) in the aggregate amount of approximately $1.8 billion. According to the offering documents, the proceeds of those bonds were used for various purposes, including to repay extraconstitutional debt, refinance existing COFINA subordinated debt, and provide funding for the government. Notably, with respect to the $1 billion Series C issuance, the deal documents reflect that about $400 million of proceeds were used to pay termination fees under COFINA Swap agreements. The use of COFINA bond proceeds to pay swap termination fees was permitted under Act 56 of 2007, expressly allowing COFINA to pay "obligations assumed under any kind of financing contracts, surety or interest rate swap contract executed in relation to [COFINA] bonds."[340]

Further, through 2008, COFINA issued several series of bonds totaling approximately $5.23 billion, the proceeds of which were to pay or refinance the extraconstitutional debt. In 2009, COFINA issued three series of bonds (2009A and 2009B Series) in the aggregate amount of approximately $5.3 billion. Offering documents for the 2009 issuances reflect that the proceeds for those issuances were, consistent with Act 91, principally used to pay outstanding obligations of the government and provide funds for operating expenses. None of those issuances appear to have been used to repay extraconstitutional debt.[341] Yet, with respect to the Series 2010A COFINA Bonds, about $500 million of proceeds (out of approximately $1.8 billion) appear to have been used to repay previously issued bond anticipation notes.[342]

---

[340] Act of July 5, 2007, No. 56, 2007 P.R. Laws.

[341] For one of those issuances—the Series 2010A bonds, in the amount of approximately $1.8 billion—about $500 million of proceeds appear to have been used to repay previously issued bond anticipation notes. *See*   Closing Memorandum from Citi to Working Group, Citigroup, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, First Subordinate Series 2010A (Feb. 9, 2010) (on file with author) Bond anticipation notes are short-term interest-bearing securities used in advance of a larger, future bond issuance. Mun. Sec. Rulemaking Bd., Glossary of Municipal Securities Terms, Note, http://www.msrb.org/glossary/definition/note.aspx ("*Bond anticipation notes (BANs)* – Notes issued by a governmental unit, usually for capital projects, that are repaid from the proceeds of the issuance of long-term bonds." (emphasis in original)).

[342] *See* Closing Memorandum from Citi to Working Group (Feb. 9, 2010) (on file with author).

The Independent Investigator's Final Investigative Report

We have not been tasked with identifying or analyzing any payments or transfers made by the Debtors, including COFINA, before the Title III Proceedings' filing date.  Also, we did not have the benefit of a solvency analysis for any of the Debtors, including COFINA, and therefore take no position on whether COFINA is or has ever been insolvent, as required for avoidance.  Notwithstanding the above, if any of the COFINA transfers (such as the $400 million transfer of COFINA proceeds to repay the termination fees under COFINA swap agreements) constitute fraudulent transfers under applicable law, which we expect various parties in interest to consider, such parties (such as the Oversight Board), assuming they have the requisite standing, on behalf of COFINA, may be able to use the ten-year lookback period under the Tax Code, or the six-year lookback period under the FDCPA, to potentially avoid such transfers under section 544(b) of the Bankruptcy Code, subject to application of any affirmative defenses (including the Safe Harbor), as discussed above concerning the Insolvency Claims.

(g)    **Potential Equitable Subordination and Unjust Enrichment Claims**

In order for a claim of equitable subordination to be successful, the party seeking subordination must establish (i) inequitable conduct on the part of the claimant and (ii) that the conduct resulted in an unjust benefit to the claimant and a corresponding detriment to other creditors.  On the basis of the evidence we reviewed, it is possible that a court could conclude that the actions of bond and underwriter counsel, described above, standing alone or in conjunction with other actions, constitute inequitable conduct and/or resulted in an unjust benefit to them and a corresponding detriment to other stakeholders.  On that basis, to the extent either of them has filed or will file any claims in the Title III Proceeding, a representative of the Title III estate or other creditors could seek to equitably subordinate those claims pursuant to Section 510(c).

Additionally, to the extent counsel obtained an undeserved benefit, an unjust enrichment claim might be available as well.  Yet, any such claim could be the subject of partial or complete defenses, and, as noted above, in Puerto Rico unjust enrichment is a subsidiary claim.

2.    **Potential Actions Arising from the 2014 GO Bond Issuance**

On March 11, 2014, just over one month after Puerto Rico's bonds were downgraded to junk status,[343] Puerto Rico issued $3.5 billion of GO Bonds.  We examined several issues relating to this issuance, including the disclosures in the Official Statement and related documents, the timing for disclosure of Puerto Rico's audited financial statements for the fiscal year ending 2013, and the professional duties of certain entities working on behalf of Puerto Rico.

(a)    **Disclosures Regarding the 2014 GO Bond Issuance**

The risk factors section of the 2014 GO Bond Official Statement begins by warning that the "Commonwealth and its instrumentalities face a number of fiscal and economic

---

[343] *Rating Action: Moody's Downgrades Puerto Rico GO and Related Bonds to Ba2, Notched Bonds to Ba3 and COFINA Bonds to Baa1, Baa2; Outlook Negative*, Moody's Investors Service (Feb. 7, 2014) https://www.moodys.com/research/Moodys-downgrades-Puerto-Rico-GO-and-related-bonds-to-Ba2--PR_292399.

challenges that, either individually or in the aggregate, could adversely affect the Commonwealth's ability to pay debt service on the Bonds when due."[344]  The risks set forth include those related to downgrades of Puerto Rico-related credit ratings, liquidity, very high debt level, restructuring, deficit spending, debt limitation, a contracting economy, and population decrease.[345]

Several witnesses involved with the 2014 GO Bond issuance opined that the risk factor section of the 2014 GO Bond Official Statement was extensive and thorough.  In fact, the Official Statement set forth "Risks Related to the Commonwealth's Financial and Fiscal Condition" and disclosed the following (among other statements):

- Puerto Rico may be unable to honor its obligation to pay debt service on the bonds;

- If Puerto Rico is unable to obtain sufficient funds from this and other future debt offerings, it may not have sufficient liquidity to meet its obligations as they come due;

- GDB, the principal source of short-term liquidity for Puerto Rico, has been adversely affected by recent events and it may be unable to provide necessary financing to Puerto Rico;

- If Puerto Rico's financial condition does not improve, it may need to implement emergency measures that may include a restructuring, moratorium or other actions affecting creditors' rights.

One investment banker who worked as an underwriter on the transaction described these disclosures and the due diligence process for this issuance as unprecedented and a model for later municipal bond offerings.  In addition, according to the witness, the bond denomination was $100,000, which served to protect unsophisticated investors from buying the bonds.

Alejandro García Padilla, the Governor of Puerto Rico's at the time of the 2014 GO Bond Issuance, stated that because the Official Statement contained many caveats and set forth many risk factors, investors were aware of Puerto Rico's financial situation. Padilla said that Puerto Rico did not conceal information. Similarly, Melba Acosta Febo, the Treasury Secretary at the time of the 2014 GO Bond Issuance, conveyed that the risk factors were disclosed in the Official Statement and, in addition, that a GDB Liquidity Report and a Commonwealth Quarterly Report were issued in February 2014, explaining the situation of GDB and Puerto Rico's financial status, including the then recent downgrades of certain Puerto Rico-related credit ratings to junk status. Acosta described the 2014 GO Bonds as being for investors who were willing to take a risk. Although these extensive disclosures laid bare many risks of buying the bond issued through the 2014 GO Bond Issuance, they did not discuss any imminent plans to restructure Puerto Rico's debts.

Moreover, despite the apparent lack of plans to restructure and the lack of a legal mechanism for Puerto Rico to restructure at that time (see the discussion below), GDB hired Millco, Cleary, and Proskauer prior to the 2014 GO Bond Issuance, as discussed in Part IV.

---

[344] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A,* 5 (2014).
[345] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A,* 5-18 (2014).

Millco was a reputable restructuring firm and both Cleary and Proskauer were law firms with reputable restructuring practices. While GDB hired Cleary and Proskauer at the same time in January 2014 and caused both engagement letters to be posted on the website at the same time in April 2014, the press and witnesses reacted to Cleary's engagement, but not Proskauer's. GDB's engagement of Cleary became the subject of press coverage on April 7, 2014. Because the act of hiring these advisors could have been significant to at least some investors, and the engagement of Millco became the subject of a separate disclosure, we examined their engagements carefully.

Puerto Rico hired Millco on February 5, 2014. Mr. Millstein, Millco's chief executive, reported that GDB hired Millco to perform a liquidity forecast so that GDB could determine "how much runway it had." In other words, GDB hired Millco to assess, among other things, the impact of various proposals on GDB's and Puerto Rico's liquidity. Mr. Millstein also reported that he did not know when he was hired if it would be necessary to restructure Puerto Rico obligations. Mr. Millstein said that GDB chair David Chafey was not considering a restructuring.

Despite Millco's view that it was not hired to provide advice for restructuring of Puerto Rico obligations, one witness reported that several underwriters requested disclosure of the Millco hiring in GDB's liquidity projections, which were ultimately referenced in the Official Statement. According to Millstein, Barclays, the lead underwriter for the 2014 GO Bond Issuance, thought it was important to inform the market of the Millco engagement.

On March 5, 2014, GDB issued a Special Liquidity Update, which was "intended to provide a brief overview of GDB's liquidity position as of January 31, 2014 and a liquidity projection as of such date based on the assumptions set forth [t]herein."[346] GDB's hiring of Millco was disclosed at that time.[347] The disclosure stated that Millco had been hired as GDB's "financial advisor to assist it, at this time, in evaluating potential funding sources and financing proposals provided to GDB or the Commonwealth, analyzing cash flow projections and liquidity for the Commonwealth and its component parts, GDB and the public corporations, and analyzing the capital structure of the Commonwealth and its component parts, GDB and the public corporations, including understanding all direct and contingent liabilities, based on information provided by relevant government agencies and/or public corporations."[348]

### (b)    Disclosures of Other Professionals

Based on our investigation and as discussed below, we found that even though Puerto Rico had disclosed with the 2014 GO Bond Issuance potential emergency measures including a restructuring, Puerto Rico did not disclose that it had retained law firms with reputable restructuring capabilities on February 3, 2014, just over one month before the bonds issued.

Puerto Rico, through GDB, engaged Cleary on January 29, 2014. While the engagement was initially scheduled to end on March 31, 2014, the engagement was extended through December 31, 2016.[349]

---

[346] Gov't Dev. Bank for the Commonwealth of P.R., *Special Liquidity Update* 1 (2014).

[347] Gov't Dev. Bank for the Commonwealth of P.R., *Special Liquidity Update* 3 (2014).

[348] Gov't Dev. Bank for the Commonwealth of P.R., *Special Liquidity Update* 3 (March 5, 2014).

[349] *See* Database of Contracts, Oficina del Contralor del Estado Libre Asociado de P.R., https://contratos.ocpr.gov.pr/Contfilter.aspx.

One witness who worked on the bond issuance stated that Cleary was not hired in January 2014 to carry out a debt restructuring, but was hired to advise broadly on alternatives for various contingency scenarios with respect to Puerto Rico and the Puerto Rico-Related Entities. The witness also stated that issuers typically do not disclose the name of the law firms they hire or consult with (even less the nature of any legal advice). The witness stated that, in the context of the 2014 GO Bond Issuance, what was important to investors was the substantive disclosure about Puerto Rico'sfinancial condition and the risks it faced if its financial condition continued to deteriorate – as to which there was ample disclosure (including disclosure about restructuring, moratorium and insolvency risks and that GDB was evaluating alternative courses of action "with financial and legal advisors" in the event Puerto Rico's financial condition did not improve).

On June 28, 2014, the Recovery Act was enacted, establishing a restructuring regime for certain Issuers, including the public corporations. Witnesses told us that Cleary and Proskauer helped draft this legislation.

One investment banker at an underwriter reported that Puerto Rico did not tell underwriters that it had retained Cleary in the time between the engagement and the time it was made public. Another banker reported he was very surprised to learn in April that Cleary had been hired and was shocked to learn in May 2014 about the consideration of the Recovery Act. The witness stated that the underwriters were completely surprised to learn of restructurings, as were the rating agencies and the market. The witness reported that he told GDB personnel that he thought the restructurings were a violation of representations Puerto Rico had made to investors about its commitment to honor its general obligation debt.

Alejandro García Padilla, the Governor of Puerto Rico at the time of the 2014 GO Bond issuance, stated that at the time of the issuance he was not thinking about a default and was convinced that a default could be avoided. Padilla conveyed that the main goal of advisors such as Millstein and Cleary was to prevent a fiscal crisis, not to counsel about a default.

### (c)   Potential Actions Arising from Failure to Timely Disclose Retention of Other Professionals

The SEC conducted an investigation into the 2014 GO Bond Issuance and notified involved parties that it did not intend to recommend enforcement action. The SEC also advised the involved parties that the notice should not be construed to indicate that any party had been exonerated or that no action would ultimately result from the SEC investigation.

While we did not identify any recent SEC enforcement action arising generally from the failure to disclose the retention of professionals who have restructuring expertise, there is no question that any potential government or private action arising from Puerto Rico's failure to disclose counsel's retention would require proof that the fact of the retention was a material fact at the time of the 2014 GO Bond Issuance. As noted repeatedly, a fact is material "if there is a substantial likelihood that a reasonable  investor would consider it important in making an investment decision." Numerous witnesses have stated that Cleary and Millco were not hired for the purpose of restructuring. However, in light of the statements of some of the bankers above, given Puerto Rico's precarious financial situation at the time  of the GO Bond Issuance and the timing surrounding the announcement of the hiring of professionals, we  cannot exclude the possibility that the disclosure or lack thereof can one day be the subject of review.

We do note however, that any new private claims for material misrepresentation or omissions arising against the issuers, underwriters, or other professionals connected with the sale of the 2014 GO Bonds would have to overcome, among other things, the statute of limitations for these types of claims as discussed above.

**(d)**　　**Puerto Rico's Continuing Disclosure Obligations**

In 2014, Puerto Rico failed to timely file its audited financial statements for the fiscal year ending 2013, despite written assurances to do so. Namely, in the 2014 GO Bonds Official Statement and corresponding Bond Resolution, Puerto Rico undertook to file with MSRB "core financial information and operating data for the prior fiscal year," including its "audited financial statements, prepared in accordance with generally accepted accounting principles," within 305 days after the end of each fiscal year, starting with the fiscal year ending on June 30, 2013.[350] In other words, Puerto Rico agreed to provide audited financial statements for the fiscal year ended 2013 by May 1, 2014.

Initially, the disclosure appeared to be on track. Puerto Rico hired KPMG in 2013 to audit the financial statements for fiscal year ending 2013. A former high-level Department of Treasury official reported that at the time of the 2014 GO Bond Issuance, the financial statements for fiscal year ending 2013 were in good shape. While there were some pending issues to be resolved, the official felt confident that the financial statements could be issued on time, noting that there were always risks associated, some of them outside of the control of Puerto Rico. The Official Statement in addition included a statement in which Puerto Rico covenanted to file a notice of failure to file the financial statement if a delay in filing occurred, which notice was in fact filed. An underwriter witness involved with the due diligence concurred. The witness reported that the underwriters wanted to be forthcoming in the offering statement about the audit and received assurances from GDB and the auditors that the deadline could be met.

Despite these beliefs, Puerto Rico did not file the audited financial statement until June 30, 2014, or sixty days late.[351] According to the high-level Treasury Department official, the filing delay from May 1, 2014 to June 30, 2014 was due to several matters, some of them related to post-issuance events that affected the consolidated financial statements, such as a Puerto Rico Supreme Court ruling invalidating a restructuring of the Teachers' Retirement System and the passage of the Recovery Act. The witness reported that the issuance could have been delayed until the new financial statements were issued, but GDB, as fiscal agent, and the bankers set the schedule. The witness reported no knowledge of Puerto Rico pressuring the underwriters to issue the GO Bonds before the financial statements for the fiscal year ending 2013 were completed. While the high-level Department of Treasury official stated that the 2014 GO Bond Issuance was initially scheduled to avoid a credit ratings downgrade, by the time the bonds were issued, the downgrade had already occurred.

An internal KPMG communication on March 2, 2014 indicates, however, that Puerto Rico had not provided several key items needed to complete the audit, including a final trial

---

[350] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 39 (2014); Bond Resolution 15 § 33(a) (2014). The Official Statement also disclosed that the Commonwealth had filed late audited financial statements in several prior years.
[351] *Municipal Secondary Market Disclosure Information Cover Sheet* (2014) (providing audited financial statements for fiscal year 2012-2013).

balance, cash reconciliations, and a draft of financial statements. An auditor witness stated that the original plan allowed eight weeks from receipt of the final draft of financial statements to issue the audit report. The witness reported that Puerto Rico had said it would provide the financial statements on March 15, leaving just six weeks to meet the May 1 deadline. These witness accounts suggest that Puerto Rico's failure to submit financial statements delayed the audit.

An internal KPMG email on March 3, 2014 documents that in a call that day, "management communicated that the May 1 deadline is a challenge and they may not make it, although they are proactively managing the process."

In a March 4, 2014 internal GDB email, the Treasury Secretary, Melba Acosta, stated that Puerto Rico was doing everything possible to have audited financial statements completed by May 1, but did not know if it could guarantee meeting that deadline. That same day, Acosta wrote to Jose Coleman-Tio, the GDB general counsel, copying disclosure counsel, bond counsel, and underwriters' counsel, regarding the filing of the annual financial report, "We are working to be on time but there are many issues out of our control, many coming from gdb for example a restatement of cofina."

### (e)   Potential Government Enforcement Action Arising from Failure to Timely Disclose the 2013 Audited Financials

Ultimately, Puerto Rico failed to timely disclose its audited financials for the fiscal year ended 2013. We considered whether this failure could have given rise to any government enforcement action. SEC Rule 15c2-12 governs this type of continuing disclosure.

Instead of imposing the disclosure obligation directly on the issuer, however, SEC Rule 15c2-12 places the obligation on the underwriter to ensure that the issuer agrees to provide financial information to MSRB about the bonds on an ongoing basis. Underwriters for the GO 2014 Bond Issuance undertook certain efforts to ensure compliance. Namely, they ensured that Puerto Rico committed itself to making these disclosures in the Official Statement and Bond Resolution and they had regular contact with GDB and Department of Treasury to encourage the timely filing of the financials.

SEC's recent enforcement of SEC Rule 15c2-12 has focused on the failure to disclose the untimely filing of continuing disclosures, rather than the reasonableness of underwriters' efforts to ensure timely filings.[352] For this reason, we are unable to reach conclusions, with any degree of certainty, about the likelihood of a government enforcement action against the underwriters of the 2014 GO Bond Issuance arising from Puerto Rico's failure to timely file its 2013 audited financial statements. Given the time that has passed, however, a government enforcement action arising from the late-filed 2013 financials appears unlikely.

### (f)   Use of "Stale" Financial Statements Without Consent

As set forth in Part VIII, at the time of the 2014 GO Bond issuance in March 2014, audited financial statements for Puerto Rico for the fiscal year ended 2013 were not available. The Official Statement explained that the most recent audited financial statements were for the

---

[352] *In re Beaumont Fin. Auth.*, SEC Administrative Proceeding No. 3-18132 (2017).

fiscal year ended 2012.[353]  It also stated that Puerto Rico's independent auditor for fiscal year ended 2012, Deloitte, had not performed any procedures on the financial statements since the date of its audit report, September 16, 2013, and had not performed any procedures on any other financial information of Puerto Rico.[354]  The Official Statement further explained that KPMG, Puerto Rico's independent auditor for fiscal year ended 2013, had not performed any procedures on the financial statements for fiscal year ended 2012.[355])

The Official Statement indicated that Deloitte's audit report was a matter of public record and was incorporated by reference in the Official Statement.[356]  It stated, however, that Deloitte had not reviewed or approved the Official Statement and was not associated with it.[357]  It further stated that "the Commonwealth did not request the consent of [Deloitte] to incorporate by reference its report …."[358]  The Official Statement explained that because consent was not requested, Deloitte had not performed any "subsequent event" procedures, which "are designed to identify events occurring between the date of their report and the date of th[e] Official Statement that require adjustment to, or disclosure in, such basic financial statements."[359]  It cautioned that "[p]rospective purchasers of the Bonds will not enjoy the benefit of the performance of these procedures, if any."[360]

Email communications between underwriters' counsel and GDB in February 2014 indicate that GDB authorized underwriters' counsel to contact Deloitte regarding consent.  An email from underwriters' counsel to Deloitte on February 3, 2014 states that Barclays, the lead underwriter, wanted Deloitte's consent.  An internal Deloitte email indicates that Deloitte understood that the underwriters were requesting consent.

Internal Deloitte communications evidence that Deloitte personnel believed that a lot of work would be necessary in order to provide consent.  According to former GDB and Department of Treasury officials, Puerto Rico was concerned that the work necessary by Deloitte to obtain consent would delay the issuance.  The GDB official explained that through discussions with Deloitte, Puerto Rico determined that Deloitte's consent was not necessary to incorporate by reference Deloitte's audit report for the fiscal year ended 2012 in the Official Statement.  Puerto Rico's position is that as the client, only it could request consent from Deloitte, and it never did.  Instead, according to a former Puerto Rico official, preliminary discussion with Deloitte about consent led to the conclusion that consent was not required and would not be sought.

An underwriter witness stated that he spoke with Deloitte personnel and they did not express any issue with the reference in the Offering Statement to the 2012 audited financial statements.  The same witness reported that the underwriters were asked what they thought about the reference to 2012 audited financials and stated that the underwriters were not concerned about the lack of more current financial statements at the time of issuance for three reasons: (i) the issuance took place before the deadline for the filing of the 2013 financial statements; (ii) the current financial statements were expected to be completed on time; and

---

[353] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 2 (2014).

[354] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 2 (2014).

[355] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 2 (2014).

[356] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 2 (2014).

[357] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 2 (2014).

[358] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 18 (2014).

[359] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 18 (2014).

[360] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 18 (2014).

The Independent Investigator's Final Investigative Report

(iii) comprehensive financial reports had been disclosed.  While those reports were unaudited, according to the witness, no one had raised any issues about those reports being at odds with prior or subsequent audits. Moreover, the witness stated, the issues of underperformance of revenues and overspending had been disclosed. Another underwriter witness stated that financial statements from two years before would not have mattered to investors, who were forward-looking.

The use of stale financial information in 2014 raises two questions about disclosures: (i) whether the failure to use current financial information could constitute a material omission of Puerto Rico's financial condition at the time of the issuance; and (ii) whether the statement that Puerto Rico did not seek consent from Deloitte was a material misstatement, given that underwriters' counsel apparently sought Deloitte's consent.  Again because of the fact-intensive nature of the inquiry into material representations, these are open questions. We note, however, that the 2014 GO Bond Official Statement disclosed the fact that current financials were not available.

### (g)     Popular and Citi Proposal

The short time between the 2014 GO Bond issuance and Puerto Rico's insolvency raises questions not only about disclosures, but also about the professional obligations of the individuals who advised Puerto Rico in connection with the issuance.

We reviewed evidence that in 2014, Citi and Banco Popular prepared a memorandum for David Chafey, the GDB Chairman of the Board, and other high-level GDB officials, suggesting a holistic approach to Puerto Rico's financial situation. The analysis, according to a witness, was that a long-term GO issuance did not make sense. Instead, the proposal envisioned nearly $2 billion in immediate liquidity improvements through securitizing property tax-backed and sales tax-backed municipal loans. The proposal also called for a Balanced Budget Act, a Fiscal Control Act, and the establishment of a five-member oversight body including appointees of the Federal Reserve and U.S. Treasury, as well as a member with well-known bond market credentials. A Citi witness stated that it made more sense to follow some of the suggestions in the memorandum, rather than do another bond offering.  The witness also expressed his view that, after having a conversation with GDB about Citi's recommendations in the memorandum, Citi could not in good conscience underwrite another bond while proposing a different path.

According to a former GDB official involved with the underwriting syndicate for the 2014 GO Bond issuance, Citi did not participate in that issuance because it had concerns about Puerto Rico's fiscal challenges and thought Puerto Rico needed a fiscal board and reform measures.

Popular, on the other hand, was a member of the underwriters syndicate for the 2014 GO Issuance.[361]  If we accept the evidence that Popular advised against the issuance, then the fact that Popular underwrote the 2014 GO Bond Issuance after making a recommendation against it may raise questions for interested parties.  For example, to the extent Popular obtained an undeserved benefit as a result of its underwriting of the 2014 GO Bonds after advising against their issuance, an unjust enrichment claim may be considered by various interested parties, although it also could be subject to various defenses (including, for  example, that in

---

[361] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A*, 1 (2014).

The Independent Investigator's Final Investigative Report

Puerto Rico, unjust enrichment is a subsidiary claim, meaning it is only available in situations where there is no other available action to seek relief). Based on evidence we reviewed and our understanding of applicable law as set forth in this report, it also is possible that a court could conclude that the actions of Popular described above, standing alone or in conjunction with other actions, may serve as a basis to equitably subordinate any claim it files in the Title III Proceeding to other claims. Popular earned fees from underwriting the 2014 GO Bonds after recommending against their issuance. Accordingly a court could find that Popular meets the elements for equitable subordination if it finds that Popular's actions: (i) constitute inequitable conduct; and (ii) that this conduct resulted in an unjust benefit to Popular and a corresponding detriment to other stakeholders. On that basis, to the extent Popular has filed or will file any claims in the Title III Proceedings, a representative of the Title III estate or other creditors could seek to equitably subordinate those claims pursuant to Section 510(c). These remedies may be key to the chances of value recovery here, because other claims premised on the same conduct are likely to be barred by relevant statute of limitations and/or other defenses.

### 3.     ERS Bonds

As discussed in Part VII of this report, in 2008, ERS, Puerto Rico's largest public pension, issued three series of POBs, totaling approximately $3 billion in principal amount. Like typical POBs issued by other states and municipalities, the ERS Bonds were intended to improve ERS's severe underfunding by utilizing a long-term investment strategy called "arbitrage" that poses risks of worsening the pension's financial condition if the strategy is not successful. Unlike typical POBs issued by other states and municipalities, however, the ERS Bonds were not structured as general obligations of Puerto Rico secured by pension assets. Instead they were issued by the pension itself (*i.e.*, ERS) and secured by Employer Contributions – the statutory stream of payments made each payment period by Puerto Rico's participating public employers. The aggregate size of the issuance was less than half of the amount that ERS had expected to issue pursuant to the strategy it had developed with its advisors and underwriters. That and the timing of the issuance in the first half of 2008, on the eve of the US's fiscal crisis, made it very difficult to generate investment returns with the bond proceeds that exceeded required payments to bondholders. Moreover, because of ERS's atypical structure, those payments were paid out of incoming Employer Contributions, reducing one of ERS's key sources of funding for the ensuing fifty years while the bonds remained outstanding.

Within the first years after their issuance, some were calling the ERS Bonds a failure that accelerated, rather than slowed, the depletion rate of ERS's already severely under-funded assets. For example, following a change in political administrations in 2009, newly-appointed management at GDB commissioned a report by Conway, released in October 2010, which concluded that their predecessors at GDB under the prior administration and management at ERS (collectively, the "ERS/GDB Decision-Makers") "may have failed to meet the standard of due care and other important fiduciary duties in approving" the issuance of the ERS Bonds.[362] Then in July 2011, the Puerto Rico Legislature enacted Act 116 that, among other things, foreclosed ERS from issuing any new debt intended to be secured by ERS assets, unless the legislature pre-approved it. Attached to the Act was a "Statement of Motives" which

---

[362] Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico*, 5 (2010) (indicating that the ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

characterized the ERS Bonds as "illegally made" and "so badly structured that, rather than yielding profits . . . [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System."[363]

We investigated the circumstances surrounding the conclusions in the Conway Report and Act 116's Statement of Motives and analyzed our findings under applicable law to preview the type of potential actions one might expect based on the underlying conduct.

The results of our analyses are set forth below. Potential securities actions are discussed first followed by potential breach of duty claims against ERS/GDB Decision-Makers.

We have ordered the discussion based on the following, somewhat overlapping issues which are subject to material differences of opinion by various ERS stakeholders: (i) the authority of ERS to issue the bonds, (ii) the authority of Puerto Rico's legislature to eliminate the statutorily required public employer contributions to ERS, (iii) the reasonableness of the arbitrage strategy used to invest some of the bond proceeds, and (iv) the level of care and prudence with which decision-makers at ERS and GDB in 2008 acted in issuing the bonds, particularly in light of prevailing market conditions in 2008.

### (a)   Securities Actions Based on Material Misstatements or Omissions

The ERS Bonds comprise three series of notes issued as part of a single overarching strategy to "increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability." Each of ERS Series A[364] issued on January 29, 2008 in total face amount of $1,588,810,799.60, ERS Series B[365] issued on May 28, 2008 in total face amount of $1,058,634,613.05, and ERS Series C[366] issued on June 26, 2008 in total face amount of $300,202,930, was issued with its own Official Statement containing numerous disclosures and other offering materials to comply with applicable securities laws. For all three ERS Bond series, the relevant parties include (among others), ERS as the issuer, GDB as ERS's financial advisor, Mesirow Financial, Inc. ("Mesirow") as financial advisor to GDB, and affiliates of banks UBS, Santander and Popular each as underwriter of the bonds.

Pension obligation bonds such as the ERS Bonds are subject to the antifraud provisions of US federal and Puerto Rico securities laws. As relevant here, Section 17(a)(2) of the Securities Act, Section 10b of the Exchange Act (and corresponding SEC Rule 10b-5), and Section 851 of Puerto Rico's Uniform Securities Law prohibit issuers, underwriters, advisors and others parties involved with the offer and sale of POBs from making any material misstatements or omissions in required disclosures to potential investors. Certain differences in the application of these statutes—such as who is authorized to enforce them and what level

---

[363] Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431.

[364] *See* Official Statement, *Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Senior Pension Funding Bonds, Series A, app. VI* (2008), (Emp.s Ret. Sys. of the Gov't of P.R., *Pension Funding Bond Resolution* (Jan. 24, 2008)).

[365] *See* Official Statement, *Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Senior Pension Funding Bonds, Series A, app. VI* (2008), (Emp.s Ret. Sys. of the Gov't of P.R., *Pension Funding Bond Resolution* (Jan. 24, 2008)).

[366] *See* Official Statement, *Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., Senior Pension Funding Bonds, Series A, app. VI* (2008), (Emp.s Ret. Sys. of the Gov't of P.R., *Pension Funding Bond Resolution* (Jan. 24, 2008)).

of intent or awareness with respect to the misstatement or omission they require to impose liability—are repeated below only if relevant to the analysis.

Applying law to the circumstances, ERS, GDB, each of their advisors (including Mesirow) and underwriters (including UBS, Santander and Popular) are or were subject to potential liability for any material misstatements or omissions in the 2008 Official Statements. A new action seeking to impose such liability may be subject to a statute of repose requiring private investor actions under US securities law to be commenced within five years of the issuance of securities (here, by 2013) regardless of when facts are discovered indicating a material misstatement or omission has been made.   If an action can be maintained notwithstanding this defense, we would expect it to allege one or more of the following possible misstatements or omissions.

### (i)    Disclosures Relating to ERS's Authority to Issue Bonds

Under the ERS Enabling Act, ERS is empowered "to 'seek a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the [ERS].'"[367]   As noted, in 2011, the "Statement of Motives" to Act 116 characterized issuance of the ERS Bonds as "illegally made by the [ERS/GDB Decision-Makers] even though such transaction was submitted to the Legislative Assembly for approval and rejected by the House of Representatives for deeming it detrimental to [ERS]."[368]   The act itself provides that "[b]ond issues [by ERS] are hereby prohibited as part of the direct placement of debts secured by [ERS]", begging the question whether any effective prohibition existed before 2011. [369]   More recently, AAFAF and Puerto Rico's current Governor and Treasury Secretary have taken the position that ERS lacked authority to issue the bonds without legislative approval because the bonds were neither "'a loan from any financial institution' nor a 'direct placement of debts.'   Instead, they were issued publicly through an underwriter."[370]

We express no view on the merits of the dispute regarding ERS's authority, which is the subject of pending litigation and may be ruled upon by a court adjudicating claims between stakeholders to which we are independent.   Regardless of the outcome of that litigation, however, the mere existence of any non-frivolous basis to challenge the authority of ERS to issue the bonds likely would have been important to a reasonable investor deciding whether to purchase ERS Bonds.   Thus, the failure to accurately and fully disclose the attendant risks of such potential challenge may constitute a material misstatement or omission upon which a liability action may lie under applicable securities law.

---

[367] P.R. Laws Ann. tit. 3 §§ 761-788 (2018).
[368] Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431.  As discussed in Part VII, the ERS Bonds were structured to avoid any requirement of legislative pre-approval after the House had refused to support Governor Acevedo Vila's proposal to have Puerto Rico issue POBs to support ERS that required legislative approval because they were structured as general obligations bonds.
[369] Act of July 6, 2011, No. 116, 2011 P.R. Laws 1431.
[370] *Altair Global Credit Opportunities Fund (A), LLC v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. Of P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-219 (D.P.R. Nov. 17, 2017).

The Official Statements essentially repeat language in the ERS Enabling Act that "authorizes [ERS] to borrow money, including through the direct placement of debt, and secure any such borrowing with its assets."[371]  The Official Statements do not qualify that language or expressly confirm its implication that issuance of the ERS Bonds constitutes a "direct placement of debt" notwithstanding it is public and accomplished through an underwriter. Similarly, the opinion letter of bond counsel accompanying each Official Statement does not explicitly connect the issuance to the enabling language in the 1951 Act.  Rather, it states generically that the Act is "valid in all respects material to this opinion" and the "Bonds have been duly authorized by [ERS] and constituted legal, valid and binding obligations of [ERS ….]."[372]  None of the "Investment Considerations" in the Official Statements discusses ERS's authority to issue the bonds or even implies such authority may be subject to challenge for any reason.  Given the broad scope of what is "material" for purposes of required disclosures under applicable securities law, it is possible that a court could find that existing disclosures in the Official Statement about ERS's authority to issue the bonds and/or the lack of disclosure of any risk that such authority could be challenged constitute a material misstatement or omission.

Moreover, even if a fact-finder concludes there was a material misstatement or omission, the plaintiff in a private securities action will bear the additional burden of establishing the mental awareness of those being sued.  Here, our investigation did not reveal evidence that anyone at ERS, GDB and their various advisors and professionals was aware of any basis to challenge ERS's authority at the time the bonds were issued.

### (ii)    Disclosures Related To Elimination Of Employer Contributions

The ERS bonds were marketed as "limited, non-recourse obligations of [ERS] payable solely by Employer Contributions made after the date of issuance of the Bonds."[373]  On June 23, 2017, Puerto Rico's Legislative Assembly passed a budget resolution providing that Employer Contributions to ERS "shall be eliminated."[374]  The purpose of the resolution was to fund "the pay-as-you-go system as a new method for safeguarding pensions for Government retirees."[375]  This was to be accomplished by eliminating Employer Contributions, requiring ERS to transfer all of its assets to Puerto Rico's General Fund, and requiring the General Fund to assume responsibility for all payments owed by ERS to its beneficiaries.[376]

Thereafter, holders of ERS bonds commenced litigation challenging the elimination of the Employer Contributions, including on the basis that it was an unconstitutional "taking."[377]

---

[371] *See, e.g.*, Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 7 (2008).

[372] *See, e.g.*, Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 7 (2008).

[373] *See, e.g.*, Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 23 (2008).

[374] *See* R.C. J. Res. 188, 18th Leg., 1st Sess. § 4(3) (P.R. 2017).

[375] *See* R.C. J. Res. 188, 18th Leg., 1st Sess. (P.R. 2017).

[376] *See* R.C. J. Res. 188, 18th Leg., 1st Sess. § 4(3) (P.R. 2017).

[377] *See* Amended Complaint, *Altair Global Credit Opportunities Fund (A), LLC v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. Of P.R.)*, Tit. III Case No. 17-3283-LTS, Adv. No. 17-219 (D.P.R. Nov. 8, 2017) (alleging that diversion of employer contributions violated US and Puerto

The Independent Investigator's Final Investigative Report

We express no view on the merits of this position, which is the subject of pending litigation and may be ruled upon by a court adjudicating claims between stakeholders to which we are independent.[378]   However, we did analyze disclosures in the Official Statements in light of requirements under applicable securities laws in disclosing the risk of such elimination to potential investors.

The Official Statements contain numerous disclosures about the risks involved, including that: (i) the bonds are payable and secured solely by the Employer Contributions, and as a result "bondholders may not receive the full amount due on the Bonds" if the Employer Contributions are "less than the amounts required to pay debt service on the Bonds;"[379] (ii) even though Government Employers are required by law to make the Employer Contributions and if they fail to do so ERS is required by law to "pursue all available legal remedies to collect such Employer Contributions as soon as possible," ERS may be "unable to collect the full amount due or may not collect it in time to avoid a shortfall in the amount available to pay the Bonds" which could "ultimately result in the inability of [ERS] to pay the Bonds;"[380] and (iii) the reasons Employer Contributions could be less than expected include "the attitudes of the population of Puerto Rico, the results of political elections, and public policy decisions."[381] Perhaps most relevant to this analysis, the only reference in the Official Statements warned:

> ***The Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.*** The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders.  In addition, as is the case in many other jurisdictions, the Constitution of Puerto Rico does not contain provisions that expressly prohibit the Legislature from amending the Employer Contribution requirements under the Act.  Therefore, the Legislature of the Commonwealth could reduce the Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions.  The Bonds are being issued pursuant to general authority contained in the Act, which does not include any covenant by the Legislature of the Commonwealth not to amend the Act in a way adverse to Bondholders. If any such change is made, the ability of [ERS] to pay debt service on Bonds when due could be adversely affected.  It is impossible to predict at

---

Rico Constitutions); Amended Complaint, *Altair Global Credit Opportunities Fund (AL) LLC v. United States*, Case No. 17-970 (Fed. Cl. Oct. 31, 2017) (same).

[378] For the same reason, we express no view on the merits of pending litigation concerning whether ERS bondholders hold an enforceable security interest in the stream of employer contributions that was being made by relevant public employers to ERS.  *See* Complaint, *Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R. v. Altair Glob. Credit Opportunities Fund (A) LLC*, Tit. III Case No. 17-3566-LTS, Adv. No. 17-213 (D.P.R. July 21, 2017) (alleging same).

[379] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 23 (2008).

[380] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 23 (2008).

[380] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 24 (2008).

this time the conditions that could cause the Legislature of Puerto Rico to reduce the Employer Contribution rate, but those conditions could include situations (i) where the System's unfunded accrued liability has been reduced or eliminated, which could lead the Legislature to the conclusion (if it did not take into consideration the need to pay the Bonds) that additional Employer Contributions are not required, or (ii) where there is severe financial stress affecting one or more of the Government Employers. [382]

The Official Statements do not explicitly state that the Legislative Assembly could resolve to convert ERS to a "pay as you go system" or that Employer Contributions could be "eliminated" altogether.[383]  However, such legislative acts may be covered, under the umbrella of the language "make other changes in existing law that adversely affect the amount of Employer Contributions" quoted above from the Official Statements.  If a securities action is brought on this basis and survives other defenses, we expect it to focus on whether the statements above are sufficient disclosure to bondholders of the risk that the Legislative Assembly might completely eliminate their sole source of payment and security (*i.e.*, Employer Contributions).

### (iii)     Disclosures Relating to Use of Proceeds, Arbitrage Investment Strategy and Market Conditions

In Part VII of this report, we include a detailed discussion with numeric examples to demonstrate the key components and risks to the "arbitrage" investment strategy underlying most pension obligation bonds, like the ERS Bonds.  The key take-away from that discussion relevant to this analysis is how the success of the strategy can depend on two variables: the amount of bond proceeds being invested and the rate of return made thereon.  Hypothetically, if 100% of the POB proceeds are invested then the strategy will be successful as long as the proceeds are invested at a greater rate of return than the rate of return being paid on the bonds.  In reality, the amount of POB proceeds invested is less than 100%, sometimes by a significant amount, because a portion of the proceeds are used to pay the costs of financing and often times additional amounts owed by the pension to its beneficiaries and creditors.  As the amount of these payments increases, so does the difference between the amount of bonds issued and the amount of proceeds that are invested.  As that difference grows, so too does the rate of return on investment required for arbitrage to be successful and the risk that such rate will not be realized under the market conditions in which the investments are made.  To minimize that risk, POBs should be issued in an amount that leaves sufficient bond proceeds to invest once up-front payment are made.

The ERS bonds were issued to "increase the funds currently available to pay pension benefits to certain of its beneficiaries and reduce its unfunded accrued actuarial pension liability."  To reach that result, ERS and GDB structured the bonds around certain calculated assumptions, including the amount of bond proceeds that would be needed to satisfy ERS's short-term obligations and, with respect to bond proceeds above that amount, the long-term

---

[382] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 37 (2008).
[383] *See* R.C. J. Res. 188, 18th Leg., 1st Sess. §§ 4(1), 4(3) (P.R. 2017).

rate of return that could be realized upon its investment in the market.[384]  On the basis of those assumptions, ERS's advisors and the underwriters of the ERS Bonds had calculated that ERS would be able to fund all benefits through the life of the pension if it were able to borrow $7 billion of bonds and invest the proceeds at an 8.3% rate of return.

In its October 2010 report, Conway identified what it viewed as "significant risks" that ERS would not be able (i) to issue enough bonds to provide it with the full $7 billion of proceeds and (ii) to "generate arbitrage" by investing a lesser amount of proceeds and making returns that exceed the amount required to repay the bonds.[385]  According to Conway, the failure of the arbitrage strategy was foreseeable.  In this analysis, the ERS/GDB Decision-Makers should have known that changing market conditions in 2008, coupled with ERS's severe underfunding, would make it difficult if not impossible to raise the full $7 billion.  With respect to the Series B and C Bonds in particular, Conway suggested deteriorating market conditions in the run up to June 2008 not only kept ERS from issuing the bonds outside of Puerto Rico as originally planned, but also were sufficient to warrant postponing issuance of the bonds altogether.

We address in the section following this one whether our investigation found evidence to support these findings and Conway's conclusion that ERS/GDB Decision-Makers failed to exercise an appropriate standard of care in issuing the bonds.  But first, we focus on the risks Conway identified and whether they were properly disclosed in accordance with applicable securities law for potential ERS bondholders to consider in making their decision to purchase the bonds.

The "Use of Proceeds" section of the Official Statements specified the gross amount of proceeds from each series of bond, certain discounts and deductions from that amount related to financing costs and required reserves, and the resulting amount of net proceeds that would by "[t]ransfer[ed] to [ERS] to fund retirement benefits."[386]  Specifically, after issuing the nearly $3 billion combined in ERS Series A, B and C Bonds, the Official Statements indicated cash proceeds of $2.73 billion would be "[t]ransfer[ed] to [ERS] to fund retirement benefits."[387]  That section further explained "the net proceeds from the sale of the [ERS] Bonds . . . will be added to the System's pool of invested assets, which will be used to pay retirement benefits to

---

[384] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 20-22 (2008).

[385] *See, e.g.,* Conway Mackenzie, Inc., Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico 14 (2010) (ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[386] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series B*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series C*, 17 (2008).

[387] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series B*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series C*, 17 (2008).

the beneficiaries of the System's defined benefit plan."[388]  Referencing the arbitrage strategy, the Offering Statements further disclosed that:

> The net yield of the System's assets may increase or decrease over time regardless of this transaction, but could decrease as a result of the issuance of Bonds in the event that the System is unable to invest the proceeds of the Bonds at yields that equal or exceed the interest rate on the Bonds. Although this may reduce the amount of funds available to the System to pay retirement benefits, it will not directly affect the pledge of Employer Contributions to the holders of the Bonds.[389]

Moreover, the "Investment Considerations" section includes disclosures of numerous "macroeconomic factors, some of which are specific to Puerto Rico, and some of which relate to the U.S. economy and the global economy" that could lead to ERS being unable to pay the bonds.  Although these disclosures did not reference an impact on ERS's ability to pay its retiree obligations, a reasonably prudent investor may have understood those same macroeconomic factors could have a similar impact on ERS's funding levels and investment strategy as well.  Regarding market conditions, the disclosures in the ERS Series B and C Official Statements in June 2008 remained substantially the same as their counterparts in the ERS Series A Official Statement from January 2008.  Further, notwithstanding statements in the ERS Series A Official Statement that subsequent bond series would be issued in markets outside of Puerto Rico, the ERS Series B and C Official Statements offered no description of efforts made in that regard nor any explanation why ERS Series B and C nevertheless were being issued in the local market.

Notwithstanding these disclosures, none of the Official Statements specify or provide a range for the amount of bond proceeds it intended to invest, or the rate of return (or range of rates) the arbitrage strategy was expected to require for the issuance of the bonds to provide a net benefit to the pension system.  In particular, the ERS Series A Official Statement did not disclose that the amount of net proceeds invested from that issuance might be substantially reduced by amounts used by ERS to cover operating expenses or pension benefits.  Yet, according to Conway, more than $475 million of ERS Series A net proceeds was used to pay overdraft fees to the Department of Treasury, leaving only $937 million to be invested to grow ERS.  Likewise, the ERS Series B and C Official Statements contained no risk disclosure that none of the net proceeds from those issuances would be invested at all.  Nevertheless, available evidence indicates that the entire $1.3 billion of bond proceeds from these two series was held in a cash account at GDB to satisfy pension benefits instead of being invested to grow ERS.[390]

---

[388] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series B*, 17 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series C*, 17 (2008).

[389] Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A*, 6-7 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series B*, 6-7 (2008); Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series C*, 6-7 (2008).

[390] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 14 (2010)

As a result, investors may have appreciated prior to the Conway report that as little as one-third of the net cash proceeds generated from the bonds issued was invested as part of the arbitrage strategy.[391]  For arbitrage to be successful when a third of bond proceeds are invested, those investments must realize a rate of return of more than three times the return rate being paid on the bonds.  Here, because the ERS Bonds collectively earn interest at approximately 6.5%, ERS would have to invest the $937 million at 19.5% or more just to break even.[392]  A reasonably prudent investor likely would have understood that sustaining that annual rate of return for several decades while the bonds are outstanding is highly unlikely.

Moreover, according to the Statement of Motives for Act 116, the $937 million identified by Conway was initially invested at a negative rate of return, losing $100 million by December 2009.  During that time, the US was in the midst of its longest economic recession in eighty years.  As the Conway report acknowledges, these market conditions were a significant cause of deviation from ERS's originally planned use of bond proceeds.[393]  In addition to generally reducing the rates of return available, the Great Recession also reduced ERS's cash flow from pre-existing investments.  This increased need to use the bond proceeds for short-term payments was identified as one of the reasons ERS/GDB Decision-Makers decided in late 2008 not to invest the $1.3 billion proceeds from ERS Series B and C in the arbitrage strategy.  According to the Conway report, $564 million of those proceeds had been used to cover ERS's operating cash shortfalls and fund pension liabilities between June 2008 and June 2010.[394]

Given the broad scope of what is "material" for purposes of required disclosures under applicable securities law, it is possible that a court could find that existing disclosures in the Official Statement lack sufficient detail concerning the use of proceeds, arbitrage investment strategy and/or changing market conditions to constitute material omissions.  If a fact-finder concludes there was a material misstatement or omission, the plaintiff in a private securities action bears the additional burden of establishing its reliance on that misstatement or omission in making its investment decision.  Here, potential investors were explicitly told that in the case of non-payment of the bonds they would have no recourse to the assets of ERS, including proceeds from the bond issuance itself.  As a result, any impact of ERS's funding level on the likelihood the bonds would be repaid in full would have been indirect.  Indeed, the structure of the bonds from the perspective of bondholders could lead a fact-finder to reasonably conclude

---

(indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[391] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 14 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[392] We have not been tasked with tracing the use of bond proceeds and have not independently verified the use of ERS Bond proceeds put forth by Conway in its October 2010 report.

[393] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 14 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[394] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 14 (2010) (ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

The Independent Investigator's Final Investigative Report

that disclosures about the arbitrage strategy and market conditions are immaterial from a securities law perspective.

As discussed below, however, Conway's findings warrant further consideration in connection with potential common law tort claims against the ERS and GDB Decisions-Makers and their advisors.

### (b)   Breach of Fiduciary Duty Claims: ERS/GDB Decision-Makers

During the course of our investigation, we encountered allegations by various stakeholders that the ERS/GDB Decision-Makers breached their fiduciary duties in issuing the ERS bonds.  The bases of these allegations include that they issued the ERS Bonds without proper legal authority, premised on an unreasonable arbitrage investment strategy, and subject to inherent and circumstantial risks not fully understood or vetted by relevant decision-makers. We also heard conflicting viewpoints about whether the issued bonds left ERS in a worse financial position, as well as allegations and evidence that ERS likely would have experienced a net positive yield if the full $7 billion of bonds had been issued as originally planned.

We investigated these allegations and analyzed our factual findings using applicable law to determine if they supported any legal claims or remedies against the ERS/GDB Decision-Makers and third-party professionals with the prospect of resulting in greater recoveries for ERS stakeholders.  The results of our analysis regarding ERS/GDB Decision-Makers are immediately below.  Our analysis focused on potentially available statutory and common-law tort causes of action, principally breach of duty claims against fiduciaries at ERS and GDB.  We also analyzed claims against third-parties arising out of the same operative facts, such as claims for aiding and abetting a breach of fiduciary duty and professional negligence, which are discussed in Part XVI.C.4(a), below.

ERS is a Puerto Rico trust created by statute to provide pensions and other benefits to retired employees of Puerto Rico's government, and GDB is a component unit of the government of Puerto Rico, created by legislative act.  As it concerns the ERS Bonds, our investigation gave us no reason to believe that any relevant decision made or action taken by the ERS/GDB Decision-Makers were made outside of Puerto Rico.  Moreover, the ERS Bonds were sold entirely in Puerto Rico.  Accordingly, as discussed above, it is likely that the substantive law of Puerto Rico would govern the tort-based claims under consideration, although we also considered application of New York law where appropriate.

A new action seeking to impose such liability for each of these claims may be subject to a statute of limitation requiring legal action on such claim to be commenced within a period of time following the discovery of the injury caused thereby or, to the extent a statute of repose applies, by a firm outside date regardless if or when the breach was discovered.  Here, in light of allegations that the 2008 ERS/GDB Decision-Makers breached their fiduciary duties in connection with the issuance of the ERS Bonds contained in the October 2010 Conway Report and 2011 Statement of Motives by Puerto Rico's Legislature, one of those dates may be the basis for notice of injury of the considered claims, making it potentially likely that they were time-barred prior to the filing of ERS's Title III case.

Turning to the substance of potential claims, each involves the breach of a duty to ERS. As noted above, under Puerto Rico law, fiduciaries of statutorily created publicly entities, like the ERS and GDB, likely owe those entities the same duties of care, loyalty and good faith that

the corporate law of most states, including Puerto Rico, imposes upon officers and directors of private companies.[395]  Moreover, as noted in Part XII, of our Report, the evidence does not support any conclusion that current or former GDB officials violated any applicable ethics restriction in connection with relevant Puerto Rico-related transactions, including no instances of bribery, kickbacks or improper use of information obtained through official channels. Consistent with that finding, our investigation also found the evidence did not support a conclusion that any ERS/GDB Decision-Maker acted with bad faith and/or in violation of any duty of loyalty to ERS or GDB in connection with the ERS Bonds.

As a result, our analysis focused on breach of fiduciary duty claims based on ERS/GDB Decision-Makers' duty of care, as well as claims against third parties either for aiding and abetting a breach of that duty by ERS/GDB Decision-Makers or for committing a breach of their own duty undertaken in connection with their agreement to provide professional services to ERS or GDB.  Pursuant to the business judgment rule, any party here that brings a claim against the ERS/GDB Decision-Makers may have to bear the heavy burden of proving that such ERS/GDB Decision-Makers acted in bad faith, were grossly negligent or committed a gross abuse of discretion to evade application of the business judgment rule.[396]

Moreover, ERS/GDB Decision-Makers may have one or more defenses barring or limiting their liability under the circumstances.  Like that of many states, Puerto Rico's corporate law affords a complete defense to directors and officers who rely in good faith on the advice of a professional or expert selected with reasonable care.[397]  Further, the Supreme Court of Puerto Rico has explained that under Puerto Rico law a government officer is immune from liability for any "good faith" exercise of discretion unless he acts "unreasonabl[y] or if he should have known that [his conduct] was illegal."[398]  Thus, any party here that wishes to bring a claim against the ERS/GDB Decision-Makers may not be able to do so without successfully arguing that one or both of these defenses do not apply.

If an action can be maintained notwithstanding these defenses, we would expect its merits to focus on one or more of the following allegations, which came or were brought to our attention in the course of our investigation.  Below is an analysis of our investigative findings with respect to each.

---

[395] Notably, in an August 17, 2018 decision in one of the aforementioned ongoing litigations concerning ERS-related disputes, the US District Court for the District of Puerto Rico found that ERS is "inherently capable of functioning for financial and litigation purposes as a private business or enterprise."  *See Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R. v. Commonwealth of P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, Tit. III Case No. 17-BK-3283-LTS, Adv. No. 17-213-LTS, 24, n.21 (D.P.R. Aug. 17 2018).

[396] *See Marquis Theatre Corp. v. Condado Mini Cinema.*, 846 F.2d 86, 91 (1st Cir. 1988) (noting that the business judgment rule would bar breach of fiduciary duty action under Puerto Rico law absent a showing of bad faith, negligence, gross abuse of discretion or self-dealing by fiduciary).

[397] *See* P.R. Laws Ann. tit. 14, § 2721(i).  ERS and GDB are not private corporations and therefore it is possible this defense does not apply to the ERS/GDB Decision-Makers.  We note that, although our analysis did not reveal any controlling precedent, some courts have analogized to a jurisdiction's corporate law principles when determining the fiduciary duties owed by its government officials.  *See, e.g., EM ltd. v. Republic of Argentina*, 473 F.3d 463, 476 (2d Cir. 2007).

[398] *Acevedo v. Srio. Servicios Sociales*, 12 P.R. Offic. Trans. 317 (1982) ("[Q]ualified immunity is available to officers of the executive branch" under Puerto Rico law for acts performed in the course of official conduct, when "the scope of discretion and responsibilities of the office […], coupled with good faith belief," provide "reasonable grounds" for the actions taken).

The Independent Investigator's Final Investigative Report

The Conway Report concludes that ERS/GDB Decision-Makers in 2008 breached their fiduciary duty of care to ERS by issuing the three series of ERS Bonds.[399]  For example, Conway asserts these ERS/GDB Decision-Makers: (i) did "not fully underst[and] or vet[]" certain "significant risks" with the arbitrage strategy, including "the risk of a failed or undersubscribed offering and the System's potential inability to generate arbitrage on the [ERS Bond] proceeds;"[400] and (ii) "should have known" that $3 billion would not solve ERS's long-term funding issues and had "the fiduciary responsibility to ensure market conditions were supportive of the full $7 billion" before proceeding to issue the bonds.[401]  In turn, the 2011 Statement of Motives by Puerto Rico's legislature stated in no uncertain terms that ERS/GDB Decision-Makers in 2008 "failed the fiduciary duties imposed by the law over [a] board of directors."

The Conway Report did not provide the legal standards against which it evaluated underlying circumstances and the conduct of ERS and GDB decision-makers to reach these conclusions.  The conclusions may be based on two, somewhat overlapping theories of liability for breach of fiduciary duty.

*First*, the Conway Report and subsequent Legislative Statement assert the ERS/GDB Decision-Makers breached their duty of care by agreeing to the "very risky and speculative" arbitrage strategy behind the ERS Bonds, suggesting they either failed to properly inform themselves concerning or otherwise simply did not heed the risks involved.[402]  As an initial matter, the Conway Report itself appears to undermine this allegation.  The report criticizes the ERS/GDB Decision-Makers for not issuing the full $7 billion of ERS Bonds they originally planned, asserting they should have known that only issuing $3 billion "was not large enough to create arbitrage opportunities."[403]  This criticism assumes that the arbitrage strategy had at least a reasonable chance of success had the full $7 billion been issued.

The risks of POBs were not a new phenomenon when the ERS Bonds were issued.  In fact, the governments of more than a dozen states had issued POBs over a period of twenty-three years prior by 2008.[404]  Our investigation did not reveal evidence that 2008 ERS/GDB

---

[399] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 4 (2010) (noting that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[400] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 12 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[401] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 12 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[402] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 12 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[403] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 15 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[404] *See* Alicia H. Munnell, et al., *An Update on Pension Obligation Bonds* 2 (2006).

The Independent Investigator's Final Investigative Report

Decision-Makers failed to inform themselves about the risks involved. In fact, as discussed in Part VII, throughout 2007 and 2008, ERS/GDB Decision-Makers properly informed themselves of the risks involved with the POB strategy, and their decision to proceed with that strategy was consistent with and supported by the professional analysis obtained by the 2008 ERS/GDB Decision-Makers, including from Merrill Lynch as would-be investment banker for global ERS Bonds that ultimately were never issued, and Puerto Rico law firm Fiddler, acting as bond counsel. The conclusion in the Conway Report that ERS/GDB Decision-Makers did not properly evaluate the risks involved is not supported by the evidence we reviewed. Rather, it appears to be based on hindsight analysis that, as of October 2010 when the report was issued, the bonds had "worsened the funded position of [ERS]". Under applicable law, however, any failure by ERS/GDB Decision-Makers to predict the rate of return in a volatile market likely would not constitute breach of their duty of care.[405]

*Second*, the Conway Report concludes the 2008 ERS/GDB Decision-Makers failed to comply with their "fiduciary responsibility to ensure market conditions were supportive of issuing at least the full $7.0 billion transaction required to solve [ERS's] financial crisis before proceeding with the transaction." In support of this conclusion, the report points to certain "early warning signs." Conway observed "[i]t appears that Merrill Lynch's failed offering in the global marketplace during December 2007 should have been an indication that there was no viable market to raise the full $7.0 billion necessary to comprehensively address the ERS' objectives."[406] On that basis, Conway suggests ERS/GDB Decision-makers should not have proceeded with the $1.6 billion Series A issuance in January 2008, at least without first determining the Puerto Rico market was large enough to absorb an aggregate $7 billion through subsequent issuances.[407] With respect to the June 2008 issuance of ERS Series B and C, the Conway report points to additional "early warning signs," including an apparent acknowledgment at a May 2008 ERS board meeting that deteriorating market conditions would require new bonds to be issued with a 0.35% greater interest rate than the ERS Series A bonds issued in January 2008, and that "[b]y June 2008 there were also signs that the stock market was deteriorating, which should have signaled to the ERS that its arbitrage goals were jeopardized."[408]

As an initial matter, the fiduciary duty of care generally does not include a responsibility to ensure supportive market conditions or the absence of all warning signs before accessing the capital markets.[409] Rather, under Puerto Rico law the ERS/GDB Decision-Makers were

---

[405] *See, e.g., Wilson v. U.S. Gov't,* 699 F.Supp. 20, 25 (D.P.R. 1988) ("[H]indsight cannot be the basis for a determination of negligence").

[406] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 13 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[407] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 13 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[408] *See, e.g.,* Conway Mackenzie, Inc., *Review of the Events and Decisions that Have Led to the Current Financial Crisis of the Employees Retirement System of the Government of Puerto Rico* 13 (2010) (indicating that ERS/GDB Decision-Makers "may have failed to meet the standard of due care and other important fiduciary duties" in approving ERS Bond issuance).

[409] *See, e.g., RSL Commn's PLC v. Bildirici,* 649 F. Supp. 2d 184, 219-20 (S.D.N.Y. 2009) (declining market conditions do not relieve plaintiff of burden of demonstrating defendant's alleged breach of

required to inform themselves of the risks and apply their business judgment in good faith.  If they did so, they are likely shielded from liability in connection with the issuance of the bonds by the business judgment rule.[410]  Thus our analysis of Conway's conclusions focuses on whether evidence supports a showing of bad faith, negligence, gross abuse of discretion or self-dealing by an ERS/GDB Decision-Maker that would be required to overcome the business judgment rule and would bar a breach of fiduciary duty action under Puerto Rico law.

In short, the evidence we reviewed does not support such a showing.  Rather, it shows that the ERS/GDB Decision-Makers informed themselves of market conditions and considered their impact on the arbitrage strategy.  Contemporaneous evidence shows that ERS/GDB Decision-Makers and their advisors were constantly assessing markets and considering further issuances outside of Puerto Rico from the end of 2007 through as late as August 2008, and that they believed those markets were open to further bond issuances but only at interest rates ERS/GDB Decision-Makers believed to be too high for the arbitrage strategy to be successful. The evidence further shows that as negative market trends emerged in the first half of 2008, ERS/GDB Decision-Makers remained optimistic these trends would end and reverse in time for ERS to complete the full $7 billion issuance.  Several witnesses we interviewed corroborate these findings and indicated that ERS/GDB Decision-Makers' pursuit of further issuances only ended in deference to the gubernatorial election in the fall of 2008 that led to their replacement by appointees of the newly-elected administration in early 2009. Moreover, the evidence we reviewed indicates it was at least possible that further ERS Bonds could have been issued after the election but were not as a matter of policy, not because markets remained frozen.  Indeed, by 2009 other Puerto Rico issuers had returned to issue debt in the US capital markets in connection with other bonds/issuers.

A study of POBs published in 2014 provides helpful context for understanding why views on the wisdom of the ERS Bonds diverged so greatly between ERS/GDB Decision-Makers in 2007 and 2008 and their counter-parts at GDB in 2009 and 2010.  The study "assess[ed] the extent to which POBs have met issuers' expectations" by calculating the internal rate of return for all POBs in a given year.[411]  As the authors reported:

> The results demonstrate the risk associated with a POB strategy.  If the assessment date is the end of 2007—the peak of the stock market—the picture looks fairly positive […].  If assessed in the middle of 2009—right after the market crash—most POBs appear to be a net drain on government revenues.  And, as of February 2014, the majority of POBs have produced positive returns due to the large market gains that followed the crisis.  Only those bonds issued at the end of the market run-up of the 1990s, and those issued right before

---

fiduciary duty, rather than market conditions, actually caused losses);  *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 721 (2d Cir. 2013) (while warning signs might indicate a duty to *investigate* whether it was prudent to continue to hold investments in light of such warning signs, warning signs in the market, by themselves, do not give rise to an inference that decision maker breached a fiduciary duty by continuing to hold those investments).

[410] *See Marquis Theatre Corp. v. Condado Mini Cinema.,* 846 F.2d 86, 91 (1st Cir. 1988) (noting that the business judgment rule would bar breach of fiduciary duty action under Puerto Rico law absent a showing of bad faith, negligence, gross abuse of discretion or self-dealing by fiduciary).

[411] Alicia H. Munnell, *et al.*, *An Update on Pension Obligation Bonds*, State and Local Pension Plans 3 (2014).

The Independent Investigator's Final Investigative Report

the crash in 2007, have produced a negative return; all others are in the black.[412]

If a breach of duty by ERS/GDB Decision-Makers could be established, liability would only attach upon additional showings of injury and causation.[413] Those showings may be difficult here given the passage of time and the sustained growth in the market over the last several years.

Moreover, establishing causation could require showing ERS would not have been harmed if no bonds had been issued. As even the Conway Report acknowledges, proceeds of the ERS Bonds were used to resolve near term cash-flow issues ERS was facing at the time. Alternatively, if it is shown that ERS would have suffered no harm had the full $7 billion in ERS Bonds been issued, establishing causation could require showing who was responsible for the full $7 billion not being issued. As noted, our investigation did not reveal evidence to support these conclusions.

Finally, we note that an ERS/GDB Decision-Maker against whom a claim has been asserted may seek indemnification.[414] Notably, however, any right to indemnification from ERS, GDB or other Title III Debtors that an ERS/GDB Decision-Maker may have is likely to be payable only if they assert a claim in the relevant Title III proceeding which, if allowed, would share in potential recoveries made available to unsecured creditors. Thus, a successful breach of fiduciary duty claim, to the extent paid in full by the ERS/GDB Decision-Maker found liable, will more than offset any dilution to Title III recoveries for other stakeholders on account of a corresponding indemnification claim.

## 4.  **Selling Practices**

We are aware of allegations made against banks in Puerto Rico regarding the selling practices relating to Puerto Rico-Related Bonds. These allegations have mainly focused on UBS PR, Santander Securities, and Popular Securities, and relate to the sale of Puerto Rico bonds to investors in Puerto Rico, the transaction fees charged by the relevant financial institutions, and potential conflicts of interest in the multiple roles affiliates of the banks played at various stages in the issuance and selling of Puerto Rico-Related Bonds. These practices have been the subject of litigation in various government enforcement actions and private suits in Puerto Rico and New York, and some of those actions remain pending.

The ERS Bond issuance also proved to be a prime example of several selling practices that have been called into question, and on which we focused a significant portion of our investigation. For example, in connection with issuance of the bonds, separate affiliates of the same investment bank and financial services firm, UBS, acted as lead underwriter and

---

[412] *See* Alicia H. Munnell, *et al*., *An Update on Pension Obligation Bonds*, State and Local Pension Plans 3 (2014) (explaining first POB issued by Oakland, CA in 1985 and indicating at least thirteen states had issued POBs pre-2009).

[413] *See, e.g., CMI Capital Market Invest., LLC v. Municipality of Bayamon.,* 410 F.Supp.2d 61, 68 (D.P.R. 2006).

[414] *See* P.R. Laws Ann. tit. 3, § 3085 (former government officials entitled to request indemnification by Puerto Rico for acts or omissions in good faith and within scope of functions). *See, e.g., Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza.,* 484 F.3d 1, 26 n.28 (1st Cir. 2007) ("The Commonwealth of Puerto Rico generally indemnifies its officials for suits against them in their personal capacities.").

purchased over half the issuance on behalf of its managed CEFs, while at the same time, another UBS PR affiliate was engaged to provide investment consulting services to ERS. A single firm playing multiple roles in a municipal bond issuance in this manner, because of the potential for conflicts of interest to harm stakeholders and undermine the confidence of public investors, is heavily regulated. In fact, because of their affiliate's role as underwriter, the UBS PR funds would have been prohibited under the 1940 Act from purchasing any ERS bonds if they had been issued by a municipality within the fifty states.

<strong>(a)      Aiding and Abetting Breach of Fiduciary Duty and Professional Negligence Claims Against Third Parties</strong>

Our analysis did not reveal clear precedent indicating whether a claim for aiding and abetting a breach of fiduciary duty is recognized under Puerto Rico common-law. Other jurisdictions that do recognize the claim generally require a plaintiff to establish an underlying fiduciary breach in which the targeted third-party defendant has knowledge of and substantially participates in.[415] Thus, the availability of a claim for aiding and abetting rises and falls with the availability of a claim for an underlying breach under the analysis above. Here, to the extent a claim for breach of duty relating to the ERS Bonds against an ERS/GDB Decision-Maker can be established, it may make sense to bring aiding and abetting claims against those underwriters and advisors that worked with ERS and/or GDB to facilitate the issuance of the bonds as part of the same legal action.

Moreover, parties acting as an underwriter or advisor to a bond issuer take on professional duties of their own. Puerto Rico law recognizes a claim for failure to fulfill those duties as professional negligence.[416] Although a professional negligence claim here would require evidence that a targeted professional breached its own duty to ERS or GDB, it would also require showings of injury and causation similar to those required to support a claim against the same professional for aiding and abetting a breach of fiduciary duty by ERS/GDB Decision-Makers. Thus, we consider these claims together.

If a successful claim for aiding and abetting a breach of fiduciary duty or professional negligence could be maintained, we would expect it to focus, at least in part, on evidence that the ERS transactions involved conflicts of interest that may have affected certain underwriters and advisors that played multiple fee-generating roles in connection with the issuance of ERS Bonds. For example, evidence shows that prior to issuing the bonds, ERS had retained an affiliate of UBS PR to consult on its investment portfolio and that parts of that portfolio were managed by asset management affiliates of Mesirow, Santander Securities, and Popular Securities. Arguably, each of these entities stood to gain by earning future fees if ERS's investment portfolio were to increase upon its receipt of bond proceeds. Thus, when other affiliates of UBS, Santander Securities, and Popular Securities acted as underwriters for the ERS bonds, and another affiliate of Mesirow acted as GDB's financial advisor in connection with the issuance, a potential conflict was created between their own interest in an affiliate making more money and the best interests of their clients, ERS and GDB.

Similarly, a UBS PR affiliate that was the asset manager for closed-end funds that purchased more than half of the ERS bonds would have been prohibited from doing so under

---

[415] *See, e.g.*, *Malpiede v. Townson,* 780 A.2d 1075 (Del. 2001).

[416] *See, e.g., Santana Baez v. Cardona Estelritz,* No. K DP2014-0002, 2015 WL 2202700, 4 (P.R. Cir. Mar. 12, 2015).

558

the laws regulating investment companies in the US mainland.  As discussed in detail in prior sections of this Report, *see* Parts VII and XI, the provisions of the 1940 Act aimed at preventing conflicts of interest from arising in connection with the purchase and packaging of securities by mutual funds, generally prohibits mutual funds from purchasing securities underwritten by an affiliate.  However, UBS PR was allowed to do both here because of an exemption for Puerto Rico securities in the 1940 Act.

In other cases, parties with similar conflicts of interest have been found liable for aiding and abetting a breach of fiduciary duty or professional negligence claim.  In those cases, however, the party with the conflict was found to have placed its own self-interest above the best interests of its client that resulted in an injury to the client.[417]  However, our investigation did not reveal evidence indicating that any of the entities discussed disregarded the best interests of ERS or GDB in favor of their own, or that ERS would have acted differently or avoided any negative consequences from issuing the bonds.  Moreover, the issuance was supported by the advice of other professionals that did not have multiple, conflicting roles in the transaction, including Merrill Lynch as would-be investment banker for global ERS Bonds that ultimately were never issued, and the Puerto Rico law firm Fiddler, acting as bond counsel.  Concerning UBS PR specifically, we also note that in connection with its role in this and other Puerto Rico bond issuances, UBS PR has been the subject of multiple prior investigations by SEC and other government agencies, as well as defendant in a number of lawsuit by private plaintiffs.

Finally, if a successful claim for aiding and abetting or professional negligence could be brought against UBS PR or any other third-parties, it may be subject to certain additional defenses.  For example, targets may raise the *in pari delicto* defense, which prohibits parties that commit a wrongful act together from later suing one another for injuries caused thereby.  If such claim premised on ERS's issuance of the bonds was pursued against one of these entities by the Oversight Board, standing in the shoes of ERS, this defense might be triggered.  Additionally, to the extent one considers bringing claims against them, we note that ERS agreed to indemnify the underwriters of the ERS Bonds (*e.g.*, UBS, Santander Securities, Popular Securities).[418]  Thus for the same reasons discussed above regarding successful claims against an ERS/GDB Decision-Maker, a successful claim against an indemnified third-party professional (assuming it is satisfied in full by the liable party) may be partially offset on account of an indemnification claim sharing in Title III recoveries with other stakeholders.

### (b)   Equitable Subordination and Unjust Enrichment

Regardless of the outcome of this pending and prior litigation, it is possible that a court could conclude that actions of the banks described within them and above, standing alone or in conjunction with other actions, constitute inequitable conduct and/or that this conduct resulted in an unjust benefit to those banks and a corresponding detriment to other stakeholders.  On that basis, to the extent those banks has filed or will file any claims in the Title III Proceeding, a representative of the Title III estate or other creditors could seek to equitably subordinate those claims pursuant to Section 510(c).  In order to subordinate those claims, the court would need to find that the conduct described above was "inequitable," and that the misconduct

---

[417] *In re Rural Metro Corp.,* 88 A.3d 54, 101 (Del. Ch.), *decision clarified on denial of reargument sub nom. In re Rural Metro Corp. Stockholders Litig.,* No. 6350-VCL, 2014 WL 1094173 (Del. Ch. 2014).
[418] *See, e.g.,* Emps. Ret. Sys. of the Gov't of the Commonwealth of P.R., *Official Statement for Senior Pension Funding Bonds, Series A,* 52 (2008).

resulted in injury to other creditors. Additionally, to the extent the banks obtained an undeserved benefit as a result of their role in the issuance and sales of Puerto Rico bonds to investors in Puerto Rico, an unjust enrichment claim might be available as well. This is particularly useful in instances where the banks have entered settlements without admitting wrongdoing, or where typical avenues for bringing claims has already been exhausted.

## 5. Potential Government Enforcement Actions, Civil Claims, and Avoidance Actions Arising from PREPA's Rates, Net Revenues, and the Debt Coverage Requirement and Related Representations Within Official Statements

As fully set out in Parts V and XVI.C.5(a)(i), there has been controversy over the sufficiency of PREPA's rates to cover its operational expenses, as well as PREPA's persistent collection issues, which further compromised PREPA's ability to cover its operating costs. PREPA's failure to maintain rates and collect revenues sufficient to cover its operating costs is about more than a failure of prudent business sense. As fully set out in Part XVI.C.5(a)(ii), PREPA is subject to the PREPA Trust Agreement, which imposes certain legal requirements on PREPA, its Executive Director, and its consulting engineer related to the setting and collection of rates.

Under the PREPA Trust Agreement, in order to issue bonds and while any bonds remain outstanding, PREPA is obligated to "fix, charge, and collect reasonable rates and charges so that revenues [would] be sufficient to pay [then and future] current expenses and to provide an amount of at least 120% of the aggregate principal and interest requirements for the [then] next fiscal year."[419] This is what is known as the "debt coverage requirement." Further, whenever PREPA issues a bond, PREPA's Executive Director and consulting engineer are responsible to calculate whether PREPA's net revenues satisfied its debt coverage requirement and to submit a certificate along with the Official Statement attesting to the fact that PREPA is able to meet the debt service requirement.[420]

### (a) Securities Actions Based on Possible Material Misstatements or Omissions

As noted in the general discussion of applicable securities laws above, municipal bonds are subject to the antifraud provisions of US federal and Puerto Rico securities laws. As relevant here, Section 17(a)(2) of the Securities Act, Section 10b of the Exchange Act (and corresponding SEC Rule 10b-5), and Section 851 of Puerto Rico's Uniform Securities Law prohibit issuers, underwriters, advisors and others parties involved with the offer and sale of a municipal bond from making any material misstatements or omissions in required disclosures to potential investors. Certain differences in the application of these statutes—such as who is authorized to enforce them and what level of intent or awareness with respect to the misstatement or omission they require to impose liability—have been discussed above and are repeated below only if relevant to the analysis.

---

[419] P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series A*, 13 (2013); Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 208(e), 502(A)(b) (Aug. 1, 2011) (on file with author).
[420] Trust Agreement from P.R. Elec. Power Auth. to U.S. Bank Nat'l Assoc. § 209 (Aug. 1, 2011) (on file with author).

The Independent Investigator's Final Investigative Report

From 1994 to 2013, PREPA issued over $13.5 billion in Revenue Bonds and Revenue Refunding Bonds. For each, PREPA's Executive Director signed off on the bonds and representations in the Official Statements, GDB supervised the bond issuance and approved it as fiscal agent, and the consulting engineer made various representations about the state of PREPA's infrastructure and finances.

Applying the law to these circumstances, it cannot be ruled out that each of PREPA, GDB, the consulting engineer, as well as the underwriters of the PREPA Bonds could be subject to potential liability for any material misstatements or omissions in the Official Statements. A new action seeking to impose such liability may be subject to the limitations period requiring private actions under US securities law to be commenced within two years after discovery of the facts constituting a violation of securities laws or a statute of repose requiring private investor actions under US securities law to be commenced within five years of the issuance of securities (here, by 2013) regardless of when facts are discovered indicating a material misstatement or omission has been made. Similarly, any SEC enforcement action may be subject to the five-year limitations period that is applicable to certain actions.[421]

PREPA and its Executive Director may also try to raise defenses to liability, called sovereign and qualified immunity, by arguing that PREPA is government agency and its executives are government actors not subject to being sued when in acting their official capacities. Based on the language of the PREPA Act that specifically authorizes lawsuits against PREPA and relevant case law,[422] we think it is unlikely that a sovereign immunity defense raised by PREPA would succeed.[423] Based on the language of the PREPA Act that specifically precludes liability against "any person executing the bonds" and relevant case law,[424] we think that PREPA's Executive Directors have a strong qualified immunity defense *if* they can prove that their conduct was reasonable or they lacked knowledge that it might be illegal to sign off on an official statement that included a known misrepresentation or omission.

In the event any action can be maintained notwithstanding these limitations and immunity defenses, we would expect it to focus on one or more of the following possible misstatements or omissions that we discovered in the course of our investigation.

_____

[421] 28 U.S.C. § 2462 (2018).

[422] *See* P.R. Laws Ann. tit. 22, § 193(b) (2018) ("The Authority hereby created is . . . a corporation having legal existence and personality separate and apart from that of the Government."); P.R. Laws Ann. tit. 22, § 196(d) (2018) ("The Authority is granted and shall have and may exercise all rights and powers necessary or convenient . . . [t]o sue and be sued, implead and be impleaded, complain and defend, in all courts."); s*ee also, e.g.*, *Riefkohl v. Alvarado*, 749 F. Supp. 374, 376 (D.P.R. 1990) ("PREPA is not immune from suit in federal court.").

[423] A potential plaintiff who pleads the existence of an alter ego relationship between PREPA and the Puerto Rico, however, may face obstacles in challenging a sovereign immunity defense.

[424] *See* P.R. Laws Ann. tit. 22,  § 206(f) ("Neither the members of the Board nor any person executing the bonds shall be liable personally on [for] the bonds or be subject to any liability by reason of issuance thereof."); *see also Acevedo v. Srio. Servicios Sociales*, 12 P.R. Offic. Trans. 317 (1982) (finding that, under Puerto Rico law, a government officer is immune from liability for any "good faith" exercise of discretion unless he acts "unreasonabl[y]" or if he should have known that [his conduct] was illegal" and "qualified immunity is available to officers of the executive branch" under Puerto Rico law for acts performed in the course of official conduct, when "the scope of discretion and responsibilities of the office […], coupled with good faith belief," provide "reasonable grounds" for the actions taken).

### (i)   The Sufficiency of PREPA's Rates to Cover Operating Expenses

Despite not raising its base rate for over thirty years, PREPA consistently represented to the public in Official Statements, signed by PREPA's Executive Director, that PREPA's rates were sufficient to cover operating expenses (in addition to other required reserves):

> Pursuant to the Trust Agreement, the Consulting Engineers have reviewed the Authority's rate schedules and believe that the Authority will receive sufficient Revenues to cover Current Expenses and to make the required deposits in the Sinking Fund, the Reserve Maintenance Fund and, if any are required, the Self-insurance Fund.[425]

Additionally, from at least 1994 to 2013, PREPA's consulting engineer included identical language in letters included with the Official Statements for PREPA's bonds representing the sufficiency of PREPA's rates:  "The Authority's electric rates and charges should generate sufficient revenues to pay its current expenses and debt service and to meet the Trust Agreement obligations for deposits into certain Funds from current operating revenues."[426]

Today, there is a consensus among PREPA's outside professionals—and PREPA, itself—that PREPA's rates were insufficient to cover its operating expenses.[427]  Indeed, in April 2017, PREPA admitted that, from 2011 to 2016, its rates were insufficient to cover overhead and operational costs:  "The current debt crisis was founded in years of rate deficits, during which operating expenses incurred were not recovered in rate Revenues."[428]

Given this admission, the primary factual defenses available to PREPA, GDB, the consulting engineer, and the PREPA underwriters would be if they could prove that they did not know and should not have known at the time of the issuances that PREPA's rates were not, in fact, sufficient to cover operating expenses. We view this as a somewhat weak defense, particularly to the extent that GDB, the consulting engineer, and the PREPA underwriters all denied having conducted their own due diligence when each arguably had an obligation to do so.

Specifically, in connection with the issuance of the debt service certificate, the former Project Manager from PREPA's consulting engineer told us that the consulting engineer based its certificate on figures provided to it by PREPA.  The consulting engineer relied upon these figures without reviewing any of PREPA's unaudited financials to confirm the veracity of the figures underlying the calculations. According to the witness, the certification letters were meant to certify that the revenue figure provided by PREPA was sufficient, but not that the

---

[425] *See, e.g.*, P.R. Elec. Power Auth., *Supplement to Official Statement, Power Revenue Bonds, Series AAA*, 41-42 (2010).

[426] *See, e.g.,* Letter from G. Romano, Jr., Consulting Group Manager, URS Corp., to P.R. Elec. Power Auth. (Apr. 22, 2010) (on file with the P.R. Elec. Power Auth.).

[427]

*Exploring Energy Challenges and Opportunities Facing Puerto Rico: Hearing Before the H. Comm. on Natural Resources*, 115th Cong. 2 (2016); *See* Fed. Oversight Mgmt. Bd.,, *Puerto Rico Electric Power Authority Fiscal Plan* 15 (2017).

[428] Fed. Oversight Mgmt. Bd., *Puerto Rico Electric Power Authority Fiscal Plan* 15 (2017).

revenue figure itself was accurate. Similarly, witnesses from GDB and various investment banks that underwrote PREPA bonds told us that the underwriters accepted PREPA's debt service calculations without conducting any of their own due diligence into the veracity of those figures.

> **(ii)** **The Inclusion Of Revenues PREPA Had No Intention Of Collecting Or Knew It Was Unlikely To Collect In The Debt Coverage Calculation**

As discussed in Part V, with regard to the debt coverage calculation, PREPA increased its revenue figure by including CILTs and other accounts receivable that it had reason to believe it would never collect in its revenues. There is evidence that both PREPA and GDB knew by 2012, at the very latest, that if PREPA had used a revenue figure that accurately reflected the amount of revenues it expected to, and did, collect, then PREPA would not be able to satisfy the required debt coverage needed to issue the Series 2013A Power Revenue Bonds. Despite all this, both PREPA and PREPA's consulting engineer signed off on the debt coverage calculations with the arguably inflated revenue figures and represented, albeit with qualifications, that the debt coverage met the requirements under the PREPA Trust Agreement.

Specially, according to a June 2012 presentation commission by GDB, if CILT had not been included in PREPA's revenues, then PREPA's debt coverage ratio for 2013 would have been only 1.06—below the amount required to issue the Series 2013A Power Revenue Bonds.[429] Nevertheless, despite this knowledge, PREPA issued its Series 2013A Power Revenue Bonds with GDB approval.

There also is evidence that PREPA overestimated its revenues in connection with the Series 2013A Power Revenue Bonds by an additional $25 million by being overly optimistic in the success of its theft prevention programs. Specifically, for fiscal years ending 2014 through 2018, PREPA projected that, through these theft prevention programs, it would recover $30 million in lost revenue every year.[430] In the Official Statement for the Series 2013A Power Revenue Bonds, PREPA included the estimated $30 million per year in additional revenues due to theft prevention in its debt coverage calculation.[431] During the fiscal year ending 2013, however, only $5 million of theft-related accounts receivable were successfully collected.[432]

In defense, PREPA and the PREPA Consulting Engineer will likely point to the disclosure in the Official Statements that the debt coverage calculation included CILTs:

> For purposes of the Trust Agreement, the Authority includes in its calculation of Revenues and Net Revenues . . . amounts billed to the municipalities for electric energy sales that the Authority is legally entitled to collect but historically has not collected because it instead

---

[429] Alvarez & Marsal, Presentation to the Government Development Bank of Puerto Rico, 49 (2012).
[430] URS Corp., *Fortieth Annual Report on the Electric Property of the Puerto Rico Electric Power Authority* 95 (2013).
[431] P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series A*, 64 (2013).
[432] P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series A*, 10 (2013).

offsets such billings against the CILT hat the Authority is requirement by law to pay the municipalities . . . .[433]

### (iii)     Use of Proceeds

As part of its investigation, the Independent Investigator, in consultation with the Special Investigation Committee, retained D&P, to undertake an analysis of the use of the proceeds of PREPA's public bond issuances from 2010 to 2013 (the last year in which PREPA issued bonds).  A full discussion of this may be found at Part VIII.  In summary, during that time, PREPA raised debt through ten issuances (including eight in 2010).  Much of the proceeds of those issuances were to be used to retire existing debt obligations (including outstanding bonds, as well as obligations under lines of credit extended by GDB and third party banks).  A dedicated portion of the proceeds of those issuances were, according to the offering documents, to be deposited in the Construction Fund, a  fund established under the PREPA Trust Agreement, which sets out the terms by which PREPA can borrow funds and then use those funds.   Generally speaking, the PREPA Trust Agreement provides that funds in the Construction Fund are to be used to build and improve infrastructure and capital projects, as well as for costs and expenses associated with those projects.

The analysis undertaken by D&P sought to determine how much of the bond proceeds allocated for the Construction Fund in the relevant period were reportedly used by PREPA for Construction Use – *i.e.*, investment in infrastructure and capital improvements projects.  Given the substantial amounts that PREPA raised in the capital markets, the state of disrepair of PREPA's operating grid following Hurricane Maria, and PREPA's decision to cancel previously announced infrastructure projects (such as the Via Verde pipeline project), questions naturally arise as to whether PREPA used the proceeds of bonds earmarked for the Construction Fund for non-Construction Use.

In undertaking its analysis, D&P used a methodology, described in detail at Part V, that generally compared the relevant bond proceeds earmarked for the Construction Fund with information in PREPA's financials and auditor work papers reflecting, for fiscal years ending 2010 through 2015, additions to PREPA's power-generating assets (*i.e.*, the Utility Plant Additions) and changes in restricted cash accounts used for infrastructure projects.  That analysis reflects, for the analyzed issuances and time period, that bond proceeds allocated for the Construction Fund exceed Utility Plant Additions (as adjusted by D&P) and changes in restricted cash accounts by several hundred million.  The analysis further shows that in fiscal year 2015, there was a substantial depletion of amounts held in PREPA's restricted cash accounts (based on publicly reported financials), without a corresponding increase in Utility Plant Additions.

Assuming for the moment that PREPA used bond proceeds earmarked for the Construction Fund for non-Construction Use, that does not, in and of itself, answer the question of whether that use violated applicable restrictions on PREPA's use of bond proceeds or otherwise gives rise to a claim.  For example, under the PREPA Trust Agreement, permitted uses of the Construction Fund encompass a range of cost categories that may not be reflected in an accounting-based analysis of Construction Use.  Accordingly, we expect this to be of further inquiry for interested parties.

---

[433] P.R. Elec. Power Auth., *Official Statement for Power Revenue Bonds, Series A*, 4 (2013).

The Independent Investigator's Final Investigative Report

Additionally, and separately, D&P's analysis uncovered material differences in PREPA's restricted account balances as reported in Puerto Rico's annual financial statements and as set forth in E&Y's work-papers, as described further in Part VIII.  We expect that this matter may also be of further inquiry to be pursued by interested parties.

### 6.  <u>Swaps</u>

As discussed in Part XIII, between 2004 and 2008, Issuers[434] entered into at least 77 interest rate swap agreements with bank counterparties.  Most of the Issuers' swaps were Synthetic Fixed Swaps used to hedge interest rate exposure of underlying variable interest rate bonds.  Two Issuers, Puerto Rico and PREPA, also entered into Basis Swaps, derivatives that do not hedge underlying bonds but instead exchange floating rate cash flows between the Issuer and its counterparty.  The steep fall in interest rates during and after the Great Recession left Issuers exposed to potential liabilities of about $1.32 billion, at one point, and had a significant effect on the value of Issuers' swaps and cash flow and financing needs.  All told, Issuers have paid their swap counterparties a net total of about $1.085 billion to unwind the swaps, mostly with funds raised through debt issuances.

This section analyses potential causes of action concerning these instruments and transactions.

### (a)  <u>Whether Swap Termination Fees Paid by Puerto Rico and the PBA Should Have Been Computed Towards the Constitutional Debt Limit</u>

Act 39 sets forth specific requirements on how to compute interest rate payments under the Swap agreements executed by Puerto Rico and PBA toward the Constitutional Debt Limit.[435]  But, with respect to termination fees paid by these entities, Act 39 expressly carves out any amount in termination fees for Puerto Rico Basis Swaps and all PBA Swaps from being a component of the service of the debt of Puerto Rico for purposes of Section 2 of the Article VI of the Constitution of Puerto Rico.[436]  Act 39, however, is silent about whether termination fees related to Puerto Rico's non-Basis Swaps, like Synthetic Fixed Swaps, should be counted toward the Constitutional Debt Limit.  An argument could potentially be raised that by excluding termination fees from the calculation of the constitutional debt limit, Puerto Rico issued debt in violation of the Constitutional Debt Limit.

In analyzing the disclosure language relating to Constitutional Debt Limit from fifteen GO Bond Official Statements, it appears that there is support for this being an open issue.  From

---

[434] As defined in GDB's Master Swap Policy, Issuers include Puerto Rico and its public corporations, municipalities and other instrumentalities.

[435] As stated in Part XIII, Act 39, dated August 1, 2005, replaced Joint Resolution No. 2104, enacted on September 30, 2004, which served the specific purpose of authorizing Puerto Rico to enter into interest rate exchange agreements in connection with its Public Improvement Refunding Bonds, Series 2004B.  Joint Resolution No. 2104 was the first regulation governing swap instruments.  Act 39, as emphasized in Part XIII, governs only variable interest rate obligations executed by Puerto Rico and PBA.  In addition, Act 39 applies only to Puerto Rico and PBA, and not to other issuers like GDB, PREPA, PRASA, COFINA, and HTA, whose obligations are not, per statute, considered an obligation or a debt of the Puerto Rico.  *See* P.R. Laws Ann. tit. 22 §§ 152(a) and 158(c) (PRASA); P.R. Laws Ann. tit. 22 § 210 (PREPA); P.R. Laws Ann. tit. 9 § 2012(h) (HTA).

[436] Act of Aug. 1, 2005, No. 39, 2005 P.R. Laws 97, 109, 118.

2006 to 2011, there were no references with respect to the treatment of Swap termination fees payments and Constitutional Debt Limit.  It is not until February 10, 2011, with the issuance of Public Improvement Refunding Bonds, Series 2011A, that specific language regarding swap termination fee payments is included:

> Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.[437]

Such disclosure was modified by the disclosure statement for the 2014 GO Bond Issuance.  The modified disclosure language concerning termination fee payments reads as follows:

> Any potential termination payment (which is a good faith and credit obligation of the Commonwealth) payable by the Commonwealth (which would be based on the then applicable mark-to-market value) upon termination of the applicable interest rate exchange agreement is not included in the calculation of the 15% constitutional debt limitation, because it is not a payment of principal of or interest on general obligation debt of the Commonwealth (*although the exclusion of such amounts from the debt limit has to this point never been ruled upon by any court*).[438]

The new language calls attention to the possibility of a court ruling on the constitutionality of termination fees paid by Puerto Rico in connection with Synthetic Fixed Swaps.  The fact is that termination fee payments to Swap counterparties can amount to a far higher liability for any municipal issuer than the interest payments under a swap agreement during a fiscal year, given that it is a lump sum disposal of potentially the amount of the debt obligation owed by the issuer in case an event of default is triggered.

As an example, as described in Part XIII, the amount of Swap termination fees paid solely by Puerto Rico and PBA was about $319 million, roughly one third of what Issuers paid in Swap termination fees between 2008 and 2014.  Such amount stands out when compared to the fixed interest payments computed toward the calculation of the Constitutional Debt Limit. In this sense, Puerto Rico or another party might contest termination fee payments made by Puerto Rico or PBA as unconstitutional due to their exclusion from the Constitutional Debt Limit calculation.   As a result, an argument could be raised that the portion raised by Puerto Rico and used to pay Swap termination fees was improper, and Puerto Rico could seek to declare this portion of its debt void.

In Part XIII, we address that following the enactment of Act 39, Puerto Rico issued a Master Swap Policy,[439] which states that GDB will track, evaluate and seek to mitigate a

---

[437] Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series A* (2011).

[438] Commonwealth of P.R., *Official Statement for General Obligation Bonds, Series A* (2014) (emphasis added).

[439] Gov't Dev. Bank for the Commonwealth of P.R., *Master Swap Policy* (Sept. 2005) (on file with author).

number of risks, including termination risks.  Such policy, however, mainly serves as guidance and not properly as a statute, which places a certain entity under non-compliance sanctions, such as Act 39.  An argument could be made that if Puerto Rico legislators decided to compute fixed interest payments related to swap agreements towards the calculation of the Constitutional Debt Limit, there would be no reason for leaving off a relevant and foreseeable liability under this same agreement which could potentially result in severely impacting the Issuers' cash flows and liabilities.  In other words, if the main obligation (the Swap agreement) is considered relevant for the purposes of calculating Puerto Rico's constitutional debt, then a relevant portion or contingency of it (the termination fee payments) should not be excluded from the same calculation.  This is particularly so considering that under Act 39, both the interest under the Swap agreement and the termination fee payments are backed by the good faith and credit of Puerto Rico.[440]  As such, there does not seem to be a meaningful reason why one would be counted toward the Constitutional Debt Limit, while the other is not.

Another issue related to this is whether these acts would be considered *ultra vires*, or without authority, if the Puerto Rico Constitution does not authorize it.  While a statute of limitations might be raised here given the timing of entry into and termination of the Swaps, the Supreme Court of Puerto Rico has made clear that, should a contract be left null and void, such contract is not subject to a statute of limitations defense.  This argument was raised in June 2016, by an audit report released by the Commission for Comprehensive Audit of Puerto Rico's Public Credit,[441] clarifying that the Supreme Court of Puerto Rico could hold that even if a debt that was issued thirty years ago, it could still be set aside as being unpayable.  The reason is because the statute of limitations does not apply to public or private contracts that are *nolo ab initio* since they were without legal effect in the first instance.[442]

**(b)** **Whether GDB Owed, or Breached, Fiduciary Duties by Not Complying With its Swap Master Policy**

In September 2005, GDB issued its Master Swap Policy to provide its professional staff, its Board of Directors, and the Issuers' guidance regarding the use of Swaps to manage Issuer debt obligations.[443]  In this section, we devote specific attention to items 4, 5, 8 and 9 of the policy, which set forth guidance for Swap procedure, permitted uses, risk management and reporting, respectively.

Item 4 stipulated that in order for a swap agreement to be approved, both the board of directors of the Issuer and GDB needed to sign off on the instruments.  The policy required GDB to give specific recommendations to the Issuer's board of directors based on an analysis that included, among other things: sensitivity analysis in various interest rate environments; alternatives for funding termination payments; the legal framework for the transaction within the context of Puerto Rico statutes; potential effects that the transaction might have on the credit ratings of the Issuer; the impact on the total amount of variable rate exposure; and the ability of the Issuer to handle (either directly or with the assistance of GDB) the administrative

---

[440] Act of Aug. 1, 2005, No. 39, 2005 P.R. Laws 97, 109, 118, Article 3, Section 5.

[441] P.R. Comm'n for the Comprehensive Audit of the Pub. Credit, *Pre-audit Survey Report* 23 (2016).

[442] *See Rios* v. *Municipio de Santa Isabela*, 159 D.P.R. 839, 849 (2003) (holding that actions to set aside public contracts as *nolo ab initio* are not subject to statute of limitations); *see also Guzmán Rodríguez* v. *Guzmán Rodríguez*, 78 D.P.R. 673 (1955) (holding that the statute of limitations only limits suits on private voidable contracts, not contracts that *nolo ab initio*).

[443] Gov't Dev. Bank for the Commonwealth of P.R., *Master Swap Policy*, page no. 1 (Sept. 2005) (on file with author).

burden imposed by the transaction, including payment processing, accounting and financial reporting requirements.

Item 5 outlines the permitted uses of the Swap agreements and explicitly states that GDB will consider the use of Swaps for Issuers[444] for purposes that include: managing the Issuers' exposure to floating and fixed interest rates; locking in fixed rates in current markets for use at a later date, through the use of forward Swaps, swaptions, rate locks, options, and forward delivery products; and reducing the cost of fixed or floating rate debt, through swaps and related products and other applications to enable the Issuer to increase income, lower costs, or strengthen its balance sheet. In addition, this item emphasizes that "no Swaps may be entered into for speculative purposes."[445]

Item 8 regulates one of the most important facets of the Swap agreements: risk management. This item states that in order to mitigate the risks associated with Swaps, GDB will perform a detailed evaluation and analysis of each Swap agreement (entered into by GDB and the Issuers) within a larger context of impact at both the Issuer level and at the level of Puerto Rico. Therefore, risk management outlined in the Master Swap Policy was based on a macro basis assessment, taking into consideration Puerto Rico's liabilities exposure as a whole. "Because of the size of the liabilities managed by GDB, and its established financial systems and controls, GDB will manage the risks and rewards of a Swap program alongside its overall financial risks and rewards."[446] Among the relevant risks GDB evaluated was termination risk, the risk that a Swap may be terminated prior to its scheduled maturity due to factors outside the Issuer's control; collateral posting risk, which is associated with the posting of collateral by an Issuer in the event of a credit downgrade or a market change; and basis risk, when, in a synthetic fixed rate structure, the floating rate of the Swap fails to offset the floating rate of the underlying liability.

Finally, item 9 sets forth reporting requirements for GDB. GDB was responsible for tracking and regularly reporting the financial implications of the Swaps each Issuer executed, issuing an annual report to be prepared by its board of directors. According to item 9, the report needed to include: a summary of the key terms of the agreements; the market-to-market value of the Swap; the amount of exposure that each Issuer had to each counterparty; any collateral postings; the status of any liquidity support used in connection with a Swap agreement; and an updated contingency plan to replace a terminated swap, or fund a termination payment in the event an outstanding swap is terminated. GDB would also perform any monitoring and reporting as required by CRAs to ensure compliance with FASB and GASB requirements.

Based on GDB's Master Swap Policy and on information we received from interviews conducted with Puerto Rico's swap advisors, it appears that that GDB controlled the Swap and borrowing process on behalf of the Issuers and was primarily responsible for monitoring Puerto Rico's Swap portfolio. GDB was also the main point of contact for all swap advisors hired and took the lead on all swap transactions for all Issuers. As we have learned from our investigation, GDB was the entity acting as the main advisor and agent for the Issuers with respect to the Swap agreements, taking the lead on all fronts; negotiating with swap financial

---

[444] Gov't Dev. Bank for the Commonwealth of P.R., *Master Swap Policy*, page no. 3 (Sept. 2005) (on file with author).
[445] Gov't Dev. Bank for the Commonwealth of P.R., *Master Swap Policy*, page no. 4 (Sept. 2005) (on file with author).
[446] Gov't Dev. Bank for the Commonwealth of P.R., *Master Swap Policy*, page no. 5-6 (Sept. 2005) (on file with author).

advisors and swap dealers. As a result, there is a good argument that GDB was required to adopt and follow its own guidance and procedures, such as items no. 4, 5, 8 and 9 described above, and, as the leading advisor for all Issuers, GDB may have had a duty to comply with its policies but failed to do so.

For example, it appears that GDB did not keep track of the trades and then when it failed to do so, it sought a swap advisor's assistance to map out Issuers' Swap exposure. As we reference in Part XIII, the incoming GDB administration hired, in 2009, a new swap advisor to monitor the Swap portfolio for changes in the portfolio's mark-to-market values, as well as the implications of changes in credit ratings. Although a former GDB manager told us that the Asset Liability Management Committee of GDB monitored the Swap portfolio, the new swap advisor said GDB provided a single spreadsheet with "one-liners" describing the Issuers' Swaps. It was the advisor's view that GDB did not "really know what they had" in terms of the Swap portfolio because the previous administration's recordkeeping had been inadequate.

Indeed, GDB was unable to provide the documentation associated with the Swaps, in particular those that set out the legal and business terms, including collateral posting terms, of the Swap agreements. The swap advisor then spent months tracking down the relevant documentation, in part by calling swap dealers and asking them if they had trades with Puerto Rico-Related Entities. Once the information was compiled, the swap advisor provided quarterly reports to GDB detailing each Issuer's Swap values, collateral posting requirements, and sensitivity analyses demonstrating the effects of potential credit rating downgrades and interest rates.

What makes this particularly problematic is that GDB hired this swap advisor in 2009, when all of the Swaps were in place and the bank started to terminate them. Based on these facts, a potential argument could be made that GDB breached its fiduciary roles as the leading swap advisor.

As referenced earlier in this Part, under Puerto Rico law, the statute of limitations for a breach of fiduciary duty claim extends three years from when plaintiff discovers "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[447] Accordingly, we expect interested parties may pursue arguments regarding when such discovery took place.

### (a)    Whether The GO Basis Swaps Were In Puerto Rico's Best Interest

As we explained in detail on Part XIII.C.2, in 2006, Puerto Rico entered into Basis Swaps with Goldman and Morgan Stanley, which generated an upfront cash benefit of about $100 million to Puerto Rico, but later exposed Puerto Rico to collateral calls from those counterparties, and, as a result, put pressure on Puerto Rico's finances. As discussed in detail in Part XIII.C.1, we spoke with a former high-level manager at GDB, who told us that Goldman's proposed Basis Swap generated disagreement among GDB management, the GDB Board, and the government about whether to proceed.[448] This former high-level manager also

---

[447] *See Segarra-Miranda v. Perez-Padro*, 482 B.R. 59, 69 (D.P.R. 2012); *See also* P.R. Laws Ann. tit. 32, § 261 (2018).

[448] As we mention in Part XIII, this former manager told us that the GDB Board, secretary of treasury, OMB and the Governor were all in favor of entering into the Basis Swap. Some members of GDB

The Independent Investigator's Final Investigative Report

drafted and provided to the GDB Board a memorandum outlining, among other issues, his opposition to the proposed GO Basis Swap.  As discussed, below whether these transaction were in Puerto Rico's best interests and if they were not, what liability might exist.

As per Article 3, Section 1(a) of Act 39:

> The Secretary of the Treasury is hereby authorized to negotiate and execute with any bank, investment bank or securities issuing bank or other financial institution, provided they have (directly or through guarantees) a high credit classification (of not less than investment grade), one or more qualified interest rate exchange agreements which the **Secretary may determine to be for the best interests of the Commonwealth** in relation to any other obligation of the Commonwealth, or otherwise, in relation to the management of the risks or costs of the Commonwealth related to the fluctuations in the interest rates, investments, changes in the level of prices or the credit risks of any obligation, or **in relation to obtaining economic benefits** equal to a reduction in the interest rates or in the service of the debt of the outstanding bonds **so as to generate credit for the Commonwealth of up to one hundred and sixty million dollars ($160,000,000) under the terms and conditions which the Secretary of the Treasure determines to be in the best interests of the Commonwealth.**

Act 39 confers in the Secretary of Treasury the authority to enter into basis swaps, which are characterized as included in the definition of qualified interest rate exchange agreements.  As we described in Part XIII.C and above, the purpose of basis swaps is to generate upfront payments, and based on the excerpt of Act 39, the Secretary of Treasury can only enter into a basis swap that will generate credit for Puerto Rico up to a limit of $160,000,000 and if it determines the agreement to be in the best interest of Puerto Rico.  In 2014, Puerto Rico terminated the GO Basis Swaps for approximately $26.2 million.  While this is far less than the $100 million Puerto Rico received upfront, in the interim, the GO Basis Swaps put liquidity pressure on Puerto Rico when Puerto Rico was forced to post collateral of as much as $241.4 million.[449]

There is evidence that Puerto Rico's contemplated entry into the GO Basis Swaps might have triggered a 2006 negative credit watch, followed by a downgrade of Puerto Rico's credit rating in 2007.  As discussed in Part XIII.C.1, in 2005, S&P told GDB it would downgrade Puerto Rico's credit rating if it entered into the then-proposed GO Basis Swap with Goldman.  That warning was followed by a March 2006 Negative/Credit Watch report from S&P that referenced the GO Basis Swaps (although the report does not state its reason for the negative watch, and does not mention the forthcoming S&P downgrade that took place in 2007).[450]  Puerto Rico entered into the GO Basis Swaps in June 2006.  When S&P downgraded Puerto Rico in 2007, it did not reference the GO Basis Swaps.  Nevertheless, and while acknowledging

---

management, however, opposed the proposed Basis Swap.  As discussed, below one member of GDB management resigned when the GDB Board indicated its intention to proceed with the Basis Swap.

[449] *See* Commonwealth of P.R., *Official Statement for Public Improvement Refunding Bonds, Series 2009 B*, I-42 (2009).

[450] Standard & Poors, Puerto Rico Debt Ratings Placed On CreditWatch Negative; Persistent Structural Imbalance Cited (2006).

that our investigation has the benefit of hindsight, our investigation still reveals facts, as detailed in Part XIII, such that we cannot exclude the possibility that a party in interest could argue that the GO Basis Swaps were not in the best interest of Puerto Rico. Even assuming that the transactions were not in the best interests of Puerto Rico, however, it is unclear whether that alone would be sufficient for a claim. For example, one may be able to argue that for the section to be violated, the Secretary of the Treasury had to determine, at the time, the transaction was not in Puerto Rico's best interest and decided to proceed anyway.

### 7.    Credit Rating Agencies

We have also considered whether any CRAs may be subject to liability for having assigned higher-than-merited credit ratings to financial institutions that ultimately went bankrupt, as well as to securities that carried higher risks of default than the assigned credit ratings indicated. We specifically considered whether the CRAs had a duty or obligation to seek third-party confirmations or perform independent due diligence of information supplied to them by issuers above what their own methodologies required, and whether the CRAs breached such a duty or obligation in a manner that would render them susceptible to a private cause of action.

Despite Puerto Rico's worsening financial crisis and the poor performance of certain issuers, the CRAs rated the majority of Puerto Rico-Related Bonds as investment-grade until they ultimately reduced the GO Bonds and certain other issuances to non-investment-grade starting in February 2014. Based on the evidence available to us, we identified possible vulnerabilities in the CRAs' processes and procedures. In particular, the CRAs' analyses were largely Issuer-driven and relied on Issuer-supplied information, regardless of indicia that such reliance may not have been entirely prudent under the circumstances.

We also discovered evidence suggesting that, in hindsight, there may have been reason for the CRAs to take earlier or more aggressive action to change the positive ratings of certain bond issuances. At least some of the analysts with whom we spoke identified long-standing concerns about these bonds, and a review of agency reports from between January 2006 and July 2014 demonstrates that similar concerns surfaced multiple times. We also found evidence that certain analysts were skeptical of Issuer-supplied information upon which the agencies relied in awarding positive ratings. For more details regarding our investigation of the CRAs, see Part X.

Yet, based on our review, it would be difficult for a private plaintiff or government regulator to establish a viable cause of action against a CRA merely because it provided a high-than-merited credit rating. As discussed in Part X, the Reform Act erected a statutory bar that prohibits SEC and certain other authorities from regulating the substance of the CRAs' criteria or methodologies.[451]  In addition, we found no evidence that the CRAs circumvented or deviated from existing conflict-separation or other protections with respect to Puerto Rico-Related Bonds.  In the absence of evidence related to fraudulent or other intentional misconduct, it is unlikely that claims against the CRAs would succeed.

---

[451] *See* 15 USC § 78o-7(c)(2) (1934) ("Notwithstanding any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings.").

# PART XVII
# PUBLIC COMMENTS

# PART XVII
# PUBLIC COMMENTS

We established a dedicated e-mail inbox in advance of the public conference call we held on April 9, 2018.  We reviewed all e-mails that we received and then addressed several areas of public inquiry.  We summarize those areas of inquiry below.

- One writer asked about the extent to which we investigated the creation and use of COFINA. As outlined in the Independent Investigator's second interim report and in Part VI of this Report, we interviewed key officials and employees from the Puerto Rico government, Department of Treasury, and GDB.  The witnesses included *empleados de confianza* as well as career employees who: (i) worked at those institutions when COFINA was created; or (ii) worked at those institutions when COFINA funds were used for deficit financing.  We also spoke with outside professionals and consultants who advised the Puerto Rico government and/or GDB regarding COFINA-related matters, and we analyzed a range of COFINA-related documentary evidence.  The results of our investigation into COFINA, together with related recommendations, are set forth in Part VI of this Report.

- A different writer asked about PREPA's infrastructure maintenance and capital improvement projects.  As part of our investigation, we interviewed witnesses, analyzed documentary evidence, and otherwise assessed the extent to which PREPA Bond proceeds were used for those purposes.  We also compared the uses of PREPA Bond proceeds to the stated uses identified in the relevant offering documents or in PREPA's public reports.  The results of our investigation into these and other PREPA-related issues are set forth in Part V of this Report, together with related recommendations.

- We also received public comments asking whether we would investigate potential conflicts of interest involving current or former GDB officials, including certain

The Independent Investigator's Final Investigative Report

members of the Oversight Board who previously served at GDB.  As part of our work, we interviewed various current and former GDB officials, as well as members of OGEPR, and each member of the Oversight Board who currently or previously worked at GDB.  We also reviewed relevant documentary evidence, including legal opinions that OGEPR issued regarding screening requirements and the transitions of incoming or outgoing GDB officials.  As detailed more fully in Part XII of this Report, we cannot conclude based on this evidence that any individual we considered failed to comply with applicable ethics requirements.

- We also received requests that we interview individuals who served as Governor during the Relevant Period. We interviewed four former Governors about various issues.  The relevant highlights from those interviews are captured in Part IV, Part XII, and elsewhere in this Report, as appropriate.

APPENDIX A

# Appendix A: Defined Terms

| Term | Meaning |
|---|---|
| 103 Bonds | Collective reference to municipal bonds for which, under Section 103 of the Tax Code (26 U.S.C. § 103 (2016)), the interest income received is excluded from federal income tax. |
| 1940 Act | Short-form reference to the Investment Company Act of 1940, which subjects most mutual funds in the US to a variety of regulations governing disclosure requirements, borrowing limitations, transactions with affiliates, and other features. |
| 1954 PR Act | The Investment Companies Act of Puerto Rico (Act No. 6 of October 19, 1954), which provides a legal structure for the creation and administration of investment companies in Puerto Rico. |
| 2006 Consent Decree | Comprehensive civil settlement between PRASA and the US Government related to PRASA's 2006 guilty plea to fifteen felony counts of violating the Clean Water Act (which resulted in a record-breaking $9 million criminal penalty and $1 million in fines, among other things). |
| 2013 Audit | Short-form reference to Puerto Rico's retention of KPMG to audit the consolidated financial statements for the fiscal year-ended 2013. |
| 2014 Audit | Short-form reference to the audit for the fiscal year ending June 30, 2014, during which KPMG as independent auditor disagreed with how a specific COFINA transaction involving PRIFA had been recorded, after PRIFA became a Component Unit that was "blended" with Puerto Rico for purposes of financial reporting. |
| 2014 GO Bond Issuance | Reference to the approximately $3.5 billion of GO Bonds that Puerto Rico issued in 2014 with approval in its capacity as fiscal agent. |
| 25% Concentration Rule | Reference to the limitation pursuant to Section 666 of the Puerto Rico Investment Companies Act No. 6 that restricts Puerto Rico closed-end funds to a concentration of 25% in a single issuer. |
| 67% Investment Requirement | Reference to the limitation pursuant to Section 666 of the Puerto Rico Investment Companies Act No. 6 that requires closed-end funds to invest up to 67% of aggregate fund assets in qualifying Puerto Rico assets to be sold on a tax-exempt basis to Puerto Rico residents. |
| 936 Companies | US Companies granted a tax exemption from income originating from US territories, per 26 U.S.C. § 936. |
| AABD | Acronym for Aid to the Aged, Blind, and Disabled |
| AAFAF | Spanish-language acronym for Puerto Rico Fiscal Agency and Financial Advisory Authority (*Autoridad de Asesoría Financiera y Agencia Fiscal*). |
| Accrual Basis | A method of accounting pursuant to which revenue is recorded as soon as it has been earned and expenses are recorded as soon as they have been incurred (regardless of when the revenue has been received or when the liability has actually been paid). |
| Accrued Actuarial Liability | Term for today's value of the cost of future benefits that a pension is obligated to satisfy. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| ACIR | Acronym for Advisory Commission on Intergovernmental Relations. |
| Act 116 | Reference to Puerto Rico's Act 116 of 2011 (approved by the Legislative Assembly on July 6, 2011, and signed into law by Governor Fortuño) that amended Act No. 447 of May 15, 1951, to increase employer contributions and prevent ERS from assigning or pledging them as collateral to take on loans. |
| Act 1-2009 | Reference to Puerto Rico's Act No. 1, signed into law on January 14, 2009, that further amended Act 91-2006 to increase the portion of the SUT revenues allocated to COFINA and to expand the permitted uses of COFINA bond proceeds. This Act allowed COFINA Bond proceeds to be used for a number of purposes beyond paying or refinancing extra-constitutional debt, including to fund the government's general operating expenses. |
| Act 291-2006 | Reference to Puerto Rico's Act 291 of December 26, 2006, which amended Act 91-2006. |
| Act 39- 2005 | Act No. 39 of the Legislative Assembly of Puerto Rico, H.B. 1266 (Aug. 1, 2005). |
| Act 447 | Refers to Puerto Rico's Act No 447 of May 15, 1951, which created the Employees Retirement System of the Government of Puerto Rico. |
| Act 56-2007 | Puerto Rico's Act No. 56 of July 5, 2007, which further amended Act 91-2006, after it had already been amended once through Act 291 of December 26, 2006. |
| Act 7-2009 | Reference to Puerto Rico's Act No. 7, signed into law on March 9, 2009, that created the "Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico," pursuant to Article VI, Section 8 of the Puerto Rico Constitution. |
| Act 83 | Puerto Rico's Act No. 83 of May 2, 1941. |
| Act 91-2006 | Act No. 91 of May 13, 2006 (as amended from time to time) that created COFINA |
| Actual Case or Controversy | A legal term of art that refers to whether there is a true dispute for a court to resolve. It is one component of a prerequisite to court access that is known as "legal standing." |
| Actually Fraudulent | In the context of fraudulent transfers, a transfer made with actual intent to hinder, delay, or defraud a creditor. |
| Additions | Reference to the annual increases in the general ledger category—referred to as "Utility Plant in Service"—that PREPA uses to describe its generation, transmission and distribution resources and other charges. |
| AEELA | Spanish-language acronym for Puerto Rico Commonwealth Employees Association (*Asociación de Empleados del Estado Libre Asociado de Puerto Rico*) |
| Affiliate | Any person or entity that owns or shares common ownership with the debtor. |
| Affiliated Transactions | Refers to sales of securities from the underwriting division of a bank into the managed funds of an affiliated entity of the bank. |
| AFICA | Spanish-language acronym for Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority (*Autoridad para el Financiamiento de Facilidades Industriales, Turísticas, Educativas, Médicas y de Control Ambiental*). |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
| --- | --- |
| Allowed Claim | A claim is "allowed" when it has been deemed approved for payment. |
| AMA | Spanish-language acronym for Puerto Rico Metropolitan Bus Authority (*Autoridad Metropolitana de Autobuses de Puerto Rico*) |
| Amended PRASA Trust Agreement | The Amended and Restated Trust Agreement pursuant to which PRASA issued certain PRASA Bonds in 2012. |
| Analyst | See "CRA Analyst" |
| Appropriation Debt | Puerto Rico debt that is payable solely from legislative appropriations, with no identified source of repayment, and that is not backed by Puerto Rico's full faith, credit and taxing power.   Synonym for "Extraconstitutional Debt." |
| Arbitrage | A strategy whereby the issuer borrows money in order to invest the proceeds on the expectation that its return on those investments will exceed the costs of the borrowing. |
| Asset Coverage Ratio | Used to express the ability of a company, fund, or other organization to cover debt obligations with existing assets.  Asset coverage ratios are the inverse of Leverage Ratios, and are calculated by dividing total assets by total debt. |
| Avoid or Avoidance | In the context of our overview of Insolvency Claims in Part XI, the "undoing" of certain pre-bankruptcy transfers by a debtor. |
| Balanced Budget Clause | Article VI, Section 7 of the Puerto Rico Constitution. It provides: "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." |
| Barclays | Barclays Capital Inc. |
| Basis | Term of art used in the accounting field as a synonym for "method." |
| Basis Swap | Refers to a bet between an issuer and its counterparty or counterparties based on the movements of two different interest rates, usually, a taxable rate such as LIBOR, and a tax-exempt rate, such as the SIFMA Municipal Swap Index. |
| Blended | Auditing reference to a type of Component Unit for which the accounting is reflected on Puerto Rico's financial statements. |
| CA Committee | California's Pension Obligation Bond Committee |
| CA Pension Obligation Bonds | Short-form reference to California's proposed $960 million pension obligation bond offering in 2004, which was invalidated prior to issuance. |
| CAA | Acronym for "Clean Air Act" |
| CAB | Capital appreciation bonds, which are a type of municipal security for which principal and interest are paid in one lump sum on the maturity date in lieu of payments over time. |
| CAFRs | Comprehensive Annual Financial Reports |
| Capital Improvement Fund | An account created by the PREPA Trust Agreement, which is used to pay certain costs cost that have not otherwise been provided for from the proceeds of bonds. |
| Career Employees | Government employees in Puerto Rico who may only be removed from their positions for just cause, after the due filing of charges. |
| Cash Basis | A method of accounting pursuant to which revenue is not recorded until cash is actually received, and expenses are not recorded until they have |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| | actually been paid (regardless of when the subject became entitled to the revenue or liable for the expense). |
| CDA | Continuing Disclosure Agreement |
| CEFs | Closed-end funds, which are a type of mutual fund that issues a fixed number of shares in an initial public offering, which then trade in the secondary market. CEFs are not obligated to repurchase shares from investors upon request. |
| Certificate of Borrowing Power | Reference to the "Certificate as to the Borrowing Power of the Commonwealth of Puerto Rico" that the Secretary of the Treasury issued in connection with each GO Bond offering, under Section 2 of Article VI of the Commonwealth Constitution, which sets out the figures for the Debt Limit Calculation. |
| CFTC | US Commodity Futures Trading Commission |
| Choice of Law | A two-step process in which first, the court identifies which jurisdiction's choice of law rules should apply. Because different jurisdictions vary in how they choose which body of law should govern a case, courts must begin by determining which jurisdiction's rules to use in choosing the right law. Second, using those rules, the court determines which jurisdiction's substantive body of law should control the causes of action at issue in the case. |
| CILT | Acronym for "contributions in lieu of taxes" |
| Clawback Provision | Short-form reference to a combination of certain portions of Article VI, Section 8 of the Puerto Rico Constitution, and Article VI, Section 2 of the Puerto Rico Constitution. The relevant portion of Section 8 provides: "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."<br><br>The relevant portion of Section 2 provides: "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof. [As amended by the voters at a referendum held Dec. 10, 1961.]" |
| Clawback Right | The right of GO Bondholders to have Puerto Rico apply available revenues to the payment of GO Bonds in case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, in accordance with the Clawback Provision. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Clean Audit Opinion | An opinion that an auditor provides when the auditor is entirely satisfied with the degree of transparency provided by the subject of the audit, and concludes that the financial statements that management prepared for that entity accurately represent the entity's financial condition. See also "Unqualified Audit Opinion." |
| Cleary | Cleary Gottlieb Steen & Hamilton LLP |
| Code of Ethics | Reference to Puerto Rico's collection of statutory prohibitions on unethical conduct as defined in Puerto Rico's Government Ethics Act of 2011 and/or its predecessor, the Puerto Rico Ethics in Government Act of 1985. |
| Codification | Process through which auditors incorporate figures for Component Units into Puerto Rico's financial statements. |
| COFINA | Puerto Rico Sales Tax Financing Corporation (*Corporación del Fondo de Interés Apremiante* in Spanish) |
| COFINA Bonds | Bonds that COFINA issued. |
| COFINA Senior Bondholders | Collective reference to holders of senior bonds issued by COFINA who, in one of the adversary proceedings stemming from the Title III Proceedings, have argued that, due to the nature of Puerto Rico's guarantees, the "rental obligations and payments" by Puerto Rico should have been included as future debt service payments in the Debt Limit Calculation. |
| Commissioner on Elections | Puerto Rico Commissioner on Elections |
| Component Unit | An entity that is sufficiently related to the Government of Puerto Rico to require that the entity be included in Puerto Rico's external financial reporting in a given fiscal year. |
| Constitutional Debt Limit | The portion of Section 2 of Article VI of the Puerto Rico Constitution that limits the amount of general obligation debt that Puerto Rico can issue based on a multi-part calculation that considers the relationship between future debt service payments, prior year guarantee payments and average revenues. |
| Construction Fund | An account created by the PREPA Trust Agreement that holds "the proceeds of any bonds issued for the purpose of paying the cost of Improvements" to PREPA's system. |
| Construction Use | Reference to use of funds for construction activity for infrastructure and capital improvements, in connection with our analysis of the use of funds from PREPA Bond issuances during the Subject Period. |
| Constructively Fraudulent | The debtor received "less than a reasonably equivalent value," *and* was, among other things, insolvent, left with "unreasonably small capital," or unable to pay its debts as such debts matured, when or immediately after the transfer was made or the obligation was incurred. |
| Conway | Conway MacKenzie, Inc. |
| Conway Report | Reference to October 2010 report that Conway issued. |
| Cooperation Agreement | A cooperation and non-disclosure agreement entered into between the Unsecured Creditor Committee and the Independent Investigator. |
| COP | Certificates of Participation. Pension-related obligations held by the City of Detroit, Michigan and issued between 2005 and 2006. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Counterparty Risk | A risk associated with swaps that the counterparty will not be able to pay the issuer in the event interest rates fluctuate in the issuer's favor. |
| CRA Analyst | Reference to employee of any of the three CRAs that rated Puerto Rico-Related Bonds during the Relevant Period, as defined in Part X.  Alternate reference for "Analyst" in that Part. |
| CRAs | Collective reference to the three NRSRO credit rating agencies that rated Puerto Rico-Related Bonds during the Relevant Period: (i) S&P; (ii) Moody's; and (iii) Fitch. |
| Creditor | For purposes of the Bankruptcy Code, an entity holding "a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." |
| CSA | Reference to the Credit Support Annex, a section of the form swap agreement that identifies the amount of collateral to be posted, among other business and legal terms. |
| CUSIP | Acronym for "Committee on Uniform Security Identification Procedure" numbers, which are nine-character codes akin to serial numbers that are used to identify securities. |
| CWA | Acronym for Clean Water Act. |
| CWIP | Acronym for Construction Work in Progress, a subset of PREPA's Utility Plant in Service. |
| D&P | Reference to Duff & Phelps, a financial advisory firm that worked at the direction and instruction of the Independent Investigator for purposes of certain analyses, as specified elsewhere in this Report. |
| Debt Limit Calculation | A multi-part calculation of the mathematical relationship between future debt service payments, prior-year guarantee payments and average revenues that determines the Constitutional Debt Limit. |
| Debt Maturity Provision | Reference to a portion of Section 2 of Article VI of the Puerto Rico Constitution that provides that no GO Bonds or notes "for any purpose other than housing facilities shall mature later than 30 years from their date and no bonds or notes issued for housing facilities shall mature later than 40 years from their date." |
| Debtor | Someone who owes an obligation to another, typically an obligation to pay money. |
| December 2013 Letter | A reference to the letter that certain GDB Board members and high-ranking GDB officials sent to Governor García Padilla on December 4, 2013. |
| Declaratory Judgment | Reference to court relief available pursuant to Rule 59.2 of the Puerto Rico Rules of Civil Procedure.  Pursuant to that rule, every person "whose rights, status or other legal relations are affected by any statute . . . may apply for a decision on any difference in the validity of said statutes . . . and also a declaration of rights, status or other legal relations derived therefrom." |
| Deloitte | Deloitte & Touche LLP |
| Detroit Swap Counterparties | Refers to UBS A.G. and SBS Financial. |
| Disallow | In the context of our discussion in Part XVI, the refusal to recognize a claim to a share in bankruptcy distributions asserted by the recipient of the transfer until the property is returned to the trustee. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Diversified Companies | Per Section 5(b)(1) of the 1940 Act, diversified companies are investment companies which hold assets, at least 75% of which are comprised of cash, government securities, securities of other investment companies, and securities of other issuers, with no more than 5% of their total investment in securities from any one issuer. Additionally, the 5% invested with a particular issuer cannot contain more than 10% of that issuer's voting securities. |
| Document Preservation and Request Letters | Letters sent by the Independent Investigator that identified various categories of documents that the Independent Investigator deemed relevant to the Informal Investigation and requested that the recipients preserve and produce any responsive documents in their possession, custody, or control. |
| Dodd-Frank Act | Short form reference to the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. |
| DTPW | Puerto Rico Department of Transportation and Public Works (*Departamento de Transportación y Obras Públicas* in Spanish) |
| Due Diligence | The underwriters' investigation process. |
| EMMA | Electronic Municipal Market Access system. |
| *Empleados de Carrera* | See "career employees." |
| *Empleados de Confianza* | Government employees in Puerto Rico who are politically appointed and employed "at will." They may be removed for any reason (or no reason at all). |
| Employer Contributions | Refers to the statutory stream of payments made each payment period by Puerto Rico's participating public employers to fund the Employees Retirement System of the Government of Puerto Rico's pension obligation bonds. |
| EPA | US Environmental Protection Agency. |
| ERS | Retirement System for Employees of the Government of the Commonwealth of Puerto Rico, formerly known as the Employees Retirement System of the Insular Government of Puerto Rico and its Instrumentalities (*Sistema de Retiro de los Empleados del Gobierno del Estado Libre Asociado de Puerto Rico* in Spanish). |
| ERS Board | The Board of Trustees for the Employees Retirement System of the Government of Puerto Rico, which controls the governance and operation of the system. |
| ERS Bonds | The nearly $3 billion in aggregate principal amount bonds that ERS issued in 2008. |
| ERS Enabling Act | Puerto Rico's Act No. 447 of May 15, 1951. |
| ERS Series A Bonds | The first series of pension obligation bonds issued by the Employees Retirement System of the Government of Puerto Rico, totaling approximately $1.6 billion. |
| ERS Series B | The second series of bonds issued by the Employees Retirement System of the Government of Puerto Rico, totaling approximately $1 billion. |
| ERS Series C | The third series of bonds issued by the Employees Retirement System of the Government of Puerto Rico, totaling approximately $300 million. |
| ERS/GDB Decision-Makers | Collective reference to the GDB administration in 2008 and management at ERS. |
| Ethics in Government Act | Reference to the Puerto Rico Ethics in Government Act of 1985. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|------|---------|
| Exchange Act | Reference to the Securities Exchange Act of 1934. |
| Extraconstitutional Debt | See "Appropriation Debt." |
| FACT | Fullerton Association of Concerned Taxpayers |
| FDCPA | Federal Debt Collections Procedure Act |
| FEMA | US Federal Emergency Management Agency |
| FIA Fund | *Fondo de Interés Apremiante* (in English, the "Dedicated Sales Tax Fund"), a fund that holds the portion of the SUT that is allocated to COFINA. |
| FICO Score | A type of proprietary consumer borrower credit score that the Fair Isaac Corporation generates. Lenders use FICO scores, along with other details on borrowers' credit reports, to assess individual borrowers' credit risk and determine whether to extend credit. |
| Fiddler | Fiddler González & Rodríguez PSC |
| Financial Institution | Reference to certain financial market participants, for purposes of our discussion of certain types of claims in Part XVI. |
| FINRA | US Financial Industry Regulatory Authority |
| Fitch | Fitch Ratings |
| FMAP | Federal Medical Assistance Percentage |
| FOAs | Fiscal oversight agreements that GDB and certain Puerto Rico-Related Entities entered into beginning in 2009. |
| Formal Investigation | Any formal inquiry or review of Relevant Activities undertaken by the Board pursuant to PROMESA Section 104(o) or any other authority invested in the Board pursuant to PROMESA, for which inquiry or review the Board or its designated agent has adopted an Investigative Resolution. |
| Fraudulent Transfer | A transfer of an interest in property for little or no consideration, made for the purpose of hindering or delaying a creditor by putting the property beyond the creditor's reach. |
| Fund Leverage | Refers to borrowing and issuing debt and preferred shares to increase a fund's portfolio assets. Synonym for "Structural Leverage." |
| Funding Ratio | The value of a pension's assets expressed as a percentage of its accrued actuarial liabilities. |
| GAAP | Generally Accepted Accounting Principles |
| GASB | Governmental Accounting Standards Board |
| GDB | Government Development Bank for Puerto Rico (*Banco Gubernamental de Fomento* in Spanish) |
| GDB Board | Board of Directors of GDB |
| GDP | Acronym for "Gross Domestic Product." A calculation that places a market value on the total amount of goods produced and services provided in a country during one year. |
| General Fund | The primary accounting fund that a government authority uses for operations. Puerto Rico's general fund includes the Department of Treasury's tax revenue collections, as well as all inflows from internal and external sources that are not subsumed within more specific funds. |
| GFOA | Government Finance Officers Association |
| GFOA Certificate | GFOA's award, in the form of a Certificate of Achievement for Excellence in Financial Reporting, to reporting entities that have issued their CAFRs by no later than the six-month anniversary of the relevant fiscal year-end. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
| --- | --- |
| GNP | Acronym for "Gross National Product." A calculation of the market value of an economy's domestic output of goods and services, plus the amount a country earns from overseas investments, less overseas remittances. |
| GO Basis Swaps | Refers to two 2006 Puerto Rico Basis Swap agreements with Goldman and Morgan Stanley, respectively. |
| GO Bond | General Obligation Bond |
| GO Bondholders | Bondholders who purchased Puerto Rico's GO Bonds |
| Going Concern | An auditor reference for an entity that does not face the threat of liquidation in the foreseeable future |
| Goldman | Goldman, Sachs & Co. and its affiliated entities |
| Good Faith | Refers to courts that "have applied an 'objective' or 'reasonable person standard'" in determining whether a transferee should have been on notice of a debtor's fraudulent intent or possible insolvency. |
| Good-til-cancel (GTC) | An order placed by an investor to buy or sell a security at a specific price. The order remains active until it is either executed at that price or cancelled by an investor. |
| Government Accountability Office | Reference to the US Government Accountability Office (also known at one point as the US General Accounting Office) |
| Government Employers | Refers collectively to Puerto Rico, its agencies, instrumentalities and public corporations, in their capacity as employers. |
| Government Ethics Act | Reference to Puerto Rico's Government Ethics Act of 2011 |
| GRE | Acronym for a "government-related entity," as that term of art is used in specified criteria of S&P.  S&P used the GRE criteria when evaluating PRASA Bonds. |
| Great Recession | The economic downturn that began in or around 2008 for the US mainland, and slightly earlier (approximately 2006) for Puerto Rico |
| Gross Negligence | Some courts have defined that term to mean conduct that "smacks of intentional wrongdoing" or "evinces a reckless indifference to the rights of others. |
| Hawkins | Hawkins Delafield & Wood LLP |
| Hedge | Refers to the action to protect against financial risk and potential future losses, such as with the use of interest rate swaps. |
| HFA | Puerto Rico Housing Finance Authority (*Autoridad para el Financiamiento de la Vivienda* in Spanish) |
| HRSA | United States Health Resources and Services Administration |
| HTA | Puerto Rico Highways and Transportation Authority (*Autoridad de Carreteras y Transportación* in Spanish) |
| IMF | International Monetary Fund |
| Independent Investigator | Kobre & Kim LLP |
| Individual Leverage | Refers to the various mechanisms that individual investors used to leverage their positions in closed-end funds through the use of repurchase agreements, traditional margin accounts, or lines of credit. Synonym for "Portfolio Leverage" |
| Informal Investigation | Any inquiry or review of Relevant Activities undertaken by the Board pursuant to PROMESA Section 104(o) or any other authority invested in the Board pursuant to PROMESA for which the Board has not adopted an Investigative Resolution. (PROMESA Investigative Procedures § 3.1.) |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Insider | (i) If the debtor is a municipality, an elected official of the debtor or relative of an elected official of the debtor; (ii) a managing agent of the debtor; (iii) an "affiliate" of the debtor; and (iv) any insider of an affiliate. |
| Insolvency Claims | Legal claims related to a party's inability to pay debts as they fall due, often litigated in a US Bankruptcy Court. |
| Insolvent | Refers to when the municipality is "(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) unable to pay its debts as they become due. |
| Institutional Bond Market | One of two markets, along with the Retail Bond Market, into which Puerto Rico issued bonds are sold.  In Puerto Rico, the institutional market is dominated by Puerto Rico closed end funds, which securitized the bonds into shares that were then sold to Puerto Rico investors. |
| Institutional Investors | Organizations that trade securities in large quantities.  Generally, commercial banks, mutual funds, hedge funds, pension funds, and insurance companies are considered institutional investors. |
| Institutional Leverage | The volume of assets held by a Local CEF which is purchased with borrowed money, for example, through reverse repurchase agreements.  Also referred to as Structural Leverage. |
| Investigative Subpoenas | Defined in Section 1.3(a)(16) of the PROMESA Investigative Procedures to mean a subpoena issued by the Oversight Board or its authorized agent pursuant to PROMESA Section 104(f)(i), substantially in the form of an exhibit attached to the Investigative Subpoenas Resolution. |
| Investigative Subpoenas Resolution | A resolution approved by the Special Investigation Committee, acting on behalf of the Oversight Board, Initiating Formal Investigation for Purpose of Issuing Investigative Subpoenas. |
| Investor Call | The investor call that GDB hosted on October 31, 2013, concerning the COFINA Senior Series Offerings. |
| IRS | Internal Revenue Service |
| ISDA | International Swaps and Derivatives Association |
| ISDA Agreement | Refers to an International Swaps and Derivatives Association agreement. |
| ISDA Protocol | Refers to the ISDA August 2012 D-F Protocol, issued to amend any existing master agreements and to allow end-users to make representations that enable a swap dealer to trade with them. |
| Issuers | The sub-set of Puerto Rico-Related Entities that issued Puerto Rico-Related Bonds during the Relevant Period. |
| JCOPE | Acronym for New York State Joint Commission on Public Ethics. |
| Junk Bond | A bond to which a credit rating agency has assigned a credit rating that is below investment-grade on that credit rating agency's scale. |
| KPMG | KPMG LLP |
| La Crudita | Spanish-language reference to the gas tax. |
| LDI | Liability-driven investment |
| Lehman | Lehman Brothers |
| Leverage Ratio | Ratio used to express the ability of a company, fund, or other organization to cover debt obligations with existing assets.  Leverage ratios are the inverse of Asset Coverage Ratios, and are calculated by dividing total debt by total assets. |
| LIBOR | London Inter-bank Offered Rate |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
| --- | --- |
| Local CEFs | Collective reference to the thirty-five Puerto Rico-based CEFs sponsored or co-sponsored by UBS Financial Services Incorporated of Puerto Rico, Popular Securities LLC, and Santander Securities LLC. |
| Local Market | See Non-103 Market. |
| LOCs | Lines of Credit |
| MAC | New York City Municipal Assistance Corporation, established in the 1970s to issue specific tax revenue bonds to address New York City's then-fiscal crisis. |
| Mainland Market | See 103 Market. |
| Maintenance Call | An order for an investor to deposit additional funds into his or her margin account when the value of securities in the account falls below a certain minimum. |
| Margin Payments | One of two types of transfers that are exempt under the Safe Harbor, as discussed in Part XVI of this Report. |
| Mark-to-Market Value | Refers to a swap's value at a particular point in time that is based on the difference between the amount owed by the counterparties to the issuer based on the variable interest rate and the amount owed by the issuer to the counterparties based on the fixed interest rate. |
| Master Swap Policy | Refers to a GDB policy with the purpose of providing guidance for the use of derivative financial products in conjunction with the management of the debt obligations of the Issuers. |
| Material Information | For purposes of SEC Rule 10b-5, information for which there is a substantial likelihood that a reasonable investor would consider it important in making his investment decision.<br><br>For purposes of MSRB Rule G-47, information for which there is a substantial likelihood that the information would be considered important or significant by a reasonable investor in making an investment decision. |
| MCO | Medicaid Managed Care Organization |
| Mesirow | Mesirow Financial, Inc. |
| Metro | Reference to PRASA's service region for the San Juan Metropolitan Area. |
| MFA | Puerto Rico Municipal Finance Agency |
| Michigan Act 34 | Act of Mar 1, 2002, No. 34, 2001 § 141.2317, § 317(3) (codified at Mich. Comp. Laws Ann. §§ 141.2101-141.2821 (2018). |
| Michigan's Act 34 | Short-form reference to Michigan's Revised Municipal Finance Act. |
| Millco | Millco Advisors, LLP |
| Ministerial | A type of act that a government official is mandated to perform by law, without judgment or discretion.  Compulsory actions that are procedural or administrative often qualify. |
| Moody's | Moody's Investors Service, Inc. |
| Moratorium Act | Emergency Moratorium and Financial Rehabilitation Act |
| MSRB | Municipal Securities Rulemaking Board |
| NASD | National Association of Securities Dealers |
| Net Additions | Utility Plant Additions, as adjusted by D&P, for purposes of D&P's analysis (at the Independent Investigator's direction and instruction) of PREPA's use of bond proceeds during the Subject Period. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Net Asset Value ("NAV") | Refers to the value per share of a mutual fund or exchange-traded fund at a specific time. The NAV is calculated as the difference between assets and liabilities, divided by the overall number of outstanding shares. |
| New Progressive Party ("PNP") | Puerto Rico's New Progressive Party (*Partida Nuevo Progresista in Spanish*) |
| Non-103 Market | The market for municipal bonds for which, under Section 103 of the Tax Code (26 U.S.C. § 103 (2016)), the interest income received is subject to federal income tax. The Non-103 Market for Puerto Rico-Related Bonds was almost exclusively within Puerto Rico. |
| Non-Diversified | Per Section 5(b)(1) of the 1940 Act, if a registered investment company does not meet the diversification requirements (see Diversified Companies), it is categorized as non-diversified. |
| Notional Amount | Base amount on which payable interest was to be calculated in connection with the Swaps. |
| NRSRO | A credit rating agency that is registered as a nationally recognized statistical rating organization as defined in 15 USC § 78c(a)(62). |
| OCFO | Office of the Chief Financial Officer for Puerto Rico |
| OCIF | Puerto Rico Office of the Commissioner of Financial Institutions (*Oficina del Comisionado de Instituciones Financieras* in Spanish) |
| OCIF Registration Documents | Registration documents for Local CEFs pursuant to which affiliated transactions were permitted if the value of the securities sold to an affiliate did not exceed 5% of the market value of the CEF's assets, and the purchase was approved by a majority of the independent directors of the Local CEF. |
| OCIF Ruling | OCIF Rulings set out the regulatory parameters of the thirty-five Puerto Rico-based CEFs discussed in Part XI of this Report. |
| OGE | United States Office of Government Ethics |
| OGEPR | Office of Government Ethics of Puerto Rico (*Oficina de Ética Gubernamental* in Spanish) |
| OMB | Puerto Rico Office of Management and Budget |
| OTC | Reference to "over-the-counter market," as described more fully in Part XI of this Report. |
| Outlook | Short-form reference to credit rating outlooks that the CRAs assigned. Outlooks indicate how, if at all, a CRA expects an assigned credit rating to change within a specified time period. |
| Oversight Board | Short-form reference to the Financial Oversight and Management Board for Puerto Rico. |
| PaineWebber | PaineWebber Puerto Rico |
| Pay to Play | Situation in which money is exchanged illegally for the privilege of taking part in a particular business activity. |
| PBA | Puerto Rico Public Buildings Authority (*Autoridad de Edificios Públicos* in Spanish) |
| PBA Basis Swap | A proposed 2008 PBA Basis Swap agreement with Goldman. |
| PBA Bonds | The bonds that PBA issued. |
| PFC | Puerto Rico Public Finance Corporation (*Corporación para el Financiamiento Público de Puerto Rico* in Spanish) |
| PICA | Pennsylvania Intergovernmental Cooperation Authority |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Planning Board | Short-form reference to Puerto Rico's Planning Board (*Junta de Planificación* in Spanish), the entity that forecasts economic growth estimates that the Department of Treasury then uses to forecast revenue. |
| PMA | Acronym for Pietrantoni, Méndez & Alvarez LLP |
| POBs | Pension obligation bonds |
| Popular | Popular, Inc., and its affiliates |
| Popular Democratic Party ("PPD") | Popular Democratic Party (*Partido Popular Democrático* in Spanish) |
| Popular Securities | Popular Securities LLC |
| Possession Tax Credit | A tax benefit that was available to certain companies doing business in Puerto Rico pursuant to Section 936 of the Tax Code (now repealed). |
| PRASA | Puerto Rico Aqueducts and Sewers Authority (*Autoridad de Acueductos y Alcantarillados* in Spanish), one of the Public Utilities. |
| PRASA Act | Puerto Rico's Act 40 of 1945, which transferred "ownership, possession, operation, and development thereby, of all the public aqueduct and sewer systems in Puerto Rico" to PRASA. |
| PRASA Board | PRASA's Governing Board. |
| PRASA Bond | Bonds that PRASA issued. |
| PRASA Trust Agreement | A Trust Agreement that PRASA entered into in connection with the 2008 PRASA Bond issuances, containing a rate covenant requiring PRASA to set rates sufficient to cover operations, as well as 120% of principal and interest due. |
| PRCCDA | Puerto Rico Convention Center District Authority (*Autoridad del Distrito del Centro de Convenciones* in Spanish) |
| PRDOJ | Puerto Rico Department of Justice |
| PREC | Puerto Rico Energy Commission, an oversight body for PREPA with the power to approve rate changes. |
| Preference | Bankruptcy term referring to a payment received shortly before a debtor enters bankruptcy, if that payment is more than other similarly situated creditors of the debtor will receive through the bankruptcy case, as discussed more fully in Part XVI. |
| Pre-Issuance Validation Mechanism | Reference to statutes, rules or regulations that clearly empower a jurisdiction's courts to rule on the validity, enforceability or constitutionality of a bond offering, before the issuance occurs. |
| PREPA | Puerto Rico Electric Power Authority (*Autoridad de Energía Eléctrica* in Spanish), one of the Public Utilities |
| PREPA Act | Reference to the law that established PREPA, Puerto Rico's Act No. 83 of May 2, 1941. |
| PREPA Basis Swap | A 2008 PREPA Basis Swap transaction with Goldman. |
| PREPA Board | Short-form reference to PREPA's Board of Directors. |
| PREPA Bonds | Bonds that PREPA issued. |
| PREPA Revitalization Act | Puerto Rico's Act 4 of 2016, passed by Puerto Rico's Legislature and signed by Governor Alejandro García-Padilla. |
| PREPA Trust Agreement | The PREPA Trust Agreement sets forth the types of bonds PREPA can issue, the role of the trustee, the role of the consulting engineer, and PREPA's debt coverage requirements. |
| PRIDCO | Puerto Rico Industrial Development Company (*Compañia de Fomento Industrial* in Spanish) |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| PRIFA | Puerto Rico Infrastructure Financing Authority (*Autoridad para el Financiamiento de la Infraestructura del Gobierno de Puerto Rico*) |
| Primary Market | The placement of newly issued bonds by the underwriter at a uniform price into both the retail and institutional. |
| PROMESA | Puerto Rico Oversight, Management, and Economic Stability Act |
| PROMESA Investigative Procedures | A resolution adopted by the Financial Oversight and Management Board for Puerto Rico for Conducting Investigations Pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act. |
| Proskauer | Proskauer Rose LLP |
| PSLRA | US Private Securities Litigation Reform Act of 1995 |
| Public Corporations | Reference to a subset of Puerto Rico-Related Entities and Issuers that were created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. |
| Public Utilities | Collective reference to PREPA and PRASA. |
| Puerto Rico Family of Funds | The first family of CEFs created in Puerto Rico. PaineWebber Puerto Rico and Popular Securities LLC co-sponsored these nine CEFs. |
| Puerto Rico-Related Entities | Collective reference to Puerto Rico, its agencies, the Public Utilities, other public corporations, and its instrumentalities, to the extent that, during the Relevant Period, such entities (i) drew loans from GDB; and / or (ii) issued Puerto Rico-Related Bonds. |
| PwC | PriceWaterhouseCoopers |
| Rainy Day Fund | Generally considered the subset of reserve funds that is available outside the General Fund. |
| Ratings Committee | Group of CRA employees that assigned credit ratings to Puerto Rico-Related Bonds, following a presentation of the CRA Analysts' ratings assessments. |
| Recovery Act | Puerto Rico's Public Corporations Debt Enforcement & Recovery Act, Act 71 of 2014 |
| Reform Act | US Credit Rating Agency Reform Act of 2006 |
| Registered Investment Advisor | A person or firm that, for compensation, is engaged in the act of providing advice, making recommendations, issuing reports, or furnishing analyses on securities, either directly or through publications. |
| Relevant Activities | Activities or conduct that the Oversight Board has authority to investigate under PROMESA, as referenced in the PROMESA Investigative Procedures. |
| Relevant Period | The period between 2006 and 2015, except as otherwise specified for purposes of a particular Part of this Report. |
| Report | This Final Report of the Independent Investigator. |
| Repossess | For Purposes of Part XVI of this report, a recovery of property. |
| Repurchase Agreement ("Repo")/Reverse Repurchase Agreement ("Reverse Repo") | Refers to transactions in which securities are sold (the "repo") under an agreement where the same security will be repurchased at a later date, or on demand (the "reverse repo"). |
| Restated Financials | Accounting reference to financial statements or balances that were issued and then formally corrected thereafter. |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
| --- | --- |
| Retail Bond Market | One of two markets, along with the Institutional Bond Market, into which Puerto Rico issued bonds are sold. Puerto Rico bonds designated for retail sale were sold directly to individual investors and small entities such as local insurance companies and cooperatives. |
| Retail Investors | Individual investors and small entities purchasing securities for their accounts, typically trading in smaller amounts than larger institutions. |
| Retail Repo Book | Reference to to UBS's retail repurchase exposure. |
| Retiree Committee | Official Committee of Retired Employees appointed in the Title III Proceedings |
| Revolving Door | A real or perceived pattern of rotation between private- and public-sector employment. |
| RIC | Regulated Investment Company |
| RMBS | Residential mortgage-backed securities |
| RSA | Restructuring Support Agreement |
| S&P | S&P Global Ratings (formerly known as Standard & Poor's Rating Service). |
| Safe Harbor | Provisions in Section 546(e) of the Bankruptcy Code that limit the power of a trustee to avoid certain types of transfers, as set forth in Part XVI of this Report. |
| SAM | Santander Asset Management, L.L.C., which serves as investment advisor to the Santander Funds. |
| Santander | Reference to Banco Santander Puerto Rico, and its affiliates |
| Santander Funds | Reference to the twelve Puerto Rico-based closed-end funds sponsored by Santander Securities LLC |
| Santander Securities | Santander Securities LLC |
| Scoop and Toss | A colloquial name for the practice of rolling forward the maturity of a pre-existing debt obligation by refinancing it, thereby effectively delaying the maturity payment. |
| Screening Period | A statutorily-specified period of time during which individuals entering or leaving government service may not accept certain employment, take certain official actions, or engage in certain transactions, for the purpose of avoiding a real or perceived conflict of interest. |
| SDWA | US Safe Drinking Water Act |
| SEC | US Securities and Exchange Commission |
| Secondary Market | The purchase and sale of bonds between individuals and institutions following the issuance and initial sale into the primary market. |
| Section 10(b) | Section 10(b) of the Exchange Act |
| Section 103 | The market for municipal bonds for which, under Section 103 of the Tax Code (26 U.S.C. § 103 (2016)), the interest income received is not subject to federal income tax. The 103 Market for Puerto Rico-Related Bonds was almost exclusively on the US mainland. |
| Section 17(a) | Section 17(a) of the Securities Act of 1933 |
| Section 502 | A set of provisions in the US Bankruptcy Code governing the allowance and disallowance of claims and interests in bankruptcy. |
| Section 546(e) | Section 546(e) of the Bankruptcy Code |
| Section 547(b) | Specifically, Section 547(b) of the Bankruptcy Code |
| Section 548 (a)(1) | Section 548(a)(1) of the Bankruptcy Code |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
| --- | --- |
| Section 550 | Section 550 of the Bankruptcy Code |
| Section 666 | Section 666 of the Puerto Rico Investment Companies Act No. 6 of October 19, 1954 (10 L.P.R.A. § 666) |
| Securities Act | US Securities Act of 1933 |
| Securitization | Process through which revenue-generating assets are packaged into securities that are then sold to investors. The cash flows generated by the underlying assets are used to pay principal and interest on the securities. The securities themselves are "backed" or supported by the assets. |
| Self Insurance Fund | An account created by the PREPA Trust Agreement, which, together with the Reserve Maintenance Fund, is entirely dedicated to paying the costs of any repairs, maintenance, or other extraordinary expenses incurred as a result of unexpected events, such as hurricanes, mudslides, or other natural disasters, which are not covered by insurance. |
| Settlement Payment | As this term is used in Part XVI of this Report, it has the meaning under Section 546(e) of the Bankruptcy Code: a "settlement payment . . . made by or to (or for the benefit of) . . . a financial institution [or] financial participant . . . or that is a transfer made by or to (or for the benefit of) . . . a financial institution [or] financial institution . . . in connection with a securities contract." |
| Sidley | Sidley Austin LLP |
| Sidley Austin | Short-form reference to Brown & Wood LLP and its successor law firms, including Sidley. |
| Sidley Counsel | Refers to a specific attorney and partner at Sidley Austin LLP who was identified by several witnesses interviewed by the Independent Investigator. |
| SIFMA | Acronym for Securities Industry and Financial Markets Association |
| Significant Relationship | Reference to choice of law analysis, as discussed in Part XVI, when courts combine specific rules for particular types of claims with consideration of several factors to determine which state has the most significant relationship to the case, and thus which state's law should control. |
| SLCG | Securities Litigation Consulting Group |
| SLUSA | US Securities Litigation Standards Act of 1998 |
| SNAP | Supplemental Nutrition Assistance Program |
| Soft Underwriting Process | The process by which underwriters of Puerto Rico-Related Bond issuances gauge the level of market demand for the planned issuance prior to committing to an underwriting role. The Soft Underwriting Process reduces the level of risk to underwriters. |
| Special Investigation Committee | A special committee formed by the Oversight Board in August 2017 to carry out an investigation of Puerto Rico's debt and its relationship to the fiscal crisis. |
| Squire Sanders | Squire, Sanders & Dempsey LLP |
| SSI | Supplemental Security Income |
| Standing | Legal term of art that, roughly translated, refers to a legal right to initiate a court proceeding, which must be conferred on the stakeholder seeking to commence the lawsuit. |
| Structural Imbalance | Recurring annual budget deficits wherein Puerto Rico's recurring revenues were insufficient to cover its operating expenditures. |
| Structural Leverage | See "Fund Leverage." |

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| STSC | Sales Tax Securitization Corporation that Chicago's City Council established in October 2017 |
| Subject Period | The period between fiscal year 2010 and 2015, for which the Independent Investigator and D&P (working at the Independent Investigator's instruction and direction) analyzed the use of proceeds for PREPA Bonds. |
| Suitability | While many interpretations exist, suitability generally refers to the assessment of whether an investment is appropriate for a particular investor's needs at a particular time, given various considerations such as price, rate of return, length of investment, and the degree of perceived risk. |
| SUT | Puerto Rico's Sales and Use Tax (*impuesto sobre ventas y uso*, or "IVU," in Spanish) |
| Swaps | Reference to interest rate exchange agreements that certain Issuers entered into during the Relevant Period, which transferred the risk of interest rate fluctuations between a particular Issuer and its counterparty bank or banks. |
| Syndicate | A group of banks and/or financial institutions chosen by GDB to underwrite a specific Puerto Rico-Related Bond Issuance. The syndicate is managed by the lead underwriter. |
| Synthetic Fixed Swap | A swap transaction in which a bond issuer agrees to pay one or more counterparties an amount determined by a fixed interest rate, in exchange for receiving a payment based on a variable or "floating" interest rate. |
| TANF | Temporary Assistance for Needy Families |
| Tax Code | Short-form reference to the US Internal Revenue Code, Title 26 of the US Code. |
| Tax Reform Act of 1986 (or "1986 Act") | A statute that significantly overhauled the Tax Code, for the purpose of simplifying it, broadening the tax base, and eliminating tax shelters that limited the amount of tax-exempt municipal debt issued in the US mainland. |
| Taxpayer Standing | Legal term of art that refers to the ability of taxpayers at large to challenge laws or official acts merely because their tax money is used to support them. |
| Termination Fee | A fee paid to a swap counterparty or Issuer in connection with the cancellation of an interest rate swap. |
| Termination Risk | A reference to the risk that a counterparty may terminate a swap transaction early due to the occurrence of specified triggering events. |
| The Reserve Maintenance Fund | An account created by the PREPA Trust Agreement, which, together with the Self Insurance Fund, is entirely dedicated to paying the costs of any repairs, maintenance, or other extraordinary expenses incurred as a result of unexpected events, such as hurricanes, mudslides, or other natural disasters, that are not covered by insurance. |
| The Sinking Fund | An account created by the PREPA Trust Agreement and held by PREPA's Trustee which contains all funds necessary for paying the interest on the Authority's bonds. Composed of the Bond Service Account, the Redemption Account, and the Reserve Account. |
| TIFIA | Transportation Infrastructure Finance & Innovation Act |
| Title III Committees | A collective reference to the two committees of creditors appointed in the Title III Proceedings, the Official Committee of Unsecured Creditors, and the Official Committee of Retired Employees. |

17

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Title III Court | Title III Court: A reference to the US District Court for the District of Puerto Rico overseeing the Title III Proceedings |
| Title III Proceedings | Court litigation stemming from the filing on May 3, 2017, of Puerto Rico's Title III petition, followed by filings for certain Puerto Rico-Related Entities. |
| Tort | A civil wrong for which a remedy may be obtained through a lawsuit by the injured party against the wrongdoer. |
| Traditional Test | The law that applies depends on the characteristics of each cause of action. |
| Triple Tax Exemption | Reference to the status of municipal bonds that are exempt from taxation by federal, state and local authorities |
| Trust Agreement | Except as more specifically defined in the context of particular Part of this Report, a contract that generally governs the bond issuance process and sets forth the rights and obligations of various parties, including the issuer, the bondholders and the bond trustee. |
| Trust Employees | See "*empleados de confianza*" |
| Trustee | In the specific context of our discussion in Part XVI regarding Title 11 of the Bankruptcy Code, made applicable in a case under PROMESA, the term "trustee" means the Oversight Board. |
| UBS AM | Short-form reference to UBS Asset Managers of Puerto Rico, which manages and acts as investment advisor to the UBS Funds. |
| UBS Consulting | Short-form reference to UBS Consulting Services of Puerto Rico. |
| UBS Financial | UBS Financial Services Incorporated of Puerto Rico. |
| UBS Funds | Collective reference to the twenty-three Puerto Rico-based closed-end funds sponsored or co-sponsored by UBS Financial Services Incorporated of Puerto Rico. |
| UBS PR | Short-form reference to UBS Financial Services Incorporated of Puerto Rico. |
| UBS USA | A Utah-based bank that is an affiliate of UBS PR. |
| UCC Rule 2004 Motion | A reference to the motion filed in the Title III Proceedings seeking to pursue examinations under Federal Rule of Bankruptcy Procedure 2004. |
| UFTA | Uniform Fraudulent Transfer Act |
| UIF | Acronym for the Urgent Interest Fund, a predecessor to the FIA Fund. |
| UIFC | Acronym for the Urgent Interest Fund Corporation, a predecessor to COFINA that was a subsidiary of GDB and recipient of the Urgent Interest Fund. |
| Underwriter Risk Exposure | The risk an underwriter of a Puerto Rico-Related Bond Issuance incurs during the interval between underwriting a certain allocation of newly issued bonds and then selling the allocation to customers in the primary market. |
| Unfunded Liabilities | A reference to the extent to which ERS lacked the funds to meet its obligation to pay future pension benefits. |
| Unjust Enrichments | Does not signify a single well-defined cause of action but is, rather, a general principle, underlying various legal doctrines and remedies. |
| Unqualified Audit Opinion | See "Clean Audit Opinion" |
| UPR | Acronym for the University of Puerto Rico. |
| Utility Plant Additions | Reference to the Additions to PREPA's Utility Plant in Service over the Subject Period. |

18

The Independent Investigator's Final Investigative Report
*Appendix A: Defined Terms*

| Term | Meaning |
|---|---|
| Utility Plant in Service | Reference to an accounting term that PREPA used for utility generation, transmission and generation resources. |
| Value | Property or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor. |
| VAT | Acronym for "value added tax." |
| Watches | A short-form, and collective, reference to credit rating watches (for S&P and Fitch) and credit rating reviews (for Moody's). Unlike credit rating outlooks, watches are probabilistic. They indicate an increased likelihood that the existing credit rating will be modified in the near-term (generally, within a 60-90 day period) and express the direction of that potential modification. |
| Work-Papers | Reference to internal work product that auditors generate when performing an independent audit. Work-papers generally reflect the auditors' mental impressions regarding the work they performed and the reasons why they made certain judgment calls. |
| Writ of Mandamus | A special type of court relief that, if obtained, compels a government official or government agency either to perform, or to refrain from performing, an act that would violate a "ministerial" duty imposed by law. |

APPENDIX B

**Appendix B.1**

Schedule of Bond Issuances - PREPA and Power Reserve Bonds

March 2010 - August 2013

*Series*
*Dated*

| Sources | | SUM | % |
|---|---|---:|---:|
| Principal Amount of the Bonds | $ | 4,427,440,000 | 93.8% |
| Net Original Issue (Discount) / Premium | | 55,135,024 | 1.2% |
| Deposits in the Bond Service Account | | 235,931,271 | 5.0% |
| Authority Contribution | | 150,000 | 0.0% |
| Other Available Moneys | | 2,934,025 | 0.1% |
| **Total Sources** | $ | **4,721,590,320** | |

| Uses | | SUM | |
|---|---|---:|---:|
| Deposit to Construction Fund | $ | 1,307,522,466 | 27.7% |
| Payment of Interest accrued on lines of Credit | | 325,094 | 0.0% |
| Repurchase of the Purchased Bonds | | 329,306,031 | 7.0% |
| Payment of line of credit | | 1,238,776,020 | 26.2% |
| Repayment of Bond Anticipation Notes | | 100,473,310 | 2.1% |
| Deposit to Escrow Fund for the Refunded Bonds | | 904,905,444 | 19.2% |
| Swap Terminations Payments | | 235,252,455 | 5.0% |
| Deposit to Reserve Account | | 160,812,014 | 3.4% |
| Capitalized Interest | | 393,405,835 | 8.3% |
| Underwriters' Discount and Other Costs of Issuance | | 50,811,650 | 1.1% |
| **Total Uses** | $ | **4,721,590,320** | |

**Appendix B.1**

Schedule of Bond Issuances - PREPA and Power Reserve Bonds
March 2010 - August 2013

| | Series | XX | YY | AAA | ZZ |
|---|---|---|---|---|---|
| | Dated | March 26, 2010 | April 22, 2010 | April 22, 2010 | April 22, 2010 |
| **Sources** | | | | | |
| Principal Amount of the Bonds | | $ 822,210,000 | $ 320,175,000 | $ 363,075,000 | $ 631,160,000 |
| Net Original Issue (Discount) / Premium | | (6,991,364) | | 14,019,489 | 35,271,242 |
| Deposits in the Bond Service Account | | | | | 235,931,271 |
| Authority Contribution | | | | | |
| Other Available Moneys | | | | | |
| **Total Sources** | | $ 815,218,636 | $ 320,175,000 | $ 377,094,489 | $ 902,362,512 |
| | | | | | |
| **Uses** | | | | | |
| Deposit to Construction Fund | | | $ 163,527,429 | | |
| Payment of Interest accrued on lines of Credit | | 325,094 | | | |
| Repurchase of the Purchased Bonds | | | | 329,306,031 | |
| Payment of line of credit | | 646,356,615 | 37,023,794 | | |
| Repayment of Bond Anticipation Notes | | | 100,473,310 | | |
| Deposit to Escrow Fund for the Refunded Bonds | | | | | 662,846,662 |
| Swap Terminations Payments | | | | 44,500,000 | 190,752,455 |
| Deposit to Reserve Account | | 43,191,498 | 12,746,967 | | 13,351,441 |
| Capitalized Interest | | 117,241,758 | | | 30,194,836 |
| Underwriters' Discount and Other Costs of Issuance | | 8,103,671 | 6,403,500 | 3,288,458 | 5,217,119 |
| **Total Uses** | | $ 815,218,636 | $ 320,175,000 | $ 377,094,489 | $ 902,362,512 |

**Appendix B.1**

Schedule of Bond Issuances - PREPA and Power Reserve Bonds

March 2010 - August 2013

| | Series<br>Dated | BBB<br>May 20, 2010 | CCC<br>May 20, 2010 | DDD<br>September 29, 2010 | EEE<br>December 24, 2010 |
|---|---|---|---|---|---|
| **Sources** | | | | | |
| Principal Amount of the Bonds | | $ 76,800,000 | $ 316,920,000 | $ 218,225,000 | $ 355,730,000 |
| Net Original Issue (Discount) / Premium | | | 9,623,921 | 14,310,627 | |
| Deposits in the Bond Service Account | | | | | |
| Authority Contribution | | | | | 150,000 |
| Other Available Moneys | | | | 2,551,594 | |
| **Total Sources** | | $ 76,800,000 | $ 326,543,921 | $ 235,087,221 | $ 355,880,000 |
| | | | | | |
| **Uses** | | | | | |
| Deposit to Construction Fund | | | | | $ 284,466,002 |
| Payment of Interest accrued on lines of Credit | | | | | |
| Repurchase of the Purchased Bonds | | | | | |
| Payment of line of credit | | 72,276,409 | 271,068,303 | | 50,150,000 |
| Repayment of Bond Anticipation Notes | | | | | |
| Deposit to Escrow Fund for the Refunded Bonds | | | | 219,929,264 | |
| Swap Terminations Payments | | | | | |
| Deposit to Reserve Account | | 2,637,499 | 11,212,061 | | 14,050,231 |
| Capitalized Interest | | | 41,388,574 | 12,377,379 | |
| Underwriters' Discount and Other Costs of Issuance | | 1,886,092 | 2,874,983 | 2,780,577 | 7,213,767 |
| **Total Uses** | | $ 76,800,000 | $ 326,543,921 | $ 235,087,221 | $ 355,880,000 |

**Appendix B.1**

Schedule of Bond Issuances - PREPA and Power Reserve Bonds

March 2010 - August 2013

| | Series<br>Dated | 2012A<br>& 2012B<br>May 1, 2012 | 2013A<br>August 15, 2013 |
|---|---|---|---|
| **Sources** | | | |
| Principal Amount of the Bonds | | $ 650,000,000 | $ 673,145,000 |
| Net Original Issue (Discount) / Premium | | (597,330) | (10,501,561) |
| Deposits in the Bond Service Account | | | |
| Authority Contribution | | | |
| Other Available Moneys | | 382,431 | |
| **Total Sources** | | $ 649,785,102 | $ 662,643,440 |
| | | | |
| **Uses** | | | |
| Deposit to Construction Fund | | $ 359,529,036 | $ 500,000,000 |
| Payment of Interest accrued on lines of Credit | | | |
| Repurchase of the Purchased Bonds | | | |
| Payment of line of credit | | 161,900,900 | |
| Repayment of Bond Anticipation Notes | | | |
| Deposit to Escrow Fund for the Refunded Bonds | | 22,129,518 | |
| Swap Terminations Payments | | | |
| Deposit to Reserve Account | | 17,183,417 | 46,438,900 |
| Capitalized Interest | | 82,555,885 | 109,647,403 |
| Underwriters' Discount and Other Costs of Issuance | | 6,486,346 | 6,557,137 |
| **Total Uses** | | $ 649,785,102 | $ 662,643,440 |

**Appendix B.2**
Gross Capital Asset Calculation
(in '000s)

| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Period Change |
|---|---|---|---|---|---|---|---|---|
| | | **Fiscal Year Ending June 30,** | | | | | | |
| | | (3) | (4) | | | | | |
| **Total Utility Plant in Service** | | | | | | | | |
| Plant in Service | (1) | n/a | $ 11,104,152 | $ 11,649,045 | $ 11,876,516 | $ 12,210,083 | 12,591,275 | $ 1,487,123 |
| Construction Work in Progress | (1) | n/a | 1,013,358 | 856,703 | 999,888 | 973,423 | 783,832 | (229,526) |
| **Total Utility Plant in Service, Gross** | | **n/a** | $ **12,117,510** | $ **12,505,748** | $ **12,876,403** | $ **13,183,507** | **13,375,107** | |
| *Change in Total Utility Plant in Service, Gross* | | *n/a* | | *388,238* | *370,655* | *307,103* | *191,600* | *1,257,597* |
| | | | | | | | | |
| Capital assets, not being depreciated | (2) | $ 1,285,268 | $ 1,132,002 | $ 981,111 | $ 1,119,211 | $ 1,108,149 | 1,108,149 | $ (177,119) |
| Capital assets, depreciable - net | (2) | 5,240,973 | 5,680,600 | 5,818,065 | 5,719,347 | 5,739,307 | 5,739,307 | 498,334 |
| Accumulated Depreciation | (1)(5) | 5,000,000 | 5,334,931 | 5,736,457 | 6,064,548 | 6,385,962 | 6,726,408 | 1,726,408 |
| **Total Capital Assets, Gross** | | $ **11,526,241** | $ **12,147,533** | $ **12,535,633** | $ **12,903,106** | $ **13,233,418** | **13,573,864** | |
| *Change in Total Utility Plant in Service, Gross* | | | *621,292* | *388,099* | *367,473* | *330,313* | *340,445* | *2,047,623* |
| | | | (5) | | | | | |
| *Calculated Variance* | | | $ (30,023) | $ (29,884) | $ (26,702) | $ (49,912) | $ (198,757) | |
| | | | | | | | | Change in Utility Plant in Service |
| **Average Capital Assets** | | $ 11,526,241 | $ 12,132,522 | $ 12,520,690 | $ 12,889,754 | $ 13,208,462 | 13,474,485 | |
| *Average Change in Capital Assets* | | | *606,281* | *388,169* | *369,064* | *318,708* | *266,023* | *1,948,244* |

Notes
(1) See workpaper K01 of PREPA's auditor for the respective year.
(2) See PREPA balance sheet as presented in the Comprehensive Annual Fiscal Report (CAFR) for Puerto Rico and/or Basic Financial Statements and Required Supplementary Information for the respective year.
(3) No auditor workpaper information provided for the year 2010. As bonds issuances occurred in 2010, this may preclude a timing issue.
(4) The earliest auditor workpaper was for June 30, 2012. Beginning year balances were used to find June 30, 2011 values.
(5) Auditor workpapers were not provided before the year ending June 30, 2011. As such, D&P made an assumption for PREPA accumulated depreciation to calculate a change in total utility plant in service for 2011.

**Appendix B.3**
Adjustments to Change in Utility Plant in Service
(in '000s)

| | | | | | Fiscal Year Ending June 30, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | | **Total** |
| **Adjustments to Change in Utility Plant in Service** | | | | | | | | | |
| Undistributed Interest & Overhead | (1) | n/a | n/a | $    90,709 | $    115,382 | $    103,816 | $    98,821 | $ | 408,728 |
| Reversing from CCNC - Project 100000102675 | (1) (2) | n/a | n/a | 264,858 | - | - | 34,632 | | 299,490 |
| Contributed Capital-Plant | (1) | n/a | n/a | 30,203 | 21,234 | 40,601 | 10,985 | | 103,023 |
| **Total** | (3) | $        150,000 | $    385,770 | $    136,616 | $    144,417 | $    144,438 | $ | 811,241 |

<u>Notes</u>
(1) See workpaper K01 of PREPA's auditor for the respective year.
(2) It is unclear whether or not CCNC - Project 100000102675 should be adjusted from the documents provided. It has been included as an adjustment here.
(3) Adjustments to change in Utility Plant in Service was assumed to be $150,000 which appears consistent with 2013-2015. This figure is subject to change.

**Appendix B.4**
Restricted Cash Analysis [1]
(in '000s)

| | | 2009 | 2010 | 2011 | 2012 | Fiscal Year Ending June 30,<br>2013 | 2014 | 2015 | Period Change |
|---|---|---|---|---|---|---|---|---|---|
| **Restricted Cash** | | | | | | | | | |
| Restricted - Cash and cash equivalents | (1) | $       657,893 | $       795,055 | $    1,174,481 | $    1,270,810 | $    1,006,403 | $    1,328,851 | 547,002 | |
| Change in Restricted - Cash and cash equivalents | | | *137,162* | *379,426* | *96,329* | *(264,407)* | *322,448* | *(781,849)* | *(110,891)* |
| | | | | | | | | | |
| Construction Fund and Other Special Funds | (2) | n/a | n/a | $       244,444 | $       296,669 | $         83,420 | $       325,923 | 156,221 | |
| Change in Construction Fund and Other Special Funds | | | | | *52,225* | *(213,249)* | *242,503* | *(169,702)* | *(88,223)* |

Notes
(1) PREPA information sourced from Commonwealth CAFRs published for FY 2009-2015.
(2) Auditor workpapers received for the fiscal years 2012-2015. Information for 2011 originates on the 2012 work paper. Auditor workpapers reflect the net change in restricted cash (construction use) including auditor adjustment total of (88,223)
    versus the PREPA result of (110,891); a difference not considered signficant. Auditor workpapers show an account for Construction Fund and Other Special Funds restricted held in cash.

**Appendix B.5**
Summary Results of Analytics (1)
(in '000s)

| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | Fiscal Year Ending June 30, | | | |
| **Summary of Findings** | | | | | | | | |
| Change in Utility Plant in Service ("Additions") | | n/a | $ 606,281 | $ 388,169 | $ 369,064 | $ 318,708 | $ 266,023 | $ 1,948,244 |
| Adjustments to Change in Utility Plant in Service | (2) | n/a | 150,000 | 385,770 | 136,616 | 144,417 | 144,438 | $ 961,241 |
| Net Additions | | n/a | 456,281 | 2,399 | 232,448 | 174,291 | 121,585 | 987,003 |
| | | | | | | | | |
| Change in Restricted Cash | (3) | 137,162 | 379,426 | 96,329 | (264,407) | 322,448 | (781,849) | (110,891) |
| | | | | | | | | |
| Capital Into Construction or Restricted Accounts | | $ 137,162 | $ 835,707 | $ 98,728 | $ (31,959) | $ 496,739 | $ (660,264) | $ 876,112 |
| | | | | | | | | |
| Issuances Raised for Deposit to Construction Fund" | | $ 447,993 | $ - | $ 359,529 | $ 500,000 | $ - | $ - | |

| | | |
|---|---|---|
| Issuances raised for the stated purpose of a deposit to construction fund | $ | 1,307,522 |
| **Capital Into Construction or Restricted Over / (Under) Issuances Raised and Stated** | $ | (431,410) |

*NOTES*
(1) This analysis is subject to various factors which may make the specific values cited subject to correction yet directionally correct. Those factors include, but are not limited to, timing issues,
   informational integrity and data reliability, inaccurate assumptions, and lack of specific relevant information.
(2) Adjustments to change in Utility Plant in Service was assumed to be $150,000 which appears consistent with 2013-2015. This figure is subject to change.
(3) This information for this analysis is sourced from Commonwealth CAFRs published for FY 2009-2015.